## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

**JOHN DYESS,**

     **Plaintiff,**

**v.**                                  **No. 3:07CV-635-WKW**

**AUBURN UNIVERSITY,**

     **Defendant.**

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendant, Auburn University ("Auburn"), respectfully files the following Brief in support of its Motion for Summary Judgment contemporaneously herewith.  For the reasons set forth below, there is no genuine issue of material fact, and Auburn is entitled to judgment as a matter of law on all claims asserted in the Complaint.

## STATEMENT OF THE CASE

Plaintiff John W. Dyess, III ("Dyess") is a former employee of the Defendant, Auburn University College of Veterinary Medicine ("Auburn").  Shortly after Dyess was moved to a new supervisor, Mr. Bud Richards ("Richards"), Auburn began to have problems with Dyess' job performance, including veiled threats and frequent insubordination.  Dyess was written up several times for various forms of insubordination.  Finally, only four days after

being warned in writing that "all leave must be approved in advance," Dyess took a two-hour lunch without prior approval.  Accordingly, he was terminated.

This lawsuit ensued.  Dyess claims that his discharge was unlawfully motivated by race, sex, and religious discrimination.  He also claims that Richards sexually harassed him.

For the reasons discussed below, there is no genuine issue of material fact, and Auburn is entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### UNCONTESTED FACTS[1]

Dyess was first employed by Auburn on a temporary basis in the fisheries area in 2000 or 2001.  (Dyess Depo. at 108:10-109:11.)

Beginning in March 2002, Dyess was employed by Auburn as an Animal Care Attendant in the College of Veterinary Medicine.  (Dyess Depo., Ex. 1.) Dyess's job duties generally included stocking patient (animal) surgery and recovery rooms with clean towels, food and supplies, performing various cleaning

---

[1] For purposes of this Motion only, these "facts" assume that Dyess' deposition testimony is true.  Of course, Auburn disputes Dyess' allegations and much of his deposition testimony, but even taking his testimony as true, Auburn is entitled to judgment in its favor as a matter of law. In accordance with this Court's Order of October 23, 2007 (Doc. No. 23), undersigned counsel sent a copy of these "Uncontested Facts" to Plaintiff for his review.  Plaintiff attempted to reach undersigned counsel by telephone, and left a message stating his objections to the "Uncontested Facts."  Counsel in turn attempted to reach Plaintiff many times during the week of June 2, but each time found that Plaintiff's cellular telephone was not accepting calls and would not accept a voice message.  Counsel has made a good-faith attempt to summarize Plaintiff's exceptions from the "Uncontested Facts" in the "Contested Facts" section.

and stocking duties, mopping up spills, refilling dog food bins, cleaning up dog

droppings in the yard where the patients (animals) have walked, washing and

folding laundry, sweeping, and general janitorial work.  (*See* Dyess Depo. at 212,

213 and Ex. 6.)

   When Dyess became a regular employee of Auburn, he was given a copy of

the Employee Handbook, which contains the following policy against harassment:

### Employee Non-Harassment Policy

Auburn University will not tolerate harassment of its employees.  Any form of harassment related to an employee's race, color, sex, religion, national origin, age, or physical or mental disability is a violation of this policy and will be treated as a disciplinary matter.  For these purposes, the term "harassment" includes, but is not necessarily limited to the following: Slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color, sex, religion, national origin, age, physical or mental disability.  Harassment also includes unwelcome sexual advances, requests for sexual favors and other verbal, graphic, or physical conduct of a sexual nature.

Violation of this policy by an employee shall subject that employee to disciplinary action, up to and including discharge.  If an employee feels that he or she is being harassed by any other employee because of race, color, sex, religion, national origin, age, or physical or mental disability, the employee should at once make this known to his or her immediate supervisor.   The supervisor will promptly notify the University's Equal Employment Opportunity Officer, who will see that the matter is investigated, and that, where appropriate, disciplinary action is taken.  If the employee does not feel the matter can be discussed with the supervisor, the employee should arrange for a conference with the EEO Officer to discuss the complaint.

Harassment of University employees in connection with their work by non-employees may also be a violation of this policy.  Any employee who becomes aware of any harassment of an employee by a non-employee should report such harassment to his or her supervisor or to

the EEO Officer, who is responsible for investigating all such incidents. Appropriate action will be taken against violation of this policy by any non-employee.

(Dyess Depo. at 122:4-23, Ex. 2, at 31-32.) Dyess had read and was aware of Auburn's policy prohibiting harassment of employees. (Dyess Depo. at 123:6-12.)

Dyess' first supervisor at the veterinary hospital was Junior Ledbetter. (Dyess Depo. at 110:7-13.) Dyess alleges that Ledbetter was "discriminatory at times," (Dyess Depo. at 112:4), but he appreciated Ledbetter hiring him. (Dyess Depo. at 112:8-9.) Ledbetter did not look at Dyess, attempt to touch Dyess, nor speak to Dyess in any discriminatory way. (Dyess Depo. at 112:15-19.) Ledbetter never attempted to make any sexual advances toward Dyess. (Dyess Depo. at 112:20-113:1) Dyess never complained of any alleged discrimination by Ledbetter. (Dyess Depo. at 113:2-5.)

Dyess' next supervisor was Mary Tefend. (Dyess Depo. at 113:6-8.) Tefend never discriminated against Dyess in any way. (Dyess Depo. at 116:20-117:14.) While Dyess worked for Tefend, at times he would come in to work during the hours of 2:00 to 5:00 a.m. (Dyess Depo. at 120:6-16.)

Dyess' next supervisor after Tefend was Floyd "Bud" Richards ("Richards"). (Dyess Depo. at 120:17-19.)

Two or three days after Richards became Dyess' supervisor, Richards and Dyess had a conversation that made Dyess feel uncomfortable. (*See generally*

6

Dyess Depo. at 134-144.)  Dyess was cleaning an animal room that was not used very often.  (Dyess Depo. at 134:5-8.)  Mr. Richards came into the room and made conversation with Dyess consisting of: "Hi, John," "What are you doing," "Well, John, I'm trying to get to know you better, I want to know you in a better way. Tell me more about yourself," "What do you do when you're not at the vet school," "Well, what do you do at nighttime," "Are you married," "What else do you do?  Do you go out to dinner?"  (Dyess Depo. at 135:13-136:9; 140:17-23.)

Dyess claims that Richards was too close to him during this conversation. This made Dyess uncomfortable, because Richards could have been speaking to him from across the room.  (Dyess Depo. at 137:2-14.)  Dyess felt as though Richards "was trying to date me because he could have just kept a distance and asked me."  (Dyess Depo. at 137:14-17.)  Dyess did not ask Richards to allow him more personal space.  (Dyess Depo. at 139:7-11.)  Dyess says that Richards' "body signals" made him uncomfortable; the "body signals" consisted of simply being too close to him.  (Dyess Depo. at 141:1-15.)  Dyess also claims that Richards was "looking at me like a man trying to date a woman," and that Richards' tone of voice was "too calm and casual."  (Dyess Depo. at 142:6-10; 143:12-16.) However, if Richards had said that it didn't have anything to do with the job but invited Dyess to a football game, dinner, or to take a ride and talk, that would have been fine with Dyess.  (Dyess Depo. at 67:9-21.)

Because Dyess was feeling uncomfortable, he "introduced [the] idea" that he was a minister.  (Dyess Depo. at 145:4-10, 133:2-8.)

According to Richards' handwritten account of the conversation, Dyess made a statement to the effect that Dyess was a "man of God and if I messed with him or bothered him, that 'bad' things would happen to [Richards].  [Dyess] then wanted to give me examples of bad things happening to other people.  I asked if he was threatening me.  He said he wasn't but God was.  Basically that God was threatening me through him, if I irritated him."  (Dyess Depo., Ex. 3.)

As Dyess later described the conversation in writing, "[Richards] and I had a conversation involving Christian principals [sic] and that I told him what the Bible says of what happens to people who harms a minister.  I told him that I am a licensed minister."  (Dyess Depo., Ex. 16, 307:10-22.)

Dyess admits the substance of the conversation, but says that "I didn't say it directly like that."  (Dyess Depo. at 146:23-147:8.)  Instead, Dyess says he "merely brushed around it."  (Dyess Depo. at 148:11-12.)  Dyess "reminded [Richards] of Scripture teaching of what happens when we offend, not just ministers, but people of God, period."  (Dyess Depo. at 33:23-34:4.)

One of the particular Bible verses Dyess was reminding Bud Richards of was Romans 12:19 ("Beloved, do not avenge yourselves, but rather give place to

wrath; for it is written, 'Vengeance is mine, I will repay,' says the Lord."). (Dyess Depo. 56:6-9, 54:9-19, 308:21-309-12.)

Another Bible verse stating the same principle that Dyess was explaining to Richards is Matthew 18:6 ("But whoever causes one of these little ones who believe in me to sin, it would be better for him if a millstone were hung around his neck, and he were drowned in the depth of the sea."). (Dyess Depo. 57:17-59:19.)

Dyess claims he did not say specifically that something bad was going happen to Richards, but that bad things do happen to people who oppose a child of God. (Dyess Depo. at 148:14-149:1.) Dyess believes that the Bible teaches that bad things will happen to those who oppose him, because he is one of the "Lord's people." (Dyess Depo. at 34:11-35:4.).

Richards "immediately said, 'Are you threatening me?'" (Dyess Depo. at 75:18-19; Dyess Depo. at 149:2-5.) Dyess believes that Richards "jumped to the conclusion" that Dyess was threatening him. (Dyess Depo. at 78:5-8.)

Dyess cannot understand how someone who doesn't understand the Bible the same way he does might be offended when he says "Vengeance is mine." (Dyess Depo. at 76:19-77:3.)[2]

---

[2] Before Auburn, Dyess was employed by Mobile Infirmary. Dyess was terminated from Mobile Infirmary because "It was said . . . that I threatened a women using the exact Scripture from the Bible." (Dyess Depo. at 52:19-21.) The Scripture verse Dyess used at Mobile Infirmary "quotes vengeance is mine saith the Lord. I will repay. That's in the New Testament in one of the Apostle Paul's writings. And he quotes something from the Old Testament . . . so I just rehearsed it to her." (Dyess Depo. at 54:11-18; also see Dyess Depo. at 357:2-358:1.)

Four or five days later, Richards asked Dyess to get some particular dog food. Dyess told Richards that they did not need that particular dog food. (Dyess Depo. at 150:1-10, 151:15-21.) Dyess claims that he knew better than Richards what dog food was needed, and that he was trying to prevent waste. (Dyess Depo. at 150:10-23.) Dyess and Richards "had kind of—what seemed a hot, heated conversation" in which Dyess "was firm in trying to trying to get [Richards] to understand that that was unnecessary." (Dyess Depo. at 153:2-4.) Richards "got very fierce" and said, "I said get that particular dog food." (Dyess Depo. at 151:21-23.)

The next day, Richards called Dyess into his office to discuss his failure to get the dog food. (Dyess Depo. at 153:5-9.) Richards said, "I want to discuss with you about your behavior concerning my asking for the dog food. . . . [B]e careful not to do that ever again. When I ask you to do something, you do it; Dr. Saidla made you my employee, so you do as I say." (Dyess Depo. at 154:4-10.) Dyess replied that he understood. (Dyess Depo. at 154:10-11.) Dyess went on to say, "we have to be careful how we treat God's children." (Dyess Depo. at 154:17-19, 155:4-156:7) Richards again asked Dyess if he was threatening him. (Dyess

---

Dyess admits that what happened at Mobile Infirmary is "exactly" the same as his conversation with Richards. (Dyess Depo. at 74:19-23.) Yet, he does not believe that his termination from Mobile Infirmary was motivated by racial discrimination. (Dyess Depo. at 74:2-18.) After his termination from Auburn, Dyess was terminated from his job at Ruby Tuesday for having a conversation about "Biblical views" with a customer. (Dyess Depo. at 50:13-51:10.)

Depo. at  156:14-20.)  Dyess replied, "Of course not, I'm not threatening you. This is God's Word, it's not my word."  (Dyess Depo. at 157:1-3.)

This statement led to a meeting "about a week later" between Dyess, Richards, Dr. Saidla, and Sonya Dixon of Auburn's Human Resources Department.  (*See generally*, Dyess Depo. at 158-172:1)  Dr. Saidla was the director of the Veterinary Hospital, and Richards' supervisor.

Dixon acted as a "mediator" between Richards and Dyess, and facilitated a discussion of "the supposedly heated conversation" referenced in Exhibit 3 to Mr. Dyess' deposition, as well as allegations that Dyess was "stealing" towels.[3]  (Dyess Depo. at 161:6-11.)

Dyess said in the meeting that he thought Richards "was trying to date me." (Dyess Depo. at 166:21-167:1.)  Dixon asked Dyess exactly what Richards was doing.  (Dyess Depo. at 167:4-5.)  Dyess told Dixon that "he's asking me to go out—he asked me to go—asked me about my personal life and that he made me feel uncomfortable by the way he stands too close and too much—not enough personal space."  (Dyess Depo. at 167:4-11.)  Dyess also mentioned the way Richards allegedly "looked at" Dyess, and that Richards had told Dyess that he "admired" him.  (Dyess Depo. at 167:12-168:12.)

---

[3] While Mr. Dyess uses the word "stealing" in his deposition, Auburn never accused Dyess of actually "stealing" the towels for his own use.  The issue was his taking clean, folded towels out of wards that other employees were responsible for, and moving them into his wards. Dyess admits to having done this.  (Dyess Depo. at 164:20-165:11.)

In this same meeting, Dyess also said that his former supervisor, Mary Tefend, and her staff, drove by his apartment "at all times of day and night," that Tefend had a key to his apartment, and that his neighbors had told him that people—Dyess believed it was Tefend—were going into his apartment while he wasn't there. (Dyess Depo. at 179:17-181:8.)

Dyess told Dixon, Richards, and Saidla "that it was a ridiculous meeting, that it was a waste of time, that it was uncalled for, that I didn't need to be here, and that I felt like Mr. Richards was just merely using the situation and a lot of nonsense to make me go – get too close to him in a perverted kind of way." (Dyess Depo. at 165:15-21.)

Dixon concluded the meeting by telling Dyess she understood that Dyess did not mean to threaten Richards, but that she could understand how Richards could feel threatened by the things Dyess had said. (Dyess Depo. at 170:4-12.)

This first meeting was followed by a second meeting with Dyess, Dixon, and another female, approximately 27 years old. (*See generally*, Dyess Depo. at 172-184.) In this second meeting with Dixon, Dyess again "interjected a lot of things about me being a minister." (Dyess Depo. at 174:20-21; 176:6-10.) Dyess also told Dixon and the other employee that he personally ministered to Jason

Campbell, Carnell "Cadillac" Williams, and Chet Williams.  (Dyess Depo. at 177:11-179:3.)[4]

Shortly after this second meeting with Human Resources, Dyess met again with Dixon and Albert Snipes.  (Dyess Depo. at 185:16-19.)  At this meeting, Dyess was placed on paid administrative leave and was referred for a mandatory psychological examination to determine his fitness for work.  (Dyess Depo. at 184:18-21, 201:1-6.)  At the same time, Dyess was also warned by Albert Snipes that if the threats were repeated, he would be terminated.  (Dyess Depo. at 188:15-189:7.)  Dyess said, "Man, Jason Campbell and them would love to hear about this one."  (Dyess Depo. at 188:10-14, 191:2-6.)

Dyess was evaluated by Dr. Glen Vollenweider, a psychologist.  (Dyess Depo., Ex. 4.)  Dr. Vollenweider found that, subject to some conditions, Mr. Dyess was "likely" able to work, and that Dyess was not "imminently dangerous to himself or others."  (Dyess Depo., Ex. 4.)  Dr. Vollenweider recommended more extensive psychotherapy for Mr. Dyess, and further evaluation by a psychiatrist, but Dyess refused any further treatment or counseling.  (Dyess Depo. at 193:10-13; 202:9-203:3; 203:21-204:18.)

---

[4] Campbell and "Cadillac" Williams were at the time star Auburn football players.  Both have since gone on to careers in the National Football League.  Chet Williams was and is the team Chaplain.

Based on the outcome of the evaluation, Dyess was returned to work on August 17, 2005.  (Dyess Depo., Ex. 5.)

When he returned to work, Dyess was given a written memorandum from Dr. Saidla which stated:

> This is to inform you that you may return to work on Wednesday, August 17 at 7:45 am.  Upon your return I expect you to follow all rules and policies of Auburn University and the Department of Clinical Sciences.  Before you begin working you are to discuss your hours with your supervisor, Mr. Bud Richards since you will have weekend duty as well as working Monday to Friday.  You need to understand that Mr. Richards is your supervisor and that you are to do what he tells you to do when he tells you to do it.

(Dyess Depo. at 207:12-208:11, Ex. 5.)

In December 2005, another meeting was held with Dyess, Dixon, Richards, and Dr. Saidla.  In this December 2005 meeting, Dyess told Dixon that Richards' conduct was "promiscuous and perverted."  (Dyess Depo. at 230:20-232:6.)  The alleged behavior that Dyess claims was "promiscuous and perverted" included being too close to Dyess, "trying to set something up to get us alone," and allegedly sending Dyess work in places other than where he was normally assigned to work.  (Dyess Depo. at 232:7-235:12.)  Dyess believes that Richards was trying to get them alone, so that Richards could hug or kiss him.  (Dyess Depo. at 235:4-18.)  Dyess does not describe any other alleged conduct through December 2005 as "promiscuous" or "perverted."  (Dyess Depo. at 236:14-20.)

On February 23, 2006, Dyess received a "Written Formal Reprimand" for "inappropriate behavior & insubordination toward his supervisor." (Dyess Depo., Ex. 7.)

Dyess admits the essential facts set forth in the discipline form. (Dyess Depo. at 245:6-248:7.) According to the discipline form, on February 22, 2006, Dyess had entered a room that was off-limits to him. Richards told Dyess that he was not allowed in the room, and asked him to leave. For several minutes, Dyess refused even to acknowledge his supervisor's presence or his repeated instructions to leave the room. Dyess finally left the room without ever responding to Richards or even acknowledging his presence. The written discipline noted that "this is the second time in two months that John has been insubordinate to his supervisor," and that "If John's inappropriate behavior and insubordination toward his supervisor continues, he could face termination." Dyess refused to sign the discipline form. (Dyess Depo. at 239:1-6, Ex. 7.)

According to Dyess' deposition account of the February 22, 2006 incident, he went into the Central Supply Room, which was normally locked at all times, looking for a pair of latex gloves. (Dyess Depo. at 240:7-241:6.) Dyess encountered Richards, who began "yelling, John, what are you doing here. . . . John, what are you doing in here? You don't belong in here." (Dyess Depo. at 241:11-13, 242:3-5, 243:20-22.) Dyess was surprised by "the tone of his voice as

15

well as the loudness." (Dyess Depo. at 241:14-16.) Richards appeared to Dyess to be "frustrated," "angry," "mad," and "thoroughly upset." (Dyess Depo. at 243:15-19.) Dyess did not tell Richards he was looking for a box of latex gloves; he did not answer Richards at all. (Dyess Depo. at 243:20-244:5.) Dyess left the Central Supply Room without speaking to his supervisor. (Dyess Depo. at 247:10-11.) He went out into the hall where there was a cart laden with supplies that Richards was taking out of the Central Supply Room and moving somewhere else. (Dyess Depo. at 248:8-249:7.) Dyess began to look over the cart to see if he could find the latex gloves. (Dyess Depo. at 249:20-250:4.)

According to Richards' written account of what happened next, Richards prevented Dyess from taking anything from the cart by "stepping between him and the cart." (Dyess Depo., Ex. 7.) According to Dyess, Richards "comes behind me and his hand is in my private area before I know it. . . . So when he put his hand, it just got all inside my private area." (Dyess Depo. at 250:5-6, 250:18-20, 251:1-2, 251:9-10.) Dyess believes that Richards was "trying to cop a feel." (Dyess Depo. at 257:13-16.) Dyess alleges that Richards "rubbed" his private area, but that the contact only lasted a second or two, because Dyess moved away quickly. (Dyess Depo. at 254:19-20, 257:6-20.) Neither Dyess nor Richards said anything at the time of the alleged touching. (Dyess Depo. at 257:17-20.) There were no witnesses to the alleged touching. (Dyess Depo. at 321:10-15.)

16

Dyess refused to sign the February 23 "Written Formal Reprimand" discipline form, and, while he could have written something about the alleged touching incident on the discipline form, he did not do so. (Dyess Depo. at 259:12-260:5.)

Dyess claims that the day after the February 22 alleged touching incident, he orally reported the touching to Sonya Dixon. (Dyess Depo. at 264:6-265:6.) Dixon denies receiving any such report from Dyess. (Dixon Aff., ¶ 5.) Dyess admits that he made no *written* allegation of touching until after he was terminated. (Dyess Depo. at 265:1-6, 310:17-21, Ex. 16.)

Sonya Dixon is not Auburn's "EEO Officer;" Kelley Taylor is. (Dixon Aff., ¶ 2; Taylor Aff., ¶ 2; Snipes Aff., ¶ 2.) Sonya Dixon does not work in the Affirmative Action/Equal Employment Office. (Dixon Aff., ¶¶ 2, 3.) Dixon works in the Human Resources department, which is a separate and distinct office from AA/EEO. (Dixon Aff. ¶ 2; Snipes Aff., ¶¶ 2, 3; Taylor Aff., ¶ 2.)

On another occasion, the date of which is unknown, Dyess claims that Richards attempted to get too close to him. (*See generally*, Dyess Depo. at 311-314.) On this occasion, Richards asked Dyess to review his time sheet with him. However, instead of just handing Dyess the paper, Richards allegedly held the document close to him so that Dyess had to lean in close to see it. (Dyess Depo. at 312:13-313:9.) Regarding this incident, Dyess alleges, "Now, if that's not leading,

trying to force someone to be sexually attracted to you, I don't know what is.  I mean, why would you ask someone to look at something and not give it to them?"  (Dyess Depo. at 314:2-6.)

Richards spoke to Dyess on Dyess' cellular telephone one time, but Richards did not made any sexual comments to Dyess on the call.  (Dyess Depo. at 316:12-16.)  On that one telephone call, Richards asked Dyess "where he was."  (Dyess Depo. at 316:21-317:1.)  Dyess alleges that Richards called Dyess' cellular telephone several times after that, but Dyess never answered, because he remembered Richards' telephone number.  (Dyess Depo. at 316:12-23.)

Dyess admits that the allegations stated above are the only ways in which Richards "attempted to express his sexual desires" with Dyess.  (Dyess Depo. at 306:9-12.)  Richards never made any sexual comments or used any dirty language to Dyess.  (Dyess Depo. at 306:13-18.)  Richards never propositioned Dyess.  (Dyess Depo. at 306:19-21.)  Richards also never used any language that was "racial" in nature or that ridiculed Dyess' religion.  (Dyess Depo. at 337:19-338:5.)  Dyess does not claim that Richards is homosexual.  (Dyess Depo. at 80:3-6; 81:5-8.)  Nonetheless, Dyess believes that Richards wanted to be sexually intimate with him.  (Dyess Depo. at 81:19-21.)  Dyess also believes that Richards wanted to be close to him so that Richards could take advantage of spiritual blessings.  (Dyess Depo. at 82:17-88:11.)

On February 23, 2006[5], Dyess also received a "Written Final Reprimand." (Dyess Depo., Ex. 8.)  Dyess admits the facts outlined in the February 23, 2006 "Written Final Reprimand."  (Dyess Depo. at 269:13-271:14.)  On that day, Richards saw Dyess sitting at a computer while Dyess was not on his authorized break time.  When Richards attempted to speak to Dyess about this, Dyess refused to respond or even acknowledge his supervisor's presence or his efforts to communicate with him.  Richards called another employee, Renza Floyd, into the room to observe Dyess's behavior.  Still, Dyess refused to acknowledge his supervisor's presence.  As Richards and Floyd were leaving the room, Dyess said, "Have a nice day."  The written discipline noted that "If John's inappropriate behavior and his insubordination toward his supervisor continues, he will be terminated." (Dyess Depo. at 269:13-271:14, Ex. 8.)

Dyess refused to sign the discipline form, and did not write any explanation on the form where given an opportunity to do so.  (Dyess Depo. at 269:5-12.)[6]

---

[5] Although Exhibit 8 bears a date of February 23, 2008, and the file stamp at the offices of Human Resources is dated February 24, Dyess believes that these dates are incorrect and falsified.  (Dyess Depo. at 266:16-267:3.)  Dyess does not dispute that he received the "Written Final Reprimand" write-up from Richards, he only disputes the dates.  (Dyess Depo. at 268:17-269:4; 273:11-15.)

[6] Dyess admits that he tried to keep his distance from people at work at Auburn.  (Dyess Depo. at 66:5-8.)  Dyess admits that he tried to keep his distance from co-workers at Auburn "All the time.  That's just why they wrote up in the – in my employee file that John would never talk to us.  That's all I was doing." (Dyess Depo. at 66:11-14.)

On March 29, 2006, Dyess received another "Written Final Reprimand" and a five day suspension for using a computer he was not authorized to use, while he was not on his authorized break time. (Dyess Depo., Ex. 9.) The written discipline specifically noted, "If hospital rules and policies are not followed, he will be terminated." (Dyess Depo., Ex. 9.) Dyess admits that the March 29, 2006 discipline was discussed with him. (Dyess Depo. at 277:14-19.) Dyess refused to sign the March 29, 2006 discipline form, and did not write any explanation on the form where given an opportunity to do so. (Dyess Depo. at 277:20-278:5; 281:2-5.) Dyess disputes the discipline only because the clocks in the veterinary hospital were not synchronized. (Dyess Depo. at 279:10-22.) Dyess admits that he told the office administrator that he would not meet with his supervisor, Bud Richards, unless either Dr. John Saidla or Dr. David Whitley were present. (Dyess Depo. at 281:6-14.)

Also on March 29, 2006, Dyess came to the offices of Affirmative Action/Equal Employment Opportunity to make an informal complaint that Richards was discriminating against him on the basis of race and religion. (Dyess Depo., Ex. 15.). According to Kelley Taylor and Michelle Martin, Dyess did not allege that Richards touched him in the private area. (Taylor Aff., ¶ 3.). If he had, it would have been investigated. Nonetheless, Kelley Taylor and Michelle Martin of Auburn's AA/EEO office conducted a thorough inquiry into Dyess' allegations

of racial and religious discrimination. (Taylor Aff., ¶ 3.) In addition to Dyess and

Richards, Taylor and Martin interviewed co-worker Mixti Cox, former supervisor

Mary Tefend, co-employee Henry Echols, co-worker Sara Henderson, co-worker

Chris Ferrell, and co-worker Renza Floyd. (Taylor Aff., ¶ 3.) Taylor and Martin

interviewed Richards and Dyess, and every employee who worked with Dyess who

was also supervised by Bud Richards. (Taylor Aff., ¶ 3.) At the conclusion of

their first investigation, on May 18, 2006 (after Dyess had already been fired),

Martin wrote Dyess to inform him that they had found no evidence that Auburn's

policies against discrimination or harassment had been violated. (Taylor Aff., ¶ 3;

Dyess Depo., Ex. 15.)

On April 3, 2006, Dyess filed an internal grievance of his five-day

suspension. (Dyess Depo., Ex. 10.) The grievance form did not mention any

improper touching. (Dyess Depo., Ex. 10.) On April 27, 2006, a grievance

committee made up of three disinterested members of the university community

held a hearing on Dyess' grievance. (Dyess Depo. at 290:4-19.) The grievance

panel unanimously concurred with the five-day suspension, finding that "there was

adequate documentation leading to this event." (Dyess Depo., Ex. 11.) Dyess

claims that he told the grievance panel "several times" that Richards touched him

in the private area, specifically using the word "penis." (Dyess Depo. at 263:2-22,

290:19-10.) However, the grievance hearing was audio-recorded, and all three

members of the grievance panel affirm that Dyess never mentioned any touching of his private area in his grievance hearing.  (Affidavits of Debbie Griggs, Trish Digman, and Sherry Boothe.)  Rather, Dyess told the grievance panel that Richards was trying to provoke a fight with him.  (Affidavits of Debbie Griggs, Trish Digman, and Sherry Boothe.)

On April 24, 2006, Dyess was warned in writing that "Annual leave must be pre-approved three days in advance.  There is a calendar near the time clock where you should note the day or days of your planned leave in addition to telling your supervisor.  A leave slip MUST be signed and turned in before the day of leave."  (Dyess Depo. at 298:11-17, Ex. 12.)

On April 28, 2006, Dyess, without prior authorization, was gone for two hours at lunchtime.  (Dyess Depo. at 299:13-18.)  As a result, on May 3, 2006, Dyess' employment was terminated.  (Dyess Depo. at 299:1-12, Ex. 13.)  The written discipline noted that "John has been given repeated warnings but continues to fail to follow the university's policies and rules.  He leaves no other choice but for his position to be termination [sic]."  Dyess again refused to sign the discipline form, and did not write any explanation on the discipline form where given an opportunity to do so.  (Dyess Depo. at 301:18-23, 302:1-3, Ex. 13.)

After Dyess was terminated, on May 3, 2006, he filed another internal grievance.  (Dyess Depo., Ex. 14.)  Dyess' second grievance form, like the first,

made no mention of improper touching. (Dyess Depo., Ex. 14.) On June 8, 2006—more than a month after his termination—Dyess supplemented his second grievance with a letter that alleged that he was improperly touched by Richards. (Dyess Depo., Ex. 16.) One sentence of Dyess' letter alleges that Richards "approached me in the hall and rubbed his hand and private body area on me." (Dyess Depo., Ex. 16.)

Because Dyess' June 8 letter appeared to amend his grievance to include allegations of violations of Auburn's policies prohibiting discrimination and harassment, his grievance was referred to the office of Affirmative Action/Equal Employment Opportunity for investigation. (Dyess Depo. at 318:8-15, Ex. 17; Snipes Aff., ¶ 5; Taylor Aff., ¶ 4.)

Even though Dyess was no longer employed at Auburn, Kelley Taylor, Auburn's AA/EEO Officer, investigated Dyess' "new" allegation of improper touching. (Taylor Aff., ¶ 5.) Taylor interviewed Dyess and Richards. (Taylor Aff., ¶ 5.) Richards denied that he ever touched Dyess inappropriately, and denied any romantic interest in or attraction to Dyess. (Taylor Aff., ¶ 5.) When Taylor interviewed Dyess, Dyess told Taylor that the alleged offensive touching had occurred the day before his five-day suspension, or March 28, 2006. (Taylor Aff.,

¶ 5.)[7] Dyess also told Taylor that he had previously reported the alleged offensive touching to Sonya Dixon and Albert Snipes, who were two employees in Auburn's Human Resources Department.  (Taylor Aff., ¶ 5.)  Both Dixon and Snipes told Taylor that Dyess had never made any such allegation or complaint, and that if he had, they immediately would have referred the allegation to AA/EEO for investigation, as provided by Auburn's Non-Harassment Policy.  (Taylor Aff., ¶ 5; Snipes Aff., ¶ 4; Dixon Aff., ¶ 5.)  Dixon and Snipes both deny that Dyess ever told them that Richards had touched him in his private area.  (Taylor Aff., ¶ 5; Dixon Aff., ¶ 5; Snipes Aff., ¶¶ 4-5.)  Finding no evidence to support Dyess' allegations of sexual harassment or touching, Taylor closed the investigation and so advised Dyess in writing.  (Taylor Aff., ¶ 6; Dyess Depo., Ex. 18.)

Dyess considers himself Baptist (Dyess Depo. at 18:7-23), and a licensed and ordained pastor.  (Dyess Depo. at 27:5-9.)  Dyess does not consider his religious beliefs to be that different from those who go to church on Sunday mornings at Baptist, Methodist, or Presbyterian churches.  (Dyess Depo. at 27:23-28:12.)

---

[7] Dyess also alleged in his EEOC Charge that the alleged touching occurred the day before his five-day suspension, which would be March 28, 2006; however, in the same document he also alleged that the touching occurred and "in February of 2006."  (*See* EEOC Charge of Discrimination.)

## CONTESTED FACTS[8]

1.    Dyess discussed Biblical scriptures with Mr. Richards and Mr. Richards told Dyess that his father-in-law was a minister.

2.    Dyess often referred to Scriptures when having conversations to avoid hostile situations.

3.    Richards was not there on the day that Dyess took a two hour lunch. There was no immediate supervisor to report to that day and other employees often took extra time if supervisors weren't there.  Dyess had an emergency to take care of that day.

4.    Albert Snipes and Sonya Dixon forced Dyess to attend psychological care and placed him on administrative leave.

5.    Dyess denies that he came up with the idea that Richards was touching his private area after he was terminated.  In Dyess' initial meeting with Richards, he was flirting.  Dyess constantly told Dixon and Snipes that Richards was sexually harassing him.

6.    In the incident where Richards touched Dyess, Richards used profanity and said he would "fire his ass."  Dyess was in the room for less than one minute.

---

[8] *See* fn. 1, *supra*.  Auburn believes that these six "Contested Facts" presented by Dyess fail to call any of the "Uncontested Facts" into material dispute.  These six points are the only response Auburn received to its request to consult on "Uncontested" versus "Contested" facts.

25

## **ARGUMENT**

Summary judgment is due to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant,"  *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

There simply is no evidence that Auburn discriminated against Dyess, or allowed a sexually hostile work environment to exist.  Dyess was terminated because of repeated veiled threats and persistent insubordination, which he refused to correct after several written warnings.  Auburn attempted to address these issues through progressive discipline, but Dyess simply would not change his behavior. Because there is no genuine issue of fact for trial, Auburn respectfully moves for full and final summary judgment in its favor on all claims asserted in the Complaint.

## A.     Auburn is Entitled to Summary Judgment on Dyess' Sex Harassment Claims

Auburn is entitled to summary judgment on Dyess' harassment claim on two separate and independent grounds.  <u>First</u>, Auburn maintains and enforces a strict policy prohibiting discrimination and harassment, and Dyess unreasonably failed to take advantage of Auburn's remedial process until after he was fired.  In other words, Auburn is entitled to the *Faragher* defense.[9]  <u>Second</u>, the facts alleged by Dyess, assumed to be true for purposes of summary judgment, fail to establish a *prima facie* case of sex harassment.  The evidence simply does not show that Dyess' workplace was so "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

### 1.     The *Faragher* Defense

In the case of *Faragher v. Boca Raton*, 524 U.S. 775 (1998), the United States Supreme Court held that employers are generally vicariously liable for supervisory harassment that violates Title VII, subject to an affirmative defense. Under *Faragher*, an employer may avoid liability if it demonstrates (1) that it

---

[9] The *Faragher* defense is not available where the Plaintiff has suffered an adverse employment action attributable to the harassment.  However, because there is no genuine issue of material fact that Dyess was terminated for reasons other than the alleged sex harassment, Auburn may assert the defense.  *See, e.g., Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1303 (11th Cir. 2007) ("As we have already explained, however, Baldwin did not suffer any tangible employment action as a result of the claimed sexual discrimination.  The only arguable basis for recovery that she has is hostile environment discrimination, and the *Faragher-Ellerth* defense is available to an employer defending against that type of Title VII claim.").

"exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293.

> a.   *Auburn exercised reasonable care to prevent and correct sexually harassing behavior.*

It is undisputed that Auburn maintains, as part of its Employee Handbook, strict policies prohibiting discrimination and harassment. Dyess admits that he received the Employee Handbook when he became a regular full-time employee, and admits that he knew of the anti-harassment and anti-discrimination policies set forth in the Handbook. Auburn's policy clearly sets forth its substantive prohibitions, clearly informs employees what they should do in the event of harassment or discrimination, and provides for alternate avenues of redress. Auburn's promulgation and enforcement of the policy clearly satisfies the first prong of the *Faragher* defense. *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1303 (11th Cir. 2007); *Madray v. Publix Supermarkets*, 208 F.3d 1290, 1298-99 (11th Cir. 2000).

> b.   *Dyess unreasonably failed to take advantage of the remedial process set forth in Auburn's Anti-Harassment Policy.*

With regard to the second prong of the *Faragher* defense, Auburn makes four distinct contentions:

First, Dyess did not report the alleged touching incident to the AA/EEO office on March 29, 2006, when he came to complain of racial and religious discrimination, but even if he did, Auburn's investigation was thorough enough to have uncovered evidence of harassment had there been any;

Second, even if Dyess did orally report the alleged touching incident to Sonya Dixon right after it allegedly happened, and even if Dyess told Dixon on other occasions that Richards was harassing him, his report failed to follow the written policy and therefore does not defeat the *Faragher* defense;

Third, by the time Dyess finally did report the alleged touching incident, he was no longer employed by Auburn, so the report does not defeat the *Faragher* defense; and

Finally, even though Dyess' report was tardy, Auburn responded appropriately to Dyess' allegations and found no evidence to support them.

> *1.    Dyess did not report the alleged touching incident to the AA/EEO office when he came to complain of racial and religious discrimination, but even if he did, Auburn's investigation was thorough enough to have uncovered evidence of harassment had there been any.*

It is undisputed that, on March 29, 2006, Dyess came to the AA/EEO Offices and complained that Richards was discriminating against him on the basis of his race and religion. For the sake of argument, Auburn assumes without

29

admitting that Dyess reported the alleged touching incident in this meeting, even though he did not.

Even if Dyess did complain of sex harassment or the alleged touching incident in his first visit to AA/EEO on March 29, 2006, Kelley Taylor and Michelle Martin did as thorough an investigation as could have been done, regardless of what the specific allegations were. Taylor and Martin undisputedly interviewed Dyess, Richards, and every employee that worked with Dyess under Richards' supervision. No employee reported any act of discrimination or harassment, and no employee told Taylor or Martin that Dyess had said anything about being touched inappropriately. In other words, regardless of what specific allegations Dyess brought to AA/EEO in March 2006, whether he only talked about race and religion, or even if he specifically alleged that Bud Richards had touched him inappropriately on February 22 or on some other date, Auburn interviewed every possible witness and found no evidence of discrimination. Auburn so informed Dyess of its findings by letter of May 18, 2006.

Even though Dyess might not have been satisfied with the outcome, Auburn's thorough investigation of Dyess' allegations fully satisfies its obligations under *Faragher*. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007) ("A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable

given the circumstances.  The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser.").

> 2.    *Even if Dyess did orally report the alleged touching incident to Sonya Dixon right after it allegedly happened, and even if Dyess told Dixon on other occasions that Richards was harassing him, his report failed to follow the written policy and therefore does not defeat the Faragher defense.*

The only person Dyess alleges in his deposition to have reported the alleged touching incident to is Sonya Dixon.  Dixon disputes having received any such report, and she would have referred the incident to AA/EEO to be investigated if she had.  However, this potential fact dispute is not "material," or "outcome determinative," because even if Dyess did orally report the alleged touching incident (or other innocent conduct that Dyess considered to be "promiscuous and perverted") to Sonya Dixon, he failed to follow Auburn's written policy for reporting instances of alleged discrimination or harassment.

Auburn's anti-harassment policy clearly states that "If an employee feels that he or she is being harassed by any other employee because of race, color, sex, religion, national origin, age, or physical or mental disability, the employee should at once make this known to his or her immediate supervisor.  . . .  *If the employee does not feel the matter can be discussed with the supervisor, the employee should*

31

*arrange for a conference with the EEO Officer to discuss the complaint*."  (Dyess Depo., Ex. 2, at 31-32 (emphasis supplied).)

There is a reason why Auburn's policy designates the "EEO Officer" as the person to receive harassment complaints if the employee is uncomfortable reporting harassment to his or her supervisor (which would presumably be the case here).  Kelley Taylor is specially trained in EEO matters, and is the single person at Auburn University with paramount responsibility for ensuring Title VII compliance.  Complaints are supposed to go to Kelley Taylor so that they can be handled in accordance with the law.

Dyess's alleged report of the alleged touching incident to Sonya Dixon does not comply with Auburn's policy, because Sonya Dixon is not the EEO Officer. Sonya Dixon does not even work in the office of Affirmative Action/Equal Employment Opportunity.  The appropriate person to receive a complaint of harassment would have been Kelley Taylor.  Because Dyess alleges that he reported the alleged touching incident to Dixon instead of Taylor, Dyess unreasonably failed to take advantage of Auburn's remedial policy.  *See, e.g., Madray v. Publix Supermarkets*, 208 F.3d 1290, 1300 (11th Cir. 2000) ("Therefore, we conclude that Publix cannot be considered to have been placed on notice of Selph's harassing behavior by the plaintiffs' informal complaints to

individuals not designated by Publix to receive or process sexual harassment complaints.").

> 3.    *By the time Dyess finally did report the alleged touching incident, he was no longer employed by Auburn, so the report does not defeat the Faragher defense*

While Dyess claims that he immediately orally reported the alleged touching incident to Sonya Dixon, it is undisputed that the first time Dyess made any *written* complaint of the alleged touching incident was on June 8, 2006, after he had already been fired. (Dyess Depo. at 265:1-6, 310:17-21, Ex. 16.) However, as a matter of law, by complaining of discrimination or harassment only after his employment had already been terminated, Dyess failed to discharge his obligation to act reasonably to take advantage of Auburn's remedial policies and procedures. Thus, Dyess' belated report does not defeat Auburn's *Faragher* defense. *See Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157, 165 (5th Cir. 2007) ("Likewise, [Plaintiff's] formal complaint on . . . the date of her resignation, does not defeat the second prong of the *Ellerth/Faragher* defense. Filing a complaint upon, or after, resigning does not mitigate any of the damage, because it does not allow the employer to remediate the situation. A complaint filed at such a late date is no longer a saving action contemplated and encouraged by Title VII, hence it is not sufficient to defeat the *Ellerth/Faragher* affirmative defense.").

>    4.    *Even though Dyess' report was tardy, Auburn*
>          *responded appropriately to Dyess' allegations and*
>          *found no evidence to support them.*

It is undisputed that Dyess finally reported his allegations of improper touching to Auburn, but only on June 8, 2006, more than a month after he had been fired.

Even though Dyess' report was untimely (June 8, 2006) and went to the wrong office (Human Resources instead of AA/EEO), Albert Snipes of HR forwarded Dyess' complaint to Kelley Taylor of AA/EEO for investigation.

Even though Dyess was no longer employed by Auburn, Taylor and Martin again conducted an investigation that was "reasonable given the circumstances."

Taylor and Martin again interviewed Dyess and Richards, as well as Dixon and Snipes, to whom Dyess alleged that he had previously reported the touching incident.  (Taylor Aff., ¶ 5.)  Taylor and Martin's second investigation again failed to substantiate any of Dyess' allegations.   Taylor found Dyess' allegations incredible, because (1) Dyess was in the AA/EEO office the day after he alleged the touching incident occurred, and mentioned nothing about the alleged touching; (2) both Snipes and Dixon denied receiving any report or allegation of touching; and (3) of course, Richards strongly denied ever touching Dyess inappropriately, and the investigation uncovered no other evidence that would have lent credibility to Dyess' allegations.

34

Again, an employer is not required to credit an employee's unsubstantiated, uncorroborated (and in this case, exceedingly implausible) allegations of harassment. *Baldwin v. Blue Cross*, 480 F.3d 1287, 1303.  Instead, the employer's obligation is to perform a "reasonable" investigation of the claim "given the circumstances," calibrated to "arrive at a reasonably fair estimate of truth."  *Id*. Here, Auburn conducted an investigation of Dyess' touching allegation as soon as it reasonably could have, and it found nothing to substantiate Dyess' claim. Because no evidence of harassment was found, there was no reason to undertake any remedial measures.  There is no reason to believe that the investigation would have turned out any differently if Dyess had filed a specific, written complaint of touching on February 23.

### 2.    The evidence does not establish a *prima facie* case of sex harassment.

Even if the Court concludes that a genuine issue of material fact precludes summary judgment on the *Faragher* defense, Dyess' allegations, taken as true, simply fail to establish a *prima facie* case of sex harassment.

In order to establish an actionable hostile working environment, Dyess must demonstrate (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on membership in a protected group; (4) that the harassment was sufficiently severe or pervasive to

alter the terms and conditions of employment and create an abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*). Dyess' allegations fail to establish at least the second, third, and fourth elements of his claim.

To establish the critical fourth element of his harassment claim—that the alleged harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment"—Dyess must show that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The "severe or pervasive" element "includes a subjective and an objective component." *Mendoza*, 195 F.3d at 1246.

**Subjective Test.** "[A] plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component." *Mendoza*. However, Dyess' undisputed conduct in the months following the alleged touching incident clearly demonstrates

that he did not consider the alleged touching episode to be *even subjectively* severe and pervasive.

Dyess admits that he did not say anything to Richards when Richards allegedly touched him in the private area. The next day, Dyess was issued written discipline for insubordination *arising out of the very same confrontation* in which Dyess claims Richards touched him in the private area. Even though Dyess could have written something on the discipline form about the alleged touching incident—and this would have been a most opportune time to do so—he didn't. A little more than a month later, on March 29, Dyess was again disciplined for insubordination, and again he failed to write anything on the discipline form about the alleged touching or any other kind of harassment, even though he could have. On that same date (March 29), Dyess came to the offices of AA/EEO, but he complained only of *racial and religious* discrimination. On April 3, 2006, Dyess filed a written grievance of his five-day suspension, but did not mention anything about improper touching, or any other kind of harassment, in the grievance. On April 27, 2006, a tape-recorded hearing was held on Dyess' grievance, in which Dyess told the panel about the February 22 incident. However, instead of telling the grievance panel that Richards had allegedly touched him in the private area, *he*

*told them that Richards was trying to provoke a fight with him.*[10]  On April 28, 2006, when Dyess was terminated in yet another written discipline, Dyess again failed to write anything on the discipline form about the alleged touching, even though he could have.  On May 3, 2006, Dyess filed another internal grievance. Again, the grievance form says nothing about touching.

If Richards really did touch Dyess in the private area on February 22, Dyess didn't do anything to indicate that he perceived this one incident as "severe or pervasive" until after he was fired.  To the contrary, only the only verifiable occasion that Dyess even mentioned the alleged touching incident was in his April 27, 2006 grievance hearing; and on that occasion Dyess didn't allege that Richards touched him in the private area.  Dyess said Richards was attempting to provoke a fight with him, not "cop a feel."  There is no evidence that Dyess subjectively considered this incident—assuming it happened the way Dyess says it did—as "severe or pervasive."

**Objective Test.**  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering

---

[10] Although Dyess claims in his deposition that he told the grievance panel about the alleged touching incident and used the word "penis" several times in the grievance hearing, there is no genuine dispute but that he did not.  Instead, what Dyess told the grievance panel was that Richards was trying to provoke a fight with him.  Dyess' bald claim that he told the grievance panel that Bud Richards had touched him on the "penis" is contradicted by the indelible evidence of what actually transpired at the hearing, and the panel members' undisputed affidavits about what they heard in the hearing and again on the tape.  Therefore, Dyess' bald assertion fails to create a genuine issue of material fact.

all the circumstances." *Mendoza*, 195 F.3d at 1246.  In determining whether the alleged conduct is sufficiently severe or pervasive from an objective standpoint, Courts consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Faragher*, 524 U.S. at 787-88, 118 S.Ct. at 2283; *Mendoza*, 195 F.3d at 1246-47 (holding that the absence of three of the four factors—physically threatening or humiliating conduct, interference with job performance, severity and frequency—prevented the establishment of a hostile environment claim).

In this case, Dyess does not allege that Richards ever made any lewd or sexually offensive or suggestive comments, or any "mere offensive utterances," to him.  Dyess does not allege that Richards ever sexually propositioned him. Instead, Dyess's hostile environment claim hinges on at most three alleged incidents over a period of more than a year:

- On one occasion, Richards stood too close to Dyess while asking questions such as, "Hi, John," "What are you doing," "Well, John, I'm trying to get to know you better, I want to know you in a better way. Tell me more about yourself," "What do you do when you're not at

the vet school," "Well, what do you do at nighttime," "Are you married," "What else do you do?  Do you go out to dinner?";

- On another occasion, Richards held a paper he wanted Dyess to look at, instead of handing it to Dyess, which required Dyess to stand closer to Richards than he wanted to;

- One alleged incident in which Dyess alleges that Richards was yelling angrily at him and trying to provoke a fight with him at one moment, and ten seconds later, was allegedly "trying to cop a feel"; and

- Dyess' ostensible subjectively held *beliefs* that Richards "wanted to date him," "tried to do things to get them alone," and "looked at him like a man trying to set up a date with a woman."[11]

The facts alleged by Dyess, taken as true, fail to establish a genuine issue of fact for trial.  Even accepting all of Dyess' allegations as true at face value, they simply fail to establish an actionable hostile working environment.  In fact, with one *possible* exception, Dyess alleges nothing that would even be considered rude, offensive, hostile, abusive, or even particularly annoying to the average person of ordinary sensibilities.

---

[11] Conclusory allegations such as "Richards wants to date me," or, "Richards looked at me like a man trying to set up a date with a woman" are at most Dyess' reports of his own subjective judgments about Richards' behavior, and do not describe the actual behavior on which the judgment is predicated.  Without more, a claim of sex harassment cannot be built on these kinds of subjective, conclusory allegations.

The only allegation that could even arguably constitute sexual harassment satisfying the second, third and fourth prongs of the *prima facie* case is the incident that occurred on February 22, 2006, in which Bud Richards says he tried to position himself between Dyess and a cart, and Dyess says Richards tried to "cop a feel." Even the alleged February 22 touching incident was not "severe" enough—especially in a sexual sense—to establish the "severe or pervasive" prong of Dyess' *prima facie* case. Taking Dyess' testimony as true in all respects, Richards was angry, yelling and berating Dyess one moment. Dyess even told his grievance panel that Richards was trying to provoke a fight with him. Now, Dyess also claims that Richards said he was going to "fire [Dyess'] ass." Then, only 10 seconds later, Dyess claims that Richards' hand "got all inside my private area" and that Richards was trying to "cop a feel." Dyess admits that any touching lasted only a second or two, because he quickly moved away. Dyess also admits that the alleged touching was not accompanied by any other verbal proposition or offensive language. On its face, Dyess' story simply makes no sense. Richards' alleged conduct, *as described by Dyess*, is simply inconsistent with sexual attraction or intentions, and does not implicitly or explicitly indicate that the terms and conditions of employment are in any way conditioned upon submission to sexual advances or sexually hostile language or conduct. In other words, taking Dyess' allegation as true, the purported harassment was neither "harassment," nor "based

on sex," nor "severe or pervasive."  At worst, Dyess' touching allegations could be construed as an incidental, unintended, and momentary contact with his groin area that happened in the context of anger and frustration, not as part of a sexual advance.

Dyess' one isolated instance of alleged touching is clearly not sufficiently "harassment," nor "based on sex," nor "severe or pervasive" to justify a trial. Several courts have held that isolated incidents of offensive touching, *even when combined with sexual advances and comments,*[12] do not satisfy the "severe or pervasive" element of a hostile environment claim.  *See, e.g., Otu v. Papa John's Pizza*, 96 FEP Cas. 1602 (M.D. Ga. 2005) (suitor's attempts to hug and kiss plaintiff, brushing her breasts against his back and unsuccessful attempts to rub his private parts, comments about her desire to be his girlfriend and introduction to friends and parents as same, unbuttoning her blouse, professions of love on a napkin, invitations to go to dinner, a movie, and to her home, and references to Plaintiff as "Playboy" and "Sugardaddy" not severe or pervasive); *Willets v. Interstate Hotels, LLC*, 204 F.Supp.2d 1334, 1337 (M.D. Fla. 2002) (supervisor hugged plaintiff three times a year, rubbed her head and shoulders, frequently indicated love for her, grabbed her buttocks, kissed her, and placed hand on her

---

[12] Admittedly, Auburn's research has not disclosed any reported decisions foursquare with Dyess' allegations, *i.e.*, a case involving one isolated incident of alleged, incidental touching, unaccompanied by any sort of lewd sexual comments or propositions.

inner thigh not severe enough to constitute actionable harassment); *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it

when you can"); *Hopkins v. Baltimore Gas & Elec. Co*., 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII). *Compare Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) (triable issue of hostile environment existed, where alleged harasser (1) grabbed the plaintiff and kissed her on the cheek; (2) touched her breasts "numerous times"; (3) popped rubber bands at her breasts and patted her on the buttocks "numerous times"; and (4) once made comments about her sex life).

Considering the four relevant factors—frequency, severity, threatening or humiliating, and interference with work performance—Dyess' allegations fall far short of meeting the "severe or pervasive" threshold from an objective standpoint.[13] With regard to frequency, Dyess alleges only four specific instances over a period of more than a year. Dyess' allegations taken in context are not severe. Dyess does not even allege any "mere offensive utterance[s]," and he alleges no conduct that could be described as threatening or humiliating. Likewise,

---

[13] Assuming *arguendo* that Dyess actually did find the alleged harassment to be subjectively "severe or pervasive," he also apparently believes, equally earnestly, that another reason why Richards wanted to be close to him was to take advantage of spiritual blessings. (Dyess Depo. at 82:17:88:11.)    This subjective belief further underscores the objective unreasonableness of Dyess' claims.

there is no evidence that any of Richards' alleged conduct unreasonably interfered with Dyess' job performance.[14]

Here, Dyess does not allege that Richards made any sexually lewd comments or propositions. He alleges at most, two instances of Richards standing too close to him, and one alleged instance of touching, that lasted at most one or two seconds, about which Dyess told an earlier grievance panel that his alleged harasser was attempting to *provoke a fight* with him.[15] This is not the stuff of a triable hostile environment claim.

### B. Dyess cannot establish that his discharge was motivated by any unlawful consideration.

Next, in his Complaint, Dyess claims that his discharge was unlawfully motivated by race, sex, and religious discrimination.[16] Dyess' unlawful discharge claims are also due to be dismissed.

### 1. Dyess cannot establish a *prima facie* case of discriminatory discharge.

While there is no one-size-fits-all formula for establishing a *prima facie* case of discrimination, any *prima facie* case must consist of sufficient facts to give rise

---

[14] To the contrary, Richards did everything he could to improve Dyess' job performance and workplace behavior, to no avail.

[15] Now, Dyess adds that Richards allegedly said that he was going to "fire [Dyess'] ass."

[16] In his EEOC charge, Dyess claimed that his discharge was unlawfully motivated only by sex and retaliation. No matter what unlawful motive(s) is/are alleged, however, the end result is the same. Dyess cannot establish a *prima facie* case, and cannot show that Auburn's legitimate, nondiscriminatory reason for terminating him is a pretext for any kind of unlawful discrimination.

to an initial inference of discrimination.  One recognized formulation is for Dyess to show that:

> (1) he belongs to a protected class; (2) he was qualified for the job; and (3) the misconduct for which the employer demoted him was the same or similar misconduct to that which a similarly situated employee engaged in, but was not similarly disciplined for.  . . . Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class, and … the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1276 (11th Cir. 2008).

Because Dyess does not dispute the underlying facts giving rise to his repeated disciplines, he bears the burden of demonstrating that he was treated differently than other similarly situated employees.  To carry this burden, Dyess must show that the other employees were "similarly situated in all relevant respects."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "To satisfy the similar offenses prong, the comparator's misconduct must be *nearly identical* to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Silvera v. Orange County Sch. Bd.*, 244 F. 3d 1253, 1259 (11th Cir. 2001) (emphasis supplied).  For a *prima facie* showing, "[t]he most important factors in the disciplinary context are

the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F. 3d 1364, 1368-69 (11th Cir. 1999).

Dyess has not identified, and he cannot identify, any other employee of a different race, religion, or gender, who had the same pattern of veiled threats, insubordination, and unauthorized use of leave as Dyess, who was treated more leniently. If anything, Auburn was lenient to a fault in tolerating Dyess' veiled threats, completely unacceptable workplace behavior, and repeated insubordination toward his supervisor. Accordingly, Dyess cannot establish even a *prima facie* case of discriminatory discharge, and the obligation to articulate a legitimate, nondiscriminatory reason for Dyess' discharge does not even shift to Auburn. *See, e.g., Morris v. Emory Clinic*, 402 F.3d 1076, 1082 (11th Cir. 2005) ("Morris never makes it past the first step of *McDonnell Douglas*. . . . Morris also fails to identify a female physician who received similar complaints concerning off-color remarks about her patients' ability to have children and who was accused of conducting forceful physical examinations who was not terminated (or received favorable treatment).").

### 2.    Auburn's Legitimate Nondiscriminatory Reasons

If and only if the Plaintiff establishes a *prima facie* case, an inference of discrimination arises, shifting the burden to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Lee v. GTE Florida*, 226 F.3d 1249, 1253

(11th Cir. 2000).  The employer's burden of articulation has been described as "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997); *also see Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (burden of articulation is "exceedingly light").

As set forth above in the undisputed facts, there is a well-documented trail of progressive discipline which led to Dyess' termination.  Early on in Richards' supervision of Dyess, Dyess made what Richards perceived as veiled threats against him.  A few days later, Dyess refused to get some particular dog food as directed by Richards; when Richards tried to confront Dyess about the insubordination, Dyess repeated the veiled threat.  Dyess was written up on two separate occasions for insubordination for failing to respond to or acknowledge Richards' attempts to communicate with him; the second time, Richards wrote, "If John's inappropriate behavior and his insubordination toward his supervisor continues, he will be terminated."  Dyess was written up again for using a computer he was not authorized to use while he was not on his authorized break time.  Dyess again was warned, "If hospital rules and policies are not followed, he will be terminated."  This pattern culminated in Dyess' termination for taking a two-hour lunch without prior authorization, only four days after being warned in writing that "Annual leave must be pre-approved three days in advance."

This pattern of documented insubordination more than satisfies Auburn's "exceedingly light" burden of articulation.

### 3.    Dyess Cannot Show that Auburn's Reasons are Pretextual

Once an employer articulates a legitimate, non-discriminatory reason for an adverse employment action, the burden shifts to the plaintiff to show that the proffered reason is a pretext for discrimination.  Even if Dyess can establish a *prima facie* case of discrimination relating to his discharge, he cannot show that Auburn's legitimate, nondiscriminatory reasons—which were well-documented and included several steps of progressive discipline—are pretexts for unlawful discrimination.

In order to demonstrate that an employer's proffered reason is pretext, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (emphasis added) (citations and footnote omitted).  However, in arguing that the employer's proffered reason is

pretextual, "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

Dyess must come forward with specific evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). "The heart of the pretext inquiry is not whether [the plaintiff] agrees with the reasons [the defendant] gives for the discharge, but whether [the defendant] really was motivated by those reasons." *Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Dyess "must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000). As with any Title VII action claiming disparate treatment, "the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains at all times with the plaintiff." *Wall v. Trust Co. of Georgia*, 946 F.2d 805 (11th Cir. 1991).

Dyess cannot make this showing.  Indeed, to the contrary, Dyess admits that he was disciplined for insubordination several times, and for the most part, he admits the salient facts which led to the disciplines.  At most, Dyess disputes whether discipline was appropriate, because the clocks in the clinic were allegedly not synchronized, and because he had an "emergency" that caused him to take a two-hour lunch and Richards was not in the office to call.  Neither of these allegations go to "the heart of the pretext inquiry," which is whether Auburn has given an honest explanation of why Dyess was terminated.  Instead, Dyess invites this Court to sit in review of Auburn's decisions as a "super personnel department"—something Title VII does not empower this Court to do.

Importantly, nor is there any circumstantial evidence tending to show that Auburn's legitimate, nondiscriminatory reasons for terminating him are pretexts for unlawful discrimination.  Dyess candidly admits that his supervisor never made any offensive comments of a sexual, racial, or religious nature, which might have tended to demonstrate animosity against Dyess based on federally-protected characteristics.  *See, contra, Ross v. Rhodes Furniture*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (supervisor's racially bigoted comment "might lead a reasonable jury to disbelieve Rhodes's proffered reason for firing" plaintiff).  The evidence of Dyess' repeated veiled threats and insubordination is overwhelming.  Dyess cannot meet his burden of showing pretext by simply alleging discrimination.  *See Coutu*

*v. Martin Co. Bd. of Com'rs*, 47 F.3d 1068, 1073-74 (11th Cir. 1995) ("[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."); *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).

## CONCLUSION

The facts of this case, as testified to by Dyess, simply do not give rise to a cause of action.

With regard to Dyess' harassment allegations, Auburn responded and investigated reasonably at each step of the way. Each time Dyess complained to the Affirmative Action/Equal Employment Opportunity office, it responded with an investigation that was reasonable and appropriate under the circumstances. Ultimately, these investigations failed to produce any evidence that substantiated Dyess' allegations of discrimination or harassment. Even if the Court concludes that Auburn is not entitled to the *Faragher* defense, Dyess's factual allegations, taken as true, fail to establish a *prima facie* case of hostile environment harassment.

With regard to his termination, Dyess hardly bothers to gainsay the misconduct for which he was written up, suspended, and ultimately terminated. Dyess falls fall short of demonstrating that Auburn's reasons for terminating his

employment are pretexts for unlawful discrimination of any stripe (race, sex, or religion).

For these reasons, Auburn respectfully moves the Court to enter full and final summary judgment in its favor as to all claims asserted in the Complaint.

Respectfully submitted,

*/s Aaron L. Dettling*
DAVID R. BOYD
AARON L. DETTLING

Attorneys for the Defendant, Auburn University

OF COUNSEL:

David R. Boyd (BOY005)
Aaron L. Dettling (DET003)
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 226-8723
Facsimile:   (205) 488-5699

Lee F. Armstrong
General Counsel, Auburn University
101 Samford Hall
Auburn, Alabama  36849
Telephone:  (334) 844-5176
Facsimile:   (334) 844-4575

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 6th day of June, 2008, I mailed a true and correct copy of the foregoing to the Plaintiff via first-class mail addressed as follows:

John W. Dyess
1509 Union Street
Mobile, Alabama  36617

*/s Aaron L. Dettling*
OF COUNSEL
