IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JOHN DYESS,             )
                            )
       Plaintiff,       )
                            ) CIVIL ACTION NO. 3:07CV-635-WKW
v.                        )
                            )
AUBURN UNIVERSITY       )
                            )
       Defendant.      )
                            )
                            )

## DEFENDANT AUBURN UNIVERSITY'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Auburn University hereby submits this evidentiary submission in support of its contemporaneously filed Motion for Summary Judgment:

### INDEX

| EXHIBIT | DESCRIPTION |
| --- | --- |
| Exhibit A: | Deposition of John Dyess with exhibits in two parts |
| Exhibit B: | Word Index for John Dyess Deposition |
| Exhibit C: | Affidavit of Sonya J. Dixon |
| Exhibit D: | Affidavit of Kelley G. Taylor |
| Exhibit E: | Affidavit of Debbie Griggs |
| Exhibit F: | Affidavit of Trish Digman |
| Exhibit G: | Affidavit of Sherry Boothe |
| Exhibit H: | Affidavit of Albert L. Snipes |
| Exhibit I: | EEOC Charge of Dyess |

Respectfully submitted this 6th day of June, 2008.

/s/ Aaron L. Dettling
One of the Attorneys for Defendant
Auburn University

**OF COUNSEL:**
David R. Boyd (BOY005)
Aaron L. Dettling (DET003)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

Lee F. Armstrong
General Counsel, Auburn University
101 Samford Hall
Auburn, Alabama 36849
Telephone: (334) 844-5176
Facsimile: (334) 844-4575

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June, 2008, I mailed a true and correct copy of the foregoing to the Plaintiff via first-class mail addressed as follows:

John W. Dyess
1509 Union Street
Mobile, Alabama 36617

/s/ Aaron L. Dettling
OF COUNSEL

# EXHIBIT A

# FREEDOM COURT REPORTING

1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5   CASE NUMBER:  3:07-CV-635-WKW
6   JOHN DYESS,
7          Plaintiff,
8          vs.
9   AUBURN UNIVERSITY,
10          Defendant.
11
12          S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of John W.
16   Dyess, III may be taken before Sara Mahler,
17   CCR, at the offices of Balch & Bingham, at
18   105 Tallapoosa Street, Suite 200,
19   Montgomery, Alabama 36104, on the 28th day
20   of March, 2008.
21
22      DEPOSITION OF JOHN W. DYESS, III
23

2

1      IT IS FURTHER STIPULATED AND
2   AGREED that the signature to and the reading
3   of the deposition by the witness is not
4   waived, the deposition to have the same
5   force and effect as if full compliance had
6   been had with all laws and rules of Court
7   relating to the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9   AGREED that the notice of filing of the
10   deposition by the Commissioner is waived.
11
12      * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

3

1      * * * * * * * * * * * *
2          I N D E X
3         EXAMINATION
4             PAGE
5   By Mr. Dettling ..................... 7
6   DEFENDANT'S EXHIBITS
7             PAGE
8   Exhibit 1 - Document with Dyess's
9      signature ............. 121
10   Exhibit 2 - Staff handbook ....... 121
11   Exhibit 3 - Two-page document .... 125
12   Exhibit 4 - Dr. Vollenweider's
13      report ................. 192
14   Exhibit 5 - Return to work Memo
15      dated 8/15/05 .......... 207
16   Exhibit 6 - Memo, 8/17/05 ........ 211
17   Exhibit 7 - Corrective Action
18      Report dated 2/23/06 ... 237
19   Exhibit 8 - Corrective Action
20      Report dated 2/23/06 ... 265
21   Exhibit 9 - Suspension document .. 274
22   Exhibit 10 - Grievance form. .... 288
23   Exhibit 11 - Document, 4/27/06 .... 291

4

1   Exhibit 12 - Annual leave
2      information document
3      dated 4/24/06 .......... 298
4   Exhibit 13 - document
5      recommending
6      termination, 5/3/06 .... 298
7   Exhibit 14 - Grievance form
8      regarding termination .. 302
9   Exhibit 15 - Letter from
10      affirmative action ..... 303
11   Exhibit 16 - Dyess's personal
12      statement .............. 305
13   Exhibit 17 - Grievance document ... 317
14   Exhibit 18 - document regarding
15      meeting with
16      affirmative action ..... 318
17   Exhibit 19 - Answers to
18      interrogatories ........ 326
19   Exhibit 20 - EEOC complaint ...... 332
20   Exhibit 21 - Damages claim ........ 352
21   Exhibit 22 - Memo from Sandy
22      Alexander, 3/24/00 ..... 356
23   Exhibit 23 - Document involving

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**Page 5**

1    Celeste Bankston ........ 358
2  Exhibit 24 - Document signed by
3    S. Alexander and J.
4    Beech ................. 359
5  Exhibit 25 - Mobile Infirmary
6    document, 10/7/92 ...... 362
7    * * * * * * * * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 6**

1    IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3        EASTERN DIVISION
4
5  CASE NUMBER: 3:07-CV-635-WKW
6  JOHN DYESS,
7        Plaintiff,
8        vs.
9  AUBURN UNIVERSITY,
10       Defendant.
11
12  BEFORE:
13       SARA MAHLER, Commissioner.
14
15  APPEARANCES:
16       JOHN W. DYESS, III, PRO SE, 1509
17  Union Street, Mobile, Alabama 36617,
18  appearing on behalf of the Plaintiff.
19       AARON L. DETTLING, ESQUIRE, of
20  BALCH & BINGHAM, 1901 Sixth Avenue North,
21  Suite 1500, Birmingham, Alabama 35203,
22  appearing on behalf of the Defendant.
23       * * * * * *

**Page 7**

1        I, SARA MAHLER, CCR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of Balch & Bingham, 105 Tallapoosa Street,
8  Suite 200, Montgomery, Alabama 36104,
9  beginning at 8:45 a.m., John W. Dyess, III,
10  witness in the above cause, for oral
11  examination, whereupon the following
12  proceedings were had:
13        JOHN W. DYESS, III,
14  being first duly sworn, was examined and
15  testified as follows:
16        COURT REPORTER:   Usual
17  stipulations?
18        MR. DETTLING:  Given that
19  Mr. Dyess doesn't have an attorney, it might
20  be best that we not do stipulations.  No
21  stipulations, I guess.
22        EXAMINATION
23  BY MR. DETTLING:

**Page 8**

1    Q.    Good morning, Mr. Dyess.
2    A.    Good morning.
3    Q.    I think we've met before.  My
4  name is Aaron Dettling; I'm the attorney
5  here for Auburn University this morning.
6        Do you understand, sir, kind
7  of why we're here today?
8    A.    Yes.
9    Q.    Can you explain to me what you
10  understand to be the purpose of this
11  proceeding today?
12    A.    This is a legal, lawful
13  meeting to have my statement of what
14  happened concerning this lawsuit put into
15  legal terminology on legal paper.
16    Q.    And do you understand that
17  you've just taken an oath to tell the truth?
18    A.    Right.
19    Q.    Do you understand what that
20  means and everything?
21    A.    Yes.
22    Q.    Okay.  Has your deposition
23  ever been taken before?

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

9

1    A.    No.
2    Q.    I'm sorry, did you answer that
3 last question, has your deposition ever been
4 taken before?
5    A.    No.  It's never been taken.
6    Q.    Mr. Dyess, I'm going to do my
7 best to ask my questions this morning as
8 clear as I know how.  But if at any time my
9 questions are not clear or you don't
10 understand them, please do ask me, and I'll
11 do my best to try to reask it a different
12 way, or try to clarify it or try to break it
13 into little pieces or whatever I need to do
14 to make sure you understand what I'm asking;
15 is that fair?
16    A.    That's fine.
17    Q.    If you need a break also.
18 We'll probably take a break or two in the
19 middle of the day, so we can try to get out
20 of here and get back on the road.
21    A.    Thank you.
22    Q.    So if you need to take a break
23 for any reason, please let me know.  We'll

10

1 see how we're doing around lunch time; if we
2 can stop for lunch, we will.  I usually like
3 to eat, so we'll try to do that.
4         And I would ask you too, if
5 you would -- the court reporter is here to
6 take down everything that you say.  So she
7 she's going to be typing it down.  So she
8 can't really record a nod of the head up or
9 down or side to side or anything like that,
10 so try to do your best to answer yes or no,
11 or out loud and just not with head motions.
12 Okay?
13    A.    Yes.
14    Q.    She has trouble too with
15 uh-huh and huh-uh which we're all bad about
16 doing.  So if you can try to use yes or no,
17 that will help the transcript to be clear.
18 Okay.
19    A.    Is okay fine?
20    Q.    Sure.  She can take that down.
21 Mr. Dyess do you feel like you have a pretty
22 good and solid memory of the things that
23 occurred at Auburn University while you were

11

1 employed there?
2    A.    Yes.
3    Q.    And if I ask you any question
4 that you don't know or don't remember the
5 answer to, will you just let me know?
6    A.    Sure.
7    Q.    Are you -- This morning as we
8 sit here, are you under the influence of any
9 sort of medication or drug?
10    A.    No.
11    Q.    Alcohol?
12    A.    No.
13    Q.    So you're not under any kind
14 of medication that would affect your memory
15 in any way?
16    A.    No.
17    Q.    Okay.  Mr. Dyess, what did you
18 do to prepare for your deposition?
19    A.    Basically read -- Just
20 refreshed myself of the occurrences when I
21 was employed at Auburn University.
22    Q.    Okay.  And how did you do
23 that?  How did you refresh your memory?

12

1    A.    I took time to remember
2 situations and instances, names, and some
3 dates as well as looked through my material
4 that I managed to receive.
5    Q.    Okay.  And this green binder
6 that's in front of us, is that stuff that
7 you looked through to prepare?
8    A.    Right.
9    Q.    Okay.  Is there anything in
10 your green binder that you did not receive
11 from me or that you have not given to me?
12    A.    No.
13    Q.    Okay.  Have you talked to
14 anyone?
15    A.    No.
16    Q.    You didn't place a phone call
17 to anybody to ask them if they remembered
18 this or asked them what happened or anything
19 like that?
20    A.    No.
21    Q.    In the entire time since you
22 were terminated from Auburn University, have
23 you called or spoken with anybody from

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

13

1 Auburn?
2    A.    No.
3    Q.    You haven't talked to
4 Mr. Richards?
5    A.    No.
6    Q.    You haven't talked to
7 Dr. Saidla?
8    A.    No.
9    Q.    You haven't talked to Renza
10 Floyd?
11    A.    No.
12    Q.    You haven't talked to Mixty
13 Cox?
14    A.    No.
15    Q.    You just haven't talked to
16 anybody who worked at Auburn with you?
17    A.    No.
18    Q.    Mr. Dyess, I know a little bit
19 about your educational background.  Tell us
20 where you went to school, and I know you did
21 a little bit of college.  If you would, walk
22 us through and where you went to school and
23 all that.

14

1    A.    High school, of course, four
2 years, regular diploma, M.T. Blount High
3 School, that's in Pritchard, Alabama; I have
4 three and a half years of sociology at the
5 University of South Alabama, in Mobile,
6 Alabama; as well as two years at the
7 University of Mobile, it was formerly called
8 Mobile College at the time I was there, of
9 religious studies.
10    Q.    Okay.  So you got your high
11 school diploma from Blount?
12    A.    Right.
13    Q.    And it sounds like you must be
14 pretty close to a sociology degree at South;
15 is that fair?
16    A.    That's correct.
17    Q.    You have not actually
18 graduated?
19    A.    No.
20    Q.    What would you lack to get
21 your degree from South?  What courses is
22 what I'm saying?
23    A.    It would be my classes that

15

1 would be in the senior year of my studies,
2 major.
3    Q.    Is that something that you
4 hope to do?
5    A.    Perhaps, some day.
6    Q.    How long ago was it that you
7 did the three and a half years at South?
8    A.    Twenty years.
9    Q.    Okay.  When did you do two
10 years at the University of Mobile?
11    A.    About eighteen years.
12    Q.    Eighteen years ago?
13    A.    About.
14    Q.    How did you make the switch
15 from University of South Alabama to the
16 University of Mobile?  Did you change
17 colleges?  Changed major areas, you changed
18 to religious studies?  What happened in your
19 life that made you switch educational
20 tracks?
21    A.    I began South -- To be honest,
22 my parents wanted me to attend University of
23 Mobile in the beginning because the

16

1 University of Mobile offers a religious or
2 Biblical degree for ministers, of which I
3 am.  And my parents originally wanted me to
4 go there in the beginning but they okayed me
5 to go -- allowed me to go to the University
6 of South Alabama.  And the University of
7 South Alabama doesn't offer a religious
8 program for ministers and church people.
9 And upon going there three and a half years,
10 I felt it best that I wanted to enhance my
11 ministerial career and transferred there.
12    Q.    Okay.  And so you transferred
13 to the University of Mobile.  Did they have
14 a -- Is it like a seminary program?  Is it a
15 formal pastoral training program?
16    A.    Yes.  It's not seminary, but
17 it's a four-year undergraduate program.  And
18 they have various kinds of degrees offered
19 that gives you a very good educational
20 learning experience.  Biblical, they're very
21 sound Bible-wise.  It's not a religion like,
22 you know, different types of religion, but
23 it enhanced your ministerial career

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

17

1 according to your denomination which is, of
2 course, a broad spectrum of the body of
3 Christ that we worship in.
4     Q.    That we what?
5     A.    Worship in.
6     Q.    Worship in. While we're
7 talking about the University of Mobile and
8 the religious studies topic, you do claim in
9 this case, don't you, that Auburn
10 discriminated against you on the basis of
11 your religion? Is that one of the claims in
12 this case?
13     A.    Yes. Right.
14     Q.    Let me ask you then about what
15 your religious beliefs are. You've
16 mentioned that you are a minister; is that
17 right?
18     A.    That's correct.
19     Q.    How long have you been a
20 minister?
21     A.    Twenty-five years this year.
22     Q.    And how old are you now, I'm
23 sorry?

18

1     A.    Forty-five. I'll be forty-six
2 in September.
3     Q.    So you've been a minister
4 since about the age of twenty, nineteen,
5 twenty, something like that?
6     A.    Twenty-one, actually.
7     Q.    Twenty-one. What is your
8 religious faith?
9     A.    My denomination?
10     Q.    Sure.
11     A.    Baptist.
12     Q.    Okay. You're Baptist. And
13 there's, I know, a Southern Baptist
14 Convention, there's maybe fifty or a hundred
15 different Baptist groups in America. Is
16 there a particular Baptist group that you
17 belong to?
18     A.    No. I'm not what we would
19 call Southern Baptist. I think -- you
20 basically just have Southern Baptists and
21 everyone else. So it would be just the
22 typical normal Baptist, not Southern
23 Baptist. Because southern Baptist is such a

19

1 widespread and they adhere to certain
2 standards that would be more conforming to
3 today's time, but whereas the Baptist, any
4 typical Baptist Church, is plain old
5 Baptist.
6     Q.    Okay. In the twenty-five
7 years that you've been a minister, do you
8 preach regularly?
9     A.    I do.
10     Q.    Okay. Where do you preach?
11     A.    Various churches.
12     Q.    Do you just visit from church
13 to church and preach different Sundays, is
14 that how it works?
15     A.    No. That would be a
16 evangelistic program. Basically, if I want
17 to go and worship with someone and they want
18 me to come back for a particular occasion,
19 such as youth day or youth rally or some
20 type of anniversary celebration, Sunday
21 school type teaching, then they would invite
22 me. And it's pretty much if you, you know,
23 know someone or that they know of you within

20

1 a place where you are of residence or
2 reside. They invite you and so on and so
3 forth.
4     Q.    Okay. So it's not an every
5 Sunday?
6     A.    No. Not pastoral.
7     Q.    Okay. Let's just say since
8 January 1 of this year, 2008, how many
9 different churches would you say you've
10 preached at in 2008?
11     A.    Not very many. I would say
12 two. Because I have a different area of
13 ministry where I am seeking after, and it
14 doesn't require to always minister in a
15 building. It would be perhaps outside in
16 communities, in youth settings, in community
17 centers, and encouraging other people or
18 other ministers who have started a ministry.
19 So it's not necessarily standing inside a
20 building as it is just doing the Christian
21 work of the community.
22     Q.    Okay. All right. We know
23 you're Baptist, not Southern Baptist

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1  Convention. What are your religious
2  beliefs? Can you summarize, encapsulate
3  just what are your religious beliefs?
4      A.    Basically, I believe the
5  entire Bible; I believe the full Gospel of
6  the Bible; that Jesus is the Son of God;
7  that he came to earth, he was born, lived a
8  life of thirty-three years, was crucified on
9  the cross, died, resurrected, and is now in
10 heaven.
11     Q.    And how do those historic
12 facts that you just discussed relate to you
13 personally and people, you know, living in
14 Alabama today?
15     A.    I don't quite understand.
16     Q.    Okay. Is there any part -- I
17 understand the sort of factual beliefs that
18 you just expressed about Jesus, the Gospel,
19 and so forth. How does -- How do those
20 facts interface -- How do those facts drive
21 how you live your life today? Is that a
22 part of your religion?
23     A.    To put it simply, I strive to

22

1  live the Christian life. I don't always
2  agree with what happens within our society,
3  the state, or the country. But I always
4  view -- And this is very important: I
5  always view society and the world according
6  to the way the Bible sees it, it speaks of
7  it. Such as I often refer to today's time,
8  2008, as being in the last days or as
9  according to the Bible or the New Testament
10 Word, and I also view some of the situations
11 that's happening within our country as
12 referring to what Scripture teaches upon the
13 rapture and the return of Jesus Christ.
14     Q.    Okay. You mentioned the
15 Bible. Do you read, you know, the same
16 Bible as -- a lot of people are Christians,
17 a lot of people have Bibles, there's
18 probably Bibles in this office. Do you read
19 the same Bible as most other Christians do
20 or does it include the Apocryphal books that
21 the Catholics have?
22     A.    I don't necessarily read the
23 books of other denominations so to speak,

23

1  because most denominations just use one
2  regular -- the normal Holy Bible. But if
3  it's within the confines of the normal
4  Bible, I read it. But to dib-dabble into
5  other faiths and other beliefs, I probably
6  won't read much of it.
7      Q.    Do you hold to the King James
8  Version?
9      A.    Most of the time. You have
10 other translations, of course, New
11 International Version. But it all comes
12 from the King James Version, so, yes
13     Q.    Do you read the Bible every
14 day?
15     A.    Yes.
16     Q.    Do you also pray every day?
17     A.    Of course.
18     Q.    Are there other books that you
19 read about religious matters?
20     A.    Quite a few. I will refer
21 quite a few of the reading material at
22 University of Mobile. Some of the books I
23 still have today. And it doesn't sway my

24

1  Christian beliefs, but I read up on them as
2  well as on the website, different type of
3  ethnic -- Christian ethnic books and
4  beliefs.
5      Q.    Are there particular authors
6  that you've read recently?
7      A.    No. Not really.
8      Q.    Is there a creed or confession
9  of faith that you hold to or that you hold
10 as your own like the Apostle's Creed or
11 anything like that?
12     A.    Yes and no. If it's in the
13 Bible, in the Holy Bible, King James
14 Version, I believe it and live by it; if
15 not, I pretty much don't know it.
16     Q.    Okay. You mentioned websites.
17 What particular websites were you referring
18 to?
19     A.    Mostly other church
20 denomination's websites. You might have
21 like certain pastors of churches, like Billy
22 Graham, who has his church; Jerry Falwell
23 before he passed; T.D. Jakes, different

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

25

1 other ministers, perhaps evangelists who
2 come on the television or radio and they
3 have websites.
4     Q.     Okay.  You mentioned an ethnic
5 Christian -- something about ethnic
6 Christian beliefs.  Can you elaborate on
7 that at all?
8     A.     Of course.  Different people
9 have different ethnic backgrounds, and in
10 doing so, one tends to read or not
11 understand or conform to the Bible or the
12 Word of God as it really is.  And not -- You
13 know, we tend to take the Scripture to fit
14 our lifestyle or the way we were reared, and
15 that's -- that would produce either a strong
16 faith or belief or just a nonchalant casual
17 belief of the Bible.
18         And ethnic goes into -- it
19 goes into the way you were raised or the
20 denomination, the race so to speak, the
21 community or the city area you lived in, and
22 in some instances the country or the city --
23 I said city already -- the country where you

26

1 were from.  But basically I understand the
2 Word of God as it is.  I would -- I could go
3 to seminary and attend, say if I had a
4 degree, I would attend, say, New Orleans
5 Theologic Seminary or Dallas Theologic
6 Seminary, and a lot of their teachings I
7 would probably feel humanly uncomfortable
8 with because they don't have the spiritual
9 guidance and the spiritual leading that
10 would enhance what the Bible is actually
11 trying to translate or give you the idea of
12 what it means.  And because the Bible
13 teaches that this Word of God is inspired by
14 God to men and is hard for any average man
15 to just interpret the Bible because it has
16 to be inspired or it was inspired, and if
17 you're not spirit led by the spirit of
18 Christ being the Father, Son, and the Holy
19 Spirit, then it would be -- You know, all of
20 that just relates to the ethnic background.
21 When I say ethnic, I mean the rearing and
22 the way you -- the culture in which you are
23 from.

27

1     Q.     Is there a particular website
2 on the Internet where it talks about these
3 things that you read from?
4     A.     Not necessarily.
5     Q.     Are you ordained or licensed?
6     A.     I'm licensed and ordained.
7     Q.     Okay.  Who ordained you?
8     A.     Greater Nazarene Baptist
9 Church in downtown Mobile, Alabama.
10     Q.     When did that happen?  When
11 did Greater Nazarene Baptist Church ordain
12 you?  Was that twenty-five years ago?
13     A.     About twenty years ago.
14     Q.     Is there anything that you
15 have to do to kind of stay ordained by that
16 congregation?
17     A.     No.
18     Q.     Do you go to church there?
19     A.     No.  There is really nothing.
20 Once you're ordained and call it ordained,
21 you're pretty much continued to be ordained
22 as long as you remain faithful to the Word.
23     Q.     Do you feel like your

28

1 religious beliefs are that much different
2 from anyone else who goes to church Sunday
3 morning at a Baptist Church or even a
4 Methodist church or Presbyterian church or
5 anything like that?
6     A.     No.  I understand that they
7 have certain -- The worship service may be
8 designed a little different, but actually
9 Biblically speaking, no.  It would be the
10 same as anyone else would go to any type
11 church, as long as they're preaching and
12 teaching the normal Word of God.
13     Q.     Uh-huh.  What about the
14 specific people that you worked with at
15 Auburn, do you feel like your religious
16 beliefs are that much different than, say,
17 Bud's or Mixty's or Renza's, or any of those
18 folks?
19     A.     Well, it depends on the
20 individual.  They may believe, but they
21 don't necessarily have to be a follower of
22 the Word.  They may not be -- If the Bible
23 says thou shalt not, that does not mean that

7  (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

1 that person is actually living, obeying
2 that. Whereas I would say that I am obeying
3 it. That's not being judgmental, but to say
4 you believe it doesn't mean that you're
5 going to obey it. So -- And the Bible
6 teaches that all -- that all beliefs, they
7 just don't necessarily obey it. So that
8 would cause a very -- a conflict. You know,
9 if I was a strong believer in the Bible and
10 you just won some, was a casual
11 every-now-and-then goer, attender of
12 worship, then you would have -- there would
13 be a tremendous conflict because I strive to
14 be a A, B, C, D, and E of the Bible, and you
15 just pretty much just go when you feel like
16 going. So it would indeed create a very
17 major conflict.
18    Q.    Do you feel that you,
19 personally, have a special connection to
20 spiritual things?
21    A.    Yes. It's through the power
22 of God, through prayer, all that I do and
23 say it supported within the Bible.

30

1         I'm not no magician, miracle
2 worker outside of what the Scripture
3 teaches. If the Scripture teach it, I
4 believe it. I believe God will do it either
5 through me or for me. He can use other
6 people.
7         I mean, I hold Billy Graham
8 and other ministers who are now and past on,
9 television evangelists Benny Hinn and past
10 ministers who this country admonished as
11 being the same type of men of God, called
12 to. I'm not saying I'm number one in this
13 world, can do certain things. But if it's
14 in the Bible, I believe it, and I pray.
15 It's all -- It's called prayer. It's not
16 necessarily a type of warned -- some type --
17 excuse me, but it's not necessarily -- it's
18 through prayer. It's not a weapon of any
19 type. If it's in God's Holy Word and
20 that -- prayer is the answer to any question
21 when it comes to what a Christian can and
22 cannot do.
23    Q.    Okay. You said before, and

31

1 we'll get into a little bit more, in more
2 detail later. You know, on one point you
3 said something to Bud that -- something
4 like, bad things will happen to people who
5 mess with a minister; something like that.
6 Do you recall?
7    A.    Yes, I recall.
8    Q.    What was the specific
9 statement that you made?
10    A.    The specific statement would
11 be that I -- after having a conversation
12 with him previously, on Biblical issues, I
13 encouraged him -- in order to eliminate
14 conflict and problems on the job, I
15 encouraged him to follow the rules and
16 teaching of the Bible in maintaining an
17 environment that would not be offensive.
18 Because there at the best school, you have
19 Biblical -- you have religious Christian
20 organizations that come every -- once a week
21 and preach doth saith the Lord on a
22 microphone speaker type deal, and the room
23 is a very auditorium-type place. All the

32

1 students attended. Any employee that wants
2 to go, you eat buffet style. If you want to
3 give a dollar or so, you can; if not. That
4 occurs every week. So it's not like I
5 invented the Bible that I was trying to get
6 him to understand.
7         I was trying to let him
8 know -- He had previously asked me what do I
9 do away from the school. And I told him I
10 was a minister, and I live by the Bible and
11 blah, blah, blah, blah. And we had various
12 conversations regarding Christian beliefs,
13 and he adhered, or so he said, to Biblical
14 beliefs. So I just tried to -- The idea was
15 to get him to pay attention to and not
16 create an environment, a work environment,
17 that would be offensive, be it hostile or
18 religious.
19    Q.    I understand that. I
20 appreciate that.
21         What were the exact words, the
22 best you recall, the words that you said to
23 Bud? I know you said something to the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

33

1  effect that bad things will happen to people
2  who mess with ministers. So what I'm
3  getting at was, do you remember saying those
4  exact words or was it words similar to that?
5  What were the words that you remember saying
6  to Bud?
7      A.    I just forestated (sic) what I
8  said to him. I did not say that bad things
9  will happen. That's his interpretation.
10          I said that the scripture
11  teaches as a minister -- I said, might I
12  remind you, Mr. Richards, upon having the
13  previous conversation that he and I had held
14  together on Christians, Bible, Baptist,
15  Christian beliefs, of course of which he was
16  a participant. I did not force him into a
17  conversation of Christian Biblical beliefs,
18  I just reminded him of that conversation. I
19  did not say that something bad was going to
20  happen to you, like it was a threat; that
21  would be compromising my Christian beliefs.
22          And I was trying to avoid
23  conflict. But basically I did not say that

34

1  something bad was going to happen, I
2  reminded him of Scripture teaching of what
3  happens when we offend, not just ministers,
4  but people of God, period.
5      Q.    Okay. And did you use
6  examples from the Scriptures as to what
7  kinds of things happen?
8      A.    No. We didn't talk that long
9  on it, because it was beginning to be too
10  hostile.
11      Q.    Do you, in fact, believe that
12  bad things will happen to people who oppose
13  you?
14      A.    Once, again, if it's in God's
15  Word, and it does teach that, among
16  offending God's people, the Lord's people,
17  then yes. If it's in the Bible, then of
18  course I have to believe it.
19      Q.    I guess what I'm asking you
20  then, does the Bible teach that bad things
21  will happen to people who oppose you as a
22  minister?
23      A.    Not just me, the minister, but

35

1  God -- the Lord's people.
2      Q.    And you're one of the Lord's
3  people?
4      A.    Of course.
5      Q.    Right.
6      A.    Any person that goes to church
7  on Sunday and confesses Christ is the Lord's
8  people.
9      Q.    Is there a specific Bible
10  verse or Bible passage where it refers to
11  that?
12      A.    There's several verses in the
13  New Testament, three or four of which Jesus
14  spoke himself in the New Testament. I can't
15  recall them right now without the Bible in
16  my hand. I can recall part of it but --
17  Yes, there's several Scriptures that teaches
18  that. And any good Bible studying person
19  could answer that for you.
20      Q.    Does the Bible also teach that
21  you, as a minister, have any kind of special
22  powers or special authority?
23      A.    Yes. The apostles, they were

36

1  specially selected, as well as others in the
2  Bible, who exemplified gifts from the Lord.
3  And once again, if you don't believe the
4  total Bible and you're not a believer of
5  Christ, then all of this sounds like a
6  religious rhetoric to say that. But if you
7  read the Scripture and you have been born
8  again as the Scripture teaches -- and once
9  again might I remind you, Billy Graham and
10  other ministers that you and I are both
11  familiar with, hopefully, are teaching --
12  teaches this exact thing and is not like --
13  but yes.
14      Q.    Please don't understand me to,
15  you know --
16      A.    You personally, no, I
17  understand.
18      Q.    You understand what I'm
19  saying?
20      A.    When I talk, it's generally
21  everyone, not necessarily directed to you.
22      Q.    Right. And my questions are
23  not intended to in any way --

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

37

1    A.    Compromise what the Christian
2  attitude?
3    Q.    Yeah. I'm just asking you --
4    A.    I understand. I thoroughly
5  understand.
6    Q.    I appreciate that.
7    A.    I've been through this for
8  twenty-five years, so I thoroughly
9  understand.
10    Q.    Let's back up.
11          You've been born again, I take
12  it?
13    A.    Yes.
14    Q.    When did that occur?
15    A.    About thirty-five years ago.
16    Q.    So when you were ten, eleven,
17  twelve?
18    A.    (Witness nods head in the
19  affirmative.) Most young people give their
20  life to Christ when they get baptized. So
21  that would be about that time.
22    Q.    Okay. Did you ever have any
23  military service?

38

1    A.    No.
2    Q.    Are you a conscientious
3  objector? Do you know what that means?
4    A.    No.
5    Q.    You don't know what it means,
6  or you're not a conscientious objector, I'm
7  sorry?
8    A.    I don't understand what you
9  mean.
10    Q.    Do your religious beliefs
11  prohibit you from taking up arms or the
12  military?
13    A.    No.
14    Q.    You just never did?
15    A.    No.
16    Q.    I didn't either. I'm just --
17  Do you have a computer at home?
18    A.    Not now. But I use one at
19  least twice a week.
20    Q.    Okay. Where is the computer
21  that you use?
22    A.    I have one -- I had one at
23  home, it's not working; it's a little slow

39

1  and out of date. But I mostly go to the
2  public library.
3    Q.    Okay. Is there a public
4  library close to where you live in Mobile?
5    A.    Several.
6    Q.    Okay. Do you have an e-mail
7  address?
8    A.    No.
9    Q.    Have you had an e-mail address
10  in the last five or ten years?
11    A.    No. I use -- My name was on
12  the list of -- a type of list for employees
13  while I was at Auburn University, but it
14  wasn't an e-mail. It was some type of
15  advertising type thing or announcements,
16  something of that sort, but it wasn't
17  e-mail.
18    Q.    Okay. When you go to the
19  library to use the computer, do you access
20  the Internet there?
21    A.    Yes.
22    Q.    And what kind of sites do you
23  look at on the Internet?

40

1    A.    Mostly sports, ESPN, Si.com,
2  USA Today. Sports mostly, except for
3  looking up legal terminology.
4    Q.    Looking up legal terminology.
5  Is there a particular sport that you like to
6  follow?
7    A.    There's not one. I pretty
8  much keep up with most all of them.
9    Q.    Okay. Do you participate in
10  any, like, on-line discussion groups or
11  forums or chat groups or anything like that?
12    A.    No.
13    Q.    Okay. Are you employed at
14  this time?
15    A.    Yes.
16    Q.    Okay. Where are you working?
17    A.    At -- I work for Dollar -- the
18  Dollar General Corporation.
19    Q.    Okay. Do you work in one of
20  their stores?
21    A.    Yes.
22    Q.    Which store?
23    A.    In Mobile, of course.

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1    Q.    What street?
2    A.    Dawes Road, D-A-W-E-S. I
3 can't recall the exact street building
4 number.
5    Q.    That's close enough. How long
6 have you worked at Dollar General?
7    A.    Eleven months.
8    Q.    Is that the only job that
9 you've held in Mobile since Auburn?
10   A.    No.
11   Q.    Okay. Where did you work
12 previous to that?
13   A.    I worked for Ruby Tuesday, the
14 restaurant, there in Mobile. I worked
15 for --
16   Q.    Let's stop just a second
17 there. Which Ruby Tuesday restaurant?
18   A.    Airport Boulevard. There's
19 two on Airport Boulevard, but one of them.
20   Q.    Did you say there's two Ruby
21 Tuesdays on Airport Boulevard?
22   A.    Yes.
23   Q.    Is one of them in one of the

43

1 jobs that you've held in Mobile, Dollar
2 General Corporation, Ruby Tuesday. And is
3 there another job that you've held in
4 Mobile? I'm talking about since Auburn
5 right now, since May 2006.
6    A.    Yes. I worked for -- I worked
7 for Budweiser Corporation, that only lasted
8 a week. It was on a trial basis and that
9 didn't work out. That didn't work out well.
10   Q.    What street was that on?
11   A.    I don't recall. It's only one
12 Budweiser Corporation there. I can't think
13 of the name of the street, but it's near
14 I-65, I guess you call it, that address. I
15 can't recall the name of the address.
16   Q.    Is it on the I-65 service
17 road?
18   A.    Right.
19   Q.    Okay. What else? We've got
20 Dollar General, Ruby Tuesday, Budweiser.
21   A.    Manning -- Food For Less.
22 It's Manning's Food For Less.
23   Q.    Okay. Is that a grocery

42

1 malls there?
2    A.    It was. They closed that one,
3 but it's moved near the mall.
4    Q.    Okay. And how long did you
5 work at that Ruby Tuesday?
6    A.    I worked there for a year and
7 a half. But I've been with Ruby Tuesday
8 Corporation since 200- -- I was there from
9 2003 until 2007.
10   Q.    So while you worked at Auburn,
11 I guess, did you also work at Ruby Tuesday
12 in Auburn?
13   A.    Yes.
14   Q.    And what road in Auburn was
15 that restaurant on?
16   A.    I believe it's Spirit Drive.
17   Q.    Spirit?
18   A.    (Witness nods head in the
19 affirmative.)
20        Near College Street, just off
21 that.
22   Q.    Okay. We were -- We detoured
23 for a second. We were talking about the

44

1 store?
2    A.    Yes.
3    Q.    And how long did you work
4 there?
5    A.    Five months.
6    Q.    Okay. What else?
7    A.    That's about it.
8    Q.    Okay. Let's see. Starting
9 with Manning's Food For Less, you said you
10 worked there for about five months. And
11 what street is that on?
12   A.    Manning's is on Moffatt Road.
13   Q.    Moffatt Road. And what was
14 your job duties at Manning's Food For Less?
15   A.    Stock, help.
16   Q.    Just kind of stocker, helper?
17   A.    Right.
18   Q.    And you worked there for five
19 months?
20   A.    Yes.
21   Q.    Which five months was that?
22 Was it closer to 2006 or was it sometime in
23 2007?

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

1    A.    It was in 2007, from January
2  to April or January to May.  It was from
3  January to May, I guess it was.
4    Q.    Okay.  And why did you --
5  Well, did you resign from Manning's Food For
6  Less or were you discharged?
7    A.    I was discharged, terminated.
8    Q.    Why?
9    A.    It was still a probation-type
10 job, and there was a conflict among me
11 and -- myself and one of the customers.  It
12 was a personal situation, so when she
13 brought it into the store, and she told the
14 manager which I done none of the like, and
15 he pretty much just let me go.  But it
16 wasn't a problem because I was still working
17 for Ruby Tuesday, so I didn't -- You know,
18 if you got one low-paying job, you got -- it
19 didn't really matter anyway.
20   Q.    Do you feel like that was
21 discriminatory?
22   A.    No.  Nothing like
23 discriminatory.

46

1    Q.    Okay.  So you're not going to
2  sue Manning's Food For Less?
3    A.    Of course not.
4    Q.    Did you know the proprietor or
5  the owner of Food for Less?
6    A.    No.
7    Q.    Did you know the customer
8  previously?
9    A.    Yes.
10   Q.    Y'all had some outside thing?
11   A.    Right.
12   Q.    They brought it into the store
13 you said?
14   A.    Correct.
15   Q.    What was the nature of the
16 conflict there?
17   A.    That would go to the
18 understanding of personal feelings, perhaps,
19 male/female involvement, family inverness.
20 I don't like he, I don't like she.  It falls
21 under the category of something like that.
22   Q.    When did you work for
23 Budweiser?  You said it was for one week?

47

1    A.    Yeah.  That was in 2006.  That
2  was in September 2006.
3    Q.    And what was your job duties
4  at Budweiser?
5    A.    Same thing, stock, stock help.
6    Q.    Is that a -- like a
7  distribution center or do they bottle the
8  beer there?
9    A.    That's a distribution center.
10   Q.    Distribution.  So you were
11 like loading on to trucks or what?
12   A.    Correct.
13   Q.    Okay.  And was there a
14 particular reason why that only lasted for a
15 week or a particular reason why it didn't
16 work out?
17   A.    No.  They give you a week to
18 see how you will -- Actually they hired
19 several people to fill perhaps two or three
20 positions, and they just probably thought
21 that the other ones were a little bit more
22 swifter, faster, or something, got the job
23 done faster.  And I understood.

48

1    Q.    So you didn't feel like that
2  was discriminatory either?
3    A.    No.
4    Q.    And you're not going to sue
5  Budweiser about that?
6    A.    No.
7    Q.    Okay.  Going back then to Ruby
8  Tuesday, are you still working at Ruby
9  Tuesday?
10   A.    No, I'm not employed there.
11   Q.    How long did you work at Ruby
12 Tuesday?  And, again, I'm talking about May
13 2006 forward, just in Mobile.  We'll talk
14 about Auburn later.
15   A.    Okay.  A year and a half.
16   Q.    Okay.  So would you have
17 started working at Ruby Tuesday right about
18 the time that you moved back to Mobile from
19 Auburn?
20   A.    They just sort of transferred
21 me.  You work for the company, and you want
22 to move to another city, they can just give
23 you a position at another store --

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1    Q.    Okay.
2    A.    -- in the city where you're
3  moving to.
4    Q.    Okay. And you requested that
5  with them?
6    A.    Yes.
7    Q.    And they did it for you?
8    A.    Right.
9    Q.    What were your job duties at
10  Ruby Tuesday?
11    A.    Dishwasher.
12    Q.    And I meant to ask you your
13  rate of pay for all of these, but what was
14  your rate of pay at Ruby Tuesday?
15    A.    Seven fifty an hour.
16    Q.    And what was the rate of pay
17  at Budweiser?
18    A.    Eight dollars an hour.
19    Q.    And what was the rate of pay
20  at Manning's?
21    A.    Five twenty-five an hour. The
22  minimum wage, whatever it was at that
23  particular time. I think it was five

50

1  twenty-five.
2    Q.    Okay. And I guess, is it
3  pretty recent that you're not working at
4  Ruby Tuesday anymore?
5    A.    Yes. That was back in
6  December of 2007.
7    Q.    Okay. What happened?
8    A.    Honestly I do not know. That
9  could perhaps be called discriminatory. I
10  was never warned or I was never written up
11  or suspended or counseled with the
12  management or nothing.
13    I spoke with one of the
14  customers concerning, just in general, as we
15  do when we're not as busy or I could be out
16  watching TV or something between work or
17  something, and a customer sitting there, and
18  the customers were there all the time, and
19  you get to know people all the time. And
20  they come in more frequently and you talk to
21  them about something. In some kind of way
22  that got misconstrued that I had offended
23  that person. But honestly, when I finished

51

1  talking with the person there was not
2  nothing offensive. He was not bothered by
3  anything. We had a general conversation on
4  Biblical views, life period, and he was not
5  offended by anything. And the next thing I
6  knew, I was being told that my job was in
7  jeopardy and that I needed to talk to the
8  manager. And she later terminated me. But
9  she never gave me any idea of what actually
10  happened.
11    You know, I filed a report
12  with their company concerning this issue. I
13  probably would like to sue them, to be
14  honest with you, to be totally honest,
15  because I was mistreated again. To be
16  honest with you, a lot of these jobs falling
17  apart, termination, working there for a week
18  and getting terminated is as a result of
19  hearsay from Auburn. And Auburn is -- and
20  I'll be, just be totally honest with you,
21  Auburn is a spin-off of what happened there
22  from when I worked at Mobile Infirmary
23  before I got employed, as you know, with

52

1  Auburn University. And a lot of things even
2  on the file, which you now have, a lot of
3  things Mobile Infirmary done, Auburn
4  University done. And of course in Mobile
5  you got Auburn fans, you got people who
6  graduated from Auburn, you got vice
7  president, doctors. When I worked at Mobile
8  Infirmary all we talked about was football
9  and basketball at Auburn University as well
10  as Alabama.
11    So a lot of these things sort
12  of followed me there. And Auburn University
13  kind of like followed that mold where Mobile
14  Infirmary done it, then we can do it too.
15    And to be honest with you,
16  that's what happened with Mr. Richards when
17  he asked me about the threatening
18  conversation regarding Scripture and
19  different things. It was said at Mobile
20  Infirmary that I threatened a women using
21  the exact Scripture from the Bible. No,
22  it's not my Bible: I didn't write it. I
23  didn't hang on no cross with no nails in it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

53

1  I didn't have anything to do with Jesus
2  dying two thousand years ago. So I didn't
3  say that I was going to do it, I said
4  Scripture teaches in order as I said
5  earlier, to get -- convey the message, let's
6  try to handle it in a Christian-type way.
7  And both Mr. Richards and this woman at the
8  Infirmary, were known to me as being
9  Christian people. So when I just shed the
10 Bible in on it, I was being an ordinary
11 Christian because that's the way a Christian
12 lives their life. And you're not
13 threatening them if you're saying let's see
14 if we can try. In good humor and firmness,
15 you say I live by the Bible, let's do this
16 what the Scripture teaches, and that's what
17 good people God does.
18       But a lot of things that
19 happened on these jobs, it come from, you
20 know, people wanting to follow through on
21 what Auburn did, and they know about the
22 lawsuit, and they don't want to see me get
23 the lawsuit, and they've got personal ideas.

54

1  And people are vindictive, that's why you
2  have the law.
3       Q.    Let me ask you a question
4  about something you just said. You talked
5  about Mobile Infirmary and that you had
6  quoted a particular Scripture to somebody
7  down there.
8       A.    Uh-huh.
9       Q.    What was the particular Bible
10 Scripture that you used?
11      A.    It's -- I can't recall where
12 it's found exactly now, but it is -- it
13 quotes vengeance is mine saith the Lord. I
14 will repay. That's in the New Testament in
15 one of the Apostle Paul's writings. And he
16 quotes something from the Old Testament
17 saying that what the Lord had told Israel,
18 his people, so I just rehearsed it to her.
19 I didn't say I was going to do it, I just
20 felt uncomfortable with the way I was being
21 treated. And before I overreacted in a
22 humanistic standpoint, I allowed the
23 Biblical Scripture to try to work its way

55

1  out.
2       Q.    So you were letting her know
3  that the Lord would --
4       A.    Would handle -- Instead of me
5  having to handle the situation in which I,
6  perhaps, felt like I was being harassed or
7  being mistreated, instead of me having to
8  address it saying, you're doing this, you're
9  doing that, you should not do this and this,
10 that, and the other, I wish I wouldn't be
11 treated this way, I just quoted Scripture
12 and that would calm -- It calms me down when
13 I quote Scripture, and by that same token, I
14 felt like with her being a Christian, it
15 would remind her to perhaps not -- be
16 careful as to how -- as to what she was
17 doing to offend me.
18      Q.    Okay. You -- Did it actually
19 calm her down when you said vengeance is
20 mine?
21      A.    I don't know. She didn't seem
22 to overreact. She didn't get loud or
23 boisterous or begin to weep or moan or cry

56

1  or anything. It was just like, you know,
2  she know the Scripture in the Bible, because
3  her family goes to church, so she understood
4  to -- not to allow her personal views
5  outstep her Christianity.
6       Q.    Okay. And was that the same
7  basic Bible verse that you were trying to
8  let Bud know of?
9       A.    One of them, yes.
10      Q.    What were the others?
11      A.    I can't recall them all. I
12 would have to have a Bible in front of me.
13      Q.    What was the basic intent or
14 what was the basic substance? You don't
15 have to know the exact -- I'm not asking you
16 the exact book, chapter, and verse.
17      A.    I believe that we already
18 covered that.
19      Q.    I'm not sure that we did.
20      A.    I mentioned earlier that the
21 Bible supports protection for the Lord's
22 people, and that we all are the Lord's
23 people, not just ordained, licensed

14  (Pages 53 to 56)

## FREEDOM COURT REPORTING

57

1   ministers, in one who confess Christ as
2   being the Son of God. He is the Lord's
3   people, and he has Scriptures for those who
4   would be offensive toward them, both in Old
5   Testament and New Testament. I mentioned
6   that earlier.
7       Q.   I see. Would you do me a
8   favor and try to remember the specific
9   Scripture verses, and if you can recall at
10  some time during the day, would you just
11  stop and let me know I've remembered what
12  those particular Scriptures were? Would you
13  do that?
14      A.   If I remember them, I will.
15      Q.   Sure. Okay. So we were
16  talking about Ruby Tuesday.
17      A.   I'm sorry. I might interject,
18  Ms. Dixon, and I'm sure --
19      Q.   Sonya Dixon?
20      A.   Sonya Dixon. She quoted a
21  Scripture during the meeting when she was
22  first called to meet with Mr. Richards and
23  myself and Dr. Saidla that would fit what we

58

1   were discussing now. One of the Scriptures
2   in Matthew, I believe it is, the book of
3   Matthew, talks about it's better for -- I
4   can't recall how Jesus puts that. I have to
5   have a Bible in front of me.
6       I'm trying to remember some of
7   the other things. It's better for one to
8   have had -- have a millstone put around
9   their neck and cast into the sea than for
10  them to offend one of God's people. In
11  other words, that Jesus described as -- he
12  put it in human terms for the disciples back
13  then. Something about a millstone,
14  something like a wrench or something around
15  your neck, and you're just thrown into the
16  sea, like a type of crucifixion and drowned
17  in the sea, then you offend them. And
18  that's the Scripture Ms. Dixon quoted, and
19  it is in Matthew, one of the Gospel
20  writings.
21      Q.   And when she quoted that verse
22  to you, was she saying that you were
23  offending her and that a millstone would be

59

1   hung around your neck?
2       A.   No. She was saying that in
3   my -- in my discussion with Mr. Richards on
4   Biblical issues and how he took offense as
5   to me quoting Scriptures from the Bible,
6   that that was one that I could have referred
7   to as being in the Bible meaning -- she was
8   supportive of what I was trying to tell him.
9   She wasn't saying that I was saying that was
10  going to happen to him. She was saying that
11  that's what I meant in discussing Christian
12  protection from the Lord against evil
13  people.
14      Q.   And when she said that, did
15  you agree that that was kind of the same --
16  that the principle in that verse is pretty
17  much the same as the vengeance is mine?
18      A.   Of course. That's what they
19  all mean.
20      Q.   Okay. Okay. So I think we
21  talked about Ruby Tuesday. Was there
22  anything else you wanted to add about Ruby
23  Tuesday?

60

1       A.   No. Well, perhaps other than
2   what -- that I didn't understand why I was
3   being terminated, and I didn't make a big
4   issue out of it. I didn't actually go in
5   the store. I called the manager on the
6   telephone, and she told me that I didn't
7   work there anymore. And why I don't know,
8   she didn't go into detail. And I later
9   referred to the help line in the company and
10  tried to explain what happened -- what I
11  thought had happened. And they later
12  replied that they agreed with the
13  management, about what, I'm not actually
14  sure. But I assumed it was about the
15  incident talking with the customer, and the
16  customer didn't get offensive. It was more
17  like employees had their little jealousy
18  streak on and wanted to be vindictive
19  themselves, and they done it. Which I
20  really didn't care because I was working for
21  Dollar General. And I tend to find jobs
22  easy. If you got one minimum wage job, you
23  find another one. And, of course, that's

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

61

1  why I stand firm in my faith, because I
2  believe prayer gets -- allows me to move
3  from one to the other. Not that I just want
4  a history of changing jobs every five
5  months, but yet if it occurs, then I do.
6       But as I say, you got a lot of
7  sociological ideas as well as Biblical ideas
8  that are being violated in doing all that.
9  But -- So I have to go along with it by
10 being a minister and being understandable.
11     Q.   Do you think you might file a
12 claim against Ruby Tuesday?
13     A.   No, I won't. I probably would
14 like to, but, no, it won't happen.
15     Q.   Did you talk to the EEOC down
16 in Mobile?
17     A.   Nothing like that.
18     Q.   Did you talk to a lawyer down
19 there?
20     A.   No.
21     Q.   All right. Let's talk about
22 Dollar General then. Is the only store that
23 you've worked in that store on Dawes road?

62

1      A.   No. I worked on another too.
2  It's up on Schillinger Road,
3  S-C-H-I-L-L-E-N-G-E-R (sic), doing the same
4  type job.
5      Q.   Is that kind of up there
6  around the Wal-Mart and the Toyota
7  dealership and all that? Is that the right
8  place?
9      A.   No. That one is on the corner
10 of Cottage Hill and Schillinger. Wal-Mart
11 is down closer to Airport and Schillinger.
12     Q.   Okay. How long did you work
13 at the store on Schillinger Road?
14     A.   I still do. I work at Dawes
15 Road like twenty-one hours, and I make the
16 other eighteen, nineteen hours up at the
17 Schillinger Road store.
18     Q.   Has that pretty much been the
19 set up for the whole eleven months?
20     A.   No. Before I was working --
21 When I was working at Ruby Tuesday, I didn't
22 get to work the extra hours at the
23 Schillinger Road store, because I was

63

1  working twenty-five, thirty hours at Ruby
2  Tuesday. And then after I was terminated
3  from Ruby Tuesday in December, like around
4  February, I started working at the
5  Schillinger store.
6      Q.   I see. And what's your hourly
7  wage at Dollar General store?
8      A.   Seven twenty-five an hour.
9      Q.   And what are your duties?
10 What's your job like?
11     A.   Stock. The truck comes in,
12 you unload it. You take out the boxes and
13 put it on the shelf.
14     Q.   Do you ever work more than
15 forty hours a week?
16     A.   No.
17     Q.   Do they police that pretty
18 carefully to make sure that they don't have
19 over time?
20     A.   Not really. But they just
21 remind you not to do it.
22     Q.   Have you ever worked more than
23 forty hours in a week at Dollar General?

64

1      A.   No.
2      Q.   Okay. Do you feel that things
3  are going pretty well for you at Dollar
4  General and things are getting along?
5      A.   Things are getting along. I
6  supposed to be there today and I'm missing
7  money now that I won't be able recoop. And
8  today is the day the truck comes, only
9  today. She needed me there this morning at
10 six when the truck came, or 5:30. But, like
11 I said, it works itself out. But, yes,
12 everything seems to be going fine.
13     Q.   Do you feel like your
14 supervisor or manager is pretty fair with
15 you?
16     A.   Yes. She's fine. I don't get
17 so personally involved. Like, for instance,
18 she gave me a twenty-five dollar gift card
19 for Christmas, which I was not expecting,
20 and I felt like it was too much. I asked
21 her to just give me a bag of candy out of
22 the store, two dollars and let that be that.
23 And it was twenty-five dollars was too much

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1  for her personally. Because after going
2  through all of this on jobs, I have to keep
3  my distance. And it works out better,
4  legally and everything if you just treat
5  people -- That was the problem I had with
6  Mr. Richards, he would not be professional.
7  I'd have no personal -- it was not personal.
8  It wasn't near personal, nothing at all
9  personal. I love going in and rooting,
10 rooting. I still like it. But he was too
11 unprofessional on the job, that is.
12         Now, if you wanted to take me
13 to dinner outside the job, then that's fine.
14 I'll go to dinner with men all the time, you
15 know, and sit and talk. Or go to a ball
16 game or something. That would have been
17 fine. But he was not professional on the
18 job, and you get big conflicts as you see
19 we're involved now, because of
20 unprofessionalism. If he had just spoken,
21 let's go to a game, then we could have gone
22 to a game, but not hang the job over my
23 head. But, no, Dollar General, it's not

66

1  like that. I have to just -- She gave me
2  the card, and I gave her one back too, a
3  twenty-five dollars also, so that took care
4  of that. But everything's fine.
5         Q.     So you try to keep your
6  personal kind of distance from folks at
7  work?
8         A.     Right.
9         Q.     Did you try to also do that at
10 Auburn?
11        A.     All the time. That's just why
12 they wrote up in the -- in my employee file
13 that John would never talk to us. That's
14 all I was doing. Because you're going to
15 create as you -- as you being an attorney,
16 you going to create hostile environments and
17 work environments when you overstep what you
18 should be. If a person -- Especially
19 Auburn, they're known for a lot of -- Well,
20 they're just known for being discriminatory,
21 to be honest with you. Not that I feel that
22 they personally, I feel like I was
23 mistreated that way by them, but I don't

67

1  think that they just go out discriminate on
2  everybody personally, probably because I
3  like the university. But, yes, that did
4  happen, and I'm not contradicting myself.
5  But it eliminates all of that if you just --
6  if you see a person, just don't want to get
7  over involved with them, on the job that is,
8  then you have to pretty much just be
9  professional. And if you want to go to a
10 ball game with them after the job, then he
11 could have just said, Mr. Richards being he,
12 well, John, this ain't got anything to do
13 with the job, do you want to go to a ball
14 game sometime. I would have said sure.
15        Q.     Would that have been okay with
16 you?
17        A.     It would have been perfect.
18 If you want to go to dinner or ride and
19 talk, you know after -- and state to me that
20 this has nothing to do with the job. Then
21 fine, we could have done that. But it was
22 everything geared toward if you don't do
23 what I want you to do, then I'll terminate

68

1  you. And that's why all the Scripture
2  quoting comes in, because I tried to
3  handle -- counterattack that with Scripture,
4  which is what I live in.
5         Q.     Let me jump back to something
6  you talked about earlier, Mr. Dyess. When
7  we were talking about -- I think it was
8  either Ruby Tuesday or Budweiser, it might
9  of a been Manning's. You mentioned that you
10 felt like the Auburn situation was following
11 you to your later employment. What did you
12 mean by that?
13        Well, let me reask that. I'm
14 sorry.
15        Is there some specific way
16 that you think Auburn has -- somebody from
17 Auburn has badmouthed you or said bad things
18 about you?
19        A.     Well, sort of. I can't
20 necessarily pinpoint an individual. But as
21 I said earlier, when I worked at Mobile
22 Infirmary, you had doctors, nurses,
23 anesthesiologists, and all these kind of

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

1  people who lived and -- who lived to go to
2  the ball game on Saturday, you know. And it
3  was -- I root for Auburn, I root for
4  Alabama, and I don't like you. It was just
5  a Auburn and Alabama conflict; not where you
6  couldn't work with each other, but it was a
7  feud all the time because they feel very
8  strong. And even the vice president of
9  Mobile Infirmary -- of the Mobile Infirmary,
10 his name is Alan Holly, actually he's the
11 one that terminated me when I was let go
12 there. He's a graduate of Auburn
13 University. You could see his degree on his
14 wall all the time. So I think -- You know,
15 people talk, and they -- hearsay gets -- You
16 know, Mobile is just two hours away, and you
17 come to the game where you're going to meet
18 so-and-so, I know her, I know Dr. Somebody.
19 And these things tend to -- It is a
20 sociological thing, that is, you know, you
21 get to know people. And it kind of like
22 follows you from time to time, if -- You
23 know, like in Ruby Tuesday, all the Auburn

70

1  fans will come in with their shirts on and
2  the tails and the orange hat, and Alabama
3  would come in with the red. So, you know --
4  and everybody knows -- not everybody knows
5  me, but if you know John, then you know that
6  John worked at Auburn, you know, he's trying
7  to resolve a conflict with them now, and you
8  may have personal feelings that you don't
9  exactly want that done. So that's what I
10 meant when I said that.
11     Q.    So it's not a specific
12 instance that you can point to, but you just
13 believe that by rumor, I guess, and by just
14 second- and third-hand rumor word follows
15 you around?
16     A.    From time to time. I don't
17 have a problem with it now at Dollar
18 General. I like I said, as I just stated
19 earlier, she's -- we maintain a professional
20 behavior on the job.
21     But from time to time I do
22 feel like it occurs. Because like -- For
23 instance, like I spoke about the incident

71

1  the things that happen at Mobile Infirmary,
2  they happened at Auburn University, you
3  know, exactly. And like I said, people know
4  everybody, so they tend -- you know.
5     Q.    You mentioned Alan Holly, who
6  you say was the vice president of Mobile
7  Infirmary?
8     A.    Yes. One of the vice
9  presidents there.
10     Q.    And I don't know him, I've
11 never talked to him, but you say he
12 terminated you?
13     A.    Yes.
14     Q.    Did you feel that that was
15 discriminatory?
16     A.    In a way. It didn't make any
17 sense. Because, once again, I had not -- If
18 I quote a Scripture to you, it's not my
19 Scripture. And I'm only trying to make --
20 It's contradictory to have Christian
21 organizations within a business, for
22 instance, Mobile Infirmary has a chaplain,
23 and he goes around from different

72

1  departments as well as patients' rooms. Of
2  course, at hospitals, you got ministers
3  coming in all the time. And they uphold the
4  Biblical beliefs of the Bible, then it's
5  contradictory for them to have that in the
6  same way it was at Auburn. They had this
7  religious Baptist church group, Baptist, I
8  think it was, who come over once a week,
9  bring truckloads of food and they preach --
10 while you're eating, they preach thus saith
11 the Lord. Then it's contradictory for you
12 to say that I'm threatening you if I'm
13 sitting there listening to the Word of God.
14 I could have got the Scripture I quoted to
15 Mr. Richards from that same group that meets
16 right down the hall from Dr. Saidla's
17 office. I mean, I didn't have to read it in
18 the Bible at all. I could have got that
19 from sitting there eating their food and
20 listening to them.
21     Q.    Let's stick with Mobile
22 Infirmary here for just a second. The
23 question I asked you was: Did you feel like

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

73

1  it was discriminatory when Alan Holly
2  terminated you from Mobile Infirmary?
3        Let's take race
4  discrimination. Did you feel like it was
5  racially discriminatory?
6        A.    No, not really. They may have
7  their own ideas, but personally to say that
8  that's what actually happened, no.
9        Q.    Do you feel like it was
10 religiously discriminatory? I don't know if
11 that's a word or not, but you know what I
12 mean.
13       A.    Sort of, yes.
14       Q.    I think I get what you are
15 saying now: If Mobile Infirmary has a
16 chapel, they try to uphold Biblical beliefs,
17 but then when you say -- when you quote a
18 Bible verse, then they let you go, then you
19 feel like that's sort of inconsistent?
20       A.    Yeah. Well, now, they would
21 say that it was a number of things that led
22 up to it, of course. And of course, like I
23 said, you read the file so you know what's

74

1  on there.
2        But that was the main
3  highlight of me telling her that Scripture.
4  Because thereafter -- thereafter, every
5  little thing I done was scrutinized. And
6  like I say, you get into that sociological,
7  I don't like him or her, this kind of thing,
8  and we're going to get rid of him. But I
9  know -- I can't call it -- I wouldn't call
10 it racial, because perhaps at that time I
11 was much younger and not as aware of the
12 law. But personally, I don't think Mobile
13 Infirmary discriminated against me racially.
14 It was a great misunderstanding concerning
15 my Christian beliefs or my quoting a
16 Scripture to her. So whatever you want to
17 term that, then that's the way you -- we can
18 view that.
19       Q.    I'm sorry. I didn't -- Do you
20 feel that what happened at Mobile Infirmary
21 is pretty similar to what happened at
22 Auburn?
23       A.    It was exactly. As I

75

1  mentioned earlier, Mr. Richards -- John --
2  the minute I quoted Scripture to him, we had
3  already had previous discussion about the
4  Bible. I told him I was a minister, he
5  asked me what I was doing -- what I did, I
6  told him what I did, I stated that earlier.
7  So he knew I was a minister. And we had a
8  religious discussion on Scripture. He told
9  me his father-in-law was a minister, and he
10 attends church, and blah, blah, blah, blah.
11 And he lives in the city.
12       But when he said -- When I
13 quoted Scripture -- When I said let's try
14 not to -- let's try not to get into -- let's
15 be careful about the way we treat one
16 another, because, you know, you create the
17 wrong environment, all that kind of thing
18 which I mentioned earlier, he immediately
19 said, are you threatening me. And that's
20 where that came from, Mobile Infirmary. The
21 minute I said the Scripture to her, she felt
22 like -- and others around her did -- like I
23 had threatened her. And I did not -- Once

76

1  again, I don't understand how you threaten
2  somebody with somebody's word. You know, if
3  you tell me you're going to do something to
4  someone then you say I didn't -- it's not me
5  saying it. It's not like I said I'm going
6  to go get a stick or something.
7        But -- So, yes, I feel like
8  Mobile Infirmary just sort of just followed
9  me right to Auburn University. And I
10 already explained why about people being --
11       Q.    Let me ask you though: I
12 mean, the Bible is the Word of God; right?
13       A.    Uh-huh.
14       Q.    And when you quote the Bible,
15 it's not John Dyess's words, but it's God's
16 word; correct?
17       A.    Preaches every Sunday.
18       Q.    You preach the Word.
19       Surely you can understand how
20 maybe someone who doesn't understand the
21 Bible the way that you do, might be offended
22 or might misunderstand when you say,
23 vengeance is mine or vengeance is mine says

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

77

1  the Lord. Can you understand how someone
2  would misinterpret that?
3      A.   Not really. Because, as I
4  said earlier, Mobile Infirmary and Auburn
5  University have church organizations that
6  come over. And those ministers, especially
7  at Auburn University, that church would have
8  a big -- you could hear the minister
9  preaching a mile from it. And it was on the
10  inside of the vet school. I mean, you could
11  hear it all over the vet school just about.
12  And he would lay down what thus saith the
13  Lord to those students, as well as the
14  employees. So, no, I cannot understand
15  that. Plus, as I said earlier, Ms. Sonya
16  Dixon somewhat agreed. She said that she
17  understood that I meant that by discussing
18  with Mr. Richards regarding my Christian
19  background as well as his. Mr. Richards and
20  I had pretty much became somewhat
21  acquaintances as if we were at a church
22  together. I had already -- we had clarified
23  that he goes to church, his father-in-law is

78

1  a minister like I am, I understand the Word.
2  He and I pretty much became patriarchs. So,
3  no, I didn't just quote it like, God going
4  to get you. I did not quote it that way.
5          He only jumped to the
6  conclusion, because, as I just told you
7  earlier, Mobile Infirmary followed the same
8  way.
9      Q.   So you think that -- Let me
10  ask you: Do you think that Bud knew what
11  had happened at Mobile Infirmary?
12      A.   They all do. I would say yes.
13  Quite a few people there, because I just
14  mentioned why earlier.
15      Q.   All right. Let me ask you
16  about your personal beliefs about
17  homosexuality.
18      A.   Okay.
19      Q.   What are your beliefs about
20  homosexuality?
21      A.   It's wrong.
22      Q.   Same for bisexuality?
23      A.   Of course.

79

1      Q.   How wrong is it?
2      A.   What do you mean how wrong is
3  it? It's either right or it's wrong.
4      Q.   Okay. Does the Word of God
5  speak to that?
6      A.   Yes.
7      Q.   Okay. Do you know the
8  specific verses or can you quote specific
9  verses related to that?
10      A.   There is a Scripture in --
11  Actually there's several Scriptures
12  throughout the New Testament, writings of
13  the Apostle Paul, that speaks of the deeds
14  of men. And if I had known, I would have
15  brought my Bible with me. But you can
16  understand, having so much legal
17  mumbo-jumbo, I can't remember the Scripture
18  right now; plus I'm getting older.
19          But there's several places in
20  the New Testament writings that will
21  support, as well as Sodom and Gomorrah in
22  the Old Testament, in the book of Genesis.
23  And, of course, the Bible speaks of laying

80

1  man with man being wrong. But, yes, it's
2  supported thoroughly.
3      Q.   Okay. Do you believe that
4  Mr. Bud Richards has homosexual desires?
5      A.   I don't know for exactly. I
6  can't say that yes, he is a homosexual. All
7  I can say is that he was very overreactive
8  when it came to getting close to me. That's
9  not a psychological problem. I can put my
10  arms around a man as well as a woman and not
11  feel anything or feel something.
12          As I just stated earlier, he
13  and I could have went to a ball game
14  together and sat up there like we were
15  buddies. He didn't have to -- He didn't
16  have to make it seem like he wanted to be
17  over -- get involved with me sexually. He
18  could have just been my friend and by going
19  to a ball game, I can grab -- I grab people,
20  men all the time at church. For instance,
21  watch sports like NBA, NFL, all they do is
22  hug. And they're on TV.
23          So in that instance, yes, I

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

81

1 can allow that to be. You know what I'm
2 saying? I'm not that kind of a type person.
3 I've got people now that I could probably
4 grab and get -- and caress, both male and
5 female. But to say that Mr. Richards is
6 actually that, I believe he's married and
7 have children. I don't actually think -- I
8 wouldn't think that he would be. But I
9 would feel -- I'm not lying when I said in
10 my report that you have, that he tried to
11 touch and did touch me inappropriately, as
12 well as tried to ask me out and get to know
13 me better and I -- saying I admire you after
14 two days of knowing. You know, if a
15 Scripture from God can be misunderstood and
16 by me quoting it to him, then I can
17 misunderstand him doing all that, and him
18 being a heterosexual.
19    Q.    Do you think that he wanted to
20 be involved with you sexually?
21    A.    Yes.
22    Q.    Okay. That is your belief,
23 that he wanted to be involved with you

82

1 sexually?
2    A.    That is my belief, of course.
3    Q.    That would make him
4 homosexual, wouldn't it?
5    A.    No, not necessarily. Some men
6 are just -- Some people are just that way
7 sometimes. You know, you just want to try
8 something; you may not be that, but you just
9 wanted to try it. And, you know -- You know
10 a lot of this stuff -- see, now -- and this
11 is going to take so long.
12       But a lot of this stuff comes
13 from the religious views that I was trying
14 to expound on regarding hostile environments
15 and the wrong kind of environments,
16 working-type of environments to the
17 University, to the vet school. If a person
18 knows John Dyess being a minister at a
19 Baptist church there in Auburn, and most
20 people who attend church know that ministers
21 have the ability or are supposed to be able
22 to pray and lay hands on people and heal the
23 sick; correct?

83

1       Then that would give them the
2 idea that they can get close to John being
3 the minister; not just John alone, now.
4 Billy Graham, other preachers too. I ain't
5 the only one saying I got all the power.
6 That would give them the mentality that they
7 can use John's ability through Jesus Christ.
8 And nowadays, you have people throughout
9 society, we feel that all we got to do is
10 get next to a person who is saved and feel
11 with the anointed spirit of God, presence of
12 God, because all individuals receive the
13 presence of God according to the Bible, and
14 that will allow them to be able to do the
15 same thing, prayerfully speaking, that the
16 saint of God -- that the believer of God
17 would do.
18       So, see, when you ask me do I
19 feel like Mr. Richards is homosexual, well,
20 I would say perhaps or perhaps not. But
21 that does not rule out that he wanted to
22 get -- that he was willing to overstep his
23 bounds of marriage, as well as heterosexual

84

1 in order to obtain this ability, so to
2 speak, that the Spirit of God does through
3 the believer. And that can be supported in
4 the Scripture. And of course I know that
5 don't mean much to you, because I can't
6 quote it right now. But that can be found
7 to be supportive through the Bible and from
8 a prayerful viewpoint.
9       So, no. I mean, I may or may
10 not be able to say whether he was
11 homosexual. But people in society try that,
12 they try to -- You know, they want Spirit of
13 Christ on them, especially when you don't
14 want to be a dedicated Christian. Like I
15 preach and witness to people all the time,
16 and the only thing they want, they want the
17 truth of being a believer, but they don't
18 want the service and the dedication that it
19 takes. You don't want to stop and live
20 wrong, but you want all the abilities and
21 all the privileges of living right for
22 Christ.
23       So, see, people at the vet

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  school know me to be the minister, and they
2  know me -- I even told Ms. Dixon, as well as
3  some other lady from the human resources, I
4  can't recall, she probably can tell you --
5      Q.    Michelle Martin?
6      A.    Not her. Not referring to the
7  action. I can't recall this lady's name.
8  The day after we met -- After we met, the
9  initial meeting with Ms. Dixon and
10  Dr. Saidla and myself and Mr. Richards, like
11  a couple of days -- a week or so later, I
12  met with Ms. Dixon and some other lady
13  alone. And I don't think it's in the report
14  either of -- either one of us have. But
15  anyway, we met and we discussed nothing but
16  Biblical stuff of what I feel and what they
17  viewed and what the Bible says about prayer,
18  healing the sick, and all these things as
19  well as what Jesus did and what the people
20  of God still possess today. That's all we
21  talked about.
22          Now, that's not in the report,
23  but we did discuss that, just Ms. Dixon and

86

1  some other lady. That was right before the
2  meeting that Mr. -- that Mr. Albert Snipes,
3  Ms. Dixon, and myself had that sent me to
4  psychological care. But, now, the only two,
5  three people was at that particular meeting
6  was Ms. Dixon, some other lady -- and I
7  don't recall who this lady was -- and
8  myself. And in that meeting we discussed
9  all of this. We talked about what did you
10  mean -- like, for instance, in the book of
11  Exodus, it talks about Moses, the prophet of
12  God, being the leader of God's people
13  Israel, and they were fighting a battle
14  against the Hittites or Ammonites, one of
15  those of a different type who weren't
16  necessarily God's people.
17          And the more Moses held up his
18  hand, like I just held up my hand to give
19  the -- earlier, that Israel prevailed over
20  the enemy. But when he let his hand down,
21  the enemy prevailed. And that's in Exodus
22  in the Bible. And she and I discussed all
23  of that in great length. We stayed there

87

1  about and hour or so, she, myself, and some
2  other lady that was from human resources.
3          So, see, that's what I mean
4  that, no, not necessarily Mr. Richards
5  wanted to necessarily be homosexual. But if
6  he got that kind of mind to try to get the
7  spirit of Christ -- And you may not be aware
8  of it, and that's not a personal insult, but
9  people nowadays want the spirit of Christ in
10  order to feel that they can perform miracles
11  and do different things. And that's what
12  I'm finding, as well as we're finding in our
13  evangelistic-type work among young people as
14  well as older adults. So, see, that would
15  be the mentality and that would perhaps be
16  the reason why he would allow himself to get
17  too nonprofessional with me on -- within the
18  work environment.
19          Now, if he was my friend or
20  you or anyone else was my partner, then what
21  we did outside that university or the
22  workplace was a different thing. And as I
23  mentioned, we could have went to church

88

1  together, we could have went to a ball game,
2  you could have came to the house, we could
3  have ate, laughed, talked. Okay. Well I
4  would have grabbed and hugged them and
5  choked them in a friendly type way. But to
6  just stand over me as your Lord and master
7  like the job, either you're going to let me
8  kiss you to get too close to you or touch
9  you inappropriately and to do that within
10  that job and to put me in the situation that
11  I'm in now, is very highly illegal.
12      Q.    That was a mouthful.
13      A.    Thank you.
14      Q.    And I appreciate that. Let me
15  ask you a few things in follow-up with that.
16  My original question was: Did you feel like
17  Bud had homosexual desires or bisexual, if
18  you wish?
19      A.    Okay.
20      Q.    And it sounds like you're not
21  ready to say he's really homosexual, but
22  that he might have just wanted to get close
23  to you to get some spiritual influence, have

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

89

1  some spiritual power in his life.
2       Is that basically it in a
3  nutshell of what you just said?
4       A.    My answer is whether or not
5  he's homosexual, I don't know.  But what I
6  reported to human resources, as well as in
7  my reports that you now have regarding of
8  his doing, his inappropriate homosexual
9  behavior viewed as homosexual behavior, then
10 that's what happened.  I do not -- cannot --
11 again, I do not know whether he's homosexual
12 or bisexual or not.
13      Q.    Okay.
14           MR. DETTLING:  Why don't we
15 take a quick break.
16           (Recess taken.)
17      Q.    Mr. Dyess, did Mobile
18 Infirmary ever ask you to go to any
19 psychological counseling or evaluation?
20      A.    No.  I was given the idea once
21 by one of the nurse supervisors.  She felt
22 like -- She told me if I felt like I needed
23 counseling, due to strain and stress of life

90

1  or something of that sort.  But, no, they
2  never told me that they recommended or
3  anything like that.
4       Q.    So did they kind of offer it
5  to you?
6       A.    Of course not.
7       Q.    No, they didn't offer it to
8  you?
9       A.    No.
10      Q.    What was the nurse
11 supervisor's name?
12      A.    Nancy Helton.
13      Q.    Nancy Helton.  Was Ms. Helton
14 suggesting to you that you might want to get
15 some counseling?  What was she trying to do?
16      A.    I can't recall exactly.  But I
17 do remember -- actually I read it on the
18 file that you sent me because it was so long
19 ago that it occurred.  I believe it was just
20 normal circumstances.  It had nothing to do
21 with my behavior on the job.  I believe it
22 was just that if I was just overstrained of
23 any sort, mentally, that, you know, that

91

1  counseling is good to talk to or something
2  of that behavior -- something of that
3  nature.
4       Q.    Did Ms. Helton suggest a
5  particular person, a particular counselor?
6       A.    Nothing like that.  That was
7  all she said.
8       Q.    What did you say back to her?
9       A.    I can't recall saying
10 anything.  I probably told her it wasn't
11 necessary.
12      Q.    Okay.  Mr. Dyess, are you
13 familiar with a man called Yahweh ben
14 Yahweh?
15      A.    Who?
16      Q.    Yahweh ben Yahweh?
17      A.    I'm familiar with the name
18 Yahweh, but not Ben Yahweh.
19      Q.    Yahweh is the Hebrew name for
20 God, the Lord?
21      A.    Uh-huh.
22      Q.    You're not familiar with the
23 preacher Yahweh ben Yahweh?

92

1       A.    No.
2       Q.    He's a preacher.  I just
3  didn't know if you know him or not.
4       A.    No.
5       Q.    We talked about Mobile
6  Infirmary and your employment there.  You
7  were employed there for about ten years; is
8  that correct?
9       A.    Exactly.
10      Q.    And you were terminated by
11 Alan Holly, we talked about that.  According
12 to my understanding, Mr. Dyess, you were
13 employed by the University of South Alabama
14 Medical Center, I think --
15      A.    Right.
16      Q.    -- for a couple of years
17 before that, do you remember?
18      A.    Yes.  I was employed with
19 U.S.A. Medical Center for seven years.
20      Q.    Did you resign from the
21 University of South Alabama or were you
22 terminated?
23      A.    I resigned.

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

93

1    Q.    And why did you resign?
2    A.    To attend the university.
3    Q.    To attend the university?
4    A.    Right.
5    Q.    And is that when you started
6 classes at the University of South Alabama?
7    A.    No. I started earlier, like
8 three or four years, about I was -- I wanted
9 to go full time, so I -- along with
10 minister-type things, so I stopped working.
11    Q.    Okay. And between the time
12 that you were let go from Mobile Infirmary
13 and when you started at Auburn, did you have
14 another job in between Mobile Infirmary and
15 Auburn?
16    A.    Yes. I worked for Service
17 Master, it's a cleaning company. And I
18 believe I worked for Budget Rent-A-Car for a
19 few months, also. Both of them was just for
20 a few months because I was terminated -- I
21 was terminated from Mobile Infirmary in
22 200- -- the year 2000 around October, and I
23 came -- I went -- I started working for

94

1 Auburn University temporarily, part-time in
2 July of the following year. So it was just
3 for a few months.
4    Q.    And where was the office for
5 Service Master?
6    A.    Airport Service Road, Mobile.
7    Q.    Airport Boulevard service
8 road?
9    A.    Uh-huh, service road.
10    Q.    About where on Airport
11 Boulevard in relation to the airport? Was
12 it closer to the airport or closer to I-65?
13    A.    It was closer to I-65 near Bel
14 Air Mall.
15    Q.    And how long were you employed
16 with Service Master?
17    A.    Nine months.
18    Q.    And did you resign or were you
19 let go from Service Master?
20    A.    I resigned.
21    Q.    Is there a particular reason?
22    A.    I came -- went to Auburn and
23 started working.

95

1    Q.    Okay. And Budget Rent-A-Car,
2 how long did you work with Budget
3 Rent-A-Car?
4    A.    Let's see. I worked for them,
5 I want to say, six months.
6    Q.    Okay. And what was your job
7 with Budget?
8    A.    Detailing, cleaning, driving
9 cars from one lot to the other, whatever the
10 position is. I can't recall exactly what
11 the position was.
12    Q.    And did you resign or were you
13 let go?
14    A.    I believe it was more like
15 both of them. We was on the same grid that
16 I needed to just leave it alone.
17    Q.    Okay. Did you feel like it
18 was discriminatory?
19    A.    No.
20    Q.    They didn't treat you in a
21 discriminatory way?
22          Where was the office of Budget
23 Rent-A-Car? When you went to work in the

96

1 morning, where did you go?
2    A.    It was on -- At that
3 particular time it was right across from the
4 airport on Airport Boulevard.
5    Q.    Okay. Have we talked about
6 all of your different jobs that you've had?
7    A.    I believe so.
8    Q.    Okay. I think you mentioned
9 before -- I might have misunderstood you,
10 and if I did I'm sorry. I think I
11 understood you to say earlier that you were
12 also a minister at a Baptist church in
13 Auburn?
14    A.    My membership is as a member
15 of a Baptist church in Auburn, Lakeview
16 Baptist Church; I'm not the minister. But
17 as I stated earlier, once you're licensed,
18 ordained, and called, it's important
19 statement, you're always the minister. If
20 you're faithful to being -- faithful to
21 being a Christian, you're still a minister.
22    Q.    So you weren't a minister
23 particularly at Lakeview Baptist Church?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

1    A.    No.
2    Q.    You're just a minister in your
3  every day, all the time?
4    A.    I was a minister because
5  Nazarene Baptist Church in Mobile licensed
6  and ordained me to be a minister. And by me
7  residing in Auburn, I united with Lakeview
8  as well as several other churches. But we
9  don't want to get into all of that.
10          I united with Lakeview Baptist
11 Church as a member, but I was a -- I am a
12 minister because one, God, the Lord, called
13 me to be a minister; and, two, Nazarene
14 Baptist Church licensed and ordained me to
15 be the minister.
16   Q.    Is Nazarene where you attend
17 church on Sundays?
18   A.    No. I haven't been there for
19 a while.
20   Q.    Where do you normally attend
21 on Sundays?
22   A.    Several places. Several
23 churches, as I mentioned earlier, there is a

98

1  type of ministerial type work, they have
2  people or ministers who visit, go around,
3  and to encourage the minister or the pastor.
4  And it's something, a type of minister-type
5  job I do, so I'm not necessarily at one
6  particular one all the time. But I believe
7  my membership with Lakeview is still intact,
8  because they still send me mail every month,
9  so I believe I'm still a member there.
10   Q.    I understand it's not one
11 particular church. But, you know, can you
12 narrow it down to two or three in the Mobile
13 area that you typically worship with,
14 interact with, and minister in?
15   A.    Sure. I attend Dauphin Way
16 Baptist Church, I attend Cottage Hill
17 Baptist Church. All these places I mostly
18 worship, unless at a particular point I want
19 to get involved with or encourage the
20 congregation or a particular person, such as
21 the pastor, so I attend both of those.
22   Q.    Is there any other?
23   A.    Not really. It's not any

99

1  more, no, sir.
2    Q.    Okay. So on most Sunday
3  mornings, I guess, you would be either in
4  the pews at Dauphin Way or Cottage Hill
5  Baptist Church?
6    A.    Yes.
7    Q.    Okay. And if you were not in
8  one of those two churches, you'd be sleeping
9  in or --
10   A.    I would go somewhere else.
11   Q.    Okay. If you were going
12 somewhere else, what would be your third
13 choice?
14   A.    I can't state it. I don't
15 know. I mean, it depends on -- It all
16 depends on where -- I may meet someone, they
17 may say come visit us, or something like
18 that, so I can't really say.
19   Q.    Where'd you go last Sunday?
20   A.    Dauphin Way.
21   Q.    Where are you going to go next
22 Sunday?
23   A.    I don't know.

100

1    Q.    Okay. What's the pastor's
2  name at Dauphin Way Baptist Church?
3    A.    I can't recall his last name.
4    Q.    Do you know his first name?
5    A.    Clint something.
6    Q.    Do you know the pastor's name
7  at Cottage Hill Baptist Church?
8    A.    No.
9    Q.    Okay. Somewhere, Mr. Dyess,
10 and I can't recall where I'm recalling this
11 from, somewhere, did you tell someone at
12 Auburn that something had happened to you at
13 age sixteen, some sort of anointing or
14 spiritual awakening that you had at age
15 sixteen?
16   A.    I don't think we need to get
17 into all that because as it would take --
18 make this discussion longer than necessary.
19 Because as I referred earlier, that would be
20 more of a personal testimony of some sort,
21 and it has nothing to do with Auburn
22 University, my discussion with Mr. Richards,
23 and anyone else that would have been

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

101

1   involved in this lawsuit.
2          But it has all Scripture
3   reference and, you know, the idea here is
4   not to make me out to be some kind of
5   witchcraft worker. The idea is to try to
6   figure out why we're here to solve -- come
7   to grips about why I am here. So I don't --
8   That would be more of a personal thing, and
9   it has nothing to do with Auburn University.
10      Q.   Well, it does, Mr. Dyess
11  because you told it to Mr. Richards, and you
12  are claiming Mr. Richards discriminated
13  against you, and you are claiming religious
14  discrimination in this case. So it is
15  relevant to this case.
16         Can you not just summarize it
17  in two or three sentences and maybe we can
18  come back to it if we have time?
19      A.   No, I cannot sum it up in two
20  or three statements. I cannot sum it up
21  period, because you would ask -- you're
22  asking me to compromise or to tell you
23  something that's already in the Scripture.

102

1   And I'm not going to discuss people's views
2   and ideas. And that's not being not -- I'm
3   not just seeming like I don't want to answer
4   questions, but I pretty much have already
5   clarified that already. It was in the Bible
6   and a religious Christian is pure field, and
7   that would take care of that. So we can't
8   stretch my religious views out any more than
9   what we've already stretched them.
10      Q.   Well, I'm not trying to make
11  you out to be any kind of witch doctor.
12  Here is what I'm going to do: I'm going to
13  pass over this for now, you're refusing to
14  answer my question. We're going to pass
15  over this for now. And if we have time, I
16  may come back to it. But if you refuse to
17  answer it at that time, then we may have to
18  leave your deposition open so that the Judge
19  can have a chance to clarify whether we do
20  or don't cover this area.
21      A.   Let's get it on over then if
22  it's that important.
23         I do not know anything that I

103

1   referred to him about a situation,
2   especially Mr. Richards, I don't think I
3   would have told him all of that, especially
4   when you look at the way he treated me.
5   What would be the point to try to explain
6   all that to him? I did not threaten him, I
7   did not say -- and I stated earlier, I did
8   not have any special powers other than what
9   the Bible outlines for any individual who
10  chooses Christ.
11         So I don't think I went as far
12  as saying that I'm some type of magical
13  worker. If you don't do as I say, that I
14  could manipulate and have this done that
15  way, other than the Scriptures that already
16  support it. Like the one with Aaron and
17  Moses and the battle between Israel, as well
18  as any other commonsense Scriptures that's
19  in there. But to clarify and get all this
20  over with, I cannot recall anything that I
21  told Mr. Richards regarding me and my
22  experiences, especially Mr. Richards, and
23  anyone else at Auburn University.

104

1       Q.   What happened to you at age
2   sixteen?
3       A.   Nothing happened to you, me at
4   sixteen. I was called. I could have seen a
5   vision or a dream or something from the Lord
6   and decided to become a more dedicated
7   worker to him. Does that clarify it enough?
8       Q.   I think that helps. That
9   helps.
10         Why were you telling Bud about
11  this?
12      A.   I was not telling him about
13  this. I don't recall telling him about
14  anything at sixteen or an experience like
15  that. Because see -- And you're asking me
16  to repeat statements I already discussed.
17         I said earlier, Mr. Richards
18  was leaning on me to -- like he wanted to
19  get too inappropriate with me. I felt very
20  uncomfortable with him. He and I was in a
21  room together, I was cleaning and no one
22  else was in the room. It was a room where
23  not too many people frequent -- went through

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

105

1  there very often.  It was off to itself so
2  to speak, with no animals or dogs been in.
3  And every time I moved, there he was, too
4  close to me, like we could have just held
5  and kissed.  And I was trying to avoid the
6  distance right here being terminated and
7  having to go through this ordeal.  And I
8  started trying to relay the Christian side
9  of me as he kept asking me my personal life.
10  So, no, I -- But to say that I stated to him
11  about sixteen, all these things, I did not
12  tell him anything like that.  Now, he
13  probably heard it from someone else as I
14  just stated by the sociological perspectives
15  of how people view.
16      People have Billy Graham and
17  other -- Billy Graham other ministers' lives
18  are public because they come on TV.  And in
19  that sense my life is public, because I'm
20  the minister, if that's why I don't always
21  go to a particular church all the time,
22  because I don't necessarily need people's
23  views and people's ideas interfering with

106

1  what I'm trying to accomplish.  So that's
2  why I'm pretty much just a normal everyday
3  go person -- go to church on Sunday person
4  and not just a particular officer at one.
5  Because right now I'm trying to do other
6  things within the community and society and
7  not get people involvement.
8      But, no, that's probably where
9  you got that from, other people who know of
10  me, the minister.  And, no, I did not
11  discuss all that with him in detail.
12      Q.   Okay.  Well, I'm not sure that
13  you've really answered my question, but
14  let's move on to something else.
15      Mr. Dyess, do you have a
16  concealed weapons permit?
17      A.   No.
18      Q.   Have you ever had a concealed
19  weapons permit?
20      A.   No.
21      Q.   Do you own any weapons or
22  firearms?
23      A.   No.

107

1      Q.   Have you ever brought any kind
2  of weapons on to Auburn property?
3      A.   No.
4      Q.   Do you subscribe to any
5  magazines about guns or knives or weapons or
6  anything like that?
7      A.   No.
8      Q.   How did you decide to apply
9  for a job at Auburn?
10      A.   I've always been a fan.  I
11  wanted to work there, and I just decided I
12  wanted to work there -- move there and work
13  there, and I did.
14      Q.   Did you have any acquaintances
15  or family --
16      A.   No.
17      Q.   -- in Auburn?
18      A.   No.
19      Q.   Any family acquaintance that
20  ever worked at Auburn before?
21      A.   No.
22      Q.   You just decided, hey, I'm
23  going to go?

108

1      A.   Yes.
2      Q.   And how did you learn of job
3  openings that they might have at Auburn?
4      A.   They had a website, I believe
5  they still do, as well as telephone
6  communication.
7      Q.   Okay.
8      A.   But they have a job listing
9  that will come on the telephone.
10      Q.   At the time, and I guess this
11  would have been about 2000 or so, 2001, did
12  you have your own computer with Internet
13  access?
14      A.   Possibly.
15      Q.   Somehow or another you got on
16  the Internet and found an Auburn job
17  website?
18      A.   Yeah.  Or some other public
19  computer somewhere.
20      Q.   Okay.  And I understand that
21  you were first a temporary employee; is that
22  right?
23      A.   Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

109

1    Q.    And then that was for a couple
2  of months, and then you became kind of a
3  full-time regular employee?
4    A.    Right.
5    Q.    Okay.  When you first started,
6  who was your supervisor at Auburn?
7    A.    As a temporary?
8    Q.    Sure.
9    A.    I can't remember the man's
10 name.  He was in Fisheries, the Department
11 of Fisheries.  I can't recall his name.
12   Q.    Was it Junior Ledbetter?
13   A.    No.  He came after -- with the
14 permanent part.
15   Q.    Okay.  So while you were
16 temporary, you had a separate supervisor in
17 the Fisheries area?
18   A.    No.  I began working in the
19 Department of Fisheries, that lasted a
20 couple of months; and then that was just
21 like supposed to have been like just for the
22 summer.  And then after that ended, I
23 received a job with Mr. Ledbetter being a

110

1  supervisor, I was still temporary for like
2  four or five months, and he got me on as
3  permanent.
4    Q.    Okay.  So you started in
5  Fisheries?
6    A.    Right.
7    Q.    And then you moved to the vet
8  hospital, I suppose?
9    A.    Yes.
10   Q.    And when you moved to the vet
11 hospital, Junior Ledbetter was your
12 supervisor at the very first?
13   A.    That is correct.
14   Q.    And you were temporary for a
15 little while at the vet hospital, and then
16 you became regular or permanent at the vet
17 hospital?  Do I have that kind of correct?
18   A.    That's correct.
19   Q.    And when you became regular or
20 permanent, or whatever it was, at the vet
21 hospital for a while there, at first, Junior
22 Ledbetter was your supervisor?
23   A.    Supervisor at first, right.

111

1    Q.    How long was Junior Ledbetter
2  your supervisor altogether at the vet
3  hospital?
4    A.    Maybe -- Let's see.  Maybe a
5  year, within a span of three to twelve
6  months.
7    Q.    Okay.  Did you feel like
8  Mr. Ledbetter was pretty fair with you?
9    A.    No.  Not really, no.
10   Q.    Okay.  In what way was he
11 unfair?
12   A.    Mr. Ledbetter is, or was at
13 that particular time, viewed by many people
14 as being prejudiced.
15   Q.    In a racial sense?
16   A.    Uh-huh.
17   Q.    Was he a white man?
18   A.    Of course.  Of course I don't
19 have a problem with people wanting to be
20 prejudiced.  As you can see I can talk and
21 be nice and kind all at the same time and
22 don't allow your ways of getting under my
23 skin.  But here is what we're -- where his

112

1  hands were on my shoulder.  You could tell
2  that he put that.
3         Now, he was professional but
4  yet he acted discriminatory at times.  Not
5  just me, but -- I didn't really just zero in
6  on his discriminatory behavior.  But most of
7  the African-American people always viewed
8  him as being discriminatory.  I appreciate
9  him for hiring me, and I didn't think -- I
10 really didn't look at his discriminatory
11 ways, but some of them were just too much
12 to -- too much at times for any employee
13 that was African-American, you know,
14 overall.
15   Q.    Okay.  Did he ever look at you
16 in any way or touch you in any way or speak
17 to you in any way?
18   A.    Of course not.  He was nothing
19 like that.
20   Q.    There was nothing about Junior
21 where you felt like he was trying to become
22 intimate with you in any way or anything
23 like that?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

113

1    A.    No.
2    Q.    Did you ever make any kind of
3  complaints about discrimination by Junior
4  Ledbetter?
5    A.    No.
6    Q.    Who was your supervisor after
7  Junior Ledbetter?
8    A.    Mary Teffend of ICU.
9    Q.    How did things go while you
10 worked with Mary Teffend?
11   A.    As her employee, from my
12 views, I was -- from my views, I was
13 comfortable. Now, her employees, Mr. Cox
14 and a few others, they had their ways, and
15 that's what we're dealing with within this
16 lawsuit. They had their views and their
17 ways and what they wanted to see get done,
18 what they thought I should be doing, and
19 their personal tactics that they wanted to
20 exercise.
21   Q.    You mentioned Mixty Cox, who
22 else? Who else are we talking about in
23 this --

114

1    A.    Well, I can't recall all of
2  them. Mixty just one of them I remember.
3  Because -- For instance, Mary, in her
4  playful type way, would try to fix me and
5  Mixty up as dates, you know. She invited me
6  to a Christmas party once, and I really
7  didn't want to go, as you can tell, I'm not
8  -- I'm very professional on the job. But
9  she invited me to a Christmas party that was
10 to be held at her home, Mary Teffend's home.
11 And Mary, she would drop little lines like,
12 Mixty kind of likes you a little bit, you
13 ain't got no girlfriend, or just in normal
14 comfortable behavior. And that kind of led
15 to a lot of different strife and different
16 uncomfortable situations. You know, if you
17 don't want to get involved with somebody and
18 they just determined to get involved with
19 you, it makes you uncomfortable. And it
20 creates -- You personally come up with all
21 kinds of ideas if you out to get them, and
22 even if you just like them a lot and they
23 don't necessarily like you, you come up with

115

1  all kinds of ideas and ways and behavior
2  patterns if that's what's in your mind.
3        I'm not saying that I was
4  psychologically uncomfortable, but I always
5  tried to maintain professionalism, even with
6  the students as well as with the employees.
7  But, see, the standards are so relaxed
8  there, until it's do what you want to do all
9  day long, and, you know, it's, you know, who
10 cares. No one's not going to say anything.
11 So, you know.
12   Q.    All right. Let's talk about
13 Mixty Cox for a second. Do you believe that
14 Mixty Cox wanted to become more involved
15 with you?
16   A.    Not necessarily, no. I think
17 that, you know, maybe she just wanted to be
18 friendly as a friend. Like I said, Mary
19 kind of dropped the idea -- we was at the
20 party and Mary kept saying John, sit next to
21 Mixty, y'all talk. It was just casual
22 stuff. But no -- I don't think personally
23 she tried to.

116

1        At times she seemed like she
2  was trying to --
3    Q.    She, being Mixty?
4    A.    Yeah, she being Mixty. You
5  know, perhaps within my reporting that, I
6  failed to say that Mary, with all her mixing
7  up stuff or stirring up Kool-Aid or some
8  type of drink, all that came about was that
9  it seemed like Mixty was trying to date me.
10 But it was really Mary trying to encourage
11 it to be. So I don't think necessarily that
12 Mixty -- to say exactly Mixty was trying to,
13 you know, get my clothes off, no. She never
14 came onto me that way; no, she didn't. But
15 I always felt like it was -- you know, like
16 the situation was there for us to become
17 closer because Mary kept encouraging it.
18 And Mary was just that type of person, you
19 know.
20   Q.    Did you ever feel like that
21 Mary Teffend discriminated against you in
22 any way?
23       She's a white female, by the

29  (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

117

1 way?
2      A.   Yes, she is.  No.
3      Q.   You didn't feel that she
4 discriminate against you?
5      A.   No.  I think I would say her
6 staff would say and do a lot of things to,
7 that she could have corrected.  You know,
8 like I was reported by A, I was reported by
9 B, I was reported by C, by members of her
10 staff, and I think she could have just
11 offset it and said leave John alone and let
12 him do his work.  But, no, to say that she
13 discriminated me, I don't think she ever
14 did.
15      Q.   So the other staff -- And you
16 worked for Mary?
17      A.   Uh-huh.
18      Q.   You felt like the other staff,
19 one of them being Mixty, would tell on you
20 about things to Mary?
21      A.   Yeah.  See, you have personal
22 conflicts.  Like I said -- As I stated -- I
23 don't know if I said that in the statement

118

1 or not.  Within that vet school, there are
2 no African-Americans who supervise -- at the
3 time I worked there then, who supervise, who
4 managed.  I can't recall even two of the
5 staff like doctors and that type of people,
6 I don't think there was one or two
7 African-Americans who were in that position.
8 So, see, you know -- It's wrong to say
9 whether I view them as being that way
10 when -- and me be honest, if they won't hire
11 or try to encourage minority hiring.  And
12 that's not saying that I view that -- that I
13 wasn't around with a stick saying hire
14 African-Americans.  They're saying that how
15 can a situation be comfortable always with
16 every person, and they've got perhaps
17 discriminatory or prejudice ways in their --
18 within themselves.  So, see, that's why I
19 preached so hard for Mr. Richards to be
20 professional, because, you know, as Auburn
21 University, as much as I do love it, I do
22 enjoy going to the games, and I am going
23 back.  But they are viewed that way, and I

119

1 stated that to Lynn Hammond in her office
2 very calmly.
3      But to get back to the
4 question, Mary allowed her staff, you know,
5 and I'm sure at times she meant to do well.
6 She kind of -- You know, by being in
7 positions, with being a supervisor having to
8 deal with the students, she would not always
9 remind her and her staff not to necessarily
10 pick on me, he's not doing this, he should
11 bring dog food, he should clean this up, he
12 didn't clean that up, he took this out of
13 here, he didn't sweep that up.  Instead of
14 just saying, overall I was doing the right
15 job and doing -- But, see, they -- your
16 personal feelings get involved when you
17 start -- when you want to conquer something
18 that you don't necessarily need to be doing
19 all of that, so.
20      Q.   How many hours a week did you
21 work when you worked for Mary Teffend?
22      A.   I worked directly forty hours
23 and sometimes I worked overtime.

120

1      Q.   Do you have a sense of how
2 much overtime that you worked with Mary?
3      A.   About ten hours a week, when I
4 was allowed.  It was not all the time, it
5 was just for a little period of time.
6      Q.   And would you sometimes work
7 early, early in the morning and late, late
8 at night?
9      A.   No.  Not really.  Just mostly
10 three hours a day or two hours a day, along
11 with my shift.  So it would be like early in
12 the morning, like around two, sometimes I
13 get there at two, sometimes I get there at
14 three, four, five.  And it would only be
15 allowed two hours a day or something like
16 that, so it wouldn't be all day long, no.
17      Q.   Okay.  At some point, your
18 supervisor changed to Bud Richards?
19      A.   Uh-huh.
20      Q.   What brought that about?
21      A.   Mr. Ledbetter retired, and
22 Mr. Richards was hired to be the supervisor
23 of the department of -- that done -- that

30  (Pages 117 to 120)

## FREEDOM COURT REPORTING

121

1  oversaw the work that I did. The cleaning
2  of the vet school and the washing of towels
3  and all, and the caring of the cleaning
4  part.
5          So they just decided to put me
6  back with him, they being Dr. Saidla and
7  Mary Teffend. I didn't have a problem with
8  it, honestly.
9          (Whereupon, Defendant's
10         Exhibits No. 1 and 2 were
11         marked for
12         identification.)
13  Q.    Let's look at a few documents.
14  I'm going to mark these Exhibits 1, and 2.
15  And take a look at that if you would
16  Mr. Dyess, Number 1 and Number 2. Flip
17  through those just for a second if you
18  would, please.
19  A.    I'm familiar with them
20  already. We can move on.
21  Q.    You are familiar with those
22  documents?
23  A.    Uh-huh.

122

1  Q.    Is this your signature on
2  Exhibit Number 1?
3  A.    Yes.
4  Q.    What is Exhibit Number 2?
5  A.    The staff handbook from the
6  University.
7  Q.    Is the staff handbook given to
8  you when you started your employment with
9  Auburn?
10  A.    When I started my full-time
11  employment, yes.
12  Q.    Okay. So maybe not when you
13  were temporary, but when you became a
14  regular employee?
15  A.    Right.
16  Q.    Okay. And did you read it
17  when you received it?
18  A.    Yeah.
19  Q.    Okay. And are you pretty much
20  familiar with what's in here?
21  A.    Yeah, some of it. I probably
22  can't remember now, but, yes, I'm pretty
23  familiar with it.

123

1  Q.    When you received this book,
2  did you see on page twenty-eight, the Equal
3  Employment Opportunity Policy?
4  A.    I probably read that a number
5  of times, yes.
6  Q.    Okay. And if we turn to page
7  thirty-one, did you also read the Employee
8  Nonharassment Policy?
9  A.    Yes, I've seen it before.
10  Q.    Okay. So you're aware of
11  these policies that Auburn has?
12  A.    Yes.
13  Q.    Okay. Let's see where was
14  this.
15          And on page twenty-three, did
16  you see the University grievance procedures,
17  and it follows on page twenty-three,
18  twenty-four, twenty-five, twenty-six, and I
19  think it finishes on page twenty-eight. Did
20  you read that part of the handbook as well?
21  A.    No. I wasn't familiar with
22  that, although they gave me a handbook.
23  So -- but I -- I perhaps didn't read that

124

1  part of it. But of course I received the
2  handbook, so it was in it.
3  Q.    But you, on two different
4  occasions, actually used the University
5  grievance procedures?
6  A.    Yes. Uh-huh.
7  Q.    So whether you read this part
8  in the book or not, you knew you could file
9  a grievance with the grievance panel and so
10  forth?
11  A.    No. I wasn't aware until I
12  met with Ms. Dixon and Albert Snipes about
13  filing a grievance. Ms. Dixon mentioned it
14  to me, but I had never -- I had never read
15  the handbook thoroughly. Like I said, I
16  received the handbook of course, but I had
17  never read it. So I probably know it was
18  there until I had to know.
19  Q.    Okay. So Sonya Dixon and
20  Albert Snipes told you about the grievance
21  policy?
22  A.    Right.
23          (Whereupon, Defendant's

31  (Pages 121 to 124)

# FREEDOM COURT REPORTING

125

1        Exhibit No. 3 was marked
2        for identification.)
3    Q.    Okay. Fair enough.
4        Let me show you now Exhibit
5 Number 3. Have you seen Exhibit Number 3
6 before? And it's two pages. If you would
7 just take a look at that for a second.
8    A.    Okay. I'm familiar with it.
9    Q.    Have you seen Exhibit Number 3
10 before today?
11    A.    I believe so, yes.
12    Q.    When do you believe you saw
13 Exhibit Number 3?
14    A.    When I received it in the
15 file, from the University.
16    Q.    When I sent it to you?
17    A.    Yes.
18    Q.    Okay. I'm going to ask you a
19 few questions about this document. I
20 understand you didn't write it, Mr. Dyess,
21 but I'm going to ask you about some of the
22 things that are in there.
23    A.    Sure.

126

1    Q.    The date of this document is
2 June 13th, 2005.
3    A.    Uh-huh.
4    Q.    Is that near about the time
5 that Bud became your supervisor?
6    A.    Yes.
7    Q.    Do you have a sense of how
8 close? Was it within a month or two or
9 three weeks or six weeks?
10    A.    I would think it was about a
11 month or less.
12    Q.    Okay. Most likely Bud became
13 your supervisor a month or less before June
14 13th?
15    A.    Yes.
16    Q.    Okay. The document says:
17 Discussed with John the fact that he was
18 instructed by Dr. Saidla not to work
19 overtime. Do you see that?
20    A.    Yes, I read it.
21    Q.    Do you remember a conversation
22 when Bud came to you and told you that?
23    A.    I can't remember now -- Yes.

127

1 Yes, I remember, somewhat.
2    Q.    Okay. What all do you
3 remember about that conversation?
4    A.    I can't recall exactly what
5 all occurred, because several discussions
6 between Mr. Richards and I happened. A lot
7 of times Mr. Richards would catch me off
8 guard, and he never seemed to understand or
9 comprehend what I was trying to relay to
10 him. And in the course of a day, he often
11 bumped into me several times. I can't
12 recall exactly. I will say, this did
13 happen, as far as the conversation and the
14 communication. But I can't exactly remember
15 everything that was before this happened.
16    Q.    Well, whatever the
17 conversation was, did you go and talk to
18 Dr. Saidla after -- After Bud came to you
19 and said, John, I don't want you to work
20 overtime anymore, and these other things
21 that he talks about, did you then go to
22 Dr. Saidla?
23    A.    Yes, I believe I did. Because

128

1 Dr. Saidla was the one that allowed me to
2 start working overtime. And he didn't say
3 that Dr. Saidla said not for me to work. It
4 seemed it was more so his views, he said not
5 to do it. So I was merely going back to the
6 source that allowed me to work the overtime.
7    Q.    Okay. So you thought this was
8 just Bud and it wasn't really Dr. Saidla
9 saying that?
10    A.    Right.
11    Q.    So you were going back to
12 Dr. Saidla to confirm it with him; is that
13 right?
14    A.    Exactly.
15    Q.    What happened in that
16 conversation?
17    A.    I believe he told me that I
18 was not to work so many -- so much overtime,
19 but I was allowed to work a few hours. See
20 a lot of this stuff, that's what the problem
21 was in working there, people invent ideas.
22 And Mr. Richards invented a lot of ideas,
23 whereas, when you go and ask Dr. Saidla and

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

129

1  it's not just me knowing that, that occurred
2  with a lot of the other higher-up people who
3  would communicate with Dr. Saidla about
4  ideas, as well as other people. So I felt
5  like it was more like Mr. Richards didn't
6  want me to work it, and I would just check
7  with Dr. Saidla since he was the one that
8  occurred -- that allowed me to do it, the
9  reason the situation occurred in the
10  beginning.
11       So I believe Dr. Saidla just
12  told me that I can just work -- cut down on
13  working so many. Because Dr. Saidla
14  mentioned to me that he was informed that I
15  was dillydallying while on the clock. Now,
16  Dr. Saidla would not have known this,
17  someone probably just mentioned to him like
18  Mr. Richards. Because Dr. Saidla's office
19  was a far distance from the small animal
20  clinic, which means he have to come all the
21  away down the hall to see, whereas we were
22  there all the time.
23       So I believe the correct way

130

1  of viewing it would be that Dr. Saidla just
2  reminded me not to work so many hours, to be
3  careful to stay within that -- I think he
4  wanted me just to work ten hours a week, two
5  hours extra a day, and to make sure that I
6  was not somewhere dillydallying. Which he
7  understood and Ms. Teffend did too, because,
8  see, I was -- at the time, even though
9  Mr. Richards was my supervisor, I was still
10  working within Ms. Teffend's unit. I was
11  working in two of her units actually that
12  she supervises, so which means if
13  Mr. Richards is the supervisor, it's like
14  Ms. Teffend is the supervisor too over me,
15  because she was the supervisor of the ICU
16  and the IMC, I believe it's called. Which
17  means Ms. Teffend could have just reminded
18  Dr. Saidla of some things, and Dr. Saidla
19  could have just reminded me. Now, when
20  Dr. Saidla reminded me not to dillydally, he
21  said that I have been informed that you are
22  using the computers in other places.
23       Now, he did not tell me to

131

1  stop using those computers, which is, of
2  course, where this is going. Because
3  Mr. Richards later told me -- restricted me
4  to using certain computers within the small
5  animal clinic. Dr. Saidla said that, yeah,
6  John, I have been informed that you are
7  using the computers over in, say, Green Hall
8  or somewhere. He didn't say stop doing it,
9  he just mentioned that in a casual-type way.
10  So, see, this -- That is why it's hard to
11  believe a lot of things Mr. Richards said,
12  because, see, Mr. Richards and Ms. Teffend
13  both utilizes or sort of took advantage of
14  Dr. Saidla's not being around all the time,
15  and they would just go -- they would go and
16  just, you know, invent a solution.
17       Here's one, for instance.
18  Dr. Saidla said do so-and-so, and Dr. Saidla
19  didn't say do so-and-so, just casually. And
20  Mixty would use that a lot too. And various
21  people would say that. You know, it was
22  using his name to say things that he didn't
23  actually say. Not to come down on you like

132

1  in the forming of discipline, but in the
2  form of way to say -- you know, just humor
3  mostly. They would say, Dr. Saidla say, and
4  he didn't necessarily say. So that's why I
5  went to ask Dr. Saidla myself. And he just
6  told me to cut back on the hours.
7       Q.   Okay. Have you told me
8  everything that you remember telling
9  Dr. Saidla and everything that you remember
10  him telling you in this one particular
11  meeting?
12       A.   Let me see. Now, was this
13  meeting before we met with Ms. Dixon?
14       Q.   Oh, yeah. Oh, yeah.
15       A.   I believe so. Like I said. I
16  don't think I never -- I think, yes. Yes, I
17  believe that's all.
18       Q.   Okay. After you talked to
19  Dr. Saidla, did you go back and talk to Bud
20  again?
21       A.   Yes, of course. I told him
22  that Dr. Saidla said I could work just five
23  or so hours and not extend it past the ten

# FREEDOM COURT REPORTING

133

1  and that kind of thing.
2      Q.   And was that also when you had
3  the conversation with Bud about being a
4  minister?
5      A.   No.  That came before.  The
6  conversation with me being a minister came
7  like two or three days after I was assigned
8  to be Mr. Richards' employee.
9      Q.   Okay.
10      A.   That had nothing to do with
11  this right here.
12      Q.   Okay.  Well let me ask you
13  about that then.  We may have already
14  covered it completely.
15      A.   No.  Not exactly.
16      Q.   You don't think we have?
17      A.   No.
18      Q.   Okay.  Let's go to that then.
19  You said two or three days after Bud became
20  your supervisor, there was a conversation
21  where you told him you were a minister.
22  Tell me all that you remember about that
23  conversation, please.

134

1      A.   Okay.  A couple days after --
2  I think I received a letter that I was to
3  report to Mr. Richards as being supervisor
4  from Dr. Saidla, I believe it was on my
5  file.  And Mr. Richards -- I was cleaning a
6  room that I mentioned earlier, that was not
7  being used as much, there were hardly no
8  animals -- actually the office staff
9  employees were using it for their own
10  personal animals at nighttime.  And I was
11  just -- which was allowed.  And I was just
12  sort of brushing up a little bit, and it was
13  within the area of where I was assigned to
14  clean, as I received from Dr. Saidla of
15  where to -- my specific jobs was outlined.
16      Mr. Richards came in.  I was
17  in this room.  It was not as large as this
18  room (indicating), it could have been about
19  this size or a little smaller than this
20  size, probably about half as much as this
21  room is here, not nowhere near this size.
22      And Mr. Richards come in and
23  started talking.  He walked in.  He said,

135

1  hi, John; I said hi Mr. Richards; John, what
2  are you doing?  I said, I'm cleaning, as I
3  was doing, just brushing up, because the
4  room wasn't -- wasn't any animals in it.  So
5  he probably wanted to know why I was out
6  there in the first place, because it wasn't
7  supposed to have been dirty.  But he didn't
8  know that they were messing up the cages
9  from time to time.  So I was just informing
10  him, I'm just sort of cleaning up other
11  people's stuff that had nothing to do with
12  the vet school customers.
13      So as we was discussing what I
14  was doing, I told him I was just cleaning
15  and wiping.  Well, John, I'm trying to get
16  to know you better, I want to know you in a
17  better way.  Tell me more about yourself.
18      I said, what do you mean?
19  What do you do when you're not at the vet
20  school?  I said, well, I go to football
21  games, and I go to church, and I counsel
22  at -- football players and talk with them,
23  and they're my friends we ride around and

136

1  talk and play, you know, in the line of
2  ministering and counseling.
3      Well, what do you do at
4  nighttime?  I said, well, I don't do too
5  much at nighttime.  Are you married?  No,
6  I'm not married, Mr. Richards.  What else do
7  you do?  Do you go out to dinner?  No.  And,
8  see, I couldn't understand -- that's what
9  caused me to feel uncomfortable, because --
10      Q.   Can I stop you just a second?
11  Again, this, is it happening two or three
12  days --
13      A.   Two or three days --
14      Q.   -- after he became your
15  supervisor?
16      A.   -- after he became my
17  supervisor.
18      Q.   I'm sorry to interrupt you.
19  Go ahead.
20      A.   Fine.
21      I want to know you a lot
22  better.  But what offended me was all the
23  time he was talking, I was steady trying to

## FREEDOM COURT REPORTING

137

1  clean the cage out, to wipe or something,
2  and Mr. Richards was way past the personal
3  space that he and I should have had. You
4  know, I could feel his heartbeat. I mean, I
5  actually got close enough -- my arm was near
6  his chest. I mean, you know, you could talk
7  to me from here to the other side of this
8  wall, so to speak. There was no one else in
9  the room, no one else was going to come in
10 the room. Because not like the other rooms,
11 the wards is what they're called. No one
12 else was going to come in there because no
13 animals was in there at the time. So he
14 was -- he was -- He was all -- He was being
15 uncomfortable to me because it was like he
16 was trying to date me because he could have
17 just kept a distance and asked me. And even
18 then, it was not important to him what I
19 done at nighttime. The only thing he needed
20 to know is that I done my responsibility at
21 Auburn University.
22         As I stated earlier, if he had
23 wanted to know me, get out and do something,

138

1  he never asked me -- He never stated that
2  let's go and enjoy a dinner or something,
3  not having to do anything with my
4  employment. He made it seem like he wanted
5  to know me in a more personal way, and he
6  did not know me two or three days later
7  after I was assigned to him. So we was
8  having a conversation about what I was
9  doing, what I would do afterhours. But he
10 was just so close -- He was too close to me,
11 uncomfortable. And that's when the minister
12 side of me came out. And it was not loud,
13 it was not uncalled for; I just merely
14 mentioned that I was a minister. He said,
15 oh really. Yeah, I understand that. My
16 wife and I attend church, my children
17 attend. My father-in-law is a minister. We
18 read and the preacher preach. I mean,
19 various discussions about the Biblical
20 Scripture and the attending of worship and
21 his father-in-law being a minister came
22 about, all the while that we were just too
23 close for comfort. So that's how the

139

1  minister side came out and the Scripture
2  quoting, and he knew of the Christianity
3  because he said his father-in-law was a
4  minister and that he attended worship.
5      Q.    Okay. Let me ask you a few
6  follow-ups from that if I might.
7           Did you ask Bud, hey, man,
8  could I have another -- could I have another
9  foot or so of space here, you're too close
10 to me?
11     A.    No. I didn't, because I
12 didn't want to offend him. I was just
13 trying to do my job and go home. I didn't
14 want to ruffle any feathers; it's easy to do
15 with people, and I didn't want to do it. I
16 was just trying to casually brush off a
17 little bit or not be hostile or
18 over-aggressive.
19     Q.    Did you step back from him at
20 all?
21     A.    Several times. I kept moving
22 unnecessarily. Because what I was cleaning
23 needed to be done, then done and not

140

1  anything else. Because the room, as I
2  stated was not dirty totally, it was just
3  one or two cages that I was brushing up.
4           But I was doing unnecessary
5  moving around, like I'm going to get -- he's
6  still there. I move from point A, he'll
7  move to point A too. So it was my way of
8  trying to get away from around him casually,
9  not to offend him. Because I already saw,
10 according to the way I understood it, where
11 this was going.
12     Q.    Okay. Have you told -- Sorry,
13 scratch that.
14           Do you remember anything else
15 that Mr. Richards said to you on this first
16 particular occasion?
17     A.    Other than he wanted to get to
18 know me a lot better; he kept prying in my
19 personal life, what I did outside the vet
20 school; my sleeping -- not necessarily
21 sleeping, but was I married; did I have
22 children. And his body signals of being too
23 close, that was about it.

35  (Pages 137 to 140)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

141

1    Q.    Okay. Tell me about the body
2  signals now. Was it just being too close to
3  you, just standing too close to you?
4    A.    Well, yes, basically.
5         If you're in your office, then
6  you're going to sit across from me, and
7  we're going to talk. Then that's the way he
8  should have done. It was not -- I was not
9  his friend, I did not know him. I had -- He
10 became my supervisor, we had not had any
11 previous conversations other than, hi, I'm
12 John, blah, blah, blah, blah.
13        Strike that. I'm sorry.
14        But it was mostly he's too
15 close to me period, and I was -- I'm not
16 paranoid to where I can't get close to
17 people that perhaps I don't know, because I
18 shake hands with people all the time. But
19 it was -- You know, if I walk up to a person
20 I don't know, a stranger and shake their
21 hands or at church somewhere, if I don't
22 know the person, I'm not going to overextend
23 my personal boundaries, you know, because

142

1  you don't do that. You shake a person's
2  hand, and you know them a time or two before
3  you start getting closer to them. You just
4  don't walk into a room, and I'm standing up
5  to you like I can feel your heartbeat. And
6  he was just -- I was cleaning and wiping,
7  there he was right there looking at me like
8  a man trying to date a woman. He was just
9  too close. And his conversation was too
10 calm and casual. It wasn't direct and
11 authoritative to say, well, this is what we
12 want to accomplish here, and you should do
13 your work there, you should -- you be --
14 It's professionalism. And the rate Auburn
15 University pays people, you can be
16 professional. I don't care what personal
17 feelings you have, that University pays a
18 lot of money to people who do nowhere near
19 as much as they get paid to do it. That's
20 what I'm saying, you know, you remind
21 yourself to be professionalism.
22        And he was just too close for
23 comfort. And I didn't make a big deal out

143

1  of it, I just kind of like moved away from
2  him.
3    Q.    Okay. You mentioned something
4  about the way he looked at you.
5    A.    Uh-huh.
6    Q.    We're still in this first --
7    A.    Meeting.
8    Q.    -- meeting and conversation
9  that you were telling me about, the way that
10 he looked at you.
11   A.    Uh-huh.
12   Q.    Can you be more specific? How
13 did he look at you?
14   A.    It was like he wanted to be
15 romantic. You know, it's like a man
16 interested in a woman. And he was just so,
17 baby, come on. He was just so -- it
18 wasn't -- You know, every man don't talk
19 loud and boisterous. I don't. Even though
20 my size would think -- my physical size
21 would think that I would talk more forceful.
22 I'm very calm most of the time, I don't
23 scream loud. And that's the Christian side

144

1  of me, supposedly.
2         But he was so -- so, man, I
3  want to like you so bad. You know, he was
4  just so turned on and stuff. It was like he
5  was just getting his juices flowing,
6  uncomfortable to say. I mean, he was just
7  so -- He didn't know me well enough to do
8  all that. It was like he found me
9  attractive. That's what -- It was too
10 close.
11        If you -- As I stated earlier,
12 if you're going to talk, talk; I'm here,
13 that's close enough. It ain't -- Your body
14 ain't got to be right there, I can rub your
15 chest with my -- with the other side of
16 my -- the wrong side of my arm. You know,
17 my arm shouldn't be in your chest, and I
18 just met you two days before.
19   Q.    Okay. How did the minister
20 conversation come out of this?
21   A.    As I stated, in order to get
22 away from what I thought was happening with
23 the too-close-for-comfort behavior, and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

145

1  along with him asking me what do I do at
2  nighttime away from the job, I brought it
3  up.
4       Q.    Okay. And was this the same
5  time that you said, I'm a minister, bad
6  things will happen to people who mess with
7  ministers?
8       A.    No. That happened twice with
9  him in separate meetings. But this time I
10  introduced that idea. Because once we got
11  into the conversation of Christianity and
12  his father-in-law was a minister, and the
13  Scripture, which he attend, and all this
14  stuff, then I pointed out to him that as a
15  supervisor -- now, I didn't directly say it,
16  I said it indirectly -- that as a supervisor
17  and what he needed to know as being a new
18  supervisor. See, a lot of the people have
19  been working there for years and years and
20  years; right? Which means they're used to
21  doing what they want to do, period. And --
22  As well as Ms. Teffend, you know, she's a
23  nice lady, friendly, but she's gung-ho on

146

1  what she wants to do and she gets the job
2  done.
3           So what I was trying to
4  introduce to Mr. Richards was that as a new
5  supervisor, not directly, but indirectly,
6  was he has to be careful not to allow
7  personal to overstep professional. And
8  that's why I started talking about Scripture
9  and the way I behave as a human so as to not
10  to offend anyone. And the part about --
11  that seemed threatening as it relates to the
12  Biblical references came out as a result of
13  me trying to show him of how people can
14  create a situation and an environment. And
15  I relied on the Bible in my source of
16  leadership and guidance.
17       Q.    What specific parts of the
18  Bible did you rely on?
19       A.    All of it.
20       Q.    How did you rely on the whole
21  Bible?
22       A.    I don't understand.
23       Q.    Well, what I'm trying to

147

1  understand is you're having a conversation
2  with Bud about him being a new supervisor,
3  and somehow the idea gets introduced into
4  the conversation that you're a minister and
5  bad things happen to people who mess with
6  ministers.
7       A.    Right. I didn't say it
8  directly like that. That's his quote.
9       Q.    That's what I'm trying to get
10  at, what exactly did you tell him?
11       A.    I stated earlier that in the
12  conversation of -- involving Scripture and
13  Bible reference -- Bible or Christianity or
14  the church period. And in the sense that
15  people have personal views that will allow
16  you to feel uncomfortable and create a bad
17  working place, an environment that's not
18  feasible, as the law called it, the hostile
19  environment-type environment, I relayed or
20  conveyed to him that not a particular
21  Scripture and that the Bible teaches that we
22  ought to be careful how we treat people so
23  as not to offend them. And that's how that

148

1  came out. He's stating that I said that
2  that's a bad thing, that's his
3  interpretation. I did not say that
4  something bad will happen. As I stated
5  earlier, the Bible does say that directly,
6  and you want me to quote the Scriptures that
7  I can't give you right now. And I gave you
8  the one that Ms. Dixon herself quoted as
9  well as others. But that's Mr. Richards'
10  interpretation, saying that bad things will
11  happen. I did not say it that way. I just
12  merely brushed around it. He directly
13  saying now that I said that like that.
14           So to make a long story short,
15  I just -- I just introduced that and
16  presented that for any individual Christian
17  that that happens. I did not say that it
18  was going to happen to him.
19       Q.    You didn't say it was going to
20  happen to him, but that it does happen. Bad
21  things do happen to people who mess with a
22  child of God?
23       A.    Of course, I had to say that,

37  (Pages 145 to 148)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

149

1  that's what I believe.
2      Q.    Did Bud ask you if you were
3  threatening him?
4      A.    Yes.  Not in that first
5  meeting.  In a second meeting.
6      Q.    I think we're in the second
7  meeting now.
8      A.    No.  We didn't go from the
9  first to second meeting.  We're still in the
10  first meeting.
11      Q.    I'm sorry.  Are we done with
12  the first meeting?  Do you think we've told
13  pretty much about that?
14      A.    Uh-huh.
15      Q.    Let's go into the second
16  meeting then.
17      A.    Okay.
18      Q.    There was a second
19  conversation where, I guess, the issue of
20  you being a pastor comes up?
21      A.    Uh-huh.
22      Q.    Tell me about this
23  conversation.

150

1      A.    One morning, about a few days
2  later, four or five days after this initial
3  meeting -- Actually though -- Yes, I'm
4  sorry.  Four or five days later after this
5  meeting on June the 13th, Mr. Richards asked
6  me to get some dog food -- particular dog
7  food out of the storage area for the unit
8  that I was responsible for, Ms. Teffend's
9  unit, ICU.  And I relayed to him that they
10  didn't need that particular dog food.  I had
11  been working in that unit for two or three
12  years and that I pretty much knew that they
13  didn't need that right then, but I would get
14  it if that's what he wanted me to get.  But
15  I was just trying to fill him in on how
16  people ask for unnecessary dog food in the
17  sense of cost.  They always preach and teach
18  about cost and all this, the cost
19  effectiveness and don't overuse and don't
20  put in what don't supposed to be there and
21  be careful what you open up.  So I was
22  trying to show him how that would be
23  unnecessary.  And at the same time, those

151

1  people steal that dog food.  And they were
2  stealing it then.  And that's where he said
3  about towels that you'll later want to know.
4      Stealing towels came up
5  because those people would get the dog food.
6  And it's easy to steal, you can get a big
7  twenty-five, fifty-pound bag and just walk
8  right out and put it in your car, or you can
9  ask for the dog food, and leave it sitting
10  in the particular unit you work in, and then
11  walk out later on that afternoon as if it
12  was yours because you were allowed, as an
13  employee, to purchase dog food directly from
14  them.
15      So he asked me one particular
16  morning, four or five days later after we
17  had this first June the 13th meeting, that
18  Mixty Cox or someone wanted me to get some
19  particular dog food.  And I was trying to
20  cost effective, okay, I'll get it later, but
21  we don't really need that.  And he got very
22  fierce:  I said get that particular dog
23  food.  I was not angry, I was just trying to

152

1  convey the message that they steal and it
2  was unnecessary.
3      Okay.  So he took that once
4  again as a threatening -- a situation to use
5  in the sense that he was my supervisor and I
6  was the employee and that I was going to do
7  exactly what he said.  I did not have a
8  problem with doing what he's saying.  I was
9  merely informing him, as I stated earlier,
10  that it was unnecessary, but I could get it
11  out.  Because I already knew what particular
12  dog food they needed; she wanted that
13  particular dog food for a stock item that
14  they stock certain type.  Right as he asked
15  for it, I said why does she need it; they
16  want to start stocking it in the unit.
17      I told him that they were not
18  going to use that, because I had previously
19  opened that type dog food, and so it would
20  have just been a waste.  He got upset and
21  started -- and stormed out.  And we had kind
22  of -- what seemed a hot, heated
23  conversation.  But it was not loud, as far

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

153

1    as my retrospect, because I don't talk too
2    loud no way. But I was firm in trying to
3    get him to understand that that was
4    unnecessary.
5        So later on that day, or
6    actually the next day, he called me in his
7    office with the door open to discuss my
8    behavior on why I would not get it right
9    then, which I told him I was going to get
10   the dog food, but I was merely trying to
11   get -- So that's when this -- The same
12   conversation that he and I had in the June
13   13th meeting about how you should treat and
14   be careful to invent a situation that would
15   make it illegal and hostile work environment
16   as well as those people there who all they
17   know to live for is to create an environment
18   because there's no supervision, it's not --
19   it's not -- Discipline is not followed
20   through on from day-to-day. And they love
21   to create environments that would get me
22   in a situation I'm in now, terminated.
23       So he called me in his office.

154

1    Actually I was just walking by, he said,
2    John, could you come in for a minute. The
3    door was open, he was going to sit down,
4    just he and I. I want to discuss with you
5    about your behavior concerning my asking for
6    the dog food. And I said, okay. Well, be
7    careful not to do that ever again. When I
8    ask you to do something, you do it;
9    Dr. Saidla made you my employee, so you do
10   as I say. And I understood that. And I
11   said, yes, I understand. We want to treat
12   each other fairly because people do tend to
13   step -- overstep their bounds, and that I
14   would like it to be carefully --
15   carefully -- to be careful how we treat each
16   other, because as I live the Christian life
17   and the Bible teaches that -- you know, that
18   we have to be careful how we treat God's
19   people. That was sort of the calm casual,
20   as the minister says across the pulpit. It
21   wasn't something bad's going to happen to
22   you if you go do it. I didn't need to back
23   up God's word, he can back it up on his own.

155

1    I didn't create it nor write it.
2        That's his statement, that I
3    said bad things happen and what's --
4        Q.    If I just heard what you said,
5    you said we have to be careful how we treat
6    God's children?
7        A.    Uh-huh.
8        Q.    Is that pretty much the words
9    you said?
10       A.    Yes.
11       Q.    Okay. And did you tell him
12   why we need to be careful how we treat God's
13   children?
14       A.    What do you mean? In the
15   sense of --
16       Q.    I'm just trying to figure out
17   what words -- Just tell me the words you
18   said to him, the best you recall. Not with
19   any interpretation on it from him or from
20   you, but just what words did you say?
21       A.    I told him that I want to be
22   careful how I treat each -- another person,
23   and that we all should be careful how we

156

1    treat each other, especially with me being a
2    minister, I learned to be careful how I'm
3    treated and that people ought to be careful.
4    Because the Bible, as I stated to you again
5    in the first meeting -- conversation, states
6    that we must be careful how we treat God's
7    people. That is how I told him.
8        Q.    Okay. And then we're still in
9    his office?
10       A.    Yes.
11       Q.    We're talking about the second
12   meeting again?
13       A.    Second meeting.
14       Q.    He asked you in the second
15   meeting if you were threatening him?
16       A.    Right.
17       Q.    Okay. And was that pretty
18   much the words he used, are you threatening
19   me?
20       A.    His exactly.
21       Q.    How did you respond to that
22   question?
23       A.    I said, no, I'm not

39  (Pages 153 to 156)

# FREEDOM COURT REPORTING

157

1 threatening you. I said, of course not, I'm
2 not threatening you. This is God's Word,
3 it's not my word.
4    Q.    Okay.
5         Let's look back at Number 3
6 again, document Number 3 there. It sounds
7 like you went back at some point -- and the
8 sequence might not be right, I'm asking you.
9 At some point you went back to Dr. Saidla,
10 and he basically told you that coming in his
11 office so often wasn't acceptable. And he
12 told you you could talk to -- I think this
13 is where he told you you could talk to Bob
14 Riley for all he cared. Is that that --
15    A.    No. That wasn't -- That part
16 there came in December of 2005. That was
17 nowhere near this.
18    Q.    Okay. Okay.
19    A.    Even though he reminded me not
20 to call him so often, but he did it in a
21 humorous, calm kind of way. At that
22 particular time he didn't say don't call my
23 house and do all -- he wasn't boisterous and

158

1 loud, but he did remind me -- Basically he
2 said, John, just go do your job and don't
3 think too much about it. You know, because
4 there was no need for me to get upset
5 because he wasn't -- my job wasn't at
6 jeopardy at that particular time.
7    Q.    Okay. From this second
8 meeting with Bud in his office, how soon
9 after that did Sonya Dixon come out and meet
10 with you?
11    A.    She had to come like a week
12 later or so. Because I was on leave from
13 them for two months, I think from July to
14 August -- July to August or some part of
15 September. So she had to come like a week
16 later.
17    Q.    Okay. And tell me what you
18 recall about your conversation with Sonya.
19 First, it might be helpful to ask you: The
20 first time Sonya came out and met with you,
21 did she bring anybody with her?
22    A.    No, she didn't.
23    Q.    Okay. Tell me what you

159

1 remember -- everything that you remember,
2 everything you said, everything she said the
3 first time Sonya Dixon came out to meet with
4 you by herself.
5    A.    The first meeting -- The first
6 time Ms. Dixon came out, which was -- and
7 I'll be looking up through here to see if I
8 can find the exact date on it, because it's
9 in some of these files somewhere, and my
10 employee file is what I'm referring to.
11        A week after this June the
12 13th meeting, Exhibit 3 that you just
13 pointed out to me, Ms. Dixon -- I was told
14 by Mr. Richards that I was to meet with
15 Dr. Saidla and Ms. Dixon from human
16 resources as a means of mediation to solve
17 the differences between Mr. Richards and
18 myself.
19    Q.    Okay.
20    A.    Perhaps also in that second
21 conversation Exhibit 3, the part of taking
22 towels out of one of the units that I
23 cleaned came into play also. It could have

160

1 came out casually a day or so later or
2 something like that. But the issue was I
3 was stealing towels out of one of the
4 emergency wards or something that I was
5 responsible for cleaning, and that I had
6 threatened Mr. Richards with God's Word.
7 That was why Ms. Dixon was called and as
8 a -- as a means of solving the differences,
9 human resources, Ms. Dixon, was called in,
10 and over. And Mr. Richards asked me would
11 I -- He didn't ask me. He said, John, we
12 want to meet with you.
13        And I didn't understand that I
14 had the choice of either meeting with
15 Ms. Dixon or not, because I believed
16 employees have to have -- you have to be --
17 you have to agree to have them mediate it as
18 an employee. I believe that's the way it
19 is, because that's not accurate. I can't
20 find that.
21        So he asked me -- He told me
22 one morning that he wanted to meet with me
23 in a meeting involving Ms. Dixon. Then once

40 (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

161

1  we got in the meeting, and Dr. David
2  Whitley, his office was where we had the
3  meeting; he was not there. It was
4  Dr. Saidla, Mr. Richards, myself, and
5  Ms. Dixon, but it was in Dr. Whitley's
6  office. And she introduced herself and told
7  me she was from human resources and that she
8  was sent as a sort of a mediator to
9  intervene between Mr. Richards and my
10 supposedly heated conversation that we now
11 call Exhibit 3. And I said, well, okay.
12 But I didn't know, according to the employee
13 handbook, that you wouldn't necessarily -- I
14 didn't have to agree with it, because I
15 believe as an employee, as I stated earlier,
16 that you have to agree. But they didn't
17 tell me that you have to -- that you can say
18 yes or no. But anyway, I went along with
19 it, and we sat down. She told me -- I said,
20 well, why are we here. She said
21 Mr. Richards have a couple of issues
22 concerning your behavior to him. One, being
23 that he feel like you threatened him as he

162

1  stated in Exhibit 3; and, two, that he
2  believed that you are stealing towels out of
3  one of the emergency wards what I was sort
4  of cleaning. It wasn't my responsibility to
5  clean it, I sort of cleaned it because no
6  one else was cleaning it.
7       As I passed by casually,
8  walking by or something, I would check in
9  and clean it, try to be a Mr. -- do a good
10 job.
11      And I do not wish to steal no
12 towels. They use those towels to wipe those
13 animals' waste. And the last thing I want
14 in my house is a towel that's been used by
15 an animal. And even if they're brand new, I
16 didn't want them. I thought I was doing a
17 good job by taking care of it, because the
18 person response and wasn't doing it.
19      What happened regarding the
20 stealing the towels, Mr. Richards had
21 assigned someone else that was not doing it,
22 and they would say to him that I was
23 stealing and doing a lot of things. I don't

163

1  think he ever seen me stealing or supposedly
2  stealing it, but they would report to him,
3  which was most of the time. A lot of this
4  stuff about me that he got written in my
5  file, he didn't actually see. Because
6  between his going riding in the van and
7  doing other things and meetings or whatever,
8  he was not there long enough to actually see
9  me do a lot of stuff. It had to have been
10 reported by other people, but that's not
11 written like that though.
12      So Ms. Dixon said that I had
13 the issue of stealing towels and the issue
14 of threatening him had come to play. And
15 basically I stated to them that -- also that
16 Mr. -- I felt that Mr. Richards was coming
17 onto me in a perverted type way. And she,
18 A, said that she understood what I meant
19 regarding Scripture, that's when she quoted
20 that Scripture that I just mentioned to you,
21 that --
22      Q.   The millstone?
23      A.   The millstone, that's in the

164

1  Bible. That's her quotation. I didn't
2  quote it at that time. But she also said
3  that she understood Mr. Richards' viewpoint.
4  She said, I could see how he could think
5  that you are threatening him. Now, it's
6  either I threatened him or I didn't. You
7  know, you cannot read something into
8  something. That's what Ms. Dixon would get
9  into later was her problem a lot of times,
10 she would play both sides of the stick. And
11 she would say, well, it looks like he didn't
12 do it, but then, yes, you did do it. And so
13 that's how she presented that. She said
14 that she felt like I did not threaten him,
15 yet she understand how he would feel
16 threatened. That's playing both of them.
17 Either I said I was going to do it or I said
18 the Lord -- the Bible said he was going to
19 do it. Do we understand?
20      So that was brought up as well
21 as the stealing towels. And I related to
22 her that I was not stealing towels, but in
23 order to take care of the stack of towels

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

165

1    needed -- supply of towels needed for that
2    particular ward, I would get some out and
3    take it to other wards within the vet
4    school, not put in my car, take from that
5    ward and put here or vice versa. So it
6    seemed like I was taking them -- I wasn't
7    stealing them and taking them outside. I
8    was taking them and putting in another ward
9    so the other wards would have an amount of
10   towels to use, because that's all the
11   students use the towels for everything.
12        So I basically told them
13   that -- and to put it like I said it,
14   whether I felt like this was a ridiculous
15   conversation, that it was a ridiculous
16   meeting, that it was a waste of time, that
17   it was uncalled for, that I didn't need to
18   be here, and that I felt like Mr. Richards
19   was just merely using the situation and a
20   lot of nonsense to make me go -- get too
21   close to him in a perverted kind of way.
22        Q.    Okay. Again, I appreciate the
23   very thorough answer, Mr. Dyess. Let me ask

166

1    you some specific issues here, okay.
2         You mentioned -- And this --
3    Again, this is the meeting in Dr. Whitley's
4    office?
5         A.    Uh-huh.
6         Q.    This is the first time that
7    Sonya Dixon came out to meet with you?
8         A.    Uh-huh.
9         Q.    Did you say that it was you
10   and Sonya and Bud was in there as well?
11        A.    And Dr. Saidla.
12        Q.    And Dr. Saidla. So it was the
13   four of you?
14        A.    Uh-huh.
15        Q.    You said you told Sonya that
16   you felt like Bud was trying to come onto
17   you?
18        A.    I said in the meeting with all
19   those people that Bud was trying to come
20   onto me.
21        Q.    Tell me the exact words that
22   you said in that meeting.
23        A.    I feel that Mr. Richards is

167

1    trying to date me.
2         Q.    Okay. Did you say anything
3    else more specific?
4         A.    She wanted to know exactly --
5    what exactly is he doing. And I described
6    to her in my own words that I told her was
7    that he's asking me to go out -- he asked me
8    to go -- asked me about my personal life and
9    that he made me feel uncomfortable by the
10   way he stands too close and too much -- not
11   enough personal space.
12        Q.    Okay. And did you tell her
13   anything like the way he looks at you?
14        A.    Yes. That also -- I believe I
15   did.
16        And, also, I mentioned to her
17   that Mr. Richards told me that he admired --
18   he was an admirer of me. See, that's the
19   part that perhaps he has not written
20   somewhere. Because, see, after that
21   meeting, the Exhibit 3's meeting, and after
22   the other meeting following, the part where
23   he said he felt threatened, there was

168

1    another just one morning, casual
2    conversation as he was about to leave
3    getting in the van to drive off. He was not
4    angry and I was not angry, I was just asking
5    him for the key to the dog food room to get
6    something of my own I needed to get. And he
7    said, John, I admire you. He was not angry,
8    we were not angry, we were not feuding at
9    that time or had a conflict. It was like he
10   was -- he was -- it was like he was my
11   secret admirer even though he had not known
12   him for a week or two, if that long.
13        Q.    So you told Sonya at this
14   meeting in Dr. Whitley's office that he had
15   also said he admired you?
16        A.    Right.
17        Q.    Is there anything else
18   specific that you told her about Bud trying
19   to come onto you?
20        A.    No. That was all.
21        Q.    Okay. Did you also mention in
22   that meeting being friends with Jason
23   Williams -- Jason Campbell, Cadillac

42 (Pages 165 to 168)

## FREEDOM COURT REPORTING

169

1   Williams, Chet Williams?
2        A.    That may have come -- I know I
3   mentioned it to Ms. Dixon in a separate
4   meeting, that I mentioned earlier this
5   morning here, that Ms. Dixon, myself, and
6   another person from human resources, not
7   Dr. Saidla and Mr. Richards were there, like
8   a few days later, after the initial meeting
9   with Ms. Richards -- pardon me, Ms. Dixon.
10  I mentioned that to them -- to her then.  I
11  don't think I mentioned very much about
12  Jason and nobody else in -- and none of the
13  other ball players to her during the meeting
14  with Dr. Saidla and myself and Mr. Richards
15  and her.
16       Q.    Okay.  Let's try to wrap up
17  then this meeting in Mr. Whitley's office,
18  and then maybe go to the second one.
19       A.    Okay.
20       Q.    Have you basically told me
21  everything that you remember saying in this
22  meeting in Dr. Whitley's office?
23       A.    Yes.

170

1        Q.    Okay.  What all did they say
2   to you?  I mean, did they tell you anything?
3   How did the meeting end?
4        A.    Ms. Dixon just clarified, and
5   I can't remember her exact words.  But
6   Ms. Dixon just clarified that she, A,
7   understood that I was not threatening him;
8   B, that Mr. Richards -- she could understand
9   how Mr. Richards could feel threatened.  And
10  she went on to -- in her conclusion of how
11  to treat each other as employees and be
12  fair.
13            That's all she would do.  See,
14  that was one of the main sources of the
15  problem.  It was never no one to just say,
16  well, we need to separate him and send him
17  over here, which I constantly asked her
18  during the course of my meeting with her to
19  have me transferred.  And it could have
20  eliminated all of this if they just put me
21  in another department.  The University got
22  ten million employees.
23            But she would always give a

171

1   long speech of stuff.  She would never be
2   definitive and say, well, this needs to be
3   done, that needs to be done.  The only thing
4   she was definitive of when they forced me --
5   told me I had to go have psych care.  It had
6   nothing to do with my -- my -- my
7   psychological mentality at the first meeting
8   with her.  She did not -- It was nothing
9   about me being stressed, nothing about me
10  being abnormal behavior, nothing like I was
11  being brutal, that I was using force to
12  Mr. Richards, nothing like that came out.
13            In the initial meeting between
14  Ms. Dixon, Dr. Saidla, Mr. Richards, myself,
15  nothing about me being psych out or
16  overstressed or anything like that came out
17  in the meeting.
18            Are we ready to get on to the
19  second meeting already?
20       Q.    I think.  So have you told me
21  everything you remember about the first one
22  now?
23       A.    Yes.  In conclusion, as I said

172

1   she just mumble-jumbled it.
2        Q.    Okay.  So there was this
3   meeting in Dr. Whitley's office, we've
4   talked about it.
5        A.    Uh-huh.
6        Q.    And then at some point, did
7   Sonya Dixon come back out and meet with you
8   again?
9        A.    Yes.
10       Q.    And she brought somebody, you
11  don't know who?
12       A.    Right.
13       Q.    Does the name Carmella ring
14  any kind of bell there?
15       A.    No.  It don't ring a bell, but
16  I can't recall the name.
17       Q.    Was it a female?
18       A.    Yes.  Caucasian.
19       Q.    What did the female look like?
20  Caucasian female?
21       A.    Uh-huh.  Blond.  That's about
22  all I can remember.
23       Q.    About what age?

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

173

1    A.    Twenty-seven or something like
2    that.
3    Q.    All right.  Tell me what
4    happened in this second meeting.  Where did
5    this second meeting occur?
6    A.    It occurred at the vet school
7    in another office where a computer was.  It
8    was sort of a conference -- sort of a small
9    conference area.  It was not no one's actual
10   office.  It was just a little small
11   mini-sized conference room where they had
12   like a few meetings -- a few people could
13   meet in.
14   Q.    Okay.  And who said what in
15   the meeting?
16   A.    Ms. Dixon, after having
17   Ms. Johnson -- Ms. Linda Johnson to contact
18   me and let me know that she wanted to meet.
19   She called me, and I believe Mr. Richards
20   told me that Ms. Johnson wanted to see me in
21   her office; she was Dr. Whitley's executive
22   assistant.  And after getting the message
23   from him, I went to her office.  And she

174

1    said, Ms. Dixon is here to meet with you.
2    Ms. Dixon, of course, being there, and we
3    went down the hall to this little -- small,
4    little conference room.
5    Q.    Okay.  How did the
6    conversation go?
7    A.    Ms. Dixon said, we want to
8    know, tell us more about -- Pardon me.
9          She introduced herself, and
10   she introduced this other person that was
11   there.  What we want to know -- this is --
12   She presented what they do, why they were
13   here as far as being from the human
14   resources and the employees fair treatment
15   and her job description type, what she does
16   as an employee, and that she wanted to
17   discuss me as being an employee.  Nothing
18   about psych or my mental status or nothing
19   like this.
20         I, once again, interjected a
21   lot of things about me being a minister.
22   But she just wanted to discuss more of what
23   she concluded within the first meeting of

175

1    how we, as employees, need to treat each
2    other fair.  We need to be careful, look
3    past Mr. Richards' ways, treat him right as
4    well as Mr. Richards being encouraged to
5    treat me fair and it makes a better
6    workplace, better work environment.  We must
7    be honest with each other.  That kind of
8    behavior -- That kind of conversation came
9    -- once again, it was just basically her
10   conclusion of the first meeting.
11         And so what are you going to
12   do today?  Well, I'm about to leave -- I
13   went on -- I came back for a vacation.  I
14   went back to Mobile for a few days soon
15   after that.  And I told her I was about to
16   leave then because I had spoke with
17   Mr. Richards about taking a few days off.
18   And he said I had plenty of time, and he
19   said that was fine, because they offered --
20   they encourage you to take your time,
21   because if you don't take it, you will lose
22   it, especially your acquired time.  So I had
23   extra time so I told him I would take a few

176

1    days off.
2          And she said, well,
3    Mr. Richards mentioned you were about to
4    leave.  We wanted to discuss about what we
5    had talked -- discussed earlier in the first
6    meeting.  And so when I started talking, I
7    just started my minister part and that
8    different things, Jason and all these people
9    come about.  And it's my introducing that,
10   she didn't ask for it.
11   Q.    Let me ask you something.
12   When you sat down and started the meeting,
13   did she introduce the other woman who was
14   there?
15   A.    Yes.
16   Q.    Did she tell you who the other
17   person was?
18   A.    She did.
19   Q.    What did she tell you about
20   the other person?
21   A.    She told me -- She just called
22   her name, didn't say from what
23   department she was in.

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

177

1    Q.    Did the other woman there ask
2    you any questions?
3    A.    No.
4    Q.    Did she say anything?
5    A.    If she -- Yes, she said
6    something. Just as an employee, you must be
7    careful how you treat each other and work
8    along side by side and leave the personal
9    differences at home and just pleasant work
10   environment, stuff like that.
11   Q.    Okay. What did you tell Sonya
12   and the other woman about Jason Campbell,
13   Cadillac, and Chet?
14   A.    I don't know. The only thing
15   I said about them is how much I love them, I
16   prayed with them, counseled them, and
17   encouraged them. And that people from a
18   personal viewpoint don't like to see them
19   acquire the status that they get in the NFL
20   and different places, and that people would
21   do almost anything to stop that. And it
22   wasn't necessarily saying that anyone from
23   Auburn University was that way. But she was

178

1    asking me -- She wasn't asking me, I was
2    just saying as a minister, why I counseled
3    them and encouraged them. And that just
4    came about.
5          But the only thing I said
6    about Chet was that he was the chaplain.
7    You know, I said I counseled and encouraged
8    them from my own personal viewpoint, and
9    that he's one of the chaplains that works
10   with them also. That's about all I said
11   about him. And I treated Jason like I did
12   my sons and stuff like that. I loved them
13   that much.
14   Q.    I guess they're gone on now to
15   other things, but at the time they were
16   their ball players?
17   A.    Uh-huh.
18   Q.    You had a personal ministerial
19   relationship with those guys?
20   A.    It was more so just personal.
21   I just looked at them like I was their god
22   daddy and somebody to keep up with them and
23   encourage them, not that they called me. It

179

1    was just me just -- like I said, once again,
2    one of the outreach ministries that I like
3    to get involved in doing.
4    Q.    Okay. Did you tell them --
5    Did you tell Sonya and this other person
6    anything about Mary Teffend?
7    A.    I remember in the first
8    meeting, and pardon me for this, that I felt
9    like Mary Teffend was -- and her staff was
10   overpersonally involved. Because I had
11   actually seen a lot of her staff members
12   pass by my place of residence late at night,
13   just constantly a period after I seen her
14   several times.
15   Q.    I missed part of what you
16   said.
17   A.    I said I've seen -- I pointed
18   out -- Actually I pointed it out in the
19   first meeting, now that I remember, that
20   Ms. Teffend and her staff were riding
21   through my neighborhood at all times of day
22   and night, whether they was visiting
23   somebody or not, but it was too much of a

180

1    constant barrage of it. It was like -- You
2    would have to stop long enough to get out of
3    the car, as you come in one side -- it was
4    like a circle, you come in and go back out.
5    You would never get out and go in one's
6    home.
7          So I recognized them and I
8    felt like she had -- I felt like she had a
9    key to the house --
10   Q.    To your apartment?
11   A.    Right. Because people would
12   tell me that others were going into my
13   apartment when I wasn't there. And I asked
14   one of the neighbors to keep an eye on it,
15   the guy across the street. And he described
16   one of the vehicles that was going -- that
17   was getting out when I wasn't there going in
18   and out. And it was like -- it was her car.
19   Q.    Her, being Mary Teffend?
20   A.    Right. And so that's what I
21   meant. I couldn't -- I couldn't say for
22   exact, I didn't have it on tape or nothing
23   like that, saying that I saw -- saying that

45  (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

181

1  she actually entered it. When it was like
2  one of the neighbors said I seen a woman
3  come over, she drive this kind of car; he
4  described the lady. And that's what I was
5  just trying to let her know how games we
6  play here at the vet school. But actually
7  that came out in the first meeting. I
8  forgot about that.
9        Q.    Did it come up again in the
10  second meeting with the third person?
11       A.    It could have. I can't recall
12  exactly, but it may have.
13       Q.    Do you have any belief as to
14  why Mary Teffend would come into your
15  apartment?
16       A.    No. Other than just -- Well,
17  no, not exactly. But you have to realize
18  that Auburn is a very small town, and that
19  everyone knows everyone. And sometimes
20  we -- as I described earlier, people tend to
21  have the wrong ideas. And we do -- you
22  know, people do commit crimes. And so we
23  tend -- if we know someone who can just

182

1  allow us to express all our ill feelings
2  towards someone else, just something to say,
3  well, I'm doing thus and so. Like I said, I
4  don't have any proof of that. I just said
5  that someone said that there was someone
6  like her. And besides, I had seen her
7  several times ride past the house. It's a
8  duplex. And so when he described her in her
9  car, I felt like maybe that was her. So
10  that's why I said that. I think -- It seems
11  like maybe she does. I couldn't just state
12  that as a fact.
13       Q.    Well, again, my question is
14  why in the world would she do that?
15       A.    As I just said, I
16  sometimes -- if -- I don't know. Like I
17  said, that would be something that you would
18  have to understand the individual to be able
19  to say. If she did it; I didn't say that
20  she actually done it. I said -- But I did
21  see her pass by the house all the time. I
22  do recall that.
23            But I can't say why she would

183

1  do it. As I said, from a sociological
2  viewpoint as I just described, we do a lot
3  of things that we shouldn't do.
4        Q.    Did you tell -- And this might
5  have been in the meeting with -- in
6  Dr. Whitley's office or this might have been
7  the second meeting with Sonya and the third
8  person. I'm not sure what her name is. In
9  either of those meetings, did you say that
10  the other employees in the vet school were
11  trying to lean on you in some way?
12       A.    A lot of that came out, yes,
13  when I was describing to Ms. Dixon how we --
14  how they behaved as I said earlier. We
15  do -- The principles and the standards are
16  relaxed, and you do a lot of things you
17  shouldn't do. So a lot of that -- Even the
18  first conversation with Ms. Dixon and the
19  second conversation, I'm sure it did. If I
20  opened my mouth, I'm sure I said it more
21  like that.
22       Q.    What do you mean when you say
23  people lean on you? I think you said it

184

1  earlier this morning that people sometimes
2  want to be close to you, a spiritual person
3  to get a blessing or something like that.
4  Is that pretty much the same idea?
5        A.    Yeah.
6        Q.    And in this meeting, again,
7  with Sonya and the third -- the female, the
8  twenty-seven-year-old female, did you tell
9  those two ladies anything else about Bud and
10  what he was doing?
11       A.    No.
12       Q.    Okay. How did this meeting
13  conclude?
14       A.    Thank you for meeting with us;
15  if you need us, you can get in touch with
16  us. I think Ms. Dixon gave me her card; and
17  have a good day.
18       Q.    Okay. And soon after this
19  meeting you were put on leave; is that
20  right?
21       A.    Yes.
22       Q.    Okay. How is it -- I think
23  we're done with Number 3.

46  (Pages 181 to 184)

# FREEDOM COURT REPORTING

185

1    How was it communicated to you
2    that you were going to be put on leave?
3    A.    After I came back from the few
4    days vacation, this was after the second
5    meeting, the meeting was on like a -- the
6    second meeting was on like a Friday, so I
7    left out and stayed -- I think I stayed out
8    a week. I might have stayed longer than
9    that; I think it was like a week. And once
10   I came back, I was called to a meeting in
11   another conference room. This was not the
12   same conference room that we had the second
13   conversation with Ms. Dixon, Albert Snipes,
14   and myself. And they came -- walked in and
15   introduced -- actually she said, you know,
16   I'm Ms. Dixon and this is Albert Snipes, and
17   we want to talk with you regarding the
18   meeting we've had -- I've had with you and
19   Mr. Richards. We feel that it was too much
20   to just look past and that we want to make
21   it a better environment for both you and
22   him. And, of course, during that, I can
23   recall everything Ms. Dixon says. Ms. Dixon

186

1    said a lot of stuff that -- she's like a
2    preacher herself. She adds a lot of stuff
3    into the conversations, into that part of
4    what you're discussing. So I can't recall
5    everything exactly she said in her
6    introduction of why we were here. After she
7    finished all of that, she went to saying
8    well the purpose of this meeting is to
9    inform you that we would like to offer you
10   counseling. And I said counseling, what do
11   you mean? We would like to send you to have
12   psychological care. I said psych care? I
13   said, I don't need psych care. We offer
14   this at the University here, and she didn't
15   tell me it was voluntary. We would like
16   to -- we just -- We have set up, and she
17   describes as it does in the employee
18   handbook and other pamphlets that you get
19   out of the human resource office, they offer
20   different people different places and for
21   counseling and for various reasons, all of
22   this and all of that.
23       And I went on to say that I

187

1    didn't feel -- I felt like I didn't need
2    counseling, why would I need it in the first
3    place. And then after a while I was trying
4    to get the understanding of this, because
5    Ms. Dixon just elaborates continuously. I
6    interrupted her and asked her, well, who are
7    you, again, talking to Albert Snipes. And
8    he said, my name Albert Snipes, I'm from
9    affirmative action. Now, Albert Snipes is
10   not in affirmative action. Albert Snipes is
11   in human resources under Lynn Hamlin, but he
12   told me he was from affirmative action.
13       I didn't quite understand what
14   all that means, because I was pretty much
15   knocked off my feet for them to tell me I
16   needed psych counseling. She said that we
17   want -- Auburn University will pay for it,
18   we will give you some time off and you will
19   not use your own time, and that we will pay
20   for the psychiatrist ourselves, and that it
21   would not -- you would not have to use any
22   of your insurance. And I went, man, I guess
23   Jason Campbell and them would love to hear

188

1    about this, wouldn't they? You know, I was
2    very uncomfortable that I would be forced to
3    go by them to have psychiatric treatment for
4    something I didn't know what had occurred.
5        And besides it's nothing wrong
6    with going to a psychiatrist if you need
7    a -- psychologist if you need it. But now
8    if I hadn't have done nothing, it was not
9    their place to offer -- to force me to go.
10   Okay. So I went on to say, man, Jason
11   Campbell and them would love to hear about
12   this one. Those are my heart, and they
13   still are: I love them like they're my own
14   children.
15       And I said, well, what if I
16   don't want to go to a psych care. And
17   Albert Snipes said, well, you will be
18   terminated. I said, be terminated, for what
19   reasons? I said, I have not done anything.
20   Well, you can't go around threatening
21   people. I said, I can't go around
22   threatening people? I didn't threaten him
23   the first time. I didn't say I was going to

47 (Pages 185 to 188)

# FREEDOM COURT REPORTING

189

1  do anything.  I ain't like I said I was
2  going to get something and hit him with it.
3  And we covered that already.  And I said,
4  well, that only happened one time, am I
5  supposed to get like a warning or something.
6  Well, this is your warning.  And if it
7  occurs again, you will be terminated.
8         So Ms. Dixon just basically
9  wrapped up the meeting and saying that we'll
10  arrange all of this and gave me the name of
11  the doctor to attend.  But they failed to
12  tell me that it was supposed to have been a
13  voluntary thing.  That that's not
14  something -- plus, as you received from me,
15  the paper copies of the supervisor's rights
16  for the employer, that that's a voluntary,
17  and if my behavior does not exit that, I do
18  not need to go; and, two, if I choose not to
19  have counseling after they've offered or not
20  necessary suggested it, but offered it and
21  not received it, then I would be judged by
22  my behavior as an employee.
23         But Albert made it seem like

190

1  if I didn't go, I would be terminated and
2  there was no joking and laughing at all.
3         Q.    Okay.  Let me ask you a couple
4  follow-ups if I can.
5         A.    Sure.
6         Q.    Where was this meeting held?
7         A.    At the vet school in a
8  meeting -- conference room across from
9  Dr. Whitley's office.
10         Q.    Do you remember what time of
11  day it was?
12         A.    Yes.  It was early in the
13  morning, about 9 o'clock.
14         Q.    Do you remember what day of
15  the week it was?  Was it your first day back
16  from vacation?
17         A.    Yes, my first day back.  So I
18  suppose it was a Monday.
19         Q.    Okay.  Sonya Dixon is an
20  African-American female?
21         A.    Yes.
22         Q.    Albert Snipes is an
23  African-American male?

191

1         A.    Right.
2         Q.    When you stated just a few
3  minutes ago that Jason Campbell would love
4  to hear about this, was that something that
5  you stated out loud to them?
6         A.    Of course.
7         Q.    Did they respond to that in
8  any way?
9         A.    No.  It was just my personal
10  view.
11         Q.    And did you tell them in this
12  meeting anything else about Bud and how you
13  felt Bud was trying to --
14         A.    No.
15         Q.    -- how he was trying to hook
16  up with you or anything like that?
17         A.    No.
18         Q.    They gave you the name of a
19  psychologist?
20         A.    Uh-huh.
21         Q.    I believe his name was
22  Dr. Vollenweider, or something like that?
23         A.    It's on the employee file, but

192

1  I believe it is.
2            (Whereupon, Defendant's
3            Exhibit No. 4 was marked
4            for identification.)
5         Q.    Would you look at what I've
6  marked as Exhibit 4, please.
7         A.    (Witness complies.)  Okay.
8         Q.    Have you had a chance to read
9  Exhibit 4?
10         A.    Yes.
11         Q.    Is today the first time that
12  you've seen that document?
13         A.    No.
14         Q.    When was the first time that
15  you saw that document?
16         A.    When I received the file from
17  you.
18         Q.    Okay.  So until you received
19  the file from me, which I guess would have
20  been probably like November or December of
21  this year -- or last year, '07, that would
22  have been the first time that you saw this
23  document?

48  (Pages 189 to 192)

# FREEDOM COURT REPORTING

193

1    A.    Right.
2    Q.    Okay. Let me ask you a few
3    questions about it. Do you recall going to
4    meet with Dr. Vollenweider on June 27th and
5    June 29th of '05?
6    A.    Yes.
7    Q.    Do you feel like you
8    cooperated fully with what he wanted to do,
9    his questions and that sort of thing?
10    A.    Yes. But he wanted me to have
11    more extensive psychotherapy as you read in
12    that Exhibit 4. And I told him that we
13    were -- that I was not going to do it.
14    Q.    Okay. Do you remember taking
15    the different tests and so forth that he
16    says he administered?
17    A.    Yes.
18    Q.    How were they done? Was it on
19    paper? Did you write answers down on paper?
20    How did that go?
21    A.    Some of them were
22    computerized, A, B, C, or D; some of them
23    was like ink blot. He would ask something

194

1    and get my reaction of it, basically that's
2    how they handled it.
3    Q.    Some of it was on paper, some
4    was on the computer, and some was just
5    orally, like we're doing today, he would ask
6    you questions?
7    A.    Right. Not on the computer,
8    but like a computerized sheet.
9    Q.    Like a scan sheet?
10    A.    Right.
11    Q.    Okay. He says in his letter
12    here: I also provided feedback to Mr. Dyess
13    regarding the test results.
14    Did he do that?
15    A.    Yeah. He told me that
16    everything was fine, that it didn't seem to
17    be anything he needed to -- deliberate
18    about.
19    Q.    What sort of questions did he
20    ask you when he was talking to you?
21    A.    He asked me about my personal
22    life as a minister. A lot of that came
23    because Ms. Dixon was calling him and

195

1    asking -- and informing him what to ask.
2    And I still want somebody to show me in the
3    employee handbook where they had that
4    permission to do all of that. That's not in
5    writing, but he told me that Ms. Dixon was
6    calling him and informing him what to ask
7    him -- what to ask me and what to find out.
8    Because even after the meetings of, I
9    believe the 27th and 29th on there, he
10    called me twice at home and asked more
11    questions. And I asked him why was he still
12    calling me, because he had told me -- he had
13    basically told me what this last paragraph
14    said that he would recommend, and I told him
15    I wasn't going to do it, and that was that.
16    But after the 29th, the last meeting, he
17    called me at home twice, different days.
18    And I asked him why was he calling me, and
19    he said, well, Ms. Dixon called me and she
20    went on and on and on and on. His words were that
21    she kept him on the phone much too long and
22    that -- he said she kept him on the phone to
23    find out and to giving him advice of what to

196

1    ask me a lot longer than our conversation --
2    he and our conversation had been. And so
3    that was why he was asking a lot of things
4    about my personal life as a minister and
5    some I answered, some I did not answer.
6            I wasn't incooperative, I was
7    just sort of -- just sort of said that's not
8    important and stuff like that. And he would
9    understand.
10    Q.    Okay. So the times that he
11    called you at home, there was some of his
12    questions that you did not answer?
13    A.    No. When we were in the
14    office he would ask me. When he had me on
15    the phone, just talking basically, as I
16    said, as the final paragraph in that
17    exhibit, his recommendations and all of
18    that, it was because Ms. Dixon was
19    encouraging him to do so. And, again, I
20    want to know who gave her the right to do
21    all that.
22    Q.    What specific questions did
23    Dr. Vollenweider ask you that you were not

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

197

1  willing to answer?
2      A.    Some of the same conversations
3  that you and I have had concerning minister
4  things that only another Christian and
5  minister could understand.
6          I probably answered them, I
7  just didn't elaborate as well -- as long as
8  I could have, that's what I mean.
9      Q.    Dr. Vollenweider states in his
10  second paragraph that it does not appear
11  that Mr. Dyess is imminently dangerous
12  toward himself or others.
13          Do you agree with that
14  statement?
15      A.    Of course.
16      Q.    And then he goes on to say
17  that Mr. Dyess was diagnosed with a
18  delusional disorder?
19      A.    Right.
20      Q.    Do you know what that means?
21      A.    Yes, I believe I do.  It
22  means -- Let me see, what's the word?
23          I understand what it means, I

198

1  just can't put it into words right now.  He
2  explained to me what it means.
3      Q.    Did he explain to you in the
4  office or on the phone?
5      A.    Both places.
6      Q.    Okay.  He explained to you
7  what that meant?
8      A.    Right.
9      Q.    Can you recall specifically
10  what he told you?
11      A.    He said that I tend to think
12  people -- I have a sort of a complex that
13  people -- that make me think that people are
14  out to get me, and that I was -- it made me
15  uncomfortable around individuals and that
16  that was perhaps the reason my work
17  environment was like it was.
18          But delusional is a more
19  complex terminology.  It's got another word
20  for it that he actually said, mildly
21  paranoid.  Mildly paranoidal, that's what he
22  originally said, and delusional came later
23  on paper.  And it also came from Ms. Dixon.

199

1  But he told me that I was mildly paranoidal.
2  Now, if someone is mildly paranoidal, in my
3  opinion, anyone can be mildly paranoidal if
4  they're being threatened or forced to take
5  psych care and all this unnecessary stuff
6  happening on their job.  Mildly paranoidal
7  is not extreme, nor low.  And any
8  individual, I don't care what degree they
9  have or what lifestyle, at some point in
10  time will experience mildly paranoidal.
11  It's normal.  Even I know that.  But
12  Ms. Dixon wanted -- He said Ms. Dixon was
13  asking him for information, she wanted to go
14  on file, she wanted to know exactly what the
15  psychological term was.  He said Ms. Dixon
16  was just wearing him thin, kept keeping him
17  on the phone for long periods of time in
18  order for him to ask me so that she could
19  know.
20          Now, still, I have not found
21  out whose idea and what legal terminology,
22  according to the University, that they had
23  to do all that, and what had I done at the

200

1  University concerning Mr. Richards that made
2  them want to do that.  I did not pick up
3  nothing.  I did not scream, and I did not
4  yell loudly, nor did I forcibly do anything
5  with him, other than to try to stay away
6  from around him to avoid his perverted
7  behavior, and at the same time try to cause
8  him to remain -- maintain a professional
9  behavior and treat me as I would like to be
10  treated like a Christian.
11          Now, what right gave Ms. Dixon
12  and anyone else to put me in that situation
13  of which I could not avoid because no one
14  else would listen.  Dr. Saidla knew of it
15  and Dr. Whitley and all these people, and
16  Ms. Johnson, Dr. Whitley's executive
17  assistant, and throughout the vet school
18  knew of that occurring.  They had to know,
19  they paid for it; for two months I was off
20  and got paid forty hours a week by them.
21  And I still have not found anything in the
22  employee handbook that allowed them to do
23  all that.

50  (Pages 197 to 200)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

201

1    Q.    So you were paid during the
2  time that you were off?
3    A.    Yes, sir.  By them.  Not my
4  vacation or sick time or nothing.
5    Q.    By Auburn?
6    A.    Right.
7    Q.    I could tell that you're not
8  very happy about this --
9    A.    No, sir.
10    Q.    -- incident?
11    A.    I'm very, very upset.
12    Q.    Okay.  And this incident is
13  part of -- it's one of the things you filed
14  this lawsuit about?
15    A.    Exactly.
16    Q.    You say it's one of the main
17  things you're filing this lawsuit about?
18    A.    No.  It's ranked up there kind
19  of high, but it's not one of the main
20  things.
21    Q.    It's just one of the things?
22    A.    Correct.
23    Q.    Did you ever go to the EEOC

202

1  and file a complaint or file any kind of
2  complaint before you were terminated?
3    A.    No.
4    Q.    So let's look back at Exhibit
5  4 again.  I have a few more questions to ask
6  you about it.  And I think you've already
7  answered them, so I'll go through them
8  quick.
9          Dr. Vollenweider says it's
10  recommended that Mr. Dyess participate in
11  individual psychotherapy.  Did you do that?
12    A.    No.
13    Q.    In addition to addressing his
14  primary psychological difficulties,
15  psychotherapy should focus on helping
16  Mr. Dyess relate to others in work settings.
17          Did you get any other
18  psychotherapy to help you relate to others
19  in work settings?
20    A.    No.
21    Q.    Lastly, concerns about family
22  issues have also been raised and may be a
23  focus of psychotherapy.

203

1          Have you gotten any other
2  psychotherapy relating to family issues?
3    A.    No.
4    Q.    Do you know what the family
5  issues were he was referring to?
6    A.    No.  Ms. Dixon probably helped
7  him out.
8    Q.    You think that came from
9  Ms. Dixon?
10    A.    It had to.  He told me on the
11  phone that after we had concluded our
12  meetings with him, the two meetings, two or
13  three meetings, whatever, that Ms. Dixon --
14  I asked him why was he calling.  And
15  Ms. Dixon was informing him, and that she
16  was just going on and on and on, keeping him
17  on his telephone too long -- keeping him on
18  the phone too long trying to find out
19  something concerning me.  So those were her
20  ideas, they were not his.
21    Q.    Lastly, he states:  It is also
22  recommend had Mr. Dyess participate in a
23  psychiatric evaluation to determine whether

204

1  psychotropic medications would be helpful to
2  treat his psychological difficulties.
3          Did you ever do that?
4    A.    Of course not.
5    Q.    Did you ever take any
6  psychotropic medications?
7    A.    Of course not.
8    Q.    Do you know what a
9  psychotropic medication is?
10    A.    It alters the behavior,
11  personality and it makes you more calm or
12  normal, get along with people easily,
13  relaxes you.
14    Q.    Have you ever in your life
15  taken any medicine like that?
16    A.    Of course not.
17    Q.    Do you feel that you need it?
18    A.    No.
19    Q.    I take it you never called
20  Doctors -- I'm going to try to pronounce the
21  name, you doctor never called Dr. Lusche or
22  Dr. Kern at East Alabama Mental Health
23  Center?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

205

1   A.   No.
2   Q.   Did you ever call
3   Dr. Vollenweider back and say, hey, why'd
4   you write this stuff about me?
5   A.   No.  But I may have called him
6   just to get the names.  Because, once,
7   again, I was not informed -- I did not have
8   it in writing like Exhibit 4 is.  They were
9   not about to let me come back to work right
10  then because with Ms. Dixon I never could
11  have got her on the phone.  I should have
12  been back to work like -- well, I should
13  have been there period.  But after the
14  ordeal, I should have been back to work like
15  two or three days later.  It took a month
16  and a half to get Ms. Dixon on the phone and
17  arranging for me to return back to work.  So
18  within that time, I think like a week later,
19  I may have called Dr. -- however you say his
20  name, Vollenweider to inquire so as if I
21  wanted to do it.  I did not mean that I was
22  going to actually do it.  I already told him
23  I was not going to.  Just in a moment of

206

1   stress or something maybe I do need to get
2   it all over with, right.  But I didn't have
3   the desire to do it, it was just a
4   conversation with him to put this in reverse
5   that had occurred.  Because Ms. Dixon, when
6   I did get her on the phone, would say, well,
7   he recommend what's stated in this copy
8   here, Exhibit 4, and we're trying to see --
9   you know, she stretched it out.  Like I
10  said, the whole conversation just -- So
11  anyway, so in order to try to get to the
12  bottom of it, I might have called him.  I
13  believe I did just to get the idea.  But no,
14  I never inquired, called no psychologist or
15  no other kind of doctor concerning my mental
16  health.
17  Q.   Did you tell Dr. Vollenweider
18  anything about Bud Richards wanting to come
19  onto you or anything like that?
20  A.   Yes.  I'm sure I did.
21  Q.   Do you remember specifically
22  what you told him about that?
23  A.   Just what about -- Like I've

207

1   already stated, that I felt like he was
2   unprofessional, that he was acting more like
3   he wanted to date me and go out, and he was
4   using the job to do that.
5        (Whereupon, Defendant's
6         Exhibit No. 5 was marked
7         for identification.)
8   Q.   Let me show you what I've
9   marked as Exhibit Number 5.  I'll give you a
10  second to look over that.
11  A.   Gotcha.
12  Q.   Did you receive Exhibit 5?
13  A.   Yes.
14  Q.   When did you receive it?
15  A.   In November of last year, when
16  you sent that file.
17  Q.   So you never received it from
18  Dr. Saidla?
19       Take a look at that
20  (indicating), it's addressed to you.
21  A.   Yes.  This I received on the
22  date that I returned to work, stated on this
23  exhibit.

208

1   Q.   The memo is dated August 15th.
2   A.   Okay.
3   Q.   And it says:  You may return
4   to work on Wednesday, August 17th.  So how
5   was it given to you and --
6   A.   Mr. Richards handed it to me,
7   I remember.
8   Q.   Did he bring it out to your
9   apartment?
10  A.   No.  Once I came to work, he
11  gave it to me.
12  Q.   Was that on August 17th?
13  A.   Yes.  I assume so.
14  Q.   Did somebody call you and tell
15  you to come in on the 17th?
16  A.   No.  I came in one particular
17  payday to pick up my paycheck, and
18  Dr. Whitley was in his office, and I asked
19  him to get to the bottom of my returning to
20  work and that he didn't understand what the
21  holdup was and that he didn't know anything
22  about it and he didn't even -- he didn't
23  even understand why Ms. Dixon had not

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

209

1  allowed me to return yet. And he obviously
2  talked with Ms. Dixon and Dr. Saidla, and I
3  was -- received a phone call from Ms. Dixon
4  on when to return to work, and I did, of
5  course.
6      Q.    You said Ms. Dixon called you
7  and told you when to come back in?
8      A.    Finally, yes. After a month
9  or so of having -- leaving numerous
10 messages, she finally called. But that was
11 after Dr. Whitley called and got to the
12 bottom of it.
13     Q.    And you believe that you were
14 given this memo -- If you came back to work
15 on August 17th, you believe that you were
16 given this memo on August 17th and not
17 August 15th?
18     A.    Yes. I received that on the
19 day I returned to work. No one came or
20 mailed anything.
21     Q.    Okay. Was there a meeting on
22 that morning between you, Bud, Dr. Saidla,
23 and David Whitley?

210

1      A.    No.
2      Q.    Was there a meeting that
3  morning?
4      A.    No. He just gave me the
5  letter. I read it and returned to work.
6      Q.    You didn't have any meeting
7  with Bud about job expectations and things
8  of that nature?
9      A.    Nothing like that, I don't
10 recall nothing.
11     Q.    When you got this memo,
12 Exhibit 5 -- See where it says before you
13 begin working, you are to discuss your hours
14 with your supervisor, Mr. Bud Richards?
15     A.    Uh-huh.
16     Q.    Since you will have weekend
17 duty as well as working Monday to Friday.
18 Do you see where it says that?
19     A.    Yes, I recall.
20     Q.    Did you do that?
21     A.    Yes. He may have just told me
22 what my hours were, if there was any change
23 at all. Because once -- I received a letter

211

1  from them when I became -- he became my
2  supervisor, and it had the hours on it then.
3  So I didn't have to -- he didn't have to do
4  too much updating the hours, I already knew
5  they were pretty much the same then.
6      Q.    So here is what I'm trying to
7  figure out. Was there a meeting or was
8  there not a meeting?
9      A.    I don't recall a meeting. All
10 I recall is that a letter was given to me,
11 this letter, on August 17th, once I returned
12 to work, handed to me by Mr. Richards. I
13 don't recall a meeting.
14         (Whereupon, Defendant's
15         Exhibit No. 6 was marked
16         for identification.)
17     Q.    Exhibit 6 is another memo
18 that's dated August 17th, 2005. Would you
19 take a minute to look at that.
20     A.    There must have been a
21 meeting. I just can't recall it. It's been
22 two years now, I can't remember everything.
23     Q.    Yeah. This document, Exhibit

212

1  6, I'm guessing you probably didn't see, at
2  least this front page, until I provided it
3  to you in December. Do you think that's
4  accurate? Because it says it's a memo to
5  the file or a memo for the record.
6         Was this given to you?
7      A.    This part was given.
8      Q.    The basic?
9      A.    The basic part, pages two and
10 three of this. This was given when I was --
11 Mr. Richards became my supervisor. Now, I
12 remember getting this. I didn't have to
13 have an update on duties.
14     Q.    Okay. So let me see if I can
15 be clear. You don't remember getting the
16 first page that has the number 161 at the
17 bottom? See that 161?
18     A.    What I'm saying is I -- We had
19 to have a meeting with Dr. Saidla, I just
20 can't recall it.
21     Q.    Okay.
22     A.    Now the second part -- Which
23 meant if we had this meeting, I wouldn't

53 (Pages 209 to 212)

## FREEDOM COURT REPORTING

213

1  have had to have this here given to me. It
2  occurred. This is his statement of what
3  happened at the meeting, I just can't
4  remember having it.
5      Q.    Okay.
6      A.    Which meant they didn't give
7  me a copy of this, and I didn't see it until
8  you mailed me the file.
9      Q.    Okay.
10      A.    But this basic duty part, even
11  though it's got 8/17 on it, I received when
12  Mr. Richards became my supervisor.
13      Q.    Okay.
14      A.    Because he had to reassign the
15  duties and what all I had to do, and so on
16  and so forth. So I do recall getting this
17  basic duties sheet, but I don't recall --
18  They could have given it to me again, but I
19  do remember getting it when he became my
20  supervisor, which was back in May or June
21  before I went on this leave.
22      Q.    At least, according to Exhibit
23  6, and I know you said you don't remember

214

1  the meeting, but at least according to
2  Exhibit 6, it appears that at least
3  Dr. Whitley is saying there was a meeting
4  with you, Bud --
5      A.    Dr. Whitley is not saying
6  nothing.
7      Q.    Is this not a memo that
8  Dr. Whitley wrote?
9      A.    Oh, okay. I get it.
10      Q.    Do you see what I'm saying?
11      A.    Yeah. Okay. I remember.
12          That's what makes it difficult
13  to remember. I did not meet with
14  Dr. Whitley. Now, if I met with someone of
15  which this exhibit states that I did, I met
16  with Dr. Saidla and Mr. Richards. But I do
17  not remember meeting with -- I do not recall
18  meeting with Dr. Whitley about anything.
19      Q.    You don't think Dr. Whitley
20  was in?
21      A.    Now, he -- This does not mean
22  that Dr. Whitley did not know of this. But
23  now, they sign each other name and put --

215

1  not that I'm saying they do illegal work,
2  but I'm saying that this could have meant to
3  come from him. But that does not mean -- I
4  did not meet with Dr. Whitley, that's what
5  makes it hard for me to believe that we had
6  a meeting, period. If I met with
7  Dr. Whitley about something, I remember
8  meeting with him.
9      Q.    Okay.
10      A.    But now -- Right. That's what
11  makes it difficult to remember. Because
12  Dr. Whitley and I -- we did not meet with
13  Dr. Whitley about anything.
14      Q.    I understand. I understand
15  what you're saying.
16          Do you remember now that there
17  maybe was a meeting with Dr. Saidla and Bud
18  Richards?
19      A.    No, I don't remember it. It
20  could have been.
21      Q.    Okay. If you don't remember
22  it, no sense in me asking you questions
23  about it, is it?

216

1      A.    Exactly.
2      Q.    Okay. We believe that you
3  returned to work on August 17th, 2005.
4      A.    Right.
5      Q.    I'm not going to ask you
6  anything else about this Exhibit 6.
7      A.    Okay.
8      Q.    Soon after you returned to
9  work, do you remember working with Chris
10  Farrell?
11      A.    Yes.
12      Q.    Did you have a conversation
13  with Chris soon after you came back?
14      A.    We could have. We probably
15  talked a little bit about something.
16      Q.    Was Chris a supervisor of
17  yours?
18      A.    No.
19      Q.    He was just a coworker?
20      A.    Right.
21      Q.    Do you remember telling Chris
22  or asking Chris not to talk to you in front
23  of the other employees?

54  (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

217

1    A.    Yeah, I probably did.  Yes,
2    I'm sure I did.
3    Q.    Okay.  Can you explain to me
4    why you would want Chris not to talk to you
5    in front of the other employees?
6    A.    Because as I worked so hard in
7    trying to explain during this deposition, it
8    created very hostile environment.  It was
9    very hard to work with those people.
10    All I wanted to do was go, be
11    a good employees.  And I loved those
12    students, both African-American students and
13    the Caucasians.  I treated Caucasian
14    students like they were my children, I loved
15    them from my heart.
16    I did not have time for their
17    petty, John's stealing towels out of the
18    room and stealing towels and taking towels
19    and putting them there, and then they go get
20    the towels and send Mr. Richards in.  I go
21    get more stacks, John taking more towels.
22    He comes yeah.  I did not have time for that
23    day in and day out.  And I should not have

218

1    to have myself being treated that way.
2    And I was not hostile, I was
3    not loud, I was not anywhere near forceful
4    like I am now.  But, yes, I'm sure I did ask
5    him in a decent way not to hold a
6    conversation because he was just -- it was
7    just a setup, you know, a setup started
8    this.  The whole thing was -- Chris was the
9    one who told Mr. Richards that I was late.
10    Mr. Richards was not even there on the date
11    of the -- I'm sure you read my statement, on
12    the day I was running late and all -- before
13    I was terminated.  Chris is the one.  So I
14    was trying to avoid all of that.  So, yes,
15    I'm sure I did ask him to stop, as well as
16    the other ones.
17    Q.    Did you tell Chris that you
18    would talk to him, just y'all two alone?
19    A.    I probably did.  Yes, I could
20    have.
21    Q.    Okay.  I guess what I'm trying
22    to figure out:  Why would you be willing to
23    talk with Chris one-on-one personally but

219

1    not while others are around?
2    A.    Because it involves other
3    people.  And other people will add to as
4    well as make the situation worse.  Now, I
5    could handle one-on-one if I talk, he talk,
6    we listen to each other.  But other people
7    are going to put their viewpoints in both
8    then and later.
9    So to keep down a conflict all
10    the time, I just want to just address him
11    and not offend him.  You know, be nice and
12    kind to him, and just kind of let him know,
13    let's leave each other alone, as far as
14    friends, let's work.  If you need me to do
15    something, fine, if not, just pretend like
16    I'm not there.  In other words, act
17    professional.  Yes, I probably told him that
18    several times.
19    Q.    Did you make any statement to
20    Chris that you were the light and others
21    were the darkness?
22    A.    Yes, in a ministerial
23    perspective.  That's Matthew 7th chapter,

220

1    Scripture wise.
2    Q.    And who did you mean by the
3    others?
4    A.    Other employees.  Not -- I
5    generalized a lot.  I don't necessarily
6    individualize.
7    Q.    Did you tell Chris not to be
8    around Sara Henderson?
9    A.    On a one-on-one basis when I
10    finally had a conversation separately, yes,
11    I'm sure I did.
12    Q.    And why did you think that
13    Chris shouldn't be around Sara Henderson?
14    A.    Because people like
15    Ms. Henderson know people from Mobile, and
16    they're related, they've got friends, they
17    drive to and conversate.  And they interact
18    and cause confusion.  That's very simple to
19    understand.  And they will create -- As I
20    just stated, they will create a very hostile
21    environment.  They make me uncomfortable,
22    they talk about things that I don't want to
23    discuss.  And the idea was to avoid where we

55  (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

221

1  are now.
2  So I figured if he stayed away
3  from around her and not allow her to tell
4  him -- give him ideas, then I could be --
5  maybe he and I could help each other -- or
6  he could help me and be a better employee as
7  it relates to communicating with them as
8  Dr. Vollenweider encouraged me to do. So,
9  see, he could help me to be a true friend,
10  honest and true.
11  Where I have always knew there
12  are people got relatives and they talk about
13  things I don't want to talk about. Ms. Sara
14  and their people told those people things
15  about my life that I didn't even tell them
16  myself. So -- And simply the reason is just
17  conversation, and that's what I was trying
18  to avoid.
19  Q.  So let me see if I understand
20  this. Sara Henderson is another co-employee
21  that y'all worked with?
22  A.  Right.
23  Q.  And she's from Mobile?

222

1  A.  No. She probably -- She's
2  from Auburn or that way. But I said she may
3  have had relatives, and I think she does
4  that -- from Mobile who know me.
5  Q.  Okay. And you just didn't
6  want Chris to talk to Sara and get any wrong
7  ideas like from her family who knew you from
8  Mobile?
9  A.  Exactly.
10  Q.  Okay. Did you tell Chris that
11  Sara was a bad influence?
12  A.  I doubt it. I don't think I'd
13  be quite that direct.
14  Q.  You don't think you used those
15  words, bad influence?
16  A.  No, I doubt it. I don't use
17  that kind of --
18  Q.  Was Sara one of the other
19  employees that you referred to as the
20  darkness?
21  A.  It didn't matter who I
22  referred to, it was generally speaking.
23  Q.  Just generally speaking, the

223

1  other employees?
2  A.  Right.
3  Q.  Have you ever picked on Sara
4  because of her English?
5  A.  No. I might find it humorous
6  on the way they -- some people say things.
7  Even myself, I use bad grammar. But not to
8  her personally.
9  Q.  Just to other people around?
10  A.  No, not to no one else. Now,
11  I might giggle or laugh to myself, but
12  not -- definitely not no one else.
13  Now, see, you're getting
14  into -- you're looking at people with
15  personal problems, personal views, and even
16  prejudices, even from a African-American
17  viewpoint. You know, they got the wrong
18  word prejudices. But she probably had views
19  of me that she wanted to express, and a lot
20  of that came out when Ms. Dixon would
21  interview them regarding the conflicts on
22  the job.
23  Q.  Is Sara Henderson white or

224

1  black?
2  A.  African-American.
3  Q.  African-American, I'm sorry.
4  What's wrong with how Sara Henderson talks?
5  A.  There's not nothing wrong with
6  her talk. I said I may have laughed. I'm
7  not saying that I actually done it.
8  Q.  What is it about the way she
9  talks that would make you laugh?
10  A.  I did not say that I laughed.
11  You asked me did I do it. I did not say
12  that there's anything wrong with her
13  laughing. I said if she did, which I do
14  that -- If I find something humorous like as
15  a joke, you may say a word the wrong way or
16  interject it in the wrong way; in the
17  incorrect way, I may find it humorous. I
18  did not say that I actually done it, which
19  means I did not have a problem with her
20  conversation or the way she talks.
21  Q.  Did you tell Chris
22  Henderson -- Chris Farrell that the secure
23  particular world wanted you to be gay, but

## FREEDOM COURT REPORTING

225

1　God didn't want you to be gay?
2　　A.　I'm sure I did, yes.
3　　Q.　And what did you mean by that?
4　　A.　As I stated earlier, people
5　want -- You understand there's an enemy for
6　Christian people, the devil, or Satan as he
7　is called in the Bible. Case in point.
8　　Q.　Did you and Renza Floyd talk
9　much?
10　　A.　Yeah, sometimes.
11　　Q.　And what race is Renza?
12　　A.　African-American.
13　　Q.　Is he a male?
14　　A.　Yes.
15　　Q.　Did you and Renza Floyd ever
16　talk about Bud Richards?
17　　A.　Yes. From time to time.
18　　Q.　Okay. What kind of
19　conversations would y'all have about Bud?
20　　A.　Just the obvious, that I was
21　trying to be a good employee, that he was
22　just leaning on me too much and trying to
23　act like he wasn't perverted, and that I

226

1　didn't know how to stop it, and that he
2　needed to not do it, just the obvious stuff.
3　Not anything that perhaps what you don't
4　already know.
5　　Q.　Mr. Dyess, we're going to talk
6　in more detail about the letter that you
7　wrote that you were terminated. Do you
8　remember the letter? It's dated June 8th,
9　2006.
10　　　　I don't want to go too much
11　into it right now, but you mentioned in your
12　letter that in December of 2005, you met
13　with Ms. Dixon of human resources?
14　　A.　Uh-huh.
15　　Q.　So you came back to work --
16　Let's just get the time frame in. You came
17　back to work in August of '05?
18　　A.　Uh-huh.
19　　Q.　And then we'll try to fill in
20　some details. And then in December 2005,
21　you met with Sonya Dixon again?
22　　A.　Uh-huh.
23　　Q.　Do you remember?

227

1　　A.　Yes. I met with her several
2　times between then too, but . . .
3　　Q.　Okay. On the December 2005
4　first, was there something specific that
5　prompted you to meet with Sonya Dixon in
6　December of 2005?
7　　A.　Yes. That was when I had -- I
8　was in Mr. Richards' office one morning
9　getting some cleaning solution and I, on his
10　desk, saw my name on a typed report and on
11　my behavior and work habits for the vet
12　school. And I went to her as I did several
13　times before even then -- before then, I
14　talked with Dean Busenjer. I believe he's,
15　it's head man there at the college of
16　veterinary medicine, on Mr. Richards'
17　behavior. And so I talked to Ms. Dixon
18　several times. So to talk with her then was
19　not a surprise as well as that was the time
20　when Dr. Saidla threw me out of his office
21　and said he didn't care who I talked to, the
22　governor or anybody else. And Dr. Whitley
23　was also there. That was the reason why

228

1　that particular incident occurred, and
2　Mr. Richards walked in too.
3　　Q.　In December of '05?
4　　A.　Yes, in the meeting where
5　Dr. Saidla was yelling and throwing me out,
6　so to speak. So, yes, I remember talking to
7　Ms. Dixon then.
8　　Q.　Okay. Who arranged for the
9　meeting in December 2005? Did you ask for
10　the meeting or did Bud ask for the meeting
11　or did Sonya ask for the meeting or do you
12　know?
13　　A.　The meeting with who?
14　　Q.　With Sonya Dixon?
15　　A.　I did. After Dr. Saidla
16　wouldn't listen, I had to go talk to
17　Ms. Dixon.
18　　Q.　Tell me everything that you
19　recall about the meeting in December '05
20　between you and Sonya Dixon?
21　　A.　Basically, Ms. Dixon was told
22　once again, as I stated earlier, that she
23　had been met -- that we had met each other

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

229

1  several times during August 17th and
2  December of 2005. I was constantly keeping
3  her informed of what was happening, and that
4  Mr. Richards -- I informed her in that
5  meeting in December 2005, that I had seen
6  the letter with my work ethics and habits on
7  Mr. Richards' desk, and that Dr. Saidla
8  would not have a meeting with me to discuss
9  them, and that he had -- basically didn't
10 want me in his office anymore, and that I
11 felt like Mr. Richards was plotting and
12 setting up something to cause for future
13 reference for like if -- writing things down
14 and keeping a file or inventing things.
15 See, a lot of things Mr. Richards invented.
16 As I told you earlier, he was not there to
17 try to find -- to actually know.
18        I was also helping out during
19 that time in the supply room with Dickie
20 Powell, and he would keep me going and
21 coming and going and coming. And a lot of
22 my dillydallying so to speak, or not being
23 where I should have been, was because of

230

1  that. Mr. Powell would ask me they want you
2  to distribute packages, drive the truck,
3  load the packages when they would come in
4  from UPS and FedEx and distribute them
5  throughout the vet school, and especially
6  the small animal clinic. So my
7  dillydallying would either be distributing
8  or putting, and then I would have to get
9  back and do my same work at the vet school,
10 at the small animal clinic, and at the same
11 time keep up with him. He wouldn't be
12 there, I would have to take the truck key
13 back, he wouldn't be over there. Come back
14 over and see me later on, he wouldn't be
15 there. So all of that was done so that
16 Ms. Dixon would understand what was actually
17 happening. So that was one of the main
18 reasons with Ms. Dixon at that particular
19 time.
20    Q.    In this particular meeting
21 with Ms. Dixon, what did you tell Sonya
22 Dixon about Bud's conduct towards you?
23    A.    I informed them once again, as

231

1  I had before, that Mr. Richards was still
2  acting promiscuous like he wanted to get too
3  close up on me and too perverted, sexually
4  that is, and that he had -- was calling my
5  home on his cell phone late at night, and
6  that he was following me around town, so to
7  speak. The one instance I reported to her
8  that -- that I went to the supermarket, and
9  I get there, and about ten seconds later
10 Mr. Richards walk in. And that he was
11 pretty obvious he was keeping up with me
12 because he bought two bottles of wine at
13 10:30 in the morning, and I was off that
14 particular day. I called in and taken off
15 sick or vacation day. And all of this I was
16 informing her that he was still -- he's
17 still following me, trying to ask me to go
18 out with him like so to speak on dates and
19 different things. All of that I was
20 informing her constantly of, at that
21 particular time.
22    Q.    Did you use the words -- Let
23 me back up. You just used the words

232

1  promiscuous and perverted --
2    A.    Yes.
3    Q.    -- in your answer to my
4  question. Did you tell Sonya that he was
5  promiscuous and perverted?
6    A.    A number of times.
7    Q.    What about Bud's conduct up to
8  that point had been promiscuous and
9  perverted?
10   A.    The getting too close, the
11 trying to set something up to get us alone.
12 Sending me places to work where I wasn't
13 supposed to be assigned to work. For
14 instance, he asked me one morning to go over
15 to a building across the street from the vet
16 school, the small animal clinic. And that
17 was not my normal cleaning area. And that's
18 what she asked me when I stated to her that
19 he did that, was it within my normal
20 cleaning; I told her no. And that
21 particular place is not utilized as much on
22 certain times of the year and certain days
23 of the week, and there would be no one in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

233

1   there. And he just wanted me to go over
2   there, then it seemed like he wanted me to
3   go over there, then he was going to come.
4   Because he asked me one particular morning,
5   he said -- he said, John -- he came up to
6   me, I was in my work area. He said, John,
7   where have you been. I've been looking for
8   you for about fifteen minutes. I say I must
9   have been either in the bathroom or doing
10  something out of the way. I said, what did
11  you need. Well I want you to go over to --
12  across the street is the name for it and
13  clean over there. I said, well, I just saw
14  the other employees, Renza Floyd, Sara
15  Henderson, and a couple of others, they went
16  to normally do that. I say, I just saw them
17  leave the animal clinic and go over there
18  and clean this up. He said, well, you go
19  over and send them back over here. I said
20  me go over there and I send them back over
21  here, because they normally every day, or
22  other day, however often it got cleaned,
23  they would do it. I never had to clean it.

234

1   But I would see them go do it, go clean the
2   room, the area.
3           And I said you go -- I go over
4   there and I send them back over here? I
5   said, well, I'll do it then. But they was
6   already there. And as I was going out the
7   door to go over there across the street,
8   then they were coming back, and he was
9   walking right behind me like we both were
10  going. So -- And Ms. Dixon asked me why was
11  I going in the first place, because it made
12  it seem like he just wanted to get me alone
13  where there was nobody in the building that
14  particular day, and I didn't normally do the
15  room. And I had done it when Mr. Ledbetter
16  was the supervisor, but I -- it was not
17  one -- In this exhibit where the work duties
18  are outlined, that's not in here. And so,
19  see, that's what prompted me to discuss that
20  with her. It was unnecessary for me to go
21  over there. They did it every day, why
22  would I go there in the first place. And as
23  we're walking out the door, okay, I'll go

235

1   then, okay, if this is what you want me to
2   do, even though I told him they were already
3   there.
4           I was going out the door,
5   there he was coming -- we both were going
6   over there. So I was pointing out to her
7   that he had tried -- and that seems kind of
8   small in nature, but, now, if I had allowed
9   him, it would have been a lot. He would
10  have expressed himself if I had allowed it.
11  And I just never would let him. But
12  anyway --
13      Q.    What do you mean expressed
14  himself?
15      A.    He would have kissed me or try
16  to hug me inappropriately.
17      Q.    You believe he would have?
18      A.    Of course. He did actually
19  when -- I can't recall the time of the year,
20  I think it was after -- It was after
21  December when that occurred. And I
22  reported -- it's in one of my reports that
23  he touched me inappropriately.

236

1   Q.    We're going to get to that. I
2   think it's -- I think I know where you're
3   talking about.
4       A.    So that was why the December
5   meeting, the report that was on his desk,
6   and I was trying to get to the bottom of it
7   without -- I had already been suspended
8   unnecessarily, so.
9       Q.    You were in his office, and
10  you saw some kind of log or something he was
11  keeping on you?
12      A.    It was a typed-up report like
13  Exhibits 1, 2, 3, and 4.
14      Q.    Up to this point, up to
15  December '05, have you told me every way in
16  which Bud's conduct towards you was
17  perverted --
18      A.    Yes.
19      Q.    -- and promiscuous?
20      A.    Yes.
21      Q.    Let's go to February 22nd,
22  2006, which is the laundry room time that
23  led to your grievance that I think is what

59 (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

237

1 you're talking about.
2     A.    Okay.
3             (Whereupon, Defendant's
4             Exhibit No. 7 was marked
5             for identification.)
6     Q.    All right. I'm going to show
7 you what I've marked as Exhibit Number 7,
8 Mr. Dyess, and ask you to just take a second
9 and look at that. And I'll have some
10 questions for you about it.
11     A.    Okay. I'm familiar with it.
12     Q.    Actually, before I get to
13 that, before I depart the December 15th
14 meeting with Sonya, in the December 15th
15 meeting with Sonya, did you mention anything
16 again about Mary Teffend?
17     A.    I can't recall.
18     Q.    Did you mention anything about
19 Mixty Cox?
20     A.    I can't recall right now.
21     Q.    Did you state that the other
22 employees were attempting to lean on you?
23     A.    I could have. But it wasn't

238

1 all that important, whether I stated it then
2 or before then. I -- Possibly, yes, I
3 probably did.
4     Q.    Okay.
5     A.    Because I worked very hard to
6 try to get Ms. Dixon to see, but Ms. Dixon
7 would not give a bit. She just -- She gave
8 you the same story every time and not tried
9 to get to the bottom of why. And as I said,
10 because they could have transferred me -- my
11 work habit was not that bad, they could have
12 put me in the supply room which I worked
13 with Mr. Powell. And he had people resign
14 several times, and all he did was ask me --
15 I worked with him at least twice a week
16 sometimes, every week. So they could have
17 done that right then. All this -- All that,
18 as well as this, is just highly unnecessary
19 to have been treated this way. But I
20 probably did tell her a lot of stuff like
21 that, but it didn't help any.
22     Q.    Okay. All right.
23             Now, on to Exhibit Number 7.

239

1 First off, if you will look at the second
2 page, second page of this Exhibit Number 7.
3 Were you asked to sign this document?
4     A.    I was. And I refused.
5     Q.    And you refused to sign it?
6     A.    Uh-huh.
7     Q.    Let's look at the facts on the
8 first page. And, of course, this is what
9 Bud Richards has typed out as what happened.
10 And he's talking about a situation where
11 he's in the central supply room and he's
12 moving things, and you came in looking for
13 something, and he kept asking you, what are
14 you doing here, you're not supposed to be in
15 here. And you didn't really talk back to
16 him, you kept looking for what you were
17 looking for. And then y'all left, and you
18 went to a cart, and I think you were trying
19 to get some gloves or something.
20             Do you remember the incident
21 that he's talking about here?
22     A.    Yes. I'm familiar with that.
23     Q.    Okay. Now, this particular

240

1 incident, is this the incident where you are
2 saying that he touched you inappropriately?
3     A.    Yes.
4     Q.    Okay. Let's go into this in
5 some detail then. The central supply room,
6 what is the central supply room?
7     A.    That's a -- At that particular
8 time it was not a well used place. It was a
9 place where they were storing supplies. And
10 if you really needed them, you could get a
11 key from a couple of individuals, like
12 Mr. Richards for one, and go in and get what
13 you need. But there was not an active
14 person in there, like it was in the supply
15 room where Mr. Powell was, I described. So
16 that was like an older place where they done
17 a lot of -- kept a lot of stuff, but it
18 wasn't a well used -- it was locked all the
19 time.
20     Q.    It was locked at all times?
21     A.    Uh-huh.
22     Q.    And do you remember going into
23 the room there and seeing Bud?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

241

1    A.    Yes, I recall.
2    Q.    And what were you looking for
3  when you came into the room?
4    A.    A box of gloves, large gloves.
5    Q.    Latex gloves?
6    A.    Yes.
7    Q.    Okay.  Tell me if you would,
8  just basically give me from your
9  perspective, what happened when you came
10  into the room?
11    A.    I walked in, Mr. Richards was
12  in the room, in the supply room.  He started
13  yelling, John, what are you doing here.  And
14  I was -- I sort of just -- I was surprised
15  at the tone of his voice as well as the
16  loudness.  The door was open, it was in the
17  supply room right there in our work area
18  where the small animal clinic clean-up
19  people socialize as well as wash dishes and
20  run towels in the washing machine and dryer.
21  And the students and everybody frequently
22  constantly going, like a McDonald's
23  restaurant, just go in and out.  And it's a

242

1  very large place, and a lot of people -- I
2  was mostly embarrassed because he was
3  yelling loud, John, what are you doing in
4  here?  John, what are you doing in here?
5  You don't belong in here.  I was caught off
6  guard.  Because, one, I had access to the
7  room as much as I wanted to because whenever
8  I distribute packages from the supply
9  room -- the main supply room over to large
10  animal, which was once in that small area,
11  from Mr. Powell, I just used the keys on the
12  ring, as well as get the keys from the
13  pharmacist to get in and either get packages
14  to or put packages in.  I didn't have to ask
15  him anything.  There was no sign on the door
16  saying not to go in or get permission to go
17  in.
18    Whenever I would put packages
19  in, I just used the key that I already had,
20  he didn't have to know about it, he wasn't
21  there at the time; he had never told me not
22  to go in the room before.  And I just -- I
23  was just thoroughly surprised.  I'm like,

243

1  you standing there yelling at me about
2  something that I do all the time.  John,
3  what are you in here for; John, what -- He
4  was just -- He was past professionalism.
5    Q.    Let me ask you to stop right
6  there for just a second.  He's yelling at
7  you, he's saying, John, what are you doing
8  in here; John, what you doing in here.  And
9  you said you were surprised by his tone of
10  voice.
11    A.    Uh-huh.
12    Q.    What's the look on his face
13  and what's the tone of his voice at this
14  particular moment?
15    A.    He's red, he's yelling loud,
16  he's frustrated, he's angry, he's mad.  I
17  know dogs and animals get mad.  It was just
18  like he wanted to get -- He was just very
19  thoroughly upset.
20    Q.    Okay.  Did he ask you what you
21  were doing in there?
22    A.    He did.
23    Q.    All right.  Did you tell him

244

1  you were looking for latex gloves?
2    A.    No.  I wasn't in there but ten
3  seconds.  But as I stated earlier I didn't
4  answer him, because I didn't know how to
5  answer him.  You don't yell at me.  You
6  don't yell at people, you take them in your
7  office and sit down and talk to them when
8  you're in the position that you're in --
9  that he's in.  You don't yell and ask what
10  are you doing in here, all loud; students
11  passing by, it's embarrassing.  Other
12  employees, Ms. Sara Henderson which is why I
13  gave the speech to Chris Farrell standing up
14  there laughing and going and spreading the
15  news around, embarrassing.  I had already
16  came from psych care, that -- if I ever get
17  over that.  So it was embarrassing.  It was
18  an embarrassing stunt on his part.  If he
19  wanted me to know that I didn't belong in
20  that supply room, he could have either
21  called me in the office or closed the door
22  and said, John, we're trying to clean this
23  area out and -- for renovation, so it's off

61  (Pages 241 to 244)

# FREEDOM COURT REPORTING

245

1  limits right now, try not to come back in.
2      There was not a sign on the
3  door said don't go in. And as I told you,
4  two and three times a week I got the key and
5  went in, and he knew I did.
6      Q.    Okay. Let's look at some of
7  the specific language in his write-up here.
8  Okay?
9      If you would look at it with
10  me, please. It says, John, singing to
11  himself, entered the room.
12      A.    Uh-huh.
13      Q.    And I don't really care if you
14  were singing to yourself or not. But were
15  you singing to yourself?
16      A.    I was.
17      Q.    I told him that he was not
18  allowed in there.
19      Did he make that statement?
20      A.    He did.
21      Q.    He, which is Dyess, ignored me
22  and kept looking around for something.
23      A.    But in order for me -- I was

246

1  in there then, the room, it's not that
2  large, it's like two closets put together,
3  the smallest type. Actually it's about a
4  fourth of this room, I guess. So by the
5  time he got in -- he was not standing in the
6  doorway then. I was in the room, well
7  halfway in the room when he recognized I was
8  there. And it was only a certain area where
9  the gloves are in boxes in certain place, so
10  I was at the gloves then, where they
11  supposed to have been. So the only thing I
12  had to do was just look over on the space
13  where the gloves belonged, he stood yelling.
14  I was through looking then, I just turn
15  around and come back out.
16      Q.    You didn't answer him?
17      A.    No. I was not going to
18  justify an answer with yelling.
19      Q.    Okay. And then the next
20  sentence is: He walked all around the room
21  while I was telling him that he was not
22  allowed to be in there?
23      A.    If you count two seconds of

247

1  walking, yes.
2      Q.    Two seconds?
3      A.    I mean three or four seconds.
4  I had already seen what I was looking for,
5  and they didn't have it.
6      Q.    You were just looking to see
7  if there was gloves in there, when you
8  didn't see any gloves --
9      A.    I turned right around.
10      Q.    And you didn't speak to Bud?
11      A.    No.
12      Q.    It says: The whole time he
13  kept singing to himself. Is that part true?
14      A.    I did. I sing now.
15      Q.    After several minutes of
16  looking and me telling him to leave, he
17  finally left --
18      A.    It wasn't minutes.
19      Q.    It wasn't minutes, but maybe
20  it was a few seconds?
21      A.    Yes.
22      Q.    You didn't speak to him?
23      A.    No.

248

1      Q.    Then did he leave the door and
2  follow you out?
3      A.    He did. I didn't see him
4  though.
5      Q.    Do you know if he locked the
6  door behind him or not?
7      A.    I don't recall.
8      Q.    All right. I guess that
9  brings us to the cart. Was there a cart out
10  in the corridor?
11      A.    Yes. In the hall there was a
12  very large cart. And I didn't see the cart
13  when I walked into -- heading into -- you go
14  through our work area into the supply room,
15  so I didn't see the cart in the hall. I
16  must have just walked past it or didn't see
17  it or something. Either way, I didn't see
18  it.
19      And after I didn't find the
20  gloves in the supply room, and he was
21  yelling, I walked out, and then I saw the
22  cart. And I stood there for like a few
23  seconds trying to look on that cart, because

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

249

1 the cart was pretty loaded with stuff.
2     Q.   Was it loaded with stuff that
3 he had taken out of the supply room?
4     A.   Right.
5     Q.   So the gloves, instead of
6 being in the supply room, were on the cart?
7     A.   Exactly.
8     Q.   Okay. What happened then?
9     A.   While I'm standing there, and
10 I didn't see him come turn around. You
11 know, I didn't turn around and see him. I
12 just -- as I say I went in, he yelled get on
13 out, I saw what I didn't see, I turned
14 around and came on out. But as I said, the
15 cart is right there, so I walked and had my
16 back to him so to speak. And he comes
17 around me -- he obviously came out right
18 immediately behind me, because I'm standing
19 at the cart and I wasn't at the cart no more
20 than, what, ten seconds. And as I'm
21 standing at the cart trying to look for --
22 scanning across, looking for the gloves, I'm
23 familiar with what the gloves look like. I

250

1 use them all the time, I see them every day.
2 So I'm looking for the size gloves in big
3 large letters, large, extra large, and
4 small. So there I was looking on the cart.
5 And he comes behind me and his hand is in my
6 private area before I know it. I mean, I
7 didn't even see him coming. I mean, I was
8 standing toward the end of the cart where
9 the -- where you push the cart. And I was
10 tilted like this (indicating) with my back
11 facing him and the doorway where the supply
12 room was. But he came around and the
13 cart -- The hall is large enough for you to
14 either just stand there and wait or
15 either -- you know, if it's in the hall,
16 people had to pass down the hall, so it
17 couldn't just block the door, the entrance,
18 in going and coming. So he comes around me,
19 and his hand gets in -- before I know it, I
20 jump, his hand is in my private area. I
21 mean, I didn't -- I just jumped and didn't
22 say anything. I mean, you know, one second
23 he's in the supply room yelling, the next

251

1 second he's out immediately behind me with
2 his hand in my private area.
3     And no one was in the hall at
4 that particular time. He just came around,
5 I was tilted like this (indicating) so the
6 front -- and he's short, you see I'm tall.
7 So my body in front of me was right there
8 where the cart was, right there with my
9 mid-section. So when he put his hand, it
10 just got all inside my private area.
11     But, now, what made it look
12 like trying to -- a determination to touch,
13 why would you yell at someone about
14 something so ridiculous as being in a room
15 that you know the person had access to use.
16 Now I had access to the room to use it all
17 the time. The other employees didn't
18 because they didn't deliver the packages
19 like I done. And he knew that. But why
20 would you immediately -- I mean like the
21 Roadrunner on the cartoon, just come in the
22 minute I walk out, you're right behind me,
23 and I'm standing there looking, and you

252

1 sneak up behind me, and your hand is in my
2 private area? And neither did you say,
3 excuse me, pardon me. You know, why would I
4 do that to you if you already just yelled at
5 me and embarrassed me talking all loud and
6 boisterous.
7     Q.   All right. Let me follow-up
8 on some of those things. If you look at his
9 write-up, his write-up says he, which is
10 you: Approached a cart I had been loading
11 and tried to remove some items, which I
12 assume was gloves. You were going for the
13 gloves?
14     A.   Right.
15     Q.   He goes on to say: I
16 prevented this by stepping in between the
17 him an the cart.
18     A.   He prevented it?
19     Q.   That's what he said. Read
20 that with me. He says: I reprevented this
21 by stepping in between him and the cart.
22     So it sounds like he is saying
23 he positioned himself between you and the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

253

1   cart. How is that different from what you
2   were saying?
3       A.   His trying to prevent it does
4   not make any sense. Because if the cart --
5   If the cart is -- let's see how if I can
6   stand and make it better.
7       The cart is like this here
8   (indicating). I'm like standing tilted like
9   this (indicating), he comes from behind
10  toward the left. Well, now, the cart
11  extends about from here to nearly a few
12  inches from where you're sitting. Maybe
13  like this here (indicating).
14      Q.   Maybe six foot long?
15      A.   Uh-huh. Long length cart.
16  And it's about this wide (indicating). How
17  is you preventing me from getting -- What's
18  the purpose of him preventing me in the
19  first placement? The supplies I use, I
20  wasn't taking the supplies home. I get
21  gloves every day. What would be the point
22  of preventing me to get something I use to
23  get to work with.

254

1       Q.   All right. Let's talk -- Let
2   me ask you about the actual touching of the
3   private area. You're saying Bud touched you
4   in the private area?
5       A.   Right.
6       Q.   Or his hand was in your
7   private area?
8       A.   Right.
9       Q.   Was the palm of his hand
10  facing?
11      A.   Fingers and everything in the
12  center.
13      Q.   I'm sorry?
14      A.   Fingers in the center of the
15  private area. Right on the penis.
16      Q.   Did it actually touch?
17      A.   It touched. If it had not
18  touched, I would not have jumped.
19      Q.   How long did the touch last?
20      A.   A second or two.
21      Q.   Did he rub up and down?
22      A.   Yeah.
23      Q.   He rubbed up and down on you?

255

1       A.   Right.
2       Q.   Was he trying to arouse you?
3       A.   I think he was just trying to
4   cop a feel. It didn't last -- I wasn't
5   there -- It wasn't like I was going to stand
6   up there and let him do it, so it's not like
7   it lasted more than three seconds. But,
8   now, when you're trying to -- to
9   inappropriately touch someone, it's like a
10  man touching a woman, you don't take but a
11  second, you know what I'm saying?
12      Q.   I really don't.
13      A.   I'm just saying if a man
14  wanted to inappropriately touch a female,
15  say on her breast, the female is not going
16  to stand there and just let him keep
17  rubbing. It only takes a second. Do you
18  understand? And that's inappropriate.
19      Now, if he -- Why was he in
20  such a hurry to move that cart if ten
21  seconds before he's yelling at me about why
22  I am in the room, and you just come out.
23  Now, if the cart was all that in important

256

1   to get moved immediately, why wasn't he at
2   the cart then? And besides, he's still --
3   it's not as if people were in need of the
4   supplies like he just going from room to
5   room delivering the supplies. That was
6   going to a large area where they were moving
7   those things to another part so they could
8   renovate that particular room. It was not
9   a used area anyway.
10      I was the person that go in.
11  I went in there more than anyone during the
12  period of week, delivering and putting
13  packages and stuff in it.
14      Q.   I want to focus on the
15  touching.
16      A.   Okay.
17      Q.   You told me that his hand, was
18  it just one hand, left hand, right hand?
19      A.   It had to be right hand.
20      Q.   Right hand, the fingers of his
21  right hand touched you right in the penis?
22      A.   Right.
23      Q.   Do you think he moved his hand

64   (Pages 253 to 256)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

257

1  up or down once or twice?
2      A.    As long as he could -- As much
3  always he could.
4      Q.    As much as you would let him?
5      A.    Right.
6      Q.    And it was only a second or
7  two?
8      A.    Right.
9      Q.    Because you, of course, moved
10 away really quickly?
11     A.    Of course.
12     Q.    Like anyone would. And you
13 think he was trying to cop a feel?
14     A.    Right.
15     Q.    That's your impression?
16     A.    Uh-huh.
17     Q.    Did he say anything?
18     A.    No.
19     Q.    Did you say anything?
20     A.    No. I wouldn't dare say
21 anything. He's already yelled. I was
22 trying to avoid getting terminated.
23     Q.    So --

258

1      A.    I didn't say anything when we
2  were in the -- in the room when he was
3  yelling. So of course I wasn't going to say
4  nothing then.
5      Q.    Ten seconds previous or twenty
6  seconds previous, he was in this room
7  yelling at you so much that you didn't even
8  want to respond to him, ten seconds later
9  he's trying to cop a feel?
10     A.    Right.
11     Q.    That's what you believe?
12     A.    Yes.
13           Now think about -- It takes
14 from five to ten seconds to actually walk
15 from the central supply room to the hall
16 where the cart was. That's where the time,
17 the few seconds come out. I'm walking very,
18 probably slowly and disgusted to the cart.
19 And then I see the cart there in the hall,
20 right? And about a second or two later,
21 here he comes behind me with his hand in the
22 wrong place.
23     Q.    That happened, apparently, on

259

1  February 22nd, 2006. Do you see date and
2  time of incident?
3      A.    Huh-uh.
4      Q.    2/22/06. Do you disagree with
5  that?
6      A.    No. That's what I was looking
7  for -- yes -- No, I don't disagree with it.
8      Q.    And then this document is
9  written up the next day, 2/23/06. Do you
10 see that right here where my finger is?
11     A.    Uh-huh.
12     Q.    So Bud essentially wrote you
13 up for this incident is that right?
14     A.    Uh-huh.
15     Q.    And you refused to sign it?
16     A.    Right. I refused to sign
17 another one too that's in there, but yes
18 that's one of the ones I refused to sign.
19     Q.    Did you see this comment right
20 here: For the employee, I hereby
21 acknowledge that the contents of the
22 corrective action report have been reviewed
23 with me. If you wish to make any comment

260

1  regarding this corrective action report,
2  please do so in the space below.
3           Did you write anything in the
4  space below?
5      A.    No. I don't recall.
6      Q.    Why would you not write in the
7  space below that Bud touched you on the
8  penis, if that in fact happened?
9      A.    Because every so often we were
10 having meetings with him. And he wasn't
11 doing it. He wasn't doing it right until he
12 was. I was telling Ms. Dixon with my mouth,
13 I didn't have to write anything down. I was
14 telling her; I tried to tell Dr. Saidla,
15 Dr. Saidla was throwing me out, don't come
16 back or else.
17           It was unnecessary for me to
18 write. To begin with, it's ridiculous for
19 him to write that down and for him to report
20 it. But for me to report it as it actually
21 happened and for him to write it and call a
22 meeting, I didn't need to write anything.
23     Q.    Do you remember the grievance

65 (Pages 257 to 260)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

261

1  that you filed and you got a hearing with
2  three employees of Auburn?
3      A.   Yes.  That's what I'm talking
4  about, you have that.
5      Q.   Yeah.  We'll get to that in a
6  second.
7          Let me just ask you:  Y'all
8  talked about this incident that's written up
9  in Exhibit 7 at length in that hearing,
10  didn't you?
11     A.   That's what I'm trying to
12  remember.  I was looking for this -- We had
13  the grievance after I was suspended.
14     Q.   That's correct.
15     A.   Okay.  Now, I was looking
16  through my materials trying to find the
17  report like this that states when the
18  suspension occurred.  If it occurred after
19  this, then I did tell them.  Now that's what
20  I was trying to make sure that's what I was
21  looking through my material.
22     Q.   All right.  Let's talk about
23  the grievance hearing for just a second.

262

1      A.   We can't talk about the
2  grievance if I don't know when -- Oh, here
3  it is right here.
4      Q.   Would it help to get some
5  documents to kind of orient your memory a
6  little bit?
7      A.   No.  I think I found it.
8  Written reprimand, a suspension for five
9  days.  This was 3/29.  Okay.  Yes, I did
10  tell them that.
11     Q.   You remember you filed a
12  grievance and you had a hearing with three
13  employees of Auburn University?
14     A.   Uh-huh.
15     Q.   Do you remember that?
16     A.   Right.
17     Q.   Do you remember how long that
18  hearing lasted?
19     A.   A couple of hours.  Like
20  from --
21     Q.   Maybe two, three hours?
22     A.   Yeah.  Like eight until ten or
23  nine until eleven, or seven until ten,

263

1  something like that.
2      Q.   And you-all talked about this
3  cart incident --
4      A.   Right.
5      Q.   -- in that hearing?
6      A.   Uh-huh.
7      Q.   Did you tell the three panel
8  members for your hearing that Bud touched
9  you on the penis?
10     A.   Yes.
11     Q.   Did you use the word penis?
12     A.   I did.
13     Q.   How many times?
14     A.   Go ahead.
15     Q.   How many times did you say the
16  word penis in that hearing?
17     A.   I might have said it several
18  times.
19     Q.   So if there was a tape
20  recording of that hearing, it would have the
21  word penis on it?
22     A.   It should.
23     Q.   Let's switch gears a little

264

1  bit, before we go there.  You're looking at
2  Exhibit 7 there?
3      A.   You can go ahead.
4      Q.   I'm going to ask you more
5  about Exhibit 7.
6          That happened on February
7  22nd, 2006, didn't it?
8      A.   Yes.
9      Q.   Did you go and tell anybody:
10  Hey, Bud just touched me on the penis?
11     A.   I went and told Ms. Dixon.
12     Q.   When?
13     A.   The next day.
14     Q.   You told Ms. Dixon the next
15  day, which was February 23rd?
16     A.   Uh-huh.
17     Q.   Okay.  What exactly did you
18  tell her?
19     A.   That -- What we previously
20  discussed about the issue of being in -- the
21  incident happening in the supply room and
22  what happened thereafter where we just
23  previously stated.

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

265

1    Q.    Did you write her any kind of
2  memo or write her any kind of letter?
3    A.    No.
4    Q.    You just told her with your
5  mouth?
6    A.    Yes.
7          (Whereupon, Defendant's
8          Exhibit No. 8 was marked
9          for identification.)
10    Q.    All right. Let's look at what
11  I've marked as Exhibit Number 8 then. Take
12  just a second to look at that.
13    A.    I mean, this ain't the same
14  one.
15    Q.    This is a different one.
16    A.    How do you get two dates on
17  both these -- have the same date on both of
18  these?
19    Q.    He apparently wrote you up two
20  times on the same day.
21    A.    I doubt it.
22    Q.    Where is the rest of Exhibit
23  7?

266

1          You see, some of these I
2  didn't bother to keep because they were
3  unnecessary. But I don't see how you got
4  both these on the same day because he
5  wouldn't have -- he would not have presented
6  me with both of these to sign on the same
7  day, right. So something is -- Something is
8  misleading. Because like I said, I would
9  not have -- I would not have met with him
10  regarding two different instances. So which
11  means somebody got the wrong date on one of
12  these.
13          But I do recall my copy, which
14  is in my -- in the employee file of the
15  suspension.
16    Q.    Well, do you believe that both
17  Bud and human resources would have the wrong
18  date?
19    A.    Of course.
20    Q.    Do you see that stamp on there
21  where it says received February 24th, 2006,
22  human resources?
23    A.    Uh-huh.

267

1    Q.    Do you think that somebody
2  falsified that stamp?
3    A.    Of course. If human resources
4  can force me -- can tell me to go to psych
5  care knowing that the employee handbook and
6  the supervisor's copy of the handbook says
7  that it has to be voluntary, then of course
8  dates and all these things can be changed
9  and altered. Like, for instance, the
10  write-up that I reported to Dr. Saidla --
11  the write-up that when I -- There in my
12  employee file there is some write-ups and
13  some -- that has been altered and that I --
14  words that I did not say. For instance,
15  it's regarding being sent to psych care, it
16  said that John reported -- or John discussed
17  the issues about his mother and his father. I
18  did not -- We're not going to discuss that
19  here either. But, now, I did not discuss
20  anything with Albert Snipes and Ms. Dixon
21  during the time when they told me I had to
22  go to psych care, period. But I believe
23  what's in this employee file, it said that

268

1  John discussed -- on one of them letters,
2  John discussed issues of his family.
3          So, see, yes, these can be
4  altered. Like I say, I recall both of these
5  happening. Now, I'm not saying they
6  happened on the same -- they did not occur
7  on the same date.
8    Q.    Actually, if you look and see
9  the date that Exhibit 7 happened, the
10  incident was February 22nd, 2006; if you
11  look at Exhibit 8, the date and time of
12  incident is February 23rd, '06, 9:30 a.m.
13  So the incidents happened one day after
14  another, but the date of the write-up is the
15  same. Do you see that?
16    A.    I understand that.
17          But when he presented it to me
18  at a meeting, he did not present both of
19  those at the same time, that's the point I'm
20  making.
21    Q.    Exhibit Number 8, do you
22  believe that Bud ever presented Exhibit
23  Number 8 to you?

67 (Pages 265 to 268)

# FREEDOM COURT REPORTING

269

1    A.    Yes, he did.
2    Q.    It just wasn't on the date
3  that it says on here?
4    A.    No.
5    Q.    Okay. And on the second page
6  of it, it again says refused to sign. Did
7  you refuse to sign this document?
8    A.    Right.
9    Q.    And did you write anything in
10  the box where it says you can write in your
11  explanation?
12    A.    No.
13    Q.    All right. Let me ask you
14  about some of the facts that are stated in
15  Exhibit Number 8 down here at the bottom.
16         It says: At 9:30 this
17  morning, I observed John on a computer in
18  seminar A, Room 307 Hoerlein Hall. I told
19  John that his break didn't start until 9:45.
20  He did not speak or acknowledge me.
21         Let's stop right there. Up to
22  that point, do you recall a time sitting at
23  a computer in seminar A and Bud coming in

270

1  and telling you that it wasn't your break
2  time?
3    A.    Yes.
4    Q.    And you didn't speak to or
5  acknowledge him?
6    A.    Right.
7    Q.    That's correct?
8    A.    That's correct.
9    Q.    After telling -- The document
10  goes on to say: After telling him this
11  several times and asking him if he heard me,
12  I called Renza Floyd, one of my other
13  employees, to witness the event.
14    A.    Yes.
15    Q.    Do you remember Renza Floyd
16  coming in?
17    A.    Yes, of course.
18    Q.    So that part's true also?
19    A.    Uh-huh.
20    Q.    I repeated what I had been
21  saying to John in front of -- I think it's a
22  typo, it should say in front of Renza.
23         Do you remember that

271

1  happening?
2    A.    Yes, I remember.
3    Q.    John still did not speak or
4  acknowledge us.
5         Is that true?
6    A.    That's right.
7    Q.    I told Renza to come with me,
8  at this point John said, have a nice day.
9    A.    Right.
10    Q.    And that part's true as well?
11    A.    Yes, all that's true.
12    Q.    As they were leaving, you did
13  in fact tell them have a nice day?
14    A.    Right.
15    Q.    Why were you telling them to
16  have a nice day?
17    A.    Again, he was very hostile.
18  And I was trying to be Christ like, and he
19  was yelling. Those seminar rooms where the
20  computers are, the students of the
21  University are there. And I like to think I
22  was respected by one or two of them. And he
23  was just yelling, clowning about a few

272

1  minutes. None of the clocks in that college
2  of veterinary medicine are correct, the
3  same.
4         What the clock I be looked at
5  was right at 9:45 or 9:42. He said it was
6  around 9:30 according to his recollection.
7  So when he comes in yelling, it didn't upset
8  me because I was not about to justify. If
9  he wanted to talk to me, he could have said,
10  John, let's go to my office. And that's why
11  I did not say anything again to him. He
12  called, he did, Renza, come down here.
13  There was people playing. They love to
14  create a conflicting-type work behavior as I
15  discussed already. So now I was not about
16  to justify and say anything to him. He
17  wanted -- As I said, if he wanted to talk to
18  me, the second I was in there, he could have
19  said, John, let's go to my office; I would
20  have followed him. But to stand in the hall
21  with the door wide open and all those
22  students in that room while I'm at the
23  computer and they are too, because there's

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

273

1 several computers in that room, and yell, I
2 was not about to say a word.
3    Q.    On the second page of this
4 document, do you believe that is the
5 signature of Bud Richards?
6    A.    It looks like it.
7    Q.    Do you believe this is the
8 signature of John Saidla?
9    A.    I'm not sure about his. It
10 looks like it could be.
11    Q.    You just believe that the date
12 on these documents is wrong?
13    A.    Yes. One of these dates are
14 not correct, because we didn't do both of
15 these in the meeting that we had.
16    Q.    In this encounter that's
17 described in Exhibit Number 8, is there
18 anything sexual mentioned at all?
19    A.    No.
20    Q.    This is the day following --
21 well, you think the dates aren't right. But
22 you think this happened after the cart
23 incident?

274

1    A.    Let me think. This had to
2 happen before the cart incident. Because,
3 see, this is when -- let's see. Let me
4 think.
5    Q.    Let me tell you what. Let me
6 bring another document in, and it might help
7 clear up some of the dates.
8    A.    Okay.
9         (Whereupon, Defendant's
10        Exhibit No. 9 was marked
11        for identification.)
12    Q.    This is where you were
13 suspended. I'm going to show you Exhibit
14 Number 9. Feel free to take a minute to
15 look that over.
16    A.    I already looked at that. I
17 have one myself, so I've already seen it.
18    Q.    Okay. So you're familiar with
19 Exhibit Number 9?
20    A.    Yes.
21        Now, it could be -- I'm not
22 very sure, it could be where he actually did
23 present both of these at that particular

275

1 day, and I just refused to sign both of
2 them. But I do recall in at least one of --
3 in the meetings when he did present either
4 one of these Exhibits, 7 or 8, that he told
5 me that he wanted to meet with -- that
6 Dr. Whitley wanted to meet with me. And he
7 caught me coming down the hall, he said,
8 John, Dr. Whitely would like to meet with
9 you in the board room or in his office or
10 something. Okay. I get to where -- in that
11 conference room I believe it was. I get to
12 around the corner where the meeting was, he
13 walks in, and one of the other supervisors
14 from the large animal, Mike Colley I believe
15 his name is, they're the only ones there. I
16 look around, I said where is Dr. Whitley.
17 Well, he's not here.
18        But, see, he lied and said
19 Dr. Whitley was here in order to get me to
20 the meeting. So, now, this is why I can't
21 remember whether both of these occurred,
22 Exhibits 7 and 8, at the same time. The
23 only way I got these was at the same

276

1 meeting. We did not last two separate
2 meetings, so now that's why I can't
3 remember. After finding out that
4 Dr. Whitley wasn't going to be in the
5 meeting, I went across the hall to his
6 office and talked with his executive
7 assistant, Ms. Johnson, Linda Johnson. I
8 said, where is Dr. Whitley. He's not in
9 today. I said, what do you mean he's not
10 in; Mr. Richards just told me he wanted me
11 to meet with him regarding either Exhibit 7
12 or Exhibit 8, or the combination of them
13 both. So which means -- and she went, well,
14 he can still meet with you, those are her
15 words. He can still meet with you even
16 though Dr. Whitley is not there.
17        I didn't mind meeting with
18 him, because I'm very calm and if you want
19 to meet and talk rationale. But, now, he
20 lied and said Dr. Whitley wanted to meet
21 with me in order to get me to the meeting.
22 And then Ms. Johnson said that he has the
23 authority to meet with me with another

69  (Pages 273 to 276)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

277

1  supervisor, which I had no idea. And
2  Dr. Saidla, his immediate supervisor, boss,
3  was not there either.
4       So now this is why I can't
5  remember or recall -- he could have
6  presented both of them, so that would
7  eliminate whether it actually happened, the
8  2/23 as being the date of the meeting, and
9  when I was presented with this, but I just
10  can't remember it. But I do remember having
11  a meeting to get either one of them and/or
12  both of them.
13       Does that clear that up?
14     Q.   I think so. Let me ask you
15  about Exhibit Number 9 now. And do you
16  remember receiving Exhibit Number 9?
17     A.   Yes.
18     Q.   And was it discussed with you?
19     A.   Yes, it was.
20     Q.   And did you agree to sign this
21  document?
22     A.   I disagree.
23     Q.   You refused to sign it?

278

1     A.   Right.
2     Q.   Did you write anything in the
3  box where it says you have the opportunity
4  to write any explanation you want?
5     A.   I didn't.
6     Q.   Let's look at the facts that
7  are listed down here.
8     A.   The reason I write anything is
9  because Dr. Saidla was asked by me would it
10  do any good or help my situation if I tried
11  to explain the actual incidents of why this
12  was given to me or why I was being
13  reprimanded; and Dr. Saidla said no. So, in
14  other words, no matter what I said or wrote,
15  he was not going to listen, and I was going
16  to be suspended five days very
17  unnecessarily. So, see, that's why I didn't
18  never write anything because every time we
19  met with Dr. Saidla, or with somebody, it
20  didn't matter what I said.
21     Q.   You had a grievance hearing
22  that arose out of this suspension, Exhibit
23  9?

279

1     A.   Right.
2     Q.   Before we leave Exhibit 9, is
3  it true that your breaks were supposed to be
4  9:45 until 10?
5     A.   Yes. Those were assigned by
6  him.
7     Q.   And 2:45 to three in the
8  afternoon?
9     A.   Right.
10     Q.   And the document says: Today
11  John entered over to an auditorium at 2:35,
12  which was an unauthorized lunch break, or
13  break, and began using a computer. The
14  purpose of this reprimand is to make sure
15  that John knows which computers he's allowed
16  to use and at what times he's allowed to use
17  them.
18     A.   Uh-huh.
19     Q.   Do you agree that 2:35 is ten
20  minutes before 2:45?
21     A.   Again, as I forestated, you
22  have clocks that no two are alike. I
23  pointed that out to Dr. Whitley's executive

280

1  assistant, then Ms. Johnson, that if the
2  clock where I work at might say 2:41,
3  another clock may say 2:36. They are not on
4  a timer like most businesses, big businesses
5  have, where you press a button and be all
6  the simultaneously exact. That does not
7  occur.
8       At the same time, it was hard
9  for me to always take a break at the
10  appropriate time because Mr. Powell, Dickie
11  Powell, was having me running and doing his
12  delivery stuff for which Mr. Richards was
13  informed of. So which means if I'm out
14  delivering stuff at 9:45, I can't take a
15  break at that time. And Mr. Richards would
16  not allow me to express that, and neither
17  would Dr. Saidla. But the main problem with
18  this 2:35, is that no two clocks were alike,
19  and I told that to the grievance committee.
20  And at the same time, even though I was
21  early, according to him, at 2:50 I walked
22  past Ms. Johnson's office to have her see,
23  according to her clock, that I was back

70  (Pages 277 to 280)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

281

1    within the fifteen-minute period of time.
2        Q.    So you would agree with me
3    that Bud did write you up on March 29th,
4    2006, you just disagreed with the write-up?
5        A.    Oh, yeah. It happened.
6        Q.    It says down here in the
7    facts, right here (indicating): John also
8    told the office administrator that he would
9    not meet with his supervisor, Bud Richards,
10   unless Dr. John Saidla or David Whitley was
11   at the meeting.
12       A.    Exactly.
13       Q.    Did you say that?
14       A.    Yes, I did.
15       Q.    All right. What did you do
16   after you got Exhibit 9?
17       A.    I went to human resources
18   again to see Ms. Dixon. She and I discussed
19   the issue at great length. I also went to
20   affirmative action. I set up a meeting with
21   Ms. Michelle --
22       Q.    -- Martin?
23       A.    I can't recall her last name,

282

1    but she works in affirmative action. And I
2    met with her and discussed in great length
3    the occurrences of basically everything that
4    you and I have discussed now. Mr. Richards,
5    his behavior, his inappropriate behavior;
6    Dr. Saidla's not listening, no one is not
7    doing anything, and I've been suspended
8    unnecessarily. And I also talked with
9    Albert Snipes who informed me -- he reminded
10   me that I can have the grievance to check
11   into this.
12       Q.    So we're talking about before
13   you didn't -- You weren't sure beforehand
14   that you could file a grievance, but Albert
15   Snipes told you you could?
16       A.    Uh-huh.
17       Q.    You said you met with HR and
18   affirmative action?
19       A.    Yes.
20       Q.    Those are separate offices at
21   Auburn, aren't they?
22       A.    Of course. I even went to the
23   president's office, but I was not allowed to

283

1    meet with him. They sent me to affirmative
2    action. I went to the president's office
3    several times, but they always just directed
4    me to affirmative action.
5        And within that period of
6    time, as I forestated, I met with Dean
7    Busenjer, who I did not get a letter from
8    regarding our meeting, but I did speak with
9    him and his business partner -- or business
10   manager, excuse me, regarding this.
11       Q.    In any of the conversations
12   that you had, the president's office,
13   affirmative action, human resources --
14   immediately after you received this
15   document, I'm talking about.
16       A.    Right.
17       Q.    Did you tell them again or did
18   you tell them at all about the fact of --
19   Let me restart this question.
20       After you got this document,
21   you went to go see affirmative action and HR
22   and the president's office?
23       A.    Right.

284

1        Q.    At any of those three offices,
2    did you say anything about Bud?
3        A.    Of course.
4        Q.    Did you say anything about Bud
5    trying to come onto you?
6        A.    Yes.
7        Q.    Who did you tell and what did
8    you tell?
9        A.    I didn't have to say very much
10   more to Ms. Dixon, because she had already
11   been informed. She and I had several
12   meetings, several meetings, since the June
13   13th -- June incident where she had showed
14   up for the meeting, initial meeting, between
15   Ms. Dixon, myself, Mr. Richards, and
16   Dr. Saidla. So I didn't have to say very
17   much to her, even though I did mention it
18   again.
19       At the affirmative action
20   meeting, Ms. -- several issues were
21   discussed between Ms. Michelle -- recall her
22   name again?
23       A.    Have.

71 (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

285

1    Q.    Martin?
2    A.    Martin. It sure is.
3         I reported that he was being
4    sexually harassing and even religiously made
5    me uncomfortable regarding the threatening.
6    He's not my -- As again I say, I wasn't
7    going to do it.
8         So all of that was discussed
9    and the behavior. I even discussed with her
10   him showing up at Bruno's, the supermarket,
11   one morning I was off and in the University
12   vehicle while he was still on the clock
13   working. I get to the grocery store at ten
14   o'clock, 10:30, there he is. I walk in, he
15   walks in two seconds later, and he picks up
16   two bottles of wine, which is right up front
17   in that particular store. And it showed me
18   that he was following me or something,
19   because who buys two bottles of wine while
20   you're on the clock driving a University
21   vehicle?
22        I mean, you know, I can
23   understand if -- I could understand if he

286

1    was buying some potato chips or cookies,
2    something for a party or celebration as they
3    often had. But to buy two bottles of wine
4    at 10:30 in the morning, ten seconds after I
5    walked in the store that you are up front in
6    line getting it. I discussed all of that
7    with her. We talked for a couple of hours
8    or so.
9    Q.    You told them you thought Bud
10   was following you around, based on the
11   Brunos encounter?
12   A.    Yes.
13   Q.    What specifically did you tell
14   them on March 29th -- I guess it's March
15   29th.
16   A.    Uh-huh.
17   Q.    What specifically did you tell
18   them on March 29th about sexual activity?
19   A.    Exactly the same thing that I
20   told Ms. Dixon and I forestated, that he was
21   all in my face trying to kiss; he was
22   calling my house on his cell phone at
23   nighttime when I wasn't even there at the

287

1    time because I worked at Ruby Tuesday also;
2    that he was trying to get me alone in
3    places.
4         Now, I had to try to get her
5    to understand the inappropriate behavior
6    part, but anything that I forestated earlier
7    I had already told her. I informed her as
8    well as -- I informed her everything I
9    informed Ms. Sonya Dixon.
10   Q.    Did you tell Michelle Martin
11   that you felt like your co-workers -- your
12   co-workers were trying to lean on you to
13   perform miracles?
14   A.    Yeah. That would be the
15   religious part. It's in a letter in my
16   file.
17   Q.    And you believe you mentioned
18   touching?
19   A.    Uh-huh. I'm sure I did.
20   Q.    If Michelle Martin says you
21   never mentioned touching to her, would you
22   say that she's lying?
23   A.    No. I would say that -- I

288

1    would say that within our conversation she
2    perhaps didn't -- didn't dictate it or
3    didn't note it. Because we were talking so
4    much, and I was so frustrated, it's possible
5    to often not record certain points when you
6    don't necessary elaborate on it in detail.
7    So if she says that I didn't tell her, it
8    means that she probably just didn't write it
9    in her notes.
10        (Whereupon, Defendant's
11        Exhibit No. 10 was marked
12        for identification.)
13   Q.    This is Exhibit Number 10.
14   Take a look at that please.
15        What is Exhibit Number 10?
16   A.    It's a grievance I filed with
17   human resources concerning my suspension.
18   Q.    See in the middle where it
19   says: Step one, statement of grievance,
20   identify the policy that is being grieved.
21   And you wrote see attached forms?
22   A.    Uh-huh.
23   Q.    What were the forms you

72  (Pages 285 to 288)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

289

1  attached, or were there any?
2      A.    Let's see. I think I typed
3  up -- I wrote down some stuff, a letter to
4  them, regarding that and I sent it them.
5      Q.    Do you have that letter in
6  your file there?
7      A.    Let's see. I hope so.
8          MR. DETTLING: Let's do take a
9  break. Mr. Dyess, I'd like for you to take
10 a few minutes and look through your file
11 there and see if you can find what you
12 believe you might have attached to Exhibit
13 Number 10. Because I don't know what you're
14 talking about there. And it's not in any
15 document you've provided to me and it
16 doesn't appear to be in any document I've
17 provided to you.
18     A.    I know what it is. We don't
19 have to take a break.
20         It was a copy of Exhibit 9 or
21 8.
22     Q.    It was just a copy of the
23 corrective action reports?

290

1      A.    Right.
2      Q.    One or both of them?
3      A.    Right.
4      Q.    And, again, you understand
5  that there was a hearing that you had --
6      A.    Uh-huh.
7      Q.    -- arising out of Number 10?
8      A.    Right.
9      Q.    Do you feel like the grievance
10 panel members listened carefully to you?
11     A.    They listened. I don't
12 necessarily agree -- Well, they listened.
13 Yes, I have to answer that.
14     Q.    Before we get to Exhibit 11, I
15 want to make sure I understand you. You had
16 a hearing that was maybe two or three hours
17 long?
18     A.    Yes.
19     Q.    And the -- I'm going to call
20 it the cart incident was discussed at some
21 length in that hearing?
22     A.    Yes.
23     Q.    And you had an opportunity to

291

1  tell your side and to tell what happened?
2      A.    Yes.
3      Q.    And you believe you told the
4  grievance panel that Bud, on that date
5  touched you on the penis?
6      A.    I believe I did, yes.
7      Q.    Several times. You told them
8  several times in that hearing?
9      A.    I would only have to tell them
10 once, but I believe I reported it to them.
11         (Whereupon, Defendant's
12         Exhibit No. 11 was marked
13         for identification.)
14     Q.    Okay. Let me show you Exhibit
15 Number 11. And did you receive this
16 document?
17     A.    Yes, I received that.
18     Q.    Did you receive it sometime
19 close to April 27th, 2006?
20     A.    Yes, I received it -- I
21 received it after I was -- Let's see. I
22 received it after I was terminated, yes.
23 This was after the termination.

292

1      Q.    Do you see where -- The second
2  sentence of the document says: Our finding
3  is that we agree with the action taken by
4  the Clinical Sciences department of five
5  days suspension without pay.
6          Do you see that?
7      A.    Right.
8      Q.    You understood that the
9  grievance panel upheld your suspension?
10     A.    Yeah, I understand.
11     Q.    Then they go on to say: We
12 feel there was adequate documentation
13 leading to this event.
14     A.    Uh-huh.
15     Q.    If you told them about Bud
16 touching your penis, do you have any
17 explanation in the world for why that would
18 not be mentioned in this document?
19     A.    State that again.
20     Q.    If you, in fact, told the
21 grievance hearing panel that Bud had touched
22 you on the penis, do you have any
23 explanation for why they didn't even mention

73 (Pages 289 to 292)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

293

1 that in this document?
2     A.    They didn't mention any of the
3 stuff I mentioned to them, other than I was
4 suspended. They didn't -- This is a
5 two-paragraph paper. So they didn't
6 mention -- We talked two or three hours. I
7 talked for an hour and then Mr. Richards
8 talked for his hour or so and back and
9 forth. All the instances -- None of the
10 instances I talked with them is listed other
11 than I was seeking retribution for being
12 suspended.
13     Q.    You don't think that would
14 have stood out as something requiring some
15 explanation?
16     A.    Well, now, not compromising
17 Christian principles, but each of these
18 ladies in this grievance committee was
19 Caucasian. And I regret having to state
20 that like that so. Now, I'm the only
21 African-American in the room at the time.
22 So, now, does that answer why I feel like
23 that -- Even though I can't speak too bad of

294

1 them, because they recommended that I be
2 transferred, relocated to another place.
3 So, now, I can deal with any of their
4 possible discriminatory ways of not listing
5 or not saying, because they did recommend
6 that I be transferred. But now what
7 Mr. Richards up and did, his termination
8 thing before this could -- before I got this
9 in my hand. See, this was on the way --
10 From what I understand from Albert Snipes
11 from human resources, I was supposed to
12 receive this copy the week I was terminated.
13 And Mr. Richards took off on a Friday --
14 which we're going to get to, I'm sure --
15 took off on a Friday and I got this
16 very important to do and no one was there
17 for me to report it to.
18          Now, he would not definitely
19 report that I had an emergency, I just could
20 not wait and I had significant time to fill
21 in and all that sort of stuff. But, now, to
22 answer the question regarding the grievance,
23 I can't lean on them too bad about being

295

1 unfair because they did recommend that they
2 have me transferred. They, at the same
3 time, recommended that Mr. Richards take
4 supervisor training that is offered by human
5 resources.
6     Q.    Do you know if he did that?
7     A.    I doubt it.
8     Q.    You doubt it?
9     A.    No, I don't know if he done
10 it.
11          But why would they recommend
12 he need to take supervisor training courses
13 if he's so accurate in how he's handling me?
14 I mean, if you know your job, then you don't
15 need to go take a refresher course. So I
16 cannot stand too hard on them regardless of
17 what they wrote or did not write in this --
18 in their conclusion of the meeting, because
19 they did recommend me be transferred. And
20 if that instances occurred with me being
21 terminated had not occurred, then I would
22 have been transferred and all this probably
23 wouldn't be taking place. But that's what

296

1 makes this retaliatory retaliation.
2 Because, see, I reported all that to them,
3 and they just -- and they recommended. And,
4 of course, people at Auburn is widespread,
5 I'm not the first one to state it and I
6 won't be the last one, that you got
7 cover-ups. And that happens even in the
8 dean, in the board of trustees, and it's
9 been known for years.
10          So I can't speak too bad on
11 them, whether they did what they did,
12 because they did recommend putting me
13 somewhere else. Something Dr. Saidla could
14 have done simply -- I pleaded with him time
15 and time again to have me transferred
16 anywhere. That campus is large. He could
17 have had me washing dishes at my hourly
18 wage, which would have been good for washing
19 dishes also, and I would have been
20 comfortable away from this vet school and
21 all their situations.
22     Q.    Look at the second page of
23 Exhibit Number 10, and look at the very

74 (Pages 293 to 296)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

297

1  bottom.
2      A.    (Witness complies.)
3      Q.    Do you see that handwriting
4  down at the bottom?
5      A.    Yes. It's from John Holliman,
6  I'm familiar with it.
7      Q.    You understand that he's the
8  provost to the University?
9      A.    Right.
10     Q.    Do you see where he agrees
11 with upholding your suspension, but he
12 doesn't agree with transferring you?
13     A.    Yeah. What sense does that
14 make?
15     Q.    Pardon?
16     A.    What sense does it make to not
17 have me transferred? It that University is
18 full of vacancies.
19     Q.    I'm just asking if you
20 understand that's what John Holliman --
21     A.    Yes, I understand that.
22 Correct.
23     Q.    And Dr. Holliman did agree

298

1  also that Mr. Richards ought to attend
2  supervisor training?
3      A.    Right.
4      Q.    Do you see the date on that,
5  May 3rd, 2006?
6      A.    Uh-huh. Which is also
7  the day I was terminated.
8              (Whereupon, Defendant's
9              Exhibit No. 12 was marked
10             for identification.)
11     Q.    Let me show you Exhibit Number
12 12. Is that your signature?
13     A.    It is.
14     Q.    Did you receive this document?
15     A.    I did.
16     Q.    And did you read it?
17     A.    I did.
18             (Whereupon, Defendant's
19             Exhibit No. 13 was marked
20             for identification.)
21     Q.    Let me show you Exhibit Number
22 13. You can give me 12 if you want.
23     A.    (Witness complies.)

299

1      Q.    Okay. Have you seen Exhibit
2  Number 13?
3      A.    Yes.
4      Q.    Did Bud discuss this document
5  with you? Bud Richards?
6      A.    Which document?
7      Q.    The one that's in front of
8  you, 13.
9      A.    Yes, he did.
10     Q.    And you understand this is the
11 document that recommended your termination?
12     A.    Right.
13     Q.    Now, on Friday April 28th, you
14 agree, don't you, that you left for lunch
15 and 11:58 and you came back at 1:59?
16     A.    Right.
17     Q.    So that part of it's true?
18     A.    Yes.
19     Q.    So would you look at the time
20 card that's copied there?
21     A.    Uh-huh.
22     Q.    And looking at the fifth day,
23 it appears that in fact, you know some of

300

1  the numbers are stamped on top of one
2  another?
3      A.    Right.
4      Q.    Can you explain why that is?
5      A.    Because that clock does not
6  always catch the numbers. And perhaps I was
7  nervous, because I didn't want to get in the
8  position I am in now. And it was not to
9  cover it up, it was just simply to clock in.
10 To be honest with you, I could have not
11 clocked in at all and just wrote it down.
12 But I hit the clock and did not print it,
13 and I just clocked over again.
14     Q.    What was the emergency that
15 you had that kept you from returning to
16 Auburn?
17     A.    I had a meeting with my
18 landlord, and their office closes for lunch
19 at 11:45 and opens back at 12:45. And I go
20 to lunch during that period of time also.
21 And they were busy at the time and could not
22 see me, and it was immediate urgency. They
23 just would not wait another day. And I had

# FREEDOM COURT REPORTING

301

1 no choice.
2         Now granted, I was late, but I
3 had plenty of time as I sent you copies of
4 the pay stub with regarding my annually and
5 sick time that I had available that was paid
6 for after I was terminated. I could have
7 called in and took the entire day off.
8 Because it was not an issue about me calling
9 in, and one day was not going to hurt
10 anything, because they do recommend that you
11 use all your time or you will lose it at the
12 end of the year. And I could have just took
13 off the entire day and did that. But, no, I
14 was trying to be a good employee: Come in,
15 take care of that, speak with him if I'm
16 late or if I have to be, and let him know at
17 the same time. But -- That's what happened.
18     Q.    Looking on the second page of
19 Exhibit 13, did Mr. Richards ask you to sign
20 this document?
21     A.    He did.
22     Q.    Did you refuse to sign it?
23     A.    Yes.

302

1     Q.    Did you write any comments in
2 the box where it allows you to?
3     A.    No.
4         (Whereupon, Defendant's
5         Exhibit No. 14 was marked
6         for identification.)
7     Q.    All right. I'm going to show
8 you what I've marked as Exhibit Number 14.
9 What is Exhibit 14?
10     A.    It's a grievance form I filled
11 out with human resources regarding my
12 termination.
13     Q.    Is there any mention of
14 touching on this document?
15     A.    No.
16     Q.    Is there a mention of touching
17 on the other grievance that you filed?
18     A.    No. But it is in my report
19 that I issued -- that was in my file that I
20 issued.
21     Q.    We'll get to that.
22     A.    Okay.
23     Q.    And all that handwriting on

303

1 Exhibit 14 is your handwriting?
2     A.    Yes.
3         (Whereupon, Defendant's
4         Exhibit No. 15 was marked
5         for identification.)
6     Q.    All right. Switching gears
7 just a second, let me show you Exhibit
8 Number 15. What is Exhibit 15?
9     A.    It's my -- a letter from
10 affirmative action regarding my meeting with
11 Ms. Michelle Martin after I was suspended.
12     Q.    Did you receive this letter?
13     A.    Yes.
14     Q.    You received it after you were
15 terminated?
16     A.    No. Wait a minute. Let me
17 see. Hold on a second.
18     Q.    If you look at the second page
19 of it, it's got a certified mail receipt.
20     A.    I forestated that I met
21 with -- This letter is regarding my speaking
22 with affirmative action regarding
23 suspension. But this is the letter

304

1 regarding termination. I also received a
2 letter from them regarding the suspension
3 also. And I misunderstood before, reading
4 that this was the letter, but this is the
5 letter after I was --
6     Q.    If you look at the first thing
7 there, it says on March 29th, 2006, it says
8 you filed an informal complaint?
9     A.    Let's make sure before we put
10 too much on the wrong thing.
11         Okay. Yeah. This is the
12 suspension meeting.
13     Q.    Again, going back to -- It's
14 actually Exhibit Number 9. On March 29th,
15 2006, you were suspended that day?
16     A.    Yes.
17     Q.    And you went right over to HR?
18     A.    Right. This is the suspension
19 meeting with Ms. Martin in affirmative
20 action.
21     Q.    And so Exhibit 15 is them
22 responding to what you complained about on
23 March 29th?

76 (Pages 301 to 304)

# FREEDOM COURT REPORTING

305

1      A.     Right.
2      Q.     And if you look at the second
3   page of that document, do you see where --
4   up in the upper right-hand corner it says,
5   John Dyess. Is that your signature?
6      A.     Date of delivery, 5/25? Yes,
7   this is my handwriting.
8              (Whereupon, Defendant's
9              Exhibit No. 16 was marked
10             for identification.)
11     Q.     Okay. All right. Let me show
12  you Exhibit Number 16, and ask you what is
13  this document here?
14     A.     This is my personal statement
15  regarding being terminated and what the
16  occurrences while I was employed at Auburn
17  University.
18     Q.     So you wrote this document?
19     A.     Yes.
20     Q.     And you wrote this document
21  after you had been terminated?
22     A.     Right.
23     Q.     About a month earlier?

306

1      A.     About a month after, yes.
2      Q.     Yeah. Okay.
3              In the first paragraph you
4   say: I feel that the reason Mr. Floyd
5   Richards terminated me was because I would
6   not respond to his many attempts to express
7   his sexual desires for me.
8      A.     Yes.
9      Q.     Have you already told me every
10  way in which that he attempted to express
11  his sexual desires with you?
12     A.     Yes.
13     Q.     Did he ever make sexual
14  comments to you?
15     A.     Other than asking me to go out
16  and be alone with him.
17     Q.     Did he use any dirty language?
18     A.     No.
19     Q.     Did he come out and say, John,
20  I'd like to be intimate with you?
21     A.     No.
22     Q.     If you will read down in the
23  paragraph that starts "In June of 2005, I

307

1   was asked to attend a meeting with Sonya
2   Dixon." Do you see where I'm talking about?
3      A.     What paragraph are we looking
4   at?
5      Q.     First page. I'll point it out
6   to you.
7              In this paragraph here
8   (indicating), do you see here where it says,
9   I explained -- I'm sorry.
10             Do you see where it says: I
11  explained that he and I had a conversation
12  involving Christian principles, and that I
13  told him what the Bible says of what happens
14  to people who harms a minister.
15             Do you see that?
16     A.     Yes, of course.
17     Q.     And you told him that you were
18  a licensed minister?
19     A.     Right.
20     Q.     Now, you wrote this document;
21  right?
22     A.     Yes.
23     Q.     Okay. We've been kind of

308

1   going round and round a little bit about
2   what you exactly said.
3      A.     And I've answered as well as I
4   could.
5      Q.     You don't remember the exact
6   words you said?
7      A.     Yes, I remember. I stated it
8   three or four times since I've been here,
9   that I discussed -- we was having a
10  discussion on Biblical principles, and I
11  basically toned it down in the sense of
12  being not direct that that's what was
13  happening. I said that the Bible teaches.
14  I didn't say that I was the one that was
15  actually the victim.
16     Q.     Why don't you just tell me --
17  Forget about Bud for a second. You say in
18  this document: I told him what the Bible
19  says what happens to people who harms a
20  minister.
21             Why don't you just tell me
22  what does the Bible say of what happens to
23  people who harms a minister?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

309

1    A.    I stated the Scripture that
2  was quoted by Ms. Dixon in our first meeting
3  in June of 2005. I also stated the
4  Scripture that I quoted to Ms. Celeste
5  Bankston at Mobile Infirmary when I was
6  there, regarding vengeance is mine saith the
7  Lord. I stated the many numerous Scriptures
8  in the New Testament writings, as well as
9  the Old Testament writings, that teaches
10  behavior toward -- inappropriate behavior
11  toward Christian people is not allowed by
12  the Lord, Jesus Christ.
13         And Mr. Richards understood
14  thoroughly, because he agreed that -- his
15  father-in-law was a minister and he was
16  up-to-date on Scripture teaching, or had an
17  idea -- good idea of what Scripture means.
18  He understood, period.
19    Q.    All right. Look on the second
20  page of this document.
21    A.    (Witness complies.)
22    Q.    On the second page, you write,
23  in February of 2006, Mr. Richards used

310

1  profanity on me. He said that he was going
2  to, quote, fire my ass. He later approached
3  me in the hall and rubbed his hand and
4  private body area on me. I didn't say
5  anything to him because of fear of being
6  terminated.
7         Are those your words? Have I
8  read it correctly?
9    A.    He later approached me in the
10  hall and rubbed his hands and private body
11  area on me. That's supposed to be he rubbed
12  his hands in my private body area.
13    Q.    So you're not saying that he
14  rubbed his private body area on you?
15    A.    I'm saying his hands rubbed my
16  private body area.
17    Q.    Mr. Dyess, is it fair to say
18  that this document that you're looking at is
19  the first time that you wrote that down to
20  Auburn?
21    A.    Yes.
22    Q.    And is this incident with the
23  cart, is that the only time that Bud touched

311

1  you in a sexual way?
2    A.    No. In the initial meeting
3  with Ms. Dixon, Dr. Saidla, myself, and
4  Mr. Richards, I expressed to her, Ms. Dixon,
5  that Mr. Richards, two, three days after he
6  was -- became my supervisor was too close
7  for comfort. I mean, I could feel his
8  heartbeat and my hands and my arm was in his
9  chest and had to be moved around in order
10  not to touch him. Leaning on people in that
11  way and you don't know them is very, very
12  inappropriate. It's different situation if
13  you're familiar with the person, you know
14  them years, a while, okay, you lean on them;
15  but being the same sex or opposite sex.
16         That is not all, I just
17  remembered. Mr. Richards asked me to review
18  my time sheet before he turned it in. At
19  that particular time he was new as a
20  supervisor, and he was doing the time sheets
21  for all the members of the department. And
22  he was -- He would fill them out whereas
23  most people in the vet school fill their own

312

1  time sheets out, supervisor just sign it.
2  But he was filling them all out, so when he
3  got them all filled out, he would give it to
4  us individually so we'd look at our own
5  time, make sure it's correct, and we sign
6  it.
7         When he asked me -- He and I
8  were the only ones in the area of our work,
9  and he came to me and said I want you to
10  look at your time sheet. I said okay. So
11  he goes in his office, I stand outside his
12  office, and gets the time sheet. Instead of
13  handing it to me so I can read it -- hold it
14  in my own hands and read it, he held the
15  time sheet up close to him, and Mr. Richards
16  is a small man. So in order for me to read
17  it, I had to come in close to him. It was
18  very, very inappropriate. Just give it to
19  me. If I took two hours to read it, I could
20  have gave it back to him, not standing there
21  like a little kid wanting a mama's caress.
22  That I forgot.
23         And in order for me to get to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

313

1  read -- besides my eyes don't always zero in
2  on other people's writings, I had to rub up
3  against his body. Because Mr. Richards is
4  small, and I'm very tall. In order for me
5  to lean on him, I had to have my chest near
6  his upper shoulder area from behind, because
7  the sheet was like this (indicating), right
8  up near the front of his chest. Now, that's
9  what I mean as very, very inappropriate.
10       It's like he wanted me to rub
11  him or feel on him, and he and I were the
12  only ones in that area at that particular
13  time. Granted other people could have
14  walked in just as easily.
15       But he could have just given
16  it to me. Handed it, let me read it for a
17  second, it was one page. I know what I
18  wrote on the sheet. Correction: I know
19  what should have been written on the time
20  sheet because I clock in every -- of my own
21  accord. But he would not give it to me, he
22  just held it near his chest area. So in
23  order for me to read it, I had to get close

314

1  up on him like we were sexual partners.
2       Now, if that's not leading,
3  trying to force someone to be sexually
4  attracted to you, I don't know what is. I
5  mean, why would you ask someone to look at
6  something and you not give it to them?
7       We had just met each other.
8  That occurred like even two, three weeks
9  after he became my supervisor.
10   Q.   Okay. So two or three days
11  after he became your supervisor, you had
12  this encounter in the room that you were
13  cleaning where he stands close to you and
14  you could feel his heartbeat?
15   A.   Right.
16   Q.   A couple of weeks later he was
17  trying to show a document, and he was
18  holding it too close to himself so you had
19  to stand too close -- closer than you wanted
20  to, to see what he was talking about on the
21  time sheet?
22   A.   Right. Exactly.
23   Q.   And then February 22nd, we

315

1  have the cart incident?
2   A.   Right. And between then, you
3  got phone calls at home on his cell phone.
4  The reason I knew it was his cell phone,
5  because one particular morning I called in
6  ill, and I called and told Ms. Johnson to
7  let Mr. Richards know so I wouldn't make a
8  mistake of not calling in and getting
9  reprimanded. So I called and told her
10  because she gets there before he would. And
11  I called and told her. And about -- When he
12  finally got there, which was about an hour
13  later, he called my home back about eight
14  o'clock a.m. on his cell phone. And I had
15  no idea it was his cell phone number until
16  he called that particular morning and asked
17  me why was I not at work.
18       He also made it seem like
19  we -- like I was in such trouble about
20  calling in, when the vet school makes you
21  take time off before you will lose it. If
22  you don't take -- You either had to take it
23  during the year or at the end of the year,

316

1  they'd automatically make you be off along
2  with the couple of weeks that you're off
3  during the Christmas holidays and the New
4  Year's, because you will lose the time. So
5  they encourage you to call in and take the
6  days. You can take two days off regardless
7  of whether you've got to go to a doctor or
8  not. See, I could have done that more. So,
9  see, it was not appropriate for him to call
10  me and ask me where I was. I was only going
11  to be off one day.
12   Q.   Anytime that he ever called
13  you on the cell phone, did he ever make any
14  sexual statement to you?
15   A.   No. I only answered the phone
16  once, that's how I knew it was his phone.
17  See, when I receive a call and I don't know
18  who the person is, I tend to not answer the
19  phone. And so I saw that number coming up
20  three or four times a night on my caller ID.
21  And the only way I knew it was him -- his
22  cell phone is that I identified the number
23  when he called that morning and asked me

79 (Pages 313 to 316)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

317

1  where I was.
2         (Whereupon, Defendant's
3         Exhibit No. 17 was marked
4         for identification.)
5    Q.    Let me show you Exhibit 17.
6  Did you receive Exhibit 17?
7    A.    Yes.
8    Q.    Can you tell me what Exhibit
9  17 is?
10   A.    Exhibit 17 is the report
11 regarding my termination that -- after I met
12 with affirmative action, Ms. Kelley Taylor,
13 as well as Michelle Martin, and after I was
14 terminated in May of 2006.
15   Q.    They're saying that your
16 grievance will be handled by affirmative
17 action/EEO instead of by the grievance
18 panel?
19   A.    Wait a minute. I got that
20 wrong. This is --
21   Q.    Take a second to look at it.
22   A.    Yes. This is what that is.
23 It says that they are going to let them take

318

1  care of it. Sorry for the previous
2  statement.
3    Q.    So your second grievance that
4  we've already looked at, they didn't have a
5  grievance hearing for it, they sent it to
6  affirmative action?
7    A.    Say it again.
8    Q.    The second grievance that you
9  filed when you were terminated, they didn't
10 have a grievance hearing on that, they just
11 sent it to affirmative action?
12   A.    Right.
13   Q.    And that's what this document,
14 17, is telling us?
15   A.    Right.
16         (Whereupon, Defendant's
17         Exhibit No. 18 was marked
18         for identification.)
19   Q.    Look with me at Exhibit 18.
20 And Exhibit 18 has two pages to it.
21   A.    Yes. I'm familiar with this.
22 This is the document that states that I met
23 with Ms. Kelley Taylor in affirmative action

319

1  regarding termination.
2    Q.    Do you remember meeting with
3  Kelley Taylor and Michelle Martin on June
4  21st, 2006?
5    A.    Yes, I remember.
6    Q.    In that meeting on June 21st,
7  2006, were you guys trying to figure out if
8  you had told Ms. Martin about the touching
9  incident at the time when you came earlier?
10   A.    State again.
11   Q.    When you met with Kelley and
12 Michelle on June 21st, 2006 --
13   A.    Yes.
14   Q.    -- did they tell you, well,
15 you never told us about the touching your
16 penis before?
17   A.    Yes, they did.
18   Q.    And did you tell them, yes, I
19 did tell you?
20   A.    Of course.
21   Q.    And did they take out their
22 notes and look at their notes from the
23 previous meetings you had had?

320

1    A.    Right.
2    Q.    And what was the outcome of
3  looking at the notes?
4    A.    Ms. Martin stated that she
5  didn't have it in her notes. But she agreed
6  once I told her and Ms. Taylor that when she
7  and I -- she and I being Ms. Martin and I,
8  were talking in the March meeting that it
9  was -- that it could have been not recorded
10 because we were talking so much of -- we
11 were going from one -- one to the other of
12 my -- of how I was being treated at the vet
13 school. And granted I was upset and trying
14 to get to the bottom of it, and had been not
15 treated fairly. And honest and true, she
16 agreed that I could have told her and she
17 just didn't have it in the notes.
18   Q.    Kelley's letter to you says
19 you confirmed that you had not reported it
20 to her.
21         Do you see that?
22   A.    This is incorrect.
23   Q.    Okay. You don't agree with

80  (Pages 317 to 320)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

321

1  what Kelley is saying there?
2      A.    No.
3      Q.    Look at the second page of
4  Exhibit 18. Is that your signature up
5  there, John Dyess?
6      A.    Yes.
7          MR. DETTLING: Now we're going
8  to take a break.
9          (Recess taken.)
10     Q.    (BY MR. DETTLING): Mr. Dyess,
11  going back to the cart incident.
12     A.    Uh-huh.
13     Q.    Did anyone witness Bud
14  touching your penis?
15     A.    No.
16     Q.    Have you tape-recorded any
17  conversations?
18     A.    No.
19     Q.    What witnesses will you call
20  at trial?
21     A.    The ones I -- you received
22  on -- earlier last year. Was It last year?
23     Q.    The reason I ask, I'm not sure

322

1  that I did receive a list. Let me check my
2  file again real quick.
3          Mr. Dyess, I don't believe I
4  received a list of witnesses from you.
5  Could you just tell me which witnesses you
6  believe you will call?
7      A.    You should have gotten a list
8  of them. If it is going to eliminate time,
9  I want Dean Busenjer, Dr. David Whitley,
10  Dickie Powell, Linda Johnson. A few others
11  whose name, last name I'm not familiar with
12  right now but I will have to get their name.
13     Q.    You said Linda Johnson was one
14  of them?
15     A.    (Witness nods head in the
16  affirmative.)
17     Q.    What will Dean Busenjer
18  testify to at trial?
19     A.    That I reported Mr. Richards
20  for his inappropriate behavior and his
21  mistreating me as an employee and that I was
22  unnecessarily reprimanded by him on several
23  occasions.

323

1      Q.    What will Linda Johnson
2  testify to at trial?
3      A.    She can testify how -- how as
4  a time keeper, time sheet keeper, time
5  records employee, being late for forty-five
6  minutes or so is not important enough to
7  terminate someone, when there was no one
8  there for me to let know that I had an
9  emergency. As well as the other employees
10  who take off and leave and come and go, even
11  with Mr. Richards being there.
12         She can also -- Ms. Johnson
13  can testify, as well as people who keep time
14  in employee's records, can testify quite a
15  bit of the -- how employees just refuse --
16  don't always keep accurate time sheets and
17  they take off and stay gone more than
18  fifteen-minute breaks and be gone hours, and
19  even with the supervisor there. So she and
20  the others there could testify quite a bit
21  to that. And not to mention, I don't know
22  who I was supposed to report to being -- or
23  having an emergency being late. Chris

324

1  Farrell, no one else is not a report
2  supervisor. And if I had told Ms. Johnson,
3  that does not necessarily mean that she was
4  going to report it as is, because I reported
5  my being back before the suspension, the
6  fifteen minutes, and I still got suspended.
7  And I reported and showed it to her that
8  according to her clock I was back. So
9  Ms. Johnson could testify and the time sheet
10  could show quite a bit.
11     Q.    What would Dickie Powell
12  testify to?
13     A.    That I was a good employee and
14  every time he needed my help, I was there.
15  I was working for him in his department at
16  least twice a week because he and his people
17  were always out. I would drive a truck
18  around, keep the truck for hours at a time.
19  He wouldn't make me hurry back with it. I
20  would drive it all over campus with their
21  mail and their packages, walking all through
22  every building. And Mr. Richards was the
23  only one that had a serious problem with me

81  (Pages 321 to 324)

# FREEDOM COURT REPORTING

325

1  not being where I should have been, not
2  working where I should have been. And he
3  didn't have a problem with me, that's what
4  Dickie Powell and the people in central
5  supply area can testify.
6      Q.    Who else did you mention?
7      A.    Several other people that I
8  have to mail to you the names, I can't get
9  their last names right now.
10     Q.    All right. I'll send you a
11  letter to remind you okay?
12     A.    A what?
13     Q.    I'll send you a letter to
14  remind you to send me your initial
15  disclosures.
16     A.    I wish you could find your
17  list now, that way I wouldn't have to get it
18  all that -- Let's see. I have that
19  somewhere.
20           Are you sure you don't have
21  it?
22     Q.    I sure don't see it.
23     A.    I sent it to you. You should

326

1  have it though, because you made me send you
2  a bunch of stuff several times, and it
3  should be with all that.
4           (Whereupon, Defendant's
5           Exhibit No. 19 was marked
6           for identification.)
7      Q.    Let me show you Exhibit Number
8  19. Take your time, familiarize yourself
9  with that document again.
10     A.    I'm ready.
11     Q.    Is that your signature on page
12  two?
13     A.    Yes.
14     Q.    Would you do me a favor and
15  review all of your written answers to my
16  questions. There is a list of -- it looks
17  like a total of twenty interrogatories, or
18  written questions, and you've written
19  various answers to them.
20     A.    Yes.
21     Q.    Review those for me if you
22  would, please, and tell me if there is any
23  answer that you would like to change or

327

1  amend further?
2      A.    I believe you received
3  correction of all -- with the notarized copy
4  of this, which was the last piece of mail
5  you should have received from me. And it
6  states with that notarized copy of my
7  affidavit, right. And it means that I've
8  stated that -- stated what I meant in this
9  third page that was stapled to the
10  affidavit.
11     Q.    So in looking over your
12  answers again, you solemnly swear that all
13  these answers are correct and true?
14     A.    Yes. Correct.
15     Q.    You don't wish to change any
16  of them?
17     A.    No.
18     Q.    Look at question number
19  sixteen for me please. It's on page number
20  eight, if you flip down.
21     A.    Question number what again?
22     Q.    Number sixteen.
23     A.    Okay.

328

1      Q.    I asked you to identify all
2  physicians, psychiatrists, psychologists,
3  therapists?
4      A.    That's not it. I must be
5  looking at something else. Okay.
6      Q.    Question sixteen. I asked you
7  to identify all physicians, psychiatrists,
8  psychologists, therapists, counselors,
9  ministers, or other healthcare providers,
10  whether for physical, emotional, or mental
11  health treatment or counseling from which
12  the plaintiff has sought or received
13  treatment or counseling from 1995 to the
14  present. Your answer was see employee file.
15     A.    Right.
16     Q.    As I understand your answer,
17  you're saying that Dr. Vollenweider was the
18  only one?
19     A.    Right.
20     Q.    Look at question seventeen.
21     A.    Okay.
22     Q.    I asked you to identify and
23  describe all sources and amounts of wages

82 (Pages 325 to 328)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

329

1 and all other income you have received over
2 the last ten years and your response was
3 none.
4          Mr. Dyess, I'm not sure why
5 you would answer none when you received
6 plenty of wages and income from Auburn and
7 several other employers in the last ten
8 years. Can you explain that to me?
9     A.    I obviously misunderstood the
10 question.
11    Q.    Have you now, this morning,
12 told me every source of income you've had
13 for the last ten years?
14    A.    Yes.
15    Q.    Every employer you've had --
16    A.    Yes.
17    Q.    -- in the last ten years?
18    A.    To the best of my knowledge.
19    Q.    I still have some more
20 questions for you about this Exhibit 19,
21 Mr. Dyess.
22    A.    Uh-huh.
23    Q.    Would you look for me on the

330

1 requests for production, which are down into
2 the document a little ways.
3          Do you want me to turn for
4 you?
5     A.    I'm fine. I think I have it.
6 Okay.
7     Q.    Do you see request for
8 production number one: Produce all
9 documents which support, refute, or in any
10 way relate to any fact or circumstance
11 alleged in the complaint. Do you see that
12 question?
13    A.    Yes.
14    Q.    Do you have any other
15 documents relating to this case, other than
16 what I've given you and other than what
17 you've given me?
18    A.    No.
19    Q.    Flip over to question number
20 four. I asked you to produce, among other
21 things, any diaries that you might have.
22 Did you keep any diaries of things that
23 happened at Auburn?

331

1     A.    No.
2     Q.    Number five, I asked you to
3 produce your federal and state income tax
4 returns from 1997 to the present, and you
5 answered they're not available. Have you
6 not filed income tax returns?
7     A.    Yes, I have filed income tax,
8 but I don't have copies of all this. I
9 think I sent -- I sent you what I had.
10    Q.    Well, I'll inform you,
11 Mr. Dyess, that you haven't sent me any W-2
12 forms or tax returns or related forms or
13 schedules, and I think you've sent me one
14 paycheck stub.
15    A.    I think I meant to send you at
16 least this year and last year, I know I have
17 copies of those. But I was sure that I sent
18 those, but perhaps I didn't.
19    Q.    Well, we all have to file our
20 taxes in about two weeks here for 2007.
21 When you file your '07 return, will you
22 provide me a copy of it?
23    A.    If it's on time. It may not

332

1 be on time. I owe anyway, so it may not
2 be --
3     Q.    Do I understand you to say you
4 think you have your 2006 return and you
5 thought you had sent me a copy of it?
6     A.    Right.
7     Q.    I'd like a copy of your 2006
8 return.
9     A.    May I ask why?
10    Q.    I'm requesting it here, and
11 this is a formal court proceeding, and I'm
12 entitled to receive it. And, also, all the
13 way back to 1997, that you have.
14          Have you obtained any witness
15 statements?
16    A.    No.
17          (Whereupon, Defendant's
18          Exhibit No. 20 was marked
19          for identification.)
20    Q.    All right. Let me show you
21 Exhibit Number 20, sir. And this is the
22 complaint that you filed in court; correct?
23    A.    Yes.

83 (Pages 329 to 332)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

333

1   Q.    Look at point seven on the
2  second page of this document where you list
3  out the individual people who allegedly
4  discriminated against you while you were
5  employed with Auburn.
6   A.    Uh-huh.
7   Q.    First one there is Floyd
8  Richards, which is Bud Richards; right?
9   A.    Correct.
10   Q.    Have you already told me every
11  way in which you believe Floyd Richards
12  discriminated against you?
13   A.    No.
14   Q.    Okay. What other things did
15  Floyd Richards do which in any way
16  constituted discrimination?
17   A.    Floyd Richards, as supervisor
18  while employed at Auburn University, allowed
19  other employees, my fellow employees listed,
20  Mrs. Henderson and others, Ms. Farrell, he
21  allowed them to take lengths of time whereas
22  I was always written up and reported. Every
23  payday, every other week, Mr. Chris Farrell

334

1  and Renza Floyd and several others would go
2  and cash their paycheck at the credit union.
3  And it takes fifteen minutes just to get
4  over there and get in line, and we only
5  allowed fifteen-minute breaks. And they
6  would go and leave at nine something and
7  they'd come back about ten something, then
8  they would take another lunch break at their
9  appropriate time. And I never saw or heard
10  anything about a suspension. They were
11  never off, I never saw it written up, I
12  never heard anything from them, or anyone
13  else, that they were reprimanded by him.
14  And this occurred -- Chris Farrell was
15  always off. People at that University,
16  especially vet school, they leave on and off
17  the clock if they clock in; they take
18  numerous hours off while on the clock;
19  they're off for days and still get paid for
20  it; they clock each other in and out. And
21  Mr. Richards himself, as I stated earlier,
22  was -- showed up at the supermarket at 10:30
23  in the morning watching me -- I have to

335

1  believe he had been following me, because
2  who goes to a grocery store at 10:30 in the
3  morning and buys wine while you're on the
4  clock, driving the University vehicle.
5   But enough about Mr. Richards
6  and he's at supermarket. He allowed them to
7  go and do. They dillydallied, they were
8  never reprimanded for it. And he
9  discriminated me totally, every minute I was
10  gone. And he was not even there on the day,
11  I remind us, when I had to take an emergency
12  off. I didn't -- Grant it, it was not life
13  or death, but, now, he was not even there to
14  tell. And the time sheets had been filled
15  out, and I allowed forty -- at least
16  forty-five minutes or so on the time sheet,
17  and I believe that we discovered that that
18  should have appropriated certain amount of
19  that lateness on that particular Friday.
20  And Mr. Richards was not there, the time
21  sheet had been signed by me and him, they
22  had been turned in.
23   Ms. Linda Johnson and other

336

1  people who keep time there can testify that
2  there have been numerous times when you will
3  just either -- they can always put in an
4  hour of your annual leave. Why was it so
5  important that I reported to him a day or so
6  later. He was not there to report it on the
7  day I was there.
8   So, now, that's just one of
9  two -- two of numerous incidents where he
10  totally discriminated me. I cannot list the
11  length -- the many times under his
12  supervision where they were all
13  dillydallying, going places, doing stuff,
14  and still on the clock, all at home doing
15  this and other -- It's the norm of the day
16  at the vet school.
17   And Ms. Teffend, her staff is
18  even worse, all they do is dillydally. They
19  take off all the time; they never there.
20  Whether she's there or not, they leave and
21  stay two and three hours. So, yes, there is
22  much more discriminatory ways that he done.
23   If I had allowed him to kiss

84  (Pages 333 to 336)

# FREEDOM COURT REPORTING

337

1  up to me, then I probably would not be in
2  this situation, but I just would not allow
3  it.
4      Q.    You haven't provided me any
5  documentation that shows any of that that
6  you just said. Do you have any
7  documentation that shows that Floyd "Bud"
8  Richards allowed people to take time off or
9  allowed people to dillydally around or
10  anything like that?
11     A.    No. But the testimony of my
12  witnesses should be able to prove it.
13     Q.    Have you now told me the best
14  you can in this setting?
15     A.    Yes.
16     Q.    Everything that Floyd Richards
17  did that discriminated against you?
18     A.    Yes.
19     Q.    Did he ever use any racial
20  language towards you?
21     A.    No.
22     Q.    Did he ridicule the Christian
23  religion?

338

1      A.    Not to my knowledge.
2      Q.    I think I already asked you
3  this, but he didn't make any sexual, nasty
4  comments to you, did he?
5      A.    None that I know of.
6      Q.    All right. The next person on
7  your list here is John Saidla. Have you
8  already told me every way in which John
9  Saidla discriminated against you?
10     A.    No. After Mr. Ledbetter
11  retired and before they hired Mr. Richards
12  as a supervisor, I filled out an application
13  through the Internet to human resources to
14  apply for that position. I was not just
15  desperate to get it, but I would have liked
16  to have had it, and I had mentioned it to
17  Dr. Saidla, not asking for a special favor
18  but how to apply and perhaps basically see
19  did I fit the position. And he always
20  encouraged me and let me know that he
21  thought that I would be one of the top picks
22  for that position.
23     I never heard anything from

339

1  him; I never heard anything from human
2  resources regarding it. I didn't even fill
3  out the application according to them. And
4  many people -- Ms. Teffend mentioned it
5  herself to me, and I quote, you didn't stand
6  a chance at getting that position. And at
7  times she's playful and says stuff, and it
8  reminds you of how they really are. Now,
9  she probably said it in humor, you didn't
10  stand a chance from getting that, Mr. Floyd
11  Richards has. Now I understand that to mean
12  that I was not about to get it. And there
13  are no African-Americans. When I was there,
14  there are no African-American vet techs in
15  her department; there are no
16  African-Americans doing anything but
17  cleaning in the vet school.
18     Q.    So if I understand you, you
19  applied for the job that Bud eventually got?
20     A.    Right.
21     Q.    And you didn't get the
22  promotion?
23     A.    I didn't get the promotion. I

340

1  didn't get an interview, I didn't get a
2  letter, I didn't get anything. I did get
3  Ms. Teffend's statement that I didn't stand
4  a chance of getting it.
5      Q.    Did Mary Teffend have anything
6  to do with picking Bud?
7      A.    I'm not sure. But I believe
8  that there were a committee of people within
9  the vet school who sort of gave their
10  approval of whom others -- who recommended
11  certain people. And I believe that -- I
12  believe that she may have been one of them.
13  And even if she wasn't, she's a good
14  influence on Dr. Saidla. Because Helen, the
15  pharmacy, I can't recall her last name, she
16  is one of the witnesses we want to try to
17  call too, she and Dr. Saidla had numerous
18  instances where she just disagreed with him,
19  and she felt like he was very -- he would
20  not allow her department to receive what it
21  is she want. But she -- Like Dr. Saidla
22  played favoritism with Helen -- against
23  Helen toward Mary. Now, whatever Mary

85 (Pages 337 to 340)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

341

1  want -- That's the way the talk was,
2  whatever Mary want, she would get. But if
3  Helen or somebody else wanted, they wouldn't
4  necessarily get it.
5     Q.   Is there anything else that
6  John Saidla did to discriminate against you?
7     A.   Other than make me feel like
8  either I obey Mr. Richards or not, because
9  he didn't want to listen -- I stated earlier
10  that he didn't want to listen to my
11  testimony when I was being suspended and
12  written up for things. He just wouldn't
13  allow me to meet with him. He made me feel
14  like he was going to terminate me if I came
15  to visit his office too many times. I think
16  that's about it.
17     Q.   Kelley Taylor?
18     A.   Kelley lied during a meeting
19  of the termination when -- I think it's June
20  of 2006, after I was terminated I met with
21  them. I explained to her why I was -- how I
22  was forced to go to a psychiatrist --
23  psychiatric treatment by Albert Snipes and

342

1  Ms. Dixon. Kelley lied and said that the
2  employees -- employer has the right to order
3  examinations. Now, no material I have
4  states that they have that ability. And
5  that contradicts all of the information that
6  says that that's clearly voluntary.
7        So, see, that's why when you
8  asked me about whether I told them about the
9  penis -- touching the penis, and they said
10  they didn't get it, that's what I mean. She
11  lied and said they have the ability to do
12  all that, and there's nothing in the
13  employee handbook that says that they can
14  order up an examination, especially of that
15  kind. But she lied and said, in laughter,
16  we have the ability to order examinations
17  ha, ha, ha. And I have never read it in any
18  employee handbook and any other pamphlets
19  either.
20        And she also made me not tape
21  the conversation, the meeting with them. I
22  had a tape recorder with batteries and a
23  cassette, a tape in the player. And she

343

1  said that I was not allowed to tape it. And
2  that if I were, I would have to come back
3  three weeks later after she found her tape
4  recorder. I was going to tape it. And I
5  didn't have time to go all the way back up
6  there for another meeting three weeks later,
7  when we could have just handled it then.
8  But she said I couldn't -- unless she had
9  her tape recorder, I was not allowed to tape
10  it. And how hard is it find a tape recorder
11  at Auburn University?
12     Q.   Is that the only ways that
13  Kelley Taylor discriminated against you?
14     A.   Yes.
15     Q.   Albert Snipes?
16     A.   Albert is the one, other than
17  forcing me saying I would be terminated
18  for -- if I didn't go to psychic treatment.
19  He also never listened. It was hard enough
20  to get through the next one -- It was hard
21  enough to get through to Ms. Dixon, and
22  Albert certainly would not listen to
23  anything I told him. I stood in his office

344

1  door April of 2006 and told him quite
2  frankly that Mr. Richards had touched me on
3  my penis. And now he denies it; he will
4  lie -- He will not admit that I told him.
5  The letter that we all have from me
6  regarding my statement to the affirmative
7  action and the grievance committee
8  grievance, I told him that that was what he
9  was doing. And I also stated to him during
10  the suspension that I was wrongly done then.
11  But Mr. Richards could get through to him
12  all the time. He is the one who advised
13  Mr. Richards. How do you give him
14  credibility when he allowed me -- when he
15  told me I had to go to psychiatric
16  treatment, against that University's policy,
17  but he encouraged Mr. Richards to follow the
18  University policy in termination?
19        And there are papers within my
20  file that have been miswritten and added to,
21  statements and words that I have to conclude
22  that he is the one who wrote them. There
23  are statements added to it, words that I did

86 (Pages 341 to 344)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

345

1 not say. And I asked Ms. Dixon to show me
2 my file. She would not do it. Set up an
3 appointment and two weeks later we will let
4 you view it.
5      Now, I couldn't remember to do
6 anything with Mr. Richards on my back
7 constantly, like with his setups.
8      And Ms. Dixon was no help at
9 all. Ms. Dixon is Mr. Albert Snipes -- he's
10 her superior. And he and Ms. Dixon both had
11 the ability to have me transferred, period.
12 Lynn Hammond could have had me washing
13 dishes at twelve dollars an hour, and I
14 would have been just as happy, away from
15 Mr. Richards. And Albert could have ordered
16 that himself, without Lynn Hammond's input.
17 So, now, he has no credibility at all. And
18 we can put him on -- Anyway.
19      But he has no credibility.
20 When he upheld everything Mr. Richards said
21 and done regarding my behavior, and sent me
22 to psych care saying if I didn't go or else.
23      Your next question.

346

1      Q.   Have you now told me every way
2 in which Albert Snipes discriminated against
3 you?
4      A.   Yes.
5      Q.   By the way, he's a black male?
6      A.   Correct.
7      Q.   Or African-American male.
8      Do you contend that he
9 discriminated against you on the basis of
10 your race and your sex?
11      A.   No. That would be -- I'm not
12 saying he racially discriminated. I am
13 saying that he negligently handled my
14 situations there.
15      Q.   How did Lynn Hammond
16 discriminate against you?
17      A.   She discriminated against me
18 in the sense that she looked at the document
19 that we viewed here today, of the annual
20 leave form that I signed regarding having to
21 have three days in advance. She -- I stated
22 to her that that was not the situation, and
23 she stayed with that saying that this is

347

1 what this means. I told her that that's not
2 what that meant. I don't know for sure.
3 What do you do if you got an emergency? If
4 it's an emergency to me, it's an emergency
5 to them. And, again, I remind you, I could
6 have taken off the entire day, especially
7 with Mr. Richards not being there, and still
8 got paid for it, not to mention the time
9 sheets had already been in and there were a
10 few minutes for me to run late and still be
11 within my lunch hour. Not that I didn't do
12 that almost every Friday. Because every
13 time we got paid, I had to go pay a bill or
14 go do something. And I was most of the time
15 late. And I would always let Mr. Richards
16 know ahead of time, I may be a few moments
17 late, I may be ten, fifteen, I may be thirty
18 minutes late. And he would say okay.
19 That's what makes it retaliation. Because,
20 see, he perhaps knew that that letter from
21 the grievance committee was going to come
22 out the following week, and he did not want
23 me to be transferred to another department.

348

1 So that had to occur before.
2      And why was it so important
3 that I be justified an hour when I had --
4 when I got paid, and I have pay stubs to
5 show, that I got paid for almost a month and
6 a half of annual leave when they could have
7 just put an hour in. Ms. Johnson would have
8 done that instantly. She has done it before
9 when she was working handling time sheets.
10 She would just write in an hour, regardless
11 of the three days in advance. And I believe
12 they would still do it. If you got an
13 emergency, how do you handle an emergency?
14 I can't help it that they was running late
15 and didn't want it in. And if Mr. Richards
16 had been there, then I would have informed
17 him before. He's off that day, I come back
18 late, he come in Monday talking about I
19 didn't tell anybody.
20      So Ms. Lynn Hammond looked
21 past all of that, got -- I stated to her
22 that that does not mean emergencies, it
23 means --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

349

1  Q.  Exhibit 12?
2  A.  Exhibit 12.  It means that if
3  you are preplanning to take a vacation or a
4  day or two off.  It does not make room for
5  emergencies or something you just can't
6  help.
7  Q.  Have you told me every way in
8  which Lynn Hammond discriminated against
9  you?
10  A.  Yes.
11  Q.  Tim Busenjer?
12  A.  He done nothing regarding my
13  statements to him of Mr. Richards' behavior.
14  He and his business partner, he calls
15  business manager, met with me.
16  Q.  Who's his business manager?
17  A.  I don't recall her name.  The
18  three of us met.  I discussed at great
19  length what was going on and Dr. Saidla's
20  inability to have me transferred, or try to
21  handle the situation, or reprimand
22  Mr. Richards or ask him to stop harassing
23  me, and he done nothing.  He didn't send me

350

1  any letter.  She didn't write anything down,
2  nothing was recorded.  I didn't hear
3  anything, he just gave me the good old boy
4  brush off.
5  Q.  What else?
6  A.  I believe that's about it for
7  him.
8  Q.  Sonya Dixon?
9  A.  Ms. Dixon gave me the biggest
10  runaround in town.  She never recorded
11  anything in document of what I actually told
12  her.  In the file that was mailed to me, I
13  believe courtesy of the EEOC, to my lawyer I
14  had at the time, I think they sent it to me
15  after she couldn't handle the case, it
16  states that John Dyess was met with an
17  initial meeting in June of 2005 and that he
18  was sent to psychiatric care.
19  Now, we still trying to find
20  the employer allowing -- having the ability
21  to send me and what did I do to justify to
22  be sent.
23  Ms. Dixon did everything but

351

1  what I asked.  She just saw -- to put it
2  like I told Ms. Kelley Taylor, she just sung
3  a song every time I met with her.  Nothing
4  in the file said anything about what I told
5  her.
6  No, it's not documented that
7  Mr. Richards touched and grabbed and tried
8  to kiss, because she did not write it.  But
9  I stated to her time and time and every time
10  again, it was always just sing a song.  Get
11  along, get along, try to just get along.
12  I'm sitting there telling her what this man
13  is doing, plotting and planning and sneaking
14  and trying to do.  Suspending, taking this,
15  and writing up this.  She's saying get
16  along, get along, oh, just get along.  And
17  pardon me for that being documented that
18  way.  But now that's the way she treated me
19  and handled me.  She done nothing I --
20  Everything I told her, she looked past it
21  and told me to just get along.
22  How do you get along with
23  somebody who's out to get you?

352

1  Q.  What race is she?
2  A.  She's African-American.
3  Q.  Do you claim that she
4  discriminated against you on the basis of
5  your race?
6  A.  No, of course not.  But I
7  claim that she mishandled and
8  inappropriately treated -- mistreated me as
9  an employee.
10  Q.  Let's talk about the damages
11  that you seek in this case.  Look at Exhibit
12  21.
13  (Whereupon, Defendant's
14  Exhibit No. 21 was marked
15  for identification.)
16  A.  This is not my most accurate
17  one.
18  Q.  Did you file this with the
19  federal court?
20  A.  No, I didn't file it with the
21  Court.  I sent it to you within that package
22  of materials.
23  Q.  Mr. Dyess, it's got the file

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

353

1  stamp of the United States District Court on
2  it.
3        A.    Let's see. I could -- Okay.
4  Perhaps I may have filed this one with them.
5  But you've gotten two additional ones since
6  then. Yeah, I did file it with them. I
7  apologize.
8        But you also received two
9  additional ones. I mean up-to-date, it
10 should have more claims and damages on it.
11       Q.    You're seeking more than a
12 million and a half dollars?
13       A.    Of course.
14       Q.    How much money are you seeking
15 in this case?
16       A.    If you will refer to your --
17 Do you have copies of this --
18       Q.    I don't believe I do or not.
19       A.    You should. But if you refer
20 to those, it states it in those.
21       Q.    I'm asking you as we sit here
22 today, how much money are you going to ask
23 the Judge to give you if this case goes to

354

1  trial?
2        A.    A lot more than what that --
3  If it goes to trial, a lot more than what
4  we're asking in the final claims and damage
5  report you got. Because being forced to go
6  to psych care, I will never get over it. Do
7  you know how embarrassing it is for me
8  having to talk to them ball players about --
9  So it will be worth a lot more than what's
10 on writing.
11       Q.    Did you talk to the football
12 players about that?
13       A.    No. But -- Let's not discuss
14 all that. No. The answer to your question
15 is no, I didn't talk to them about that.
16 But I'm just saying it is embarrassing. And
17 it's all over the campus, I'm sure. It had
18 to be. I was off for a month or so.
19       Nothing but embarrassing. But
20 I'm a reasonable person, I'm not -- I can be
21 fair. I'm not going to be --
22       Q.    So you're going to ask for
23 much more than a million and a half dollars?

355

1        A.    Yes, sir.
2        And if I'm not mistaken,
3  Ms. Hammond and Mr. Snipes and Ms. Taylor
4  were supposed to arrange a meeting with me
5  and the president after the grievance report
6  as well as after the meeting. I'm not sure
7  of the meeting of the -- or after the
8  meeting with affirmative action. But one of
9  those three was supposed to arrange a
10 meeting for me to meet with the president
11 concerning my grievance report findings.
12 And none of them done that. Albert could
13 have called. I went to the president, they
14 would not let me do it. But if Albert or
15 Lynn Hammond had done it, then they would
16 have set up a meeting. It wouldn't have
17 took him but five minutes to look at that
18 and say, okay, send him to another
19 department, and it would have all been over.
20       Albert would not do it, and
21 Lynn would not even suggest it. And I
22 believe that's stated in the employee
23 handbook that grievance is supposed to --

356

1  the final word is supposed to come from the
2  president.
3        It's going to be in those --
4  It would have to be in something else. It
5  wouldn't be in the everyday handbook, it
6  would be in the supervisor copy of that
7  stuff.
8        (Whereupon, Defendant's
9        Exhibit No. 22 was marked
10       for identification.)
11       Q.    All right. Let me show you
12 Exhibit Number 22. This is actually three
13 pages. Did you ever see this document
14 before I provided it to you?
15       A.    Yes.
16       Q.    Did you see it while you were
17 employed at Mobile Infirmary?
18       A.    No.
19       Q.    How did you see it?
20       A.    When you mailed me a copy of
21 what you have received from them.
22       Q.    That's what I was saying. Did
23 you ever see it before I sent it to you?

89 (Pages 353 to 356)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

357

1    A.    No.
2    Q.    Did you, in fact, say to
3 Celeste Bankston that God will do vengeance?
4    A.    I forestated earlier that I
5 quoted the Scripture vengeance is mine saith
6 the Lord to a Christian, of which I thought
7 and believed.  I believe she was and perhaps
8 still is.
9         I worked with her in operating
10 rooms.  I was at the time Dr. -- I would
11 listen to her always talk about her church
12 and her family going to church.  It was not
13 to be offensive, but it was to calm the
14 situation down.  Because I felt like she
15 was -- she was mistreating me and not
16 allowing me to go to lunch and to receive
17 breaks while everybody else was at lunch and
18 break, and we were not having an extremely
19 busy day.  But, yes, I did tell her the
20 scripture that is stated in this document.
21    Q.    Did you also make similar
22 statements to Nancy Helton?
23    A.    Once a preacher, always a

358

1 preacher.  Yes, I'm sure I did.
2         Always calm and rational.  I
3 also overheard her talk about her church.
4 She's Catholic and Ms. Bankston was Baptist.
5         And it's hard to believe
6 everything Ms. Helton would say because
7 Ms. Helton would never give me appropriate
8 raise every year.  I was making the same
9 amount of money -- every year we supposed to
10 have got a raise, I would get like a nickel
11 or a dime; other people would get like a
12 forty and fifty cents.  And I asked her why,
13 and she would tell me, well, if you would
14 just be our friend more, you would get more
15 money.  It would never -- Credibility ain't
16 going to last.  And plus Ms. Alexander's
17 credibility ain't going to last either.
18         (Whereupon, Defendant's
19         Exhibit No. 23 was marked
20         for identification.)
21    Q.    Let me show you Exhibit Number
22 23.  Again, have you ever seen this document
23 before I provided it to you?

359

1    A.    No.
2    Q.    Did you eventually apologize
3 to Ms. Bankston?
4    A.    Yes, I believe I did.
5    Q.    Did you ask Ms. Bankston:
6 Celeste, do you think that I would come up
7 here with a gun and shoot you?
8    A.    No.
9    Q.    I know you wouldn't do that.
10 I'm just saying, did you ask her that?
11    A.    No.
12    Q.    You didn't ask her that?
13    A.    (Witness shakes head in the
14 negative.)
15         (Whereupon, Defendant's
16         Exhibit No. 24 was marked
17         for identification.)
18    Q.    Let me show you Exhibit Number
19 24.  I can't quite read the names, but it
20 appears to be signed by Sandra somebody and
21 maybe Juanita Beech.
22    A.    Jarita Beech and Sandra
23 Alexander.

360

1    Q.    Sandra Alexander?
2    A.    Right.  That's the same name
3 you find on other documents.
4    Q.    Okay.  Did Sandra and Jarita
5 attempt to discuss this document with you?
6    A.    Yes, I believe so.
7    Q.    And did they ask you to sign
8 it?
9    A.    Yes.
10    Q.    And did you refuse to sign it?
11    A.    I did.
12    Q.    And when you were leaving the
13 room, did you look at Jarita and tell her
14 you need to work on what you need to work
15 on?
16    A.    Pastor John Dyess probably
17 did.  It was calm and rational, not anything
18 hostile.
19    Q.    What did Jarita Beech need to
20 work on?
21    A.    Her behavior and attitude.
22 Again, those people are Auburn fans also,
23 and Jarita used to work with Dr. Ed Dyess,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

361

1   who is an ex-football player there in the
2   hall or something with him, and his entire
3   family is Auburn fans, that's how I
4   started -- actually started going to Auburn
5   football games, through Dr. Dyess and his
6   brother there. And he had a lot of jealousy
7   and envy of people who do a lot of things.
8   And I was just so young and naive and so
9   simple, plus I have good Christian parents
10  that stood on God's Word regardless, they
11  didn't compromise. And they were always the
12  kind who just -- You know, people express
13  their envies in other ways. A lot of this,
14  I was not guilty of, but we just -- we're
15  just vindictive in a lot of ways, and that's
16  why I refuse to sign something that I wasn't
17  necessarily guilty of.
18       Q.   Were you in the doctor's
19  lounge?
20       A.   I probably was.
21       Q.   Were you supposed to be in
22  there?
23       A.   Sure. For cleaning reasons,

363

1       Q.   And October 7, 1992, did the
2   security guard tell you you're not supposed
3   to park there?
4       A.   He probably did, yes.
5       Q.   And did you tell that person
6   to, mind his own damn business?
7       A.   No, I didn't.
8       Q.   Do you have any explanation
9   for why someone would just write a memo
10  saying that you said that?
11       A.   Well, yes. I've just
12  explained earlier, I'm a very dutiful and
13  praiser to God minister. I don't -- I have
14  people that I counsel, they're millionaires
15  whereas I'm a poor African-American
16  gentleman. I'm not envious of just their
17  money, I love them. They, themselves,
18  belong to me, I don't need their money. And
19  people don't view others as that. They
20  want -- They want what they have and you
21  have and what they don't have and then some.
22  And I've always been working with Jason
23  Campbell and Carnell, all of those. I

362

1   yes.
2       Q.   Did a physician speak to you
3   and you didn't respond back to him?
4       A.   I probably -- It probably
5   happened, but there was -- it was not meant
6   to be nasty or turn off. It was more like
7   nervousness and let me see if I can get on
8   out of there.
9            Again, you got doctors who
10  regret Auburn's football record for that
11  season, and they just lose their mind. They
12  know I do a lot of work -- I've always done
13  a lot of work with football players, and
14  they just lose their integrity.
15            (Whereupon, Defendant's
16            Exhibit No. 25 was marked
17            for identification.)
18       Q.   All right. Let me show you
19  Exhibit Number 25. And, again, this is from
20  Mobile Infirmary. Mr. Dyess, were you
21  parking your car at the discharge ramp?
22       A.   Yes. If this says it, I did
23  it.

364

1   haven't just started doing that; I've been
2   ministering for twenty-five years now. That
3   includes -- Shoot includes the span of
4   working at Mobile Infirmary. So you always
5   will have people -- And even when I go over
6   there today, I go to Mobile Infirmary to
7   have prayer with sick people, I'm spied on,
8   people -- the security watches, people
9   walking behind me. I always get that
10  feeling that I'm being watched. Not that
11  I'm being paranoid, but you can always tell
12  when somebody is showing up every time you
13  come over there.
14            So it's their personal --
15  their own personal. The state of Alabama is
16  full of people with that behavior. I don't
17  need to express all that. I do have to
18  maintain some type of Christian ethics. But
19  the state of Alabama full of those people.
20  You're not going to look around
21  discrimination and prejudice to the degree
22  that it is. I'm not naive to think
23  everybody is a humble and understanding

91 (Pages 361 to 364)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

365

1  person like myself try to be. So you going
2  to always have that.
3      And, again, I stated earlier,
4  people -- Auburn University learned that
5  from Mobile Infirmary. And like I said,
6  back then I was young and naive and they had
7  their animosity cup full. And once I went
8  to Auburn, they just pretty much new with
9  everybody. And that could be
10 African-American and Caucasian people with
11 that idea. Like I say, I'm picked at,
12 picked on by both races. So, no, I
13 wouldn't -- I didn't tell him to mind his
14 own business like that. I wouldn't have
15 said that like that.
16     Q.    That wouldn't have been a
17 Christ-like response would it?
18     A.    Of course.
19     Q.    You mentioned Jason Campbell
20 and Carnell Williams in your response. Are
21 you keeping up with those guys?
22     A.    Not directly. I still pray
23 for them, but I haven't talked with them in

366

1  a while.
2      Q.    Did you meet with them when
3  they were students at Auburn?
4      A.    I was on them like their
5  parents.
6      Q.    Have you ever attended Styx
7  River Baptist Church in Robertsdale?
8      A.    No.
9      Q.    Do you know of that church?
10     A.    I think that's where -- Styx
11 River.
12         I think that's where Celeste
13 was attending. I believe at one point in
14 time she was attending there. That's about
15 the only thing I can remember when it comes
16 to Styx River Baptist Church. I do know she
17 lived in that area, so it could have been
18 the church that she attended.
19     Q.    You're not related to the
20 pastor of that church?
21     A.    Not that I know of.
22     MR. DETTLING: All right.
23 Mr. Dyess, I believe that's all the

367

1  questions that I have.
2  (The deposition was concluded at 4:10 p.m.,
3  March 28th, 2008.)

368

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22
_____
       Sara Mahler, CCR
23       ACCR #420

92 (Pages 365 to 368)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

368

1               REPORTER'S CERTIFICATE

2    STATE OF ALABAMA,

3    ELMORE COUNTY,

4          I, Sara Mahler, Certified Court

5    Reporter and Commissioner for the State of

6    Alabama at Large, do hereby certify that the

7    above and foregoing proceeding was taken

8    down by me by stenographic means, and that

9    the content herein was produced in

10   transcript form by computer aid under my

11   supervision, and that the foregoing

12   represents, to the best of my ability, a

13   true and correct transcript of the

14   proceedings occurring on said date and at

15   said time.

16          I further certify that I am neither

17   of kin nor of counsel to the parties to the

18   action; nor in any manner interested in the

19   result of said case.

20

21

22   _____

     Sara Mahler, CCR

23         ACCR #420

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

John Dyess
**Employee Name**

Clinical Science
**Department**

Animal Care Assistant
**Job Title**

JR. Ledbetter
**Supervisor**


| | |
|---|---|
| ____ | **Probationary Employment** |
| ____ | **Performance Evaluation** |
| ____ | **Personnel Record** |
| ____ | **Leave Program** |
| ____ | **Education Improvement Policy** |
| ____ | **Transfer & Promotion Policy** |
| ____ | **Employee Conduct/Job Performance Rules** |
| ____ | **Employee Grievance Procedure** |
| ____ | **Solicitation/Political Activity** |
| ____ | **University Staff Council** |
| ____ | **Non-discrimination policies** |

I have been given a personal copy of the *University Staff Handbook* during an orientation which pointed out these topics covered in the handbook. I understand this handbook is not an employee contract but rather a collection of University policies and information that will be of practical use to employees.

3-19-02
**Date**

John W. Dyess III
**Signature**

38



# UNIVERSITY STAFF
# HANDBOOK

RECEIVED
SEP 1 1 1992
A...E OFFICE
...N UNIVERSITY

# AUBURN UNIVERSITY


DEFENDANT'S
EXHIBIT
2
ALL-STATE LEGAL®

# University Staff Handbook

# January 2002

*This handbook is not an employee contract, but rather a summary of University policies and information that will be of practical use to employees. The complete policies can be found in the* Auburn University Personnel Policies and Procedures Manual.

These are policies in effect as of October 2000. Policies are subject to change. To see the latest revision, check the electronic version of this handbook at web site: www.auburn.edu/administration/human_resources/us/

# Table of Contents

<u>Section</u>

I.   General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2 - 5

II.  University Employment Policies & Procedures . . . . . . . . . . . . . . . . . . . . .    6 - 13

III. Employee Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13 - 21

IV.  Employee Rights and Responsibilities. . . . . . . . . . . . . . . . . . . . . . . . . . . .    21 - 28

V.   Policies Pertaining to the University as a Workplace. . . . . . . . . . . . . . . . . .    28 - 35

VI.  Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36 - 38

     Important Telephone Numbers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

     Departmental Orientation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

     Employee Orientation Topics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

**Message from the President's Office**

Auburn University welcomes you as a new employee. As an employee of the University, you will be contributing to and sharing in the University's efforts to provide the highest standards in instruction, research, and extension. The success and effectiveness of Auburn University in reaching these goals depends in large measure on both your dedication and your effort as well as personal interest you show in representing the University to your community.

This is your Handbook. It is designed to help you feel comfortable in your new position by acquainting you with some very important information such as University benefits, rules, and personnel policies, as well as various support and service departments on campus.

Please read your *University Staff Handbook* carefully and keep it for future reference. Reviewing it from time to time will help you refresh your memory about information that affects you on a daily basis in your job.

As you read through this handbook, we hope you begin to feel a part of Auburn University. Remember, the more you know about Auburn University and your job, the more you will enjoy working for the University.

Auburn University values you and we hope you will find your employment both a happy and rewarding experience.

## Section I: General Information

### Mission Statement

Auburn University's mission is defined by its land-grant traditions of service and access. The University will serve the citizens of the State through its instructional, research and outreach programs and prepare Alabamians to respond successfully to the challenges of a global economy. The University will provide traditional and non-traditional students broad access to the institution's educational resources. In the delivery of educational programs on campus and beyond, the University will draw heavily upon the new instructional and outreach technologies available in the emerging information age.

The University will give highest priority for resource allocation to undergraduate education and for future development of those areas that represent the traditional strengths, quality, reputation, and uniqueness of the institution and continue to effectively respond to the needs of students and other constituents. Consistent with this commitment, the University will emphasize high-quality undergraduate education including a comprehensive general education that imparts the specialized career preparation for students. In establishing the primacy of undergraduate education to the institutional mission, the University will assure the continued strength of its faculty with the realization that the quality of instruction is directly related to the quality of the University's faculty and the commitment of the faculty to excellence in undergraduate education. The University will provide graduate programs in areas of need and importance to the state and beyond. Graduate programs offer students opportunities for specialized advanced education in their chosen field and are important components of the services the University provides.

### Vision Statement

Auburn University will emerge as one of the nation's preeminent land-grant universities in the 21st century. Central to all its functions will be the University's historic commitment of service to all Alabamians as the State becomes a part of a global society with all of its challenges and opportunities. The University will be widely recognized for the quality of its undergraduate educational programs, the effectiveness of its research and outreach programs and the broad access to the University provided through the innovative use of information technology. The University will ensure the quality of its programs through careful focusing of its resources in areas of institutional strengths. One constant will remain unchanged at the University–that intangible quality men and women called the "Auburn Spirit."

# History of Auburn University

Auburn University was chartered in 1856, and traces its beginning to the East Alabama Male College, a private liberal arts institution whose doors opened in 1859. From 1861 to 1866 the college was closed because of the Civil War. The college had begun an affiliation with the Methodist Church before the war. Due to financial straits, the church transferred legal control of the institution to the state in 1872, making it the first land-grant college in the South to be established separate from the state university. It thus became the Agricultural and Mechanical College of Alabama.

Women were admitted in 1892, and in 1899 the name again was changed to the Alabama Polytechnic Institute. In 1960, the school acquired a more appropriate name, Auburn University, a title more in keeping with its location, size, and complexity. The institution has experienced its greatest growth since World War II, and today enrolls over 20,000 students, the largest on-campus enrollment in the state.

Auburn University at Montgomery was established as a separately administered branch campus in 1967. The institution has developed rapidly and is located on a 500-acre campus in east Montgomery.

As a land-grant university, Auburn University has a unique role in the state's total higher education enterprise, embracing and enhancing the interrelated functions of instruction, research and extension. In fulfillment of this mission, Auburn has developed into a premier comprehensive University offering outstanding, economically accessible instruction to its undergraduate, graduate, and professional students; conducting research in an ever-expanding array of disciplines; and reaching a growing number of Alabamians through public service and extension programs.

By striving for excellence in all its activities, Auburn represents a major resource in the state's economic, social, and cultural development. In recognition of obligations to society, instruction, research, and extension programs are also sensitive to national and global concerns. The primary resource for realizing these goals, as at all universities, are the employees; and it is through systematic recruitment, assignment, development, recognition, and comprehensive programs that Auburn nurtures such a prominent, highly productive staff.

## Auburn University Staff Council

All non-exempt* employees are members of the ***University Staff Council*** (AUSC). This Council was established to afford University Staff employees representative participation in the University governance process. Similar governance groups exist for other employee classifications: the University Senate for faculty members and the Administrative and Professional Assembly for exempt* employees.

The AUSC is an elected body established at Auburn University by authority of the University Board of Trustees. The purpose of the AUSC is to facilitate communication to the President regarding policies, procedures, and general welfare issues affecting the staff employee group.

The Staff in each division elects an individual who can best represent and serve as the point of contact for their Staff employees. This individual becomes the division's AUSC representative. Council meetings are scheduled once each quarter. Council representatives are responsible for bringing employee concerns to the attention of the AUSC.

Staff employees are eligible to serve on various University committees. Each spring all staff employees are surveyed as to interest in serving on these committees.

In addition to the University committees, several AUSC committees exist for which all Staff employees are eligible. Contact your division representative for more information.

All AUSC employees are encouraged to discuss any policies or concerns affecting the Staff employee group with their representative on the AUSC. A list of representatives is available on the AUSC web site:

http://www.auburn.edu:80/administration/governance/staff


* "Nonexempt" employees are, by and large, hourly wage employees. The term derives from the Fair Labor Standards Act, a federal law, which establishes categories of employees eligible for overtime payment. In general the law "exempts" from overtime payment employees who are monthly salaried and declares non-exempt (from the law) hourly wage employees.

Orientation

The process of orienting you to your new position consists of two phases:

- **A general orientation**: Shortly after you report to your new position, you will be scheduled for an orientation coordinated by Human Resources and presented by Human Resources and Payroll and Benefits representatives. This session will provide general information to help you get started and will address University employment, conduct and job performance rules, and workplace policies; additionally, it will assist you in completing pay and payroll deduction forms and in signing up for University benefits.

- **Departmental Orientation**: Your supervisor will discuss details relating to your specific key responsibilities and departmental policies. This orientation will probably be completed on the day you report to your unit. The departmental orientation checklist should be reviewed with your supervisor during your departmental orientation and sent to Human Resources for inclusion in your personnel file.

### Human Resources

Human Resources functions to serve the best interests of both the employees and the University. The Assistant Vice President for AU Human Resources and staff are responsible for implementing human resource policies included in the *Auburn University Personnel, Policies and Procedures Manual.* They also handle recruiting, position classification, wage and salary administration, orientation, training, employee records, employee relations, and employee recognition.

If you need any information or counsel, members of the Human Resources staff are available to provide assistance. Contact the Department of Human Resources in Langdon Hall for assistance at 844-4145.

## Section II:    University Employment Policies & Procedures

### Probationary Period of Employment

As a new employee of Auburn University, you are on probation for a 90-day period. The probationary period serves two purposes: (1) It allows you, as a new employee, to evaluate your job, unit, supervisor and colleagues and to decide whether to remain in University employment; and (2) it allows your supervisor the opportunity to evaluate your performance and to decide whether to retain you as a regular employee, extend your probationary status, or terminate your employment.

The probationary period can be extended only once up to a maximum of 90 additional days. If you have questions about your job or performance, we encourage you to seek assistance from your supervisor.

### Commitment to Fairness in Work Practices

Auburn University recognizes its legal and moral obligation to provide an environment in which an opportunity for employment is available to all qualified individuals without discrimination on the basis of race, color, sex, age, religion, national origin, disability, and Vietnam era veteran status. The University affirms its commitment to this principle and to an affirmative action program which not only will establish and sustain the criteria of equal opportunity for employment but which will also detect and eliminate any elements of discrimination in employment which may be found to exist within the institution.

The University also commits itself to maintaining on a nondiscriminatory basis the conditions for continuing employment and for individual advancement within the job structure of the University.

Any employee or group of employees has the right, without discrimination or retaliation, to discuss with their supervisor(s) and/or the Assistant Vice President for AU Human Resources and/or the Executive Director of Affirmative Action, the terms of their employment or working conditions.

Occasionally, the University, just as any other large organization, has to make decisions without prior consultation with its employees. The University must, therefore, maintain exclusive discretion to exercise the customary functions of management including, but not limited to, the discretion to select, hire, promote, transfer, demote, suspend, dismiss, assign, supervise, and discipline employees; to determine the work schedule; to determine the sizes of and composition of the workforce; to establish, change and abolish policies, procedures, rules and regulations; to determine and modify job descriptions and job classifications; to assign responsibilities to employees, and to establish and change salary and wage rates in accordance with needs and requirements determined by the University.

Responsibility for administration of the policies and rules herein set forth in this section (University Employment Policies and Procedures) is delegated by the President to the Assistant Vice President of Human Resources through the Vice President for Administrative Services.

## Your Appointment Status

Your employment is subject to a variety of terms and conditions as identified by University needs and generally accepted personnel management practices. Once you have successfully completed the probationary period, you are considered a regular employee and subject to a *limited term* or *continuing term* appointment.

University Staff employees are paid biweekly and are classified as "Non-exempt" under the provisions of the Fair Labor Standards Act.

Employees hired for a specific period of time (generally governed by the duration of a project, contract, or grant) are on a *limited term* appointment. The duration of your term will be specified at time of employment.

Employees hired for an unspecified time are on a *continuing term* appointment. These individuals are still subject to the availability of funds, rules of performance, and the business needs of the University.

Employees with a normal scheduled work week for less than 40 hours are considered to be *part-time*. Employees with a normal scheduled work week of 40 hours or more are considered to be *full-time*.

An employee who is appointed to a regular schedule for a specific calendar period of nine months under the University's nine-month program for pay and benefits is considered a nine-month employee. An employee who is appointed to a regular schedule for twelve months is a twelve-month employee.

## Employment Eligibility Verification Form I-9

The Immigration Reform and Control Act requires that all newly employed individuals provide documents which establish identity and employment eligibility and complete an I-9 form. The University will employ only U.S. citizens and aliens authorized to work in the United States. Failure to comply with the provisions of the act will result in immediate termination of employment.

## Personnel Record

Your permanent and official Personnel file is maintained only in the Department of Human Resources. This file represents an historical employment record. The information in your file will be kept confidential and only released when you have given written permission. Exceptions to this confidentiality policy involve

a.      Verification of employment for benefits purposes, and

b.      Requests from governmental agencies as to your work status or pay.

## Working Hours

Regular University office hours are 7:45 to 11:45 a.m. and 12:45 to 4:45 p.m., Monday through Friday. *These times may vary depending on your departmental schedule or your position.* It may be necessary for you to work outside your normal schedule because of emergency situations. If you have any questions concerning your work schedule, please direct them to your unit supervisor.

## Overtime Pay

The standard workweek for nonexempt employees is 40 hours. During peak workloads or emergencies, it may be necessary that you work overtime (over 40 hours in a week). In such cases you will receive either compensatory time off from work or overtime pay (at the discretion of your department). Nonexempt employees earn one and one-half (1.5) hours of compensatory time for each hour of authorized overtime work, or are paid at one and one-half time (1.5) times their standard pay rate for overtime hours. Overtime is calculated for the period of each workweek, **not** on a daily basis. Only time actually worked, plus holiday time, counts toward overtime; leave time taken does not count toward the 40-hour period for overtime purposes. **Any overtime work must be approved by your supervisor prior to the work being performed.**

**There are some differences in overtime pay and working hours for certain agricultural jobs.** If you are classified as *agriculture exempt,* you will be paid for all hours worked, or given compensatory time off, at your **standard rate of pay.**

## Overtime & Holidays

If you are required to work on an officially designated University holiday, and you are not given an alternative day off, you will be paid for all hours worked plus your holiday time. Holiday time does count toward the 40 hours per week required to qualify for overtime pay.

## Call-Back Work Time

University staff employees who are called back to work outside their regular schedule are guaranteed at least *four hours* of work. This does not apply when an employee still at work asked to continue working past the normal quitting time.

### Time Card or Time Sheet Procedure

You are required to maintain accurate records of all time worked. Your supervisor will explain the time card or time sheet procedure used in your unit. Please follow this procedure carefully. In no case should you punch another employee's time card or make entries to another employee's time sheet. Forging or falsifying these documents, or any other University records, is a serious offense which may result in disciplinary action.

### Work Breaks

Supervisors may authorize two 15-minute breaks, one mid-morning and one mid-afternoon, for nonexempt employees. Employees may leave their work area during their break unless notified otherwise by their supervisor. Where it is necessary to have someone on duty at all times, care should be taken to make sure the work assignment is covered. Breaks are not cumulative; employees cannot forgo a break time to use later.

### Paycheck

University Staff employees are paid biweekly. If a payday falls on a holiday, checks will be distributed on the last working day preceding the holiday. You paycheck will be delivered to your department or you may have it deposited directly to your bank.

### Job Opportunities

The Employment section of Human Resources maintains a current posting of all job vacancies. The list is posted each week at Human Resources in Langdon Hall and is available in your department. You may telephone the Job Line at 844-4336 to receive a pre-recorded listing of available job openings. This service operates 24 hours a day, seven days a week. You may consult the job vacancy list for a complete listing at

www.auburn.edu/administration/human_resources/employment/vacindex.htm.

### Promotions and Transfers

A **promotion** is any personnel action resulting in the movement of an employee to a job in a higher salary grade and generally resulting in an increase in pay. Employees are eligible to be considered for positions which represent promotional opportunities for them outside their current work unit as they become available once they have completed one year of service in their current work unit. (Application paperwork may be submitted to the Employment section of Human Resources at 10 months of service.)

Employees may apply for promotional opportunities within their work unit provided they have satisfactorily completed the probationary period (minimum of 90 days in regular appointment). Positions are filled through a competitive process and may include external as well as internal searches. Current job performance and compliance with university work rules are given great consideration in making the selection decision.

A **promotion** also may occur as the result of reclassification in connection with progression through designated job families or restructuring of a unit's organization and/or job assignment changes. Reclassifications are initiated by the department supervisor and require the approval of central administration.

A **transfer** is the movement of an employee from one position to another position without a change in salary grade. Transfer actions are not considered eligible for pay increases. An employee may apply for positions which represent lateral transfers through the above referenced competitive process. Transfers may also be initiated by unit supervisors in compliance with University policies and procedures.

## Resignation

University Staff employees may resign by submitting their resignation in writing to their immediate administrative supervisor. A copy of the written resignation must be forwarded to Human Resources for inclusion in the employee's personnel file. University Staff employees should give at least a two-week notice.

## Layoff

Employees may be placed in layoff status for a period of 180 days as a result of reduction in force. Reduction in force may result from major restructuring or realignment, organizational downsizing, outsourcing of programs or services, changes in work volume, or reductions in or elimination of funding. Following the 180 days in layoff status and the lack of an employment opportunity, the employee will be terminated from Auburn University employment.

## Performance Development Plan

Each of us wants to know where we stand with our supervisor and how well we are meeting the requirements of the job we hold. To assist you in these areas, your supervisor will formally review your job performance with you at least once a year. This performance appraisal process may include a review of such items as job knowledge, or how well you meet objectives and standards. You will have an opportunity to review the appraisal with your supervisor to discuss its contents, ways to improve your performance, and any concerns you may have. The performance review is intended to be a constructive two-way process. Your supervisor expects you to express your own views and ask questions. We encourage you to ask your supervisor to discuss with you any questions that you have about your duties and responsibilities, the performance standards for the jobs, and development opportunities and plans.

## Recognition and Awards

A key resource of the University is the experience, expertise and service of its employees. To help recognize and reward this dedicated service, two University programs, the **Employee**

**Recognition Award Program** and the **Spirit of Excellence Award Program** are available. These programs are administered by the Employee Relations Office of the Human Resources Department.

**Spirit of Excellence Award** - The Spirit of Excellence Award Program recognizes a special group of employees for excellent service to Auburn University and this award is given every month to an employee from each of the following groups:

- Service/Maintenance
- Secretarial/Clerical
- Technical
- Administrative/Professional

Employees may be nominated for these awards by any regular Auburn University employee, including University faculty. Nominations are not limited to your immediate area of employment. In order to nominate an employee, simply complete a nomination form and send it to the Employee Recognition Advisory Committee, c/o AU Human Resources, Langdon Hall.

In order to be selected as a Spirit of Excellence Award winner, an employee must meet these criteria:

a.   Be a regular Auburn University employee (excludes temporary employees, graduate student employees, county agents and extension specialists, and tenure-track faculty).

b.   Have at least one year continuous employment with Auburn University.

c.   Have a satisfactory performance evaluation rating at the time of nomination.

Each monthly winner of the Spirit of Excellence Award will be eligible to receive the Employee of the Year Award. The honorees will be announced and recognized at the annual Employee Recognition Award ceremony held in the spring of each year.

**Employee Recognition Award Program** -  The Employee Recognition Award Program recognizes employees for years of service to the University. The program also recognizes personnel retiring from University employment. In order to receive an award in any particular year, the employee must have completed the appropriate years of service by December 31, of the year prior to the award ceremony. Honorees will be recognized for total years of service. Time worked before a break in service will be counted toward the total.

## Inclement Weather

When inclement weather creates a condition under which there might be a question as to whether the University will operate on a normal basis, a designated administrative official will release to

11

the campus and local news media a statement concerning the University schedule. If the weather condition occurs during working hours, the statement will be released through normal distribution channels on campus. If it occurs after working hours, employees are requested to listen to local radio stations for announcements regarding the University working schedule.

## Parking

You are authorized parking privileges as an employee of Auburn University. A parking permit will be issued to you by the Department of Public Safety located on Donahue Drive after you complete a registration form and pay the initial fee.

You should abide by the parking and traffic regulations in order to avoid any more traffic congestion than we already have and to avoid being fined. A copy of these Traffic Rules and Regulations will be given to you when you register your vehicle.

## Auburn University Identification Card

Your Employee Identification Card will entitle you to utilize certain University facilities such as the Library, Student Activities Center, and Martin Aquatics Center. Other privileges available to you upon presentation of your Identification Card include discounts to Auburn University sporting events sponsored by the Athletic Department, items purchased at the University Bookstore, and attendance at movies sponsored by the University Program Council, on a space available basis (students have priority).

## Safety

The prevention of accidents is primarily your individual responsibility as an employee. If any unsafe working conditions are detected, report them to your supervisor immediately. The University strives to develop and maintain safe working conditions and encourages you to work carefully and safely.

The University maintains a comprehensive Safety and Environmental Health Division with specialists in accident prevention, environmental safety, fire prevention, laboratory safety, and radiation safety.

Specialists are available to assist with safety classes, inspections, and recommendations. Employees should call Safety and Environmental Health for help at 334-844-4870. For emergencies, notify the Department of Public Safety in the Dawson Building at 334-844-4158.

## Section III:  Employee Benefits

### Insurance

**Health Insurance**

Auburn University has a self-insured, group health insurance program for full-time University employees which is administered by Blue Cross/Blue Shield of Alabama.  Participation in the program is optional, and there is no waiting period for a pre-existing condition. You must enroll within 30 days of full-time employment or later during an open enrollment period.

The program includes hospital benefits, preferred medical doctor benefits, a prepaid prescription drug card, and major medical benefits.  Each benefit is explained more fully in the Group Health Care Plan booklet that you will be provided.

If you choose to participate in this health insurance, the University contributes a portion of the monthly premium while your share is deducted from your paycheck and is exempt from federal, state, and FICA/Medicare taxes.

**The Preferred Dental Program**

This is an optional program which allows you to receive dental diagnostic and maintenance coverage from a dentist on a preferred list.  You must enroll within 30 days of full-time employment.

**Life Insurance**

Also available is group, term life insurance which has a base plan offering coverage of up to $35,000 with all costs paid by the University. There is an opportunity to voluntarily purchase additional term life insurance up to three times your salary and to provide coverage for your dependents.  A statement of health is not required for your coverage if you apply for this voluntary part of the insurance within 30 days following the date of your initial eligibility.  However if you reject the voluntary life plan initially but decide later to apply for coverage, you may apply at any time by furnishing a satisfactory statement of health.  Coverage will begin upon approval by the life insurance company.

**Disability - Insurance Plans**

**Group Disability Plan** - AU employees qualify for group disability coverage after one year of continuous service.  The plan consists of two parts:

a.  Salary Continuation during the first six months of disability; and

b.  Long-Term Disability Insurance beginning at the end of the six-month period. Both parts provide a percentage coverage of the employee's salary.  For the purpose of this insurance, total disability is, during the first two years, the inability to perform the duties of one's occupation. If the disability continues beyond two years, then total disability means that the disabled person is unable to engage in any business or occupation or to work for compensation, gain, or profit in an endeavor for which he or she is reasonably fitted by education, training, or experience.

**Supplemental Insurance** - This supplement plan gives Auburn University employees the opportunity to complete their disability insurance program according to their individual financial needs. The individual plan provides coverage during the one-year waiting period before the group plan takes effect; and, since it would not be coordinated with the group plan, provides additional monthly benefits during the total period of disability.

The employee is responsible for the cost of coverage.

## On The Job Injury Program

The Auburn University On-the-Job Injury (OJI) Program provides medical and lost wage benefits for compensable work related injuries for Auburn University employees. Employees must report their injury to their supervisor and complete a First Report of Work Related Injury OJI Form-1, as soon as possible but no later than three days from the date of injury. More information about the OJI Program and forms are available on the Department of Risk Management web page and from the program administrator Crawford & Company @ 1-800-844-2524.

## Holidays

You will receive a minimum of eight paid holidays each year. University recognized holidays include: *New Year's Day, Martin Luther King's Birthday, Memorial Day, July 4th, Labor Day, Thanksgiving and the day after,* and *Christmas Day.*

If the holiday falls on a Saturday you will receive the Friday prior to the holiday as your day off, and if it falls on a Sunday, you will receive the following Monday as the holiday. *Additional holidays are often announced by the University President throughout the year.*

## Leave Programs

Employees eligible for participation in Auburn University leave programs are those on a Regular appointment of 50 percent time or more and who are expected to be employed continuously for twelve months or longer. Your supervisor may request written documentation prior to approving any paid leave except annual leave.

**Annual Leave** - The University provides annual leave which an employee may use for recreation or other activities in order to provide a change from the pattern of day-to-day work. Employees are encouraged to take, not accumulate, annual leave. Annual leave may not be used until it is accrued. Annual leave must be requested, and approved by the supervisor, in advance, using the appropriate form (HR-8).

As a nonexempt employee, you will earn annual leave according to the following table:

| Years of Service | Hrs/Yr | Lv/Hr | Hrs/40 Hr | Days/Yr |
|---|---|---|---|---|
| 0 - 2 | 97.76 | 0.047 | 1.88 | 12.22 |
| 3 - 4 | 112.32 | 0.054 | 2.16 | 14.04 |
| 5 - 6 | 128.96 | 0.062 | 2.48 | 16.12 |
| 7 - 8 | 145.60 | 0.070 | 2.80 | 18.20 |
| 9 - 10 | 160.00 | 0.077 | 3.08 | 20.02 |

You will be allowed to carry over one year's accrual of leave as of January 1 of each year. After you have been employed for ten years, you can carry over two years' accrual of leave as of January 1.

You will be compensated for accrued annual leave at the time of separation from University employment (termination or retirement) up to a maximum of one month's additional compensation.

**Sick Leave** – Auburn University provides paid sick leave benefits to all eligible employees. Sick leave is defined as the absence of an employee from work for one or more of the following reasons:

a.   Personal illness or injury which prevents the employee from performing his or her duties.

b.   The employee's or immediate family member's appointment with a physician, dentist, optometrist, psychologist or other recognized health practitioner, hospital, or clinic. Employees are expected to return to work as soon as the appointment is completed. Employees are encouraged to schedule such appointments outside working hours whenever possible.

c.   The illness, injury or disability of a member of the immediate family, when the presence of the employee is required.

d.   Your sick leave must be used for medical reasons. You must notify your immediate supervisor prior to the beginning of the scheduled workday if unable to report for work due to illness or injury. You must assume full responsibility for notifying your supervisor. A supervisor may request written documentation as to the circumstances of an employee's absence prior to approving **any paid leave** except annual leave.

As a full-time employee you will accrue sick leave at the rate of 8 hours per month (96 hours per

year). Sick leave may not be used until it is accrued. "Hours worked" includes holidays and paid leave.

You accrue sick leave whenever you are in pay status, including approved leave with pay, with the exception of salary continuation pay. Sick leave does not accrue during any period of leave without pay. Sick leave accrues while participating in the on-the-job injury program.

If you have advance knowledge of the need for extended sick leave, you should notify your supervisor so arrangements can be made for a temporary replacement, if necessary. Included with such leave request must be a written document from the attending physician indicating the inclusive sick leave dates. The request will include a statement of the anticipated date on which you are approved to return to work, and a statement that you intend to return to work. Upon returning to work from extended sick leave, you must present written documentation from the attending physician certifying fitness to work. You are expected to give your supervisor as much notice as possible of the planned date of return to work.

Sick leave requests (HR-8) must be filed by the first workday following the return from an absence.

All eligible employees hired before October 1, 1990, may be compensated for unused sick leave at the rate of 25 percent of the balance, subject to a maximum of one additional month's compensation upon terminating University employment.

Outside employment during an employee's sick leave is prohibited and may result in disciplinary action, up to and including immediate termination of employment.

**Funeral Leave** - Eligible employees may be granted paid leave up to three working days for the funeral of an immediate family member. One additional day may be granted for travel purposes when the funeral is more than 100 miles from the regularly assigned work site, or two additional days (i.e., five days total) when the funeral is more than 200 miles from the work site.

*Immediate Family - For purposes of sick leave as well as funeral leave the immediate family is defined as spouse, son, daughter, parents, stepchild, stepparent, brother, sister, stepbrother, stepsister, half-brother, half-sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandchild, grandparent, and grandparent-in-law.*

**Court and Jury Duty Leave** - Employees will be granted leave with pay when legally required to attend court, specifically when summoned for jury duty or when required to appear in a proceeding involving Auburn University. Evidence of attendance (including applicable dates and time of service) in court is required before payment by the University. An employee is expected to return to work if released from court prior to the end of his or her scheduled work day. Reasonable travel time will be allowed.

**Military Leave** - An eligible employee who is an active member of the National Guard, State Guard, Naval Militia or the reserve components of the Army, Navy, Marine Corps, Air Force, or Coast Guard will be entitled to military leave of absence for training or other service for up to 21 days per calendar year. As an employee you must submit a request in advance for the leave, along with copies of your military orders, to the department head and AU Human Resources.

**Family and Medical Leave Act (FMLA) Policy** - In compliance with the Family and Medical Leave Act (FMLA) of 1993, Auburn University will grant an eligible employee up to 12 work weeks of unpaid job protected leave within the defined 12-month period for anyone or a combination of the following:

a.   The birth, adoption, or foster placement of a child or the care for a newly-born child.

b.   The care for a family member (spouse, child, or the employee's parent) who has a serious health condition.

c.   A serious health condition of the employee that renders the employee unable to perform the functions of the employee's job.

For additional information contact AU Human Resources at 844-4145.

**Leave Without Pay** - (LWOP) has three major categories:

**Extended Leave Without Pay** - a certified personal illness, injury, or disability. The critical nature of an immediate family member's illness or injury may also justify the granting of extended leave without pay depending upon the circumstances. All accrued sick leave must be used before extended sick leave without pay may be considered.

**Voluntary Leave Without Pay** - a leave status for employees who have exhausted applicable paid leave time, but who, for approved reasons, are not immediately returning to work. A memo of request for extended sick leave without pay will be submitted in advance through the Department Head to the Assistant Vice President for AU Human Resources for approval. The employee should provide a statement of the date he or she intends to return to work. Such leave, once approved, will not exceed a period of six months.

**Disciplinary LWOP** - placement on leave as a result of disciplinary action taken by an employee's supervisor and the University.

## Retirement Plans

The University administers both mandatory and voluntary retirement plans:

## Mandatory Retirement Plans

**Retirement Systems of Alabama is the first mandatory plan.**
As a condition of employment at the University, all eligible employees in at least a 50% time capacity are required to join the Retirement Systems of Alabama. This program provides allowances for eligible members in accordance with the plan or option the member designates at the time of application for retirement. All contributions to the retirement system are tax deferred

17

for federal income tax purposes until retirement or withdrawal from the plan. All University employees will be a part of one of the following Alabama retirement plans:

a.    Teachers' Retirement System of Alabama

    All non-student employees, who are employed for a year in at least a 50% work capacity on a continuing basis, must be participants in the Teachers' Retirement System. Those employees appointed on a temporary basis for no longer than one year may be exempt for that period.

b.    Employees' Retirement System of Alabama

    All Civil Service employees employed by the Alabama Cooperative Extension Service must participate in the Employees' Retirement system.

The second mandatory retirement plan is covered under the **Federal Insurance Contribution Act (FICA)/Medicare** and is commonly called Social Security.
    A deduction is made from all employees' wages, except Civil Service employees, for Social Security. Civil Service employees are only eligible for Medicare and have a prorated deduction from their wages to cover Medicare.


## Voluntary Retirement Plans

**Tax Sheltered Annuities**
University employees, under Section 403(B) of the Internal Revenue Code, have a means of deferring federal and state income tax that is unique to colleges, universities and other non-profit organizations. These tax deferred annuity plans offer tax and retirement benefit advantages which reduce your gross wages before federal and state taxes are computed. Theoretically, when these funds are withdrawn later in life, the employee is in a lower income tax bracket and receives a tax benefit. You can enroll in a tax-deferred annuity plan at any time during the year by calling one of the approved companies' representatives that offer such plans; you will be provided a list of those representatives.

Generally, you are allowed to invest up to specified amounts in these plans and the University matches your contributions up to a certain level. Specific matching figures will be provided to you.

**The Deferred Compensation Plan**
The Retirement Systems of Alabama have implemented a Deferred Compensation Plan (RSA-1) and made it available to all members of the Teachers' and Employees' Retirement Systems. The income deferred as part of this plan cannot be included in the employee's taxable wages for federal or state income tax purposes, and this plan allows **ONLY** employee contributions.

## Education and Training

**Attending University Courses - The Employee Educational Improvement Benefit**
Because we recognize that education is and should be a continuous opportunity, the University allows full-time regular employees **to take University courses during a regular work-day**, and receive a waiver for some or all of the fees associated with attendance: (1) Full-time, regular employees are immediately eligible for **a waiver of the course registration fee**, and (2) after one full year of continuous employment, **tuition charges** for the course are waived for up to five credit hours per academic term. If you wish to take a course, you must consult with your supervisor, take the necessary steps to become a student, and then sign up for the course. You may not preregister for classes but must register on the first day of class. You should discuss your involvement in the appropriate programs with your supervisor.

**Family Member Tuition Assistance Benefit**
Dependents and spouses of full-time employees are eligible for a 50% tuition remission each academic term. Dependents must be under the age of 24 and supported by the employee. Specific application procedures and a fuller explanation of what fees are covered by the waiver will be provided during the New Employees Orientation.

**Training and Development**
Career development and job skills acquisition after employment are the joint responsibility of the employee and the employing unit, but the University assists by providing a program of training and development. Auburn University designed its program to improve organizational effectiveness and productivity through the enhancement of the skills, knowledge, abilities, and competencies brought to the position by the employee and necessary for work-related success, individual growth, and career development. Human Resource Development, a section within the Department of Human Resources, analyzes training and development needs, prepares and coordinates programs, budgets for those programs, monitors enrollment and completion, and provides records and certification of completed training.

Prior to the beginning of the academic year, HRD publishes the <u>Training and Development Guide</u> for each academic year, which describes all the course offerings for that period. At the beginning of each academic period, HRD will publish a separate "Schedule of Courses" listing the specific dates, times, and locations for all the course offerings for that quarter. The <u>Guide</u> and "Schedule" will announce the registration period for that academic period; usually the first two or three weeks of the period. Both the Guide and "Schedule" will be available at Human Resources" University web site: http://www.auburn.edu . Normally the "Schedule" will be distributed and placed on the University's web page the week before registration. Once you are registered for a class, HRD will send you a memo confirming that you have been registered. HRD reserves the right to limit enrollment in classes based on class size, facilities, course content or focus, and curriculum requirement, where appropriate.

## Employee Assistance Program

Auburn University's largest investment and most valuable resources are its people. The goal of our Employee Assistance Program is to preserve and protect this valuable resource. A wide range of personal problems not directly associated with one's position of responsibility can adversely affect an employee's job performance. In most instances, the employee will overcome such personal problems independently, and the effect on job performance will be minimal. In other instances, normal supervisory assistance will serve either as motivation or guidance to resolve such problems, and the employee's job performance will return to an acceptable level.

Sometimes, neither the employee nor the supervisor can resolve the employee's problem, and unsatisfactory performance exists.

Auburn University recognizes that most human problems can be successfully treated or resolved, if identified early, and appropriate action or care provided. This applies whether the problem is emotional, marital or family, legal, financial, alcohol or drug related, or any other undetected behavioral/medical problem.

The purpose of this program is to assure employees that if such personal problems are the cause of deteriorating job performance, they will receive an offer of assistance to help resolve such problems in an effective and confidential manner. Contact Employee Relations in AU Human Resources for more information.

### Other Benefits

**Auburn University Identification Card -** Your Employee Identification Card will entitle you to use certain University facilities and services such as the Library, Student Activities Center, Martin Aquatics Center. Other privileges available to you upon representation of your Identification Card include discounts to Auburn University sporting events sponsored by the Athletic Department and a 10% discount on items purchased at the University Bookstore. You may also attend movies sponsored by the University Program Council.

**Direct Deposit -** The pay check of a University Staff employee may be automatically deposited into his/her bank account. For more information, please contact the Payroll and Employee Benefits Office in Ingram Hall.

**Auburn University Federal Credit Union -** Payroll deduction is permitted for savings and loans; but all arrangements must be made with the Credit Union office.

**United States Savings Bonds -** Monthly payroll deductions are available for United States Savings Bonds. Employees may request application forms from the Payroll and Employee Benefits office.

**Athletic Events Discounts -** Eligible employees may receive discounted tickets for home games with the purchase of a season ticket book. Please contact the Athletic Department for further information.

**Employers' Child Care Alliance:** Auburn University, in partnership with other major Lee County employers, formed this consortium to identify and address child care needs of employees. Its initial projects are 1) The Quality Enhancement Partnership through which several thousand hours of child care training have been sponsored and several centers assisted through incremental steps to accreditation; 2) BRIDGES, a full-time program of care for older children during the spring, summer, and after school hours; and 3) the Enhanced Resource and Referral Service for employee families.

**United Way Participation** - All faculty and staff are invited to participate in the annual United Way Fund Drive. The necessary pledge cards are distributed each fall by the United Way local representatives and should be returned to the local representatives who will forward the pledge cards to Payroll and Employee Benefits for payroll deduction.

**Flexible Spending Account Plan** - This plan allows you to elect a portion of your income to be used to pay for expenses such as outside medical premiums, unreimbursed medical expenses, and dependent child care with pre-tax money. The amounts contributed to the plan are not subject to federal, state, or FICA/Medicare taxes; therefore, you recognize tax savings for allowable expenses and an increase in your spendable income. The plan year runs from January 1 to December 31, and all full-time, non-student employees are eligible to participate if their most recent employment period is continuous for a minimum of one year-nine or twelve months as appropriate to the appointment. Participation is optional, and there is a 30-day enrollment period each year. BenefitElect of Alabama administers the program.

## Section IV:   Employee Rights and Responsibilities

Auburn's philosophy is that you have the right to fair and equitable treatment and that you are responsible for conducting yourself in accordance with University policies and procedures.

### Employee Conduct and Job Performance Rules

Auburn University's rules concerning employee conduct and job performance are simple, common-sense guidelines. They are necessary to ensure that all employees can work in an orderly, efficient, economical manner, free from disturbances which might hinder job training, job production, and job enjoyment. It is the full responsibility of each employee to know what University and departmental rules and regulations do exist and to observe them at all times.

**Classification of Rules and Regulations** - The Employee Conduct and Job Performance rules are classified into three groups below so that corrective action can be consistently administered. The classification and the rule are intended as general guidelines for good judgment and fair treatment. Rules are not restricted to those listed here since some are covered by specific departmental regulations which will be discussed with you by your supervisor. You should know and understand what these other regulations contain as well as the general conduct and job performance rules listed below.

**Group I** - Employees found guilty of actions in Group I will be subject to immediate discharge. These actions are

a.    Intimidating or intentionally imposing on the rights and privileges of other employees.
b.    On University property, drinking intoxicants or using drugs which could have an adverse effect on or endanger other employees.
c.    Changing or otherwise falsifying or forging any University records, permits, time cards or time sheets, licenses, certifications, passes, badges, or approving signatures thereon.
d.    Indulging in grossly offensive, obscene, or immoral conduct.
e.    Deliberately restricting production output and/or University operations or concealing defective work.
f.    Stealing or misappropriating University property or property belonging to other employees.
g.    Intentionally defacing or damaging University property or the property of other employees.
h.    Any other actions, not listed in a-g above, but considered by the University as constituting major misconduct, insubordination, gross negligence, or gross disregard of obligation to the University. Such actions will include violation of another employee's rights concerning discrimination or harassment as set out in the Equal Opportunity Affirmative Action Policy of Auburn University.

**Note:** *Under certain circumstances, being convicted of a criminal offense outside of the University could lead to discharge. Specific action will be determined by the nature of the offense and the employee's job performance.*

**Group II** - Employees found guilty of actions listed in Group II, except where the circumstances are extremely aggravated, will be given a last Formal Written Reprimand which will show that any repetition of the violation or further violation of University rules generally within six months could result in discharge. These written reprimands will be posted to the employee's individual record. These actions are

a.    Fighting on University property or creating disturbances which adversely affect morale, production, studies, or discipline.
b.    Sleeping while on duty during working hours.
c.    Continually or intentionally disregarding any appropriate departmental or University rules.
d.    Reporting to work under the influence of intoxicants, narcotics, or drugs which could have an adverse effect on the safety of other employees.
e.    Refusing to obey reasonable and necessary orders or job assignments or using abusive or threatening language.
f.    Indulging in horseplay or malicious mischief in any form.
g.    Smoking in nonsmoking areas or disregarding any University security or fire regulations.
h.    Leaving University premises prior to the end of any normal work period without prior notice or approval.
i.    Failing to return to work at the end of an authorized leave period unless supervision has been advised of the reason for delay.

j.     Having continued absences or tardiness from scheduled work for which the reasons for absence or tardiness are not considered valid.

**Group III** - Employees who are guilty of actions listed in Group III, except where circumstances are extremely aggravated will be (in order and as repeated violations occur) (1) given an oral reprimand on the first offense; (2) given a written formal reprimand on the second offense; (3) given a last formal reprimand showing the employee was advised that future offenses could result in discharge; (4) subject to discharge.

These actions are

a.     Failing to immediately report to your supervisor all injuries or illnesses occurring at work.
b.     Continually disregarding normal safe work practices.
c.     Contributing to poor housekeeping or unsanitary conditions.
d.     Distracting or annoying other employees while they are performing assigned duties.
e.     Damaging University property and equipment through improper use or lack of care.
f.     Abusing sick leave privileges.
g.     Failing to notify your supervisor each day of any absence from scheduled work.

**Note:** *An employee serving in his or her probationary period of initial employment or re-employment is considered to be on a trial basis, and could be formally disciplined and/or discharged for any conduct or job performance rule violation during this probationary period. They also do not have a right of appeal except for grievances pertaining to pay matters or those based on claims of discrimination or harassment because of race, color, religion, sex, age, disability, national origin, or veterans status; contact the Executive Director of the Affirmative Action office for information.*

### Progressive Disciplinary Procedures

Auburn University encourages open and informal discussion of complaints and problems between supervisors and employees. Supervisors should afford employees the opportunity to discuss their complaints and problems. When a conflict between supervisors and employees cannot be resolved through normal channels, one or both parties may seek resolution and advice from Human Resources. Nonexempt employees also have access to the University Staff grievance process.

### University Grievance Procedures

#### Definition of Grievance

A grievance is an allegation by an employee that there has been a violation, misinterpretation, misapplication, discriminatory application, or unreasonable application of a University policy, procedure, rule, or regulation regarding the employee's employment conditions. The appeal process in the employee grievance procedure is not a formal court proceeding. It is an attempt to determine which allegations are factual and to resolve the issues.

**The Beginning of the Process**

Discussions about work-related complaints should begin with the person's immediate supervisor. If this effort does not produce a satisfactory resolution of the problem within a reasonable time frame, the grievant may appeal to his or her peer employee group for consideration through the Staff Council Grievance Committee. Grievance allegations between employees represented under different grievance policies shall be decided under the jurisdiction of the grievance policy which first receives and responds to the grievance. Issues of discrimination, harassment and other civil rights issues should be referred immediately and directly to the office of Affirmative Action/EEO.

**The Grievance Committee**

The Staff Council Steering Committee will appoint a standing Grievance Committee made up of at least 15 members appointed at-large from the Staff employee group. A fair distribution of members among the major vice-presidential representative categories shall be maintained. Members will be expected to be discrete, impartial, and able to dedicate the necessary time and thought to a grievance process. At least one Steering Committee member will serve on the Grievance Committee. The Steering Committee will appoint one Grievance Committee member to serve as Chair of that committee for a two-year term.

**General Procedure for Resolution of Grievances**

A staff member who believes that he or she has a grievance must discuss the matter thoroughly with his/her immediate supervisor, or, if the immediate supervisor is the alleged cause of the grievance, the grievant should proceed up the chain of command. This discussion should be initiated by the grievant within 15 working days after the grievant becomes aware of the subject of the grievance. Under extenuating circumstances, such as prolonged illness, the grievance may be initiated at a later date. However, the Grievance Committee may deny a hearing if it was not initiated in a timely manner.

During this discussion, the grievant must define clearly the nature of the grievance and specifically request that a decision be made by the supervisor. The supervisor will respond with a decision as soon as possible, but no later than **10 working days**, after the discussion. If the supervisor does not provide a timely response, or if the grievant is not satisfied by the response, the grievant may request that the Staff Council Grievance Committee provide informal mediation. **It is to the grievant's advantage to document these discussions.**

**Informal Mediation**

If 10 working days elapse without a decision from the supervisor, or if a decision is announced that does not satisfy the grievant, he/she may present the grievance for mediation by an assigned team from the Grievance Committee. When responding to a mediation request, the Chair of the Grievance Committee shall designate three committee members to comprise the Mediation Team. The Grievance Committee Chair shall appoint one of the team members as team leader.

The mediation process will be informal, with the Mediation Team attempting to facilitate a resolution of the problem quickly by whatever techniques and procedures the Team believes to be appropriate. Every effort will be made to maintain an informal atmosphere that encourages an expeditious, cooperative resolution of the problem. The Mediation Team may meet privately with either of the parties or with other informed persons in order to explore the possibility of

24

finding a mutually acceptable resolution.

The mediation process will continue until a settlement is reached or until the Mediation Team or one of the parties decides to stop mediation. When a decision to stop mediation is made, it is the responsibility of the Mediation Team to inform both parties in writing. After receiving notice that mediation efforts have stopped, the grievant who desires a formal grievance hearing has **10 working days** in which to request a formal grievance hearing.

**Formal Grievance Hearing**

a.  The Role of the Grievance Committee - A grievant who wants a formal hearing of his/her grievance, initiates the process by a written request to the Staff Council Grievance Committee. Before requesting a formal hearing, the grievant is expected to have made a good faith effort to resolve the grievance through full discussion with his/her supervisor and to have participated willingly in mediation efforts by the Mediation Team.

   The Grievance Committee will require the grievant who requests a formal hearing to provide a clear written statement of the grievance. The Grievance Committee will determine whether the situation warrants a formal hearing; their decision will be final. Grievances based upon the termination of a non-probationary employee or the significant or continued reduction of pay as a result of disciplinary action, qualify automatically for a hearing if a timely request is made by the grievant. The Grievance Committee shall base its decision to convene a formal hearing on evaluation of the content provided in the grievant's formal request and on recommendations received from the Mediation Team. Grievance Committee action shall be decided by a majority vote of those committee members present.

b.  Grievance Hearing Panel - If it is decided that a formal hearing is to be held, then the Grievance Committee will oversee formation of a Grievance Hearing Panel. The Grievance Hearing Panel shall consist of two members of the Staff Grievance Committee, excluding any members of the mediation team originally assigned to the grievant, two members of the supervisor's employee group, and one member selected randomly, by the grievance committee chairperson, from the remaining members of the Staff Grievance Committee. It shall be the responsibility of the Hearing Panel to elect one of its members as chair.

   It will be the responsibility of the Chair of the Staff Grievance Committee to empanel Hearing Panel members. Refusals by Grievance Committee members to serve on a Hearing Panel should be based on strong reasons such as recent service on a large number of hearings, prior commitments, or knowledge of the parties or issues that could make impartiality difficult.

   A list of all eligible Staff Grievance Committee members will be presented to the grievant. He/she will have two working days to choose two persons from this list to be members of the Hearing Panel. The supervisor must also choose two persons from this list or may provide two eligible members from the Grievance Committee representing his/her employee group within two working days. In the event that the grievant and

25

supervisor choose the same candidates, the Chairman of the Grievance Committee shall appoint additional members to complete a panel of five. No panel member shall be an attorney or professional advocate. The Grievance Committee Chair may, at his/her discretion, appoint a replacement panel member if extended sickness or other circumstances prevent discharge of the Hearing Panel member's responsibility.

Each member of the Hearing Panel shall avoid any discussions of the case **with the parties or their advocates** before the hearing. Panel members are obligated, when considering evidence, to restrict their attention to evidence presented at the Hearing.

c.  The Liaison Person - The Department of Human Resources will provide a liaison person to serve the Hearing Panel. The liaison person will assist the Hearing Panel by arranging for any facilities needed by the Hearing Panel, arranging for witnesses to be available, and providing the routine support that may be needed during the hearing. The liaison person shall arrange for witnesses or members of the Hearing Panel to be excused from work or to receive appropriate compensatory time or remuneration so that their participation in these services will not require personal sacrifice. The liaison person will play no role in the hearing other than providing necessary support services.

d.  Representation - The parties in a grievance shall have the right to be represented by anyone whom they choose during the hearing and in pre-hearing meetings. However, the supervisor shall not be represented by an attorney or professional advocate unless the grievant has chosen to be represented by an attorney or professional advocate.

e.  Grievance Hearings - shall be closed. No witness (except the parties themselves)will be allowed to hear the testimony of any other witness.

The Hearing Panel (or a representative thereof) will consult the parties before setting a time for the hearing and may, with the consent of the parties, hold joint pre-hearing meetings with them in order to (1) clarify the issues, (2) provide for the exchange of documents or other information, and (3) achieve any other objective in the pre-hearing period that will contribute to a fair and expeditious hearing.

The Hearing Panel shall ensure that **ten working days** occur between the official announce date and the actual hearing date to allow for the preparation of statements. The Panel may extend that time period for meritorious requests.

f.  Statements - The grievant will be given **five working days** from the announced date for the Grievance Hearing to supply the Hearing Panel and the supervisor with a final written statement describing the grievance, **and will state at that time whether he/she is to be represented by an attorney or professional advocate**. The grievant's statement will describe the facts and issues he/she wishes the Hearing Panel to consider. The statement may differ from the statement the grievant made during the mediation process but must be based on the same complaint presented to the original Mediation Team and for which a formal Hearing was first requested. On receipt of the grievant's statement, the supervisor will be given **five working days** to supply the grievant and the Hearing Panel

26

with a written response to the grievant's statement.

g.    The Record - official record of the hearing will be made by the Hearing Panel. A copy will be made available to each party upon request.

h.    The Hearing - The hearing will be informal and unlike those used in courts of law. The Panel may admit any evidence it considers to be relevant, credible, and of sufficient importance to determining the issues. The Hearing Panel may ask the parties to produce witnesses and evidence on specific issues and may also examine witnesses of its own selection. Each party will have the right to ask questions of all witnesses appearing at the hearing and may rebut any evidence heard by the Panel.

Witnesses will not be required to testify under oath, but the Chair of the Hearing Panel shall inform each witness who is an employee of the University that any deliberate falsehood can result in a separate grievance and/or disciplinary action against the witness. The Panel may grant adjournments of reasonable length to investigate evidence if the Panel believes newly introduced evidence has created an undue element of surprise in the grievance hearing.

Both parties and the University administration will cooperate with the Hearing Panel and the liaison person in obtaining witnesses and making documents and other evidence available as needed by the parties or the Hearing Panel unless it is determined by the Vice President or President that the information sought is confidential and not subject to release. Tenure and promotion records and records subject to the Family Education and Privacy Act shall be considered confidential. The Hearing Panel will be obligated to announce to both parties when it has begun its final, formal deliberation.

The Hearing Panel will base its findings and recommendations solely on relevant facts surrounding the issues and material presented to the Hearing. The Hearing Panel's official findings and statements of recommendations shall be prepared in writing. In the case of dissenting opinions within the Hearing Panel, these shall be prepared and submitted as well.

The Hearing Panel will report its findings and recommendations to the appropriate Vice President. If the Vice President was a party to the original grievance or the direct supervisor of the grievant, then the findings and recommendations shall go to the President. The grievant and the supervisor will be notified in writing of the Hearing Panel's findings and recommendations within **10 working days** after formally commencing final deliberation.

No grievant will be entitled to more than one formal hearing on the same complaint.

i.    Final Disposition - The final disposition of the grievance shall be made known in writing to the grievant, the supervisor charged, and the Grievance Committee Chair by the Vice President or President within 30 days of the filing of the Hearing Panel's report. In unusual instances in which a decision cannot be reached within 30 days, the Vice President or President shall give written notification to the persons noted above and indicate a date on which a decision can be expected.

27

## Withdrawal of Grievance

Employees who request formal grievance hearing procedures may withdraw a grievance at any such withdrawal shall be without prejudice.

## Section V:  Policies Pertaining to the University as a Workplace

The policies cited below that pertain to Equal Employment Opportunity, Harassment, Employment of Individuals with a Disability, and Drug-Free Campus and Workplace are responsive to University commitments and provisions of state and federal statutes. Changes in federal law in areas covered by these policies take precedence over the policies cited here.

Auburn University has an Affirmative Action Plan, approved by the U.S. Department of Labor. A copy is on file in the Office of Affirmative Action/EEO and is available for inspection upon request in the Special Collections Department of the Ralph B. Draughon Library. The Equal Opportunity Policy and the Harassment Policy printed below are part of this plan.

### Equal Employment Opportunity

Auburn University recognizes its moral and legal obligation to provide a work environment in which employment opportunities are open to all qualified individuals without discrimination on the basis of race, color, sex, age, religion, national origin, disability, or disabled veteran/ Vietnam era veteran status. The University affirms its commitment to this principle and to an affirmative action program which not only establishes the goal of achieving equal opportunity in employment but which also detects and eliminates any elements of discrimination in employment which may be found to exist within the institution. The University also commits itself to maintaining on a nondiscriminatory basis the conditions for continuing employment and for individual advancement within the job structure of the University.
These are the nondiscriminatory conditions for certain employment and individual advancement to which the University is committed:

a.    Recruiting, hiring, training, retaining, and promoting individuals in all job classifications, without regard to race, color, religion, sex, age, national origin, disability, or disabled veteran/ Vietnam era veteran status, except where sex, age, national origin, or disability are bonafide occupational qualifications;

b.    Making employment decisions so as to further the principle of equal employment opportunity;

c.    Ensuring that promotion decisions are in accordance with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities;

d.    Ensuring that all personnel actions, such as compensation, benefits, transfers, and leave policies, are administered without regard to race, color, religion, sex, age, national origin, disability, or disabled veteran/Vietnam era veteran status; and

28

e.  Ensuring that harassment of employees by other employees in connection with work-related matters is not tolerated. This refers to any form of harassment related to an employee's race, color, sex, religion, national origin, age, physical or mental disability, or veteran status.

## NOTICE

Auburn University is a government contractor subject to Section 503 of the Rehabilitation Act of 1973 and Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended, which require government contractors to take affirmative action to employ and to advance in employment qualified individuals with disabilities, qualified special disabled veterans, and qualified veterans of the Vietnam era.

An individual with a disability or a veteran covered by this program who desires to be considered under the Affirmative Action Program should contact the Affirmative Action Office between the hours of 7:45 a.m. and 4:45 p.m., Monday through Friday.  You may request consideration under the Affirmative Action Program at any time prior to or during employment.

Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. Information obtained shall be kept confidential, except that supervisors and managers may be informed regarding restrictions on your work or duties and necessary accommodations; safety personnel (First Aid) may be informed to the extent appropriate, if the condition might require emergency treatment.

Government officials investigating compliance with the Act shall also be informed. The information provided will be used only in ways that are not inconsistent with Section 503 of the Rehabilitation Act and Vietnam Era Veteran Readjustment Assistance Act of 1974, as amended.

## Affirmative Acton Program on
## Employment of Individuals with a Disability

It is the policy of Auburn University, at all levels of employment, to take affirmative action to employ, to advance in employment, and otherwise to treat qualified employees and applicants with a disability without discrimination based on physical or mental disability. Positive action shall be taken to ensure the fulfillment of this policy. This policy covers the following:

a.  Hiring, placing, upgrading, transferring, and demoting employees;

b.  Recruiting, advertising, and soliciting applicants for employment;

c.  Treatment of employees during employment;

d.  Rates of pay and all forms of compensation and employment benefits;

e.  Selection for training and promotion;

f.  Layoff and termination;

29

g.      Facilities; and

h.      Other terms, conditions, and privileges of employment.

The University's policy is consistent with the requirements and objectives set forth by Section 503 and 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 793 and the Americans With Disabilities Act of 1990, 42 U.S.C. 1201 et seq.

The University's objective is to employ individuals qualified for or trainable for positions based upon job related standards involving education, training, experience, and personal qualifications. Responsibility for supervising compliance and continued implementation of this policy on employing, advancing in employment, and otherwise treating fairly qualified individuals with disabilities is assigned to the Executive Director of Affirmative Action/Equal Employment Opportunity.

Employees and applicants are protected from coercion, intimidation, interference, or discrimination for filing a complaint of discrimination because of physical or mental disability.

**Internal Complaint Review Procedure for Employees with Disabilities**

a.      Any employee with a disability who feels he or she has been discriminated against because of the disability should first discuss the complaint with his or her immediate supervisor. In the event the complaint is not resolved to the satisfaction of the complainant, then the complainant should request to see the department head.

b.      The department head will set aside time for an interview with the complainant. After the interview, the department head will investigate the circumstances concerning the complaint. In the event the department head is unable to resolve the complaint to the satisfaction of the complainant, then the Executive Director of Affirmative Action/Equal Opportunity shall be notified.

c.      The Executive Director of Affirmative Action will interview the complainant. The complaint will be thoroughly investigated. After making a determination, the Executive Director of Affirmative Action will give his or her decision to the complainant and will also take any action necessary to implement the decision. All written records will be maintained for a period of three years.

## Affirmative Action Program on
## Employment of Veterans

Auburn University will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran or veteran of the Vietnam era in regard to any position for which the employee or applicant is qualified. The contractor agrees to take affirmative action to employ, to advance in employment and otherwise to treat qualified disabled veterans and veterans of the Vietnam era without discrimination based on disability or Vietnam era veteran status. Positive action shall be taken to ensure the fulfillment of this policy. This policy covers:

a.    Hiring, placing, upgrading, promoting, awarding of tenure, transferring, demoting, and rehiring employees;

b.    Recruiting, advertising and soliciting for applicants;

c.    Treatment of employees during employment;

d.    Rates of pay and all forms of compensation or employment benefits including leave of absence, sick leave or any other leave;

e.    Selection for training, job assignments, job classifications, professional meetings, conferences and selection for leaves of absence to pursue training;

f.    Layoff and termination;

g.    Facilities and activities sponsored by the contractor including social or recreational programs; and

h.    Any other term, condition, or privilege of employment.

Auburn University's policy is consistent with the requirements and objectives set forth by Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, 38 U.S.C. § 2012.

Auburn University's objective is to employ individuals qualified for or trainable for positions based upon job-related standards involving education, training, experience and personal qualifications. Responsibility for supervising compliance and continued implementation of this policy on employing, advancing in employment, and otherwise treating disabled veterans and veterans of the Vietnam era fairly is assigned to the Executive Director of Affirmative Action/Equal Employment Opportunity.

## Employee Non-Harassment Policy

Auburn University will not tolerate harassment of its employees. Any form of harassment related to an employee's race, color, sex, religion, national origin, age, or physical or mental disability is a violation of this policy and will be treated as a disciplinary matter. For these purposes, the term "harassment" includes, but is not necessarily limited to the following: Slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color, sex, religion, national origin, age, physical or mental disability. Harassment also includes unwelcome sexual advances, requests for sexual favors and other verbal, graphic, or physical conduct of a sexual nature.

Violation of this policy by an employee shall subject that employee to disciplinary action, up to and including discharge. If an employee feels that he or she is being harassed by any other employee because of race, color, sex, religion, national origin, age, or physical or mental disability, the employee should at once make this known to his or her immediate supervisor. The supervisor will promptly notify the University's Equal Employment Opportunity Officer, who will see that the matter is investigated, and that, where appropriate, disciplinary action is taken. If the employee does not feel the matter can be discussed with the supervisor, the employee should

31

arrange for a conference with the EEO Officer to discuss the complaint.

Harassment of University employees in connection with their work by non-employees may also be a violation of this policy. Any employee who becomes aware of any harassment of an employee by a non-employee should report such harassment to his or her supervisor or to the EEO Officer, who is responsible for investigating all such incidents. Appropriate action will be taken against violation of this policy by any non-employee.

## Drug-Free Campus and Workplace Policy

Auburn University will provide students and employees a drug-free campus environment. Drug abuse affects all aspects of American life: it threatens the student's educational development and the workplace, as well as the community. In order to promote a safe and efficient educational and work environment, this policy has been adopted to supplement existing University policies, practices, and procedures. Implementation of this policy is subject to restrictions contained in all local, state, and federal laws.

"Workplace" means any office, building, classroom, or property (including parking lots) owned or operated by the University, or any other site at which an employee is to perform work for the employer. An "employee" of the University is any faculty, staff, or student receiving remuneration for services rendered. "Student" means any person registered at the University for any type of academic credit, except for continuing education units, regardless of the length of the student's program of study. "Possess" means to be contained either on a student's or employee's person, or in a student's or employee's motor vehicle, tools, briefcases, book bags, or areas entrusted to the control of the student or employee. "Impaired" means under the influence of an illicit drug or alcohol such that the student or employee is unable to perform his or her assigned tasks properly.

Drug abuse creates problems for the entire University. It decreases the student's capacity to learn, thereby inhibiting one's educational development. It interferes with an employee's efficient and safe performance of work responsibilities and reduces the employee's dependability. Drug abuse can adversely affect health, safety, and productivity while destroying public confidence and trust. Therefore, it is the policy of University that the unlawful manufacture, distribution, dispensation, possession, or use of illicit drugs or alcohol by students or employees is prohibited at any time on any University property or at any University activity. No employee will report for work or will work or be present in the workplace who is impaired by an illegal drug or by alcohol. No student will attend classes or any University activity who is impaired by illegal drugs or alcohol.

Employees or students who are so impaired or who unlawfully possess, use, manufacture, dispense, or distribute illicit drugs or alcohol in the workplace, on any University property or at any University activity are subject to the disciplinary procedures of the University, which may include dismissal, expulsion, and/or referral for prosecution. All students and employees shall be provided a copy of the Drug-Free Campus and Workplace Policy for the University. As a condition of enrollment or employment, the student and employee will abide by the terms of this policy. It is the responsibility of AU Human Resources, the Office of the Provost, and the Office of the Vice President for Student Affairs to distribute this written policy statement to students and employees under their jurisdiction.

Any employee receiving a criminal drug statute conviction for a violation occurring in the workplace shall notify AU Human Resources, the Office of Provost, or the Office of Vice President for Student Affairs of such conviction not later than five days after such conviction, and such offices will immediately report this information to the Office of Associate Provost and Vice President for Research. If the employee reporting such a conviction is employed under a contract or grant, Auburn University, through the Office of Associate Provost and Vice President for Research, will notify the appropriate granting or contracting agencies within ten days after receiving such notice of a criminal drug statute conviction.

AU Human Resources on behalf of Auburn University has established the drug-free awareness program, now held quarterly, to inform employees about the danger of drug abuse in the workplace. AU Human Resources, through Human Resource Development and the Employee Assistance Program, shall offer drug abuse training and treatment referral in appropriate circumstances. Student Health Services and the Alcohol and Drug Information Center, sponsored by the Student Government Association, provide information on health issues and legal consequences associated with drug use and offer referral for counseling and treatment.

A committee, appointed by the President, will promote and further develop the University's drug prevention program. This committee will establish procedures to ensure an annual distribution, in writing, to each student and employee: (a) a description of applicable legal sanctions under local, state, or federal law for the unlawful possession or distribution of illicit drugs and alcohol; (b) a description of the health risks associated with the use of illicit drugs and the abuse of alcohol; and (c) a description of any drug or alcohol counseling, treatment, or rehabilitation or re-entry programs that are available to employees or students. The committee will evaluate the University's drug prevention program biennially to determine its effectiveness and report to the President. The committee's report will include recommendations for changes that are needed in the program and identify any evidence that disciplinary sanctions are not consistently enforced for violations of this policy.

For further information, contact the office of the Vice President for Research (844-4438). Web site:  http://www.auburn.edu/student_info/student_life/recreation/

## Smoking Policy

It is the policy of Auburn University to prohibit the smoking of tobacco within the interior of any building or facility except under the conditions described below:

- Residential units owned by the University and occupied by individuals or families are subject to the smoking preferences of the occupants.

- Residence hall rooms inhabited by two or more individuals will be considered to be no smoking areas if one of the occupants is a non-smoker. Every effort will be made to avoid the involuntary placement of smokers and non-smokers together in the same room.

- Smoking at University sponsored public events at Beard-Eaves Memorial Coliseum and intercollegiate athletic facilities will be regulated by the management of those facilities in conjunction with the local fire authority.

In keeping with the University's concern for the well being of its employees and students, smoking cessation classes are provided by Human Resources Development and Student Health Services.

Failure to comply with this policy will constitute a violation of University policy and may be dealt with accordingly through established, formal disciplinary procedures.

Requests for assistance and questions regarding this policy can be addressed to the Office of Safety & Environmental Health (334) 844-4870.

## Weapons Policy

Auburn University prohibits possession, use, and transportation of any dangerous or potentially dangerous weapons described below on all University properties:

a.    Fixed blade knives concealed on the person or in vehicle (e.g., Bowie knife, knife, or instrument of like kind or description)
b.    Shotgun or rifle or other shoulder gun
c.    Pistol or revolver
d.    Air gun (e.g., air or gas powered rifle or pistol)
e.    Bow and arrow (e.g., archery equipment)
f.    Slingshots (including throwing weapons)
g.    Swords
h.    Crossbows
i.    Brass knuckles
j.    Fireworks or explosive devices

This policy shall apply to all faculty, staff, students of Auburn University, and to all visitors to the campus or University properties. This policy shall not apply to duly authorized law enforcement officials in the lawful discharge of their duties .

Temporary exclusions may be granted by written permit only by the Chief of Police or his authorized designee for job related, educational, or demonstration purposes.

Where applicable concerning these instruments, department heads and respective instructors may be granted a blanket authorization for organized activities by the Chiefs of the Auburn University and AUM Police. These organizations must guarantee qualified instruction, safety, and security for such activities.

Where applicable, all federal, state, and local laws and ordinances will be strictly enforced by the Auburn University Police Department and respective mutual aid agencies and shall be separate from this administrative policy.

## Other Policies, Rules and Regulations

**Solicitation and Distribution**: Distribution, canvassing and placing of signs and posters for solicitation purposes, chain letters, and collection of any kind, and sales of tickets or merchandise are not permitted on University property unless prior approval is granted by the appropriate authority.

**Political Activity**: Each employee of Auburn University is specifically exempted from any obligation or compulsion to support any candidate or cause even though the support of such candidates or cause may be urged or suggested by any other employee of the institution, or division, school, or department thereof. An individual employee of the University who may be expressing personal support for a candidate or partisan issues should do nothing to suggest or imply that he speaks as a representative of Auburn University.

Auburn University recognizes the constitutional rights of its employees to participate in and to assume the responsibilities of citizenship in government affairs. These rights include that of seeking public office in local, county, state and federal governments. It must be recognized, however, that this participation must not interfere with the performance of the employee's work obligations to the University.

Any employee who may decide to qualify for full-time elective office in federal, state, county, or municipal governments will submit his resignation at the time he presents his request for qualification as a candidate of election. Such resignations will be upon the standard forms and will be processed in the same manner as all other resignations. Such persons, so resigning, will do so without any guarantee by Auburn University that they may be re-employed in the event they are not elected; or, if elected, that they may be re-employed while holding an elective office; or, that they may be re-employed at the expiration of the term of office for which they have been elected.

Full-time employees of Auburn University may serve in nominally remunerative local and county elective offices provided the duties and responsibilities of such offices do not interfere with the proper performance of the duties of such employees to the institution. In such cases, it will be the duty of the employee, before qualifying for such nominally remunerative local or county elective office, to receive the approval of Auburn University. Such approval will depend only upon the effect of the elective office on the employee's ability to perform his or her University duties. However, in no case will such approval carry with it any obligation of Auburn University to support any such candidate.

# Important Telephone Numbers

| | |
|---|---|
| Accounts Payable | 844-4612 |
| Affirmative Action | 844-4794 |
| AU Credit Union | 844-4120 |
| AU Human Resources | 844-4145 |
| AU Parking Department | 844-4143 |
| AU Police/Public Safety | 844-4158 |
| Bookstore | 844-4241 |
| Budget Control | 844-5852 |
| Bursar | 844-4634 |
| Controller | 844-5588 |
| Computing (Information Technology) | 844-5555 |
| AU Hotel and Dixon Conference Center | 844-4718 |
| Facilities (Work Orders) | 844-4557 |
| I.D. Card Center | 844-4507 |
| Internal Auditing | 844-4389 |
| Library | 844-4500 |
| Mail Service | 844-4845 |
| Meat Market (Recording) | 844-1565 |
| Motor Pool | 844-4757 |
| Payroll & Benefits | 844-4183 |
| President's Office | 844-4650 |
| Printing | 844-4187 |
| Property Control | 844-4759 |
| Purchasing | 844-4625 |
| Risk Management | 844-4533 |
| Telecommunications | 844-2222 |

# Departmental Orientation

| | |
|---|---|
| ____ | Welcome (Introduction, department functions, department tour, introduction of employees) |
| ____ | Daily Routine/Procedures |
| ____ | Work hours and use of time sheet or time clock |
| ____ | Lunch Break (other breaks) |
| ____ | Pay Information |
| ____ | Individual Performance Plan |
| ____ | Job requirements/responsibilities |
| ____ | Job description |
| ____ | University & Department rules/policies |
| ____ | Reporting absences |
| ____ | Preparing leave requests |
| ____ | First Aid facilities |
| ____ | Appropriate dress |
| ____ | Smoking policy |
| ____ | Weapons policy |
| ____ | Drug-Free workplace policy |
| ____ | Care of equipment |
| ____ | Security & fire prevention |
| ____ | Reporting accidents |
| ____ | Safety |
| ____ | Allow for employee questions |
| ____ | Access to Info. Tech. |

_____

**Employee's Name (please print)**

_____

**Date**

_____

**Supervisor's Signature**

**Date**    _____

**Return to Human Resources for filing in the employee's personnel record.**

## Employee Orientation Topics

**Employee Name**

**Department**

**Job Title**

**Supervisor**

_____ **Probationary Employment**
_____ **Performance Evaluation**
_____ **Personnel Record**
_____ **Leave Program**
_____ **Education Improvement Policy**
_____ **Transfer & Promotion Policy**
_____ **Employee Conduct/Job Performance Rules**
_____ **Employee Grievance Procedure**
_____ **Solicitation/Political Activity**
_____ **University Staff Council**
_____ **Non-discrimination policies**

I have been given a personal copy of the *University Staff Handbook* during an orientation which pointed out these topics covered in the handbook. I understand this handbook is not an employee contract but rather a collection of University policies and information that will be of practical use to employees.

**Date**                    **Signature**

# The Auburn Creed

I believe that this is a practical world and
that I can count only on what I earn.
Therefore, I believe in work, hard work.

I believe in education, which gives me the
knowledge to work wisely and trains my
mind and my hands to work skillfully.

I believe in honesty and truthfulness,
without which I cannot win the respect
and confidence of my fellow men.

I believe in a sound mind, in a sound body
and a spirit that is not afraid, and in clean
sports to develop these qualities.

I believe in obedience to law because it
protects the rights of all.

I believe in the human touch, which
cultivates sympathy with my fellow men
and mutual helpfulness and brings
happiness for all.

I believe in my Country, because
it is a land of freedom and because
it is my own home, that I can
best serve that country by "doing justly,
loving mercifully, and walking humbly
with my God."

And because Auburn men and women
believe these things, I believe in
Auburn and love it.

—George Petrie

Discussed with John the FACT that
he was instructed by DR. Saidla NOT to
WORK OVERTIME; and that I suspected that
he was NOT clocking out when he was
on PERSONAL TIME.

HE SAID he was NOT REQUIRED to clock
out when he took bREAKS. THE problem
is that he takes EXCESSIVE bREAKS. HE
is spotted IN diFFERENT AREAS USING
COMPUTERS. DiFFERENT Doctors hAVE CONFIRMED
SEEINg him. (DR. GOldEN).

John spoke to DR. Saidla About his CONCERNS.
HE then CAME bACK to ME ANd went ON ANd
ON About bEING A MiNisTER. HE SAid that
he was A MAN oF God ANd iF I MESSEd with
him OR bothered him, that "BAd" things would
hAPPEN to ME. HE then wANTEd to GivE
ME EXAMPLES OF BAd things hAPPENING to
other PEOPLE. I ASKEd iF he was thREATENING
ME. HE SAid he wASN'T but God was. BASicAlly
that God was thREATENING ME throuah him,
iF I iRRiTATED him.

John CAME to ME LATER ANd SAid he had spokEN
to DR. SAidlA AgAiN ANd was told that comiNG
to his oFFicE EVERY FiFTEEN MiNuTES with
A COMPLAiNT was NOT ACCEPTAbLE; that he
shouLd GO bAcK to his WORK AREA ANd do
whAt he is supposEd to do. HE ALso SAid

Dyess v. Auburn
AU R26-159


DEFENDANT'S EXHIBIT 3
ALL-STATE LEGAL®

~~ON About being a minister. He said that~~
~~he was a man of God and it~~
~~him or bothered him, that bad things would~~
HAPPEN to ME ~~HE~~
ME EXAMPLES ~~of bad things happening to~~
~~OTHER people~~
ME ~~he said he wasn't but God was~~ ~~THREATENING~~
~~that God~~
~~I irritated him.~~
~~John came to me later and said he had spoken~~
to DR. SAidlA AgAiN ANd wAs told that ~~coming~~
~~to his office every fifteen minutes with~~
A complAiNt ~~was not acceptable, that he~~
~~should go back to his work area and do~~
whAt hE is supposEd to do. HE Also sAid
thAt DR. SAidlA sAid thAt what hE sAid
to ME About "BAd" thiNgs hAppENiNg to
mE could bE coNsidEREd A thREAt

Bud Richard

# Psychological Associates, LLC
## 1915 Professional Circle
## Auburn, Alabama  36830
### 334-826-1699

July 13, 2005

Ms. Sonya Dixon
Auburn University Human Resources
Langdon Hall
Auburn University, Alabama  36849

Dear Ms. Dixon:

At your request, I have completed a psychological evaluation of Mr. John Dyess on June 27 and June 29, 2005.  I conducted a clinical interview and a mental status examination. In addition, I administered the following tests: Kaufman Brief Intelligence Test, Second Edition; Personality Assessment Inventory, Thematic Apperception Test, and Rorschach Inkblot Test.  I also provided feedback to Mr. Dyess regarding the test results.

Based on the clinical interview, background information, and psychological testing, it does not appear that Mr. Dyess is imminently dangerous toward himself or others.  Mr. Dyess was diagnosed with a delusional disorder.

Based on the evaluation, I have the following recommendations:  It is recommended that Mr. Dyess participate in individual psychotherapy.  His psychotherapist should monitor him for any deterioration in functioning.  As long as he is being monitored by a psychotherapist, it seems likely that Mr. Dyess can continue to work.  In addition to addressing his primary psychological difficulties, psychotherapy should focus on helping Mr. Dyess relate to others in work settings.  Lastly, concerns about family issues have also been raised and may be a focus of psychotherapy.

It is also recommended that Mr. Dyess participate in a psychiatric evaluation to determine whether psychotropic medications would be helpful to treat his psychological difficulties. Doctors Lusche and Kern (821-0238) offer psychiatric services in an outpatient setting. In addition, psychiatric services are provided at East Alabama Mental Health (742-2821).

If I can be of any assistance, please do not hesitate to contact me at (334) 826-1699.

Sincerely,

Glen Vollenweider, Ph.D.
Licensed Psychologist
Alabama License # 1167



DEFENDANT'S
EXHIBIT
**4**

Dyess v. Auburn
AU R26-177

# Auburn University

Auburn University, Alabama 36849-5524

College of Veterinary Medicine
Office of the Director
Veterinary Medical Teaching Hospital

Telephone: 334-844-6002
Fax: 334-844-6715
saidlje@auburn.edu

DATE: August 15, 2005

MEMORANDUM

TO: John Dyess

FROM: John E. Saidla

SUBJECT: Return to Work

This is to inform you that you may return to work on Wednesday, August 17 at 7:45am. Upon your return I expect you to follow all rules and policies of Auburn University and the Department of Clinical Sciences. Before you begin working you are to discuss your hours with your supervisor, Mr. Bud Richards since you will have weekend duty as well as working Monday to Friday. You need to understand that Mr. Richards is your supervisor and that you are to do what he tells you to do when he tells you to do it.



**DEFENDANT'S EXHIBIT 5**

Dyess v. Auburn
AU R26-190

# Auburn University

Auburn University, Alabama 36849-5540

Department of Clinical Sciences
College of Veterinary Medicine
612 Hoerlein Hall

Telephone: (334) 844-5045
Fax: (334) 844-5084

August 17, 2005

MEMORANDUM:    For the Record  John Dyess

FROM:    R. David Whitley
Professor and Head
Clinical Sciences

SUBJECT:    John Dyess

On this date, Wednesday, August 17, 2005 a meeting was held to explain work rules, duties, and to re-state that Mr. Bud Richards isand will continue to be John Dyess' supervisor. Dr. Saidla made it perfectly clear that the work hours were 7:45 AM to 4:45 PM, with 2 breaks, and one hour for lunch. He also stated that Mr. Dyess was to do what he was instructed to do by Mr. Richards. If he does not perform his duties as instructed and abide by the work schedule that Mr. Dyess will be terminated from employment. John Dyess stated on at least two occasions during the meeting that he did not understand the one hour for lunch, this was again communicated to John and he agreed to abide by the schedule. He does not want to interact with other employees, but must do this when helping co-workers with shared duties, ie, steam cleaning animal wards.

Mr. Dyess has returned today from an extended administrative leave, beginning June 20, 2005.

cc:    Dr. John Saidla

DEFENDANT'S
EXHIBIT
**6**
ALL-STATE LEGAL®

Dyess v. Auburn
AU R26-161

A LAND-GRANT UNIVERSITY

8.17.05

# Basic Duties

### Wards 562,563,566 and Treatment Room 561 & 564

**Daily:**

Sweep and mop (change water and mop head before each use)
Empty trash cans
Clean and disinfect vacant cages as needed.
Stock wards and treatment rooms:
    Cage paper, brown paper towels, white paper towels,
    Cat litter, animal food, trash bags, cleaning supplies, etc.
Handle anything that a reasonable person could see that needs attention.

**Weekly:**

Help pressure wash.

### Water Treatment Room

**Daily:**

Sweep, empty trash cans, keep towels supplied, stock cleaning supplies
Clean treadmill
Clean A/C filters

**Weekly:**

Scrub floor

## ALL ROOMS

**Daily:**

Re-check all rooms periodically and perform any needed cleaning or
stocking of supplies.

## General Duties

**Daily:**

Clean exercise yare
Empty trash cans out front, including emptying and re-stocking of mutt-
mitts

**Monday/Thursday:**

Empty Cigarette butt containers

**As needed:**

Help cut grass, help clean vacuum machine, perform any housekeeping that
is     needed or requested over the intercom.

Dyess v. Auburn
AU R26-162

This is only a "BASIC" review of your responsibilities. You are expected to perform any and all tasks that is with-in reason. You are expected to be ready, willing and able to help-out in any situation. There is no job you are excused from. Your work day begins at 7:45 am and ends at 4:45 pm Monday thru Friday. You will have two fifteen minute breaks, on in the am one in the pm; one hour for lunch, clocking in and out for lunch. You are not allowed to leave the area after your work day has started unless you notify me first with a valid excuse.

Dyess v. Auburn
AU R26-163

# AUBURN UNIVERSITY
## CORRECTIVE ACTION REPORT

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed, it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

Date 2/23/2006

Purpose of Conference John's inappropriate behavior & insubordination toward his supervisor

Employee Name John Dyess                    SSN ████████

Job Title Animal Care Attendant          Department Clinical Sciences

Date and Time of Incident 2/22/06                          4:20          am/**pm**

Date and Time of Supervisor/Employee Conference _____ am/pm

Check Which Action Applies:  ☐ Verbal Reprimand (Do not forward to Human Resources.)

☒ Written Formal Reprimand

☐ Written Final Reprimand

☐ Written Reprimand With Suspension For ____ Working Days, Beginning _____ and Ending _____ Without Pay ☐ With Pay ☐

☐ Recommendation for Termination. Effective Date _____ Pending Approval From The Appropriate Administrator

RECEIVED FEB 24 2006 HUMAN RESOURCES

Dates of prior reports, if any, during the last six (6) months: 12/16/05

**FACTS - What happened: (Be specific)**

The Central Supply Room is an area that is to be renovated and turned into a experimental surgery area. This room is off-limits to all but a few selected employees. I was in the process of moving the inventory from this room to a new storage area in the hospital, so that renovations could begin. John, singing to himself, entered the room. I told him that he was not allowed in there. He ignored me and kept looking around for something. He walked all around the room while I was telling him that he was not allowed to be in there. The whole time, he kept singing to himself. After several minutes of looking and me telling him to leave, he finally left without ever acknowledging me. I locked the door and followed him. He approached a cart I had been loading and tried to remove some items. I prevented this by stepping between him and the cart. I pushed the cart to the new storage area and reported the incident to Dr. Saidla. This is the second time in two months that John has been insubordinate to his supervisor.

Dyess v. Auburn
AU R26-027

DEFENDANT'S EXHIBIT 7
ALL-STATE LEGAL®

**FACTS - What happened: (Continued)**

**What is planned to correct or eliminate the problem:**

John will abide by the rules and policies of Auburn University as set forth in the University Staff Handbook.

**What steps will be taken if the problem is not corrected or eliminated:**

If John's inappropriate behavior and his insubordination toward his supervisor continues, he could face termination.

**FOR THE EMPLOYEE: I hereby acknowledge that the contents of this Corrective Action Report have been reviewed with me. (If you wish to make any comment regarding this Corrective Action Report, please do so in the space below.)**

Employee Signature: *REFUSED to SIGN*

(The employee's signature indicates he/she has seen this report
The signature does not necessarily indicate agreement.)

*Buel Richard*
Supervisor

*Jm Etidler 2-23-04*
Dean/Director

A copy of this report shall be given to the employee and one copy should be forwarded to Human Resources.

HR 80-Effective: 03/05/2001

Dyess v. Auburn
AU R26-028

## AUBURN UNIVERSITY
## CORRECTIVE ACTION REPORT

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed, it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

Date 2/23/2006

Purpose of Conference John's inappropriate behavior & insubordination toward his supervisor

Employee Name John Dyess                SSN ▮▮▮▮▮▮▮

Job Title Animal Care Attendant         Department Clinical Sciences

Date and Time of Incident 2/23/06                              9:30          (am)/pm

Date and Time of Supervisor/Employee Conference _____ am/pm

Check Which Action Applies:
- ☐ Verbal Reprimand (Do not forward to Human Resources.)
- ☐ Written Formal Reprimand
- ☒ Written Final Reprimand
- ☐ Written Reprimand With Suspension For ___ Working Days, Beginning _____ and Ending _____ Without Pay ☐ · With Pay ☐
- ☐ Recommendation for Termination. Effective Date_____ Pending Approval From The Appropriate Administrator

RECEIVED
FEB 24 2006
HUMAN RESOURCES

Dates of prior reports, if any, during the last six (6) months: 12/16/05 , 2-22-06

**FACTS - What happened: (Be specific)**

John has been instructed that his two scheduled breaks will be from 9:45-10:00 AM and 2:45-3:00 PM. At these times, he is allowed to use the hospital's computers. At 9:30 this morning, I observed John on a computer in Seminar A (Room 307 Hoerlein Hall). I told John that his break did not start until 9:45. He did not speak or acknowledge me. After telling him this several times and asking him if he heard me, I called Renza Floyd, one of my other employees, to witness the event. I repeated what I had been saying to John in from of Renza. John still did not speak or acknowledge us. I told Renza to come with me. At this point, John said, "Have a Nice Day". I couldn't help but feel that he was taunting me. John was watched and did not leave the computer until 10:00.

Dyess v. Auburn
AU R26-029

DEFENDANT'S EXHIBIT 8
ALL-STATE LEGAL

FACTS - What happened: (Continued)

**What is planned to correct or eliminate the problem:**

John will abide by the rules and policies of Auburn University as set forth in the University Staff Handbook.

**What steps will be taken if the problem is not corrected or eliminated:**

If John's inappropriate behavior and his insubordination toward his supervisor continues, he will be terminated.

**FOR THE EMPLOYEE: I hereby acknowledge that the contents of this Corrective Action Report have been reviewed with me. (If you wish to make any comment regarding this Corrective Action Report, please do so in the space below.)**

*REFUSED to SIGN*

Employee Signature: _____

(The employee's signature indicates he/she has seen this report
The signature does not necessarily indicate agreement.)

*Bud Richards*

**Supervisor**

*Jim Hyde  2-23-06*

**Dean/Director**

A copy of this report shall be given to the employee and one copy should be forwarded to Human Resources.

**HR 80-Effective: 03/05/2001**

Dyess v. Auburn
AU R26-030

# AUBURN UNIVERSITY
## CORRECTIVE ACTION REPORT

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

Date  3/29/2006

Purpose of Conference  Use of Hospital Computers

Employee Name  John Dyess                          SSN  ▆▆▆▆▆▆▆

Job Title  Animal Care Attendant          Department  Clinical Sciences

Date and Time of Incident  3/28/2006 PM                                am/pm

Date and Time of Supervisor/Employee Conference  3/29/2006                am/pm

Check Which Action Applies:

- [ ] Verbal Reprimand (Do not forward to Human Resources.)
- [ ] Written Formal Reprimand
- [x] Written Final Reprimand
- [x] Written Reprimand With Suspension For  5  Working Days, Beginning  3/29/2006  and Ending  4/5/2006  Without Pay [x]   With Pay [ ]
- [ ] Recommendation for Termination. Effective Date _____ Pending Approval From The Appropriate Administrator

Dates of prior reports, if any, during the last six (6) months:  12/16/05, 2/22/06, 2/23/06

**FACTS - What happened: (Be specific)**

John has been told that his scheduled breaks are to be 9:45 - 10:00 AM and 2:45-3:00 PM.  Today, John entered Overton Auditorium at 2:35 PM which was an unauthorized break and began using a computer.  The purpose of this reprimand is to make sure that John knows which computers he is allowed to use and at what times he is allowed to use them.

John also told the Office Administrator that he would not meet with his supervisor (Bud Richards) unless Dr. John Saidla or Dr. David Whitley was at the meeting.

Any infraction of the policy could lead to further disciplinary action up to/and including termination of employment.

John has also been informed that Dr. Saidla and Dr. Whitley may not be able at all times to meet with him and Bud Richards.  At that time Mr. Richards will have someone else sit in on the meetings, if needed.

Dyess v. Auburn
AU R26-031

DEFENDANT'S EXHIBIT 9

**FACTS - What happened: (Continued)**

**What is planned to correct or eliminate the problem:**

John is to only have use of the computers located in seminar rooms "A", "B" and "C" in Hoerlein Hall. The only times he is allowed on these computers id during his scheduled breaks.

**What steps will be taken if the problem is not corrected or eliminated:**

If hospital rules and policies are not followed, he will be terminated.

**FOR THE EMPLOYEE: I hereby acknowledge that the contents of this Corrective Action Report have been reviewed with me. (If you wish to make any comment regarding this Corrective Action Report, please do so in the space below.)**

Employee Signature: ✗ _Employee refused to sign._

(The employee's signature indicates he/she has seen this report
The signature does not necessarily indicate agreement.)

_Bud Richards_                              _Don Handle_ 3-29-06
**Supervisor**          3-29-06          **Dean/Director**

**A copy of this report shall be given to the employee and one copy should be forwarded to Human Resources.**

HR 80-Effective: 03/05/2001

Dyess v. Auburn
AU R26-032

**AUBURN UNIVERSITY**
**GRIEVANCE FORM**
**(To be filed within 45 calendar days of alleged occurrence)**

Please refer to the University's Policy Statement on Grievance Procedures to ensure your concern(s) is grievable. (http://www.auburn.edu/administration/human_resources/manual/sect08.htm#8.6) You may also contact the Human Resources Office at 844-4145 for further clarification. **Attach additional pages if more space is required.**

Employee's Name: John W. Dyess III

Employee ID #: 3-29-06                    Date Grievance Occurred

Department: Clinical Science (Vet. School)    Date Grievance Filed with Human Resources Office: 4-3-06

Job Title: Animal Care Assistant

✓ Staff                                    Date Sent to Dean/Dept Head/Director: _____

_____ Administrative/Professional

**STEP 1 – STATEMENT OF GRIEVANCE**
**(Attach any additional supporting documents as deemed necessary)**

**IDENTIFY THE POLICY THAT IS BEING GRIEVED**

See Attached Forms

**STATEMENT OF GRIEVANCE**

I Feel that There are Reasons that I can explain that would prove that being suspended was wrong. Mr. Richards used very abusive language and Actions on me.

**REMEDY REQUESTED**

For this Issue to be Resolved and lost wages be Restored.

Employee's Signature: John W Dyess III       Date: 4-3-06

**STEP 2 – GRIEVANCE COMMITTEE CHAIR REVIEW**
**(Time Limit: Within 5 working days)**

ALL-STATE LEGAL®
DEFENDANT'S
EXHIBIT
10

☑ Issue is grievable. Employee will be contacted to schedule hearing
☐ Issue is not grievable for the following reason: _____

Dyess v. Auburn
AU R26-180

Chair, Grievance Committee Signature: Wendy Pechman       Date: 4/7/06

Hearing Panel selected
Chair of Panel: _Debbie Griggs - Staff_
Panel Members: _Patricia Digman - A+P_
_Sherry Boothe - Staff_

## RESPONSE OF THE PERSON(S) AGAINST WHOM THE GRIEVANCE IS FILED

See attached statement written by the person(s) against whom the grievance is filed.

Person(s) against whom the Grievance is filed signature: _Floyd Richards Jr._

Date: _4-10-06_

---

## STEP 4 – HEARING

Witnesses to be called: _DR. John Saidla_

If either party chooses to have an advisor in attendance – please fill out the section below.

Advisor to Employee: _____
Occupation and/or Campus Unit: _____
Advisor to the person(s) against whom the grievance is filed: _____
Occupation and/or Campus Unit: _____

## RECOMMENDATION OF GRIEVANCE HEARING PANEL

(Time Limit: Within 15 working days following the hearing, unless Grievance Committee notified employee of additional time needed. See attached statement written by the Grievance Hearing Panel.)

_Debbie Griggs_                  Signature                  _4/27/06_
Chair, Grievance Hearing Panel                              Date

## OFFICE OF THE VICE PRESIDENT'S REVIEW & RESPONSE

(Time Limit: Within 30 calendar days following receipt of Grievance Hearing Panel's recommendation)

☐ Agree with Grievance Hearing Panel's recommendation
☒ Disagree with Grievance Hearing Panel's recommendation.
☐ Alternative Resolution: _I agree with the grievance panel support of the action taken by_
_Clinical Sciences. I do not agree that Mr. Dyess should be relocated to another department. He needs to_
_remain in Clinical Sciences and follow all hospital policies and procedures. I am in agreement_
_that Mr. Richards attend Supervisor Training as offered by Human Resources._

Name and Title _JOHN HEILMAN_       Signature _John Heilman_       Date _5-3-6_

8/15/05

Dyess v. Auburn
AU R26-181

# Auburn University

Auburn University, Alabama 36849-5101

Procurement & Payment Services
311 Ingram Hall

Telephone: (334) 844-7771

April 27, 2006

On April 27, 2006 the Grievance filed by John W. Dyess, III against Floyd "Bud"

Richards, Jr was heard by the Grievance Panel consisting of Debbie Griggs, Trish Digman and

Sherry Boothe.  Our finding is that we agree with the action taken by the Clinical Sciences

Department of 5 days suspension without pay.  We feel there was adequate documentation

leading to this event.

We recommend that Mr. Dyess be relocated to another department away from Clinical

Sciences within 30 days.  We also recommend that Mr. Richards attend the Supervisor Training

that is offered by Human Resources.

Debbie Griggs, Chair

Trish Digman

Sherry Boothe

DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
11

Dyess v. Auburn
AU R26-036

*LINDA JOHNSON's notes*

Annual leave must be pre-approved three days in advance. There is a calendar near the time clock where you should note the day or days of your planned leave in addition to telling your supervisor.  A leave slip MUST  be signed and turned in before the day of leave.

Any meetings with parties on main campus must be scheduled and verifiable.  The names of the parties and their contact numbers are required for verification.

## SIGN AND DATE

John W. Dyess    4-24-06

DEFENDANT'S
EXHIBIT
*12*
ALL-STATE LEGAL®

Dyess v. Auburn
AU R26-158

**AUBURN UNIVERSITY**
**CORRECTIVE ACTION REPORT**

RECEIVED
MAY 04 2006
HUMAN RESOURCES

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed, it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

Date 5/3/2006

Purpose of Conference Termination

Employee Name John W. Dyess                    SSN ▇▇▇▇▇▇▇

Job Title Animal Care Attendant          Department Clinical Sciences

Date and Time of Incident 04/28/2006                    1:59 PM                    am/pm

Date and Time of Supervisor/Employee Conference 05/03/2006          8:00 AM          am/pm

Check Which Action Applies:    ☐ Verbal Reprimand (Do not forward to Human Resources.)

☐ Written Formal Reprimand

☐ Written Final Reprimand

☐ Written Reprimand With Suspension For ____ Working
Days, Beginning _____ and Ending _____
Without Pay ☐   With Pay ☐
☒ Recommendation for Termination.
Effective Date 5/3/2006 ____ Pending Approval From
The Appropriate Administrator

Dates of prior reports, if any, during the last six (6) months: 3/29/06, 2/23/06, 2/22/06, 12/16/06

**FACTS - What happened: (Be specific)**

John turned in a bi-weekly payroll time sheet on Friday morning, April 28, 2006. The sheet showed that he would be working eight total hours that day. John left for lunch at 11:58 AM. He returned from lunch at 1:59 PM. John is very careful with his time card when he clocks in or out that the dates and times do not overlap. On this particular instance, the dates and times were stamped over more than once, making the card hard to read.

John is well aware of the policies concerning leave and the application for leave. He signed a form detailing the leave policy on April 24, 2006. John had two full days in which he could have explained the situation and requested a leave application. He chose to ignore the situation and appeared to try to cover it up by clocking over the dates and times on his time card.



DEFENDANT'S
EXHIBIT
3
ALL-STATE LEGAL

Dyess v. Auburn
AU R26-164

**FACTS - What happened: (Continued)**

**What is planned to correct or eliminate the problem:**

John has received both verbal and formal written reprimands. He received a written final reprimand on 2/23/06 and a written final reprimand with a five day suspension without pay on 3/29/06. John has been given repeated warnings but continues to fail to follow the university's policies and rules. He leaves no other choice but for his position to be termination.

**What steps will be taken if the problem is not corrected or eliminated:**

**FOR THE EMPLOYEE: I hereby acknowledge that the contents of this Corrective Action Report have been reviewed with me. (If you wish to make any comment regarding this Corrective Action Report, please do so in the space below.)**

Employee Signature: _refused to sign_

(The employee's signature indicates he/she has seen this report
The signature does not necessarily indicate agreement.)

_Floyd Richards Jr_            _John Hardin_  5-3-06
Supervisor  5-3-06            Dean/Director

A copy of this report shall be given to the employee and one copy should be forwarded to Human Resources.

HR 80-Effective: 03/05/2001

Dyess v. Auburn
AU R26-165

PAY PERIOD ENDING

NO.

NAME John Dyess

REGULAR TIME

EXTRA TIME

| | A.M. | NOON | P.M. | | | |
|---|---|---|---|---|---|---|
| | IN | OUT | IN | OUT | IN | OUT |
| 1st Day | | | | | | |
| 2nd Day | | | | | | |
| 3rd Day | | | | | | |
| 4th Day | | | | | | |
| 5th Day | | | | | | |
| 6th Day | | | | | | |
| 7th Day | | | | | | |

Dyess v. Auburn
AU R26-166

**AUBURN UNIVERSITY**
**GRIEVANCE FORM**
(To be filed within 45 calendar days of alleged occurrence)

Please refer to the University's Policy Statement on Grievance Procedures to ensure your concern(s) is grievable. (http://www.auburn.edu/administration/human_resources/manual/sect08.htm#8.6) You may also contact the Human Resources Office at 844-4145 for further clarification. **Attach additional pages if more space is required.**

John W. Dyess III
Employee's Name

_____          5-3-06
Employee ID #                               Date Grievance Occurred

College of Vet med (Clinical Science)          6-12-06
Department                          Date Grievance Filed with Human Resources Office

Animal Care Ass.
Job Title

✓ Staff                                Date Sent to Dean/Dept Head/Director: _____

_____ Administrative/Professional

**STEP 1 – STATEMENT OF GRIEVANCE**
(Attach any additional supporting documents as deemed necessary)

**IDENTIFY THE POLICY THAT IS BEING GRIEVED**

Unauthorized Use of Annual leave,
Reporting back from lunch an hour late

**STATEMENT OF GRIEVANCE**

I Feel that I was terminated Unjustly, MR Richard
was not there for me to call and Report my lateness.
As a Result of being late, I was terminated

**REMEDY REQUESTED**

To Have job Restored and to be Financially
compensated For this experience. Lust Wages - moving expenses, etc.

Employee's Signature  John W. Dyess          Date  6-12-06

**STEP 2 – GRIEVANCE COMMITTEE CHAIR REVIEW**
(Time Limit: Within 5 working days)

☐ Issue is grievable. Employee will be contacted to schedule hearing
☐ Issue is not grievable for the following reason: _____

_____

Chair, Grievance Committee Signature _____ Date _____

DEFENDANT'S EXHIBIT
14
ALL-STATE LEGAL®

Dyess v. Auburn
AU R26-185

---

**STEP 3 – REBUTTAL STATEMENT, SELECTION OF HEARING PANEL**
**(Time Limit: Within 10 working days)**

---

Hearing Panel selected
Chair of Panel: _____
Panel Members: _____

---

## RESPONSE OF THE PERSON(S) AGAINST WHOM THE GRIEVANCE IS FILED

See attached statement written by the person(s) against whom the grievance is filed.

Person(s) against whom the Grievance is filed signature: _____

Date: _____

---

**STEP 4 – HEARING**

---

Date of Hearing: _____    Location of Hearing: _____

Witnesses to be called: _____

If either party chooses to have an advisor in attendance – please fill out the section below.

---

Advisor to Employee: _____
Occupation and/or Campus Unit: _____
Advisor to the person(s) against whom the grievance is filed: _____
Occupation and/or Campus Unit: _____

---

### RECOMMENDATION OF GRIEVANCE HEARING PANEL

(Time Limit: Within 15 working days following the hearing, unless Grievance Committee notified employee of additional time needed. See attached statement written by the Grievance Hearing Panel.)

---

Chair, Grievance Hearing Panel                    Signature            Date

### OFFICE OF THE VICE PRESIDENT'S REVIEW & RESPONSE
(Time Limit: Within 30 calendar days following receipt of Grievance Hearing Panel's recommendation)

☐  Agree with Grievance Hearing Panel's recommendation
☐  Disagree with Grievance Hearing Panel's recommendation.
☐  Alternative Resolution:_____
_____
_____

---

Name and Title                        Signature              Date

8/15/05

Dyess v. Auburn
AU R26-186

# Auburn University

Auburn University, Alabama 36849-5147

Affirmative Action/Equal Employment Opportunity Office
005 Quad Center

Telephone: (334) 844-4794
FAX: (334) 844-4793

May 18, 2006

Mr. John Dyess
████████████████
Auburn AL ████

Dear Mr. Dyess:

On March 29, 2006, you filed an informal complaint with the Office of Affirmative Action/Equal Employment Opportunity alleging discrimination on the basis of race and religion from your supervisor, Mr. Floyd Richards.

Our office has conducted a thorough inquiry into the allegations you raised but was unable to determine that the university's policies prohibiting discrimination or harassment were violated. Thus, our office considers this matter administratively closed.

Sincerely,

Michelle E. Martin
AA/EEO Compliance Administrator
Office of AA/EEO & ADA/504



AUBURN UNIVERSITY IS AN AFFIRMATIVE ACTION/EQUAL OPPORTUNITY EMPLOYER
AND EQUAL OPPORTUNITY EDUCATIONAL INSTITUTION

A LAND-GRANT UNIVERSITY

Dyess v. Auburn
AU R26-043

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X  ̄ John Dyes   ☐ Agent  ☐ Addressee <br> B. Received by ( *Printed Name* )   C. Date of Delivery  5-25-06 |
| 1. Article Addressed to: <br><br> John Dyess <br> ▆▆▆▆  ▆▆▆▆▆▆▆ <br> Auburn Al. <br> ▆▆▆▆ | D. Is delivery address different from item 1?  ☐ Yes <br> If YES, enter delivery address below:  ☐ No |
| | 3. Service Type <br> ☐ Certified Mail  ☐ Express Mail <br> ☐ Registered  ☐ Return Receipt for Merchandise <br> ☐ Insured Mail  ☐ C.O.D. |
| | 4. Restricted Delivery? ( *Extra Fee* )   ☐ Yes |
| 2. Article Number <br> *(Transfer from service label)* | |
| PS Form 3811, February 2004   Domestic Return Receipt | 102595-02-M-1540 |

John W. Dyess



Mobile, AL

To:
Auburn University Human Resources
Albert Snipes
Sonya Dixon
Grievance Committees
Len Hammond

June 8, 2006

    This letter is in regards to my being terminated from A.U. on May 3, 2006. I feel that I have been thoroughly mistreated in being terminated. I feel that the reason Mr. Floyd Richards terminated me was because I would not respond to his many attempts to express his sexual desires with me. I will list several of the reasons I feel I was sexually harassed below.

In June of 2005, I was asked to a meeting with Sonya Dixon (Human Resources) Dr. John Saidla (Administrator-Vet School) and Mr. Floyd Richards. Mr. Richards stated that I had threatened him; I explained that he and I had a conversation involving Christian principals and that I told him what the Bible says of what happens to people who harms a minister. I told him that I am a licensed Minister. He said he understood what I meant and that his father-in-law was also a minister. He also stated that I had been seen stealing towels from the Emergency Room. I explained that I made it my daily task to clean the Emergency Room and that I would make sure there were enough clean towels for use. I then told Ms. Dixon and Dr. John Saidla that Mr. Richards was approaching me like he wanted to date me. I explained that Mr. Richards told me (3 days after I had been assigned to him) that he admired me and that he wanted to get to know me better. I further stated that he looked me in the eyes like a man trying to set-up a date with a woman. After I finished talking, Ms. Dixon concluded the meeting.

In December of 2005, I met with Ms. Dixon of Human Resources. I told her that Mr. Richards was still trying to get me alone. He was trying to get me to go places at the Vet School saying he needed me to clean or do something. She asked was any of this told to me when I had first been assigned to him as my responsibility. I answered "No". I received a written letter detailing what room and areas of the vet school I was responsible for cleaning. The Kennel Room (dog food) and the surgery area across the street were the two rooms where he constantly tried to get me alone. I further stated to Ms. Dixon that Mr. Floyd (Bud) Richards was always asking me to get to know him better. This, I said, was very unprofessional of him. I felt like he and I had a descent enough working relationship and that I needed not to know anything else about him. I also stated to Ms. Dixon that Dr. John Saidla had no interest in helping me with this situation and that he felt like I was wasting his time. He said I could talk with Dr. Ed Richardson or even Governor Riley for all he cared.

DEFENDANT'S
EXHIBIT
16
ALL-STATE LEGAL®

Dyess v. Auburn
AU R26-187

John W. Dyess- Grievance Page 2

He made me feel like I was never to come in his office again. Mr. Richards and Dr. David Whitley (Vet School Administrator) both were there and heard him.

In February of 2006, Mr. Richards used profanity on me. He said that he was going to "fire my ass". He later approached me in the hall and rubbed his hand and private body area on me. I didn't say anything to him because of fear of being terminated. The next morning Mr. Richards called me to a meeting with Dr. John Saidla and himself. In this meeting, I was suspended for 5 days without pay. I asked Dr. Saidla if it would help if I explained my side of the story. He said "No". I reported this to Albert Snipes (Human Resources) and to Ms. Dixon. I was given no advice other than it was proper procedure. I further spoke with affirmative action. I informed them that Mr. Richards was harassing me sexually. I told them that he had rubbed against me. I was told by them that they would contact me after they had investigated this situation. I also told them that Mr. Richards was stalking me, calling my home from his cellular phone (for no reason). Two weeks went by and I had not heard from anyone from Affirmative Action or Human Resources.

Between the time I was suspended and the time I was terminated, Mr. Richards continued to stalk and harass me. The reason I think the termination was unjust is that I had an Emergency to occur during my lunch period and was detained. Mr. Richards was off that day, so I had no one to report to. Further, I was never warned or advised on how to handle this situation before it happened. Moreover, I always missed lunch breaks earlier (returned early) so I had overtime to replace the lost time. In previous time when ever I was late returning from lunch, I explained to Mr. Richards that I would shorten my lunch the following day to accumulate the proper 40 hours. He said that would be alright. Finally, the reason I say this is wrong is because Mr. Richards allowed my fellow co-worker to leave without notice, clock each other in/out etc.

Dyess v. Auburn
AU R26-188

# Auburn University

Auburn University, Alabama 36849-5126

Department of Human Resources
Langdon Hall

Telephone: (334) 844-4145
TDD (334) 844-1612
Jobline for TDD Users: (334) 844-4561
FAX: (334) 844-1617

June 13, 2006

Mr. John Dyess
███████████
Mobile, AL █████

Dear Mr. Dyess:

I am writing to inform you that the grievance form that you filed with this office has been forwarded to the University Affirmative Action- Equal Employment Opportunity Office for review. This action was taken as a result of allegations made be you that are included in your grievance. You can reference policy 8.6.3: **Employees who feel they are being discriminated against because of race, color, sex, national origin, religion, age, veteran's status, or disability should immediately and directly take the issue to the Office of Affirmative Action/EEO which can be reached at (334) 844-4794 or via the web at http://www.auburn.edu/administration/aaeeo/.**

Someone from the Office of AA/EEO will be in contact with you regarding your complaint.

Albert L. Snipes, Director
**Employee Relations**

C: Kelley Taylor

Dyess v. Auburn
AU R26-045



DEFENDANT'S
EXHIBIT
17

A LAND-GRANT UNIVERSITY

# Auburn University

Auburn University, Alabama 36849-5147

Affirmative Action/Equal Employment Opportunity Office
005 Quad Center

Telephone: (334) 844-4794
FAX: (334) 844-4793

**VIA CERTIFIED MAIL**

July 7, 2006

Mr. John Dyess
~~███████████~~
Mobile, AL ~~██████~~

Dear Mr. Dyess:

As you are aware, we investigated your original complaint of discrimination based on race and religion and notified you by letter dated May 18, 2006 that we found no evidence to support your claim. Subsequently you alleged the real reason for you dismissal was sexual harassment by your supervisor.

We have reviewed again your complaint of harassment, including this new allegation against your supervisor, Mr. Floyd Richards, and found no evidence or witnesses to support your allegations of inappropriate touching, sexual language and/or sexual behavior. Additionally, none of the administrators you said you alerted to the inappropriate behavior confirmed your statements. Mr. Albert Snipes and Ms. Sonya Dixon said you never told them that Mr. Richards had touched you inappropriately. Sexual touching is a very serious allegation, and one the university considers a major infraction. Both Mr. Snipes and Ms. Dixon assured us they would have immediately reported the incident to this office for investigation if you had notified them of its occurrence.

When you and I met with Ms. Michelle Martin on June 21, 2006, Ms. Martin reviewed her notes from a two-hour meeting you and she held on March 29, 2006. In reviewing your allegations and her notes of the meeting in March, Ms. Martin indicated she had no written record or recollection of your allegation that Mr. Richards had brushed his hand over your penis on March 28, 2006, and you confirmed that you had not reported it to her.

In summary, we can find no evidence to support your allegation that the university's anti-harassment policy has been violated. Thus, we consider this matter administratively closed.

Sincerely,

Kelley G. Taylor
Compliance Administrator, AA/EEO

cc:     Mr. Albert Snipes
        Ms. Sonya Dixon
        Ms. Lynne Hammond
        Ms. Michelle Martin

Dyess v. Auburn
AU R26-046



DEFENDANT'S
EXHIBIT
18

AUBURN UNIVERSITY IS AN AFFIRMATIVE ACTION/EQUAL OPPORTUNITY EMPLOYER
AND EQUAL OPPORTUNITY EDUCATIONAL INSTITUTION

**A LAND-GRANT UNIVERSITY**

SENDER: *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

John Dyess

~~████████~~

Mobile, AL ~~███~~

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ⟋ John Dy—

☐ Agent
☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery
7-12-06

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☑ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

2. Article Number
   (*Transfer from service label*)    7005 1160 0001 9323 8633

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

Dyess v. Auburn
AU R26-047

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

JOHN DYESS,

        Plaintiff,

v.                                                   No. 3:07CV-635-WKW

AUBURN UNIVERSITY,

        Defendant.

<u>**AFFIDAVIT OF JOHN W. DYESS, III**</u>

STATE OF ALABAMA      )
COUNTY OF MOBILE     )
_____)



BEFORE ME, the undersigned Notary Public for the said County and State, personally appeared John W. Dyess, III, who, being sworn, deposes and says the following:

1.    My name is John W. Dyess, III. I am the plaintiff in this lawsuit. I reside at ▮▮▮▮▮▮▮▮▮▮, Mobile, Alabama ▮▮▮▮. I am over the age of majority and am under no legal or other disability that prevents me from making this affidavit. I make this affidavit freely and upon my own personal knowledge. I

solemnly swear or affirm that the statements made in this Affidavit are true and correct to the best of my knowledge and belief.

2.      I swear or affirm, under penalty of perjury, that the statements made in my handwritten responses to Auburn University's Interrogatories and Requests for Production, which are attached to this Affidavit, are complete, true and correct to the best of my present knowledge and belief.

3.      Where I have responded, "Defendant counsel already has," "Defendant counsel has already," "You have already," or "Have already," it simply means that I do not have any further knowledge, information, or documents in my custody or control responsive to Auburn's request, other than the information I have already provided (also attached).

_John W. Dyess—Pro-se_

John W. Dyess, III, Plaintiff *pro se*

NOTARY PUBLIC

My Commission Expires:    My Notary Public Expires
on 12-17-08

2-8-08

[AFFIX NOTARIAL SEAL HERE]



AFFIDAVIT OF JOHN W. DYESS, III

PAGE 2 OF 2

Response to Affidavit Statement 3.

Where I have Responded Defendant
Counsel already has, Defendant counsel
has already, or you have already or
have already, it simply means that
I do not have any Further information
or documents in my custody that cannot
be Found in my Former employee
Files at Auburn University, Mobile
Infirmary or any other Document
Defendant Counsel have already viewed
or have Knowledge of.

John Dyess- Prose
2-6-08
John W. Dyess

discovery request all responses that might otherwise be construed as outside its scope.

## INTERROGATORIES

1.    State Plaintiff's full legal name (including middle name), all nicknames or aliases by which Plaintiff is or has ever been known, all former names or identities by which Plaintiff is or has ever been known, Plaintiff's social security number, and Plaintiff's date of birth.

**RESPONSE:**

John Wesley Dyess III

2.    State all addresses at which Plaintiff has lived during the past fifteen (15) years, specifying the dates during which Plaintiff resided at each address.

**RESPONSE:** ████ ███████ ██ Auburn Ala ███
████ ████████ ██ mobile Ala ███

3.    State the name, address, and telephone number of each and every witness who may offer testimony in this case pursuant to Fed. R. Evid. 701, 702, or 704, and provide the following information regarding each such individual:

(a)    The subject matter on which the witness is expected to testify;

3

(b)    The substance of the facts and opinions to which said witness is

expected to testify;

(c)    The basis for the witness' opinions;

(d)    The witness' qualifications to render the opinions; and

(e)    Any actual or hypothetical facts submitted to the witness for his or her

use in forming opinions.

**RESPONSE:**

DeFendant C ouSel Has allReady

4.    State the name, address, and telephone number of any and all persons

having any knowledge or information relevant to any fact or circumstance alleged

in your Complaint, regardless of whether or not Plaintiff intends to present such

knowledge or information at trial. .

**RESPONSE:**

Defendnt C ouSel Has allReady

5.    Identify all schools you have attended, beginning with ninth grade,

including the name and address of the school, years attended, and any diploma,

certificate or degree received.

M.T Blount High School PRichared Alc-4-Diplim
Uhiv of South Ala - Mobile Alc- 3 years
Univ of Mobile - Mobile Alc 1 1/2 years

**RESPONSE:**

6. If you are now married, or have ever been married, identify each of your spouses' names, including pre-married names, and the beginning and ending dates of your marriage to each spouse.

**RESPONSE:**

Never. been Married

7. Identify any social groups or organizations, including churches or other religious organizations, to which you now belong, or have belonged for the past 20 years, either formally or informally, including the purpose of the group or organization.

**RESPONSE:** Nazarea Baptist Church
Lakeview Baptist Church
Tuskegea C.O.G.

8. Identify all civil or criminal legal matters in which you are or have ever been a party or witness, including for each matter: the name of the court, the case style and docket number, the subject matter of the case, and the outcome of

5

the case, including the specifics of any verdict, settlement, plea, punishment, and/or sentence.

**RESPONSE:**

 none

9.    Have you ever applied or filed a claim for unemployment compensation benefits?  If so, please state where and when the application or claim was submitted.

**RESPONSE:**

 no

10.    Have you ever applied or filed a claim for workers' compensation benefits?  If so, please state where and when the application or claim was submitted.

**RESPONSE:**

 no

11.    Have you ever applied or filed a claim for disability benefits of any type, including through the Social Security Administration or a private insurance

carrier? If so, state the date of the application and the entity from which the benefits were sought.

**RESPONSE:**



12.   Have you ever filed a petition for bankruptcy? If so, please state when such petition was filed, in which court the petition was filed, and the case number.

**RESPONSE:**



13.   Have you ever, either before or after the filing of this suit, ever asserted any lawsuit, claim, grievance, charge, or other complaint of any description, involving unlawful discrimination or harassment? If so, please state the nature of your complaint, when the complaint was made, to whom the complaint was made, against whom the complaint was made, the agency or court to whom the charge was made, and the case number, if applicable.

**RESPONSE:**



7

14.   Identify any affidavit, deposition, or other sworn testimony the Plaintiff has given, including the case number, the name of the court, the case style and docket number, the result of the case, and/or the circumstances under which the affidavit, deposition, or other sworn testimony was given.

**RESPONSE:**

None

15.   Identify with specificity each and every element and item of damages that you contend you are entitled to recover from Defendant, and explain in detail how each item of damages was calculated.

**RESPONSE:**

Defendant Cousel Already Has

16.   Identify all physicians, psychiatrists, psychologists, therapists, counselors, ministers or other healthcare providers, whether for physical, emotional, or mental health treatment or counseling, from which Plaintiff has sought or received treatment or counseling from 1995 through the present.

**RESPONSE:**

See employee File

8

17.    Identify and describe all sources and amounts of wages and/or other income you have received over the last 10 years.

**RESPONSE:**

None

18.    Identify each document to which you referred in the course of answering these Interrogatories.

**RESPONSE:**

None

19.    Identify any and all persons, firms, organizations, or entities (including, but not limited to, any current or former employees of Defendant) that Plaintiff or his agents has contacted or communicated with regarding the allegations of the Complaint.

**RESPONSE:**

None

20.    State the name, address, and telephone number of all persons with whom you conferred or consulted in the course of answering these Interrogatories.

None                    9

memos, audio tapes, recordings, video tapes, cassettes, notes, photographs, movies, microfilm, microfiche, computer programs, computer printouts, diaries, calendars, and every other means by which information is preserved, or capable of being preserved, regardless of the duration or nature of its preservation.

10.    As used in these Interrogatories, the term "Defendant" shall mean Auburn University, its Board of Trustees, its administration, employees, former employees, departments, representatives, and/or agents, inclusive, and shall be construed so as to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

## REQUESTS FOR PRODUCTION

1.    Produce all documents which support, refute or in any way relate to any fact or circumstance alleged in the Complaint. *You Have Already*

2.    Produce all documents that reflect or relate to any complaint, objection, grievance, protest or other indication of displeasure expressed by the Plaintiff, or any other person, concerning any alleged unlawful acts or practices by Defendant. *You Have Already*

3.    Produce all documents reflecting the identity of any witness to any matter alleged in the Complaint.

*You Have Already*

3

4. Produce all documents you have received or taken from the premises of the Defendant, including but not limited to, discipline, policies and procedures, notices, notes, diaries, e-mails, correspondence, and/or memoranda.

*You Have Already*

5. Produce the Plaintiff's federal and state income tax returns, whether individually or jointly filed, including W-2 forms, paycheck stubs, and all related forms and schedules, for and including the years 1997 through the present.

*Not Available*

6. Produce all documents relating to any matter identified in response to Interrogatory Nos. 8 through 14.

7. Produce all diaries, calendars, journals, notes, e-mails, tape recordings, photographs, videotapes, or other accounts of events made or kept by the Plaintiff concerning:

(a) Any fact or circumstance alleged in the Complaint;

(b) Plaintiff's employment by Defendant;

(c) Any events, conversations, or other occurrences taking place in the Defendant's workplace;

(d) Plaintiff's EEOC charge or lawsuit against Defendant; or

(e) Any purported wrongful conduct directed toward Plaintiff by Defendant. *You Have Already*

8. Produce all documents reflecting or constituting any writings or communications to, from, or by any present or former employee of Defendant.

*You Have Already*

4

9.     Produce all documents which reflect or in any way relate to the nature, basis, amount and manner of computation of all monetary and equitable relief Plaintiff is seeking to recover in this litigation, including but not limited to, any alleged damages for lost salary, employment benefits, or other compensation, pain and suffering or emotional distress, and punitive damages. *Have Already*

10.     Produce all medical, psychological, counseling or other records or documents relating in any way to any treatment for any physical, emotional, or mental conditions for the last ten years. *Have Already*

11.     Produce all documents Plaintiff sent to or received from the U. S. Equal Employment Opportunity Commission, the U. S. Department of Labor, the U. S. Department of Justice, the Alabama Department of Industrial Relations, or any other governmental agencies relating to the Plaintiff's employment with Defendant. *Have Already*

12.     Produce all documents relating to the Plaintiff's qualifications for employment, including, without limitation, the Plaintiff's educational achievement or background, diplomas, degrees, licenses, certifications, and training. *N/A*

13.     Produce a copy of any statement or affidavit Plaintiff or his agent(s) or attorney(s) have obtained from any individual regarding any fact or circumstance relevant to the allegations of the Complaint.

*Have Already*

5

14.    Produce all documents which in any way relate to or reflect Plaintiff's employment with Defendant or events occurring in the course of Plaintiff's employment with Defendant, including but not limited to, all audio recordings, video recordings, personal diaries, calendars, photographs, date books, statements, e-mails, and/or written summaries of events. *Have Already*

15.    Produce all lists, logs, or notes containing the names of persons or entities that Plaintiff has contacted or communicated with concerning the facts surrounding the allegations of the Complaint. *None*

16.    Produce all documents, reports, notes, memoranda, e-mails, and/or correspondence which Plaintiff and/or her agents or attorneys have sent to, or received from, any person identified in your responses to Interrogatories 3, 4, 16, 19, and 20. *Have Already*

17.    Produce any and all documents relating to any attempts by Plaintiff to secure alternate employment. *N/A*

18.    Produce all documents identified or relied upon in answering Defendant's First Interrogatories to Plaintiff, or which in any way relate to or reflect the information requested in those Interrogatories, including but not limited to any documents identified in your response to Interrogatory No. 18.

*Have Already*

6

PLAINFIFF; JOHN W.DYESS-PRO-SE

DEFENDANT; AUBURN UNIVERSITY

CASE NUMBER; 3;07-CV-635

DATE; 12-27-07

AMMENDMANT  TO  CLAIMS AND DAMAGES

RACIAL DISCRIMINATION

RELIGIOUS DISCRIMINATION    (SEE CIVIL RIGHTS ACT-1964 TITLE V11)

SEXUAL HARRASSMENT

WRONGFUL TERMINATION

NEGLIGENCE

DEFAMATION OF CHARACTER

HOSTILE WORK ENVIROMENT

*Public- Embarrassment*

*Retaliation*

DAMAGES;

LOSS OF INCOME UNTIL RETIREMENT; $975,000(NINE HUNDRED SEVENTY FIVE THOUSAND DOLLARS

PERSONAL-PUNITIVE; $2.500,000.00(TWO MILLION –FIVE HUNDRED THOUSAND DOLLARS).

RESPECTFULLY SUBMITED

*John Dyer*

*12-27-07*



AUBURN

UNIVERSITY

JOHN DYESS
ANIMAL CARE ATTENDENT
Clinical Sciences
612 Hoerlein Hall
Auburn Univ, AL 36849

Annual leave must be pre-approved three days in advance. There is a calendar near the time clock where you should note the day or days of your planned leave in addition to telling your supervisor. A leave slip MUST be signed and turned in before the day of leave.

Any meetings with parties on main campus must be scheduled and verifiable. The names of the parties and their contact numbers are required for verification.

**SIGN AND DATE**

_John W. Pyen_    4-24-06

**AUBURN UNIVERSITY**
**CORRECTIVE ACTION REPORT**

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed, it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

Date 3/29/2006

Purpose of Conference Use of Hospital Computers

Employee Name John Dyess                                SSN ███████

Job Title Animal Care Attendant            Department Clinical Sciences

Date and Time of Incident 3/28/2006 PM _____ am/pm

Date and Time of Supervisor/Employee Conference 3/29/2006 _____ am/pm

Check Which Action Applies:   ☐ Verbal Reprimand (Do not forward to Human Resources.)

☐ Written Formal Reprimand

☐ Written Final Reprimand

☒ Written Reprimand With Suspension For _5_ Working
Days, Beginning 3/29/2006 and Ending 4/5/2006
Without Pay ☒   With Pay ☐
☐ Recommendation for Termination.
Effective Date_____Pending Approval From
The Appropriate Administrator

Dates of prior reports, if any, during the last six (6) months: 12/16/05, 2/22/06, 2/23/06

**FACTS - What happened: (Be specific)**

John has been told that his scheduled breaks are to be 9:45 - 10:00 AM and 2:45-3:00 PM. Today, John entered Overton Auditorium at 2:35 PM which was an unauthorized break and began using a computer. The purpose of this reprimand is to make sure that John knows which computers he is allowed to use and at what times he is allowed to use them.

John also told the Office Administrator that he would not meet with his supervisor (Bud Richards) unless Dr. John Saidla or Dr. David Whitley was at the meeting.



DEPARTMENT OF
HUMAN RESOURCES

### AUBURN UNIVERSITY
*Sesquicentennial*

May 5, 2006

Mr. John Dyess

Auburn, AL

Dear Mr. Dyess:

I am forwarding to you the decision made by Dr. John Heilman, Provost, regarding your grievance filed on March 29, 2006, against Mr. Floyd "Bud" Richards, Jr. Dr. Heilman's decision concludes the grievance process.

Albert L. Snipes
Director Employee Relations

# Auburn University

Auburn University, Alabama 36849-5147

Affirmative Action/Equal Employment Opportunity Office
005 Quad Center

Telephone: (334) 844-4794
FAX: (334) 844-4793

May 18, 2006

Mr. John Dyess
▉▉▉▉▉▉▉▉▉▉
Auburn AL ▉▉▉

Dear Mr. Dyess:

On March 29, 2006, you filed an informal complaint with the Office of Affirmative Action/Equal Employment Opportunity alleging discrimination on the basis of race and religion from your supervisor, Mr. Floyd Richards.

Our office has conducted a thorough inquiry into the allegations you raised but was unable to determine that the university's policies prohibiting discrimination or harassment were violated.   Thus, our office considers this matter administratively closed.

Sincerely,

Michelle E. Martin
AA/EEO Compliance Administrator
Office of AA/EEO & ADA/504

# Auburn University

## Auburn University, Alabama 36849-5147

Affirmative Action/Equal Employment Opportunity Office
005 Quad Center

Telephone: (334) 844-4794
FAX: (334) 844-4793

## VIA CERTIFIED MAIL

July 7, 2006

Mr. John Dyess
████████████████
Mobile, AL ████

Dear Mr. Dyess:

As you are aware, we investigated your original complaint of discrimination based on race and religion and notified you by letter dated May 18, 2006 that we found no evidence to support your claim. Subsequently you alleged the real reason for you dismissal was sexual harassment by your supervisor.

We have reviewed again your complaint of harassment, including this new allegation against your supervisor, Mr. Floyd Richards, and found no evidence or witnesses to support your allegations of inappropriate touching, sexual language and/or sexual behavior. Additionally, none of the administrators you said you alerted to the inappropriate behavior confirmed your statements. Mr. Albert Snipes and Ms. Sonya Dixon said you never told them that Mr. Richards had touched you inappropriately. Sexual touching is a very serious allegation, and one the university considers a major infraction. Both Mr. Snipes and Ms. Dixon assured us they would have immediately reported the incident to this office for investigation if you had notified them of its occurrence.

When you and I met with Ms. Michelle Martin on June 21, 2006, Ms. Martin reviewed her notes from a two-hour meeting you and she held on March 29, 2006. In reviewing your allegations and her notes of the meeting in March, Ms. Martin indicated she had no written record or recollection of your allegation that Mr. Richards had brushed his hand over your penis on March 28, 2006, and you confirmed that you had not reported it to her.

In summary, we can find no evidence to support your allegation that the university's anti-harassment policy has been violated. Thus, we consider this matter administratively closed.

Sincerely,

Kelley G. Taylor
Compliance Administrator, AA/EEO

cc:    Mr. Albert Snipes

# GLOVER & MILLER, L.L.C.
### ATTORNEYS AT LAW
**502 Dauphin Island Parkway**
**Mobile, Alabama 36606**
Telephone: (251) 476-3504
Facsimile: (251) 476-3582
E-Mail Addresses:  Jglov43@aol.com; Lycmiller@aol.com

Julie C. Glover, Esq.,                                                    Lynn C. Miller, Esq.,

August 17, 2006

Mr. John Dyes, III
████████████████
Mobile, Alabama

Re: Dyes vs. Auburn University

Dear Mr. Dyes,

My office has been in contact with the EEOC regarding your suit against Auburn University.  I am enclosing the letter dated August 10, 2006, the consent for mediation, and a brochure from the EEOC, regarding mediation of your case. Cases are now being sent to mediation in order to consider the possibility of resolving the disagreement between parties. Please sign the attached form and return to my office, I will forward the consent to the EEOC office.  If the other party consents to mediation, I will contact you when we have received a notice of mediation.

If you have any questions, or if I can be of any service to you do not hesitate to contact my office.

With best regards,

Very truly yours,

*Lynn C Miller*

LYNN C. MILLER, ESQ.

LCM/bc

# Auburn University

Auburn University, Alabama 36849-5126

Department of Human Resources
Langdon Hall

Telephone: (334) 844-4145
TDD (334) 844-1612
Jobline for TDD Users: (334) 844-4561
FAX: (334) 844-1617

June 13, 2006

Mr. John Dyess

Mobile, AL

Dear Mr. Dyess:

I am writing to inform you that the grievance form that you filed with this office has been forwarded to the University Affirmative Action- Equal Employment Opportunity Office for review. This action was taken as a result of allegations made be you that are included in your grievance. You can reference policy 8.6.3: **Employees who feel they are being discriminated against because of race, color, sex, national origin, religion, age, veteran's status, or disability should immediately and directly take the issue to the Office of Affirmative Action/EEO which can be reached at (334) 844-4794 or via the web at http://www.auburn.edu/administration/aaeeo/.**

Someone from the Office of AA/EEO will be in contact with you regarding your complaint.



Albert L. Snipes, Director
Employee Relations

C: Kelley Taylor



**U.S. Equal Employment Opportunity Commission**
**Birmingham District Office - 420**

Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105
1-800-669-4000

John W. Dyess, III

Mobile, AL

Reference:    John W. Dyess, III v Auburn University
Charge No: 420-2006-04034

Dear Mr. Dyess:

The Equal Employment Opportunity Commission has received your request for the issuance of a Notice of Right to Sue in the above referenced charge.

Your request has been forwarded to the U.S. Department of Justice (DOJ) for action. That Agency will act on your request and issue the Notice directly to you.

If you have any questions, please call Ollie M. Croom, Investigator at  (205) 212-2140.

On behalf of the Commission:

*3-9-07*

Date

Delner  Franklin-Thomas
Director

cc.  Lynn C. Mille, Esquire
Glover & Miller, L.L.C.
502 Dauphin Island Parkway
Mobile, AL  36606



These are Copys Which Represent:

1. Plaintiff had Vacation & Sick hours to accomadute the hour missed due to Unexpected Emergency

2. Copy of Attorney who stated that Retailation Is one Claim to be Used.

JOHN WESLEY DYESS III

PAY
TO THE
ORDER
OF

MOBILE AL
CLINICAL SCIENCES                217          N


THIS IS NOT A CHECK
EMPLOYEE RETAIN
FOR YOUR RECORD

PAY EXACTLY    $    15.32 DEPOSITED IN BANK:AMSOUTH BANK NA

ISSUE
DATE:    05/19/2006

| EMPLOYEE NAME | EMPLOYEE ID | ISSUE DATE | PERIOD END DATE | DEL. LOCATION | PAYROLL ID | TAX CODES FED. | STATE |
|---|---|---|---|---|---|---|---|
| DYESS III,JOHN WESLEY | | 051906 | 051306 | 217 | 4R16 | S01 | S00 |

### EARNINGS

| DESCRIPTION | HOURS | CURRENT AMOUNT | YEAR TO DATE AMOUNT |
|---|---|---|---|
| REG BIWKLY | 16 50 | 172 59 | 6 257 69 |
| VACATION | | | 478 55 |
| SICK LEAVE | | | 502 08 |
| TOTAL EARNINGS | | 172 59 | 7 238 32 |

### TAXABLE BENEFITS

| DESCRIPTION | CURRENT AMOUNT | YEAR TO DATE AMOUNT |
|---|---|---|
| | | |

LEAVE BAL. AS OF PERIOD END DATE SHO
ABOVE. —    ANNUAL 0102.88 SICK 0155.

### TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | YEAR TO DATE AMOUNT | TAXABLE GROSS CURRENT | YEAR TO DATE | EXEMPT | DESCRIPTION | CURRENT AMOUNT | YEAR TO DATE AMOUNT |
|---|---|---|---|---|---|---|---|---|
| FICA | 868 | 42860 | 14005 | 691292 | | | | |
| MEDICARE | 203 | 10024 | 14005 | 891292 | | | | |
| FED W/H | 177 | 152815 | 13096 | 854840 | 1 | | | |
| AL W/H | 177 | 23949 | 13959 | 690832 | | | | |
| AUBURN | 173 | 7240 | 17259 | 723832 | | | | |
| BCBS-SNGL | 3300 | 33000 | | | | | | |
| TEACH RET | 863 | 36192 | | | | | | |
| COURT ORD | 6800 | 68000 | | | | | | |
| LIFE INS | 363 | 3630 | | | | | | |
| TIGER CLUB | 2980 | 64048 | | | | TOTAL TAX/DEDUCT | 15727 | 341558 |

NON-NEGOTIABLE - EMPLOYEE STATEMENT OF EARNINGS AND DEDUCTIONS

### OTHER DEDUCTIONS

| | CURRENT AMOUNT | YEAR TO DATE AMOUNT |
|---|---|---|
| BANK DEPOSITS | 15 32 | 3 822 74 |
| TOTALS | 15 32 | 3,822 74 |

CONTROL NO.
0784437

NET PAY    $    15.32

**R E C E I P T**

| | |
|---|---|
| DATE May 10, 2007 | No. 156211 |
| RECEIVED FROM John Dycos | $ 50 00 |
| Fifty + NO/100 | DOLLARS |
| FOR RENT FOR Consultation fee | |

| | | | | |
|---|---|---|---|---|
| ACCOUNT | | ○ CASH | FROM | Stephen M. Middleton |
| PAYMENT | 50 00 | ○ CHECK | | TO |
| BAL. DUE | | ○ MONEY DUE | | L. Williamson |

REBUTTAL STATEMENT SELECTION OF HEARING PANEL
(Time Limit: Within 10 working days)

Hearing Panel selected
Chair of Panel: _Debbie Griggs - Staff_
Panel Members: _Patricia Digman - A + P_
_Sherry Brothe - Staff_

## RESPONSE OF THE PERSON(S) AGAINST WHOM THE GRIEVANCE IS FILED

See attached statement written by the person(s) against whom the grievance is filed.

Person(s) against whom the Grievance is filed signature: _Floyd Richards Jr_

Date: _4-10-06_

---

### STEP 4 – HEARING

---

Witnesses to be called: _DR. John Saidla_

If either party chooses to have an advisor in attendance – please fill out the section below.

Advisor to Employee: _____
Occupation and/or Campus Unit: _____
Advisor to the person(s) against whom the grievance is filed: _____
Occupation and/or Campus Unit: _____

## RECOMMENDATION OF GRIEVANCE HEARING PANEL

(Time Limit: Within 15 working days following the hearing, unless Grievance Committee notified employee of additional time needed. See attached statement written by the Grievance Hearing Panel.)

_Debbie Griggs_                    _4/27/06_
Chair, Grievance Hearing Panel          Signature          Date

### OFFICE OF THE VICE PRESIDENT'S REVIEW & RESPONSE

(Time Limit: Within 30 calendar days following receipt of Grievance Hearing Panel's recommendation)

☐ Agree with Grievance Hearing Panel's recommendation
☒ Disagree with Grievance Hearing Panel's recommendation.
☐ Alternative Resolution: _I agree with the grievance panel support of the action taken by_
_Clinical Sciences. I do not agree that Mr. Dyess should be relocated to another department. He needs to_
_remain in Clinical Sciences and follow all hospital policies and procedures. I am in agreement_
_that Mr. Richards attend supervisor Training as offered by Human Resources._

Name and Title _JOHN HEILMAN_          Signature _____          Date _5-3-6_

8/15/05

**AUBURN UNIVERSITY**
**GRIEVANCE FORM**
(To be filed within 45 calendar days of alleged occurrence)

Please refer to the University's Policy Statement on Grievance Procedures to ensure your concern(s) is grie~~~~
(http://www.auburn.edu/administration/human_resources/manual/sect08.htm#8.6)You may also contact th~
Human Resources Office at 844-4145 for further clarification. **Attach additional pages if more sp~~~ ~~
~~~~~~~~** John W. Dyess III

Employee's Name

3-29-06

Employee ID #                          Date Grievance Occurred

Clinical Science (Vet. School)          4-3-06

Department                             Date Grievance Filed with Human Resources Office

Animal Care Assistant

Job Title

✔ Staff                                Date Sent to Dean/Dept Head/Director: _____

Administrative/Professional

---

**STEP 1 – STATEMENT OF GRIEVANCE**
(Attach any additional supporting documents as deemed necessary)

**IDENTIFY THE POLICY THAT IS BEING GRIEVED**

See Attached Forms

_____

_____

STATEMENT OF GRIEVANCE

**REMEDY REQUESTED**

For this Issue to be Resolved and lost wages be
Restored.

Employee's Signature   John W. Dyess III          Date   4-3-06

---

**STEP 2 – GRIEVANCE COMMITTEE CHAIR REVIEW**
(Time Limit: Within 5 working days)

☑ Issue is grievable. Employee will be contacted to schedule hearing.
☐ Issue is not grievable for the following reason: _____

_____

Chair, Grievance Committee Signature  Wendy Rechman      Date  4/7/06



**John W. Dyess**

████████████

**Mobile, AL** ████

████████████

To:
**Auburn University Human Resources**
**Albert Snipes**
**Sonya Dixon**
**Grievance Committees**
**Len Hammond**

June 8, 2006

This letter is in regards to my being terminated from A.U. on May 3, 2006. I feel that I have been thoroughly mistreated in being terminated. I feel that the reason Mr. Floyd Richards terminated me was because I would not respond to his many attempts to express his sexual desires with me. I will list several of the reasons I feel I was sexually harassed below.

In June of 2005, I was asked to a meeting with Sonya Dixon (Human Resources) Dr. John Saidla (Administrator-Vet School) and Mr. Floyd Richards. Mr. Richards stated that I had threatened him; I explained that he and I had a conversation involving Christian principals and that I told him what the Bible says of what happens to people who harms a minister. I told him that I am a licensed Minister. He said he understood what I meant and that his father-in-law was also a minister. He also stated that I had been seen stealing towels from the Emergency Room. I explained that I made it my daily task to clean the Emergency Room and that I would make sure there were enough clean towels for use. I then told Ms. Dixon and Dr. John Saidla that Mr. Richards was approaching me like he wanted to date me. I explained that Mr. Richards told me (3 days after I had been assigned to him) that he admired me and that he wanted to get to know me better. I further stated that he looked me in the eyes like a man trying to set-up a date with a woman. After I finished talking, Ms. Dixon concluded the meeting.

In December of 2005, I met with Ms. Dixon of Human Resources. I told her that Mr. Richards was still trying to get me alone. He was trying to get me to go places at the Vet School saying he needed me to clean or do something. She asked was any of this told to me when I had first been assigned to him as my responsibility. I answered "No". I received a written letter detailing what room and areas of the vet school I was responsible for cleaning. The Kennel Room (dog food) and the surgery area across the street were the two rooms where he constantly tried to get me alone. I further stated to Ms. Dixon that Mr. Floyd (Bud) Richards was always asking me to get to know him better. This, I said, was very unprofessional of him. I felt like he and I had a descent enough working relationship and that I needed not to know anything else about him. I also stated to Ms. Dixon that Dr. John Saidla had no interest in helping me with this situation and that he felt like I was wasting his time. He said I could talk with Dr. Ed Richardson or even Governor Riley for all he cared.

He made me feel like I was never to come in his office again. Mr. Richards and Dr. David Whitley (Vet School Administrator) both were there and heard him.

In February of 2006, Mr. Richards used profanity on me. He said that he was going to "fire my ass". He later approached me in the hall and rubbed his hand and private body area on me. I didn't say anything to him because of fear of being terminated. The next morning Mr. Richards called me to a meeting with Dr. John Saidla and himself. In this meeting, I was suspended for 5 days without pay. I asked Dr. Saidla if it would help if I explained my side of the story. He said "No". I reported this to Albert Snipes (Human Resources) and to Ms. Dixon. I was given no advice other than it was proper procedure. I further spoke with affirmative action. I informed them that Mr. Richards was harassing me sexually. I told them that he had rubbed against me. I was told by them that they would contact me after they had investigated this situation. I also told them that Mr. Richards was stalking me, calling my home from his cellular phone (for no reason). Two weeks went by and I had not heard from anyone from Affirmative Action or Human Resources.

Between the time I was suspended and the time I was terminated, Mr. Richards continued to stalk and harass me. The reason I think the termination was unjust is that I had an Emergency to occur during my lunch period and was detained. Mr. Richards was off that day, so I had no one to report to. Further, I was never warned or advised on how to handle this situation before it happened. Moreover, I always missed lunch breaks earlier (returned early) so I had overtime to replace the lost time. In previous time when ever I was late returning from lunch, I explained to Mr. Richards that I would shorten my lunch the following day to accumulate the proper 40 hours. He said that would be alright. Finally, the reason I say this is wrong is because Mr. Richards allowed my fellow co-worker to leave without notice, clock each other in/out etc.

# Auburn University

Auburn University, Alabama 36849-5101

Procurement & Payment Services
311 Ingram Hall

Telephone: (334) 844-7771

April 27, 2006

On April 27, 2006 the Grievance filed by John W. Dyess, III against Floyd "Bud" Richards, Jr was heard by the Grievance Panel consisting of Debbie Griggs, Trish Digman and Sherry Boothe. Our finding is that we agree with the action taken by the Clinical Sciences Department of 5 days suspension without pay. We feel there was adequate documentation leading to this event.

We recommend that Mr. Dyess be relocated to another department away from Clinical Sciences within 30 days. We also recommend that Mr. Richards attend the Supervisor Training that is offered by Human Resources.

Debbie Griggs, Chair

Trish Digman

Sherry Boothe

TRANSMITTAL TO DEPARTMENT OF JUSTICE OF REQUEST FOR
NOTICE OF RIGHT TO SUE

*(The attached charge involves state/local government or political subdivisions, including public education institutions.)*

| TO: | FROM (Area or District Name/Address): |
|---|---|
| DEPARTMENT OF JUSTICE<br>CIVIL RIGHTS DIVISION<br>EMPLOYMENT LITIGATION SECTION, PHB<br>950 PENNSYLVANIA AVE., NW<br>WASHINGTON, D.C. 20530 | **BIRMINGHAM DISTRICT OFFICE - 420 RIDGE PARK PLACE<br>1130 22ND STREET, SOUTH<br>BIRMINGHAM, AL 35205**<br>OFFICE WHERE CASE FILE IS LOCATED:<br>(If different from above) |

NOTICE OF RIGHT TO SUE TO BE ISSUED BASED ON THE INFORMATION PROVIDED BELOW

| NAME/ADDRESS OF CHARGING PARTY TO WHOM NOTICE IS TO BE ADDRESSED: | IF CHARGE WAS THIRD PARTY CHARGE, NAME AND ADDRESS OF AGGRIEVED PERSON TO WHOM NOTICE IS TO BE SENT: |
|---|---|
| **John W. Dyess, III**<br><br>**Mobile, AL** | |

[ ] Charging party has filed the charge on behalf of an aggrieved person whose identity is confidential (29 CFR 1601.7(a)).

NAME/ADDRESS OF RESPONDENT(S) AND EEOC CHARGE NUMBER(S)

| | | |
|---|---|---|
| **AUBURN UNIVERSITY**<br>**147 Lowder Building,**<br>**Auburn, AL 36830** | 420-2006-04034 | **Aaron L. Dettling**<br>**Balch & Bingham LLP**<br>P.O. Box 306   Birmingham, AL 35203-2015 |

ATTACHED IS A REQUEST FOR NOTICE OF RIGHT TO SUE FOR THE ABOVE CHARGE(S) AND OTHER ATTACHED DOCUMENTS AS INDICATED BELOW:

LETTER OF REQUEST FROM:

| | | | |
|---|---|---|---|
| | CHARGING PARTY DATED: | [X] ATTORNEY FOR CHARGING PARTY DATED | **Jan 26, 2007** |
| ATTACHMENTS: | [X] ORIGINAL CHARGE | [ ] AMENDED CHARGE | [ ] CAUSE DETERMINATION *(if issued)* DATED |

THE CHARGE WAS FILED (Filing Date)                    **July 25, 2006**

[ ] Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the date shown above.

[ ] Please indicate on the Notice of Right To Sue that the Commission will continue to process this charge.

| NAME AND TELEPHONE NUMBER OF CONTACT PERSON *(Use FTS No.)* | DATE |
|---|---|
| **SAMUEL HALL, SUPERVISOR (205) 212-2068** | 3-9-07 |
| TYPED NAME OF EEOC OFFICIAL<br>**DELNER FRANKLIN-THOMAS** | SIGNATURE |

DEPARTMENT OF JUSTICE USE ONLY

| [ ] RS | [ ] OMITATTY# | [ ] DCT | [ ] FILE |
|---|---|---|---|

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

REMARKS

EEOC Form 257 (10/94)

# GLOVER & MILLER, L.L.C.

### ATTORNEYS AT LAW
**502 Dauphin Island Parkway**
**Mobile, Alabama 36606**
Telephone: (251) 476-3504
Facsimile: (251) 476-3582
E-Mail Addresses: Lycmiller@aol.com

Julie C. Glover, Esq., (1961-2006)                              Lynn C. Miller, Esq.,

---

January 26, 2007


Equal Employment Opportunity Commission
Ridgepark Place
1130 22nd Street, South
Suite 2000
Birmingham, Alabama 35205


      Re:    Charging Party:    John W. Dyes, III
               Employer:         Auburn University
               Social Security No.:
               Charge No.:      420-2006-04034

To Whom It May Concern:

      Our office represents Mr. John W. Dyes, III with regard to his claim of sexual
harassment and discrimination against his former employer, Auburn University. The
EEOC investigator has completed his investigation of this charge. Please issue the Notice
of Right to Sue to the charging party.

                                    Sincerely,

                                    LYNN C. MILLER, ESQ.

LCM/

**CHARGE OF DISCRIMINATION**

| | |
|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA |
| | ☒ EEOC 420-2006-04034 |

_____ and EEOC
(State and local Agency, if any)

| NAME (Indicate Mr., Ms., Mrs.) MR. JOHN W. DYESS, III | HOME TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADRESS | CITY, STATE ZIP CODE | COUNTY |
|---|---|---|
| | MOBILE, ALABAMA | MOBILE |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)**

| NAME AUBURN UNIVERSITY | NO. OF EMPLOYEES/MEMBERS + 15 | TELEPHONE NUMBER (Include Area Code) (334) 844-4794 |
|---|---|---|
| STREET ADDRESS AFFIRMATIVE ACTION/EQUAL EMPLOYMENT OPPORTUNITY OFFICE 005 QUAD CENTER | | CITY, STATE AND ZIP CODE AUBURN UNIVERSITY, ALABAMA 36849-5147 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN   ☐ AGE   ☒ RETALIATION   ☐ OTHER (Specify) | MAY 3, 2006 |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

My name is John W. Dyess, III. I am a black male. My social security number is ███████. I was employed by Auburn University in Auburn, Alabama. Auburn University is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended. I was employed as an animal care assistant at the College of Veterinary Medicine. I have been discriminated against on the basis of my sex in violation of Title VII. In addition I have been retaliated against for complaining of discrimination. During the term of my employment I was sexually harassed by my supervisor, Mr. Floyd Richards. Mr. Richards approached me in 2005 as if he wanted to date me. Mr. Richards always asked me if I wanted to get to know him better. In addition, Mr. Richards often called my home, stalked me and rubbed my private area. Mr. Richards often made requests to get me alone while I was employed. I initially complained of Mr. Richards behavior in June of 2005. I explained to human resources that Mr. Richards made me feel uncomfortable and was always trying to get me alone. In December of 2005 I again complained. Nothing was done at that time. I explained to human resources that Mr. Richard's supervisor did not want to take my complaints and told me I was wasting his time. In February of 2006 Mr. Richards approached me in the hall and rubbed his hand and private area on my body. I rejected Mr. Richards. The next morning I was called to a meeting with Mr. Richards and his supervisor, Dr. John Saidla and was suspended for five days without pay. I complained to human resources and to the affirmative action office. I explained that I had been sexually harassed by Mr. Richards. I was told the matter would be investigated. Between the time I was suspended and the time I was terminated Mr. Richards continued to stalk me and was calling my home. I was never informed of any results of the investigation. I was terminated on May 3, 2006. The reason given for my termination is pretextual. I was terminated after returning late from lunch. I had an emergency and Mr. Richards was out of the office that day. I had no one to report to to explain the situation. On prior occasions I had taken too long at lunch and made it up on subsequent days. This practice had been approved by Mr. Richards in the past. In addition, other employees are allowed to make up time or leave without notice and are not terminated.

| | |
|---|---|
| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT John W. Dyess |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. Date 7-20-06   John W. Dyess Charging Party (Signature) | NOTARY - (When necessary to meet State and Local Requirements) Barbara Christie SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE July 20, 06 (Day, month and year) Commission expires 9/23/09 |

# Auburn University

Auburn University, Alabama 36849-5147

Affirmative Action/Equal Employment Opportunity Office
005 Quad Center

Telephone: (334) 844-4794
FAX: (334) 844-4793

May 18, 2006

Mr. John Dyess
████████████████
Auburn AL █████

Dear Mr. Dyess:

On March 29, 2006, you filed an informal complaint with the Office of Affirmative
Action/Equal Employment Opportunity alleging discrimination on the basis of race and
religion from your supervisor, Mr. Floyd Richards.

Our office has conducted a thorough inquiry into the allegations you raised but was
unable to determine that the university's policies prohibiting discrimination or
harassment were violated.   Thus, our office considers this matter administratively closed.

Sincerely,

Michelle E. Martin
AA/EEO Compliance Administrator
Office of AA/EEO & ADA/504

**EXHIBIT**

**9**

ALL-STATE LEGAL®

AUBURN UNIVERSITY IS AN AFFIRMATIVE ACTION/EQUAL OPPORTUNITY EMPLOYER
AND EQUAL OPPORTUNITY EDUCATIONAL INSTITUTION

A LAND-GRANT UNIVERSITY

## 8.0 Employee Relations

## 8.1 Recognition and Awards

**8.1.1 General** - A key resource of the University is the experience, expertise, and service of its employees. To help recognize and reward this dedicated service, the University has the Employee Recognition and the Spirit of Excellence award program. These programs are administered with the help of the Employee Recognition Advisory Committee.

**8.1.2 Employee Recognition Advisory Committee** - This committee is composed of nine University employees from a variety of campus areas and activities. The Director of Employee Relations is an ex-officio committee member and serves as its coordinator. Each member is appointed by the Assistant Vice President of the Department of Human Resources with recommendations from the two employees' governance groups. Each member of the committee serves for three years. The committee's objectives are to assist the program coordinator in planning for each year's Employee Recognition Program; review all nominations for the Spirit of Excellence Award and select four employees to receive this award each month and four employees for the annual Employee of the Year Award. The committee also provides assistance for any other recognition programs that might be planned for any particular year.

**8.1.3 Spirit of Excellence Award** - This award program recognizes a special group of employees for excellent service to Auburn University and is given each month to an employee from each of the following groups:

a) Service/Maintenance

b) Secretarial/Clerical

c) Technical/Paraprofessional

d) Administrative/Professional

8.1.3.1 To be eligible for a Spirit of Excellence Award winner, an employee must

a) Be a regular Auburn University employee (excludes temporary employees, graduate student employees, county agents and extension specialists, and tenure track and non-tenure track faculty).

b) Have at least one year continuous employment with Auburn University.

c) Have a satisfactory performance evaluation rating at the time of nomination.

8.1.3.2 Employees may be nominated for these awards by any regular Auburn University employee, including University faculty and are not limited to an employee's area of

8.2.3 **Guidelines** – Auburn University believes that one of the basic functions at all levels of supervision is to identify below standard job performance and take the necessary steps to help the employee improve his or her performance. All supervisors are responsible for the effective adoption and implementation of this policy in their departments or units. In such situations the proper supervisory action is to refer the troubled employee, on the basis of deteriorating job performance only, to the EAP Coordinator who will, if necessary, refer the employee for appropriate consultation. However, the cause of below standard job performance may well be outside the realm of job responsibilities when the employee is unable or unwilling to correct the situation on his or her own or with normal supervisory assistance.

8.2.3.1 Auburn University becomes involved with an employee's behavioral, medical, and other personal problems only when the problems affect job performance, attendance, safety, conduct, and productivity. There is no wish or intent to intrude upon the private or personal life of an employee but rather to provide assistance where needed for his or her success.

8.2.3.2 Some employees may have problems that have not yet progressed to the point of seriously affecting job performance. Any employee who recognizes such problems may voluntarily contact the EAP Coordinator for confidential help.

8.2.3.3 An employee's job performance may be affected when a family member is troubled. For this reason, Auburn University extends the same offer of assistance, through the employee, to immediate family members.

8.2.3.4 Participation in Auburn University's EAP is voluntary to the extent that the employee will not be forced to participate in or accept recommended treatment. Refusing an offer to participate in the Employee Assistance Program will not be a basis for disciplinary actions and will not, in itself, be used against the employee. If the employee fails to follow recommendations, normal existing disciplinary action based on documented job performance will be taken.

8.2.3.5 Employees are responsible for the costs involved in resolving or treating any personal problem just as they are presently responsible for any costs for hospitalization or medical services. Auburn University's group health and hospital insurance coverage may cover all or a percentage of the cost of services of health care professional (including alcoholism and drug abuse treatment) to whom employees and their eligible dependents may be referred for assistance.

8.2.3.6 If the problem is not covered by health insurance, the EAP Coordinator will inform the employee in advance and work with the employee to locate other resources to provide assistance if needed.

8.2.3.7 **Confidentiality** – Referral for evaluation or acceptance of suggested treatment

# AUBURN UNIVERSITY
## CORRECTIVE ACTION REPORT

This form is used as a guide for the supervisor when documenting issues that need attention under the provisions of the University Progressive Disciplinary Procedures. When completed, it serves as a written record of corrective action taken against an employee for violation of one or more University rules or for poor job performance. This report will remain in the employee personnel file for a period of six months or a lesser period of time if specified by the supervisor. See Auburn University Progressive Disciplinary Procedures for details on how to complete this report.

**Date** 5/3/2006

**Purpose of Conference** Termination

**Employee Name** John W. Dyess          **SSN** ▮▮▮▮▮▮▮▮

**Job Title** Animal Care Attendant          **Department** Clinical Sciences

**Date and Time of Incident** 04/28/2006          1:59 PM          am/pm

**Date and Time of Supervisor/Employee Conference** 05/03/2006          8:00 AM          am/pm

**Check Which Action Applies:**

☐ Verbal Reprimand (Do not forward to Human Resources.)

☐ Written Formal Reprimand

☐ Written Final Reprimand

☐ Written Reprimand With Suspension For ____ Working
Days, Beginning _____ and Ending _____
Without Pay ☐   With Pay ☐

☒ Recommendation for Termination.
Effective Date 5/3/2006 _____ Pending Approval From
The Appropriate Administrator

**Dates of prior reports, if any, during the last six (6) months:** 3/29/06, 2/23/06, 2/22/06, 12/16/06

**FACTS - What happened: (Be specific)**

John turned in a bi-weekly payroll time sheet on Friday morning, April 28, 2006. The sheet showed that he would be working eight total hours that day. John left for lunch at 11:58 AM. He returned from lunch at 1:59 PM. John is very careful with his time card when he clocks in or out that the dates and times do not overlap. On this particular instance, the dates and times were stamped over more than once, making the card hard to read.

John is well aware of the policies concerning leave and the application for leave. He signed a form detailing the leave policy on April 24, 2006. John had two full days in which he could have explained the situation and requested a leave application. He chose to ignore the situation and appeared to try to cover it up by clocking over the dates and times on his time card.

**FACTS - What happened: (Continued)**

**What is planned to correct or eliminate the problem:**

John has received both verbal and formal written reprimands.  He received a written final reprimand on 2/23/06 and a written final reprimand with a five day suspension without pay on 3/29/06.  John has been given repeated warnings but continues to fail to follow the university's policies and rules. He leaves no other choice but for his position to be termination.

**What steps will be taken if the problem is not corrected or eliminated:**

**FOR THE EMPLOYEE: I hereby acknowledge that the contents of this Corrective Action Report have been reviewed with me. (If you wish to make any comment regarding this Corrective Action Report, please do so in the space below.)**

**Employee Signature:** _____

(The employee's signature indicates he/she has seen this report
The signature does not necessarily indicate agreement.)

_____          _____
Supervisor                                  Dean/Director

A copy of this report shall be given to the employee and one copy should be forwarded to Human Resources.

HR 80-Effective: 03/05/2001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### Eastern            DIVISION RECEIVED

John Iyess
Mobile Ala
**PLAINTIFF**

2007 JUL 11  P 3: 13

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

v.

Kelley G. Taylor-
Len Hammond
John Saidla
**DEFENDANT**

**CASE ACTION NO.**

3:07 CV 635 -WKW

## EEOC  COMPLAINT

1. Plaintiff resides at ▮▮▮▮▮▮▮  Mobile Ala ▮▮▮▮

2. Defendant(s)' name(s) Kelley G. Taylor-Len Hammond
Plc. John Saidla

   Location of principal office(s) of the named defendant(s) Auburn University

   Nature of defendant(s)' business Auburn University

   Approximate number of individuals employed by defendant(s)_____

3. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for
employement discrimination. Jurisdiction is specifically conferred on the Court by 42
U.S.C. §2000e-5. Equitable and other relief are also sought under 42 §2000e-5(g).

4. The acts complained of in this suit concern:

   1. ☐ Failure to employ me.
   2. ☑ Termination of my employment.
   3. ☐ Failure to promote me.
   4. ☐ Other acts as specified below:_____

1



DEFENDANT'S
EXHIBIT
20

5.     Plaintiff is:
       A.        ☐ Presently employed by the defendant.
                 ☑ Not presently employed by the defendant.  The dates of employement were
                 _July 2001 - May 2006_    Employment was terminated because:

                 (1)    ☑ Plaintiff was discharged.
                 (2)    ☐ Plaintiff was laid off.
                 (3)    ☐ Plaintiff left job voluntarily.

6.     Defendant(s)' conduct is discriminatory with respect to the following:

       A.        ☑ My race.
       B.        ☑ My religion.
       C.        ☑ My sex.
       D.        ☐ My national origin.
       E.        ☐ Other, as specified below: _____

       _____
       _____

7.     The name(s), race, sex, and the position or title of the individual(s) who allegedly
       discriminated against me during the period of my employment with the defendant
       company is (are) _Floyd Richards- Male- White- Supervisor_
       _John Saidla- White- Male- Director- Vet school - Kelley Taylor- White- Female- A.A_
       _Albert Snipes- Black- Male - Human Resource - Len Hammond- White- Female_
       _Tim Boosinger- White- Male- Dean- Vet school - Sonya Dixon- Black- Female_

8.     The alleged discrimination occurred on or about _June-2005- May-2006_ .

9.     The nature of my complaint, i.e., the manner in which the individual(s) named above
       discriminated against me in terms of the conditions of my employment, is as follows:
       _Forced me to Recieve Psychological counseling on the bases of Remaining Employed_
       _Failed to assist in transferring to another department_
       _allowed a Hostile environment to be maintained_
       _Refused to listen when I complained about sexual Harrassment_
       _wrongfully terminated me. Supervisor was off the of lateness abused_
       _exhibited Negligence in handling my civil Rights_

       _____
       _____
       _____
       _____
       _____

10.    The alleged illegal activity took place at _World- College of Vet. Medicine_

       _____
       _____

2

11.   I filed charges with the Equal Employment Opportunity Commission regarding defendant(s)' alleged discriminatory conduct on or about __July-2006__. I have attached a copy of the Notice-of-Right-to-Sue letter issued by the Equal Employment Opportunity Commission. The letter was received by me on __April -2007__

12.   I seek the following relief:

A.   ☑ Recovery of back pay.
B.   ☑ Reinstatement to my former job, and any other relief as may be appropriate, including injunctive orders, damages, costs, and attorneys fees.

Date: _7-11-07_

_John W. Dyess_
**Signature of Plaintiff**

_John W. Dyess_
██████████ _Mobile Ala_ ██████
**Address & Telephone Number of Plaintiff**

3

OCTOBER 6,2007

PLAINTIFF; JOHN W. DYESS   —   3 : 0 RECEIVED. 3 5 WKW

2007 OCT -9 P 12: 01

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

DEFENDANT; AUBURN UNIVERSITY

REPORT OF PARTIES PLANING MEETING

PLAINTIFF AND DEFENDANT DIS AGREED ON SEVERAL ITEMS.

PLAINFIFFS CLAIMS AND DAMAGES.

CLAIMS; DISCRIMINATION, SEXUAL HARRASSMENT, HOSTILE WORK EVIROMENT, WRONGFUL TERMINATION , RELIGIOUS RIGHTS VIOLATED NEGLEGIENCE.

DAMAGES; EIGHT-HUNDRED THOUSAND DOLLARS ($800,000) LOSS OF INCOME UNTIL RETIREMENT.

SEVEN-HUNDRED THOUSAND DOLLARS ($700,000) MENTAL AUGUISH AND PUBLIC ENBARRASMENT.

PLAINTIFF REQUEST COURT ORDER FOR CLAIMS OF PRIVILEDGE OR OF PROTECTION

\
PLAINTIFF ANTICIPATE THE NEED FOR ELECTIONICALLY STORED INFORMATION IN THIS CASE AND REQUEST ORDER FROM THE COURT.

ALL DISCOVERY COMMENCED IN TIME TOBE COMPLETED BY NOVEMBER 22, 2007

PLAINTIFF REQUEST FINAL PRE-TRAIL CONFERENCE IN DECEMBER 2007.

PLAINFIFF REQUEST ALL DISPOSITIVE MOTION SHOULD BE FILED BY DECEMBER 2007.

DEFENDANT'S
EXHIBIT
21
ALL-STATE LEGAL®

PLAINTIFF STATES SETTLEMENT IS VERY LIKELY AND REQUEST
MEDIATION BY THE COURT.


PLAINTIFF STATES THIS CASE SHOULD BE READY FOR TRAIL BY JANUARY
2008.

*John W. Dyer*

*10-09-07*

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
_____DIVISION

### CERTIFICATE OF SERVICE

I, _John W. Dyess_, do hereby Certify that a true and correct copy of the foregoing has been furnished by _U.S. mail_ (manner of service, i.e., U.S. Mail, electronic mail, etc.) on this _9_ day of _October_ 200_7_ to:

_AARon Dettling - Attorney_
_For Defendant - Auburn University_
_Birmingham Ala._

_____

_10-9-07_

**Date**

_John W. Dye_

**Signature**

093968

# MOBILE INFIRMARY MEDICAL CENTER
## SURGERY DEPARTMENT

Name: John Dyess                    E#                    Date:8/24/00

Memo re John Dyess

As I was coming around a corner in hallway of Pod I, I encounter John Dyess addressing Cora Curry in a verbally loud tone. She made the statement, "this is ridiculous". As John saw me he made a reference to my presence and ask for us to meet. We, myself, John, Cora, and Viola Dunson who was present, we to the DeBakey Library to meet and I asked Sandra Alexander to be present also.

John and Cora had differences stemming from Cora asking John a question. When OR rooms needed to be cleaned, she wanted to know why he would leave the OR room when she would arrive, she felt he should stay and help clean that room. John did not want Cora to have discussions with him, he said he told her this when she came to work here, he would only answer questions related to Mobile Infirmary business. He said he was going somewhere else to clean.

I reminded John that a few years ago we had a team meeting in which we discuss the role of two TA in the room to expedite cleaning and improve efficiency. I also told him that he has walk out when I have come into a room also; and that this has been a complaint in the past.

Following several minutes of discussion, John said it wasn't going to do any good to talk to us, he wanted to talk to the king "dogs". Sandra Alexander said that was fine and we would end the discussion. She went into her office and John wanted to talk to me and I told him there was no more to be discussed right now we would wait for him to meet with the king dogs. He kept having conversation and questions in the hall with me, even though I kept telling him there was no reason for us to continue. He started talking about the comment of him leaving the room, I told him he does that and he has done it to me. He denied it, I said he had, he told me I was lying. I told him I was not and that we were not going to continue this conversation, that he and Viola had work to do. He said he was going to speak to Mrs. Alexander when she finished talking with Cora in her office. Shortly thereafter, Cora came out and John went in to talk and I went in also. Sandra called Alan Holley and he gave a time he could come. John waited in the DeBakey Library, he was then told it would be later and he could go back to work. John returned later, several minutes prior to the appointment time and was seated in the DeBakey Library. During this time, there was an electrical power failure. Someone made a comment a few times about loosing computer info. John got up from his seat, the power and lights had returned, he walked into the office hallway and then turned and came

Dyess v. Auburn
AU R26-206

back. As he passed by my door he was making purposeful comments that I did not hear completely, but gathered that it was comments regarding vergence of the Lord or devil (in reference to the lights going out). I asked him if he said something to me and he said, "no I was talking to myself".

This is the type of behavior that the staff is very uneasy with because it gives the appearance of an unstable person.

Shortly after that, Mr. Holley and Mr. Woods arrived; Sandra and I were present for the meeting that ensued.

*Nancy Dutra* 8/28/00

2

Memo for File:                                                              3/17/2000

     Approximately 10:15 am, I tried paging John Dyess on the intercom and on the walkie-talkie but got no answer. So, when I finally saw him pass by about 10 minuets later, I said "John, did you hear me paging you" and he said "no". I said " well I paged you four times and you need to go to room one and scrub." Then he went one way and I went another. I met Clarence coming around the corner and I asked him what John had said after I left. Just then I heard a voice from behind me. It was John, he said " why don't you ask me". I said "ok John, what did you say". John then said " well come over here and I will tell you". So I looked at Clarence and asked him to come over with me and be my witness to what ever John had to say. Then John said "you don't need a witness" and I replied "I do if you are going to say anything ugly to me" and he said, "I'm not going to say anything ugly to you". So I went over to the board and John came over and got real close to my ear and said, "you know the bible says vengeance is mine!" I immediately stopped him and said, "I want you to come to Pat's office and tell him what you just told me." John said, " I don't have anything else to say" and headed toward room one. I then walked into Pat's office to tell Pat what had just happened and John followed in behind me. John decided to try and explain what he had said. Pat asked him why would he tell me something like that. At first he said it was because he quotes bible verses to people when he needs to. I then told John, "I've been here for 10 years and he has never quoted me a bible verse before and then why didn't he quote me a bible blessing instead of saying vengeance is mine". I said, " that sounds like a threat to me" and that made me feel scared. Then John said that he heard a lot of people complaining that they didn't like me running the board and that's why he said it.

     We left Pat's office and later Pat and John returned so they could talk privately. They talked for a long time. Then John opened the door and asked me to come back in. In a roundabout way John apologized saying, "for the sake of Mobile Infirmary, I'm sorry". Then he asked, "Celese do you think that I would come up here with a gun and shoot you?" I said, "John, I don't know what you would do if you got really mad, just like you don't know what I would do." Then John said, "you know I wouldn't". Then John stated, "the reason I said that was because I think the way you talked to me at the board was ugly and that I had pulled him from room to room unfairly". Pat and I both said, "next time if he had a problem with me or anyone else to talk to them or come talk to Pat.

                                                     *Celese Bankston*



ALL-STATE LEGAL®
DEFENDANT'S EXHIBIT
**23**

Dyess v. Auburn
AU R26-216

MEMO FOR FILE

**JOHN DYESS**                                    **SURGICAL TECHNITION**
E093968                                           **SURGERY**

**MAY 2, 1995**

On May 2,1995 it was brought to my attention by Jarita
Beech,Manager of Surgery that there had been a complaint by a
physician that John Dyess was in the Doctors lounge drinking a soda
from the refrigerator. This physician spoke to John and he did not
speak in return but gave an arrogant attitude. He described it as
a go to hell retart. John has been told on two occasions not to go
into the Doctors lounge. Once was in Outpatient Surgery, he was
leaving the Surgery department with out permission and going over
to the Doctors lounge in OPS eating,drinking reading the newspaper
and watching TV. On another occasion the entire staff was told not
to go into the Doctors lounge and it was documented in the staff
minutes. Taking food and drinks would be classified as stealing.

In addition John has had other problems with not wanting to follow
directions and assignments by the Manager or Team Leaders.

RECOMMENDATION: Suspension 3 scheduled work days.

John is expected to show immediate improvement in the following
areas:
        Communicate appropriately with physicians management and
staff.
        Focus on job duties and assignments and staying out of the
physician quarters.
        Attitude toward physicians, management and staff.
        Flexibility and being a team player in all surgical suites.
If any other infraction occurs you will be subject to suspension
and or termination.

DEFENDANT'S
EXHIBIT
**24**
ALL-STATE LEGAL®

*Sandra Albrant*
*Jarita Beech*
*John refused to sign he said he would work on
it & he could deal with it. He shook our heads
& upon leaving he looked at Jarita & said "And
you need to work on what you need to work on"
I told him that was being insubordinate & not
acceptable to speak to his manager in this manner.*
*Sandra Albrant*
*Jarita Beech*

Dyess v. Auburn
AU R26-245

MOBILE INFIRMARY MEDICAL CENTER
PROTECTIVE SERVICES

October 7, 1992

TO:        Andrew Mc Donald, Vice President
           Administration

FROM:      Tony Best, Corporate Director
           Safety & Security

SUBJECT:   ILLEGAL PARKING

*************************************************************************

I was made aware of an employee who insists on parking at the Discharge Ramp
on a daily basis. This morning the Security Guard at the Ramp informed him
that he was not supposed to park at the Ramp. The employee's reply to the
Guard was: "Mind your own damned business." I trust you will assist us, as
usual, in this situation.

The employee's name is John W. Dyess, E#093968, of Dept: 661, vehicle license
number: ███████, green Oldsmobile.

*Counselled 10/12/92 next incident will receive corrective action C. Wormuth*

Tony Best

cc:  Alan Holley, Vice President/Administration
     file

DEFENDANT'S
EXHIBIT
ALL-STATE LEGAL®
**25**

Dyess v. Auburn
AU R26-252

# EXHIBIT B

# FREEDOM COURT REPORTING

| A | | | | |
|---|---|---|---|---|
| **Aaron** 6:19 8:4 103:16 | 281:20 282:1 282:18 283:2,4 283:13,21 | **30**:10 **adults** 87:14 **advance** 346:21 | 27:12,13 37:15 53:2 90:19 191:3 | 187:7,8,9,10 188:17 189:23 190:22 267:20 |

**Aaron** 6:19 8:4 103:16
**abilities** 84:20
**ability** 82:21 83:7 84:1 342:4,11,16 345:11 350:20 368:12
**able** 64:7 82:21 83:14 84:10 182:18 337:12
**abnormal** 171:10
**acceptable** 157:11
**access** 39:19 108:13 242:6 251:15,16
**accomplish** 106:1 142:12
**accord** 313:21
**ACCR** 368:23
**accurate** 160:19 212:4 295:13 323:16 352:16
**acknowledge** 259:21 269:20 270:5 271:4
**acquaintance** 107:19
**acquaintances** 77:21 107:14
**acquire** 177:19
**acquired** 175:22
**act** 219:16 225:23
**acted** 112:4
**acting** 7:2 207:2 231:2
**action** 3:17,19 4:10,16 85:7 187:9,10,12 259:22 260:1

281:20 282:1
282:18 283:2,4
283:13,21
284:19 289:23
292:3 303:10
303:22 304:20
317:12 318:6
318:11,23
344:7 355:8
368:18
**action/EEO** 317:17
**active** 240:13
**activity** 286:18
**actual** 173:9 254:2 278:11
**add** 59:22 219:3
**added** 344:20,23
**addition** 202:13
**additional** 353:5 353:9
**address** 39:7,9 43:14,15 55:8 219:10
**addressed** 207:20
**addressing** 202:13
**adds** 186:2
**adequate** 292:12
**adhere** 19:1
**adhered** 32:13
**administered** 193:16
**administrator** 281:8
**admire** 81:13 168:7
**admired** 167:17 168:15
**admirer** 167:18 168:11
**admit** 344:4
**admonished**

**30**:10
**adults** 87:14
**advance** 346:21 348:11
**advantage** 131:13
**advertising** 39:15
**advice** 195:23
**advised** 344:12
**affect** 11:14
**affidavit** 327:7 327:10
**affirmative** 4:10 4:16 37:19 42:19 187:9,10 187:12 281:20 282:1,18 283:1 283:4,13,21 284:19 303:10 303:22 304:19 317:12,16 318:6,11,23 322:16 344:6 355:8
**African-Amer...** 112:7,13 190:20,23 217:12 223:16 224:2,3 225:12 293:21 339:14 346:7 352:2 363:15 365:10
**African-Amer...** 118:2,7,14 339:13,16
**afterhours** 138:9
**afternoon** 151:11 279:8
**age** 18:4 100:13 100:14 104:1 172:23
**ago** 15:6,12

27:12,13 37:15
53:2 90:19
191:3
**agree** 22:2 59:15 160:17 161:14 161:16 197:13 277:20 279:19 281:2 290:12 292:3 297:12 297:23 299:14 320:23
**agreed** 1:13 2:2 2:9 60:12 77:16 309:14 320:5,16
**agrees** 297:10
**ahead** 136:19 263:14 264:3 347:16
**aid** 368:10
**ain't** 67:12 83:4 114:13 144:13 144:14 189:1 265:13 358:15 358:17
**Air** 94:14
**airport** 41:18,19 41:21 62:11 94:6,7,10,11 94:12 96:4,4
**Alabama** 1:2,19 6:2,17,21 7:2,8 14:3,5,6 15:15 16:6,7 21:14 27:9 52:10 69:4,5 70:2 92:13,21 93:6 204:22 364:15 364:19 368:2,6
**Alan** 69:10 71:5 73:1 92:11
**Albert** 86:2 124:12,20 185:13,16

187:7,8,9,10
188:17 189:23
190:22 267:20
282:9,14
294:10 341:23
343:15,16,22
345:9,15 346:2
355:12,14,20
**Alcohol** 11:11
**Alexander** 4:22 5:3 359:23 360:1
**Alexander's** 358:16
**alike** 279:22 280:18
**alleged** 330:11
**allegedly** 333:3
**allow** 56:4 81:1 83:14 87:16 111:22 146:6 147:15 182:1 221:3 280:16 337:2 340:20 341:13
**allowed** 16:5 54:22 119:4 120:4,15 128:1 128:6,19 129:8 134:11 151:12 200:22 209:1 235:8,10 245:18 246:22 279:15,16 282:23 309:11 333:18,21 334:5 335:6,15 336:23 337:8,9 343:1,9 344:14
**allowing** 350:20 357:16
**allows** 61:2 302:2
**altered** 267:9,13

268:4
alters 204:10
altogether 111:2
amend 327:1
America 18:15
Ammonites
  86:14
amount 165:9
  335:18 358:9
amounts 328:23
and/or 277:11
anesthesiologi...
  68:23
angry 151:23
  168:4,4,7,8
  243:16
animal 129:19
  131:5 162:15
  230:6,10
  232:16 233:17
  241:18 242:10
  275:14
animals 105:2
  134:8,10 135:4
  137:13 162:13
  243:17
animosity 365:7
anniversary
  19:20
announcements
  39:15
annual 4:1
  336:4 346:19
  348:6
annually 301:4
anointed 83:11
anointing
  100:13
answer 9:2
  10:10 11:5
  30:20 35:19
  89:4 102:3,14
  102:17 165:23
  196:5,12 197:1

232:3 244:4,5
246:16,18
290:13 293:22
294:22 316:18
326:23 328:14
328:16 329:5
354:14
answered
  106:13 196:5
  197:6 202:7
  308:3 316:15
  331:5
answers 4:17
  193:19 326:15
  326:19 327:12
  327:13
anybody 12:17
  12:23 13:16
  158:21 227:22
  264:9 348:19
anymore 50:4
  60:7 127:20
  229:10
Anytime 316:12
anyway 45:19
  85:15 161:18
  206:11 235:12
  256:9 332:1
  345:18
apart 51:17
apartment
  180:10,13
  181:15 208:9
Apocryphal
  22:20
apologize 353:7
  359:2
Apostle 54:15
  79:13
apostles 35:23
Apostle's 24:10
apparently
  258:23 265:19
appear 197:10

289:16
APPEARAN...
  6:15
appearing 6:18
  6:22
appears 214:2
  299:23 359:20
application
  338:12 339:3
applied 339:19
apply 107:8
  338:14,18
appointment
  345:3
appreciate
  32:20 37:6
  88:14 112:8
  165:22
approached
  252:10 310:2,9
appropriate
  280:10 316:9
  334:9 358:7
appropriated
  335:18
approval 340:10
April 45:2
  291:19 299:13
  344:1
area 20:12 25:21
  98:13 102:20
  109:17 134:13
  150:7 173:9
  232:17 233:6
  234:2 241:17
  242:10 244:23
  246:8 248:14
  250:6,20 251:2
  251:10 252:2
  254:3,4,7,15
  256:6,9 310:4
  310:11,12,14
  310:16 312:8
  313:6,12,22

325:5 366:17
areas 15:17
arising 290:7
arm 137:5
  144:16,17
  311:8
arms 38:11
  80:10
arose 278:22
arouse 255:2
arrange 189:10
  355:4,9
arranged 228:8
arranging
  205:17
asked 12:18
  32:8 52:17
  64:20 72:23
  75:5 137:17
  138:1 150:5
  151:15 152:14
  156:14 160:10
  160:21 167:7,8
  170:17 180:13
  187:6 194:21
  195:10,11,18
  203:14 208:18
  224:11 232:14
  232:18 233:4
  234:10 239:3
  278:9 307:1
  311:17 312:7
  315:16 316:23
  328:1,6,22
  330:20 331:2
  338:2 342:8
  345:1 351:1
  358:12
asking 9:14
  34:19 37:3
  56:15 101:22
  104:15 105:9
  145:1 154:5
  157:8 167:7

168:4 178:1,1
195:1 196:3
199:13 215:22
216:22 239:13
270:11 297:19
306:15 338:17
353:21 354:4
ass 310:2
assigned 133:7
  134:13 138:7
  162:21 232:13
  279:5
assistant 173:22
  200:17 276:7
  280:1
assume 208:13
  252:12
assumed 60:14
ate 88:3
attached 288:21
  289:1,12
attempt 360:5
attempted
  306:10
attempting
  237:22
attempts 306:6
attend 15:22
  26:3,4 82:20
  93:2,3 97:16
  97:20 98:15,16
  98:21 138:16
  138:17 145:13
  189:11 298:1
  307:1
attended 32:1
  139:4 366:6,18
attender 29:11
attending
  138:20 366:13
  366:14
attends 75:10
attention 32:15
attitude 37:2

360:21
**attorney** 7:19
8:4 66:15
**attracted** 314:4
**attractive** 144:9
**Auburn** 1:9 6:9
8:5 10:23
11:21 12:22
13:1,16 17:9
28:15 39:13
41:9 42:10,12
42:14 43:4
48:14,19 51:19
51:19,21 52:1
52:3,5,6,9,12
53:21 66:10,19
68:10,16,17
69:3,5,12,23
70:6 71:2 72:6
74:22 76:9
77:4,7 82:19
93:13,15 94:1
94:22 96:13,15
97:7 100:12,21
101:9 103:23
107:2,9,17,20
108:3,16 109:6
118:20 122:9
123:11 137:21
142:14 177:23
181:18 187:17
201:5 222:2
261:2 262:13
282:21 296:4
300:16 305:16
310:20 329:6
330:23 333:5
333:18 343:11
360:22 361:3,4
365:4,8 366:3
**Auburn's**
362:10
**auditorium**
279:11

**auditorium-ty...**
31:23
**August** 158:14
158:14 208:1,4
208:12 209:15
209:16,17
211:11,18
216:3 226:17
229:1
**authoritative**
142:11
**authority** 35:22
276:23
**authors** 24:5
**automatically**
316:1
**available** 301:5
331:5
**Avenue** 6:20
**average** 26:14
**avoid** 33:22
105:5 200:6,13
218:14 220:23
221:18 257:22
**awakening**
100:14
**aware** 74:11
87:7 123:10
124:11
**a.m** 7:9 268:12
315:14

___ **B** ___
**B** 29:14 117:9
170:8 193:22
**baby** 143:17
**back** 9:20 19:18
37:10 48:7,18
50:5 58:12
66:2 68:5 91:8
101:18 102:16
118:23 119:3
121:6 128:5,11
132:6,19

139:19 154:22
154:23 157:5,7
157:9 172:7
175:13,14
180:4 185:3,10
190:15,17
202:4 205:3,9
205:12,14,17
209:7,14
213:20 216:13
226:15,17
230:9,13,13
231:23 233:19
233:20 234:4,8
239:15 245:1
246:15 249:16
250:10 260:16
280:23 293:8
299:15 300:19
304:13 312:20
315:13 321:11
324:5,8,19
332:13 334:7
343:2,5 345:6
348:17 362:3
365:6
**background**
13:19 26:20
77:19
**backgrounds**
25:9
**bad** 10:15 31:4
33:1,8,19 34:1
34:12,20 68:17
144:3 145:5
147:5,16 148:2
148:4,10,20
155:3 222:11
222:15 223:7
238:11 293:23
294:23 296:10
**badmouthed**
68:17
**bad's** 154:21

**bag** 64:21 151:7
**Balch** 1:17 6:20
7:7
**ball** 65:15 67:10
67:13 69:2
80:13,19 88:1
169:13 178:16
354:8
**Bankston** 5:1
309:5 357:3
358:4 359:3,5
**Baptist** 18:11,12
18:13,15,16,19
18:22,23,23
19:3,4,5 20:23
20:23 27:8,11
28:3 33:14
72:7,7 82:19
96:12,15,16,23
97:5,10,14
98:16,17 99:5
100:2,7 358:4
366:7,16
**Baptists** 18:20
**baptized** 37:20
**barrage** 180:1
**based** 286:10
**basic** 56:7,13,14
212:8,9 213:10
213:17
**basically** 11:19
18:20 19:16
21:4 26:1
33:23 89:2
141:4 157:10
158:1 163:15
165:12 169:20
175:9 189:8
194:1 195:13
196:15 228:21
229:9 241:8
282:3 308:11
338:18
**basis** 17:10 43:8

220:9 346:9
352:4
**basketball** 52:9
**bathroom** 233:9
**batteries** 342:22
**battle** 86:13
103:17
**Beech** 5:4
359:21,22
360:19
**beer** 47:8
**began** 15:21
109:18 279:13
**beginning** 7:9
15:23 16:4
34:9 129:10
**behalf** 6:18,22
**behave** 146:9
**behaved** 183:14
**behavior** 70:20
89:9,9 90:21
91:2 112:6
114:14 115:1
144:23 153:8
154:5 161:22
171:10 175:8
189:17,22
200:7,9 204:10
227:11,17
272:14 282:5,5
285:9 287:5
309:10,10
322:20 345:21
349:13 360:21
364:16
**Bel** 94:13
**belief** 25:16,17
81:22 82:2
181:13
**beliefs** 17:15
21:2,3,17 23:5
24:1,4 25:6
28:1,16 29:6
32:12,14 33:15

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 33:17,21 38:10 | 162:2 357:7 | 103:9 146:15 | 346:5 | 94:11 96:4 |
| 72:4 73:16 | **believer** 29:9 | 146:18,21 | **blah** 32:11,11,11 | **boundaries** |
| 74:15 78:16,19 | 36:4 83:16 | 147:13,13,21 | 32:11 75:10,10 | 141:23 |
| **believe** 21:4,5 | 84:3,17 | 148:5 154:17 | 75:10,10 | **bounds** 83:23 |
| 24:14 28:20 | **bell** 172:14,15 | 156:4 164:1,18 | 141:12,12,12 | 154:13 |
| 29:4 30:4,4,14 | **belong** 18:17 | 225:7 307:13 | 141:12 | **box** 241:4 |
| 34:11,18 36:3 | 242:5 244:19 | 308:13,18,22 | **blessing** 184:3 | 269:10 278:3 |
| 42:16 56:17 | 363:18 | **Bibles** 22:17,18 | **block** 250:17 | 302:2 |
| 58:2 61:2 | **belonged** 246:13 | **Bible-wise** 16:21 | **Blond** 172:21 | **boxes** 63:12 |
| 70:13 80:3 | **ben** 91:13,16,18 | **Biblical** 16:2,20 | **blot** 193:23 | 246:9 |
| 81:6 90:19,21 | 91:23 | 31:12,19 32:13 | **Blount** 14:2,11 | **boy** 350:3 |
| 93:18 95:14 | **Benny** 30:9 | 33:17 51:4 | **board** 275:9 | **brand** 162:15 |
| 96:7 98:6,9 | **best** 7:20 9:7,11 | 54:23 59:4 | 296:8 | **break** 9:12,17 |
| 108:4 115:13 | 10:10 16:10 | 61:7 72:4 | **Bob** 157:13 | 9:18,22 89:15 |
| 125:11,12 | 31:18 32:22 | 73:16 85:16 | **body** 17:2 | 269:19 270:1 |
| 127:23 128:17 | 155:18 329:18 | 138:19 146:12 | 140:22 141:1 | 279:12,13 |
| 129:11,23 | 337:13 368:12 | 308:10 | 144:13 251:7 | 280:9,15 289:9 |
| 130:16 131:11 | **better** 58:3,7 | **Biblically** 28:9 | 310:4,10,12,14 | 289:19 321:8 |
| 132:15,17 | 65:3 81:13 | **big** 60:3 65:18 | 310:16 313:3 | 334:8 357:18 |
| 134:4 149:1 | 135:16,17 | 77:8 142:23 | **boisterous** 55:23 | **breaks** 279:3 |
| 160:18 161:15 | 136:22 140:18 | 151:6 250:2 | 143:19 157:23 | 323:18 334:5 |
| 167:14 173:19 | 175:5,6 185:21 | 280:4 | 252:6 | 357:17 |
| 191:21 192:1 | 221:6 253:6 | **biggest** 350:9 | **book** 56:16 58:2 | **breast** 255:15 |
| 195:9 197:21 | **Bible** 21:5,6 | **bill** 347:13 | 79:22 86:10 | **bring** 72:9 |
| 206:13 209:13 | 22:6,9,15,16 | **Billy** 24:21 30:7 | 123:1 124:8 | 119:11 158:21 |
| 209:15 215:5 | 22:19 23:2,4 | 36:9 83:4 | **books** 22:20,23 | 208:8 274:6 |
| 216:2 227:14 | 23:13 24:13,13 | 105:16,17 | 23:18,22 24:3 | **brings** 248:9 |
| 235:17 258:11 | 25:11,17 26:10 | **binder** 12:5,10 | **born** 21:7 36:7 | **broad** 17:2 |
| 266:16 267:22 | 26:12,15 28:22 | **Bingham** 1:17 | 37:11 | **brother** 361:6 |
| 268:22 273:4,7 | 29:5,9,14,23 | 6:20 7:7 | **boss** 277:2 | **brought** 45:13 |
| 273:11 275:11 | 30:14 31:16 | **Birmingham** | **bother** 266:2 | 46:12 79:15 |
| 275:14 287:17 | 32:5,10 33:14 | 6:21 | **bothered** 51:2 | 107:1 120:20 |
| 289:12 291:3,6 | 34:17,20 35:9 | **bisexual** 88:17 | **bottle** 47:7 | 145:2 164:20 |
| 291:10 322:3,6 | 35:10,15,18,20 | 89:12 | **bottles** 231:12 | 172:10 |
| 327:2 333:11 | 36:2,4 52:21 | **bisexuality** | 285:16,19 | **Brunos** 286:11 |
| 335:1,17 340:7 | 52:22 53:10,15 | 78:22 | 286:3 | **Bruno's** 285:10 |
| 340:11,12 | 54:9 56:2,7,12 | **bit** 13:18,21 31:1 | **bottom** 206:12 | **brush** 139:16 |
| 348:11 350:6 | 56:21 58:5 | 47:21 114:12 | 208:19 209:12 | 350:4 |
| 350:13 353:18 | 59:5,7 72:4,18 | 134:12 139:17 | 212:17 236:6 | **brushed** 148:12 |
| 355:22 357:7 | 73:18 75:4 | 216:15 238:7 | 238:9 269:15 | **brushing** 134:12 |
| 358:5 359:4 | 76:12,14,21 | 262:6 264:1 | 297:1,4 320:14 | 135:3 140:3 |
| 360:6 366:13 | 79:15,23 83:13 | 308:1 323:15 | **bought** 231:12 | **brutal** 171:11 |
| 366:23 | 84:7 85:17 | 323:20 324:10 | **Boulevard** 41:18 | **Bud** 31:3 32:23 |
| **believed** 160:15 | 86:22 102:5 | **black** 224:1 | 41:19,21 94:7 | 33:6 56:8 |

# FREEDOM COURT REPORTING

78:10 80:4
88:17 104:10
120:18 126:5
126:12,22
127:18 128:8
132:19 133:3
133:19 139:7
147:2 149:2
158:8 166:10
166:16,19
168:18 184:9
191:12,13
206:18 209:22
210:7,14 214:4
215:17 225:16
225:19 228:10
239:9 240:23
247:10 254:3
259:12 260:7
263:8 264:10
266:17 268:22
269:23 273:5
281:3,9 284:2
284:4 286:9
291:4 292:15
292:21 299:4,5
308:17 310:23
321:13 333:8
337:7 339:19
340:6
**buddies** 80:15
**Budget** 93:18
95:1,2,7,22
**Budweiser** 43:7
43:12,20 46:23
47:4 48:5
49:17 68:8
**Bud's** 28:17
230:22 232:7
236:16
**buffet** 32:2
**building** 20:15
20:20 41:3
232:15 234:13

324:22
**bumped** 127:11
**bunch** 326:2
**Busenjer** 227:14
283:7 322:9,17
349:11
**business** 71:21
283:9,9 349:14
349:15,16
363:6 365:14
**businesses** 280:4
280:4
**busy** 50:15
300:21 357:19
**button** 280:5
**buy** 286:3
**buying** 286:1
**buys** 285:19
335:3

_____
C
_____
**C** 29:14 117:9
193:22
**Cadillac** 168:23
177:13
**cage** 137:1
**cages** 135:8
140:3
**call** 12:16 18:19
27:20 43:14
74:9,9 157:20
157:22 161:11
205:2 208:14
209:3 260:21
290:19 316:5,9
316:17 321:19
322:6 340:17
**called** 12:23
14:7 30:11,15
50:9 57:22
60:5 91:13
96:18 97:12
104:4 130:16
137:11 147:18

153:6,23 160:7
160:9 173:19
176:21 178:23
185:10 195:10
195:17,19
196:11 204:19
204:21 205:5
205:19 206:12
206:14 209:6
209:10,11
225:7 231:14
244:21 270:12
272:12 301:7
315:5,6,9,11
315:13,16
316:12,23
355:13
**caller** 316:20
**calling** 194:23
195:6,12,18
203:14 231:4
286:22 301:8
315:8,20
**calls** 315:3
349:14
**calm** 55:12,19
142:10 143:22
154:19 157:21
204:11 276:18
357:13 358:2
360:17
**calmly** 119:2
**calms** 55:12
**Campbell**
168:23 177:12
187:23 188:11
191:3 363:23
365:19
**campus** 296:16
324:20 354:17
**candy** 64:21
**car** 151:8 165:4
180:3,18 181:3
182:9 362:21

**card** 64:18 66:2
184:16 299:20
**care** 60:20 66:3
86:4 102:7
142:16 162:17
164:23 171:5
186:12,12,13
188:16 199:5,8
227:21 244:16
245:13 267:5
267:15,22
301:15 318:1
345:22 350:18
354:6
**cared** 157:14
**career** 16:11,23
**careful** 55:16
75:15 130:3
146:6 147:22
150:21 153:14
154:7,15,18
155:5,12,22,23
156:2,3,6
175:2 177:7
**carefully** 63:18
154:14,15
290:10
**cares** 115:10
**caress** 81:4
312:21
**caring** 121:3
**Carmella**
172:13
**Carnell** 363:23
365:20
**cars** 95:9
**cart** 239:18
248:9,9,12,12
248:15,22,23
249:1,6,15,19
249:19,21
250:4,8,9,13
251:8 252:10
252:17,21

253:1,4,5,7,10
253:15 255:20
255:23 256:2
258:16,18,19
263:3 273:22
274:2 290:20
310:23 315:1
321:11
**cartoon** 251:21
**case** 1:5 6:5 17:9
17:12 101:14
101:15 225:7
330:15 350:15
352:11 353:15
353:23 368:19
**cash** 334:2
**cassette** 342:23
**cast** 58:9
**casual** 25:16
29:10 115:21
142:10 154:19
168:1
**casually** 131:19
139:16 140:8
160:1 162:7
**casual-type**
131:9
**catch** 127:7
300:6
**category** 46:21
**Catholic** 358:4
**Catholics** 22:21
**Caucasian**
172:18,20
217:13 293:19
365:10
**Caucasians**
217:13
**caught** 242:5
275:7
**cause** 7:10 29:8
200:7 220:18
229:12
**caused** 136:9

CCR 1:17 7:1
368:22
celebration
19:20 286:2
Celeste 5:1
309:4 357:3
359:6 366:12
cell 231:5
286:22 315:3,4
315:14,15
316:13,22
center 47:7,9
92:14,19
204:23 254:12
254:14
centers 20:17
central 239:11
240:5,6 258:15
325:4
cents 358:12
certain 19:1
24:21 28:7
30:13 131:4
152:14 232:22
232:22 246:8,9
288:5 335:18
340:11
certainly 343:22
CERTIFICA...
368:1
certified 303:19
368:4
certify 7:3 368:6
368:16
chance 102:19
192:8 339:6,10
340:4
change 15:16
210:22 326:23
327:15
changed 15:17
15:17 120:18
267:8
changing 61:4

chapel 73:16
chaplain 71:22
178:6
chaplains 178:9
chapter 56:16
219:23
chat 40:11
check 129:6
162:8 282:10
322:1
chest 137:6
144:15,17
311:9 313:5,8
313:22
Chet 169:1
177:13 178:6
child 148:22
children 81:7
138:16 140:22
155:6,13
188:14 217:14
chips 286:1
choice 99:13
160:14 301:1
choked 88:5
choose 189:18
chooses 103:10
Chris 216:9,13
216:16,21,22
217:4 218:8,13
218:17,23
219:20 220:7
220:13 222:6
222:10 224:21
224:22 244:13
323:23 333:23
334:14
Christ 17:3
22:13 26:18
35:7 36:5
37:20 57:1
83:7 84:13,22
87:7,9 103:10
271:18 309:12

Christian 20:20
22:1 24:1,3
25:5,6 30:21
31:19 32:12
33:15,17,21
37:1 53:9,11
53:11 55:14
59:11 71:20
74:15 77:18
84:14 96:21
102:6 105:8
143:23 148:16
154:16 197:4
200:10 225:6
293:17 307:12
309:11 337:22
357:6 361:9
364:18
Christianity
56:5 139:2
145:11 147:13
Christians 22:16
22:19 33:14
Christian-type
53:6
Christmas 64:19
114:6,9 316:3
Christ-like
365:17
church 16:8
19:4,12,13
24:19,22 27:9
27:11,18 28:2
28:3,4,4,11
35:6 56:3 72:7
75:10 77:5,7
77:21,23 80:20
82:19,20 87:23
96:12,15,16,23
97:5,11,14,17
98:11,16,17
99:5 100:2,7
105:21 106:3
135:21 138:16

141:21 147:14
357:11,12
358:3 366:7,9
366:16,18,20
churches 19:11
20:9 24:21
97:8,23 99:8
circle 180:4
circumstance
330:10
circumstances
90:20
city 25:21,22,23
48:22 49:2
75:11
Civil 7:4
claim 4:20 17:8
61:12 352:3,7
claiming 101:12
101:13
claims 17:11
353:10 354:4
clarified 77:22
102:5 170:4,6
clarify 9:12
102:19 103:19
104:7
classes 14:23
93:6
clean 119:11,12
134:14 137:1
162:5,9 233:13
233:18,23
234:1 244:22
cleaned 159:23
162:5 233:22
cleaning 93:17
95:8 104:21
121:1,3 134:5
135:2,10,14
139:22 142:6
160:5 162:4,6
227:9 232:17
232:20 314:13

339:17 361:23
clean-up 241:18
clear 9:8,9 10:17
212:15 274:7
277:13
clearly 342:6
clinic 129:20
131:5 230:6,10
232:16 233:17
241:18
Clinical 292:4
Clint 100:5
clock 129:15
272:4 280:2,3
280:23 285:12
285:20 300:5,9
300:12 313:20
324:8 334:17
334:17,18,20
335:4 336:14
clocked 300:11
300:13
clocks 272:1
279:22 280:18
close 14:14 39:4
41:5 80:8 83:2
88:8,22 105:4
126:8 137:5
138:10,10,23
139:9 140:23
141:2,3,15,16
142:9,22
144:10,13
165:21 167:10
184:2 231:3
232:10 291:19
311:6 312:15
312:17 313:23
314:13,18,19
closed 42:2
244:21
closer 44:22
62:11 94:12,12
94:13 116:17

142:3 314:19
closes 300:18
closets 246:2
clothes 116:13
clowning 271:23
college 13:21
  14:8 42:20
  227:15 272:1
colleges 15:17
Colley 275:14
combination
  276:12
come 19:18 25:2
  31:20 50:20
  53:19 69:17
  70:1,3 72:8
  77:6 99:17
  101:6,18
  102:16 105:18
  108:9 114:20
  114:23 129:20
  131:23 134:22
  137:9,12
  143:17 144:20
  154:2 158:9,11
  158:15 163:14
  166:16,19
  168:19 169:2
  172:7 176:9
  180:3,4 181:3
  181:9,14 205:9
  206:18 208:15
  209:7 215:3
  230:3,13 233:3
  245:1 246:15
  249:10 251:21
  255:22 258:17
  260:15 271:7
  272:12 284:5
  301:14 306:19
  312:17 323:10
  334:7 343:2
  347:21 348:17
  348:18 356:1

359:6 364:13
comes 23:11
  30:21 63:11
  64:8 68:2
  82:12 149:20
  217:22 249:16
  250:5,18 253:9
  258:21 272:7
  366:15
comfort 138:23
  142:23 311:7
comfortable
  113:13 114:14
  118:15 296:20
coming 72:3
  157:10 163:16
  229:21,21
  234:8 235:5
  250:7,18
  269:23 270:16
  275:7 316:19
comment 259:19
  259:23
comments 302:1
  306:14 338:4
Commissioner
  2:10 6:13 7:3
  368:5
commit 181:22
committee
  280:19 293:18
  340:8 344:7
  347:21
commonsense
  103:18
communicate
  129:3
communicated
  185:1
communicating
  221:7
communication
  108:6 127:14
communities

20:16
community
  20:16,21 25:21
  106:6
company 48:21
  51:12 60:9
  93:17
complained
  304:22
complaint 4:19
  202:1,2 304:8
  330:11 332:22
complaints
  113:3
completely
  133:14
complex 198:12
  198:19
compliance 2:5
complies 192:7
  297:2 298:23
  309:21
comprehend
  127:9
compromise
  37:1 101:22
  361:11
compromising
  33:21 293:16
computer 38:17
  38:20 39:19
  108:12,19
  173:7 194:4,7
  269:17,23
  272:23 279:13
  368:10
computerized
  193:22 194:8
computers
  130:22 131:1,4
  131:7 271:20
  273:1 279:15
concealed
  106:16,18

concerning 8:14
  50:14 51:12
  74:14 154:5
  161:22 197:3
  200:1 203:19
  206:15 288:17
  355:11
concerns 202:21
conclude 184:13
  344:21
concluded
  174:23 203:11
  367:2
conclusion 78:6
  170:10 171:23
  175:10 295:18
conduct 230:22
  232:7 236:16
conference
  173:8,9,11
  174:4 185:11
  185:12 190:8
  275:11
confess 57:1
confesses 35:7
confession 24:8
confines 23:3
confirm 128:12
confirmed
  320:19
conflict 29:8,13
  29:17 31:14
  33:23 45:10
  46:16 69:5
  70:7 168:9
  219:9
conflicting-type
  272:14
conflicts 65:18
  117:22 223:21
conform 25:11
conforming 19:2
confusion
  220:18

congregation
  27:16 98:20
connection
  29:19
conquer 119:17
conscientious
  38:2,6
constant 180:1
constantly
  170:17 179:13
  229:2 231:20
  241:22 345:7
constituted
  333:16
contact 173:17
contend 346:8
content 368:9
contents 259:21
continued 27:21
continuously
  187:5
contradicting
  67:4
contradictory
  71:20 72:5,11
contradicts
  342:5
Convention
  18:14 21:1
conversate
  220:17
conversation
  31:11 33:13,17
  33:18 51:3
  52:18 126:21
  127:3,13,17
  128:16 133:3,6
  133:20,23
  138:8 142:9
  143:8 144:20
  145:11 147:1,4
  147:12 149:19
  149:23 152:23
  153:12 156:5

**FREEDOM COURT REPORTING**

158:18 159:21
161:10 165:15
168:2 174:6
175:8 183:18
183:19 185:13
196:1,2 206:4
206:10 216:12
218:6 220:10
221:17 224:20
288:1 307:11
342:21
**conversations**
32:12 141:11
186:3 197:2
225:19 283:11
321:17
**convey** 53:5
152:1
**conveyed** 147:20
**cookies** 286:1
**cooperated**
193:8
**cop** 255:4
257:13 258:9
**copied** 299:20
**copies** 189:15
301:3 331:8,17
353:17
**copy** 206:7
213:7 266:13
267:6 289:20
289:22 294:12
327:3,6 331:22
332:5,7 356:6
356:20
**corner** 62:9
275:12 305:4
**Corporation**
40:18 42:8
43:2,7,12
**correct** 14:16
17:18 46:14
47:12 76:16
82:23 92:8

110:13,17,18
129:23 201:22
261:14 270:7,8
272:2 273:14
297:22 312:5
327:13,14
332:22 333:9
346:6 368:13
**corrected** 117:7
**correction**
313:18 327:3
**corrective** 3:17
3:19 259:22
260:1 289:23
**correctly** 310:8
**corridor** 248:10
**cost** 150:17,18
150:18 151:20
**Cottage** 62:10
98:16 99:4
100:7
**counsel** 1:15 7:6
135:21 363:14
368:17
**counseled** 50:11
177:16 178:2,7
**counseling**
89:19,23 90:15
91:1 136:2
186:10,10,21
187:2,16
189:19 328:11
328:13
**counselor** 91:5
**counselors**
328:8
**count** 246:23
**counterattack**
68:3
**country** 22:3,11
25:22,23 30:10
**COUNTY** 368:3
**couple** 85:11
92:16 109:1,20

134:1 161:21
190:3 233:15
240:11 262:19
286:7 314:16
316:2
**course** 14:1 17:2
23:10,17 25:8
33:15 34:18
35:4 40:23
46:3 52:4
59:18 60:23
72:2 73:22,22
78:23 79:23
82:2 84:4 90:6
111:18,18
112:18 124:1
124:16 127:10
131:2 132:21
148:23 157:1
170:18 174:2
185:22 191:6
197:15 204:4,7
204:16 209:5
235:18 239:8
257:9,11 258:3
266:19 267:3,7
270:17 282:22
284:3 295:15
296:4 307:16
319:20 352:6
353:13 365:18
**courses** 14:21
295:12
**court** 1:1 2:6 6:1
7:1,16 10:5
332:11,22
352:19,21
353:1 368:4
**courtesy** 350:13
**cover** 102:20
300:9
**covered** 56:18
133:14 189:3
**cover-ups** 296:7

**coworker**
216:19
**Cox** 13:13
113:13,21
115:13,14
151:18 237:19
**co-employee**
221:20
**co-workers**
287:11,12
**create** 29:16
32:16 66:15,16
75:16 146:14
147:16 153:17
153:21 155:1
220:19,20
272:14
**created** 217:8
**creates** 114:20
**credibility**
344:14 345:17
345:19 358:15
358:17
**credit** 334:2
**creed** 24:8,10
**crimes** 181:22
**cross** 21:9 52:23
**crucified** 21:8
**crucifixion**
58:16
**cry** 55:23
**culture** 26:22
**cup** 365:7
**customer** 46:7
50:17 60:15,16
**customers** 45:11
50:14,18
135:12
**cut** 129:12 132:6

---
**D**
---
**D** 3:2 29:14
193:22
**daddy** 178:22

**Dallas** 26:5
**damage** 354:4
**damages** 4:20
352:10 353:10
**damn** 363:6
**dangerous**
197:11
**dare** 257:20
**darkness** 219:21
222:20
**date** 7:3 39:1
116:9 126:1
137:16 142:8
159:8 167:1
207:3,22
218:10 259:1
265:17 266:11
266:18 268:7,9
268:11,14
269:2 273:11
277:8 291:4
298:4 305:6
368:14
**dated** 3:15,18,20
4:3 208:1
211:18 226:8
**dates** 12:3 114:5
231:18 265:16
267:8 273:13
273:21 274:7
**Dauphin** 98:15
99:4,20 100:2
**David** 161:1
209:23 281:10
322:9
**Dawes** 41:2
61:23 62:14
**day** 1:19 9:19
15:5 19:19
23:14,16 57:10
64:8 85:8 97:3
115:9 120:10
120:10,15,16
127:10 130:5

# FREEDOM COURT REPORTING

377

153:5,6 160:1
179:21 184:17
190:11,14,15
190:17 209:19
217:23,23
218:12 231:14
231:15 233:21
233:22 234:14
234:21 250:1
253:21 259:9
264:13,15
265:20 266:4,7
268:13 271:8
271:13,16
273:20 275:1
298:7 299:22
300:23 301:7,9
301:13 304:15
316:11 335:10
336:5,7,15
347:6 348:17
349:4 357:19
**days** 22:8 81:14
85:11 133:7,19
134:1 136:12
136:13 138:6
144:18 150:1,2
150:4 151:16
169:8 175:14
175:17 176:1
185:4 195:17
205:15 232:22
262:9 278:16
292:5 311:5
314:10 316:6,6
334:19 346:21
348:11
**day-to-day**
153:20
**deal** 31:22 119:8
142:23 294:3
**dealership** 62:7
**dealing** 113:15
**dean** 227:14

283:6 296:8
322:9,17
**death** 335:13
**December** 50:6
63:3 157:16
192:20 212:3
226:12,20
227:3,6 228:3
228:9,19 229:2
229:5 235:21
236:4,15
237:13,14
**decent** 218:5
**decide** 107:8
**decided** 104:6
107:11,22
121:5
**dedicated** 84:14
104:6
**dedication** 84:18
**deeds** 79:13
**Defendant** 1:10
6:10,22
**Defendant's** 3:6
121:9 124:23
192:2 207:5
211:14 237:3
265:7 274:9
288:10 291:11
298:8,18 302:4
303:3 305:8
317:2 318:16
326:4 332:17
352:13 356:8
358:18 359:15
362:15
**definitely**
223:12 294:18
**definitive** 171:2
171:4
**degree** 14:14,21
16:2 26:4
69:13 199:8
364:21

**degrees** 16:18
**deliberate**
194:17
**deliver** 251:18
**delivering** 256:5
256:12 280:14
**delivery** 280:12
305:6
**delusional**
197:18 198:15
198:22
**denies** 344:3
**denomination**
17:1 18:9
25:20
**denominations**
22:23 23:1
**denomination's**
24:20
**depart** 237:13
**department**
109:10,19
120:23 170:21
176:23 292:4
311:21 324:15
339:15 340:20
347:23 355:19
**departments**
72:1
**depends** 28:19
99:15,16
**deposition** 1:15
1:22 2:3,4,10
8:22 9:3 11:18
102:18 217:7
367:2
**depositions** 2:7
**describe** 328:23
**described** 58:11
167:5 180:15
181:4,20 182:8
183:2 240:15
273:17
**describes** 186:17

**describing**
183:13
**description**
174:15
**designed** 28:8
**desire** 206:3
**desires** 80:4
88:17 306:7,11
**desk** 227:10
229:7 236:5
**desperate**
338:15
**detail** 31:2 60:8
106:11 226:6
240:5 288:6
**Detailing** 95:8
**details** 226:20
**determination**
251:12
**determine**
203:23
**determined**
114:18
**detoured** 42:22
**Dettling** 3:5
6:19 7:18,23
8:4 89:14
289:8 321:7,10
366:22
**devil** 225:6
**diagnosed**
197:17
**diaries** 330:21
330:22
**dib-dabble** 23:4
**Dickie** 229:19
280:10 322:10
324:11 325:4
**dictate** 288:2
**died** 21:9
**differences**
159:17 160:8
177:9
**different** 9:11

16:22 18:15
19:13 20:9,12
24:2,23 25:8,9
28:1,8,16
52:19 71:23
86:15 87:11,22
96:6 114:15,15
124:3 176:8
177:20 186:20
186:20 193:15
195:17 231:19
253:1 265:15
266:10 311:12
**difficult** 214:12
215:11
**difficulties**
202:14 204:2
**dillydallied**
335:7
**dillydally**
130:20 336:18
337:9
**dillydallying**
129:15 130:6
229:22 230:7
336:13
**dime** 358:11
**dinner** 65:13,14
67:18 136:7
138:2
**diploma** 14:2,11
**direct** 142:10
222:13 308:12
**directed** 36:21
283:3
**directly** 119:22
145:15 146:5
147:8 148:5,12
151:13 365:22
**dirty** 135:7
140:2 306:17
**disagree** 259:4,7
277:22
**disagreed** 281:4

# FREEDOM COURT REPORTING

340:18
**discharge**
362:21
**discharged** 45:6
45:7
**disciples** 58:12
**discipline** 132:1
153:19
**disclosures**
325:15
**discovered**
335:17
**discriminate**
67:1 117:4
341:6 346:16
**discriminated**
17:10 74:13
101:12 116:21
117:13 333:4
333:12 335:9
336:10 337:17
338:9 343:13
346:2,9,12,17
349:8 352:4
**discrimination**
73:4 101:14
113:3 333:16
364:21
**discriminatory**
45:21,23 48:2
50:9 66:20
71:15 73:1,5
73:10 95:18,21
112:4,6,8,10
118:17 294:4
336:22
**discuss** 85:23
102:1 106:11
153:7 154:4
174:17,22
176:4 210:13
220:23 229:8
234:19 267:18
267:19 299:4

354:13 360:5
**discussed** 21:12
85:15 86:8,22
104:16 126:17
176:5 264:20
267:16 268:1,2
272:15 277:18
281:18 282:2,4
284:21 285:8,9
286:6 290:20
308:9 349:18
**discussing** 58:1
59:11 77:17
135:13 186:4
**discussion** 40:10
59:3 75:3,8
100:18,22
308:10
**discussions**
127:5 138:19
**disgusted**
258:18
**dishes** 241:19
296:17,19
345:13
**Dishwasher**
49:11
**disorder** 197:18
**distance** 65:3
66:6 105:6
129:19 137:17
**distribute** 230:2
230:4 242:8
**distributing**
230:7
**distribution**
47:7,9,10
**District** 1:1,2
6:1,2 353:1
**DIVISION** 1:3
6:3
**Dixon** 57:18,19
57:20 58:18
77:16 85:2,9

85:12,23 86:3
86:6 124:12,13
124:19 132:13
148:8 158:9
159:3,6,13,15
160:7,9,15,23
161:5 163:12
164:8 166:7
169:3,5,9
170:4,6 171:14
172:7 173:16
174:1,2,7
183:13,18
184:16 185:13
185:16,23,23
187:5 189:8
190:19 194:23
195:5,19
196:18 198:23
199:12,12,15
200:11 203:6,9
203:13,15
205:10,16
206:5 208:23
209:2,3,6
223:20 226:13
226:21 227:5
227:17 228:7
228:14,17,20
228:21 230:16
230:18,21,22
234:10 238:6,6
260:12 264:11
264:14 267:20
281:18 284:10
284:15 286:20
287:9 307:2
309:2 311:3,4
342:1 343:21
345:1,8,9,10
350:8,9,23
**doctor** 102:11
189:11 204:21
206:15 316:7

**doctors** 52:7
68:22 118:5
204:20 362:9
**doctor's** 361:18
**document** 3:8
3:11,21,23 4:2
4:4,13,14,23
5:2,6 125:19
126:1,16 157:6
192:12,15,23
211:23 239:3
259:8 269:7
270:9 273:4
274:6 277:21
279:10 283:15
283:20 289:15
289:16 291:16
292:2,18 293:1
298:14 299:4,6
299:11 301:20
302:14 305:3
305:13,18,20
307:20 308:18
309:20 310:18
314:17 318:13
318:22 326:9
330:2 333:2
346:18 350:11
356:13 357:20
358:22 360:5
**documentation**
292:12 337:5,7
**documented**
351:6,17
**documents**
121:13,22
262:5 273:12
330:9,15 360:3
**dog** 119:11
150:6,6,10,16
151:1,5,9,13
151:19,22
152:12,13,19
153:10 154:6

168:5
**dogs** 105:2
243:17
**doing** 10:1,16
20:20 25:10
55:8,9,17 61:8
62:3 66:14
75:5 81:17
89:8 113:18
119:10,14,15
119:18 131:8
135:2,3,14
138:9 140:4
145:21 152:8
162:16,18,21
162:23 163:7
167:5 179:3
182:3 184:10
194:5 233:9
239:14 241:13
242:3,4 243:7
243:8,21
244:10 260:11
260:11 280:11
282:7 311:20
336:13,14
339:16 344:9
351:13 364:1
**dollar** 32:3
40:17,18 41:6
43:1,20 60:21
61:22 63:7,23
64:3,18 65:23
70:17
**dollars** 49:18
64:22,23 66:3
345:13 353:12
354:23
**door** 153:7
154:3 234:7,23
235:4 241:16
242:15 244:21
245:3 248:1,6
250:17 272:21

| | | | | |
|---|---|---|---|---|
| 344:1 | 260:14,15 | 91:12 92:12 | 357:4 363:12 | 358:17 |
| **doorway** 246:6 | 267:10 275:6,8 | 100:9 101:10 | 365:3 | **elaborate** 25:6 |
| 250:11 | 275:16,19 | 106:15 121:16 | **early** 120:7,7,11 | 197:7 288:6 |
| **doth** 31:21 | 276:4,8,16,20 | 125:20 165:23 | 190:12 280:21 | **elaborates** 187:5 |
| **doubt** 222:12,16 | 277:2 278:9,13 | 194:12 197:11 | **earth** 21:7 | **eleven** 37:16 |
| 265:21 295:7,8 | 278:19 279:23 | 197:17 202:10 | **easily** 204:12 | 41:7 62:17 |
| **downtown** 27:9 | 280:17 281:10 | 202:16 203:22 | 313:14 | 262:23 |
| **Dr** 3:12 13:7 | 282:6 284:16 | 226:5 237:8 | **East** 204:22 | **eliminate** 31:13 |
| 57:23 69:18 | 296:13 297:23 | 245:21 289:9 | **EASTERN** 1:3 | 277:7 322:8 |
| 72:16 85:10 | 311:3 322:9 | 305:5 310:17 | 6:3 | **eliminated** |
| 121:6 126:18 | 328:17 338:17 | 321:5,10 322:3 | **easy** 60:22 | 170:20 |
| 127:18,22 | 340:14,17,21 | 329:4,21 | 139:14 151:6 | **eliminates** 67:5 |
| 128:1,3,8,12 | 349:19 357:10 | 331:11 350:16 | **eat** 10:3 32:2 | **ELMORE** 368:3 |
| 128:23 129:3,7 | 360:23 361:5 | 352:23 360:16 | **eating** 72:10,19 | **embarrassed** |
| 129:11,13,16 | **dream** 104:5 | 360:23 361:5 | **Ed** 360:23 | 242:2 252:5 |
| 129:18 130:1 | **drink** 116:8 | 362:20 366:23 | **educational** | **embarrassing** |
| 130:18,18,20 | **drive** 21:20 | **Dyess's** 3:8 4:11 | 13:19 15:19 | 244:11,15,17 |
| 131:5,14,18,18 | 42:16 168:3 | 76:15 | 16:19 | 244:18 354:7 |
| 132:3,5,9,19 | 181:3 220:17 | **dying** 53:2 | **EEOC** 4:19 | 354:16,19 |
| 132:22 134:4 | 230:2 324:17 | **D-A-W-E-S** | 61:15 201:23 | **emergencies** |
| 134:14 154:9 | 324:20 | 41:2 | 350:13 | 348:22 349:5 |
| 157:9 159:15 | **driving** 95:8 | | **effect** 2:5 33:1 | **emergency** |
| 161:1,4,5 | 285:20 335:4 | **E** | **effective** 151:20 | 160:4 162:3 |
| 166:3,11,12 | **drop** 114:11 | E 3:2 29:14 | **effectiveness** | 294:19 300:14 |
| 168:14 169:7 | **dropped** 115:19 | **earlier** 53:5 | 150:19 | 323:9,23 |
| 169:14,22 | **drowned** 58:16 | 56:20 57:6 | **eight** 49:18 | 335:11 347:3,4 |
| 171:14 172:3 | **drug** 11:9 | 68:6,21 70:19 | 262:22 315:13 | 347:4 348:13 |
| 173:21 183:6 | **dryer** 241:20 | 75:1,6,18 77:4 | 327:20 | 348:13 |
| 190:9 191:22 | **due** 89:23 | 77:15 78:7,14 | **eighteen** 15:11 | **emotional** |
| 193:4 196:23 | **duly** 7:14 | 80:12 86:19 | 15:12 62:16 | 328:10 |
| 197:9 200:14 | **duplex** 182:8 | 93:7 96:11,17 | **either** 25:15 | **employed** 11:1 |
| 200:15,16 | **duties** 44:14 | 97:23 100:19 | 30:4 38:16 | 11:21 40:13 |
| 202:9 204:21 | 47:3 49:9 63:9 | 103:7 104:17 | 48:2 68:8 79:3 | 48:10 51:23 |
| 204:22 205:3 | 212:13 213:15 | 134:6 137:22 | 85:14,14 88:7 | 92:7,13,18 |
| 205:19 206:17 | 213:17 234:17 | 144:11 147:11 | 99:3 160:14 | 94:15 305:16 |
| 207:18 208:18 | **dutiful** 363:12 | 148:5 152:9 | 164:6,17 183:9 | 333:5,18 |
| 209:2,11,22 | **duty** 210:17 | 161:15 169:4 | 230:7 233:9 | 356:17 |
| 212:19 214:3,5 | 213:10 | 176:5 181:20 | 242:13 244:20 | **employee** 32:1 |
| 214:8,14,16,18 | **Dyess** 1:6,16,22 | 183:14 184:1 | 248:17 250:14 | 66:12 108:21 |
| 214:19,22 | 6:6,16 7:9,13 | 225:4 228:22 | 250:15 267:19 | 109:3 112:12 |
| 215:4,7,12,13 | 7:19 8:1 9:6 | 229:16 244:3 | 275:3 276:11 | 113:11 122:14 |
| 215:17 221:8 | 10:21 11:17 | 287:6 305:23 | 277:3,11 | 123:7 133:8 |
| 227:20,22 | 13:18 68:6 | 319:9 321:22 | 315:22 336:3 | 151:13 152:6 |
| 228:5,15 229:7 | 82:18 89:17 | 334:21 341:9 | 341:8 342:19 | 154:9 159:10 |

160:18 161:12
161:15 174:16
174:17 177:6
186:17 189:22
191:23 195:3
200:22 221:6
225:21 259:20
266:14 267:5
267:12,23
301:14 322:21
323:5 324:13
328:14 342:13
342:18 352:9
355:22
**employees** 39:12
60:17 77:14
113:13 115:6
134:9 160:16
170:11,22
174:14 175:1
183:10 216:23
217:5,11 220:4
222:19 223:1
233:14 237:22
244:12 251:17
261:2 262:13
270:13 323:9
323:15 333:19
333:19 342:2
**employee's**
323:14
**employer**
189:16 329:15
342:2 350:20
**employers** 329:7
**employment**
68:11 92:6
122:8,11 123:3
138:4
**encapsulate**
21:2
**encounter**
273:16 286:11
314:12

**encourage** 98:3
98:19 116:10
118:11 175:20
178:23 316:5
**encouraged**
31:13,15 175:4
177:17 178:3,7
221:8 338:20
344:17
**encouraging**
20:17 116:17
196:19
**ended** 109:22
**enemy** 86:20,21
225:5
**English** 223:4
**enhance** 16:10
26:10
**enhanced** 16:23
**enjoy** 118:22
138:2
**entered** 181:1
245:11 279:11
**entire** 12:21
21:5 301:7,13
347:6 361:2
**entitled** 332:12
**entrance** 250:17
**envies** 361:13
**envious** 363:16
**environment**
31:17 32:16,16
75:17 87:18
146:14 147:17
147:19 153:15
153:17 175:6
177:10 185:21
198:17 217:8
220:21
**environments**
66:16,17 82:14
82:15,16
153:21
**environment-t...**

147:19
**envy** 361:7
**Equal** 123:2
**especially** 66:18
77:6 84:13
103:2,3,22
156:1 175:22
230:5 334:16
342:14 347:6
**ESPN** 40:1
**ESQUIRE** 6:19
**essentially**
259:12
**ethics** 229:6
364:18
**ethnic** 24:3,3
25:4,5,9,18
26:20,21
**evaluation** 89:19
203:23
**evangelistic**
19:16
**evangelistic-ty...**
87:13
**evangelists** 25:1
30:9
**event** 270:13
292:13
**eventually**
339:19 359:2
**everybody** 67:2
70:4,4 71:4
241:21 357:17
364:23 365:9
**everyday** 106:2
356:5
**everything's**
66:4
**every-now-an...**
29:11
**evil** 59:12
**exact** 32:21 33:4
36:12 41:3
52:21 56:15,16

159:8 166:21
170:5 180:22
280:6 308:5
**exactly** 54:12
70:9 71:3
74:23 80:5
90:16 92:9
95:10 116:12
127:4,12,14
128:14 133:15
147:10 152:7
156:20 167:4,5
181:12,17
186:5 199:14
201:15 216:1
222:9 249:7
264:17 281:12
286:19 308:2
314:22
**examination** 3:3
7:11,22 342:14
**examinations**
342:3,16
**examined** 7:14
**examples** 34:6
**excuse** 30:17
252:3 283:10
**executive** 173:21
200:16 276:6
279:23
**exemplified** 36:2
**exercise** 113:20
**exhibit** 3:8,10,11
3:12,14,16,17
3:19,21,22,23
4:1,4,7,9,11,13
4:14,17,19,20
4:21,23 5:2,5
122:2,4 125:1
125:4,5,9,13
159:12,21
161:11 162:1
167:21 192:3,6
192:9 193:12

196:17 202:4
205:8 206:8
207:6,9,12,23
210:12 211:15
211:17,23
213:22 214:2
214:15 216:6
234:17 237:4,7
238:23 239:2
261:9 264:2,5
265:8,11,22
268:9,11,21,22
269:15 273:17
274:10,13,19
276:11,12
277:15,16
278:22 279:2
281:16 288:11
288:13,15
289:12,20
290:14 291:12
291:14 296:23
298:9,11,19,21
299:1 301:19
302:5,8,9
303:1,4,7,8
304:14,21
305:9,12 317:3
317:5,6,8,10
318:17,19,20
321:4 326:5,7
329:20 332:18
332:21 349:1,2
352:11,14
356:9,12
358:19,21
359:16,18
362:16,19
**Exhibits** 3:6
121:10,14
236:13 275:4
275:22
**exit** 189:17
**Exodus** 86:11,21

# FREEDOM COURT REPORTING

| expectations | **F** | 326:8 | 29:15,18 45:20 | 287:11 340:19 |
|---|---|---|---|---|
| 210:7 | **face** 243:12 | **family** 46:19 | 48:1 64:2,13 | 357:14 |
| **expecting** 64:19 | 286:21 | 56:3 107:15,19 | 66:21,22 69:7 | **female** 81:5 |
| **experience** | **facing** 250:11 | 202:21 203:2,4 | 70:22 71:14 | 116:23 172:17 |
| 16:20 104:14 | 254:10 | 222:7 268:2 | 72:23 73:4,9 | 172:19,20 |
| 199:10 | **fact** 34:11 | 357:12 361:3 | 73:19 74:20 | 184:7,8 190:20 |
| **experiences** | 126:17 182:12 | **fan** 107:10 | 76:7 80:11,11 | 255:14,15 |
| 103:22 | 260:8 271:13 | **fans** 52:5 70:1 | 81:9 83:9,10 | **feud** 69:7 |
| **explain** 8:9 | 283:18 292:20 | 360:22 361:3 | 83:19 85:16 | **feuding** 168:8 |
| 60:10 103:5 | 299:23 330:10 | **far** 103:11 | 87:10 88:16 | **field** 102:6 |
| 198:3 217:3,7 | 357:2 | 127:13 129:19 | 95:17 111:7 | **fierce** 151:22 |
| 278:11 300:4 | **facts** 21:12,20 | 152:23 174:13 | 116:20 117:3 | **fifteen** 233:8 |
| 329:8 | 21:20 239:7 | 219:13 | 136:9 137:4 | 324:6 334:3 |
| **explained** 76:10 | 269:14 278:6 | **Farrell** 216:10 | 142:5 147:16 | 347:17 |
| 198:2,6 307:9 | 281:7 | 224:22 244:13 | 161:23 164:15 | **fifteen-minute** |
| 307:11 341:21 | **factual** 21:17 | 324:1 333:20 | 166:23 167:9 | 281:1 323:18 |
| 363:12 | **failed** 116:6 | 333:23 334:14 | 170:9 185:19 | 334:5 |
| **explanation** | 189:11 | **faster** 47:22,23 | 187:1 193:7 | **fifth** 299:22 |
| 269:11 278:4 | **fair** 9:15 14:15 | **father** 26:18 | 204:17 255:4 | **fifty** 18:14 49:15 |
| 292:17,23 | 64:14 111:8 | 267:17 | 257:13 258:9 | 358:12 |
| 293:15 363:8 | 125:3 170:12 | **father-in-law** | 274:14 290:9 | **fifty-pound** |
| **expound** 82:14 | 174:14 175:2,5 | 75:9 77:23 | 292:12 293:22 | 151:7 |
| **express** 182:1 | 310:17 354:21 | 138:17,21 | 306:4 311:7 | **fighting** 86:13 |
| 223:19 280:16 | **fairly** 154:12 | 139:3 145:12 | 313:11 314:14 | **figure** 101:6 |
| 306:6,10 | 320:15 | 309:15 | 341:7,13 | 155:16 211:7 |
| 361:12 364:17 | **faith** 18:8 24:9 | **favor** 57:8 | **feeling** 364:10 | 218:22 319:7 |
| **expressed** 21:18 | 25:16 61:1 | 326:14 338:17 | **feelings** 46:18 | **figured** 221:2 |
| 235:10,13 | **faithful** 27:22 | **favoritism** | 70:8 119:16 | **file** 52:2 61:11 |
| 311:4 | 96:20,20 | 340:22 | 142:17 182:1 | 66:12 73:23 |
| **extend** 132:23 | **faiths** 23:5 | **fear** 310:5 | **feet** 187:15 | 90:18 124:8 |
| **extends** 253:11 | **falling** 51:16 | **feasible** 147:18 | **fellow** 333:19 | 125:15 134:5 |
| **extensive** 193:11 | **falls** 46:20 | **feathers** 139:14 | **felt** 16:10 54:20 | 159:10 163:5 |
| **extra** 62:22 | **falsified** 267:2 | **February** 63:4 | 55:6,14 64:20 | 191:23 192:16 |
| 130:5 175:23 | **Falwell** 24:22 | 236:21 259:1 | 68:10 75:21 | 192:19 199:14 |
| 250:3 | **familiar** 36:11 | 264:6,15 | 89:21,22 | 202:1,1 207:16 |
| **extreme** 199:7 | 91:13,17,22 | 266:21 268:10 | 104:19 112:21 | 212:5 213:8 |
| **extremely** | 121:19,21 | 268:12 309:23 | 116:15 117:18 | 229:14 266:14 |
| 357:18 | 122:20,23 | 314:23 | 129:4 163:16 | 267:12,23 |
| **ex-football** | 123:21 125:8 | **federal** 7:4 | 164:14 165:14 | 282:14 287:16 |
| 361:1 | 237:11 239:22 | 331:3 352:19 | 165:18 166:16 | 289:6,10 |
| **eye** 180:14 | 249:23 274:18 | **FedEx** 230:4 | 167:23 179:8 | 302:19 322:2 |
| **eyes** 313:1 | 297:6 311:13 | **feedback** 194:12 | 180:8,8 182:9 | 328:14 331:19 |
| **e-mail** 39:6,9,14 | 318:21 322:11 | **feel** 10:21 26:7 | 187:1 191:13 | 331:21 344:20 |
| 39:17 | **familiarize** | 27:23 28:15 | 207:1 229:11 | 345:2 350:12 |

# FREEDOM COURT REPORTING

351:4 352:18
352:20,23
353:6
**filed** 51:11
201:13 261:1
262:11 288:16
302:17 304:8
318:9 331:6,7
332:22 353:4
**files** 159:9
**filing** 2:9 124:13
201:17
**fill** 47:19 150:15
226:19 294:20
311:22,23
339:2
**filled** 302:10
312:3 335:14
338:12
**filling** 312:2
**final** 196:16
354:4 356:1
**finally** 209:8,10
220:10 247:17
315:12
**find** 60:21,23
159:8 160:20
195:7,23
203:18 223:5
224:14,17
229:17 248:19
261:16 289:11
325:16 343:10
350:19 360:3
**finding** 87:12,12
276:3 292:2
**findings** 355:11
**fine** 9:16 10:19
64:12,16 65:13
65:17 66:4
67:21 136:20
175:19 194:16
219:15 330:5
**finger** 259:10

**fingers** 254:11
254:14 256:20
**finished** 50:23
186:7
**finishes** 123:19
**fire** 310:2
**firearms** 106:22
**firm** 61:1 153:2
**firmness** 53:14
**first** 7:14 57:22
100:4 108:21
109:5 110:12
110:21,23
135:6 140:15
143:6 149:4,9
149:10,12
151:17 156:5
158:19,20
159:3,5,5
166:6 171:7,21
174:23 175:10
176:5 179:7,19
181:7 183:18
187:2 188:23
190:15,17
192:11,14,22
212:16 227:4
234:11,22
239:1,8 253:19
296:5 304:6
306:3 307:5
309:2 310:19
333:7
**Fisheries** 109:10
109:11,17,19
110:5
**fit** 25:13 57:23
338:19
**five** 39:10 44:5
44:10,18,21
49:21,23 61:4
110:2 120:14
132:22 150:2,4
151:16 258:14

262:8 278:16
292:4 331:2
355:17
**fix** 114:4
**flip** 121:16
327:20 330:19
**flowing** 144:5
**Floyd** 13:10
225:8,15
233:14 270:12
270:15 306:4
333:7,11,15,17
334:1 337:7,16
339:10
**focus** 202:15,23
256:14
**folks** 28:18 66:6
**follow** 31:15
40:6 53:20
248:2 344:17
**followed** 52:12
52:13 76:8
78:7 153:19
272:20
**follower** 28:21
**following** 7:11
68:10 94:2
167:22 231:6
231:17 273:20
285:18 286:10
335:1 347:22
**follows** 7:15
69:22 70:14
123:17
**follow-up** 88:15
252:7
**follow-ups**
139:6 190:4
**food** 43:21,22
44:9,14 45:5
46:2,5 72:9,19
119:11 150:6,7
150:10,16
151:1,5,9,13

151:19,23
152:12,13,19
153:10 154:6
168:5
**foot** 139:9
253:14
**football** 52:8
135:20,22
354:11 361:5
362:10,13
**force** 2:5 33:16
171:11 188:9
267:4 314:3
**forced** 171:4
188:2 199:4
341:22 354:5
**forceful** 143:21
218:3
**forcibly** 200:4
**forcing** 343:17
**foregoing** 7:5
368:7,11
**forestated** 33:7
279:21 283:6
286:20 287:6
303:20 357:4
**Forget** 308:17
**forgot** 181:8
312:22
**form** 3:22 4:7
132:2 302:10
346:20 368:10
**formal** 16:15
332:11
**formerly** 14:7
**forming** 132:1
**forms** 288:21,23
331:12,12
**forth** 20:3 21:19
124:10 193:15
213:16 293:9
**forty** 63:15,23
119:22 200:20
335:15 358:12

**forty-five** 18:1
323:5 335:16
**forty-six** 18:1
**forums** 40:11
**forward** 48:13
**found** 54:12
84:6 108:16
144:8 199:20
200:21 262:7
343:3
**four** 14:1 35:13
93:8 110:2
120:14 150:2,4
151:16 166:13
247:3 308:8
316:20 330:20
**fourth** 246:4
**four-year** 16:17
**frame** 226:16
**frankly** 344:2
**free** 274:14
**frequent** 104:23
**frequently** 50:20
241:21
**Friday** 185:6
210:17 294:13
294:15 299:13
335:19 347:12
**friend** 80:18
87:19 115:18
141:9 221:9
358:14
**friendly** 88:5
115:18 145:23
**friends** 135:23
168:22 219:14
220:16
**front** 12:6 56:12
58:5 212:2
216:22 217:5
251:6,7 270:21
270:22 285:16
286:5 299:7
313:8

# FREEDOM COURT REPORTING

**frustrated** 243:16 288:4
**full** 2:5 21:5 93:9 297:18 364:16,19 365:7
**fully** 193:8
**full-time** 109:3 122:10
**further** 2:1,8 327:1 368:16
**future** 229:12

**G**

**game** 65:16,21 65:22 67:10,14 69:2,17 80:13 80:19 88:1
**games** 118:22 135:21 181:5 361:5
**gay** 224:23 225:1
**geared** 67:22
**gears** 263:23 303:6
**general** 40:18 41:6 43:2,20 50:14 51:3 60:21 61:22 63:7,23 64:4 65:23 70:18
**generalized** 220:5
**generally** 36:20 222:22,23
**Genesis** 79:22
**gentleman** 363:16
**getting** 33:3 51:18 64:4,5 79:18 80:8 111:22 142:3 144:5 168:3

173:22 180:17 212:12,15 213:16,19 223:13 227:9 232:10 253:17 257:22 286:6 315:8 339:6,10 340:4
**gift** 64:18
**gifts** 36:2
**giggle** 223:11
**girlfriend** 114:13
**give** 26:11 32:3 37:19 47:17 48:22 64:21 83:1,6 86:18 148:7 170:23 187:18 207:9 213:6 221:4 238:7 241:8 298:22 312:3 312:18 313:21 314:6 344:13 353:23 358:7
**given** 7:18 12:11 89:20 122:7 208:5 209:14 209:16 211:10 212:6,7,10 213:1,18 278:12 313:15 330:16,17
**gives** 16:19
**giving** 195:23
**gloves** 239:19 241:4,4,5 244:1 246:9,10 246:13 247:7,8 248:20 249:5 249:22,23 250:2 252:12 252:13 253:21
**go** 16:4,5,5

19:17 26:2 27:18 28:10 29:15 32:2 39:1,18 45:15 46:17 60:4,8 61:9 65:14,15 65:21 67:1,9 67:13,18 69:1 69:11 73:18 76:6 89:18 93:9,12 94:19 95:13 96:1 98:2 99:10,19 99:21 105:7,21 106:3,3 107:23 113:9 114:7 127:17,21 128:23 131:15 131:15 132:19 133:18 135:20 135:21 136:7 136:19 138:2 139:13 149:8 149:15 154:22 158:2 165:20 167:7,8 169:18 171:5 174:6 180:4,5 188:3 188:9,16,20,21 189:18 190:1 193:20 199:13 201:23 202:7 207:3 217:10 217:19,20 226:10 228:16 231:17 232:14 233:1,3,11,17 233:18,20 234:1,1,3,3,7 234:20,22,23 236:21 240:4 240:12 241:23 242:16,16,22 245:3 248:13

256:10 263:14 264:1,3,9 267:4,22 272:10,19 283:21 292:11 295:15 300:19 306:15 316:7 323:10 334:1,6 335:7 341:22 343:5,18 344:15 345:22 347:13,14 354:5 357:16 364:5,6
**god** 21:6 25:12 26:2,13,14 28:12 29:22 30:4,11 34:4 35:1 53:17 57:2 72:13 76:12 78:3 79:4 81:15 83:11,12,13,16 83:16 84:2 85:20 86:12 91:20 97:12 148:22 178:21 225:1 357:3 363:13
**God's** 30:19 34:14,16 58:10 76:15 86:12,16 154:18,23 155:6,12 156:6 157:2 160:6 361:10
**goer** 29:11
**goes** 25:18,19 28:2 35:6 56:3 71:23 77:23 197:16 252:15 270:10 312:11 335:2 353:23 354:3

**going** 9:6 10:7 16:9 29:5,16 33:19 34:1 46:1 48:4,7 53:3 54:19 59:10 64:3,12 65:1,9 66:14 66:16 69:17 74:8 76:3,5 78:3 80:18 82:11 88:7 99:11,21 102:1 102:12,12,14 107:23 115:10 118:22,22 121:14 125:18 125:21 128:5 128:11 131:2 137:9,12 140:5 140:11 141:6,7 141:22 144:12 148:18,19 152:6,18 153:9 154:3,21 163:6 164:17,18 175:11 180:12 180:16,17 185:2 188:6,23 189:2 193:3,13 195:15 203:16 204:20 205:22 205:23 216:5 219:7 226:5 229:20,21 233:3 234:6,10 234:11 235:4,5 236:1 237:6 240:22 241:22 244:14 246:17 250:18 252:12 255:5,15 256:4 256:6 258:3 264:4 267:18 274:13 276:4

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

384

278:15,15
285:7 290:19
294:14 301:9
302:7 304:13
308:1 310:1
316:10 317:23
320:11 321:7
321:11 322:8
324:4 336:13
341:14 343:4
347:21 349:19
353:22 354:21
354:22 356:3
357:12 358:16
358:17 361:4
364:20 365:1
**Gomorrah**
79:21
**good** 8:1,2 10:22
16:19 35:18
53:14,17 91:1
162:9,17
184:17 217:11
225:21 278:10
296:18 301:14
309:17 324:13
340:13 350:3
361:9
**Gospel** 21:5,18
58:19
**Gotcha** 207:11
**gotten** 203:1
322:7 353:5
**governor** 227:22
**grab** 80:19,19
81:4
**grabbed** 88:4
351:7
**graduate** 69:12
**graduated** 14:18
52:6
**Graham** 24:22
30:7 36:9 83:4
105:16,17

**grammar** 223:7
**Grant** 335:12
**granted** 301:2
313:13 320:13
**great** 74:14
86:23 281:19
282:2 349:18
**Greater** 27:8,11
**green** 12:5,10
131:7
**grid** 95:15
**grievance** 3:22
4:7,13 123:16
124:5,9,9,13
124:20 236:23
260:23 261:13
261:23 262:2
262:12 278:21
280:19 282:10
282:14 288:16
288:19 290:9
291:4 292:9,21
293:18 294:22
302:10,17
317:16,17
318:3,5,8,10
344:7,8 347:21
355:5,11,23
**grieved** 288:20
**grips** 101:7
**grocery** 43:23
285:13 335:2
**group** 18:16
72:7,15
**groups** 18:15
40:10,11
**guard** 127:8
242:6 363:2
**guess** 7:21 34:19
42:11 43:14
45:3 50:2
70:13 99:3
108:10 149:19
178:14 187:22

192:19 218:21
246:4 248:8
286:14
**guessing** 212:1
**guidance** 26:9
146:16
**guilty** 361:14,17
**gun** 359:7
**gung-ho** 145:23
**guns** 107:5
**guy** 180:15
**guys** 178:19
319:7 365:21

---

### H

**ha** 342:17,17,17
**habit** 238:11
**habits** 227:11
229:6
**half** 14:4 15:7
16:9 42:7
48:15 134:20
205:16 348:6
353:12 354:23
**halfway** 246:7
**hall** 72:16
129:21 131:7
174:3 248:11
248:15 250:13
250:15,16
251:3 258:15
258:19 269:18
272:20 275:7
276:5 310:3,10
361:2
**Hamlin** 187:11
**Hammond**
119:1 345:12
346:15 348:20
349:8 355:3,15
**Hammond's**
345:16
**hand** 35:16
86:18,18,20

142:2 250:5,19
250:20 251:2,9
252:1 254:6,9
256:17,18,18
256:18,19,20
256:21,23
258:21 294:9
310:3
**handbook** 3:10
122:5,7 123:20
123:22 124:2
124:15,16
161:13 186:18
195:3 200:22
267:5,6 342:13
342:18 355:23
356:5
**handed** 208:6
211:12 313:16
**handing** 312:13
**handle** 53:6 55:4
55:5 68:3
219:5 348:13
349:21 350:15
**handled** 194:2
317:16 343:7
346:13 351:19
**handling** 295:13
348:9
**hands** 82:22
112:1 141:18
141:21 310:10
310:12,15
311:8 312:14
**handwriting**
297:3 302:23
303:1 305:7
**hang** 52:23
65:22
**happen** 27:10
31:4 33:1,9,20
34:1,7,12,21
59:10 61:14
67:4 71:1

127:13 145:6
147:5 148:4,11
148:18,20,20
148:21 154:21
155:3 274:2
**happened** 8:14
12:18 15:18
50:7 51:10,21
52:16 53:19
60:10,11 71:2
73:8 74:20,21
78:11 89:10
100:12 104:1,3
127:6,15
128:15 145:8
162:19 173:4
189:4 213:3
239:9 241:9
249:8 258:23
260:8,21 264:6
264:22 268:6,9
268:13 273:22
277:7 281:5
291:1 301:17
330:23 362:5
**happening**
22:11 136:11
144:22 199:6
229:3 230:17
264:21 268:5
271:1 308:13
**happens** 22:2
34:3 148:17
296:7 307:13
308:19,22
**happy** 201:8
345:14
**harassed** 55:6
**harassing** 285:4
349:22
**hard** 26:14
118:19 131:10
215:5 217:6,9
238:5 280:8

# FREEDOM COURT REPORTING

295:16 343:10
343:19,20
358:5
**harms** 307:14
308:19,23
**hat** 70:2
**head** 10:8,11
37:18 42:18
65:23 227:15
322:15 359:13
**heading** 248:13
**heal** 82:22
**healing** 85:18
**health** 204:22
206:16 328:11
**healthcare**
328:9
**hear** 77:8,11
187:23 188:11
191:4 350:2
**heard** 105:13
155:4 270:11
334:9,12
338:23 339:1
**hearing** 261:1,9
261:23 262:12
262:18 263:5,8
263:16,20
278:21 290:5
290:16,21
291:8 292:21
318:5,10
**hearsay** 51:19
69:15
**heart** 188:12
217:15
**heartbeat** 137:4
142:5 311:8
314:14
**heated** 152:22
161:10
**heaven** 21:10
**Hebrew** 91:19
**held** 33:13 41:9

43:1,3 86:17
86:18 105:4
114:10 190:6
312:14 313:22
**Helen** 340:14,22
340:23 341:3
**help** 10:17 44:15
47:5 60:9
202:18 221:5,6
221:9 238:21
262:4 274:6
278:10 324:14
345:8 348:14
349:6
**helped** 203:6
**helper** 44:16
**helpful** 158:19
204:1
**helping** 202:15
229:18
**helps** 104:8,9
**Helton** 90:12,13
90:13 91:4
357:22 358:6,7
**Henderson**
220:8,13,15
221:20 223:23
224:4,22
233:15 244:12
333:20
**heterosexual**
81:18 83:23
**hey** 107:22
139:7 205:3
264:10
**he'll** 140:6
**hi** 135:1,1
141:11
**high** 14:1,2,10
201:19
**higher-up** 129:2
**highlight** 74:3
**highly** 88:11
238:18

**Hill** 62:10 98:16
99:4 100:7
**Hinn** 30:9
**hire** 118:10,13
**hired** 47:18
120:22 338:11
**hiring** 112:9
118:11
**historic** 21:11
**history** 61:4
**hit** 189:2 300:12
**Hittites** 86:14
**Hoerlein** 269:18
**hold** 23:7 24:9,9
30:7 218:5
303:17 312:13
**holding** 314:18
**holdup** 208:21
**holidays** 316:3
**Holliman** 297:5
297:20,23
**Holly** 69:10 71:5
73:1 92:11
**Holy** 23:2 24:13
26:18 30:19
**home** 38:17,23
114:10,10
139:13 177:9
180:6 195:10
195:17 196:11
231:5 253:20
315:3,13
336:14
**homosexual**
80:4,6 82:4
83:19 84:11
87:5 88:17,21
89:5,8,9,11
**homosexuality**
78:17,20
**honest** 15:21
51:14,14,16,20
52:15 66:21
118:10 175:7

221:10 300:10
320:15
**honestly** 50:8,23
121:8
**hook** 191:15
**hope** 15:4 289:7
**hopefully** 36:11
**hospital** 110:8
110:11,15,17
110:21 111:3
**hospitals** 72:2
**hostile** 32:17
34:10 66:16
82:14 139:17
147:18 153:15
217:8 218:2
220:20 271:17
360:18
**hot** 152:22
**hour** 49:15,18
49:21 63:8
87:1 293:7,8
315:12 336:4
345:13 347:11
348:3,7,10
**hourly** 63:6
296:17
**hours** 62:15,16
62:22 63:1,15
63:23 69:16
119:20,22
120:3,10,10,15
128:19 130:2,4
130:5 132:6,23
200:20 210:13
210:22 211:2,4
262:19,21
286:7 290:16
293:6 312:19
323:18 324:18
334:18 336:21
**house** 88:2
157:23 162:14
180:9 182:7,21

286:22
**HR** 282:17
283:21 304:17
**hug** 80:22
235:16
**hugged** 88:4
**huh-uh** 10:15
259:3
**human** 58:12
85:3 87:2 89:6
146:9 159:15
160:9 161:7
169:6 174:13
186:19 187:11
226:13 266:17
266:22 267:3
281:17 283:13
288:17 294:11
295:4 302:11
338:13 339:1
**humanistic**
54:22
**humanly** 26:7
**humble** 364:23
**humor** 53:14
132:2 339:9
**humorous**
157:21 223:5
224:14,17
**hundred** 18:14
**hung** 59:1
**hurry** 255:20
324:19
**hurt** 301:9

_____

**I**
**ICU** 113:8
130:15 150:9
**ID** 316:20
**idea** 26:11 32:14
51:9 83:2
89:20 101:3,5
115:19 145:10
147:3 184:4

199:21 206:13
220:23 277:1
309:17,17
315:15 365:11
**ideas** 53:23 61:7
61:7 73:7
102:2 105:23
114:21 115:1
128:21,22
129:4 181:21
203:20 221:4
222:7
**identification**
121:12 125:2
192:4 207:7
211:16 237:5
265:9 274:11
288:12 291:13
298:10,20
302:6 303:5
305:10 317:4
318:18 326:6
332:19 352:15
356:10 358:20
359:17 362:17
**identified**
316:22
**identify** 288:20
328:1,7,22
**ignored** 245:21
**III** 1:16,22 6:16
7:9,13
**ill** 182:1 315:6
**illegal** 88:11
153:15 215:1
**IMC** 130:16
**immediate**
277:2 300:22
**immediately**
75:18 249:18
251:1,20 256:1
283:14
**imminently**
197:11

**important** 22:4
96:18 102:22
137:18 196:8
238:1 255:23
294:16 323:6
336:5 348:2
**impression**
257:15
**inability** 349:20
**inappropriate**
89:8 104:19
255:18 282:5
287:5 309:10
311:12 312:18
313:9 322:20
**inappropriately**
81:11 88:9
235:16,23
240:2 255:9,14
352:8
**inches** 253:12
**incident** 60:15
70:23 201:10
201:12 228:1
239:20 240:1,1
259:2,13 261:8
263:3 264:21
268:10,12
273:23 274:2
284:13 290:20
310:22 315:1
319:9 321:11
**incidents** 268:13
278:11 336:9
**include** 22:20
**includes** 364:3,3
**income** 329:1,6
329:12 331:3,6
331:7
**inconsistent**
73:19
**incooperative**
196:6
**incorrect** 224:17

320:22
**indicating**
134:18 207:20
250:10 251:5
253:8,9,13,16
281:7 307:8
313:7
**indirectly**
145:16 146:5
**individual** 28:20
68:20 103:9
148:16 182:18
199:8 202:11
333:3
**individualize**
220:6
**individually**
312:4
**individuals**
83:12 198:15
240:11
**Infirmary** 5:5
51:22 52:3,8
52:14,20 53:8
54:5 68:22
69:9,9 71:1,7
71:22 72:22
73:2,15 74:13
74:20 75:20
76:8 77:4 78:7
78:11 89:18
92:6 93:12,14
93:21 309:5
356:17 362:20
364:4,6 365:5
**influence** 11:8
88:23 222:11
222:15 340:14
**inform** 186:9
331:10
**informal** 304:8
**information** 4:2
199:13 342:5
**informed** 129:14

130:21 131:6
205:7 229:3,4
230:23 280:13
282:9 284:11
287:7,8,9
348:16
**informing** 135:9
152:9 195:1,6
203:15 231:16
231:20
**initial** 85:9
150:2 169:8
171:13 284:14
311:2 325:14
350:17
**ink** 193:23
**input** 345:16
**inquire** 205:20
**inquired** 206:14
**inside** 20:19
77:10 251:10
**inspired** 26:13
26:16,16
**instance** 64:17
70:12,23 71:22
80:20,23 86:10
114:3 131:17
231:7 232:14
267:9,14
**instances** 12:2
25:22 266:10
293:9,10
295:20 340:18
**instantly** 348:8
**instructed**
126:18
**insult** 87:8
**insurance**
187:22
**intact** 98:7
**integrity** 362:14
**intended** 36:23
**intent** 56:13
**interact** 98:14

220:17
**interested**
143:16 368:18
**interface** 21:20
**interfering**
105:23
**interject** 57:17
224:16
**interjected**
174:20
**International**
23:11
**Internet** 27:2
39:20,23
108:12,16
338:13
**interpret** 26:15
**interpretation**
33:9 148:3,10
155:19
**interrogatories**
4:18 326:17
**interrupt** 136:18
**interrupted**
187:6
**intervene** 161:9
**interview**
223:21 340:1
**intimate** 112:22
306:20
**introduce** 146:4
176:13
**introduced**
145:10 147:3
148:15 161:6
174:9,10
185:15
**introducing**
176:9
**introduction**
186:6
**invent** 128:21
131:16 153:14
**invented** 32:5

128:22 229:15
**inventing**
229:14
**inverness** 46:19
**invite** 19:21 20:2
**invited** 114:5,9
**involved** 64:17
65:19 67:7
80:17 81:20,23
98:19 101:1
114:17,18
115:14 119:16
179:3,10
**involvement**
46:19 106:7
**involves** 219:2
**involving** 4:23
147:12 160:23
307:12
**Israel** 54:17
86:13,19
103:17
**issue** 51:12 60:4
149:19 160:2
163:13,13
264:20 281:19
301:8
**issued** 302:19,20
**issues** 31:12
59:4 161:21
166:1 202:22
203:2,5 267:17
268:2 284:20
**item** 152:13
**items** 252:11
**I-65** 43:14,16
94:12,13

_____
**J**
**J** 5:3
**Jakes** 24:23
**James** 23:7,12
24:13
**January** 20:8

45:1,2,3
**Jarita** 359:22
360:4,13,19,23
**Jason** 168:22,23
169:12 176:8
177:12 178:11
187:23 188:10
191:3 363:22
365:19
**jealousy** 60:17
361:6
**jeopardy** 51:7
158:6
**Jerry** 24:22
**Jesus** 21:6,18
22:13 35:13
53:1 58:4,11
83:7 85:19
309:12
**job** 31:14 41:8
43:3 44:14
45:10,18 47:3
47:22 49:9
51:6 60:22
62:4 63:10
65:11,13,18,22
67:7,10,13,20
70:20 88:7,10
90:21 93:14
95:6 98:5
107:9 108:2,8
108:16 109:23
114:8 119:15
139:13 145:2
146:1 158:2,5
162:10,17
174:15 199:6
207:4 210:7
223:22 295:14
339:19
**jobs** 43:1 51:16
53:19 60:21
61:4 65:2 96:6
134:15

**John** 1:6,15,22
6:6,16 7:9,13
66:13 67:12
70:5,6 75:1
76:15 82:18
83:2,3 115:20
117:11 126:17
127:19 131:6
135:1,1,15
141:12 154:2
158:2 160:11
168:7 217:21
233:5,6 241:13
242:3,4 243:2
243:3,7,8
244:22 245:10
267:16,16
268:1,2 269:17
269:19 270:21
271:3,8 272:10
272:19 273:8
275:8 279:11
279:15 281:7
281:10 297:5
297:20 305:5
306:19 321:5
338:7,8 341:6
350:16 360:16
**Johnson** 173:17
173:17,20
200:16 276:7,7
276:22 280:1
315:6 322:10
322:13 323:1
323:12 324:2,9
335:23 348:7
**Johnson's**
280:22
**John's** 83:7
217:17
**joke** 224:15
**joking** 190:2
**Juanita** 359:21
**Judge** 102:18

353:23
**judged** 189:21
**judgmental** 29:3
**juices** 144:5
**July** 94:2 158:13
158:14
**jump** 68:5
250:20
**jumped** 78:5
250:21 254:18
**June** 126:2,13
150:5 151:17
153:12 159:11
193:4,5 213:20
226:8 284:12
284:13 306:23
309:3 319:3,6
319:12 341:19
350:17
**Junior** 109:12
110:11,21
111:1 112:20
113:3,7
**justified** 348:3
**justify** 246:18
272:8,16
350:21

_____
**K**
**keep** 40:8 65:2
66:5 178:22
180:14 219:9
229:20 230:11
255:16 266:2
323:13,16
324:18 330:22
336:1
**keeper** 323:4,4
**keeping** 199:16
203:16,17
229:2,14
231:11 236:11
365:21
**Kelley** 317:12

318:23 319:3
319:11 321:1
341:17,18
342:1 343:13
351:2
**Kelley's** 320:18
**kept** 105:9
115:20 116:17
137:17 139:21
140:18 195:21
195:22 199:16
239:13,16
240:17 245:22
247:13 300:15
**Kern** 204:22
**key** 168:5 180:9
230:12 240:11
242:19 245:4
**keys** 242:11,12
**kid** 312:21
**kin** 368:17
**kind** 8:6 11:13
27:15 35:21
39:22 44:16
50:21 52:13
59:15 62:5
66:6 68:23
69:21 74:7
75:17 81:2
82:15 87:6
90:4 101:4
102:11 107:1
109:2 110:17
111:21 113:2
114:12,14
115:19 119:6
133:1 143:1
152:21 157:21
165:21 172:14
175:7,8 181:3
201:18 202:1
206:15 219:12
219:12 222:17
225:18 235:7

# FREEDOM COURT REPORTING

236:10 262:5
265:1,2 307:23
342:15 361:12
**kinds** 16:18 34:7
114:21 115:1
**King** 23:7,12
24:13
**kiss** 88:8 286:21
336:23 351:8
**kissed** 105:5
235:15
**knew** 51:6 75:7
78:10 124:8
139:2 150:12
152:11 200:14
200:18 211:4
221:11 222:7
245:5 251:19
315:4 316:16
316:21 347:20
**knives** 107:5
**knocked** 187:15
**know** 9:8,23
11:4,5 13:18
13:20 16:22
18:13 19:22,23
19:23 20:22
21:13 22:15
24:15 25:13
26:19 29:8
31:2 32:8,23
36:15 38:3,5
45:17 46:4,7
50:8,19 51:11
51:23 53:20,21
55:2,21 56:1,2
56:8,15 57:11
60:7 65:15
67:19 69:2,14
69:16,18,18,20
69:21,23 70:3
70:5,5,6 71:3,3
71:4,10 73:10
73:11,23 74:9

75:16 76:2
79:7 80:5 81:1
81:12,14 82:7
82:9,9,20 84:4
84:12 85:1,2
89:5,11 90:23
92:3,3 98:11
99:15,23 100:4
100:6 101:3
102:23 106:9
112:13 114:5
114:16 115:9,9
115:11,17
116:5,13,15,19
117:7,23 118:8
118:20 119:4,6
124:17,18
131:16,21
132:2 135:5,8
135:16,16
136:1,21 137:4
137:6,20,23
138:5,6 140:18
141:9,17,19,20
141:22,23
142:2,20
143:15,18
144:3,7,16
145:17,22
151:3 153:17
154:17 158:3
161:12 164:7
167:4 169:2
172:11 173:18
174:8,11
177:14 178:7
181:5,22,23
182:16 185:15
188:1,4 196:20
197:20 199:11
199:14,19
200:18 203:4
204:8 206:9
208:21 213:23

214:22 218:7
219:11,12
220:15 222:4
223:17 226:1,4
228:12 229:17
236:2 242:20
243:17 244:4
244:19 248:5
249:11 250:6
250:15,19,22
251:15 252:3
255:11 262:2
285:22 289:13
289:18 295:6,9
295:14 299:23
301:16 311:11
311:13 313:17
313:18 314:4
315:7 316:17
323:8,21
331:16 338:5
338:20 347:2
347:16 354:7
359:9 361:12
362:12 366:9
366:16,21
**knowing** 81:14
129:1 267:5
**knowledge**
329:18 338:1
**known** 53:8
66:19,20 79:14
129:16 168:11
296:9
**knows** 70:4,4
82:18 181:19
279:15
**Kool-Aid** 116:7

**L**

**L** 1:12 6:19
**lack** 14:20
**ladies** 184:9
293:18

**lady** 85:3,12
86:1,6,7 87:2
145:23 181:4
**lady's** 85:7
**Lakeview** 96:15
96:23 97:7,10
98:7
**landlord** 300:18
**language** 245:7
306:17 337:20
**large** 134:17
241:4 242:1,9
246:2 248:12
250:3,3,3,13
256:6 275:14
296:16 368:6
**lasted** 43:7
47:14 109:19
255:7 262:18
**Lastly** 202:21
203:21
**late** 120:7,7
179:12 218:9
218:12 231:5
301:2,16 323:5
323:23 347:10
347:15,17,18
348:14,18
**lateness** 335:19
**latex** 241:5
244:1
**laugh** 223:11
224:9
**laughed** 88:3
224:6,10
**laughing** 190:2
224:13 244:14
**laughter** 342:15
**laundry** 236:22
**law** 54:2 74:12
147:18
**lawful** 8:12
**laws** 2:6
**lawsuit** 8:14

53:22,23 101:1
113:16 201:14
201:17
**lawyer** 61:18
350:13
**lay** 77:12 82:22
**laying** 79:23
**leader** 86:12
**leadership**
146:16
**leading** 26:9
292:13 314:2
**lean** 183:11,23
237:22 287:12
294:23 311:14
313:5
**leaning** 104:18
225:22 311:10
**learn** 108:2
**learned** 156:2
365:4
**learning** 16:20
**leave** 4:1 95:16
102:18 117:11
151:9 158:12
168:2 175:12
175:16 176:4
177:8 184:19
185:2 213:21
219:13 233:17
247:16 248:1
279:2 323:10
334:6,16 336:4
336:20 346:20
348:6
**leaving** 209:9
271:12 360:12
**led** 26:17 73:21
114:14 236:23
**Ledbetter**
109:12,23
110:11,22
111:1,8,12
113:4,7 120:21

234:15 338:10
**left** 185:7 239:17
247:17 253:10
256:18 299:14
**legal** 8:12,15,15
40:3,4 79:16
199:21
**legally** 65:4
**length** 86:23
253:15 261:9
281:19 282:2
290:21 336:11
349:19
**lengths** 333:21
**letter** 4:9 134:2
194:11 210:5
210:23 211:10
211:11 226:6,8
226:12 229:6
265:2 283:7
287:15 289:3,5
303:9,12,21,23
304:2,4,5
320:18 325:11
325:13 340:2
344:5 347:20
350:1
**letters** 250:3
268:1
**letting** 55:2
**let's** 20:7 37:10
41:16 44:8
53:5,13,15
61:21 65:21
72:21 73:3
75:13,14,14
95:4 102:21
106:14 111:4
115:12 121:13
123:13 133:18
138:2 149:15
157:5 169:16
202:4 219:13
219:14 226:16

236:21 239:7
240:4 245:6
253:5 254:1
261:22 263:23
265:10 269:21
272:10,19
274:3 278:6
289:2,7,8
291:21 304:9
325:18 352:10
353:3 354:13
**library** 39:2,4
39:19
**licensed** 27:5,6
56:23 96:17
97:5,14 307:18
**lie** 344:4
**lied** 275:18
276:20 341:18
342:1,11,15
**life** 15:19 21:8
21:21 22:1
37:20 51:4
53:12 89:1,23
105:9,19
140:19 154:16
167:8 194:22
196:4 204:14
221:15 335:12
**lifestyle** 25:14
199:9
**light** 219:20
**liked** 338:15
**likes** 114:12
**limits** 245:1
**Linda** 173:17
276:7 322:10
322:13 323:1
335:23
**line** 60:9 136:1
286:6 334:4
**lines** 114:11
**list** 39:12,12
322:1,4,7

325:17 326:16
333:2 336:10
338:7
**listed** 278:7
293:10 333:19
**listen** 200:14
219:6 228:16
278:15 341:9
341:10 343:22
357:11
**listened** 290:10
290:11,12
343:19
**listening** 72:13
72:20 282:6
**listing** 108:8
294:4
**little** 9:13 13:18
13:21 28:8
31:1 38:23
47:21 60:17
74:5 110:15
114:11,12
120:5 134:12
134:19 139:17
173:10 174:3,4
216:15 262:6
263:23 308:1
312:21 330:2
**live** 21:21 22:1
24:14 32:10
39:4 53:15
68:4 84:19
153:17 154:16
**lived** 21:7 25:21
69:1,1 366:17
**lives** 53:12 75:11
105:17
**living** 21:13 29:1
84:21
**load** 230:3
**loaded** 249:1,2
**loading** 47:11
252:10

**locked** 240:18
240:20 248:5
**log** 236:10
**long** 15:6 17:19
27:22 28:11
34:8 41:5 42:4
44:3 48:11
62:12 82:11
90:18 94:15
95:2 111:1
115:9 120:16
148:14 163:8
168:12 171:1
180:2 195:21
197:7 199:17
203:17,18
253:14,15
254:19 257:2
262:17 290:17
**longer** 100:18
185:8 196:1
**look** 39:23 103:4
112:10,15
121:13,15
125:7 143:13
157:5 172:19
175:2 185:20
192:5 202:4
207:10,19
211:19 237:9
239:1,7 243:12
245:6,9 246:12
248:23 249:21
249:23 251:11
252:8 265:10
265:12 268:8
268:11 274:15
275:16 278:6
288:14 289:10
296:22,23
299:19 303:18
304:6 305:2
309:19 312:4
312:10 314:5

317:21 318:19
319:22 321:3
327:18 328:20
329:23 333:1
352:11 355:17
360:13 364:20
**looked** 12:3,7
143:4,10
178:21 272:4
274:16 318:4
346:18 348:20
351:20
**looking** 40:3,4
142:7 159:7
223:14 233:7
239:12,16,17
241:2 244:1
245:22 246:14
247:4,6,16
249:22 250:2,4
251:23 259:6
261:12,15,21
264:1 299:22
301:18 307:3
310:18 320:3
327:11 328:5
**looks** 164:11
167:13 273:6
273:10 326:16
**Lord** 31:21 36:2
54:13,17 55:3
59:12 72:11
77:1,13 88:6
91:20 97:12
104:5 164:18
309:7,12 357:6
**Lord's** 34:16
35:1,2,7 56:21
56:22 57:2
**lose** 175:21
301:11 315:21
316:4 362:11
362:14
**lot** 22:16,17 26:6

| | | | | |
|---|---|---|---|---|
| 51:16 52:1,2 | **lunch** 10:1,2 | 346:5,7 | 288:11 291:12 | 241:22 |
| 52:11 53:18 | 279:12 299:14 | **male/female** | 298:9,19 302:5 | **mean** 26:21 |
| 61:6 66:19 | 300:18,20 | 46:19 | 302:8 303:4 | 28:23 29:4 |
| 82:10,12 95:9 | 334:8 347:11 | **mall** 42:3 94:14 | 305:9 317:3 | 30:7 38:9 |
| 114:15,22 | 357:16,17 | **malls** 42:1 | 318:17 326:5 | 59:19 68:12 |
| 117:6 127:6 | **Lusche** 204:21 | **mama's** 312:21 | 332:18 352:14 | 72:17 73:12 |
| 128:20,22 | **lying** 81:9 | **man** 26:14 80:1 | 356:9 358:19 | 76:12 77:10 |
| 129:2 131:11 | 287:22 | 80:1,10 91:13 | 359:16 362:16 | 79:2 84:5,9 |
| 131:20 136:21 | **Lynn** 119:1 | 111:17 139:7 | **marriage** 83:23 | 86:10 87:3 |
| 140:18 142:18 | 187:11 345:12 | 142:8 143:15 | **married** 81:6 | 99:15 135:18 |
| 145:18 162:23 | 345:16 346:15 | 143:18 144:2 | 136:5,6 140:21 | 137:4,6 138:18 |
| 163:3,9 164:9 | 348:20 349:8 | 187:22 188:10 | **Martin** 85:5 | 144:6 155:14 |
| 165:20 174:21 | 355:15,21 | 227:15 255:10 | 281:22 285:1,2 | 170:2 183:22 |
| 179:11 183:2 | | 255:13 312:16 | 287:10,20 | 186:11 197:8 |
| 183:12,16,17 | **M** | 351:12 | 303:11 304:19 | 205:21 214:21 |
| 186:1,2 194:22 | **machine** 241:20 | **managed** 12:4 | 317:13 319:3,8 | 215:3 220:2 |
| 196:1,3 220:5 | **mad** 243:16,17 | 118:4 | 320:4,7 | 225:3 235:13 |
| 223:19 229:15 | **magazines** 107:5 | **management** | **Mary** 113:8,10 | 247:3 250:6,7 |
| 229:21 235:9 | **magical** 103:12 | 50:12 60:13 | 114:3,10,11 | 250:21,22 |
| 238:20 240:17 | **magician** 30:1 | **manager** 45:14 | 115:18,20 | 251:20 265:13 |
| 240:17 242:1 | **Mahler** 1:16 | 51:8 60:5 | 116:6,10,17,18 | 276:9 285:22 |
| 354:2,3,9 | 6:13 7:1 368:4 | 64:14 283:10 | 116:21 117:16 | 295:14 311:7 |
| 361:6,7,13,15 | 368:22 | 349:15,16 | 117:20 119:4 | 313:9 314:5 |
| 362:12,13 | **mail** 98:8 303:19 | **manipulate** | 119:21 120:2 | 324:3 339:11 |
| **loud** 10:11 55:22 | 324:21 325:8 | 103:14 | 121:7 179:6,9 | 342:10 348:22 |
| 138:12 143:19 | 327:4 | **manner** 368:18 | 180:19 181:14 | 353:9 |
| 143:23 152:23 | **mailed** 209:20 | **Manning** 43:21 | 237:16 340:5 | **meaning** 59:7 |
| 153:2 158:1 | 213:8 350:12 | **Manning's** | 340:23,23 | **means** 8:20 |
| 191:5 218:3 | 356:20 | 43:22 44:9,12 | 341:2 | 26:12 38:3,5 |
| 242:3 243:15 | **main** 74:2 | 44:14 45:5 | **master** 88:6 | 129:20 130:12 |
| 244:10 252:5 | 170:14 201:16 | 46:2 49:20 | 93:17 94:5,16 | 130:17 145:20 |
| **loudly** 200:4 | 201:19 230:17 | 68:9 | 94:19 | 159:16 160:8 |
| **loudness** 241:16 | 242:9 280:17 | **man's** 109:9 | **material** 12:3 | 187:14 197:20 |
| **lounge** 361:19 | **maintain** 70:19 | **March** 1:20 | 23:21 261:21 | 197:22,23 |
| **love** 65:9 118:21 | 115:5 200:8 | 281:3 286:14 | 342:3 | 198:2 224:19 |
| 153:20 177:15 | 364:18 | 286:14,18 | **materials** | 266:11 276:13 |
| 187:23 188:11 | **maintaining** | 304:7,14,23 | 261:16 352:22 | 280:13 288:8 |
| 188:13 191:3 | 31:16 | 320:8 367:3 | **matter** 45:19 | 309:17 327:7 |
| 272:13 363:17 | **major** 15:2,17 | **mark** 121:14 | 222:21 278:14 | 347:1 348:23 |
| **loved** 178:12 | 29:17 | **marked** 121:11 | 278:20 | 349:2 368:8 |
| 217:11,14 | **making** 268:20 | 125:1 192:3,6 | **matters** 23:19 | **meant** 49:12 |
| **low** 199:7 | 358:8 | 207:6,9 211:15 | **Matthew** 58:2,3 | 59:11 70:10 |
| **low-paying** | **male** 81:4 | 237:4,7 265:8 | 58:19 219:23 | 77:17 119:5 |
| 45:18 | 190:23 225:13 | 265:11 274:10 | **McDonald's** | 163:18 180:21 |

| | | | | |
|---|---|---|---|---|
| 198:7 212:23 | 166:3,18,22 | 355:16 | 75:18 78:14 | 303:11 317:13 |
| 213:6 215:2 | 167:21,21,22 | **meetings** 145:9 | 87:23 96:8 | 319:3,12 |
| 327:8 331:15 | 168:14,22 | 163:7 173:12 | 97:23 113:21 | **microphone** |
| 347:2 362:5 | 169:4,8,13,17 | 183:9 195:8 | 124:13 129:14 | 31:22 |
| **mediate** 160:17 | 169:22 170:3 | 203:12,12,13 | 129:17 131:9 | **middle** 1:2 6:2 |
| **mediation** | 170:18 171:7 | 260:10 275:3 | 134:6 138:14 | 9:19 288:18 |
| 159:16 | 171:13,17,19 | 276:2 284:12 | 143:3 163:20 | **mid-section** |
| **mediator** 161:8 | 172:3 173:4,5 | 284:12 319:23 | 166:2 167:16 | 251:9 |
| **Medical** 92:14 | 173:15 174:23 | **meets** 72:15 | 169:3,4,10,11 | **Mike** 275:14 |
| 92:19 | 175:10 176:6 | **member** 96:14 | 176:3 226:11 | **mildly** 198:20 |
| **medication** 11:9 | 176:12 179:8 | 97:11 98:9 | 273:18 287:17 | 198:21 199:1,2 |
| 11:14 204:9 | 179:19 181:7 | **members** 117:9 | 287:21 292:18 | 199:3,6,10 |
| **medications** | 181:10 183:5,7 | 179:11 263:8 | 293:3 338:16 | **mile** 77:9 |
| 204:1,6 | 184:6,12,14,19 | 290:10 311:21 | 339:4 365:19 | **military** 37:23 |
| **medicine** 204:15 | 185:5,5,6,10 | **membership** | **merely** 128:5 | 38:12 |
| 227:16 272:2 | 185:18 186:8 | 96:14 98:7 | 138:13 148:12 | **million** 170:22 |
| **meet** 57:22 | 189:9 190:6,8 | **memo** 3:14,16 | 152:9 153:10 | 353:12 354:23 |
| 69:17 99:16 | 191:12 195:16 | 4:21 208:1 | 165:19 | **millionaires** |
| 158:9 159:3,14 | 209:21 210:2,6 | 209:14,16 | **mess** 31:5 33:2 | 363:14 |
| 160:12,22 | 211:7,8,9,13 | 210:11 211:17 | 145:6 147:5 | **millstone** 58:8 |
| 166:7 172:7 | 211:21 212:19 | 212:4,5 214:7 | 148:21 | 58:13,23 |
| 173:13,18 | 212:23 213:3 | 265:2 363:9 | **message** 53:5 | 163:22,23 |
| 174:1 193:4 | 214:1,3,17,18 | **memory** 10:22 | 152:1 173:22 | **mind** 87:6 115:2 |
| 214:13 215:4 | 215:6,8,17 | 11:14,23 262:5 | **messages** 209:10 | 276:17 362:11 |
| 215:12 227:5 | 228:4,9,10,10 | **men** 26:14 30:11 | **messing** 135:8 | 363:6 365:13 |
| 275:5,6,8 | 228:11,13,19 | 65:14 79:14 | **met** 8:3 85:8,8 | **mine** 54:13 |
| 276:11,14,15 | 229:5,8 230:20 | 80:20 82:5 | 85:12,15 | 55:20 59:17 |
| 276:19,20,23 | 236:5 237:14 | **mental** 174:18 | 124:12 132:13 | 76:23,23 309:6 |
| 281:9 283:1 | 237:15 260:22 | 204:22 206:15 | 144:18 158:20 | 357:5 |
| 341:13 355:10 | 268:18 273:15 | 328:10 | 214:14,15 | **minimum** 49:22 |
| 366:2 | 275:12,20 | **mentality** 83:6 | 215:6 226:12 | 60:22 |
| **meeting** 4:15 | 276:1,5,17,21 | 87:15 171:7 | 226:21 227:1 | **minister** 17:16 |
| 8:13 57:21 | 277:8,11 | **mentally** 90:23 | 228:23,23 | 17:20 18:3 |
| 85:9 86:2,5,8 | 281:11,20 | **mention** 168:21 | 266:9 278:19 | 19:7 20:14 |
| 132:11,13 | 283:8 284:14 | 237:15,18 | 282:2,17 283:6 | 31:5 32:10 |
| 143:7,8 149:5 | 284:14,20 | 284:17 292:23 | 303:20 314:7 | 33:11 34:22,23 |
| 149:5,7,9,10 | 295:18 300:17 | 293:2,6 302:13 | 317:11 318:22 | 35:21 61:10 |
| 149:12,16 | 303:10 304:12 | 302:16 323:21 | 319:11 341:20 | 75:4,7,9 77:8 |
| 150:3,5 151:17 | 304:19 307:1 | 325:6 347:8 | 349:15,18 | 78:1 82:18 |
| 153:13 156:5 | 309:2 311:2 | **mentioned** | 350:16 351:3 | 83:3 85:1 |
| 156:12,13,15 | 319:2,6 320:8 | 17:16 22:14 | **Methodist** 28:4 | 96:12,16,19,21 |
| 158:8 159:5,12 | 341:18 342:21 | 24:16 25:4 | **Michelle** 85:5 | 96:22 97:2,4,6 |
| 160:14,23 | 343:6 350:17 | 56:20 57:5 | 281:21 284:21 | 97:12,13,15 |
| 161:1,3 165:16 | 355:4,6,7,8,10 | 68:9 71:5 75:1 | 287:10,20 | 98:3,14 105:20 |

| | | | | |
|---|---|---|---|---|
| 106:10 133:4,6 | 335:16 347:10 | 15:16,23 16:1 | 44:5,10,19,21 | 79:17 |
| 133:21 138:11 | 347:18 355:17 | 16:13 17:7 | 61:5 62:19 | **M.T** 14:2 |
| 138:14,17,21 | **miracle** 30:1 | 23:22 27:9 | 93:19,20 94:3 | |
| 139:1,4 144:19 | **miracles** 87:10 | 39:4 40:23 | 94:17 95:5 | **N** |
| 145:5,12 147:4 | 287:13 | 41:9,14 43:1,4 | 109:2,20 110:2 | N 1:12 3:2 |
| 154:20 156:2 | **misconstrued** | 48:13,18 51:22 | 111:6 158:13 | **nails** 52:23 |
| 174:21 176:7 | 50:22 | 52:3,4,7,13,19 | 200:19 | **naive** 361:8 |
| 178:2 194:22 | **mishandled** | 54:5 61:16 | **morning** 8:1,2,5 | 364:22 365:6 |
| 196:4 197:3,5 | 352:7 | 68:21 69:9,9 | 9:7 11:7 28:3 | **name** 8:4 39:11 |
| 307:14,18 | **misinterpret** | 69:16 71:1,6 | 64:9 96:1 | 43:13,15 69:10 |
| 308:20,23 | 77:2 | 71:22 72:21 | 120:7,12 150:1 | 85:7 90:11 |
| 309:15 363:13 | **misleading** | 73:2,15 74:12 | 151:16 160:22 | 91:17,19 100:2 |
| **ministerial** | 266:8 | 74:20 75:20 | 168:1 169:5 | 100:3,4,6 |
| 16:11,23 98:1 | **missed** 179:15 | 76:8 77:4 78:7 | 184:1 190:13 | 109:10,11 |
| 178:18 219:22 | **missing** 64:6 | 78:11 89:17 | 209:22 210:3 | 131:22 172:13 |
| **ministering** | **mistake** 315:8 | 92:5 93:12,14 | 227:8 231:13 | 172:16 176:22 |
| 136:2 364:2 | **mistaken** 355:2 | 93:21 94:6 | 232:14 233:4 | 183:8 187:8 |
| **ministers** 16:2,8 | **mistreated** | 97:5 98:12 | 269:17 285:11 | 189:10 191:18 |
| 20:18 25:1 | 51:15 55:7 | 175:14 220:15 | 286:4 315:5,16 | 191:21 204:21 |
| 30:8,10 33:2 | 66:23 352:8 | 221:23 222:4,8 | 316:23 329:11 | 205:20 214:23 |
| 34:3 36:10 | **mistreating** | 309:5 356:17 | 334:23 335:3 | 227:10 233:12 |
| 57:1 72:2 77:6 | 322:21 357:15 | 362:20 364:4,6 | **mornings** 99:3 | 275:15 281:23 |
| 82:20 98:2 | **misunderstand** | 365:5 | **Moses** 86:11,17 | 284:22 322:11 |
| 105:17 145:7 | 76:22 81:17 | **Moffatt** 44:12 | 103:17 | 322:11,12 |
| 147:6 328:9 | **misunderstan...** | 44:13 | **mother** 267:17 | 340:15 349:17 |
| **minister-type** | 74:14 | **mold** 52:13 | **motions** 10:11 | 360:2 |
| 93:10 98:4 | **misunderstood** | **moment** 205:23 | **mouth** 183:20 | **names** 12:2 |
| **ministries** 179:2 | 81:15 96:9 | 243:14 | 260:12 265:5 | 205:6 325:8,9 |
| **ministry** 20:13 | 304:3 329:9 | **moments** 347:16 | **mouthful** 88:12 | 359:19 |
| 20:18 | **miswritten** | **Monday** 190:18 | **move** 48:22 61:2 | **Nancy** 90:12,13 |
| **mini-sized** | 344:20 | 210:17 348:18 | 106:14 107:12 | 357:22 |
| 173:11 | **mixing** 116:6 | **money** 64:7 | 121:20 140:6,7 | **narrow** 98:12 |
| **minority** 118:11 | **Mixty** 13:12 | 142:18 353:14 | 255:20 | **nasty** 338:3 |
| **minute** 75:2,21 | 113:21 114:2,5 | 353:22 358:9 | **moved** 42:3 | 362:6 |
| 154:2 211:19 | 114:12 115:13 | 358:15 363:17 | 48:18 105:3 | **nature** 46:15 |
| 251:22 274:14 | 115:14,21 | 363:18 | 110:7,10 143:1 | 91:3 210:8 |
| 303:16 317:19 | 116:3,4,9,12 | **Montgomery** | 256:1,23 257:9 | 235:8 |
| 335:9 | 116:12 117:19 | 1:19 7:8 | 311:9 | **Nazarene** 27:8 |
| **minutes** 191:3 | 131:20 151:18 | **month** 98:8 | **moving** 49:3 | 27:11 97:5,13 |
| 233:8 247:15 | 237:19 | 126:8,11,13 | 139:21 140:5 | 97:16 |
| 247:18,19 | **Mixty's** 28:17 | 205:15 209:8 | 239:12 256:6 | **NBA** 80:21 |
| 272:1 279:20 | **moan** 55:23 | 305:23 306:1 | **mumble-jumb...** | **near** 42:3,20 |
| 289:10 323:6 | **Mobile** 5:5 6:17 | 348:5 354:18 | 172:1 | 43:13 65:8 |
| 324:6 334:3 | 14:5,7,8 15:10 | **months** 41:7 | **mumbo-jumbo** | 94:13 126:4 |

# FREEDOM COURT REPORTING

393

134:21 137:5
142:18 157:17
218:3 313:5,8
313:22
**nearly** 253:11
**necessarily**
20:19 22:22
27:4 28:21
29:7 30:16,17
36:21 68:20
82:5 86:16
87:4,5 98:5
105:22 114:23
115:16 116:11
119:9,18 132:4
140:20 161:13
177:22 220:5
290:12 324:3
341:4 361:17
**necessary** 91:11
100:18 189:20
288:6
**neck** 58:9,15
59:1
**need** 9:13,17,22
100:16 105:22
119:18 150:10
150:13 151:21
152:15 154:22
155:12 158:4
165:17 170:16
175:1,2 184:15
186:13 187:1,2
188:6,7 189:18
204:17 206:1
219:14 233:11
240:13 256:3
260:22 295:12
295:15 360:14
360:14,19
363:18 364:17
**needed** 51:7
64:9 89:22
95:16 137:19

139:23 145:17
152:12 165:1,1
168:6 187:16
194:17 226:2
240:10 324:14
**needs** 171:2,3
**negative** 359:14
**negligently**
346:13
**neighborhood**
179:21
**neighbors**
180:14 181:2
**neither** 252:2
280:16 368:16
**nervous** 300:7
**nervousness**
362:7
**never** 9:5 38:14
50:10,10 51:9
66:13 71:11
90:2 116:13
124:14,14,17
127:8 132:16
138:1,1 170:15
171:1 180:5
204:19,21
205:10 206:14
207:17 233:23
235:11 242:21
278:18 287:21
319:15 334:9
334:11,11,12
335:8 336:19
338:23 339:1
342:17 343:19
350:10 354:6
358:7,15
**new** 22:9 23:10
26:4 35:13,14
54:14 57:5
79:12,20
145:17 146:4
147:2 162:15

309:8 311:19
316:3 365:8
**news** 244:15
**NFL** 80:21
177:19
**nice** 111:21
145:23 219:11
271:8,13,16
**nickel** 358:10
**night** 120:8
179:12,22
231:5 316:20
**nighttime**
134:10 136:4,5
137:19 145:2
286:23
**nine** 94:17
262:23 334:6
**nineteen** 18:4
62:16
**nod** 10:8
**nods** 37:18
42:18 322:15
**nonchalant**
25:16
**Nonharassment**
123:8
**nonprofessional**
87:17
**nonsense** 165:20
**norm** 336:15
**normal** 18:22
23:2,3 28:12
90:20 106:2
114:13 199:11
204:12 232:17
232:19
**normally** 97:20
233:16,21
234:14
**North** 6:20
**notarized** 327:3
327:6
**note** 288:3

**notes** 288:9
319:22,22
320:3,5,17
**notice** 2:9
**November**
192:20 207:15
**nowadays** 83:8
87:9
**number** 1:5 6:5
30:12 41:4
73:21 121:16
121:16 122:2,4
123:4 125:5,5
125:9,13 157:5
157:6 184:23
207:9 212:16
232:6 237:7
238:23 239:2
265:11 268:21
268:23 269:15
273:17 274:14
274:19 277:15
277:16 288:13
288:15 289:13
290:7 291:15
296:23 298:11
298:21 299:2
302:8 303:8
304:14 305:12
315:15 316:19
316:22 326:7
327:18,19,21
327:22 330:8
330:19 331:2
332:21 356:12
358:21 359:18
362:19
**numbers** 300:1
300:6
**numerous** 209:9
309:7 334:18
336:2,9 340:17
**nurse** 89:21
90:10

**nurses** 68:22
**nutshell** 89:3

## O

**O** 1:12
**oath** 8:17
**obey** 29:5,7
341:8
**obeying** 29:1,2
**objector** 38:3,6
**observed** 269:17
**obtain** 84:1
**obtained** 332:14
**obvious** 225:20
226:2 231:11
**obviously** 209:1
249:17 329:9
**occasion** 19:18
140:16
**occasions** 124:4
322:23
**occur** 37:14
173:5 268:6
280:7 348:1
**occurred** 10:23
90:19 127:5
129:1,8,9
173:6 188:4
206:5 213:2
228:1 235:21
261:18,18
275:21 295:20
295:21 314:8
334:14
**occurrences**
11:20 282:3
305:16
**occurring**
200:18 368:14
**occurs** 32:4 61:5
70:22 189:7
**October** 93:22
363:1
**offend** 34:3

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 55:17 58:10,17 | 312:12 341:15 | 122:12,16,19 | 245:6,8 246:19 | **one's** 115:10 |
| 139:12 140:9 | 343:23 | 123:6,10,13 | 249:8 256:16 | 173:9 180:5 |
| 146:10 147:23 | **officer** 106:4 | 124:19 125:3,8 | 261:15 262:9 | **one-on-one** |
| 219:11 | **offices** 1:17 7:6 | 125:18 126:12 | 264:17 269:5 | 218:23 219:5 |
| **offended** 50:22 | 282:20 284:1 | 126:16 127:2 | 274:8,18 | 220:9 |
| 51:5 76:21 | **offset** 117:11 | 128:7 132:7,18 | 275:10 291:14 | **on-line** 40:10 |
| 136:22 | **oh** 132:14,14 | 133:9,12,18 | 299:1 302:22 | **open** 102:18 |
| **offending** 34:16 | 138:15 214:9 | 134:1 139:5 | 304:11 305:11 | 150:21 153:7 |
| 58:23 | 262:2 281:5 | 140:12 141:1 | 306:2 307:23 | 154:3 241:16 |
| **offense** 59:4 | 351:16 | 143:3 144:19 | 311:14 312:10 | 272:21 |
| **offensive** 31:17 | **okay** 8:22 10:12 | 145:4 149:17 | 314:10 320:23 | **opened** 152:19 |
| 32:17 51:2 | 10:18,19 11:17 | 151:20 152:3 | 325:11 327:23 | 183:20 |
| 57:4 60:16 | 11:22 12:5,9 | 154:6 155:11 | 328:5,21 330:6 | **openings** 108:3 |
| 357:13 | 12:13 14:10 | 156:8,17 157:4 | 333:14 347:18 | **opens** 300:19 |
| **offer** 16:7 90:4,7 | 15:9 16:12 | 157:18,18 | 353:3 355:18 | **operating** 357:9 |
| 186:9,13,19 | 18:12 19:6,10 | 158:7,17,23 | 360:4 | **opinion** 199:3 |
| 188:9 | 20:4,7,22 | 159:19 161:11 | **okayed** 16:4 | **opportunity** |
| **offered** 16:18 | 21:16 22:14 | 165:22 166:1 | **old** 17:22 19:4 | 123:3 278:3 |
| 175:19 189:19 | 24:16 25:4 | 167:2,12 | 54:16 57:4 | 290:23 |
| 189:20 295:4 | 27:7 30:23 | 168:21 169:16 | 79:22 309:9 | **oppose** 34:12,21 |
| **offers** 16:1 | 34:5 37:22 | 169:19 170:1 | 350:3 | **opposite** 311:15 |
| **office** 22:18 | 38:20 39:3,6 | 172:2 173:14 | **older** 79:18 | **oral** 7:10 |
| 72:17 94:4 | 39:18 40:9,13 | 174:5 177:11 | 87:14 240:16 | **orally** 194:5 |
| 95:22 119:1 | 40:16,19 41:11 | 179:4 184:12 | **once** 27:20 | **orange** 70:2 |
| 129:18 134:8 | 42:4,22 43:19 | 184:18,22 | 31:20 34:14 | **ordain** 27:11 |
| 141:5 153:7,23 | 43:23 44:6,8 | 188:10 190:3 | 36:3,8 71:17 | **ordained** 27:5,6 |
| 156:9 157:11 | 45:4 46:1 | 190:19 192:7 | 72:8 75:23 | 27:7,15,20,20 |
| 158:8 161:2,6 | 47:13 48:7,15 | 192:18 193:2 | 89:20 96:17 | 27:21 56:23 |
| 166:4 168:14 | 48:16 49:1,4 | 193:14 194:11 | 114:6 145:10 | 96:18 97:6,14 |
| 169:17,22 | 50:2,7 55:18 | 196:10 198:6 | 152:3 160:23 | **ordeal** 105:7 |
| 172:3 173:7,10 | 56:6 57:15 | 201:12 208:2 | 174:20 175:9 | 205:14 |
| 173:21,23 | 59:20,20 62:12 | 209:21 212:14 | 179:1 185:9 | **order** 31:13 53:4 |
| 183:6 186:19 | 64:2 67:15 | 212:21 213:5,9 | 205:6 208:10 | 84:1 87:10 |
| 190:9 196:14 | 78:18 79:4,7 | 213:13 214:9 | 210:23 211:11 | 144:21 164:23 |
| 198:4 208:18 | 80:3 81:22 | 214:11 215:9 | 228:22 230:23 | 199:18 206:11 |
| 227:8,20 | 88:3,19 89:13 | 215:21 216:2,7 | 242:10 257:1 | 245:23 275:19 |
| 229:10 236:9 | 91:12 93:11 | 217:3 218:21 | 291:10 316:16 | 276:21 311:9 |
| 244:7,21 | 95:1,6,17 96:5 | 222:5,10 | 320:6 357:23 | 312:16,23 |
| 272:10,19 | 96:8 99:2,7,11 | 225:18 227:3 | 365:7 | 313:4,23 342:2 |
| 275:9 276:6 | 100:1,9 106:12 | 228:8 234:23 | **ones** 47:21 | 342:14,16 |
| 280:22 281:8 | 108:7,20 109:5 | 235:1 237:2,11 | 218:16 259:18 | **ordered** 345:15 |
| 282:23 283:2 | 109:15 110:4 | 238:4,22 | 275:15 312:8 | **ordinary** 53:10 |
| 283:12,22 | 111:7,10 | 239:23 240:4 | 313:12 321:21 | **organizations** |
| 300:18 312:11 | 112:15 120:17 | 241:7 243:20 | 353:5,9 | 31:20 71:21 |

# FREEDOM COURT REPORTING

77:5
orient 262:5
original 88:16
originally 16:3
198:22
Orleans 26:4
ought 147:22
156:3 298:1
outcome 320:2
outlined 134:15
234:18
outlines 103:9
outreach 179:2
outside 20:15
30:2 46:10
65:13 87:21
140:19 165:7
312:11
outstep 56:5
overall 112:14
119:14
overextend
141:22
overheard 358:3
overpersonally
179:10
overreact 55:22
overreacted
54:21
overreactive
80:7
oversaw 121:1
overstep 66:17
83:22 146:7
154:13
overstrained
90:22
overstressed
171:16
overtime 119:23
120:2 126:19
127:20 128:2,6
128:18
overuse 150:19

over-aggressive
139:18
owe 332:1
owner 46:5
o'clock 190:13
285:14 315:14

---
**P**

P 1:12
package 352:21
packages 230:2
230:3 242:8,13
242:14,18
251:18 256:13
324:21
page 3:4,7 123:2
123:6,15,17,19
212:2,16 239:2
239:2,8 269:5
273:3 296:22
301:18 303:18
305:3 307:5
309:20,22
313:17 321:3
326:11 327:9
327:19 333:2
pages 125:6
212:9 318:20
356:13
paid 142:19
200:19,20
201:1 301:5
334:19 347:8
347:13 348:4,5
palm 254:9
pamphlets
186:18 342:18
panel 124:9
263:7 290:10
291:4 292:9,21
317:18
paper 8:15
189:15 193:19
193:19 194:3

198:23 293:5
papers 344:19
paragraph
195:13 196:16
197:10 306:3
306:23 307:3,7
paranoid 141:16
198:21 364:11
paranoidal
198:21 199:1,2
199:3,6,10
pardon 169:9
174:8 179:8
252:3 297:15
351:17
parents 15:22
16:3 361:9
366:5
park 363:3
parking 362:21
part 21:16,22
35:16 109:14
121:4 123:20
124:1,7 146:10
157:15 158:14
159:21 167:19
167:22 176:7
179:15 186:3
201:13 212:7,9
212:22 213:10
244:18 247:13
256:7 287:6,15
299:17
participant
33:16
participate 40:9
202:10 203:22
particular 18:16
19:18 24:5,17
27:1 40:5
47:14,15 49:23
54:6,9 57:12
86:5 91:5,5
94:21 96:3

98:6,11,18,20
105:21 106:4
111:13 132:10
140:16 147:20
150:6,10
151:10,15,19
151:22 152:11
152:13 157:22
158:6 165:2
208:16 224:23
228:1 230:18
230:20 231:14
231:21 232:21
233:4 234:14
239:23 240:7
243:14 251:4
256:8 274:23
285:17 311:19
313:12 315:5
315:16 335:19
particularly
96:23
parties 1:14
368:17
partner 87:20
283:9 349:14
partners 314:1
parts 146:17
party 114:6,9
115:20 286:2
part's 270:18
271:10
part-time 94:1
pass 102:13,14
179:12 182:21
250:16
passage 35:10
passed 24:23
162:7
passing 244:11
pastor 98:3,21
149:20 360:16
366:20
pastoral 16:15

20:6
pastors 24:21
pastor's 100:1,6
patients 72:1
patriarchs 78:2
patterns 115:2
Paul 79:13
Paul's 54:15
pay 32:15 49:13
49:14,16,19
187:17,19
292:5 301:4
347:13 348:4
paycheck
208:17 331:14
334:2
payday 208:17
333:23
pays 142:15,17
penis 254:15
256:21 260:8
263:9,11,16,21
264:10 291:5
292:16,22
319:16 321:14
342:9,9 344:3
people 16:8
20:17 21:13
22:16,17 25:8
28:14 30:6
31:4 33:1 34:4
34:12,16,16,21
35:1,3,8 37:19
47:19 50:19
52:5 53:9,17
53:20 54:1,18
56:22,23 57:3
58:10 59:13
65:5 69:1,15
69:21 71:3
76:10 78:13
80:19 81:3
82:6,20,22
83:8 84:11,15

84:23 85:19
86:5,12,16
87:9,13 98:2
104:23 105:15
105:16 106:7,9
111:13,19
112:7 118:5
128:21 129:2,4
131:21 139:15
141:17,18
142:15,18
145:6,18
146:13 147:5
147:15,22
148:21 150:16
151:1,5 153:16
154:12,19
156:3,7 163:10
166:19 173:12
176:8 177:17
177:20 180:11
181:20,22
183:23 184:1
186:20 188:21
188:22 198:12
198:13,13
200:15 204:12
217:9 219:3,3
219:6 220:14
220:15 221:12
221:14,14
223:6,9,14
225:4,6 238:13
241:19 242:1
244:6 250:16
256:3 272:13
296:4 307:14
308:19,23
309:11 311:10
311:23 313:13
323:13 324:16
325:4,7 333:3
334:15 336:1
337:8,9 339:4

340:8,11
358:11 360:22
361:7,12
363:14,19
364:5,7,8,8,16
364:19 365:4
365:10
**people's** 102:1
105:22,23
135:11 313:2
**perfect** 67:17
**perform** 87:10
287:13
**period** 34:4 51:4
101:21 120:5
141:15 145:21
147:14 179:13
205:13 215:6
256:12 267:22
281:1 283:5
300:20 309:18
345:11
**periods** 199:17
**permanent**
109:14 110:3
110:16,20
**permission**
195:4 242:16
**permit** 106:16
106:19
**person** 29:1 35:6
35:18 50:23
51:1 66:18
67:6 81:2
82:17 83:10
91:5 98:20
106:3,3 116:18
118:16 141:19
141:22 155:22
162:18 169:6
174:10 176:17
176:20 179:5
181:10 183:8
184:2 240:14

251:15 256:10
311:13 316:18
338:6 354:20
363:5 365:1
**personal** 4:11
45:12 46:18
53:23 56:4
65:7,7,8,9 66:6
70:8 78:16
87:8 100:20
101:8 105:9
113:19 117:21
119:16 134:10
137:2 138:5
140:19 141:23
142:16 146:7
147:15 167:8
167:11 177:8
177:18 178:8
178:18,20
191:9 194:21
196:4 223:15
223:15 305:14
364:14,15
**personality**
204:11
**personally** 21:13
29:19 36:16
64:17 65:1
66:22 67:2
73:7 74:12
114:20 115:22
218:23 223:8
**person's** 142:1
**perspective**
219:23 241:9
**perspectives**
105:14
**perverted**
163:17 165:21
200:6 225:23
231:3 232:1,5
232:9 236:17
**petty** 217:17

**pews** 99:4
**pharmacist**
242:13
**pharmacy**
340:15
**phone** 12:16
195:21,22
196:15 198:4
199:17 203:11
203:18 205:11
205:16 206:6
209:3 231:5
286:22 315:3,3
315:4,14,15
316:13,15,16
316:19,22
**physical** 143:20
328:10
**physician** 362:2
**physicians**
328:2,7
**pick** 119:10
200:2 208:17
**picked** 223:3
365:11,12
**picking** 340:6
**picks** 285:15
338:21
**piece** 327:4
**pieces** 9:13
**pinpoint** 68:20
**place** 12:16 20:1
31:23 62:8
135:6 147:17
179:12 187:3
188:9 232:21
234:11,22
240:8,9,16
242:1 246:9
258:22 294:2
295:23
**placement**
253:19
**places** 79:19

97:22 98:17
130:22 177:20
186:20 198:5
232:12 287:3
336:13
**plain** 19:4
**plaintiff** 1:7 6:7
6:18 328:12
**planning** 351:13
**play** 136:1
159:23 163:14
164:10 181:6
**played** 340:22
**player** 342:23
361:1
**players** 135:22
169:13 178:16
354:8,12
362:13
**playful** 114:4
339:7
**playing** 164:16
272:13
**pleaded** 296:14
**pleasant** 177:9
**please** 9:10,23
36:14 121:18
133:23 192:6
245:10 260:2
288:14 326:22
327:19
**plenty** 175:18
301:3 329:6
**plotting** 229:11
351:13
**plus** 77:15 79:18
189:14 358:16
361:9
**point** 31:2 70:12
98:18 103:5
120:17 140:6,7
157:7,9 172:6
199:9 225:7
232:8 236:14

253:21 268:19
269:22 271:8
307:5 333:1
366:13
pointed 145:14
159:13 179:17
179:18 279:23
pointing 235:6
points 288:5
police 63:17
policies 123:11
policy 123:3,8
124:21 288:20
344:16,18
poor 363:15
position 48:23
95:10,11 118:7
244:8 300:8
338:14,19,22
339:6
positioned
252:23
positions 47:20
119:7
possess 85:20
possible 288:4
294:4
Possibly 108:14
238:2
potato 286:1
Powell 229:20
230:1 238:13
240:15 242:11
280:10,11
322:10 324:11
325:4
power 29:21
83:5 89:1
powers 35:22
103:8
praiser 363:13
pray 23:16
30:14 82:22
365:22

prayed 177:16
prayer 29:22
30:15,18,20
61:2 85:17
364:7
prayerful 84:8
prayerfully
83:15
preach 19:8,10
19:13 31:21
72:9,10 76:18
84:15 138:18
150:17
preached 20:10
118:19
preacher 91:23
92:2 138:18
186:2 357:23
358:1
preachers 83:4
Preaches 76:17
preaching 28:11
77:9
prejudice
118:17 364:21
prejudiced
111:14,20
prejudices
223:16,18
prepare 11:18
12:7
preplanning
349:3
Presbyterian
28:4
presence 83:11
83:13
present 268:18
274:23 275:3
328:14 331:4
presented
148:16 164:13
174:12 266:5
268:17,22

277:6,9
president 52:7
69:8 71:6
355:5,10,13
356:2
presidents 71:9
president's
282:23 283:2
283:12,22
press 280:5
pretend 219:15
pretty 10:21
14:14 19:22
24:15 27:21
29:15 40:7
45:15 50:3
59:16 62:18
63:17 64:3,14
67:8 74:21
77:20 78:2
102:4 106:2
111:8 122:19
122:22 149:13
150:12 155:8
156:17 184:4
187:14 211:5
231:11 249:1
365:8
prevailed 86:19
86:21
prevent 253:3
prevented
252:16,18
preventing
253:17,18,22
previous 33:13
41:12 75:3
141:11 258:5,6
318:1 319:23
previously 31:12
32:8 46:8
152:18 264:19
264:23
primary 202:14

principle 59:16
principles
183:15 293:17
307:12 308:10
print 300:12
Pritchard 14:3
private 250:6,20
251:2,10 252:2
254:3,4,7,15
310:4,10,12,14
310:16
privileges 84:21
PRO 6:16
probably 9:18
22:18 23:5
26:7 47:20
51:13 61:13
67:2 81:3 85:4
91:10 105:13
106:8 122:21
123:4 124:17
129:17 134:20
135:5 192:20
197:6 203:6
212:1 216:14
217:1 218:19
219:17 222:1
223:18 238:3
238:20 258:18
288:8 295:22
337:1 339:9
360:16 361:20
362:4,4 363:4
probation-type
45:9
problem 45:16
65:5 70:17
80:9 111:19
121:7 128:20
152:8 164:9
170:15 224:19
280:17 324:23
325:3
problems 31:14

223:15
Procedure 7:5
procedures
123:16 124:5
proceeding 8:11
332:11 368:7
proceedings
7:12 368:14
produce 25:15
330:8,20 331:3
produced 368:9
production
330:1,8
profanity 310:1
professional
65:6,17 67:9
70:19 112:3
114:8 118:20
142:16 146:7
200:8 219:17
professionalism
115:5 142:14
142:21 243:4
program 16:8
16:14,15,17
19:16
prohibit 38:11
promiscuous
231:2 232:1,5
232:8 236:19
promotion
339:22,23
prompted 227:5
234:19
pronounce
204:20
proof 182:4
property 107:2
prophet 86:11
proprietor 46:4
protection 56:21
59:12
prove 337:12
provide 331:22

# FREEDOM COURT REPORTING

provided 7:4
194:12 212:2
289:15,17
337:4 356:14
358:23
providers 328:9
provost 297:8
prying 140:18
psych 171:5,15
174:18 186:12
186:13 187:16
188:16 199:5
244:16 267:4
267:15,22
345:22 354:6
psychiatric
188:3 203:23
341:23 344:15
350:18
psychiatrist
187:20 188:6
341:22
psychiatrists
328:2,7
psychic 343:18
psychological
80:9 86:4
89:19 171:7
186:12 199:15
202:14 204:2
psychologically
115:4
psychologist
188:7 191:19
206:14
psychologists
328:2,8
psychotherapy
193:11 202:11
202:15,18,23
203:2
psychotropic
204:1,6,9
public 39:2,3

105:18,19
108:18
pulpit 154:20
purchase 151:13
pure 102:6
purpose 8:10
186:8 253:18
279:14
push 250:9
put 8:14 21:23
58:8,12 63:13
80:9 88:10
112:2 121:5
150:20 151:8
165:4,5,13
170:20 184:19
185:2 198:1
200:12 206:4
214:23 219:7
238:12 242:14
242:18 246:2
251:9 304:9
336:3 345:18
348:7 351:1
puts 58:4
putting 165:8
217:19 230:8
256:12 296:12
p.m 367:2

## Q
question 9:3
11:3 30:20
54:3 72:23
88:16 102:14
106:13 119:4
156:22 182:13
232:4 283:19
294:22 327:18
327:21 328:6
328:20 329:10
330:12,19
345:23 354:14
questions 9:7,9

36:22 102:4
125:19 177:2
193:3,9 194:6
194:19 195:11
196:12,22
202:5 215:22
237:10 326:16
326:18 329:20
367:1
quick 89:15
202:8 322:2
quickly 257:10
quite 21:15
23:20,21 78:13
187:13 222:13
323:14,20
324:10 344:1
359:19
quotation 164:1
quote 55:13
71:18 73:17
76:14 78:3,4
79:8 84:6
147:8 148:6
164:2 310:2
339:5
quoted 54:6
55:11 57:20
58:18,21 72:14
75:2,13 148:8
163:19 309:2,4
357:5
quotes 54:13,16
quoting 59:5
68:2 74:15
81:16 139:2

## R
race 25:20 73:3
225:11 346:10
352:1,5
races 365:12
racial 74:10
111:15 337:19

racially 73:5
74:13 346:12
radio 25:2
raise 358:8,10
raised 25:19
202:22
rally 19:19
ramp 362:21
ranked 201:18
rapture 22:13
rate 49:13,14,16
49:19 142:14
rational 358:2
360:17
rationale 276:19
reaction 194:1
read 11:19
22:15,18,22
23:4,6,13,19
24:1,6 25:10
27:3 36:7
72:17 73:23
90:17 122:16
123:4,7,20,23
124:7,14,17
126:20 138:18
164:7 192:8
193:11 210:5
218:11 252:19
298:16 306:22
310:8 312:13
312:14,16,19
313:1,16,23
342:17 359:19
reading 2:2
23:21 304:3
ready 88:21
171:18 326:10
real 322:2
realize 181:17
really 10:8 24:7
25:12 27:19
45:19 60:20
63:20 73:6

77:3 88:21
98:23 99:18
106:13 111:9
112:5,10 114:6
116:10 120:9
128:8 138:15
151:21 239:15
240:10 245:13
255:12 257:10
339:8
reared 25:14
rearing 26:21
reask 9:11 68:13
reason 9:23
47:14,15 87:16
94:21 129:9
198:16 221:16
227:23 278:8
306:4 315:4
321:23
reasonable
354:20
reasons 186:21
188:19 230:18
361:23
reassign 213:14
recall 31:6,7
32:22 35:15,16
41:3 43:11,15
54:11 56:11
57:9 58:4 85:4
85:7 86:7
90:16 91:9
95:10 100:3,10
103:20 104:13
109:11 114:1
118:4 127:4,12
155:18 158:18
172:16 181:11
182:22 185:23
186:4 193:3
198:9 210:10
210:19 211:9
211:10,13,21

| | | | | |
|---|---|---|---|---|
| 212:20 213:16 | recommend | refuse 102:16 | 331:12 366:19 | 126:21,23 |
| 213:17 214:17 | 195:14 203:22 | 269:7 301:22 | relates 26:20 | 127:1,3,14 |
| 228:19 235:19 | 206:7 294:5 | 323:15 360:10 | 146:11 221:7 | 132:8,9 133:22 |
| 237:17,20 | 295:1,11,19 | 361:16 | relating 2:7 | 140:14 159:1,1 |
| 241:1 248:7 | 296:12 301:10 | refused 239:4,5 | 203:2 330:15 | 169:21 170:5 |
| 260:5 266:13 | recommendati... | 259:15,16,18 | relation 94:11 | 171:21 172:22 |
| 268:4 269:22 | 196:17 | 269:6 275:1 | relationship | 179:7,19 |
| 275:2 277:5 | recommended | 277:23 | 178:19 | 190:10,14 |
| 281:23 284:21 | 90:2 202:10 | refusing 102:13 | relatives 221:12 | 193:14 206:21 |
| 340:15 349:17 | 294:1 295:3 | refute 330:9 | 222:3 | 208:7 211:22 |
| recalling 100:10 | 296:3 299:11 | regarding 4:8 | relaxed 115:7 | 212:12,15 |
| receipt 303:19 | 340:10 | 4:14 32:12 | 183:16 | 213:4,19,23 |
| receive 12:4,10 | recommending | 52:18 77:18 | relaxes 204:13 | 214:11,13,17 |
| 83:12 207:12 | 4:5 | 82:14 89:7 | relay 105:8 | 215:7,11,16,19 |
| 207:14 291:15 | recoop 64:7 | 103:21 162:19 | 127:9 | 215:21 216:9 |
| 291:18 294:12 | record 10:8 | 163:19 185:17 | relayed 147:19 | 216:21 226:8 |
| 298:14 303:12 | 212:5 288:5 | 194:13 223:21 | 150:9 | 226:23 228:6 |
| 316:17 317:6 | 362:10 | 260:1 266:10 | relevant 101:15 | 239:20 240:22 |
| 322:1 332:12 | recorded 320:9 | 267:15 276:11 | relied 146:15 | 260:23 261:12 |
| 340:20 357:16 | 350:2,10 | 283:8,10 285:5 | religion 16:21 | 262:11,15,17 |
| received 109:23 | recorder 342:22 | 289:4 294:22 | 16:22 17:11 | 270:15,23 |
| 122:17 123:1 | 343:4,9,10 | 301:4 302:11 | 21:22 337:23 | 271:2 275:21 |
| 124:1,16 | recording | 303:10,21,22 | religious 14:9 | 276:3 277:5,10 |
| 125:14 134:2 | 263:20 | 304:1,2 305:15 | 15:18 16:1,7 | 277:10,16 |
| 134:14 189:14 | records 323:5 | 309:6 317:11 | 17:8,15 18:8 | 308:5,7 319:2 |
| 189:21 192:16 | 323:14 | 319:1 339:2 | 21:1,3 23:19 | 319:5 345:5 |
| 192:18 207:17 | red 70:3 243:15 | 344:6 345:21 | 28:1,15 31:19 | 366:15 |
| 207:21 209:3 | refer 22:7 23:20 | 346:20 349:12 | 32:18 36:6 | remembered |
| 209:18 210:23 | 353:16,19 | regardless | 38:10 72:7 | 12:17 57:11 |
| 213:11 266:21 | reference 101:3 | 295:16 316:6 | 75:8 82:13 | 311:17 |
| 283:14 291:17 | 147:13 229:13 | 348:10 361:10 | 101:13 102:6,8 | remind 33:12 |
| 291:20,21,22 | references | regret 293:19 | 287:15 | 36:9 55:15 |
| 303:14 304:1 | 146:12 | 362:10 | religiously 73:10 | 63:21 119:9 |
| 321:21 322:4 | referred 59:6 | regular 14:2 | 285:4 | 142:20 158:1 |
| 327:2,5 328:12 | 60:9 100:19 | 23:2 109:3 | relocated 294:2 | 325:11,14 |
| 329:1,5 353:8 | 103:1 222:19 | 110:16,19 | rely 146:18,20 | 335:11 347:5 |
| 356:21 | 222:22 | 122:14 | remain 27:22 | reminded 33:18 |
| receiving 277:16 | referring 22:12 | regularly 19:8 | 200:8 | 34:2 130:2,17 |
| Recess 89:16 | 24:17 85:6 | rehearsed 54:18 | remember 11:4 | 130:19,20 |
| 321:9 | 159:10 203:5 | relate 21:12 | 12:1 33:3,5 | 157:19 282:9 |
| recognized | refers 35:10 | 202:16,18 | 57:8,14 58:6 | reminds 339:8 |
| 180:7 246:7 | refresh 11:23 | 330:10 | 79:17 90:17 | remove 252:11 |
| recollection | refreshed 11:20 | related 79:9 | 92:17 109:9 | renovate 256:8 |
| 272:6 | refresher 295:15 | 164:21 220:16 | 114:2 122:22 | renovation |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 244:23 | 368:12 | respond 156:21 | 326:15,21 | 229:4,7,11,15 |
| **Rent-A-Car** | **reprevented** | 191:7 258:8 | **reviewed** 259:22 | 231:1,10 239:9 |
| 93:18 95:1,3 | 252:20 | 306:6 362:3 | **rhetoric** 36:6 | 240:12 241:11 |
| 95:23 | **reprimand** | **responding** | **Richards** 13:4 | 273:5 276:10 |
| **Renza** 13:9 | 262:8 279:14 | 304:22 | 33:12 52:16 | 280:12,15 |
| 225:8,11,15 | 349:21 | **response** 162:18 | 53:7 57:22 | 281:9 282:4 |
| 233:14 270:12 | **reprimanded** | 329:2 365:17 | 59:3 65:6 | 284:15 293:7 |
| 270:15,22 | 278:13 315:9 | 365:20 | 67:11 72:15 | 294:7,13 295:3 |
| 271:7 272:12 | 322:22 334:13 | **responsibility** | 75:1 77:18,19 | 298:1 299:5 |
| 334:1 | 335:8 | 137:20 162:4 | 80:4 81:5 | 301:19 306:5 |
| **Renza's** 28:17 | **request** 330:7 | **responsible** | 83:19 85:10 | 309:13,23 |
| **repay** 54:14 | **requested** 49:4 | 150:8 160:5 | 87:4 100:22 | 311:4,5,17 |
| **repeat** 104:16 | **requesting** | **rest** 265:22 | 101:11,12 | 312:15 313:3 |
| **repeated** 270:20 | 332:10 | **restart** 283:19 | 103:2,21,22 | 315:7 322:19 |
| **replied** 60:12 | **requests** 330:1 | **restaurant** | 104:17 118:19 | 323:11 324:22 |
| **report** 3:13,18 | **require** 20:14 | 41:14,17 42:15 | 120:18,22 | 333:8,8,11,15 |
| 3:20 51:11 | **requiring** | 241:23 | 127:6,7 128:22 | 333:17 334:21 |
| 81:10 85:13,22 | 293:14 | **restricted** 131:3 | 129:5,18 130:9 | 335:5,20 337:8 |
| 134:3 163:2 | **reside** 20:2 | **result** 51:18 | 130:13 131:3 | 337:16 338:11 |
| 227:10 236:5 | **residence** 20:1 | 146:12 368:19 | 131:11,12 | 339:11 341:8 |
| 236:12 259:22 | 179:12 | **results** 194:13 | 133:8 134:3,5 | 344:2,11,13,17 |
| 260:1,19,20 | **residing** 97:7 | **resurrected** 21:9 | 134:16,22 | 345:6,15,20 |
| 261:17 294:17 | **resign** 45:5 | **retaliation** 296:1 | 135:1 136:6 | 347:7,15 |
| 294:19 302:18 | 92:20 93:1 | 347:19 | 137:2 140:15 | 348:15 349:13 |
| 317:10 323:22 | 94:18 95:12 | **retaliatory** | 146:4 148:9 | 349:22 351:7 |
| 324:1,4 336:6 | 238:13 | 296:1 | 150:5 159:14 | **rid** 74:8 |
| 354:5 355:5,11 | **resigned** 92:23 | **retired** 120:21 | 159:17 160:6 | **ride** 67:18 |
| **reported** 89:6 | 94:20 | 338:11 | 160:10 161:4,9 | 135:23 182:7 |
| 117:8,8,9 | **resolve** 70:7 | **retribution** | 161:21 162:20 | **ridicule** 337:22 |
| 163:10 231:7 | **resource** 186:19 | 293:11 | 163:16 164:3 | **ridiculous** |
| 235:22 267:10 | **resources** 85:3 | **retrospect** 153:1 | 165:18 166:23 | 165:14,15 |
| 267:16 285:3 | 87:2 89:6 | **return** 3:14 | 167:17 169:7,9 | 251:14 260:18 |
| 291:10 296:2 | 159:16 160:9 | 22:13 205:17 | 169:14 170:8,9 | **riding** 163:6 |
| 320:19 322:19 | 161:7 169:6 | 208:3 209:1,4 | 171:12,14 | 179:20 |
| 324:4,7 333:22 | 174:14 187:11 | 331:21 332:4,8 | 173:19 175:3,4 | **right** 8:18 12:8 |
| 336:5 | 226:13 266:17 | **returned** 207:22 | 175:17 176:3 | 14:12 17:13,17 |
| **reporter** 7:2,16 | 266:22 267:3 | 209:19 210:5 | 185:19 200:1 | 20:22 35:5,15 |
| 10:5 368:5 | 281:17 283:13 | 211:11 216:3,8 | 206:18 208:6 | 36:22 43:5,18 |
| **REPORTER'S** | 288:17 294:11 | **returning** | 210:14 211:12 | 44:17 46:11 |
| 368:1 | 295:5 302:11 | 208:19 300:15 | 212:11 213:12 | 48:17 49:8 |
| **reporting** 116:5 | 338:13 339:2 | **returns** 331:4,6 | 214:16 215:18 | 61:21 62:7 |
| **reports** 89:7 | **respected** | 331:12 | 217:20 218:9 | 66:8 72:16 |
| 235:22 289:23 | 271:22 | **reverse** 206:4 | 218:10 225:16 | 76:9,12 78:15 |
| **represents** | **respective** 1:14 | **review** 311:17 | 227:8,16 228:2 | 79:3,18 84:6 |

| | | | | |
|---|---|---|---|---|
| 92:15 93:4 | 265:10 266:7 | 366:7 | **Ruby** 41:13,17 | 228:5,15 229:7 |
| 96:3 105:6 | 269:8,13,21 | **romantic** 143:15 | 41:20 42:5,7 | 260:14,15 |
| 106:5 108:22 | 270:6 271:6,9 | **room** 31:22 | 42:11 43:2,20 | 267:10 273:8 |
| 108:23 109:4 | 271:14 272:5 | 104:21,22,22 | 45:17 48:7,8 | 277:2 278:9,13 |
| 110:6,23 | 273:21 278:1 | 134:6,17,18,21 | 48:11,17 49:10 | 278:19 280:17 |
| 115:12 119:14 | 279:1,9 281:7 | 135:4 137:9,10 | 49:14 50:4 | 281:10 284:16 |
| 122:15 124:22 | 281:15 283:16 | 140:1 142:4 | 57:16 59:21,22 | 296:13 311:3 |
| 128:10,13 | 283:23 285:16 | 168:5 173:11 | 61:12 62:21 | 338:7,9,17 |
| 133:11 142:7 | 290:1,3,8 | 174:4 185:11 | 63:1,3 68:8 | 340:14,17,21 |
| 144:14 145:20 | 292:7 297:9 | 185:12 190:8 | 69:23 287:1 | 341:6 |
| 147:7 148:7 | 298:3 299:12 | 217:18 229:19 | **ruffle** 139:14 | **Saidla's** 72:16 |
| 150:13 151:8 | 299:16 300:3 | 234:2,15 | **rule** 83:21 | 129:18 131:14 |
| 152:14 153:8 | 302:7 303:6 | 236:22 238:12 | **rules** 2:6 7:4 | 282:6 349:19 |
| 156:16 157:8 | 304:17,18 | 239:11 240:5,6 | 31:15 | **saint** 83:16 |
| 168:16 172:12 | 305:1,11,22 | 240:15,23 | **rumor** 70:13,14 | **saith** 31:21 |
| 173:3 175:3 | 307:19,21 | 241:3,10,12,12 | **run** 241:20 | 54:13 72:10 |
| 180:11,20 | 309:19 313:7 | 241:17 242:7,9 | 347:10 | 77:12 309:6 |
| 184:20 191:1 | 314:15,22 | 242:9,22 | **runaround** | 357:5 |
| 193:1 194:7,10 | 315:2 318:12 | 244:20 245:11 | 350:10 | **Sandra** 359:20 |
| 196:20 197:19 | 318:15 320:1 | 246:1,4,6,7,20 | **running** 218:12 | 359:22 360:1,4 |
| 198:1,8 200:11 | 322:12 325:9 | 248:14,20 | 280:11 348:14 | **Sandy** 4:21 |
| 201:6 205:9 | 325:10 327:7 | 249:3,6 250:12 | | **Sara** 1:16 6:13 |
| 206:2 215:10 | 328:15,19 | 250:23 251:14 | —————— | 7:1 220:8,13 |
| 216:4,20 | 332:6,20 333:8 | 251:16 255:22 | **S** | 221:13,20 |
| 221:22 223:2 | 338:6 339:20 | 256:4,5,8 | **S** 1:12 5:3 | 222:6,11,18 |
| 226:11 234:9 | 342:2 356:11 | 258:2,6,15 | **Saidla** 13:7 | 223:3,23 224:4 |
| 237:6,20 | 360:2 362:18 | 264:21 269:18 | 57:23 85:10 | 233:14 244:12 |
| 238:17,22 | 366:22 | 272:22 273:1 | 121:6 126:18 | 368:4,22 |
| 241:17 243:5 | **rights** 189:15 | 275:9,11 | 127:18,22 | **sat** 80:14 161:19 |
| 243:23 245:1 | **right-hand** | 293:21 314:12 | 128:1,3,8,12 | 176:12 |
| 247:9 248:8 | 305:4 | 349:4 360:13 | 128:23 129:3,7 | **Satan** 225:6 |
| 249:4,15,17 | **Riley** 157:14 | **rooms** 72:1 | 129:11,13,16 | **Saturday** 69:2 |
| 251:7,8,22 | **ring** 172:13,15 | 137:10 271:19 | 130:1,18,18,20 | **saved** 83:10 |
| 252:7,14 254:1 | 242:12 | 357:10 | 131:5,18,18 | **saw** 125:12 |
| 254:5,8,15 | **River** 366:7,11 | **root** 69:3,3 | 132:3,5,9,19 | 140:9 180:23 |
| 255:1 256:18 | 366:16 | **rooting** 65:9,10 | 132:22 134:4 | 192:15,22 |
| 256:19,20,21 | **road** 9:20 41:2 | **round** 308:1,1 | 134:14 154:9 | 227:10 233:13 |
| 256:21,22 | 42:14 43:17 | **rub** 144:14 | 157:9 159:15 | 233:16 236:10 |
| 257:5,8,14 | 44:12,13 61:23 | 254:21 313:2 | 161:4 166:11 | 248:21 249:13 |
| 258:10,20 | 62:2,13,15,17 | 313:10 | 166:12 169:7 | 316:19 334:9 |
| 259:10,13,16 | 62:23 94:6,8,9 | **rubbed** 254:23 | 169:14 171:14 | 334:11 351:1 |
| 259:19 260:11 | **Roadrunner** | 310:3,10,11,14 | 200:14 207:18 | **saying** 14:22 |
| 261:22 262:3 | 251:21 | 310:15 | 209:2,22 | 30:12 33:3,5 |
| 262:16 263:4 | **Robertsdale** | **rubbing** 255:17 | 212:19 214:16 | 36:19 53:13 |
| | | | 215:17 227:20 | |

54:17 55:8
58:22 59:2,9,9
59:10 73:15
76:5 81:2,13
83:5 91:9
103:12 115:3
115:20 118:12
118:13,14
119:14 128:9
142:20 148:10
148:13 152:8
169:21 177:22
178:2 180:23
180:23 186:7
189:9 212:18
214:3,5,10
215:1,2,15
224:7 240:2
242:16 243:7
252:22 253:2
254:3 255:11
255:13 268:5
270:21 294:5
310:13,15
317:15 321:1
328:17 343:17
345:22 346:12
346:13,23
351:15 354:16
356:22 359:10
363:10
**says** 28:23 76:23
85:17 126:16
154:20 185:23
193:16 194:11
202:9 208:3
210:12,18
212:4 245:10
247:12 252:9
252:20 266:21
267:6 269:3,6
269:10,16
278:3 279:10
281:6 287:20

288:7,19 292:2
304:7,7 305:4
307:8,10,13
308:19 317:23
320:18 339:7
342:6,13
362:22
**scan** 194:9
**scanning** 249:22
**schedules**
331:13
**Schillinger** 62:2
62:10,11,13,17
62:23 63:5
**school** 13:20,22
14:1,3,11
19:21 31:18
32:9 77:10,11
82:17 85:1
118:1 121:2
135:12,20
140:20 165:4
173:6 181:6
183:10 190:7
200:17 227:12
230:5,9 232:16
296:20 311:23
315:20 320:13
334:16 336:16
339:17 340:9
**Sciences** 292:4
**scratch** 140:13
**scream** 143:23
**scripture** 22:12
25:13 30:2,3
33:10 34:2
36:7,8 52:18
52:21 53:4,16
54:6,10,23
55:11,13 56:2
57:9,21 58:18
68:1,3 71:18
71:19 72:14

74:3,16 75:2,8
75:13,21 79:10
79:17 81:15
84:4 101:2,23
138:20 139:1
145:13 146:8
147:12,21
163:19,20
220:1 309:1,4
309:16,17
357:5,20
**Scriptures** 34:6
35:17 57:3,12
58:1 59:5
79:11 103:15
103:18 148:6
309:7
**scrutinized** 74:5
**SE** 6:16
**sea** 58:9,16,17
**season** 362:11
**second** 41:16
42:23 70:14
72:22 115:13
121:17 125:7
136:10 149:5,6
149:9,15,18
156:11,13,14
158:7 159:20
169:18 171:19
173:4,5 181:10
183:7,19 185:4
185:6,12
197:10 207:10
212:22 237:8
239:1,2 243:6
250:22 251:1
254:20 255:11
255:17 257:6
258:20 261:6
261:23 265:12
269:5 272:18
273:3 292:1
296:22 301:18

303:7,17,18
305:2 308:17
309:19,22
313:17 317:21
318:3,8 321:3
333:2
**seconds** 231:9
244:3 246:23
247:2,3,20
248:23 249:20
255:7,21 258:5
258:6,8,14,17
285:15 286:4
**secret** 168:11
**secure** 224:22
**security** 363:2
364:8
**see** 10:1 44:8
47:18 53:13,22
57:7 63:6
65:18 67:6
69:13 82:10
83:18 84:23
87:3,14 95:4
104:15 111:4
111:20 113:17
115:7 117:21
118:8,18
119:15 123:2
123:13,16
126:19 128:19
129:21 130:8
131:10,12
132:12 136:8
145:18 159:7
163:5,8 164:4
167:18,20
170:13 173:20
177:18 182:21
197:22 206:8
210:12,18
212:1,14,17
213:7 214:10
221:9,19

223:13 229:15
230:14 234:1
234:19 238:6
247:6,8 248:3
248:12,15,16
248:17 249:10
249:11,13
250:1,7 251:6
253:5 258:19
259:1,10,19
266:1,3,20
268:3,8,15
274:3,3 275:18
278:17 280:22
281:18 283:21
288:18,21
289:2,7,11
291:21 292:1,6
294:9 296:2
297:3,10 298:4
300:22 303:17
305:3 307:2,8
307:10,15
314:20 316:8,9
316:17 320:21
325:18,22
328:14 330:7
330:11 338:18
342:7 347:20
353:3 356:13
356:16,19,23
362:7
**seeing** 240:23
**seek** 352:11
**seeking** 20:13
293:11 353:11
353:14
**seen** 104:4 123:9
125:5,9 163:1
179:11,13,17
181:2 182:6
192:12 229:5
247:4 274:17
299:1 358:22

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| sees 22:6 | September 18:2 | 324:9 335:16 | sides 164:10 | sites 39:22 |
| selected 36:1 | 47:2 158:15 | 335:21 | sign 214:23 | sitting 50:17 |
| seminar 269:18 | sequence 157:8 | sheets 311:20 | 239:3,5 242:15 | 72:13,19 151:9 |
| 269:23 271:19 | serious 324:23 | 312:1 323:16 | 245:2 259:15 | 253:12 269:22 |
| seminary 16:14 | service 28:7 | 335:14 347:9 | 259:16,18 | 351:12 |
| 16:16 26:3,5,6 | 37:23 43:16 | 348:9 | 266:6 269:6,7 | situation 45:12 |
| send 98:8 | 84:18 93:16 | shelf 63:13 | 275:1 277:20 | 55:5 68:10 |
| 170:16 186:11 | 94:5,6,7,9,16 | shift 120:11 | 277:23 301:19 | 88:10 103:1 |
| 217:20 233:19 | 94:19 | shirts 70:1 | 301:22 312:1,5 | 116:16 118:15 |
| 233:20 234:4 | set 62:19 186:16 | shoot 359:7 | 360:7,10 | 129:9 146:14 |
| 325:10,13,14 | 232:11 281:20 | 364:3 | 361:16 | 152:4 153:14 |
| 326:1 331:15 | 345:2 355:16 | short 148:14 | signals 140:22 | 153:22 165:19 |
| 349:23 350:21 | setting 229:12 | 251:6 | 141:2 | 200:12 219:4 |
| 355:18 | 337:14 | shoulder 112:1 | signature 2:2 | 239:10 278:10 |
| Sending 232:12 | settings 20:16 | 313:6 | 3:9 122:1 | 311:12 337:2 |
| senior 15:1 | 202:16,19 | show 125:4 | 273:5,8 298:12 | 346:22 349:21 |
| sense 71:17 | setup 218:7,7 | 146:13 150:22 | 305:5 321:4 | 357:14 |
| 105:19 111:15 | setups 345:7 | 195:2 207:8 | 326:11 | situations 12:2 |
| 120:1 126:7 | seven 49:15 63:8 | 237:6 274:13 | signed 5:2 | 22:10 114:16 |
| 147:14 150:17 | 92:19 262:23 | 291:14 298:11 | 335:21 346:20 | 296:21 346:14 |
| 152:5 155:15 | 333:1 | 298:21 302:7 | 359:20 | six 64:10 95:5 |
| 215:22 253:4 | seventeen | 303:7 305:11 | significant | 126:9 253:14 |
| 297:13,16 | 328:20 | 314:17 317:5 | 294:20 | sixteen 100:13 |
| 308:11 346:18 | sex 311:15,15 | 324:10 326:7 | similar 33:4 | 100:15 104:2,4 |
| sent 86:3 90:18 | 346:10 | 332:20 345:1 | 74:21 357:21 | 104:14 105:11 |
| 125:16 161:8 | sexual 273:18 | 348:5 356:11 | simple 220:18 | 327:19,22 |
| 207:16 267:15 | 286:18 306:7 | 358:21 359:18 | 361:9 | 328:6 |
| 283:1 289:4 | 306:11,13 | 362:18 | simply 21:23 | Sixth 6:20 |
| 301:3 318:5,11 | 311:1 314:1 | showed 284:13 | 221:16 296:14 | size 134:19,20 |
| 325:23 331:9,9 | 316:14 338:3 | 285:17 324:7 | 300:9 | 134:21 143:20 |
| 331:11,13,17 | sexually 80:17 | 334:22 | simultaneously | 143:20 250:2 |
| 332:5 345:21 | 81:20 82:1 | showing 285:10 | 280:6 | Si.com 40:1 |
| 350:14,18,22 | 231:3 285:4 | 364:12 | sing 247:14 | skin 111:23 |
| 352:21 356:23 | 314:3 | shows 337:5,7 | 351:10 | sleeping 99:8 |
| sentence 246:20 | shake 141:18,20 | sic 33:7 62:3 | singing 245:10 | 140:20,21 |
| 292:2 | 142:1 | sick 82:23 85:18 | 245:14,15 | slow 38:23 |
| sentences | shakes 359:13 | 201:4 231:15 | 247:13 | slowly 258:18 |
| 101:17 | shalt 28:23 | 301:5 364:7 | sir 8:6 99:1 | small 129:19 |
| separate 109:16 | shed 53:9 | side 10:9,9 105:8 | 201:3,9 332:21 | 131:4 173:8,10 |
| 145:9 169:3 | sheet 194:8,9 | 137:7 138:12 | 355:1 | 174:3 181:18 |
| 170:16 276:1 | 213:17 311:18 | 139:1 143:23 | sit 11:8 65:15 | 230:6,10 |
| 282:20 | 312:10,12,15 | 144:15,16 | 115:20 141:6 | 232:16 235:8 |
| separately | 313:7,18,20 | 177:8,8 180:3 | 154:3 244:7 | 241:18 242:10 |
| 220:10 | 314:21 323:4 | 291:1 | 353:21 | 250:4 312:16 |

# FREEDOM COURT REPORTING

313:4
smaller 134:19
smallest 246:3
sneak 252:1
sneaking 351:13
Snipes 86:2
124:12,20
185:13,16
187:7,8,9,10
188:17 190:22
267:20 282:9
282:15 294:10
341:23 343:15
345:9 346:2
355:3
socialize 241:19
society 22:2,5
83:9 84:11
106:6
sociological 61:7
69:20 74:6
105:14 183:1
sociology 14:4
14:14
Sodom 79:21
solemnly 327:12
solid 10:22
solution 131:16
227:9
solve 101:6
159:16
solving 160:8
somebody 54:6
68:16 69:18
76:2 114:17
172:10 178:22
179:23 195:2
208:14 266:11
267:1 278:19
341:3 351:23
359:20 364:12
somebody's 76:2
somewhat 77:16
77:20 127:1

Son 21:6 26:18
57:2
song 351:3,10
sons 178:12
Sonya 57:19,20
77:15 124:19
158:9,18,20
159:3 166:7,10
166:15 168:13
172:7 177:11
179:5 183:7
184:7 190:19
226:21 227:5
228:11,14,20
230:21 232:4
237:14,15
287:9 307:1
350:8
soon 158:8
175:14 184:18
216:8,13
sorry 9:2 17:23
38:7 57:17
68:14 74:19
96:10 136:18
140:12 141:13
149:11 150:4
224:3 254:13
307:9 318:1
sort 11:9 21:17
39:16 48:20
52:11 68:19
73:13,19 76:8
90:1,23 100:13
100:20 131:13
134:12 135:10
154:19 161:8
162:3,5 173:8
173:8 193:9
194:19 196:7,7
198:12 241:14
294:21 340:9
sought 328:12
sound 16:21

sounds 14:13
36:5 88:20
157:6 252:22
source 128:6
146:15 329:12
sources 170:14
328:23
South 14:5,14
14:21 15:7,15
15:21 16:6,7
92:13,21 93:6
southern 18:13
18:19,20,22,23
20:23
so-and-so 69:18
131:18,19
space 137:3
139:9 167:11
246:12 260:2,4
260:7
span 111:5
364:3
speak 22:23
25:20 79:5
84:2 105:2
112:16 137:8
228:6 229:22
231:7,18
247:10,22
249:16 269:20
270:4 271:3
283:8 293:23
296:10 301:15
362:2
speaker 31:22
speaking 28:9
83:15 222:22
222:23 303:21
speaks 22:6
79:13,23
special 29:19
35:21,22 103:8
338:17
specially 36:1

specific 28:14
31:8,10 35:9
57:8 68:15
70:11 79:8,8
134:15 143:12
146:17 166:1
167:3 168:18
196:22 227:4
245:7
specifically
198:9 206:21
286:13,17
spectrum 17:2
speech 171:1
244:13
spied 364:7
spin-off 51:21
spirit 26:17,17
26:19 42:16,17
83:11 84:2,12
87:7,9
spiritual 26:8,9
29:20 88:23
89:1 100:14
184:2
spoke 35:14
50:13 70:23
175:16
spoken 12:23
65:20
sport 40:5
sports 40:1,2
80:21
spreading
244:14
stack 164:23
stacks 217:21
staff 3:10 117:6
117:10,15,18
118:5 119:4,9
122:5,7 134:8
179:9,11,20
336:17
stamp 266:20

267:2 353:1
stamped 300:1
stand 61:1 88:6
250:14 253:6
255:5,16
272:20 295:16
312:11 314:19
339:5,10 340:3
standards 19:2
115:7 183:15
standing 20:19
141:3 142:4
243:1 244:13
246:5 249:9,18
249:21 250:8
251:23 253:8
312:20
standpoint
54:22
stands 167:10
314:13
stapled 327:9
start 119:17
128:2 142:3
152:16 269:19
started 20:18
48:17 63:4
93:5,7,13,23
94:23 105:8
109:5 110:4
122:8,10
134:23 146:8
152:21 176:6,7
176:12 218:7
241:12 361:4,4
364:1
Starting 44:8
starts 306:23
state 22:3 67:19
99:14 182:11
237:21 292:19
293:19 296:5
319:10 331:3
364:15,19

# FREEDOM COURT REPORTING

405

| | | | | |
|---|---|---|---|---|
| 368:2,5 | 350:16 353:1 | 131:1,8 136:10 | **students** 32:1 | **Sunday** 19:20 |
| **stated** 70:18 | 353:20 | 177:21 180:2 | 77:13 115:6 | 20:5 28:2 35:7 |
| 75:6 80:12 | **stating** 148:1 | 218:15 226:1 | 119:8 165:11 | 76:17 99:2,19 |
| 96:17 103:7 | **status** 174:18 | 243:5 269:21 | 217:12,12,14 | 99:22 106:3 |
| 105:10,14 | 177:19 | 349:22 | 241:21 244:10 | **Sundays** 19:13 |
| 117:22 119:1 | **stay** 27:15 130:3 | **stopped** 93:10 | 271:20 272:22 | 97:17,21 |
| 137:22 138:1 | 200:5 323:17 | **storage** 150:7 | 366:3 | **sung** 351:2 |
| 140:2 144:11 | 336:21 | **store** 40:22 44:1 | **studies** 14:9 | **superior** 345:10 |
| 144:21 147:11 | **stayed** 86:23 | 45:13 46:12 | 15:1,18 17:8 | **supermarket** |
| 148:4 152:9 | 185:7,7,8 | 48:23 60:5 | **studying** 35:18 | 231:8 285:10 |
| 156:4 161:15 | 221:2 346:23 | 61:22,23 62:13 | **stuff** 12:6 82:10 | 334:22 335:6 |
| 162:1 163:15 | **steady** 136:23 | 62:17,23 63:5 | 82:12 85:16 | **supervise** 118:2 |
| 191:2,5 206:7 | **steal** 151:1,6 | 63:7 64:22 | 115:22 116:7 | 118:3 |
| 207:1,22 | 152:1 162:11 | 285:13,17 | 128:20 135:11 | **supervises** |
| 220:20 225:4 | **stealing** 151:2,4 | 286:5 335:2 | 144:4 145:14 | 130:12 |
| 228:22 232:18 | 160:3 162:2,20 | **stores** 40:20 | 163:4,9 171:1 | **supervision** |
| 238:1 244:3 | 162:23 163:1,2 | **storing** 240:9 | 177:10 178:12 | 153:13 336:12 |
| 264:23 269:14 | 163:13 164:21 | **stormed** 152:21 | 186:1,2 196:8 | 368:11 |
| 308:7 309:1,3 | 164:22 165:7 | **story** 148:14 | 199:5 205:4 | **supervisor** |
| 309:7 320:4 | 217:17,18 | 238:8 | 226:2 238:20 | 64:14 109:6,16 |
| 327:8,8 334:21 | **stenographic** | **strain** 89:23 | 240:17 249:1,2 | 110:1,12,22,23 |
| 341:9 344:9 | 368:8 | **stranger** 141:20 | 256:13 280:12 | 111:2 113:6 |
| 346:21 348:21 | **step** 139:19 | **streak** 60:18 | 280:14 289:3 | 119:7 120:18 |
| 351:9 355:22 | 154:13 288:19 | **street** 1:18 6:17 | 293:3 294:21 | 120:22 126:5 |
| 357:20 365:3 | **stepping** 252:16 | 7:7 41:1,3 | 326:2 336:13 | 126:13 130:9 |
| **statement** 4:12 | 252:21 | 42:20 43:10,13 | 339:7 356:7 | 130:13,14,15 |
| 8:13 31:9,10 | **stick** 72:21 76:6 | 44:11 180:15 | **stunt** 244:18 | 133:20 134:3 |
| 96:19 117:23 | 118:13 164:10 | 232:15 233:12 | **style** 32:2 | 136:15,17 |
| 155:2 197:14 | **STIPULATED** | 234:7 | **Styx** 366:6,10,16 | 141:10 145:15 |
| 213:2 218:11 | 1:13 2:1,8 | **stress** 89:23 | **subscribe** 107:4 | 145:16,18 |
| 219:19 245:19 | **stipulation** 7:5 | 206:1 | **substance** 56:14 | 146:5 147:2 |
| 288:19 305:14 | **stipulations** | **stressed** 171:9 | **sue** 46:2 48:4 | 152:5 210:14 |
| 316:14 318:2 | 7:17,20,21 | **stretch** 102:8 | 51:13 | 211:2 212:11 |
| 340:3 344:6 | **stirring** 116:7 | **stretched** 102:9 | **suggest** 91:4 | 213:12,20 |
| **statements** | **stock** 44:15 47:5 | 206:9 | 355:21 | 216:16 234:16 |
| 101:20 104:16 | 47:5 63:11 | **strife** 114:15 | **suggested** | 277:1,2 281:9 |
| 332:15 344:21 | 152:13,14 | **Strike** 141:13 | 189:20 | 295:4,12 298:2 |
| 344:23 349:13 | **stocker** 44:16 | **strive** 21:23 | **suggesting** 90:14 | 311:6,20 312:1 |
| 357:22 | **stocking** 152:16 | 29:13 | **Suite** 1:18 6:21 | 314:9,11 |
| **states** 1:1 6:1 | **stood** 246:13 | **strong** 25:15 | 7:8 | 323:19 324:2 |
| 156:5 197:9 | 248:22 293:14 | 29:9 69:8 | **sum** 101:19,20 | 333:17 338:12 |
| 203:21 214:15 | 343:23 361:10 | **stub** 301:4 | **summarize** 21:2 | 356:6 |
| 261:17 318:22 | **stop** 10:2 41:16 | 331:14 | 101:16 | **supervisors** |
| 327:6 342:4 | 57:11 84:19 | **stubs** 348:4 | **summer** 109:22 | 89:21 275:13 |

# FREEDOM COURT REPORTING

406

| | | | | |
|---|---|---|---|---|
| **supervisor's** 90:11 189:15 267:6 | 106:12 109:8 119:5 125:23 130:5 183:8,19 183:20 190:5 206:20 217:2 218:4,11,15 220:11 225:2 261:20 273:9 274:22 279:14 282:13 285:2 287:19 290:15 294:14 304:9 312:5 321:23 325:20,22 329:4 331:17 340:7 347:2 354:17 355:6 358:1 361:23 | **switch** 15:14,19 263:23 | 347:6 368:7 | 261:8 263:2 |
| **supplies** 240:9 253:19,20 256:4,5 | | **Switching** 303:6 | **takes** 84:19 | 276:6 282:8 |
| **supply** 165:1 229:19 238:12 239:11 240:5,6 240:14 241:12 241:17 242:8,9 244:20 248:14 248:20 249:3,6 250:11,23 258:15 264:21 325:5 | | **sworn** 7:14 | 255:17 258:13 | 286:7 293:6,7 |
| **support** 79:21 103:16 330:9 | | **S-C-H-I-L-L-...** 62:3 | 334:3 | 293:8,10 |
| **supported** 29:23 80:2 84:3 | | _____ | **talk** 34:8 36:20 | 365:23 |
| **supportive** 59:8 84:7 | | **T** | 48:13 50:20 | **talking** 17:7 |
| **supports** 56:21 | | **T** 1:12,12 | 51:7 61:15,18 | 42:23 43:4 |
| **suppose** 110:8 190:18 | | **tactics** 113:19 | 61:21 65:15 | 48:12 51:1 |
| **supposed** 64:6 82:21 109:21 135:7 150:20 189:5,12 232:13 239:14 246:11 279:3 294:11 310:11 323:22 355:4,9 355:23 356:1 358:9 361:21 363:2 | | **tails** 70:2 | 66:13 67:19 | 57:16 60:15 |
| | | **take** 9:18,22 10:6,20 25:13 37:11 63:12 65:12 73:3 82:11 89:15 100:17 102:7 121:15 125:7 164:23 165:3,4 175:20,21,23 199:4 204:5,19 207:19 211:19 230:12 237:8 244:6 255:10 265:11 274:14 280:9,14 288:14 289:8,9 289:19 295:3 295:12,15 301:15 315:21 315:22,22 316:5,6 317:21 317:23 319:21 321:8 323:10 323:17 326:8 333:21 334:8 334:17 335:11 336:19 337:8 349:3 | 69:15 91:1 | 68:7 113:22 |
| | | | 111:20 115:12 | 134:23 136:23 |
| | | | 115:21 127:17 | 146:8 156:11 |
| | | | 132:19 135:22 | 176:6 187:7 |
| | | | 136:1 137:6 | 194:20 196:15 |
| | | | 141:7 143:18 | 228:6 236:3 |
| | | | 143:21 144:12 | 237:1 239:10 |
| **supposedly** 144:1 161:10 163:1 | | | 144:12 153:1 | 239:21 252:5 |
| **sure** 9:14 10:20 11:6 18:10 56:19 57:15,18 60:14 63:18 67:14 98:15 | **Surely** 76:19 **surprise** 227:19 **surprised** 241:14 242:23 243:9 **suspended** 50:11 236:7 261:13 274:13 278:16 282:7 293:4,12 303:11 304:15 324:6 341:11 **Suspending** 351:14 **suspension** 3:21 261:18 262:8 266:15 278:22 288:17 292:5,9 297:11 303:23 304:2,12,18 324:5 334:10 344:10 **sway** 23:23 **swear** 327:12 **sweep** 119:13 **swifter** 47:22 | | 157:12,13 | 261:3 282:12 |
| | | | 185:17 216:22 | 283:15 288:3 |
| | | | 217:4 218:18 | 289:14 307:2 |
| | | | 218:23 219:5,5 | 314:20 320:8 |
| | | | 220:22 221:12 | 320:10 348:18 |
| | | | 221:13 222:6 | **talks** 27:2 58:3 |
| | | | 224:6 225:8,16 | 86:11 127:21 |
| | | | 226:5 227:18 | 224:4,9,20 |
| | | | 228:16 239:15 | **tall** 251:6 313:4 |
| | | | 244:7 254:1 | **Tallapoosa** 1:18 |
| | | | 261:22 262:1 | 7:7 |
| | | | 272:9,17 | **tape** 180:22 |
| | | | 276:19 341:1 | 263:19 342:20 |
| | | | 352:10 354:8 | 342:22,23 |
| | | | 354:11,15 | 343:1,3,4,9,9 |
| | | | 357:11 358:3 | 343:10 |
| | | | **talked** 12:13 | **tape-recorded** |
| | | | 13:3,6,9,12,15 | 321:16 |
| | | | 52:8 54:4 | **tax** 331:3,6,7,12 |
| | | | 59:21 68:6 | **taxes** 331:20 |
| | | | 71:11 85:21 | **Taylor** 317:12 |
| | | **taken** 1:16 8:17 8:23 9:4,5 89:16 204:15 231:14 249:3 292:3 321:9 | 86:9 88:3 92:5 | 318:23 319:3 |
| | | | 92:11 96:5 | 320:6 341:17 |
| | | | 132:18 172:4 | 343:13 351:2 |
| | | | 176:5 209:2 | 355:3 |
| | | | 216:15 227:14 | **teach** 30:3 34:15 |
| | | | 227:17,21 | 34:20 35:20 |

| | | | | |
|---|---|---|---|---|
| 150:17 | 177:11 179:4,5 | 130:4 132:23 | 344:18 | **things** 10:22 |
| **teaches** 22:12 | 180:12 183:4 | 170:22 231:9 | **terminology** | 27:3 29:20 |
| 26:13 29:6 | 184:8 186:15 | 244:2 249:20 | 8:15 40:3,4 | 30:13 31:4 |
| 30:3 33:11 | 187:15 189:12 | 255:20 258:5,8 | 198:19 199:21 | 33:1,8 34:7,12 |
| 35:17 36:8,12 | 191:11 201:7 | 258:14 262:22 | **terms** 58:12 | 34:20 52:1,3 |
| 53:4,16 147:21 | 206:17 208:14 | 262:23 279:19 | **test** 194:13 | 52:11,19 53:18 |
| 154:17 308:13 | 218:17 220:7 | 285:13 286:4 | **Testament** 22:9 | 58:7 64:2,4,5 |
| 309:9 | 221:3,15 | 329:2,7,13,17 | 35:13,14 54:14 | 68:17 69:19 |
| **teaching** 19:21 | 222:10 224:21 | 334:7 347:17 | 54:16 57:5,5 | 71:1 73:21 |
| 28:12 31:16 | 228:18 230:21 | **tend** 25:13 60:21 | 79:12,20,22 | 85:18 87:11 |
| 34:2 36:11 | 232:4 238:20 | 69:19 71:4 | 309:8,9 | 88:15 93:10 |
| 309:16 | 241:7 243:23 | 154:12 181:20 | **testified** 7:15 | 105:11 106:6 |
| **teachings** 26:6 | 260:14 261:19 | 181:23 198:11 | **testify** 322:18 | 113:9 117:6,20 |
| **techs** 339:14 | 262:10 263:7 | 316:18 | 323:2,3,13,14 | 125:22 127:20 |
| **Teffend** 113:8 | 264:9,18 267:4 | **tends** 25:10 | 323:20 324:9 | 130:18 131:11 |
| 113:10 116:21 | 271:13 274:5 | **term** 74:17 | 324:12 325:5 | 131:22 145:6 |
| 119:21 121:7 | 283:17,18 | 199:15 | 336:1 | 147:5 148:10 |
| 130:7,14,17 | 284:7,8 286:13 | **terminate** 67:23 | **testimony** | 148:21 155:3 |
| 131:12 145:22 | 286:17 287:10 | 323:7 341:14 | 100:20 337:11 | 162:23 163:7 |
| 179:6,9,20 | 288:7 291:1,1 | **terminated** | 341:11 | 174:21 176:8 |
| 180:19 181:14 | 291:9 308:16 | 12:22 45:7 | **tests** 193:15 | 178:15 183:3 |
| 237:16 336:17 | 308:21 317:8 | 51:8,18 60:3 | **Thank** 9:21 | 183:16 196:3 |
| 339:4 340:5 | 319:14,18,19 | 63:2 69:11 | 88:13 184:14 | 197:4 201:13 |
| **Teffend's** | 322:5 326:22 | 71:12 73:2 | **Theologic** 26:5,5 | 201:17,20,21 |
| 114:10 130:10 | 335:14 348:19 | 92:10,22 93:20 | **therapists** 328:3 | 210:7 220:22 |
| 150:8 340:3 | 357:19 358:13 | 93:21 105:6 | 328:8 | 221:13,14 |
| **telephone** 60:6 | 360:13 363:2,5 | 153:22 188:18 | **they'd** 316:1 | 223:6 229:13 |
| 108:5,9 203:17 | 364:11 365:13 | 188:18 189:7 | 334:7 | 229:14,15 |
| **television** 25:2 | **telling** 74:3 | 190:1 202:2 | **thin** 199:16 | 231:19 239:12 |
| 30:9 | 104:10,12,13 | 218:13 226:7 | **thing** 36:12 | 252:8 256:7 |
| **tell** 8:17 13:19 | 132:8,10 143:9 | 257:22 291:22 | 39:15 46:10 | 267:8 330:21 |
| 59:8 76:3 85:4 | 216:21 246:21 | 294:12 295:21 | 47:5 51:5 | 330:22 333:14 |
| 100:11 101:22 | 247:16 260:12 | 298:7 301:6 | 69:20 74:5,7 | 341:12 361:7 |
| 105:12 112:1 | 260:14 270:1,9 | 303:15 305:15 | 75:17 83:15 | **think** 8:3 18:19 |
| 114:7 117:19 | 270:10 271:15 | 305:21 306:5 | 84:16 87:22 | 43:12 49:23 |
| 130:23 133:22 | 318:14 351:12 | 310:6 317:14 | 101:8 133:1 | 59:20 61:11 |
| 135:17 141:1 | **temporarily** | 318:9 341:20 | 137:19 148:2 | 67:1 68:7,16 |
| 147:10 149:22 | 94:1 | 343:17 | 162:13 171:3 | 69:14 72:8 |
| 155:11,17 | **temporary** | **termination** 4:6 | 177:14 178:5 | 73:14 74:12 |
| 158:17,23 | 108:21 109:7 | 4:8 51:17 | 189:13 193:9 | 78:9,10 81:7,8 |
| 161:17 166:21 | 109:16 110:1 | 291:23 294:7 | 218:8 246:11 | 81:19 85:13 |
| 167:12 170:2 | 110:14 122:13 | 299:11 302:12 | 286:19 294:8 | 92:14 96:8,10 |
| 173:3 174:8 | **ten** 37:16 39:10 | 304:1 317:11 | 304:6,10 | 100:16 103:2 |
| 176:16,19 | 92:7 120:3 | 319:1 341:19 | 366:15 | 103:11 104:8 |

# FREEDOM COURT REPORTING

112:9 115:16
115:22 116:11
117:5,10,13
118:6 123:19
126:10 130:3
132:16,16
133:16 134:2
143:20,21
149:6,12
157:12 158:3
158:13 163:1
164:4 169:11
171:20 182:10
183:23 184:16
184:22 185:7,9
198:11,13
202:6 203:8
205:18 212:3
214:19 220:12
222:3,12,14
235:20 236:2,2
236:23 239:18
255:3 256:23
257:13 258:13
262:7 267:1
270:21 271:21
273:21,22
274:1,4 277:14
289:2 293:13
330:5 331:9,13
331:15 332:4
338:2 341:15
341:19 350:14
359:6 364:22
366:10,12
**third** 99:12
181:10 183:7
184:7 327:9
**third-hand**
70:14
**thirty** 63:1
347:17
**thirty-five** 37:15
**thirty-one** 123:7

**thirty-three**
21:8
**thorough** 165:23
**thoroughly** 37:4
37:8 80:2
124:15 242:23
243:19 309:14
**thou** 28:23
**thought** 47:20
60:11 113:18
128:7 144:22
162:16 286:9
332:5 338:21
357:6
**thousand** 53:2
**threat** 33:20
**threaten** 76:1
103:6 164:14
188:22
**threatened**
52:20 75:23
160:6 161:23
164:6,16
167:23 170:9
199:4
**threatening**
52:17 53:13
72:12 75:19
146:11 149:3
152:4 156:15
156:18 157:1,2
163:14 164:5
170:7 188:20
188:22 285:5
**three** 14:4 15:7
16:9 35:13
47:19 86:5
93:8 98:12
101:17,20
111:5 120:10
120:14 126:9
133:7,19
136:11,13
138:6 150:11

203:13 205:15
212:10 245:4
247:3 255:7
261:2 262:12
262:21 263:7
279:7 284:1
290:16 293:6
308:8 311:5
314:8,10
316:20 336:21
343:3,6 346:21
348:11 349:18
355:9 356:12
**threw** 227:20
**throwing** 228:5
260:15
**thrown** 58:15
**tilted** 250:10
251:5 253:8
**Tim** 349:11
**time** 9:8 10:1
12:1,21 14:8
19:3 22:7 23:9
37:21 40:14
48:18 49:23
50:18,19 57:10
63:19 65:14
66:11 69:7,14
69:22,22 70:16
70:16,21,21
72:3 74:10
80:20 84:15
93:9,11 96:3
97:3 98:6
101:18 102:15
102:17 105:3
105:21 108:10
111:13,21
118:3 120:4,5
126:4 129:22
130:8 131:14
135:9,9 136:23
137:13 141:18
142:2 143:22

145:5,9 150:23
157:22 158:6
158:20 159:3,6
163:3 164:2
165:16 166:6
168:9 175:18
175:20,22,23
178:15 182:21
187:18,19
188:23 189:4
190:10 192:11
192:14,22
199:10,17
200:7 201:2,4
205:18 217:16
217:22 219:10
225:17,17
226:16 227:19
229:19 230:11
230:19 231:21
235:19 236:22
238:8 240:8,19
242:21 243:2
246:5 247:12
250:1 251:4,17
258:16 259:2
267:21 268:11
268:19 269:22
270:2 275:22
278:18 280:8
280:10,15,20
281:1 283:6
287:1 293:21
294:20 295:3
296:14,15
299:19 300:20
300:21 301:3,5
301:11,17
310:19,23
311:18,19,20
312:1,5,10,12
312:15 313:13
313:19 314:21
315:21 316:4

319:9 322:8
323:4,4,4,13
323:16 324:9
324:14,18
326:8 331:23
332:1 333:21
334:9 335:14
335:16,20
336:1,19 337:8
343:5 344:12
347:8,13,14,16
348:9 350:14
351:3,9,9,9
357:10 364:12
366:14 368:15
**timer** 280:4
**times** 112:4,12
116:1 119:5
123:5 127:7,11
139:21 164:9
179:14,21
182:7 196:10
219:18 227:2
227:13,18
229:1 232:6,22
238:14 240:20
245:4 263:13
263:15,18
265:20 270:11
279:16 283:3
291:7,8 308:8
316:20 326:2
336:2,11 339:7
341:15
**today** 8:7,11
21:14,21 23:23
40:2 64:6,8,9
85:20 125:10
175:12 192:11
194:5 276:9
279:10 346:19
353:22 364:6
**today's** 19:3
22:7

| | | | | |
|---|---|---|---|---|
| **token** 55:13 | 291:3,7 292:15 | 319:15 321:14 | 55:11 103:4 | 82:9 84:11,12 |
| **told** 32:9 45:13 | 292:20 306:9 | 342:9 | 156:3 178:11 | 87:6 101:5 |
| 51:6 54:17 | 307:13,17 | **towel** 162:14 | 200:10 217:13 | 103:5 114:4 |
| 60:6 75:4,6,8 | 308:18 315:6,9 | **towels** 121:2 | 218:1 238:19 | 118:11 162:9 |
| 78:6 85:2 | 315:11 319:8 | 151:3,4 159:22 | 320:12,15 | 169:16 200:5,7 |
| 89:22 90:2 | 319:15 320:6 | 160:3 162:2,12 | 351:18 352:8 | 204:20 206:11 |
| 91:10 101:11 | 320:16 324:2 | 162:12,20 | **treatment** | 226:19 229:17 |
| 103:3,21 | 329:12 333:10 | 163:13 164:21 | 174:14 188:3 | 235:15 238:6 |
| 124:20 126:22 | 337:13 338:8 | 164:22,23 | 328:11,13 | 245:1 287:4 |
| 128:17 129:12 | 342:8 343:23 | 165:1,10,11 | 341:23 343:18 | 340:16 349:20 |
| 131:3 132:6,7 | 344:1,4,8,15 | 217:17,18,18 | 344:16 | 351:11 365:1 |
| 132:21 133:21 | 346:1 347:1 | 217:20,21 | **tremendous** | **trying** 26:11 |
| 135:14 140:12 | 349:7 350:11 | 241:20 | 29:13 | 32:5,7 33:22 |
| 149:12 152:17 | 351:2,4,20,21 | **town** 181:18 | **trial** 43:8 321:20 | 56:7 58:6 59:8 |
| 153:9 155:21 | **tone** 241:15 | 231:6 350:10 | 322:18 323:2 | 70:6 71:19 |
| 156:7 157:10 | 243:9,13 | **Toyota** 62:6 | 354:1,3 | 82:13 90:15 |
| 157:12,13 | **toned** 308:11 | **tracks** 15:20 | **tried** 32:14 | 102:10 105:5,8 |
| 159:13 160:21 | **too-close-for-c...** | **training** 16:15 | 60:10 68:2 | 106:1,5 112:21 |
| 161:6,19 | 144:23 | 295:4,12 298:2 | 81:10,12 115:5 | 116:2,9,10,12 |
| 165:12 166:15 | **top** 300:1 338:21 | **transcript** 10:17 | 115:23 235:7 | 127:9 135:15 |
| 167:6,17 | **topic** 17:8 | 368:10,13 | 238:8 252:11 | 136:23 137:16 |
| 168:13,18 | **total** 36:4 | **transferred** | 260:14 278:10 | 139:13,16 |
| 169:20 171:5 | 326:17 | 16:11,12 48:20 | 351:7 | 140:8 142:8 |
| 171:20 173:20 | **totally** 51:14,20 | 170:19 238:10 | **trouble** 10:14 | 146:3,13,23 |
| 175:15,23 | 140:2 335:9 | 294:2,6 295:2 | 315:19 | 147:9 150:15 |
| 176:21 187:12 | 336:10 | 295:19,22 | **truck** 63:11 64:8 | 150:22 151:19 |
| 193:12 194:15 | **touch** 81:11,11 | 296:15 297:17 | 64:10 230:2,12 | 151:23 153:2 |
| 195:5,12,13,14 | 88:8 112:16 | 345:11 347:23 | 324:17,18 | 153:10 155:16 |
| 198:10 199:1 | 184:15 251:12 | 349:20 | **truckloads** 72:9 | 166:16,19 |
| 203:10 205:22 | 254:16,19 | **transferring** | **trucks** 47:11 | 167:1 168:18 |
| 206:22 209:7 | 255:9,14 | 297:12 | **true** 221:9,10 | 181:5 183:11 |
| 210:21 218:9 | 311:10 | **translate** 26:11 | 247:13 270:18 | 187:3 191:13 |
| 219:17 221:14 | **touched** 235:23 | **translations** | 271:5,10,11 | 191:15 203:18 |
| 228:21 229:16 | 240:2 254:3,17 | 23:10 | 279:3 299:17 | 206:8 211:6 |
| 232:20 235:2 | 254:18 256:21 | **treat** 65:4 75:15 | 320:15 327:13 | 217:7 218:14 |
| 236:15 242:21 | 260:7 263:8 | 95:20 147:22 | 368:13 | 218:21 221:17 |
| 245:3,17 | 264:10 291:5 | 153:13 154:11 | **trustees** 296:8 | 225:21,22 |
| 256:17 264:11 | 292:21 310:23 | 154:15,18 | **truth** 8:17 84:17 | 231:17 232:11 |
| 264:14 265:4 | 344:2 351:7 | 155:5,12,22 | **try** 9:11,12,12 | 236:6 239:18 |
| 267:21 269:18 | **touching** 254:2 | 156:1,6 170:11 | 9:19 10:3,10 | 244:22 248:23 |
| 271:7 275:4 | 255:10 256:15 | 175:1,3,5 | 10:16 53:6,14 | 249:21 251:12 |
| 276:10 280:19 | 287:18,21 | 177:7 200:9 | 54:23 57:8 | 253:3 255:2,3 |
| 281:8 282:15 | 292:16 302:14 | 204:2 | 66:5,9 73:16 | 255:8 257:13 |
| 286:9,20 287:7 | 302:16 319:8 | **treated** 54:21 | 75:13,14 82:7 | 257:22 258:9 |

| | | | | |
|---|---|---|---|---|
| 261:11,16,20 | **twenty-one** 18:6 | 285:15,16,19 | 126:3 143:5,11 | 77:14 78:1 |
| 271:18 284:5 | 18:7 62:15 | 286:3 290:16 | 149:14,21 | 79:16 98:10 |
| 286:21 287:2 | **Twenty-seven** | 293:6 311:5 | 155:7 166:5,8 | 108:20 125:20 |
| 287:12 301:14 | 173:1 | 312:19 314:8 | 166:14 172:5 | 127:8 136:8 |
| 314:3,17 319:7 | **twenty-seven-...** | 314:10 316:6 | 172:21 178:17 | 138:15 146:22 |
| 320:13 350:19 | 184:8 | 318:20 326:12 | 191:20 210:15 | 147:1 153:3 |
| 351:14 | **twenty-six** | 331:20 336:9,9 | 226:14,18,22 | 154:11 160:13 |
| **Tuesday** 41:13 | 123:18 | 336:21 345:3 | 239:6 240:21 | 164:15,19 |
| 41:17 42:5,7 | **twenty-three** | 349:4 353:5,8 | 243:11 245:12 | 170:8 182:18 |
| 42:11 43:2,20 | 123:15,17 | **Two-page** 3:11 | 253:15 257:16 | 187:13 196:9 |
| 45:17 48:8,9 | **twice** 38:19 | **two-paragraph** | 259:11,14 | 197:5,23 |
| 48:12,17 49:10 | 145:8 195:10 | 293:5 | 262:14 263:6 | 208:20,23 |
| 49:14 50:4 | 195:17 238:15 | **type** 19:20,21 | 264:16 266:23 | 215:14,14 |
| 57:16 59:21,23 | 257:1 324:16 | 24:2 28:10 | 270:19 279:18 | 220:19 221:19 |
| 61:12 62:21 | **two** 9:18 14:6 | 30:11,16,16,19 | 282:16 286:16 | 225:5 230:16 |
| 63:2,3 68:8 | 15:9 20:12 | 31:22 39:12,14 | 287:19 288:22 | 255:18 268:16 |
| 69:23 287:1 | 41:19,20 47:19 | 39:15 58:16 | 290:6 292:14 | 285:23,23 |
| **Tuesdays** 41:21 | 53:2 64:22 | 62:4 81:2 | 298:6 299:21 | 287:5 290:4,15 |
| **turn** 123:6 | 69:16 81:14 | 86:15 88:5 | 321:12 329:22 | 292:10 294:10 |
| 246:14 249:10 | 86:4 97:13 | 98:1,1,4 | 333:6 | 297:7,20,21 |
| 249:11 330:3 | 98:12 99:8 | 103:12 114:4 | **unauthorized** | 299:10 328:16 |
| 362:6 | 101:17,19 | 116:8,18 118:5 | 279:12 | 332:3 339:11 |
| **turned** 144:4 | 118:4,6 120:10 | 152:14,19 | **uncalled** 138:13 | 339:18 |
| 247:9 249:13 | 120:12,13,15 | 163:17 174:15 | 165:17 | **understandable** |
| 311:18 335:22 | 124:3 125:6 | 246:3 364:18 | **uncomfortable** | 61:10 |
| **TV** 50:16 80:22 | 126:8 130:4,11 | **typed** 227:10 | 26:7 54:20 | **understanding** |
| 105:18 | 133:7,19 | 239:9 289:2 | 104:20 114:16 | 46:18 92:12 |
| **twelve** 37:17 | 136:11,13 | **typed-up** 236:12 | 114:19 115:4 | 187:4 364:23 |
| 111:5 345:13 | 138:6 140:3 | **types** 16:22 | 136:9 137:15 | **understood** |
| **twenty** 15:8 18:4 | 142:2 144:18 | **typical** 18:22 | 138:11 144:6 | 47:23 56:3 |
| 18:5 27:13 | 150:11 158:13 | 19:4 | 147:16 167:9 | 77:17 96:11 |
| 258:5 326:17 | 162:1 168:12 | **typically** 98:13 | 188:2 198:15 | 130:7 140:10 |
| **twenty-eight** | 184:9 189:18 | **typing** 10:7 | 220:21 285:5 | 154:10 163:18 |
| 123:2,19 | 200:19 203:12 | **typo** 270:22 | **undergraduate** | 164:3 170:7 |
| **twenty-five** | 203:12 205:15 | **T.D** 24:23 | 16:17 | 292:8 309:13 |
| 17:21 19:6 | 211:22 212:9 | | **understand** 8:6 | 309:18 |
| 27:12 37:8 | 218:18 231:12 | ——————<br>**U** | 8:10,16,19 | **unfair** 111:11 |
| 49:21 50:1 | 245:4 246:2,23 | **U** 1:12 | 9:10,14 21:15 | 295:1 |
| 63:1,8 64:18 | 247:2 254:20 | **uh-huh** 10:15 | 21:17 25:11 | **union** 6:17 |
| 64:23 66:3 | 257:7 258:20 | 28:13 54:8 | 26:1 28:6 32:6 | 334:2 |
| 123:18 151:7 | 262:21 265:16 | 76:13 91:21 | 32:19 36:14,17 | **unit** 130:10 |
| 364:2 | 265:19 266:10 | 94:9 111:16 | 36:18 37:4,5,9 | 150:7,9,11 |
| **twenty-four** | 271:22 276:1 | 117:17 120:19 | 38:8 60:2 76:1 | 151:10 152:16 |
| 123:18 | 279:22 280:18 | 121:23 124:6 | 76:19,20 77:1 | **united** 1:1 6:1 |

97:7,10 353:1
**units** 130:11
159:22
**university** 1:9
6:9 8:5 10:23
11:21 12:22
14:5,7 15:10
15:15,16,22
16:1,5,6,13
17:7 23:22
39:13 52:1,4,9
52:12 67:3
69:13 71:2
76:9 77:5,7
82:17 87:21
92:13,21 93:2
93:3,6 94:1
100:22 101:9
103:23 118:21
122:6 123:16
124:4 125:15
137:21 142:15
142:17 170:21
177:23 186:14
187:17 199:22
200:1 262:13
271:21 285:11
285:20 297:8
297:17 305:17
333:18 334:15
335:4 343:11
344:18 365:4
**University's**
344:16
**unload** 63:12
**unnecessarily**
139:22 236:8
278:17 282:8
322:22
**unnecessary**
140:4 150:16
150:23 152:2
152:10 153:4
199:5 234:20

238:18 260:17
266:3
**unprofessional**
65:11 207:2
**unprofessiona...**
65:20
**update** 212:13
**updating** 211:4
**upheld** 292:9
345:20
**uphold** 72:3
73:16
**upholding**
297:11
**upper** 305:4
313:6
**UPS** 230:4
**upset** 152:20
158:4 201:11
243:19 272:7
320:13
**up-to-date**
309:16 353:9
**urgency** 300:22
**USA** 40:2
**use** 10:16 23:1
30:5 34:5
38:18,21 39:11
39:19 83:7
131:20 152:4
152:18 162:12
165:10,11
187:19,21
222:16 223:7
231:22 250:1
251:15,16
253:19,22
263:11 279:16
279:16 301:11
306:17 337:19
**Usual** 7:16
**usually** 10:2
**utilized** 232:21
**utilizes** 131:13

**U.S.A** 92:19

---
**V**
---
**vacancies**
297:18
**vacation** 175:13
185:4 190:16
201:4 231:15
349:3
**van** 163:6 168:3
**various** 16:18
19:11 32:11
131:20 138:19
186:21 326:19
**vehicle** 285:12
285:21 335:4
**vehicles** 180:16
**vengeance** 54:13
55:19 59:17
76:23,23 309:6
357:3,5
**versa** 165:5
**verse** 35:10 56:7
56:16 58:21
59:16 73:18
**verses** 35:12
57:9 79:8,9
**Version** 23:8,11
23:12 24:14
**vet** 77:10,11
82:17 84:23
110:7,10,15,16
110:20 111:2
118:1 121:2
135:12,19
140:19 165:3
173:6 181:6
183:10 190:7
200:17 227:11
230:5,9 232:15
296:20 311:23
315:20 320:12
334:16 336:16
339:14,17

340:9
**veterinary**
227:16 272:2
**vice** 52:6 69:8
71:6,8 165:5
**victim** 308:15
**view** 22:4,5,10
74:18 105:15
118:9,12
191:10 345:4
363:19
**viewed** 85:17
89:9 111:13
112:7 118:23
346:19
**viewing** 130:1
**viewpoint** 84:8
164:3 177:18
178:8 183:2
223:17
**viewpoints**
219:7
**views** 51:4 56:4
82:13 102:1,8
105:23 113:12
113:12,16
128:4 147:15
223:15,18
**vindictive** 54:1
60:18 361:15
**violated** 61:8
**vision** 104:5
**visit** 19:12 98:2
99:17 341:15
**visiting** 179:22
**voice** 241:15
243:10,13
**Vollenweider**
191:22 193:4
196:23 197:9
202:9 205:3,20
206:17 221:8
328:17
**Vollenweider's**

3:12
**voluntary**
186:15 189:13
189:16 267:7
342:6
**vs** 1:8 6:8

---
**W**
---
**W** 1:15,22 6:16
7:9,13
**wage** 49:22
60:22 63:7
296:18
**wages** 328:23
329:6
**wait** 250:14
294:20 300:23
303:16 317:19
**waived** 2:4,10
**walk** 13:21
141:19 142:4
151:7,11
231:10 251:22
258:14 285:14
**walked** 134:23
185:14 228:2
241:11 246:20
248:13,16,21
249:15 280:21
286:5 313:14
**walking** 154:1
162:8 234:9,23
247:1 258:17
324:21 364:9
**walks** 275:13
285:15
**wall** 69:14 137:8
**Wal-Mart** 62:6
62:10
**want** 19:16,17
32:4 48:21
53:22 61:3
67:6,9,13,18
67:23 70:9

# FREEDOM COURT REPORTING

412

| | | | | |
|---|---|---|---|---|
| 74:16 82:7 | 113:17,19 | 142:10 143:18 | 129:23 131:9 | 38:19 43:8 |
| 84:12,14,16,16 | 115:14,17 | 154:21 157:11 | 132:2 135:17 | 46:23 47:15,17 |
| 84:18,19,20 | 130:4 135:5 | 157:15,23 | 137:2 138:5 | 51:17 63:15,23 |
| 87:9 90:14 | 137:23 138:4 | 158:5,5 162:4 | 140:7,10 141:7 | 72:8 85:11 |
| 95:5 97:9 | 140:17 143:14 | 162:18 165:6 | 143:4,9 146:9 | 119:20 120:3 |
| 98:18 102:3 | 150:14 151:18 | 177:22 178:1 | 148:11 153:2 | 130:4 158:11 |
| 114:7,17 115:8 | 152:12 160:22 | 180:13,17 | 157:21 160:18 | 158:15 159:11 |
| 119:17 127:19 | 167:4 173:18 | 195:15 196:6 | 163:17 165:21 | 168:12 185:8,9 |
| 129:6 135:16 | 173:20 174:16 | 225:23 232:12 | 167:10,13 | 190:15 200:20 |
| 136:21 139:12 | 174:22 176:4 | 237:23 240:18 | 177:23 183:11 | 205:18 232:23 |
| 139:14,15 | 193:8,10 | 242:20 244:2 | 191:8 218:1,5 | 238:15,16 |
| 142:12 144:3 | 199:12,13,14 | 247:18,19 | 222:2 223:6 | 245:4 256:12 |
| 145:21 148:6 | 205:21 207:3 | 249:19 253:20 | 224:8,15,16,17 | 294:12 324:16 |
| 151:3 152:16 | 217:10 223:19 | 255:4,5 256:1 | 224:20 233:10 | 333:23 347:22 |
| 154:4,11 | 224:23 231:2 | 258:3 260:10 | 236:15 238:19 | **weekend** 210:16 |
| 155:21 160:12 | 233:1,2 234:12 | 260:11 269:2 | 248:17 275:23 | **weeks** 126:9,9 |
| 162:13,16 | 242:7 243:18 | 270:1 276:4 | 294:9 306:10 | 314:8,16 316:2 |
| 174:7,11 184:2 | 244:19 255:14 | 285:6 286:23 | 311:1,11 | 331:20 343:3,6 |
| 185:17,20 | 272:9,17,17 | 340:13 361:16 | 316:21 325:17 | 345:3 |
| 187:17 188:16 | 275:5,6 276:10 | **waste** 152:20 | 330:10 332:13 | **weep** 55:23 |
| 195:2 196:20 | 276:20 313:10 | 162:13 165:16 | 333:11,15 | **went** 13:20,22 |
| 200:2 217:4 | 314:19 341:3 | **watch** 80:21 | 338:8 341:1 | 80:13 87:23 |
| 219:10 220:22 | **wanting** 53:20 | **watched** 364:10 | 343:5 346:1,5 | 88:1 93:23 |
| 221:13 222:6 | 111:19 206:18 | **watches** 364:8 | 349:7 351:18 | 94:22 95:23 |
| 225:1,5 226:10 | 312:21 | **watching** 50:16 | 351:18 | 103:11 104:23 |
| 229:10 230:1 | **wants** 32:1 | 334:23 | **ways** 111:22 | 132:5 157:7,9 |
| 233:11 235:1 | 146:1 | **way** 9:12 11:15 | 112:11 113:14 | 161:18 170:10 |
| 256:14 258:8 | **ward** 165:2,5,8 | 22:6 25:14,19 | 113:17 115:1 | 173:23 174:3 |
| 276:18 278:4 | **wards** 137:11 | 26:22 36:23 | 118:17 175:3 | 175:13,14 |
| 290:15 298:22 | 160:4 162:3 | 50:21 53:6,11 | 294:4 330:2 | 186:7,23 |
| 300:7 312:9 | 165:3,9 | 54:20,23 55:11 | 336:22 343:12 | 187:22 188:10 |
| 322:9 330:3 | **warned** 30:16 | 66:23 68:15 | 361:13,15 | 195:20 213:21 |
| 340:16,21 | 50:10 | 71:16 72:6 | **weapon** 30:18 | 227:12 231:8 |
| 341:1,2,9,10 | **warning** 189:5,6 | 74:17 75:15 | **weapons** 106:16 | 233:15 239:18 |
| 347:22 348:15 | **wash** 241:19 | 76:21 78:4,8 | 106:19,21 | 245:5 249:12 |
| 363:20,20 | **washing** 121:2 | 82:6 88:5 | 107:2,5 | 256:11 264:11 |
| **wanted** 15:22 | 241:20 296:17 | 95:21 98:15 | **wearing** 199:16 | 276:5,13 |
| 16:3,10 59:22 | 296:18 345:12 | 99:4,20 100:2 | **website** 24:2 | 281:17,19 |
| 60:18 65:12 | **wasn't** 39:14,16 | 103:4,15 | 27:1 108:4,17 | 282:22 283:2 |
| 80:16 81:19,23 | 45:16 59:9 | 111:10 112:16 | **websites** 24:16 | 283:21 304:17 |
| 82:9 83:21 | 65:8 91:10 | 112:16,17,22 | 24:17,20 25:3 | 355:13 365:7 |
| 87:5 88:22 | 118:13 123:21 | 114:4 116:14 | **Wednesday** | **weren't** 86:15 |
| 93:8 104:18 | 124:11 128:8 | 116:22 117:1 | 208:4 | 96:22 282:13 |
| 107:11,12 | 135:4,4,6 | 118:9,23 | **week** 31:20 32:4 | **Wetumpka** 7:2 |

# FREEDOM COURT REPORTING

413

| | | | | |
|---|---|---|---|---|
| we'll 9:18,23 | why'd 205:3 | 70:14 72:13 | 202:16,19 | 94:23 109:18 |
| 10:3 31:1 | wide 253:16 | 73:11 76:2,12 | 205:9,12,14,17 | 128:2,21 |
| 48:13 189:9 | 272:21 | 76:16,18 78:1 | 207:22 208:4 | 129:13 130:10 |
| 226:19 261:5 | widespread 19:1 | 79:4 154:23 | 208:10,20 | 130:11 145:19 |
| 302:21 | 296:4 | 157:2,3 160:6 | 209:4,14,19 | 147:17 150:11 |
| we're 8:7 10:1 | wife 138:16 | 197:22 198:19 | 210:5 211:12 | 210:13,17 |
| 10:15 17:6 | Williams 168:23 | 223:18 224:15 | 215:1 216:3,9 | 216:9 285:13 |
| 50:15 65:19 | 169:1,1 365:20 | 263:11,16,21 | 217:9 219:14 | 324:15 325:2 |
| 74:8 87:12 | willing 83:22 | 273:2 356:1 | 226:15,17 | 348:9 363:22 |
| 101:6 102:14 | 197:1 218:22 | 361:10 | 227:11 229:6 | 364:4 |
| 111:23 113:15 | wine 231:12 | words 32:21,22 | 230:9 232:12 | working-type |
| 141:7 143:6 | 285:16,19 | 33:4,4,5 58:11 | 232:13 233:6 | 82:16 |
| 149:6,9 156:8 | 286:3 335:3 | 76:15 155:8,17 | 234:17 238:11 | workplace 87:22 |
| 156:11 184:23 | wipe 137:1 | 155:17,20 | 241:17 248:14 | 175:6 |
| 194:5 206:8 | 162:12 | 156:18 166:21 | 253:23 272:14 | works 19:14 |
| 226:5 234:23 | wiping 135:15 | 167:6 170:5 | 280:2 312:8 | 64:11 65:3 |
| 236:1 244:22 | 142:6 | 195:20 198:1 | 315:17 360:14 | 178:9 282:1 |
| 267:18 282:12 | wise 220:1 | 219:16 222:15 | 360:14,20,23 | world 22:5 |
| 294:14 321:7 | wish 55:10 | 231:22,23 | 362:12,13 | 30:13 182:14 |
| 354:4 361:14 | 88:18 162:11 | 267:14 276:15 | worked 13:16 | 224:23 292:17 |
| we've 8:3 43:19 | 259:23 325:16 | 278:14 308:6 | 28:14 41:6,13 | worse 219:4 |
| 102:9 149:12 | 327:15 | 310:7 344:21 | 41:14 42:6,10 | 336:18 |
| 172:3 185:18 | witch 102:11 | 344:23 | 43:6,6 44:10 | worship 17:3,5 |
| 307:23 318:4 | witchcraft 101:5 | work 3:14 20:21 | 44:18 51:22 | 17:6 19:17 |
| Where'd 99:19 | witness 2:3 7:10 | 32:16 40:17,19 | 52:7 61:23 | 28:7 29:12 |
| white 111:17 | 37:18 42:18 | 41:11 42:5,11 | 62:1 63:22 | 98:13,18 |
| 116:23 223:23 | 84:15 192:7 | 43:9,9 44:3 | 68:21 70:6 | 138:20 139:4 |
| Whitely 275:8 | 270:13 297:2 | 46:22 47:16 | 93:16,18 95:4 | worth 354:9 |
| Whitley 161:2 | 298:23 309:21 | 48:11,21 50:16 | 107:20 113:10 | wouldn't 55:10 |
| 200:15 208:18 | 321:13 322:15 | 54:23 60:7 | 117:16 118:3 | 74:9 81:8 82:4 |
| 209:11,23 | 332:14 359:13 | 62:12,14,22 | 119:21,22,23 | 120:16 161:13 |
| 214:3,5,8,14 | witnesses 321:19 | 63:14 66:7,17 | 120:2 217:6 | 188:1 212:23 |
| 214:18,19,22 | 322:4,5 337:12 | 69:6 87:13,18 | 221:21 238:5 | 228:16 230:11 |
| 215:4,7,12,13 | 340:16 | 95:2,23 98:1 | 238:12,15 | 230:13,14 |
| 227:22 275:6 | woman 53:7 | 107:11,12,12 | 287:1 357:9 | 257:20 266:5 |
| 275:16,19 | 80:10 142:8 | 117:12 119:21 | worker 30:2 | 295:23 315:7 |
| 276:4,8,16,20 | 143:16 176:13 | 120:6 121:1 | 101:5 103:13 | 324:19 325:17 |
| 281:10 322:9 | 177:1,12 181:2 | 126:18 127:19 | 104:7 | 341:3,12 |
| Whitley's 161:5 | 255:10 | 128:3,6,18,19 | working 38:23 | 355:16 356:5 |
| 166:3 168:14 | women 52:20 | 129:6,12 130:2 | 40:16 45:16 | 359:9 365:13 |
| 169:17,22 | word 22:10 | 130:4 132:22 | 48:8,17 50:3 | 365:14,16 |
| 172:3 173:21 | 25:12 26:2,13 | 142:13 151:10 | 51:17 60:20 | wrap 169:16 |
| 183:6 190:9 | 27:22 28:12,22 | 153:15 175:6 | 62:20,21 63:1 | wrapped 189:9 |
| 200:16 279:23 | 30:19 34:15 | 177:7,9 198:16 | 63:4 93:10,23 | wrench 58:14 |

# FREEDOM COURT REPORTING

write 52:22
125:20 155:1
193:19 205:4
260:3,6,13,18
260:19,21,22
265:1,2 269:9
269:10 278:2,4
278:8,18 281:3
288:8 295:17
302:1 309:22
348:10 350:1
351:8 363:9
write-up 245:7
252:9,9 267:10
267:11 268:14
281:4
write-ups
267:12
writing 195:5
205:8 229:13
351:15 354:10
writings 54:15
58:20 79:12,20
309:8,9 313:2
written 50:10
163:4,11
167:19 259:9
261:8 262:8
313:19 326:15
326:18,18
333:22 334:11
341:12
wrong 75:17
78:21 79:1,2,3
80:1 82:15
84:20 118:8
144:16 181:21
188:5 222:6
223:17 224:4,5
224:12,15,16
258:22 266:11
266:17 273:12
304:10 317:20
wrongly 344:10

wrote 66:12
214:8 226:7
259:12 265:19
278:14 288:21
289:3 295:17
300:11 305:18
305:20 307:20
310:19 313:18
344:22
W-2 331:11

___ X ___

X 3:2

___ Y ___

Yahweh 91:13
91:14,16,16,18
91:18,19,23,23
yeah 37:3 47:1
73:20 108:18
116:4 117:21
122:18,21
131:5 132:14
132:14 138:15
184:5 194:15
211:23 214:11
217:1,22
225:10 254:22
261:5 262:22
281:5 287:14
292:10 297:13
304:11 306:2
353:6
year 15:1 17:21
20:8 42:6
48:15 93:22
94:2 111:5
192:21,21
207:15 232:22
235:19 301:12
315:23,23
321:22,22
331:16,16
358:8,9
years 14:2,4,6

15:7,8,10,11
15:12 16:9
17:21 19:7
21:8 27:12,13
37:8,15 39:10
53:2 92:7,16
92:19 93:8
145:19,19,20
150:12 211:22
296:9 311:14
329:2,8,13,17
364:2
Year's 316:4
yell 200:4 244:5
244:6,9 251:13
273:1
yelled 249:12
252:4 257:21
yelling 228:5
241:13 242:3
243:1,6,15
246:13,18
248:21 250:23
255:21 258:3,7
271:19,23
272:7
young 37:19
87:13 361:8
365:6
younger 74:11
youth 19:19,19
20:16
you-all 263:2
y'all 46:10
115:21 218:18
221:21 225:19
239:17 261:7

___ Z ___

zero 112:5 313:1

___ # ___

#420 368:23

___ 0 ___

05 193:5 226:17
228:3,19
236:15
06 268:12
07 192:21
331:21

___ 1 ___

1 3:8 20:8
121:10,14,16
122:2 236:13
1:59 299:15
10 3:22 279:4
288:11,13,15
289:13 290:7
296:23
10/7/92 5:6
10:30 231:13
285:14 286:4
334:22 335:2
105 1:18 7:7
11 3:23 290:14
291:12,15
11:45 300:19
11:58 299:15
12 4:1 298:9,12
298:22 349:1,2
12:45 300:19
121 3:9,10
125 3:11
13 4:4 298:19,22
299:2,8 301:19
13th 126:2,14
150:5 151:17
153:13 159:12
284:13
14 4:7 302:5,8,9
303:1
15 4:9 303:4,8,8
304:21
15th 208:1
209:17 237:13
237:14
1500 6:21

1509 6:16
16 4:11 305:9,12
161 212:16,17
17 4:13 317:3,5
317:6,9,10
318:14
17th 208:4,12,15
209:15,16
211:11,18
216:3 229:1
18 4:14 318:17
318:19,20
321:4
19 4:17 326:5,8
329:20
1901 6:20
192 3:13
1992 363:1
1995 328:13
1997 331:4
332:13

___ 2 ___

2 3:10 121:10,14
121:16 122:4
236:13
2/22/06 259:4
2/23 277:8
2/23/06 3:18,20
259:9
2:35 279:11,19
280:18
2:36 280:3
2:41 280:2
2:45 279:7,20
2:50 280:21
20 4:19 332:18
332:21
200 1:18 7:8
42:8 93:22
2000 93:22
108:11
2001 108:11
2003 42:9

# FREEDOM COURT REPORTING

**2005** 126:2
157:16 211:18
216:3 226:12
226:20 227:3,6
228:9 229:2,5
306:23 309:3
350:17
**2006** 43:5 44:22
47:1,2 48:13
226:9 236:22
259:1 264:7
266:21 268:10
281:4 291:19
298:5 304:7,15
309:23 317:14
319:4,7,12
332:4,7 341:20
344:1
**2007** 42:9 44:23
45:1 50:6
331:20
**2008** 1:20 20:8
20:10 22:8
367:3
**207** 3:15
**21** 4:20 352:12
352:14
**21st** 319:4,6,12
**211** 3:16
**22** 4:21 356:9,12
**22nd** 236:21
259:1 264:7
268:10 314:23
**23** 4:23 358:19
358:22
**23rd** 264:15
268:12
**237** 3:18
**24** 5:2 359:16,19
**24th** 266:21
**25** 5:5 362:16,19
**265** 3:20
**27th** 193:4 195:9
291:19

**274** 3:21
**28th** 1:19 299:13
367:3
**288** 3:22
**29th** 193:5 195:9
195:16 281:3
286:14,15,18
304:7,14,23
**291** 3:23
**298** 4:3,6

___

### 3

**3** 3:11 125:1,5,5
125:9,13 157:5
157:6 159:12
159:21 161:11
162:1 184:23
236:13
**3rd** 298:5
**3's** 167:21
**3/24/00** 4:22
**3/29** 262:9
**3:07-CV-635-...**
1:5 6:5
**302** 4:8
**303** 4:10
**305** 4:12
**307** 269:18
**317** 4:13
**318** 4:16
**326** 4:18
**332** 4:19
**352** 4:20
**35203** 6:21
**356** 4:22
**358** 5:1
**359** 5:4
**36104** 1:19 7:8
**362** 5:6
**36617** 6:17

___

### 4

**4** 3:12 192:3,6,9
193:12 202:5
205:8 206:8

**236**:13
**4/24/06** 4:3
**4/27/06** 3:23
**4:10** 367:2

___

### 5

**5** 3:14 207:6,9
207:12 210:12
**5/25** 305:6
**5/3/06** 4:6
**5:30** 64:10

___

### 6

**6** 3:16 211:15,17
212:1 213:23
214:2 216:6

___

### 7

**7** 3:5,17 237:4,7
238:23 239:2
261:9 264:2,5
265:23 268:9
275:4,22
276:11 363:1
**7th** 219:23

___

### 8

**8** 3:19 265:8,11
268:11,21,23
269:15 273:17
275:4,22
276:12 289:21
**8th** 226:8
**8/15/05** 3:15
**8/17** 213:11
**8/17/05** 3:16
**8:45** 7:9

___

### 9

**9** 3:21 190:13
274:10,14,19
277:15,16
278:23 279:2
281:16 289:20
304:14

**9:30** 268:12
269:16 272:6
**9:42** 272:5
**9:45** 269:19
272:5 279:4
280:14

# EXHIBIT C

## AFFIDAVIT OF SONYA A. DIXON

STATE OF ALABAMA    )
LEE COUNTY    )

BEFORE ME, the undersigned Notary Public, there personally appeared SONYA A. DIXON, who, being known to me and duly sworn, deposes and says the following:

1.    My name is Sonya A. Dixon. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.    I am employed by Auburn University as an Employee Relations professional in the Office of Human Resources ("HR"). The Office of HR is responsible for managing employment, classification and compensation, training, leave, employee discipline, and employee grievances not based on Title VII protections.). The Office of HR has no direct responsibility for investigating reports of violations of Auburn's policies prohibiting discrimination and harassment; instead, this responsibility rests with the Office of Action/Equal Employment Opportunity ("AA/EEO"), which is headed by its Director, Kelley G. Taylor. I am not the Director of the AA/EEO Office; Kelley Taylor is.

3.    The Offices of Human Resources and AA/EEO are completely separate and distinct offices, in separate buildings, with separate responsibilities.

4.    If HR receives a complaint or concern relating to EEO issues, we refer the matter to Kelley Taylor at the Office of AA/EEO. If Dyess had ever reported to me that his supervisor was sexually harassing him, I would have referred the matter to AA/EEO immediately. In fact, when Dyess did complain of improper touching by his supervisor—after Dyess was already terminated from employment—the matter was referred to AA/EEO for investigation.

5.      Dyess never reported anything to me about Bud Richards or anyone else touching him inappropriately, until his letter of June 8, 2006.  If Dyess had made any such allegation, I would have referred him immediately to AA/EEO.

Further, the Affiant says nothing.

_Sonya A. Dixon_

SONYA A. DIXON, AFFIANT

_Catherine Wh___

NOTARY PUBLIC
My Commission Expires:  11 - 27 - 2011

# EXHIBIT D

## AFFIDAVIT OF KELLEY G. TAYLOR

STATE OF ALABAMA    )
LEE COUNTY          )

BEFORE ME, the undersigned Notary Public, there personally appeared KELLEY G. TAYLOR, who, being known to me and duly sworn, deposes and says the following:

1.    My name is Kelley G. Taylor. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.    I am employed by Auburn University as the Director of Affirmative Action/Equal Employment Opportunity ("AA/EEO"). As Director of AA/EEO, I am responsible for the daily operations of the AA/EEO office and all aspects of Title VII compliance at Auburn University. I do not work in the Office of Human Resources ("HR"). The HR and AA/EEO offices are in separate buildings, with separate staff, duties, and responsibilities. One of my central duties is to investigate claims or reports of violations of Auburn's policies prohibiting discrimination and harassment. The duty to investigate claims or reports of violations of Auburn's policies prohibiting discrimination and harassment rests ultimately with my office. We may occasionally ask for assistance from HR or other administrative offices, although we did not seek it in this case.

3.    On March 29, 2006, John W. Dyess, III came to the AA/EEO office to make an informal complaint that his supervisor, Bud Richards, was discriminating against him on the basis of race and religion. Dyess did not allege that Richards had touched him inappropriately. Together with Michelle Martin, another employee in my office, I investigated Dyess' complaints thoroughly. In addition to Dyess and Richards, Martin and I interviewed co-worker Mixti Cox, former supervisor Mary Tefend, co-worker  Henry Echols, co-worker Sara Henderson, co-

worker Chris Ferrell, and co-worker Renza Floyd. In sum, Martin and I interviewed Richards and Dyess, and every employee who worked with Dyess who was also supervised by Bud Richards. We uncovered no evidence of discrimination whatsoever. After we completed our investigation, on May 18, 2006, we wrote a letter to Dyess advising him that we found no evidence that Auburn's policies against discrimination or harassment had been violated. This letter is annexed to Dyess' deposition as Exhibit 15.

4.    On or a few days after June 13, 2006, I received a letter from Albert Snipes in the Human Resources department referring another complaint to me for investigation. This letter is annexed to Dyess' deposition as Exhibit 17. Dyess' second complaint is annexed to his deposition as Exhibit 16.

5.    Even though Dyess was no longer employed by Auburn at this time, Michelle Martin and I investigated Dyess' second complaint, including the new allegation that he had been touched in the private area by Bud Richards. First, we interviewed Dyess and Richards. When we interviewed Dyess, he said that Bud Richards had touched him in the private area on March 28, 2006—the day before he was in the AA/EEO office the first time. Dyess also said that he had reported the alleged touching to Sonya Dixon and Albert Snipes in HR. When we interviewed Richards, he denied Dyess's allegations, and denied any romantic interest in, or attraction to, Dyess or any other male. Then we called Dixon and Snipes to see if Dyess had ever told them about any alleged improper touching. Both of them denied that Dyess had ever reported this to them. Both Dixon and Snipes assured me that if Dyess had made any allegation of improper touching, they immediately would have referred the complaint to my office for investigation.

6.    Upon completion of the second investigation, I found Dyess' new allegation of improper touching to lack credibility, because (1) when Dyess was in the AA/EEO office the day following the alleged touching incident, he complained of race and religious discrimination, but not sex discrimination, harassment, or any improper touching; (2) when I talked to Dixon and Snipes, both of them denied that Dyess' had ever told them about any alleged improper touching; and (3) Richards denied ever touching Dyess, and I did not uncover any evidence that Richards had behaved in a sexual or improper manner towards co-workers or subordinates in the past, that Richards was sexually attracted to Dyess or any other males, nor that gave any credibility to Dyess' allegations. I advised Dyess of my findings in a letter dated July 7, 2006. I sent this letter to Dyess via certified mail at his Mobile address. This letter is annexed to Dyess' deposition as Exhibit 18.

Further, the Affiant says nothing.

_____   6/6/08
KELLEY G. TAYLOR, AFFIANT

_____
NOTARY PUBLIC
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 2, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

# EXHIBIT E

## AFFIDAVIT OF DEBBIE GRIGGS

STATE OF ALABAMA      )
LEE COUNTY            )

BEFORE ME, the undersigned Notary Public, there personally appeared DEBBIE GRIGGS, who, being known to me and duly sworn, deposes and says the following:

1.     My name is Debbie Griggs. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.     I am employed by Auburn University. On April 27, 2006, I was one of three Auburn employees who served on a panel to hear a grievance filed by John W. Dyess, III. I have no recollection of Dyess making any mention in the hearing of sex harassment or being touched in his private area.

3.     In addition, the grievance hearing was audio recorded. Today, I listened to the audio recording of the grievance hearing, and have confirmed that Mr. Dyess made no mention of sex harassment or being touched in his private area. Mr. Dyess does discuss an incident in which he was looking for gloves, and his supervisor told him he was not supposed to be in a particular room. Dyess said that Richards acted as if he were trying to provoke a fight with him.

Further, the Affiant says nothing.

_____
DEBBIE GRIGGS, AFFIANT

_____
NOTARY PUBLIC
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 30, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

# EXHIBIT F

## AFFIDAVIT OF TRISH DIGMAN

STATE OF ALABAMA    )
LEE COUNTY          )

BEFORE ME, the undersigned Notary Public, there personally appeared TRISH DIGMAN, who, being known to me and duly sworn, deposes and says the following:

1.    My name is Trish Digman. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.    I am employed by Auburn University. On April 27, 2006, I was one of three Auburn employees who served on a panel to hear a grievance filed by John W. Dyess, III. I have no recollection of Dyess making any mention in the hearing of sex harassment or being touched in his private area.

3.    In addition, the grievance hearing was audio recorded. Today, I listened to the audio recording of the grievance hearing, and have confirmed that Mr. Dyess made no mention of sex harassment or being touched in his private area. Mr. Dyess does discuss an incident in which he was looking for gloves, and his supervisor told him he was not supposed to be in a particular room. Dyess said that Richards acted as if he were trying to provoke a fight with him.

Further, the Affiant says nothing.

_____
TRISH DIGMAN, AFFIANT

_____
NOTARY PUBLIC
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 30, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

# EXHIBIT G

## AFFIDAVIT OF SHERRY BOOTHE

STATE OF ALABAMA    )
LEE COUNTY          )

BEFORE ME, the undersigned Notary Public, there personally appeared SHERRY BOOTHE, who, being known to me and duly sworn, deposes and says the following:

1.     My name is Sherry Boothe. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.     I am employed by Auburn University. On April 27, 2006, I was one of three Auburn employees who served on a panel to hear a grievance filed by John W. Dyess, III. I have no recollection of Dyess making any mention in the hearing of sex harassment or being touched in his private area.

3.     In addition, the grievance hearing was audio recorded. Today, I listened to the audio recording of the grievance hearing, and have confirmed that Mr. Dyess made no mention of sex harassment or being touched in his private area. Mr. Dyess does discuss an incident in which he was looking for gloves, and his supervisor told him he was not supposed to be in a particular room. Dyess said that Richards acted as if he were trying to provoke a fight with him.

Further, the Affiant says nothing.

_Sherry G. Boothe_
SHERRY BOOTHE, AFFIANT

_Mahasin Ahmad_
NOTARY PUBLIC
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 30, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

# EXHIBIT H

## AFFIDAVIT OF ALBERT L. SNIPES

STATE OF ALABAMA  )
LEE COUNTY  )

BEFORE ME, the undersigned Notary Public, there personally appeared ALBERT L. SNIPES, who, being known to me and duly sworn, deposes and says the following:

1.    My name is Albert L. Snipes. I am above the age of majority and am under no disability that prevents me from making this affidavit. I give this affidavit of my own personal knowledge and under oath.

2.    At the times relevant to Dyess' complaint, I was employed by Auburn University as Director of Employee Relations within the Office of Human Resources ("HR"). The Office of HR is responsible for managing employment, classification and compensation, training, leave, employee discipline, and employee grievances not based on Title VII protections. "). The Office of HR has no direct responsibility for investigating reports of violations of Auburn's policies prohibiting discrimination and harassment; instead, this responsibility rests with the Office of Action/Equal Employment Opportunity ("AA/EEO"), which is headed by its Director, Kelley G. Taylor. I am not the Director of the AA/EEO Office; Kelley Taylor is.

3.    The Offices of Human Resources and AA/EEO are completely separate and distinct offices, in separate buildings, with separate responsibilities.

4.    If HR receives a complaint or concern relating to EEO issues, we refer the matter to Kelley Taylor at AA/EEO. If Dyess had ever reported to me that his supervisor was sexually harassing him, I would have referred the matter to AA/EEO immediately.

5.    Dyess never reported anything to me about Bud Richards or anyone else touching him inappropriately until I received his letter of June 8, 2006. I immediately referred Dyess'

complaint to Kelley Taylor for investigation.  My letter doing so is attached to Dyess' deposition as Exhibit 17.

      Further, the Affiant says nothing.

ALBERT L. SNIPES, AFFIANT

NOTARY PUBLIC
My Commission Expires: May 3, 2009

# EXHIBIT I

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

☒ EEOC 420-2006-04034

_____ and EEOC
(State and local Agency, if any)

| NAME (Indicate Mr., Ms., Mrs.) MR. JOHN W. DYESS, III | HOME TELEPHONE NUMBER (Include Area Code) |
|---|---|
| STREET ADRESS | CITY, STATE ZIP CODE MOBILE, ALABAMA | COUNTY MOBILE |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (*If more than one list below.*)

| NAME AUBURN UNIVERSITY | NO. OF EMPLOYEES/MEMBERS + 15 | TELEPHONE NUMBER (*Include Area Code*) (334) 844-4794 |
|---|---|---|
| STREET ADDRESS AFFIRMATIVE ACTION/EQUAL EMPLOYMENT OPPORTUNITY OFFICE 005 QUAD CENTER · AUBURN UNIVERSITY, ALABAMA 36849-5147 | | |

| NAME | TELEPHONE NUMBER ( *Include Area Code*) |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE |

| CAUSE OF DISCRIMINATION BASED ON ( *Check appropriate box(es)*) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (*Month, day, year*) |
|---|---|
| ☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE ☒ RETALIATION ☐ OTHER (*Specify*) | MAY 3, 2006 |

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):
My name is John W. Dyess, III. I am a black male. My social security number is ████████ I was employed by Auburn University in Auburn, Alabama. Auburn University is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended. I was employed as an animal care assistant at the College of Veterinary Medicine. I have been discriminated against on the basis of my sex in violation of Title VII. In addition I have been retaliated against for complaining of discrimination. During the term of my employment I was sexually harassed by my supervisor, Mr. Floyd Richards. Mr. Richards approached me in 2005 as if he wanted to date me. Mr. Richards always asked me if I wanted to get to know him better. In addition, Mr. Richards often called my home, stalked me and rubbed my private area. Mr. Richards often made requests to get me alone while I was employed. I initially complained of Mr. Richards behavior in June of 2005. I explained to human resources that Mr. Richards made me feel uncomfortable and was always trying to get me alone. In December of 2005 I again complained. Nothing was done at that time. I explained to human resources that Mr. Richard's supervisor did not want to take my complaints and told me I was wasting his time. In February of 2006 Mr. Richards approached me in the hall and rubbed his hand and private area on my body. I rejected Mr. Richards. The next morning I was called to a meeting with Mr. Richards and his supervisor, Dr. John Saidla and was suspended for five days without pay. I complained to human resources and to the affirmative action office. I explained that I had been sexually harassed by Mr. Richards. I was told the matter would be investigated. Between the time I was suspended and the time I was terminated Mr. Richards continued to stalk me and was calling my home. I was never informed of any results of the investigation. I was terminated on May 3, 2006. The reason given for my termination is pretextual. I was terminated after returning late from lunch. I had an emergency and Mr. Richards was out of the office that day. I had no one to report to to explain the situation. On prior occasions I had taken too long at lunch and made it up on subsequent days. This practice had been approved by Mr. Richards in the past. In addition, other employees are allowed to make up time or leave without notice and are not terminated.

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT John W. Dyess I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. Date 7-20-06 Charging Party ( *Signature*) John W. Dyess | NOTARY- ( *When necessary to meet State and Local Requirements*) Barbara Christie SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE July 20, 06 (*Day, month and year*) Commission Expires 9/23/09 |

EEOC FORM    5        PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED