IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JOHN DYESS,

     Plaintiff,

v.

AUBURN UNIVERSITY,

     Defendant.

No. 3:07CV-635-WKW

## APPENDIX OF AUTHORITIES

1.    *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997)

2.    *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555 (11th Cir. 1990)

3.    *Madray v. Publix Supermarkets*, 208 F.3d 1290 (11th Cir. 2000)

4.    *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999)

5.    *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)

6.    *Willets v. Interstate Hotels, LLC*, 204 F.Supp.2d 1334 (M.D. Fla. 2002)

7.    *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871 (5th Cir. 1999)

8.    *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d. Cir. 1998)

9.    *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998)

10.    *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir. 1997)

11.    *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745 (4th Cir. 1996)

12.    *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428 (5th Cir. 2005)

13.    *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997)

14.    *Silvera v. Orange County School Board*, 244 F.3d 1253 (11th Cir. 2001)

15.    *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999)

16.    *Morris v. Emory Clinic*, 402 F.3d 1076 (11th Cir. 2005)

17.    *Meeks v. Computer Associates Int'l*, 15 F.3d 1013 (11th Cir. 1994)

18.    *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997)

19.    *Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318 (11th Cir. 1998)

20.    *Alexander v. Fulton County, Ga.*, 207 F.3d 1303 (11th Cir. 2000)

21.    *Wall v. Trust Co. of Georgia*, 946 F.2d 805 (11th Cir. 1991)

22.    *Ross v. Rhodes Furniture*, 146 F.3d 1286 (11th Cir. 1998)

23.    *Coutu v. Martin Co. Bd. of Com'rs*, 47 F.3d 1068 (11th Cir. 1995)

24.    *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371 (11th Cir. 1996)

25.    *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998)

26.    *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287 (11th Cir. 2007)

27.    *Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157 (5th Cir. 2007)

28.    *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269 (11th Cir. 2008)

29.    *Lee v. GTE Florida*, 226 F.3d 1249 (11th Cir. 2000)

30.    *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000)

31.    *Otu v. Papa John's Pizza*, 96 FEP Cas. 1602 (M.D. Ga. 2005)

32.    *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)

Respectfully submitted,

*/s Aaron L. Dettling*
DAVID R. BOYD
AARON L. DETTLING

Attorneys for the Defendant, Auburn University

OF COUNSEL:

David R. Boyd (BOY005)
Aaron L. Dettling (DET003)
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 226-8723
Facsimile:   (205) 488-5699

Lee F. Armstrong
General Counsel, Auburn University
101 Samford Hall

Auburn, Alabama  36849
Telephone:  (334) 844-5176
Facsimile:   (334) 844-4575

## CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of June, 2008, I mailed a true and correct copy of the foregoing to the Plaintiff via first-class mail addressed as follows:

John W. Dyess, III
1509 Union Street
Mobile, Alabama  36617

*/s Aaron L. Dettling*
OF COUNSEL

4

Westlaw.

117 F.3d 1278                                                                                              Page 1
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

▷

Stewart v. Happy Herman's Cheshire Bridge, Inc.
C.A.11 (Ga.),1997.

United States Court of Appeals,Eleventh Circuit.
Terri L. STEWART, Plaintiff-Appellant,
v.
HAPPY HERMAN'S CHESHIRE BRIDGE, INC.,
Defendant-Appellee.
No. 96-8689.

July 24, 1997.

Former employee brought Americans with Disabilities Act (ADA) claim against her former employer. The United States District Court for the Northern District of Georgia, No. 1:95-cv-512-GET, G. Ernest Tidwell, J., granted summary judgment for employer. Former employee appealed. The Court of Appeals, Hatchett, Chief Judge, held that: (1) employer adequately accommodated former employee's inability to stand for long periods of time by offering paid break five minutes shorter than her previous break, but not subject to any interruption, unpaid break of up to sixty minutes, shorter work shifts, leave of absence, and planned break time, and (2) former employee failed to establish that she was retaliated against in violation of the ADA.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ☞2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and Sufficiency. Most Cited Cases
District court is not obliged to deny summary judgment for moving party when evidence favoring nonmoving party is merely colorable or is not significantly probative. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Federal Courts 170B ☞762**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk759 Theory and Grounds of Decision of Lower Court
                    170Bk762 k. Grounds for Sustaining Decision Not Relied Upon or Considered. Most Cited Cases
Court of Appeals may affirm district court's grant of summary judgment on any adequate ground, even if it is other than the one on which district court actually relied. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[3] Civil Rights 78 ☞1018**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1016 Handicap, Disability, or Illness
            78k1018 k. Elements of Discrimination Claims in General. Most Cited Cases
    (Formerly 78k107(1))
To establish a prima facie case of discrimination under the ADA, a plaintiff must show that she has a disability, is a qualified individual, and was unlawfully subjected to discrimination because of her disability. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[4] Civil Rights 78 ☞1019(1)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1016 Handicap, Disability, or Illness
            78k1019 Who Is Disabled; What Is Disability
                78k1019(1) k. In General. Most Cited

117 F.3d 1278                                                                Page 2
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

Cases
 (Formerly 78k107(1))
Whether an individual has a "disability" within the
ADA's purview turns on a determination of whether
the individual has a physical or mental impairment
that substantially limits one or more of his major
life activities, a record of such an impairment, or is
regarded as having such an impairment. Americans
with Disabilities Act of 1990, §§ 2 et seq., 3, 42
U.S.C.A. §§ 12101 et seq., 12102.

**[5] Civil Rights 78 ⇐1218(2)**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
      78k1218 Who Is Disabled; What Is Disab-
ility
        78k1218(2) k. Impairments in General;
Major Life Activities. Most Cited Cases
 (Formerly 78k173.1)
When individuals claim that they are substantially
limited in the major life activity of "working," for
purposes of determining whether they are disabled
under the ADA, their condition must significantly
restrict their ability to perform either a class of jobs
or a broad range of jobs in various classes as com-
pared to the average person having comparable
training skills and abilities. Americans with Disab-
ilities Act of 1990, §§ 2 et seq., 3, 42 U.S.C.A. §§
12101 et seq., 12102.

**[6] Civil Rights 78 ⇐1218(2)**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
      78k1218 Who Is Disabled; What Is Disab-
ility
        78k1218(2) k. Impairments in General;
Major Life Activities. Most Cited Cases
 (Formerly 78k173.1)
An impairment does not substantially limit the abil-
ity to work, for purposes of determining whether an

individual is disabled under the ADA, merely be-
cause it prevents a person from performing either a
particular specialized job or a narrow range of jobs
nor does inability to perform a single, particular job
constitute a substantial limitation in major life
activity of working. Americans with Disabilities
Act of 1990, §§ 2 et seq., 3, 42 U.S.C.A. §§ 12101
et seq., 12102.

**[7] Civil Rights 78 ⇐1225(2)**

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
      78k1225 Accommodations
        78k1225(2) k. What Are Reasonable
Accommodations; Factors Considered. Most Cited
Cases
 (Formerly 78k173.1)
The word "reasonable" as an adjective for the word
accommodate under ADA section requiring that
employer make a reasonable accommodation for
disabled employee unless accommodation imposed
undue hardship on employer connotes that an em-
ployer is not required to accommodate an employee
in any manner in which that employee desires.
Americans with Disabilities Act of 1990, §
102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A).

**[8] Civil Rights 78 ⇐1020**

78 Civil Rights
  78I Rights Protected and Discrimination Prohib-
ited in General
    78k1016 Handicap, Disability, or Illness
      78k1020 k. Accommodations in General.
Most Cited Cases
 (Formerly 78k107(1))
Under the ADA, a qualified individual with a disab-
ility is not entitled to the accommodation of her
choice, but only to a reasonable accommodation.
Americans with Disabilities Act of 1990, §§ 2 et
seq., 102(b)(5)(A), 42 U.S.C.A. §§ 12101 et seq.,
12112(b)(5)(A).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                    Page 3
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

**[9] Civil Rights 78 ⬳1540**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1540 k. Discrimination by Reason of Handicap, Disability, or Illness. Most Cited Cases
    (Formerly 78k240(2))
Burden of identifying an accommodation that would allow a qualified individual with a disability to perform the job rests with that individual under the ADA, as does ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. Americans with Disabilities Act of 1990, §§ 2 et seq., 102(b)(5)(A), 42 U.S.C.A. §§ 12101 et seq., 12112(b)(5)(A).

**[10] Civil Rights 78 ⬳1225(3)**

78 Civil Rights
   78II Employment Practices
      78k1215 Discrimination by Reason of Handicap, Disability, or Illness
         78k1225 Accommodations
            78k1225(3) k. Particular Cases. Most Cited Cases
    (Formerly 78k173.1)
Employer adequately accommodated grocery store cashier's inability to stand for long periods of time and, thus, did not violate the ADA, by offering paid break five minutes shorter than her previous break, but not subject to any interruption, unpaid break of up to sixty minutes, shorter work shifts, leave of absence, and planned break time. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[11] Civil Rights 78 ⬳1225(4)**

78 Civil Rights
   78II Employment Practices
      78k1215 Discrimination by Reason of Handicap, Disability, or Illness
         78k1225 Accommodations

            78k1225(4) k. Requesting and Choosing Accommodations; Interactive Process; Cooperation. Most Cited Cases
    (Formerly 78k173.1)
Employer's obligation, under the ADA, to accommodate disabled employee does not extend to engaging in generalized negotiations with employee concerning employer's workplace rules and policies for all employees. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[12] Civil Rights 78 ⬳1225(4)**

78 Civil Rights
   78II Employment Practices
      78k1215 Discrimination by Reason of Handicap, Disability, or Illness
         78k1225 Accommodations
            78k1225(4) k. Requesting and Choosing Accommodations; Interactive Process; Cooperation. Most Cited Cases
    (Formerly 78k173.1)
Liability cannot arise under ADA when employer does not obstruct informal interactive process, employer makes reasonable efforts to communicate with employee and to provide accommodations based on information it possesses, and employee's actions cause breakdown in interactive process. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[13] Civil Rights 78 ⬳1242**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1242 k. In General. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
ADA retaliation claims are assessed under the same framework as retaliation claims arising under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[14] Civil Rights 78 ⬳1243**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                    Page 4
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

78 Civil Rights

   78II Employment Practices

      78k1241 Retaliation for Exercise of Rights

         78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

   (Formerly 255k40(1) Master and Servant)
To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between protected expression and the adverse action. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[15] Civil Rights 78 ☞1251**

78 Civil Rights

   78II Employment Practices

      78k1241 Retaliation for Exercise of Rights

         78k1251 k. Motive or Intent; Pretext.
Most Cited Cases

   (Formerly 255k30(6.10) Master and Servant)
Former employee failed to rebut former employer's assertion that it legitimately fired her for insubordination rather than in retaliation for asserting an ADA claim; former employee admitted that she committed numerous insubordinate acts around same time that she requested accommodations. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Rose E. Goff, Atlanta, GA, for Plaintiff-Appellant.
Frank B. Shuster, Constangy Brooks & Smith, Atlanta, GA, for Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and LAY [FN*], Senior Circuit Judge.

     FN* Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

HATCHETT, Chief Judge:

In this Americans With Disabilities Act (ADA) case we affirm the district court's grant of summary judgment to Happy Herman's Cheshire Bridge, Inc. (Happy Herman's), because Happy Herman's reasonably accommodated its former employee Teri Stewart, the appellant, and because Stewart failed to produce sufficient evidence of a triable issue on the question of whether Happy Herman's illegally retaliated against her. We also affirm the district court's award of sanctions and attorney's fees to Happy Herman's.

BACKGROUND

Happy Herman's, a small retail grocery store in Atlanta, has operated for twenty-two years and has approximately eighteen employees. In November 1991, Stewart applied for a part-time position at Happy Herman's. When General Manager David Levine interviewed Stewart, Stewart informed Levine that she had previously undergone pelvic surgery and could not stand for long periods of time or lift heavy objects. Stewart also indicated that if Happy Herman's hired her it would need to allow her to take frequent bathroom breaks. Stewart also inquired about the length of lunch breaks. According to Stewart, Levine replied that lunch breaks were "half an hour, but you will still have to get up and wait on customers." In addition, Levine reportedly told Stewart that she could take bathroom breaks as needed.

Levine soon hired Stewart as a part-time seasonal employee, and subsequently retained her as a permanent part-time employee. Stewart worked primarily as a cashier, four days a week for six to seven hours a day. Although Levine initially hired Stewart as a seasonal employee, Happy Herman's permitted her to participate in its health insurance plan because Stewart informed Levine that health insurance was very important to her.

Although Stewart now claims to be disabled, at the time she filled out her health insurance plan application, she answered "no" to the question, "are you

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                    Page 5
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

currently hospitalized or disabled." In fact, Stewart suffered from a number of conditions arising from the radical pelvic surgery she underwent to combat invasive cervical cancer. These conditions include an inability to fully employ her bladder and chronic pain for which Stewart takes prescription medications. According to Stewart, her conditions make it impossible for her to stand for long periods without sitting, limit her ability to lift objects and cause her to urinate frequently.

During the period from November 1991 through April 1993, Stewart seemed to do well at Happy Herman's. She had some physical problems, but Happy Herman's management consented to every request she made for accommodations. For instance, when Stewart complained that she was unable to restock the drink cooler, Happy Herman's reassigned that duty to another employee. When Stewart asked for help carrying large bags of groceries, Happy Herman's provided it. When Stewart told Happy Herman's that she could not work additional hours, Levine did not discipline her or take any other adverse employment action. And when Stewart requested bathroom and cigarette breaks, Happy Herman's granted her requests. (On average, Stewart took four to six bathroom breaks, and five to seven cigarette breaks, per six-hour *1281 shift.) Stewart admits that Happy Herman's also accommodated the needs of other employees with physical problems. These accommodations included allowing an employee with knee problems to sit on a stool at his cash register, and allowing a diabetic employee to take her lunch break at times of her choosing in accordance with her medical needs.

In addition to the foregoing, Stewart benefitted from Happy Herman's provision of a thirty minute paid lunch break to all of its cashiers. Stewart acknowledges, however, that the paid lunch break was often disturbed because of the need to assist customers at the cash registers. As a result, Stewart's paid lunch break generally lasted closer to twenty-five minutes.

On April 27, 1993, Stewart's situation at Happy

Herman's took a turn for the worse. Stewart's immediate supervisor, Guy Cassingham, approached her and told her that the paid lunch breaks would henceforth be fifteen minutes. According to Happy Herman's, Cassingham did so because Stewart's breaks were becoming excessively long-in the range of forty to fifty minutes. In response to the news about the changed break policy, Stewart promptly told Cassingham, "Yeah right, kiss my ass; sure." After ascertaining that Cassingham was serious and that the policy was being implemented at Levine's direction, Stewart responded, "Then he [Levine] can kiss my ass too."

At the end of her shift, Stewart went to see Levine and told him that fifteen minutes was not enough time to eat. Either later that day or the following day, Stewart also told Levine that the change in the lunch break policy was "causing her physical problems." It does not appear that Stewart was more specific about the nature of the physical problems-*i.e.,* whether the new break policy aggravated conditions arising from her radical pelvic surgery or whether it caused new unrelated physical problems. Stewart did, however, attempt to give Levine a note from her doctor to buttress her claim. Levine, who was conducting a meeting in his office when Stewart approached him, refused the note at the time, although Stewart concedes that the note eventually ended up in her personnel file.[FN1] Levine also declined to discuss the break policy with Stewart beyond simply telling her that the break policy had always provided for fifteen minutes of paid break time.

> FN1. During discovery it was revealed that the note related to a reaction Stewart was having to a skin allergy medicine.

Following the exchange with Levine, Stewart discussed the fifteen minute break policy with her coworkers and told them of her desire to get a thirty minute paid break for all employees. According to Stewart, her coworkers "more or less nominated" her to pursue a thirty minute break policy. Stewart then proceeded to meet with several Happy Her-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                    Page 6
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
(Cite as: 117 F.3d 1278)

man's management officials to discuss the break policy. During these meetings Stewart also attempted, largely without success, to raise other topics like the recycling of food, giving food to homeless shelters, a first-aid kit, a wet floor sign, a rain mat and "a number of other positive social changes."

On one of these occasions Stewart met with Ann Marie Moraitakis, a senior management official with supervisory responsibilities for all of Happy Herman's employees. Stewart told Moraitakis that she needed and wanted a thirty minute break because she couldn't eat within a shorter time period. Stewart also asked Moraitakis what the Happy Herman's policy was regarding breaks and asked Moraitakis to post the policy in writing. Moraitakis responded that the policy was that employees could take paid breaks of between fifteen and twenty minutes, or could clock out and take up to sixty minutes unpaid break time. Moraitakis also subsequently posted the break policy as Stewart requested.

The posted policy indicated that employees were entitled to a twenty minute paid break for an eight-hour shift. When Stewart later complained that the posted policy excluded her because she only worked a six-hour shift, Moraitakis amended the posted policy to read as follows:

**\*1282** THE FOLLOWING IS THE STATEMENT OF THE POLICY REGARDING MEAL BREAKS FOR EMPLOYEES, WITH WHICH YOU ARE EXPECTED TO COMPLY:

1. HAPPY HERMAN'S PROVIDES IT'S [sic] EMPLOYEES WITH ONE PAID TWENTY (20) MINUTE BREAK FOR MEALS PER SIX TO EIGHT HOUR SHIFT. EMPLOYEES DO NOT HAVE TO CLOCK OUT OR CLOCK IN TO TAKE THIS 20 MINUTE BREAK.

2. EMPLOYEES WHO WISH TO TAKE LONGER THAN 20 MINUTES FOR MEALS MAY DO SO ONLY UPON THE FOLLOWING CONDITIONS:

A) EMPLOYEES MUST CLOCK OUT AT THE BEGINNING OF THEIR MEAL BREAK AND CLOCK BACK IN AT THE END OF THEIR MEAL BREAK.

B) NO MEAL BREAK MAY EXCEED SIXTY (60) MINUTES.

3. REGARDLESS OF LENGTH OF MEAL BREAK, NO EMPLOYEE MAY TAKE MEAL BREAKS UNLESS THEY ARE SCHEDULED IN ADVANCE WITH SUCH EMPLOYEE'S SUPERVISOR.

The day after the policy was originally posted, Stewart issued a five-page flyer to all Happy Herman's employees. Stewart entitled the flyer "Food for Thought: The Fifteen Minute War."In the flyer Stewart alternately praised Happy Herman's for changing its policy and accused Happy Herman's of engaging in "inhumane, unhealthy, unprofitable, and illegal conduct." The flyer also compared Happy Herman's treatment of its employees with the local municipality's treatment of incarcerated criminals. With respect to the break issue in particular, Stewart's flyer stated:

Today the formal policy concerning meal breaks was posted. The break period was increased from 15 minutes to 20 minutes in accordance with my closed door negotiations with Ann Marie Moraitakis and David Levin [sic] (5/4/93). This is an extremely positive step in the right direction. According to Ms. Moraitakis the policy has been in effect at least since 1978-1979, without revision or modification, and that there are no exceptions ... The additional 5 minutes is a positive step in the negotiation process towards a fair and equitable 30 minute break per 7-10 hr. shift. It shows that management is willing to reconsider their former position and it is the first break time increase in 14 years.... We only have 10 more minutes to go in our negotiation process. I applaud the "new policy". It is 2/3 of what is needed for a humane resolution, before it was only 1/2 . Employees now have the "right" to clock out if they need to for an additional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                         Page 7
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
(Cite as: 117 F.3d 1278)

40 minutes. For the first time policy is "posted". Ms. Moraitakis said that Happy Herman's was, "a good company" ... with Management empathy and Employee imput *we* could become a *great* company.

Stewart's flyer also stated:
It is my sincere hope that management will understand that hungry, tired employees are not an asset to customer service or safety factors. And that this issue also contributes to employee disatisfaction [sic] and high turnover. It's not good business.... I am no longer angry ... or ashamed. But I am determined that Happy Herman's allow every employee (including management) to have an on clock 1/2 hr. break per 7-10 hr. shift. This is a reasonable request and it is in the best interest of the company.

Give us half the break that our city gives criminals.

Sincerely, Teri another 20th. century wage slave.

Stewart also engaged in a number of conversations with Happy Herman's employees during which she referred to Happy Herman's managers as "petty tyrants" that she wanted to "disembowel," and on one occasion Stewart even told Levine that Happy Herman's managers were "petty tyrants." Happy Herman's responded to Stewart's conduct with a disciplinary warning, which it issued to her on May 19, 1993. This warning indicated that Happy Herman's considered Stewart's behavior evidence of "insubordination and activity that is not in the best interest of Happy Herman's." In addition, Levine instructed*1283 Stewart not to distribute further flyers.

Two days later, however, on May 21, 1993, Stewart issued a six-page flyer to all Happy Herman's managers. In this flyer, Stewart responded to the statements contained in her disciplinary warning and voiced additional concerns about working conditions and sanitation. Stewart also stated that "I greatly appreciate your concern in this matter, since my physical condition (for the first time in two years of employment) has begun to deteriorate ...

due to lack of adequate breaks." Stewart entitled the last page of the flyer "Mission Statement" and indicated that her objective was "[t]o help management and employees reach a workable compromise concerning meal breaks."

Slightly more than a week later, on June 4, 1993, Happy Herman's management again met with Stewart to discuss the lunch break issue and Stewart's disciplinary warning. During this meeting, Happy Herman's managers informed Stewart that she could take an uninterrupted twenty minute paid lunch break if she so desired. Contemporaneous notes from the meeting also indicate that Happy Herman's offered Stewart shorter shifts, a leave of absence and planned break time in order to aid her with health problems. Happy Herman's also told Stewart that the disciplinary warning would remain in her file. Stewart contends that she thereafter received an uninterrupted break on only two occasions. Stewart's contemporaneous private journals, however, reflect that she experienced interruptions during her break on only three additional occasions.

During the same time period as Stewart's negotiations with Happy Herman's management, Levine began to request Stewart's discharge. According to Levine, he made his requests because he found Stewart insubordinate and was concerned that her conduct was affecting employee morale. Levine also expressed concern that Stewart was engaging customers in her disputes with Happy Herman's management. On June 16, 1993, this concern appeared to be validated in a dramatic way, as Stewart-in front of a Happy Herman's customer-refused a supervisor's instruction to issue a refund. Stewart claims that she refused to do so in accordance with company policy, but she provides no company policy guideline to buttress her claim in this respect. Also during the month of June, Stewart reported Happy Herman's to the Health Department, Department of Agriculture, Georgia Power and the Building Inspector. Soon thereafter, on June 29, 1993, at Levine's request, Happy Herman's discharged Stewart for insubordination.

117 F.3d 1278                                                              Page 8
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

Although the cause listed on Stewart's discharge notice was insubordination, Stewart contends that Happy Herman's management never told her which of her actions were insubordinate. Stewart also contends that the various acts that Happy Herman's cited as the basis for her discharge have shifted in post-termination proceedings before the Georgia Unemployment Board and the National Labor Relations Board.

Stewart brought this lawsuit against Happy Herman's and a number of Happy Herman's employees and affiliated entities on March 1, 1995. Stewart's lawsuit included claims for relief under the ADA for discrimination and retaliation. On October 30, 1995, Happy Herman's and the other defendants moved to dismiss for want of prosecution, or, in the alternative to compel discovery responses, impose sanctions and grant attorney's fees. The district court held the motion for sanctions in abeyance at that time, but granted other relief not relevant to this appeal. Following the close of discovery, the district court granted summary judgment to Happy Herman's on May 13, 1996. In so ruling, the district court found that Stewart failed to establish that she is substantially limited in one or more major life activities, and that she failed to offer sufficient evidence to show that Happy Herman's discharged her for pretextual reasons. On May 28, 1996, Happy Herman's renewed its motion for sanctions and attorney's fees in the amount of $4,408.50. Stewart failed to respond to the renewed motion. On July 30, 1996, the district court noted that under local rule 220-1(b) for the Northern District of Georgia the motion was unopposed, and granted the requested relief. Stewart filed this appeal.

## *1284 ISSUES

Stewart raises three issues on appeal: (1) whether the district court erred in granting summary judgment to Happy Herman's on her discrimination claim; (2) whether the district court erred in granting summary judgment to Happy Herman's on her retaliation claim; and (3) whether the district court

erred in granting Happy Herman's sanctions and attorney's fees.

## CONTENTIONS

We find Stewart's arguments on these issues unpersuasive, and discuss only the first two issues.[FN2]

> FN2. We affirm with respect to the third issue pursuant to Eleventh Circuit Rule 36-1.

Stewart contends that summary judgment was inappropriately granted in this case. She contends, *inter alia,* that she is disabled because (1) she cannot stand for long periods or lift heavy objects; (2) she needs to urinate frequently; and (3) needs to take prescription medicine for pain arising from her radical pelvic surgery.[FN3] According to Stewart, this disability constitutes a substantial limitation on her ability to perform major life activities such as working, walking, lifting, sitting and standing. Stewart further contends that she was discriminated against because of her disability in that Happy Herman's could have easily accommodated her with the thirty minute paid lunch break she requested. In addition, Stewart contends that Happy Herman's illegally retaliated against her, subjecting her to repeated discipline because she requested accommodation. Stewart further argues that her employer's claim that it discharged her for insubordination is pretextual. Stewart bases this argument on the allegedly "suspect timing" of her discharge and on the allegedly varying reasons for discharging her. Stewart also contends that she presented uncontroverted evidence of other adverse treatment occurring prior to her discharge that could sustain a finding of retaliation in this case.

> FN3. Stewart also contends that she is disabled because of her inability to reproduce. Because we ultimately resolve this case on grounds not related to the existence of Stewart's disability, we need not discuss this contention.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                          Page 9
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

Happy Herman's contends that summary judgment was properly granted in this case because Stewart failed to show that she is substantially limited in the major life activity of working. Happy Herman's further contends that the other so-called life activities Stewart identifies (*e.g.,* standing and lifting) are merely cited as evidence of Stewart's limitations with respect to working. According to Happy Herman's, Stewart's work history proves that her various conditions merely interfered with her ability to perform a particular job and did not substantially limit her ability to obtain other satisfactory employment or to perform a class of jobs. As a result, Happy Herman's claims, Stewart failed to establish a necessary prerequisite for liability to arise under the ADA. Happy Herman's also argues that it reasonably accommodated Stewart as a matter of law, and that this court can affirm the grant of summary judgment on "reasonable accommodation" grounds even though the district court did not reach that issue. Finally, Happy Herman's contends that it legitimately discharged Stewart for multiple acts of insubordination.

## DISCUSSION

### A. *Standard of Review*

[1][2] We review a district court's grant of summary judgment *de novo* applying the same standards as the district court. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996). Summary judgment is appropriate if the pleadings, depositions and affidavits show that no genuine issue of material fact exists for trial and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists only if sufficient evidence is presented favoring the nonmoving party for a jury to \*1285

return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510-11. When assessing the sufficiency of the evidence in favor of the nonmoving party, we must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993). We are not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510-11. Moreover, we may affirm the district court's grant of summary judgment on any adequate ground, even if it is other than the one on which the district court actually relied. *Parks v. City of Warner Robins,* 43 F.3d 609, 613 (11th Cir.1995).

### B. *Stewart's ADA Claims*

#### 1. The ADA Discrimination Claim

The Americans with Disabilities Act of 1990, as amended in the Civil Rights Amendments Act of 1991, 42 U.S.C. § 12101*et seq.,* prohibits covered employers from discriminating based upon the known physical or mental impairments of a qualified individual with a disability. 42 U.S.C. § 12112. "Indeed the ADA imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship upon the employer." *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996) (citation omitted).

[3][4][5][6] To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that she: (1) has a disability; (2) is a qualified individual; and (3) was unlawfully subjected to discrimination because of her disability. *Morisky,* 80 F.3d at 447. Whether an individual has a "disability" within the ADA's purview turns on a determination of whether the individual has: a physical or mental impairment that substantially limits one or more of the major life activities of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                                      Page 10
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
(Cite as: 117 F.3d 1278)

such individual; a record of such an impairment; or is regarded as having such an impairment. 42 U.S.C. § 12102; *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 (11th Cir.), *amended on reh'g,*102 F.3d 1118 (11th Cir.1996). When individuals claim that they are substantially limited in the major life activity of "working," their condition "must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities." *Pritchard,* 92 F.3d at 1133 (internal quotations and citations omitted). "An impairment does not substantially limit the ability to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs. Nor does the inability to perform a single, particular job ... constitute a substantial limitation in the major life activity of working." *Pritchard,* 92 F.3d at 1133 (internal quotations and citations omitted).

[7][8] As suggested above, a qualified individual with a disability may be unlawfully discriminated against because of the individual's disability when the individual's employer does not reasonably accommodate the disability-unless such an accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). Under the ADA, the term "reasonable accommodation" may include, *inter alia,*"job restructuring, parttime or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). This list notwithstanding, "[t]he use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 947 (N.D.Ga.1995). This is so because the word "reasonable" would be rendered superfluous in the ADA if employers were required in every instance

to provide employees "the maximum accommodation or every conceivable accommodation possible." *Lewis,* 908 F.Supp. at 947; *see also Vande Zande v. State of Wis. Dept. of Admin.,* 851 F.Supp. 353, 360 (W.D.Wis.1994) ("an employee is **\*1286** entitled only to a reasonable accommodation and not to [a] preferred accommodation"), *aff'd,*44 F.3d 538 (7th Cir.1995). Stated plainly, under the ADA a qualified individual with a disability is "not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Lewis,* 908 F.Supp. at 948.

[9] Moreover, the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. *Willis v. Conopco,* 108 F.3d 282, 283 (11th Cir.1997).

[10] The district court in this case never reached the "reasonable accommodation" issue, as it found, in part, that Stewart was not substantially limited in the major life activity of working. On appeal, Happy Herman's urges us to affirm the district court's analysis and, in the alternative, to find that it reasonably accommodated Stewart. We accept the suggestion to affirm on the alternative basis. We do so because the record clearly reveals that Happy Herman's met its burden to accommodate Stewart's disability.

The uncontroverted record in this case demonstrates that prior to any change in break policy Stewart effectively had a twenty-five minute paid lunch break that was subject to interruption if the store was busy. Stewart managed to perform her duties with no special accommodation under this break policy for more than a year. After the "new" break policy went into effect, Happy Herman's ultimately offered Stewart multiple accommodations which presented her a broad range of work options. Specifically, Happy Herman's offered Stewart: (1) a paid break that was five minutes shorter than her previous break, but not subject to any interruption;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                                                                Page 11
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

(2) an unpaid break of up to sixty minutes; (3) shorter work shifts to obviate the need for a lunch break altogether; (4) a leave of absence; and (5) planned break time in order to aid her with health problems. Happy Herman's made these accommodation offers despite the fact that Stewart made her requests for accommodation to management in a manner that can only be described as highly confrontational. Rather than accept the Happy Herman's accommodation offers or explain with some specificity why they were all unreasonable in light of her medical condition, Stewart admits that she took on the role of ad hoc employee negotiator for a thirty minute break for all employees, as well as the role of general lobbyist for "positive social change" at Happy Herman's.

[11] Whatever the obligations of an employer are under the ADA to accommodate an employee, they do not extend to engaging in generalized negotiations with an employee concerning the employer's workplace rules and policies for all employees. As we have stated before, the ADA is "remedial in nature-ensuring that those with disabilities can fully participate in all aspects of society, including the workplace." *Willis,* 108 F.3d at 285. The ADA thus requires that employers reasonably accommodate qualified individuals with a disability, not that employers negotiate with disabled individuals on behalf of all workers, disabled or not. *See* 42 U.S.C. § 12111(9)(B) (discussing accommodations that must be offered "for *individuals with disabilities* ") (emphasis added).

In this case, Stewart clearly crossed the line from seeking an accommodation on her own behalf to becoming an advocate on behalf of a policy goal-thirty minutes of paid break time for all Happy Herman's employees. Happy Herman's nonetheless still attempted to accommodate Stewart's individual needs and offered her no less than five different accommodations. To the extent that the ADA requires an employer in some limited circumstances to engage in an "interactive process" with the disabled employee, Happy Herman's met its burden in that

regard. *See Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) (under the ADA regulations it may be necessary for an employer to engage in an informal interactive process with the individual in need of an accommodation). The record is clear that Stewart failed to engage Happy Herman's in an interactive process after it offered accommodations, in that she did not provide Happy Herman's with any substantive reasons as to why all five of the proffered accommodations *1287 were unreasonable given her medical needs. Instead, Stewart simply demanded that Happy Herman's capitulate and provide a thirty minute paid break for her and all of her coworkers.

[12] Under these circumstances, no reasonable juror could find in Stewart's favor, and summary judgment is thus appropriate. Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process. *Cf. Beck,* 75 F.3d at 1137 ("liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown"); *Willis,* 108 F.3d at 283 (an ADA plaintiff has the burden of proving that an accommodation is reasonable).

2. The ADA Retaliatory Discharge Claim

[13][14] The ADA also provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. Accordingly, we assess ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII. *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1075-77 (11th Cir.1996)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 F.3d 1278                                                                 Page 12
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201
**(Cite as: 117 F.3d 1278)**

(relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993) (explaining requirements to show retaliation in the Title VII context). Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation. *See Goldsmith,* 996 F.2d at 1163. The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation. *Cf. Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 440 (11th Cir.1996).

In this case, the district court found that Stewart established a *prima facie* case, but failed to rebut Happy Herman's assertion that it legitimately fired Stewart for insubordination. We agree that Stewart failed to rebut Happy Herman's non-discriminatory explanation for discharging her.

[15] Stewart argues that the district court erred in two respects. First, she contends that an inference of retaliation arises in this case because of the timing of her discharge and because Happy Herman's provided varying reasons for her termination. This claim is meritless. It is undisputed that the numerous acts of alleged insubordination in this case occurred around the same time period as Stewart's request for accommodations. Indeed, Stewart admits doing most of the acts at issue. No inference of retaliation based on "suspect timing" arises under these particular circumstances. *Cf. Severino v. North Fort Myers Fire Control Dist.,* 935 F.2d 1179, 1183( 11th Cir.1991) (finding that the Rehabilitation Act does not subject employers to liability for maintaining appropriate discipline in the work-

place even when the discipline is directed at a handicapped individual). We are also unpersuaded that Stewart could prevail before a jury on her pretext claim based on the alleged "varying explanations." The discharge notice in this case stated only that Stewart was discharged for "insubordination." Happy Herman's later provided different examples of Stewart's alleged insubordination to the Georgia Unemployment Board and the National Labor Relations Board. The explanation that Happy Herman's proffered, though, remained unvarying: it discharged Stewart for insubordination. Under these circumstances no question of pretext arises. *See* **\*1288** *Combs v. Plantation Patterns,* 106 F.3d 1519, 1534-35 (11th Cir.1997) (employer entitled to judgment as a matter of law when the reasons for the employer's action remain unrebutted).

Stewart's second contention is that the district court overlooked other adverse acts which occurred prior to her discharge, such as Happy Herman's managers denying Stewart the right to take accrued vacation time to extend her breaks. We agree that the district court did not address these alleged acts, but find that Stewart cannot rely on the district court's oversight to defeat the grant of summary judgment in this case. In our view, the acts Stewart describes relate directly to her "reasonable accommodation" discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue.

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment and its award of sanctions and attorney's fees.

AFFIRMED.

C.A.11 (Ga.),1997.
Stewart v. Happy Herman's Cheshire Bridge, Inc.
117 F.3d 1278, 6 A.D. Cases 1834, 23 A.D.D. 8, 10 NDLR P 247, 11 Fla. L. Weekly Fed. C 201

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



894 F.2d 1555
894 F.2d 1555
**(Cite as: 894 F.2d 1555)**

**C**

United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America
C.A.11 (Ga.),1990.

United States Court of Appeals,Eleventh Circuit.
UNITED OF OMAHA LIFE INSURANCE COMPANY, Plaintiff-Counter-Defendant-Appellee,
v.
SUN LIFE INSURANCE COMPANY OF AMERICA, Defendant-Counter-Claimant-Appellant.
**No. 89-8218.**

March 1, 1990.

Insurer brought action against employer to recover benefits paid to employer's employee under group life policy. Employer counterclaimed to recover benefits which insurer denied to second employee. The United States District Court, Northern District of Georgia, No. 1:87-cv-1272-JTC, Jack T. Camp, J., entered summary judgment in favor of insurer on both claims. Employer appealed. The Court of Appeals, Kravitch, Circuit Judge, held that: (1) material issues of fact existed as to whether employer was negligent in enrolling employee for supplemental coverage for which employee was allegedly ineligible; (2) term "disabled," within meaning of policy provision for "When Your Insurance Ends" would be read to mean "totally disabled"; (3) "active work" requirement of policy would not be construed to terminate coverage for employees who were out on short-term sick leave; and (4) absent evidence that insured was totally disabled at time of his death, award of benefits to surviving widow under group life policy was warranted.

Reversed and remanded.

West Headnotes

**[1] Insurance 217 €⇒1654**

217 Insurance
    217XI Agents and Agency

        217XI(C) Agents for Insurers
            217k1654 k. Duties and Liabilities to Insureds or Other Third Persons. Most Cited Cases
                (Formerly 208k13.1(2.1), 208k13.1(2))
Employer was acting as group life insurer's agent when it enrolled employee in supplemental coverage for which employee was allegedly ineligible, as required for insurer to prevail on its claim of indemnification from employer for payment of such benefits; it was not relevant that employer sent memorandum sheet on which employee was to indicate his desire for supplemental coverage at time before coverage began, as it was clear at that time that insurer would be providing coverage.

**[2] Federal Civil Procedure 170A €⇒2501**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2501 k. Insurance Cases. Most Cited Cases
Material issues of fact existed as to whether employer was negligent in enrolling employee for supplemental life insurance coverage for which employee was allegedly ineligible under group insurer's plan, precluding summary judgment for insurer on its claim for indemnification from employer for payment of such benefits; issues remained as to whether employer's belief in employee's eligibility was reasonable, given nature of negotiations between parties and absence of written policy.

**[3] Insurance 217 €⇒2425**

217 Insurance
    217XIX Coverage--Life Insurance
        217k2425 k. Duration of Coverage. Most Cited Cases
            (Formerly 217k178.3(3))
Term "disabled," within meaning of group life policy provision for "When Your Insurance Ends" would be read to mean "totally disabled," which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

was defined by policy as disability which completely and continuously prevented employee from engaging in any occupation; it was reasonable to construe contract such that employee's coverage ceased when he was no longer physically able to engage in his occupation.

**[4] Insurance 217 🔗2425**

217 Insurance
    217XIX Coverage--Life Insurance
        217k2425 k. Duration of Coverage. Most Cited Cases
    (Formerly 217k178.3(2))
"Active work" requirement of group life policy would not be construed to terminate coverage for employees who were out on short-term sick leave.

**[5] Insurance 217 🔗2425**

217 Insurance
    217XIX Coverage--Life Insurance
        217k2425 k. Duration of Coverage. Most Cited Cases
    (Formerly 217k178.3(3))
Absent evidence that insured was totally disabled at time of his death, award of benefits to surviving widow under group life policy was warranted; at time of insured's death, he had been out of work for less than six months, and was thus on short-term disability leave, he had not been terminated, but remained listed as active employee, and he was on employer's payroll.

**\*1556** Michael A. Dailey, Phears & Dailey, Norcross, Ga., for defendant-counter claimant-appellant.
Ben Kingree, III, Carter & Ansley, Atlanta, Ga., for plaintiff-counter defendant-appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before VANCE [FN*] and KRAVITCH, Circuit Judges, and LYNNE [FN**], Senior District Judge.

FN* Judge Robert S. Vance was a member of the panel which heard oral argument but due to his death on December 16, 1989 did not participate in this decision. This case is decided by a quorum. *See* 28 U.S.C. § 46(d).

FN** Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

KRAVITCH, Circuit Judge:
United of Omaha Life Insurance Company ("United") brought an action against Sun Life Insurance Company ("Sun Life") to recover certain insurance benefits paid to a Sun Life employee under a group insurance policy issued by United to Sun Life and its employees. In a counterclaim, Sun Life sued to recover benefits that United denied to a different employee. Both parties moved for summary judgment on both claims. Sun Life appeals from the grant of summary judgment to United and from the denial of its motion for summary judgment. Because we find that United's claim for reimbursement presents genuine **\*1557** issues of material fact, we reverse the grant of summary judgment on that claim. We also reverse the district court's grant of summary judgment in favor of United on Sun Life's counterclaim and direct the court to enter summary judgment in favor of Sun Life on that claim.

## I. BACKGROUND

Until January of 1986, Sun Life had maintained a group life insurance policy with Life Insurance Company of Georgia ("Life of Georgia") covering its employees. For two years prior to January 1986, negotiations were conducted between Sun Life and United's Sales Manager, Donald Nelson, regarding the possibility of United replacing Life of Georgia as the provider of Sun Life's group policy. After Sun Life refused United's 1984 proposal, United submitted another proposal in August 1985 in an attempt to duplicate as closely as possible the bene-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

fits that were provided by Life of Georgia.

Under the proposal, premiums for basic life insurance coverage for all employees were to be paid for entirely by Sun Life, and the benefits were to be based upon an employee's salary. Supplemental coverage could be purchased separately with premiums to be paid by individual employees electing this option.

When the policy went into effect on January 1, 1986, Sun Life had only the 1985 proposal before it. It did not receive United's Master Policy and accompanying Certificate-Booklets spelling out the terms of the policy until several months later.

## II. DISCUSSION

The instant case involves a dispute over the claims of two employees, Frank Wells and James Del Guidice. The district court found that there were no material facts in dispute regarding either claim and that United was entitled to summary judgment in its favor on both. We find that the district court erred in both cases and review each in turn.

### A. The Wells Claim

#### 1. Background

Frank Wells, an employee in Sun Life's Home Office Division, enrolled for supplemental insurance on January 4, 1986. Premiums for supplemental coverage were deducted from his paycheck by Sun Life and remitted to United. At the time he enrolled, Wells was on short-term disability leave, which had begun on November 22, 1985 and continued until his death on February 27, 1986. After Wells' death, his widow submitted a claim to United which United honored by paying the basic benefits in the amount of $36,300 plus $53,306.47 for supplemental death benefits plus interest.[FN1] After payment, United filed this action alleging that Sun Life, acting as its agent, knowingly or negligently enrolled an ineligible employee for supple-

mental benefits. United claims indemnification from Sun Life for the violation of the latter's duty to enroll only eligible employees for coverage.

> FN1. United initially refused to pay Wells' claim for supplemental benefits, but later reconsidered its position.

#### 2. Standards for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment is proper when the court determines, on the basis of materials submitted by both parties, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden of establishing the absence of a genuine issue of material fact is on the party seeking summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Once the moving party has come forward with materials in support of its motion, the party opposing the motion must demonstrate the existence of evidence that would support a verdict in its favor. *Celotex,* 477 U.S. at 322-23, 106 S.Ct. at 2552. The **\*1558** court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant. *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). In addition, the Eleventh Circuit held in *Washington v. Dugger* that "if reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." 860 F.2d 1018, 1020 (11th Cir.1988) (quoting *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985)). If a review of the evidence presented reveals that the non-movant has failed to produce evidence sufficient to support a jury verdict in his favor, then summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We review the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

trial court's summary judgment decision *de novo.* See *Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1513 (11th Cir.1989); *Clemons v. Dougherty,* 684 F.2d 1365, 1368 (11th Cir.1982).

With these standards in mind, we turn to the issues surrounding Wells' claim for supplemental benefits.

3. Agency

[1] United contends that Sun Life's negligence in enrolling Wells for supplemental coverage for which he allegedly was ineligible was the basis of United's liability to the beneficiary. United can prevail on its claim for indemnification from Sun Life for the payment of supplemental benefits only if it can show that Sun Life was acting as its agent at the time that it enrolled Wells for this coverage.

The district court found that the question of agency was "easily answered" in the affirmative by the Georgia Supreme Court's decision in *Dawes Mining Company, Inc. v. Callahan,* 246 Ga. 531, 272 S.E.2d 267 (1980). In *Dawes,* the court had to decide whether an employer acts as the agent of the employee or of the insurance company when changing a group policy. The court noted that the agency relationship may change depending on the circumstances:

Once the group policy has been issued, the employer is the agent of the insurer in determining which persons are its employees and are thereby eligible to participate as a member of the group, *Equitable Life v. Florence* [47 Ga.App. 711, 171 S.E. 317 (1933) ], supra, in determining which of its employees are regularly performing their duties and are thereby eligible to receive certificates of increased insurance, *Cason v. Aetna Life* [91 Ga.App. 323, 85 S.E.2d 568 (1954) ], supra, and in determining which of its employees are employed full time, *Pilot Life v. McCrary* [103 Ga.App. 549, 120 S.E.2d 134 (1961) ], supra. These cases are governed by the rule that the employer who obtains a group insurance policy covering its employees is the agent

of the insurance company for every purpose necessary to make effective the group policy, and thus the insurance company has imputed knowledge of facts which the employer knows. *Cason v. Aetna Life,* supra;*Piedmont Southern Life v. Gunter* [108 Ga.App. 236, 132 S.E.2d 527 (1963) ], supra.

However, in selecting a group insurer, in selecting a policy, in selecting coverages to be afforded by the insurer, the employer is negotiating with the prospective insurer; there is no contract in force; and the employer cannot be the agent of the insurer. It has been said that " 'When procuring the policy [and] obtaining applications of employees ... employers act not as agents of the insurer but for their employees or for themselves.' " *Thigpen v. Metropolitan Life* [57 Ga.App. 405, 195 S.E. 591 (1938) ], supra; *Blaylock v. Prudential* [84 Ga.App. 641, 67 S.E.2d 173 (1951) ], supra.

Hence, we find that the relationship which is decisive in this case is that in procuring the group policy and obtaining employee applications, the employer acts as an agent of the employees where the employees will be contributing toward payment of the premium.

*Id.* at 533-34, 272 S.E.2d 267.

We agree with the district court that *Dawes* is controlling. At the time it enrolled*1559 Frank Wells for supplemental coverage, Sun Life was no longer in the process of selecting a group insurer or negotiating over types of coverage; it was clear that United would be its insurer as of January 1, 1986. Instead, when enrolling Wells for one of the types of coverage offered by United, it was implicitly determining that Wells was eligible for that insurance.

In support of its contention that it was acting as Wells' agent and not the insurers', Sun Life points to the language in *Dawes* stating that when "obtaining applications of employees" an employer acts as an agent of the employees. We agree with United that the process of obtaining applications is distinct from the process of enrolling employees for

supplemental coverage. Because Wells was automatically covered by the basic insurance of the group policy, no application was necessary. Consequently, this language in *Dawes* is inapposite.

Sun Life also points to the fact that it sent the memorandum sheet on which the employee was to indicate his desire for supplemental coverage in December, *before* coverage began. This, we find, is irrelevant. At the time the memorandum was sent, it was already clear that United would be providing coverage as of January 1, 1986. In fact, the memorandum refers to "The new Supplemental Life Rates to be effective January 1, 1986." Thus, it is clear that United was not engaged in the process of negotiating the contract, but was rather involved in carrying it out.

For the foregoing reasons, we find that the district court was correct in determining that under *Dawes,* as a matter of law, Sun Life was acting as United's agent when it enrolled Wells for supplemental coverage.

4. Negligence of Sun Life

[2] Although we find that Sun Life was acting as United's agent, United can only prevail on its motion for summary judgment if it shows that there are no material facts in dispute as to whether Sun Life was negligent in enrolling Frank Wells for supplemental coverage and that it is entitled to judgment as a matter of law. We do not find that United has made such a showing.

United's policy went into effect on January 1, 1986. It is undisputed that when Wells enrolled on January 4, Sun Life had United's 1985 proposal in its possession. It is also undisputed that United's Master Policy as well as the Certificate-Booklets that set forth the terms and conditions of the actual agreement were not delivered to Sun Life until some time after Wells' death.[FN2]

> FN2. The parties dispute the exact date of arrival. United contends that the booklets

were distributed in the Spring of 1986. Sun Life contends that they received the booklets in September of 1986.

Under the subject heading "General Information," the 1985 proposal contained the following language:

All persons actively working a minimum of 30 hours a week on a full-time basis who have completed the prescribed qualifying period will be eligible for insurance.

The proposal did not contain a definition of the term "actively working" as used to determine eligibility. In contrast, the Certificate-Booklets, that arrived some months later, make clear that an "active employee" is a person who is working at his regular job at his place of employment. Furthermore, and central to this case, the booklets specify that only "eligible employees," that is, employees actively at work, may be enrolled for supplemental coverage. They contain the following language:
Eligible Employees

You are eligible on January 1, 1986, if you were hired on or before January 1, 1986. If you are hired after January 1, 1986, you are eligible on the day you begin active employment with the Policyholder.

You are eligible as long as:

(a) you are a permanent full-time employee of the Policyholder; and

(b) you are and continue to be actively employed.

**\*1560** Active employment and actively employed means working 32 hours a week at your:

(a) regular job; and

(b) customary place of employment.

When Your Insurance Begins (Supplemental Life Insurance)

894 F.2d 1555
894 F.2d 1555
**(Cite as: 894 F.2d 1555)**

Page 6

If you make a written request before, on or within 90 days from the day you become eligible, you will become insured on the later of:

(a) the day you become eligible; or

(b) the day we receive your request, provided you are actively at work on that day. If you are not actively at work, your insurance will begin on the day you return to active work.

The language of the policy is clear, and had the booklet with this language been available to Sun Life at the time it enrolled Wells for supplemental coverage we would have no difficulty in concluding that Sun Life was negligent in enrolling Wells for supplemental coverage. *See Smith v. Founders Life Assurance Company of Florida,* 175 Ga.App. 262, 333 S.E.2d 5, 6 (1985). The crux of this dispute is what the parties should have understood the term "active employment" to mean between the time the policy took effect and the time that the booklets defining that language were received by Sun Life.[FN3]

> FN3. Despite United's contention that the proposal was a "sample booklet containing the material terms and conditions of the policy," it is clear that the proposal differed from the booklets. For instance, the number of hours that constituted full-time employment was changed from 30 in the proposal to 32 in the booklets.

The district court found that the non-delivery of the booklets was irrelevant. It stated that Sun Life should have known, based on the language in the 1985 proposal, that an employee must be actually at work in order to be eligible for supplemental coverage. It stated that " '[a]ctively working' means what it says. Someone on disability leave is not actively working thirty hours a week. Whether Sun Life considered Mr. Wells to be an active employee and continued to pay him full salary is irrelevant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America,* No. 1:87-CV-1272-JTC, slip op. at 6 (N.D.Ga.1989).

We find, however, that Sun Life has presented evidence from which a jury could find that at the time Wells enrolled, Sun Life could reasonably have been confused as to the eligibility of its employees for supplemental coverage. During negotiations preceding January of 1986, the parties had an understanding that the United policy would replicate Sun Life's current policy with Life of Georgia as closely as possible. The Life of Georgia policy defined an "employee" as follows:

"Employee" means

(a) a person working for the Employer on a regular full-time permanent basis for thirty (30) hours or more per week and who is compensated by the Employer for such work

. . . . .

(c) a person who is an Employee as defined in (a) except for being temporarily unable to work 30 hours per week because of Injury or Illness. This [exception] applies only if the Employer continues such person as a full-time employee in Your payroll records.

Life of Georgia's summary plan description states that:

[i]f your employer grants you a temporary leave of absence, insurance may be continued for a maximum of three months, if premiums are paid and the group policy remains in force. Insurance may be continued beyond three months in the case of illness or injury. If the sick leave plan established by your employer exceeds three months [sic].

Karen Supthin, Sun Life's Personnel Manager, testified that sick leave or "short term disability" could extend up to six months without jeopardizing an employee's "active status." She stated that Sun Life employees on short-term disability are treated "as an active employee in that they remain on our payroll, and their benefits remain the same." Only after six months is the employee converted from short-term *1561 to long-term disability status. At

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this point, the employee is no longer considered active and his eligibility for the group plan changes.

Gloria Van Dyke Lee, former Personnel Director at Sun Life, stated that it was her understanding that under the Life of Georgia policy, an employee with basic insurance could apply for supplemental benefits even after he became disabled or was on sick leave "because they were continued as an active employee. Everything continued whether it was employee paid or company paid."

According to Sun Life, its understanding of the requirements for supplemental coverage was based on representations made by Donald Nelson, the Sales Manager negotiating the contract for United. Deposition testimony from Nelson provides evidence from which a jury could conclude that Sun Life's construction of the term "actively working" was justified by Nelson's representations. For instance, Nelson testified that United's practice is to ask what the prospective insured's employment policies are with regard to active and inactive employees. He also stated that United would accept Sun Life's test for determining when an active employee's sick leave had extended so long that he or she was no longer regarded as active.

United argues that Sun Life confuses the right of employees such as Wells, who were on short-term disability, to be enrolled under United's policy for a continuation of their Life of Georgia basic coverage and the right of such employees to enroll for supplemental benefits which were not offered by Life of Georgia. United states that the only reason Wells, though not at work, was eligible for basic coverage was because United was required by Georgia Insurance Department Regulation Section 120-2-10.10 [FN4] to provide Wells with the same coverage that he received under Sun Life's prior group plan with Life of Georgia. It contends that at no time did it waive the requirement that an employee be "actively working" to be eligible for coverage.

    FN4. Regulation § 120-2-10.10 entitled

"Group Coverage Discontinuation and Replacement" mandates that every employee validly covered under a prior plan on the date of discontinuance be covered by the succeeding carrier. These regulations also spell out the method for determining the scope of the prior carrier's benefits.

Although United may have had no intention of offering supplemental coverage to employees in Wells' position, we note that no distinction was made in the 1985 proposal between basic and supplemental insurance and that testimony from Sun Life personnel officers concerning the availability of supplemental coverage under the Life of Georgia plan demonstrated confusion as to what their employees' coverage had been under that plan.[FN5]

    FN5. For instance, Gloria Van Dyke Lee testified that the employees under the Life of Georgia plan "always had the option of purchasing the supplemental coverage" though she could not point out any provision in the Life of Georgia plan for supplemental benefits.

The parties dispute at length the meaning of Nelson's statement in his deposition that "all active full-time employees would be given an opportunity to enroll for their basic amount of life insurance and a supplemental amount of insurance." Sun Life contends that this statement leaves the distinct impression that Wells was eligible for supplemental insurance, as he was still considered "active" in their books. The district court agreed with United, however, that the statement supports United's position. It found that Nelson was implying that active employees would be able to enroll for supplemental coverage in the future, *after* they met the eligibility requirements set out in the policy. It further stated that the word "active" in Nelson's mind "*may connote* an employee who is actually working full time." *United of Omaha,* slip op. at 8 (emphasis added). While we do not pass judgment on the import of Nelson's statement, we are convinced that it is ambiguous and points to the confusion surrounding

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

the parties' understanding of employee eligibility for supplemental coverage.

In granting summary judgment in United's favor, the district court found that the *1562 language setting forth eligibility requirements in the 1985 proposal was unambiguous and that Nelson had never suggested that a disabled non-working employee could enroll for supplemental coverage. We find that in so concluding, the court was forced to rely heavily on its own interpretation of what the parties must have agreed to. Our own review of the evidence convinces us that genuine issues of fact remain as to whether Sun Life's belief in Wells' eligibility for supplemental coverage was a reasonable one given the nature of the negotiations between the parties and the absence of a written policy. This determination, requiring the weighing of evidence and decisions regarding credibility, is one that should be left to a jury. Accordingly, we reverse the grant of summary judgment in favor of United on the question of Sun Life's negligence in enrolling Wells for coverage and remand for further proceedings consistent with this opinion.

*B. The Del Guidice Claim*

The Del Guidice claim does not concern the difference between the parties' understanding of the policy provisions before the booklets arrived, but rather points up a distressing lack of clarity in the policy as printed.

Del Guidice was an employee in Sun Life's Career Division. Although he was covered by the same Master Policy as Wells, the terms of that policy, as it applied to him, were set out in the Certificate-Booklet covering employees in the Career Division. There is no dispute that Del Guidice was an active Sun Life employee at the time that United's policy went into effect on January 1, 1986, and that he was covered by the basic life insurance plan. Del Guidice went on short-term disability leave in February 1986. He turned 60 in March 1986. Del Guidice returned to work in August and again went

on disability in September 1986. He died in January 1987, less than six months after commencing his September leave.

United refused to honor Del Guidice's widow's claim for benefits. In a letter to Mrs. Del Guidice, it explained its reasons as follows:

Information in file shows your husband last worked on 9-26-86 due to disability.

Under the group policy it states in part under the When Your Insurance Ends Provision of the policy, "coverage would end at midnight on the earliest of the day in which you are no longer eligible under the policy. You are no longer eligible when you are disabled."

Your husband's coverage terminated on September 30, 1986. Since he was over age 60 at the time he became disabled he would not be eligible under the continuance of life insurance if you become totally disabled provision of the policy. Since he was no longer eligible under the policy when he died, we are unable to provide the life benefits.

When United refused to pay the claim of $35,254.15 following Del Guidice's death, Sun Life paid it in accordance with its obligation under a union collective bargaining agreement. Sun Life then filed a counterclaim against United to recover the money.

*1. Policy Provisions*

The policy provisions in the Career Employees booklet referred to in United's letter refusing the Del Guidice claim are as follows:

When Your Insurance Ends

Your insurance will end at midnight on the earliest of:

(a) the day the policy ends;

(b) the day any premium for your insurance is due

and unpaid;

. . . . .

(d) the day in which you are no longer eligible under the policy.

If you are eligible because of your employment, you will no longer be eligible when:

(a) you resign or retire;

(b) you go on leave of absence or strike;

(c) you are dismissed, disabled, suspended, laid off, locked out or are not working due to work stoppage;

*1563 (d) you are no longer in an eligible class; or

(e) you do not satisfy:

(1) the requirement for hours worked; or

(2) any other eligibility conditions in the policy.

The booklet's definition of "eligibility" was identical to the definition in the Home Office employee's booklet and is set out above in our discussion of the Wells claim.

The booklet covering Del Guidice also contained the following language:

Continuance of Life Insurance If You Become Totally Disabled

If you become totally disabled, your life insurance will not end in accord with the When Your Insurance Ends provision, but will be continued without payment of premium provided:

(a) the disability began while you were insured under this provision;

(b) the disability began before you reach [sic] age 60; and

(c) proof of the disability is given to us as described

in the following paragraph.

The meaning of the letter sent to Mrs. Del Guidice and the policy provisions it refers to are the subject of this dispute. Specifically, the parties disagree on the reason for United's refusal of benefits. Discerning that reason proves to be no easy task.

The district court stated that "Del Guidice's coverage ended when he failed to be '*actively employed*' as that term was defined in the Policy." *United of Omaha,* slip op. at 14 (emphasis added). However, it also stated that "United refused payment on the grounds that Mr. Del Guidice had become *totally disabled* on the date his leave began and that he was then over the age of 60." *Id.* at 13 (emphasis added). Elsewhere, the court states that when he "became *disabled* in September of 1986, [his] coverage ended and he was ineligible for continuation of coverage." *Id.* at 15 (emphasis added).

Confusion over the exact grounds for termination of coverage is also evident in United's brief before this court, where United offers a variety of reasons for its denial of coverage. Contrary to its letter to Mrs. Del Guidice, in which it indicates that her husband's coverage was stopped because he was disabled, United states in its brief that Del Guidice's coverage was terminated when he "failed to meet the active work requirement." It thus suggests that there is no distinction between "disability" and "failure to meet the active work requirement." It then suggests that there is no distinction between "disabled" and "totally disabled" when it states that Del Guidice was not covered under the continuation of coverage provision because "the policy provided for a continuation of coverage in the event the employee became disabled provided the disability began before the employee reached age 60." Finally, it states that the only exception to the termination of insurance for an employee "is when the employee is totally disabled." This conflation of the terms "disabled" and "totally disabled" is particularly troubling given that "totally disabled" is a term of art, defined in the policy to mean "a disability which completely and continuously keeps you

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

from performing any work or engaging in any occupation." The term "disability" is not defined.

Sun Life claims that United refused to pay Del Guidice's claim on the grounds that he had become totally disabled on September 29, 1986 and was at that time over the age of 60. It then argues that United did not demonstrate that Del Guidice was totally disabled within the meaning of the policy. Under the policy, *proof* of total disability is required in the form of initial notice of total disability by the insured within twelve months followed by physician certification.

2. Interpreting the Policy Provisions

Because this case is a diversity action governed by Georgia law, we apply principles of that state's law to interpret the provisions of the insurance contract covering Del Guidice. *See Georgia R.R. Bank & Trust Co. v. Fed. Deposit. Ins. Corp.,* 758 F.2d 1548, 1551 (11th Cir.1985). Under *1564 Georgia law, construction of an insurance contract is a question of law for the court. *Giles v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 578 F.Supp. 376, 378 (D.C.Ga.1984); O.C.G.A. 13-2-1 (1982). Georgia law also makes clear that "the process of contract construction ... is composed of three steps." *Travelers Ins. Co. v. Blakey,* 255 Ga. 699, 342 S.E.2d 308, 309,*on remand,*180 Ga.App. 520, 349 S.E.2d 474 (1986). First, the court must decide whether the contract is ambiguous. Then, where ambiguity exists, the court must apply the rules of construction governing interpretation of insurance contracts. Finally, if ambiguity still remains, the court must submit the issue to the jury. *United States Fire Ins. Co. v. Cowley & Associates,* 183 Ga.App. 478, 359 S.E.2d 160, 162 (Ga.App.1987); *Travelers,* 349 S.E.2d at 476.

On close examination, we find that the provisions of the contract that United relies on to deny coverage to Del Guidice are ambiguous. Our construction of the contract resolves the ambiguity, however, and leaves no question requiring submission to a jury.

*a. Disability*

[3] The principal reason given by United for terminating Del Guidice's coverage is that he was disabled. The meaning of the word "disability" as it is used in the provision for "When Your Insurance Ends" is not defined in the policy. United appears to equate disability with failure to meet the "actively at work" requirement. Under this reading of the term, the first day an employee stays home from work because of sickness, United would consider him "disabled" within the meaning of the policy, and accordingly, coverage would end. That is, there is no coverage for any employee who does not die at work or before missing any days of work. At oral argument, United was unable to explain any way in which its policy differentiates between sick leave and disability.

Sun Life contends that under United's policy, "disability" is not equivalent to sick leave, but means "total disability," a condition in which an individual is unable to perform any work or engage in any occupation. Sun Life equates total disability with long-term disability and argues that because Del Guidice was ill for less than six months, he was, by definition, not totally disabled.

In deciding which party's interpretation is correct, we are guided by principles of construction that Georgia applies to insurance contracts. This court has held that in Georgia, "construction of insurance contracts begins with the premise that the policy must 'be construed so as to give effect to the intentions of the parties. All other rules of contract interpretation and construction are subservient to that principle....' " *National Hills Shopping Ctr., Inc. v. Liberty Mut. Ins. Co.,* 551 F.2d 655, 657 (5th Cir.1977) (quoting *Tennessee Corp. v. Hartford Accident and Indemnity Co.,* 463 F.2d 548, 551 (5th Cir.1972)).[FN6] In addition, it is an established rule of Georgia law that, with respect to insurance contracts, "ambiguities ... must be construed strongly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
(Cite as: 894 F.2d 1555)

against the carrier, and an insurance policy must be construed to provide coverage unless the contrary clearly appears." *Garmany v. Mission Ins. Co.,* 785 F.2d 941, 945 (11th Cir.1986) (summarizing Georgia cases so holding). In particular, exclusions from coverage sought to be invoked by the insurer are to be strictly construed against the insurer unless they are clear and unequivocal. *First Georgia Ins. Co. v. Goodrum,* 187 Ga.App. 314, 370 S.E.2d 162, 163 (1988).

> FN6. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

We find it inconceivable that Sun Life would have agreed to a policy whereby an individual, who remains an employee of the company, loses coverage as soon as he is not at his place of employment.[FN7] We agree *1565 with Sun Life that "disabled" must be read to mean "totally disabled," that is, a disability which completely and continuously prevents the employee from engaging in any occupation. We find that it is reasonable to construe the contract such that an employee's coverage ceases when he is no longer physically able to engage in his occupation. It is not unusual for group policies to link extension of coverage to the insured's continued employment with the employer offering the policy. Indeed, "[n]early all group insurance contracts provide either that at the termination of the employment or at a certain fixed period of time thereafter the insurance will automatically cease to be effective." 1 J. Appleman, *Insurance Law and Practice* § 121 at 375 (1981); *see also Shands v. Nationwide Life Insurance Co.,* 250 F.Supp. 627, 629 (N.D.Ga.1965), *aff'd,*355 F.2d 103 (5th Cir.1966) (referring to general rule that coverage under group policy terminates automatically with the termination of employment).

> FN7. Under United's reading of "disabled," an employee who works from 9 a.m. to 5 p.m. and has a heart attack after work at 8

p.m. is covered if he dies at 8:45 a.m. the next morning (before he is due at work), but loses coverage if he dies at 9:15 a.m.

*b. The "actively at work" requirement*

[4] The eligibility requirements for Career Division employees state that to be eligible for insurance, an employee must be working 32 hours a week at his regular job and customary place of employment. According to United, coverage for Del Guidice terminated when he was no longer "actively employed." We find that the requirement of "active employment" as used for purposes of termination of coverage is ambiguous. It does not distinguish between those parties who fail to meet the "active work" requirement because they are on vacation and those parties who fail to meet the requirement because they are working only part-time or have permanently left work. As with disability, United appears to argue that the "active work" requirement disqualifies an employee as soon as he does not show up at his place of business. Sun Life argues, on the other hand, that the "active employment" requirement is superseded when an employee is on short-term disability, and that this is defined by Sun Life to begin five days after an employee is out sick and to extend for six months. It is undisputed that Sun Life has an internal policy of continuing existing coverage for employees who are on short-term disability.

As noted above, where provisions of an insurance contract are ambiguous or subject to doubt, the interpretation most favorable to coverage of the insured will prevail. We agree with Sun Life that the "active work" requirement cannot be construed to terminate coverage for employees who are out on short-term sick leave. As the court stated in *Morris v. Mutual Benefit Life Insurance Company,* 258 F.Supp. 186, 190 (N.D.Ga.1966), "it would be unreasonable to assume that the parties intended a contract whereby any regular employee would be excluded during any week in which he did not work 30 hours because of illness, vacation, etc."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

894 F.2d 1555
894 F.2d 1555
**(Cite as: 894 F.2d 1555)**

Page 12

[5] Having held that the contract covering Del Guidice allows for termination of coverage due to disability only in the event that the disability is total, we must now decide whether this case should go to trial on the question of whether Del Guidice was totally disabled when he ceased work in September of 1986.

We decline to remand the case for trial because we find that United has not put the extent of Del Guidice's disability at issue as a disputed question of fact. Sun Life has offered evidence to show that at the time Del Guidice died, he had been out of work for less than six months and was thus on short-term disability leave. He had not been terminated from employment, but remained listed as an active employee of Sun Life, was on its payroll, and received his paycheck. Not only has United offered no evidence to show that Del Guidice was totally disabled when he went on sick-leave in September of 1986, but United has made it clear that under its interpretation of the contract, the extent of Del Guidice's disability is irrelevant.

United had an opportunity to offer proof on the issue of Del Guidice's disability in response to Sun Life's motion for summary judgment and it declined to do so. Because United has come forth with no proof of Del *1566 Guidice's total disability, we reverse the grant of summary judgment in favor of United on the Del Guidice claim and direct the district court to enter summary judgment in favor of Sun Life in the amount of $35,254.15.

REVERSED and REMANDED.

C.A.11 (Ga.),1990.
United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America
894 F.2d 1555

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

208 F.3d 1290                                                          Page 1
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

▷
Madray v. Publix Supermarkets, Inc.
C.A.11 (Fla.),2000.

United States Court of Appeals,Eleventh Circuit.
Connie Lynn MADRAY and Melody Holden,
Plaintiffs-Appellants,
v.
PUBLIX SUPERMARKETS, INC., Defendants-Appellees.
No. 98-5802.

April 13, 2000.

Female employees brought Title VII action against employer alleging hostile environment sexual harassment. The United States District Court for the Southern District of Florida, No. 96-14235-CV-NCR, Norman C. Roettger, Jr., J., 30 F.Supp.2d 1371, entered summary judgment in favor of employer. Employees appealed. The Court of Appeals, Birch, Circuit Judge, held that: (1) employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; (2) employer was on notice of alleged sexual harassment when employees contacted persons identified in employer's sexual harassment policy, not when they complained informally to various mid-level managers; and (3) employees unreasonably failed to take advantage of opportunities provided by employer to correct alleged sexual harassment.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
    (Formerly 78k167)

Coemployee's complaint to mid-level managers about store manager's alleged sexually harassing behavior did not provide employer effective notice of store manager's alleged sexual harassment of plaintiff employees, for purposes of determining whether employer established affirmative defense to Title VII liability. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
    (Formerly 78k371)

Generally, an employer is subject to vicarious liability under Title VII to a victimized employee for an actionable hostile environment created by a supervisor with immediate or successively higher authority over the employee; however, an affirmative defense exists under which employers have a safe harbor from vicarious liability when the victimized employee suffered no adverse tangible employment action. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
    (Formerly 78k167)

To successfully interpose an affirmative defense to Title VII liability for sexual harassment by a supervisor, an employer must satisfy two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                          Page 2
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ⟲1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
        (Formerly 78k167)
Dissemination of an employer's anti-harassment policy is fundamental to meeting the requirement, necessary to establish the affirmative defense to Title VII liability for sexual harassment by a supervisor, of exercising reasonable care in preventing sexual harassment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⟲1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
        (Formerly 78k167)
Employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, as required to establish affirmative defense to Title VII liability for alleged sexual harassment by supervisor, by establishing complaint procedures identifying various persons to whom complaints could be made, even if only one of those persons was in employees' store, and that person was the alleged harasser; procedures identified and provided phone numbers of persons to whom complaints could be made, and one of those persons visited store once a week. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⟲1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
        (Formerly 78k167)
An employer's size, location, geographic scope, organizational structure, and industry segment are just some of the characteristics that impact the analysis of whether the complaint procedures of an employer's anti-harassment policy adequately fulfill Title VII's deterrent purpose, for purposes of determining whether the employer has established an affirmative defense to liability for sexual harassment by a supervisor. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⟲1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
        (Formerly 78k167)
Employer was on notice of alleged sexual harassment by supervisor, for purposes of determining whether it took reasonable care to correct alleged harassment, as required to establish affirmative defense to Title VII liability, when employees contacted persons identified in employer's sexual harassment policy as persons with whom complaints should be registered, not when employees complained informally to various mid-level managers not listed in policy. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ⟲1189**

78 Civil Rights
    78II Employment Practices

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                    Page 3
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

78k1181 Sexual Harassment; Work Environment

78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
(Formerly 78k167)

For purposes of determining whether an employer has established an affirmative defense to Title VII liability for sexual harassment by a supervisor, once the employer has promulgated an effective anti-sexual harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 €══1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
(Formerly 78k167)

Even if a sexual harassment complaint to second assistant manager could have put employer on notice of alleged sexual harassment by supervisor, for purposes of employer's affirmative defense to Title VII liability, employee's complaint to such manager at restaurant during party for departing employee that supervisor's conduct "made me sick" was insufficient to provide such notice; employee failed to disclose extent or precise nature of supervisor's alleged behavior. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 €══1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases

(Formerly 78k167)

Even if a sexual harassment complaint to second assistant manager could have put employer on notice of alleged sexual harassment by supervisor, for purposes of employer's affirmative defense to Title VII liability, employee's statement to such manager during dinner at restaurant attended by several other employees, relaying a particular incident she found offensive, together with manager's alleged witnessing of second incident of harassment, were insufficient to provide such notice; employee did not indicate on-going pattern of sexual harassment or that she wanted manager to take action. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 €══1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
(Formerly 78k167)

Even if bakery manager's knowledge of alleged sexual harassment by supervisor could have put employer on notice of alleged sexual harassment by supervisor, for purposes of employer's affirmative defense to Title VII liability, bakery manager's witnessing of incident of alleged sexual harassment by supervisor did not provide employer with such notice, inasmuch as employee assured bakery manager she would report alleged harassment to employer through representative designated in employer's sexual harassment policy. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 €══1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                          Page 4
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

ventive or Remedial Measures. Most Cited Cases
     (Formerly 78k167)
Employees unreasonably failed to take advantage of
opportunities provided by employer to correct al-
leged sexual harassment committed by their super-
visor, and, thus, employer was not liable under
Title VII, where employees complained to mid-
level managers informally instead of complaining
to persons designated in employer's sexual harass-
ment policy, employees did not fully inform man-
agers of extent of alleged harassment, employees
did not ask managers to take action, and one em-
ployee declined manager's assistance, saying she
would take action herself. Civil Rights Act of 1964,
§ 701 et seq., as amended, 42 U.S.C.A. § 2000e et
seq.

**[13] Civil Rights 78 ⚖══1189**

78 Civil Rights
     78II Employment Practices
          78k1181 Sexual Harassment; Work Environ-
ment
               78k1189 k. Knowledge or Notice; Pre-
ventive or Remedial Measures. Most Cited Cases
          (Formerly 78k167)
An employer cannot use its own policies to insulate
itself from Title VII liability for sexual harassment
by a supervisor by placing an increased burden on a
complainant to provide notice beyond that required
by law. Civil Rights Act of 1964, § 701 et seq., as
amended, 42 U.S.C.A. § 2000e et seq.

**\*1292** Erika Deutsch Rotbart,Rotbart & Deutsch,
P.A., Boca Raton, FL, Christopher C. Sharp, Ft.
Lauderdale, FL, for Plaintiffs-Appellants.
Amy W. Littrell, Alley & Alley/Ford & Harrison,
LLP, James Morgan Craig, Alley & Alley,
Chartered, Tampa, FL, Paul H. Field, Lane, Reese,
Aulick, Summers & Field, Coral Gables, FL, for
Plaintiffs-Appellees.

Appeal from the United States District Court for the
Southern District of Florida.

Before BIRCH and MARCUS, Circuit Judges, and

ALAIMO [FN*], Senior District Judge.

> FN* Honorable Anthony A. Alaimo, Seni-
> or U.S. District Judge for the Southern
> District of Georgia, sitting by designation.

BIRCH, Circuit Judge:
Connie Lynn Madray and Melody Holden
(collectively, "plaintiffs") appeal the district court's
order granting summary judgment to Publix Super
Markets, Inc. ("Publix") and dismissing their
claims against Publix for hostile environment sexu-
al harassment, in violation of Title VII of the 1964
Civil Rights Act, 42 U.S.C. § 2000e, et seq., as
amended. The plaintiffs argue that Publix is not en-
titled to the affirmative defense to vicarious liabil-
ity for sexual harassment announced by the Su-
preme Court in *Faragher v. City of Boca Raton,*
524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662
(1998), and *Burlington Industries v. Ellerth,* 524
U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998),
(the "*Faragher* affirmative defense") because ques-
tions persist about (1) whether Publix exercised due
care to prevent sexual harassment in its store, (2)
when Publix became aware of the sexual harass-
ment to which the plaintiffs were being subjected,
and (3) whether the plaintiffs utilized the appropri-
ate procedures for reporting sexual harassment.[FN1]
For the reasons that follow,**\*1293** we AFFIRM the
holding of the district court.

> FN1. The plaintiffs also argue that a genu-
> ine issue of material fact exists as to
> whether the harassing behavior to which
> they were subjected by their manager was
> sufficiently severe or pervasive to satisfy
> the requirements for hostile environment
> sexual harassment. Although the district
> court noted "that the alleged behavior f[ell]
> short of other conduct that courts have held
> did not constitute a hostile environment,"
> R4-144 at 8 n. 3; *Madray, et al. v. Publix
> Super Markets, Inc.,* 30 F.Supp.2d 1371,
> 1375 n. 3 (S.D.Fla.1998), the district court
> neither made a specific finding of whether

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                   Page 5
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
(Cite as: 208 F.3d 1290)

the conduct at issue in this case was sufficiently severe or pervasive to constitute hostile work environment sexual harassment nor did the district court base its judgment upon such a finding. We will not address this issue, but will assume *arguendo* that Selph's conduct constituted sexual harassment.

### I. BACKGROUND

Holden has worked in Publix store number 118 in Okeechobee, Florida since 1987. She continues to be employed as a scan price clerk in store 118. Madray worked at store 118 from 1990 until April 1997, when she moved to Georgia. She is now employed by Publix as a part-time stock clerk in Athens, Georgia. Ronald Selph became the manager of store 118 in 1994. As store manager, Selph was the highest ranking employee in store 118. Thus, he exercised supervisory authority over both Holden and Madray until he was transferred to store 61 as an assistant manager in September 1995.

From the commencement of his employment as manager of store 118, Selph made a practice of hugging and patting his employees. Selph explained that he engaged in this behavior in an effort to promote a family atmosphere at the store and increase productivity. The plaintiffs were not initially offended by Selph's behavior; however, over time, the plaintiffs contend that Selph's conduct escalated and became offensive.[FN2]

> FN2. According to the plaintiffs, Selph's harassing behavior included groping, full-body hugs, rubbing his body against theirs in such a way that his genitals made contact with their body, kissing, blowing in their ear, wetting his finger in his mouth and sticking it in their ears, and rubbing their shoulders, backs, hips, and legs, as well as an array of suggestive and provocative comments. Because the question of whether this behavior amounted to hostile work environment sexual harassment is not

appropriately before this court, we will not provide a detailed account of the alleged harassment.

The plaintiffs first complained about Selph's harassing behavior to three mid-level managers at store 118. Holden testified that, at a party for a departing employee, she told Darlene Clark, a Second Assistant Manager, "[t]hat it made me sick for [Selph] to hug me and touch me and kiss me." R3-82, Deposition of Melody Holden, at 58. However, Holden did not request that Clark take any action as a result of her comment. *See id.* at 59. Rather, Holden "hop[ed] that [Clark would] take it in her own hands and do it because she's in management." *Id.* at 59.

About a month or two later, Holden testified that, while in a restaurant with several other employees of store 118, she told Second Assistant Manager Gary Priest that Selph had "grabbed me and ducked me over and kissed me on the neck." *Id.* at 62. While Holden did not request that Priest undertake any action regarding her complaint, she did tell him that she did not know what do about Selph's behavior. *See id.* at 63. Holden stated that Priest was "shocked" by her account of Selph's behavior and "didn't know what to say either." *Id.* at 62-63.

Holden also testified that approximately two to three weeks before she lodged a formal complaint against Selph, David Neff, the Bakery Manager, witnessed an incident of inappropriate behavior by Selph. According to Holden, Neff told Selph "That's sexual harassment," but Selph responded that he did not care what Neff called it. *Id.* at 125-26. Holden stated that when she thanked Neff for trying to stop Selph's inappropriate behavior, she explained that she hoped he would stop since Neff had told him it was sexual harassment. Neff replied: "Well, if it doesn't, you let me know. And if it still continues, if you don't complain about it, then I have to as a manager." *Id.* at 126. Holden responded that she would talk to Madray and make arrangements to see District Manager Richard Rhodes.

208 F.3d 1290                                                                                                                              Page 6
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

[1] Approximately three or four days before Holden made her formal complaint, Priest actually witnessed Selph's inappropriate behavior towards Holden and made *1294 an effort to distract Selph from Holden. Additionally, Madray testified that a few days prior to lodging a formal complaint, Priest also witnessed Selph hugging her and said, "I've seen too much. We need to talk to Mr. Rhodes." R3-84, Deposition of Connie Lynn Madray, at 133. Subsequently, Holden requested that Priest call district manager Rhodes and set up an appointment so that the plaintiffs could complain about Selph's harassing behavior towards them. Rhodes met with the plaintiffs the next day and began an investigation. The plaintiffs agreed that Rhodes was responsive to their complaints and was very upset because "[h]e said that the managers knew better and should have let him know what was going on." R3-82 at 132. Upon completion of Rhodes' investigation, Selph was given a written warning, demoted to assistant manager, and transferred to a store in another city. After making the complaint neither plaintiff had any contact with Selph.[FN3]

> FN3. The plaintiffs also point to an incident where another female employee complained to mid-level managers about Selph's harassing behavior and they attempted unsuccessfully to handle the problem "in the store." R4-141-102 (Maria Chesser's statement). Meat Manager Steve Pitts suggested that this incident happened at least six months prior to the plaintiffs' complaint to Rhodes. *See* R4-141-88 (Steve L. Pitts 8/24/95 statement). The plaintiffs contend that this other employee's previous complaint to the mid-level managers provided Publix notice of Selph's sexual harassment as much as six months prior to their formal complaint. However, our conclusion that the plaintiffs' own complaints to the mid-level managers did not provide Publix effective notice of the harassment they were experiencing applies equally to the complaint of the other em-

ployee to mid-level managers. Thus, we conclude that the complaint of another employee to the mid-level managers in store 118 did not place Publix on notice of Selph's sexually harassing behavior.

Publix has promulgated a sexual harassment policy and disseminated it to employees in their employee handbook. The policy requires that the employees "bring [any complaints] to the attention of appropriate persons in Company Management.... [I]n order for the Company to deal with the problem, *we must report such offensive conduct or situations to the Store Manager, District Manager, or Divisional Personnel Managers.*" R2-67-Ex. 4 at 3. (emphasis in original).[FN4]

> FN4. The pertinent part of Publix's "Statement Concerning Prohibited Harassment, Including Sexual Harassment" consists of the following:
>
>> To help ensure that none of us ever feel we are being subjected to harassment, and in order to create a comfortable work environment, the Company prohibits any offensive physical, written or spoken conduct regarding any of these items, including conduct of a sexual nature.
>>
>> ....
>>
>> If any of us believe that he or she is being subjected to any of these forms of harassment, or believes he or she is being discriminated against because other associates are receiving favored treatment in exchange for, (example-sexual favors), he or she must bring this to the attention of appropriate persons in Company Management. The very nature of harassment makes it virtually impossible to detect unless the person being harassed registers his or her discontent with the appropriate Company representative.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                      Page 7
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

Consequently, in order for the Company to deal with the problem, *we must report such offensive conduct or situations to the Store Manager, District Manager or Divisional Personnel Managers*:

[list of individuals and telephone numbers by location]

....

A record of the complaint and the findings will become a part of the complaint investigation record and the file will be maintained separately from the associate's personal file.

Any person electing to utilize this complaint resolution procedure will be treated courteously. The complaint will be handled as swiftly and as confidentially as practical in light of the need to remedy the problem, and registering the complaint will in no way be used against the associate nor will it have adverse impact on the individual's employment status.

R2-67-Ex. 4 at 2-4.

Additionally, Publix maintained an "Open Door Policy" which was also published in the employee handbook. This policy encouraged employees to talk to a manager about any "problems or misunderstandings." *Id.* at 1-2. This policy **\*1295** reminded employees that they could "talk to anyone in management," but encouraged them to first discuss their problem with their "immediate Supervisor" and then proceed to "the next highest level of management." *Id.*[FN5]

FN5. Publix's "Open Door Policy," as set forth in the employee handbook, provides the following:

It is just a fact of life that occasionally there will be problems and misunderstandings among people. If something bothers you, or if you need clarification of a Publix policy or procedure, please talk to a manager about it. Always remember, as a Publix associate you can talk to anyone in management. Experience has shown, however, that many problems can best be worked out by the following steps:

1. Discuss you problem or raise your question directly with your immediate Supervisor/Manager/Department Head.

2. If the matter is not resolved or you still have a question or concern, go to the next highest level of management (for example, Store Manager, District Manager, Regional Director of Retail Operations, or a Vice-President).

Just remember-you can discuss your problem with anyone in management all the way to the top level. Also, your Divisional Human Resources Department is available to assist you with any matter at any time, and you may contact the Employee Assistance Department in Lakeland for confidential counseling.

R2-67-Ex. 4 at 1-2 (emphasis omitted).

The plaintiffs filed suit against Publix and Selph, alleging hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[FN6] The plaintiffs claimed that they were each subjected to an array of improper conduct by Selph as a condition of their employment, they were retaliated against by Selph after they reported his inappropriate conduct to other store management personnel, the management personnel to whom they reported Selph's conduct responded ineffectively, and they were ridiculed and embarrassed because Publix and its agents allowed their complaints to be made public. The plaintiffs further claimed that Publix was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                                                Page 8
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
(Cite as: 208 F.3d 1290)

aware of Selph's behavior via the managers and supervisors in store 118, Publix was ineffective in curtailing the bad conduct, and, after transferring Selph from store 118, Publix allowed the plaintiffs' complaint to become public, thereby exposing them to further ridicule, embarrassment, and retaliation. The plaintiffs asserted that they had both suffered damages in the form of lost income and benefits, as well as nightmares and migraines. Additionally, Madray claimed she was demoted, scheduled to work fewer hours, and her schedule was changed to be less convenient for her family as a result of complaints against Selph.

> FN6. The plaintiffs also alleged violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes, battery, intentional infliction of emotional distress, and invasion of privacy. Only the claims regarding Publix's alleged violation of Title VII are at issue in this appeal; therefore, we will not discuss the plaintiffs other allegations.

Publix moved for summary judgment, arguing that it was not liable for Selph's conduct because it had a well-disseminated anti-harassment policy in force and it responded immediately to the plaintiffs' complaints. Selph also moved for summary judgment, adopting Publix's arguments and further asserting that the facts as set forth by the plaintiffs failed to satisfy the requirements for the state law claims of battery and invasion of privacy. The plaintiffs replied that Publix should be considered to have had notice of Selph's behavior beginning with Holden's initial complaint to Second Assistant Manager Darlene Clark, as much as six months prior to the initiation of District Manager Rhodes' investigation. Therefore, the plaintiffs argued that Publix's response to the plaintiffs' complaints could not be considered prompt.

The district court concluded that Publix was not liable for Selph's alleged harassment because Publix had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy,

of which the plaintiffs were aware, and Publix responded promptly and effectively to stop the alleged harassment once the plaintiffs utilized the policy's established *1296 reporting procedures. The district court found that the plaintiffs failed to follow the procedures established by Publix's sexual harassment policy because they were afraid of potential negative consequences. The court further found that it was unreasonable for the plaintiffs not to take advantage of the preventive and corrective procedures developed by Publix because Publix's policy was unambiguous and the plaintiffs admitted that they knew and understood the sexual harassment policy. The district court noted that "[t]o permit an employee to disregard a policy of which she was admittedly aware based on generalized fears would require an employer to be automatically liable for harassment committed by a supervisor." R4-144 at 10-11. Accordingly, the district court granted Publix's motion for summary judgment on the plaintiffs' claims for hostile work environment sexual harassment and dismissed the plaintiffs' federal claims with prejudice.[FN7]

> FN7. The district court also granted Selph's motion for summary judgment regarding the Title VII claims because the relief available under Title VII is against the employer, not the alleged harasser. Additionally, the district court declined to exercise supplemental jurisdiction over the plaintiffs' state law claims for battery, invasion of privacy, and violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes and dismissed those claims without prejudice. The plaintiffs do not appeal these actions.

## II. DISCUSSION

We review the district court's order granting summary judgment de novo. See Williams v. Vitro Services Corp., 144 F.3d 1438, 1441 (11th Cir.1998). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                                    Page 9
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). In making this assessment, we "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555, 1558 (11th Cir.1990).

[2][3] In 1998, the Supreme Court delivered two opinions which provided increased guidance on the circumstances under which an employer should be found vicariously liable for the hostile work environment created by a supervisory employee's sexual harassment. *See Burlington Indus.,* 524 U.S. at 755-765, 118 S.Ct. at 2265-70; *Faragher,* 524 U.S. at 785-808, 118 S.Ct. at 2282-93. In these cases, the Supreme Court utilized common law agency principles to establish that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2292-93; *see also Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. at 2270. However, the Supreme Court also created an affirmative defense providing employers a safe harbor from vicarious liability when the victimized employee suffered no adverse tangible employment action. *Id.* at 807,118 S.Ct. at 2293; *see also Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. at 2270. The employer must satisfy two elements to successfully interpose this defense: "(a) that the employer exer-

cised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take **\*1297** advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.; see also Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. at 2270.

The district court concluded that Publix had fulfilled the requirements of the first element of the *Faragher* affirmative defense by promulgating the anti-harassment policy and then acting promptly to stop Selph's harassment once the plaintiffs complained to Rhodes. Next, the district court determined that the second element had been satisfied by the plaintiffs' failure to contact any of the individuals identified for reporting offensive conduct or situations by Publix's "Statement Concerning Prohibited Harassment, Including Sexual Harassment."

On appeal, the plaintiffs argue that Publix does not meet the requirements for the *Faragher* affirmative defense. First, the plaintiffs assert that Publix's "Statement Concerning Prohibited Harassment, Including Sexual Harassment" does not demonstrate that Publix "exercised reasonable care to prevent such harassment" because the policy is too narrow and identifies only one person in each store, the store manager, as available to address sexual harassment complaints. Additionally, the plaintiffs suggest that the failure of the mid-level managers to whom they complained to respond demonstrates that Publix failed to take reasonable care to prevent harassment in its stores. Second, the plaintiffs contend that Publix did not respond promptly to correct Selph's sexually harassing behavior. The plaintiffs assert that Publix should be considered to have had notice of Selph's harassing behavior when they first complained to Second Assistant Manager Darlene Clark months before District Manager Rhodes undertook his investigation and remedial action. Therefore, Rhodes' actions cannot be considered a prompt corrective response. Finally, the plaintiffs argue that their decision to report Selph's harassing behavior to the mid-level managers within store

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118, rather than the individuals delineated in Pub-lix's sexual harassment policy, was not unreason-able given Publix's Open Door Policy which en-couraged employees to talk to "anyone in manage-ment" regarding problems and further recommen-ded that employees first discuss these problems with their "immediate Supervisor/ Manager/ De-partment Head." R2-67-Ex.4 at 1-2. We will ad-dress each of these arguments in turn.FN8

> FN8. Although Madray initially claimed
> that she was demoted, scheduled to work
> fewer hours, and that her schedule was
> changed to be less convenient to her fam-
> ily, the plaintiffs do not argue on appeal
> that they suffered any adverse, tangible
> employment action. Therefore, we do not
> address this issue. *See Malowney v. Feder-*
> *al Collection Deposit Group,* 193 F.3d
> 1342, 1345 (11th Cir.1999) (stating that is-
> sues not argued on appeal are deemed
> abandoned), *cert. denied,*529 U.S. 1055,
> 120 S.Ct. 1558, 146 L.Ed.2d 463 (2000).

A. *Employer's Reasonable Care To Prevent Sexual Harassment*

[4][5] When crafting the first prong of the *Faragh-er* affirmative defense which requires, in part, that the employer exercise reasonable care to prevent sexual harassment, the Supreme Court sought to give effect to Title VII's deterrent purpose. *See Faragher,* 524 U.S. at 806, 118 S.Ct. at 2292 ("It would therefore implement clear statutory policy and complement the Government's Title VII en-forcement efforts to recognize the employer's af-firmative obligation to prevent violations and give credit here to employers who make reasonable ef-forts to discharge their duty."); *Burlington Indus.,* 524 U.S. at 764, 118 S.Ct. at 2270 (noting that making employer liability contingent "in part on an employer's effort to create [antiharassment policies and effective grievance] procedures, ... would effect Congress' intention to promote conciliation rather than litigation in the Title VII context, and the EEOC's policy of encouraging the development of

grievance procedures") (citation omitted). Accord-ingly, the Supreme Court *1298 implied that em-ployers could meet the initial burden in determining whether they had exercised reasonable care to pre-vent sexual harassment by promulgating an anti-harassment policy. *See Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293 ("While proof that an employer had promulgated an antiharassment policy with complaint procedures is not necessary in every in-stance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."); *see also Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. at 2270. The Supreme Court further determined, when applying the new affirmative defense, that dissemination of an employer's anti-harassment policy was fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment. *See Faragher,* 524 U.S. at 808, 118 S.Ct. at 2293 (noting that it appeared the defendant employer would be unable to utilize the affirmative defense because it "had entirely failed to dissemin-ate its policy against sexual harassment among [its] ... employees"). There is no dispute that Publix pro-mulgated and effectively disseminated complaint procedures as a part of its sexual harassment policy. Rather, the plaintiffs contend that Publix did not exercise reasonable care to prevent the supervisor's harassing behavior because the complaint proced-ures in Publix's sexual harassment policy identify only one person in an employee's store who can be contacted regarding sexual harassment, the store manager.

[6] We recognize that the wide variety of employ-ment settings make it difficult to establish a uni-form test for determining whether an employer's anti-harassment policy complaint procedures demonstrate the employer's reasonable care in pre-venting sexual harassment. The employer's size, location, geographic scope, organizational struc-ture, and industry segment are just some of the characteristics that impact the analysis of whether the complaint procedures of an employer's anti-

208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

harassment policy adequately fulfill Title VII's deterrent purpose. Nonetheless, the Supreme Court did provide some guidance regarding the minimum requirement for an anti-harassment policy's complaint procedures to be considered effective. The Court noted that Title VII's deterrent purpose was clarified by a 1990 policy statement from the Equal Employment Opportunity Commission (EEOC) "enjoining employers to establish a complaint procedure 'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.' " *Faragher,* 524 U.S. at 806, 118 S.Ct. at 2292 (quoting EEOC Policy Guidance on Sexual Harassment, 8 FEP Manual 405:6699 (March 19, 1990)) (alteration in original); *see also Burlington Indus.,* 524 U.S. at 764, 118 S.Ct. at 2270 (citing EEOC Policy Guidance on Sexual Harassment, 8 BNA FEP Manual 405:6699 (March 19, 1990)). Publix's sexual harassment policy meets the standard established by the EEOC's 1990 policy statement by providing to employees alternative avenues for lodging a complaint other than a harassing supervisor. Although the store manager was the only designated company representative located within each store and, in this case, was the alleged harasser, Publix's policy also designated several additional individuals to whom an employee could complain regarding harassment.

These other designated, appropriate company representatives were accessible to Publix's store employees. District Manager Rhodes visited store 118 at least once each week and phone numbers, including a toll-free phone number, were provided for other appropriate company representatives to whom an employee could complain about a supervisor's sexual harassment. *See Shaw v. AutoZone, Inc.,* 180 F.3d 806, 812 (7th Cir.1999) (concluding that a sexual harassment policy was reasonable when the offending supervisor's immediate supervisor "visited the store approximately every two to three weeks"), *cert. denied,*528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000). Additionally, the Publix*1299 complaint procedures provided em-

ployees multiple avenues for lodging a sexual harassment complaint outside the supervisory chain of command. *See id.* at 811-812 (finding a sexual harassment policy to be reasonable when it made it clear that sexual harassment would not be tolerated, was both specific and detailed, provided multiple mechanisms for the prompt resolution of complaints, and allowed the complainant to circumvent the supervisory chain of command). Therefore, we conclude that the complaint procedures established by Publix's sexual harassment policy meet the minimum requirements for the *Faragher* affirmative defense because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives.

Moreover, the complaint procedures established by Publix's sexual harassment policy are similar to those in the policy we found to be reasonable in *Coates v. Sundor Brands,* 164 F.3d 1361, 1364 (11th Cir.1999) (per curiam). *See id.* at 1369 (concluding that the policy directing employees who have been sexually harassed to "immediately contact their line manager, Personnel Contact, or other manager with whom they feel comfortable" was a reasonable policy). Similarly, our sister circuits have found more narrowly drawn anti-harassment policies to satisfy the requirement that an employer exercise reasonable care to prevent sexual harassment. *See Montero v. Agco Corp.,* 192 F.3d 856, 862 (9th Cir.1999) (finding that promulgation of a policy which identified only an employee's supervisors and the company's Human Resources Department as the appropriate vehicles for registering a sexual harassment complaint and dissemination of that policy to employees satisfied the requirement that an employer exercise reasonable care to prevent sexual harassment); *see also Watkins v. Professional Security Bureau, Ltd.,* 201 F.3d 439 (4th Cir.1999) (per curiam) (concluding a policy was reasonable when employee was not placed in the position of having to report their su-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                    Page 12
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

pervisor's conduct to someone in the supervisors's chain of command); *Ritchie v. Stamler Corp.,* No. 98-5750 (6th Cir. Jan. 12, 2000) (per curiam) (finding a policy which only allowed sexual harassment complaints to be made in writing to the president of the company reasonable).[FN9]

> FN9. These are unpublished opinions cited solely for their persuasive value pursuant to 4th Cir. R. 36(c) and 6th Cir. R. 28(g), respectively.

Therefore, because we find no inherent defect in the complaint procedures established by Publix's sexual harassment policy, nor any evidence that the policy was administered in bad faith, we conclude that Publix exercised reasonable care to prevent sexual harassment. *Cf. Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999) (noting that where "there is no evidence that an employer adopted or administered an antiharassment policy in bad faith or that the policy was otherwise defective or dysfunctional, [its] existence ... militates strongly in favor of a conclusion that the employer 'exercised reasonable care to prevent' and promptly correct sexual harassment") (quoting *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293).

B. *Employer's Reasonable Care To Correct Promptly Sexual Harassment*

In applying the *Faragher* affirmative defense, we have noted that "the employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment ... then it is liable unless it took prompt corrective action." *Dees v. Johnson Controls World Services,* 168 F.3d 417, 422 (11th Cir.1999). Therefore, we must determine when Publix had notice of Selph's harassing behavior in order to evaluate the alacrity of its response.

[7] This inquiry is facilitated by the identification of the "appropriate Company representative" to whom employees should \*1300 register their complaints in the Publix's sexual harassment policy. R2-67-Exh. 4 at 2-4. Publix required that its employees report harassing behavior to either the Store Manager, District Manager, or Divisional Manager and went so far as to list the names and phone numbers for some of the appropriate company representatives in various locations. *See id.* Therefore, by this policy, Publix established that when one of the delineated "appropriate Company representatives" was contacted regarding harassment, it then had been given notice sufficient to obligate it to make a prompt corrective response. *See Coates,* 164 F.3d at 1364 (noting that when an employer's sexual harassment policy clearly specifies the steps an employee should take to alert the employer of sexual harassment, the employer has, by the policy, "itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures").

[8] The plaintiffs contend that Publix should be deemed to have been on notice prior to their meeting with District Manager Rhodes, an appropriate company representative, via their complaints to various mid-level managers, not designated as appropriate company representatives by the antiharassment policy. However, as we have noted, once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then "it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Farley v. American Cast Iron Pipe,* 115 F.3d 1548, 1554 (11th Cir.1997). *See also Young v. Bayer Corp.,* 123 F.3d 672, 674 (7th Cir.1997) (noting that when an employer has identified and appointed a recipient for sexual harassment complaints, "complainants can be expected to utilize it"). Therefore, we conclude that Publix cannot be considered to have been placed on notice of Selph's harassing behavior by the plaintiffs' informal complaints to individuals not designated by Publix to receive or process sexual harassment complaints.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                              Page 13
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

Moreover, even if we considered the mid-level managers to whom the plaintiffs complained agents of Publix placing it on notice of Selph's behavior, the context surrounding the plaintiffs' comments to these individuals compels the conclusion that these mid-level managers could not reasonably have been expected to act to address the plaintiffs' complaints. *Cf. Coates,* 164 F.3d at 1365 (concluding that an employer has not been given adequate notice of sexual harassment to require action when an employee provided to an appropriate company representative a harassing note she received from her supervisor, but did not indicate that the note "represented a problem about which she was concerned or that required [the manager's] immediate attention," or "that the note was only the latest in an on-going pattern of sexually harassing behavior," and "the primary purpose for seeking out [the manager] was to discuss not the harassment," but other matters).

### 1. Conversation with Darlene Clark

[9] Holden complained to Second Assistant Manager Clark at a restaurant during a party for a departing employee. She only told Clark that Selph's behavior "made me sick." R3-82 at 58. Nothing Holden said to Clark disclosed the extent or precise nature of Selph's behavior towards Holden. Clark could not have been expected to take corrective action on the basis of this informal, general complaint.

### 2. Conversations with Gary Priest

[10] Holden next complained to Second Assistant Manager Priest while eating dinner in a restaurant with several other employees. Here, she relayed a particular incident where she found Selph's behavior offensive. Holden did not indicate that this incident was part of an on-going pattern of sexually harassing behavior or that she wanted Priest to take action to stop Selph's inappropriate behavior. Again, *1301 Priest could not have been expected to take

action to address the singular incident recounted by Holden during a dinner gathering.

Additionally, Holden asserts that approximately three or four days before she lodged a formal complaint, Priest witnessed Selph's harassment of Holden. Again, the deposition testimony suggests that at that time Priest knew of only two occasions where Selph behaved inappropriately towards Holden-the one incident described by Holden during dinner and the incident he witnessed. Knowledge of these two isolated incidents is not sufficient to indicate Priest should have known Selph was engaging in a consistent pattern of harassment towards Holden or to create a reasonable expectancy that he would take corrective action against Selph. Moreover, when Priest witnessed the subsequent incident where Selph hugged Madray, Priest did take action, indicating that they needed to speak with District Manager Rhodes.

### 3. Discussion with David Neff

[11] After Bakery Manager Neff witnessed Selph's harassment of Holden, Holden assured him that she would report Selph's behavior to Publix through District Manager Rhodes, one of the appropriate company representatives designated in Publix's sexual harassment policy. The communication between Neff and Holden demonstrates that Holden knew and understood Publix's established procedure for reporting sexual harassment and intended to lodge the formal complaint herself rather having Neff take action. Neff could not reasonably be expected to take corrective action when Holden insisted that she would contact District Manager Rhodes herself to inform him of Selph's behavior towards her.

Nothing in the plaintiffs' complaints to mid-level managers prior to their meeting with Rhodes indicates that these managers' failure to take prompt action to stop Selph's harassment was unreasonable. Neither plaintiff fully explained the full dimensions of their harassment by Selph to the mid-level man-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 1290                                                                                    Page 14
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
(Cite as: 208 F.3d 1290)

agers or approached these mid-level managers in a professional capacity to request assistance with correcting Selph's behavior. Therefore, we conclude that Publix did not have adequate notice of Selph's harassing behavior through the mid-level managers. Publix can first be charged with notice of Selph's behavior when the plaintiffs requested a meeting with District Manager Rhodes. The plaintiffs do not dispute that Rhodes responded promptly to end their harassment by Selph. Accordingly, we find that Publix did exercise reasonable care to correct promptly Selph's sexually harassing behavior.

## C. *Employee's Reasonable Use of Preventative or Corrective Opportunities*

[12] "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense." *Faragher,* 524 U.S. at 807-808, 118 S Ct. at 2293; *see also Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. at 2270. The plaintiffs admit that they knew the appropriate complaint procedures and understood whom they should contact according to Publix's sexual harassment policy. Their understanding of these procedures was illustrated by Holden's response to Bakery Manager Neff that she would contact District Manager Rhodes to lodge a complaint against Selph after Neff witnessed Selph's harassing behavior. Yet, despite knowing exactly who they should contact regarding sexual harassment, the plaintiffs chose to complain informally to managers that were not authorized to receive such complaints under the Publix sexual harassment policy.

[13] The plaintiffs contend that they chose to complain to the mid-level managers within store 118 in accordance with Publix's Open Door Policy. Therefore, *1302 they assert that their decision to discuss Selph's behavior with these managers, rather than

those individuals identified by the sexual harassment policy, was not unreasonable and that they reasonably took advantage of preventative and corrective opportunities Publix made available-the Open Door Policy. The district court concluded that the plaintiffs had not adequately followed the procedures of the Open Door Policy to satisfy their duty to report Selph's sexually harassing behavior because that policy requires that "if a problem is not resolved, the employee should go to the next highest level of management, to the top level if necessary." R4-144 at 10. While we note that "[a]n employer cannot use its own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law," we, nonetheless, conclude that the plaintiffs failed to reasonably utilize the complaint procedures provided by Publix's Open Door Policy. *Williamson v. City of Houston,* 148 F.3d 462, 467 (5th Cir.1998); *see also Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2nd Cir.1998) (rejecting the argument that an anti-harassment policy can create "an affirmative duty [for the plaintiff] to bring her allegations to the company's attention in more than one way when she believes the company's response to her harassment claim is inadequate.... When a plaintiff reports harassing misconduct in accordance with company policy, she is under no duty to report it a second time before the company is charged with knowledge of it."). The plaintiffs complained to the mid-level managers within store 118 during informal, often social, circumstances. They did not fully inform the mid-level managers of the extent of the harassment Selph directed towards them, nor did they request that the mid-level managers take any action to stop Selph's harassment. In fact, on at least one occasion the plaintiffs declined the assistance of a mid-level manager and insisted that they would take action themselves in accordance with the sexual harassment complaint procedures. Therefore, we can find no basis upon which a reasonable fact-finder could conclude that the plaintiffs reasonably availed themselves of the preventive and corrective opportunities provided by either Publix's sexual harassment policy or its Open

208 F.3d 1290                                                                    Page 15
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588
**(Cite as: 208 F.3d 1290)**

Door Policy.

As we have noted, "the problem of workplace dis-crimination ... cannot be [corrected] without the co-operation of the victims." *Coates,* 164 F.3d at 1366. Here, we conclude that the plaintiffs unreasonably delayed utilizing the complaint procedures estab-lished by Publix's sexual harassment policy and they concede that Publix responded promptly once they cooperated by providing the company notice via its established complaint procedures. *Cf. Montero,* 192 F.3d at 863 (finding an employee's delay in utilizing an employer's established com-plaint procedures equated to unreasonably failing to take advantage of the company's preventive and corrective opportunities). Therefore, we conclude that the second prong of the *Faragher* affirmative defense is satisfied with regard to Publix's vicarious liability before District Manager Rhodes was noti-fied of Selph's behavior.

### III. CONCLUSION

Publix promulgated an effective sexual harassment policy with appropriate complaint procedures, dis-seminated this information to its employees, and made a good-faith effort to enforce the policy; therefore, Publix satisfied the standards for exer-cising reasonable care to prevent sexual harass-ment. As a result, Publix cannot be charged with notice of the harassment via the plaintiffs' earlier, informal complaints to mid-level managers within their store who were not designated to receive com-plaints of sexual harassment under Publix's anti-harassment policy. Publix responded promptly to correct the alleged harassment when it received ef-fective notice by the plaintiffs' complaints to a des-ignated, appropriate company representative. Fi-nally, the plaintiffs acted unreasonably in delaying their use of the complaint procedures established by Publix. Therefore, we conclude *1303 that Publix is entitled to interpose the affirmative defense estab-lished in *Faragher* and *Burlington Indus.* to elimin-ate its vicarious liability for the sexual harassment the plaintiffs experienced. Accordingly, we AF-

FIRM the decision of the district court.

C.A.11 (Fla.),2000.
Madray v. Publix Supermarkets, Inc.
208 F.3d 1290, 82 Fair Empl.Prac.Cas. (BNA) 1071, 77 Empl. Prac. Dec. P 46,348, 13 Fla. L. Weekly Fed. C 588

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

195 F.3d 1238                                                                                          Page 1
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

▷

Mendoza v. Borden, Inc.
C.A.11 (Fla.),1999.

United States Court of Appeals,Eleventh Circuit.
Red MENDOZA, Plaintiff-Appellant,
v.
BORDEN, INC., d.b.a. Borden's Dairy, Defendant-
Appellee.
**No. 97-5121.**

Nov. 16, 1999.

Former employee brought action against former
employer alleging violations of Age Discrimination
in Employment Act (ADEA), Americans with Dis-
abilities Act (ADA), Title VII, and state anti-
discrimination law, as well as intentional infliction
of emotional distress. The United States District
Court for the Southern District of Florida, No.
96-1082-CV-LCN, Lenore C. Nesbitt, J., entered
summary judgment for former employer as to AD-
EA, Title VII retaliation, and state-law claims, and
entered judgment as matter of law for employer as
to remaining claims. Former employee appealed.
The Court of Appeals, Hull, Circuit Judge, held
that: (1) conduct alleged by employee, including,
inter alia, supervisor's "constant" following and
staring at employee, did not reach level of severe or
pervasive conduct sufficient to alter employee's
terms or conditions of employment, thus defeating
hostile environment sexual harassment claim, and
(2) district court properly granted summary judg-
ment and judgment as a matter of law on employ-
ee's state-law claims and claims for age discrimina-
tion, disability discrimination, and retaliation.

Affirmed.

Edmondson, Circuit Judge, filed concurring opin-
ion.

Carnes, Circuit Judge, filed concurring opinion.

Tjoflat, Circuit Judge, filed opinion concurring in

part and dissenting in part, in which Birch, Barkett
and Marcus, Circuit Judges, joined.

Barkett, Circuit Judge, filed opinion concurring in
part and dissenting in part, in which Birch, Circuit
Judge, joined.

Opinion, 158 F.3d 1171, vacated.

West Headnotes

**[1] Civil Rights 78 ☜1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1183 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
    (Formerly 78k167)
In sexual harassment cases, courts must consider
the alleged conduct in context and cumulatively.
Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A.
§ 2000e-2(a)(1).

**[2] Federal Courts 170B ☜776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews de novo a district court's
denial of a motion for judgment as a matter of law.
Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[3] Federal Courts 170B ☜798**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk798 k. Directed Verdict. Most
Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                          Page 2
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

**Federal Courts 170B ☞801**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)3 Presumptions
            170Bk801 k. Judgment N. O. v. Most
Cited Cases
In reviewing district court's denial of a motion for
judgment as a matter of law, Court of Appeals em-
ploys same standard the district court applied, re-
viewing all evidence in light most favorable to, and
with all reasonable inferences drawn in favor of,
nonmoving party. Fed.Rules Civ.Proc.Rule 50, 28
U.S.C.A.

**[4] Federal Civil Procedure 170A ☞2146**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from
Jury
         170AXV(F)2 Questions for Jury
            170Ak2142 Weight and Sufficiency of
Evidence
               170Ak2146 k. Scintilla of Evid-
ence. Most Cited Cases

**Federal Civil Procedure 170A ☞2152**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from
Jury
         170AXV(F)2 Questions for Jury
            170Ak2152 k. Conclusions or Infer-
ences from Evidence. Most Cited Cases
Although existence of genuine issue of material fact
precludes judgment as a matter of law, jury ques-
tion does not exist because of the presence of a
mere scintilla of evidence, and motion for judgment
as matter of law will be denied only if reasonable
and fair-minded persons in the exercise of impartial
judgment    might    reach    different    conclusions.
Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞2142.1**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from
Jury
         170AXV(F)2 Questions for Jury
            170Ak2142 Weight and Sufficiency of
Evidence
               170Ak2142.1 k. In General. Most
Cited Cases

**Federal Civil Procedure 170A ☞2152**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from
Jury
         170AXV(F)2 Questions for Jury
            170Ak2152 k. Conclusions or Infer-
ences from Evidence. Most Cited Cases
On motion for judgment as a matter of law, court
must consider whether evidence presents a suffi-
cient disagreement to require submission to a jury
or whether it is so one-sided that one party must
prevail as a matter of law, and, if facts and infer-
ences point overwhelmingly in favor of one party,
such that reasonable people could not arrive at a
contrary verdict, then the motion is properly gran-
ted. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[6] Civil Rights 78 ☞1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1555 k. Questions of Law or Fact. Most
Cited Cases
   (Formerly 78k389)

**Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                              Page 3
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

ment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most
Cited Cases
Though claims of employment discrimination, in-
cluding sexual-harassment claims, present fact-
intensive issues, motions for summary judgment or
judgment as a matter of law are appropriate to po-
lice the baseline for hostile environment claims.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[7] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
To establish hostile-environment sexual-harassment
claim under Title VII based on harassment by a su-
pervisor, employee must show: (1) that he or she
belongs to a protected group; (2) that employee has
been subject to unwelcome sexual harassment, such
as sexual advances, requests for sexual favors, and
other conduct of a sexual nature; (3) that harass-
ment was based on the sex of the employee; (4) that
harassment was sufficiently severe or pervasive to
alter terms and conditions of employment and cre-
ate a discriminatorily abusive working environ-
ment; and (5) a basis for holding employer liable.
Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A.
§ 2000e-2(a)(1).

**[8] Civil Rights 78 ☞1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1183 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
    (Formerly 78k167)
Although Title VII's prohibition of sex discrimina-

tion clearly includes sexual harassment, Title VII is
not a federal "civility code," and sexual harassment
constitutes sex discrimination only when the har-
assment alters terms or conditions of employment.
Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A.
§ 2000e-2(a)(1).

**[9] Civil Rights 78 ☞1184**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1184 k. Quid Pro Quo. Most Cited
Cases
    (Formerly 78k167)
The paradigm of sexual harassment as federally
prohibited employment discrimination occurs when
employee's expressed terms of employment, such as
salary or continued employment, are conditioned
upon compliance with employer's sexual demands.
Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A.
§ 2000e-2(a)(1).

**[10] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
Absent "explicit" discrimination with respect to
terms or conditions of employment, employee must
make some showing in order to connect allegations
of sexual harassment to a violation of Title VII,
and, thus, in cases traditionally described as hostile-
environment cases, employer's harassing actions to-
ward an employee do not constitute employment
discrimination under Title VII unless the conduct is
sufficiently severe or pervasive to alter conditions
of victim's employment and create abusive working
environment. Civil Rights Act of 1964, § 703(a)(1),
42 U.S.C.A. § 2000e-2(a)(1).

195 F.3d 1238                                                        Page 4
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

**[11] Civil Rights 78 €➞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Establishing that sexually harassing conduct was sufficiently severe or pervasive to alter employee's terms or conditions of employment includes a subjective and an objective component, such that employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable; environment must be one that a reasonable person would find hostile or abusive and that victim subjectively perceives to be abusive. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[12] Civil Rights 78 €➞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Objective severity of sexual harassment should be judged from perspective of a reasonable person in the plaintiff's position, considering all the circumstances. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[13] Civil Rights 78 €➞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Factors that should be considered in determining whether sexual harassment objectively altered employee's terms or conditions of employment include (1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with employee's job performance; courts should examine the conduct in context, not as isolated acts, and determine under totality of circumstances whether the harassing conduct is sufficiently severe or pervasive to alter terms or conditions of plaintiff's employment and create hostile or abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[14] Civil Rights 78 €➞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Conduct alleged by female employee, including one instance in which supervisor said to employee "I'm getting fired up," one occasion in which supervisor rubbed his hip against employee's hip while touching her shoulder and smiling, two instances in which supervisor made sniffing sound while looking at employee's groin area and one instance of sniffing without looking at her groin, and supervisor's "constant" following and staring at employee in a "very obvious fashion," did not reach level of severe or pervasive conduct sufficient to alter employee's terms or conditions of employment, thus defeating hostile environment sexual harassment claim. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[15] Civil Rights 78 €➞1183**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 5
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
      (Formerly 78k167)

To establish that harm alleged was based on her sex, sexual harassment plaintiff must show that but for the fact of her sex, she would not have been the object of harassment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[16] Civil Rights 78 ⬅1172**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate Treatment. Most Cited Cases
      (Formerly 78k158.1)

Purpose of Title VII is to strike at disparate treatment of men and women. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[17] Civil Rights 78 ⬅1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
      (Formerly 78k389)

Female employee's testimony about supervisor's "constant" following and staring did not create jury issue on employee's sexual-harassment claim, where there was no allegation of any staring or following employee outside the workplace or of calling her after work, employee admitted that supervisor never followed her in office part of the plant where employee worked and spent most of her time, and employee did not describe supervisor's following and staring as intimidating or threatening. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**\*1241** Ronald Renzy, Wallberg & Renzy, P.A., Hollywood, FL, for Plaintiff-Appellant.
Wesley Robert Parsons, Adorno & Zeder, PA, Miami, FL, for Defendant-Appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before ANDERSON, Chief Judge, and TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL and MARCUS, Circuit Judges.[FN*]

> FN* Judge Charles R. Wilson was appointed after this case was orally argued en banc, but is an active member of the court at the time the case is decided. He has elected not to participate in the decisional process.

HULL, Circuit Judge:

This appeal requires this Court to determine whether Appellant Red Mendoza introduced sufficient evidence at trial to support her claim alleging hostile-environment sexual harassment. We conclude that she did not, and therefore we hold that the district court properly granted Appellee Borden's Rule 50(b) motion for judgment as a matter of law on Mendoza's sexual-harassment claim.[FN1]

> FN1. All judges concur in the majority opinion's disposition of Mendoza's claims for age and disability discrimination, retaliation, and under state law. The opinion for the Court on her sexual harassment claim is joined in full by Chief Judge Anderson and Judges Edmondson, Cox, Dubina, Black, and Carnes. Regarding her sexual harassment claim, Judges Edmondson and Carnes also file separate concurring opinions; Judge Tjoflat files a dissenting opinion, in which Judges Birch, Barkett, and Marcus join; Judge Barkett files a dissenting opinion, in which Judge Birch joins.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                         Page 6
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

*I. Procedural History*

In April 1997, Mendoza filed a complaint in the United States District Court for the Southern District of Florida against Borden alleging a variety of employment claims. Mendoza asserted claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), disability discrimination under the Americans with Disabilities Act ("ADA"), retaliation under Title VII, and sexual harassment under Title VII. Mendoza also asserted state-law claims alleging intentional infliction of emotional distress and discrimination in violation of the Florida Civil Rights Act.

Following discovery, Borden moved for summary judgment on all claims. After hearing oral argument, the district court granted summary judgment to Borden on all of Mendoza's claims except her sexual-harassment and disability-discrimination claims.

The parties then proceeded to a jury trial. Following the conclusion of Mendoza's case in chief, the district court granted judgment as a matter of law to Borden on her remaining claims including Mendoza's **\*1242** hostile-environment sexual-harassment claim.

Mendoza appealed the district court's orders awarding summary judgment to Borden on her ADEA, retaliation, and state-law claims and the district court's order granting Borden judgment as a matter of law on Mendoza's sexual-harassment and ADA claims. A panel of this Court affirmed the district court's summary-judgment rulings and the entry of judgment as a matter of law on the ADA claim, but reversed the district court's ruling on Borden's motion for judgment as a matter of law on Mendoza's sexual-harassment claim. *Mendoza v. Borden, Inc.,* 158 F.3d 1171 (11th Cir.1998). On Borden's suggestion for rehearing en banc, this Court voted to hear the case en banc, vacated the panel's opinion, and subsequently directed the parties to brief issues related to Mendoza's sexual-harassment claim. *Mendoza v. Borden, Inc.,* 169 F.3d 1378 (11th

Cir.1999).

We agree with the panel that the district court properly granted Borden's motions for summary judgment and judgment as a matter of law on Mendoza's claims for age discrimination, disability discrimination, retaliation, intentional infliction of emotional distress, and discrimination in violation of the Florida Civil Rights Act. Therefore, we affirm the district court's entry of judgment in favor of Borden on Mendoza's claims for age discrimination, disability discrimination, retaliation, and Mendoza's state-law claims. However, we disagree with the panel's conclusion on Mendoza's sexual-harassment claim. For the reasons below, we conclude that the district court did not err in granting Borden's motion for judgment as a matter of law on Mendoza's sexual-harassment claim.

*II. Factual Background*

Mendoza worked in Borden's Miami facility for a total of sixteen months. In December 1993, Mendoza began work with Borden as a temporary employee in the accounting department. In April 1994, she became a permanent employee. Her employment ended in April 1995. According to Borden, Mendoza's employment ended because she was absent from work for three consecutive days without calling to explain her absence as required by Borden's written personnel policies.

During most of her tenure with Borden, Mendoza's supervisor was Daniel Page. He began working in the Miami facility in May 1994; and therefore, his employment overlapped with Mendoza's for approximately eleven months. As the controller of the Miami facility, Page was the highest ranking Borden employee at the facility. Thus, Page exercised supervisory authority over Mendoza.

The Miami facility where Mendoza worked consisted of several discrete areas. The plant where the milk was processed constituted the majority of the facility, but the facility also included various of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                 Page 7
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

fices, hallways, and an outdoor picnic area. Mendoza worked in the same office area with eight to twelve other accounting clerks. Page worked in a glass-enclosed office situated in one corner of that office area. From his desk, Page could observe the rest of the office area.

[1] In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively. Therefore, we set forth all alleged harassing conduct so that we can look at the totality of the circumstances. At trial, Mendoza testified to these instances of conduct by Page. First, she testified that:

the man was constantly watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and to go back to the office.

Later, Mendoza further explained Page's conduct: He seemed to be wherever I was in the plant. He followed me not around the office, but around the hallways in the Plant. Okay? He was at a lunch table in the lunch room. He would be at a picnic table outside. And he would look me up and down, very, in a very obvious fashion.*1243 When I was face to face with him, when I would get up and walk away from these tables or areas, I would feel him watching me up and down from-okay.

Finally, Mendoza reiterated that Page's following and watching "was a constant thing" and that Page never said anything during the following and watching.

Mendoza also testified about two instances when Page "looked at me up and down, and stopped in my groin area and made a ... sniffing motion." Mendoza described these two instances as follows:

There was an incident where I was standing at a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. *He was sitting at a*

*chair in the conference room, which is approximately 20, 25 feet away from me,* at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.

This also happened another time. It had to be in March, I had the flu. *I went into his office-he was sitting at his computer*-to tell him that my doctor wanted me to take time off because of this flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Emphasis supplied). In one instance, Page was twenty to twenty-five feet away from Mendoza, and in the other, Page was sitting at his computer when Mendoza entered his office. She further testified to one other time when he walked around her desk and sniffed without looking at her groin. Mendoza admitted that Page also *never said anything to her* during what she perceived to be the sniffing nor the looking up and down.

Explaining her only allegation that included any physical conduct, Mendoza testified that while she was at a fax machine in a hallway, Page passed by her and "rubbed his right hip up against my left hip" while touching her shoulder and smiling. Mendoza's complete description of this follows:

I was doing a fax. We had a small coffee machine directly outside the office to the right of our office. I was doing a fax. And this was-the fax machine was by the doorway, and he rubbed-he went by me and he rubbed his right hip up against my left hip. I was at an angle, rubbed against me, walked by me, touched my shoulders at the same time, simultaneously. I was startled, I looked up, and he gave me a big smile.

When asked if Page said anything at that point, Mendoza testified, "No, he didn't." Mendoza also explained that this was the only physical contact during the eleven months she worked for Page. Fi-

195 F.3d 1238                                                                              Page 8
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

nally, Mendoza described an incident when she confronted Page by entering his office and saying "I came in here to work, period." According to Mendoza, Page responded by saying "Yeah, I'm getting fired up, too." [FN2] When asked if Page said anything else during that meeting, Mendoza testified, "No, he didn't." Mendoza also admitted this was the only time where Page said anything to her that she perceived to be of a sexual nature. When asked if "Page ever use[d] vulgar language with you?", Mendoza replied, "No, he didn't." [FN3]

> FN2. The jury trial began with opening statements at 1:13 P.M. on May 13 and concluded on May 14 by 10:15 A.M. Mendoza's entire testimony covers seventynine pages, but her direct and cross examination about Page's harassing conduct totals twenty-four pages. Since her testimony is fairly brief, we are able to quote her exact descriptions of Page's conduct in order to assure full consideration of Mendoza's allegations cumulatively and in context. Besides Mendoza, only one other witness testified at trial. Jenny Voltapelti, who is married to Mendoza's dentist, testified that during several dental appointments, Mendoza related to her that she was being sexually harassed at work. Voltapelti did not recall the details that Mendoza related.

> FN3. Although Page never used vulgar language with her, Mendoza did testify that other workers did. The example Mendoza gave was Ms. Diaz's being in the habit of sharing with Ms. Murphy her sexual plans with her husband.

**\*1244** At the close of Mendoza's evidence, Borden moved for judgment as a matter of law on Mendoza's hostile-environment sexual-harassment claim. After hearing argument from counsel, the district court, ruling from the bench, granted Borden's motion. The court found the incidents of harassment "in the minds of a reasonable juror or to a reasonable person, are not physically threatening or humi-

liating, and certainly there was not a sufficient frequency and severity to suggest a hostile or abusive environment." The court further remarked that the allegations were largely devoid of any physical contact or overly offensive comments. Accordingly, the district court concluded that, assuming Mendoza's allegations were sexual in nature, Mendoza had not established a hostile or abusive work environment.

### III. Standard of Review and Standard for Granting Judgments as a Matter of Law

[2][3][4][5] This Court reviews de novo a district court's denial of a motion for judgment as a matter of law. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997), *cert. denied sub nom. Combs v. Meadowcraft Co.,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). We employ the same standard the district court applied, "review[ing] all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995). Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a 'mere scintilla of evidence' ". *Id.* A motion for judgment as a matter of law will be denied only if "reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions." *Id.* These standards require us to consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Combs,* 106 F.3d at 1526 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." *Combs,* 106 F.3d at 1526 (quoting *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                    Page 9
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

[6] We recognize that claims of employment discrimination, including sexual-harassment claims, present fact-intensive issues. However, we agree with the Fifth Circuit's observation that motions for summary judgment or judgment as a matter of law are appropriate to "police the baseline for hostile environment claims." *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 n. 8 (5th Cir.1999).

*IV. Discussion*

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It expressly prohibits refusing to hire or discharging an employee based on a prohibited factor. *Id.* Likewise, Title VII also expressly provides that "[i]t shall be an unlawful employment practice for an employer ... otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.*

Title VII does not mention sexual harassment. Nevertheless, the Supreme Court and this Court long have recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *\*1245Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (other internal quotation marks and citations omitted)); *Henson v. City of Dundee,* 682 F.2d 897, 901 (11th Cir.1982) (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971) ("[T]he phrase 'terms, conditions, or privileges of employment' in (Title VII) is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.")).

[7] To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Henson,* 682 F.2d at 903-05.[FN4]

> FN4. Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee-subject to an affirmative defense. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

[8] Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1000-02, 140 L.Ed.2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " (internal citation omitted)); *Merit-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                                          Page 10
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

*or,* 477 U.S. at 67, 106 S.Ct. 2399 ("[N]ot all work-place conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

[9] Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment. The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. *Burlington Indus.,* 118 S.Ct. at 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."). In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit." *Id.* at 2264; *see also Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1246 (11th Cir.1998).

[10] Absent such "explicit" discrimination, an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII. Thus, in the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'*1246 " *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson,* 682 F.2d at 904).

[11][12] Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Harris,* 510 U.S. at 21-22, 114 S.Ct. 367. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or

conditions of employment, and this subjective perception must be objectively reasonable. *Id.* The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive." *Id.* at 21, 114 S.Ct. 367. Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale,* 118 S.Ct. at 1003 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

[13] The objective component of this analysis is somewhat fact intensive. Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir.1997) (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. *Id.; see Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Henson,* 682 F.2d at 904; *Faragher,* 118 S.Ct. at 2283 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances' ").

Other circuits have applied these factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII. Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as seri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 11
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

ous or more serious than the conduct at issue in this appeal. *Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir.1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264-67 (5th Cir.1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365-66 (10th Cir.1997) (holding "sexually-oriented, offensive"*1247 statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167-68 (7th Cir.1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 753-54 (4th Cir.1996) (holding evidence that the harasser

"bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823-24 (6th Cir.1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.,* No. 93-1720, 1994 WL 136971 (4th Cir.1994) (holding insufficient under *Harris* seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims-supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work-were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 593 (5th Cir.1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 263 (5th Cir.1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

[14] In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment. Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable. *See* *1248Brill v. Lante Corp.,* 119 F.3d 1266, 1274 (7th Cir.1997) (rejecting the plaintiff's attempt to buttress a hostile-environment claim with evidence of unpleasant, but non-sexual, conduct); *Galloway,* 78 F.3d at 1167-68 (noting that the term "sick bitch" is not necessarily a sexual or gender-related term). For example, although the statement "I'm getting fired up" could come under some circumstances denote sexual or romantic desire, Page's statement that he was "getting fired up" occurred in the context of reacting to a complaint by Mendoza. As she described the interaction: "I went into his office angry and disgusted.... Mr. Page turned around and I said to him, 'I came in here to work, period' and his reply to me was 'yeah, I'm getting fired up, too.' " By Mendoza's own description, Page did not ap-

proach her but instead, she approached Page while another employee was present in his office. Mendoza also admits that Page said nothing else. Thus, the circumstances of this interaction do not objectively indicate that the statement "I'm getting fired up" had a sexual or other gender-related connotation.

[15][16] As another example, although "following and staring" can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees. For example, Mendoza described Page's constant "following and staring" as "he always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there." Nevertheless, because we conclude that the conduct established by Mendoza was not sufficiently severe or pervasive to alter Mendoza's terms or conditions of employment, we assume, but do not decide, that this conduct is sexual in nature and thus might implicate sex discrimination.[FN5]

> FN5. To establish that the harm alleged was "based on her sex," Mendoza "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982). The purpose of Title VII is to strike at the disparate treatment of men and women. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Mendoza never claimed, and never produced any direct evidence, that Page treated women employees differently from male employees. Instead, Mendoza sought to establish discrimination "based on sex" circumstantially by claiming Page's conduct amounted to sexual advances towards her. Thus, we discuss whether Page's conduct was sexual in nature.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                                    Page 13
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

Turning to the heart of this appeal, an examination of the factors from *Harris* and applied in *Allen* demonstrates that Mendoza did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her employment. Three of the four factors-physically threatening or humiliating conduct, interference with job performance, and severity-are clearly absent from the conduct established by Mendoza. The other factor-frequency of the harassing conduct-is also for the most part lacking, but to the extent Mendoza showed frequent conduct, the frequency of it does not compensate for the absence of the other factors.

First and most importantly, Mendoza did not present evidence that Page's conduct was "physically threatening or humiliating" or that the cumulative effect of this conduct "unreasonably interfered" with Mendoza's job performance. Even construing the evidence in the light most favorable to Mendoza, Page's statement "I'm getting fired up" and the sniffing sounds are hardly threatening or humiliating. *Compare Hall v. Gus Const. Co.,* 842 F.2d 1010, 1012 (8th Cir.1988) (sexual harassment established with evidence that, *inter alia,* female employees were held down so that other employees could touch their breasts and legs), *with Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996) (holding sexually-oriented joke is the kind of non-threatening "utterance" that cannot alone support hostile-environment claim). Even more clearly, the one instance of Page brushing his hip against Mendoza's *1249 hip and Page's constant "following" of Mendoza are neither threatening nor humiliating. Likewise, nothing in the record indicates that Page's conduct impaired Mendoza's job performance.

Second, none of the conduct alleged by Mendoza is severe. Even if somehow offensive, Page's statement "I'm getting fired up," the three sniffing sounds, the one instance of physical conduct, and the following/staring are much less severe than the incidents of sexual banter and inappropriate touching described, and found insufficient, by the Second Circuit in *Quinn* and the Fourth Circuit in *Hopkins,*

for example. *Quinn,* 159 F.3d at 768 (holding a comment about the plaintiff's "posterior" and touching of her breasts with some papers did not create a hostile environment); *Hopkins,* 77 F.3d at 753-54 (holding that multiple instances of inappropriate conduct, including placing a magnifying glass over the plaintiff's crotch, did not establish sexual harassment).

Third, aside from Page's "constant" following and staring, the conduct asserted by Mendoza was not frequent. She established a single instance of slight physical contact, one arguably inappropriate statement, and three instances of Page's making a sniffing sound. These instances occurred over an eleven-month period and therefore were far too infrequent to alter the conditions under which Mendoza was required to perform her job. *Cf. Sprague,* 129 F.3d at 1366 (reasoning that five sexually-oriented incidents over sixteen months were sporadic).

[17] To the extent Mendoza's testimony about "constant" following and staring established the frequency factor, this evidence does not create a jury issue on Mendoza's sexual-harassment claim. There is no allegation of any staring or following Mendoza outside the workplace or of any calling Mendoza after work. Regarding the workplace, Mendoza admits that Page never followed her in the office part of the plant where Mendoza worked, and thus necessarily spent most of her time.[FN6] Indeed, Mendoza did not describe the following as walking close behind her in an intimidating or threatening fashion, but instead simply as Page's showing up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside. In her testimony at trial, Mendoza never described Page's following or staring as "stalking" or "leering" or "intimidating" or "threatening." Similarly, none of Mendoza's briefs regarding her Title VII claim before the panel or en banc characterizes Page's following or staring as "stalking," "leering," "intimidating," or "threatening."[FN7]

> FN6. Mendoza says she never went into the processing plant which constituted the

195 F.3d 1238                                                                                          Page 14
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

majority of the Miami facility.

FN7. The initial panel opinion does not either. *Mendoza v. Borden, Inc.,* 158 F.3d 1171 (11th Cir.1998), *vacated,*169 F.3d 1378 (11th Cir.1999). The first and only time "stalking" in connection with Mendoza's Title VII claim appears in this case are the dissents filed at the en banc stage.

Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring was "constant" and thus "frequent" under the *Harris* factors. Also, considering the following and staring described by Mendoza with and in the context of the sniffs, one verbal statement, and one slight touching as Page walked by the fax, we find Mendoza's claim still falls far short of actionable hostile environment sexual harassment.FN8

FN8. Judge Tjoflat's dissent cites seven decisions involving following and/or staring. However, each case involves additional conduct that is far more egregious than what Mendoza alleges, and those cases in the dissent, if anything, highlight the insufficiency of Mendoza's evidence. For example, the dissent notes that *Cross v. Alabama Dep't of Mental Health & Mental Retardation,* 49 F.3d 1490, 1495-97 (11th Cir.1995), involved "glaring looks, piercing looks." However, that case also had seven female plaintiffs' testifying that the harasser treated his women employees differently than men. According to the plaintiffs, the harasser threw objects at the women daily, yelled, screamed and belittled them, and engaged in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching with women, but never engaged in this conduct with his male employees. The harasser's manner of communicating with female em-

ployees was described as "extremely hostile, very angry, very aggressive" and "demeaning" but as "very professional" with male employees. The harasser's derogatory comments to women included "women belonged barefoot and pregnant," "fat butt," "a butt head," "a cow," "rather dumb," "stupid," and "just a woman." The harasser told "sexual and dirty jokes," and said, "I guess women are taking over things" and made comments that mistakes would not happen if males were in the position of decision making. The harasser had an affair with a female employee who testified that he described women as less intelligent than men and said they "cause a lot of trouble, and the facility would be better off with men than women."

The other staring and following cases cited in Judge Tjoflat's dissent also involve egregious conduct that is missing here. *Westvaco Corp. v. United Paperworkers Intern.,* 171 F.3d 971, 972-73 (4th Cir.1999) (going into plaintiff's office and staring but accompanied by calling her at home; leaving messages with heavy breathing, panting, and "love you, baby"; addressing her as "foxy mama" and "foxy lady" for a year; asking for a kiss and, when she refused, saying "I am serious, I want some tongue"); *Stoll v. Runyon,* 165 F.3d 1238, 1239 (9th Cir.1999) ( "stalking" is alleged but the court also described the "gruesome facts" as "[n]umerous male coworkers and supervisors asked [plaintiff] to perform oral sex on them, commented on her body, shot rubber bands at her backside, asked her to wear lacy black underwear for them, bumped and rubbed against her from behind, pressed their erect penises into her back while she was sorting mail and unable to get away, followed her into the women's bathroom,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                    Page 15
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

asked her to go on vacations, 'stalked her throughout the postal facility,' and fondled her body"); *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 570-74 (8th Cir.1997) (involving Brewer's "following her around the store" but also involving testimony that harassers Brewer and Mais treated their women employees differently than men, with these examples: Brewer made overt sexual remarks to plaintiff and comments on her body; Brewer smacked his lips with kissing noises at her; Mais kicked her legs when he walked by; Mais called her "mother fucker" and "lazy-son-of-a-bitch," commented on her "tight-ass jeans," used profanity with her; Brewer called her "damn dummy," "stupid," and "idiot" daily, and yelled at her for extended periods, telling her he wanted her to work on the ladder so he could see her "cute ass"; Brewer yelled and swore at other female employees; plaintiff complained to store manager about Brewer's "behavior, drinking and intimidation"; Mais gestured with a screwdriver toward plaintiff's rear; and Mais and Brewer "directed harsh treatment, abusive language, and profanity at women, but not at men"); *Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475, 1478 (9th Cir.1997) (alleging that harasser not only "stare[d] at her during work" but also made "inappropriate jokes and comments and sen[t] [plaintiff] unwanted notes, gifts and e-mail messages," attempted to kiss her, made "sexual gestures and remarks about her body, perfume, and clothing and about other women in the workplace"; came to plaintiff's apartment and "allegedly tied her up, gagged her and raped her"); *Harris v. L&L Wings, Inc.,* 132 F.3d 978, 980 (4th Cir.1997) (alleging the main harasser "followed her around the warehouse," but also that he "grabbed [plaintiff], embraced her, stroked her hair, massaged her back and shoulders, fondled her legs,""pinned [plaintiff] against a box and tried to kiss her," persistently "boasts ... about his sexual prowess, offers to promote her in exchange for dating him, and another offer of a hundred dollars if [plaintiff] would go to bed with him,""offered to reward [plaintiff's] son with a raise if he would convince his mother to go out with him,""[e]very time [plaintiff] encountered [harasser], he would either touch her or make vulgar comments or sexual advances to her or both"); *Hathaway v. Runyon,* 132 F.3d 1214, 1217 (8th Cir.1997) (the harasser "stared at her with a menacing look," but also was "getting physically close and making peculiar comments, telling [plaintiff] that other workers believed they were romantically involved," making "physical sexual advances," such as "he hit her on the buttocks with a clipboard," and a week later "squeezed her buttocks"; plaintiff regularly had to interrupt her work in order to avoid encountering the harasser, and "[a]fter [plaintiff] rebuffed the [harasser's] advances, he began to snicker and laugh at her, making guttural noises when she walked by him"); *Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 780-81 (10th Cir.1995) (alleging "threatening and intimidating stares" but also that the harasser was "making verbal and written sexually offensive remarks propositioning [plaintiff] and attempting to touch her breast"; after plaintiff reported the harassment, he "grabbed [plaintiff] between her legs"; also made "persistent requests for sex [to two other females] and inquiries of their sexual conduct,""open-ended invitations to all fe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 16
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

male employees to satisfy his sexual desires," "passed a sexually explicit note" to another female employee, "attempted to kiss [another female employee] on the neck and brushed her breast with his hand"); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1461-63 (9th Cir.1994) (alleging "stares, glares, snickers, and comments," but along with "habitually refer[ring] to [plaintiff] and to other female employees in a derogatory fashion using sexual explicit and offensive terms," such as calling plaintiff "dumb fucking broad," "cunt," and "fucking cunt"; also yelling "why don't you go in the restaurant and suck their dicks...."); *Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 197-98 (5th Cir.1992) (alleging supervisor "would follow her and wait in the hall until she returned" but along with "propositioning [plaintiff] seeking sexual favors," "repeatedly asked [plaintiff] to have sexual relations with him, sometimes threatening to demote or fire her if she refused,"'"made lewd remarks about her body, told her vulgar jokes on a daily basis, showed her pornographic photographs, asked her to come to his house for 'training' after work hours,"'"bragged about the size of his penis, and frequently brushed up against her legs and breasts," and after plaintiff complained, the harasser "then began requiring that [plaintiff] ask his permission ... to go to the restroom" and "[w]henever she asked to go the restroom, [the harassser] would follow her and wait in the hall until she returned").

The dissent's cases vividly demonstrate why Mendoza's hostile environment claim is not actionable and why holding that her claim is actionable would deviate significantly from the law of other circuits.

**\*1251** Were we to conclude that the conduct established by Mendoza was sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish a baseline of actionable conduct that is far below that established by other circuits. For example, in *Baskerville v. Culligan International Co.,* the Seventh Circuit considered a sexual harassment-claim consisting of nine instances of sexually-graphic behavior by the alleged harasser over a period of seven months. 50 F.3d 428, 430 (7th Cir.1995). These instances included diminutive references to the plaintiff as a "pretty girl" and a "tilly" and one particularly obscene instance in which the alleged harasser simulated the act of masturbation. *Id.* The Seventh Circuit acknowledged the obvious offensiveness and vulgarity of this conduct, but nonetheless concluded that these events could not "reasonably be thought to add up to sexual harassment." *Id.* The Seventh Circuit expressly held that "[w]e conclude that no reasonable jury could find that Hall's remarks created a hostile working environment." *Id.* at 431.[FN9] Likewise, in *Shepherd,* the plaintiff produced evidence of **\*1252** several fairly serious instances of harassment including: (1) the statement "your elbows are the same color as your nipples"; (2) the statement "you have big thighs"; (3) attempts to look down the plaintiff's clothing; and (4) multiple instances of touching. 168 F.3d at 872. Similar to the Seventh Circuit's reasoning in *Baskerville,* the Fifth Circuit in *Shepherd* noted that the conduct was "boorish and offensive." *Id.* at 874. The Court, however, specifically found that the conduct was not severe, threatening, or an impediment to job performance and therefore concluded that the plaintiff could not establish a hostile-environment claim. *Id.* at 874-75. Although we need not endorse or adopt the conclusions in *Baskerville, Shepherd,* or the other cases cited herein, these decisions illustrate that conduct that is much more severe and pervasive than the conduct shown by Mendoza has been found insufficient as a matter of law to sustain hostile-environment claims.[FN10]

FN9. In *Baskerville,* the Seventh Circuit

195 F.3d 1238                                                                                                   Page 17
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

made an alternative holding that in any event the plaintiff loses because the defendant company took all reasonable steps to protect plaintiff from Hall and was not vicariously liable. *Baskerville v. Culligan International Co.,* 50 F.3d 428, 431-32 (7th Cir.1995). However, the initial and primary holding was that Hall's conduct did not add up to actionable sexual harassment. *Id.* at 428-31. The Seventh Circuit also affirmed this *Baskerville* holding in *Gleason v. Mesirow Financial Inc.,* 118 F.3d 1134 (7th Cir.1997). The *Gleason* court stated, "We held in *Baskerville* [that Title VII] was 'not designed to purge the workplace of vulgarity,' for a certain amount of 'vulgar banter, tinged with sexual innuendo' is inevitable in the modern workplace...." *Id.* at 1144 (quoting from *Baskerville,* 50 F.3d at 430-31). The court continued, "Our specific holding in *Baskerville* was that plaintiff's supervisor had not engaged in actionable sexual harassment even though over a seven-month period, he was guilty of the following: (1) called the plaintiff a 'pretty girl,' (2) made grunting sounds when the plaintiff wore a leather skirt, (3) said to the plaintiff that his office was not hot 'until you walked in here,' (4) stated that a public address announcement asking for everyone's attention meant that 'all pretty girls [should] run around naked,' and (5) alluded to his wife's absence from town and his loneliness, stating that he had only his pillow for company while making an obscene gesture." *Id.* at 1144.

The court in *Gleason* reiterated that the "central teaching of the Baskerville opinion [is that] 'low-level harassment' is not actionable-[this holding] was recently re-affirmed by another panel of this court in *Galloway v. General Motors,* 78 F.3d 1164, 1168 (7th Cir.1996).

Thus, it is established in this circuit as of this date that there is a 'safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex.' " *Id.*

FN10. Sexual harassment in the workplace is a serious matter. However, beyond taking us out of step with the other circuits, holding that the conduct here constitutes sexual harassment actionable under Title VII would trivialize true instances of sexual harassment. *See, e.g., Dees v. Johnson Controls World Services, Inc.,* 168 F.3d 417, 422 n. 12 (11th Cir.1999) (noting that "almost daily" abuse including sexual jokes, references to the plaintiff's body, and physical harassment established sexual harassment); *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 490 (11th Cir.1996) (reasoning evidence that the harassers "grabbed Plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, speculated as to the plaintiffs' sexual prowess, and so on" was sufficient to establish a hostile environment).

Both dissents cite decisions from other circuits which they contend found conduct as serious or less serious than Page's sufficiently severe or pervasive to be actionable sexual harassment. However, when all alleged conduct in those decisions is accurately listed, these decisions, if anything, highlight the insufficiency of Mendoza's evidence. *Williams v. General Motors,* 187 F.3d 553, 558-59 (6th Cir.1999) (these comments on different occasions: supervisor looked

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                                                Page 18
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

at plaintiff's breasts and said "You can rub up against me anytime"; supervisor said "You would kill me, [plaintiff's name],""I don't know if I can handle it, but I'd die with a smile on my face"; as plaintiff bent over, "Back up; just back up," or "You can back right up to me"; while placing his arm around her neck and his face against hers, said "You left the dick out of the hand"; co-worker used the "F-word," "Hey slut," "I'm sick and tired of these fucking women"; and plaintiff encountered "pranks" including finding office supplies glued to her desk, being hit by a thrown box, and being locked in her work area); *Rorie v. UPS, Inc.,* 151 F.3d 757, 761-62 (8th Cir.1998) (facts considered on the borderline of actionable harassment, but described as manager McFadden "often would tell [plaintiff] that she smelled good, pat her on the back, and brush up against her," and "[t]his behavior continued throughout her employment with UPS"; he "was constantly 'coming on' to her" and was "always flirty" and said "this was '[j]ust the way he [was] with women' "; "[r]ecognizing" McFadden's telephone call to plaintiff's home-asking her to go swimming and if she "had heard rumors about a co-worker's penis" and stating she "looked better in the UPS uniform than other women"-falls outside of 180-day period, but stating "we believe that, at the very least, McFadden's comments suggest that his later behavior presents a jury question as to hostile environment"); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 838-39 (8th Cir.1998) (co-employee "always saying sexual innuendos," such as plaintiff "had nice legs and that he was 'going to get [her]' "; he would "often brush against [plaintiff] intentionally while the two of them were working in the narrow area

behind the fuel counter"; once he "brushed her buttocks and she kicked him"; he "said and did inappropriate things to other female employees"; another employee complained that he would "touch [her] butt or put his arm around [her]" or "talk nasty"; calling another employee a "fucking bitch"; other co-employees complained of two jokes "in which the punch line involved lewd gestures, in one instance, touching a woman's breast, and in the other, thrusting his hips into a woman from behind"); *Gallagher v. Delaney,* 139 F.3d 338, 343-44 (2d Cir.1998) (supervisor told plaintiff "he had a dream that she kissed him"; three days later he gave her a potted plant; the next day, told her "the only place for her to sit was on his lap"; "invited her to lunch on numerous occasions"; then gave her more gifts, including jewelry, teddy bear, pink rose, angel book; sent her cards with handwritten notes that read "Believe me, you [sic] the last person on Earth I want to see hurt"; complimented her on her physical appearance; asked her personal questions; "told her she brought out feelings in him that he had not had since he was sixteen"; invited her to Atlantic City and asked her to keep her dance card free; gave her a Valentine's card with printed message, "But somehow it seems only right To say, today of all days, You're someone close in thought and heart, Not 'now and then,' but always"); *Barna v. City of Cleveland,* Nos. 96-3971, 96-4178, 97-4138, 1998 WL 939884 (6th Cir.1998) (sexual harassment occurred on a daily basis and involved a constant stream of sexual propositions, comments, advances, characterizations and gestures, including asking plaintiff for oral sex; at one point harasser "grabbed her" and "squeezed so hard"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                    Page 19
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

that her breasts were "crushed," while whispering "We're friends, aren't we honey. I could take care of you"; harasser's bragging about his sexual prowess to plaintiff); *Carrero v. New York City Housing Authority,* 890 F.2d 569, 578 (2d Cir.1989) (harasser "constantly touching [plaintiff] and attempting to bestow unasked for and unacceptable kisses upon her"); *Smith v. Norwest Fin. Acceptance, Inc.,* 129 F.3d 1408, 1412-15 (10th Cir.1997) (six clearly sexual and severe disparaging remarks, such as plaintiff "would be the worst piece of ass that I ever had"; told plaintiff to "get a little this weekend" so she would "come back in a better mood"; she "would find a decent man if [she] just quit dating Mexicans"; she "must be a sad piece of ass" who "can't keep a man"; plaintiff was the only full time female employee in small office with supervisor harasser and three male co-employees, two of whom saw the conduct and testified that supervisor's conduct towards her was "sexually inappropriate," "offensive," and "intimidating").

**\*1253 V. Conclusion**

For the foregoing reasons, we conclude that the district court did not err in granting Borden judgment as a matter of law on Mendoza's sexual-harassment claim under Title VII. We agree with the panel's decision in this case that the district court properly granted summary judgment and judgment as a matter of law on Mendoza's other claims. Therefore, we affirm the district court's entry of judgment in favor of Borden on Mendoza's claims for age discrimination, disability discrimination, retaliation, and Mendoza's state-law claims. The judgment of the district court is

AFFIRMED.

EDMONDSON, Circuit Judge, concurring:

I concur in today's judgment and court opinion.

I write separately on a point, which the court's opinion does not reach, that I think deserves some attention: the essence of a Title VII case, including one based on a claim of sexual harassment, is plaintiff's proof of actual discrimination. And in this case, plaintiff never presented evidence that other employees-particularly men-at her workplace were treated considerably differently and better than she was treated. This failure of proof (apart from other reasons) warranted the district court's grant of a judgment as a matter of law for defendant.

Plaintiff says she, at the job site, was "constantly" observed and followed by her supervisor. She says her supervisor brushed against her once at the fax machine. She also says that, after she angrily entered her supervisor's office (where he was already meeting with another employee) and said she was there "to work, period," the supervisor replied "Yeah, I'm getting fired up, too." And she says, on two or three occasions, the supervisor (after looking her up and down) looked in the direction of her groin and sniffed.

Nothing in the record suggests that other employees, including men, were treated differently. When plaintiff was asked if other employees were treated the same as she was treated, she testified that she did not know.[FN1]

> FN1. This question and answer is all that we have to go on about how other people were treated:
>
> Q: Well, you say [your supervisor] smiled at you. But, in fact, he smiled at other employees, also, didn't he?
>
> A: I don't know what he did with other employees.

Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.[FN2] It is an anti-**\*1254** discrimination statute.

195 F.3d 1238                                                                          Page 20
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

Title VII provides, in pertinent part:

> FN2. *See, e.g., Oncale v. Sundowner Off-shore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) ("Title VII [is not] a general civility code[.]"); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable.]").

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e-2(a) (emphasis added). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (citations and internal quotations omitted). But in this case, plaintiff made no effort to show that she was treated differently and less favorably than male employees.

The conduct of which plaintiff complains is neither obviously sexual in nature nor even sex-specific. That supervisors regularly look at employees or place themselves in the same common areas of the workplace as employees can occur whether the employees are men or women. A supervisor can bump into men at the office occasionally. The phrase "I'm getting fired up, too" is not necessarily (and frequently is not) a sexual statement. The words can readily be explained as either a statement of anger or exasperation which could have been aimed at any employee-man or woman-who interrupts a conference to inject some heated protest towards the supervisor. Even the looking-and-sniffing incidents are not unambiguously sexual gestures. To sniff at something or someone is commonly understood to be a sign of contempt or disdain; a man or a woman could be the subject of that disdain and of that treatment.

My thought is not that the supervisor's conduct in this case could not possibly have sexual connotations. I suppose that almost every act can-depending on context, tone of voice and so on.

My thought is this one: at least when the sexual content of a supervisor's conduct is not obvious, a plaintiff asserting a claim of sexual discrimination in employment must present some evidence that plaintiff's coworkers, those not of plaintiff's sex, were treated differently and better.[FN3] Otherwise, Title VII's *vital* element-discrimination-is read out of the statute. The plaintiff's burden to show that similarly situated employees were treated better is not a heavy one; ordinarily, the plaintiff testifies to that circumstance herself or himself. But that the burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired. This evidence-evidence of the discrimination-is the heart of the case. And, therefore, courts must allow no fudging on the proof.

> FN3. Sometimes harassment plaintiffs are complaining of conduct that is definitely sex-specific or very clearly sexual in nature, for example, an invitation by a supervisor to engage in sexual intercourse. In those distinctive cases, the discrimination might be inferred from the conduct (it is circumstantial evidence of discrimination based on sex) without further evidence: in the example, it is too unlikely that the same invitation would have been made by the same supervisor to a person of a different sex than plaintiff. But this footnote's example illustrates an exceptional case. A claim of sexual harassment is a claim of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                                      Page 21
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

disparate treatment. The rule is that the plaintiff must actually prove discrimination, normally by evidence showing directly that similarly situated persons not of plaintiff's sex were treated differently and better.

Here plaintiff put forward just two witnesses, including herself. Neither of the witnesses claimed to know whether other employees-especially men-were treated significantly differently and better than plaintiff. Discrimination based on plaintiff's sex must be proved in harassment cases. The proof of discrimination was insufficient. This failure of proof by itself **\*1255** warranted the district court's grant of a judgment as a matter of law for defendant.

CARNES, Circuit Judge, concurring:

Concurring fully in the judgment of the Court and in Judge Hull's opinion for it, I write separately to discuss the reluctance courts should have about permitting plaintiffs who claim sexual harassment to rely upon their subjective interpretations of ambiguous conduct. An essential part of Mendoza's contention that she was sexually harassed is based upon her perception that Page, her supervisor, constantly followed her around and stared at her. That is her perception, or more specifically, what she testified at trial is her perception, of the frequency and the manner in which Page went to where she was in the work place and looked at her during the eleven months she was under his supervision.

Mendoza's perception that Page had followed her around and looked at her in an offensive way brings to mind a recent Seventh Circuit case in which the plaintiff perceived that her boss had regularly talked to her in a "sexy voice." *See Minor v. Ivy Tech State College,* 174 F.3d 855 (7th Cir.1999). The Seventh Circuit's treatment of the "sexy voice" contention in *Minor* is instructive. The plaintiff in that case was employed by a public vocational college whose chancellor, a man named Cole, had an office in another town. She claimed that for eleven months Cole called her "almost every day, rarely

discussing business." *Id.* at 856. The court described the plaintiff's perception of these daily phone calls as follows:

Cole talked, she thought, in a very friendly way, the way a boyfriend might talk; his voice was sexy; and though he never asked her for a date or proposed any sexual or otherwise erotic connection, she believed that his calls constituted overtures awaiting a response from her. She says that his words were at times "stalker-like" and "had these overtones at certain times that were sexual," but she does not indicate what the words were that gave her these impressions.

*Id.* The plaintiff in *Minor* also said that Cole, her boss, once entered her office and told her he had been watching her through a window, which she thought was "lecherous of Cole," and it really scared her. *Id.* There was objectionable conduct, including Cole putting his arms around her, squeezing her, and kissing her while saying, "Now, is this sexual harassment?" *Id.* at 857.

The Seventh Circuit affirmed the grant of summary judgment for the defendant in *Minor,* holding that the "sexy voice" conduct was outside the period of limitations and should not be considered. But the Court went on to hold in the alternative that even if that conduct was considered, there was still insufficient evidence of sexual harassment to avoid summary judgment. The Seventh Circuit explained why this had to be so:

As for Cole's "sexy voice," we are concerned about the legal risk that would be placed on employers if a plaintiff in a sexual harassment case could get to a jury on the basis of nebulous impressions concerning tone of voice, body language, and other nonverbal, nontouching modes of signaling. It is one thing to tell a supervisor that he should not propose sex to a subordinate, display pornographic pictures to her, or touch her in a suggestive fashion; those are indeed things that an employer should tell its supervisors not to do. It is another thing for an employer to be required under pain of legal sanctions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                              Page 22
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

to make sure that its supervisors never inflect their voice or posture in such a way that a woman might think they were "coming on" to her. That would be a counsel of perfection, and the aims of Title VII are more modest.

*Id.* at 858.[FN1]

> FN1. The *Minor* court correctly recognized that "stalking a female employee crosses the line,"*id.* at 858, but also rejected any notion that the employee's perception of whether she had been stalked is controlling. The plaintiff in that case testified that she perceived the conduct of Cole, her supervisor, to be "stalker-like." *Id.* at 856. Instead of accepting her characterization, or even considering it as evidence ("there is no evidence of [stalking] here"), the court considered the objective conduct involved and reached its own conclusion, which is that there had been no stalking. *Id.* at 858.

> In reaching that conclusion, the *Minor* court noted: "Cole did not follow Minor about, or drive past her home, or call her late at night, or query her about her personal life. He did not engage her in conversations about sex or love." *Id.* at 858. Although Mendoza did testify that Page followed her about the workplace, that is not enough to distinguish this case from *Minor*-to make this a "stalker" case. As the context of *Minor* 's remark about Cole not following Minor about makes clear, the court there was talking about off-hours conduct ("or drive past her home, or call her late at night"), or conduct that had no conceivable connection to supervisory duties ("He did not engage her in conversations about sex or love."). The court was not talking about an employee's perception of on-the-job conduct by a supervisor whose duties included observing employees.

That the present case does not involve stalking is obvious from the undisputed fact, which the Court's opinion makes clear, that it never occurred to Mendoza and her attorney, to use the word "stalking" to describe Page's conduct. They did not do so in the trial court, in their panel briefs, or in their en banc briefs. So far removed are these facts from a stalking case that it never occurred to anyone at the pre-trial, trial, or panel appeal levels of this case to describe Page as a stalker. The remarkable revelation that this is a stalking case has come only to the authors of the dissenting opinions at this, the en banc stage. Their insight in this regard is as belated as it is unique. What appears so obvious to them now apparently never occurred to either of them at the panel stage, because their carefully crafted panel opinion fails even to mention the word "stalk" or any derivative of it.

**\*1256** Likewise, it is "another thing" for an employer to be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they were "coming on" to her. That would be, in the Seventh Circuit's words, "a counsel of perfection, and the aims of Title VII are more modest." *Id.* The Seventh Circuit in *Minor* also recognized that, "[i]t is no part of Title VII to change a 'hands on' management style (provided 'hands on' is understood metaphorically) merely because it might strike a suspicious employee as having sexual overtones." *Id.* The same is true of an "eyes on" management style. There is an objective as well as a subjective component to a sexual harassment claim. *See Harris v. Forklift Systems,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Stated somewhat differently, Title VII requires a baseline of objectively offensive conduct, and that baseline cannot be met with objectively ambiguous conduct that a suspicious employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                           Page 23
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

ee subjectively perceives to be improper.

There are good reasons that this is so. In addition to those discussed by the Seventh Circuit in *Minor,* there is also the problem of perception prevarication. An employee who makes up or exaggerates a description of objective conduct runs a risk of being found out that is greater than the risk run by an employee who is attempting to make a case based upon her subjective impressions. There is more temptation to exaggerate, to "puff," to put subjective spin on the facts. A plaintiff describing her subjective impressions can say that while her supervisor's conduct might have appeared neutral to some, she felt, believed-just knew-it was lecherous. That is what the plaintiff in *Minor* said about the voice her boss used when talking with her: she considered it "sexy" and stalker-like. *Id.* at 856. Similarly, Mendoza testified that when her boss was looking at her, he was staring in an offensive manner; and when he turned up where she was in the workplace, he had followed her there.

And what could Page or any other supervisor accused of doing something that was objectively neutral but perceived by a subordinate to be lecherous do to rebut testimony about those perceptions? If an employee says that her supervisor looked or stared at her in a sexy way, or spoke to her in a sexy voice, or did both things, how is a supervisor who is innocent of any lecherous intent or thoughts to establish his innocence? Supervisors must observe, *1257 look at, and speak to employees they supervise; they regularly go about the work place to see what employees are doing, and sometimes follow them around on the work site. And supervisors should be free to do so without being hauled into court every time an employee-who may well have other reasons to be unhappy with the supervision-perceives the supervisor's constant presence, or the way he looks at her, or the tone of his voice, or the way he stands, or the way he walks, to be offensive to her.

This case illustrates the dangers of permitting litigation by perception. At her deposition, Mendoza was questioned about her claim that Page had followed her around the workplace:

Q. The second thing you mentioned was that Dan Page followed you all over the place.

A. Yes, he did, several times. This happened several times, two, three times that I can remember. I would go to the routeman's room reference paperwork. And when I would come out, go to the left to go back to my office, he would be at the end of the hall and watching me and smiling at me. Several times I laughed in his face. He might have taken it to be a smile like I enjoyed it. It wasn't a smile. I laughed in his face.

For Mendoza, the problem with her perception about Page following her around only "several times, two, three that I can remember," as she described it under oath at deposition, is that it was unlikely to get her to the jury, to give her a chance at recovery from the company that had terminated her because she failed to come to work for three consecutive days. Given the nature of perceptions, however, that was no problem for Mendoza. When she got to trial, she simply changed her perception. During her trial testimony, she no longer perceived that Page had followed her around only "several times, two, three times that I can remember," but instead perceived that he had followed her around "constantly."

The Court does well to rule out litigation by perception and require objectively offensive conduct that is itself severe or pervasive before a Title VII claim can go to a jury.

TJOFLAT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, BARKETT and MARCUS, Circuit Judges, join:

In its zeal to discourage the filing of frivolous lawsuits, the Court today hands down an opinion that will certainly be used by other courts as a model of how *not* to reason in hostile environment sexual harassment cases brought under Title VII.[FN1] Ten years ago, in *Vance v. Southern Bell Telephone and Telegraph Company,* 863 F.2d 1503 (11th

Cir.1989), *overruled on other grounds, Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), this court set forth an analytical framework for deciding when, under the totality of the circumstances, the plaintiff's case of harassment is sufficient to withstand a defendant's motion for judgment as a matter of law.[FN2] In reversing the district court, we explained that the district court had erred in granting the motion because it had failed to consider all of the circumstances in context and had instead analyzed each alleged instance of harassment separately. Apparently, *Vance* has now either been forgotten or is being ignored, because the court today **\*1258** makes *exactly* the same mistake the district court made in that case ten years ago. I, therefore, respectfully dissent from the majority's holding with respect to the plaintiff's sexual harassment claim brought under Title VII.[FN3]

> FN1. *See* Theresa M. Beiner, "The Misuse of Summary Judgment in Hostile Environment Cases,"34 *Wake Forest L.Rev.* 71, 119 (1999) (positing that courts often grant motions for summary judgment and for judgment as a matter of law improperly because, in part, "the courts have seen a marked increase in Title VII claims generally, and in harassment claims in particular").

> FN2. The question in *Vance* was whether the plaintiff's case was sufficient to withstand a motion for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b). *See*863 F.2d at 1505-06. Rule 50(b) has now been amended to substitute the term "judgment as a matter of law" for directed verdict and judgment notwithstanding the verdict.

> FN3. I concur with the judgment of the court in all other respects.

I.

Title VII forbids an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is a form of sex discrimination within the meaning of Title VII. *See, e.g., Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. 57, 65-67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986). Two types of sexual harassment are prohibited by Title VII: quid pro quo harassment and hostile work environment harassment. *See Fleming v. Boeing Co.,* 120 F.3d 242, 244 (11th Cir.1997). In this appeal, we focus on Red Mendoza's allegations of hostile work environment sexual harassment.

In order to establish a hostile work environment sexual harassment claim, an employee must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based upon the employee's sex; (4) that the harassment was sufficiently severe or pervasive to alter a "term, condition, or privilege" of employment and create an abusive working environment; and (5) a basis for holding the employer liable. *Henson v. City of Dundee,* 682 F.2d 897, 903-05 (11th Cir.1982).

With regard to the fourth element, sufficient severity or pervasiveness, the harassing conduct must create both an objectively hostile or abusive environment-one "that a reasonable person would find hostile or abusive"-and a subjectively hostile or abusive environment-one that "the victim ... subjectively perceive[s] ... to be abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

In determining whether a plaintiff has met the burden of alleging sufficient harassment, the Supreme Court has recently reaffirmed "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *On-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                    Page 25
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

*cale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 371). If there is one principle of law that stands out in this area, it is that courts must look to the totality of the circumstances to determine whether harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *See Harris,* 510 U.S. at 23, 114 S.Ct. at 371; *Vinson,* 477 U.S. at 69, 106 S.Ct. at 2406; *Henson,* 682 F.2d at 904. Among other things, courts should look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

The inquiry is both fact intensive, and contextually specific. It "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale,* 118 S.Ct. at 1003. This means that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor. No act can be considered in isolation. Depending upon the circumstances, an employer's comment to an employee that he or she "looks good today" could be construed as a friendly compliment, a harmless flirtation, or the kind of sexually offensive verbal assault that is "every bit the arbitrary barrier to sexual equality at the workplace that racial \*1259 harassment is to racial equality." *Henson,* 682 F.2d at 902. To put the point yet another way,

[a] professional football player's working environment is not severely or pervasively abusive ... if the coach smacks him on the buttocks as he heads onto the field-even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Oncale,* 118 S.Ct. at 1003.

## II.

We review the district court's grant of a Rule 50(a) motion for judgment as a matter of law *de novo,* considering all the evidence in the light most favorable to Mendoza, the non-moving party. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997), *cert. denied, Combs v. Meadowcraft Co.,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). A directed verdict is only proper when "[t]he facts and inferences ... 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc.,* 140 F.3d 898, 905 (11th Cir.1998) (quoting *Hibiscus Assocs. v. Board of Trustees,* 50 F.3d 908, 920 (11th Cir.1995)). Thus, to affirm the judgment as a matter of law, we must be convinced that no reasonable juror could have concluded that the conduct complained of constituted actionable sexual harassment in violation of Title VII.

## III.

Before Mendoza went to work in the accounting department of Borden's Miami facility, she spent some time as a cocktail waitress in restaurants, bars, and hotel lounges. Her work environment was often pervaded by foul language and personal insult. Some customers, doubtless after a few libations, attempted to approach Mendoza sexually. On at least one occasion Mendoza was followed home from work, and she was propositioned for dates several times. Throughout it all, Mendoza never made a claim of sexual harassment. At trial she stated that "it was just part of the job."

In December 1993, Mendoza found work as a temporary employee at Borden. For six months she ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                          Page 26
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

perienced no job related difficulties that could give rise to a Title VII lawsuit. In fact, Mendoza was so successful in her temporary position that she was eventually hired as a permanent employee and given a pay raise. All of that changed when Dan Page came to work at Borden in 1994. Page was hired as the plant's "Controller," the highest ranking position at the Miami facility. From his glass enclosed office, Page kept a watchful eye on the employees in the accounting department, all of whom knew that their job security and employment possibilities rested in his hands.

Page kept a particularly watchful eye on one employee-Red Mendoza. In early 1995, Page began to "constantly" follow Mendoza around the plant, and stare at her in a suggestive manner. Page's stalking and leering continued for at least four months until Mendoza finally left Borden in April 1995. Mendoza testified that Page "always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at the picnic table outside on a break, he was there." Page did not limit his physical pursuit of Mendoza to the actual office in which they both worked. He followed her in the plant's hallways and outside to the facility's picnic area.

Unfortunately for Page, his physical pursuit did not have its intended effect of piquing Mendoza's interest, and so he decided to use other methods of beguilement. Perhaps hoping that Mendoza would see his true "animal magnetism," Page stared at Mendoza's groin on at least three occasions*1260 and made a loud, sniffing sound. For unexplained reasons, Mendoza failed to become enraptured. In fact, she became rather terrified. But Page remained undaunted. Because Mendoza was not succumbing to his Casanova-like charms, he decided to make physical contact. One day when Mendoza was at the fax machine, Page walked over and moved his hips into hers while grabbing her shoulders and smiling at her. As inexplicable as it may seem, this again failed to capture Mendoza's favorable attentions.

By now Mendoza had also had enough. She had

been stalked, leered at, touched on her hips and shoulders, and her groin area had been made the object of a sniffing ritual so bizarre that only Page could understand its true import. Jenny Voltapetti FN4 testified that on at least twelve occasions Mendoza told her that she was "being harassed on the job," and that "it was an immediate supervisor." Voltapetti described Red Mendoza, a woman who had accepted as "just part of the job" being propositioned and followed home from work during her years as a cocktail waitress, as "extremely distraught" and "very upset." But what could Mendoza do? With instances of co-worker harassment or even in many situations where one's superior is doing the harassing, the employee has access to channels of complaint-the head boss or somebody who is superior to the superior. In this situation, however, Page *was* the head boss. He was the highest ranking employee at the Miami plant. Mendoza nevertheless went to Page to tell him that she had come there "to work, period." Page's only response was that he was "getting fired up, too."

> FN4. Jenny Voltapeti is the wife of Mendoza's dentist, and she also manages his office. Her testimony is based upon conversations she had with Mendoza during several of Mendoza's dental visits.

### IV.

These are the facts when we view the evidence in the light most favorable to Mendoza, as we are required to do in reviewing a judgment as a matter of law. Reading the majority opinion, however, one would think that we are required to view the facts in the light most favorable to the *defendant*. The *en banc* opinion reads like a defense attorney's classic attack on a plaintiff's (or a prosecutor's) circumstantial evidence case. Contrary to the Supreme Court's direction, what the majority does is examine each instance of alleged harassment in isolation and then declare that it alone could not support a finding of liability. Because of this, and here is the rub, all of the evidence added *together* is likewise insufficient to satisfy the *Harris* requirement of severity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                          Page 27
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

or pervasiveness.

The majority declares that "Page's statement 'I'm getting fired up' and the sniffing sounds are hardly threatening or humiliating." [FN5] *Ante* at 1249. With that evidence conveniently disposed of, the *1261 court then moves on to scoff at "the one instance of Page brushing his hip against Mendoza's." *Id.* Last, we are told that Page's constant following and staring at Mendoza in a sexually suggestive manner cannot save the claim, because "[g]iven normal office interaction among employees, following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable...." *Id.* at 1250. [FN6]

> FN5. It is a mystery to me how the court could find that the sniffing sounds, in particular, "are hardly ... humiliating." The majority brushes over this piece of evidence lightly, but one wonders what response, if not humiliation mixed with indignation, would be appropriate for a situation in which a woman's supervisor at work feels the need to stare at her groin while making sniffing sounds. Perhaps the court views such conduct as normal and acceptable workplace behavior. *See generally* Daniel Patrick Moynihan, "Defining Deviancy Down," 62 *Am. Scholar* 17 (1993). In any event, the only case cited to support the majority's novel proposition is *Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996). In *Long,* the Fifth Circuit took the entirely unremarkable position that one "offensive joke concerning condoms ... told in [the plaintiff's] presence" could not, alone, form the basis of a hostile work environment claim. *Id.* From that case, the majority draws the conclusion that "the sniffing sounds are hardly threatening or humiliating." How the court could compare one joke, the subject of which was a prophylactic (and not the plaintiff's genitalia), told, apparently, not

to the plaintiff, herself, but only "in [the plaintiff's] presence," to this case, where Mendoza has alleged multiple instances of Page staring directly at her groin (targeting Mendoza, specifically) and sniffing at her like some beast marking its prey, is beyond me.

> FN6. The court's casual assertion that "Mendoza did not present evidence that Page's conduct was 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance" is bizarre. *Ante* at 1249. In order for this assertion to be correct, Mendoza would have had to have taken the stand at trial, and then remained completely silent when questioned by her attorney. Remarkably, however, Mendoza did testify when she took the stand, and she presented a wealth of testimonial evidence that Page stalked and leered at her, sniffed at her groin, touched her, and made inappropriate sexual remarks. The inference that a reasonable jury could draw from this evidence is that Mendoza felt threatened and humiliated, and that Page substantially interfered with Mendoza's job performance.

> There are only two possible conclusions that I can draw from the court's conclusion that Mendoza "did not present [any] evidence." The first is that in order for a plaintiff to be deemed to have presented "evidence that [the] conduct was 'physically threatening or humiliating' or that the cumulative effect of [the] conduct 'unreasonably interfered' with [the plaintiff's] job performance," the court is now requiring that the plaintiff use "magic words" in her trial testimony, because we will no longer permit either juries, or ourselves, to draw *inferences* from the testimony presented. If this is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                           Page 28
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

the correct interpretation of the majority's statement, then henceforth, we will be requiring plaintiffs in hostile environment cases to recite the *Harris* factors, verbatim, in their testimony in order for us to recognize that the harassment was "frequen[t]," "sever[e]," "physically threatening or humiliating," and an "unreasonabl[e] interfere[nce] with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371. In order to be adequate, the transcript from Mendoza's trial would have had to read something like this:

Q: What did [Page] do that changed things?

A: The man was constantly watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and to go back to the office. [And I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]

....

Q: Okay. Aside from the looking you up and down, what did he do anything else?

A: There was an incident where I was standing at a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion. [And I no-

ticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]

This also happened another time. It had to be in March, I had the flu. I went into his office-he was sitting at his computer-to tell him that my doctor wanted me to take time off because of this flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that. [And again, I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]

The alternative inference that we might draw from the majority's statement is that we should not actually take the majority at its word, and that what the court means to say is that "Mendoza did not present [*enough*] evidence that Page's conduct was 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance." This is, likely, the correct interpretation of the majority's conclusion; but if it is, the court completely fails to explain *why* Mendoza's evidence is insufficient. From on high, the majority has determined that female employees should feel no humiliation or anxiety when their bosses sniff in the direction of their groins, touch their hips, and follow them around the office, staring at them in a sexually suggestive manner; but the court never explains *why* this is the case. That the court feels the need to resort to bald assertion in lieu of providing some justification

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                          Page 29
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

for its position only bolsters my conclusion that it is a *jury* (traditionally, the finder of fact) and not the court who should be making these determinations.

**\*1262** Every defense attorney knows that this is the traditional way to undermine a case built upon circumstantial evidence. You isolate each piece that the other side puts into evidence and then attempt to trivialize it by taking it out of context. The defendant was just driving his car, the defense attorney will argue. So what of the fact that the car was parked outside a bank? People park outside of banks all the time. The bank was being robbed at the time? How could the defendant have known that? He was sitting *outside* the bank, remember. And so what of the fact that defendant allowed the two men who *were* robbing the bank into his car, and then drove away at a high rate of speed? People drive at a high rate of speed all the time. Can the members of the jury actually say that they have never broken the speed limit?

The majority's analysis might be useful for a practicing seminar on defense strategies in employment discrimination cases, but it is certainly not faithful to the Supreme Court's direction that we look at the "constellation of surrounding circumstances" when analyzing the sufficiency of a plaintiff's allegations. *Oncale,* 118 S.Ct. at 1003. More than a decade ago in *Vance,* we addressed a district court that made the same analytical mistake in a racial harassment case that the majority makes today. In that case, the district court granted a directed verdict to the employer after examining independently each allegation of harassment, and finding either that the plaintiff had failed to make out a prima facie case for each incident, or that the defendant had provided a legitimate, nondiscriminatory reason for its conduct. After weeding out most of the plaintiff's allegations in this manner, the district court then ruled that the two remaining instances of harassment (a noose was twice hung over the plaintiff's work station) were insufficient to establish a " 'persistent, pervasive practice.' " *Vance,*

863 F.2d at 1510 (quoting *Vance v. Southern Bell Tel. & Tel. Co.,* 672 F.Supp. 1408, 1413 (M.D.Fla.1987)). We corrected the district court as follows:

The prima facie showing in a hostile environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment. It is important to recognize that in assessing the credibility and weight of the evidence presented, the jury does not necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.

....

[T]he district court examined each individual allegation of discrimination in turn, and found that the plaintiff had made out a prima facie case of discrimination only as to the two noose incidents.... [But] as we stated in *Henson,* the severity of the harassment is to be determined by the totality of the circumstances. It was thus incorrect for the district court to require that the plaintiff establish a prima facie case of discrimination as to each individual allegation that the jury could properly consider. A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits.

*Id.* at 1510-11 (citations omitted).

The majority today makes the same mistake as the district court did in *Vance.* By examining each of Mendoza's allegations of harassment in isolation from one another, the majority concludes that Mendoza does not have enough evidence to reach the jury because each allegation is individually insufficient. But the whole of a hostile environment sexual harassment case will often **\*1263** be greater than the sum of its parts. Incidents that might not seem so disturbing by themselves can take on new mean-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 30
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

ing in the context of other evidence of discrimination. This case is a perfect example. By itself, it may not seem so significant that Page moved his hip into Mendoza's while touching her shoulder and smiling at her suggestively. But add to that a suggestive comment ("I'm getting fired up"). Now the hip incident begins to look a little more troubling. By the time we get to the repeated incidents of Page's staring directly at Mendoza's groin and making sniffing sounds, we realize that Mendoza's whole employment experience at Borden's may have been pervaded by overt and highly offensive acts of sexual aggression. Once we take all the evidence into account, we begin to appreciate that Page's constant following and staring at Mendoza may have been motivated less by a need to monitor employee work habits, than by a desire to stalk and terrorize an innocent female victim.[FN7] If we looked to the majority for guidance, however, we would miss all of this. We would miss the proverbial forest for the trees because we would fail to see the cumulative meaning of Mendoza's allegations in context.

> FN7. The majority, and Judge Carnes in his concurrence, make much of the fact that Mendoza never actually uses the word "stalking" to describe what Page was doing to her. What Mendoza testified to at trial was that Page "followed" her "constantly." Webster's Third defines "follow" as "to go after in pursuit or in an effort to overtake;" and it lists as synonyms the words "pursue," "chase," "tag," "trail," and "tail." *Webster's Third New International Dictionary* 883 (1993). "Constantly" is defined as "without variation, deviation, or change," or "with regular occurrence" (the listed synonyms are "ever," "always," and "incessantly"). *Id.* at 485. The verb-tense form of "stalk" is defined as "to pursue (as game) stealthily and often under cover for the purpose of killing," and "to pursue or follow in a stealthy, furtive, or persistent manner." *Id.* at 2221. Even if Mendoza

never used the word "stalk" at trial, she certainly alleged that Page "pursued" her "incessantly," which is the same in substance as alleging that Page "stalked" her. Mendoza certainly never alleged that Page's stalking was "for the purpose of killing" her, but given the animal-like connotations of Page's sniffing ritual, she may have alleged that Page pursued her "as game."

The court's analytical mistakes do not end here. As I read the majority opinion today, it appears that we are telling district courts that they should cast a skeptical eye towards a plaintiff's evidence of pervasive stalking and leering by a supervisor in hostile environment sexual harassment cases. The court writes that "[g]iven normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent' under the *Harris* factors." *Ante* at 1250. The first problem with this reasoning is that it is circular. The court answers the question, why are the following and staring alleged by Mendoza not the kind of conduct that can support a sexual harassment claim, with a most insightful response: because they "are not the [right] type of conduct." *Id.* This is plainly inadequate. The question deserves an answer, not a tautology.

But the real problem runs deeper. The logical inference that one draws from the court's statement is either: (a) that a plaintiff can never use evidence of following and staring by a supervisor to buttress a claim of sexual harassment; or (b) that in order for evidence of following and staring to be considered probative, it must be something more than "constant." The answer almost certainly cannot be (a). No court has ever made such a sweeping declaration, defining an entire class of conduct as immune to suspicion. In fact, courts routinely use evidence of following and/or staring to support a

195 F.3d 1238                                                    Page 31
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

finding of sufficient severity or pervasiveness. *See Cross v. Alabama Dep't of Mental Health & Mental Retardation,* 49 F.3d 1490, 1495 (11th Cir.1995) ( "glaring looks, piercing looks"); *Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO,* 171 F.3d 971, 973 (4th Cir.1999) ("stare at her for periods of **\*1264** ten to twenty minutes"); *Stoll v. Runyon,* 165 F.3d 1238, 1239 (9th Cir.1999) ("stalked her throughout the postal facility"); *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 571 (8th Cir.1997) ( "following her around the store"); *Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1478 (9th Cir.1997) ("stare at her during work"); *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 980 (4th Cir.1997) ("followed her around the warehouse"); *Hathaway v. Runyon,* 132 F.3d 1214, 1217 (8th Cir.1997) ("stared at her with a menacing look"); *Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 780 (10th Cir.1995) ("threatening and intimidating stares"); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1462 (9th Cir.1994) ("stares, glares, snickers, and comments"); *Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 198 (5th Cir.1992) ("Whenever she asked to go to the restroom, [the supervisor] would follow her and wait in the hall until she returned.").[FN8] Given the Supreme Court's repeated emphasis on social context, that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships[,]"*Oncale,* 118 S.Ct at 1003, it would make no sense for us to exclude, *ex ante,* a whole class of behavior from the realm of what might contribute to a finding of sexual harassment.

> FN8. The majority appears to have gone to some trouble to distinguish these cases. *See ante* at 1249-51, n. 8. The court's purported distinction lies in the difference between the severity or pervasiveness of the harassing conduct at issue in the cases I cite, and the severity or pervasiveness of the conduct at issue in this case. But I do not cite these cases for the proposition that courts have found conduct equivalent to

that alleged by Mendoza to be sufficiently severe or pervasive to support a hostile environment sexual harassment claim (I cite cases that establish *that* proposition, *infra.*); I cite them for the proposition which I state in the text of this opinion, that "courts routinely use evidence of following and/or staring to support a finding of sufficient severity or pervasiveness." Nothing in the majority's lengthy commentary discussing these cases undermines that proposition.

The court must, therefore, be saying that in order for evidence of following and staring to be considered probative, it must be something more than what Mendoza alleged. It is difficult to imagine what that "more" might consist of. Mendoza alleged that Page's following and staring were "constant," making his conduct appear to be the equivalent of stalking and leering. *See supra* at n. 7. But apart from the majority's failure to describe what kind of following and staring would be sufficiently harassing to "count" in an employee's claim for hostile environment sexual harassment (must the harasser walk closer to the victim? touch her? breathe down her neck?), the court once again substitutes bald assertion for reasoned argument. Why is the following and staring "not the type of conduct that can render Mendoza's claim actionable"? We do not know. The court has cited no case to support this specific proposition; we must take it on faith that judges, and not juries, are the appropriate persons to be deciding what conduct can and cannot be interpreted as sufficiently offensive and harassing.

At the risk of appearing monotonous, let me repeat that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor. And "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of sev-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

eral other related incidents." *Vance,* 863 F.2d at 1510. Certainly an employee's bare allegation that her supervisor was "following" her around the office and that the supervisor often "stared" at her while she was trying to work would not be sufficient to support a claim for harassment. But when that supervisor has been "following and staring" at the employee "constantly" for over four months, stared at the employee's groin and made sniffing noises, rubbed up against the employee's hips with his own while touching the employee's shoulder **\*1265** and smiling suggestively, and made sexually suggestive remarks to the employee, then the "following and staring" begin to look more like "stalking and leering."

When analyzed cumulatively and in context, Mendoza has certainly presented enough evidence to survive Borden's Rule 50(a) motion for judgment as a matter of law. *See Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 647-48 (11th Cir.1997). None of the cases cited by the majority supports the proposition that "the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal." *Ante* at 1246. If one carefully examines the cases the majority cites, one finds in every single one of them either that the conduct alleged was much *less* pervasive than the conduct at issue in this case, or that the case is inapposite for other reasons.[FN9] In this case, Mendoza alleges that **\*1266** the harassment she experienced was "constant." This means that she was stalked and leered at *every* day for at least four months, in addition to being touched, verbally harassed, and sniffed at in a clearly sexual and disgusting manner. It may well be that at trial, a jury would conclude that Mendoza was not subject to sexual harassment that was sufficiently severe or pervasive to create a hostile work environment. Because the inquiry is so fact intensive and contextually specific, however, Mendoza's allegations certainly meet the threshold of what is required for the case to reach a jury. *See Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1561, n. 13 (11th Cir.1987) ("With access to all the evidence, and

with the common sense to make credibility determinations, a factfinder should not find it difficult to distinguish between harassing actions that constitute a violation of Title VII and those 'ambiguous' actions which simply may not 'create an abusive working environment.' ").

> FN9. My reading of these cases convinces me that they do not stand for the proposition for which they are cited. *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir.1999), only involved five sexually related comments that "were no more offensive than sexual jokes regularly told on major network television programs." But the real trouble is that the court in *Indest* did not hold that the plaintiff's allegations were insufficient to establish a hostile environment. Instead, the decision affirmed summary judgment for the defendant because the employer had taken prompt remedial action and so the plaintiff could not establish a basis for the employer's vicarious liability for the actions of its employee:
>
> > [W]e hold that because she promptly complained of [the supervisor's] harassing conduct, and because the company promptly responded ... the district court properly granted judgment as a matter of law to [the defendant employer]. Even if a hostile work environment claim had been stated, which is dubious, [the employer's] prompt remedial response relieves it of Title VII vicarious liability.
>
> *Indest,* 164 F.3d at 267. In *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2nd Cir.1998), the plaintiff only alleged *two* instances of harassment (comment that plaintiff had the "sleekest ass" in the office, and a contact with plaintiff's breasts by some papers that the alleged harasser was holding in his hand), a far cry from Mendoza's claim of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

"constant" harassment. The same lack of pervasiveness is evident in *Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir.1998), where the plaintiff alleged "no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched [plaintiff's] arm, fingers, or buttocks." The court in *Adusumilli* specifically affirmed the district court's exclusion of evidence that would have made the harassment at issue appear more pervasive. The district court struck a statement from the plaintiff's affidavit that she "was harassed on a near daily basis by [her] co-workers," because the court found that it was contradicted by the plaintiff's deposition testimony. *Id.* at 360. There is a similar lack of pervasiveness in *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (four relatively innocuous comments and one attempt to look down plaintiff's dress over a sixteen month period). *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164 (7th Cir.1996) is inapposite. That case did not hold that plaintiff's allegations were "insufficient under *Harris,*" *ante* at 1247, in the sense that the harassment was not sufficiently severe or pervasive (the proposition for which the majority attempts to find support). Rather the court in *Galloway* went into a long discussion about why the harassing conduct (calling the plaintiff a "sick bitch") was not gender related at all because the alleged harasser was only calling the plaintiff "crazy" or "whacko," and thus there could be no liability under Title VII because there was no evidence of *differential* treatment. *Galloway,* 78 F.3d at 1167-68. In this case, the court purports to assume that the conduct alleged by Mendoza "is sexual in nature and thus might implicate sex discrimination." *Ante* at 1248-49.

The citation to *Black v. Zaring Homes, Inc.,* 104 F.3d 822 (6th Cir.1997), would be effective, were it not for the court's reliance in that case on the fact that "most of the [allegedly harassing] comments were not directed at plaintiff." *Id.* at 826. In the instant case, there is no dispute that Page's harassment was directed specifically toward Mendoza (indeed, Page's sniffing was apparently directed specifically toward Mendoza's genital region). *Kidwai v. McDonald's Corp.,* No. 93-1720, 1994 WL 136971 (4th Cir.1994), involved isolated incidents that were not nearly as severe or pervasive as the conduct alleged in this case (stating that plaintiff had a boyfriend; once asking plaintiff if she was in bed with someone; asking plaintiff to meet his mother; once asking plaintiff whether she had a good time on her vacation; asking plaintiff if she would cook for him; and using profanity on one occasion). With regard to *Kidwai,* it is odd that the court feels the need to resort to an unpublished opinion from the Fourth Circuit, given that citations to such cases are disfavored. 4th Cir. R. 36(c). The holding in *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333 (7th Cir.1993), is on shaky ground because in that case, the court relied heavily on *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 211-214 (7th Cir.1986). The Seventh Circuit has since recognized that its holding in *Scott*-that to be actionable, harassment must "cause such anxiety and debilitation to the plaintiff that working conditions [are] poisoned"-has been effectively overruled by the Supreme Court's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

Page 34

decision in *Harris,* 510 U.S. at 22, 114 S.Ct. at 370-71. *See Saxton v. American Tel. and Tel. Co.,* 10 F.3d 526, 533-34 (7th Cir.1993).

The two major cases that the majority uses to support its claim that "[w]ere we to conclude that the conduct established by Mendoza was sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish a baseline of actionable conduct that is far below that established by other circuits" are *Baskerville v. Culligan International Co.,* 50 F.3d 428 (7th Cir.1995), and *Shepherd v. Comptroller of Public Accounts,* 168 F.3d 871 (5th Cir.1999), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999). *Ante* at 1248. *Baskerville* is not directly on point because that case was a pre-*Faragher* decision in which the court found that "even if ... [the alleged harasser's] remarks could reasonably be thought to cross the line that separates vulgarity (not actionable) from harassment (potentially actionable), the plaintiff must lose because the company took all reasonable steps to protect her from [the alleged harasser]" and so was not vicariously liable. *Baskerville,* 50 F.3d at 431. In note 9 of its opinion, the majority attempts to resuscitate *Baskerville* by citing *Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1144 (7th Cir.1997), in which the court opined that the "specific holding in *Baskerville* was that the plaintiff's supervisor had *not* engaged in actionable sexual harassment...." That may be true, but it does not change the fact that the "holding" in *Baskerville* that the harassment was not sufficiently severe or pervasive was, as the *Baskerville* court, itself, recognized, an "alternative ground for [the] decision."

*Baskerville,* 50 F.3d at 432.

The only cases that the majority cites with any effectiveness are *Shepherd,* 168 F.3d at 872 (one comment that the plaintiff's elbows were the same color as her nipples; one comment that the plaintiff had big thighs; touching plaintiff's arm; and attempting to look down dress), and *Hopkins v. Baltimore Gas and Elec. Co.,* 77 F.3d 745, 753 (4th Cir.1996) (alleged harasser "bumped into [plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom"). In *Shepherd,* unlike this case, the alleged harasser was a coworker, and not a supervisor, and thus the plaintiff likely experienced the conduct as less severe because she did not have to worry about complaining about a superior. *Hopkins* was a pre-*Oncale* decision that was likely colored by the fact that the harassment was same-sex, male on male. The court found that much of the alleged conduct was "sexually neutral or, at most, ambiguous." *Hopkins,* 77 F.3d at 753. Again, the court in this case purports to assume that the conduct alleged by Mendoza "is sexual in nature." *Ante* at 1248-49.

In sum, the majority lacks case support for its proposition that conduct like that alleged by Mendoza has been found insufficient "as a matter of law" to meet the *Harris* requirements of sufficient severity or pervasiveness. *Ante* at 1253.

Other circuits have found conduct that is less egregious than that alleged by Mendoza to be sufficiently severe or pervasive to survive a motion for judgment as a matter of law. *See, e.g.,* **\*1267***Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 761-62

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                          Page 35
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

(8th Cir.1998) (plaintiff's allegations that manager patted her on the back, brushed up against her, and told her that she smelled good sufficient to survive a motion for summary judgment); [FN10] *Smith v. Norwest Fin. Acceptance, Inc.,* 129 F.3d 1408, 1412-15 (10th Cir.1997) (allegation of six sexually disparaging remarks sufficient to survive motion for judgment as a matter of law). Today's opinion appears to require a plaintiff to make a showing that is beyond that required by any other circuit. I say this because the only cases cited approvingly by the majority involved conduct so outrageous that it would shock the conscience of the court: female employees being held down bodily so that other employees could fondle their breasts and legs, *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1012 (8th Cir.1988); physical and verbal abuse that took place on a daily basis, *Dees v. Johnson Controls World Servs., Inc.,* 168 F.3d 417, 418-19 (11th Cir.1999); and the grabbing of plaintiffs' bodies, commenting extensively on their physical attributes, showing them pornographic photos and videotapes, offering them money for sex, and speculating on plaintiffs' sexual prowess, *1268*Splunge v. Shoney's, Inc.,* 97 F.3d 488, 489 (11th Cir.1996). Those cases certainly presented hostile working environments, but as a matter of precedent we are far beyond the day when a woman must allege multiple rapes before she can make out a case of sexual harassment. *See Vinson,* 477 U.S. at 60, 106 S.Ct. at 2402 (harassment included forcible rape on several occasions). As the Court made clear in *Harris,*

> FN10. The majority's reading of *Rorie* seems slightly misleading. In note 10 of the court's opinion, the majority claims that "when all the alleged conduct in [the decision] is accurately listed, [the decision], if anything, highlight[s] the insufficiency of Mendoza's evidence." The only conduct at issue in *Rorie* is the conduct I list in the text of my opinion: the plaintiff alleged that her manager patted her on the back, brushed up against her, and told her that she smelled good. In note 10 of the

court's opinion, the majority attempts to "reveal" the "actual" facts at issue in *Rorie* when it suggests that, in addition to the facts I list, the court also relied heavily on findings that the manager placed a "telephone call to plaintiff's home-asking her to go swimming and if she 'had heard rumors about a co-worker's penis' and stat[ed] that she 'looked better in the UPS uniform than other women.' " *Ante* at 1252-53 n. 10. The court in *Rorie,* however, did not rely on these "additional" allegations to support its conclusion that plaintiff's allegations of the manager patting her on the back, brushing up against her, and telling her that she smelled good were enough to present a jury question as to hostile environment. The court specifically found that the "additional" allegations that the majority cites today fell outside of the 180 day period within which the plaintiff filed her compliant with the EEOC, and thus could not be considered by the court in any way other than to "provide relevant background to later discriminatory acts." *Rorie,* 151 F.3d at 761. The *Rorie* court wrote:

> UPS argues that the only allegations falling within the 180-day period are McFadden's comments about Rorie smelling good, patting her on the back, and brushing up against her. UPS contends that these actions are insufficient to support a hostile environment claim because McFadden was seldom in [the place where Rorie worked].... UPS also contends that Rorie failed to complain of McFadden's conduct. We disagree.

> In September 1995, McFadden telephoned Rorie at home. During their conversation, McFadden asked Rorie if she would like to go swimming and whether she had heard the rumors about a co-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 36
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

worker's penis size. She declined the swimming invitation. During the same conversation, Rorie complained to McFadden about a female co-worker's attitude toward her. McFadden told her it was because Rorie looked better in the UPS uniform than the other woman....

While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, *we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law. Recognizing that the September 1995 conversation falls outside of the 180-day period,* we believe that, at the very least, McFadden's comments suggest that *his later behavior* presents a jury question as to hostile environment.

*Rorie,* 151 F.3d at 761-62 (emphasis added). The proposition for which I cite the case, therefore, remains undisputed. The Eighth Circuit has found that a plaintiff who alleged that her manager patted her on the back, brushed up against her, and told her that she smelled good had alleged conduct severe or pervasive enough to create a jury question as to hostile environment. Mendoza's allegations unquestionably go beyond the conduct at issue in *Rorie.* Therefore, other circuits have found conduct that is less egregious than that alleged by Mendoza to be sufficiently severe or pervasive to survive a motion for judgment as a matter of law.

Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees'

job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris,* 510 U.S. at 22, 114 S.Ct. at 370-71.

We do not transform Title VII into a workplace "civility code," *Oncale,* 118 S.Ct. at 1002, when we condemn conduct less severe than that which shocks our conscience. And when we raise the bar as high as the majority does today, it becomes more likely that we will miss the more subtle forms of sex discrimination that may still infest the workplace, and make it more difficult for women, especially, to participate on terms of equality with their male counterparts.[FN11] The sexist remark, the offensive touch, the repeated request for an intimate outing: all of these may seem merely annoying and relatively harmless in isolation from one another. But add them up; see them in context; and then try to imagine what it must be like for an employee who merely wants to come to work and make a living to have to endure a daily barrage of sexual assault. Then we might begin to understand the power that these "little" sexual offenses, when considered collectively, can have in reproducing a workplace in which women, especially, are often still thought of by their male employers as incompetents and playthings.

> FN11. We also become more vulnerable to the charge that in deciding whether the "reasonable person" would find alleged instances of workplace harassment to be sufficiently severe or pervasive to alter the conditions of employment, we are in fact adopting the perspective of the "reasonable harasser," and systematically excluding the experiences of the victims of sexual harassment. *See* Kathryn Abrams, "Gender

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Discrimination and the Transformation of Workplace Norms,"42 *Vand. L.Rev.* 1183, 1203 (1989); Susan Estrich, "Sex at Work," 43 *Stan. L.Rev.* 813, 820 (1991); *see also, Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir.1991) ("a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women"); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 626 (6th Cir.1986) ("[U]nless the outlook of the reasonable woman is adopted, the defendants as well as the courts are permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders.") (Keith, J., concurring in part and dissenting in part). This case is a perfect example. Mendoza is certainly not a woman of Victorian sensibilities who was uninitiated in the often boorish ways of working-class employment. Before going to Borden she worked for years as a cocktail waitress, a job that one imagines could not be staffed with those who possess the most delicate of constitutions. If Mendoza found her harassment at Borden to be severe and pervasive, then it is likely that our objective reasonable person, who has probably never had to serve drinks to a gaggle of besotted, leering males, would feel similarly.

Of course not all sexually offensive conduct in the workplace rises to the level of a Title VII violation. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (excluding from Title VII's coverage "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment"). The conduct alleged in this case, however, goes far beyond " 'simple teasing,' offhand comments, and isolated incidents." *Faragher,* 118 S.Ct. at 2283 (citations omitted). According to Red Mendoza, her direct supervisor made a daily game out of following and staring at her in a sexually offensive and humiliating *1269 manner. He touched her, made sexual comments to her, and sniffed in the direction of her groin in a way that goes beyond the boorish to the patently offensive. This is not just "uncivil." It may be illegal. At the very least, Mendoza ought to be allowed to present her claim to a jury.

V.

Today's decision represents a major departure from established sexual harassment law. Out of nowhere, the court has decided that evidence of stalking and leering by a harasser should be given short shrift when used by a plaintiff to support a claim for hostile environment sexual harassment. Moreover, the court's whole method of analysis is unfaithful to a body of precedent directing us to review the plaintiff's allegations cumulatively.[FN12] I sympathize with what the majority is trying to do today-to "police the baseline for hostile environment claims,"*Ante* at 1244 (citation omitted), thus enabling district courts to weed out frivolous claims that burden the federal docket. This, however, is not the way to do it. It is *Congress* that enacted Title VII. When we ignore the congressional mandate, as interpreted by the Supreme Court, we become most vulnerable to the charge that we, as members of the unelected federal judiciary, are usurping the legislative prerogative. It may be the case, as Justice Scalia has observed, that "[a]s a practical matter, [the Court's holding in *Harris* ] lets virtually unguided juries decide whether sex-related conduct engaged in (or permitted by) an employer is egregious enough to warrant an award of damages." *Harris,* 510 U.S. at 24, 114 S.Ct. at 372 (Scalia, J., concurring). If this is a problem, however, the solution lies with Congress and not the Third Branch.

> FN12. The degree of departure from established precedent is made even more manifest when one observes that this case was not worthy of *en banc* review in the first place. Under Eleventh Circuit Rule 35-3, *en banc* consideration "is an extraordinary procedure intended to bring to the attention of the entire court a precedent-setting error

195 F.3d 1238                                                                    Page 38
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

of exceptional importance ... [or] a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court or of this circuit." *See also,*Fed. R.App. P. 35(a). There was certainly nothing "extraordinary" or "precedent-setting" about the panel opinion in this case. It was a rather routine decision that rested on an extremely fact-intensive review. One senses that the court is reaching to draw a line in the sand in hostile environment sexual harassment cases, but it was certainly a mistake for the majority to seize upon this case. There is nothing extraordinary about finding that allegations of pervasive harassment over a four month period are sufficient to make out a claim under Title VII, and so it appears that it is the court's *en banc* decision today, and not the panel opinion, that is "in direct conflict with precedent of the Supreme Court [and] of this circuit."

Accordingly, I would vacate the judgment dismissing Mendoza's Title VII sexual harassment claim, and remand that claim to the district court for a new trial.

BARKETT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, Circuit Judge, joins:

I concur with the judgment of the court but for the affirmance of the directed verdict on the sexual harassment claim. To affirm the directed verdict on the sexual harassment claim in this case, the majority must conclude, after "review [ing] all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," that no genuine issue of material fact exists and no "reasonable and fair-minded persons ... might reach different conclusions" as to whether Red Mendoza suffered sexual harassment. A directed verdict is only proper where "[t]he facts and inferences ... 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." *Bivens Gardens Office Bldg., Inc. v.*

*Barnett Banks of Florida, Inc.,* 140 F.3d 898, 905 (11th Cir.1998) (quoting *Hibiscus Assoc. v. Board of Trustees,* 50 F.3d 908, 920 (11th Cir.1995)). Under this standard, the directed verdict in this case cannot be affirmed. This record in conjunction with the directives of **\*1270** the Supreme Court leads, instead, to the conclusion that the question presented here is one only for the jury.

The method by which the majority reaches its desired conclusion that the alleged conduct fails to present a jury question is flawed in several respects. First, that conclusion depends on an account of the alleged conduct that is inconsistent with the record. Second, to achieve that account, the majority disregards the law requiring that all incidents be considered as a whole and disaggregates the conduct at issue. Taking each alleged incident separately, the majority credits only one of the several possible inferences which could be drawn from the conduct described, and deliberately excludes from consideration major components of Mendoza's harassment claim, inferring that being followed or stared at in the workplace can not under any circumstances contribute to a sexually harassing hostile environment. Thus, by selectively considering the facts and choosing the inferences to be drawn from them, the majority usurps the quintessential jury function. Third, throughout this process the majority misapprehends and misstates the law of sexual harassment. Because reasonable people could differ as to the inferences to be drawn from the facts in evidence, and because the majority errs in explicating and applying the law, I dissent from the affirmance of the directed verdict on Mendoza's sexual harassment claim.

*I. THE TESTIMONY IN THIS CASE*

The crux of this case is whether the conduct conveyed by Mendoza's testimony in its totality *could* be deemed by a reasonable jury to be objectively either (a) severe, *or* (b) pervasive enough to alter the conditions of her employment sufficient to create an abusive work environment. There is no ques-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                    Page 39
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

tion that the issue here relates not to severity but to acts which, because of their alleged frequency and connection to other acts sexual in nature, could be deemed pervasive enough to constitute a hostile environment. The standard for whether such an environment exists has been expressly defined-in quintessential jury terms-as an environment that a *reasonable person* would find hostile or abusive. Instead of viewing the evidence tending to disprove the claim, the Supreme Court has told us that, "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case." *Wilkerson v. McCarthy,* 336 U.S. 53, 57, 69 S.Ct. 413, 93 L.Ed. 497 (1949). As Judge Arnold of the Eighth Circuit paraphrased this standard:

In other words, when a motion for directed verdict or for judgment not withstanding the verdict is made, the court must assume that all of the evidence supporting the party opposing the motion is true, and must, in addition, give that party the benefit of all reasonable inferences drawn from that evidence. The case may be taken from the jury only if no rational jury could find against the moving party on the evidence so viewed. Probably this formulation will result in fewer grants of motions for directed verdict than would result if judges were free to take cases from the jury because of what they view as very strong evidence supporting the moving party. Occasionally verdicts may be returned with which judges strongly disagree. This is a price, we think, worth paying for the jury system, which is enshrined in the Bill of Rights and sanctified by centuries of history.

*Dace v. ACF Indus., Inc.,* 722 F.2d 374, 376-77 (8th Cir.1993) (footnote omitted).

Mendoza's testimony, viewed in the light most favorable to her and with all reasonable inferences drawn in her favor, was that on a daily basis, she had to work in an atmosphere where the plant's highest ranking executive was always after her. In 79 pages of transcript, Mendoza detailed the con-

duct of her supervisor throughout the year during which Page was her supervisor. In summary, she asserted that he (i) constantly followed her; *1271 (ii) continuously stared at her in a sexual manner, looking her body up and down; (iii) on two occasions, sniffed at her groin area; (iv) on one occasion just sniffed at her; (v) rubbed up against her; and (vi) made inappropriate comments which were sexual in nature. Specifically, Mendoza testified that:

From the time Mr. Page came to the Miami plant, he *always* seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there. The man was *constantly* watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and back to the office.... He seemed to be *wherever I was* in the plant. He followed me not around the office, but around the hallways in the plant. Okay? He was at a lunch table in the lunch room. He would be at a picnic table outside. And he would look me up and down, very, in a very obvious fashion. When I was face to face with him, when I would get up and walk away from these tables and areas, I could feel him watching me up and down.... This was a *constant* thing.

(Tr. Trn. at 24-27) (emphasis added). On cross examination, Mendoza was asked if the incidents of following were constant, or something which took place only two to four times. She replied:
[N]o, that was a *constant* thing from the time he walked into the plant.... It was a *constant* thing.

(Tr. Trn. at 71) (emphasis added).

In addition to the staring and following, Mendoza described Page's actions in staring and sniffing at her groin area. She testified that while at the copy machine,

I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                                      Page 40
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.

(Tr. Trn. at 27). Mendoza testified that another time, when in Page's office seeking permission to leave work because of the flu,

[He] turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Tr. Trn. at 27). He then rejected her request and when asked if she recalled the expression on his face, Mendoza said, "He was intense.... He was staring at me...." (Tr. Trn. at 27).

The majority suggests that the sniffing was not necessarily sexually motivated or, as the majority puts it, "gender related" but could have been totally innocent conduct.[FN1] Indeed, it may have been innocent, and the jury may well have agreed with the majority's view. However, the jury was equally entitled to believe Mendoza's perception that it was sexually motivated, and directed at her in order to intimidate and harass:

> FN1. Of course, the majority is unable to evaluate what Mendoza described through her actions before the jury as there is no videotape of the trial testimony. An appellate court is unable to observe the witnesses' body language, the tone of the witnesses' testimony, and the manner in which the testimony was given. The transcript says only "indicating" as to the sniffing motion. The jury is the only fact finding body with knowledge of Mendoza's testimony about Page's expression, demeanor, and what her gesture indicated-an exaggerated lewd sniffing, a mere allergy-induced sniffle, or something else.

It was obvious to me.... The man would look me up and down, stop in my groin area. He was looking

right at me, directly at me. It was obvious to me, it was at me. This happened twice, stopped in the groin area and (indicating) made the sniffing.

(Tr. Trn. at 34-35). She further testified to Page's comment on another occasion which she found offensive and consistent *1272 with the sniffing incidents, "You're just like me, always sniffing around." (Tr. Trn. at 75). When asked whether it could have been an innocent comment, she said that she "most certainly" thought it a sexual comment. "I have never heard a complete [ly] innocent comment like that," she testified. (Tr. Trn. at 75).

After describing the incident in which Page rubbed his hip against her, Mendoza testified that, "I was startled. I looked over and he had a smile on his face, right, had a smile on his face, like he was enjoying himself." (Tr. Trn. at 73). When asked if she had never put her hands on someone's shoulders when passing them to prevent them from being startled, Mendoza responded, "I may have, but not rubbed my hips up against people." (Tr. Trn. at 73).

Mendoza testified that Page was "coming on to me, flirting with me." (Tr. Trn. at 29). "I went into his office angry and disgusted at this.... Mr. Page turned around and I said to him, 'I came in here to work, period.' And his reply to me was, 'yeah, I'm getting fired up, too.' " (Tr. Trn. at 29). When asked whether Page's comment-"I'm getting fired up, too"-was necessarily sexual in nature, she said, "I took those words to be his response to what I was saying to him. And he knew what I was talking about." (Tr. Trn. at 69). Similarly, she testified that the way he smiled at her, "along with other things," was inappropriate, (Tr. Trn. at 69), and that when she "put it all together, I realized what was going on.... He was, his advances to me were definitely sexual in nature." (Tr. Trn. at 68).

Crediting Mendoza's account of the frequency and intensity of Page's unrelenting stares and looks, together with her allegations of his more egregious sexual conduct, such as overtly sniffing and looking at her groin area, it simply cannot be said that, "no reasonable and fair-minded persons ... might reach

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 41
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

different conclusions" as to whether Red Mendoza suffered sexual harassment. Of course, it is possible that a reasonable person might conclude, based on the totality of the evidence, that Mendoza's workplace environment was neither hostile nor abusive. The jury may not have believed that the incidents occurred. The jury may have believed the alleged incidents occurred, but they may have drawn different inferences from them. Or the jury may have determined that a reasonable person would not have found the environment to be hostile. The point is that it was within the jury's province to decide and not within an appellate court's. This record cannot support a conclusion that "[t]he facts and inferences ... 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." *Bivens Gardens,* 140 F.3d at 905 (quoting *Hibiscus Assoc.,* 50 F.3d at 920).

### II. THE TESTIMONY MUST BE VIEWED IN ITS TOTALITY, AND NOT DISAGGREGATED INTO SEPARATE ACTS.

As noted, an objectively hostile sexual environment is "an environment that a *reasonable person* would find hostile or abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (emphasis added). Under the law, that means, as common sense would likewise tell us, that when deciding whether the conduct at issue is pervasive enough to constitute a sexually harassing "hostile environment," it is the "environment" created by disparate acts which must be examined. Or, put another way, the incidents alleged must be viewed in the context of the environment they create and cannot be viewed and analyzed as separate and discrete claims based on separate and discrete incidents:

[T]he analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and

*1273 that the work environment created thereby may exceed the sum of the individual episodes. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." It follows naturally from this proposition that the environment viewed as a whole may satisfy the legal definition of an abusive working environment although no single episode crosses the Title VII threshold.

*Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1524 (M.D.Fla.1991) (quoting *Andrews v. City of Philadelphia et al.,* 895 F.2d 1469, 1484 (3rd Cir.1990)).

This Court validated this approach in holding that "[a] hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits," making it improper to "examine each alleged incident of harassment in a vacuum." *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510-11 (11th Cir.1989) (holding that the district court erred in requiring plaintiff to establish a claim as to each allegation of harassment); *see Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1109 (9th Cir.1998) ("Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender.").

The Supreme Court expressed the same principle in *Harris,* 510 U.S. at 23, 114 S.Ct. 367, saying that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Most recently, it was amplified by Justice Scalia writing for a unanimous court in *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998):

The real social impact of workplace behavior often

195 F.3d 1238                                                                                                    Page 42
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Although the majority acknowledges the Supreme Court's admonition that courts must look to the "totality of the circumstances," it repeatedly fails to adhere to the legal requirement that it is the context in its totality and not each incident in isolation that courts are required to examine when considering Title VII claims. To reduce the impact of the evidence in support of Mendoza's hostile environment claim, the majority first separately considers Mendoza's testimony that she was constantly followed and then simply eliminates consideration of that testimony.

The majority suggests that following and staring are behaviors categorically exempt from the reach of Title VII because they are ambiguous in meaning, and somehow would create a lower "baseline" for sexual harassment claims. The majority then concludes that, *"aside from Page's 'constant' following and staring,* the conduct asserted by Mendoza was not frequent," and that "frequency of the harassing conduct-is also for the most part lacking." (Maj. Op. at 1249 (emphasis added)).

There is no question that being followed may not be actionable. On the other hand, it may very well constitute a violation of Title VII. Such a determination must depend on the circumstances. The act of walking behind someone cannot be determined by itself to be either bad or good, malicious or benign, actionable or not. The circumstances necessarily dictate how **1274** it must be characterized. Can it be characterized as simply two people walking serially toward the same destination? Can it be characterized, as the majority suggests, simply as an employ-er "keeping an eye" on an employee? Or can it be characterized as stalking?[FN2] The various possibilities illustrate the necessity of examining allegations of being followed in the context of other incidents alleged. The claim here is *not* one based on simply being followed. From Mendoza's testimony, were it to be credited, it is a claim of being "constantly" followed-which in any lexicon can only mean all the time and, certainly, frequently-by someone who had sniffed at her groin area, leered at her by looking her "up and down," made innuendos ("I'm getting fired up"), and, when the opportunity arose, rubbed his hip against hers.

> FN2. Indeed, Mendoza's allegations could constitute the crime of stalking as it is defined in most jurisdictions. For example, Florida's statute criminalizes any repeated following, whether or not accompanied by a threat: "Any person who willfully, maliciously, and repeatedly follows or harasses another person commits the offense of stalking, a misdemeanor of the first degree...." Fla. Stat. § 784.048(3) (West 1992).

The characterization of Mendoza's claim as one based on the "everyday observation of fellow employees" and as "a natural and unavoidable occurrence" arising out of "people work[ing] together in close quarters," is one way of viewing the evidence. (Maj. Op. at 1248). As the majority points out, another credible interpretation is that following or staring "can betray romantic or sexual attraction." (*Id.*). Perhaps Mendoza's supervisor was indeed only "keep[ing] an eye" on her. (*Id.*). An equally reasonable but unmentioned possible interpretation, however, is that the staring and following were intended to harass, humiliate, or intimidate. The majority errs in crediting any one interpretation over the others, and does so, among other reasons, because it fails to view the staring and following in the context of the surrounding testimony. In making its choice of inferences from selected facts, the majority fails to "look only to the evidence and reas-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 43
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

onable inferences which tend to support the case of a litigant...." *Wilkerson,* 336 U.S. at 57, 69 S.Ct. 413.

### III. REQUIREMENTS OF A SEXUAL HARASS-MENT CLAIM

In addition to failing to view the facts as a whole, the majority compounds its mistakes by misstating and misapplying the law of sexual harassment.

*A. The Purposes of Title VII*

The Supreme Court has repeatedly recognized that the purpose of Title VII is to strike at the disparate treatment of men and women in employment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Employees of either gender may experience discrimination or harassment in a variety of different forms, one of which is unwelcome sexual advances.[FN3]

> FN3. As Justice Scalia wrote for a unanimous court in *Oncale:*
>
> > [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.
>
> 118 S.Ct. at 1002.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). The Court in *Meritor* stated that this language was "not

limited to 'economic' or 'tangible' discrimination," but that it "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *1275*477 U.S. at 64, 106 S.Ct. 2399 (quoting *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). The Court went on to say that Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. 2399). As Justice Ginsburg noted in her concurring opinion in *Harris:*

The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.

*Harris,* 510 U.S. at 25, 114 S.Ct. 367; *see also Andrews,* 895 F.2d at 1485 ("[T]he offensive conduct is not necessarily required to include sexual overtones in every instance."); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 905 (1st Cir.1988) ("[verbal attack,] although not explicitly sexual, was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances."); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987) (rejecting narrow definition of sexual harassment that requires predicate acts to be clearly sexual in nature); *McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir.1985) ("We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of the employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                    Page 44
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

overtones. And we decline to do so now."); Vicki Schultz, *Reconceptualizing Sexual Harassment,* 107 Yale L.J. 1683, 1769-74 (1998).

The correct question in a sexual harassment case is whether the conduct, sexual or not, ridicules women, treats them as inferior, or is intended to humiliate or intimidate them such that they are subjected to unequal treatment in the workplace. The Supreme Court has stated that the answer to this question is not, "and by its nature cannot be," subject to "a mathematically precise test." *Harris,* 510 U.S. at 22, 114 S.Ct. 367. The majority ignores the question and relies exclusively on a list of four factors which, in fact, were included by Justice O'Connor in *Harris* as a non-exhaustive list:

But we can say that whether an environment is "hostile" or "abusive" *can be determined only by looking at all the circumstances.* These *may* include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, *no single factor is required.*

*Id.* at 23, 114 S.Ct. 367 (emphasis added).

Assuming there are reasonable people who, while crediting Mendoza's version of the facts, would not think that staring at a woman's groin area while making sexually suggestive sniffing noises is degrading, humiliating, and/or intimidating, it seems beyond peradventure that many reasonable people would indeed find it to be so.

### B. Mendoza Sufficiently Alleged Impairment To Her Job Performance

In addition, the majority errs in contending that Mendoza's claim must fail because she has not

demonstrated any impairment of her job performance. As Justice Ginsberg noted in *Harris:*

To show such interference [with an employee's work performance], "the plaintiff need not prove that his or her tangible productivity has declined as a result **\*1276** of the harassment." It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "ma[k]e it more difficult to do the job." Davis concerned race-based discrimination, but that difference does not alter the analysis....

510 U.S. at 25, 114 S.Ct. 367 (quoting *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (6th Cir.1988)). Title VII "comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22,114 S.Ct. 367. In response to Page's treatment, Mendoza complained to him: "I came in here to work, period" (Tr. Trn. at 29), and relayed her state of mind as a result of Page's conduct: "I was embarrassed, I was humiliated, I felt degraded." (Tr. Trn. at 35).

If credited by a jury, the totality of Page's conduct can create an inference that her gender was the motivating impulse for his behavior and strikes at the core of Mendoza's entitlement to a workplace free of discriminatory animus. In rejecting an assertion that the consequences of a hostile environment must be so severe as to affect one's psychological health, the Supreme Court stated:

[T]he District Court erred in relying on whether the conduct "seriously affect[ed] plaintiff's psychological well-being" or led her to "suffe[r] injury." Such an inquiry may needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require. Certainly Title VII bars conduct that would seriously affect a reas-

195 F.3d 1238                                                                                              Page 45
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
(Cite as: 195 F.3d 1238)

onable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.

*Harris,* 510 U.S. at 22, 114 S.Ct. 367 (internal citation omitted). Based on these Supreme Court pronouncements, Mendoza has presented sufficient evidence for a jury to consider her claim under Title VII.

*C. The Majority "Polices the Baseline" in Contravention of Congress' Direction*

At the heart of the majority's opinion is the view that the incidents endured by Mendoza simply weren't that bad, that she should just put up with them rather than bring a Title VII claim. The majority contends that directing a verdict for the defendant in this case will promote its goal of "polic[ing] the baseline for hostile environment claims." (Maj. Op. at 1244). In support of the majority's project, the majority cites a number of cases which it claims "delineate a minimum level of severity or pervasiveness" necessary for Title VII violations. (*Id.* at 1246). In so doing, the majority attempts to compare various lists of allegedly harassing conduct with that alleged by Mendoza.

Again, such an analysis ignores our duty to consider the incidents not in isolation or as a laundry list, but in context and in light of the testimony as a whole. To rely on a string cite of cases-several of which reached rather dubious results-is a serious mistake because the majority continues to eliminate context as a criterion. Each of these cases must be taken on the totality of their unique facts. These cases, when viewed in conjunction with the many other cases where the "bar" is so low or lower,[FN4] underscore that this is a matter for *1277 juries and not judges to decide as a matter of law.

> FN4. *See Williams v. General Motors,* 187 F.3d 553 (6th Cir.1999) (overturning the

district court's dismissal of plaintiff's complaints of foul language, mean and annoying treatment by co-workers, sexually related remarks, on grounds that "the district court disaggregated the plaintiff's claims ... which robbed the incidents of their cumulative effect"); *Rorie v. UPS, Inc.,* 151 F.3d 757, 762 (8th Cir.1998) (finding case "borderline" but holding allegations that supervisor "pat[ted] female employee on the back, brush[ed] up against her, and told her she smells good" constituted actionable sexual harassment); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) (sexual innuendos and brushing up against co-employees constituted actionable harassment); *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998) ("Evaluation of ambiguous acts such as ... [giving a female employee a teddy bear, directing her to go to lunch with him, inviting her to go to Atlantic City with him] in this case presents an issue for the jury."); *Sandra Barna v. City of Cleveland,* 172 F.3d 47 (6th Cir.1998) (affirming the district court's denial of a directed verdict motion because the "jury was free to conclude" that plaintiff was telling the truth regarding harassment including a constant stream of sexual comments, requests, and advances occurring on a daily basis); *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 578 (2d Cir.1989) ("emphatically" rejecting defendant's argument that "[harasser's] conduct, though not a paradigm of modern inter-gender workplace relations, was not pervasive enough to trigger relief, ... and federal law does not punish 'trivial behavior' consisting of only 'two kisses, three arm strokes,' several degrading epithets and other objectionable-but ultimately harmless-conduct").

The majority offers no substantiation for the claim-which underlies its argument-that juries will be un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able to distinguish sexually threatening staring and following from "innocent looking" or merely crossing paths with a coworker. The Supreme Court does not appear to entertain the same doubts. Justice Scalia explained in *Oncale* that the requirement that allegedly harassing behavior must create "an environment that a reasonable person would find hostile or abusive" is "sufficient to ensure that courts *and juries* do not mistake ordinary socializing in the workplace ... for discriminatory 'conditions of employment.' " *Oncale,* 118 S.Ct. at 1003 (emphasis added) (internal quotation marks omitted).

This case comes to us for review of the district court's grant of a Rule 50 motion for judgment as a matter of law. "A motion for a directed verdict, or for a judgment notwithstanding the verdict under Rule of Civil Procedure 50, 28 U.S.C.A., raises a question of law only: Whether there is *any evidence* which, *if believed,* would authorize a verdict against movant. The trial judge in considering those motions does not exercise discretion, but makes a ruling of law...." *Marsh v. Illinois Cent. R. Co.,* 175 F.2d 498, 500 (5th Cir.1949) [FN5] (emphasis added). In contravention of this clearly articulated judicial role, the majority repeatedly engages in its own assessments of the credibility and value of Mendoza's testimony. For instance, the majority concludes that Page's statement that he was "getting fired up" had no "sexual or other gender-related connotation." (Maj. Op. at 1248). Moreover, the majority concludes that none of the conduct of which Mendoza complained was humiliating (*Id.* at 1249)-in direct contradiction to her sworn statement that she in fact felt "humiliated" (Tr. Trn. at 35). Further, the majority dismisses Mendoza's allegations that Page harassed her by constantly following her and staring at her, preferring instead to infer that Page "simply showed up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside." (Maj. Op. at 1250). These explicit credibility determinations and factual interpretations are clearly far outside this Court's appropriate role at this stage of Mendoza's litigation. Indeed, it is our duty "to review all of the

evidence in the light most favorable to, and with all reasonable inferences drawn in favor of" Mendoza. *Bivens,* 140 F.3d at 905. By making these determinations and drawing these inferences, the majority has usurped the traditional role of the rightful finder of fact.

> FN5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

In the Civil Rights Act of 1991, Congress specifically amended Title VII. Having from its inception in 1964 charged the **\*1278** court with the task of deciding whether actions alleged by discrimination plaintiffs constituted a violation of Title VII, Congress changed its mind in 1991 and specifically provided all plaintiffs seeking compensatory or punitive damages with the right to have his or her case heard before a jury. 42 U.S.C. § 1981a(c)(1). The mistrust of juries evidenced by the majority is at odds with the specific directive of Congress that the jury is to decide whether gender discrimination has occurred in the workplace. In concluding that plaintiffs seeking compensatory and punitive damages should have the right to seek a jury determination of their claims, Congress reasoned that "[t]he jury system is the cornerstone of our system of civil justice, as evidenced by the Seventh Amendment's guarantee. Just as they have for hundreds of years, juries are fully capable of determining whether an award of damages is appropriate and if so, how large it must be to compensate the plaintiff adequately and to deter future repetition of the prohibited conduct." H.R.Rep. No. 102-40(I), 72 (1991) (footnote omitted), *reprinted in* 1991 U.S.C.C.A.N. 549, 610.[FN6]

> FN6. The legislative history of the Civil Rights Act of 1991 is extremely limited. Most of the discussion that led to the compromise statute took place in closed door discussions between the Bush White House

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

195 F.3d 1238                                                                                          Page 47
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143
**(Cite as: 195 F.3d 1238)**

and Congressional leaders. *See* Douglas C. Herbert & Lani Schweiker Shelton, *A Pragmatic Argument Against Applying the Disparate Impact Doctrine in Age Discrimination Cases,* 37 S. Tex. L.Rev. 625, 652 n. 147 (1996).

Civil juries traditionally have been charged with the task of deciding all questions of fact where reasonable people might credit different versions of the facts presented, thereby differing as to the proper resolution of the ultimate question in the case. As in other contexts wherein the jury is charged with applying a "reasonable man" standard, allowing jurors to decide the question of reasonableness as to Title VII issues is precisely what Congress intended. *Cf. Smith v. United States,* 431 U.S. 291, 302, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) ("It would be just as inappropriate for a legislature to attempt to freeze a jury to one definition of reasonableness as it would be for a legislature to try to define the contemporary community standard of appeal to prurient interest or patent offensiveness ...."); *id.* ("A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes ....") (internal quotation marks omitted).

Because I believe the majority has not only misinterpreted but misstated the law of sexual harassment and has arrogated to itself the jury function in violation of our legal precedent and Title VII's specific entitlement to a jury's verdict, I dissent.

C.A.11 (Fla.),1999.
Mendoza v. Borden, Inc.
195 F.3d 1238, 81 Fair Empl.Prac.Cas. (BNA) 470, 13 Fla. L. Weekly Fed. C 143

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

114 S.Ct. 367                                                                                    Page 1
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

▷

Harris v. Forklift Systems, Inc.
U.S.,1993.

Supreme Court of the United States
Teresa HARRIS, Petitioner,
v.
FORKLIFT SYSTEMS, INC.
**No. 92-1168.**

Argued Oct. 13, 1993.
Decided Nov. 9, 1993.

Former employee filed Title VII action, claiming
that the conduct of the employer's president amoun-
ted to "abusive work environment" harassment on
the basis of gender. The United States District
Court for the Middle District of Tennessee dis-
missed the action pursuant to a report and recom-
mendation of a United States Magistrate Judge.
Former employee appealed. The Court of Appeals
for the Sixth Circuit, 976 F.2d 733, affirmed. Certi-
orari was granted. The Supreme Court, Justice
O'Connor, held that: (1) to be actionable under Title
VII as "abusive work environment" harassment, the
conduct need not seriously affect an employee's
psychological well-being or lead the employee to
suffer injury; (2) the *Meritor* standard requires an
objectively hostile or abusive environment as well
as the victim's subjective perception that the envir-
onment is abusive; and (3) whether an environment
is sufficiently hostile or abusive to be actionable re-
quires consideration of all the circumstances, not
any one factor.

Judgment of Court of Appeals reversed and case re-
manded.

Justices Scalia and Ginsburg filed concurring opin-
ions.

West Headnotes

**[1] Civil Rights 78 €══1167**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1167 k. Adverse Actions in General.
Most Cited Cases
    (Formerly 78k141)

**Civil Rights 78 €══1172**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate Treatment. Most
Cited Cases
    (Formerly 78k141)

**Civil Rights 78 €══1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167, 78k145)
Title VII's prohibition against discrimination with
respect to "terms, conditions, or privileges of em-
ployment" based on race, color, religion, sex, or na-
tional origin is not limited to economic or tangible
discrimination, but extends to entire spectrum of
disparate treatment of men and women in employ-
ment, which includes requiring people to work in
discriminatorily hostile or abusive environment.
Civil Rights Act of 1964, §§ 701 et seq., 703(a)(1),
as amended, 42 U.S.C.A. §§ 2000e et seq.,
2000e-2(a)(1).

**[2] Civil Rights 78 €══1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                          Page 2
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62 USLW 4004
(Cite as: 510 U.S. 17, 114 S.Ct. 367)

Cases
(Formerly 78k145)
Title VII is violated when workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter conditions of victim's employment and create abusive working environment. Civil Rights Act of 1964, §§ 701 et seq., 703(a)(1), as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

[3] Civil Rights 78 ⊜═1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k145)
*Meritor* standard for determining whether conduct is actionable under Title VII as "abusive work environment" harassment requires objectively hostile or abusive environment-one that reasonable person would find hostile or abusive-as well as victim's subjective perception that environment is abusive; conduct that is not severe or pervasive enough to create objectively hostile or abusive work environment is beyond Title VII's purview, as is conduct that victim does not subjectively perceive as abusive. Civil Rights Act of 1964, §§ 701 et seq., 703(a)(1), as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

[4] Civil Rights 78 ⊜═1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k145)
Discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance to such a degree as to be actionable under Title VII, even before harassing conduct leads to nervous breakdown. Civil Rights Act of 1964, §§ 701 et seq., as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

[5] Civil Rights 78 ⊜═1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167, 78k145)
Even without regard to tangible effects of objectively hostile or abusive work environment, very fact that discriminatory conduct is so severe or pervasive that it creates work environment abusive to employees on basis of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. Civil Rights Act of 1964, §§ 701 et seq., 703(a)(1), as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

[6] Civil Rights 78 ⊜═1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k145)

Civil Rights 78 ⊜═1185

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)
To be actionable under Title VII as "abusive work

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                              Page 3
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

environment" harassment, conduct need not seri-
ously affect employee's psychological well-being or
lead employee to suffer injury, so long as environ-
ment would reasonably be perceived, and is per-
ceived, as hostile or abusive; focusing on employ-
ee's psychological well-being or whether employee
suffered injury could unnecessarily focus fact find-
er's attention on concrete psychological harm,
which Title VII does not require. Civil Rights Act
of 1964, §§ 701 et seq., 703(a)(1), as amended, 42
U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

**[7] Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k145)

**Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
Whether work environment is "hostile" or
"abusive" in violation of Title VII can be determ-
ined looking only at all circumstances, which may
include frequency of discriminatory conduct, its
severity, whether it is physically threatening or hu-
miliating, or merely offensive, and whether it un-
reasonably interferes with employee's work per-
formance; effect on employee's psychological well-
being is relevant in determining whether victim ac-
tually found environment abusive, but that factor,
like any other relevant factor, may be taken into ac-
count and no single factor is required. Civil Rights
Act of 1964, §§ 701 et seq., 703(a)(1), as amended,
42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

**[8] Federal Courts 170B ☞462**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts
of Appeals
            170Bk462 k. Determination and Disposi-
tion of Cause. Most Cited Cases
Reversal and remand was necessary for further pro-
ceedings on whether work environment was suffi-
ciently intimidating or abusive to female employee
that it would have been actionable under Title VII;
district court had erroneously required, in close
case, that conduct must have seriously affected em-
ployee's psychological well-being or led her to suf-
fer injury. Civil Rights Act of 1964, §§ 701 et seq.,
703(a)(1), as amended, 42 U.S.C.A. §§ 2000e et
seq., 2000e-2(a)(1).

**\*\*368 Syllabus**[FN*]

> FN* The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the con-
> venience of the reader. See *United States v.
> Detroit Lumber Co.,* 200 U.S. 321, 337, 26
> S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner Harris sued her former employer, re-
spondent Forklift Systems, Inc., claiming that the
conduct of Forklift's president toward her consti-
tuted "abusive work environment" harassment be-
cause of her gender in violation of Title VII of the
Civil Rights Act of 1964. Declaring this to be "a
close case," the District Court found, among other
things, that Forklift's president often insulted Harris
because of her gender and often made her the target
of unwanted sexual innuendos. However, the court
concluded that the comments in question did not
create an abusive environment because they were
not "so severe as to ... seriously affect [Harris'] psy-
chological well-being" or lead her to "suffe[r] in-
jury." The Court of Appeals affirmed.

*Held:* To be actionable as "abusive work environ-
ment" harassment, conduct need not "seriously af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                                    Page 4
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

fect [an employee's] psychological well-being" or
lead the plaintiff to "suffe[r] injury." Pp. 370-371.

(a) The applicable standard, here reaffirmed, is
stated in *Meritor Savings Bank, FSB v. Vinson,* 477
U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49: Title VII is
violated when the workplace is permeated with dis-
criminatory behavior that is sufficiently severe or
pervasive to create a discriminatorily hostile or ab-
usive working environment, *id.,* at 64, 67, 106
S.Ct., at 2404, 2405. This standard requires an ob-
jectively hostile or abusive environment-one that a
reasonable person would find hostile or abusive-as
well as the victim's subjective perception that the
environment is abusive. Pp. 370-371.

**369 (b) Whether an environment is "hostile" or
"abusive" can be determined only by looking at all
the circumstances, which may include the fre-
quency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating,
or a mere offensive utterance; and whether it un-
reasonably interferes with an employee's work per-
formance. The effect on the employee's psycho-
logical well-being is relevant in determining whether
the plaintiff actually found the environment abus-
ive. But while psychological harm, like any other
relevant factor, may be taken into account, no
single factor is required. Pp. 370-371.

(c) Reversal and remand are required because the
District Court's erroneous application of the incor-
rect legal standard may well have influenced its ul-
timate conclusion that the work environment was
not intimidating*18 or abusive to Harris, especially
given that the court found this to be a "close case."
P. 371.

976 F.2d 733 (CA6 1992), reversed and remanded.

O'CONNOR, J., delivered the opinion for a unan-
imous Court. SCALIA, J., *post,* p. 371, and GINS-
BURG, J., *post,* p. 372, filed concurring opinions.

Irwin Venick, Nashville, TN, for petitioner.
Jeffrey P. Minear, Washington, DC, for U.S. as

*amicus curiae,* by special leave of the Court.
Stanley M. Chernau, Nashville, TN, for respond-
ent.For U.S. Supreme Court briefs, see:1993 WL
302216 (Pet. Brief).1993 WL 302223 (Resp. Brief).
Justice O'CONNOR delivered the opinion of the
Court.
In this case we consider the definition of a discrim-
inatorily "abusive work environment" (also known
as a "hostile work *19 environment") under Title
VII of the Civil Rights Act of 1964, 78 Stat. 253, as
amended, 42 U.S.C. § 2000e*et seq.* (1988 ed., Supp.
III).


I

Teresa Harris worked as a manager at Forklift Sys-
tems, Inc., an equipment rental company, from
April 1985 until October 1987. Charles Hardy was
Forklift's president.

The Magistrate found that, throughout Harris' time
at Forklift, Hardy often insulted her because of her
gender and often made her the target of unwanted
sexual innuendos. Hardy told Harris on several oc-
casions, in the presence of other employees,
"You're a woman, what do you know" and "We
need a man as the rental manager"; at least once, he
told her she was "a dumb ass woman." App. to Pet.
for Cert. A-13. Again in front of others, he sugges-
ted that the two of them "go to the Holiday Inn to
negotiate [Harris'] raise." *Id.,* at A-14. Hardy occa-
sionally asked Harris and other female employees
to get coins from his front pants pocket. *Ibid.* He
threw objects on the ground in front of Harris and
other women, and asked them to pick the objects
up. *Id.,* at A-14 to A-15. He made sexual innuendos
about Harris' and other women's clothing. *Id.,* at A-
15.

In mid-August 1987, Harris complained to Hardy
about his conduct. Hardy said he was surprised that
Harris was offended, claimed he was only joking,
and apologized. *Id.,* at A-16. He also promised he
would stop, and based on this assurance Harris
stayed on the job. *Ibid.* But in early September,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                                      Page 5
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

Hardy began anew: While Harris was arranging a deal with one of Forklift's customers, he asked her, again in front of other employees, "What did you do, promise the guy ... some [sex] Saturday night?" *Id.,* at A-17. On October 1, Harris collected her paycheck and quit.

Harris then sued Forklift, claiming that Hardy's conduct had created an abusive work environment for her because of her gender. The United States District Court for the Middle District of Tennessee, adopting the report and recommendation*20 of the Magistrate, found this to be "a close case," *id.,* at A-31, but held that Hardy's conduct did not create an abusive environment. The court found that some of Hardy's comments "offended**370 [Harris], and would offend the reasonable woman,"*id.,* at A-33, but that they were not

"so severe as to be expected to seriously affect [Harris'] psychological well-being. A reasonable woman manager under like circumstances would have been offended by Hardy, but his conduct would not have risen to the level of interfering with that person's work performance.

"Neither do I believe that [Harris] was subjectively so offended that she suffered injury.... Although Hardy may at times have genuinely offended [Harris], I do not believe that he created a working environment so poisoned as to be intimidating or abusive to [Harris]." *Id.,* at A-34 to A-35.

In focusing on the employee's psychological well-being, the District Court was following Circuit precedent. See *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620 (CA6 1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). The United States Court of Appeals for the Sixth Circuit affirmed in a brief unpublished decision, 976 F.2d 733. (1992)

We granted certiorari, 507 U.S. 959, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993), to resolve a conflict among the Circuits on whether conduct, to be actionable as "abusive work environment" harassment

(no *quid pro quo* harassment issue is present here), must "seriously affect [an employee's] psychological well-being" or lead the plaintiff to "suffe[r] injury." Compare *Rabidue* (requiring serious effect on psychological well-being); *Vance v. Southern Bell Telephone & Telegraph Co.,* 863 F.2d 1503, 1510 (CA11 1989) (same); and *Downes v. FAA,* 775 F.2d 288, 292 (CA Fed.1985) (same), with *Ellison v. Brady,* 924 F.2d 872, 877-878 (CA9 1991) (rejecting such a requirement).

## *21 II

[1][2] Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As we made clear in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. *Id.,* at 64, 106 S.Ct., at 2404, quoting *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978) (some internal quotation marks omitted). When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," 477 U.S., at 65, 106 S.Ct., at 2405, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,"*id.,* at 67, 106 S.Ct., at 2405 (internal brackets and quotation marks omitted), Title VII is violated.

[3] This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                                                                    Page 6
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

duct to cause a tangible psychological injury. As we pointed out in *Meritor,* "mere utterance of an ... epithet which engenders offensive feelings in an employee,"*ibid.*(internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the *22 conditions of the victim's employment, and there is no Title VII violation.

[4][5] But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work **371 environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in *Meritor,* and the reference in that case to environments " 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers,' "*id.,* at 66, 106 S.Ct., at 2405, quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (CA5 1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

[6] We therefore believe the District Court erred in relying on whether the conduct "seriously affect[ed] plaintiff's psychological well-being" or led her to "suffe[r] injury." Such an inquiry may needlessly focus the factfinder's attention on concrete

psychological harm, an element Title VII does not require. Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, *Meritor, supra,* 477 U.S., at 67, 106 S.Ct., at 2405, there is no need for it also to be psychologically injurious.

[7] This is not, and by its nature cannot be, a mathematically precise test. We need not answer today all the potential *23 questions it raises, nor specifically address the Equal Employment Opportunity Commission's new regulations on this subject, see 58 Fed.Reg. 51266 (1993) (proposed 29 CFR §§ 1609.1, 1609.2); see also 29 CFR § 1604.11 (1993). But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

### III

[8] Forklift, while conceding that a requirement that the conduct seriously affect psychological well-being is unfounded, argues that the District Court nonetheless correctly applied the *Meritor* standard. We disagree. Though the District Court did conclude that the work environment was not "intimidating or abusive to [Harris]," App. to Pet. for Cert. A-35, it did so only after finding that the conduct was not "so severe as to be expected to seriously affect plaintiff's psychological well-being,"*id.,* at A-34, and that Harris was not "subjectively so offended that she suffered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                                     Page 7
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62 USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

*ibid.* The District Court's application of these incorrect standards may well have influenced its ultimate conclusion, especially given that the court found this to be a "close case," *id.,* at A-31.

We therefore reverse the judgment of the Court of Appeals, and remand the case for further proceedings consistent with this opinion.

*So ordered.*
*24 Justice SCALIA, concurring.

*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), held that Title VII prohibits sexual harassment that takes the form of a hostile work environment. The Court stated that sexual harassment is actionable if it is "sufficiently **372 severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.,* at 67, 106 S.Ct., at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (CA11 1982)). Today's opinion elaborates that the challenged conduct must be severe or pervasive enough "to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive." *Ante,* at 370.

"Abusive" (or "hostile," which in this context I take to mean the same thing) does not seem to me a very clear standard-and I do not think clarity is at all increased by adding the adverb "objectively" or by appealing to a "reasonable person['s]" notion of what the vague word means. Today's opinion does list a number of factors that contribute to abusiveness, see *ante,* at 371, but since it neither says how much of each is necessary (an impossible task) nor identifies any single factor as determinative, it thereby adds little certitude. As a practical matter, today's holding lets virtually unguided juries decide whether sex-related conduct engaged in (or permitted by) an employer is egregious enough to warrant an award of damages. One might say that what constitutes "negligence" (a traditional jury question) is not much more clear and certain than what constitutes "abusiveness." Perhaps so. But the class of plaintiffs seeking to recover for negligence is lim-

ited to those who have suffered harm, whereas under this statute "abusiveness" is to be the test of whether legal harm has been suffered, opening more expansive vistas of litigation.

Be that as it may, I know of no alternative to the course the Court today has taken. One of the factors mentioned in the Court's nonexhaustive list-whether the conduct unreasonably*25 interferes with an employee's work performance-would, if it were made an absolute test, provide greater guidance to juries and employers. But I see no basis for such a limitation in the language of the statute. Accepting *Meritor*'s interpretation of the term "conditions of employment" as the law, the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered. I know of no test more faithful to the inherently vague statutory language than the one the Court today adopts. For these reasons, I join the opinion of the Court.

Justice GINSBURG, concurring.

Today the Court reaffirms the holding of *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986): "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. See 42 U.S.C. § 2000e-2(a)(1) (declaring that it is unlawful to discriminate with respect to, *inter alia,* "terms" or "conditions" of employment). As the Equal Employment Opportunity Commission emphasized, see Brief for United States and Equal Employment Opportunity Commission as *Amici Curiae* 9-14, the adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance. To show such interference, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment." *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (CA6 1988). It suffices to prove that a reasonable person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 S.Ct. 367                                                                         Page 8
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62
USLW 4004
**(Cite as: 510 U.S. 17, 114 S.Ct. 367)**

subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "ma[k]e it more difficult to do the job." See *ibid. Davis* concerned race-based discrimination, but that difference*26 does not alter the analysis; except in the rare case in which a bona fide occupational qualification is shown, see **373*Automobile Workers v. Johnson Controls, Inc.,* 499 U.S. 187, 200-207, 111 S.Ct. 1196, 1204-1208, 113 L.Ed.2d 158 (1991) (construing 42 U.S.C. § 2000e-2(e)(1)), Title VII declares discriminatory practices based on race, gender, religion, or national origin equally unlawful.[FN*]

> FN* Indeed, even under the Court's equal protection jurisprudence, which requires "an exceedingly persuasive justification" for a gender-based classification, *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981) (internal quotation marks omitted), it remains an open question whether "classifications based upon gender are inherently suspect." See *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090, and n. 9 (1982).

The Court's opinion, which I join, seems to me in harmony with the view expressed in this concurring statement.

U.S.,1993.
Harris v. Forklift Systems, Inc.
510 U.S. 17, 114 S.Ct. 367, 63 Fair Empl.Prac.Cas. (BNA) 225, 62 Empl. Prac. Dec. P 42,623, 126 L.Ed.2d 295, 62 USLW 4004

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

204 F.Supp.2d 1334
204 F.Supp.2d 1334
**(Cite as: 204 F.Supp.2d 1334)**

**C**

Willets v. Interstate Hotels, LLC
M.D.Fla.,2002.

United States District Court,M.D. Florida,
Jacksonville Division.
Jason K. WILLETS, Plaintiff,
v.
INTERSTATE HOTELS, LLC, a foreign limited li-
ability corporation d/b/a Sawgrass Marriott Resort,
Defendant.
**No. 3:01CV206-J-20TEM.**

May 6, 2002.

Male employee brought Title VII action against
employer alleging sexual harassment by male
coworker. Employer moved for summary judgment.
The District Court, Schlesinger, J., held that incid-
ents were not sufficiently frequent or severe to cre-
ate hostile work environment under Title VII.

Granted.

West Headnotes

**Civil Rights 78 ☞1187**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1187 k. Same-Sex Harassment. Most
Cited Cases
    (Formerly 78k167)
Allegations by male employee that over seven-year
period male coworker hugged him in a sexualized
manner about 20 times, rubbed his head and
shoulders, frequently indicated that he loved him,
kissed him on the neck once, grabbed his buttocks
once, and placed his hand on inside of employee's
thigh near his crotch were not sufficiently frequent
or severe to create hostile work environment under
Title VII, absent evidence that incidents interfered
with employee's job duties. Civil Rights Act of

1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

***1335** Archibald J. Thomas, III,Philip Daniel Willi-
ams, Archibald J. Thomas, III, P.A., Jacksonville,
FL, for Jason K. Willets, plaintiff.
John R. Hunt, Stokes & Murphy, Atlanta, GA,
Richard N. Margulies, Akerman, Senterfitt & Edis-
on, Jacksonville, FL, Christopher Terrell, Stokes &
Murphy, Atlanta, GA, for Interstate Hotels, L.L.C.,
a foreign limited liability corporation, defendant.

*ORDER*

SCHLESINGER, District Judge.
This cause is before the Court on Defendant's Mo-
tion for Summary Judgment (Doc. No. 15, filed
February 1, 2002) and Plaintiff's Response (Doc.
No. 23, filed February 19, 2002). Plaintiff's
Amended Complaint (Doc. No. 13, filed November
23, 2002) asserts a claim of sexual harassment un-
der Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e, *et seq.,* and state law claims of in-
vasion of privacy, assault, battery, and negligent su-
pervision or retention. Plaintiff alleges that while
employed as a dining room attendant, and later a
server, at the Café on the Green in the Sawgrass
Mariott Resort ("Mariott"), he was sexually har-
assed by Duane Parsons, another dining room at-
tendant. Parsons, who is deaf-mute and must some-
times resort to gesturing or touching to communic-
ate, allegedly harassed Plaintiff over a course of
several years. Although Plaintiff alleges that he
began reporting the harassment as early as 1995, he
claims that his employer failed to take adequate
steps to control Parsons until August 2000, when
Plaintiff filed a complaint with Mariott's human re-
sources department on August 10, 2000. Following
an investigation, Parsons was suspended on August
11, 2000, and ultimately terminated for violating
Mariott's sexual harassment policy.

**Standard of Review**

Summary judgment is appropriate "if the pleadings,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

204 F.Supp.2d 1334
204 F.Supp.2d 1334
(Cite as: 204 F.Supp.2d 1334)

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*1336 In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, *Key West Harbour v. City of Key West,* 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256, 257 (11th Cir.1989).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir.1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgment motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S.Ct. 2505.

**Analysis**

The Supreme Court has recognized that a plaintiff may bring a Title VII claim based on "same sex" sexual harassment. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, the fact that Plaintiff alleges that he was harassed by another man does not necessary preclude his Title VII claim. Nevertheless, as with other forms of unlawful harassment, in order to prevail under Title VII Plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on his membership in a protected class; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (citing *Henson v. City of Dundee,* 682 F.2d 897, 903-05 (11th Cir.1982)).

As reflected in the fourth of these elements, not all harassment is actionable. For example, offhand comments and isolated incidents will not amount to discriminatory changes in the "terms and conditions" of employment and therefore do not amount to harassment under Title VII. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971). In weighing the severity of the harassment, four important factors to consider are: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Mendoza,* 195 F.3d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1246. Moreover, the Supreme Court has emphasized that: "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (quoting *1337Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Plaintiff alleges that Parsons continuously harassed him from 1993 up until Parsons' termination in August 2000. Viewing the facts in the light most favorable to Plaintiff, the harassment consisted of Parsons' hugging Plaintiff in a sexualized manner, rubbing Plaintiff's head and shoulders, frequently indicating that he loved Plaintiff, once kissing Plaintiff on the neck, once grabbing Plaintiff's buttocks, and once placing his hand on the inside of Plaintiff's thigh near his crotch. In his deposition, Plaintiff guessed that Parsons tried to hug him "around 20 [times]" from 1993 to 2000. Even when considered collectively, these incidents are not frequent or severe enough to constitute actionable harassment. Although the record supports that Parsons may have been extremely irritating to Plaintiff and other Mariott employees, there is no indication that Plaintiff ever felt physically threatened by Parsons, and there is little indication in the record that these incidents unreasonably interfered with Plaintiff's job responsibilities.

Moreover, Parsons was often forced to rely on touch as a consequence of his disability. Although this did not give Parsons license to sexually harass coworkers, the Court must consider this fact in weighing the severity of the harassment. Given this context as well as all other relevant circumstances, the Court finds that Plaintiff cannot demonstrate the level of pervasiveness necessary to sustain a cause of action for sexual harassment under Title VII. *See Mendoza,* 195 F.3d at 1246-47 (cataloguing cases from other circuits holding that alleged incidents of

harassment were insufficient to be actionable under Title VII).

The Court also questions whether the alleged harassment occurred because of sex. *See id.* at 1248 n. 5 ("To establish that the harm alleged was 'based on her sex,' [plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.' " (quoting *Henson,* 682 F.2d at 904)). For example, at least one of Parsons' coworkers indicated that Parsons hugged both men and women. Plaintiff seems to acknowledge as much, though he claims that Parsons affections were overwhelmingly directed toward men. Because the Court has concluded that the incidents involving Parsons were not sufficiently severe to constitute unlawful harassment, it is unnecessary to determine whether the alleged harassment was necessarily "because of" Plaintiff's sex. The Court also declines to consider Defendant's alternative argument that Plaintiff unreasonably failed to put his employer on notice of the harassment.

**Conclusion**

Plaintiff has failed to sustain his burden in showing actionable harassment. Therefore it is **ORDERED** that:

1) Defendant's Motion for Summary Judgment (Doc. No. 15, filed February 1, 2002) is **GRANTED,** insofar as Count I of Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE;**

2) Counts II, III, IV, and V of Plaintiff's Amended Complaint, raising claims under state law, are **DISMISSED WITHOUT PREJUDICE.** *See*28 U.S.C. § 1367(c)(3).

3) The clerk shall close the file.

M.D.Fla.,2002.
Willets v. Interstate Hotels, LLC
204 F.Supp.2d 1334

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



168 F.3d 871

Page 1

168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
**(Cite as: 168 F.3d 871)**

▷

Shepherd v. Comptroller of Public Accounts of
State of Tex.
C.A.5 (Tex.),1999.

United States Court of Appeals,Fifth Circuit.
Debra Jean SHEPHERD, Plaintiff-Appellant,
v.
The COMPTROLLER OF PUBLIC ACCOUNTS
OF the STATE OF TEXAS, Defendant-Appellee.
No. 98-20171.

March 16, 1999.

State employee sued her employer for sexually hos-
tile work environment in violation of Title VII of
the Civil Rights Act of 1964. The United States
District Court for the Southern District of Texas,
Lynn N. Hughes, J., granted summary judgment in
favor of employer. Employee appealed. The Court
of Appeals, Emilio M. Garza, Circuit Judge, held
that co-worker's sexual harassment did not render
employee's work environment objectively hostile or
abusive.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
A plaintiff may establish a violation of Title VII by
proving that discrimination based on sex has cre-
ated a hostile or abusive working environment.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[2] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
There are five elements necessary to set forth a
sexually hostile work environment claim under
Title VII: (1) that the employee belongs to a protec-
ted class, (2) that the employee was subject to un-
welcome sexual harassment, (3) that the harassment
was based on sex, (4) that the harassment affected a
term, condition or privilege of employment, and (5)
that the employer knew or should have known of
the harassment and failed to take prompt remedial
action. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[3] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews a district court's grant of
summary judgment de novo, applying the same
standard   as   the   district   court.   Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[4] Federal Courts 170B ☞759.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk759 Theory and Grounds of De-
cision of Lower Court
                    170Bk759.1 k. In General. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

168 F.3d 871                                                                 Page 2
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
**(Cite as: 168 F.3d 871)**

Cited Cases

Court of Appeals may affirm a grant of summary judgment on any ground raised to the district court and upon which both parties had the opportunity to present evidence. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[5] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

Male co-worker's sexual harassment of female employee, which included incidents of unwanted touching on employee's arm, attempting to look down employee's clothing and making offensive remarks, did not render employee's work environment objectively hostile or abusive, as was necessary to support hostile work environment sexual harassment claim under Title VII, though incidents occurred intermittently for over a year. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

The mere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment, so as to create sexually hostile work environment in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

Whether a work environment is hostile or abusive, for purposes of Title VII claim for hostile work environment sexual harassment, is determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

To be actionable in Title VII claim for sexually hostile work environment, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited

168 F.3d 871                                                          Page 3
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
**(Cite as: 168 F.3d 871)**

Cases
    (Formerly 78k145)
Title VII was only meant to bar conduct that is so
severe and pervasive that it destroys a protected
classmember's opportunity to succeed in the work-
place. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**\*872** Peter D. Costea, Houston, TX, for Plaintiff-
Appellant.
Jonathan   Brian   Morgan,   Michael   Winget-
Hernandez, Austin, TX, for Defendant-Appellee.

Appeal from the United States District Court for the
Southern District of Texas.

Before JONES, SMITH and EMILIO M. GARZA,
Circuit Judges.

EMILIO M. GARZA, Circuit Judge:
Debra Jean Shepherd ("Shepherd") brought this ac-
tion against her employer, the Comptroller of Pub-
lic Accounts of the State of Texas ("Comptroller"),
alleging a sexually hostile working environment in
violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e*et seq.* Shepherd appeals
the district court's grant of the Comptroller's Mo-
tion for Summary Judgment. We affirm.

I

Shepherd is employed by the Comptroller as a Tax
Payer Service Person. Shepherd met co-worker Jod-
ie Moore when he transferred into her office from a
different agency. Shepherd became engaged to
Moore's brother-in-law, Darrell Gilmore, and Shep-
herd claimed in her deposition that Moore began to
sexually harass her thereafter. According to Shep-
herd's deposition, on one occasion Moore stood in
front of Shepherd's desk and remarked "your el-
bows are the same color as your nipples." Shepherd
testified that Moore remarked once "you have big
thighs" while he simulated looking under her dress.
Shepherd claimed Moore stood over her desk on
several occasions and attempted to look down her
clothing. According to Shepherd, Moore touched

her arm on several occasions, rubbing one of his
hands from her shoulder down to her wrist while
standing beside her. Shepherd alleged additionally
that on two occasions, when Shepherd looked for a
seat after coming in late to an office meeting,
Moore patted his lap and remarked "here's your
seat." Shepherd testified that Moore never proposi-
tioned her, asked her out on a date, or suggested
that he would like to sleep with her. The touching
stopped when Moore was reassigned to a different
agency. Shepherd affirmed that, apart from the
above instances, she engaged in friendly discus-
sions with Moore on almost a daily basis and had a
friendly relation with him at work and outside of
work.

The conduct about which Shepherd complains al-
legedly took place for almost two years. The Comp-
troller had a sexual harassment**\*873** policy in place
that urged employees to report sexual harassment to
their supervisors or to the Employee Assistance Li-
aison. After a year, Shepherd complained to her su-
pervisor that Moore harassed her, although she did
not mention the sexual nature of the harassment.
Shepherd raised complaints about the sexual nature
of the harassment immediately after receiving an
unfavorable evaluation of her work product, and
she blamed Moore for her poor performance. The
Comptroller performed an investigation, and Moore
denied the conduct. The investigation led to the
transfer of Moore to a different location. Shepherd
continues to work for the Comptroller.

Shepherd filed a charge of discrimination with the
Equal   Employment   Opportunity   Commission
("EEOC"), alleging that discrimination based on
sex created a hostile work environment in violation
of Title VII. The EEOC issued Shepherd a right-
to-sue letter, and Shepherd filed suit in state court.
After the Comptroller removed to federal district
court, the Comptroller moved for summary judg-
ment, arguing that the facts did not rise to the level
of actionable hostile work environment, and altern-
atively, that the Comptroller took prompt, effective
remedial action once it learned of Shepherd's alleg-

168 F.3d 871                                                                                                    Page 4
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
(Cite as: 168 F.3d 871)

ations. The district court entered a final judgment against Shepherd from which she has timely appealed.

## II

[1][2] Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). There are five elements necessary to set forth a hostile environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Jones v. Flagship Int'l,* 793 F.2d 714, 719-20 (5th Cir.1986); *see also Sharp v. City of Houston,* 164 F.3d 923, 929 (5th Cir.1999) (stating that the fifth element remains undisturbed).

[3][4] Shepherd contends that the district court erred in granting summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). In its motion for summary judgment, the Comptroller argued that there is no genuine issue of material fact regarding two elements of Shepherd's claim. The Comptroller argued that the harassment did not affect a "term, condition, or privilege" of employment, and that it

took prompt, effective remedial action once it learned of Shepherd's allegations. On appeal, Shepherd challenges each of the arguments advanced by the Comptroller in favor of summary judgment.[FN1] We review a district court's grant of summary judgment *de novo,* applying the same standard as the district court. *See Duffy v. Leading Edge Prods., Inc.,* 44 F.3d 308, 312 (5th Cir.1995).

> FN1. We may affirm a grant of summary judgment on any ground raised to the district court and upon which both parties had the opportunity to present evidence. *See Brown v. CSC Logic, Inc.,* 82 F.3d 651, 653-54 (5th Cir.1996). We are uncertain of the district court's reasons for the judgment against Shepherd because the district court did not issue an opinion. Although district court judges are not required to specify a reason for a grant of summary judgment, we urge them to do so in order to allow the parties to focus their arguments on appeal. *See Erco Indus. Ltd. v. Seaboard Coast Line R.R. Co.,* 644 F.2d 424, 434 (5th Cir.1981) ( "the parties are entitled to know the reasons upon which the summary judgment was based in order to facilitate appellate review").

**\*874** [5][6][7][8] We turn to whether Shepherd has raised a genuine issue that Moore's harassment affected a "term, condition, or privilege" of her employment. The Supreme Court explained in *Meritor* that, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " 477 U.S. at 67, 106 S.Ct. at 2403 (citation omitted). Not all harassment will affect a term, condition, or privilege of employment. *See id.* The " 'mere utterance of an ... epithet which engenders offensive feelings in a employee' does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

168 F.3d 871                                                                                           Page 5
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
(Cite as: 168 F.3d 871)

at 2405). "A recurring point in [Supreme Court] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citation omitted). Whether an environment is "hostile" or "abusive" is determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. at 371. To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. *See id.* at 21-22, 114 S.Ct. at 370.

Whether Moore's comments and actions rendered Shepherd's working environment objectively "hostile" or "abusive" must be considered in light of the totality of the circumstances. Shepherd alleges that Moore's harassing actions spanned a period of time over a year. Even if the conduct occurred with some regularity over this time period, we must also consider the other factors that contribute to whether an environment is hostile. We agree with Shepherd that the comments made by Moore were boorish and offensive. The comments, however, were not severe. We find each comment made by Moore to be the equivalent of a mere utterance of an epithet that engender offensive feelings. *See id.* at 21, 114 S.Ct. at 370. In *Adusumilli v. City of Chicago,* the Seventh Circuit considered averments of conduct similar to Moore's, including several incidents that involved staring and unwanted touching between the elbow and shoulder. *See Adusumilli,* 164 F.3d 353, 357 (7th Cir.1998). The court noted that "the most salient feature of the harassment is its lack of severity." *Id.* at 361.The court concluded that the conduct was too tepid to amount to actionable harassment. *See id.* at 362. We find

similarly that Moore's stares and the incidents in which he touched Shepherd's arm, although they occurred intermittently for a period of time, were not severe. None of Moore's actions physically threatened Shepherd. Nor would Moore's conduct interfere unreasonably with a reasonable person's work performance. Furthermore, Moore's actions did not undermine Shepherd's workplace competence. *See Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 269 (5th Cir.1998) (considering, in addition to the other factors, that "[a] plaintiff ... must show that implicit or explicit in the sexual content is the message that the plaintiff is incompetent because of her sex").

[9] "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996), *cert. denied,*519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997). Moore's harassing actions, although offensive, are not the type of extreme conduct that would prevent Shepherd from succeeding in the workplace. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998) ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."). We find, based on a consideration of all of the circumstances, that Moore's conduct did not render Shepherd's work environment objectively "hostile" or "abusive."

Shepherd's claim involves far less objectionable circumstances than those for which **\*875** courts afford relief. Moore's comments were not as frequent or as serious as comments that we have found to alter the work environment. *See Farpella-Crosby v. Horizon Health Care.* 97 F.3d 803, 806 (5th Cir.1996) (finding that frequent egregious comments about sexual proclivity created hostile environment); *cf. Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996) (finding single joke involving condoms insufficient to create hostile environment). The touching of Shepherd's shoulder is not the type of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

168 F.3d 871                                                                 Page 6
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801
**(Cite as: 168 F.3d 871)**

severe conduct that courts have found to create a hostile environment. *See, e.g., Waltman v. International Paper Co.,* 875 F.2d 468, 478 (5th Cir.1989) (concluding hostile environment existed where female employee sexually groped repeatedly); *Hall v. Gus Const. Co.,* 842 F.2d 1010, 1012 (8th Cir.1988) (finding hostile environment where male coworkers cornered women and rubbed their thighs, grabbed their breasts, and held a woman so that a man could touch her). There is no evidence of an atmosphere of sexual inequality at the Comptroller's office. *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 596 (5th Cir.1995) (considering this factor when comparing cases). The Comptroller has a sexual harassment policy in place and educates new employees about the policy. Furthermore, Shepherd does not allege that supervisors or coworkers other than Moore engaged in the harassment. *See id.*(same). The comparison to other cases bolsters our conclusion that, based on the totality of the circumstances, Shepherd has not demonstrated a genuine issue that the harassment created a "hostile" or "abusive" working environment.

Viewing the harassment in light of existing caselaw, we hold that Shepherd has not raised a genuine issue that the harassment affected a "term, condition, or privilege" of employment. Thus, we do not reach the question of whether the Comptroller knew or should have known of the harassment and failed to take prompt remedial action. We AFFIRM the grant of summary judgment by the district court.

C.A.5 (Tex.),1999.
Shepherd v. Comptroller of Public Accounts of State of Texas
168 F.3d 871, 79 Fair Empl.Prac.Cas. (BNA) 508, 75 Empl. Prac. Dec. P 45,801

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Westlaw.

159 F.3d 759                                                                    Page 1
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

▷

Quinn v. Green Tree Credit Corp.
C.A.2 (N.Y.),1998.

United States Court of Appeals,Second Circuit.
Stephanie J. QUINN, Plaintiff-Appellant,
v.
GREEN TREE CREDIT CORPORATION, Defendant-Appellee.
**Docket No. 97-9045.**

Submitted June 5, 1998.
Decided Nov. 5, 1998.

Former employee brought action under Title VII and New York law alleging that former employer discriminated against her on the basis of sex and terminated her in retaliation for making sexual harassment complaints. The United States District Court for the Northern District of New York, Gustave J. DiBianco, United States Magistrate Judge, entered summary judgment in favor of former employer. Former employee appealed. The Court of Appeals, José A. Cabranes, Circuit Judge, held that: (1) continuing violation exception did not apply so as to extend limitations period; (2) employer was not liable for alleged sexual harassment by coworkers and customers; (3) supervisor's alleged actions were not sufficiently severe to create hostile work environment; (4) employee established prima facie case of retaliation; and (5) fact issues existed as to whether employer's proffered reason for terminating employee was pretextual.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Federal Courts 170B ☜═770776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most

Cited Cases
Court of Appeals reviews de novo a grant of summary judgment, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☜═772470**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to
Judgment
            170Ak2470 k. Absence of Genuine
Issue of Fact in General. Most Cited Cases

**Federal Civil Procedure 170A ☜═772470.4**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to
Judgment
            170Ak2470.4 k. Right to Judgment
as Matter of Law. Most Cited Cases
Motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no issue warrant judgment for the moving party as a matter of law. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Civil Rights 78 ☜═771744**

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment Practices. Most
Cited Cases
   (Formerly 78k453, 78k141)
New York courts require the same standard of proof for claims brought under Human Rights Law as for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                                Page 2
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

those brought under Title VII. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

**[4] Civil Rights 78 ⚭1744**

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment Practices. Most Cited Cases
   (Formerly 78k453, 78k145)
Cause of action exists under Title VII when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⚭1505(4)**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1503 Administrative Agencies and Proceedings
         78k1505 Time for Proceedings; Limitations
            78k1505(4) k. Effect; Excuses in General. Most Cited Cases
   (Formerly 78k342)
Title VII's requirement, that employee file a discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 180 days of alleged unlawful employment action or, if employee has already filed charge with state or local equal employment agency, within 300 days of alleged act of discrimination, functions as a statute of limitations, in that discriminatory incidents not timely charged will be time-barred upon the employee's suit in district court. Civil Rights Act of 1964, § 706(d)(1), as amended, 42 U.S.C.A. § 2000e-5(e)(1).

**[6] Civil Rights 78 ⚭1505(7)**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1503 Administrative Agencies and Proceedings
         78k1505 Time for Proceedings; Limitations
            78k1505(7) k. Continuing Violations; Serial, Ongoing, or Related Acts. Most Cited Cases
   (Formerly 78k342)
Continuing-violation exception to Title VII's requirement that administrative charge be timely filed extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the requirement. Civil Rights Act of 1964, § 706(d)(1), as amended, 42 U.S.C.A. § 2000e-5(e)(1).

**[7] Civil Rights 78 ⚭1505(7)**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1503 Administrative Agencies and Proceedings
         78k1505 Time for Proceedings; Limitations
            78k1505(7) k. Continuing Violations; Serial, Ongoing, or Related Acts. Most Cited Cases
   (Formerly 78k342)
Continuing violation may be found, so as to extend limitations period for Title VII action, where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice. Civil Rights Act of 1964, § 706(d)(1), as amended, 42 U.S.C.A. § 2000e-5(e)(1).

**[8] Civil Rights 78 ⚭1505(7)**

78 Civil Rights

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                                              Page 3
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

78IV Remedies Under Federal Employment Discrimination Statutes
          78k1503 Administrative Agencies and Proceedings
                78k1505 Time for Proceedings; Limitations
                      78k1505(7) k. Continuing Violations; Serial, Ongoing, or Related Acts. Most Cited Cases
          (Formerly 78k342)
Alleged incidents occurring prior to limitations period applicable to Title VII action, consisting of several incidents in 1985, two incidents in 1988 in which manager allegedly commented on employee's body and propositioned her, a 1989 incident in which co-worker allegedly directed sexual advances at her, and 1990 alleged comment by regional manager that employee's dress was too large, were not sufficiently continuous in time with one another or with timely acts alleged by employee to extend limitations period under continuing violation exception. Civil Rights Act of 1964, § 706(d)(1), as amended, 42 U.S.C.A. § 2000e-5(e)(1).

**[9] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
              78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
          (Formerly 78k167)
When a co-employee, as distinct from a supervisor, is alleged to have engaged in sexually harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
              78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
          (Formerly 78k167)
Any duty that employers owe to employees who are subjected to sexual harassment by outsiders such as customers can be no greater than that owed with respect to co-worker harassment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 29 C.F.R. § 1604.11(d, e).

**[11] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
              78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
          (Formerly 78k167)
Employer was not liable under Title VII for alleged sexual harassment of employee by coworkers and customers, absent showing that employer failed to provide a reasonable complaint procedure or knew of the alleged harassment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
              78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
          (Formerly 78k167)

**Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
              78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                                    Page 4
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

(Formerly 78k167)

Although employer is presumptively liable for all acts of harassment perpetrated by employee's supervisor, employer will avoid liability if it can plead and prove, as affirmative defense, that: (1) employer exercised reasonable care to prevent and promptly correct any sexual harassment by such supervisor, and (2) employee unreasonably failed to avail herself or himself of any corrective or preventative opportunities provided by employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ⊂⟶1190**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1190 k. Other Particular Cases. Most Cited Cases
    (Formerly 78k167)

**Civil Rights 78 ⊂⟶1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
    (Formerly 78k167)

Although Court of Appeals would first decide which alleged incidents of sexual harassment by supervisors could be attributed to employer and only then would consider whether such conduct rose to the level of actionable Title VII harassment, Court was not required to proceed in such order. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 ⊂⟶1147**

78 Civil Rights
    78II Employment Practices

78k1143 Harassment; Work Environment
    78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
(Formerly 78k145)

Whether an environment is hostile or abusive for purposes of Title VII depends on the totality of circumstances. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 ⊂⟶1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

In determining whether environment is hostile or abusive for purposes of Title VII, courts must consider a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[16] Civil Rights 78 ⊂⟶1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under Title VII; to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                         Page 5
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
(Cite as: 159 F.3d 759)

**[17] Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)
Where conduct is sufficiently severe, it may alter employee's conditions of employment, so as to create hostile environment in violation of Title VII, even if it is not repeated. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[18] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and creates an abusive work environment for purposes of Title VII. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[19] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Supervisor's alleged actions of telling employee that she had been voted the "sleekest ass" in the office and deliberately touching her breasts with papers that he was holding in his hand were not suffi-

ciently severe to create hostile work environment in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[20] Civil Rights 78 ☞1541**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1541 k. Retaliation Claims. Most Cited Cases
    (Formerly 255k40(1) Master and Servant)
Retaliation claims under Title VII are tested under a three-step burden shifting analysis under which, first, employee must make out prima facie case of retaliation, second, employer then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action, and, third, if employer meets its burden, employee must adduce evidence sufficient to raise a fact issue as to whether employer's reason was merely a pretext for retaliation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[21] Civil Rights 78 ☞1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
To establish a prima facie case of retaliation under Title VII, employee must show: (1) participation in a protected activity known to the employer; (2) employment action disadvantaging employee; and (3) causal connection between the protected activity and the adverse employment action. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[22] Civil Rights 78 ☞1244**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                    Page 6
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1244 k. Activities Protected. Most
Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
To prove that filing of discrimination complaint
with administrative agency was protected activity,
for purposes of prima facie case of retaliation under
Title VII, employee need not establish that he or
she successfully described in that complaint con-
duct amounting to violation of Title VII; rather,
employee need only demonstrate that he or she had
good faith, reasonable belief that underlying chal-
lenged actions of employer violated the law. Civil
Rights Act of 1964, § 704(a), as amended, 42
U.S.C.A. § 2000e-3(a).

**[23] Civil Rights 78 ☞1244**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1244 k. Activities Protected. Most
Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
It is possible for employee to reasonably believe
that conduct specified in administrative charge
amounts to sexual harassment, such that charge
amounts to protected activity for purposes of prima
facie case of retaliation under Title VII, even when
that conduct would not actually qualify as harass-
ment under the law. Civil Rights Act of 1964, §
704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[24] Civil Rights 78 ☞1244**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1244 k. Activities Protected. Most
Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
Employee's administrative sexual harassment
charge alleging various acts of harassment by su-
pervisors included evidence sufficient to sustain

good faith, reasonable belief that employer stood in
violation of the law, such that charge amounted to
protected activity for purposes of prima facie case
of retaliation, notwithstanding that employee failed
to adduce facts sufficient to establish employer's li-
ability under Title VII against sexual harassment. Civil
Rights Act of 1964, § 704(a), as amended, 42
U.S.C.A. § 2000e-3(a).

**[25] Civil Rights 78 ☞1252**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
Employee's sexual harassment complaints and her
termination were causally connected, as required
for prima facie case of retaliation under Title VII,
where her discharge came less than two months
after she filed complaint with management and just
ten days after she filed complaint with administrat-
ive agency. Civil Rights Act of 1964, § 704(a), as
amended, 42 U.S.C.A. § 2000e-3(a).

**[26] Civil Rights 78 ☞1553**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1553 k. Retaliation Claims. Most
Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
Employer fulfilled its burden in Title VII retaliation
action of articulating a legitimate, non-retaliatory
reason for terminating employee, and pointing to
evidence to support that proffered reason, where
employer stated that employee's performance was
poor, and supported such explanation with memor-
andum detailing complaints of rudeness, evaluation
reflecting a need to improve interpersonal skills,
and affidavit from client complaining about em-
ployee's attitude. Civil Rights Act of 1964, §
704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                Page 7
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

**[27] Federal Civil Procedure 170A** ☜══2497.1

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most
Cited Cases
Issues of material fact existed as to whether em-
ployer's proffered nondiscriminatory reason for ter-
minating employee, i.e., poor performance, was
pretext for retaliation for making sexual harassment
complaints, precluding summary judgment in Title
VII action. Civil Rights Act of 1964, § 701 et seq.,
as amended, 42 U.S.C.A. § 2000e et seq.;
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

*762 Stephanie J. Quinn, Scotia, NY, pro se.
Mark L. Dunn, Martin, Ganotis, Brown, Mould &
Currie, P.C., Dewitt, NY, for Appellee.

Before: OAKES, MESKILL, and CABRANES Cir-
cuit Judges.

JOSÉ A. CABRANES, Circuit Judge:
It sometimes happens-more frequently than might
be imagined-that an employee whose primary claim
of discrimination cannot survive pre-trial disposit-
ive motions is able to take to trial the secondary
claim that he or she was fired or adversely affected
in retaliation for asserting the primary claim. This
is such a case.

Stephanie J. Quinn appeals from the summary judg-
ment of the United States District Court for the
Northern District of New York (Gustave J. DiBi-
anco, *Magistrate Judge* ), entered in favor of de-
fendant Green Tree Credit Corporation ("Green
Tree" or the "Company"), Quinn's former employ-
er.[FN1] Because we find that Quinn has failed to ad-
duce facts sufficient to support a sex discrimination
claim for a hostile work environment, we affirm the
district court's grant of summary judgment for the
defendant as to that claim. However, we conclude

that Quinn has developed a factual record sufficient
to withstand summary judgment as to her claim for
retaliatory discharge. Accordingly, we vacate so
much of the district court's judgment as
disposed*763 of that claim, and we remand for fur-
ther proceedings.

> FN1. Pursuant to 28 U.S.C. § 636(c) and
> the consent of the parties, this matter was
> referred to the magistrate judge for all pro-
> ceedings, through entry of judgment.

## Background

Between October 1983 and January 1992, Quinn
worked at the Syracuse office of Green Tree, a
company based in St. Paul, Minnesota that makes
loans to mobile home dealers. Quinn was hired for
the position of "Loan Processor I," and, by Decem-
ber 1989, had been promoted to "Loan Processor
III." During the relevant years of Quinn's employ-
ment, her immediate supervisor was Paul Fahey, a
credit manager whose own superior was Charles
Harwood, the office's regional manager.

From 1984 until 1991, all but one of Green Tree's
annual evaluations of Quinn rated her performance
"satisfactory" (a three out of a possible five, with
five being the highest score) or better in each cat-
egory. The one exception was Quinn's last review,
dated November 29, 1991, which rated as "needs
improvement"                                Quinn's
"Communication/Interpersonal Skills" and com-
mented that she "must continue to develop a better
working relationship with her fellow employees."
Prior reports, by contrast, had noted that Quinn
"[h]as a good rapport with dealers and customers"
and "continues to demonstrate a good work atti-
tude." On her penultimate review (conducted in
November 1990), the report had concluded that,
"[t]hroughout all the changes we have been
through, she has continued to be an asset to the
company." Harwood recommended Quinn for a six
percent pay raise following the November 29, 1991
evaluation, and Quinn was given that raise.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                           Page 8
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
(Cite as: 159 F.3d 759)

In July and September 1991, Quinn had called the New York Division of Human Rights ("DHR") to inquire about possible discrimination occurring at Green Tree. Subsequently, in a letter bearing a receipt stamp of November 21, 1991, Quinn complained to Green Tree's main office of sexual harassment and a hostile work environment at the Syracuse office. Quinn's letter included allegations of sexual harassment perpetrated by Fahey and Harwood, and informed the Company that an identical complaint would be filed with the DHR on December 23, 1991.[FN2] Thereafter, on November 29, 1991, Quinn received her regular annual evaluation and the six percent pay raise. In December 1991, Green Tree responded by letter to Quinn's complaint. Based on an investigation in the Syracuse office conducted by Harwood, Green Tree's human resources director, located in St. Paul, wrote Quinn that there was no support for her allegations. Quinn responded by filing a charge on December 27, 1991 with the DHR, alleging sexual harassment and a hostile work environment.[FN3] Then, on January 6, 1992, Green Tree fired Quinn. In March 1992, Quinn filed a second charge with the DHR against Green Tree, alleging retaliatory discharge.

> FN2. Nothing in the record explains Quinn's identification of this particular date as the one on which she planned to file a formal charge with the DHR.

> FN3. Quinn's DHR charge summarizes the same basic allegations made in her initial complaint to Green Tree's main office.

Following the December 16, 1993 issuance of a "right to sue" letter by the Equal Employment Opportunity Commission ("EEOC"), Quinn promptly filed a complaint in the district court. As amended in August 1994, that complaint alleges that Green Tree (a) discriminated against her on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the New York Human Rights Law, N.Y. Exec. Law § 296; and (b) fired her in retaliation for her filing a sexual harassment complaint with the DHR, in violation of

42 U.S.C. § 2000e-3(a) and N.Y. Exec. Law § 296.

In her complaint and discovery responses, Quinn alleged that she was subjected to over thirty separate incidents of sexual harassment during her tenure at Green Tree. The perpetrators of this conduct allegedly included Fahey and Harwood (Quinn's supervisors), Quinn's co-workers, and Green Tree clients. The alleged conduct principally consisted of offensive comments, referring either to the speaker's own sexual prowess, to Quinn's body, or to Quinn's (and her husband's)*764 perceived sexual orientation. Other allegations included the display to Quinn of pornography, the pantomiming of sexual acts, and one instance of Fahey brushing against Quinn's breasts with papers he was carrying.

Following the completion of discovery, Green Tree moved for summary judgment. In support of its motion, Green Tree submitted, along with other documentary evidence, an affidavit subscribed by Harwood. Harwood denied "all ... allegations of harassment or unlawful employment practices." Harwood averred that Quinn had not informed him of any alleged sexual harassment prior to her November 1991 complaint to Green Tree's main office. In addition, Harwood cited complaints from Green Tree clients and other Green Tree employees regarding Quinn's poor "attitude" and "interpersonal skills." Green Tree contended that its decision to discharge Quinn had turned exclusively on these complaints. Quinn resisted summary judgment, submitting copies of her own discovery statements as well as documentary evidence relating principally to her past job evaluations.

In June 1997, the district court granted Green Tree's motion for summary judgment. In considering Quinn's harassment claim, the district court first ruled that all incidents alleged to have occurred prior to March 2, 1991 would be time-barred under the applicable three-hundred-day limitations period, see 42 U.S.C. § 2000e-5(e)(1),[FN4] and that, because Quinn had failed to demonstrate that the alleged conduct amounted to a "continuing violation," the limitations period could not be tolled.

159 F.3d 759                                                                     Page 9
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

Looking only at the acts alleged to have occurred within the limitations period, the district court held that the conduct described by Quinn failed to rise to the level of an actionable hostile work environment. In addition, the court ruled that none of the alleged conduct could be imputed to Green Tree.

> FN4. This section provides, in pertinent part, that a Title VII charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ..., *except* that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local [EEO] agency ..., such charge shall be filed by or on behalf of the person aggrieved *within three hundred days* after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) (emphasis added). The district court held that only acts alleged to have occurred within the 300 days preceding Quinn's December 27, 1991 charge filed with the DHR would be timely under this provision.

As to Quinn's retaliatory discharge claim, the district court, applying the burden-shifting rules of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[FN5] found that Quinn had adduced sufficient evidence to make out a *prima facie* case, and that Green Tree had responded by articulating a permissible reason for her discharge-namely, a desire to preserve Green Tree's good will with clients, who had complained about treatment they received from Quinn. The court determined that Quinn had thereafter failed to rebut Green Tree's response with any evidence of pretext, and accordingly dismissed Quinn's retaliatory discharge claim.

> FN5. We have summarized these burden-shifting rules, in the context of a defendant's motion for summary judgment directed at a plaintiff's retaliation claim, as follows:

> On a motion for summary judgment, (1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.

> *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998).

Judgment was entered on June 30, 1997, and Quinn's timely appeal followed.

### Discussion

[1][2][3] We review *de novo* a grant of summary judgment, *see Kracunas v. Iona College,* 119 F.3d 80, 86 (2d Cir.1997), construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); ***765****Maguire v. Citicorp Retail Services, Inc.,* 147 F.3d 232, 235 (2d Cir.1998). "A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no issue warrant judgment for the moving party as a matter of law." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). In addition, because New York courts require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII, *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995), we can analyze these claims in tandem.

I. Hostile Work Environment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                                    Page 10
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

[4] Title VII provides, in relevant part, that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted Title VII to reach, among other conduct, "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("hostile work environment" as sex discrimination). This form of harassment is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations and internal quotation marks omitted).

*A. Which Allegations Are Timely?*

[5] As a preliminary matter, we turn to the question of whether the district court correctly confined its consideration to those incidents alleged to have occurred within the limitations period, or instead whether the limitations period should have been extended due to the existence of a "continuing violation." Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged act of discrimination. *See* 42 U.S.C. § 2000e-5(e)(1), *quoted at* note 3, *supra; Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). This requirement functions as a statute of limitations, *see Van Zant,* 80 F.3d at 712, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court, *see Butts v. City of New York,* 990 F.2d 1397, 1401 (2d Cir.1993).

Because Quinn filed her sex-discrimination charge with the state agency-the DHR-on December 27,

1991, her Title VII cause of action would normally include any incidents alleged to have occurred in the preceding 300 day period; thus, any incidents alleged to have occurred prior to March 2, 1991, would be time-barred under Title VII.

In contrast to her Title VII claim, Quinn's cause of action under New York's Human Rights Law is governed by a three-year statute of limitations, measured from the filing of the action in court. *See* N.Y. CPLR § 214(2); *Van Zant,* 80 F.3d at 714. The instant action was filed on December 28, 1993, and thus, for purposes of the state-law cause of action, any incidents of discrimination alleged to have occurred prior to December 1990 would ordinarily be time-barred.

Quinn asserts that she was subjected to a "continuing violation," of such a character as to extend the limitations period. It is not clear whether she seeks to extend the period only for the Title VII claim, or for the state-law claim as well. In either case, we find her argument unpersuasive.

[6][7] The continuing-violation exception "extends the limitations period for all claims of discriminatory acts committed *under an ongoing policy of discrimination* even if those acts, standing alone, would have been barred by the statute of limitations." *Annis v. County of Westchester,* 136 F.3d 239, 246 (2d Cir.1998) (emphasis added; internal quotation marks, citation, and bracketing omitted). We have held that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) (citing *\*766Stoller v. Marsh,* 682 F.2d 971, 975 (D.C.Cir.1982)). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                    Page 11
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

[8] We conclude that the acts Quinn alleges to have occurred outside the limitations periods are not continuous in time with one another or with the timely acts that she has alleged; this discontinuity is fatal to Quinn's "continuing violation" argument. *See Annis,* 136 F.3d at 246 (discrimination allegedly suffered before and after a six-year gap "cannot be joined as a 'continuing violation' "); *Selan v. Kiley,* 969 F.2d 560, 566-67 (7th Cir.1992) (two-year gap between discriminatory events "negates the contention that the acts were continuous or connected"). Quinn alleges only the following incidents as occurring prior to December 1990: (1) several incidents occurring in 1985, (2) two incidents in March 1988, in which a Green Tree manager commented on Quinn's body and "propositioned" her, (3) a March 1989 incident in which a co-worker directed apparent sexual advances at Quinn, and (4) a February 1990 comment by Harwood to the effect that Quinn's dress was too large. All of these alleged acts are sufficiently isolated in time (usually from each other, and at least from the timely allegations) as to break the asserted continuum of discrimination.

## B. Which Conduct Can Be Attributed to Green Tree?

Having established the relevant time period (after March 2, 1991 for purposes of the Title VII claim; after December 28, 1990 for purposes of the state law claim), we must now consider which, if any, of the alleged acts are attributable to Green Tree. In this regard, we note that Quinn's complaints and discovery papers have included allegations of harassing conduct purportedly committed by co-workers, customers, and her supervisors. The district court ruled that, even accepting *arguendo* Quinn's factual allegations as true, Green Tree could not be held legally responsible for *any* of the alleged perpetrators' conduct. *See Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992) (plaintiff "must establish that the conduct which created the hostile environment should be imputed to the employer").

[9][10] When a "co-employee"-as distinct from a supervisor-is alleged to have engaged in harassing activity, the "employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." *Tomka,* 66 F.3d at 1305 (citation and internal quotation marks omitted). Though we need not decide the precise contours of the duty, if any, that employers owe to employees who are subjected to harassment by outsiders such as customers, such a duty can be no greater than that owed with respect to co-worker harassment. *Compare* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer *is* responsible for acts of sexual harassment in the workplace where the employer ... knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.") (emphasis added), *with id.* § 1604.11(e) ("An employer *may also be responsible* for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer ... knows or should have known of the conduct and fails to take immediate and appropriate corrective action. *In reviewing these cases the [EEOC] will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.*") (emphasis added). *Cf. Folkerson v. Circus Circus Enterprises, Inc.,* 107 F.3d 754, 756 (9th Cir.1997) (holding that "an employer may be held liable for sexual harassment on the part of a private individual, such as the casino patron, where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct").

[11] We agree with the district court that Quinn has failed to adduce evidence tending *767 to show that Green Tree either failed to provide a reasonable complaint procedure or that it knew of her harassment (either by co-workers or customers) and failed to take any action. Accordingly, we find that the court properly declined to consider allegations re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                Page 12
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

garding the conduct of Quinn's coworkers or of Green Tree's customers.

[12] In contrast to allegations of harassment by co-workers or customers, employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, ----, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), *Faragher v. City of Boca Raton,* 524 U.S. 775, ---- - ----, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998).FN6 However, the employer will avoid liability if it can plead and prove, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise. *See Burlington Industries,* 524 U.S. at ----, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at ---- - ----, 118 S.Ct. at 2292-93. Under these recent Supreme Court precedents, we presume that Green Tree is responsible for any harassment Fahey and Harwood may have perpetrated against Quinn, because both men acted as Quinn's supervisors.

> FN6. Prior to the Supreme Court's decisions in *Burlington Industries* and *Faragher,* the law of this Circuit held an employer liable for harassment perpetrated by a supervisor only if the plaintiff could prove one of the following:
>
> [1] the supervisor was at a sufficiently high level in the company, or [2] the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or [3] the employer provided no reasonable avenue for the complaint, or [4] the employer knew (or should have known) of the harassment but unreasonably failed to stop it.

*Gallagher,* 139 F.3d at 348.

Under the regime set forth by *Burlington Industries* and *Faragher,* Green Tree would be entitled to offer evidence in an effort to rebut this presumption, and perhaps to show that Fahey and Harwood's conduct should not be imputed to it. However, because *Burlington Industries* and *Faragher* were decided after the district court rendered its decision-and, indeed, after this appeal was briefed and argued-Green Tree has not endeavored to build a record in support of such an affirmative defense. Accordingly, we assume for purposes of reviewing this summary judgment that all of Fahey and Harwood's alleged harassing acts should be imputed to Green Tree.FN7

> FN7. If any remand of the harassment cause of action were in order, Green Tree would be entitled to offer evidence in support of the affirmative defense described in *Burlington Industries* and *Faragher.*

## C. Do the Surviving Allegations Amount to Actionable Harassment?

[13][14][15] The remaining question before us is whether Quinn has alleged cognizable acts-that is, acts said to have been perpetrated by Fahey or Harwood within the applicable limitations periods-that do, in fact, amount to actionable harassment.FN8 In other words, we must determine whether the alleged conduct amounts to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citations and internal quotation marks omitted). Whether an environment is "hostile" or "abusive" depends on the totality of circumstances. *Id.* at 23, 114 S.Ct. 367. Courts must consider a variety of factors including "the frequency of the discriminatory conduct;*768 its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

FN8. Although in this case, we first decide

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                    Page 13

159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617

**(Cite as: 159 F.3d 759)**

which alleged incidents can be attributed to the defendant and only then consider whether this conduct rises to the level of actionable Title VII harassment, we do not mean to suggest that these steps of the inquiry must proceed in this order. Indeed, other cases first determine whether the conduct at issue is actionable before considering whether liability can be attributed to the defendant, *see, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d. 55 (2d Cir.1998); we do not read such cases, however, to require that sequence either.

[16][17][18] As a general matter, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka,* 66 F.3d at 1305 n. 5 (citations omitted); *see Carrero v. New York City Housing Authority,* 890 F.2d 569, 577-78 (2d Cir.1989) (to be actionable, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition: *"[E]ven a single incident of sexual assault* sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Tomka,* 66 F.3d at 1305 (emphasis added; footnote and citations omitted).

[19] In a September 1994 response to interrogatories posed by Green Tree, at a time when she was represented by counsel, Quinn purported to state "each and every fact" upon which she bases her claim of sexual harassment. There she made only untimely allegations against Harwood. Quinn did, however, make two allegations against Fahey that appear to be timely: (1) that he told Quinn she had been voted the "sleekest ass" in the office and (2) that, on another occasion, he "deliberately touched [Quinn's] breasts with some papers that he was

holding in his hand."[FN9] Quinn's hostile work environment claim against the Company accordingly rests on these two alleged incidents.

> FN9. Quinn's November 1991 letter to Green Tree's main office did relate other instances of putatively harassing conduct allegedly perpetrated by Fahey and Harwood. However, the interrogatory responses-submitted nearly three years later, and at a time when Quinn was represented by counsel-purport to exhaustively catalog her allegations of harassment. As a result, we view these responses as abandoning all allegations that were (1) made previously and (2) not mentioned in the interrogatory responses. We have not been made aware of any attempt on Quinn's part to revive any such allegations.

Accepting as true all of Quinn's allegations that are both timely and attributable to the Company, as we are required to do in light of this case's posture on appeal, we conclude that Quinn has not adduced evidence sufficient to support a finding that she was subjected to abuse of sufficient severity or pervasiveness as to "alter the conditions of [her] employment,"*Harris,* 510 U.S. at 21, 114 S.Ct. 367. Though the two incidents in question-Fahey's comment, apparently regarding Quinn's posterior, and his use of papers held in his hand to touch her breasts-are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded Quinn's work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of Quinn's employment without regard to frequency or regularity.

## II. Retaliatory Discharge

[20] Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759                                                                Page 14
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

unlawful practice by this subchapter...." 42 U.S.C. § 2000e-3(a). Retaliation claims under Title VII are tested under a three-step burden shifting analysis. *See, e.g., Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka,* 66 F.3d at 1308. First, the plaintiff must make out a *prima facie* case of retaliation. *See Tomka,* 66 F.3d at 1308. Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. *See id.; see also Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1226 (2d Cir.1994) ("Once a plaintiff demonstrates a *prima facie* case of age discrimination, the defendant is obligated to produce evidence 'which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.' ") (quoting *769St. Mary's Honor Center v. Hicks,* 509 U.S. at 509, 113 S.Ct. 2742 (emphasis in original)).Third, if the defendant meets its burden, plaintiff must adduce evidence "sufficient to raise a fact issue as to whether [the employer]'s reason was merely a pretext" for retaliation. *See Tomka,* 66 F.3d at 1309.

*A. Prima Facie Case*

[21] To establish a *prima facie* case of retaliation, an employee must show "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Id.* at 1308.

[22][23] As noted earlier, Quinn claims that Green Tree fired her in retaliation for having filed a complaint with the DHR. To prove that the filing of her particular complaint with the DHR on December 27, 1991 was a protected activity, Quinn need not establish that she successfully described in that complaint conduct amounting to a violation of Title VII. *See Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). She need only demonstrate that she had a "*good faith, reasonable belief*" that the underlying

challenged actions of the employer violated the law." *Id.* (emphasis added; internal quotation marks and citation omitted); *accord Reed,* 95 F.3d at 1178. Thus, it is possible for an employee to reasonably believe that specified conduct amounts to harassment, even when that conduct would not actually qualify as harassment under the law.

[24] In her deposition, Quinn stated that she consulted with a DHR representative as early as July 1991 and was informed of the law of hostile work environment sexual harassment. Subsequently, in a letter received by the Company on November 21, 1991, Quinn complained of alleged sexual harassment; this letter also informed the Company that she planned to file an identical complaint with the DHR on December 23, 1991. Quinn, in fact, filed her complaint with the DHR on December 27, 1991. Though we held above that Quinn has failed to adduce facts sufficient to establish Green Tree's liability for sexual harassment, we are satisfied that her complaints of sexual harassment-filed initially with the Company in November 1991 and then with the DHR in December 1991-included evidence sufficient to sustain a good faith, reasonable belief that Green Tree stood in violation of the law. *Cf. Reed,* 95 F.3d at 1179-80 (upholding jury verdict for *retaliation,* where plaintiff had adduced sufficient evidence of a "good faith, reasonable belief," in the form of testimony regarding two arguments in which co-workers had used offensive sex-charged language). Accordingly, Quinn has established the first prong of her *prima facie* case.

[25] Green Tree's termination of Quinn satisfies the second prong of the *prima facie* case-"an employment action disadvantaging the plaintiff,"*Tomka,* 66 F.3d at 1308-as her discharge clearly amounted to an adverse employment action. Additionally, because Quinn's discharge came less than two months after she filed a complaint with Green Tree management and just ten days after she filed a complaint with the DHR, the third prong of the *prima facie* case-"a causal connection between the protected activity and the adverse employment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 F.3d 759
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617
**(Cite as: 159 F.3d 759)**

-is satisfied as well. *See Manoharan,* 842 F.2d at 593 ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."). Therefore, Quinn adduced evidence establishing a *prima facie* case of retaliation, thus shifting the burden to Green Tree to point to evidence supporting a legitimate, non-retaliatory reason for her termination.

*B. A Legitimate, Non-retaliatory Reason for the Adverse Employment Action*

[26] Green Tree contends that it discharged Quinn due to her poor performance. This explanation is supported by (1) a handwritten memorandum to the file, drafted by Harwood in September 1991, detailing the complaints of clients and co-workers about Quinn's rudeness; (2) Green Tree's evaluation of Quinn, prepared by Fahey and Harwood in November 1991, reflecting Quinn's need to improve her interpersonal skills; and **\*770** (3) an affidavit (dated October 23, 1995) from a client complaining about Quinn's attitude. This offer of proof satisfies Green Tree's burden of articulating a legitimate, non-retaliatory reason for terminating Quinn, and pointing to evidence to support that proffered reason.

*C. Pretext*

[27] Accordingly, we must determine whether the record contains evidence to support Quinn's contention that Green Tree's proffered reason was merely pretext for retaliation-evidence sufficient to require a trial before a trier of fact. We are satisfied, upon a review of this record, that an issue of fact remains on the question of retaliatory discharge. Quinn has proffered evidence suggesting a strong temporal correlation between her complaints to the Company and to the DHR, on the one hand, and her termination, on the other. Nearly all of the record evidence supporting the Company's asserted non-retaliatory reason for discharge both was generated by two of Quinn's alleged harassers-Fahey and Harwood-and

followed her initial inquiry with the DHR regarding sexual harassment. Construing the record most favorably to Quinn, as we are required to do in evaluating the district court's grant of Green Tree's motion for summary judgment, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, we conclude that there is a sufficient basis for a trier of fact to doubt the persuasiveness of the company's proffered evidence and ultimately to find that the reasons offered by the Company for Quinn's dismissal were pretextual. In so concluding, we intimate no view on the conclusion that a fact-finder might actually make on the disputed and material claim by Quinn that she was fired because she filed a claim of discrimination with the DHR.

### Conclusion

For the foregoing reasons:

(1) We affirm the district court's order granting summary judgment in favor of Green Tree, to the extent that it disposed of Quinn's harassment claim.

(2) We vacate the judgment to the extent that it dismissed plaintiff's claim for retaliatory discharge.

(3) We remand the cause to the district court for proceedings consistent with this opinion.

C.A.2 (N.Y.),1998.
Quinn v. Green Tree Credit Corp.
159 F.3d 759, 78 Fair Empl.Prac.Cas. (BNA) 371, 74 Empl. Prac. Dec. P 45,617

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

164 F.3d 353                                                                                                                          Page 1
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

▷

Adusumilli v. City of Chicago
C.A.7 (Ill.),1998.

United States Court of Appeals,Seventh Circuit.
Indira ADUSUMILLI, Plaintiff-Appellant,
v.
CITY OF CHICAGO, Defendant-Appellee.
**No. 98-1019.**

Argued Sept. 11, 1998.
Decided Dec. 28, 1998.

Former employee brought Title VII action against city alleging discrimination, harassment, and retaliation. The United States District Court for the Northern District of Illinois, Paul E. Plunkett, J., 1997 WL 769457, granted city's motion for summary judgment. Former employee appealed. The Court of Appeals, Bauer, Circuit Judge, held that: (1) District Court did not abuse its discretion in finding that certain statements in employee's affidavit were beyond her personal knowledge; (2) District Court did not abuse its discretion in finding that certain statement in employee's affidavit contradicted her deposition testimony; (3) coemployees' alleged sexually harassing actions were insufficiently severe to create hostile environment; and (4) employee failed to establish prima facie retaliation case.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟲802**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
        170Bk802 k. Summary Judgment.
Most Cited Cases
Where district court granted summary judgment in favor of defendant, Court of Appeals would take

the facts alleged by the plaintiff to be true. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Courts 170B ⟲813**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk813 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases
Trial judge's decision to strike parts of an affidavit in opposition to a motion for summary judgment is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[3] Federal Courts 170B ⟲812**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk812 k. Abuse of Discretion.
Most Cited Cases
Under abuse of discretion standard, decisions that are reasonable, that is, not arbitrary, will not be questioned.

**[4] Federal Civil Procedure 170A ⟲2539**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2536 Affidavits
          170Ak2539 k. Sufficiency of Showing. Most Cited Cases
On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under rule requiring, inter alia, that affidavit be made on personal knowledge. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟲2539**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                                    Page 2

164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698

**(Cite as: 164 F.3d 353)**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2536 Affidavits
               170Ak2539 k. Sufficiency of Show-
ing. Most Cited Cases

District court did not abuse its discretion in determining that city employee's statement, that it became apparent to her that alleged harassment by coemployees was based upon her gender and national origin, was not within employee's personal knowledge and thus should be stricken from affidavit submitted in opposition to summary judgment motion in Title VII action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A €⟶2539**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2536 Affidavits
               170Ak2539 k. Sufficiency of Show-
ing. Most Cited Cases

District court did not abuse its discretion in determining that city employee's statement, that her superiors knew of but did not alleviate her discomfort from having to work in proximity to alleged harasser, was not within employee's personal knowledge and thus should be stricken from affidavit submitted in opposition to summary judgment motion in Title VII action; record did not support employee's allegation that she complained to a superior that alleged harasser's presence made her uncomfortable. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A €⟶2539**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment

170AXVII(C)3 Proceedings
   170Ak2536 Affidavits
      170Ak2539 k. Sufficiency of Show-
ing. Most Cited Cases

District court did not abuse its discretion in determining that city employee's statement, that she was harassed almost on a daily basis during her tenure with employer, contradicted her deposition testimony to the effect that her first year with her employer was uneventful, and thus should be stricken from affidavit submitted in opposition to summary judgment motion in Title VII action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A €⟶2539**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2536 Affidavits
               170Ak2539 k. Sufficiency of Show-
ing. Most Cited Cases

Party cannot prevail on a motion for summary judgment by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A €⟶2539**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2536 Affidavits
               170Ak2539 k. Sufficiency of Show-
ing. Most Cited Cases

Where deposition and affidavit submitted upon motion for summary judgment are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A €⟶2497.1**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                Page 3
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most
Cited Cases
Summary judgment standard is applied with partic-
ular care in employment discrimination cases,
where intent and credibility are critical. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A** ⟜**2546**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and Suffi-
ciency. Most Cited Cases
Party needs more than a scintilla of evidence to de-
feat summary judgment. Fed.Rules Civ.Proc.Rule
56(c), 28 U.S.C.A.

**[12] Federal Courts 170B** ⟜**776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
District court's grant of summary judgment is re-
viewed de novo. Fed.Rules Civ.Proc.Rule 56(c), 28
U.S.C.A.

**[13] Civil Rights 78** ⟜**1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environ-
ment
         78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited

Cases
   (Formerly 78k167)
Employer violates Title VII when discrimination
based on sex creates a hostile or abusive work en-
vironment. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78** ⟜**1145**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1145 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
   (Formerly 78k145)
Not all workplace conduct that may be described as
harassment affects a term, condition, or privilege of
employment so as to be actionable under Title VII.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[15] Civil Rights 78** ⟜**1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environ-
ment
         78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
   (Formerly 78k167)
For sexual harassment to be actionable under Title
VII, it must be sufficiently severe or pervasive.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[16] Civil Rights 78** ⟜**1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environ-
ment
         78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
   (Formerly 78k167)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                    Page 4
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

To prevail on a hostile environment sexual harassment claim, an employee must show that his or her work environment was both subjectively and objectively hostile. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[17] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
      (Formerly 78k167)

**Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
           78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
      (Formerly 78k167)
While employers are vicariously liable, subject to certain defenses, for hostile environment sexual harassment by supervisors, an employee must show negligence in order to hold an employer liable under Title VII for co-worker harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[18] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
      (Formerly 78k167)
"Objectively hostile environment," for purposes of Title VII sexual harassment claim, is one that a reasonable person would find hostile or abusive.

Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[19] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
      (Formerly 78k167)
In determining whether employee has demonstrated objectively hostile environment for purposes of Title VII sexual harassment claim, courts must consider all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[20] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
      (Formerly 78k167)

**Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
      (Formerly 78k167)
Coemployees' alleged actions of teasing, staring at, and attempting to make eye contact with city em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                    Page 5
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
(Cite as: 164 F.3d 353)

ployee, and briefly touching employee on four occasions on her arm, fingers, or buttocks, together with employer's assignment of coemployee to work near employee after employee allegedly complained about coemployee's conduct, were insufficiently severe to create hostile environment within meaning of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[21] Civil Rights 78 ☞1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
   (Formerly 78k145)
Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment within meaning of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[22] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
   (Formerly 78k145)
There is a safe harbor from Title VII liability for employers in cases in which the alleged sexually harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that he or she has been discriminated against on the basis of his or her sex. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[23] Civil Rights 78 ☞1185**

78 Civil Rights

78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
   (Formerly 78k145)
In some Title VII hostile environment sexual harassment cases, the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Civil Rights 78 ☞1243**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
Under McDonnell Douglas burden shifting method, employee alleging retaliation under Title VII must first establish a prima facie case by showing that: (1) he or she engaged in statutorily protected expression; (2) he or she suffered an adverse action by employer; and (3) there is a causal link between the protected expression and the adverse action. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[25] Civil Rights 78 ☞1541**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1541 k. Retaliation Claims. Most Cited Cases
   (Formerly 255k40(1) Master and Servant)
Once employee makes prima facie showing of retaliation under Title VII, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse action, and, if employer is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able to state such a reason, the burden shifts back to employee to show that the proffered reasons are pretextual and that the actual reason was discriminatory. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[26] Civil Rights 78 ⟲1541**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1541 k. Retaliation Claims. Most Cited Cases
    (Formerly 255k40(1) Master and Servant)
Despite shifting of burden of production in Title VII retaliation action, the burden of persuasion rests at all times on the employee. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[27] Civil Rights 78 ⟲1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Employee may establish a causal link between protected expression and adverse action, as required for prima facie case of retaliation under Title VII, through evidence that employee's discharge took place on the heels of protected activity. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[28] Civil Rights 78 ⟲1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
City employee's placement in program for employees with performance problems, and her subsequent

termination, were not causally related to her sexual harassment complaint, and she thus failed to establish prima facie retaliation case under Title VII, where, although she was terminated only eight months after making complaint, city documented serious and persistent performance problems beginning long before she made complaint. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[29] Civil Rights 78 ⟲1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
To meet the causal link requirement for establishing a prima facie case of retaliation under Title VII, employee must demonstrate that employer would not have taken the adverse action "but for" the protected expression. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[30] Civil Rights 78 ⟲1553**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1553 k. Retaliation Claims. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Employee's self-serving statements about his or her ability are insufficient to contradict an employer's negative assessment of that ability, for purposes of determining whether employee has satisfied causation element of prima facie case of retaliation under Title VII. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[31] Municipal Corporations 268 ⟲218(10)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(C) Agents and Employees

164 F.3d 353                                                                     Page 7
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
(Cite as: 164 F.3d 353)

268k218 Removal, Discharge, Transfer or Demotion

268k218(10) k. Liability for Unauthorized Acts. Most Cited Cases

That decision to terminate city employee allegedly was made with input from persons who allegedly had sexually harassed her did not constitute evidence of retaliation under Title VII, where employee had never complained about the alleged harassment by those persons. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

[32] Civil Rights 78 ☞1251

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1251 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)

That employer's proffered reason for terminating employee is pretextual can be demonstrated in Title VII retaliation action either by showing that a discriminatory reason more likely motivated the employer or by showing that the employer's proffered explanation is unworthy of credence. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

*356 Michael J. Merrick (argued), Witwer, Poltrock & Giampietro, Chicago, IL, for Plaintiff-Appellant.

Ruth F. Masters (argued), Office of Corporation Counsel, Appeals Division, Chicago, IL, for Defendant-Appellee.

Before POSNER, Chief Judge, and BAUER and EASTERBROOK, Circuit Judges.

*357 BAUER, Circuit Judge.

Indira Adusumilli ("Adusumilli") was fired from her position as an Administrative Assistant for the City of Chicago, Department of Police ("City"). She subsequently brought suit for discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). After striking portions of Adusum-

illi's affidavit, the district court granted the City's motion for summary judgment on all claims. Adusumilli now appeals, arguing that several statements in her affidavit should not have been stricken, and that summary judgment was inappropriate with respect to her claims of sexual harassment and retaliation. We affirm.

## I. BACKGROUND

[1] Because the district court granted summary judgment in favor of the defendant, we take the facts alleged by the plaintiff to be true. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, ----, 118 S.Ct. 2257, 2262, 141 L.Ed.2d 633 (1998).

The City hired Adusumilli as an Administrative Assistant for the Twenty-Fourth District on January 16, 1992. She was fired on September 6, 1994. Adusumilli claims that while she worked at the Twenty-Fourth District, she encountered many instances of sexual harassment. Of these, Adusumilli recalls several incidents that occurred between December 1993 and September 1994, for which period her filing with the Equal Employment Opportunity Commission was timely.[FN1]

> FN1. Adusumilli does not appeal the trial court's determination that her EEOC filing was untimely with respect to events that occurred prior to November 12, 1993.

Adusumilli objects to a number of comments that were made to her. Civilian District Manager Zenia Zeliasz ("Zeliasz"), Adusumilli's immediate supervisor, told Adusumilli that to avoid being laughed at, she should break her banana in the middle rather than eating it whole. Officer Phyllis Muzupappa ("Muzupappa") told Adusumilli to wash a banana before she ate it. On another day, Muzupappa asked Adusumilli what putting one rubber band on top and another on the bottom means. On another occasion, Officer Joe Cannon told Adusumilli that she should not wave at squad cars in front of the police station because people would think she was a pros-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                      Page 8
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
(Cite as: 164 F.3d 353)

titute.

Adusumilli also complains of several incidents in-
volving staring and unwanted physical contact. One
day, Officer Joseph O'Connor tried to make eye
contact with Adusumilli and stared at her breasts.
Another day, Officer James Lupi stared at Adusum-
illi's breasts and, during computer training, he
touched her left arm between the elbow and
shoulder.

Adusumilli was particularly disturbed by the con-
duct of Officer Paul Gray ("Gray"), a co-worker
with whom she had minimal contact. One day, she
overheard Gray ask Muzupappa if Muzupappa had
worn a low-neck top the night before. Another day,
Gray tried to make eye contact with Adusumilli and
stared at her breasts. On two occasions, Gray poked
at Adusumilli's fingers. Finally, Adusumilli be-
lieves that Gray poked her buttocks, though she ad-
mits that she was in a public area and failed to see
him make physical contact.

In January of 1994, a few days after it happened,
Adusumilli reported the buttocks-poking incident to
Zeliasz. Zeliasz immediately reported Adusumilli's
complaint to the watch lieutenant, who initiated an
Internal Affairs Department ("IAD") investigation.
Officer Putney, from the IAD, interviewed Adusu-
milli, Gray, Zeliasz, and Sergeant Bruce Rottner
(Adusumilli's supervisor). Officer Putney con-
cluded that Adusumilli's allegations of sexual har-
assment could not be sustained. After her complaint
to the IAD, Adusumilli stopped reporting incidents
to anyone in the police department.

In the spring of 1994, after the IAD investigation
had concluded, the City assigned Gray to prepare
arrest reports on a computer terminal five to ten feet
away from Adusumilli's desk. Gray used the com-
puter two or three days a week for a few hours at a
time. The City explains that it made this assignment
because Gray had computer knowledge and knew
arrest procedures. The computer that Gray used was
one of only a few at the Twenty-Fourth District,
and was the only *358 computer with the database

that both Adusumilli and Gray needed. Adusumilli
complains that at one point after Gray began work-
ing on the computer, she observed him staring at
her breasts, smiling, and trying to make eye contact
with her.

The City has its own complaints. It documented a
number of mistakes made by Adusumilli during her
tenure. For example, in 1992, Commander Kenneth
Alexander ("Alexander") wrote a letter to the
Deputy Chief, informing him that Adusumilli had
processed some traffic reports incorrectly, that
Adusumilli's learning process was slow, and that
she required a lot of help.

In 1993, District Officer Beth Atkins ("Atkins")
wrote a memo to Alexander to inform him that
Adusumilli had mistyped the address on a notifica-
tion for a meeting between a police officer and the
Corporation Counsel's office, causing the officer to
miss the appointment. When Atkins confronted
Adusumilli about the missing notification, Adusum-
illi complained that people were conspiring against
her and that someone had taken the notification
from the file. When Atkins asked her to look again,
Adusumilli found the notification, which had been
misfiled. Also in 1993, Atkins wrote a letter to Al-
exander, documenting the fact that Adusumilli had
mishandled a Mayor's License Commission notific-
ation, despite detailed written instructions.

On January 9, 1994, Lieutenant Torres reported to
Atkins that Adusumilli had made errors in the court
notifications. When Atkins looked into the matter,
she found that Adusumilli had used 1993 schedules
instead of 1994 schedules to write up the notifica-
tions. On March 31, 1994, Atkins sent a memo to
Commander Thomas Byrne ("Byrne")[FN2] indicat-
ing errors made by Adusumilli in preparing requisi-
tions. In April, May, and June 1994, Zeliasz docu-
mented Adusumilli's errors in several memos to
Byrne. On May 12, and June 30, 1994, Byrne sent
memos to Sergeant Brad Woods at the Police Per-
sonnel Department, listing examples of Adusum-
illi's performance errors. Byrne's comments were
based, in part, on his own experience of having to

do damage control when officers were reprimanded for not appearing in court due to Adusumilli's errors.

> FN2. On February 18, 1994, Byrne replaced Alexander, who had retired.

At first, Adusumilli's errors did not affect her performance evaluations. Between January 1992 and December 1993, Adusumilli received four performance evaluations. On all four evaluations, she was rated "good" on a scale of "unsatisfactory," "marginal," "good," and "excellent." However, Adusumilli was not satisfied. After she received her February 1993 evaluation, Adusumilli looked at the evaluations for all five hundred employees in the district. She then complained to Sergeant Rottner because she felt that, comparatively, she deserved a rating of excellent. Adusumilli was upset when Sergeant Rottner and Commander Alexander told her that they agreed with the original rating.

On her June 1994 evaluation, Adusumilli received an overall rating of "unsatisfactory." The evaluation stated that Adusumilli was "careless in her work, unable to engage in cooperative effort with coworkers, slow to learn, required repeated instructions, required follow-up even on routine duties, had difficulty maintaining supply orders, and had great difficulty adjusting to new work or changed conditions." (Defendant's Statement of Undisputed Facts ¶ 161).

In March 1994, Byrne placed Adusumilli in the Behavior Alert program, a program for employees with performance problems. The program is meant to retrain the employee as well as to document performance problems. In May, Byrne recommended that Adusumilli be transferred to a position with less responsibility. Finally, on September 1, 1994, Adusumilli was notified that she was being terminated as of September 6, 1994.

Adusumilli admits to making some mistakes during her time at the Twenty-Fourth District. However, she believes that she "was performing up to the le-

gitimate expectations of [her] employer," and that she "was performing just as well as [her] coworkers." (Adusumilli Aff. ¶ 3). In addition, Adusumilli asserts that she "had no performance problems that would justify placing [her] into the *359 Behavioral Alert Program" and discharging her. (Adusumilli Aff. ¶ 3). She believes that she "was placed in the Behavioral Alert Program, received a final performance evaluation rating of 'unsatisfactory,' and ultimately was discharged in retaliation ... for lodging ... complaints." (Adusumilli Aff. ¶ 14).

On September 7, 1994, Adusumilli filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On September 29, 1995, the EEOC issued a right to sue letter. On December 28, 1995, Adusumilli filed a complaint against the City, alleging discrimination based on race, color, and national origin; harassment based on race, color, national origin, and gender; and retaliation based on race, color, national origin, and gender.

In a Memorandum Order and Opinion dated December 5, 1997, the district court ordered several statements in Adusumilli's affidavit stricken. The court also granted the City's motion for summary judgment on all of Adusumilli's claims. On appeal, Adusumilli challenges the district court's decision to strike three statements from her affidavit, and argues that the court's grant of summary judgment was inappropriate with respect to her claims of sexual harassment and retaliation.

## II. DISCUSSION

### A. Adusumilli's Affidavit

[2][3] As a preliminary matter, we must address Adusumilli's appeal of the lower court's order striking portions of her affidavit. We review a trial judge's decision to strike parts of an affidavit in opposition to a motion for summary judgment for abuse of discretion. *See Whitted v. General Motors Corp.*, 58 F.3d 1200, 1203 (7th Cir.1995). Under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                      Page 10
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

this standard, "[d]ecisions that are reasonable, i.e., not arbitrary, will not be questioned...." *Id.*

[4] According to the Federal Rules of Civil Procedure, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under Rule 56(e). *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir.1987).

The district court held that three statements in Adusumilli's affidavit lack foundation and concern matters not within her personal knowledge, and that one statement contradicts Adusumilli's prior testimony under oath at her deposition. *Adusumilli v. City of Chicago,* 1997 WL 769457 at *3 (N.D.Ill.1997). For these reasons, the court ordered all four statements stricken. *Id.* Adusumilli challenges the district judge's order with respect to three of the four stricken statements. We consider each of these in turn.

[5] First, Adusumilli challenges the lower court's decision to strike the following sentence from her affidavit: "However, as time passed, it became apparent to me that the harassment was based upon my gender and national origin." (Adusumilli Aff. ¶ 2). The district court held that this statement lacks foundation and is not within Adusumilli's personal knowledge because it addresses the reasons that co-workers allegedly harassed her. This determination was eminently reasonable and safely within the district judge's discretion.

[6] Next, Adusumilli argues that the lower court erred in striking the second sentence of the following paragraph: "The presence of Paul Gray in my work area seriously affected my ability to carry out my job responsibilities. My superiors knew of my discomfort, but did nothing to alleviate it." (Adusumilli Aff. ¶ 6). Concluding that this second sentence contains speculation about what Adusum-

illi's superiors knew, the district court held that the statement lacks foundation and is not within Adusumilli's personal knowledge.

Adusumilli argues that she has personal knowledge of what her superiors knew because she informed Zeliasz of her discomfort. In support of this argument, Adusumilli cites paragraphs 19 and 20 of her Local Rule 12(N) Statement of Additional Facts. Paragraph **\*360** 19 is irrelevant.[FN3] Paragraph 20 states: "Gray's presence in Plaintiff's work area interfered with Plaintiff's *performance.* Plaintiff complained to her supervisor, Zeliasz, but nothing was done to remedy the situation." (Adusumilli 12(N) Statement ¶ 20 (emphasis added)). Although it is possible to interpret this paragraph to imply that Adusumilli complained that Gray's presence interfered with her performance *because he made her uncomfortable,* paragraph 20's cross-references to Adusumilli's deposition belie this interpretation. The cross-referenced pages show only that Adusumilli complained to Zeliasz about the fact that Gray often used the computer when she needed it, making it difficult for her to get her work done on time. (Adusumilli Dep. at 82-83). They do not show that Adusumilli told Zeliasz that Gray's presence made her uncomfortable. For this reason, the district judge did not abuse his discretion.

> FN3. Paragraph 19 states: "After Plaintiff reported the three incidents involving Paul Gray, he began using the computer located behind Plaintiff's desk to enter arrest reports. During that time, he continued to engage in inappropriate conduct, including staring at Plaintiff's breasts and attempting to make eye contact with her." (Adusumilli 12(N) Statement ¶ 19).

[7][8][9] Finally, Adusumilli challenges the district judge's determination that one of the statements in her affidavit conflicts with her earlier deposition testimony. A party cannot prevail on a motion for summary judgment by "submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sworn testimony." *Diliberti v. United States,* 817 F.2d 1259, 1263 (7th Cir.1987) (collecting cases). Therefore, "[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken...." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 67-68 (7th Cir.1995).

Following this well-established rule, the district judge struck the following statement from Adusumilli's affidavit: "During my tenure at the 24th District, I was harassed on a near daily basis by my co-workers, Atkins, Muzupappa, and Zeliasz." (Adusumilli Aff. ¶ 2). The judge found that this statement "clearly contradicts" Adusumilli's deposition testimony to the effect that her first year at the Twenty-Fourth District was uneventful. *Adusumilli,* 1997 WL 769457 at *3. Specifically, when Adusumilli was asked whether "there [was] anything in the first year that made [her] feel that [she was] ... being discriminated against on the basis of [her] sex," she responded "[n]o." (Adusumilli Dep. at 60).[FN4] Adusumilli asserts that her deposition testimony and affidavit do not really conflict because at her deposition she was referring to specific incidents, while in her affidavit she was referring to the general atmosphere at the Twenty-Fourth District.

> FN4. Adusumilli testified similarly when asked about race and national origin discrimination. (Adusumilli Dep. at 59).

Even under Adusumilli's interpretation, however, there is no getting around the contradiction. First she says that she cannot recall any incidents of harassment in 1992 and then she says that she was harassed on a near daily basis during her tenure at the Twenty-Fourth District. In the language of *Diliberti,* Adusumilli has done nothing more than "submit[ ] an affidavit containing conclusory allegations which contradict plain admissions in prior deposition ... testimony." 817 F.2d at 1263. *See also Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1296 (7th Cir.1993) (finding a "direct contradiction" between an antitrust plaintiff's deposition

testimony that "he could not remember any specific instance in which he wanted to charge more but didn't," and his affidavit statement that " '[i]f Schweigert had not fixed the price that I had to charge my customers, there would have been many occasions on which I would have charged more for many of the Schweigert products I sold' "). Therefore, the trial judge did not abuse his discretion.

**B. Summary Judgment**

[10][11][12] Under Federal Rule of Civil Procedure 56, summary judgment must only be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We apply this standard **\*361** with particular care in employment discrimination cases, where intent and credibility are critical. *Senner v. Northcentral Technical College,* 113 F.3d 750, 757 (7th Cir.1997). Nevertheless, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Furthermore, a "party needs more than a scintilla of evidence ... to defeat summary judgment." *Senner,* 113 F.3d at 757. Applying these standards, the district judge held that there was no genuine issue as to any material fact and that the City was entitled to judgment as a matter of law on all of Adusumilli's claims. On appeal, Adusumilli contends that summary judgment was inappropriate with respect to her sexual harassment and retaliation claims. We review the district court's grant of summary judgment *de novo.*

**1. Hostile Environment Sexual Harassment**

[13][14][15] Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such indi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                    Page 12

164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

vidual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII when "discrimination based on sex ... create[s] a hostile or abusive work environment." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). However, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."*Id.* at 67, 106 S.Ct. at 2405. Rather, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive." *Id.* (internal quotation marks omitted).

[16][17] In order to prevail on a hostile environment sexual harassment claim, a plaintiff must show that his or her work environment was both subjectively and objectively hostile. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Furthermore, while employers are vicariously liable for hostile environment sexual harassment by supervisors (subject to certain defenses), *Faragher v. City of Boca Raton,* 524 U.S. 775, ---- - ----, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc.,* 118 S.Ct. at 2270, a plaintiff must show negligence in order to hold an employer liable for co-worker harassment, *Baskerville v. Culligan Internat'l Co.,* 50 F.3d 428, 431-32 (7th Cir.1995). The district court assumed that Adusumilli had been sufficiently adversely affected to satisfy the subjective test for hostile environment harassment; however, the court held that there was no genuine issue of material fact as to either the objective test for harassment, or the negligence test for employer liability. *Adusumilli,* 1997 WL 769457 at *10-11. Either deficiency is sufficient to sustain the district court's grant of summary judgment. Adusumilli challenges both holdings.

[18][19] An objectively hostile environment is one that a reasonable person would find hostile or abusive. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370. In determining whether a plaintiff has met this standard, courts must consider all the circumstances, includ-

ing "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371.

[20][21][22] In this case, the most salient feature of the harassment is its lack of severity. As the Supreme Court recently cautioned, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher,* 118 S.Ct. at 2283 (internal citations omitted). Yet that is precisely what we have here. Adusumilli complains of no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks. The **\*362** "low-neck" comment was not even directed at Adusumilli, and was, therefore, only "second-hand harassment." *SeeGleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1144 (7th Cir.1997) (holding that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). Furthermore, the most serious misconduct, the unwanted touching of Adusumilli's buttocks, took the relatively mild form of a poke and occurred only once. It is well established in this Circuit that there is a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex." *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th Cir.1996). Adusumilli's allegations clearly fall within this safe harbor.

[23] Adusumilli raises the additional argument that the City created an environment that was sexually hostile to her by assigning Gray to work near her after she had complained about his conduct. It is true that "in some cases the mere presence of an employee who has engaged in *particularly severe*

164 F.3d 353                                                    Page 13
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

*or pervasive harassment* can create a hostile working environment." *Ellison v. Brady,* 924 F.2d 872, 883 (9th Cir.1991) (emphasis added). *See alsoCortes v. Maxus Exploration Co.,* 977 F.2d 195, 199 (5th Cir.1992) (holding that an employer created a sexually hostile environment by transferring an employee to a department supervised by someone who had previously harassed the employee). However, in this case, as discussed above, Gray did not engage in harassment, let alone "particularly severe or pervasive harassment." Therefore, as a matter of law, the City's actions in assigning Gray to work near Adusumilli did not create an objectively hostile environment. See*Saxton v. American Telephone and Telegraph Co.,* 10 F.3d 526, 536 n. 18 (7th Cir.1993) (holding misconduct insufficiently severe or pervasive to cause supervisor's mere presence to render the employee's environment hostile when misconduct consisted of supervisor placing his hand on employee's leg above the knee, rubbing his hand along her upper thigh, forcibly kissing her, and lurching at her from behind bushes).

Because we hold that the incidents alleged by Adusumilli do not constitute harassment, we need not discuss the City's liability for the conduct of its employees.

## 2. Retaliation

[24][25][26] Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* burden shifting method of proving discrimination, Adusumilli must first establish a prima facie case of retaliation. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to do so, she must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and

the adverse action." *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994) (internal quotation marks and citations omitted). Once Adusumilli makes this showing, the burden shifts to the City to state a "legitimate, nondiscriminatory reason" for the adverse action. *Id.* If the City is able to state such a reason, the burden shifts back to Adusumilli to show that the "proffered reasons are pretextual and that [the] actual reason was discriminatory." *Id.* Although the burden of production shifts under this method, "the burden of persuasion rests at all times on the plaintiff." *Klein v. Trustees of Indiana University,* 766 F.2d 275, 280 (7th Cir.1985). The district court held that Adusumilli had satisfied the first two elements of a prima facie case of retaliation. First, her complaint about Gray's conduct was protected expression. *Adusumilli,* 1997 WL 769457 at *8. Second, placing Adusumilli in the Behavior Alert program and subsequently firing her were adverse actions. *Id.* However, the lower court held that Adusumilli had not created a genuine issue of fact with respect to the causal link between the protected activity*363 and the adverse action. Furthermore, the court held, Adusumilli had not created a genuine issue regarding whether the City's proffered reason for its adverse actions was pretextual. Adusumilli challenges these determinations.

[27][28] It is settled in this Circuit that, "a plaintiff may establish ... a [causal] link [between protected expression and adverse action] through evidence that the discharge took place on the heels of protected activity." *Dey,* 28 F.3d at 1458. *See also*Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir.1997) ("[S]uspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination."); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) (holding that a causal nexus between protected activity and adverse action can be established by showing that "the employer's adverse action follows fairly soon after the employee's protected expression"). In this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                                    Page 14
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

case, Adusumilli complained about Gray's conduct in January, she was placed in the Behavior Alert program in March, and she was terminated in September, approximately eight months after her complaint. Although, in some circumstances, this sequence of events could raise the inference of a causal connection, it cannot do so here because Adusumilli has failed to show that she was fired in retaliation for her complaint rather than for her inability to do her job well. See Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir.1992) (holding that the "timing of the complaints, standing alone, d[id] not create a genuine issue as to a causal connection" when Juarez "could not prove that she was terminated because of her sexual harassment complaint rather than for poor work performance").

[29][30] In order to meet the causal link requirement for establishing a prima facie case of retaliation, Adusumilli must demonstrate that the City "would not have taken the adverse action 'but for' the protected expression." McKenzie v. Illinois Department of Transportation, 92 F.3d 473, 483 (7th Cir.1996) (citing Klein, 766 F.2d at 280). The City asserts that it would have fired Adusumilli whether or not she had complained about Gray's conduct because she was performing poorly. Adusumilli admits to making some mistakes, but she insists that she "was performing up to the legitimate expectations of [her] employer." (Adusumilli Aff. ¶ 3). However, "[a]n employee's self-serving statements about [her] ability ... are insufficient to contradict an employer's negative assessment of that ability." Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir.1992); Dey, 28 F.3d at 1460. Self-serving statements do not "shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases." Dey, 28 F.3d at 1460; Gustovich, 972 F.2d at 848. Therefore, Adusumilli must rely on other evidence to show that the City is insincere when it asserts that it fired her for poor performance.

In an attempt to provide such evidence, Adusumilli offers her first four evaluations, which rated her "good" on a scale of "unsatisfactory," "marginal," "good," and "excellent." She further asserts that her last, unfavorable, evaluation should not be credited. In addition to being out of line with her previous evaluations, she reasons, the last evaluation was prepared after she complained about Gray and is, therefore, suspect.[FN5] In any case, Adusumilli's reliance on her positive evaluations is misplaced in light of the extensive documentation of her poor performance. We recently characterized similar performance evaluations as "makeweight evidence," and admonished that "[s]uch evaluations have little significance in a case in which there is so dramatic a discrepancy between evaluation and performance." Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1398 (7th Cir.1997) (addressing a situation in which the employee "received*364 generally favorable evaluations till shortly before he was fired"). See also Clay v. City of Chicago Department of Health, 143 F.3d 1092, 1094 (7th Cir.1998) ("The fact that at one point [the employee] had received a 'good' rating does not help her because uncontradicted evidence is replete that her performance was extremely flawed."). The City documented serious and persistent performance problems beginning in 1992, long before Adusumilli's complaint about Gray. See Davidson, 133 F.3d at 512 (finding that a decision to discharge an employee was not tainted by discriminatory animus because, inter alia, "criticism [of the employee] was aired long before" his discharge). The errors, and documentation thereof, continued up to the time when Adusumilli was fired. Given this history, no jury could rationally conclude that the City would not have fired Adusumilli but for her complaint against Gray.

> FN5. The City attests that the difference between the evaluations may be explained by the fact that the first four evaluations were prepared by Sergeant Rottner, while the final evaluation was prepared by Zeliasz, who worked more closely with Adusumilli and was, therefore, more familiar

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

164 F.3d 353                                                                                   Page 15

164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698
**(Cite as: 164 F.3d 353)**

with her work.

[31] As a final matter, Adusumilli notes that in *Dey,* this Court found it significant that the decision to fire Dey was made with input from the person who had harassed her. *SeeDey,* 28 F.3d at 1459. The Court reasoned that, "even if [the harasser] kept Dey's sexual harassment complaints to himself, those complaints may have affected [the harasser's] unflattering assessment of her job performance." *Id.* Adusumilli asserts that her situation is similar because Commander Byrne conferred with Muzupappa and Zeliasz before deciding to terminate her. However, Adusumilli's situation is distinguishable from the one addressed in *Dey,* where the alleged harasser was consulted *after* Dey had complained about his behavior. *Id.* In this case, Adusumilli never complained about either Muzupappa or Zeliasz. Therefore, there is no reason to believe that they sought to retaliate against her.

[32] Even if Adusumilli's allegations were sufficient to show a causal connection between her complaint about Gray and the City's decision to fire her, summary judgment on the retaliation claim would still be appropriate because Adusumilli has not shown that the City's stated reason for firing her is pretextual. Pretext can be demonstrated either by showing "that a discriminatory reason more likely motivated the employer or [by showing] that the employer's proffered explanation is unworthy of credence." *Gleason,* 118 F.3d at 1143 (internal quotation marks and citations omitted). As we have already discussed, Adusumilli has not shown that the City's stated reason for firing her, i.e. poor performance, was insincere. Therefore, Adusumilli has failed to create a genuine issue as to pretext.

## CONCLUSION

The district court did not err in striking several statements from Adusumilli's affidavit. Furthermore, summary judgment was appropriate as to both Adusumilli's hostile environment sexual harassment claim and her retaliation claim. Therefore,

we AFFIRM.

C.A.7 (Ill.),1998.
Adusumilli v. City of Chicago
164 F.3d 353, 78 Fair Empl.Prac.Cas. (BNA) 1669, 74 Empl. Prac. Dec. P 45,698

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

129 F.3d 1355                                                                                    Page 1
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

▷

Sprague v. Thorn Americas, Inc.
C.A.10 (Kan.),1997.

United States Court of Appeals,Tenth Circuit.
Shelley A. SPRAGUE, Plaintiff-Appellant,
v.
THORN AMERICAS, INC. and Ed Kowalski, De-
fendants-Appellees.
**No. 96-3021.**

Nov. 24, 1997.

Employee sued her former employer and supervisor
for gender discrimination and sexual harassment in
violation of Title VII and the Kansas Acts Against
Discrimination, constructive and retaliatory dis-
charge, breach of contract, and violation of the
Equal Pay Act. The United States District Court for
the District of Kansas, Patrick F. Kelly, J., 1995
WL 767308, entered summary judgment in favor of
employer. Employee appealed. The Court of Ap-
peals, Holloway, Circuit Judge, held that: (1) em-
ployee failed to establish prima facie case of failure
to promote because of her gender under Title VII;
(2) employee failed to establish prima facie equal
pay claim under Title VII; (3) employee occupied
position and performed functions that were not sub-
stantially equal to those of better paid male cowork-
ers, as required to establish prima facie claim under
Equal Pay Act; (4) five separate incidents, over
span of approximately 16 months, in which male
coworker made unpleasant and boorish comments
to female employee did not create hostile or abus-
ive work environment in violation of Title VII; (5)
employee failed to establish prima facie case of re-
taliatory or constructive discharge; and (6) legal
memorandum prepared by employer's attorney was
protected by attorney-client privilege.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A** ⬤⟲**2554**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determina-
tion
                    170Ak2554 k. Matters Considered.
Most Cited Cases
Employer's failure to include, in brief before dis-
trict court, a separate argument or heading address-
ing employee's Title VII gender discrimination was
not fatal to employer's motion for summary judg-
ment on that claim, where Title VII claim was es-
sentially raised and incorporated within employer's
brief's discussion of alleged violations of Equal Pay
Act, and employee did not object below that em-
ployer failed to address Title VII. Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
Fair Labor Standards Act of 1938, § 6, as amended,
29 U.S.C.A. § 206.

**[2] Civil Rights 78** ⬤⟲**1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1)
In Title VII case, initial burden is on employee to
make prima facie showing of discrimination by em-
ployer. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78** ⬤⟲**1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                        Page 2
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

(Formerly 78k378)

Only when employee makes prima facie showing of discrimination in violation of Title VII does burden shift to employer to articulate some legitimate, nondiscriminatory reason for questioned action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
        (Formerly 78k153)

If employer accused of violating Title VII articulates some legitimate, nondiscriminatory reason for questioned action, employee must show that stated reason is actually pretext for prohibited discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ☞1166**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1166 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
            (Formerly 78k158.1)

To establish prima facie claim of discriminatory failure to promote under Title VII, employee was required to show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ☞1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof

78k1535 k. In General. Most Cited Cases
(Formerly 78k377.1)

Employee bears ultimate burden of establishing that employer intentionally discriminated against her in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1168**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1168 k. Particular Cases. Most Cited Cases
            (Formerly 78k158.1)

Female employee failed to establish prima facie case of failure to promote because of her gender under Title VII; although employee alleged that she performed duties of assistant product manager but was not promoted to position of assistant product manager, employee's department was too small to warrant having assistant product manager position and there was no indication that employee purposely refused to create such position in effort to discriminate against women or deny employee promotional opportunities. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1175**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1175 k. Compensation; Comparable Worth. Most Cited Cases
            (Formerly 78k161)

Female Title VII plaintiff establishes prima facie case of sex discrimination by showing that she occupies job similar to that of higher paid males. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1537**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-

129 F.3d 1355                                                                              Page 3
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

crimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
            78k1537 k. Sex Discrimination. Most
Cited Cases
      (Formerly 78k379)
Once female Title VII plaintiff establishes prima facie case of sex discrimination by showing that she occupies job similar to that of higher paid males, employer must articulate legitimate, nondiscriminatory reason for pay disparity; this burden is exceedingly light, and employer must merely proffer non-gender based reasons, not prove them. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1175**

78 Civil Rights
      78II Employment Practices
            78k1164 Sex Discrimination in General
                  78k1175 k. Compensation; Comparable
Worth. Most Cited Cases
      (Formerly 78k161)
Once employer advances non-gender based reason for pay disparity, female employee, under Title VII, must show that employer, regardless of proffered reasons, intentionally discriminated against her; employee must show that discriminatory reason more likely than not motivated employer to pay her less than males. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ☞1175**

78 Civil Rights
      78II Employment Practices
            78k1164 Sex Discrimination in General
                  78k1175 k. Compensation; Comparable
Worth. Most Cited Cases
      (Formerly 78k161)
Female employee failed to establish prima facie equal pay claim under Title VII; difference between employee's pay and what male coworkers were paid was consistent with different levels of importance, value, and depth of responsibility between depart-

ments. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Labor and Employment 231H ☞2461**

231H Labor and Employment
      231HXIII Wages and Hours
            231HXIII(C) Equal Pay
                  231Hk2460 Discrimination in General
                        231Hk2461 k. In General. Most Cited
Cases
      (Formerly 232Ak1333 Labor Relations)
To establish prima facie case under Equal Pay Act, employee has burden of proving that (1) she was performing work which was substantially equal to that of male employees considering the skills, duties, supervision, effort and responsibilities of jobs; (2) conditions where work was performed were basically the same; and (3) male employees were paid more under such circumstances. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1).

**[13] Labor and Employment 231H ☞2481(2)**

231H Labor and Employment
      231HXIII Wages and Hours
            231HXIII(C) Equal Pay
                  231Hk2472 Actions
                        231Hk2481 Evidence
                              231Hk2481(2) k. Presumptions and
Burden of Proof. Most Cited Cases
      (Formerly 232Ak1511.1 Labor Relations)
If prima facie case is established under Equal Pay Act, employer must undertake burden of persuading jury that there existed reasons for wage disparity which are described in the Act. Fair Labor Standards Act of 1938, § 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1)

**[14] Labor and Employment 231H ☞2481(2)**

231H Labor and Employment
      231HXIII Wages and Hours
            231HXIII(C) Equal Pay
                  231Hk2472 Actions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                      Page 4
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

231Hk2481 Evidence
　　231Hk2481(2) k. Presumptions and
Burden of Proof. Most Cited Cases
　　(Formerly 232Ak1521.1 Labor Relations)
If employer accused of violating Equal Pay Act
does not persuade jury that there existed reasons for
wage disparity which are described in the Act, em-
ployee prevails on prima facie case. Fair Labor
Standards Act of 1938, § 6(d)(1), as amended, 29
U.S.C.A. § 206(d)(1)

**[15] Civil Rights 78 ☞1175**

78 Civil Rights
　78II Employment Practices
　　78k1164 Sex Discrimination in General
　　　78k1175 k. Compensation; Comparable
Worth. Most Cited Cases
　　(Formerly 78k161)

**Labor and Employment 231H ☞2481(2)**

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(C) Equal Pay
　　　231Hk2472 Actions
　　　　231Hk2481 Evidence
　　　　　231Hk2481(2) k. Presumptions and
Burden of Proof. Most Cited Cases
　　(Formerly 232Ak1511.1 Labor Relations)
Under Equal Pay Act, onus is on employer to estab-
lish that pay differential was premised on factor
other than sex, while under Title VII employee
must prove that employer had discriminatory intent.
Fair Labor Standards Act of 1938, § 6, as amended,
29 U.S.C.A. § 206; Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

**[16] Labor and Employment 231H ☞2463**

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(C) Equal Pay
　　　231Hk2460 Discrimination in General
　　　　231Hk2463 k. Equal Work; Skill, Ef-
fort, and Responsibility. Most Cited Cases

　　(Formerly 232Ak1333 Labor Relations)
Female employee occupied position and performed
functions that were not substantially equal to those
of better paid male coworkers, as required to estab-
lish prima facie claim under Equal Pay Act; em-
ployee worked in department which produced less
than one-tenth of the revenues of departments man-
aged by coworkers, and tasks and functions em-
ployee performed were dissimilar in level of experi-
ence required and level of complexity in perform-
ing required functions. Fair Labor Standards Act of
1938, § 6(d)(1), as amended, 29 U.S.C.A. §
206(d)(1)

**[17] Labor and Employment 231H ☞2463**

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(C) Equal Pay
　　　231Hk2460 Discrimination in General
　　　　231Hk2463 k. Equal Work; Skill, Ef-
fort, and Responsibility. Most Cited Cases
　　(Formerly 232Ak1333 Labor Relations)
Equal Pay Act's "equal work" requirement is not
construed broadly; rather, jobs must be substan-
tially equal in terms of skill, effort, responsibility,
and working conditions. Fair Labor Standards Act
of 1938, § 6(d)(1), as amended, 29 U.S.C.A. §
206(d)(1)

**[18] Civil Rights 78 ☞1185**

78 Civil Rights
　78II Employment Practices
　　78k1181 Sexual Harassment; Work Environ-
ment
　　　78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
　　(Formerly 78k167)
Not all workplace conduct that may be described as
"harassment," affects term, condition, or privilege
of employment within meaning of Title VII; rather,
to prevail on hostile work environment sexual har-
assment claim, employee is required to show that
unwelcome, sexually-oriented conduct was suffi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                    Page 5
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

ciently severe or pervasive as to alter conditions of her employment and create abusive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[19] Civil Rights 78 ⚖1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)
In determining whether workplace harassment was sufficiently pervasive as to create hostile work environment under Title VII, court must consider variety of factors, including frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or mere offensive utterance, and whether it unreasonably interferes with employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[20] Civil Rights 78 ⚖1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)
Whether complained of conduct is sufficiently pervasive as to create hostile work environment under Title VII must be determined from totality of circumstances, since no single factor is required. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[21] Civil Rights 78 ⚖1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment

         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Employee may prove existence of hostile work environment sexual harassment in violation of Title VII where sexual conduct has purpose or effect of unreasonably interfering with individual's work performance or creating intimidating, hostile, or offensive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[22] Civil Rights 78 ⚖1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)
Title VII comes into play before harassing conduct leads to nervous breakdown; so long as environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[23] Civil Rights 78 ⚖1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment

         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Five separate incidents, over span of approximately sixteen months, in which male coworker made unpleasant and boorish comments to female employee did not create hostile or abusive work environment in violation of Title VII; after first three incidents, employee stated in writing that she believed coworker helped her in her work and that she was

129 F.3d 1355                                                    Page 6
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

happy to work with him, and fourth incident occurred away from workplace. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Labor and Employment 231H ☞819**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk817 Other Particular Rights or Contexts
            231Hk819 k. Particular Cases in General. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
Employee failed to establish prima facie case of retaliatory discharge; employer only terminated employee when, after prolonged absence during which employee received full salary, employer refused employee's demands for new supervisor, better title, and higher salary.

**[25] Civil Rights 78 ☞1123**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)

**Labor and Employment 231H ☞826**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk823 What Constitutes Adverse Action
            231Hk826 k. Constructive Discharge. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Evidence that, over span of approximately 16 months, male coworker made five unpleasant and boorish comments to female employee failed to show that reasonable person would have viewed employee's working conditions as intolerable, as required to support constructive discharge claim.

**[26] Labor and Employment 231H ☞826**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk823 What Constitutes Adverse Action
            231Hk826 k. Constructive Discharge. Most Cited Cases
    (Formerly 255k31(2) Master and Servant)
Employee alleging constructive discharge must show that employer by its unlawful acts made working conditions so intolerable that reasonable person in employee's position would feel forced to resign.

**[27] Federal Courts 170B ☞820**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
            170Bk820 k. Depositions and Discovery. Most Cited Cases
Court of appeals reviews rulings related to discovery under abuse of discretion standard.

**[28] Federal Civil Procedure 170A ☞1267.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1267 Discretion of Court
            170Ak1267.1 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞1272.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
            170Ak1272.1 k. In General. Most Cited Cases
Although discovery in discrimination cases should not be narrowly circumscribed, desire to afford broad discovery is not without limits and trial court is given wide discretion in balancing needs and

129 F.3d 1355                                                        Page 7
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

rights of both plaintiff and defendant.

**[29] Federal Courts 170B ⚏416**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk416 k. Evidence Law. Most Cited
Cases
If state and federal privilege laws conflict, analytical solution must be worked out to accommodate conflicting policies embodied in state and federal laws.

**[30] Witnesses 410 ⚏199(2)**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by
Attorney or Counsel
       410k199 Relation of Attorney and Client
        410k199(2) k. Parties and Interests
Represented by Attorney. Most Cited Cases

**Witnesses 410 ⚏200**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by
Attorney or Counsel
       410k200 k. Professional Character of
Employment or Transaction. Most Cited Cases
Legal memorandum allegedly addressing employer's disparate treatment of women was protected by attorney-client privilege; memorandum was prepared for higher management by in-house counsel acting within scope of his employment and memorandum related to rendition of legal services and advice.

**[31] Witnesses 410 ⚏198(1)**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by
Attorney or Counsel
       410k198 In General
        410k198(1) k. In General. Most
Cited Cases
Attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also giving of information to lawyer to enable him to give sound and informed advice.

**[32] Witnesses 410 ⚏198(1)**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by
Attorney or Counsel
       410k198 In General
        410k198(1) k. In General. Most
Cited Cases
Under Kansas law, attorney-client privilege protects attorney's communications to his client even if communications do not contain confidential matters revealed by client earlier to attorney. K.S.A. 60-426.

**[33] Witnesses 410 ⚏219(3)**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k219 Waiver of Privilege
       410k219(3) k. Communications to or
Advice by Attorney or Counsel. Most Cited Cases
Power to waive corporate attorney-client privilege rests with corporation's management and is normally exercised by its officers and directors, hence, corporate employee cannot waive corporation's privilege.

129 F.3d 1355                                                                    Page 8
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

**\*1359** M. Kathryn Webb,McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Plaintiff-Appellant.
Timothy B. Mustaine (Mary Kathleen Babcock with him on the brief), Foulston & Siefkin, Wichita, KS, for Defendants-Appellees.

Before BRORBY, HOLLOWAY and EBEL, Circuit Judges.

HOLLOWAY, Circuit Judge.
Plaintiff-appellant Shelley Sprague brought the present action against defendants, alleging gender discrimination and sexual harassment in violation of Title VII and the Kansas Acts Against Discrimination, K.S.A. § 44-1001, *et seq,* constructive and retaliatory discharge, breach of contract,[FN1] and violation of the Equal Pay Act. The United States District Court for the District of Kansas entered summary judgment against Sprague on each of her claims and this appeal followed, asserting error in the summary judgment ruling. Sprague also claims error in the district court's denial of her motion to compel. We have jurisdiction by virtue of 28 U.S.C. § 1291, and we affirm.

> FN1. Sprague does not appeal the district court's rejection of her implied contract claim and we will therefore not review this issue.

### I. Background

Viewing the evidence in the light most favorable to the non-moving party, as we must when reviewing a grant of summary judgment, *Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996), the essential facts are as follows:

Plaintiff-appellant, Shelley Sprague, began working for defendant-appellee, Thorn Americas, Inc., as a secretary in September 1989.[FN2] I Aplt.App. at 58 (statement of uncontroverted facts). While attending orientation Sprague was given an employee handbook, which she signed on September 7, 1989. By signing the handbook, Sprague acknowledged

that her employment with Thorn was an "at will" relationship, which permitted either Sprague or Thorn to terminate her employment at any time, with or without cause. *Id.; see also* II Aplt.App. at 398-399, 407 (district court's Memorandum and Order granting summary judgment).

> FN2. At the time Sprague was known as Shelley Rose. Additionally, Thorn did business as Rent-A-Center.

During the events forming the basis of this lawsuit, Sprague's title with Thorn was "Market Analyst." Aple. Supp.App. at 92. Until June 1992, Sprague's duties involved the entire range of Thorn's products and her supervisor was J.D. Henning. In June 1992, Sprague took on additional responsibilities as Market Analyst in the jewelry department and she was reassigned to defendant-appellee Ed Kowalski. Specifically, she conducted meetings for a jewelry task force charged with "[u]pdating the product, putting in a new assortment." I Aplt.App. at 116-17. She also recorded the minutes of these meetings. *Id.* at 116. These tasks were ones that were performed by Assistant Product Managers (APMs) for other departments. *Id.* at 139. However, some of the tasks that Sprague performed differed from those of the APMs because the APMs had more marketing experience and hence were given more discretion. *Id.*

Sprague last reported for work on September 24, 1993, and was terminated on November 1, 1993. *Id.* at 82. She continued to draw her full salary, however, until October 28. *See* Appellant's Reply Brief, Attachment A at 4 (letter from Douglas B. Westerhaus to M. Kathryn Webb). Between September 24 and November 1, Sprague indicated that she **\*1360** would be willing to return to work if Kowalski were not her supervisor. Aple. Supp.App. at 85-86. She also sought to have her job description upgraded and to receive back pay back to mid-1992, when she began to perform tasks similar to those performed by the APMs, both of whom were male. *Id.* at 49, 52, 82. Thorn refused to keep Sprague in her position with a different supervisor and on November 1 deemed her to have abandoned

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                          Page 9
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

her job and terminated her.

Sprague filed her original complaint in the district court on December 1, 1993. On the next day, she filed charges of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC), and she amended the charges on April 15, 1994. I Aplt.App. at 3. The EEOC issued a "Notice of Right to Sue" on May 23, 1994. *Id.* On November 8, 1994, Sprague filed her first amended complaint. Sprague raised several separate claims in her lawsuit. She contends that she should have been promoted to the position of an Assistant Product Manager and paid a salary commensurate with such position. Since both of Thorn's APM positions were occupied by males, she alleges that Thorn's failure to promote her and pay her at a rate equal to that of the male APMs constituted gender discrimination in violation of both the Equal Pay Act and Title VII. Sprague also brought a claim alleging hostile work environment sexual harassment, which is based on five incidents involving Mr. Kowalski, detailed later in Part III-C. Finally, Sprague asserts that she was subjected to constructive and retaliatory discharge.

The district court held that there were no genuine issues of material fact and that defendants were entitled to summary judgment. Memorandum and Order, II Aplt.App. at 396. *Sprague v. Thorn Americas,* No. 93-1478, 1995 WL 767308 (D.Kan. Dec. 18, 1995). The judge concluded that Sprague failed to present an actionable claim under the Equal Pay Act; the evidence revealed that Thorn did not have an assistant manager position in its jewelry department because that department constituted a relatively minor part of Thorn's business. The judge further stated that Sprague's job functions were not substantially similar to those of the two males who acted as assistant managers of other departments and that Sprague merely performed some, but not all, of the functions of an assistant manager. With respect to Sprague's allegations of sexual harassment and hostile working environment, the judge

stated the standard of liability to be that: "An employer may be liable for sexual discrimination when it permits the existence of an atmosphere so severe or pervasive in its offensiveness or hostility to reasonable workers that it alters the conditions of the employees' work environment. *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986)." Memorandum and Order at 8-9. The judge identified the occurrences complained of and held that they did not establish a sexually hostile working environment. *Id.* The judge also held that Sprague failed to show that she was constructively discharged since Sprague offered no evidence that a reasonable person would have viewed the working conditions as intolerable.

With respect to Sprague's claim of retaliatory discharge, the district judge concluded that Sprague failed to demonstrate any action by Thorn which reflected wrongful adverse job action, other than terminating her after not returning to work for several months. The district court stressed that Sprague conceded that she was an "at will" employee and that the parties did not enter into any implied employment contract.

## II. Standard of Review

We review *de novo* the district court's grant of summary judgment, applying the same standard used by the district court. *Bohn v. Park City Group, Inc.,* 94 F.3d 1457, 1460 (10th Cir.1996). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " *Williams v. Widnall,* 79 F.3d 1003, 1005 (10th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). When applying this standard, we must "examine the factual record and reasonable inferences therefrom in the light most favorable**1361** to the non-moving/opposing party." *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir.1996). If there is no dispute concerning a genuine issue of material fact, we then determine

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                    Page 10
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

whether the district court correctly applied the substantive law. *Peck v. Horrocks Engineers, Inc.,* 106 F.3d 949, 951 (10th Cir.1997).

## III. Analysis

[1] We first examine whether the district court erred in granting summary judgment in favor of defendants on Sprague's claims of gender discrimination under Title VII, 42 U.S.C. § 2000e-2(a), and the Equal Pay Act (EPA), 29 U.S.C. § 206(d)(1).FN3 At the outset we note that with respect to her Title VII claim of gender discrimination, Sprague argues on appeal that defendants' motion for summary judgment did not specifically address this claim and that defendants produced no specific evidence to refute the claim. Sprague thus contends that the district court erred in granting summary judgment since defendants failed to meet their burden of showing that they were entitled to judgment on the claim of gender discrimination. Our independent review of the record also reveals that the district court did not precisely address Sprague's Title VII gender discrimination claim in the context of her employment privileges, denial of promotion, and rate of pay, although the district court did specifically address Sprague's EPA claim.

> FN3. We are mindful that the elements and burdens of proof differ under the Equal Pay Act and Title VII. *See Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409-10 (10th Cir.1993); *Meeks v. Computer Assoc. International,* 15 F.3d 1013, 1020 (11th Cir.1994). We therefore address these claims separately in our discussion.

We are not persuaded by Sprague's procedural objection to the defendants' presentation of their position on the Title VII claim of gender discrimination. It appears from the record that defendants' motion for summary judgment did, in fact, address the issue of gender discrimination under Title VII, both in its discussion regarding sexual harassment as well as equal pay. I Aplt.App. at 52-89. Indeed, the

issue of Sprague's gender and the discrimination and mistreatment she allegedly suffered as a result thereof, forms the basis of Sprague's entire action. Throughout their motion for summary judgment, defendants clearly and specifically contested Sprague's assertions that she was deprived certain privileges of employment due to her gender.

Although we recognize that the Equal Pay Act and Title VII provide distinct causes of action and do not require precisely the same standard of proof, we are satisfied that defendants' arguments contained in their motion for summary judgment adequately addressed both Sprague's Title VII gender discrimination claim as well as her Equal Pay Act claim. We do not consider it fatal to defendants' motion for full summary judgment that defendants did not specifically include a separate argument or heading on Title VII "gender discrimination," when their argument against that gender discrimination claim by Sprague below was essentially raised and incorporated within defendants' discussion of the alleged violations of the Equal Pay Act in defendants' brief below. *See* I Aplt.App. at 31-35. Moreover, it appears from the record that Sprague did not raise any objection below that defendants failed to precisely challenge the Title VII gender discrimination claim in her response to defendants' motion for summary judgment.

In sum, we conclude that the issue regarding gender discrimination under Title VII was adequately presented to the district court and we further find that, in its order granting summary judgment, the district court necessarily concluded by implication that defendants' alleged failure to formally promote Sprague to assistant manager or pay her the salary commensurate with such a position did not violate Title VII.

### A. Title VII Gender Discrimination Claim

Turning specifically to Sprague's Title VII gender discrimination claim, Sprague stated in her amended complaint that she was "discharged, dis-

129 F.3d 1355                                                                                                    Page 11
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

criminated against and treated differently by defendant [Thorn] with respect to compensation, terms, conditions and privileges**1362** of her employment due to her sex, female, in violation of 42 U.S.C. § 2000e2(a)(1) and (2)." I Aplt.App. at 7. Sprague essentially contends that males who performed the duties of assistant managers were given the title and salary commensurate with such a position, while Sprague was denied a promotion to such title and salary because of her gender, even though she performed the same functions.

[2][3][4] "In a Title VII case, the initial burden is on the employee to make a *prima facie* showing of discrimination by the employer." *Nulf v. International Paper Co.,* 656 F.2d 553, 557 (10th Cir.1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). "Only when such a showing has been made does the burden shift to the employer to articulate 'some legitimate, nondiscriminatory reason' for the questioned action. If the employer meets this burden, the employee must show that the stated reason is actually a pretext for prohibited discrimination." *Id.* at 558 (quoting *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825).

[5][6] We have recognized that the "elements of a prima facie case set forth in *McDonnell Douglas* have been applied to promotion cases." *Nulf,* 656 F.2d at 558 (citations omitted). In order to establish a *prima facie* claim of discriminatory failure to promote under Title VII, Sprague was required to "show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted." *Id.* And Sprague bears the ultimate burden of establishing that Thorn intentionally discriminated against her. *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409 (10th Cir.1993); *see also Meeks v. Computer Associates International,* 15 F.3d 1013, 1019 (11th Cir.1994) (the *McDonnell Douglas* framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer).

[7] We are not persuaded that Sprague established a *prima facie* case of failure to promote because of gender. As the record reveals, and the district court concluded, Thorn "did not have an Assistant Manager position in its Jewelry Department, because that department formed such a small part of the company's business." *See* district court's Memorandum and Order at 10. It is indeed difficult for us to understand how Sprague can maintain that she was the victim of discrimination due to Thorn's refusal to promote her to the position of assistant manager of jewelry when such a position did not even exist. We therefore find it highly questionable whether promotional opportunities were even available with respect to Sprague's position. More importantly, Sprague failed to produce any evidence which shows that if such opportunities did, in fact, exist, Thorn intentionally gave such positions to males because of a gender preference. Further, there is no indication that Thorn purposely refused to create such a position in an effort to discriminate against women or deny Sprague promotional opportunities. We therefore conclude that Sprague failed to make a *prima facie* showing of intentional gender discrimination with respect to Thorn's refusal to promote her.

With respect to Sprague's Title VII equal pay claim, we earlier stated that "the equal pay/equal work concept applies to Title VII in the same way it applies to" the EPA. *Nulf,* 656 F.2d at 560. However, the Supreme Court in *County of Washington v. Gunther,* 452 U.S. 161, 168-71, 180-81, 101 S.Ct. 2242, 2247-49, 2253-54, 68 L.Ed.2d 751 (1981), determined that the EPA's requirement that a plaintiff prove equal work does not apply to Title VII. Rather, "a cause of action for discriminatory compensation based on sex could arise under Title VII even if a plaintiff did not allege unequal pay for equal work." *Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1132 (5th Cir.1983). *See also Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1527 (11th Cir.1992)(*Gunther* held that Title VII, 42 U.S.C. § 2000e-2(h), only incorporates the affirmative defenses of the EPA, not its prohibitory lan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                 Page 12
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

guage requiring equal pay for equal work); *Loyd v. Phillips Brothers, Inc.,* 25 F.3d 518, 525 (7th Cir.1994) (even when jobs are not sufficiently similar to constitute "equal work" under the EPA, a Title VII claim for wage discrimination is not precluded; however, in an action under Title *1363 VII, plaintiff must show an intent and actual desire to pay women less than men because of gender).

In *Tidwell,* 989 F.2d at 410, we acknowledged that our statement in *Ammons v. Zia Co.,* 448 F.2d 117 (10th Cir.1971), that Title VII required a showing of equal work, must be treated as substantially modified by the Supreme Court in *Gunther.* We also acknowledged that *Gunther* emphasized that the purpose of the Bennett Amendment was to incorporate into Title VII the four affirmative defenses of the EPA, but not the EPA equal work requirement. *Id.* at 411.

[8][9][10] Thus, "a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Meeks,* 15 F.3d at 1019. "Once a *prima facie* case is established, the defendant must articulate a 'legitimate, non-discriminatory reason for the pay disparity.' This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Id.,* (quoting *Miranda,* 975 F.2d at 1529). Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her. *Id.; See also Tidwell,* 989 F.2d at 409. That is, "the plaintiff must show that 'a discriminatory reason more likely than not motivated [the employer] to pay her less.' " *Meeks,* 15 F.3d at 1019 (quoting *Miranda,* 975 F.2d at 1529).

[11] It is apparent from the record that Sprague failed to present genuine issues of material fact which would support her equal pay claim under Title VII. As the district court observed, Sprague contrasts her functions and pay in the jewelry department to those of the assistant product manager of electronics and the assistant product manager of

furniture/appliances, both of whom are males. "However, the Electronics, Furniture/Appliances, and Jewelry Departments do not contribute equally to [Thorn's] revenues." *See* district court's Memorandum and Order at 5. While the electronics department comprises approximately 50% of revenues and the furniture/appliance department accounts for approximately 45% of revenues, the jewelry department only produces approximately 4% of revenues. *Id.* Thus, a difference in pay between Sprague and the assistant product managers is justifiable and is consistent with the different levels of importance, value, and depth of responsibility between the respective departments.

Thorn also suggests that these higher paid managers had much greater marketing experience than Sprague, had a greater array of responsibilities, and that Sprague did not perform all of the functions in the jewelry department that these managers performed in their respective departments. Additionally, the district judge noted that Sprague did not receive high marks by Thorn's review committee, and, as "a result of the review, Sprague was eventually placed on an action plan to be let go." *See* district court's Memorandum and Order at 6. Further, the district judge recognized that although Sprague contends that she began to do the work of assistant product manager for jewelry in 1992 or January of 1993, Sprague expressed a goal in January of 1993 of being promoted to assistant product manager in June of 1993, "a career goal which was surely unnecessary if she had already achieved this position." *Id.* at 4."Nor does evidence cited by Sprague support the conclusion that she was a de facto Assistant Manager." *Id.*

Given the evidence presented to the district court, we find that Sprague failed to present a *prima facie* case of intentional gender discrimination. The evidence shows a legitimate basis for the difference in pay, and none of the evidence presented by Sprague reveals a desire on the part of Thorn to intentionally pay her less because of her gender. Since there is no genuine issue of material fact regarding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                    Page 13
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

Sprague's Title VII gender discrimination claim, summary judgment on that claim was appropriate.

## B. Equal Pay Act Claim

We now examine Sprague's claim under the EPA, 29 U.S.C. § 206(d)(1). The EPA provides that:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between **\*1364** employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

[12][13][14][15] To establish a *prima facie* case under the EPA, Sprague "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." *Tidwell,* 989 F.2d at 409 (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). "If a prima facie case is so established under the EPA the *defendant* must undertake the burden *of persuading* the jury that there existed reasons for the wage disparity which are described in the [EPA]."*Tidwell,* 989 F.2d at 409 (emphasis in original). If the defendant

fails in this respect, the plaintiff will prevail on her *prima facie* case. *Id.* Thus, under the EPA, "the onus is on the employer to establish that the pay differential was premised on a factor other than sex. Under Title VII, however, the plaintiff must prove that the employer had a discriminatory intent." *Id.*

[16] Sprague contends that the district court erred in granting summary judgment on her EPA claim because there was a genuine issue of material fact as to whether she was paid less than two male employees for equal work in a job which required equal skill, effort, and responsibility and which was performed under similar working conditions. However, we agree with the district court that Sprague failed to produce evidence that her job functions were substantially similar to those of the male assistant managers. "The uncontroverted evidence is that Sprague was not an Assistant Manager, and that at most, she performed only 'some' functions of an Assistant Manager." *See* district court's Memorandum and Order at 11. The district judge concluded that because Sprague did not demonstrate that she occupied substantially the same position or performed substantially the same tasks as the assistant managers, her EPA claim must fail. We agree.

Much of our analysis regarding Sprague's equal pay claim under Title VII applies here as well. As previously noted, Sprague worked in a department which produced less than one-tenth of the revenues of the departments managed by the male assistant managers. Such a substantial difference in revenues between Sprague's department and those departments managed by her male counterparts indicates that the tasks and functions performed by Sprague were quite dissimilar both in the level of experience required to adequately manage operations and the level of complexity in performing required functions. We are also persuaded that equal pay was not required due to the varied level of experience between Sprague and the male assistant managers, the somewhat poor review given to Sprague's performance, the recommendation that Sprague even-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                Page 14
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

tually be "let go", and the fact that no assistant manager position existed in the jewelry department.

[17] We do not construe the "equal work" requirement of the EPA broadly, and we have stated that failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. *See, Nulf,* 656 F.2d at 560 (citing *Lemons v. City and County of Denver,* 620 F.2d 228, 229-30 (10th Cir.), *cert. denied,*449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980)). Rather, in order to prevail in such an EPA action, the jobs "must be 'substantially equal' in terms of 'skill,' 'effort,' 'responsibility,' and 'working conditions.' " *Nulf,* 656 F.2d at 560 (citing *1365Ammons v. Zia Co.,* 448 F.2d at 120). We conclude that, based on the materials submitted by the parties, it is clear that Sprague occupied a position and performed functions that were not "substantially equal" to those of the male assistant managers. At most, Sprague's job functions were merely comparable to those of the assistant managers. Hence, the district court did not err in holding that no genuine issue of material fact existed and in granting summary judgment in favor of defendants on the EPA claim.

### C. Sexual Harassment

Sprague argues that the district court erred in granting summary judgment to defendants on her sexual harassment claim.[FN4] As discussed more fully below, Sprague alleges five separate incidents of allegedly sexually-oriented, offensive comments either directed to her or made in her presence in a sixteen month period. All such incidents involved Mr. Kowalski.[FN5] She further alleges that management was aware of at least three of these incidents, as well as a pattern of abuse directed toward other women by Kowalski, but that management refused to remedy the situation by placing her with a different supervisor.

> FN4. In Sprague's complaint, she alleged hostile work environment harassment as well as *quid pro quo* sexual harassment.

*See Harrison v. Potash,* 112 F.3d 1437, 1443 (10th Cir.1997), for a discussion regarding the distinction between these types of prohibited conduct. However, on appeal Sprague directs her argument solely to hostile work environment harassment and we therefore assume that Sprague has abandoned her *quid pro quo* claim. Hence, we will focus exclusively on whether the district court erred in granting summary judgment against Sprague on her hostile work environment harassment claim.

> FN5. We note, however, that Kowalski was not Sprague's supervisor with respect to the three incidents occurring prior to June 1992. Kowalski became Sprague's supervisor after Sprague's review in June 1992, at which she was told that she "would be working specifically for the product group under Ed [Kowalski]." Sprague Dep., I Aplt.App. at 114.

It is beyond contention that Title VII prohibits sexual harassment in the workplace. *Harrison v. Potash, Inc.,* 112 F.3d 1437, 1442 (10th Cir.1997) (citations omitted); 42 U.S.C. § 2000e-2(a)(1). Further, in certain circumstances, the employer can be held liable for an employee's sexually offensive conduct which creates a hostile work environment. *Id.* at 1443. However, prior to addressing the issue of whether summary judgment was properly entered in favor of Thorn as Kowalski's employer, we must first examine the evidence to determine if a genuine issue of material fact exists as to whether Kowalski's alleged conduct created a hostile work environment within the meaning of Title VII.

[18][19][20] It is clear that not all "workplace conduct that may be described as 'harassment,' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Rather, in order to prevail on a hostile work environment sexual harassment claim, Sprague is required to show that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                    Page 15
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

the unwelcome, sexually-oriented conduct was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995) (quoting *Hirschfeld v. New Mexico Corrections Dep't.,* 916 F.2d 572, 575 (10th Cir.1990), and *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405-06). In determining whether Sprague made the requisite showing, we must consider a variety of factors, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Moreover, whether the complained of conduct is sufficiently pervasive as to create a hostile work environment must be determined from the totality of the circumstances since no single factor is required. *Id.* at 23, 114 S.Ct. at 371.

[21][22] "A plaintiff may prove the existence of hostile work environment sexual harassment in violation of Title VII 'where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating,*1366 hostile, or offensive working environment.' " *Hirase-Doi,* 61 F.3d at 782 (quoting *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404-05) (internal quotations omitted). In *Harris,* the Supreme Court held that a plaintiff bringing a hostile Title VII work environment sexual harassment claim must establish both an objectively hostile or abusive work environment and a subjective perception by the plaintiff that the environment was abusive. But Title VII comes into play before the harassing conduct leads to a nervous breakdown, and a discriminatorily abusive work environment, even one that does not seriously affect the employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. *Harris,* 510 U.S. at 22, 114 S.Ct. at 371. "So long as the environment

would reasonably be perceived, and is perceived, as hostile or abusive, *Meritor,...* there is no need for it also to be psychologically injurious." *Id. See also Hirase-Doi,* 61 F.3d at 782.

[23] As noted above, the conduct allegedly creating a hostile work environment consisted of five separate incidents involving Kowalski over a span of approximately sixteen months. On one occasion in April 1992, when Sprague entered Kowalski's office, he allegedly said, "Shelley, you really need to undo that top button." Sprague Deposition, I Aplt.App. at 119. Sprague also complained of an incident in February or March 1992 where an unknown person asked, "Hey, are the girls going down to aerobics," to which Kowalski allegedly replied, "Hey, you can't call them girls. You have to call them ladies." Aple. Supp.App. at 38. Another incident allegedly occurred in May 1992 when Sprague, Kowalski, and two other employees were standing in a hallway. Kowalski allegedly "brought up the subject about women and PMS and you know how they are at that time of the month...." I Aplt.App. at 120. As the district court noted in its Memorandum and Order granting summary judgment for defendants, p. 9, in January 1993, after the first three incidents described above, "Sprague stated in writing that she believed Kowalski helped her in her work and that she was 'happy' to work with him."

On March 20, 1993, Sprague got married. Her wedding reception was at Crestview Country Club. I Aple. Supp.App. at 55. Sprague stated in her deposition that:

> Ed [Kowalski] was there, and he put his arm around me and I caught him looking down my dress. And, you know, I looked at him, and he said 'well, you got to get it when you can.' I was so uncomfortable and I was so embarrassed that I didn't even tell my husband for a few weeks because he would have been extremely upset, and he was when he heard it.

I Aplt.App. at 125. Finally, a week before Labor

129 F.3d 1355                                                                                                    Page 16
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

Day in 1993, in discussing what to call "neck chains," Sprague testified that she had said "neck chains," and "Ed said, 'neck chains! That sounds kind of kinky.' " Aple. Supp.App. at 56.

From the record evidence respecting the five incidents, it appears to us that unpleasant and boorish conduct by Kowalski was shown, but that Sprague was not, in fact, subjected to such offensive comments or conduct as to create a "hostile or abusive" work environment. *Harris,* 510 U.S. at 22, 114 S.Ct. at 370-71. The incident at Sprague's wedding reception was the most serious, but it occurred at a private club, not in the workplace. Moreover, the conduct occurred sporadically over an extended period of some 16 months. Our review of the remarks allegedly made by Kowalski leads us to conclude that these remarks were not sufficiently severe or pervasive as to alter the condition of Sprague's employment and create an actionable hostile work environment.

In sum, considering Sprague's evidence concerning the five incidents at issue, the totality of the circumstances, and the standard of *Harris* and *Meritor,* which the district judge properly applied, there was not a showing by Sprague sufficient to avoid summary judgment on this claim. Sprague did not proffer evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

### D. Retaliatory and Constructive Discharge

[24] Sprague contends that the district court erroneously granted summary judgment*1367 in favor of defendants on her claims of retaliatory and constructive discharge. However, we feel that the record clearly supports the district court's ruling.

As set out more fully above, Sprague's last day of work with Thorn was Friday, September 24, 1993. On the following Monday, Sprague called in sick with a sinus headache, and she never returned to

work. However, Sprague continued to draw her full salary until October 28. On October 1, 1993, Sprague, along with her attorney, went to Thorn and indicated that she would be willing to return to work if, (1) Kowalski were not her supervisor, and (2) she be given the title and salary of product manager, retroactive to June 1992. Thorn refused to accept Sprague's demands. Although Sprague was repeatedly urged to return to work by representatives of Thorn, on November 1, 1993, Thorn deemed her to have abandoned her job and therefore terminated her.

These facts hardly support a claim of retaliatory discharge. As the district court noted, Sprague's claim of retaliatory discharge is based largely on the fact that she hired an attorney and that Thorn refused to accept her conditions for returning to work. We have held that in order to establish a *prima facie* case of retaliatory discharge, a plaintiff must show: (1) she engaged in protected activity; (2) she subsequently suffered adverse action by the employer; and (3) there was a causal connection between the protected activity and the adverse action. *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 208-09 (10th Cir.1997); *Archuleta v. Colorado Dep't of Institutions, Division of Youth Services,* 936 F.2d 483, 486 (10th Cir.1991). However, as the district court correctly recognized, Sprague failed to identify any action by Thorn, "other than her termination after not returning to work for several months, which supposedly reflects ... wrongful adverse job action." *See* district court's Memorandum and Order at 11. There is no indication that Thorn terminated Sprague because she attempted to engage in protected activity or because she exercised legal rights. On the contrary, the record supports the conclusion that Sprague was terminated because she refused to return to work after a period of prolonged absence. Thus, we conclude that Sprague failed to show that any genuine issue of material fact existed with respect to her retaliation claim, and summary judgment was therefore properly granted in favor of defendants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                 Page 17
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

[25][26] Turning to Sprague's constructive discharge claim, we similarly conclude that Sprague failed to present material facts which support her claim. A plaintiff alleging constructive discharge must show that the employer by its unlawful acts made working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign. *Thomas v. Denny's Inc.,* 111 F.3d 1506, 1514 (10th Cir.1997) (citing *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1154 (10th Cir.1990)). We agree with the district court that Sprague offered no evidence such that a reasonable person would have viewed her working conditions as intolerable. Accordingly, the district court properly granted summary judgment in favor of defendants on this claim.

### E. Motion to Compel Discovery

#### I

We lastly review the district court's denial of Sprague's motion to compel production of documents, particularly a memorandum prepared by in-house counsel Doug Westerhaus for management, and testimony by Westerhaus in response to 42 questions which he refused to answer on his counsel's advice and assertion of privilege.

Sprague took the deposition of Westerhaus on October 24, 1995. Following the deposition, on November 22, 1995, Sprague filed a motion to compel with a supporting memorandum, and she subsequently filed an addendum to the supporting memorandum on December 1, 1995. II Aplt.App. at 256, 258, 335. Sprague sought to compel the production of documents by Westerhaus relevant to the deposition inquiries, testimony by Westerhaus regarding 42 questions Westerhaus was instructed not to answer by defendants' counsel based on attorney-client and work product privileges, and, in particular, the production of a memorandum prepared by Westerhaus for Thorn's senior management, *1368 allegedly addressing disparate treatment of women

at Thorn. On appeal, Sprague has focused her arguments mainly on the memorandum. *See, e.g.,* Appellant's Reply Brief at 10-12.

There was apparently no substantial argument below on Sprague's motion to compel. The motion was disposed of by the trial judge in his Memorandum and Order, which denied the motion to compel and granted the defendants' motion for summary judgment. II Aplt.App. at 396-408. The order states in part:

> The court has at hand the plaintiff's motion to compel the production of documents and testimony from Doug Westerhaus, an attorney employed by the defendant THORN Americas. The court finds that the motion to compel should be denied, since the matters sought to be discovered reflect privileged information and the plaintiff has failed to identify any actions by the defendant indicating a waiver of that privilege.

*Id.* at 396.

#### II

[27][28] We review rulings related to discovery under an abuse of discretion standard. *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1520 (10th Cir.1995) (quoting *Johnson v. Thompson,* 971 F.2d 1487, 1497 (10th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993)). Although discovery in discrimination cases should not be narrowly circumscribed, the desire to afford "broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Gomez,* 50 F.3d at 1520 (quoting *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 906 (6th Cir.1991)).

This discovery issue turns on the claim of attorney-client privilege and attorney work product privilege. In addressing the issue, we face consideration of both federal and Kansas law since both federal claims and state law pendent jurisdiction claims are asserted in the instant case.[FN6] The briefs of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                  Page 18
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

Sprague on appeal make no argument focusing on any distinction between federal and state law and cite only one federal case and Fed.R.Civ.P. 26(b)(5) with its provisions concerning the required procedure when a party withholds information, otherwise discoverable, by claiming privilege or protection of it as trial preparation material. Brief of Appellant at 26-27; Appellant's Reply Brief at 10-12. The defendants likewise make no assertion as to the applicability of federal as opposed to state law, or the reverse, in their brief before us, although they cite our *Gomez* opinion on the scope of review and *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), in support of their attorney-client privilege claim concerning the Westerhaus memorandum. Brief of Appellees at 28-29.

> FN6. In the Brief of Appellant at 1-2, plaintiff Sprague alludes to her several federal claims and also to her claims under the Kansas Acts Against Discrimination, K.S.A. § 44-1001, *et seq.* Sprague does not separately argue her state and federal claims and instead asserts general arguments of alleged errors in the rulings on her claims of sex discrimination, sexual harassment, violation of the Equal Pay Act, and retaliatory and constructive discharge. The standards governing sexual harassment claims under the Kansas statute are identical to those under Title VII in any event. *Ulrich v. K-Mart Corp.,* 858 F.Supp. 1087, 1091 n. 4 (D.Kan.1994); *see also Reber v. Mel Falley, Inc.,* 235 Kan. 562, 683 P.2d 1229, 1230-32 (1984).

In *Motley v. Marathon Oil Co.,* 71 F.3d 1547 (10th Cir.1995), *cert. denied,*517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996), the plaintiff asserted both federal and state claims. We said that as to the state causes of action, a federal court should look to state law in deciding privilege questions, citing Fed.R.Evid. 501 and *White v. American Airlines, Inc.,* 915 F.2d 1414, 1424 (10th Cir.1990). *Motley,* 71 F.3d at 1551. Rule 501 provides in part that in

civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, privilege of a witness or person, *inter alia,* shall be determined in accordance with state law. In *White v. American Airlines, Inc.,* 915 F.2d 1414 (10th Cir.1990), we applied Oklahoma law in deciding an attorney-client privilege question in a civil case based on a state cause of action, where the case had been removed to federal court. *Id.* at 1423-24.

**\*1369** [29] Here, with both federal claims and pendent state law claims implicated, we should consider both bodies of law under *Motley* and Fed.R.Evid. 501. If the privilege is upheld by one body of law, but denied by the other, problems have been noted. "In this situation, permitting evidence inadmissible for one purpose to be admitted for another purpose defeats the purpose of a privilege. The moment privileged information is divulged the point of having the privilege is lost." 3 *Weinstein's Federal Evidence,* § 501.02[3][b] (Matthew Bender 2d ed.) (citing *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455, 458 (N.D.Cal.1978)). If such a conflict on the privilege exists, then an analytical solution must be worked out to accommodate the conflicting policies embodied in the state and federal privilege law.[FN7] Here, however, for reasons given below we are convinced that both federal and Kansas law support application of the attorney-client privilege. Therefore we need not articulate an analytical solution here for conflicts in attorney-client privilege rules.

> FN7. *See, e.g., Hancock v. Hobbs,* 967 F.2d 462, 466-67 (11th Cir.1992) (federal law applied rejecting psychiatrist-patient privilege claim in § 1983 case although pendent state law counts were asserted and conflicting state law might provide different result); *Hancock v. Dodson,* 958 F.2d 1367, 1372-73 (6th Cir.1992) (In federal question case involving a § 1983 claim, existence of pendent state law claims held not to relieve court of obligation to apply

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                    Page 19
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

federal law of privilege); *United States v. Prouse,* 945 F.2d 1017, 1024 (8th Cir.1991) (Minnesota statutory privilege against use of test result from employer's drug or alcohol testing program not applied due to Fed.R.Evid. 501 instruction "to apply privileges in light of reason and experience"); *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987) (where federal RICO claim was asserted along with pendent state law claims and a diversity claim, it was held that federal law of privilege controlled question of journalist's privilege); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 104 (3d Cir.1982) (when there are federal claims in a case also presenting state law claims, federal rule favoring admissibility rather than state law privilege is the controlling rule); *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 and n. 3 (7th Cir.1981) (in federal antitrust suit with pendent state law claim, federal rule denying privilege applied to reject privilege claim under state Medical Studies Act).

We turn now to the consideration of the merits of the privilege claims here.

### III

[30] Plaintiff Sprague supported her motion to compel discovery with an affidavit of Ms. Melanie Owens which was attached to her memorandum in support of her motion to compel. II Aplt.App. 283-85. The principal facts are stated in the affidavit of Owens, who was employed by Thorn for some six years from early January 1990 until September 1995. Her affidavit states she filled the position of Manager of Compensation in the Human Resources Department during her employment with Thorn. Her responsibilities included developing and implementing salary range structures and incentive programs, evaluating jobs and placing them in a

salary range, researching compensation schemes, *inter alia. Id.*

On July 12, 1995, at about 6:15 p.m. as Owens exited the building after work, she saw Doug Westerhaus in the parking lot. He was the staff attorney at Thorn responsible for the Human Resources Department. Westerhaus indicated he wanted to talk with Ms. Owens. During the course of their conversation, Westerhaus advised Ms. Owens, according to the affidavit, that he was concerned about the disparate treatment of women at Thorn, mentioning specific women employed at Thorn. The critical portion of the affidavit stated:

> 7. Westerhaus proceeded to inform me that he had sent a memorandum addressing the subject of the disparate treatment of women by the company to Mr. Dave Egan, Senior Vice President and General Counsel for THORN. Westerhaus said he intended to follow up on the subject of the memorandum with Egan and other members of senior management including Mr. Alan St. Clair, Vice President of Human Resources.

II Aplt.App. 283.

Owens' affidavit says that she told Westerhaus her department had been responsible for preparing historical data, including graphic analysis and backup information for the Legal Department that provided statistical support for the memorandum. Westerhaus*1370 said that he had reviewed that information, and that information made available to him indicated that women received disparate treatment at Thorn. Westerhaus commented on the fact that there were no women in executive level positions with the company, which amounted to disparate treatment. The affidavit continues with specific examples given by Westerhaus dealing with the allegedly disparate treatment. The conversation of Owens and Westerhaus lasted between 15 and 30 minutes. II Aplt.App. 284-85.

[31] We are persuaded that the critical memorandum of Westerhaus is protected by the attorney-cli-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                          Page 20
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

ent privilege. It was prepared for higher management by in-house counsel acting within the scope of his employment and, as paragraph 7 of the affidavit demonstrates, it related to the rendition of legal services and advice. As the Supreme Court has noted, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States,* 449 U.S. at 390, 101 S.Ct. at 683; *United States v. Amerada Hess Corp.,* 619 F.2d 980, 986 (3d Cir.1980) ("Legal advice or opinion from an attorney to his client, individual or corporate, has consistently been held by the federal courts to be within the protection of the attorney-client privilege"); *Natta v. Hogan,* 392 F.2d 686, 692-93 (10th Cir.1968) ("The recognition that privilege extends to statements of a lawyer to a client is necessary to prevent the use of the lawyer's statements as admissions of the client").

A dichotomy in treatment of the attorney-client privilege has been noted in several cases. In *Loftis v. Amica Mutual Insurance Co.,* 175 F.R.D. 5 (D.Conn.1997), the two general approaches are discussed. Under a narrower approach, the attorney-client privilege is held not to protect from disclosure a legal opinion and advice communicated in confidence by an attorney to his client where that opinion and advice do not reveal client confidences. *Id.* at 9-10.Predicting Connecticut law, *Loftis* held that the narrower approach should be applied and a letter from counsel to the client was denied protection. *Id.* at 10.

*Loftis* noted, however, that some courts have held that the privilege protects communications from the lawyer, regardless of whether the lawyer's communications reveal confidences from the client, citing *United States v. Amerada Hess Corp.,* discussed above. *Id.* at 8-9.This broader approach has been applied in cases holding that any communication from an attorney to his client made in the course of giving legal advice is protected. *In re LTV Securities Litigation,* 89 F.R.D. 595, 602 (N.D.Tex.1981).

The *LTV* opinion rejects the narrower view, pointing out that the predictability of confidence is central to the role of the attorney and that "[a]doption of such a niggardly rule has little to justify it and carries too great a price tag." *Id.* at 602. The *LTV* opinion concludes that a broader rule prevails in the federal courts, one that protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice, citing our opinion in *Natta v. Hogan,* discussed earlier. *Id.* The distinction between the narrow and broad approaches was also noted in *Potts v. Allis-Chalmers Corp.,* 118 F.R.D. 597 (N.D.Ind.1987). The court there concluded that attorneys' communications to their clients are not uniformally privileged but that resolution of the conflict of case law was not necessary for decision in that case. *Id.* at 603.

[32] We are persuaded that our *Natta v. Hogan* opinion, 392 F.2d at 692-93, does represent an application of the broader rule, which was the view of the *LTV* opinion. We are further persuaded that under the wording of the statutory privilege in Kansas, K.S.A. § 60-426, the Kansas courts would apply the broader rule. That statute protects, *inter alia,* "communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence ...."§ 60-426(a). Also K.S.A. § 60-426(c) defines "communication" to include *"advice given by the lawyer in the course of representing the client* and includes disclosures of the client to a representative, associate or employee of the lawyer...." (Emphasis added). In *\*1371 State of Kansas v. Breazeale,* 11 Kan.App.2d 103, 713 P.2d 973 (1986), the court held that the "lawyer-client privilege protects statements transmitting information between a lawyer and his client that are made in professional confidence." (Syllabus 1 by the court). Because of the breadth of the language of the Kansas statute and the opinion interpreting it, we are convinced that the Kansas courts favor the broader approach, namely protecting an attorney's communications to his client without the qualification that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                                    Page 21
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
(Cite as: 129 F.3d 1355)

the communications must contain confidential matters revealed by the client earlier to the attorney.

One further argument of plaintiff Sprague against application of the privilege is that Westerhaus has not produced any facts establishing a basis for withholding the memorandum and that he therefore should be compelled to produce it, along with all other items described in the deposition subpoena. Brief of Appellant at 27. We disagree. Owens' affidavit, attached to the motion to compel of plaintiff Sprague, itself asserted the relationship of Westerhaus as an attorney, that the memorandum addressed the legal subject of allegedly disparate treatment of women by the company, and that the memorandum had been sent to members of senior management of Thorn. II Aplt.App. at 283-85. These circumstances properly supported application of the attorney-client privilege, unless there was a waiver or other special ground for disregarding the privilege. We will now discuss those questions as argued by Sprague.

[33] We are not persuaded by Sprague's contention that the attorney-client privilege was waived here. As the Supreme Court has noted, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348-49, 105 S.Ct. 1986, 1990-91, 85 L.Ed.2d 372 (1985). Hence, "a corporate employee cannot waive the corporation's privilege." *United States v. Chen,* 99 F.3d 1495, 1502 (9th Cir.1996), *cert. denied,* 520 U.S. 1167, 117 S.Ct. 1429, 137 L.Ed.2d 538 (1997); *In re Claus von Bulow,* 828 F.2d 94, 100-101 (2d Cir.1987). Here there is no showing that the officers or directors of Thorn ever expressly or impliedly waived the attorney-client privilege of the corporation with respect to the memorandum as required by federal law. We must also consider the Kansas law on the attorney-client privilege since Sprague asserts both federal claims and Kansas pendent state law claims. Kansas affords protection by statute to the privilege, giving

the same basic protection to communications between lawyer and client which we discussed in *Natta v. Hogan,* 392 F.2d at 692-93, in treating federal law on the attorney-client privilege. See K.S.A. § 60-426.[FN8] Further, the waiver of the privilege is confined to circumstances where the judge may find that the client (a person or corporation, directly or through an authorized representative) has waived the privilege in accordance with the conditions in the Kansas statutes. K.S.A. § 60-437. Here no such waiver satisfying the Kansas requirements is shown.

> FN8. The Kansas attorney-client privilege is afforded by K.S.A. § 60-426, which provides in part:
>
> 60-426. Lawyer-client privilege.
>
> (a) General rule. Subject to K.S.A. 60-437, and except as otherwise provided by subsection (b) of this section communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (1) if he or she is the witness to refuse to disclose any such communication, and (2) to prevent his or her lawyer from disclosing it, and (3) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated by the client, or (iii) as a result of a breach of the lawyer-client relationship. The privilege may be claimed by the client in person or by his or her lawyer, or if an incapacitated person, by either his or her guardian or conservator, or if deceased, by his or her personal representative.

There remains the contention by plaintiff Sprague

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 1355                                                                                              Page 22
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA) 1111, 72 Empl. Prac. Dec. P 45,104, 39 Fed.R.Serv.3d 706, 97 CJ
C.A.R. 3234, 97 CJ C.A.R. 2990
**(Cite as: 129 F.3d 1355)**

that the attorney-client privilege does not apply be-
cause of the crime or fraud exception. Brief of Ap-
pellant at 28. We have recognized that there is an
exception under federal law that "the attorney-cli-
ent *1372 privilege does not apply where the client
consults an attorney to further a crime or fraud."
*Motley,* 71 F.3d at 1551 (quoting *In re Grand Jury
Proceedings,* 857 F.2d 710, 712 (10th Cir.1988),
*cert. denied,*492 U.S. 905, 109 S.Ct. 3214, 106
L.Ed.2d 565 (1989)). In Kansas there is also a stat-
utory provision that the attorney-client privilege
and others do not extend to a communication if
there was sufficient evidence that the communica-
tion was sought to enable or aid the commission or
planning "of a crime or a tort...." K.S.A. §
60-426(b). *See Burton v. R.J. Reynolds Tobacco
Co.,* 167 F.R.D. 134, 140-41 (D.Kan.1996); *In re
A.H. Robins Co., Inc.,* 107 F.R.D. 2, 9
(D.Kan.1985). However, Sprague points to no re-
cord evidence to support a contention that Wester-
haus' advice was sought to perpetuate a crime, a
fraud or a tort, and we have found none.

In sum, we are convinced that under federal and
Kansas law the critical memorandum and informa-
tion sought by the motion to compel are protected
by the attorney-client privilege. Since this privilege
applies, it is unnecessary for us to consider the
work product privilege. We are persuaded that the
district judge properly denied the motion to compel.

Accordingly, the judgment of the district court is
**AFFIRMED.**

C.A.10 (Kan.),1997.
Sprague v. Thorn Americas, Inc.
129 F.3d 1355, 75 Fair Empl.Prac.Cas. (BNA)
1111, 72 Empl. Prac. Dec. P 45,104, 39
Fed.R.Serv.3d 706, 97 CJ C.A.R. 3234, 97 CJ
C.A.R. 2990

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

77 F.3d 745                                                                                        Page 1
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

▷

Hopkins v. Baltimore Gas and Elec. Co.
C.A.4 (Md.),1996.

United States Court of Appeals,Fourth Circuit.
George E. HOPKINS, Jr., Plaintiff-Appellant,
v.
BALTIMORE GAS AND ELECTRIC COMPANY,
Defendant-Appellee.
American Civil Liberties Union Foundation; Amer-
ican Civil Liberties Union of Maryland, Inc.; Wo-
men's Legal Defense Fund; National Women's Law
Center; Equal Employment Opportunity Commis-
sion, Amici Curiae.
**No. 95-1209.**

Argued Sept. 28, 1995.
Decided March 5, 1996.

Former employee brought action against former
employer under Title VII of the Civil Rights Act of
1964, alleging that his supervisor's conduct created
sexually hostile work environment and that he was
retaliated against for making complaint about the
harassment. The United States District Court for the
District of Maryland, Alexander Harvey, II, Senior
District Judge, 871 F.Supp. 822, granted summary
judgment in favor of former employer on both
claims. Former employee appealed. The Court of
Appeals, Niemeyer, Circuit Judge, held that: (1) su-
pervisor's alleged harassment of former employee
was not sufficiently severe or pervasive to create
objectively hostile work environment, and (2)
former employee failed to show that former em-
ployer took adverse employment action against
him.

Affirmed.

Wilkinson, Chief Judge, concurred in part with
opinion in which Hamilton, Circuit Judge, joined.

West Headnotes

**[1] Civil Rights 78 ⬡⟹1187**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1187 k. Same-Sex Harassment. Most
Cited Cases
    (Formerly 78k167)
Male supervisor's alleged sexual harassment of
male employee, which included bumping into em-
ployee, positioning magnifying glass over employ-
ee's crotch, giving employee congratulatory kiss at
employee's wedding, staring at employee in bath-
room, commenting on employee's appearance and
making inappropriate sexual comments, was not
sufficiently severe or pervasive to create object-
ively hostile or abusive work environment within
meaning of Title VII, where alleged incidents oc-
curred intermittently over seven-year period, and
several of incidents occurred in group settings with
employee subjectively perceiving them to have
been directed solely at him. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⬡⟹1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
To establish claim for sexual harassment under
Title VII, plaintiff employee must prove that sub-
ject conduct was unwelcome, that it was based on
plaintiff's sex, that it was sufficiently severe or per-
vasive to alter plaintiff's conditions of employment
and to create abusive work environment and that it
was imputable on some factual basis to employer.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[3] Civil Rights 78 ⬡⟹1183**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                    Page 2
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k167)

Not all sexual harassment that is directed at individual because of his or her sex is actionable under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ⚖1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

Title VII does not attempt to purge workplace of vulgarity. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⚖1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

In deciding whether alleged harassment of employee is sufficiently severe or pervasive to bring it within Title VII's purview, court must examine totality of circumstances, including frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating or mere offensive utterance and whether it unreasonably interferes with employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⚖1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

Title VII was not designed to create federal remedy for all offensive language and conduct in workplace. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⚖1246**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1246 k. Particular Cases. Most Cited Cases

**Civil Rights 78 ⚖1248**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1248 k. Discipline. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)

Former employee did not establish that former employer took adverse employment action against him after he complained about alleged sexual harassment by his supervisor, for purposes of establishing prima facie case of retaliation under Title VII, where former employee's position was eliminated as part of corporate restructuring and former employee voluntarily chose to terminate his employment rather than continue working at company in another capacity, formal disciplinary warning was removed from former employee's personnel record, both former employee and supervisor were required to undergo psychological examination, and former employee's only other allegations of adverse employment action were that company officials told him to put behind him the alleged instances of harassment and that supervisor wrote in evaluation that former employee needed improvement in job behavior and work relations. Civil Rights Act of 1964, §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                    Page 3
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

704(a), 42 U.S.C.A. § 2000e-3(a).

**[8] Civil Rights 78 ⟲1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
To establish prima facie case of retaliation under
Title VII, employee must show that he or she en-
gaged in protected activity, that his or her employer
took adverse employment action against him or her
and that sufficient causal connection existed
between the protected activity and employer's ad-
verse employment action. Civil Rights Act of 1964,
§ 704(a), 42 U.S.C.A. § 2000e-3(a).

**\*746** Appeal from the United States District Court
for the District of Maryland, at Baltimore, No. CA-
93-4167-H;Alexander Harvey, II, Senior District
Judge.
**ARGUED:** Lee David Hoshall, Baltimore, Mary-
land, for Appellant. Mary Lee Clark, Office of the
General Counsel, Equal Employment Opportunity
Commission, Washington, D.C., for Amicus Curiae
EEOC. Sara Louise Mandelbaum, Women's Rights
Project, American Civil Liberties Union Founda-
tion, New York, New York, for Amici Curiae Wo-
men's Rights Project, et al. Joseph Michael
McGuire, Shawe & Rosenthal, Baltimore, Mary-
land, for Appellee. **ON BRIEF:** John P. Rowe,
Acting General Counsel, Gwendolyn Young
Reams, Associate General Counsel, Carolyn L.
Wheeler, Assistant General Counsel, Office of the
General Counsel, Equal Employment Opportunity
Commission, Washington, D.C., for Amicus Curiae
EEOC. Susan Goering, American Civil Liberties
Union Foundation Of Maryland, Baltimore, Mary-
land, for Amici Curiae Women's Rights Project, et
al. Robert H. Ingle, III, Shawe & Rosenthal, Bal-
timore, Maryland; L. Ellis Justis, Jr., Baltimore Gas
& Electric Company, Baltimore, Maryland, for Ap-
pellee.

Before WILKINSON, Chief Judge, and NIEMEY-
ER and HAMILTON, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER
wrote the opinion for the court only in parts I, III,
and IV and wrote separately in part II. Chief Judge
WILKINSON and Judge HAMILTON join in parts
I, III, and IV of the opinion. Chief Judge WILKIN-
SON wrote a concurring opinion in which Judge
HAMILTON joins.

## \*747 OPINION

NIEMEYER, Circuit Judge, writing for the court
only in parts I, III, and IV:
George E. Hopkins, Jr., alleges in his complaint in
this case that his male supervisor's comments and
actions created a sexually hostile work environment
in violation of Title VII of the Civil Rights Act of
1964. In granting the motion for summary judgment
of Hopkins' employer, the district court held that
Title VII does not provide a cause of action for an
employee who has been subjected to sexual harass-
ment by a supervisor of the same gender. We affirm
the district court's judgment, but for the reason that
Hopkins failed to make out a prima facie case of a
hostile work environment.

I

From 1985 until 1993, Hopkins worked in the Pho-
tographic Services Unit of Baltimore Gas & Elec-
tric Company (BG & E) as a color photographic
technician. His immediate supervisor was Ira Swad-
ow. In October 1993, as part of a reduction in force
and a company-wide reorganization, BG & E elim-
inated the Photographic Services Unit and its 13
positions, including those held by Hopkins and
Swadow.

Hopkins contends that throughout his term of em-
ployment at BG & E, Swadow subjected him to dis-
criminatory sexual harassment, creating a hostile
work environment. Hopkins bases his claim on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                          Page 4
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

following incidents:

1. Swadow frequently entered the men's bathroom when Hopkins was there alone. On one occasion in 1986, while Hopkins was at the urinal, Swadow pretended to lock the door and said, "Ah, alone at last." He walked towards Hopkins, making Hopkins feel "very uncomfortable."

2. In 1987, Swadow wrote "S.W.A.K., kiss, kiss," and drew small hearts on internal mail Hopkins received from his fiancee, a BG & E employee. On another occasion, Swadow added the word "Alternative" in front of the company name "Lifestyles" on a piece of mail addressed to Hopkins.

3. In February 1988, during a party given by Hopkins, Swadow suggested to a BG & E employee that Hopkins and his fiancee were getting married because she was pregnant. Upon Hopkins' engagement, Swadow told him that he would be "counting the months" to see when the baby arrives. Before Hopkins' marriage, Swadow occasionally asked him if he had gone on dates over the weekend and whether he had sex with anyone. Swadow also mentioned repeatedly that his children called him "Daddy," that it took a special person to be called "Daddy," and that he was sure Hopkins' son would never call Hopkins "Daddy."

4. At Hopkins' wedding on June 25, 1988, Swadow was the only man who attempted to greet Hopkins in the receiving line by kissing him.

5. Sometime before 1990, while Hopkins was leaning back on a table and speaking on the telephone, Swadow pivoted an illuminated magnifying lens over Hopkins' crotch, looked through it while pushing the lens down, and asked "Where is it?"

6. Sometime before 1990, Swadow asked Hopkins, "On a scale of one to ten, how much do you like me?" Hopkins felt that the question was inappropriate. He had previously told Swadow that he objected to Swadow's "sexual overtones."

7. Sometime before 1990, Swadow bumped into Hopkins and said, "You only do that so you can touch me."

8. Sometime before 1990, during a conversation with Hopkins and a vendor about a recent airplane crash, Swadow looked at Hopkins and said that in order to survive with burning fuel on the surface of the water, Swadow would "find a dead man and cut off his penis and breathe through that." Hopkins told Swadow that he was offended by such a "sick" statement.

9. In 1989 or 1990, while Hopkins was showing the color darkroom to a supervisor's female guest, Swadow came in and asked "Are you decent?"

10. In 1991, while preparing to leave on a business trip from Hopkins' home, Swadow found an unloaded gun in the house and pointed it at Hopkins.

*748 11. On August 1, 1991, Swadow squeezed into the one-person revolving door to the darkroom with another employee. Upon exiting the door, Swadow looked at Hopkins, who was in the darkroom, and asked, "Was it as good for you as it was for me?" The other employee looked very uncomfortable. Later, Swadow attempted to force himself into the same revolving door with Hopkins. He had made physical contact with Hopkins' back before Hopkins pushed Swadow away and told him that he "objected to it" and did not want to be in the darkroom with him.

12. Throughout 1993, Swadow regularly commented on Hopkins' appearance. For example, Swadow would say, "You look nice today," "You have a really pretty shirt on," or "You look so distinguished." Once he turned over Hopkins' tie and examined it.

13. On July 2, 1993, while Swadow and Hopkins were discussing a photographic negative, Swadow, with a "very peculiar" look on his face, commented that "orientation is subjective."

Late in 1989, Hopkins complained to his super-

77 F.3d 745                                                                                                Page 5
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

visors about Swadow's sexual harassment, particularly his inappropriate sexual comments and jokes. He identified the events described above in paragraphs 5 and 7. In response, BG & E conducted an internal investigation, which included interviews of Hopkins, Swadow, and nine other employees in the Photographic Services Unit. A manager's report concluded that "practically all of the Sections's employees engage in joking and comments of one kind or another" but that such comments were "not offensive" and were not "intended to be so." An employee case analyst, who could not conclude that Swadow's behavior was "sexually motivated," felt that Hopkins was trying to "hang" Swadow.

The matter was then referred to higher management, which assured Hopkins that Swadow was "under close scrutiny" and that "none of this would happen in the future." Hopkins appeared satisfied with BG & E's response. Without ultimately taking a position on whether Hopkins' charges were true, BG & E offered to interview him for a transfer to two different positions in other departments. Hopkins declined the offer out of a concern that his transfer would give his coworkers the impression that he was the one at fault.

Over a year later, Hopkins filed a charge of sexual discrimination with the Equal Employment Opportunity Commission (EEOC), and the EEOC issued a right to sue letter in September 1993. Hopkins filed this action in December 1993, alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.

Following discovery, the district court granted BG & E's motion for summary judgment on both of Hopkins' claims. *Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822 (D.Md.1994). The court concluded that same-gender sexual harassment is not actionable under Title VII and, alternatively, that the harassment of which Hopkins complained did not occur "because of" Hopkins' gender. *Id.* at 834-35. With respect to Hopkins' retaliation claim, the court concluded that he had failed to show any "adverse employment action." *Id.* at 836-37. This

appeal followed.

## II

Hopkins first argues that the district court erred in holding that same-gender sexual harassment is not actionable under Title VII. In entering summary judgment for BG & E, the district court concluded that Title VII does not provide a cause of action for an employee who has been subjected to sexual harassment by a supervisor or co-worker of the same gender. 871 F.Supp. at 834. The court's reasoning focused on Congress' purpose in enacting Title VII and the statute's language:

Title VII prohibits discriminatory conduct on the basis of gender and "evinces a congressional intent 'to strike at the entire spectrum of *disparate treatment of men and women.*' " Where, as here, the alleged harasser and the alleged victim are both of the same gender, the language of the statute would be strained beyond its manifest intent were the Court to hold *749 under these facts there has been discrimination "because of ... sex".

*Id.* (alteration in original) (citations omitted).

In deciding the question of whether same-gender sexual harassment is actionable under Title VII, we begin with the applicable statutory language. Title VII prohibits "an employer" from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Since Title VII's enactment, the meaning of the term "sex" as used in the Act has become the subject of judicial and academic debate. Viewed in the abstract, a prohibition of discrimination based on "sex" is broad and perhaps even undefinable. Arguably, such a prohibition might be read to preclude discrimination based on human psychological and physiological characteristics or on sexual orientation. It might also be read to prohibit all workplace sexual behavior or words and deeds having sexual content. Indeed, at oral ar-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                 Page 6
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

gument, Hopkins' counsel argued that dirty jokes or sexually-based profanity spoken by a male supervisor to other male employees implicates the prohibitions of Title VII.

In the context of Title VII's legislative history, however, it is apparent that Congress did not intend such sweeping regulation. The suggestion that Title VII was intended to regulate everything sexual in the workplace would undoubtedly have shocked every member of the 88th Congress, even those most vigorously supporting passage of the Act. Detached from their historical setting, the terms of Title VII's prohibition of discrimination, "because of" an individual's "sex," stand only as "inert language, lifeless words," and, perhaps, even "playthings with which to reconstruct the Act." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 379, 79 S.Ct. 468, 483-84, 3 L.Ed.2d 368 (1959) (Frankfurter, J.). Accordingly, it becomes necessary to turn to Title VII's legislative history.

Just two days before the House of Representatives passed Title VII, it adopted an amendment adding "sex" as a prohibited basis for discrimination. Congressman Smith proposed the amendment to "do some good for the minority sex" by ensuring that women receive "as high compensation for their work as do the majority sex." 110 Cong.Rec. 2577 (1964). Congressman Celler opposed the amendment, arguing that the bill was already "all-embracing," covering "everybody in the United States" including "white men and white women and all Americans." *Id.* at 2578. Congresswoman Griffiths, however, responded that when a qualified white woman is denied a job because she is a woman, she has no recourse without the amendment. *Id.* at 2579. To combat such discrimination, the House adopted Congressman Smith's amendment, adding "sex" as a prohibited basis for discrimination.[FN1]

> FN1. Because Congress intended that the term "sex" in Title VII mean simply "man" or "woman," there is no need to distinguish between the terms "sex" and "gender" in Title VII cases. Consequently, courts, speaking in the context of Title VII, have used the term "sex" and "gender" interchangeably to refer simply to the fact that an employee is male or female. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 239-41, 109 S.Ct. 1775, 1784-86, 104 L.Ed.2d 268 (1989) (using "gender" and "sex" interchangeably). Indeed, the use of "sex" and "gender" interchangeably may impose a useful limit on the term "sex," which otherwise might be interpreted to include sexual behavior. Some academic writers, however, seek to maintain or to heighten a distinction between the terms "sex" and "gender," asserting that "gender" connotes cultural or attitudinal characteristics distinctive to the sexes, as opposed to their physical characteristics. *See, e.g.,* Mary Anne C. Case, *Disaggregating Gender From Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence,* 105 Yale L.J. 1 (1995) ("gender [is] to sex what masculine and feminine are to male and female"). *See also JEB v. Alabama,* 511 U.S. 127, ---- n. 1, 114 S.Ct. 1419, 1436 n. 1, 128 L.Ed.2d 89 (1994) (Scalia, J., dissenting). While it may be useful to disaggregate the definition of "gender" from "sex" for some purposes, in this opinion we make no such effort, using the terms interchangeably to refer to whether an employee is a man or a woman.

While Congress' particular focus in amending Title VII to prohibit discrimination on the basis of "sex" was to ensure equal employment rights for women, the Supreme Court has interpreted the Act's broad language to protect both men and women. *See, e.g.,* **\*750***Newport News Shipbuilding and Dry Dock Co. v. EEOC,* 462 U.S. 669, 676, 103 S.Ct. 2622, 2627-28, 77 L.Ed.2d 89 (1983) (holding that insurance plan that provided less extensive pregnancy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                                    Page 7
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

benefits to married male employees than to married female employees discriminated against males in violation of Title VII). Examining the legislative history of the Pregnancy Discrimination Act, which amended Title VII in 1978, the Court in *Newport News* reasoned that even though "congressional discussion focused on the needs of female members of the work force ... [t]his does not create a 'negative inference' limiting the scope of the Act to the specific problem that motivated its enactment." *Id.* at 679, 103 S.Ct. at 2629; *cf. McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976) (holding that Title VII proscribes racial discrimination against whites "upon the same standards" as racial discrimination against nonwhites).

In 1986, the Supreme Court expanded the scope of Title VII in yet another direction by recognizing that the prohibition against "discrimination" protects employees from "discriminatory sexual *harassment.*" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64-66, 106 S.Ct. 2399, 2404-2405, 91 L.Ed.2d 49 (1986) (emphasis added). Noting that "the language of Title VII is not limited to 'economic' or 'tangible' discrimination" but rather "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," the *Meritor* Court announced that "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404 (alteration in original) (citation omitted). Thus, the Court established that a claim of "hostile environment" sex discrimination is actionable under Title VII. *Id.* at 73, 106 S.Ct. at 2408.

While the Supreme Court has interpreted Title VII to protect both men and women against workplace sexual harassment by the opposite sex, it has not specifically addressed the question of whether the Act's prohibitions apply when the harasser and the victim are the same sex. The EEOC and several circuits, however, appear to agree that Title VII may

cover same-sex harassment.

The EEOC Compliance Manual states that the respective sexes of the harasser and the victim are irrelevant in determining whether Title VII has been violated:

The victim does not have to be of the opposite sex from the harasser. Since sexual harassment is a form of sex discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. The victim and the harasser may be of the same sex where, for instance, the sexual harassment is based on the victim's sex (*not* on the victim's sexual preference) and the harasser does not treat the employees of the opposite sex the same way.

EEOC Compliance Manual, § 615.2(b)(3). Although the courts are not bound by the EEOC's interpretation of Title VII, it is nevertheless appropriate to consider the EEOC's interpretation because of the EEOC's charge to enforce the Act. *See Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404-05.

The District of Columbia Circuit has acknowledged the possibility of actionable sexual harassment under Title VII where "a subordinate of either gender" is harassed "by a homosexual superior of the same gender." *Barnes v. Costle,* 561 F.2d 983, 990 n. 55 (D.C.Cir.1977). That same court subsequently reiterated, "in each instance the question is ... would the complaining employee have suffered the harassment had he or she been of a different gender?" *Bundy v. Jackson,* 641 F.2d 934, 942 n. 7 (D.C.Cir.1981). Similarly, in *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995), the Seventh Circuit commented that "[s]exual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." *See also Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994) (commenting that "we do not rule out the possibility that *both* men and women ...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                                      Page 8
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

have viable claims against [a male supervisor] for sexual harassment"), *cert. denied,*513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); \*751 *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 148 (2d Cir.1993) (Van Graafeiland, J., concurring) (arguing that "harassment is harassment regardless of whether it is caused by a member of the same or opposite sex"), *cert. denied,*510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *cf. Morgan v. Massachusetts Gen. Hosp.,* 901 F.2d 186, 192 (1st Cir.1990) (holding that homosexual advances by male co-worker were not sufficiently severe or pervasive to be actionable).

Thus far, only the Fifth Circuit has expressly refused to recognize a cause of action for same-gender sexual harassment. *See Garcia v. Elf Atochem North America,* 28 F.3d 446, 451-52 (5th Cir.1994). In *Garcia,* the court held, without any discussion, that " '[h]arassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones' " because " 'Title VII addresses gender discrimination.' " *Id.* at 451-52 (quoting *Giddens v. Shell Oil Co.,* No. 92-8533, slip op. at 1-2, 12 F.3d 208 (5th Cir. Dec. 6, 1993) (reasoning that employee "did not allege how his employer treated him differently because he was a male") (unpublished), *cert. denied,*513 U.S. 925, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994)). *Garcia* also cited *Goluszek v. Smith,* 697 F.Supp. 1452, 1453 (N.D.Ill.1988), a case in which an "unsophisticated" male mechanic, who had "little or no sexual experience" and was "abnormally sensitive to comments pertaining to sex," had been teased about women by co-workers using crude language and nude photographs. In *Goluszek,* the district court held that harassment by fellow male co-workers in a male-dominated environment "was not the type of conduct Congress intended to sanction when it enacted Title VII." *Id.* at 1456.

District courts across the country are deeply divided on whether Title VII applies to same-gender sexual harassment.[FN2] In the case before us, the

district court concluded that same-gender sexual harassment is never actionable under Title VII. *Hopkins,* 871 F.Supp. at 834.

> FN2. *Compare,e.g., Sardinia v. Dellwood Foods, Inc.,* 1995 WL 640502 (S.D.N.Y.1995) (holding that same-sex sexual harassment claims are actionable under Title VII) *and Griffith v. Keystone Steel & Wire,* 887 F.Supp. 1133 (C.D.Ill.1995) (same) *and Raney v. District of Columbia,* 892 F.Supp. 283 (D.D.C.1995) (same) *with Ashworth v. Roundup Co.,* 897 F.Supp. 489 (W.D.Wash.1995) (holding that same-sex sexual harassment claims are *not* actionable under Title VII) *and Goluszek v. Smith,* 697 F.Supp. 1452 (N.D.Ill.1988) (same) *and Myers v. City of El Paso,* 874 F.Supp. 1546 (W.D.Tex.1995) (same).

In addressing this issue, I do not find persuasive the reasoning of the Fifth Circuit in *Garcia* and those district courts that have concluded *categorically* that same-gender sexual harassment can never be actionable under Title VII. In aligning myself with those courts that have observed that same-gender sexual harassment may be actionable under Title VII in appropriate circumstances, I conclude that such a holding is required by the statutory language, understood in its historical context and as subsequently interpreted by the Supreme Court. While it is apparent from the historical record that Congress, in prohibiting sex discrimination, meant to prohibit discrimination only on the basis of the employee's status as a man or a woman, it is also clear from the statutory language itself that only the sex of the *employee* is relevant in determining whether Title VII is implicated. Title VII imposes no gender restriction for the person effecting the discrimination; it prohibits discriminatory conduct by an "employer," regardless of the employer's gender or the gender of those whose conduct imputes liability to the employer. Thus, the requisite causation of prohibited conduct is defined only by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                    Page 9
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

the status of the *employee* as a man or a woman.

It follows that in prohibiting sex discrimination solely on the basis of whether the employee is a man or a woman, Title VII does not reach discrimination based on other reasons, such as the employee's sexual behavior, prudery, or vulnerability. *See McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1196 (4th Cir.1996) (explaining that "because of ... sex" in Title VII does not mean because of "the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focused speech or conduct"). Similarly, Title VII does not prohibit conduct based on the employee's sexual orientation, whether homosexual,**752** bisexual, or heterosexual. Such conduct is aimed at the employee's sexual orientation and not at the fact that the employee is a man or a woman.[FN3] Thus, as the Supreme Court observed in *Price Waterhouse v. Hopkins,*"[W]hile an employer may not take gender into account in making an employment decision (except in those very narrow circumstances in which gender is a [bona fide occupational qualification] ), it is free to decide against a woman *for other reasons.*" 490 U.S. 228, 244, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989) (emphasis added).

> FN3. Recognizing that Title VII does not prohibit discrimination because of sexual orientation, several local civil rights laws have added "sexual orientation" as a proscribed basis of discrimination. *See, e.g.,* Montgomery County Code, § 27-19(a) (prohibiting discrimination because of an individual's "race, color, religion, creed, ancestry, national origin, age, sex, marital status, handicap or *sexual orientation* " (emphasis added)).

Moreover, since the language of Title VII prohibits sex *discrimination* based solely on the employee's gender without consideration of the gender of the person effecting the discrimination, because of the holding in *Meritor* the Act must be construed also to prohibit sexual *harassment* against an employee because of that employee's gender, regardless of the harasser's gender. As we noted earlier, in *Meritor* the Supreme Court concluded that sexual harassment, which is sufficiently severe and pervasive to alter the conditions of employment, constitutes discrimination of the type prohibited by Title VII. I therefore conclude that sexual harassment of a male employee, whether by another male or by a female, may be actionable under Title VII if the basis for the harassment is because the employee is a man.

The more difficult question arises as to what proof is necessary to demonstrate that harassment is because of the employee's gender and not for some other reason, particularly when the harasser and the victim are the same gender.

When someone sexually harasses an individual of the opposite gender, a presumption arises that the harassment is "because of" the victim's gender. This presumption is grounded on the reality that sexual conduct directed by a man, for example, toward a woman is usually undertaken because the target is female and the same conduct would not have been directed toward another male. *See, e.g., Barnes,* 561 F.2d at 990 (plaintiff "became target of her superior's sexual desires because she was a woman.... [N]o male employee was susceptible to such an approach"). But when the harasser and the victim are the same gender, the presumption is just the opposite because such sexually suggestive conduct is usually motivated by entirely different reasons.

Thus, when a male employee seeks to prove that he has been sexually harassed by a person of the same sex, he carries the burden of proving that the harassment was directed against him "because of" his sex. The principal way in which this burden may be met is with proof that the harasser acted out of sexual attraction to the employee. In *McWilliams,* 72 F.3d at 1195 n. 5, we noted that a male employee who undertakes to prove sexual harassment directed at him by another male may use evidence of the harasser's homosexuality to demonstrate that the action was directed at him because he is a man. But we cautioned that proof of such homosexuality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

Page 10

must include more than "merely suggestive" conduct. *Id.*

I recognize that conduct directed toward an employee of the same gender as the harasser can have sexual content or innuendo and, indeed, may be offensive. But unless such harassment is directed toward an employee "because of" his or her status as a man or a woman, it does not implicate Title VII. I reject the notion that when a man, for example, uses sexually oriented gestures and language, or engages in sexually perverse activity to harass another man, Title VII automatically imposes liability. Such conduct may constitute a common law tort, but, without more, it does not amount to discrimination against the employee because he is a man. "There perhaps 'ought to be a law against'... puerile and repulsive workplace behavior ... in order to protect the victims against its indignities and debilitations, but ... Title VII is not that law." *McWilliams,* 72 F.3d at 1196.

**\*753** In sum, while harassment directed toward an individual employee by another individual of the same gender may be actionable if it is directed at the employee "because of" the employee's gender, the plaintiff must overcome the presumption in that circumstance that the harassment was *not* "because of" that employee's gender.

### III

[1][2] Regardless of whether Hopkins' same-gender sexual harassment is actionable under Title VII, Hopkins still bears the burden of demonstrating, in the context of this case, that Swadow's alleged harassment was sufficiently severe or pervasive to create an objectively hostile or abusive work environment and the harassment was directed at him because of his sex.[FN4]

> FN4. Generally, to establish a claim for sexual harassment under 42 U.S.C. § 2000e-2(a)(1), a plaintiff employee must prove that (1) the subject conduct was un-

welcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *See Spicer v. Commonwealth of Va.,* 66 F.3d 705, 710 (4th Cir.1995) (en banc). But in this case, elements (1) and (4) are not at issue.

[3][4] Not all sexual harassment that is directed at an individual because of his or her sex is actionable. Title VII does not attempt "to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). As the Supreme Court recognized in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *See also Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (recognizing that conduct amounts to actionable sexual harassment only when it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment' " (alteration in original) (citation omitted)).

[5] In deciding whether the harassment to which Swadow allegedly subjected Hopkins was sufficiently severe or pervasive to bring it within Title VII's purview, we must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at ----, 114 S.Ct. at 371. We recognize that the "line between a merely unpleasant working environment ... and a hostile or deeply repugnant one" may be difficult to discern. *Baskerville,* 50 F.3d at 431 (overturning jury verdict for employee in Title VII suit because incidents did not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                                                    Page 11
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

amount to actionable sexual harassment and em-
ployer took adequate remedial measures). After
carefully considering the entire record before us,
however, we are convinced that the conduct of
which Hopkins complains was neither sufficiently
severe nor sufficiently pervasive to create an envir-
onment that a reasonable man would find hostile or
abusive.

For his claim, Hopkins relies on conduct by Swad-
ow that was temporally diffuse, ambiguous, and of-
ten not directed specifically at him. First, the incid-
ents that Hopkins recounts occurred intermittently
over a seven-year period, with gaps between incid-
ents as great as a year. That alone suggests the ab-
sence of a condition sufficiently pervasive to estab-
lish Title VII liability. "A handful of comments
spread over months is unlikely to have so great an
emotional impact as a concentrated or incessant
barrage." *Baskerville,* 50 F.3d at 431.

Second, Swadow's alleged conduct toward Hopkins
was sexually neutral or, at most, ambiguous. Ac-
cording to Hopkins, Swadow bumped into him, po-
sitioned a magnifying glass over his crotch, flipped
his tie over to see its label, gave him a congratulat-
ory kiss in the receiving line at Hopkins' wedding,
and stared at him in the bathroom. Notably, Hop-
kins has not asserted that Swadow ever made an
overt sexual proposition or touched Hopkins in a
sexual manner. While Swadow's conduct was un-
doubtedly tasteless and inappropriately forward, we
cannot conclude that it was "of the type that would
interfere **\*754** with a reasonable person's work per-
formance ... to the extent required by Title VII."
*Morgan v. Massachusetts Gen. Hosp.,* 901 F.2d
186, 193 (1st Cir.1990) (holding that allegations
fell short of Title VII liability where male plaintiff
claimed that male co-worker stood behind him and
bumped into him while he mopped, "peeped" at
him in restroom, and asked him to dance at Christ-
mas party).

Third, several of the incidents upon which Hopkins
relies occurred in group settings, and only Hopkins
subjectively perceives them to have been directed

solely at him. On one occasion, Hopkins was offen-
ded by Swadow's comment during a group discus-
sion concerning how to use a sexual organ to sur-
vive a plane crash. On another occasion, he was of-
fended by Swadow's comment-"Was it as good for
you as it was for me?"-made after Swadow forced
himself into a revolving door with a third party.

[6] While we do not approve of Swadow's apparent
willingness to offend and provoke employees with
his ambiguously sexual innuendos, Title VII was
not designed to create a federal remedy for all of-
fensive language and conduct in the workplace.
When presented in other Title VII cases with con-
duct of the type alleged by Hopkins in this case, we
have consistently affirmed summary judgment dis-
missing the claims. *See, e.g., Dwyer v. Smith,* 867
F.2d 184, 187-88 (4th Cir.1989) (affirming directed
verdict in Title VII case despite evidence that fe-
male police officer was subjected to pornographic
material placed in her station mailbox and to fellow
officers' sexually explicit conversations); *Harris v.
Clyburn,* 1995 WL 56634, at *3 (4th Cir.1995)
(unpublished) (per curiam) (affirming summary
judgment for employer where "only specific factual
allegation of sexual harassment [was] occasional
tickling [by her male superior] in the hallway");
*Cobbins v. School Bd. of Lynchburg, Va.,* No.
90-1754, slip op. at 7-10, 1991 WL 1828 (4th Cir.
Jan. 14, 1991) (unpublished) (per curiam) (holding
that where male teacher asked female teacher out
for a drink, asked her to perform tasks she per-
ceived as secretarial, and struck her in a fight, pur-
ported harassment was not gender-based and was
not sufficiently severe or pervasive). *See also Bask-
erville,* 50 F.3d at 430-31 (overturning verdict be-
cause evidence that her male superior called her
"pretty girl," commented on her attire, and made
"vulgar banter tinged with sexual innuendo" did not
establish actionable Title VII claim).

Accordingly, we hold in this case that as a matter of
law the conduct of which Hopkins complains,
spread over seven years with significant time gaps
between incidents, does not create a sufficiently

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745                                                                    Page 12
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
(Cite as: 77 F.3d 745)

hostile environment on which to rest a Title VII claim. Because we conclude that Swadow's alleged conduct was not sufficiently severe or pervasive for Hopkins to establish a prima facie case of sexual harassment under Title VII, we do not reach the question of whether it was directed at Hopkins because of his sex.

IV

[7] Hopkins also contends that the district court erred in dismissing his claim that BG & E retaliated against him for complaining to management about Swadow's offensive conduct and for filing an EEOC complaint that alleged discriminatory sexual harassment. The district court concluded that Hopkins did not need to prevail on his underlying discrimination claim to succeed on his retaliation claim, but that he had failed to show that BG & E had taken any adverse employment action against him. *Hopkins,* 871 F.Supp. at 835-37. We agree.

[8] Title VII prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Hopkins must show that (1) he engaged in protected activity; (2) his employer took adverse employment action against him; and (3) a sufficient causal connection existed between his protected activity and his employer's adverse employment action. *See McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991).

The record in this case, considered in the light most favorable to Hopkins, reveals that BG & E's entire Photographic Services Unit, including both Swadow's and Hopkins' positions,*755 were eliminated as part of a 1,100-employee reduction in force and corporate restructuring that took place in October 1993. Hopkins continued to receive a full salary and benefits until January 1994 and could have continued his employment with BG & E in another capacity had he not voluntarily chosen to terminate

it.

In addition to his alleged discharge, Hopkins attempts to characterize various other employment actions as adverse. For example, Hopkins was advised by BG & E officials on more than one occasion that he should forget about Swadow's conduct and "put it behind" him. On another occasion, Hopkins received a formal disciplinary warning for substituting a color print for an original-conduct that Hopkins denies-but the warning was subsequently removed from his personnel record. Both Hopkins and Swadow were required to undergo a "Fitness for Duty" psychological examination. Finally, although Hopkins' overall ratings on his evaluations remained the same after his complaints to management, Swadow wrote that Hopkins needed improvement in "job behavior" and "work relations."

We agree with the district court that no reasonable jury could find on these facts that Swadow or any other BG & E official took any adverse employment action against Hopkins because of his complaints about alleged sexual harassment. Hopkins was not discharged from his employment and the comments in question never amounted to or resulted in any adverse employment action.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*
WILKINSON, Chief Judge, with whom HAMILTON, Circuit Judge, joins, concurring in part:
We are pleased to concur in parts I, III, and IV of Judge Niemeyer's opinion. Those sections ably demonstrate that every example of offensive and tasteless workplace conduct does not provide the basis of a cause of action under Title VII. *See, e.g., Baskerville v. Culligan Int'l Co.,* 50 F.3d 428 (7th Cir.1995). The discussion in part II on the actionability of same sex harassment, however, is quite unnecessary to the resolution of this case, and we do not concur in it.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570
**(Cite as: 77 F.3d 745)**

Moreover, the inadvisability of undertaking such a discussion is underscored by Title VII itself. The general language used by Congress in Title VII makes its intentions with respect to the actionability of same sex conduct ambiguous at best. To expand the reach of Title VII to same sex harassment risks dragging a multitude of workplace conflicts before the courts that may well exceed both the language and intent of the statute. Indeed, it is anything but clear to us exactly which kinds of workplace behavior will be held to be actionable under this view and which will not.

Finally, the position taken by our good colleague in section II is in tension with this court's decision in *McWilliams v. Fairfax County Board of Supervisors,* 72 F.3d 1191, 1195 (4th Cir.1996) (rejecting Title VII hostile-environment claims "where both the alleged harassers and the victim are heterosexuals of the same sex"). The court explained in *McWilliams* that same sex harassment all too often takes place not " 'because of the [target's] sex' " but rather " 'because of' the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focused speech or conduct" or because of the perpetrator's own sexual "obsession," "insecurity," "vulgarity," or simple "meanness of spirit." *Id.* at 1196. While *McWilliams* technically did not reach the question addressed by Judge Niemeyer in section II, *id.* at 1195 n. 4, it surely suggested that the many possible explanations for same gender incidents dictate caution in recognizing them as the basis for a Title VII action. If Title VII is to be extended to cover a whole new generation of same sex harassment claims, it is far better that it be accomplished by legislative action than by judicial fiat. The last place to reach out to recognize such claims is a case whose lack of merit is, in all events, apparent.

C.A.4 (Md.),1996.
Hopkins v. Baltimore Gas and Elec. Co.
77 F.3d 745, 70 Fair Empl.Prac.Cas. (BNA) 184, 67 Empl. Prac. Dec. P 43,923, 64 USLW 2570

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

433 F.3d 428                                                                                                Page 1
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
(Cite as: 433 F.3d 428)

▷

Harvill v. Westward Communications, L.L.C.
C.A.5 (Tex.),2005.

United States Court of Appeals,Fifth Circuit.
Molly HARVILL, Plaintiff-Appellant,
v.
WESTWARD COMMUNICATIONS, L.L.C., et
al., Defendants,
Westward Communications, L.L.C.; Westward
Communications, LP, Defendants-Appellees.
**No. 04-40418.**

Dec. 13, 2005.

**Background:** Former employee brought action
against employer alleging sexual harassment, con-
structive discharge, and retaliation, in violation of
Title VII, and alleging she was denied overtime pay
in violation of the Fair Labor Standards Act
(FLSA). The United States District Court for the
Eastern District of Texas, William M. Steger, J.,
311 F.Supp.2d 573, granted summary judgment for
employer, and employee appealed.

**Holdings:** The Court of Appeals, Carl E. Stewart,
Circuit Judge, held that:
(1) fact issues existed as to whether coworker's al-
leged conduct towards employee was sufficiently
severe or pervasive so as to alter terms and condi-
tions of employee's employment;
(2) employer took sufficiently prompt, remedial ac-
tion to preclude imposition of Title VII liability for
alleged harassment;
(3) employee suffered no adverse employment ac-
tion, as would support her claim of retaliation; and
(4) employee's FLSA allegations were too conclus-
ory to raise fact issue that would preclude summary
judgment on that claim.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⚖=1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environ-
ment
         78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
To establish Title VII sexual harassment claim
based on an alleged hostile work environment,
plaintiff must demonstrate that: (1) she is member
of a protected group; (2) she was the victim of un-
invited sexual harassment; (3) the harassment was
based on sex; (4) the harassment affected a term,
condition, or privilege of her employment; and (5)
her employer knew or should have known of the
harassment and failed to take prompt remedial ac-
tion. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⚖=1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environ-
ment
         78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
For sexual harassment to be actionable under Title
VII, it must be sufficiently severe or pervasive to
alter the conditions of the victim's employment and
create an abusive working environment. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[3] Civil Rights 78 ⚖=1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
In determining whether a work environment is hos-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tile or abusive within the meaning of Title VII, courts look at the totality of the circumstances including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
To be actionable as sexual harassment under Title VII, based on a hostile work environment, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
Genuine issue of material fact existed as to whether coworker's alleged conduct towards employee, including deliberate and unwanted touching of employee's intimate body parts, was sufficiently severe or pervasive so as to alter terms and conditions of employee's employment, thus precluding summary judgment for employer on that issue in employee's Title VII action alleging sexual harassment, notwithstanding employee's failure to provide

precise dates for, or exact number of, such occurrences. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ☞1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Prompt remedial action taken by employer must be reasonably calculated to end sexual harassment, to avoid Title VII liability, and employer may be held liable despite having taken remedial steps if plaintiff employee can establish that employer's response was not reasonably calculated to halt the harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Although an employee alleging sexual harassment must take advantage of corrective opportunities provided by the employer to address such harass-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                          Page 3
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

ment, the harassed employee is not obligated to go through the wasted motion of reporting the harassment if the employee believes that bringing a subsequent sexual harassment complaint would be futile, or it becomes objectively obvious that the employer has no real intention of stopping the harassment.

**[9] Civil Rights 78 ☞1189**

78 Civil Rights
 78II Employment Practices
  78k1181 Sexual Harassment; Work Environment
   78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Employer's response to employee's complaint of sexual harassment by coworker was sufficiently prompt, remedial action to preclude imposition of Title VII liability upon employer; employee failed to report her supervisor's allegedly inadequate investigation of complaint to human resources department, as instructed by employee handbook's anti-harassment policy, thereby failing to take advantage of corrective opportunities provided by employer, and, once human resources director and chief executive officer (CEO) were notified of employee's claims, employer swiftly took remedial measures and harassment ceased. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1123**

78 Civil Rights
 78II Employment Practices
  78k1123 k. Constructive Discharge. Most Cited Cases
Employee who filed sexual harassment complaint suffered no adverse employment action, as would support her claim of retaliation in violation of Title VII, which was based on alleged constructive discharge; conduct alleged by employee, including rude and hateful treatment by other supervisors and employees, taking of pictures of employee by stranger, bringing of meritless racial harassment charge against employee, and supervisor's state-

ment that he would receive bonus if he "ran her off," was not so intolerable that a reasonable employee would feel compelled to resign. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ☞1243**

78 Civil Rights
 78II Employment Practices
  78k1241 Retaliation for Exercise of Rights
   78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
To establish a prima facie retaliation claim, under Title VII, plaintiff employee must prove that: (1) she engaged in an activity that Title VII protects; (2) employer carried out an adverse employment action; and (3) a causal nexus exists between her protected activity and employer's adverse action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ☞1244**

78 Civil Rights
 78II Employment Practices
  78k1241 Retaliation for Exercise of Rights
   78k1244 k. Activities Protected. Most Cited Cases
The filing of an Equal Employment Opportunity Commission (EEOC) complaint is clearly a protected activity within the meaning of Title VII, for purpose of employee's claim of unlawful retaliation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ☞1123**

78 Civil Rights
 78II Employment Practices
  78k1123 k. Constructive Discharge. Most Cited Cases
In order to establish a prima facie case of retaliation under Title VII based on constructive discharge, employee must prove that working conditions would have been so difficult or unpleasant that a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                    Page 4
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

reasonable person in her shoes would have felt compelled to resign. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 ⟜1123**

78 Civil Rights
   78II Employment Practices
      78k1123 k. Constructive Discharge. Most Cited Cases
Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, in Title VII action alleging unlawful retaliation; rather, plaintiff employee must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Federal Civil Procedure 170A ⟜2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
Employee's allegations that supervisor required employee to turn in false time sheets and that employer clearly permitted her to work overtime, were too conclusory to raise fact issue, as would preclude summary judgment, on employee's claim that employer violated FLSA by failing to properly compensate employee for overtime work; employee offered no factual allegations at all to substantiate her claim, she presented no evidence of amount or extent of hours she worked without compensation, and presented no evidence that employer was aware that she worked overtime hours without compensation. Fair Labor Standards Act of 1938, § 7(a)(1), 29 U.S.C.A. § 207(a)(1).

**[16] Labor and Employment 231H ⟜2305**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)4 Operation and Effect of Regulations
            231Hk2305 k. Overtime Pay in General. Most Cited Cases

**Labor and Employment 231H ⟜2365**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)6 Actions
            231Hk2364 Defenses
               231Hk2365 k. In General. Most Cited Cases
An employer who is armed with knowledge that an employee is working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation, but if the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the Fair Labor Standards Act (FLSA). Fair Labor Standards Act of 1938, § 7(a)(1), 29 U.S.C.A. § 207(a)(1).

**[17] Labor and Employment 231H ⟜2385(3)**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)6 Actions
            231Hk2383 Evidence
               231Hk2385 Presumptions and Burden of Proof
                  231Hk2385(3) k. Working Time. Most Cited Cases
An employee bringing an action pursuant to the FLSA, based on unpaid overtime compensation,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                    Page 5
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

must first demonstrate that she has performed work
for which she alleges she was not compensated.
Fair Labor Standards Act of 1938, § 7(a)(1), 29
U.S.C.A. § 207(a)(1).

**[18] Labor and Employment 231H ☞2385(3)**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)6 Actions
          231Hk2383 Evidence
            231Hk2385 Presumptions and Bur-
den of Proof
              231Hk2385(3) k. Working
Time. Most Cited Cases
An employee bringing an FLSA action, based on
unpaid overtime compensation, has met her requis-
ite burden of proof if she proves that she has in fact
performed work for which she was improperly
compensated and if she produces sufficient evid-
ence to show the amount and extent of that work as
a matter of just and reasonable inference; burden
shifts to employer to come forward with evidence
of the precise amount of work performed or with
evidence to negative the reasonableness of the in-
ference to be drawn from the employee's evidence,
and, if the employer fails to produce such evidence,
the court may then award damages to the employee
even though the result may only be approximate.
Fair Labor Standards Act of 1938, § 7(a)(1), 29
U.S.C.A. § 207(a)(1).

***431** Alex Arthur Castetter (argued), Stuckey, Gar-
rigan & Castetter, Nacogdoches, TX, for Harvill.
Felicity A. Fowler, Matthew Thomas Deffebach
(argued), Haynes & Boone, Houston, TX, for De-
fendants-Appellees.
John Foster Suhre (argued), EEOC, Washington,
DC, for EEOC, Amicus Curiae.

***432** Appeal from the United States District Court
for the Eastern District of Texas.

Before KING, Chief Judge, and BARKSDALE and

STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:
Plaintiff Molly Harvill ("Harvill") brought this suit
against her employer, Westward Communications
("Westward"), alleging claims for sexual harass-
ment, constructive discharge and retaliation under
Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e*et seq.,* and for unpaid overtime compensa-
tion under the Fair Labor Standards Act, 29 U.S.C.
§ 201*et seq.* The district court granted summary
judgment in favor of Westward on the grounds that
(1) the alleged harasser's conduct was not suffi-
ciently severe and pervasive to constitute a hostile
work environment, (2) Harvill did not establish that
Westward failed to take prompt remedial action
once it learned of the alleged harassment, (3) Har-
vill failed to exhaust her administrative remedies
before the Equal Employment Opportunity Com-
mission (EEOC) as to her constructive discharge
claim, (4) Harvill could not establish constructive
discharge, which was also the basis for her retali-
ation claim, and (5) there was a paucity of evidence
to support her claim for unpaid overtime compensa-
tion under the Fair Labor Standards Act. She ap-
peals the district court's grant of summary judgment
as to her sexual harassment, retaliation and unpaid
overtime compensation claims. For the following
reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACK-
GROUND

Molly Harvill brought this action alleging that she
had been repeatedly subjected to sexual harassment
by a co-worker. In January of 2001, she began
working with the *Grand Saline Sun* ("the *Sun*") as
an office manager for the newspaper. The paper is
owned by Westward Communications. During a
new employee orientation, Harvill received a com-
pany handbook that included an explanation of the
company's anti-harassment policies. The handbook
stated that if an employee believed that she was be-
ing harassed, she was to directly inform her imme-
diate supervisor. If speaking with the supervisor did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                    Page 6
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

not provide sufficient recourse, then the employee must direct her complaint to the Director of Human Resources.

On October 11, 2001, Harvill, along with fellow employee Ladonna Allison Hockman ("Hockman"), alleged to their immediate supervisor Nell French, the publisher of the *Sun,* that they had been sexually harassed by Oscar Rogers, who operated a commercial printing press within the *Sun*'s offices. French then initiated an investigation into the allegations, speaking with several female employees of the *Sun* about whether they were cognizant of any inappropriate behavior by Rogers. Additionally, French spoke with former employees to determine whether they too had information regarding allegations of Rogers' having sexually harassed female employees at the *Sun*; however, French never spoke with Rogers, who remained unaware of any sexual harassment allegations being made against him.

Harvill claimed that Rogers continued to sexually harass her even after she had reported his conduct to French. Harvill approached French two or three times to inform her that Rogers' inappropriate behavior was continuing. Finally, in February of 2002, Harvill informed Westward that she would be filing an EEOC charge against the company based on Rogers' continuing conduct. Gina Fisher, Westward's Director of Human Resources, then *433 launched her own investigation. Fisher contacted Rogers and informed him that sexual harassment allegations had been made against him. Fisher also alerted French that Harvill claimed that she was still being harassed by Rogers. Fisher further spoke with an employee of the *Sun* named Aggie McDonald. Harvill and Hockman claimed that McDonald would substantiate their claims. McDonald had alleged that Rogers had accidently brushed up against her more than a decade earlier; however, contrary to Harvill's representation of McDonald's declarations, McDonald told Fisher that she did not believe that he had intended anything untoward. Indeed, McDonald asserted that, to her knowledge, Rogers had never behaved inappropriately towards any female

employee.

Harvill and Fisher scheduled a telephone conversation for February 21, 2002, during which Harvill described Rogers' conduct towards her, which included several alleged instances of lewd and inappropriate touching. When Fisher queried Harvill as to why Harvill had not brought these complaints to her earlier, Harvill asserted that she had been expressly instructed by her supervisor French not to ever go above French's head on any matters.

Fisher immediately ordered that Rogers no longer work in close physical proximity to either Harvill or Hockman, who had both made allegations of sexual harassment against him. Fisher continued to interview numerous former and current employees of the *Sun.* Fisher's investigation uncovered no evidence specifically corroborating Harvill's or Hockman's allegations regarding Rogers. On March 13, 2002, Fisher informed both Rogers and French of the results of her investigation. She also instructed Rogers to avoid direct interaction with Harvill and Hockman. Less than a week later, Fisher met with Harvill and informed Harvill that she was unable to uncover sufficient corroborating evidence to support Harvill's allegations and warrant further company action against Rogers.

On March 25, 2002, Harvill sought leave under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601*et seq.* She was informed by Fisher that her job and benefits would remain in place, and that her leave fell under the auspices of the FMLA. Within a relatively short period of time after she had taken her leave, Harvill tendered her resignation, asserting that this was at the behest of her physician. Shortly thereafter, Harvill brought this action claiming, inter alia, sexual harassment, constructive discharge, and retaliation. Westward eventually moved for summary judgment, and the motion was granted. This timely appeal ensued.

## II. DISCUSSION

433 F.3d 428                                                                                Page 7
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

## A. Standard of Review

A party's motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party has the burden of demonstrating that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *Steadman v. Texas Rangers,* 179 F.3d 360, 366 (5th Cir.1999). We review the district court's grant of summary judgment de novo and apply the same legal standards that the district *434 court applied to determine whether summary judgment was appropriate. *Lamar Adver. Co. v. Cont'l Cas. Co.,* 396 F.3d 654, 659 (5th Cir.2005).

## B. Sexual Harassment Claim

Harvill first argues that the district court erred in granting summary judgment for Westward on her sexual harassment claim because substantial evidence exists that the harassing conduct was severe or pervasive, and that her employer failed to take prompt remedial action.

[1] Harvill can establish that she was sexually harassed in violation of Title VII by proving, inter alia, that the harassment created a hostile or abusive working environment. *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 298 (5th Cir.2001). To establish a hostile work environment claim, Harvill must demonstrate that: (1) she is member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of Harvill's employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

*Id.* at 298.

The parties agree that Harvill has established the first three elements of her prima facie case; they only dispute whether the harassment affected a "term, condition, or privilege" of Harvill's employment, and whether Westward knew or should have known of the harassment and failed to take prompt remedial measures.

### 1. *Whether the harassment affected a term, condition, or privilege of employment*

[2][3][4] "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (alteration in original) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). In determining whether an environment is "hostile" or "abusive" within the meaning of Title VII, courts look at the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). We have also considered whether the complained of conduct undermines the plaintiff's workplace competence. *Hockman v. Westward Commc'ns,* 407 F.3d 317, 326 (5th Cir.2004) (citing *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270 (5th Cir.1998)). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 874 (5th Cir.1999) (citing *Harris,* 510 U.S. at 21-22, 114 S.Ct. 367).

The district court held that the harassment by Rogers was not so severe and pervasive that it altered

433 F.3d 428                                                                                                          Page 8
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
(Cite as: 433 F.3d 428)

the terms and conditions of Harvill's employment. In requiring Harvill to establish that the conduct was both severe *and* pervasive, the district court applied the wrong legal standard. As quoted above, the Supreme Court has stated that Title VII provides a legal remedy to victims who establish that the abusive conduct was severe *or* pervasive. *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399; *see also Harris,* 510 U.S. at 21, 114 S.Ct. 367; **\*435**\*Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Faragher v. Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir.2000) ("Harassment need not be severe *and* pervasive to impose liability; one or the other will do."). The district court's error may have resulted from inconsistent application of the "severe or pervasive" standard in this circuit. Compare *Hockman,* 407 F.3d at 326, 329 ("severe and pervasive"), *and Shepherd,* 168 F.3d at 874 (same (quoting *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996))), with *Septimus v. Univ. of Houston,* 399 F.3d 601, 611 (5th Cir.2005) ("severe or pervasive"), *Farpella-Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996) (same), *Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794 (5th Cir.1994) (same), *and Indest v. Freeman Decorating, Inc.,* 168 F.3d 795, 802 (5th Cir.1999) (Weiner, J., specially concurring) (emphasizing that the standard is the disjunctive severe *or* pervasive). Nevertheless, the Supreme Court's decisions are controlling and we correctly stated the standard originally in *Waltman v. International Paper,* 875 F.2d 468, 477 (5th Cir.1989); therefore, subsequent incorrect statements of the test are not binding. *See, e.g., H&D Tire & Automotive-Hardware, Inc. v. Pitney Bowes Inc.,* 227 F.3d 326, 330 (5th Cir.2000) ("When panel opinions appear to conflict, we are bound to follow the earlier opinion.").

Contrary to being an irrelevant distinction, as West-ward's counsel asserts, the requirement that a plaintiff establish that reported abusive conduct be both severe *and* pervasive in order to be actionable imposes a more stringent burden on the plaintiff than required by law. The Supreme Court has stated that isolated incidents, if egregious, can alter the terms and conditions of employment. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275; *see also Worth v. Tyer,* 276 F.3d 249, 268 (7th Cir.2001) ("[W]e have often recognized that even one act of harassment will suffice [to create a hostile work environment] if it is egregious."); *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1072 (10th Cir.1998) (holding that a single incident of physically threatening and humiliating conduct can be sufficient to create a hostile work environment for a sexual harassment claim); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for the purposes of Title VII liability."). By contrast, under a conjunctive standard, infrequent conduct, even if egregious, would not be actionable because it would not be "pervasive."

[5] Harvill alleges that Rogers' harassment began in July 2001 and continued until Gina Fisher, the Director of Human Resources, confronted Rogers with the allegations in February 2002. In her deposition, Harvill testified that, during that seven-month period, Rogers grabbed her and kissed her on the cheek, popped rubber bands at her breasts, fondled her breasts "numerous times," patted her on her buttocks "numerous times," and came behind her and rubbed his body against her. At one point, Harvill estimated that Rogers touched her breasts or her buttocks perhaps as often as once a week-although she later stated that it may not have been as often as once a week. She also claims that on one occasion Rogers made comments to her about her sex life and her abilities in bed. Harvill stated **\*436** that she protested *every time* Rogers touched her breasts and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                    Page 9
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
(Cite as: 433 F.3d 428)

she also protested when Rogers would pat her but-
tocks. Undoubtedly, the deliberate and unwanted
touching of Harvill's intimate body parts can consti-
tute severe sexual harassment. *See, e.g., Worth,* 276
F.3d at 268 ("[D]irect contact with an intimate body
part constitutes one of the most severe forms of
sexual harassment."). Viewing the evidence in the
light most favorable to Harvill, the non-movant, we
conclude that a reasonable jury could find that Ro-
gers' conduct was sufficiently severe or pervasive
to alter a term or condition of Harvill's employ-
ment. *See Matsushita Elec. Indus. Co. v. Zenith Ra-
dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89
L.Ed.2d 538 (1986) (stating that the inquiry on
summary judgment is whether the evidence could
lead a rational trier of fact to find for the non-
moving party); *see also Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986).

The district court concluded, and Westward strin-
gently urges on appeal, that "Harvill's allegations of
'numerous touchings or fondlings' and 'numerous
butt grabbings' [were] too conclusory as to create
an issue of material fact on her harassment claim."
*Harvill v. Westward Communications, LLC,* 311
F.Supp.2d 573, 582 (E.D.Tex.2004). We disagree.
Harvill recalled that the first incident of harassment
occurred in July 2001, after Rogers had returned
from a vacation and she walked back to his office
area to give him a message. She contends that he
used the opportunity to grab her and kiss her on her
cheek. She stated that sometime after that, Rogers
touched her breast for the first time in the hallway
leading to the front office, and she described the ex-
change that occurred as a result of the touching.
She recalled the circumstances surrounding occa-
sions when Rogers popped rubber bands at her
breast and patted her on her buttocks, and she listed
individuals who allegedly witnessed the events. Ad-
ditionally, she recalled a conversation in which Ro-
gers questioned her about her sex life and told her
that a technician from Ramirez Air Conditioning,
who she had dated many years prior, had allegedly
told him that she was skilled in bed. We do not

agree that Harvill's allegations are too conclusory to
permit a fact finder to assess the totality of the cir-
cumstances. Harvill's assertions that she was
touched "numerous times" instead of providing ex-
act dates or the exact number of instances do not
render her allegations so conclusory that they fail to
create a genuine issue of material fact. *Cf. Torres v.
Pisano,* 116 F.3d 625, 631 (2d Cir.1997) (finding
that the ability to recall the exact dates and circum-
stances of only a few of the incidents of harassment
may make it "difficult to convince a jury that per-
vasive harassment in fact took place," but do not
defeat the plaintiff's claim as a matter of law). To
require that Harvill provide precise dates for the oc-
currences or provide an exact number of occur-
rences to support her allegations is an onerous bur-
den not required by law. Whether her allegations
are too vague to ultimately carry the day is a cred-
ibility determination, or requires weighing the evid-
ence, both of which are more appropriately done by
the trier of fact. *See Moore v. Willis Indep. Sch.
Dist.,* 233 F.3d 871, 874 (5th Cir.2000) (stating that
the court cannot make credibility determinations or
weigh any evidence on a summary judgment mo-
tion). Accordingly, the district court erred in con-
cluding that Harvill did not raise a genuine issue of
fact as to whether Rogers' alleged conduct towards
Harvill was sufficiently severe and pervasive[FN1]
such that it *437 altered the terms and conditions of
her employment.

> FN1. Again, we emphasize that the district
> court erroneously applied the conjunctive
> "severe and pervasive" standard rather
> than the disjunctive "severe or pervasive"
> standard.

*2. Whether Westward failed to take prompt remedi-
al action*

The district court also held that Harvill failed to es-
tablish the fifth prong of a prima facie case for a
hostile work environment sexual harassment claim;
specifically, she did not show that Westward failed
to take prompt remedial action upon being in-
formed of the harassment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                                    Page 10
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

[6][7] We have observed that determining "[w]hether an employer's response to discriminatory conduct is sufficient 'will necessarily depend on the particular facts of the case,' " such as the remedial steps taken and the severity of the harassment. *Hirras v. Nat'l. R.R. Passenger Corp.,* 95 F.3d 396, 399-400 (5th Cir.1996) (quoting *Waltman,* 875 F.2d at 479). "When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability." *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 402 (5th Cir.1993). "Prompt remedial action must be reasonably calculated to end the harassment," therefore, Westward may be held liable "despite having taken remedial steps if [Harvill] can establish that [Westward's] response was not reasonably calculated to halt the harassment." *Skidmore v. Precision Printing & Packaging Inc.,* 188 F.3d 606, 615-16 (5th Cir.1999) (internal quotation marks omitted).

[8] We have also recognized that an employee must take advantage of corrective opportunities provided by the employer. *Woods,* 274 F.3d at 300 n. 3. Nonetheless, if an employee believes that bringing a subsequent sexual harassment complaint would be futile, or "it becomes objectively obvious that the employer has no real intention of stopping the harassment, the harassed employee is not obligated to go through the wasted motion of reporting the harassment." *Id.* at 300-01.

[9] Harvill informed her supervisor, Nell French, of the harassment in October 2001. She argues that French failed to take prompt remedial action and, as a result, the harassment continued for four more months. She claims that French's investigation was not reasonably calculated to end the harassment because French did not confront Rogers or interview the appropriate witnesses. Westward counters that French did take remedial action, by investigating the allegations; however, French found that the claims could not be substantiated and, therefore, further remedial steps were unnecessary. Westward also argues that Harvill unreasonably failed to fol-

low the company's procedure for lodging a harassment complaint because Harvill did not bring her complaint to higher management when she became dissatisfied with the way French handled the situation. When Harvill did contact Human Resources, the company immediately separated Rogers and Harvill, after which time Harvill concedes that all harassment ceased. Therefore, Westward contends that it did take prompt remedial action that was calculated to end the harassment after Harvill bypassed French and took advantage of the corrective opportunities made available to her. The district court granted summary judgment for Westward on this basis because it concluded that Harvill unreasonably failed to follow the company procedure for lodging a complaint, and once she did, prompt remedial action was taken. Harvill claims that the district court's ruling was in error because the court did not take into account that she and her coworker, Hockman, reported**438** their allegations on more than one occasion to French, but did not initially go to Human Resources because they were directly commanded by French to never go over French's head on any matters.

Hockman asserted similar claims against Rogers in a Title VII action in federal court and on appeal this court denied her relief. *See Hockman,* 407 F.3d 317. The facts presented here are distinguishable from the factual circumstances in *Hockman* specifically as they relate to whether the harassment was "severe or pervasive."[FN2] Notwithstanding the unique factual scenario Harvill presents regarding her interactions with Rogers, we find that the fifth prong, namely the remedial measures Harvill sought and received from Westward, is the dispositive issue and it is on this issue that our prior opinion in *Hockman* is instructive. Because the record before us is substantially similar to the record in *Hockman* as to this dispositive issue, the fates of Hockman and Harvill are intertwined. In *Hockman,* this court held that Hockman "unreasonably failed to bring her complaint to a higher-echelon employee (Fisher) [even] though she was dissatisfied with the way French handled the situation." 407 F.3d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                              Page 11
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
(Cite as: 433 F.3d 428)

329. The *Hockman* court concluded that Hockman could not establish that Westward failed to take prompt remedial action because:

> FN2. As it relates to our prior discussion of "severe or pervasive" standard, we note the two cases are distinguishable. Harvill stated that Rogers touched her breasts "numerous times" and would pat her buttocks. She also averred that she protested *every time* Rogers touched her breasts and she also protested when Rogers would pat her buttocks. As previously stated, we find that the harassment Harvill endured satisfies the disjunctive standard. By contrast, Hockman alleged that "Rogers 'would sort of brush up against [her]' " and she admitted that "these *brushings* were neither severe nor pervasive." *Hockman,* 407 F.3d at 326 (emphasis added). In her deposition testimony, Hockman admitted that she did not protest when he brushed up against her because the incidents were over before she had the chance to say anything. "In fact, at first she thought they were accidental, stating that 'just as quickly as [an incident] started, ... it ended .... And once it was over, it was over.' " *Id.* (second omission in original).

(1) Hockman received the Westward employee handbook containing the company's anti-harassment policy; (2) the policy provides that if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the incident directly to the Director of Human Resources; (3) she acknowledged her receipt of the handbook and understanding of its provisions with her signature; and (4) despite her awareness, there is no evidence that Hockman availed herself of any of the company's provisions after speaking to French, several months after the alleged harassment began.

*Id.* at 329-30. The court found it irrelevant that Hockman and Harvill were provided with an out-

dated copy of the anti-harassment policy. The *Hockman* court also found it irrelevant that, at an employee meeting concerning an unrelated event, French had emphatically told Harvill and Hockman that they were never to go over her head about anything.

As in *Hockman,* Harvill acknowledged that she signed a document stating that she received Westward's employee handbook. The employee handbook outlined the company's anti-harassment policy and stated that "[i]f the employee feels that it would be inappropriate to report the matter to the immediate supervisor or the matter is not satisfactorily resolved at this level, the employee should report the incidents directly to the director, Human Resources ...." Harvill also conceded that the document she signed acknowledging receipt of the employee handbook stated **439** that it was the obligation and responsibility of the employee to read and be familiar with the contents of the handbook. Harvill and Hockman approached French together in October 2001 to present their claims of sexual harassment by Rogers. On more than one occasion, both Harvill and Hockman approached French after the October meeting to report that the harassment was continuing but did not inform Human Resources of their complaints. Both women also stated that the harassment *completely ceased* after an attorney, acting on behalf of both Harvill and Hockman, finally sent a letter to Robert McMaster, the Chief Executive Officer of Westward, and Gina Fisher, Westward's Director of Human Resources, to inform Westward of Rogers' behavior.

As it concerns Harvill's familiarity with the anti-harassment policy and the steps she took to inform her employer of the alleged harassment, the circumstances in *Hockman* and in the case at bar are not just similar but identical. Harvill and Hockman each signed a document in which she acknowledged receipt of the employee handbook and stated that she understood the anti-harassment policy. Moreover, they acted in concert in informing their employer of the alleged harassment. Because the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                          Page 12
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
(Cite as: 433 F.3d 428)

circumstances in *Hockman* and in the case at bar are indistinguishable as to this fifth prong, we conclude that we are bound by this court's decision in *Hockman* that, on these particular facts, the employee unreasonably failed to take advantage of corrective opportunities provided by Westward. *See Lowrey v. Tex. A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997) ("[O]ne panel of this court cannot overrule the decision of another panel ...."). Once the CEO and Director of Human Resources were notified of Harvill's claims, Westward acted swiftly in taking remedial measures and the harassment ceased. Harvill has not raised a genuine issue of fact on the prompt remedial action element of her prima facie hostile work environment claim; therefore, we affirm the district court's grant of summary judgment for Westward.

### C. Retaliation Claim

[10] Harvill also argues that there is sufficient evidence to support her claim that Westward retaliated against her for filing a sexual harassment complaint. She contends that after she filed her sexual harassment complaint, she heard her new supervisor say he would get a bonus if he ran her off; a bogus racial harassment charge was brought against her; an unknown individual began taking pictures of her outside of the offices; and the other supervisors and co-workers treated her in a hostile manner. She argues that she was constructively discharged because all of these circumstances combined to create intolerable working conditions, which ultimately caused her to resign on advice of her doctor.

[11][12] To establish a prima facie retaliation claim, Harvill must prove that: (1) she engaged in an activity that Title VII protects; (2) Westward carried out an adverse employment action; and (3) a causal nexus exists between her protected activity and Westward's adverse action. *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167 (5th Cir.1999). The filing of an EEOC complaint is clearly a protected activity within the meaning of

the statute. *Walker v. Thompson,* 214 F.3d 615, 629 (5th Cir.2000). Thus, Harvill has satisfied the first prong of her prima facie case.

[13][14] Constructive discharge is the adverse employment action that is the basis for Harvill's retaliation claim. In order to establish a prima facie case of retaliation based on constructive discharge, Harvill*440 "must prove that 'working conditions would have been so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.' " *Landgraf v. USI Film Products,* 968 F.2d 427, 429-30 (5th Cir.1992) (quoting *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980)).

In determining whether a reasonable employee would feel compelled to resign, we have considered the relevancy of the following events:

(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status] ....

*Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir.2001) (alteration in original) (quoting *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000)). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge ...." *Kinney Shoe,* 237 F.3d at 566. Harvill "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf,* 968 F.2d at 430.

The district court concluded that Harvill did not exhaust her administrative remedies as to this claim because she failed to allege constructive discharge in her EEOC complaint. Consequently, the court granted summary judgment to Westward on Har-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vill's constructive discharge claim. Aside from constructive discharge, Harvill has not alleged any adverse employment action that could serve as a basis for a retaliation claim. Thus, the court held that her retaliation claim must fail because the court could not consider her constructive discharge argument.

Even assuming arguendo that the district court could have considered her constructive discharge argument, we still conclude that Harvill's allegations of retaliatory conduct do not preclude summary judgment. In her affidavit, Harvill asserts that she was "treated rudely and with general hatefulness" by other supervisors and employees; that a man she did not know began taking pictures of her; that a meritless racial harassment charge was brought against her; and that she heard a new supervisor state that he would receive a bonus if he ran her off. Aside from conclusory allegations, Harvill has presented no summary judgment evidence to substantiate her claims. *See Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 242 (5th Cir.1993). Moreover, even if we were to accept these allegations, Harvill has not alleged any aggravating factors that would render the harassment so intolerable that a reasonable employee would feel compelled to resign. *See id.; Ward v. Bechtel Corp.,* 102 F.3d 199, 202 (5th Cir.1997). Accordingly, Harvill has not raised a genuine issue of material fact as to the second prong of her prima facie case, i.e., whether she suffered an adverse employment action, and the district court did not err in granting summary judgment to Westward on this claim.

D. Fair Labor Standards Act Claim

[15] Finally, Harvill argues that the district court erred in granting summary judgment for Westward as to her FLSA claim for unpaid overtime because substantial evidence exists that she was required to keep false time sheets, which resulted in her not being paid for approximately 210 hours of overtime. The district \*441 court held that Harvill failed to present sufficient evidence that she was not properly compensated for overtime work or that her em-

ployer was aware that she was engaging in the unpaid overtime work.

[16] The Fair Labor Standards Act mandates that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). " 'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.' " *Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir.1995) (alteration in original) (quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981)). "[I]f the 'employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207.' " *Id.* (quoting *Forrester,* 646 F.2d at 414).

[17][18] An employee bringing an action pursuant to the FLSA, based on unpaid overtime compensation, must first demonstrate that she has performed work for which she alleges she was not compensated. *See Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). An employee has met her requisite burden of proof

if [she] proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

433 F.3d 428                                                                                    Page 14
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage
& Hour Cas.2d (BNA) 142
**(Cite as: 433 F.3d 428)**

*Id.*

In the district court, Harvill's argument against summary judgment on her FLSA claim consisted of her unsubstantiated assertions that French required her to turn in false time sheets, and that Westward "clearly suffered or permitted" her to work overtime. She contended that it was up to the jury to decide who was telling the truth. She offered no factual allegations *at all* to substantiate her claim, and she presented *no* evidence of the amount or the extent of hours she worked without compensation. Moreover, she presented *no* evidence that Westward was aware that she worked overtime hours without compensation. On appeal, Harvill only adds to her argument the assertion that she worked 210 hours of unpaid overtime. Again, she offers absolutely no evidence that she actually worked the hours she alleges, or that Westward was aware that she worked overtime hours without compensation. Harvill has failed to raise a genuine issue of material fact as to whether she went uncompensated for overtime work. Accordingly, the district court did not err in granting summary judgment for Westward on Harvill's FLSA claim.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for Westward on Harvill's sexual *442 harassment, retaliation and Fair Labor Standards Act claims.

C.A.5 (Tex.),2005.
Harvill v. Westward Communications, L.L.C.
433 F.3d 428, 96 Fair Empl.Prac.Cas. (BNA) 1793, 87 Empl. Prac. Dec. P 42,222, 152 Lab.Cas. P 35,090, 11 Wage & Hour Cas.2d (BNA) 142

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

115 F.3d 1555                                                                                    Page 1
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

▷

Holifield v. Reno
C.A.11 (Fla.),1997.

United States Court of Appeals,Eleventh Circuit.
Edward A. HOLIFIELD, Plaintiff-Appellant,
v.
Janet RENO, Attorney General of the United
States, Joseph Class, Warden of FCI Marianna,
Garland Jeffers, Associate Warden, FCI Marianna,
Defendants-Appellees.
**No. 95-3280.**

July 2, 1997.

Black doctor sued his former employer for employment discrimination and retaliation in violation of Title VII. The United States District Court for the Northern District of Florida, No. 94-50357-RV, Roger Vinson, J., granted summary judgment for employer. Doctor appealed. The Court of Appeals held that: (1) evidence was insufficient to support discrimination claim, and (2) peer review, performance appraisals, and testimony of supervisors, colleagues, and medical staff showing that work for which doctor was responsible was not performed properly was fatal to retaliation claim.

Affirmed.

West Headnotes

**[1] Civil Rights 78 €═══1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)
Non-minority doctor who was transferred for allegedly poor performance rather than terminated was not treated more favorably, for purposes of Title VII analysis, to black doctor who was terminated for allegedly poor performance; supervisor's undisputed testimony was that he made phone calls in effort to transfer black doctor but that no other opportunities were available. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 €═══1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)
Non-minority doctor who was criticized for his temper but received excellent performance evaluations was not similarly situated, for purposes of Title VII analysis, to black doctor who was terminated for allegedly poor performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78 €═══1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Evidence, including statistical reports prepared by United States Office of Personnel Management studying percentage of minorities in selected management positions in Bureau of Prisons nationwide, and coworkers' impressions that racism played part in employment decisionmaking, was insufficient to support black doctor's claim that his transfer and termination by prison constituted racial discrimination in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 €═══1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k144)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                                Page 2
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

Employer presented legitimate, non-discriminatory reason for transferring and later terminating black doctor, as required to rebut doctor's prima facie case of race discrimination in violation of Title VII, by showing that evaluations indicated schism between doctor and his colleagues, supervisors, and support staff, and that reviewers recommended doctor be removed for delaying treatment and evaluation of patients, displaying unprofessional behavior toward staff and physicians, and causing conflict within department and with administration. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⚬1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
Black doctor's unsubstantiated assertion that his supervisors began documenting untrue assessment of his performance to terminate him because of his race was insufficient to show that employer's articulated reason for transfer and termination was pretext for race discrimination in violation of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Prisons 310 ⚬7**

310 Prisons
    310k5 Officers and Employees
        310k7 k. Appointment, Qualification, and Tenure. Most Cited Cases
Peer review, performance appraisals, and testimony of supervisors, colleagues, and medical staff showing that work for which black doctor was responsible was not performed properly was fatal to doctor's claim he was transferred and terminated in violation of Title VII, in retaliation for filing equal employment opportunity complaint and expressing concerns about racism to his supervisor. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**\*1556** Edward A. Holifield, pro se, Tallahassee, Florida, Jerry G. Traynham, Tallahassee, FL, for Appellant.
Michael P. Finney, Special Asst. U.S. Atty., Tallahassee, Florida, Steve R. Simon, Federal Bureau of Prisons, Phoenix, Arizona, for Appellees.

Appeal from the United States District Court for the Northern District of Florida.

Before BLACK, Circuit Judge, and FAY and ALARCON [FN*], Senior Circuit Judges.

> FN* Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:
We affirm the judgment of the district court for the reasons stated in its dispositive **\*1557** order dated September 11, 1995, attached hereto as an Appendix.

AFFIRMED.

ATTACHMENT

APPENDIX

IN THE UNITED STATESDISTRICT COURT,NORTHERN DISTRICT OF FLOR-IDA,PANAMA CITY DIVISION.

Edward W. HOLIFIELD, Plaintiff,

v.

Janet RENO, Attorney General of the United States, Defendant.

No. 94-50357-RV.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                    Page 3
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

### *ORDER*

Pending is the defendant's motion for summary
judgment. (doc. 8)

### I. *BACKGROUND*

This is a petition for review of a decision by the
Merit Systems Protection Board ("MSPB"),
brought pursuant to Title 5, United States Code,
Section 7703, and Title VII of the Civil Rights Act
of 1964 [42 U.S.C. §§ 2000e, et seq.]. The plaintiff,
Dr. Edward W. Holifield, is proceeding *pro se*. Dr.
Holifield, who is black, alleges that the Bureau of
Prisons discriminated against him on the basis of
his race when it removed him from his position as a
physician at Federal Correctional Institution Mari-
anna, Florida ("FCI Marianna"). Dr. Holifield also
alleges that racial discrimination formed the basis
for his reassignment from Chief of Health Programs
to staff physician at FCI Marianna. Except as noted,
the following material facts are not in dispute.

Holifield was appointed Chief of Health Programs
("CHP") at FCI Marianna on July 28, 1991.[FN1]
The position was open because a Quality Assurance
Physician Peer Review performed in November
1990 at the request of Warden Joseph Class re-
vealed widespread problems within the medical de-
partment, and the incumbent CHP, Dr. Hosain, was
relieved of his duties. *Walter Hollingsworth, Health
Services Administrator, brought Holifield's name to
the attention of Warden Class.* (doc. 8, ex. C Vol.
III, p. 462) Because of problems in Holifield's prior
employment record, a waiver had to be obtained so
that Holifield could be hired by the Bureau of Pris-
ons. Holifield was hired on the basis of both his
credentials and his racial minority status. (doc. 8,
ex. C Vol. I, p. 176, ex. C Vol. III, p. 550)

> FN1. The CHP serves as Co-Department
> Head of the Health Services division, and
> is responsible for planning and directing
> the professional aspects of the health deliv-
> ery program. The position involves a wide

range of responsibilities. (doc. 8, ex. A (ex.
C, att. C)) The official job description
states that the CHP has "direct supervisory
responsibility of all staff physicians and
Chief Dental Officer." *Id.*

When Holifield arrived at FCI Marianna, the Health
Services Division was under the supervision of As-
sociate Warden Garland Jeffers. Holifield was in-
formed by Jeffers that he would not be allowed su-
pervisory powers until he passed a course entitled
Introduction to Supervision. (doc. 32, ex. 17-B-29)
Holifield was not informed of this requirement pri-
or to or at the time he was appointed to the position.
Jeffers withheld authority because Holifield was
new to the Bureau of Prisons, and Jeffers felt it
would be beneficial if Holifield had additional
training in supervision. (doc. 8, ex. A Vol. III, p.
554-555)

On March 30, 1992, Holifield received his six-
month performance appraisal from Jeffers. Holi-
field was favorably rated, and Jeffers noted that
"Dr. Holifield is progressing extremely well...."
(doc. 8, ex. B Vol. III, ex. A-4) On August 20,
1992, Holifield received an overall rating of
"excellent" on his one-year performance appraisal.
(doc. 8, ex. B Vol III, ex. A-5) Jeffers stated that
Holifield "has completed a very successful proba-
tionary year...." *Id.* Warden Class concurred in the
appraisal.

Holifield passed the supervision course on May 12,
1992. He sent a memorandum to Jeffers and Class
asking for written clarification of his supervisory
status. (doc. 32, ex. 17-B-29) Jeffers verbally gran-
ted supervisory authority to Holifield in May 1992,
but **\*1558** Holifield demanded that the grant of au-
thority be made in writing. He finally received writ-
ten notice that he was CHP with full supervisory
authority on November 3, 1992. (doc. 8, ex. A (ex.
C, att. E))

On November 20, 1992, Dr. Elsy Rucker sent a
memorandum to Class concerning Holifield's beha-
vior. (doc. 8, ex. A ex. C, att. G)[FN2] Dr. Rucker

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                          Page 4
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
(Cite as: 115 F.3d 1555)

stated that Holifield threatened to destroy her if she undermined him in staff meetings, and ordered her to clear out her office and move to a less desirable room in another location. *Id.;* (doc. 8, ex. C Vol. I, p. 180) On the day Class received the memorandum, he assigned Randy Ream, Camp Administrator, and Sterling Dawson, Paralegal, to investigate Rucker's claims of unprofessional conduct against Holifield. (doc. 8, ex. A ex. C, att. H; doc. 8, ex. C Vol. III, p. 466) *The parties dispute whether Holifield was aware of this investigation before he saw the EEO counselor on December 2, 1992.* (doc. 8, ex. C Vol. V, p. 950)

> FN2. Rucker began working at FCI Marianna in July 1992. The record shows that while the working relationship between Rucker and Holifield was initially satisfactory, the relationship began to deteriorate when Rucker suggested that Holifield make changes in the administration of the department. (doc. 8, ex. C Vol. II, p. 350-62)

On December 2, 1992, Holifield went to Diana Graden, EEO counselor at FCI Marianna, for the purpose of finding out how to file an EEO complaint. (doc. 8, ex. C Vol. V, p. 898; doc. 32, ex. 17-C-5) Holifield was concerned about the lack of support of Class and Jeffers for his supervisory authority and position as CHP (doc. 8, ex. C Vol. V, p. 977-981) While Graden and Holifield were still in the counseling session, Ream and Dawson interrupted the meeting and escorted Holifield to another room. (doc. 8, ex. C Vol. V, p. 898) Ream and Dawson informed Holifield that they were investigating Rucker's claim of unprofessional behavior against Holifield, and proceeded to question Holifield regarding Rucker's allegations.

The next day, on December 3, 1992, an entry was made in Holifield's performance log stating that Holifield habitually arrived at work 10 to 15 minutes late and took longer lunch breaks than the allotted 30 minutes. (doc. 8, ex. B Vol. III, ex. A-13) Prior to December 3, 1992, Holifield had not

received any log entries. (doc. 8, ex. C Vol. V, p. 898) Log entries were required to be made at least every three months, and preferably every month. (doc. 8, ex. C Vol. V, p. 824-25) Another entry was made in Holifield's performance log on December 9, 1992, stating that the pattern of Holifield's sick leave use appeared to be excessive. (doc. 8, ex. B Vol. III, ex. A-14) An additional entry was made in Holifield's performance log in December, dated "October, November, December 1992." (doc. 8, ex. B Vol. III, ex. A-15) The entry stated that Holifield had made successful changes in departmental policy, but noted that Holifield experienced "significant difficulty in maintaining a professional demeanor when it comes to verbally communicating with subordinates, peers and supervisors." The entry downgraded Holifield's appraisal rating on three of five performance elements.

On December 14, 1992, Holifield sent a lengthy memorandum to Jeffers complaining about lack of recognition from Jeffers concerning Holifield's treatment of a patient. Holifield stated that "[d]espite the actions taken by me that may have prevented the death of this patient, I have not received a single favorable word of recognition from you. Nor has there been a positive entry in my performance log reflecting the role that I played." (doc. 32, ex. 17-B-23) Holifield proceeded to give several examples of actions he felt did not receive sufficient recognition from Jeffers.

The relationship between Holifield and the staff and administration continued to deteriorate. On December 17, 1992, Jeffers confronted Holifield concerning his treatment of an inmate. The issue was brought to Jeffers' attention by Rucker. *Holifield sent a memorandum to Jeffers on December 21, 1992, accusing Jeffers of discrimination, (doc. 32, ex. 17-B-24), and Jeffers sent a memorandum to Class concerning the incident on December 28, 1992.* (doc. 32, ex. 17-B-26)

On December 21, 1992, Ream and Dawson issued their report to Class, in which they concluded that the events of November 19 *1559 occurred as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                    Page 5
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
(Cite as: 115 F.3d 1555)

charged by Rucker. (doc. 8, ex. A, ex. 4i-27) They also concluded that Rucker's allegations concerning Holifield's poor management skills were substantially true. Ream and Dawson noted schisms between Holifield and his subordinates, his supervisor, and the support staff, and concluded that *"effective management of the department can only be restored by changing the department head,"* since Holifield lacked the supervisory experience and leadership skills to make needed changes. (doc. 8, ex. A, ex. 4i-27)

On December 28, 1992, Dr. Holifield was notified by Class that effective January 4, 1993, he was reassigned from his position as CHP to that of staff physician. (doc. 8, ex. A (ex. C, att. J)) Class took this action on the basis of the recommendation by Ream and Dawson. (doc. 8, ex. C Vol. III, p. 467) The memorandum from Class stated that the reassignment was not a disciplinary action. On December 29, 1992, Class circulated a memorandum stating that Dr. Rucker would serve as acting CHP. (doc. 8, ex. A (ex. C, att. K)) Associate Warden Danny L. Roswurm was to take over supervision of the medical department from Jeffers, and did so in January of 1993. (doc. 8, ex. C Vol. III, p. 513) *Class reassigned Jeffers to another position in part because of the strained relationship between Jeffers and Holifield.*

Holifield sent numerous memoranda to Class, Roswurm, and Hollingsworth on January 19, 1993, asking for the results of the investigation, asking why few African-Americans were present in the medical department at FCI Marianna, asking why no African-Americans were on the Executive Staff, questioning the entries in his performance log, and alleging discrimination as to his removal from the position of CHP. (doc. 8, ex. F. Vol. II, ex. 43) Holifield filed a complaint of discrimination on February 5, 1993, alleging that Warden Class and Associate Warden Jeffers initially denied him supervisory authority, and then removed him from supervisory authority, on the basis of racial discrimination. (doc. 8, ex. B Vol. IV, ex. 25c)

*On February 8, 1993, Roswurm sent a memorandum to Holifield detailing incidents that Roswurm considered unacceptable conduct on the part of Holifield.* (doc. 8, ex. A (ex. D, att. A)) Specifically, Roswurm stated that Holifield had displayed a belligerent attitude toward Rucker, and had failed to maintain a professional demeanor when communicating when subordinates, peers, and supervisors. Holifield sent a memorandum to Roswurm on February 22, 1993, specifically rebutting each of Roswurm's allegations, and alleging discrimination on the part of the staff and administration.

Roswurm made an entry in Holifield's performance log on March 30, 1993, directing Holifield to treat staff in a professional manner, and to not impose frivolous requests on other staff's work schedules. (doc. 8, ex. B Vol. III, ex. A-17) On April 19, 1993, Holifield received a performance appraisal done by Roswurm which rated him lower on all elements than his previous appraisal. (doc. 8, ex. B Vol. III, ex. A-20) The appraisal stated that Holifield continued "to have significant difficulty in maintaining a professional demeanor when it comes to verbal communication with subordinates, peers, and supervisors." On April 23, 1993, Holifield wrote Roswurm a memorandum stating that the appraisal was the result of racism, and was intended to encourage Holifield to leave the institution. (doc. 8, ex. E Vol. I, ex. 1) During this time, Holifield sent several other memoranda to Roswurm and Class alleging discrimination on the part of officials at FCI Marianna. (doc. 8, ex. F. Vol. II, ex. 43)

On May 3, 1993, Holifield filed another complaint of discrimination with the EEOC. (doc. 8, ex. A, ex. D) The complaint alleged that various actions taken by officials at FCI Marianna, including harassment, perpetual investigations, false entries in Holifield's performance logs, and poor performance appraisals, were taken in reprisal for Holifield's filing of an EEO complaint. After Holifield filed this complaint, Jeffers asked personnel at FCI Marianna to specify what requests they had received from Holi-

115 F.3d 1555                                                                                           Page 6
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

field for information concerning the number of minority employees at the institution. Numerous personnel sent memoranda to Jeffers detailing information requested by Holifield concerning minority employees, their performance *1560 ratings, and EEO policies. (doc. 8, ex. B vol. III, ex. B38-B43; ex. C Vol. V, p. 900-905) Personnel also sent memoranda to Jeffers informing Jeffers that Holifield was seen with Graden, the EEO counselor. (doc. 8, Ex. C Vol. V, p. 905)

In May 1993, Class asked for a peer review to focus on the clinical care provided by Holifield. Class asked for the peer review because *Edward Garisiak, the Regional Health Services Administrator in Atlanta, had visited FCI Marianna and written Class a memorandum recommending such a review on the basis of Holifield's disruptive behavior and the poor morale of the health department.* (doc. 8, Ex. C Vol. III, p. 468-69) Two doctors from other Bureau of Prisons institutions, Dr. Michael Nelson and Dr. German Maisonet, conducted the review on May 24-25, 1993. (doc. 8, ex. A, ex. 4i-28) The reviewers concluded that the health services department at FCI Marianna was in a state of crisis, and cited the demoralization of the health services staff as the central reason for the crisis. The reviewers found that Holifield, through delaying treatment and evaluation of patients, displaying unprofessional behavior toward staff and other physicians, and causing conflict within the department and with his superiors, was the cause of the problem. The reviewers recommended removing Holifield from his position as staff physician at FCI Marianna, stating that "[i]t is unlikely that he would function effectively in any BOP facility...." (doc. 8, ex. A, ex. 4i-28)

On June 3, 1993, Holifield was escorted from his office and was told he was being placed on home duty status. (doc. 8, ex. C, Vol. V, p. 908-909) He was given a letter confirming this change of duty station. (doc. 8, ex. A (ex. E, att. J)). The letter stated that "[t]his is not a disciplinary or an adverse action." Roswurm and Ross escorted him out of the

institution. On that same date, a memorandum was circulated within FCI Marianna by Captain R.K. Ross stating that Holifield was no longer authorized entrance into the institution. The memorandum stated that only the Warden or his designee could authorize Holifield's admittance, and that if admittance was authorized, "a representative from the Human Resources Department will provide escort."

On July 14, 1993, Holifield filed another complaint of discrimination alleging reprisal on the part of the administration at FCI Marianna. (doc. 8, ex. A (ex. E)) Holifield alleged that actions taken by officials at FCI Marianna, including the reassignment of Holifield to home duty, were taken in retaliation for his prior discrimination complaints. On July 23, 1993, Holifield was called back to the institution, and was given a letter of proposed removal. (doc. 8, ex. A, ex. 4n) The letter proposed that he be removed from his position for: (1) failure to provide adequate medical care; (2) inappropriate deferral of medical care; (3) unauthorized destruction of medical documents; and (4) unacceptable professional behavior. On August 26, 1993, Holifield was given the decision letter removing him effective that same date. (doc. 8, ex. A, ex. 4d, 4e)

Holifield appealed his removal to the Merit Systems Protection Board ("MSPB") on September 3, 1993. (doc. 8, ex. B Vol. IV, ex. 25) In the appeal, Holifield alleged that his termination was without just cause, and was in retaliation for filing multiple complaints with the EEOC for racial discrimination and reprisal. On February 28, 1994, a MSPB Administrative Judge ("AJ") issued an initial decision affirming the agency's action and finding that the agency did not discriminate against Holifield. The AJ sustained the agency's charges of failure to provide adequate medical care and unacceptable professional behavior. The AJ found that Holifield failed to establish a causal connection between his race and his removal, since he failed to show that a similarly situated employee not of his race was treated more favorably. As to Holifield's retaliation claim, the AJ concluded that Holifield failed to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                                    Page 7
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

show that his removal was for reasons other than his personal misconduct.

On June 17, 1994, the MSPB affirmed its initial decision issued on February 28, 1994, which found that the Bureau of Prisons had not engaged in discrimination as alleged by Holifield. (doc. 8, ex. B Vol. I, ex. 6) The EEOC affirmed the MSPB decision on October*1561 5, 1994. (doc. 8, ex. B Vol. I, doc. 1) The EEOC found that Holifield failed to establish a prima facie case of race discrimination. As to Holifield's reprisal claim, the EEOC found that the agency articulated legitimate, non-discriminatory reasons for its action, and Holifield failed to demonstrate pretext. Holifield filed the present action on November 14, 1994.

## II. *ANALYSIS*

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,*494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993). Likewise, if reasonable minds could differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992).

On a summary judgment motion, the record and all

reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994).

In this case, the plaintiff is proceeding *pro se,* so I will not hold him to strict accountability of compliance with the rules of procedure, and will construe the complaint more leniently than I would formal pleadings drafted by lawyers. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980). However, although the plaintiff's complaint is entitled to a less strict interpretation, the plaintiff must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case. *Brown v. Crawford,* 906 F.2d 667, 669-70 (11th Cir.1990).

### B. *Discussion*

### (1) Disparate Treatment

The defendants argue that Dr. Holifield has failed to establish a prima facie case of unlawful race discrimination. Specifically, the defendants contend that Holifield was not qualified to retain his position as a prison physician, cannot offer evidence of a similarly situated and similarly mistreated employee, and has shown no evidence of racial bias or reprisal on the part of Roswurm or Class.

When a plaintiff appeals from a MSPB decision, the district court reviews discrimination claims de novo and non-discrimination claims on the administrative record under Title 5, United States Code, Section 7703(c). *Mason v. Frank,* 32 F.3d 315, 317 (8th Cir.1994); *Carr v. Reno,* 23 F.3d 525, 528 (D.C.Cir.1994); *Johnson v. Burnley,* 887 F.2d 471, 474 (4th Cir.1989). *Discrimination claims are analyzed under the disparate treatment analysis common to Title VII employment discrimination cases. Id.*

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compens-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1988). The plaintiff may establish a prima facie case of discrimination under Title VII on the basis of statistical proof of a pattern of discrimination [see *Wilson v. AAA Plumbing Pottery Corp.,* 34 F.3d 1024, 1027 (11th Cir.1994) ], or on the basis of direct evidence of discrimination, which consists of "evidence which, if believed, would prove the existence of discrimination without inference or presumption." *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir.1989). In the usual case, however, direct evidence is not *1562 present, and the plaintiff must rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677; *Coutu v. Martin Cty. Bd. of Cty. Commissioners,* 47 F.3d 1068, 1073 (11th Cir.1995); *Turnes v. Am-South Bank, N.A.,* 36 F.3d 1057, 1060 (11th Cir.1994). See *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1308 (8th Cir.1994). See *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-4, 67 L.Ed.2d 207 (1981).

The defendants argue that Holifield has failed to point to a similarly situated, non-minority employee who was treated more favorably than Holifield.[FN3] As part of the Title VII plaintiff's prima facie case, the plaintiff must show that his employer treated

similarly situated employees outside his classification more favorably than herself. *Coutu v. Martin Cty. Bd. of Cty. Commissioners,* 47 F.3d 1068, 1073 (11th Cir.1995). To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992); *Smith v. Monsanto Chemical Co.,* 770 F.2d 719, 723 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1309 (8th Cir.1994). *If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. See, e.g., Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 182 (1st Cir.1989).

> FN3. The defendants also argue that Holifield was not qualified for his job at FCI Marianna. *Because the issue of Holifield's job performance is intertwined with the issue of whether his termination was pretextual, Holifield's job performance will not be examined until a later stage of the McDonnell Douglas analysis. See Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 n. 4 (7th Cir.1994); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3rd Cir.1990).

[1] Dr. Holifield points to Dr. Hosain and Dr. Mirandella as similarly situated employees who were treated more favorably. Dr. Hosain, Holifield's predecessor as CHP, was transferred from FCI Marianna following a peer review conducted on November 12-16, 1990. (doc. 8, ex. B Vol III, ex. 17 D-2) FN4 The reviewers found that Hosain maintained a

115 F.3d 1555                                                                        Page 9
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

minimal workload, and was often away from FCI Marianna. The report stated that the health services department suffered from lack of leadership by the CHP, and that "the physicians are at odds with each other, as well as with the physician assistants." The report concluded that Hosain's relationship "to all medical staff is at lowest imaginable level." The report recommended that Hosain be removed from his position. On the basis of the report, Class suspended Hosain for fourteen days and reassigned him to another facility where he could work under supervision. (doc. 8, ex. C Vol. III, p. 478) Holifield contends that Hosain was treated more favorably, as he was transferred rather than terminated. However, *the undisputed \*1563 testimony of Class is that he made phone calls in an effort to see if Holifield could be transferred to another institution, but no such opportunity was available.* (doc. 8, ex. C Vol. III, p. 473)

> FN4. Class requested the peer review because: (1) in the six months prior to the request, four Physician's Assistants left the institution because of their treatment by the physicians; and (2) four inmate deaths occurred in the six months prior to the review while under the care of the institution's physicians. (doc. 8, ex. B Vol. III, ex. 17 D-2)

[2] As to Mirandella, the record contains two performance evaluations of Mirandella, both of which give him an overall rating of excellent. (doc. 8, ex. F Vol. II, ex. 31) The record shows that Mirandella was criticized by the staff for his temper, and that Mirandella received an unfavorable performance log entry for shouting at a supervisor. (doc. 32, ex. 17-B-11) [FN5] However, his performance evaluations and the peer review reports all state that Mirandella was working at his full capacity, and no evidence in the record shows that the quality of his work was a concern at FCI Marianna. Mirandella was not accused of the same or similar conduct as Holifield, and is not similarly situated for purposes of establishing a prima facie case.

> FN5. The peer review performed in 1990 recommended that Mirandella not be considered for the position of CHP, but stated that Mirandella performed his duties well as staff physician. (doc. 8, ex. B Vol. III, ex. 17 D-2)

Holifield has failed to produce sufficient affirmative evidence to establish that the non-minority employees with whom he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged. Having failed to meet his burden of proving he was similarly situated to a more favorably treated employee, Holifield has not established a prima facie case. *Ricks v. Riverwood Int'l Corp.,* 38 F.3d 1016, 1018 (8th Cir.1994). *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 584 (6th Cir.1992). Recognizing, however, that these are only a limited number of potential "similarly situated employees" when higher level supervisory positions for medical doctors are involved, I will also further analyze the plaintiff's claim.

[3] Assuming that Holifield had met the requirement of producing evidence of similarly situated, non-minority employees being treated more favorably, he still has not established a prima facie case. Holifield has presented no direct evidence of discrimination on the part of the defendants. Instead, he relies upon statistical and circumstantial evidence. As to statistical evidence, Holifield points to a 1992 Affirmative Action Task Force Report, a February 26, 1993 Task Force Report, and a 1995 Report of Minority/Non-Minority Disparate Discharge Rates issued by the United States Office of Personnel Management. (doc. 27, 28) The first two reports study the percentage of minorities in selected management positions within the Bureau of Prisons. These reports, which examine nationwide statistics, do little to advance Holifield's claims of discrimination in the specific environment of FCI Marianna. *See Diamond v. T. Rowe Price Asso-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                    Page 10
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

*ciates, Inc.,* 852 F.Supp. 372, 408 (D.Md.1994). The 1992 Affirmative Action Task Force Report studies all federal employees, and is clearly not relevant in this case. While the statistics presented in these reports might conceivably be relevant to a disparate impact claim, they are not relevant to Holifield's discriminatory treatment claim. *See United States v. Redondo-Lemos,* 27 F.3d 439, 444 (9th Cir.1994).

Holifield also relies on the perception of other employees at FCI Marianna that racism is present at the institution. Several staff members, none of whom worked directly with Holifield, stated that they felt racism played a part in decisionmaking by the administration, and that not enough African-Americans were in positions of authority at FCI Marianna. (doc. 8, ex. E. Vol. I, ex. 6, 8, 18) None of these employees spoke of incidents of discrimination concerning Holifield; rather, they stated that it was their impression that discrimination existed at FCI Marianna. These generalizations are insufficient to establish a prima facie case of disparate treatment on the part of Holifield. *See Jatoi v. Hurst-Euless-Bedford Hospital Authority,* 807 F.2d 1214, 1220 (5th Cir.1987), *cert. denied,*484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). In addition, the alleged biases of other staff members are not relevant. "The biases of one who neither makes nor influences the challenged *1564 personnel decision are not probative in an employment discrimination case." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 10 (1st Cir.1990). *See LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1412 (7th Cir.1984).

The central inquiry in evaluating whether the plaintiff has met his initial burden in a Title VII case is whether the circumstantial evidence presented is sufficient to create an inference of discrimination. *Shah v. General Electric Co.,* 816 F.2d 264, 268 (6th Cir.1987). Sufficient evidence is simply not present in this case. At most, the evidence, taken in the light most favorable to plaintiff, supports the conclusion that incidents of discrimination

on the basis of race have occurred at FCI Marianna. The evidence does not support an inference that Holifield was discriminated against on the basis of his race when he was reassigned from the CHP position or when he was terminated. While Holifield has testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination. *See Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988); *Locke v. Commercial Union Ins. Co.,* 676 F.2d 205, 206 (6th Cir.1982).[FN6]

> FN6. Holifield also claims that he was discriminated against when he was required to take a supervisor's course before assuming supervisory duties as CHP. However, *the undisputed evidence is that other employees at FCI Marianna were required to take such a course before exercising supervisory powers.* Evidence in the record shows that Holifield was required to take the course because he had not previously worked in a position with the federal government. Holifield's conclusory assertions to the contrary, in the absence of supporting evidence, are insufficient to withstand summary judgment. *See Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133 (6th Cir.1993); *Pitts v. Shell Oil Co.,* 463 F.2d 331 (5th Cir.1972).

But even assuming that Holifield has established a prima facie case, the defendant is still entitled to summary judgment. Once the plaintiff has established a prima facie case, thereby raising an inference that he was the subject of intentional race discrimination, the burden shifts to the defendant to rebut this inference by presenting legitimate, nondiscriminatory reasons for its employment action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This intermediate burden is "exceedingly light." *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir.1994). The defendants have fully met their burden in this case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                Page 11
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

[4] The report issued by Dawson and Ream on December 21, 1992 noted schisms between Holifield and colleagues, supervisors, and support staff, and concluded that "effective management of the department can only be resorted by changing the department head."(doc. 8, ex. A, ex. 4i-27) This report was based on interviews with supervisors and personnel in the medical department. Entries in Holifield's performance log noted Holifield's difficulties in "maintaining a professional demeanor" in "communicating with subordinates, peers, and supervisors." (doc. 8, ex. B Vol. III, ex. A-15) Various other memoranda and performance log entries criticize Holifield for his inability to effectively communicate and relate with staff and supervisors. During this time period, the medical staff also criticized Holifield for delayed treatment of patients. The peer review of Holifield performed in May 1993 made the same criticism, concluding that the medical department was in a state of crisis, due largely to the demoralization of the staff resulting from Holifield's behavior. The two doctors performing the peer review found that Holifield delayed treatment and evaluation of patients, displayed unprofessional behavior toward staff and physicians, and caused conflict within the department and with the administration. The reviewers recommended removing Holifield from his position as staff physician, and stated that "[i]t is unlikely that he would function effectively in an BOP facility...." (doc. 8, ex. A, ex. 4i-28) There is nothing in the record to indicate that these independent reviews were biased or were not objective.

The defendant has clearly met its burden of presenting legitimate, non-discriminatory reasons for the reassignment of Holifield to staff physician, and for Holifield's termination. *See* **\*1565**_Spearmon v. Southwestern Bell Telephone Co.,_ 662 F.2d 509, 511 (8th Cir.1981). Where the defendant meets this burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination. _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36

L.Ed.2d 668 (1973); _Roberts v. Gadsden Memorial Hosp.,_ 835 F.2d 793, 796 (11th Cir.1988). This demonstration merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against the plaintiff. _St. Mary's Honor Ctr. v. Hicks,_ 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 422 (1993). _See Pignato v. American Trans Air, Inc.,_ 14 F.3d 342, 346-47 (7th Cir.); _cert. denied,_512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). Put another way, once the employer succeeds in carrying its intermediate burden of production, the ultimate issue in the case becomes whether the plaintiff has proven that the employer intentionally discriminated against him because of his race. _Turnes v. AmSouth Bank, N.A.,_ 36 F.3d 1057, 1061 (11th Cir.1994).

Holifield essentially argues that the defendants, in an effort to conceal their discrimination, have made it appear that Holifield was the cause of the conflict with the health services department at FCI Marianna. Holifield contends that he acted appropriately with his relations with personnel at FCI Marianna, and that the reasons put forth by the defendants are pretextual.[FN7]

> FN7. Holifield also argues that his previous performance evaluations show that he was performing adequately, and support his claim. However, the issue is whether Holifield was performing well at the time of his reassignment and at the time of his termination. _See, e.g., Karazanos v. Navistar Int'l Transp. Corp.,_ 948 F.2d 332, 336 (7th Cir.1991).

The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance. _Billet v. CIGNA Corp.,_ 940 F.2d 812, 818-22 (3rd Cir.1991). _See Sempier v. Johnson & Higgins,_ 45 F.3d 724, 731 (3rd Cir.1995); _Gray v. U. of Arkansas at Fayetteville,_ 883 F.2d 1394, 1401 (8th Cir.1989); _Weihaupt v. American Medical Ass'n,_ 874 F.2d 419, 428 (7th Cir.1989); _Smith v. Flax,_ 618 F.2d 1062, 1067 (4th Cir.1980) (perception of decisionmaker, not em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                          Page 12
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
(Cite as: 115 F.3d 1555)

ployee, is relevant). Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence. *Billet v. CIGNA Corp.,* 940 F.2d at 818-22.

Here, the defendants have produced ample documentary evidence showing that Holifield was not performing the job of CHP or staff physician according to their requirements. *As to Holifield's contention that this evidence was created solely in retaliation for Holifield's discrimination complaints, the other physicians and staff at the health services department who worked with Holifield on a daily basis all stated that Holifield had a poor relationship with staff and administrators, that Holifield was a disruptive influence on the department, and that Holifield delayed treatment and evaluation of patients.* (doc. 8, ex. E Vol. I, ex. 16-17, 22-23; ex. E Vol. II, ex. 49; ex. F Vol. I, ex. 10-12, 14, 15, 22-24) Class testified that the decision to terminate Holifield was based on the fact that Holifield "was such a disruptive factor ... that not only was he not functioning at an adequate level, but that he was destroying the ability of the rest of the department to function." (doc. 8, ex. C Vol. III, p. 472)

[5] Holifield has failed to establish that the defendants' proffered reason is unworthy of credence, or that the defendants were more likely motivated by a discriminatory reason in taking their actions against Holifield. *See Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991). His assertion that the defendants began documenting an untrue assessment of his performance in order to terminate him because of his race is unsubstantiated. Since the defendants have proffered evidence supporting a legitimate, nondiscriminatory reason for Holifield's reassignment from the CHP position and his termination, and Holifield has not come forward with any evidence to show that this reason is pretextual, summary**1566** judgment is warranted. *See*

*Richmond v. Board of Regents of University of Minnesota,* 957 F.2d 595, 598 (8th Cir.1992); *Karazanos,* 948 F.2d at 336; *Mason v. Pierce,* 774 F.2d 825, 829 (7th Cir.1985).

**(2) Retaliation**

Holifield alleges that in retaliation for his complaints of racial discrimination, the defendants undermined his authority as CHP, demoted him to the position of staff physician, commenced investigations against him, and ultimately terminated him from his employment. The defendants contend that Holifield's allegations are not supported by the facts, and that his disruptive behavior and professional misconduct were the basis for the defendants' actions.

To establish a prima facie case of retaliation, the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *Meeks v. Computer Associates Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994); *E.E.O.C. v. Ohio Edison Co.,* 7 F.3d 541 (6th Cir.1993); *Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483 (10th Cir.1991). To recover for retaliation, the plaintiff "need not prove the underlying claim of discrimination which led to [his] protest;" however, the plaintiff must have had a reasonable good faith belief that the discrimination existed. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989). *To meet the causal link requirement, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." E.E.O.C. v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993). *The plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff. Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1524 (11th Cir.1991). The employer's aware-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                                                                      Page 13
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

ness of the statement may be established by circumstantial evidence. *Id.*

Once the plaintiff establishes his prima facie case, the employer must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *E.E.O.C. v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993). If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. *Meeks,* 15 F.3d at 1021; *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993).

Here, it is clear that Holifield engaged in statutorily protected expression. Holifield filed EEO complaints and voiced his concerns about racial discrimination to his superiors. Both forms of expression are protected under Section 704(a). *Rollins v. State of Florida Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989); *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981). It is also clear that Holifield suffered adverse employment action during this time; he was reassigned from CHP to staff physician, and was then terminated from his employment altogether. It is the causal relationship between these events that is in dispute.

The record shows that Holifield sought counseling on December 2, 1992, in anticipation of filing a discrimination complaint. The next day, an unfavorable entry was made in Holifield's performance log, the first entry made in the log since Holifield began his employment in July 1991. Several other unfavorable entries were made in December 1992, and his appraisal rating, previously high, was downgraded. Ream and Dawson, who were aware of Holifield's discrimination complaint, filed their report on December 21, 1992, recommending that Holifield be removed from his position as CHP. The report stated that Holifield had been "vocal in his assertation of problems with his supervisor, especially lack of support and discrimination," and that in light of the complaint filed on December 2, 1992, Holifield could not continue to work with Jeffers.

(doc. 8, ex. A, ex. 4i-27) On December 28, 1992, Class, acting on the basis of the report, notified Holifield that he was reassigned from CHP to staff physician.

**\*1567** A genuine issue of material fact remains as to Holifield has established a prima facie case of retaliation concerning his reassignment, but, for purposes of this analysis, I give all inferences in his favor and accept that he has met this initial burden. While evidence of discrimination is slight, in the context of retaliation, the plaintiff "need not prove the underlying claim of discrimination which led to [his] protest." *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989). Taken in a light most favorable to the plaintiff, the evidence shows that Class was aware of the protected activity at the time he reassigned Holifield, and that "the protected activity and the negative employment action are not completely unrelated." *E.E.O.C. v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993).

The other alleged incident of retaliation concerns Holifield's termination. Holifield filed a complaint of discrimination on February 5, 1993. During March and April, Holifield received several unfavorable performance log entries, and his performance appraisal was downgraded to minimally successful. In response, Holifield sent memoranda to Roswurm and Class alleging discrimination as the basis for his appraisal. On May 3, 1993, Holifield filed another discrimination complaint. After Holifield filed this complaint, Jeffers asked staff at the institution to inform him what requests Holifield had made for information concerning the number of minority personnel at the institution. Class asked for a peer review to focus on the clinical care provided by Holifield. On June 3, 1993, Holifield was escorted from his office and placed on home duty status. Holifield filed another complaint of discrimination on July 14, 1993. On July 23, 1993, Holifield was given a letter of proposed removal, and was ultimately terminated on August 26, 1993.

As with the first alleged incident of retaliation, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115 F.3d 1555                                                                    Page 14
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91
**(Cite as: 115 F.3d 1555)**

evidence, taken in a light most favorable to the plaintiff, shows that the defendants were aware of the protected activity during the time Holifield was given poor performance appraisals, investigated, and ultimately removed. I find that Holifield has met his initial burden as to the alleged incident of retaliation. Thus, I next examine the defendant's reasons for the negative actions.

[6] As stated earlier with regard to Holifield's claim of race discrimination, the defendant has definitely met its burden of presenting legitimate, non-discriminatory reasons for the reassignment of Holifield and his ultimate termination. As with the discrimination claim, Holifield has failed to demonstrate that the employer's proffered explanation is a pretext for retaliation. *Meeks,* 15 F.3d at 1021; *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). *The peer review, performance appraisals, and testimony of supervisors, colleagues, and medical staff all show that the work for which Holifield was responsible was not performed properly during the period at issue.* In this case, the defendant's evidence of a legitimate, non-discriminatory reason for its action is so strong as to rebut completely the inference raised by the plaintiff's prima facie case of retaliation. *See Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987). The evidence supporting Holifield's prima facie case is simply not sufficient to create an issue of fact in light of the substantial evidence of lawful motive presented by the defendant. As a result, the defendant is entitled to summary judgment on the plaintiff's retaliation claim.

## III. *CONCLUSION*

For the reasons discussed above, the defendant's motion for summary judgment is GRANTED. (doc. 8) The Clerk is directed to enter final judgment in favor of the defendant and against the plaintiff, together with taxable costs.

DONE AND ORDERED this 11th day of September, 1995.

/s/ <u>Roger Vinson</u>

/s/ Roger Vinson

/s/ United States District

/s/ Judge

C.A.11 (Fla.),1997.
Holifield v. Reno
115 F.3d 1555, 74 Fair Empl.Prac.Cas. (BNA) 511, 11 Fla. L. Weekly Fed. C 91

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

244 F.3d 1253                                                    Page 1
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L. Weekly C499
(Cite as: 244 F.3d 1253)

▷

Silvera v. Orange County School Bd.
C.A.11 (Fla.),2001.

United States Court of Appeals,Eleventh Circuit.
Richard S. SILVERA, Plaintiff-Appellee-Cross-Appellant,
v.
ORANGE COUNTY SCHOOL BOARD, Defendant-Appellant-Cross-Appellee.
No. 99-15318.

March 20, 2001.

Terminated school employee brought Title VII action, claiming unlawful termination because of his race. A jury returned verdict for employee but declined to award compensatory damages. The United States District Court for the Middle District of Florida, No. 98-00082-CV-ORL-19B,Ann Aldrich, J., sitting by designation, 87 F.Supp.2d 1265, having awarded front pay and back pay, denied motions for judgment as matter of law or new trial, and appeal and cross-appeal were taken. The Court of Appeals, Carnes, Circuit Judge, held that school board offered evidence showing legitimate, nondiscriminatory reasons for its decision to terminate black maintenance employee who had a 16-year-old conviction for lewd assault on a child, while not terminating a white employee who had a similar conviction about the same time, and black employee failed offer sufficient evidence to show that these reasons were pretext.

Reversed and remanded.

West Headnotes

[1] Federal Courts 170B ⬛⬛776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most

Cited Cases
Court of Appeals reviews de novo a district court's denial of a defendant's renewed motion for judgment as a matter of law, and applies the same standards as the district court.

[2] Federal Courts 170B ⬛⬛764

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk764 k. Taking Case from Jury. Most Cited Cases

Federal Courts 170B ⬛⬛798

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk798 k. Directed Verdict. Most
Cited Cases
On review of denial of a motion for judgment as a matter of law, Court of Appeals must consider whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law, considering all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party.

[3] Federal Civil Procedure 170A ⬛⬛2142.1

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from Jury
            170AXV(F)2 Questions for Jury
                170Ak2142 Weight and Sufficiency of Evidence
                    170Ak2142.1 k. In General. Most Cited Cases

244 F.3d 1253                                                                 Page 2
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L. Weekly C499
**(Cite as: 244 F.3d 1253)**

**Federal Civil Procedure 170A ☞2608.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(E) Notwithstanding Verdict
      170Ak2608 Evidence
        170Ak2608.1 k. In General. Most Cited Cases
The nonmoving party must provide more than a de minimus level of evidence to survive a motion for judgment as a matter of law.

**[4] Civil Rights 78 ☞1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
     78k1534 Presumptions, Inferences, and Burden of Proof
       78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)

**Civil Rights 78 ☞1544**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
     78k1543 Weight and Sufficiency of Evidence
      78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Where direct evidence of discrimination is unavailable, a Title VII plaintiff may nonetheless present circumstantial evidence of discrimination sufficient to create a jury question, and in such cases, the *McDonnell Douglas/Burdine* three-step burden-shifting framework applies. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[5] Civil Rights 78 ☞1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
     78k1555 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 78k389)

In deciding a motion by the defendant for judgment as a matter of law in a discrimination case where the defendant has offered nondiscriminatory reasons for its conduct, a court must, considering all the evidence, ascertain whether the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct.

**[6] Civil Rights 78 ☞1128**

78 Civil Rights
   78II Employment Practices
     78k1124 Public Employment
       78k1128 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k146)

**Civil Rights 78 ☞1137**

78 Civil Rights
   78II Employment Practices
     78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
School board offered evidence showing legitimate, nondiscriminatory reasons for its decision to terminate black maintenance employee who had a 16-year-old conviction for lewd assault on a child, while not terminating a white employee who had a similar conviction about the same time, and black employee failed offer sufficient evidence to show that these reasons were pretext, where black employee had in addition three arrests for violent assaults, two of them recent, and the board also put on uncontradicted evidence that it did not terminate the white employee because it believed it was bound by an earlier agreement not to terminate him on the basis of his conviction. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[7] Civil Rights 78 ☞1138**

78 Civil Rights

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                                    Page 3
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L. Weekly C499
**(Cite as: 244 F.3d 1253)**

78II Employment Practices
    78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)
In determining whether employees are similarly situated for purposes of establishing a prima facie case of employment discrimination, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways; the most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed, and in order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[8] Civil Rights 78 ⟲1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)
That school board thought that its predecessor had made a binding agreement with white employee, at the time of his 1977 arrest for lewd assault on a child, not to terminate him was a sufficiently race-neutral reason to explain the different treatment of that employee and a black employee who had a child molestation conviction about the same time, before he was hired, and who was fired after the board learned of it, regardless of whether there had in fact been such an agreement, or whether it was legally binding. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[9] Civil Rights 78 ⟲1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)

An employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[10] Civil Rights 78 ⟲1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)
Differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of employment discrimination. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[11] Civil Rights 78 ⟲1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
Evidence that black school maintenance employee told interviewer of his two prior arrests, one of them for lewd assault on a child, before he was hired, would not support finding that school board's reason for firing him was pretextual, as interviewer's knowledge could not imputed to the board for purpose of finding actual intent, and where, at the time employee was fired, he had been arrested two more times for violent crimes, those two additional arrests were recent, and there was intense media coverage of the story. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[12] Civil Rights 78 ⟲1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                Page 4
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

Employment discrimination involves actual know-
ledge and real intent, not constructive knowledge
and assumed intent. Civil Rights Act of 1964, §
703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[13] Civil Rights 78 €══1126**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1126 k. Particular Cases. Most Cited
Cases
    (Formerly 78k146)
Regardless of whether responding to media atten-
tion and the resulting perceived public pressure to
take action against a convicted child molester is a
laudatory trait in a public board, it is race neutral,
for purposes of defeating claim of employment dis-
crimination. Civil Rights Act of 1964, § 703(a)(1),
42 U.S.C.A. § 2000e-2(a)(1).

**\*1255** M. Susan Sacco, Joseph Elton Blitch, James
G. Brown, Brown & Green, P.A., Orlando, FL, for
Orange County School Bd.
Wilbur V. Chaney, Law Office of Wilbur V.
Chaney, Delray Beach, FL, for Silvera.

Appeals from the United States District Court for
the Middle District of Florida.

Before CARNES and RONEY, Circuit Judges, and
O'KELLEY[FN*], District Judge.

        FN* Honorable William C. O'Kelley, U.S.
        District Judge for the Northern District of
        Georgia, sitting by designation.

CARNES, Circuit Judge:
A school board fired an employee who had pleaded
no contest to a charge of child molestation and who
also had multiple arrests for violent assaults. One
would think that would have been the end of it,
since in any sane world school boards should not be
required to employ child molesters. But the fired
employee made a federal case of it and managed to
convince a judge and jury that he had been fired be-

cause of his race in violation of Title VII.

**\*1256** The school board appeals from the judgment
against it, contending that the judge was wrong to
let the case even go to a jury. The matter is com-
plicated by the fact that the school board did not
fire another employee of a different race who had
also pleaded no contest to a charge of child mo-
lestation, because even child molesters are protec-
ted against racial discrimination in employment by
Title VII. Nonetheless, we agree with the school
board that the case should never have gone to the
jury, because no reasonable person could find from
the evidence that the reason the board fired the
child molester plaintiff was race. The board was
and is entitled to judgment as a matter of law.

## I. BACKGROUND

### A. FACTS

On January 4, 1996, a local television station ad-
vised the Orange County School Board that two of
its employees, Richard Silvera and Wayne Ritter,
had arrest records for child molestation. The Board
immediately began an investigation into the back-
grounds of both employees.

What the Board found is that Silvera, who is black,
had been arrested four times. He was first arrested
on March 4, 1979 for battery of his wife. He was
arrested again on September 23, 1979, this time for
lewd assault on a female child. The arrest report
from that incident indicated that Silvera's wife had
discovered him "with his pants down a little and his
zipper opened" kneeling in front of his six-year-old
step-daughter, who had no pants on. To that charge,
Silvera pleaded no contest, and although adjudica-
tion of guilt was withheld, he received three years
probation and a fine as punishment. Silvera was
again arrested on August 7, 1995, this time for bat-
tery of his wife. His fourth arrest was on December
14, 1995, for aggravated assault of his son-Silvera
allegedly threatened his son with a machete. That

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                    Page 5
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

last criminal charge against Silvera was still pending at the time the Board took the action against him that gave rise to this lawsuit.

At roughly the same time, the Board also learned from its investigation that Ritter, who is white, and who is somewhat mentally retarded, had been arrested twice. He was first arrested in 1977 for lewd assault on a minor. He pleaded no contest to that charge, adjudication of guilt was withheld, and he was put on probation. Ritter's alleged lewd assault occurred on school property and involved students of Orange County. Ritter was said to have engaged in graphic sexual discussion with young boys in a locker room, exposed and touched his genitals in their presence, made homosexual advances, and touched, or encouraged the boys to touch, their genitals. Ritter was arrested a second time on January 13, 1994, on a charge of driving under the influence. The Board's investigation led it to conclude that second charge against Ritter was probably unfounded.[FN1]

> FN1. The Board concluded that the DUI charge against Ritter, which had been dismissed, was unfounded because its investigator learned that the arresting officer who thought Ritter was drunk did not realize that he was mentally retarded, and Ritter "blew a 0.00 on the intoximeter" after he was arrested.

On January 5, 1996, Silvera met with Emma Brown Newton, the Board's Associate Superintendent for Human Resources, and at least one other official. Silvera admitted that he had been arrested on a child molestation charge sixteen years earlier. Newton then told Silvera that he was being suspended with pay pending an investigation and that he was entitled to have legal representation at their next meeting. Silvera was then escorted by Board officials through an assembled group of reporters and television cameras.

On January 10, 1996 Silvera and his attorney met with Newton and Ronald Blocker, the Board's

Deputy Superintendent for Operations. Silvera provided his arrest records and claimed that he had fully disclosed his past arrests to Mack Wright, who had interviewed Silvera before he was hired by the Board on July 6, **\*1257** 1982, as an electric motor repair master. Silvera stated that Wright had told him then there was no problem regarding his prior arrests. Newton contacted Wright at some point after the January 10, 1996 meeting with Silvera, and Wright denied to Newton that Silvera had ever told him about the arrests. Newton and Blocker, in consultation with other officials, recommended to the Board that Silvera be fired. By unanimous vote the Board fired Silvera on February 13, 1996. The Board points out that Blocker and Newton, as well as Board member Kattie Adams, are black.

Newton met with Ritter on January 5, 1996, and, like Silvera, Ritter was suspended with pay pending the outcome of the investigation. Ritter, however, was not terminated and he retired sometime in 1997, having worked as a custodian in the school system since sometime in the 1970's.

The Board asserts that it fired Silvera because of his arrest records, including their frequency, recency, and violent nature. The Board asserts that it also would have fired Ritter, but believed it was bound by an agreement reached shortly after his first arrest in 1977, an agreement in which the Superintendent of Schools, the state attorney's office, and the Corrections Department agreed that Ritter would not be terminated as a result of that arrest but that the Board would keep him away from children.

### B. PROCEDURAL HISTORY

In March 1996, Silvera filed a charge with the Equal Employment Opportunity Commission alleging unlawful racial discrimination. After the EEOC issued Silvera a right-to-sue letter, he filed suit in the United States District Court for the Middle District of Florida, claiming unlawful termination of his employment because of his race in violation of Title VII of the Civil Rights Act of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                                    Page 6
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
(Cite as: 244 F.3d 1253)

1964, 42 U.S.C. §§ 2000e*et seq.*

The district court denied the Board's motion for summary judgment, and Silvera's race discrimination claim was tried to a jury with Silvera proceeding *pro se.* At trial, the Board proffered evidence in support of its stated legitimate, nondiscriminatory reason for firing Silvera: the nature, number, and recency of his various arrests.

The jury returned a verdict for Silvera, but declined to award compensatory damages. The district court entered judgment and awarded Silvera back pay of $75,593, front pay of $62,167, and interest. Silvera timely filed a motion seeking a new trial on compensatory damages only. The Board timely filed a renewed motion for judgment as a matter of law and made an alternative motion for a new trial. In support of those motions, the Board argued among other things that Silvera had failed to put forward sufficient evidence to permit the jury to find that the nondiscriminatory reasons the Board had proffered in explanation of its decision to terminate Silvera, but not Ritter, were pretextual.[FN2] The district court denied both the principal and alternative motions, as well as Silvera's motion, and this appeal and cross-appeal followed.

> FN2. The Board also contends that the district court erred in denying it judgment as a matter of law on the grounds of res judicata and collateral estoppel relating to an arbitration proceeding Silvera filed. The Board further argues that it is entitled to a new trial, even if it is not entitled to judgment as a matter of law, on two grounds: (1) insufficiency of the evidence, and (2) prejudicial errors that occurred at trial. Due to our conclusion that the evidence was insufficient to permit the jury to find that the Board fired Silvera because of his race, we need not reach those issues or any issues raised by Silvera in support of his claim that he is entitled to a new trial on compensatory damages.

## II. DISCUSSION

[1][2] We review *de novo* a district court's denial of a defendant's renewed motion for judgment as a matter of law, and apply the same standards as the district court. *Sherrin v. Northwestern Nat'l Life Ins. Co.,* 2 F.3d 373, 377 (11th Cir.1993). Pursuant to those standards, we must consider "whether the evidence presents a sufficient disagreement to require *1258 submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In the course of our review:

> [W]e consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.

*Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989) (footnotes omitted).

[3] Pursuant to this standard, the nonmoving party must provide more than a de minimus level of evidence to survive a motion for judgment as a matter of law: "[T]here must be a substantial conflict in evidence to support a jury question." *Id.* (footnote omitted). We are required to consider all of the evidence in the light most favorable to Silvera and ascertain "whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented." *Quick v. Peoples Bank,* 993 F.2d 793, 797 (11th Cir.1993) (citation and quotations omitted).

[4] Title VII makes it unlawful for an employer "to discriminate against any individual with respect to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                    Page 7
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where direct evidence of discrimination is unavailable, a Title VII plaintiff may nonetheless present circumstantial evidence of discrimination sufficient to create a jury question. In reviewing Title VII claims that are supported by circumstantial evidence, we use the familiar *McDonnell Douglas/Burdine* three-step burden-shifting framework. Under this framework, the plaintiff shoulders the initial "burden ... of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If a prima facie case has been shown, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Id.*If this is accomplished, the plaintiff may then attempt to demonstrate that the proffered reason was in fact merely a pretext for the defendant's actions. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

[5] In deciding a motion by the defendant for judgment as a matter of law in a discrimination case where the defendant has offered nondiscriminatory reasons for its conduct, a court conducts a focused inquiry. The court must, considering all the evidence, ascertain whether the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered "legitimate reasons were not what actually motivated its conduct." *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994) (citation omitted). "The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfind-

er could find them unworthy of credence.' "*Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (citation omitted).

[6] Applying that analytical framework to this case, we readily determine that the Board offered evidence showing legitimate, nondiscriminatory reasons for its decision to terminate Silvera, and not terminate Ritter. Specifically, the Board put on evidence**1259** that it terminated Silvera due to the nature (assault and child molestation) and number (four) of his arrests, as well as the recency of two of them (one was six months, and the other just two months, before his termination). The Board also put on uncontradicted evidence that it did not terminate Ritter as a result of his nineteen-year old lewd assault arrest, because the Board believed it was bound by an earlier agreement not to terminate Ritter on the basis of that.

Silvera attempted to show that the Board's proffered reasons were merely a pretext for its decision. He argued at trial and repeats before us that Ritter, a white employee, was arrested for the same conduct, lewd assault on a child, and yet Ritter was retained while he was terminated. To Silvera that means he was similarly situated to a non-minority employee, yet subjected to disparate treatment. That could be an adequate basis for the jury's verdict, because the disparate treatment of similarly situated employees of different races is enough to support an inference of racial discrimination. The problem with Silvera's theory of the case, however, is with its premise that he and Ritter were similarly situated at the time the Board decided to terminate one but not the other.

[7] "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997)), *opinion modified by*151 F.3d 1321 (11th Cir.1998).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                                                Page 8
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

"The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted). In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir.1999) (citation omitted); *see also Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Although Silvera claims that he was similarly situated to Ritter, key differences are readily apparent between the two. First, although Silvera and Ritter have in common the fact that they were arrested in the 1970's for lewd assault on a child, Silvera has three additional arrests for violent assaults. The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter. *See Maniccia,* 171 F.3d at 1369 (female plaintiff in Title VII sex discrimination case not similarly situated to male employees who each committed a single policy violation where female plaintiff had committed at least four policy violations); *Bessemer,* 137 F.3d at 1312-13 (employees who allegedly committed single act of misconduct in one day not similarly situated to female plaintiff in Title VII race discrimination case who had engaged in multiple instances of misconduct on the same day). In order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the nonminority employee. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992). Silvera cannot meet that requirement, because the number of arrests on his record exceeds by a factor of two (if Ritter's DUI arrest is counted) or a factor of four (if it is not) those of his would-be comparat-

or.[FN3]

> FN3. We do not think that Ritter's DUI arrest is relevant for purposes of showing that he was similarly situated to Silvera. Even assuming for present purposes that DUI is comparable to crimes involving assault, the Board had good reason to believe (and the uncontradicted evidence is that it did believe) Ritter's DUI arrest was unfounded. *See supra* n. 1.

**\*1260** The second significant difference between the two that prevents Ritter from being a valid comparator for Silvera is the fact that Silvera had three arrests for violent conduct, while Ritter had none. A third difference is that Silvera's most recent arrest was only two months before his termination, while Ritter's most recent one (if the DUI arrest is counted) was over two years behind him (nineteen years if the DUI arrest is not counted). All of these differences are undisputed in the record. The uncontradicted evidence also establishes that the Board believed it was bound by a pre-existing agreement not to terminate Ritter because of the arrest for lewd assault, and it establishes that no such agreement (or belief in one by the Board) existed with respect to Silvera. Ironically, the evidence concerning the old agreement not to fire Ritter because of his child molestation arrest was the linchpin of the district court's reasoning denying the Board's motion for judgment as a matter of law.

At trial, one school official testified that given Ritter's child molestation arrest she would have recommended that he be fired along with Silvera, but for the belief that the Board in existence nineteen years earlier had agreed not to fire Ritter for that reason. The district court focused on that testimony and concluded it effectively erased any difference between the criminal records of Silvera and Ritter. The court reasoned that because the jury could have credited that testimony and found Ritter's criminal record alone should have warranted termination, the difference between his record and Silvera's could not have been the reason Ritter was not fired.[FN4]

244 F.3d 1253                                                                                                     Page 9
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

As for the old agreement being the reason the two employees were treated differently, the district court knocked down that possibility because the Board did not prove that there was a binding agreement not to fire Ritter.

> FN4. An initial problem with the district court's reasoning is that it equates school officials with the Board, which is the actual decision maker, apparently assuming the Board would have rubber-stamped whatever the school officials recommended concerning Ritter. There is no evidence of that. Just because that school official and others might have changed their recommendations if the facts had been different does not mean the Board would have decided differently if presented with a different recommendation. For present purposes, we will ignore that flaw in the district court's reasoning and assume that the Board felt exactly the same as the school official who testified about the effect of the old agreement.

Whether the district court's reasoning is logical is something we need not decide because, logical or not, the reasoning depends upon the factual premise that there is a basis in the evidence for the jury to disbelieve the testimony that the Board felt bound by an old agreement not to fire Ritter for his child molestation arrest. After all, if the Board failed to fire Ritter because of its belief about the old agreement, that belief alone is a sufficiently race-neutral reason to explain the different treatment of Ritter and Silvera. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (the nondiscriminatory reason for the employer's action does not have to be the one proffered by the employer). Only if there is some reasonable basis in the evidence for finding that the Board did not believe itself bound by the agreement is a jury issue presented. There is no such basis. The testimony on the matter was unrefuted and uncontradicted.

[8] The district court said the Board failed to prove at trial that there was a binding pre-existing agreement. That's where the district court missed the mark. Neither the plaintiff nor the court may recast the reason given by an employer for taking or failing to take a particular job action. *See Chapman v. AI Transport,* 229 F.3d 1012, 1030 n. 19 (11th Cir.2000) (en banc) ("Just as plaintiffs are not allowed to recast an employer's proffered *1261 reason, so also should courts refrain from doing so."). The issue is not whether the Board actually was legally bound by the old agreement not to fire Ritter; the issue is not even whether there was an old agreement. The issue, instead, is whether the Board thought that its predecessor had made such an agreement with Ritter which the Board was bound to follow. About that there was no dispute in the evidence. All of the evidence on the issue was that the Board thought there was an agreement and that it was bound by that agreement not to fire Ritter. There was no contrary evidence and thus no basis for a jury to find that this stated difference between Ritter and Silvera was pretextual.

[9][10] Even if we believed, as the district court did, that the Board was not bound by an old agreement with Ritter, that would only establish the Board was mistaken, and an employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII. *See Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253 (11th Cir.2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by sex."); *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1339 (11th Cir.2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.") (internal marks and citations omitted).[FN5]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                                    Page 10
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

FN5. Silvera claims disparate treatment only in regard to the Board's 1996 decision not to terminate Ritter because of Ritter's lewd assault arrest in the 1970's. Silvera has never claimed a violation of Title VII occurred because the Board made an agreement with Ritter shortly after his arrest in 1977 not to terminate him based on that arrest but made no such agreement with Silvera about his 1979 arrest when it hired him in 1982. The district court alluded to that arguable difference in treatment when it remarked about the "generous accommodations to Ritter" after his arrest was first brought to the Board's attention in 1977, as compared to the treatment Silvera received in 1996. But differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination. *See Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."); *Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1271 (6th Cir.1986) ("Although a change in managers is not a defense to claims of race or sex discrimination, it can suggest a basis other than race or sex for the difference in treatment received by two employees."); *Bessemer,* 137 F.3d at 1312 n. 7 ("Different supervisors may have different management styles that-while not determinative-could account for the disparate disciplinary treatment that employees experience."); *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 605-06 (8th Cir.1983) (fact that one manager may be more lenient than another may explain the different treatment that employees receive on a non-racial basis). In any event, because Silvera did not raise that claim in his complaint, did not argue it at trial, and has not raised it before us, we need not decide it.

[11] The district court gave one other reason for denying the Board judgment as a matter of law. It thought a jury reasonably could have determined that the Board's proffered reasons for terminating Silvera were pretextual because there was evidence from which the jury could have found the Board knew about Silvera's two arrests in the 1970's when it hired him in 1982. There was a conflict in the evidence about whether Silvera told Wright about his prior arrests during his 1982 job interview. Silvera indicated that he did, Wright's sworn statement insisted that he did not. For purposes of deciding whether the Board was entitled to judgment as a matter of law, the district court quite properly resolved that conflict in the evidence in favor of Silvera and took it as fact that Wright knew about those two arrests. But the court went beyond that by imputing Wright's knowledge to the Board and reasoning that if the Board constructively knew of Silvera's lewd assault arrest when it hired him in 1982, the Board's stated reason that it fired Silvera in 1996 for that **\*1262** same arrest must have been pretextual, or at least a jury could so find.

[12] We disagree. To begin with, there is no evidence at all that Wright actually told the Board anything about Silvera's arrest. His sworn statement indicated that he did not. The district court overcame that obstacle to a judgment for Silvera by simply imputing the knowledge Wright had to the Board. Doing that was error, because it equates constructive knowledge with actual intent. Even assuming the Board that fired Silvera in 1996 was composed of exactly the same members as the Board that had hired him fourteen years earlier-which is unlikely-if the Board had no actual knowledge of Silvera's two arrests from the 1970's when it hired him in 1982, it did not actually know of those arrests at that time, and all the imputing in the world is not going to change that fact. Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. *See Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 800 (11th Cir.2000) (for purposes of Family and Medical Leave Act retaliation claim, knowledge of employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

244 F.3d 1253                                                                          Page 11
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L.
Weekly C499
**(Cite as: 244 F.3d 1253)**

ee's protected conduct could not be imputed to decision maker from other corporate officials or supervisors who had knowledge of it); *Pressley v. Haeger,* 977 F.2d 295, 297 (7th Cir.1992) (stating, in employment discrimination case, that "[r]acial discrimination is an intentional wrong. An empty head means no discrimination. There is no 'constructive intent,' and constructive knowledge does not show actual intent.").

[13] That is not the only problem with the district court's reasoning. It is undisputed that when Silvera told Wright in 1982 about his two arrests prior to that time, there was no public disclosure and no media attention. Contrast that with the situation that existed when the Board decided to fire Silvera in 1996. There had been public disclosure and there was intense media coverage of the story and of the Board meeting where the decision was made. After the local television station turned up the information about the child molestation records, a media frenzy ensued. The record shows, for example, that a horde of reporters pounced on Silvera after his January 5, 1996 meeting with Newton. Responding to media attention and the resulting perceived public pressure to take action against a child molester may or may not be laudatory traits in a public board, but it is race neutral. *See Chapman,* 229 F.3d at 1030 ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (internal marks and citation omitted).

Finally, the district court's reasoning ignores the fact that, assuming Silvera told Wright about his arrest record in 1982, that record consisted of two arrests. When the Board made the decision to fire Silvera in 1996, his arrest record had doubled. In the intervening years, Silvera had been arrested two more times for violent crimes, and those two additional arrests were recent. Indeed, one of the arrests, which involved charges that Silvera held a machete to his son's face, was still pending at the time the Board decided to get rid of Silvera. The

Board's proffered reason for firing Silvera after the television station brought the matter to public attention is the nature, number, and recency of Silvera's arrests. There were twice as many arrests then as in 1982, the additional arrests were for violent crimes, and they were recent.

### III. CONCLUSION

Silvera failed to produce evidence sufficient to permit a reasonable factfinder to disbelieve the Board's proffered nondiscriminatory explanation for terminating him. Because of that failure, the Board was entitled to judgment as a matter of law. Accordingly, we REVERSE the entry of judgment in favor of Silvera, and we **\*1263** REMAND the case for entry of judgment in favor of the Board.

C.A.11 (Fla.),2001.
Silvera v. Orange County School Bd.
244 F.3d 1253, 88 Fair Empl.Prac.Cas. (BNA) 1001, 80 Empl. Prac. Dec. P 40,494, 152 Ed. Law Rep. 75, 14 Fla. L. Weekly C499

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

171 F.3d 1364                                                                    Page 1
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
(Cite as: 171 F.3d 1364)

▷

Maniccia v. Brown
C.A.11 (Fla.),1999.

United States Court of Appeals,Eleventh Circuit.
Sandra J. MANICCIA, Plaintiff-Appellant,
v.
Jerry D. BROWN, Sheriff of Santa Rosa County,
Florida, Defendant-Appellee.
No. 97-3011.

April 9, 1999.
Rehearing Denied June 7, 1999.

Female deputy sheriff-employee sued county sher-
iff-employer, alleging disparate treatment and re-
taliation in violation of Title VII and the Florida
Civil Rights Act. Employer moved for summary
judgment. The United States District Court for the
Northern District of Florida, No. 3:96-cv-214/
LAC, Lacey A. Collier, J., granted motion. Em-
ployee appealed. The Court of Appeals, Black, Cir-
cuit Judge, held that: (1) employee was collaterally
estopped by findings in prior administrative hearing
from arguing that she did not commit policy viola-
tions which led to her termination; (2) alleged mis-
conduct of male employees was not sufficiently
similar to support disparate treatment claim; and (3)
fact that employee was reassigned 15 months after
filing a sexual harassment grievance against her su-
pervisor and terminated 21 months after filing such
grievance failed to establish retaliation claim under
Title VII.

Affirmed.

West Headnotes

[1] Federal Courts 170B ⧟776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most

Cited Cases
Court of Appeals reviews a district court's grant of
summary judgment de novo applying the same
standards as the district court. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

[2] Federal Courts 170B ⧟802

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
When reviewing a district court's grant of summary
judgment, the Court of Appeals must view all the
evidence and all factual inferences reasonably
drawn from the evidence in the light most favorable
to the nonmoving party. Fed.Rules Civ.Proc.Rule
56(c), 28 U.S.C.A.

[3] Judgment 228 ⧟828.7

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts
in United States Courts
            228k828.7 k. Nature of State Tribunal.
Most Cited Cases
For purposes of her sex discrimination and retali-
ation claims under Title VII, female employee of
county sheriff's office terminated for various policy
violations was collaterally estopped from arguing
that she did not commit such violations; county's
civil service board found in administrative hearing
that employee did commit alleged violations, and
such finding was affirmed by state circuit court on
appeal. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

[4] Judgment 228 ⧟828.7

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                    Page 2
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

in United States Courts
          228k828.7 k. Nature of State Tribunal.
Most Cited Cases
A state court's decision upholding an administrative
body's findings has preclusive effect in a sub-
sequent federal court proceeding if: (1) the courts
of that state would be bound by the decision; and
(2) the state proceedings that produced the decision
comported with the requirements of due process.
U.S.C.A. Const.Amend. 14.

**[5] Judgment 228 ☞642**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in Gener-
al
            228k635 Courts or Other Tribunals Ren-
dering Judgment
                228k642 k. Appellate Courts. Most
Cited Cases
Florida courts recognize the preclusive effect of
state court decisions upholding administrative de-
terminations.

**[6] Civil Rights 78 ☞1172**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate Treatment. Most
Cited Cases
    (Formerly 78k158.1)
To establish a prima facie case of disparate treat-
ment under Title VII, a female employee must
show: (1) she is a member of a protected class; (2)
she was subjected to adverse employment action;
(3) her employer treated similarly situated male em-
ployees more favorably; and (4) she was qualified
to do the job. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices

            78k1138 k. Disparate Treatment. Most Cited
Cases
    (Formerly 78k153)
In determining whether employees are similarly
situated for purposes of establishing a prima facie
case of disparate treatment under Title VII, it is ne-
cessary to consider whether the employees are in-
volved in or accused of the same or similar conduct
and are disciplined in different ways. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[8] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
            78k1138 k. Disparate Treatment. Most Cited
Cases
    (Formerly 78k153)
In determining whether employees are similarly
situated for purposes of establishing a prima facie
case of disparate treatment under Title VII, the
most important factors in the disciplinary context
are the nature of the offenses committed and the
nature of the punishments imposed. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[9] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
            78k1138 k. Disparate Treatment. Most Cited
Cases
    (Formerly 78k153)
In determining whether employees are similarly
situated for purposes of establishing a prima facie
case of disparate treatment under Title VII, courts
require that the quantity and quality of the compar-
ator's misconduct be nearly identical to prevent
courts from second-guessing employers' reasonable
decisions. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1172**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                                    Page 3
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate Treatment. Most
Cited Cases
        (Formerly 78k159)
Alleged misconduct of male employees of county
sheriff's department was not sufficiently similar to
misconduct of female employee, as required for fe-
male employee to establish that her termination for
misconduct constituted disparate treatment under
Title VII; female employee committed four policy
violations, including misuse of confidential inform-
ation, while male employees each committed only a
single incident of misconduct of a less serious
nature. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[11] Counties 104 ⇒67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
Fact that female employee of county sheriff's office
was reassigned 15 months after filing a sexual har-
assment grievance against her supervisor and ter-
minated 21 months after filing such grievance
failed to establish retaliation claim under Title VII.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[12] Civil Rights 78 ⇒1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
        (Formerly 255k30(6.10) Master and Servant)
To establish a prima facie case of retaliation under
Title VII, a female employee must show: (1) she
engaged in protected activity; (2) her employer was
aware of that activity; (3) she suffered adverse em-
ployment action; and (4) there was a causal link
between her protected activity and the adverse em-
ployment action. Civil Rights Act of 1964, § 701 et

seq., 42 U.S.C.A. § 2000e et seq.

**\*1366** Brian T. Hayes, P.A., Monticello, FL, for
Maniccia.
Leonard J. Dietzen, Powers, Quaschnick &
Tischler, Tallahassee, FL, for Brown.

Appeal from the United States District Court for the
Northern District of Florida.

Before EDMONDSON and BLACK, Circuit
Judges, and RESTANI[FN*], Judge.

> FN* Honorable Jane A. Restani, Judge,
> U.S. Court of International Trade, sitting
> by designation.

BLACK, Circuit Judge:
Appellant Sandra J. Maniccia appeals the district
court's order granting summary judgment for Ap-
pellee Sheriff Jerry D. Brown in her suit alleging
disparate treatment and retaliation in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000e to 2000e-17, and the Florida Civil Rights
Act of 1992, Fla. Stat. chs. 760.01 to 760.11. The
district court determined that: (1) Appellant could
not establish a prima facie case of disparate treat-
ment because she failed to adduce sufficient evid-
ence from which a reasonable jury could find that
Appellee treated similarly situated male employees
more favorably; and (2) Appellant could not estab-
lish a prima facie case of retaliation because she
failed to adduce sufficient evidence from which a
reasonable jury could find that she suffered adverse
employment action or that her protected activity
motivated Appellee's actions. We affirm.

## I. BACKGROUND

Appellant was employed as a deputy sheriff for
Santa Rosa County in Florida. In August 1991, she
filed a sexual harassment complaint against Ser-
geant Edward Johnson, her supervisor on road
patrol, and Corporal James Spencer, her coworker.
About the same time that she filed the complaint,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                    Page 4
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

she was taken off road patrol and was thus no longer under Sergeant Johnson's supervision. In November 1992, Appellant was transferred again, this time to work in the jail as a corrections officer. Although her pay was not affected, Appellant regarded the transfer to the jail as a demotion.

Appellee took office as Sheriff of Santa Rosa County in December 1992. In early 1993, Appellant complained to Appellee about her work assignment. In March 1993, Appellee reassigned Appellant to road patrol where she was again under Sergeant Johnson's supervision. After Appellant worked three shifts on road patrol, Sergeant Johnson filed charges against her for failure to follow operating procedures and policies. An internal investigation followed, and Appellee fired Appellant on April 2, 1993.

With the assistance of counsel, Appellant challenged her termination at a hearing before the Santa Rosa County Civil Service Board (CSB). The CSB determined that Appellant committed the following policy violations: (1) Appellant obtained confidential driver's license information via the Florida Crime Information Computer (FCIC) for an acquaintance who then used the information for the private benefit of a corporation; (2) Appellant lied when she advised a dispatcher that she was seeking the FCIC driver's license information; (3) Appellant transported an unauthorized passenger without advising the dispatcher or requesting authorization from a superior; and (4) Appellant lied when she denied transporting an unauthorized passenger. Indeed, the CSB determined, and the district court agreed, that Appellant's untruthfulness about her misconduct continued during the internal affairs investigation and when she testified under oath during the administrative challenge before the CSB. As a result of these findings, the CSB concluded Appellant committed the charged offenses and Appellee had just cause to terminate her. Despite Appellant's attempts to raise the issue, the CSB did not consider or rule upon Appellant's contention that she was disciplined more severely than male em-

ployees.

The circuit court of Santa Rosa County, Florida, denied Appellant's petition for writ of certiorari. Appellant filed this action*1367 in state court, contending she was disciplined more severely than similarly situated male employees and she was terminated in retaliation for filing a sexual harassment complaint. Appellee removed the case to federal court. Following discovery, the district court granted Appellee's motion for summary judgment. The court determined at the outset that the findings in the administrative and state court proceedings estopped Appellant from arguing she did not violate policies or lie.

With respect to Appellant's allegation of disparate treatment, the district court determined Appellant could not establish a prima facie case because none of her proffered comparators was similarly situated to her. Specifically, the district court concluded that "several magnitudes of difference" existed between Appellant's misconduct and the cases of male employee misconduct documented in the record.

With respect to Appellant's allegation of retaliation, the district court determined Appellee was aware of the sexual harassment complaint Appellant filed against Sergeant Johnson in 1991, even though Appellee was not yet in office. Nevertheless, the court found Appellant could not establish a prima facie case because the temporal gap between the alleged instances of retaliation-her reassignment to the jail in November 1992 and her termination in April 1993-and the August 1991 sexual harassment complaint precluded a finding that retaliation motivated Appellee's employment actions.[FN1]

> FN1. In addition, after reviewing Appellant's complaint, the district court concluded she did not attempt to state a claim for hostile work environment sexual harassment and that such a claim did not exist in this case. On appeal, Appellant challenges that finding, contending her initial administrative complaint and EEOC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                                      Page 5
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

charge were based entirely on sexual harassment. Whether she alleged sexual harassment in prior proceedings does not affect the contents of her complaint. Our review of the record confirms the district court's finding that her complaint did not contain a sexual harassment claim. *See Case v. State Farm Mut. Auto. Ins. Co.,* 294 F.2d 676, 678 (5th Cir.1961) (noting the liberal construction accorded a pleading (now codified by Rule 8(f) of the Federal Rules of Civil Procedure) does not require courts to fabricate a claim that a plaintiff has not spelled out in his pleadings).

## II. DISCUSSION

[1][2] We review a district court's grant of summary judgment de novo applying the same standards as the district court. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996). The Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997) (citation omitted). Summary judgment is proper if the pleadings, depositions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. Collateral Estoppel

[3] Appellant asserts the district court erred by finding she was collaterally estopped from arguing she did not commit the violations that led to her termination. In particular, she contends that she did not violate the policy against untruthfulness.

The CSB determined Appellant did, in fact, engage in the misconduct of which she was accused. Indeed, a review of the CSB's factual findings reveals that Appellant admitted at the hearing that she committed each of the violations, except those dealing with untruthfulness. Following the CSB hearing, Appellant sought review in the Florida circuit court. In her petition for review, she again admitted violating department rules and regulations, but argued she should have been allowed to present evidence other employees committed the same violations and were not punished. The circuit court ruled that Appellant failed to show that the CSB hearing was procedurally defective or that the *1368 CSB's findings were not supported by competent evidence and therefore denied Appellant's petition.

[4][5] A state court's decision upholding an administrative body's findings has preclusive effect in a subsequent federal court proceeding if: (1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982); *see also Sharpley v. Davis,* 786 F.2d 1109, 1111-12 (11th Cir.1986) (citing *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). Florida courts recognize the preclusive effect of state court decisions upholding administrative determinations. *See, e.g., School Bd. of Seminole County v. Unemployment Appeals Comm'n,* 522 So.2d 556, 556-57 (Fla.Dist.Ct.App.1988). In addition, the record indicates that Appellant had counsel at both the administrative hearing and on petition for certiorari to the Florida circuit court. The CSB allowed her to testify, call witnesses, and cross-examine the witnesses called against her. The fact that the CSB did not allow Appellant to present evidence on issues other than whether she committed the charged violations does not render the CSB's findings procedurally defective.

On these bases, we agree with the district court's determination that Appellant is estopped from arguing she did not lie, disseminate confidential in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                                    Page 6
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

formation, or misuse her patrol car. As the district court correctly found, however, this conclusion does not preclude Appellant from alleging and proving her termination was the product of sex discrimination or retaliation. *See Carlisle v. Phenix City Bd. of Educ.,* 849 F.2d 1376, 1380 (11th Cir.1988) (holding that even though plaintiff was estopped from arguing that no legitimate reasons existed for adverse employment action, nothing precluded him from arguing that racially discriminatory reason existed as well).

B. *Disparate Treatment* FN2

> FN2. The district court analyzed Appellant's discrimination claims, which are based on both state and federal law, solely by reference to cases interpreting Title VII. Florida's Civil Rights Act is patterned after Title VII, and thus federal case law dealing with Title VII is applicable to employment discrimination claims brought under Florida law. *See Florida Dep't of Community Affairs v. Bryant,* 586 So.2d 1205, 1209 (Fla.Dist.Ct.App.1991).

[6] To establish a prima facie case of disparate treatment, Appellant must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job. *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The parties do not dispute that Appellant is a woman, she was fired, and she was qualified for her job. They do disagree, however, as to whether Appellant was treated less favorably than similarly situated male employees.

[7][8][9] "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by*151 F.3d 1321 (1998) (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See \*1369Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

[10] Appellant identifies several individuals whom she believes engaged in misconduct similar to hers, but received less severe punishments. In particular, she points to three male officers-Deputies Bodree, Odell, and Lane-who allegedly carried unauthorized passengers in their cruisers; four male officers-Deputies Fortner, Blow, Cook, and Johnson-who lied; and one male officer-Deputy Riley-who was convicted of criminal charges based on conduct while he was off duty.

Keeping in mind that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules,"*Jones,* 137 F.3d at 1311 (quoting *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984)), we believe the misconduct engaged in by these male comparators is easily distinguished from that engaged in by Appellant on the basis of both the quantity and the quality of the misconduct. Each of these male officers was involved in a single incident of misconduct or alleged misconduct, whereas Appellant committed at least four policy violations. *See id.* at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

171 F.3d 1364                                                                                    Page 7
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

1313 (recognizing that "Plaintiff's multiple instances of misconduct on the same day may simply have been 'the straw that broke the camel's back' "). Deputies Bodree, Odell, and Lane each may have carried unauthorized passengers on one occasion, but there is no evidence they lied about it as Appellant did. Deputies Fortner, Blow, Cook, and Johnson may have lied once, but there is no evidence any of them lied repeatedly under oath as Appellant did. Moreover, Deputy Riley may have been convicted of crimes, but there is no evidence he ever engaged in any misconduct while on duty as Appellant did. His convictions were based on off-duty misconduct, with which most employers understandably are not as concerned.

Furthermore, Appellant has not offered any evidence that a male officer has ever used confidential information accessible only to police officers for non-police purposes. Appellee entrusted Appellant with confidential information, and she exploited the information for the private benefit of a corporation. Confidentiality goes to the very heart of law enforcement, as well as any employment relationship. It is quite reasonable for Appellee to respond to such a breach of trust with the most serious punishment available. In sum, Appellant has failed to meet her burden of pointing to a male employee who engaged in the same or similar misconduct.

## C. Retaliation

[11][12] Appellant claims Appellee retaliated against her by reassigning her to work at the jail in November 1992 and by terminating her in April 1993. To establish a prima facie case of retaliation, Appellant must show: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered adverse employment action; and (4) there was a causal link between her protected activity and the adverse employment action. *Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir.1997).

Assuming, as the district court did, that the transfer

to the jail was an adverse employment action,[FN3] Appellant's transfer and termination occurred 15 and 21 months, respectively, after Appellant filed *1370 her grievance against her supervisor. Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to Appellant's protected activity. The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter. *See, e.g., O'Connor v. Chicago Transit Auth.,* 985 F.2d 1362, 1370 (7th Cir.1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir.1998) (13-month delay between protected activity and termination too long for causation to be established); *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation); *cf. Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir.1986) (averring that fact plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation").

> FN3. Although the issue was not raised in the district court's order or Appellee's motion for summary judgment, we note the record does not support a finding that Appellant's transfer to the jail was an adverse employment action. Appellant admitted that she lost no pay or benefits as a result of that transfer and that previously in her career she had requested placement at the jail. Appellant also testified that, had she been informed of a need for additional staff at the jail, she would have volunteered to work there. At the hearing before the CSB, Appellant testified she did not think working in the jail was "less of a job" than working on patrol. Thus, beyond Appellant's assertion that she considered

171 F.3d 1364                                                                                        Page 8
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901, 75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly Fed. C 704
**(Cite as: 171 F.3d 1364)**

the transfer to be a demotion, no evidence
in the record suggest that the transfer was
an adverse employment action.

The only causal connection established by the evid-
ence is between Appellant's misconduct and her ter-
mination. Beyond showing that she filed a griev-
ance and was transferred and terminated well over a
year later, Appellant has presented no evidence
suggesting her sexual harassment complaint motiv-
ated Appellee's actions.

### III. CONCLUSION

We hold Appellant failed to present evidence from
which a reasonable jury could find a prima facie
case of disparate treatment or retaliation. Thus, the
district court properly granted summary judgment
in favor of Appellee.

AFFIRMED.

C.A.11 (Fla.),1999.
Maniccia v. Brown
171 F.3d 1364, 80 Fair Empl.Prac.Cas. (BNA) 901,
75 Empl. Prac. Dec. P 45,855, 12 Fla. L. Weekly
Fed. C 704

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

402 F.3d 1076                                                                Page 1
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
**(Cite as: 402 F.3d 1076)**

**C**

Morris v. Emory Clinic, Inc.
C.A.11 (Ga.),2005.

United States Court of Appeals,Eleventh Circuit.
Brian MORRIS, Plaintiff-Appellant,
v.
EMORY CLINIC, INC., Defendant-Appellee.
**No. 04-15090**
**Non-Argument Calendar.**

March 8, 2005.

**Background:** Male obstetrician-gynecologist brought action against medical school clinic, alleging age and sex discrimination in violation of Title VII and the Age Discrimination in Employment Act (ADEA). Clinic moved for summary judgment. The United States District Court for the Northern District of Georgia, No. 02-00106-CV-WBH-1,Willis B. Hunt, Jr., J., granted clinic's motion. Obstetrician-gynecologist appealed.

**Holdings:** The Court of Appeals, held that:
(1) clinic's alleged preference for a certain ratio of females to males at one of its locations did not show direct evidence of sex discrimination;
(2) obstetrician-gynecologist who was terminated failed to establish that he was treated less favorably than similarly situated female doctors; and
(3) obstetrician-gynecologist who alleged that he was terminated based on his age failed to show that there were any younger physicians who had received nearly identical patient complaints.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟷776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent

            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ⟷802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
Court of Appeals reviews *de novo* a district court's order granting a motion for summary judgment and construes all reasonable doubts about the facts in favor of the non-movant.

**[2] Evidence 157 ⟷587**

157 Evidence
    157XIV Weight and Sufficiency
        157k587 k. Circumstantial Evidence. Most
Cited Cases
"Direct evidence" is evidence that, if believed, proves the existence of a fact without inference or presumption.

**[3] Civil Rights 78 ⟷1549**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1549 k. Sex Discrimination. Most
Cited Cases
Clinic's alleged preference for a certain ratio of females to males at one of its locations did not show direct evidence of sex discrimination, for purposes of male obstetrician-gynecologist's claim of sex discrimination; other males worked at the clinic location and clinic never stated that it had such a preference. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[4] Civil Rights 78 ⟷1536**

402 F.3d 1076                                                                    Page 2
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
**(Cite as: 402 F.3d 1076)**

78 Civil Rights
　78IV Remedies Under Federal Employment Discrimination Statutes
　　　78k1534 Presumptions, Inferences, and Burden of Proof
　　　　　78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases

**Civil Rights 78 ☞1545**

78 Civil Rights
　78IV Remedies Under Federal Employment Discrimination Statutes
　　　78k1543 Weight and Sufficiency of Evidence
　　　　　78k1545 k. Prima Facie Case. Most Cited Cases
An employee alleging discrimination does not shift the burden to the employer under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably; *McDonnell Douglas* requires the employee to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class.

**[5] Civil Rights 78 ☞1179**

78 Civil Rights
　78II Employment Practices
　　　78k1164 Sex Discrimination in General
　　　　　78k1179 k. Discrimination Against Men; Reverse Discrimination. Most Cited Cases
Male obstetrician-gynecologist who was terminated after receiving patient complaints failed to establish that he was treated less favorably than similarly-situated female doctors, as required for his sex discrimination claim under Title VII; no female physicians had received complaints concerning off-color remarks about patients' ability to have children or had been accused of conducting forceful physical examinations, and there was no evidence that prior to his termination, male doctor had been disadvantaged by working at one clinic location as opposed to another location. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[6] Civil Rights 78 ☞1210**

78 Civil Rights
　78II Employment Practices
　　　78k1199 Age Discrimination
　　　　　78k1210 k. Disparate Treatment. Most Cited Cases
Male obstetrician-gynecologist who alleged that he was terminated based on his age failed to show that there were any younger physicians who had received nearly identical patient complaints and were treated more favorably than he was, as required for his claim that he was terminated in violation of the ADEA. Age Discrimination in Employment Act of 1967, § 4(a), 29 U.S.C.A. § 623(a).

**[7] Action 13 ☞3**

13 Action
　131 Grounds and Conditions Precedent
　　　13k3 k. Statutory Rights of Action. Most Cited Cases

**Health 198H ☞196**

198H Health
　198HI Regulation in General
　　　198HI(B) Professionals
　　　　　198Hk191 Regulation of Professional Conduct; Boards and Officers
　　　　　198Hk196 k. Records and Duty to Report; Confidentiality in General. Most Cited Cases

**Health 198H ☞257**

198H Health
　198HI Regulation in General
　　　198HI(C) Institutions and Facilities
　　　　　198Hk257 k. Records and Duty to Report; Confidentiality in General. Most Cited Cases
There is no express private right of action under the Health Care Quality Improvement Act (HCQIA). Health Care Quality Improvement Act of 1986, § 423, 42 U.S.C.A. § 11133.

**\*1077** Robert Milton Lewis, Jr., Meadows & Lewis, P.C., Stockbridge, GA, for Plaintiff-Ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

402 F.3d 1076                                                                        Page 3
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
**(Cite as: 402 F.3d 1076)**

pellant.
Burton Freeman Dodd, Fisher & Phillips, Atlanta, GA, for Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before BLACK, PRYOR and GODBOLD, Circuit Judges.

PER CURIAM:
This is an employment discrimination case brought by a male doctor, an obstetrician and gynecologist, against his employer, a medical school clinic, for age and sex *1078 discrimination. The doctor claims the university clinic fired him because it favored younger female doctors. The clinic asserts that the doctor was terminated as a result of patient complaints concerning his forceful physical examinations and off-color remarks he made on the ability of older patients to have children. The district court granted summary judgement for the university clinic. We affirm.

Dr. Brian Morris' tenure with Emory University School of Medicine began in 1995 when he was appointed to the faculty as an assistant professor. Along with his faculty appointment Morris was to work as an obstetrician and gynecologist at one of the University's Clinic locations around the Atlanta metropolitan area. Morris initially was assigned to the Clinic's location in nearby Fayetteville, Georgia. His employment was subject to termination by the University for any reason upon 90 days written notice. His supervisor at the Clinic was Dr. Penny Castellano who headed the Clinic's obstetrics and gynecology section.

In 2000 the University closed its Fayetteville Clinic location for financial reasons. Morris was reassigned to the Clinic's Crawford Long location, a large facility in Midtown Atlanta named after a prominent Georgia physician. He was also assigned to perform "back up" duties at the Clinic location on Clifton Road. The Clifton Road facility was located a short distance away from Crawford Long on

the University's Medical School campus. Morris asserts-without explanation-that the Clifton Road location was favorable to Crawford Long. Morris submitted evidence that the Clinic ensured that both female and male doctors were located at the Clifton Road location. One administrator speculated that a reason for balancing the male to female physician ratio at a Clinic location was that some female patients might prefer to see female gynecologists. Both the Crawford Long and Clifton Road locations had male and female doctors.

After Morris moved to Crawford Long, he received a series of patient complaints that alleged he conducted forceful physical examinations and made disparaging remarks to patients over 40 seeking to have children. In March 2000 a patient called the Clinic to complain that, in response to her question whether the examination of her cervix would hurt, Morris "dug his nails into her ankle and asked her what she would say if something hurt." As Morris' supervisor Castellano was charged with investigating this complaint. She met with Morris to discuss the incident and informed him that she would raise the matter with Clinic administration personnel.

In December 2000 another patient wrote a letter criticizing the "forceful" and "rough manner" in which Morris conducted her examination. She also described several off-color remarks Morris made about her chances for pregnancy given her age. The patient wrote that Morris told her "the realities are that you have 42-year-old eggs, which means that it will be difficult for you to get pregnant." When she informed him that another physician in Washington, D.C. had success with pregnancies in women over the age of 40, Morris retorted "it does not change the statistics that you only have a 50% chance of getting pregnant." Morris recommended the patient see a fertility clinic to potentially qualify to receive an egg from a younger female. The patient wrote in her letter that she felt Morris had an underlying resentment of women who chose to postpone motherhood in favor of pursuing a career.

After receiving the letter Castellano and Paul Ham-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

402 F.3d 1076                                                          Page 4
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
(Cite as: 402 F.3d 1076)

monds, Administrator of Primary*1079 Care, met with Morris to discuss the patient's complaints. During this meeting Castellano requested that Morris write a letter of apology to the patient. Castellano also suggested Morris view a video on patient care and advise her after he had viewed the tape. A letter of apology was drafted by Castellano and signed by Morris. Morris conceded that he may have been "less sensitive to the woman's needs that day" but felt that the patient had "overreacted." The tape was later sent to Morris' residence with what Morris viewed as a threatening note which he interpreted to mean "fly straight or you are going to be fired." Morris never reported to Castellano that he had viewed the tape.

Around the same period the Clinic sought to increase the number of physicians on staff. In February 2001 the Clinic made a job offer to Dr. Leslie Choy-Hee, a female physician in the residence program at the University's School of Medicine. The Clinic also extended an offer to Dr. Todd Bashuk, a male resident in the same program.

Two months later, in April 2001, another patient complained about Morris' harsh treatment of her during a physical examination which she characterized as "degrading." The patient complained that Morris had an "animosity toward women" and that his physical examination was "unnecessarily forceful compared to other pelvic exams she has had." She was ten weeks pregnant and complained that because she was 39 years old, had experienced one miscarriage, and an ovarian cyst, Morris informed her that she was the perfect candidate for follow-up with a mid-wife. When she expressed opposition to this idea he informed her that "this is not your call."

As evidence of the unnecessary force used during the examination the patient stated that she had been instructed by an assistant not to remove her bra prior to the examination. When Morris entered the examination room, however, and discovered the patient was wearing a bra, he became upset and "ripped it over her head." Morris disputed that he ripped off the patient's bra and speculated that he

may have assisted her if she appeared to be struggling with removing it. This patient also complained that during the April visit Morris neglected to listen for the fetal heartbeat as was customarily done by an obstetrician. A few days after her examination she suffered a miscarriage and was told by an examining physician that the fetus was probably dead when she was examined by Morris. The physician noted that if Morris had listened for the heartbeat he would have detected the problem.

Her complaint however was not limited to Morris. The patient also complained that after her examination by Morris, while she was out of town she called the Clinic for a referral for her sister's obstetrician and spoke with Dr. Jessica Arluck. The patient thought she was having a miscarriage and did not want to go to the emergency room. She felt that Arluck was insensitive because she responded to her request for a referral with "no-I'm at home, either call the office or your insurance company." The Clinic did not view the patient's complaint against Arluck in the same light as her allegations against Morris.

Castellano was alarmed by the allegation concerning the bra and suggestion that the patient see a midwife against her wishes-particularly in light of the prior complaints. She began discussing firing Morris with the other physicians at the Clinic including Dr. Arluck. Arluck volunteered that she "wanted [Morris] out of the practice" because of the continuing problem with Morris' treatment of his patients. She indicated that the practice group at the Clinic would rather work *1080 harder than have Morris damage the reputation of the Clinic.

In May 2001 Castellano and Hammonds met with Morris and informed him that he was being placed on administrative leave. Morris understood that this action was undertaken so that the Clinic could conduct an investigation into the complaints. He maintains that he was not provided with specific details of the undergarment incident. Following this meeting a letter was sent to Morris. It stated that Morris was placed "on an Administrative Leave of Ab-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

402 F.3d 1076                                                                                                    Page 5
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
(Cite as: 402 F.3d 1076)

sence (with pay) pending further investigation." After the meeting Castellano spoke with different physicians and administrators regarding the complaints against Morris and his treatment of his patients.

Two weeks later Castellano and Hammonds met with Morris again. According to them, during this meeting they presented Morris with an overview of the two most recent complaints against him and provided him with an opportunity to rebut any of the allegations. Morris says that this meeting did not provide any meaningful opportunity to explore the allegations and that he did not comment on the complaints at the meeting. Castellano offered Morris the option of resigning rather than having the Clinic terminate his employment. Morris opted not to resign. As a consequence, Castellano sent Morris a letter dated May 25, 2001 providing him with 90 days notice of his termination pursuant to the employment agreement. It stated that Morris' employment with the Clinic was terminated effective August 23, 2001 and that he would remain on administrative leave until that date. Until this time he would continue to receive his salary but could not see any patients at the Clinic.

During the summer of 2001 both Bashuk and Choy-Hee accepted their employment offers and began working at the Clinic. Choy-Hee started on August 1, 2001, over two months after Morris' discharge. She split her time between Crawford Long and Clifton Road. Morris contends that the majority of her time was spent at Clifton Road. Bashuk began working on July 15, 2001. He also practiced at Clifton Road and another facility, the Perimeter location. The Perimeter location later closed because the University downsized the number of Clinic locations. For a brief period following the closure Bashuk worked at Clifton Road before he ultimately resigned.

After his termination Morris sued the Clinic for employment discrimination under federal and state law including Title VII and the Age Discrimination in Employment Act (ADEA). He contends that the Clinic discriminated against him on the basis of both his sex and age when it terminated his employment and hired Choy-Hee, a younger female. He also avers that the Clinic responded more aggressively to patient complaints against him because he was an older male than it did to similar complaints against other younger female physicians. The complaints he identified however generally involved administrative failures (e.g., failure to return phone calls, lack of promptness in examining a patient, difficulty in obtaining an appointment) or allegations of negligence in connection with a medical procedure.

A magistrate judge in a detailed and lengthy order issued a report and recommendation granting summary judgment to the Clinic on the federal claims and dismissing the state claims. The magistrate judge held that Choy-Hee was hired for a different location and therefore did not replace Morris. He also held that Morris failed to identify similar complaints lodged against other physicians who were treated favorably compared to him. Morris objected to the magistrate judge's order. *1081 The district court agreed with the magistrate judge and adopted his report and recommendation. This appeal followed. We affirm.

[1] We review *de novo* a district court's order granting a motion for summary judgment and construe "all reasonable doubts about the facts in favor of the non-movant." *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990). Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Discrimination on the basis of an individual's sex or age is unlawful. 42 U.S.C. § 2000e-2; 29 U.S.C. § 623(a). The critical question for us is whether Morris created a genuine issue of material fact concerning whether his termination was lawful. *See Wright v. Southland Corp.,* 187 F.3d 1287, 1289 (11th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1999). Put differently, did the Clinic discriminate against Morris on the basis of his sex or age or were its actions the lawful result of patient complaints?

[2] As we held in *Wright* Morris can avoid summary judgment in one of two ways. *See id.* at 1290. He can use the traditional framework and use direct evidence to create a triable issue of whether he was fired or treated less favorably because he was an older male. *See id.* at 1291-92. Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004) (internal citation omitted). Or he can use the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) framework.

*McDonnell Douglas* places a burden of production on the Clinic if Morris can show that he was terminated or treated less favorably because of his age or sex. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-7, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Our inquiry under *McDonnell Douglas* consists of three steps. First, Morris must first present evidence that he was qualified to work at the Clinic and that he lost his position to, or was otherwise treated less favorably than a younger female physician. *See Wright*, 187 F.3d at 1290-91. If he does this, the burden then shifts to the Clinic to offer a nondiscriminatory reason for its actions-the second step. *See id.* If the Clinic fails to offer a legitimate explanation for its actions, Morris is entitled to a judgment as a matter of law. *See id.* If however the Clinic offers a legitimate explanation then Morris must take the third step. He must show the explanation is inadequate, a mere pretext. *See id.* The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 (11th Cir.1989).

Under either the traditional method or the *McDonnell Douglas* framework, Morris' employment discrimination claim is without merit. He has no evidence that age or sex played any role in the Clinic's determination to terminate his employment. Rather than confront this deficiency in his case, on appeal Morris cites several positive reviews he received while employed with the Clinic to show that his dismissal was unwarranted. Our task however is not to second-guess whether terminating Morris was a good or bad business decision by the Clinic. Our review is limited to whether the Clinic has used age or sex as a basis to terminate him or treat him less favorably.

**\*1082** *Sex Discrimination*

[3] Morris' allegations of direct evidence are unsupportable. He asserts that the Clinic's preference for a certain ratio of females to males at the Clifton Road location shows direct evidence of discrimination against males. Without this preference, Morris alleges that he would have been able to work at Clifton Road. Morris cites numerous employment cases involving defendants making discriminatory statements to the plaintiff to support his position. *See, e.g., Lindsey v. Am. Cast Iron Pipe Co.*, 772 F.2d 799, 802 (11th Cir.1985) (statement that employer looking for "younger person"), *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir.1990) (statement that no woman would be named to position).

The Clinic however did not make such a statement. To the contrary, other males worked at the Clifton Road location and at least one other male physician, Bashuk, was hired to perform duties there. The district court correctly concluded Morris failed to present any direct evidence of unlawful sex discrimination.

[4] The *McDonnell Douglas* framework is unhelpful to Morris. A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated bet-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

402 F.3d 1076                                                                    Page 7
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
(Cite as: 402 F.3d 1076)

ter than he was who was not a member of his protected class (here an older male). See *Hawkins*, 883 F.2d at 982. When evaluating a replacement we have stated "[w]here the employee's position is clearly delineated and responsibilities are well defined, the court should focus on the person that physically replaced the employee or consider whether that job title was actually filled." *Id.* Only after the plaintiff has made his prima facie case does the burden shift to the defendant.

[5] Morris never makes it past the first step of *McDonnell Douglas*. He has not identified any female physician who replaced him. He claims that he was replaced by Choy-Hee, but the undisputed evidence shows that she was hired for the Clifton Road location several months before the Clinic decided to terminate Morris. Morris also fails to identify a female physician who received similar complaints concerning off-color remarks about her patients' ability to have children and who was accused of conducting forceful physical examinations who was not terminated (or received favorable treatment). Without showing that a comparable female received "nearly identical" complaints, we cannot adequately compare the Clinic's actions towards Morris and other female physicians. See *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir.1999). Finally Morris fails to explain how he is disadvantaged by working at Crawford Long as opposed to Clifton Road. We have identified no meaningful way to distinguish the two other than geography. Accordingly the Clinic's placement of Morris at the Crawford Long location is not circumstantial evidence of discrimination.

Under the traditional framework of *McDonnell Douglas,* Morris cannot connect his termination to his sex. Because Morris has not presented sufficient evidence that he was treated less favorably than a female worker, we need not evaluate the Clinic's burden of production under the *McDonnell Douglas* framework.

*Age Discrimination*

[6] Morris failed to present any evidence of age discrimination-direct or indirect using *McDonnell Douglas. See Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989) (applying *McDonnell *1083 Douglas* framework to age discrimination claim). He did not identify a younger physician who replaced him. He also failed to show that any younger physician who received nearly identical complaints was treated better than he was. Therefore the district court did not err in dismissing this claim.

The district court adopted the magistrate's ruling that because Morris was not 40 years of age at the time of his termination, he was not within the class of persons protected by the ADEA. We may agree with that legal principle, *see*29 U.S.C. § 631, however we have identified nothing in the record to suggest that Morris was under 40 years old at the time of his termination. While few people would view Morris, aged 40, as old in relation to a person in mid to late 30s such as Choy-Hee, we need not address this issue.

*Health Care Quality Improvement Act*

[7] Morris invokes the Health Care Quality Improvement Act (HCQIA) to show that the Clinic's failure to adequately conduct an investigation before his termination is evidence of employment discrimination. Indeed he carefully outlines the hospital's alleged failure to follow its own internal procedures and other guidelines in its investigation and his termination. The HCQIA directs that a hospital investigating one of its physicians report the results of its inquiry to the national data bank. *See*42 U.S.C. § 11133. Hospitals have immunity from liability for complying with this statute unless the report filed is knowingly false. *See*42 U.S.C. § 11137(c). There is no express private right of action under the HCQIA.

At bottom Morris' HCQIA claim is really about the Clinic allegedly not conducting a full and thorough investigation before terminating him. While Morris

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

402 F.3d 1076                                                                    Page 8
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288
**(Cite as: 402 F.3d 1076)**

disputes the characterization of the patient complaints and the adequacy of the Clinic's investigation, without showing that sex or age played a role in his termination he has no employment discrimination case.

This is not to say he is without legal recourse if the hospital in fact arbitrarily revoked his staff privileges in violation of its bylaws. Under Georgia law a physician may have a cause of action for a hospital's revocation of staff privileges without substantially complying with its bylaws. *See*O.C.G.A. § 51-1-6; *Lee v. Hosp. Auth.,* 397 F.3d 1327 (11th Cir.2005). Morris however has not alleged a cause of action under Georgia state law against the Clinic for failure to comply with its bylaws in his termination as in *Lee.* Our review therefore is limited to Morris' legally insufficient discrimination claim.

AFFIRMED.

C.A.11 (Ga.),2005.
Morris v. Emory Clinic, Inc.
402 F.3d 1076, 95 Fair Empl.Prac.Cas. (BNA) 599, 85 Empl. Prac. Dec. P 41,903, 18 Fla. L. Weekly Fed. C 288

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15 F.3d 1013                                                                 Page 1
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

▷

Meeks v. Computer Associates Intern.
C.A.11 (Fla.),1994.

United States Court of Appeals,Eleventh Circuit.
Jessica Lind MEEKS, Plaintiff-Appellee,
v.
COMPUTER ASSOCIATES INTERNATIONAL, a
foreign corporation, Defendant-Appellant.
**No. 92-2926.**

March 7, 1994.

Employee brought action against former employer
for discrimination under Equal Pay Act for discrim-
ination and retaliation under Title VII. The United
States District Court for the Middle District of Flor-
ida, No. 90-227-CIV-ORL-20,Donald P. Dietrich,
United States Magistrate Judge, entered judgment
for employee and employer appealed. The Court of
Appeals, Carnes, Circuit Judge, held that: (1) evid-
ence supported jury's finding of liability under
Equal Pay Act; (2) jury's finding of Equal Pay Act
liability did not support finding of Title VII dis-
crimination liability absent additional finding of in-
tentional discrimination; and (3) evidence suppor-
ted finding of Title VII retaliation liability.

Affirmed in part, reversed and remanded in part.

West Headnotes

**[1] Labor and Employment 231H ☞2461**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(C) Equal Pay
            231Hk2460 Discrimination in General
                231Hk2461 k. In General. Most Cited
Cases
    (Formerly 232Ak1333 Labor Relations)
Employer lacked degree of centralization necessary
to justify treating all of its technical writers
throughout the nation as working at single
"establishment," for purposes of Equal Pay Act; in-

stead, single office where complaining employee
worked was properly treated as relevant
"establishment." Fair Labor Standards Act of 1938,
§ 6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1).

**[2] Labor and Employment 231H ☞2461**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(C) Equal Pay
            231Hk2460 Discrimination in General
                231Hk2461 k. In General. Most Cited
Cases
    (Formerly 232Ak1333 Labor Relations)
Multiple offices may be treated as single
"establishment" for Equal Pay Act purposes, but it
is presumed that multiple offices are not single es-
tablishment unless unusual circumstances are
demonstrated. Fair Labor Standards Act of 1938, §
6(d)(1), as amended, 29 U.S.C.A. § 206(d)(1).

**[3] Labor and Employment 231H ☞2481(5)**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(C) Equal Pay
            231Hk2472 Actions
                231Hk2481 Evidence
                    231Hk2481(4) Weight and Suffi-
ciency
                        231Hk2481(5) k. In General.
Most Cited Cases
    (Formerly 232Ak1511.1 Labor Relations)
Employee sufficiently established that employer
paid different wages to employees of opposite sexes
for equal work in jobs whose performance required
equal skill, effort, and responsibility, and which
were performed under similar working conditions,
to establish prima facie case under Equal Pay Act
based on her own testimony and that of male co-
worker. Fair Labor Standards Act of 1938, § 6(d),
as amended, 29 U.S.C.A § 206(d).

**[4] Labor and Employment 231H ☞2481(2)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                          Page 2
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(C) Equal Pay
      231Hk2472 Actions
       231Hk2481 Evidence
        231Hk2481(2) k. Presumptions and
Burden of Proof. Most Cited Cases
   (Formerly 232Ak1511.1 Labor Relations)

**Labor and Employment 231H &#8734;2481(5)**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(C) Equal Pay
      231Hk2472 Actions
       231Hk2481 Evidence
        231Hk2481(4) Weight and Suffi-
ciency
         231Hk2481(5) k. In General.
Most Cited Cases
   (Formerly 232Ak1511.1 Labor Relations)
Once employee established prima facie case under
Equal Pay Act, burden shifted to employer to prove
by preponderance of evidence that pay differential
was justified because it was result of seniority sys-
tem, merit system, system which measured earnings
by quantity or quality of production, or any factor
other than sex. Fair Labor Standards Act of 1938, §
6(d), as amended, 29 U.S.C.A. § 206(d).

**[5] Labor and Employment 231H &#8734;2481(5)**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(C) Equal Pay
      231Hk2472 Actions
       231Hk2481 Evidence
        231Hk2481(4) Weight and Suffi-
ciency
         231Hk2481(5) k. In General.
Most Cited Cases
   (Formerly 232Ak1521.1 Labor Relations)
Jury was not compelled to credit testimony intro-
duced by employer that starting salaries were based
primarily on experience, work experience, educa-
tional background, salary request, and employee

surveys in concluding that employer violated Equal
Pay Act. Fair Labor Standards Act of 1938, § 6(d),
as amended, 29 U.S.C.A. § 206(d).

**[6] Labor and Employment 231H &#8734;2481(5)**

231H Labor and Employment
   231HXIII Wages and Hours
     231HXIII(C) Equal Pay
      231Hk2472 Actions
       231Hk2481 Evidence
        231Hk2481(4) Weight and Suffi-
ciency
         231Hk2481(5) k. In General.
Most Cited Cases
   (Formerly 232Ak1535 Labor Relations)
Testimony of employee's expert witness regarding
appropriate nondiscriminatory starting salary sup-
ported jury's award of Equal Pay Act damages. Fair
Labor Standards Act of 1938, § 6(d), as amended,
29 U.S.C.A. § 206(d).

**[7] Civil Rights 78 &#8734;1175**

78 Civil Rights
   78II Employment Practices
     78k1164 Sex Discrimination in General
      78k1175 k. Compensation; Comparable
Worth. Most Cited Cases
   (Formerly 78k161)
Jury's findings of liability on Equal Pay Act claim
did not support district court's finding that employ-
er also violated Title VII, absent any additional
finding of intentional discrimination. Fair Labor
Standards Act of 1938, § 6(d)(1), as amended, 29
U.S.C.A. § 206(d)(1); Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).

**[8] Civil Rights 78 &#8734;1549**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
     78k1543 Weight and Sufficiency of Evidence
      78k1549 k. Sex Discrimination. Most
Cited Cases

15 F.3d 1013                                                                                          Page 3
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

(Formerly 78k387)
Proof under Title VII that discriminatory reason
more likely than not motivated employer to pay fe-
male employee less than male employees may be
direct or circumstantial. Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).

**[9] Civil Rights 78 ☞1553**

78 Civil Rights
  78IV Remedies Under Federal Employment Dis-
crimination Statutes
    78k1543 Weight and Sufficiency of Evidence
      78k1553 k. Retaliation Claims. Most
Cited Cases
  (Formerly 255k40(3.1), 255k40(4) Master and
Servant)
Employee's testimony that she had complained of
unequal pay and that she was subjected to adverse
employment action supported finding of construct-
ive discharge and Title VII retaliation. Civil Rights
Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[10] Civil Rights 78 ☞1244**

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1244 k. Activities Protected. Most
Cited Cases
  (Formerly 255k30(6.10) Master and Servant)
To recover under Title VII for retaliation, plaintiff
need not prove underlying claim of discrimination
which led to her protest, so long as she had reason-
able good faith belief that discrimination existed.
Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. §
2000e-3(a).

**[11] Civil Rights 78 ☞1243**

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1243 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
  (Formerly 255k40(1) Master and Servant)

To establish prima facie case of retaliation under
Title VII, plaintiff must show that she engaged in
statutorily protected expression, that she suffered
adverse employment action, and that there is some
causal relationship between the two events. Civil
Rights Act of 1964, § 704(a), 42 U.S.C.A. §
2000e-3(a).

**\*1014** Christopher K. Kay, Richard A. DuRose, Or-
lando, FL, for defendant-appellant.
Patricia L. Strowbridge, Sharon Lee Stedman, De-
ciccio & Associates, P.A., Orlando, FL, for
plaintiff-appellee.

Appeal from the United States District Court for the
Middle District of Florida.

Before DUBINA and CARNES, Circuit Judges, and
MORGAN, Senior Circuit Judge.

CARNES, Circuit Judge:
In this sex discrimination case, Computer Asso-
ciates appeals from a judgment based upon a jury
verdict finding it liable under the Equal Pay Act
(EPA), 29 U.S.C.A. § 206(d)(1), and upon a district
court finding of liability for sex discrimination and
retaliation in violation of Title VII, 42 U.S.C.A. §§
2000e-2(a), 2000e-3(a). We affirm the part of the
judgment based upon the EPA claim and reject
Computer Associates' contention that the district
court erred by limiting the evidence of comparators'
salaries to those of the plaintiff's colleagues in the
specific office where she worked. We also reject
Computer Associates' contentions that there was in-
sufficient evidence to support the jury's verdict on
liability and damages. As for the two-component
Title VII portion of the judgment, we affirm insofar
as the retaliation claim is concerned. We reverse,
however, on the sex discrimination claim, because
the district court made no finding of intentional dis-
crimination, and because it erroneously held that
the jury's EPA verdict compelled it to enter a Title
VII discrimination judgment for the plaintiff.

**I. BACKGROUND**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                                      Page 4
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

### A. FACTS

Jessica Meeks was hired as a technical writer at Computer Associates' Maitland, Florida, facility in September 1988. The Maitland facility develops computer software for the banking industry and the technical writers prepare manuals to accompany the software. During 1988, Computer Associates added four technical writers and a supervisor at the Maitland facility. Of the four writers, two, Peter George and J.R. Arth, are male and two, Meeks and Susan Cain, are female. George transferred from a Computer Associates facility in Massachusetts, and the other three writers were new hires. In March 1989, Meeks inadvertently learned the salaries of her three co-workers. George was earning $35,000 per year (the same as his salary in Massachusetts); Arth $28,500; Cain and Meeks $24,500 each. Meeks' initial salary had been $23,500, but she had received a $1,000 raise in February 1989. **\*1015** Meeks believed the salaries to be discriminatory and complained to her supervisor, Laverne Peter.

According to Meeks, her complaint resulted in ongoing harassment from Laverne Peter, including a series of fierce verbal confrontations. Meeks was placed on thirty days probation in September 1989, allegedly because of declining work performance and absenteeism. At the end of the probationary period, Peter asked Meeks to set out her goals for the ensuing thirty days. Meeks characterized the request as "obviously a continuation of harassment."

In November 1989, Meeks filed a complaint with the EEOC. In December, because she was pregnant and experiencing difficulties with her pregnancy, Meeks began to work at home. In March, she initiated this suit. In May 1990, Meeks returned to work after her maternity leave. Meeks maintains that shortly after her return to the office she was given an unjustified work evaluation, rating her performance as unsatisfactory. Later, Meeks decided to take some of her work product for use in her pending lawsuit. Apparently she had a change of heart and left the materials under a public stairwell at work, where they were found. Meeks was also absent on one occasion and failed to call until hours after she should have reported. After these events, Meeks was summoned to a meeting with Peter and Ron Nall, the general manager. Computer Associates issued Meeks a written warning but claims to have taken no other action. Meeks testified that she was called into Nall's office where Nall and Peter "proceeded to yell and scream. And, I mean, Ron was so close, he was in my face, his spit was flying in my face. He was leaning over, this big guy. I thought he was going [to] hit me." Meeks resigned in June 1990, shortly after this meeting. Meeks alleged a pattern of harassment that constituted constructive discharge in retaliation for complaining about the disparities in the technical writers' salaries, in violation of Title VII. 42 U.S.C.A. § 2000e-3(a).

### B. PROCEDURAL HISTORY

With the consent of the parties, the action was referred to a Magistrate Judge. *See*28 U.S.C.A. § 636(c) (1993). The case went to trial on Meeks' claims that Computer Associates violated the Equal Pay Act by paying her less than her male colleagues and by retaliating against her for filing her claim with the EEOC and that Computer Associates had violated Title VII by discriminating against her on the basis of her gender and her pregnancy and by retaliating against her for having complained of the pay disparities. The EPA claim was tried to a jury while the Title VII claim was tried to the court simultaneously.

At trial, Computer Associates sought to introduce evidence of the salaries of the 116 technical writers it employs at its various offices. Meeks objected that the only relevant salaries were those paid to the Maitland technical writers. The district court sustained Meeks' objection, ruling that only Meeks' three colleagues at the Maitland facility were proper comparators.

The jury returned a special verdict:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                    Page 5
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
(Cite as: 15 F.3d 1013)

Do you find from a preponderance of the evidence that the plaintiff and member or members of the opposite sex have been employed by the defendant on jobs the performance of which requires substantially equal skills, effort and responsibilities? Answer, Yes.

Do you find from the preponderance of the evidence that the plaintiff and member or members of the opposite sex have been employed by the defendant on jobs which were performed under similar working conditions? Answer, Yes.

Do you find from the preponderance of the evidence that the plaintiff was paid at a lower salary than a member of the opposite sex working as a technical writer at the Maitland office? Answer, Yes.

Do you find from a preponderance of the evidence that the defendant has shown that the difference in salary between plaintiff and the male technical writer(s) in the Maitland office was based upon a factor other than the plaintiff's sex? Answer, No.

Do you find from a preponderance of the evidence that the defendant retaliated *1016 against the plaintiff for filing a complaint or charge for violation of the Equal Pay Act? Answer, Yes.

Do you find that the defendant constructively discharged the plaintiff? Answer, Yes.

What do you find from a preponderance of the evidence is the amount of damages plaintiff sustained, that is the amount plaintiff should have been paid less the amount she was actually paid by reason of her wage disparity from the date she was hired until her termination of June 13, 1990? Damages, $14,388.00.

The district court remitted the EPA damages to $13,371. The court held that Computer Associates had failed to show that it had acted in good faith and therefore awarded Meeks an equal amount ($13,371) in liquidated damages under 29 U.S.C.A. §§ 216(b) and 260. The court further found that Computer Associates had retaliated against Meeks for lodging her EPA complaint and awarded her another equal amount ($13,371) in liquidated damages under 29 U.S.C.A. § 215(b). Thus, Meeks' total award under the EPA was $40,113.

The court "consider[ed] itself bound by the jury's" EPA findings to conclude that Computer Associates had violated Title VII by engaging in gender-based wage discrimination. The court also specifically found that Computer Associates had retaliated against Meeks in violation of Title VII. The district court credited Meeks' expert's uncontroverted testimony that she had lost approximately $16,829 between the date of her constructive discharge and the date of judgment. The court also concluded, based on the expert's uncontroverted testimony, that Meeks "continues to suffer wage diminution, as a result of Defendant's pay discrimination, at an amount equal to $5,000 per year." The court awarded Meeks two years front pay differential or $10,000, for a total Title VII recovery of $26,829. The district court also ruled that Computer Associates did not discriminate against Meeks on the basis of her pregnancy; Meeks has not appealed this ruling.

## II. STANDARD OF REVIEW

We will affirm a jury's verdict if " 'the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict.' " *Deakle v. John E. Graham & Sons,* 756 F.2d 821, 827 (11th Cir.1985) (quoting *American Cas. Co. v. Myrick,* 304 F.2d 179, 182 (5th Cir.1962)). "[T]he jury's verdict should not be disturbed if there is competent evidence in the record to support it." *Id.*

We will affirm the trial court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a). Moreover, when, as here, those findings "are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings." *Anderson v. City of*

15 F.3d 1013                                                                                                    Page 6

15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
(Cite as: 15 F.3d 1013)

*Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### III. DISCUSSION

### A. THE EQUAL PAY ACT CLAIM

#### 1. The Definition of "Establishment": The Pay Comparators Used

The Equal Pay Act provides, in part:

No employer having employees subject to any provisions of this section shall discriminate, *within any establishment* in which such employees are employed, between employees on the basis of sex by paying wages to employees *in such establishment* at a rate less than the rate at which he pays wages to employees of the opposite sex *in such establishment* for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection,*1017 reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1) (emphasis added).

[1] Computer Associates argues that "establishment" should be interpreted functionally, and that therefore the appropriate "establishment" for purposes of determining whether Meeks suffered gender-based discrimination is not Computer Associates' Maitland, Florida, facility but the company as a whole, i.e., all Computer Associates' technical writers throughout the nation. This is so, according to Computer Associates, because the company "retains the centralized control of personnel functions, salary administration and identity of work among the technical writers regardless of location." Job applicants are screened and interviewed by local supervisors who then recommend the applicants and a suggested salary to the central personnel office, which gives final approval. Computer Associates argues that, had the court permitted, it would have introduced evidence to establish that as of March 1, 1989, Computer Associates employed 116 technical writers, 36 men and 80 women. It further would have shown that the median salary for male technical writers was $36,375 and for female technical writers was $36,210. Computer Associates maintains that by limiting the comparison to the four writers at Maitland, the salary differences were exaggerated and the jury was prejudiced.

[2] Under appropriate circumstances, multiple offices may constitute a single establishment for EPA purposes. *See, e.g., Marshall v. Dallas Indep. Sch. Dist.,* 605 F.2d 191, 194 (5th Cir.1979) (Wisdom, J.) (school district with 182 schools is a single establishment for EPA purposes); 29 C.F.R. § 1620.9(b) (1993) ("[U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions."). However, we presume that multiple offices are not a "single establishment" unless unusual circumstances are demonstrated. *See* 29 C.F.R. § 1620.9(a) (1993).

The district court found that Computer Associates lacked the degree of centralization necessary to justify admitting evidence concerning the salaries of non-Maitland based technical writers. Specifically, the court found that "the ultimate decision respecting the hiring of the two persons really in issue, male and female, plaintiff and Mr. Arth, was at the Maitland level considering the Maitland community

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                  Page 7

15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

and the office requirements." The evidence supports the trial court's ruling. Although Computer Associates centrally sets broad salary ranges, the specific salary to be offered a job applicant is determined by the local supervisor. Although personnel records are maintained centrally, job applicants are interviewed by local officials and hired upon their recommendation. The evidence proffered by Computer Associates does not demonstrate the level of centralization necessary to justify treating all of the company's technical writers as working at a single establishment. We therefore affirm the trial court's decision to limit the evidence to the salaries of the Maitland technical writers.

### 2. The Sufficiency of the Evidence

Computer Associates also challenges the sufficiency of the evidence underlying the jury's EPA verdict. Computer Associates makes two arguments. First, Computer Associates argues that it established its affirmative defense that the salary differentials were based on a factor other than sex, namely education, experience, and a computer industry personnel study. Second, Computer Associates argues that the jury erroneously relied on one of Meeks' expert witnesses, who testified that a nondiscriminatory starting salary for Meeks would have been $32,000. Computer Associates maintains that Meeks' expert "literally pull[ed] a number out of the air" and that he failed to consider the relationship between Meeks' salary and experience and the salaries and experience of George, Arth, or Cain in deriving the $32,000 figure. We address each of these contentions in turn.

### *1018 a. As to Computer Associates' Affirmative Defense

[3] To establish a *prima facie* case under the EPA, Meeks had to demonstrate that Computer Associates " 'pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and re-

sponsibility, and which are performed under similar working conditions." ' " *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1532 (11th Cir.1992) (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1))). The jury was entitled to find these requirements satisfied on the basis of Meeks' own testimony as well as that of George.

[4] Once Meeks established a *prima facie* case, the burden shifted to Computer Associates to prove by a preponderance of the evidence that the pay differential was justified under one of the four affirmative defenses in section 206(d). A pay differential does not violate the EPA if it is the result of (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than sex. 29 U.S.C.A. § 206(d)(1). If the employer fails to convince the trier of fact, then the plaintiff wins. *Id.* at 1533. The risk of nonpersuasion is borne by the employer.

[5] At trial, Computer Associates introduced testimony that starting salaries are based primarily on "experience, work experience, educational background, what a person is asking for, [and] salary surveys." Given its response to the special interrogatory about this affirmative defense, the jury obviously chose not to credit this testimony. "We will not override the jury's decision on the credibility of a witness." *Jones v. Otis Elevator Co.,* 861 F.2d 655, 658 n. 1 (11th Cir.1988) (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir.1969)). The jury's finding of liability stands.

### b. As to Damages

[6] Computer Associates also argues that Dan Jones, one of Meeks' expert witnesses, erroneously determined that a nondiscriminatory starting salary in 1988 for Meeks would have been $32,000. According to Computer Associates, Jones did not compare Meeks' salary with those of the male tech-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                                    Page 8
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
(Cite as: 15 F.3d 1013)

nical writers at Computer Associates' Maitland office based on their respective skills, education, and experience.

The record shows that Jones did testify concerning the relative experience and salaries of Meeks, George, and Arth. Thus, there was sufficient evidence from which the jury could determine Meeks' EPA damages. Jones also discussed a 1988 salary survey prepared by the Society for Technical Communication, an industry trade association. In determining that $32,000 would have been an appropriate salary, Jones was asked to take all of the above factors into consideration. We have grave doubts about the propriety of using such a survey-which canvassed salaries of non-Computer Associates technical writers working elsewhere than Maitland, Florida-to determine a nondiscriminatory salary for Meeks, especially when the district court had already ruled that the appropriate "establishment" for EPA purposes was Computer Associates' Maitland facility. However, Computer Associates did not object to the introduction of the salary study in evidence, nor to Jones' reliance upon it in arriving at the $32,000 figure. Because no complaint was ever made to the district court, there is no ruling for us to review and the jury's EPA damage award, as modified by the district court, is affirmed.

### B. THE TITLE VII CLAIM

[7] Computer Associates argues that in ruling on the Title VII claim, the district court erroneously held itself to be bound by the jury's findings on the EPA claim. Computer Associates maintains that a violation of the EPA is not, *per se,* a violation of Title VII. Even if Meeks made out a *prima facie* EPA case, Title VII requires proof of the additional element of discriminatory intent, which Computer Associates claims is lacking.

We have previously held that the Supreme Court's disparate treatment cases, such as *1019McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide "the appropriate framework for evaluating [a] claim of gender-based wage discrimination" under Title VII. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1528 (11th Cir.1992). The *McDonnell Douglas/Burdine* framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer. *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1570 (11th Cir.1993); *Miranda,* 975 F.2d at 1529. Because the district court did not make a finding of intentional discrimination, either explicitly or implicitly, we must reverse its judgment for Meeks on her Title VII wage discrimination claim.

[8] Under the *McDonnell Douglas/Burdine* approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males. *Miranda,* 975 F.2d at 1529. Once a *prima facie* case is established, the defendant must articulate a "legitimate, non-discriminatory reason for the pay disparity." *Id.* (citing *Burdine,* 450 U.S. at 255-56, 101 S.Ct. at 1095). This burden is "exceedingly light"; the defendant must merely proffer non-gender based reasons, not prove them. *Id.* (quoting *Perryman v. Johnson Prod., Inc.,* 698 F.2d 1138, 1142 (11th Cir.1983)). Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must show that "a discriminatory reason more likely than not motivated [the employer] to pay her less." *Id.* (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Such proof may be direct or circumstantial. *Reichhold Chem.,* 988 F.2d at 1564 (citing *Smith v. Horner,* 839 F.2d 1530, 1536 (11th Cir.1988)); *see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, ----, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ( "[R]ejection of the defendant's proffered reasons [for disparate treatment], will *permit* the trier of fact to infer the ultimate fact of intentional discrimination...."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(emphasis in original)).[FN1]

> FN1. Our holding in *Miranda,* 975 F.2d at
> 1518, has been modified slightly by the
> Supreme Court's 1993 decision in *Hicks,*
> 509 U.S. at ----, 113 S.Ct. at 2742. In *Mir-
> anda* we held that the plaintiff could satis-
> fy her Title VII burden by proving *either*
> that "a discriminatory reason more likely
> than not motivated [her employer] to pay
> her less, *or* that [the employer's] explana-
> tion is not worthy of belief." 975 F.2d at
> 1529 (emphasis added) (citing *Burdine,*
> 450 U.S. at 256, 101 S.Ct. at 1095). In
> *Hicks,* however, the Supreme Court held
> that only a finding of intentional discrimin-
> ation will satisfy the plaintiff's burden of
> proof under Title VII. 509 U.S. at ----, 113
> S.Ct. at 2749. "The factfinder's disbelief of
> the reasons put forward by the defendant
> (particularly if disbelief is accompanied by
> a suspicion of mendacity) may, together
> with the elements of the prima facie case,
> suffice to show intentional discrimination."
> *Id.* However, although " '[n]o additional
> proof of discrimination is *required* ' " to
> support a finding of intentional discrimina-
> tion, *id.*(quoting *Hicks v. St. Mary's Honor
> Center,* 970 F.2d 487, 493 (8th Cir.1992)
> (emphasis added) (bracketed material in
> original)), "rejection of the defendant's
> proffered reasons" does not *compel* judg-
> ment for the plaintiff as a matter of law. *Id.*

In contrast to Title VII, the EPA establishes a form
of "strict liability":

Once the disparity in pay between substantially
similar jobs is demonstrated, the burden shifts to
the defendant to prove that a "factor other than sex"
is responsible for the differential. If the defendant
fails, the plaintiff wins. The plaintiff is not required
to prove discriminatory intent on the part of the de-
fendant.

*Miranda,* 975 F.2d at 1533; *accord Fallon v.*

*Illinois,* 882 F.2d 1206, 1213 (7th Cir.1989). Thus,
there is a significant difference between Title VII
and the EPA as to both elements and burdens of
proof. Under the EPA, the onus is on the employer
to establish that the pay differential was premised
on a factor other than sex. Under Title VII,
however, the plaintiff must prove that the employer
had a discriminatory intent. If the evidence is in
equipoise on the issue of whether a salary differen-
tial is based on a "factor other than sex," the
plaintiff is entitled to judgment on her EPA claim.
However, the employer prevails on the Title VII
claim. Under Title VII, the risk of nonpersuasion
always remains with the plaintiff. *See Hicks,* 509
U.S. at ----, 113 S.Ct. at 2747 (quoting Fed.R.Evid.
301). Although sharply *1020 divided, the majority
of circuits to address this issue have held, as we did
in *Miranda,* that the elements and burdens of proof
differ under the EPA and Title VII. *See Tidwell v.
Fort Howard Corp.,* 989 F.2d 406, 410-12 (10th
Cir.1993) (affirming district court's Title VII find-
ing for the defendant despite jury's EPA verdict for
the plaintiff); *Fallon,* 882 F.2d at 1213 & n. 5;
*Peters v. City of Shreveport,* 818 F.2d 1148,
1154-55 & n. 3 (5th Cir.1987) (holding that "[t]he
burden of persuading the court that the differential
was due to the city's intentional sex discrimination
remained with the plaintiffs as to the Title VII
claims," although the burden under the EPA may
shift to the defendant (citing *Plemer v. Parsons-Gil-
bane,* 713 F.2d 1127, 1136 (5th Cir.1983))), *cert.
dismissed,*485 U.S. 930, 108 S.Ct. 1101-02, 99
L.Ed.2d 264 (1988); *Brewster v. Barnes,* 788 F.2d
985, 992-93 (4th Cir.1986) (affirming district
court's findings for plaintiff on EPA claim and for
defendant on Title VII claim due to difference in
burdens of proof). *But see Korte v. Diemer,* 909
F.2d 954, 959 (6th Cir.1990) ("We find the distinc-
tion drawn by the district court between [EPA] liab-
ility and Title VII liability overly technical.");
*McKee v. Bi-State Dev. Agency,* 801 F.2d 1014,
1019 (8th Cir.1986) ("Where a claim is for unequal
pay for equal work based upon sex, the standards of
the [EPA] apply whether the suit alleges a violation
of the [EPA] or of Title VII."); *Kouba v. Allstate*

15 F.3d 1013                                                                                    Page 10
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

*Ins. Co.,* 691 F.2d 873, 875 (9th Cir.1982) ("[E]ven under Title VII, the employer bears the burden of showing that the wage differential resulted from a factor other than sex. Nothing in *Burdine* converts this affirmative defense ... into an element of the cause of action...." (citation omitted)); *see also* 29 C.F.R. § 1620.27(a) (1993) (providing that when the jurisdictional requirements of both the EPA and Title VII are satisfied, "any violation of the Equal Pay Act is also a violation of Title VII"). However, having reviewed these decisions and the relevant Supreme Court precedent, we are convinced that our decision in *Miranda* not only binds us on this issue but has the added merit of being correct.

In this case, the EPA jury returned a special verdict:

Do you find from a preponderance of the evidence that the defendant has shown that the difference in salary between the plaintiff and the male technical writer(s) in the Maitland office was based on a factor other than the plaintiff's sex? Answer, No.

The jury found that Computer Associates had not established its affirmative defense, and therefore Meeks was entitled to recover on her EPA claim. In ruling on the Title VII claim, the district court relied on the jury's EPA verdict. However, the jury had found only that Computer Associates had failed to prove that the salary differential was based on factors other than sex, which is all that the EPA requires. The jury did not find that Meeks had proven that the salary differentials *were* based on gender and that the discrimination was intentional, both of which Title VII requires. *See Fallon,* 882 F.2d at 1213 n. 5. Neither the jury nor the district court expressly found that Computer Associates had intentionally discriminated against Meeks on the basis of her gender. In the absence of such a finding, the court's judgment in favor of Meeks cannot stand.

The Supreme Court's decision in *Hicks* reinforces our holding that the jury's EPA findings neither require nor support the district court's ruling for Meeks on her Title VII claim. Even if we were to accept Meeks' invitation to treat the jury's finding

as establishing that she had disproved Computer Associates' proffered justifications, we would still have to reverse Meeks' Title VII wage discrimination judgment. As *Hicks* makes clear, the trier of fact *must* make a finding of intentional discrimination. *See* 509 U.S. at ----, 113 S.Ct. at 2751 ("[N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable."). In this case, the district court never made a finding of intentional discrimination. The court may have believed that Meeks proved intent, but it did not so find, and its findings are therefore insufficient**1021** under *Hicks* to support its Title VII wage discrimination judgment.[FN2]

> FN2. Under the Civil Rights Act of 1991 § 102, 42 U.S.C.A. § 1981a(c) (Supp.1993), Title VII sex discrimination claims seeking compensatory or punitive damages may now be tried to a jury at the election of one of the parties. In cases in which a Title VII and an EPA claim are simultaneously tried to the jury, the district court should take care to instruct the jury on the differences in the elements and burdens of proof between the two causes of action.

On remand, the district court will have the opportunity to enter additional findings of fact as it deems appropriate. If the district court finds that Meeks did not prove intentional sexual discrimination, it should recalculate her Title VII damages accordingly. If, however, the court finds that she did prove intentional discrimination, it should reinstate its total damages award.

## C. RETALIATION UNDER TITLE VII

[9] Computer Associates also contends that the district court erroneously found retaliation in violation of Title VII simply because the jury had found retaliation under the EPA. It argues that the evidence

15 F.3d 1013                                                                                          Page 11
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

presented at trial was insufficient to support a finding of retaliation.

[10] The shortcomings of the district court's Title VII discrimination ruling do not affect its conclusion that Computer Associates retaliated against Meeks in violation of Title VII. Retaliation is a separate offense under Title VII. *See* 42 U.S.C.A. § 2000e-3(a); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491 (11th Cir.1989). To recover for retaliation, the plaintiff "need not prove the underlying claim of discrimination which led to her protest," so long as she had a reasonable good faith belief that the discrimination existed. *Tipton,* 872 F.2d at 1494.

[11] To establish a *prima facie* case of retaliation, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1524 (11th Cir.1991); *Tipton,* 872 F.2d at 1494. As we explained in *Reichhold Chem.,* we interpret "the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." 988 F.2d at 1571-72 (citing *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985)). Once the *prima facie* case is established, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. As with a Title VII discrimination claim, the employer's burden is "exceedingly light." *Tipton,* 872 F.2d at 1495 (internal quotation omitted). The plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation; "the burden of production shifts, but the burden of persuasion remains with the plaintiff." *Reichhold Chem.,* 988 F.2d at 1572.

In this case, the district court specifically found that Meeks had carried her burden:

[T]his Court finds retaliation. Specifically, this Court finds the testimony of the Plaintiff regarding the existence and nature of retaliatory conduct by her supervisor and that it commenced after her complaint regarding unequal pay to be credible. Conversely, the Court finds the testimony of the Plaintiff's supervisor, Laverne Peter, not to be credible on these points.

The court also expressly found that Meeks had been constructively discharged. Thus, the district court concluded that Meeks had engaged in protected conduct (she had complained of unequal pay); that adverse employment action had occurred (the court credited Meeks' testimony as to the *nature of retaliatory conduct* and found that she had been constructively discharged); and that the two were related. The court expressly found that Computer Associates' proffered explanations were not credible and that Meeks' testimony was credible. Taken as true, Meeks' testimony supports the district court's findings of constructive discharge and retaliation. The district court's ruling on **\*1022** this issue was therefore not clearly erroneous and must be affirmed.[FN3]

> FN3. Computer Associates makes three additional arguments: first, that the district court erred in awarding Meeks liquidated damages for a non-good faith violation of the EPA; second, that the district court erred in awarding Meeks liquidated damages *and* post-judgment interest; and third, that Meeks did not satisfy the Title VII jurisdictional requirement of obtaining a right to sue letter from the EEOC. Having reviewed these issues we conclude that Computer Associates' arguments are without merit and do not warrant further discussion.

### IV. CONCLUSION

Because the district court failed to make a finding of intentional discrimination, we REVERSE the district court's judgment for Meeks on her Title VII

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 F.3d 1013                                                                  Page 12

15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258, 124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883, 127
Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d (BNA) 1544
**(Cite as: 15 F.3d 1013)**

wage discrimination claim, VACATE the district
court's Title VII damage award, and REMAND for
the entry of any additional findings of fact and for
reinstatement or recalculation of the damages
award consistent with this opinion. All other as-
pects of the district court's judgment are AF-
FIRMED.

C.A.11 (Fla.),1994.
Meeks v. Computer Associates Intern.
15 F.3d 1013, 64 Fair Empl.Prac.Cas. (BNA) 258,
124 A.L.R. Fed. 711, 63 Empl. Prac. Dec. P 42,883,
127 Lab.Cas. P 33,065, 1 Wage & Hour Cas.2d
(BNA) 1544

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

106 F.3d 1519                                                                                                Page 1
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

▷

Combs v. Plantation Patterns
C.A.11 (Ala.),1997.

United States Court of Appeals,Eleventh Circuit.
Darrell COMBS, Plaintiff-Appellee,
v.
PLANTATION PATTERNS, Meadowcraft Com-
pany, and Sam Blount Company, Inc., Defendants,
Meadowcraft, Inc., Defendant-Appellant.
No. 95-6922.

Feb. 20, 1997.

Former employee sued former employer under Title
VII, alleging race discrimination in failure to pro-
mote him to supervisory position. The United
States District Court for the Middle District of
Alabama, No. CV94-T-103-E,Myron H. Thompson,
Chief Judge, entered judgment on jury verdict for
former employee. Former employer appealed. The
Court of Appeals, Carnes, Circuit Judge, held that:
(1) plaintiff in discrimination case based on circum-
stantial evidence can avoid judgment as matter of
law by putting on prima facie case and by produ-
cing evidence sufficient to discredit in mind of
reasonable juror all defendant's proffered nondis-
criminatory reasons for its actions, but (2) former
employee failed to produce evidence sufficient to
permit reasonable juror to reject as spurious former
employer's explanation that it promoted white can-
didate instead of former employee to supervisor be-
cause white candidate had superior supervisory ex-
perience.

Reversed and remanded.

Black, Circuit Judge, filed opinion specially con-
curring.

West Headnotes

**[1] Federal Courts 170B ⟨⟐⟩776**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews *de novo* a district court's
denial of defendant's renewed motion for judgment
as matter of law, applying same standards as dis-
trict court. Fed.Rules Civ.Proc.Rule 50, 28
U.S.C.A.

**[2] Federal Civil Procedure 170A ⟨⟐⟩2142.1**

170A Federal Civil Procedure
170AXV Trial
170AXV(F) Taking Case or Question from
Jury
170AXV(F)2 Questions for Jury
170Ak2142 Weight and Sufficiency of
Evidence
170Ak2142.1 k. In General. Most
Cited Cases
Motion for judgment as matter of law requires court
to consider whether evidence presents sufficient
disagreement to require submission to jury or
whether it is so one-sided that one party must pre-
vail as matter of law. Fed.Rules Civ.Proc.Rule 50,
28 U.S.C.A.

**[3] Federal Courts 170B ⟨⟐⟩798**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)3 Presumptions
170Bk798 k. Directed Verdict. Most
Cited Cases

**Federal Courts 170B ⟨⟐⟩801**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)3 Presumptions
170Bk801 k. Judgment N. O. v. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 2
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

Cited Cases

In reviewing motion for judgment as matter of law, Court of Appeals considers all evidence, and inferences drawn therefrom, in light most favorable to nonmoving party. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⟺2142.1**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from Jury
        170AXV(F)2 Questions for Jury
          170Ak2142 Weight and Sufficiency of Evidence
            170Ak2142.1 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟺2152**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from Jury
        170AXV(F)2 Questions for Jury
          170Ak2152 k. Conclusions or Inferences from Evidence. Most Cited Cases

If facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at contrary verdict, then motion for judgment as matter of law is properly granted, but, conversely, if there is substantial evidence opposed to motion such that reasonable people, in exercise of impartial judgment, might reach differing conclusions, then such motion is due to be denied and case is properly submitted to jury. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟺2142.1**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from Jury
        170AXV(F)2 Questions for Jury

          170Ak2142 Weight and Sufficiency of Evidence
            170Ak2142.1 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟺2146**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(F) Taking Case or Question from Jury
        170AXV(F)2 Questions for Jury
          170Ak2142 Weight and Sufficiency of Evidence
            170Ak2146 k. Scintilla of Evidence. Most Cited Cases

Nonmoving party must provide more than mere scintilla of evidence to survive motion for judgment as matter of law; there must be substantial conflict in evidence to support jury question. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[6] Civil Rights 78 ⟺1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1555 k. Questions of Law or Fact. Most Cited Cases
      (Formerly 78k389)

Despite Title VII plaintiff's failure to present direct evidence of discrimination, he or she may nevertheless present sufficient circumstantial evidence of discrimination to create jury question. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⟺1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
        78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                      Page 3
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

(Formerly 78k378)

Court uses *McDonnell Douglas-Burdine* burden-shifting framework in evaluating Title VII claims supported by circumstantial evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
        (Formerly 78k378)
Under *McDonnell Douglas-Burdine* framework, Title VII plaintiff has initial burden of establishing prima facie case of discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
        (Formerly 78k378)
Establishment of prima facie case under Title VII in effect creates presumption that employer unlawfully discriminated against employee, and, if trier of fact believes plaintiff's evidence, and if employer is silent in face of presumption, court must enter judgment for plaintiff because no issue of fact remains in case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
        (Formerly 78k378)
Effect of presumption of discrimination created by establishment of prima facie case under Title VII is to shift to employer the burden of producing legitimate, nondiscriminatory reasons for challenged employment action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
        (Formerly 78k378)
To satisfy burden of producing legitimate, nondiscriminatory reasons for challenged employment action, Title VII defendant need not persuade court that it was actually motivated by proffered reasons; it is sufficient if defendant's evidence raises genuine issue of fact as to whether it discriminated against plaintiff. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
        (Formerly 78k378)
To satisfy intermediate burden of producing legitimate, nondiscriminatory reasons for challenged employment action, employer need only produce admissible evidence which would allow trier of fact rationally to conclude that employment decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                        Page 4
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

had not been motivated by discriminatory animus. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ⬥1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
If Title VII defendant carries its burden of producing legitimate, nondiscriminatory reasons for employment decision, presumption of discrimination created by *McDonnell Douglas* framework drops from case, and factual inquiry proceeds to new level of specificity. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 ⬥1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Elimination of presumption of discrimination, which occurs when employer carries its burden of producing legitimate, nondiscriminatory reasons for employment decision, does not imply that trier of fact no longer may consider evidence previously introduced to establish prima facie case under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 ⬥1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

78k1534 Presumptions, Inferences, and Burden of Proof
        78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Once Title VII defendant satisfies its intermediate burden of production, and initial presumption of discrimination accompanying prima facie case has been eliminated, plaintiff has opportunity to discredit defendant's proffered explanations for its decision. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[16] Civil Rights 78 ⬥1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
After employer has produced legitimate, nondiscriminatory reason for adverse action, Title VII plaintiff has opportunity to come forward with evidence, including previously produced evidence establishing prima facie case, sufficient to permit reasonable fact finder to conclude that reasons given by employer were not real reasons for adverse employment decision. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[17] Civil Rights 78 ⬥1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1)
While disbelief of employer's proffered nondiscriminatory reasons for employment action does not require judgment for Title VII plaintiff, such disbelief, in tandem with plaintiff's prima facie case, is sufficient to permit fact finder to infer discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[18] Federal Civil Procedure 170A ⟳2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
          170Ak2497.1 k. In General. Most
Cited Cases
Title VII plaintiff is entitled to survive summary
judgment, and judgment as matter of law, if there is
sufficient evidence to demonstrate existence of
genuine issue of fact as to truth of each of employ-
er's proffered reasons for its challenged action.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[19] Federal Civil Procedure 170A ⟳2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
          170Ak2497.1 k. In General. Most
Cited Cases
Once Title VII plaintiff introduces evidence suffi-
cient to permit fact finder to disbelieve employer's
proffered explanations for employment action, sum-
mary judgment is inappropriate, because issues of
fact and sufficiency of evidence are properly re-
served for jury; nothing else is required to avoid
summary judgment. Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

**[20] Courts 106 ⟳90(2)**

106 Courts
   106II Establishment, Organization, and Proced-
ure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling
or as Precedents
        106k90 Decisions of Same Court or

Co-Ordinate Court
          106k90(2) k. Number of Judges
Concurring in Opinion, and Opinion by Divided
Court. Most Cited Cases
Where there are inconsistent panel decisions, earli-
est panel opinion resolving issue in question binds
Eleventh Circuit until court resolves issue en banc.

**[21] Courts 106 ⟳90(2)**

106 Courts
   106II Establishment, Organization, and Proced-
ure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling
or as Precedents
        106k90 Decisions of Same Court or
Co-Ordinate Court
          106k90(2) k. Number of Judges
Concurring in Opinion, and Opinion by Divided
Court. Most Cited Cases
Once panel of Court of Appeals has decided partic-
ular issue, questions about whether different view
of matter might be "more correct" are rendered aca-
demic insofar as subsequent panels are concerned;
in other words, unless and until issue is addressed
by en banc Court, Supreme Court, or Congress, the
first panel decision on it is, by definition, "more
correct" than any subsequent panel decisions.

**[22] Civil Rights 78 ⟳1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
     78k1555 k. Questions of Law or Fact. Most
Cited Cases
   (Formerly 78k389)
Jury question is created when prima facie case un-
der Title VII is coupled with evidence sufficient to
permit reasonable fact finder to disbelieve employ-
er's proffered reasons for challenged action. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[23] Civil Rights 78 ⟳1536**

106 F.3d 1519                                                                          Page 6
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
        78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
   (Formerly 78k378)
Under *McDonnell Douglas* framework, if Title VII plaintiff establishes prima facie case, and defendant employer proffers no nondiscriminatory reasons for adverse employment action, plaintiff wins judgment as matter of law. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Civil Rights 78 ☞1535**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
        78k1535 k. In General. Most Cited Cases
   (Formerly 78k377.1)
Jury is not required to make inference of discrimination upon rejection of employer's proffered nondiscriminatory reasons for given employment action, but rather, in determining whether Title VII plaintiff's proffered reason of race is correct, jury must perform its traditional duties of assessing credibility of witnesses through observation of trial testimony and of weighing evidence, and it must measure strength of permissible inference of discrimination that can be drawn from plaintiff's prima facie case along with evidence that discredits employer's proffered explanations for its decision. Civil Rights Act of 1964, § 701 et seq, 42 U.S.C.A. § 2000e et seq.

**[25] Civil Rights 78 ☞1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
   (Formerly 78k153)

Even if jury concludes that all employer's proffered explanations are unworthy of belief, it may still remain unpersuaded that discrimination was real reason for employer's decision; that determination is entrusted to jury's discretion. Civil Rights Act of 1964, § 701 et seq, 42 U.S.C.A. § 2000e et seq.

**[26] Civil Rights 78 ☞1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1555 k. Questions of Law or Fact. Most Cited Cases
   (Formerly 78k389)
When deciding defense motion for judgment as matter of law in discrimination case in which defendant has proffered nondiscriminatory reasons for its actions, district court must, in view of all evidence, determine whether plaintiff has cast sufficient doubt on defendant's proffered nondiscriminatory reasons to permit reasonable fact finder to conclude that employer's proffered legitimate reasons were not what actually motivated its conduct, and court must evaluate whether plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in employer's proffered reasons that reasonable fact finder could find them unworthy of credence. Civil Rights Act of 1964, § 701 et seq, 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[27] Civil Rights 78 ☞1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1555 k. Questions of Law or Fact. Most Cited Cases
   (Formerly 78k389)
In discrimination case, once district court determines that reasonable jury could conclude that employer's proffered reasons for adverse action were not real reason for its decision, court may not preempt jury's role of determining whether to draw inference of intentional discrimination from plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                    Page 7
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

prima facie case taken together with rejection of employer's explanations for its action; at that point, judgment as matter of law is unavailable. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[28] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
By meeting its burden of producing legitimate reasons for its decision to promote another candidate rather than black employee to welding supervisor position, former employer successfully eliminated presumption of discrimination that initially accompanied black employee's prima facie case under Title VII, where employer proffered evidence in support of three legitimate, nondiscriminatory reasons for its promotion decision, including other candidate's superior welding experience and superior supervisory experience, and recommendations of supervisors. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[29] Civil Rights 78 ☞1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
    (Formerly 78k148)
To establish prima facie case of discriminatory failure to promote, plaintiff must prove that he is member of protected class, that he was qualified for and applied for promotion, that he was rejected, and that other equally or less qualified employees who were not members of protected class were promoted. Civil Rights Act of 1964, § 701 et seq., 42

U.S.C.A. § 2000e et seq.

**[30] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
When trier of fact has before it all evidence needed to decide ultimate issue of whether defendant intentionally discriminated against Title VII plaintiff, question of whether plaintiff properly made out prima facie case is no longer relevant. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[31] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Because employer, as defendant in Title VII suit, failed to persuade district court to dismiss former employee's failure to promote claim for lack of prima facie case, and responded to employee's proof by offering evidence to explain why employee was rejected in favor of another candidate, fact finder was then required to decide whether rejection was discriminatory within meaning of Title VII, and thus, on appeal, question of whether employee properly made out prima facie case was no longer relevant. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[32] Civil Rights 78 ☞1555**

78 Civil Rights

106 F.3d 1519                                                                    Page 8
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

78IV Remedies Under Federal Employment Discrimination Statutes
　　78k1555 k. Questions of Law or Fact. Most Cited Cases
　(Formerly 78k389)
Reasonable jury could have concluded that employer's promotional decision was not actually motivated by chosen candidate's concededly superior welding experience, but rather that chosen candidate was hired to work as packing supervisor and that he spent at least a year in that position before being transferred to welding department, and thus employer's proffered reason of superior experience did not allow judgment as matter of law for employer on black employee's claim of race discrimination in failure to promote him to welding supervisor position. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[33] Civil Rights 78 ☞1555**

78 Civil Rights
　78IV Remedies Under Federal Employment Discrimination Statutes
　　78k1555 k. Questions of Law or Fact. Most Cited Cases
　(Formerly 78k389)
Conflicting evidence about communications that supervisors made to decision maker about relative merits of candidates for welding supervisor position, and about which candidate was in fact each supervisor's recommended candidate, created jury question as to whether supervisory recommendations actually motivated employer's decision to promote white candidate instead of black candidate, and thus employer's proffered reason of supervisory recommendations did not allow judgment as matter of law for employer on black candidate's failure to promote claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[34] Civil Rights 78 ☞1135**

78 Civil Rights

78II Employment Practices
　　78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
　(Formerly 78k148)
Evidence that white candidate resigned prior supervisory position due to financial misconduct was not sufficient to permit reasonable fact finder to disbelieve employer's proffered nondiscriminatory explanation that it promoted white candidate to welding supervisor position instead of black employee because of white candidate's superior supervisory experience, thus entitling employer to judgment as matter of law on Title VII claim; white candidate had better experience as supervisor, in quality and quantity, while black candidate had virtually none, and welding supervisory position did not involve financial responsibility. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[35] Civil Rights 78 ☞1555**

78 Civil Rights
　78IV Remedies Under Federal Employment Discrimination Statutes
　　78k1555 k. Questions of Law or Fact. Most Cited Cases
　(Formerly 78k389)
Plaintiff in discrimination case based on circumstantial evidence can avoid judgment as matter of law by putting on prima facie case and by producing evidence sufficient to discredit in mind of reasonable juror all defendant's proffered nondiscriminatory reasons for its actions. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**\*1524** James Walker May, John W. Smith, Bradley, Arant, Rose & White, Birmingham, AL, for Defendant-Appellant.
Samuel Fisher, Ann C. Robertson, Amelia Haines Griffith, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Middle District of Alabama.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                    Page 9
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

Before BIRCH, BLACK and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Meadowcraft, Inc. appeals from a judgment entered against it pursuant to a jury verdict in favor of Darrell Combs in this Title VII race discrimination case. The jury found that Meadowcraft denied Combs a supervisory position because of his race. The dispositive issue in the appeal is whether Combs produced evidence sufficient to allow a reasonable factfinder to disbelieve Meadowcraft's proffered nondiscriminatory reasons for failing to promote Combs. We conclude that he did not, and that Meadowcraft was entitled to judgment as a matter of law for that reason.

Part I of this opinion is a discussion of the facts. In Part II, we summarize the procedural history of this case, followed by a brief discussion of the standard of review in Part III. Our discussion of the law and application of it to the facts is contained in Part IV, which has four subparts.

Subparts A through C of Part IV contain an explication of the legal framework applicable to discrimination cases in light of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). It is in those parts of this opinion that we answer the dicta contained in the recent panel opinion in *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436 (11th Cir.1996), which is critical of the holding in *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir.1994), and by implication, of a number of our other decisions in line with it. *Howard* and those decisions like it hold that after a plaintiff has established a prima facie case, evidence from which the factfinder could find that all of the employer's proffered reasons for the challenged job action are pretextual entitles the plaintiff to have the factfinder decide the ultimate issue of discrimination. We answer the *Isenbergh* panel's criticism of the *Howard* line of decisions and explain why the holding of those cases is the law of this circuit, as

well as at least eight other circuits.

Subpart D of Part IV applies the law to the facts of this case, and Part V contains our conclusion.

### I. BACKGROUND FACTS

Meadowcraft owns and operates a manufacturing plant in Wadley, Alabama. The plant produces outdoor patio furniture, which is sold under the brand name "Plantation Patterns." The plant's workforce is divided into a number of departments, including materials, forming, welding, painting, packing, and shipping. The departments have various shifts, and there are supervisors for each shift.

In January 1992, Meadowcraft hired Combs, who is black, to work in the plant as a "crimp and form" operator. Shortly thereafter, Combs was promoted to "material handler" and given a pay raise. Combs was supervised by George Anderson and Edward Lane. Both Anderson and Lane are black, and both worked as supervisors in the plant's welding department.

Shortly after Combs started working at Meadowcraft, he introduced himself to John Hart, the plant superintendent. Combs told Hart that he had a degree in computer science from Alabama A & M and that he was interested in doing office work that would allow him to use his degree. In June 1992, Hart made arrangements with the plant manager for Combs to do a temporary assignment programming personal computers *1525 in the plant and preparing spreadsheets. At some point, those arrangements included reclassifying Combs to be a plant "lead man"-meaning a quasi-supervisor-even though he was not actually doing lead man work or supervising anyone. When Combs was nominally promoted to lead man, his pay was increased.

Prior to his pay raise, Combs held a second job as manager at a low-income apartment complex at which he was responsible for maintenance, cleaning, and painting, as well as supervising teenagers who did maintenance work at the complex. After

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                      Page 10
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

Combs' pay raise, he quit his second job.

On several occasions, when Meadowcraft officials from Birmingham headquarters visited the plant, Combs was asked to "hide" from the officials. At trial, Combs implied that he was asked to hide because he is black, but he admitted on cross-examination that he was never told that was the reason. Hart testified that Combs was asked to hide because headquarters had not approved his computer job, and that he had explained that to Combs.

While Combs was assigned to the temporary computer project, Hart asked him whether he would be interested in being a supervisor at the plant. Combs said that he was interested. Although Combs indicated an interest in supervisory positions in both the painting and welding departments, he was awarded neither position. Both positions were awarded to white persons. At trial, Combs conceded that the person who was made painting supervisor was better qualified than he, and Combs abandoned his discrimination claim with respect to that position. Meadowcraft's failure to promote Combs to the welding supervisor position was the only failure-to-promote claim that was submitted to the jury, and it is the only claim in controversy in this appeal.

Meadowcraft awarded the welding supervisor position to Fred Walker in July 1992. Walker served in that capacity for ten or eleven days, but then was reassigned to work temporarily as a supervisor in the packing department. That temporary reassignment lasted for about a year, after which Walker returned to his position as a supervisor in the welding department.

Around November 1992, after Combs had completed his temporary computer assignment, he was asked to assist with a "bar code" scanning project in the plant's packing department-where Walker was then a temporary supervisor. By December 1992, the scanning project had been put on hold, and Hart told Combs that he had run out of temporary assignments for him. Hart suggested that Combs return to his position as a material handler in the plant. Combs declined to return to his material handler job, and his employment at Meadowcraft came to an end on December 18, 1992.[FN1]

> FN1. Meadowcraft contends that Combs resigned voluntarily. In his complaint and at trial, Combs contended that he was not offered the option of returning to his job as material handler, and that he was laid off or forced to quit. However, the jury specifically rejected Combs' discriminatory termination claim, and the only claim at issue on appeal is Combs' failure-to-promote claim.

## II. PROCEDURAL HISTORY

In February 1993, Combs filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging unlawful racial discrimination. After receiving his right-to-sue letter from the EEOC, Combs filed suit in the Middle District of Alabama, alleging claims based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e*et seq.*, and on 42 U.S.C. § 1981. Combs sought recovery under the following race discrimination theories: (1) that Meadowcraft terminated him from his employment because of his race; (2) that Meadowcraft subjected him to impermissible racial harassment; and (3) that Meadowcraft denied him a supervisory position because of his race. Combs also appended a state law claim for the tort of outrage, but the district court dismissed that claim with prejudice, and Combs has not appealed that dismissal.

Combs' three race discrimination claims were tried to a jury on August 21-25, 1995. At trial, Meadowcraft proffered evidence in support of three legitimate, nondiscriminatory reasons for its decision to promote Walker instead of Combs. Those reasons were: (1) **\*1526** Walker's superior welding experience; (2) the recommendations of supervisors Lane and Anderson; and (3) Walker's superior supervisory experience. At trial, Meadowcraft moved for judgment as a matter of law both at the close of the

106 F.3d 1519                                                                                    Page 11
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

plaintiff's case and at the close of all the evidence. The district court denied those motions, and the case was submitted to the jury.

The jury unanimously rejected Combs' discriminatory termination claim, but could not reach a unanimous verdict on the remaining two claims. Thereafter, the parties agreed that the remaining two claims could be decided by majority verdict. The jury by a majority vote determined that Combs had not proven his claim for discriminatory harassment, but that he had proven his claim that he was denied a supervisory position because of his race. The jury awarded Combs compensatory damages of $76,552 and punitive damages of $42,700.

After the jury returned its verdict, Meadowcraft renewed its motion for judgment as a matter of law and made an alternative motion for a new trial. In support of those motions, Meadowcraft argued (among other things) that Combs had failed to put forward sufficient evidence to permit the jury to disbelieve the nondiscriminatory reasons that Meadowcraft had proffered in explanation of its decision to promote Walker to welding supervisor instead of Combs. The district court denied both the principal and alternative motions, and this appeal followed.[FN2]

> FN2. On appeal, Meadowcraft contends that it is entitled to a new trial, even if it is not entitled to judgment as a matter of law. Meadowcraft asserts three grounds in support of that contention: (1) insufficiency of the evidence; (2) prejudicial admission of inadmissible evidence; and (3) excessive damages. Because we conclude that Meadowcraft is entitled to judgment as a matter of law, we do not discuss further Meadowcraft's arguments in favor of a new trial.

### III. STANDARD OF REVIEW

[1][2][3][4] We review *de novo* a district court's denial of a defendant's renewed motion for judgment as a matter of law, applying the same standards as the district court. *Sherrin v. Northwestern Nat'l Life Ins. Co.,* 2 F.3d 373, 377 (11th Cir.1993). Those standards require us to consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In conducting our review:

> [W]e consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.

*Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989) (footnotes omitted).

[5] Under the foregoing standard, the nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law: "[T]here must be a substantial conflict in evidence to support a jury question." *Id.* To summarize, we must consider all the evidence in the light most favorable to Combs and determine "whether or not reasonable jurors could have concluded as this jury did based on the evidence presented." *Quick v. Peoples Bank,* 993 F.2d 793, 797 (11th Cir.1993) (citation and internal quotation marks omitted).

### IV. WHETHER MEADOWCRAFT WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW

*A. The Issue-Once a Prima Facie Case Has Been* Established, Does Evidence Sufficient to *Disprove*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                        Page 12
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

*All of the Employer's Proffered* Reasons Preclude
Judgment as a Matter *of Law for the Employer?*

Meadowcraft and Combs disagree both as to the applicable law and the weight of the evidence. Meadowcraft contends that it is **\*1527** entitled to judgment as a matter of law because (1) Combs failed to produce evidence sufficient to allow a reasonable factfinder to disbelieve its proffered nondiscriminatory reasons for promoting Walker instead of Combs, and (2) even if Combs had produced such evidence, he still failed to present evidence that discrimination was the true reason for the decision. According to Meadowcraft, it is entitled to judgment as a matter of law even if a reasonable factfinder could have rejected each of its proffered nondiscriminatory reasons for promoting Walker instead of Combs, because Combs had the additional burden of demonstrating that Meadowcraft's decision was motivated by racial animus. For that proposition, Meadowcraft relies primarily on *Walker v. NationsBank of Florida,* 53 F.3d 1548 (11th Cir.1995), and dicta contained in this circuit's recent decision in *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436 (11th Cir.1996).

Combs takes issue with Meadowcraft's view of the law and the evidence. First, Combs contends that he put forward sufficient evidence to permit a reasonable factfinder to disbelieve Meadowcraft's proffered nondiscriminatory reasons for its decision, and he argues that no further evidence of discrimination is required for the jury's verdict to be sustained. Combs relies primarily on this Court's decision in *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir.1994), as well as the Supreme Court's landmark decision in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Alternatively, Combs contends that he put forward sufficient additional evidence of discriminatory intent to support the jury's verdict-even if rejection of Meadowcraft's proffered nondiscriminatory reasons were not enough, when coupled with his prima facie case, to support a finding of discrimination.[FN3]

FN3. According to Combs' alternative theory, the jury's verdict is supported by evidence that Meadowcraft had no established criteria for promotion to supervisor and only two out of twelve plant supervisors were black. We reject that theory without detailed discussion, because the evidence offered to support it was undeveloped and without analytic foundation. *See, e.g., Brown v. American Honda Motor Co.,* 939 F.2d 946, 952-53 (11th Cir.) (noting that statistics without analytic foundation are "virtually meaningless"), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

We turn first to the parties' legal arguments. In light of the parties' differing views of the law governing Title VII discrimination claims that rely on circumstantial evidence, and the arguments that the parties make in support of those views, we think it appropriate to examine the applicable law in some detail. Such a review is especially appropriate in light of the *Isenbergh* panel's recent observation in dicta that, "some confusion exists in the law of this circuit about whether *Hicks* always precludes judgments as a matter of law for employers whenever there is a plausible basis on which to disbelieve the employer's proffered reason for the employment decision in question," 97 F.3d at 442.

We believe that any confusion about this question in our circuit's law-defined by holdings, not dicta-is limited, and we hope that our discussion will limit that confusion even more. As we will discuss, there is a substantial line of cases in this circuit that adequately and accurately sets forth the legal principles governing the nature and quantum of evidence necessary to permit a jury to infer discrimination. Before turning to those cases, however, we will review briefly the basic legal framework governing discrimination cases that are based on circumstantial evidence.

*B. The Basic Framework Governing Discrimination*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 13
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

### *Cases Based on Circumstantial Evidence*

[6][7][8][9] Despite a Title VII plaintiff's failure to present direct evidence of discrimination, he may nevertheless present sufficient circumstantial evidence of discrimination to create a jury question. In evaluating Title VII claims supported by circumstantial evidence, we use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under that framework, the plaintiff has the initial burden\*1528 of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253-54 & n. 6, 101 S.Ct. at 1093-94 & n. 6.

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

*Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 (footnote omitted).

[10][11][12] The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted). "[T]o satisfy this intermediate burden, the employer need only

produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1096 (emphasis added).

[13][14] If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094-95 & n. 10. However, elimination of the presumption does "not imply that the trier of fact no longer may consider evidence previously introduced to establish a prima facie case." *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10. As the Supreme Court has explained:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

*Id.*

[15][16] Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the prima facie case has been eliminated, the plaintiff has the opportunity to discredit the defendant's proffered explanations for its decision. According to the Supreme Court:

> [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 14
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*

*Id.* at 256, 101 S.Ct. at 1095 (emphasis added) (citation omitted). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Id.; McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

*C. The Effect of Evidence Sufficient to Permit* Rejection of the Employer's Proffered *Nondiscriminatory Reasons*

### 1. The Supreme Court's Hicks Opinion

The framework for evaluating discrimination cases based on circumstantial evidence, *1529 which we have just discussed, had been established for some time when the Supreme Court decided *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Before the *Hicks* decision, however, the circuits had split over the effect of a decision by the factfinder that the proffered nondiscriminatory reasons given by the employer were not the real reasons for its employment decision. Some of the circuits had held that a finding of pretext mandated a finding of illegal discrimination, while others had held that a finding of pretext did not. *See Hicks,* 509 U.S. at 512-13, 113 S.Ct. at 2750 (listing cases). The divergent views of the circuits on the effect of a finding of pretext prompted the Supreme Court to grant certiorari in *Hicks* to resolve the question. *Id.* at 512, 113 S.Ct. at 2750.

In *Hicks,* the plaintiff had brought a Title VII lawsuit, alleging he had been demoted and discharged because of his race. *Id.* at 505, 113 S.Ct. at 2746. After a full bench trial, the district court found for

the defendant, despite its finding that the reasons the defendant gave for its actions were not the real reasons for the plaintiff's demotion and discharge. *Id.* at 508, 113 S.Ct. at 2748. The Eighth Circuit reversed, holding that once the plaintiff had discredited all of the employer's proffered nondiscriminatory reasons for its decision, the plaintiff was entitled to judgment as a matter of law. *Id.* The Supreme Court reversed the Eighth Circuit and held that judgment for the plaintiff was not compelled by rejection of all of the employer's proffered nondiscriminatory reasons. *Id.* at 511, 113 S.Ct. at 2749.

[17] Although the Supreme Court in *Hicks* rejected the position that disbelief of the employer's proffered reasons *requires* judgment for the plaintiff, the Court was careful to explain that such disbelief, in tandem with the plaintiff's prima facie case, is sufficient to *permit* the factfinder to infer discrimination. The Court said:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, *upon such rejection, "[n]o additional proof of discrimination is required."*

*Id.* at 511, 113 S.Ct. at 2749 (quoting *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 493 (8th Cir.1992)) (footnote omitted) (second emphasis added). That is a pretty clear statement.

Four justices dissented in *Hicks,* but none of them did so because they thought that rejection of an employer's proffered nondiscriminatory reasons, together with the prima facie case, is insufficient to permit the factfinder to infer the ultimate fact of intentional discrimination. To the contrary, the dissenting justices would have gone even further than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 15
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

the majority did. They would have affirmed the Eighth Circuit's holding that once the factfinder rejects the employer's explanations for its decision, a finding of discrimination is required, and the plaintiff is "entitled to judgment." *See Hicks,* 509 U.S. at 532-33, 113 S.Ct. at 2760-61 (dissenting opinion of Souter, J., joined by White, Blackmun, and Stevens, JJ.).

[18] Based on the Supreme Court's clear statement in the majority opinion in *Hicks,* read together with the rationale of the dissenting justices, we understand the *Hicks* Court to have been unanimous that disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination. Therefore, it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action. With one exception, which we will discuss later, up until the *Isenbergh* opinion, not only the holdings but also the statements of this Court have been entirely consistent with that understanding of the *Hicks* decision.

### 2. The Post-Hicks Case Law in this Circuit Before Isenbergh

Just a few months after the Supreme Court decided *Hicks,* we were called upon to **\*1530** apply it in *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913 (11th Cir.1993). In *Hairston,* a terminated employee sued his former employer, alleging age discrimination and retaliatory termination.[FN4] The district court granted summary judgment for the employer. We reversed. In doing so, we explained that, under *Hicks,* if the employer carries its burden of production (by articulating legitimate reasons for the action), the plaintiff must demonstrate "that the proffered reason was not the true reason for the employment decision." *Id.* at 919 (quoting *Hicks,* 509 U.S. at 508, 113 S.Ct. at 2747) (internal quotation

marks omitted). Following the *Hicks* rule, we did *not* hold that additional proof of discrimination would be required at trial. Instead, we explained:

> FN4. Although *Hairston* was an age discrimination case brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621*et seq.,* and not under Title VII, "[t]he Eleventh Circuit has adapted to issues of age discrimination the principles of law applicable to cases arising under the very similar provisions of Title VII."*Hairston,* 9 F.3d at 919 (citing *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)). Indeed, the *Isenbergh* panel opinion, which we discuss *infra* in some detail, acknowledges that the Title VII burden-shifting framework of *McDonnell Douglas* and *Burdine* also applies to age discrimination cases. *See Isenbergh,* 97 F.3d at 440.

*The plaintiff may succeed* by directly persuading the court at trial that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.* In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case.

....

[P]laintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext....

*Id.* at 920-21 (citations omitted) (emphasis added). Because the plaintiff in *Hairston* had submitted sufficient evidence to permit the factfinder to find that the employer's proffered reasons were pretextual, we held it was error for the district

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                                                   Page 16
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

court to grant summary judgment. *Id.* at 921.

[19] Thus *Hairston,* our first decision on this issue following *Hicks,* clearly held that one way a plaintiff may succeed in establishing discrimination is by showing that the employer's proffered explanations are not credible. When that happens, the plaintiff may or may not ultimately prevail in the litigation, because the factfinder may or may not choose to make the permissible inference of discrimination. However, as we explained in *Hairston,* once the plaintiff introduces evidence sufficient to permit the factfinder to disbelieve the employer's proffered explanations, summary judgment is not appropriate, because "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury." *Id.* at 921. We said nothing in *Hairston* about the plaintiff being required to establish anything more than a prima facie case plus the falsity of the tendered explanations; we said nothing about anything else being required for the plaintiff to avoid summary judgment, because nothing else is required.

In *Batey v. Stone,* 24 F.3d 1330 (11th Cir.1994), we were again called upon to apply the *Hicks* rule, this time in the context of sex discrimination. In *Batey,* we recognized that under *Hicks,* evidence demonstrating the incredibility of the employer's proffered explanations is not, standing alone, enough to "*compel* judgment for the plaintiff." *Id.* at 1334 n. 12 (emphasis added) (citation and internal quotation marks omitted). Nevertheless, we held that such evidence is sufficient to satisfy the plaintiff's burden in responding to a summary judgment motion, because *Hicks* permits the trier of fact to base a finding of discrimination on rejection of the employer's proffered nondiscriminatory reasons, taken together with the plaintiff's prima facie case. *Id.* at 1334. Because the plaintiff in *Batey* had produced sufficient evidence for the factfinder to disbelieve the reasons that the employer proffered for the employment decision, we reversed the district court's grant of summary judgment for the employer. *Id.* at 1335-36. Consistent *1531 with our *Hairston* pre-

cedent, and with *Hicks,* we held that evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment. *Id.*

*Batey* was followed closely by our decision in *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir.1994). In *Howard,* we reversed the district court's grant of summary judgment for the defendant where there was sufficient evidence to permit the factfinder to reject the defendant's proffered reasons for awarding gas station dealerships to white and Asian dealers instead of to the plaintiff, who was black. We explained the effect of that evidence as follows:

> [*Hicks* ] holds that *proof* that a defendant's articulated reasons are false is not *proof* of intentional discrimination; it is merely *evidence* of intentional discrimination. However, *evidence* of intentional discrimination is all a plaintiff needs to defeat a motion for summary judgment. That evidence must be sufficient to create a genuine factual issue with respect to the truthfulness of the defendant's proffered explanation.

*Id.* at 525 (emphasis in original). In *Howard,* as in *Hairston* and *Batey,* we held that summary judgment was inappropriate because, taken together with the plaintiff's prima facie case, "the fact finder's rejection of [the] defendant's proffered reasons is sufficient circumstantial evidence upon which to base a judgment for the plaintiff." *Id.* at 527.

We again addressed application of the *Hicks* rule in *Cooper-Houston v. Southern Railway Co.,* 37 F.3d 603 (11th Cir.1994). In that case, we reversed the district court's grant of summary judgment in favor of an employer where the evidence was sufficient to permit the factfinder to reject the employer's proffered explanation for its employment decision. We explained that in order to avoid summary judgment, "[the plaintiff] was ... obligated to present evidence that [the employer's] legitimate reasons were not what actually motivated its conduct," and we held that the plaintiff had met that obligation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                          Page 17
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

*Id.* at 605 (citations omitted). The plaintiff's pretext evidence in *Cooper-Houston* included evidence that the employer had made racially derogatory remarks in the workplace, so it was unnecessary to discuss whether summary judgment would have been inappropriate even if the plaintiff's pretext evidence itself had not been racially charged. Significantly, however, we did *not* say that evidence of racially prejudiced attitudes was required for proof of pretext, even though such evidence was present in that case. Therefore, *Cooper-Houston* represents our fourth post-*Hicks* decision on this issue, all consistently establishing the law of this circuit that a prima facie case plus evidence permitting disbelief of the employer's proffered reasons equals the plaintiff's entitlement to have the factfinder decide the ultimate issue of discrimination. So far, so good. But then came the incongruent *Walker* decision.

In *Walker v. NationsBank of Florida,* 53 F.3d 1548 (11th Cir.1995), a panel of this Court affirmed the grant of judgment as a matter of law in favor of the employer in an age and sex discrimination case, even though the plaintiff had established a prima facie case and had put on evidence sufficient to permit the factfinder to disbelieve all of the employer's proffered reasons for the adverse employment action. *Id.* at 1556-58. Despite that evidence, the *Walker* panel said that "Walker did not produce evidence that raised a suspicion of mendacity sufficient to permit us to find on this record that the bank intentionally discriminated against her on the basis of age and/or sex." *Id.* at 1558. For that reason, the panel concluded that "[r]easonable and fair-minded persons, in the exercise of impartial judgment, would not conclude that the bank had discriminated against [the plaintiff] on the basis of her age or sex." *Id.*

In a concurring opinion, Judge Johnson accurately noted that the majority had exceeded its proper role by "deciding whether evidence of pretext supports an inference of intentional discrimination," a task that requires credibility determinations and the weighing of evidence-which is the jury's function.

*Id.* at 1563 (Johnson, J., concurring). As Judge Johnson pointed out, 53 F.3d at 1561-62, the majority's reasoning was not consistent with the teaching of *Hicks,* or with our decisions in *Howard* and *\*1532 Batey.* Judge Johnson agreed with the result in *Walker* only because, in his view, the evidence was not sufficient to permit a factfinder to reject the employer's proffered reasons for its action. *Id.* at 1564-65.

[20] As we have recognized before, "no one is perfect, least of all federal appellate judges, and from our mistakes and oversights spring inconsistent decisions which we must deal with as best we can." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). The *Walker* decision is a mistake. Not only is *Walker* inconsistent with the Supreme Court's clear instruction in *Hicks,* but it is also inconsistent with the holdings of our *Hairston, Batey, Howard,* and *Cooper-Houston* decisions. Where there are inconsistent panel decisions, "the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc." *United States v. Dailey,* 24 F.3d 1323, 1327 (11th Cir.1994) (quoting *Clark v. Housing Auth. of Alma,* 971 F.2d 723, 726 n. 4 (11th Cir.1992)). Our next decision on the issue at hand is consistent with that principle, because it followed the law established in the earlier decisions instead of the *Walker* decision.

In *Richardson v. Leeds Police Department,* 71 F.3d 801 (11th Cir.1995), we reversed the district court's entry of judgment as a matter of law in a racial discrimination case, after the close of all the evidence, because the evidence was sufficient to permit a jury to disbelieve the employer's proffered reasons for its adverse employment decision. In reviewing the law applicable to these cases, we cited *Hicks* and explained:

> If the defendant meets this burden [of proffering a nondiscriminatory reason for its decision], the plaintiff must then have the *opportunity to persuade the trier of fact,* through the presentation of his own case and by cross-examining the defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 18
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

ant's witnesses, that the reason proffered was not the real basis for the decision, but a pretext for discrimination.

*Richardson,* 71 F.3d at 806 (emphasis added). Of course, persuading the trier of fact "that the proffered reason was not the real basis for the decision" is pointless unless that trier of fact is then permitted to make the inference, which *Hicks* permits, that the disbelieved reason is "but a pretext for discrimination." Therefore, the fact that "a reasonable jury could ... have concluded that [the employer's proffered explanation] was not the true reason he was not rehired," precluded entry of judgment as a matter of law in *Richardson,* 71 F.3d at 807. That holding, of course, is inconsistent with *Walker,* but is consistent with the binding precedents of *Hicks, Hairston, Batey, Howard,* and *Cooper-Houston.*[FN5]

> FN5. *Trotter v. Board of Trustees,* 91 F.3d 1449 (11th Cir.1996), is not inconsistent with our post-*Hicks* line of precedents properly applying the *Hicks* standard. In *Trotter,* the district court directed a verdict for the defendant at the close of all the evidence. We affirmed, because the defendant had proffered legitimate, nondiscriminatory reasons for its actions, and at the close of all the evidence, those reasons "remain[ed] unrebutted." *Id.* at 1457. In other words, the plaintiffs failed to produce evidence sufficient to allow a reasonable factfinder to disbelieve those reasons.

To summarize, with the exception of *Walker,* which is an anomaly, this circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law. Nevertheless, that well-established rule of law was recently called into question in dicta contained in *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436 (11th Cir.1996).

### 3. *The Isenbergh Dicta*

In *Isenbergh,* a former employee brought an Age Discrimination in Employment Act lawsuit against his former employer when, following a merger, the employee was not awarded a new managerial position. *Id.* at 438. The district court granted summary judgment for the employer, and a panel of this Court affirmed. In its opinion, the *Isenbergh* panel criticized the interpretation of *Hicks* established by our *Howard* decision and questioned whether it represents a "correct statement of the law." *Isenbergh,* 97 F.3d at 443. Noting that the *Walker* decision is out of line with the reasoning of *1533 Howard,* the panel said that "[s]ome confusion exists in the law of this circuit about whether *Hicks* always precludes judgments as a matter of law for employers whenever there is a plausible basis on which to disbelieve the employer's proffered reason for the decision in question." *Isenbergh,* 97 F.3d at 442. The panel concluded its critique of *Howard* by noting its "fear that what *Howard* says about sufficient evidence is a mistake." *Isenbergh,* 97 F.3d at 442.FN6

> FN6. As we have explained in the previous section of this opinion, *Howard* followed and was entirely consistent with the holdings of our earlier decisions in *Hairston* and *Batey.* The *Isenbergh* opinion mentions *Batey,* but not *Hairston.*

Although the *Isenbergh* panel opinion criticized our *Howard* decision's application of the *Hicks* standard, the actual *decision* in *Isenbergh* was in harmony with it. As the panel explained, it affirmed the district court's grant of summary judgment in favor of the employer, because its "examination of the record here indicates that Isenbergh failed in creating an issue of fact about the disbelievability of the employer's reason for the hiring decision." *Isenbergh,* 97 F.3d at 443-44. Therefore, the *Isenbergh* holding, as distinguished from its dicta, is consistent with *Hicks,* and with our post-*Hicks* precedents properly applying the *Hicks* standard. *See, e.g., New Port Largo, Inc. v. Monroe County,* 985

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                              Page 19
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

F.2d 1488, 1500 (11th Cir.) (Edmondson, J., concurring) (emphasizing that "for law-of-the-circuit purposes, a study of [case law] ought to focus far more on the judicial decision than on the judicial opinion"), *cert. denied,* 510 U.S. 964, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993). Nevertheless, the ideas and critiques advanced by *Isenbergh* 's dicta are worthy of some discussion.[FN7]

> FN7. In Part IV.D, *infra,* we conclude that in this case the evidence was insufficient to create a genuine issue of material fact as to one of Meadowcraft's proffered reasons for not promoting Combs. We realize, of course, that that holding makes our response to *Isenbergh* 's dicta itself dicta. Instead of defending our use of dicta with the cliché about it sometimes being necessary to fight fire with fire, we will rely on our recent acknowledgment that "[d]icta can sometimes be useful when it contains a persuasive analysis." *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1077 (11th Cir.1996). We leave it to the reader to determine whether that condition is met in this instance.

> The concurring opinion in this case states that "[t]he legal principles that control this dispute are familiar and do not require extended explication." It then goes on to list as one of these "familiar" principles the proposition that under the *McDonnell Douglas* framework, the plaintiff may shoulder the burden of convincing the factfinder that a discriminatory reason motivated the employment action "either directly by persuading the factfinder that a discriminatory reason motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." That principle was not so familiar to the *Isenbergh* panel, which went to some length to state its views to the contrary.

> We make no apologies for attempting to clarify this area of the law, or at least to illuminate the difference of opinion which exists among some members of this Court concerning it. Unless and until the issue is presented in a dispositive fashion by the facts of some future case, which will provide an opportunity for the en banc court to settle the matter, that is all we can do.

First, we believe that a chronological review of our post-*Hicks* case law, *see supra* Part IV.C.2, ought to dispel any "confusion [that] exists in the law of this circuit about whether *Hicks* always precludes judgments as a matter of law for employers whenever there is a plausible basis on which to disbelieve the employer's proffered reason for the decision in question." *Isenbergh,* 97 F.3d at 442.

[21] Second, we hope that the *Isenbergh* opinion will not be read to call into question the binding authority of our *Howard, Hairston,* and *Batey* precedents. While recognizing the "ostensible conflict" FN8 between *Howard* and *Walker,* the *Isenbergh* opinion states **\*1534** that "[w]e suspect ... that [*Walker v.*]*NationsBank,* not *Howard,* is the more correct statement of the law." *Isenbergh,* 97 F.3d at 443; *see also id.* at 444 ("even if *Howard* is and ought to be the law"). Of course, once a panel of this Court has decided the issue, questions about whether a different view of the matter might be "more correct" are rendered academic insofar as subsequent panels are concerned. Stated somewhat differently, unless and until an issue is addressed by the en banc Court, the Supreme Court, or Congress, the first panel decision on it is, by definition, "more correct" than any subsequent panel decisions. That is what our prior precedent rule, upon which much of the rule of law in this circuit depends, is all about.

> FN8. In a footnote, the *Isenbergh* opinion refers to "the possibility" that the "*ostensible conflict*" between *Walker* and *Howard* might be reconciled on the grounds that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 20
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

*Howard* is a Rule 56 (summary judgment) case, whereas *Walker* is a Rule 50 (judgment as a matter of law) case. *Isenbergh,* 97 F.3d at 443 n. 4. We are unpersuaded by that suggested distinction. Rule 56 and Rule 50 are both concerned with judgment as a matter of law–either before the trial begins or after. *Compare*Fed.R.Civ.P. 56*with*Fed.R.Civ.P. 50. As the Supreme Court has instructed us, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). *Isenbergh* 's suggested reconciliation of *Walker* and *Howard* would set up differing substantive liability standards for judgment as a matter of law in discrimination cases, depending entirely upon the timing of the related motion. We know of no authority for making such a change in the law, and we believe *Anderson* squarely prohibits it.

> The reality of the situation is that *Walker* is irreconcilably out of step with this circuit's precedents. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 n. 4 (11th Cir.1996) (acknowledging that "an apparent conflict exists within this circuit on the issue").

[22] Because the *Walker* decision was preceded by a number of earlier Eleventh Circuit decisions holding that a jury question is created when a prima facie case is coupled with evidence sufficient to permit a reasonable factfinder to disbelieve an employer's proffered reasons for the challenged action, those earlier decisions remain binding on this Court, and all panels of it. They, and not *Walker* or *Isenbergh,* state what has been and will be the law of this circuit unless and until the en banc Court,

the Supreme Court, or Congress changes it. *See, e.g., United States v. Dailey,* 24 F.3d 1323, 1327 (11th Cir.1994); *Clark v. Housing Auth. of Alma,* 971 F.2d 723, 726 n. 4 (11th Cir.1992).

Finally, the *Isenbergh* opinion sets up a *reductio ad absurdum* that bears further examination:

> Assume the following situation by way of example. A defendant sues, alleging he was terminated based on his membership in a protected class. The employer responds with a neutral reason for the hiring decision: the employee was terminated because he was late nine times. After a bench trial, the judge finds, among other facts, that the defendant was late not nine, but seven times. Relying on *Hicks,* however, the judge determines that this case is one where the employer's reason should be disbelieved, but where application of discrimination law to the instant facts (including disbelievability) nonetheless supports a judgment for the employer. This result is the one specifically authorized by *Hicks. See* 509 U.S. at 508-11, 113 S.Ct. at 2748-49.

> The issue in *Howard* and *[Walker v.] Nations-Bank* and the issue alluded to in the original panel opinion here is essentially this one: might there be a case where the application of law to facts can proceed in a similar way, but at the summary judgment stage or for the purposes of judgment as a matter of law? To continue with the prior example, suppose the employer offers the nine-latenesses explanation, and the record in a jury trial shows that no reasonable jury could find but that the plaintiff was late only seven times. Assuming the employee made out a bare prima facie case and nothing else points to discrimination, may the employer-at least, sometimes-be entitled to a judgment as a matter of law even though the jury could (indeed, must) disbelieve the employer's stated reason? The *Howard* panel, reading *Hicks,* seems to say "no."

> We suspect, however, that the answer is "yes"....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                              Page 21
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

*Isenbergh,* 97 F.3d at 442-43.

The real answer is that in the *Isenbergh* opinion's hypothetical, the nondiscriminatory reason proffered by the employer for its actions is excessive *lateness,* not that the employee was late exactly a specific number of times, no more and no less. In the hypothetical, there is a conflict only between the precise number of times the employer said the employee was late, and the actual number of times the employee was late. But there is no conflict about the employee's being late an excessive number of times. **\*1535** The issue upon which judgment as a matter of law turns is whether the employer's proffered nondiscriminatory reason for its action, excessive lateness, may reasonably be disbelieved, not whether the employee was late nine times as opposed to seven.[FN9]

> FN9. By treating the employer's proffered nondiscriminatory reason as a specific number of "latenesses," instead of excessive lateness, the hypothetical also makes the same sort of analytical error that the Supreme Court identified and addressed in *Hicks* itself:
>
> These statements imply that the employer's "proffered explanation," his "stated reasons," his "articulated reasons," somehow exist apart from the record-in some pleading, or perhaps in some formal, nontestimonial statement made on behalf of the defendant to the factfinder. ("Your honor, pursuant to *McDonnell Douglas* the defendant hereby formally asserts, as its reason for the dismissal at issue here, incompetence of the employee.") Of course it does not work like that. The reasons the defendant sets forth are set forth "through the introduction of admissible evidence." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094.
>
> *Hicks,* 509 U.S. at 522-23, 113 S.Ct. at 2755 (emphasis omitted).

Because the employer is required to proffer its explanation not by a mere assertion, but by the introduction of admissible evidence, the hypothetical's assumption that the employer somehow "offers the nine-latenesses explanation" when the overwhelming weight of the evidence is that the employee was late only seven times, is unrealistic. As the Supreme Court said in *Hicks,* "[I]t does not work like that." *Id.* at 523, 113 S.Ct. at 2755.

In the hypothetical set up in the *Isenbergh* opinion, there is no evidence to discredit the employer's explanation that the defendant was fired for excessive lateness; the defendant's reason for its action remains unrebutted. So, the employer would be entitled to judgment as a matter of law under *Hicks,* 509 U.S. at 515-18, 113 S.Ct. at 2751-53 (discussing plaintiff's burden of discrediting the defendant's explanations), and under all of our prior decisions, including *Hairston, Batey,* and *Howard.*

### 4. The Post-Hicks Case Law in Other Circuits

Eight other circuits have considered the issue and interpreted *Hicks* to mean exactly what we have interpreted it to mean-that evidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, is sufficient to support (but not require) a finding of discrimination. That is the law not only in this circuit, but also in the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and District of Columbia Circuits. *See, e.g., EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994) ("A finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); *Sheridan v. E.I. DuPont De Nemours & Co.,* 100 F.3d 1061, 1066-67 (3d Cir.1996) (en banc) ("[T]he elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                    Page 22
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination."); [FN10] *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (considering two questions at summary judgment: (1) the prima facie case and (2) "whether [the plaintiff] has shown that there is a genuine dispute of material fact about [the defendant's] proffered explanation for the discharge"); *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir.1994) ("[T]he only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination based upon the plaintiff's prima facie case from a mandatory one which the jury *must* draw, to a permissive one the jury *may* draw, *provided* that the jury finds the employer's explanation 'unworthy' of belief.") (emphasis in original); *Perdomo v. Browner,* 67 F.3d 140, 146 (7th Cir.1995) ("The district court found Perdomo's [direct] evidence of racial discrimination unpersuasive, but ... such evidence is not required: the trier of fact is permitted to infer discrimination from a finding that the employer's proffered reason was spurious."); *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1110 (8th Cir.) ("The elements of *1536 the plaintiff's prima facie case are thus present and the evidence is sufficient to allow a reasonable jury to reject the defendant's non-discriminatory explanations. The 'ultimate question' of discrimination must therefore be left to the trier of fact to decide."), *cert. denied,* 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ("If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed."); *Barbour v. Merrill,* 48 F.3d 1270, 1277 (D.C.Cir.1995) ( "According to *Hicks,* a plaintiff need only establish a prima facie case and introduce evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the factfinder, if so persuaded, may infer discrimination.").

FN10. The Third Circuit's en banc opinion in *Sheridan* is a particularly illuminating and thorough study of the issue, especially its discussion of the justification for the interpretation of *Hicks* that has been adopted by a majority of the circuits. *See* 100 F.3d at 1068-72.

Of course, the holdings of other federal courts of appeals on the issue do not determine the law of this circuit. However, in considering whether the rule established in our precedents "ought to be the law," it is of no small moment that eight of the ten other circuits that have considered the question are in agreement with our interpretation of *Hicks.* Thus far, only the First and Fifth Circuits have issued opinions expressing a contrary view, and in neither opinion was that expression actually a holding.

In *Woods v. Friction Materials, Inc.,* 30 F.3d 255 (1st Cir.1994), the First Circuit *stated* that proof of pretext will not always shield a plaintiff from summary judgment, *id.* at 260 n. 3, but *held* only that the defendant in that case was entitled to summary judgment because the plaintiff had presented "no evidence ... to rebut [the defendant's] assertion that those hired were more qualified," *id.* at 262. Of course, that holding-as distinguished from the dicta-is entirely consistent with the law of our circuit and the eight other circuits we have cited.

In *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (5th Cir.1996) (en banc), the Fifth Circuit affirmed judgment in favor of an employee in an age discrimination case, holding that the evidence was sufficient to allow a rational jury to find that age discrimination was the true reason the employer discharged the employee. That holding itself is no problem, but the *Rhodes* opinion also contains dicta regarding the *Hicks* rule that is arguably inconsistent with the law of this circuit and eight others. Although the *Rhodes* opinion states that under *Hicks,* "evidence of pretext will permit a trier of fact to infer that the discrimination was intentional," *id.* at 993, it also states that "[i]t is unclear ... whether the [Supreme] Court intended that in all such cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                     Page 23
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

in which an inference of discrimination is permitted a verdict of discrimination is necessarily supported by sufficient evidence,"*id.* Additionally, the opinion states, "[w]e are convinced that ordinarily such verdicts would be supported by sufficient evidence, but not always." *Id.*

The fact remains that the contrary dicta in the First and Fifth Circuit decisions are just that: dicta. We have not found any holding of any circuit inconsistent with the holding of our *Hairston, Batey, Howard, Cooper-Houston* line of decisions, and at least eight other circuits have reached the same holding.

### 5. The Hicks Standard is not a "Dramatic and Hurtful-to-Employers Change in the Law"

We close out our discussion of the *Isenbergh* dicta by answering its charge that the *Howard* line of decisions represents a "dramatic and hurtful-to-employers change in the law" that the Supreme Court did not intend or command in the *Hicks* decision, *see Isenbergh*, 97 F.3d at 443. Not only does *Hicks* command the rule recognized in our *Howard* line of decisions, but that rule is a rational, common-sense consequence of the unique evidentiary framework that has been in place for over twenty years-ever since the Supreme Court decided *McDonnell Douglas.*

[23] Under the *McDonnell Douglas* framework, if a plaintiff establishes a prima facie case, and the defendant employer proffers no nondiscriminatory reasons for the action, it is settled that the plaintiff wins judgment as a matter of law. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093-94. Hopefully, no one would suggest that in such a case the *defendant* might be entitled to a judgment as **\*1537** a matter of law. Yet, those who argue against the *Howard* line of decisions are advocating a position that is not much more logically defensible than that. Given the establishment of a prima facie case in each, the case in which an employer puts forward nothing but false reasons is too analytically close to the case in

which the employer puts forward no reasons for the law to permit judgment as a matter of law to be entered for opposite sides in the two cases. Stated somewhat differently, why should the law reward so handsomely mendacity in legal proceedings?

The upshot of *Hicks* and the *Howard* line of decisions is that a defendant cannot win judgment as a matter of law merely by proffering nothing but false nondiscriminatory reasons for its actions. The justification for that rule is closely analogous to the justification for the mandatory presumption of discrimination that initially accompanies a plaintiff's prima facie case. As then-Justice (now Chief Justice) Rehnquist pointed out long before the *Hicks* decision, we require a defendant, on pain of losing the case, to come forward with explanations for its actions once a plaintiff has made out a prima facie case of discrimination, "because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978). Justice Rehnquist further explained:

> [W]e are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

*Id.*

As the Third Circuit, sitting en banc, recently observed, "The distinct method of proof in employment discrimination cases, relying on presumptions and shifting burdens of articulation and production, arose out of the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire." *Sheridan*

106 F.3d 1519                                                                                    Page 24
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

*v. E.I. DuPont De Nemours & Co.,* 100 F.3d 1061, 1071 (3d Cir.1996) (en banc). Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Because of those realities, plaintiffs are often obliged to build their cases entirely around circumstantial evidence. The unique proof problems that accompany discrimination cases are the genesis of the unique solutions that the Supreme Court has devised for those cases in *McDonnell Douglas* and its progeny. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 1801-02, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.").

A defendant who puts forward only reasons that are subject to reasonable disbelief in light of the evidence faces having its true motive determined by a jury. But we fail to see how that result is particularly "hurtful-to-employers," as *Isenbergh* suggests, 97 F.3d at 443. The Third Circuit recently explained:

> We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful discrimination. If the employer fails to come forth with the true and credible explanation and instead keeps a hidden agenda, it does so at its own peril. Under those circumstances, there is no policy to be served by refusing to permit the jury to infer that the real motivation is the one that the plaintiff has charged.

*Sheridan,* 100 F.3d at 1069.

[24][25] Of course, the law is that the jury is not *re-quired* to make the inference of *\*1538* discrimination that *Hicks* permits upon rejection of the employer's proffered nondiscriminatory reasons. "That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct. That remains a question for the factfinder to answer...." *Hicks,* 509 U.S. at 524, 113 S.Ct. at 2756. In answering that question, the jury must perform its traditional duties of assessing the credibility of witnesses through observation of trial testimony and of weighing the evidence-tasks peculiarly within the province of the jury. E.g., *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir.1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact."). In performing those traditional duties, the jury must measure the strength of the permissible inference of discrimination that can be drawn from the plaintiff's prima facie case along with the evidence that discredits the employer's proffered explanations for its decision. Even if the jury concludes that all the employer's proffered explanations are unworthy of belief, it may still remain unpersuaded that discrimination was the real reason for the employer's decision. That decision is entrusted to the jury's discretion, but to exercise that discretion, the jury has to get the case.

[26][27] When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct,"*Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan,* 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker,* 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

### D. Application of the Legal Standard to the Evidence in this Case

[28] Having reviewed the legal principles that govern this case, we now proceed to apply those principles to the evidence adduced at trial. In doing so, we consider the entire record in the light most favorable to Combs, for the limited purpose of ascertaining whether there was sufficient evidence for Combs to withstand Meadowcraft's motions for judgment as a matter of law. Our task, like that of the district court, is a highly focused one. We must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994).

[29][30][31] As previously noted, Meadowcraft proffered evidence in support of three legitimate, nondiscriminatory reasons for its decision to promote Walker, instead of Combs, to the position of welding supervisor. Those reasons were: (1) Walker's superior welding experience; (2) the recommendations of supervisors Lane and Anderson; and (3) Walker's superior supervisory experience. By meeting its burden of producing legitimate reasons

for its decision, Meadowcraft successfully eliminated the presumption of discrimination that initially accompanied *1539 Combs' prima facie case.[FN11] Provided that the record evidence would permit a reasonable factfinder to reject each of Meadowcraft's proffered explanations for its decision, the case properly was submitted to the jury for a decision on the ultimate question of intentional discrimination. We now consider the evidence related to each of the three proffered nondiscriminatory reasons for Meadowcraft's decision to promote Walker instead of Combs.

> FN11. To establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted. *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). Although Meadowcraft contends that we should revisit whether Combs successfully established a prima facie case of discrimination, the Supreme Court has instructed otherwise:

> [W]hen the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide whether the rejection was discriminatory within the meaning of Title VII.

> *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714-15, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (footnote omitted). "When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally dis-

criminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case 'is no longer relevant.' " *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 806 (11th Cir.1995) (quoting *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482); *see also Wall v. Trust Co.,* 946 F.2d 805, 809-10 (11th Cir.1991) (same).

Because Meadowcraft failed to persuade the district court to dismiss Combs' lawsuit for lack of a prima facie case, and responded to Combs' proof by offering evidence to explain why Combs was rejected in favor of Walker, the factfinder was then required to "decide whether the rejection was discriminatory within the meaning of Title VII."*Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481. Of course, the factfinder could conclude that the decision was discriminatory only if it permissibly could disbelieve Meadowcraft's proffered nondiscriminatory reasons for its decision. Therefore, on appeal-as on Meadowcraft's motion for judgment as a matter of law-the question of whether Combs "properly made out a prima facie case 'is no longer relevant,' "*Richardson,* 71 F.3d at 806 (11th Cir.1995) (quoting *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482). While we consider the *evidence* submitted by Combs in connection with his prima facie case in evaluating whether a reasonable jury could disbelieve Meadowcraft's proffered nondiscriminatory reasons for its actions, we do not revisit the existence of the prima facie case itself.

### 1. Welding Experience

[32] The parties agree that Walker had welding experience and that Combs did not. Combs concedes that "some difference in the two existed" with respect to welding experience, which we take to mean

that Walker was more qualified as a welder than Combs. Nonetheless, Combs contends that the jury reasonably could have concluded that Walker's welding experience did not actually motivate Meadowcraft's promotional decision, because Walker was transferred to the packing department-where welding experience is irrelevant-almost immediately after his promotion.

Viewing the record evidence in the light most favorable to Combs, we agree that a reasonable jury could have concluded that Meadowcraft's promotional decision was not actually motivated by Walker's concededly superior welding experience. At trial, John Hart, supervisor of the Wadley plant, testified: "Fred was packing supervisor when I hired him. He wasn't in the weld area, he was a packing supervisor." Although Meadowcraft contends that Walker's stint in the packing department lasted only a short time, that contention is undermined by the record. George Anderson, one of the welding department supervisors, testified about the duration of Walker's packing assignment as follows: "Fred made a good supervisor. When he was first hired, I think he spent a couple of weeks in welding, then he was moved to packing for a year or so. Now he's back over there with the men in the welding, and he's doing an outstanding job."

When viewed in the light most favorable to Combs, the foregoing evidence would permit a reasonable juror to conclude that Walker was hired to work as a *packing* supervisor and that he spent at least a year in that position before being transferred to the welding department. Because *welding* experience is not relevant to supervisory work in *1540 the packing department, a reasonable juror would be permitted to conclude that Walker's superior welding experience was not a factor that actually motivated Meadowcraft's decision to promote Walker instead of Combs.

### 2. Supervisory Recommendations

[33] Meadowcraft contends that its decision to pro-

106 F.3d 1519                                                                                    Page 27
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

mote Walker instead of Combs was based on the recommendations of welding department supervisors George Anderson and Edward Lane, both of whom are black. According to Meadowcraft, those supervisory recommendations favored Walker, because Walker was endorsed by both supervisors, whereas Combs was endorsed only by Lane. That view of the circumstances is supported by the testimony of Plant Supervisor Hart. At trial, Hart testified: "George and Edward both recommended Fred Walker for the job. They were more familiar with Fred Walker than I was. I had never spoken to Fred Walker until I interviewed him." Hart further testified that "[a]fter George and Edward came to me and recommended him, I did pull his resume." Additionally, Hart testified that neither Anderson nor Lane ever recommended that Combs be promoted to supervisor.

Meadowcraft's view of the evidence is also supported by Anderson's testimony. At trial, the following exchange took place on direct examination of Anderson:

> Q. Did you have anything to do with Mr. Walker's promotion to supervisor?
>
> A. Well, one day Fred come up to the office and talked with me and Mr. Lane about do they think we have any chance of progressing himself in the plant. He told him to send out a resume. He did, and I sort of recommended him to John [Hart] that, you know, I have nothing to do with the hiring, but I did recommend Fred to be a supervisor.
>
> Q. Why did you do that?
>
> A. Well, I worked with Fred down there on the floor. He came in and he got into welding, and I already knew that he had used to be a principal, and I knew he worked with people. At that time we was needing supervisors. We was going to start up a second shift and we'd have to get some supervisors, and I hadn't thought about him until he came and talked with us that day. I figured he'd be a good candidate.

> Q. And you communicated that to Mr. Hart?
>
> A. Yes.
>
> Q. Did you ever recommend Darrell Combs to be supervisor?
>
> A. No, I didn't.

Although Hart's and Anderson's testimony supports Meadowcraft's proffered nondiscriminatory explanation for promoting Walker instead of Combs, Edward Lane's testimony paints a different picture of the supervisory assessments of Walker and Combs. According to Lane's testimony on direct examination, he recommended Combs for the supervisor position, and Anderson agreed with Lane's evaluation of Combs' qualifications for the position:

> Q. Now, were you there when Mr. Combs sought a position in the office?
>
> A. Yes, ma'am, I was.
>
> Q. And tell the ladies and gentlemen of the jury what you know about that.
>
> A. At the time it was for other positions, supervision positions were open. The man that I was working for by the name of Mr. John Hart, knew of such a position, and we made a recommendation for him to be a supervisor.
>
> Q. You made a recommendation for who to be a supervisor?
>
> A. This gentleman in the courtroom by the name of Darrell Combs.
>
> Q. To whom did you make that recommendation?
>
> A. To Mr. John Hart.
>
> Q. Now, at the time you made that recommendation, was there any other individuals discussed?
>
> A. Yes, ma'am, there was. A gentleman by the name of Mr. Fred Walker.

106 F.3d 1519                                                                                                Page 28
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

Q. Now, when you made this recommendation about Mr. Combs, it was being *1541 of supervisory material, is that correct?

A. Yes, ma'am, I did.

Q. Who else was-Was it at a meeting you made that recommendation?

A. Yes, ma'am.

Q. Who else was at that meeting?

A. Mr. George Anderson.

Q. Did Mr. Anderson go along with your assessment that Mr. Combs was qualified to be a supervisor?

A. Yes, he did.

Q. Did he express that to Mr. Hart?

A. Yes, ma'am, he did.

In addition to testifying that both he and Anderson supported Combs for the supervisory position, Lane repeatedly denied recommending Walker for the job:

Q. Did you recommend Fred Walker be promoted to supervisor, and did you make that recommendation to John Hart?

A. No, sir, I made the recommendation for Darrell Combs.

....

Q. All I want you to tell me, I don't mean to cut you off again, but I want you to tell me what you said.

A. I'm telling you direct as to what I directed to the gentleman right there, Darrell Combs. That's the recommendation I made to be supervisor.

Q. I got that. You recommended Darrell Combs.

A. Yes, sir.

Q. Did you, or did you not, recommend Fred Walker?

A. No, sir, I did not.

Q. You did not?

A. No, sir.

When confronted with his deposition testimony, however, Lane admitted that he told Hart that Walker would make a good supervisor, but indicated that he was pressured to do so:

Q. So you did tell John Hart that Fred Walker would make a good supervisor.

A. Yes, sir, I had to.

Q. All right. Tell us about that.

A. The reason I had to, sir, was we was in a meeting. ... And John was the manager. If I would have said yes or no, still John was going to pick who he wanted.

Q. I'm not trying to get at what Mr. Hart was going to do with your recommendation, I'm trying to get at what your recommendation was.

A. Yes, sir. We all agreed.

To summarize, the evidence is in conflict about the communications that Anderson and Lane made to Hart about the relative merits of Walker and Combs for the supervisory position. It is undisputed that Anderson recommended Walker, but there is conflicting testimony about whether he also endorsed Combs. Similarly, Lane's testimony clearly indicates that he recommended Combs, but there is conflicting testimony about whether he also endorsed Walker, or merely begrudgingly agreed at a meeting with Hart and Anderson that Walker would be a good supervisor. Viewing the evidence in the light most favorable to Combs, a reasonable jury could conclude that the supervisory recommendations of Anderson and Lane did not clearly point to Walker

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                    Page 29
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
(Cite as: 106 F.3d 1519)

or Combs as the preferable candidate and that, therefore, those supervisory recommendations did not actually motivate Meadowcraft's decision to promote Walker instead of Combs.

### 3. Supervisory Experience

[34] Meadowcraft's third proffered nondiscriminatory reason for promoting Walker instead of Combs is that Walker had better experience as a supervisor, both in quality and quantity. On that point, it is undisputed that prior to joining the workforce at Meadowcraft, Walker worked for over twenty years as a school administrator and had supervised others throughout most of his career. Walker's testimony about his supervisory experience, which is entirely undisputed, is as follows:

Q. [Y]ou say, you became principal with Woodland High School in 1974?

A. About January of 1974, immediately after New Year's.

*1542 Q. And did you supervise people?

A. Yes, sir.

Q. How many people would you say you supervised?

A. Approximately forty-seven or forty-eight teachers, thirty-five to thirty-six bus drivers, thirteen or fourteen lunchroom personnel, and custodian type workers. Probably around a hundred or more people.

....

Q. All right. How long were you principal at Woodland?

A. Seven years.

Q. And then what did you do?

A. I received a promotion to the superintendent's

office at the county courthouse, and I joined the superintendent's staff as supervisor of instruction.

....

Q. How many schools did you all have jurisdiction over?

A. We had four high schools, two middle schools and one junior high school at that time. Also a share of the vocational trade school.

....

Q. All right. How long were you supervisor of instruction?

A. Six years.

....

Q. So after the superintendent's office, you went to Rock Mill?

A. Yes, sir.

Q. And Rock Mill is a-what type of school is that?

A. It's a K through 8 junior high school.

Q. All right. How many students were there?

A. Approximately at that time 350 students.

Q. And you had responsibility for those students?

A. Yes, sir.

Q. How many teachers were there?

A. At that time probably sixteen or seventeen on staff.

Q. Did you supervise any other workers?

A. My custodial workers, my lunchroom workers and my bus drivers.

Q. Okay. And you were principal of Rock Mill

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519                                                                                        Page 30
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

beginning in '86 until what year?

A. 1991.

By contrast, Combs' testimony at trial established that his own supervisory experience was extremely limited:

Q. Now, you had never really had any power to discipline, or counsel, or fire anybody while you were out there [in the scanning department], had you?

A. On that job?

Q. Yes, sir.

A. No, sir.

Q. While you were at the company at all?

A. No, sir.

Q. And you never really supervised anyone, other than showing the people how to use the scanning guns for over those two or three weeks?

A. Right.

Q. Let's look at your work experience, if we can. Prior to the company, okay, you had been a grocery store bagger?

A. Yes, sir.

Q. You had been a resident manager at an apt [apartment] complex, right?

A. Yes, sir.

Q. Had you supervised anybody there?

A. Supervise? Well, I used to have little teenagers working for me when I was doing some of my maintenance duties, but as far as-like as far as like company people, no.

....

Q. So at the point of 1992 when you're working for Mr. Hart on this assignment he had for you, you hadn't really ever supervised anybody except those teenagers you told me about, is that right?

A. That's right.

Thus, the evidence was undisputed that Walker had substantial supervisory experience, while Combs had virtually none. Nonetheless, Combs contends that he put on sufficient evidence to permit a reasonable *1543 jury to disbelieve that Meadowcraft's decision to promote Walker was motivated by Walker's supervisory experience. Combs points to the fact that, prior to joining Meadowcraft, Walker was forced to resign his position as principal of Rock Mills Junior High School after acknowledging that he had misused approximately $5,000 of school funds. Combs' theory seems to be that Walker's substantial supervisory experience is sufficiently undermined by the circumstances surrounding his resignation as principal that a reasonable juror could disbelieve Meadowcraft's explanation that it promoted Walker instead of Combs because Walker had more and better supervisory experience. We disagree.

Financial impropriety is a serious matter, but there is no evidence in the record that either Walker or Combs were considered for a position that involved the custody or management of company funds. Walker and Combs were contenders for a position that involved managing people, not money. If Meadowcraft had contended that it promoted Walker instead of Combs because it believed Walker would be a more trustworthy financial manager, the evidence of Walker's misuse of funds clearly would have been sufficient to permit a reasonable jury to disbelieve Meadowcraft's proffered explanation. However, Meadowcraft never proffered that as a reason. Instead, Meadowcraft proffered evidence that the reason it promoted Walker was that he had years of extensive supervisory experience that Combs did not.

In relying on Walker's financial improprieties to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undermine Meadowcraft's explanation that it based its promotion decision on Walker's superior supervisory experience, Combs confuses *disagreement* about the wisdom of an employer's reason with *disbelief* about the existence of that reason and its application in the circumstances. Reasonable people may *disagree* about whether persons involved in past financial improprieties should be made supervisors, but such potential disagreement does not, without more, create a basis to *disbelieve* an employer's explanation that it in fact based its decision on prior non-financial supervisory experience. Meadowcraft's decision to promote Walker instead of Combs may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

To summarize, Combs failed to produce evidence sufficient to permit a reasonable factfinder to disbelieve Meadowcraft's proffered nondiscriminatory explanation that it promoted Walker instead of Combs because Walker had superior supervisory experience. Because of that failure, the district court should not have permitted the case to go to the jury. Meadowcraft was entitled to judgment as a matter of law.

## V. CONCLUSION

[35] A plaintiff in a discrimination case based on circumstantial evidence can avoid judgment as a matter of law by putting on a prima facie case and by producing evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions. In this case, however, Combs failed to produce evidence sufficient to permit a reasonable juror to reject as spurious Meadowcraft's explanation that it promoted Walker instead of Combs to supervisor

because Walker had superior supervisory experience.

Therefore, we REVERSE the entry of judgment in favor of Combs, and we REMAND the case for entry of judgment in favor of Meadowcraft.

BLACK, Circuit Judge, specially concurring:

Although I agree with the majority opinion, I would confine the discussion to those legal concepts directly implicated by the instant facts. The legal principles that control this dispute are familiar and do not require extended explication. Under the *McDonnell Douglas* framework, a presumption of discrimination arises if a Title VII plaintiff succeeds in establishing a prima facie case. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The defendant may **\*1544** rebut the presumption by articulating a legitimate, nondiscriminatory reason for the challenged employment decision. *Id.* at 254-55, 101 S.Ct. at 1094-95. At that point, the presumption disappears from the case, leaving the plaintiff with the ultimate burden of convincing the factfinder that a discriminatory reason more likely than not motivated the employment action. *Id.* at 256, 101 S.Ct. at 1095. The plaintiff may shoulder this burden either directly by persuading the factfinder that a discriminatory reason motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id.*

The majority opinion properly applied these fundamental principles when it determined that Combs failed to adduce sufficient evidence to withstand Meadowcraft's motions for judgment as a matter of law. The evidence offered by Combs would not permit a reasonable trier of fact to find either that a discriminatory reason motivated Meadowcraft or that the legitimate, nondiscriminatory reasons proffered were not worthy of belief. Undisputed evidence established that Walker had superior managerial experience, and Combs offered no evidence tending to undermine the veracity of Meadowcraft's claimed reliance on this factor.

C.A.11 (Ala.),1997.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232, 71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly Fed. C 731
**(Cite as: 106 F.3d 1519)**

Combs v. Plantation Patterns
106 F.3d 1519, 73 Fair Empl.Prac.Cas. (BNA) 232,
71 Empl. Prac. Dec. P 44,793, 10 Fla. L. Weekly
Fed. C 731

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

161 F.3d 1318                                                                Page 1
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

▷

Standard v. A.B.E.L. Services, Inc.
C.A.11 (Ga.),1998.

United States Court of Appeals,Eleventh Circuit.
Alan K. STANDARD, Jr., Plaintiff-Appellant,
v.
A.B.E.L. SERVICES, INC., Plaster Concepts, Inc.,
et al., Defendants-Appellees.
**No. 97-9226.**

Dec. 3, 1998.

Caucasian former employee brought action against
his former employer and others, claiming that he
was discriminated against on basis of race, national
origin, age and disability and that he was retaliated
against for exercising his rights under civil rights
statutes. The United States District Court for the
Northern    District    of    Georgia,    No.
1:96-CV-1196-ODE, J. Owen Forrester, J., granted
summary judgment in favor of defendants. Former
employee appealed. The Court of Appeals, Fay,
Senior Circuit Judge, held that: (1) former employ-
ee failed to show that he had disability within
meaning of Americans with Disabilities Act
(ADA); (2) former employee's requests for accom-
modation of his back injury did not constitute pro-
tected activity for purposes of ADA retaliation
claim; (3) alleged statement of management mem-
ber did not show that former employer intended to
discriminate against former employee because of
his age; (4) alleged statements of management
members did not constitute direct evidence of race
or national origin discrimination; (5) former em-
ployee failed to show that former employer's
proffered reason for discharging him was pretext
for race or national origin discrimination; and (6)
former employee failed to show that former em-
ployer's proffered reasons for not considering him
for certain promotion were pretext for race or na-
tional origin discrimination.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟸776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews grants of summary judg-
ment de novo, using the same legal standard as the
district court. Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A.

**[2] Federal Courts 170B ⟸802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
In making assessment as to whether summary judg-
ment is appropriate, Court of Appeals must view
the evidence in the light most favorable to the non-
moving party. Fed.Rules Civ.Proc.Rule 56(c), 28
U.S.C.A

**[3] Civil Rights 78 ⟸1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disab-
ility
                78k1218(3) k. Particular Conditions,
Limitations, and Impairments. Most Cited Cases
    (Formerly 78k173.1)
Former employee failed to show that his back in-
jury substantially limited his major life activity of
working, such that he would have disability within
meaning of ADA, where former employee did not
explicitly argue that his back injury significantly re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                 Page 2
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

stricted his ability to work, and he admitted that he
was fully capable of performing his job at all times
that he was employed by his former employer.
Americans with Disabilities Act of 1990, § 3(2)(A),
42 U.S.C.A. § 12102(2)(A).

**[4] Civil Rights 78 ☞1217**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
            78k1217 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
    (Formerly 78k173.1)
To state a claim for wrongful termination under the
ADA, a plaintiff must first prove that he has a dis-
ability, as defined by the Act. Americans with Dis-
abilities Act of 1990, § 3(2), 42 U.S.C.A. §
12102(2).

**[5] Civil Rights 78 ☞1019(2)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1016 Handicap, Disability, or Illness
            78k1019 Who Is Disabled; What Is Disab-
ility
                78k1019(2) k. Impairments in General;
Major Life Activities. Most Cited Cases
    (Formerly 78k107(1))
Merely proving the existence of a physical impair-
ment, without addressing any limitation on major
life activities, is not sufficient to prove disability
under the ADA. Americans with Disabilities Act of
1990, § 3(2), 42 U.S.C.A. § 12102(2).

**[6] Civil Rights 78 ☞1218(6)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handi-
cap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disab-
ility

                78k1218(6) k. Perceived Disability;
"Regarded As" Claims. Most Cited Cases
    (Formerly 78k173.1)
Alleged statement of administrative staff member at
employee leasing company which had arranged
former employee's employment, that she felt that
former employee was not able to do his job any-
more and that "perhaps" he was not fit for his job
anymore, did not show that former employer re-
garded former employee's back injury as substan-
tially limiting major life activity, such that former
employee would have disability under ADA, given
tentative nature of staff member's statement, her po-
sition relative to former employee's employment
and evidence that all of decisionmakers perceived
former employee as having temporary injury.
Americans with Disabilities Act of 1990, § 3(2)(C),
42 U.S.C.A. § 12102(2)(C).

**[7] Civil Rights 78 ☞1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
To establish a prima facie case of retaliation under
the ADA, employee must show (1) that he engaged
in statutorily protected activity, (2) that he suffered
an adverse employment action, and (3) a causal link
between the protected activity and the adverse ac-
tion. Americans with Disabilities Act of 1990, § 2
et seq., 42 U.S.C.A. § 12101 et seq.

**[8] Civil Rights 78 ☞1242**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1242 k. In General. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
ADA retaliation claims are assessed under the same
framework employed for retaliation claims under
Title VII. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.; Americans with Dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                      Page 3
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

abilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[9] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most
Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
To engage in protected activity for purposes of ADA retaliation claim, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[10] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most
Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
Employee's requests for accommodation of his back injury did not constitute statutorily protected activity, for purposes of ADA retaliation claim, absent showing that he had good faith, objectively reasonable belief that he was disabled under ADA at time he made the requests. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[11] Civil Rights 78 ☞1019(2)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1016 Handicap, Disability, or Illness
            78k1019 Who Is Disabled; What Is Disability
                78k1019(2) k. Impairments in General;
Major Life Activities. Most Cited Cases
    (Formerly 78k107(1))

In determining whether an injury substantially limits a major life activity, so as to constitute disability under ADA, court considers (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(j)(3)(I).

**[12] Civil Rights 78 ☞1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most
Cited Cases
    (Formerly 78k170)
Alleged statement of management member that "older people have more go wrong" did not show that former employer intended to discriminate against former employee because of his age in terminating him as part of reduction-in-force, for purposes of establishing prima facie case under ADEA; statement was devoid of meaningful context and was too vague, and management member who made statement was not involved in decision to terminate former employee. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[13] Civil Rights 78 ☞1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most
Cited Cases
    (Formerly 78k170)
To make out a prima facie case of age discrimination for a reduction-in-force termination, former employee must prove that (1) he was a member of the age group protected by the ADEA at the time of his termination, (2) he was qualified at the time of his termination, and (3) there is evidence from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                    Page 4
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

which a reasonable fact finder could conclude that
the employer intended to discriminate on the basis
of age in making the decision. Age Discrimination
in Employment Act of 1967, § 2 et seq., 29
U.S.C.A. § 621 et seq.

**[14] Civil Rights 78 ⟊1401**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Bur-
dens of Proof
            78k1401 k. In General. Most Cited Cases
    (Formerly 78k240(1))

**Civil Rights 78 ⟊1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1)
Both Title VII and § 1981 have the same require-
ments of proof and use the same analytical frame-
work. 42 U.S.C.A. § 1981; Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 ⟊1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1)

**Civil Rights 78 ⟊1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)

To establish a case under Title VII, a plaintiff may
use three different kinds of evidence of discriminat-
ory intent: direct evidence, circumstantial evidence
or statistical evidence; the analytical framework
and burden of production varies depending on the
method of proof chosen. Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[16] Civil Rights 78 ⟊1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k153)
If a Title VII plaintiff can provide direct evidence
of discriminatory intent, then the employer must
prove by a preponderance of the evidence that the
same employment decision would have been made
in the absence of the discriminatory intent. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[17] Civil Rights 78 ⟊1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most
Cited Cases
    (Formerly 78k242(3))

**Civil Rights 78 ⟊1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Alleged statements of management members that
company's president wanted only Hispanics to be
hired and that one of reasons why Caucasian em-
ployee was not considered for certain promotion
was because he was not Hispanic did not constitute
direct evidence of race or national origin discrimin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                           Page 5
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

ation with regard to employee's termination; such management members did not make decision to terminate employee, and statements referred to hiring practices for department other than employee's. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[18] Civil Rights 78 ⟞1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most
Cited Cases
    (Formerly 78k242(3))

**Civil Rights 78 ⟞1544**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Alleged statement of management member, before Caucasian employee was hired, that company desired to staff its production plant with Hispanic workers did not constitute direct evidence of race or national origin discrimination with regard to employee's termination; any direct link between the statement and discriminatory intent against employee was broken when employee was hired on the management member's recommendation, and employee had not worked in production department. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[19] Civil Rights 78 ⟞1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most
Cited Cases
    (Formerly 78k242(3))
Direct evidence of employment discrimination is

evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption.

**[20] Civil Rights 78 ⟞1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most
Cited Cases
    (Formerly 78k242(3))
Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of employment discrimination.

**[21] Civil Rights 78 ⟞1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
           78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Under *McDonnell Douglas* burden-shifting framework for establishing employment discrimination claims, the plaintiff must first establish a prima facie case of discrimination; the establishment of a prima facie case creates a presumption of discrimination.

**[22] Civil Rights 78 ⟞1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
           78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Under *McDonnell Douglas* burden-shifting framework for establishing employment discrimination claims, once plaintiff establishes prima facie case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                         Page 6
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

of discrimination, the employer must offer legitim-
ate, nondiscriminatory reasons for the employment
action to rebut the presumption of discrimination; if
the employer successfully rebuts the presumption,
the burden shifts back to the plaintiff to discredit
the proffered nondiscriminatory reasons by show-
ing that they are pretextual.

**[23] Civil Rights 78 ☞1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited
Cases
    (Formerly 78k144)
Former employee who was discharged as part of re-
duction-in-force could establish a prima facie case
of discrimination under Title VII by (1) showing
that he was a member of a protected group and was
adversely affected by an employment decision, (2)
proving that he was qualified for his own position
or to assume another position at the time of the dis-
charge, and (3) producing sufficient evidence from
which a rational fact finder could conclude that his
employer intended to discriminate against him in
making the discharge decision. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Civil Rights 78 ☞1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or Na-
tional Origin. Most Cited Cases
    (Formerly 78k144)
Former employer satisfied its burden, with regard
to Caucasian former employee's race and national
origin discrimination claims under Title VII and §
1981, of articulating legitimate, nondiscriminatory
reason for discharging former employee as part of
reduction-in-force; management member who se-
lected former employee for discharge believed that
former employee was less qualified than other three
members of his department and gave detailed reas-
ons for this belief. 42 U.S.C.A. § 1981; Civil Rights

Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[25] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
    (Formerly 78k378)
To satisfy its burden in Title VII case of articulat-
ing legitimate, nondiscriminatory reason for dis-
charging employee, employer need only produce
evidence that could allow a rational fact finder to
conclude that employee's discharge was not made
for a discriminatory reason. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[26] Civil Rights 78 ☞1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or Na-
tional Origin. Most Cited Cases
    (Formerly 78k153)
Caucasian former employee failed to show that his
former employer's proffered reason for discharging
him as part of reduction-in-force, that he was less
qualified than other three members of his depart-
ment, was pretext for race or national origin dis-
crimination in violation of Title VII and § 1981;
former employee admitted that other department
employees either had superior qualities attributed to
them or were perceived as having them by man-
ager. 42 U.S.C.A. § 1981; Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[27] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                    Page 7
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

Cited Cases
  (Formerly 78k153)
Title VII plaintiff may show that employer's proffered reasons for challenged employment decision are pretext (1) by showing that the legitimate nondiscriminatory reasons should not be believed, or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[28] Civil Rights 78 ☞1137**

78 Civil Rights
  78II Employment Practices
    78k1137 k. Motive or Intent; Pretext. Most Cited Cases
      (Formerly 78k153)
To directly attack employer's proffered nondiscriminatory reasons for employment decision, Title VII plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find all of those reasons unworthy of credence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[29] Civil Rights 78 ☞1421**

78 Civil Rights
  78III Federal Remedies in General
    78k1416 Weight and Sufficiency of Evidence
      78k1421 k. Employment Practices. Most Cited Cases
        (Formerly 78k242(3))
Alleged statement of management member that Caucasian employee was not considered for certain promotion in part because he was not Hispanic did not constitute direct evidence of race or national origin discrimination in violation of § 1981, where there was no evidence that the management member was involved in the promotion decision or even talked to responsible management member about the decision. 42 U.S.C.A. § 1981.

**[30] Civil Rights 78 ☞1234**

78 Civil Rights
  78II Employment Practices
    78k1232 Reverse Discrimination
      78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
        (Formerly 78k148)
Caucasian employee established prima facie case under § 1981 of race and national origin discrimination with regard to employer's failure to promote him to certain position; he was in protected group as a Caucasian-American, he suffered adverse employment action when he was not considered for promotion, employer did not dispute that employee was qualified for the job, and person ultimately hired was Hispanic. 42 U.S.C.A. § 1981.

**[31] Civil Rights 78 ☞1135**

78 Civil Rights
  78II Employment Practices
    78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
      (Formerly 78k148)
To establish prima facie case of discriminatory failure to promote, plaintiff in § 1981 case must show that (1) he was in a protected group, (2) he was not given the promotion, (3) he was qualified for the position and (4) someone outside of the protected group was given the position. 42 U.S.C.A. § 1981.

**[32] Civil Rights 78 ☞1234**

78 Civil Rights
  78II Employment Practices
    78k1232 Reverse Discrimination
      78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
        (Formerly 78k153)
Caucasian employee failed to show that his employer's proffered reasons for not considering him for certain promotion, that he was needed in his current position and that he did not have the military background desired for the promotion, were pretext for race or national origin discrimination in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

violation of § 1981. 42 U.S.C.A. § 1981.

**[33] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k153)
To establish pretext in employment discrimination
case, a plaintiff may not in all cases merely rest on
the laurels of her prima facie case in the face of
powerful justification evidence offered by the de-
fendant.

**\*1322** Rose E. Goff, Atlanta, GA, for Plaintiff-
Appellant.
Kurtis A. Powell, Jerry C. Newsome, Atlanta, GA,
for Defendants-Appellees.

Appeal from the United States District Court for the
Northern District of Georgia.

Before BLACK and CARNES, Circuit Judges, and
FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:
Appellant, Allen K. Standard, Jr., a Caucasian
former employee of Plaster Concepts, Inc. ("Plaster
Concepts") through A.B.E.L. Services Inc., brought
an action against twelve defendants, five of whom
were dismissed by the district court. The complaint
alleges employment discrimination under 42 U.S.C.
§ 1981, Title VII, the Age Discrimination in Em-
ployment Act ("ADEA"), the Americans with Dis-
abilities Act ("ADA"), and unlawful retaliation for
the exercise and protection of his civil rights under
the above statutes, based on his race, national ori-
gin, age and disability. Appellees moved for sum-
mary judgement, contending that Standard was not
considered for a promotion and was later termin-
ated for legitimate, nondiscriminatory reasons. The
district court granted summary judgement on all
counts, finding that Standard failed to establish a
prima facie case under the ADA or show that Ap-
pellees' legitimate, nondiscriminatory reasons were

pretextual. Because we conclude **\*1323** that Stand-
ard failed to establish a prima facie case under the
ADA and the ADEA, or produce evidence suffi-
cient for a reasonable jury to find pretext under
Title VII and § 1981, we AFFIRM the district
court's order of summary judgement for defendants
on all counts.

I. BACKGROUND

*A. Facts*

1. Plaster Concepts

Plaster Concepts, Inc. is a business engaged in the
production and sale of decorative architectural
pieces, such as cornices, columns and ceiling pan-
els. These pieces are produced by casting them
from molds. The manufacturing process is per-
formed by two different departments: the tooling
department and the production department. The
tooling department is responsible for crafting the
molds that the production department uses to make
the finished product. The molds can be made from
various materials, such as wood, plaster, bondo,
rubber and steel. The production of these molds re-
quires a far greater level of skill than is required to
cast the finished pieces. Some of the molds are
made from scratch, but others are made by altering
or combining pre-existing molds in a process
known as mold setup.

Plaster Concepts leases most of its employees from
A.B.E.L. Services, Inc. ("A.B.E.L."), an employee
leasing company owned by Barbara Norsworthy,
the wife of Plaster Concepts president, Paul
Norsworthy. Standard was such a leased employee.
Leased employees are interviewed and selected by
Plaster Concepts, while A.B.E.L. is responsible for
handling payroll, tax filings and insurance for the
employees. Plaster Concepts pays A.B.E.L. for the
employees' compensation package, as well as a fee
for providing this service.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                    Page 9
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

In the Spring of 1994, Plaster Concepts moved its production facility from Griffin, Georgia to East Point, bringing the plant closer to Atlanta. This move was motivated by several considerations, including the deterioration of the Griffin plant and the benefits of proximity to Atlanta area customers and suppliers. In moving to East Point, management also hoped to draw from the larger labor pool in the Atlanta area. More specifically, Plaster Concepts wanted to target the Hispanic community and increase the number of Hispanic workers at the plant.

2. Standard is Hired by Plaster Concepts

Prior to the move to East Point, Plaster Concepts purchased most of its molds from outside sources. During this period, only one employee, James Carroll, was engaged in mold-making inside the company. At around the time of the move, in the spring of 1994, Plaster Concepts management decided that it would be more profitable to increase their in-house mold-making capabilities. Appellant Standard was hired as part of this plan. Standard was first interviewed by Harv Mier, and was brought back for a second interview with Don Grubbs and Mark Hicks. During the course of these interviews, Standard alleges that various members of management told him that they intended to staff the production facility with Hispanic workers. Management allegedly believed that Hispanic workers were more likely to work longer hours without complaint than other workers. Furthermore, Standard alleges that the fact that he spoke Spanish was a factor in the decision to hire him, because it would enable him to communicate with future Hispanic hires.

At the time that he was hired, Standard was 49 years old, and had no architectural mold-making experience. He did, however, have sufficient basic skills and wood-working experience that Plaster Concepts management felt he could be trained to become a proficient mold-maker. Standard began working in the tooling department with James Carroll in July of 1994.

3. Work Force Turnover at Plaster Concepts

It is undisputed that, even prior to the move to East Point, Plaster Concepts had a chronic problem retaining employees. Several months before the move, management changed its pay scheme from an hourly rate to a set payment per finished piece produced. After the plant moved to East Point and several days after Standard began working there, most of the workers ended their employment with Plaster Concepts in a dispute *1324 over the price set for production of a specific piece. The parties disagree about whether the terminations were called firings or resignations. All of the evidence shows, however, that after negotiations in which the price was raised the workers refused to work at the final price offered. One of the workers who left at this time was James Caroll, Standard's fellow Caucasian tooling department worker. Caroll was rehired shortly after he left.

This mass exodus of employees brought production to a near standstill, requiring a massive hiring effort. During this effort, Plaster Concepts specifically targeted the Hispanic community. Ads were placed, both in English and in Spanish, in bilingual newspapers. Furthermore, the answering-machine message was changed to include both Spanish and English messages, with only the Spanish message discussing the application process.

4. Plaster Concepts Hires a Production Supervisor

A few months after Standard was hired, Plaster Concepts decided to hire a manager to assist in supervising the production department. Standard alleges that he indicated interest in the position, but was never actively considered for the job. He also admits that he had recently been hired into the tooling department without having architectural mold-making experience, that he was in the process of being trained in mold setup and mold-making, and that it was difficult to find skilled workers suitable for the tooling department. It is also undisputed that management wanted to hire a manager out of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                                Page 10
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

military, with experience supervising and motivating unskilled workers, such as those in the production department. Consequently, the position was advertised in military publications.

Ultimately, Enrique Torres was hired as production supervisor. Torres is a bilingual Hispanic-American citizen, who had recently retired from the Army with twenty years experience as a sergeant. Standard alleges that he was passed up for the supervisor position because of racial and national origin discrimination. His only evidence of this discrimination is his own allegation that Mark Hicks made the statement that Standard was not considered for the position because he "A, was not Hispanic; B, not ex-military; and C, they needed a tool maker, couldn't spare me." Standard concedes that when he initially inquired about the position, Don Grubbs told him that Steve Norsworthy had decided to only consider candidates with a military background. It is also undisputed that Mark Hicks was not involved at any stage of the hiring process for the production supervisor position.

5. Plaster Concepts Further Expands the Tooling Department

During the same period of time that Torres was hired, the fall of 1994, Plaster Concepts decided to further expand the tooling department. Management hired Freddie Kinney, a Caucasian who was only two years younger than Standard. Similar to Standard, Kinney had no architectural mold-making experience, but he had over twenty years experience in metal fabrication. Standard admits that Plaster Concepts hired Kinney, in part, because they planned on using more metal fabrication in the tooling department. Kinney's hire brought the tooling department's staff up to three workers, all of them Caucasian Americans.

In January, 1995, Elias Thiers, a Chilean citizen, applied for a job at Plaster Concepts. In contrast to all of the other tooling department workers, Thiers had nine years of mold-making experience and also

had an impressive portfolio of past work. Thiers was in the United States on a tourist visa, and therefore was ineligible to become an employee. He was so potentially valuable to the tooling department, however, that Plaster Concepts gave him work as an independent contractor while sponsoring him for a work visa. After Thiers was granted a work visa, Plaster Concepts hired him as an employee.

6. Standard's Back Injury

In February, 1995, Standard injured his back while moving a heavy mold. The injury included several herniated discs. Standard had to make several appointments with a doctor and a physical therapist for treatment of this injury. He alleges that the doctor recommended that he schedule his doctor appointments     directly     after     his     therapy appointments.**\*1325** Plaster Concepts requested that Standard schedule his appointments late in the workday in order to minimize the amount of time lost at work. Standard's workday ended at 3:30, and the doctor's office closed at 5:00. Instead of scheduling his appointments for the late afternoon, however, Standard scheduled them for the middle of the day. Because Standard did not make up any of his lost time, the tooling department began to fall behind schedule. At this point, Plaster Concepts called the physical therapist and rescheduled two of Standard's appointments. As was company policy, Plaster Concepts did not pay Standard for the time missed due to doctor's appointments.

At the same time as he was seeking treatment and therapy for his injury, Standard began taking short breaks during the day to do stretching exercises for his back. His supervisor, Don Grubbs, told him that such breaks would be permitted, but that he had to clock out on his time card for them. Standard failed to do so, and was written up for the violation. Standard also requested special assistance with heavy lifting during this time. Standard claims that he was denied this assistance, but admits that management agreed to give it to him and further admits that co-workers gave him help every time he re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                    Page 11
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

quested it.

After July, 1995, Standard stopped his physical therapy. His doctor, after reviewing M.R.I. films, suggested that he could try stopping the treatment and that the problem could alleviate itself. Standard claims that after one month without treatment the pain worsened, but that he could not resume treatment because his insurance company had gone bankrupt and he could not afford to pay the doctor. After this time, Standard did not miss another day as a result of his back injury, and he maintains that he remained capable of performing his work up through the time that he was terminated. He alleges, however, that his condition has worsened since his termination and that he is no longer capable of working.

### 7. Standard's Work Record

Between the time of his injury and the date of his termination, Standard received several write-ups indicating problems with his job performance. Some of the disciplinary write-ups concern problems stemming from mold-making blueprints. Plaster Concepts maintains that Standard was having difficulty reading or understanding the blueprints, while Standard alleges that the blueprints were defective and were used to set him up for disciplinary action. Other write-ups are undisputed, such as one stemming from an incident in which Standard shot Elias Thiers, several times, in the leg with a high-powered staple gun.

### 8. Reduction in Force

Towards the end of 1995, Paul Norsworthy, president of Plaster Concepts, anticipated a drop in business due to the expiration of several large contracts in December. In order to prepare for this drop in business, Norsworthy decided that the number of staff would have to be reduced by four workers in the production department and one worker in the tooling department. The task of choosing the specific workers to be laid off was given to Steve

Norsworthy for the production department and Don Grubbs for the tooling department.

Grubbs testified that he considered the skill sets of each member of the tooling department in order to select the worker whose departure would cause the least drop in productivity. Grubbs felt that James Carroll was the best of the four at making molds with epoxy, rubber and plaster. It is undisputed that Carroll was also engaged in research and development for various new materials and finishes for the architectural pieces, and was the only worker doing so. Freddie Kinney had over twenty years of metal fabrication experience, and was able to do work useful outside of the tooling department, such as welding and forklift operation. Standard admits that Plaster Concepts was increasing its use of metal in mold-making. Kinney was also able to do mold setups and produce basic wooden molds. It is undisputed that Elias Thiers had years of mold-making experience before he began working at Plaster Concepts. Standard admits that Grubbs considered Thiers a better mold-maker than Standard. Grubbs and Steven Norsworthy both testified that Thiers was more skilled in woodworking than Standard. **\*1326** Standard has offered no evidence to refute that testimony.

Standard alleges that he trained Thiers in how to do his job. On closer examination, this alleged training consisted mainly of helping Thiers adjust to the differences between working in Chile and America, such as help with English so that he could understand the blueprints better and helping Thiers' transition from the metric system. Plaster Concepts alleges that Standard refused to learn new mold-making techniques, and this resistance to adaptation made him less useful to the company. It is undisputed that Standard was qualified to be a mold-maker at the time of his termination. Plaster Concepts maintains that he was the least valuable qualified tooling department employee, and was therefore laid off on December 28, 1995.

Shortly before the time of his layoff, Standard alleges that he walked in on a conversation between

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                          Page 12
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

Grubbs and Steve Norsworthy, in which Norsworthy said that "older people have more go wrong." Standard did not hear any of the conversation immediately before or after this statement, and so cannot provide any context for it. He advances this statement as evidence of age discrimination.

### 9. EEOC Complaint

On January 20, 1996, Standard filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging national origin and race discrimination. A.B.E.L. responded by claiming that Standard was dismissed as part of a reduction in force due to lack of work, while more qualified employees were retained. During the course of the EEOC investigation, layoff worksheets were provided, purporting to document the evaluation process that Don Grubbs went through while deciding who from the tooling department to let go. Grubbs produced these documents after the EEOC investigation began, but he back-dated them, listing the date that he claims he originally discussed the evaluations orally with Paul Norsworthy. Ultimately, the EEOC entered a determination of "no cause."

### B. *Procedural History*

On May 14, 1996, after receiving notice of the impending no cause determination, Standard commenced this action in the United States District Court for the Northern District of Georgia. He alleged employment discrimination under 42 U.S.C. § 1981, Title VII, the ADEA, the ADA, and unlawful retaliation for the exercise and protection of Appellant's civil rights under the above statutes, based on his race, national origin, age and disability. The district court granted Appellees' motion for summary judgement, holding that the Title VII and ADEA failure to promote claims were time barred, that Standard failed to satisfy the prima facie case for the ADA, that he failed to present any evidence of retaliatory discharge relating to Title VII or the

ADEA, and that his failure to introduce proof of a disability under the ADA was also fatal to his ADA retaliation claim. On the ADEA and Title VII discharge claims and the § 1981 claim, the court held that once Appellees offered legitimate nondiscriminatory reasons for the employment actions, Standard did not introduce evidence sufficient to allow a rational jury to find the reasons pretextual.

Standard filed notice of appeal on October 27, 1997, and we have jurisdiction pursuant to 28 U.S.C. § 1291. He does not appeal the dismissal of the Title VII and ADEA failure to promote claims or the retaliation claims based on Title VII, § 1981 or the ADEA. We are, therefore, left with the termination claims based on Title VII, § 1981, the ADEA and the ADA, as well as the § 1981 failure to promote claim and the ADA retaliation claim.

## II. STANDARD OF REVIEW

[1][2] We review grants of summary judgement *de novo,* using the same legal standard as the district court. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1374 (11th Cir.1996). Summary judgment is appropriate when the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In making this assessment, we must view the evidence in the light most favorable to the non-moving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992).

## *1327 III. DISCUSSION

### A. *Disability Discrimination and Retaliation*

Standard alleges that he was discriminated against on the basis of his back injury, in violation of the Americans with Disabilities Act. The ADA prohibits discrimination against a qualified individual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                          Page 13
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

with a disability based on that disability when the discrimination involves the hiring, advancement, termination or conditions of employment of that qualified individual. 42 U.S.C. § 12112(a). Under the ADA rubric of discrimination, an employer must make reasonable accommodations that allow a disabled individual to perform her job, unless that accommodation would cause an undue hardship. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 519 (11th Cir.1996); 42 U.S.C. § 12112(b)(5)(A). A disability, for the purposes of the ADA, is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

1. Discriminatory Termination

[3][4][5] In order to state a claim for wrongful termination under the ADA, a plaintiff must first prove that he has a disability, as defined by the Act. *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 910 (11th Cir.1996), *cert. denied,* 522 U.S. 1030, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act. *Id.,* at 911. Standard has failed to argue or present evidence that his back injury substantially limited any of his major life activities under the ADA. Even after the district court ruled that he had failed to produce evidence of disability, Standard neglected to argue the issue in his Appellant's Brief. Finally, in his Reply Brief, Standard points to a statement that he alleges Susan Morgan made about his ability to perform his job after the injury. Although he did not address the legal standard for disability or major life activity, we will assume that he was arguing that the major life activity at issue is working.<sup>FN1</sup>

> FN1. Although the ADA does not explicitly define the term "major life activity," we are guided by EEOC regulations. The

ADA regulations adopt the definition set forth in the Rehabilitation Act regulations. 34 C.F.R. § 104. Major life activities are defined as " functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R § 1630.2(I).

Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job. 29 C.F.R. § 1630.2(j)(3)(i). Instead, the impairment must significantly restrict "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* Standard does not explicitly argue that his back injury significantly restricted his ability to work. In fact, he admits that he was fully capable of performing his job at all times that he was employed by Plaster Concepts. Therefore, he cannot be considered disabled by virtue of § 12102(2)(A) of the ADA.

[6] In his Reply Brief, Standard seems to expand his argument to assert disability under § 12102(2)(C), which applies to individuals who are regarded as being disabled, as defined in the ADA FN2. Under this provision, the impairment must also be perceived to substantially limit a major life activity. This "regarded as" provision is "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." *Gordon,* 100 F.3d at 913.

> FN2. Standard does not cite any provision of the ADA, but merely asserts that he was perceived by defendants to be disabled under the ADA without explaining the legal significance of this allegation. The only way that this fact might be significant is under § 12102(2)(C). The applicable regulations make clear that this provision applies only to an individual who (1) has an impairment that does not substantially lim-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                    Page 14
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
(Cite as: 161 F.3d 1318)

it a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA. 29 C.F.R. § 1630.2($l$ ).

**\*1328** The only evidence Standard points to is his claim that Susan Morgan, an administrative staff member at A.B.E.L., made a statement regarding his ability to perform his job. He claims that when he contacted the A.B.E.L. office about recording mileage driven for medical appointments, Morgan "said that she felt that [he] wasn't able to do [his] job anymore, and ... perhaps [he] wasn't fit for [his] job anymore." Standard does not explain how this proves that his employer regarded him as disabled under the ADA. There is no evidence that Morgan had any authority to make decisions for A.B.E.L., much less Plaster Concepts. It is difficult, therefore, to see how this statement evinces an erroneous or archaic attitude that would disadvantage someone wrongly suspected of being disabled. Indeed, after Morgan made her statement that "perhaps" he was not fit for his job, Standard immediately replied that he was currently performing his job without problems. This ended the inquiry, and there is no evidence that anyone ever inquired further into Standard's ability to work in light of his injury. Furthermore, it is uncontested that all of the decision makers at A.B.E.L. and Plaster Concepts considered Standard's back injury to be a temporary condition.

Given the tentative nature of Morgan's alleged statement, her position relative to Standard's employment, and the evidence that all of the decision makers perceived Standard as having a temporary injury, we hold that Standard has failed to present sufficient evidence to allow a rational juror to find him disabled under § 12102(2)(C) of the ADA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADA

wrongful termination claim.

2. Retaliation

[7][8][9] In order to establish a prima facie case of retaliation under the ADA, Standard must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir.1997)."[W]e assess ADA retaliation claims under the same framework we employ for retaliation claims under Title VII."*Id.* Therefore, to satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute. *See, e.g., Clover v. Total Sys. Servs., Inc.,* 157 F.3d 824, 827 (11th Cir.1998)(employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998)(employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

[10][11] In this case, Standard argues that his requests for accommodation of his back injury constitute statutorily protected activity. In this context, it would be sufficient for him to show that he had a good faith, objectively reasonable belief that he was entitled to those accommodations under the ADA. He cannot show this, however. Standard has not produced any evidence that, at the time that he requested accommodations for his back injury, his belief that he was disabled was objectively reasonable. He merely asserts that his back injury was a disability, without any grounds for the conclusion. As discussed, *supra,* the mere existence of a physical impairment does not constitute a disability under the ADA; the impairment must substantially limit a major life activity. *Gordon,* 100 F.3d at 911. In determining whether an injury substantially limits a major life activity, we consider "(1) the nature

161 F.3d 1318                                                                                    Page 15
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(I)). Standard has not introduced any evidence that his doctors, or anyone else, gave him reason to consider his back injury as impairing his ability to work in a long term or permanent way. In fact, he was taking physical therapy in order to improve his condition. Don Grubbs testified that Standard initially did not want to go to the doctor on the day of his injury, and had to be told to go anyway. Grubbs also testified**1329** that on return to work after going to the doctor, Standard told him that he was fine, and that the doctor wanted to continue to see him. This testimony is not disputed.

The only evidence that Standard points to as establishing his disability is, once again, the statement by Ms. Morgan, a secretary for A.B.E.L., relating to his ability to perform his job. Standard argues that this statement proves that, at that time, his employer perceived his injury as being permanent. This argument fails for two reasons. First, as discussed *supra*, the tentative nature of her statement and her position relative to Standard's employment undercut any argument that he reasonably believed that he was perceived as disabled by his employer. Second, this statement was made after he requested accommodation. Therefore, it could not have been the basis for his belief that he was disabled under the ADA at the relevant time.

In summary, Standard has not introduced any evidence that would allow a rational fact finder to conclude that his belief that he was disabled under the ADA was objectively reasonable. He cannot, therefore, establish the first element of the prima facie case. *See Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1096-97 (7th Cir.1998), *cert. denied,*525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998)(affirming summary judgement for defendant when plaintiff's belief that employee was disabled, as defined by the ADA, was not reason-

able). Because Standard has failed to present evidence sufficient to allow a fact finder to rationally conclude that he was retaliated against under the ADA, we must affirm the district court's grant of summary judgement for defendants on the retaliation claim.

### B. *Age Discrimination*

[12][13] Standard alleges that he was terminated because of his age, in violation of the ADEA. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to make a prima facie case of age discrimination for a reduction in force termination, Standard must prove that (1) he was a member of the age group protected by the ADEA at the time of his termination; (2) he was qualified at the time of his termination; and (3) there is evidence from which a reasonable fact finder could conclude that the employer intended to discriminate on the basis of age in making the decision. *Jameson v. Arrow Co.,* 75 F.3d 1528, 1532 (11th Cir.1996). Neither party disputes that Standard has proved the first two prongs of this test. At issue is whether Standard can point to sufficient evidence to allow a reasonable juror to find discriminatory intent.

The only evidence of discriminatory intent that Standard points to is a part of a conversation that he claims he overheard between Don Grubbs and Steve Norsworthy. Standard walked into a room in the middle of a sentence in which Norsworthy said "older people have more go wrong." Standard did not hear any other part of the conversation. The district court found that a reasonable juror could find that this proved a discriminatory animus in upper management, which could have influenced the termination decision. We disagree.[FN3]

> FN3. After holding that Standard satisfied, for the purpose of avoiding summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                    Page 16
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

judgement, the prima facie case, the district court went on to grant the summary judgement against Standard. The court held that he failed to show that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts for the termination were pretextual. Assuming, arguendo, that Standard had made the prima facie case, we agree that he failed to show pretext, for the same reasons stated in our Title VII analysis, *infra.*

First, the conversation fragment, devoid of any meaningful context, is simply too vague to prove even generalized discriminatory animus. We simply have no way of knowing what Steve Norsworthy was talking about. In the light most favorable to Standard, it states a general proposition that old age brings on health complications. There is no nexus to employment issues, nor is it clear what range of old age was being discussed. Without any other circumstantial evidence, it is not probative of employment-related animus.

Second, it is undisputed that Steve Norsworthy was not involved in the decision to *1330 terminate Standard. His brother, Paul Norsworthy, made the decision to reduce the work force, and Don Grubbs decided which of the four tooling department employees to terminate. This statement by Steve Norsworthy, even if it had been uttered in the context of employment issues, is not probative of a discriminatory intent behind Standard's termination. *See Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir.1987)(holding that company vice president's statement, "The Hardy Corporation was going to weed out the old ones" did not present a genuine issue of material fact as to discriminatory intent when the vice president played no part in the decision to terminate plaintiff and had no knowledge of the decision making process); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 610-11 (11th Cir.1987)(holding that plaintiff did not establish a prima facie case by introducing personnel manager's statement, "You would have to take an-

other physical examination and at your age, I don't believe you could pass it."). Because this fragment of a conversation is insufficient to allow a rational juror to find that Plaster Concepts intended to terminate Standard because of his age, Standard has failed to establish a prima facie case under the ADEA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADEA claim.

### C. *Race and National Origin Discrimination*

1. Termination in Violation of Title VII and § 1981

[14][15][16] Standard alleges that he was terminated on the basis of his race and national origin (Caucasian-American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well. In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen. If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent. *Wall v. Trust Co. of Georgia,* 946 F.2d 805, 809 (11th Cir.1991).

[17][18] Standard argues that he has provided direct evidence of discriminatory intent by pointing to three alleged statements made by various members of management. The first was Harvey Mier's affidavit stating that Paul Norsworthy wanted him to hire only Hispanics. The second was a statement made to Standard by either Don Grubbs or Mark Hicks, before Standard was hired, indicating a desire to staff the production plant with Hispanic workers. The third was a statement by Hicks that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                      Page 17
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

one of the reasons Standard was not considered for a promotion was because he was not Hispanic. The district court held that none of these statements constituted direct evidence, and we agree.

[19][20] Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. *Carter v. City of Miami,* 870 F.2d 578, 580-81 (11th Cir.1989). Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination. *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990). Of the three statements, only the second might have been made by a decisionmaker, and only if it was made by Grubbs and not Hicks. Assuming for the purposes of summary judgement that it was Grubbs, any direct link between the statement and discriminatory intent against Standard is broken by the simple fact that Standard was hired, on Grubbs's recommendation, after Grubbs made the statement. Furthermore, all three statements referred to hiring practices for production department positions, whereas Standard was fired from the tooling department. Although these statements may constitute direct evidence of discriminatory intent in refusing to hire production workers at those times, one must infer that the same discrimination applied to the tooling department positions at a significantly *1331 later date if they are relevant to Standard's discharge. *See Kier v. Commercial Union Ins. Co.,* 808 F.2d 1254, 1259 (7th Cir.1987)(holding that evidence of discriminatory intent in hiring for a different position is not direct evidence of discriminatory intent regarding plaintiff's termination, but may be circumstantial evidence); *Atkin v. Lincoln Property Co.,* 991 F.2d 268, 272 (5th Cir.1993)(holding that a demotion accompanied by employer's statement that plaintiff was "getting up there in years" and should retire was not direct evidence of age discrimination when he was terminated almost one year later). Because all of these statements require some inference or presumption, they do not constitute direct evidence, but may constitute circumstan-

tial evidence.

[21][22] When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual. *Id.,* at 802-04, 93 S.Ct. at 1824-25.

[23] Because this case involves a discharge as part of a reduction in force, Standard may establish a prima facie case of discrimination by (1) showing that he was a member of a protected group and was adversely affected by an employment decision; (2) proving that he was qualified for his own position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision. *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1208 (11th Cir.1997). It is undisputed that Standard has satisfied the first two prongs of the prima facie case. He is a Caucasian-American and was terminated from his employment. It is not disputed that he was qualified to perform his job at the time of the discharge. The district court also found that Standard satisfied the third prong, although just barely. For our purposes, we will assume that he established the prima facie case.

[24][25] Once Standard established his prima facie case, Plaster Concepts needed to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for Standard's discharge. This is a burden of production, not persuasion. Plaster Concepts need only produce evidence that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                  Page 18
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

could allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied,*522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In this case, Plaster Concepts asserts that a drop in business necessitated a reduction in force. As part of this reduction, one of the four members of the tooling department had to be discharged. Although Standard was qualified, Don Grubbs felt that he was the least valuable to the company when compared to the other three. Specifically, Grubbs determined that (1) James Carroll was valuable for his research and development work and was the best at making molds with epoxy, plaster and rubber; (2) Freddie Kinney was best at mold setups and had twenty years of metal working experience, at a time when Plaster Concepts was expanding its use of metal in molds; (3) Elias Thiers was the a better overall mold-maker than Standard, having had years of mold-making experience before he began working at Plaster Concepts as opposed to Standard, who learned entirely on the job; and (4) Standard had no unique skills compared to the others, was less talented in his primary area of expertise (wooden molds) than Thiers while the use of wooden molds was decreasing, resisted learning to work with new materials, was not as hardworking as the others, and had disciplinary problems that the others lacked. These detailed reasons, if believed, are certainly sufficient to allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason.

**\*1332** [26][27] By presenting legitimate, nondiscriminatory reasons for Standard's termination, Plaster Concepts has rebutted the presumption of discriminatory intent. In light of this, Standard must now create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, Standard must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. *Combs,* 106 F.3d at 1538. Standard may do this (1) by showing that the legit-

imate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996)(quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

Standard takes the first approach, arguing that the proffered reasons should not be believed because the reasons have shifted over time and have included misrepresentations. First, Standard claims that the initial reason offered for the discharge, that he was least qualified, was later changed to dissatisfaction with his job performance. However, the evidence that Standard was slow, resistant to change, error-prone, and had disciplinary problems was not provided as a new reason for the discharge. Instead, it was used as later elaboration on the reasons he was less qualified than the other three tooling department workers, who did not have these problems. Such explanation of a general reason is insufficient to show pretext. *Id.,* at 1377 (holding that plaintiff failed to show pretext when the employer's later statements merely offered more detail regarding perceived performance problems). Standard also asserts that many of the negative write-ups he received were unwarranted or based on errors that were not his fault. He does not dispute the validity of some of the more serious write-ups, however, including an incident in which he shot Elias Thiers in the back of the leg with a high powered staple gun. He also does not dispute that all of the mistakes that are the subject of the write-ups did actually happen, nor does he introduce any evidence that he was set up to make those mistakes. Therefore, Standard has failed to show that Plaster Concepts' evaluation of his job performance was pretextual.

Standard also asserts that Plaster Concepts engaged in a pattern of misrepresentations before the EEOC. Specifically, he claims that the initial response stated that Standard was the least qualified of four

"mold-makers" when, in fact, there is evidence that only two of the four were technically given the job title of mold-maker. However, he does not dispute that there were four workers in the tooling department and that the person to be discharged was to be chosen from those four workers. The district court found that his kind of minimal, technical discrepancy is insufficient to show pretext, and we agree. Standard further asserts that Plaster Concepts' statement to the EEOC, that two similarly situated Caucasian-Americans were retained in the tooling department, was a lie. He does not explain why this was a lie. Such a naked assertion is not evidence of pretext, especially when the uncontroverted evidence suggests that the statement was in fact true.

Finally, Standard focuses on the fact that Plaster Concepts submitted a series of layoff worksheets to the EEOC, explaining the evaluation process that Don Grubbs went through when making the discharge decision. Although Grubbs wrote out the sheets after the EEOC charges were instituted, he back-dated them to the time that the evaluation process occurred, giving the impression that the worksheets were written contemporaneously with the evaluation process. This fact, in isolation, could be seen as evidence that the reasons listed on the worksheets were made up after the decision was made, and therefore pretextual. However, Standard either admits or fails to dispute the truth of virtually all of the evaluations listed on the worksheets. Instead of disputing the truth of Grubbs' evaluations, he focuses on his own belief that he was objectively as qualified as Elias Thiers even though he admits that Thiers had nine years of mold-making experience and that Grubbs considered Thiers to be a superior mold-maker. This argument must fail. The pretext inquiry is concerned **\*1333** with the employer's perception of the employee's performance, not the employee's own beliefs. *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997)(holding that when employer produces negative performance reviews, employee's assertion of his own good performance is insufficient to defeat summary judgement). Standard cannot show that the reasons listed

on the worksheets are pretextual when he admits their truth, even if the forms are back-dated. The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons. Once Standard admitted that the other tooling department employees either had the superior qualities attributed to them or were perceived as having them by Grubbs, he can not establish pretext merely by disagreeing with the evaluations or by pointing out the back-dating.

[28] In order to directly attack Plaster Concepts' reasons, Standard must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." *Combs,* 106 F.3d at 1538. Standard has failed to produce such evidence, and so has failed to prove that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts are merely pretext. Therefore, we must affirm the grant of summary judgement for defendants on the Title VII and the § 1981 wrongful discharge claims.

2. Failure to Promote in Violation of § 1981

In addition to his discharge, Standard alleges that he was not considered for a promotion because of his race and national origin, in violation of 42 U.S.C. § 1981. A few months after Standard was hired and began training as a mold-maker in the tooling department, Plaster Concepts decided to hire a manager for the production department. The company focused its search on bilingual persons with military backgrounds, with experience supervising and motivating unskilled workers. Although Standard mentioned his interest in the position, he was never considered for the job and was immediately told by Don Grubbs that they were looking for someone with a military background. Ultimately, Enrique Torres was hired for the supervisor's job. He had twenty years of military experience as a ser-

161 F.3d 1318                                                                                                                    Page 20
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

geant.

[29] Standard alleges that Mark Hicks told him that he was not considered for the position because he "A, was not Hispanic; B, not ex-military; and C, they need a tool-maker, couldn't spare me." Standard, again, claims that this statement constitutes direct evidence of Plaster Concepts' discriminatory intent. Again, we disagree. Steve Norsworthy was responsible for the decision of who was promoted, and there is no evidence that Hicks was involved in the decision or even talked to Norsworthy about the decision. As speculation of a non-decisionmaker, this statement is circumstantial evidence at best.

[30][31] In the absence of direct evidence, we must proceed with the *McDonnell Douglas* analysis used above for the Title VII claim. Because this claim is based on a failure to promote rather than a reduction in force termination, however, the requirements for a prima facie case are slightly different. To establish his prima facie case of discriminatory failure to promote, Standard must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position. *See Coutu v. Martin County Bd. of County Commissioners,* 47 F.3d 1068, 1073 (11th Cir.1995). Under this framework, the district court found that Standard established a prima facie case, and we agree. He is in a protected group, as a Caucasian-American, and he suffered an adverse employment action when he was not considered for the supervisor's job. Plaster Concepts does not dispute that he was qualified for the job, and the person ultimately hired was Hispanic. Having established a prima facie case, Standard is now entitled to a rebuttable presumption of discriminatory intent on the part of Plaster Concepts.

[32] To rebut this presumption, Plaster Concepts must advance legitimate, nondiscriminatory reasons why Standard was not *1334 considered for the job. The first reason they advance is that Standard had recently been hired into the tooling department, without experience making architectural molds.

Standard admits that in contrast to production department workers, tooling department workers are highly skilled and difficult to find. The company had already invested in training Standard, and this investment would be wasted if he were transferred to the production department. Furthermore, Plaster Concepts argues, they were already short-staffed in the tooling department, and could not afford to lose Standard. The second reason advanced is that management had decided to hire someone with a military background, and Standard did not have one.

[33] Faced with these legitimate, nondiscriminatory reasons, Standard must now show that they are pretextual. However, Standard has not presented any particular evidence tending to discredit the proffered reasons. He relies on the same evidence he has introduced for his prima facie case, specifically that Plaster Concepts hired a Hispanic production supervisor and the statement allegedly made by Hicks. This evidence falls far short of establishing pretext in light of the proffered nondiscriminatory reasons. "[A] plaintiff may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant." *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987). The fact that an Hispanic was hired does not make discriminatory animus a more likely motivating force in this case, because Torres, besides being Hispanic, also had the attributes listed as lacking by Standard in the proffered reasons: (1) Torres was not hired, trained or needed in the tooling department; and (2) he had twenty years of military supervisory experience. Likewise, Hicks's statement regarding the reason Standard wasn't considered, even though it is the speculation of a non-decisionmaker, actually supports the two legitimate reasons advanced by Plaster Concepts.

Standard has failed to produce evidence sufficient to allow a rational fact finder to conclude that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts are unworthy of belief. Therefore, we must affirm the grant of summary judgement for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                              Page 21
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**


defendants on the § 1981 failure to promote claim.

### IV. CONCLUSION

After addressing each of Plaintiff-Appellant's
claims in detail above, we agree with all of the dis-
trict court's conclusions. We therefore AFFIRM the
grant of summary judgement for Defendants-Ap-
pellees on all counts.

C.A.11 (Ga.),1998.
Standard v. A.B.E.L. Services, Inc.
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750,
74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12
Fla. L. Weekly Fed. C 302

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

207 F.3d 1303                                                        Page 1
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

▷

Alexander v. Fulton County, Ga.
C.A.11 (Ga.),2000.

United States Court of Appeals,Eleventh Circuit.
A.M. ALEXANDER, Charles Alexander, et al.,
Plaintiffs-Appellees,
v.
FULTON COUNTY, GEORGIA; Jacquelyn H.
Barrett, Individually and in her Official Capacity as
Sheriff of Fulton County, Georgia, Defendants-Ap-
pellants.
**No. 97-8189.**

March 30, 2000.
Rehearing and Rehearing En Banc Denied May 26,
2000.

Eighteen white current and former employees of
sheriff's department brought race discrimination ac-
tion against county and sheriff under Title VII, §
1981, and § 1983. Following jury trial, the United
States District Court for the Northern District of
Georgia, No. 93-02131-1-CV-WBH, Willis B.
Hunt, Jr., J., entered judgment for 15 of the em-
ployees. County and sheriff appealed. The Court of
Appeals, Marcus, Circuit Judge, held that: (1) Dis-
trict Court did not err in denying sheriff's motion
for qualified immunity given substantial evidence
of intentional workplace discrimination based on
race; (2) District Court did not abuse its discretion
in joining employees' claims; (3) District Court did
not abuse its discretion in deciding not to order sep-
arate trials; (4) erroneous admission of statistical
evidence comparing racial composition of sheriff's
department to general population, and showing in-
crease in number of minority employees of county
government, did not prejudice defendants; (5) of-
ficers' Title VII claims fell within ambit of their
Equal Employment Opportunity Commission
(EEOC) charges; and (6) evidence presented at trial
was sufficient to sustain some, but not all, jury ver-
dicts on employees' numerous individual claims.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Officers and Public Employees 283 ⚙︎114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most
Cited Cases
Qualified immunity is an affirmative defense which
must be pled by the defendant.

**[2] Federal Civil Procedure 170A ⚙︎1752.1**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)2 Grounds in General
                170Ak1752 Affirmative Defenses,
Raising by Motion to Dismiss
                    170Ak1752.1 k. In General. Most
Cited Cases

**Federal Civil Procedure 170A ⚙︎2535**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2535 k. Presentation of Case in
General. Most Cited Cases
Where county sheriff adequately pled defense of
qualified immunity in her answer to employment
discrimination complaint, but did not pursue the de-
fense further by either pretrial motion to dismiss or
for summary judgment, she lost the protection from
litigation, including discovery and trial, that quali-
fied immunity may afford government actors.
Fed.Rules Civ.Proc.Rules 12, 56, 28 U.S.C.A.

**[3] Federal Courts 170B ⚙︎776**

170B Federal Courts
    170BVIII Courts of Appeals

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                        Page 2
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most
Cited Cases
A district court's denial of qualified immunity is re-
viewed de novo.

**[4] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
      (Formerly 78k214(2))
Under the doctrine of qualified immunity, govern-
ment officials performing discretionary functions
generally are shielded from liability for civil dam-
ages insofar as their conduct does not violate
clearly established statutory or constitutional rights
of which a reasonable person would have known.

**[5] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
      (Formerly 78k214(2))

**Civil Rights 78 ☞1407**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Bur-
dens of Proof
        78k1407 k. Defenses; Immunity and Good

Faith. Most Cited Cases
      (Formerly 78k240(5))
In analyzing a defense of qualified immunity, the
Court of Appeals first considers whether the public
official was acting within the scope of his or her
discretionary authority when the alleged wrongful
acts occurred; if the official meets this burden, the
plaintiffs must then demonstrate that the official vi-
olated clearly established law based upon objective
standards.

**[6] Civil Rights 78 ☞1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(10) k. Employment Practices.
Most Cited Cases
      (Formerly 78k214(6))

**Civil Rights 78 ☞1529**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1529 k. Defenses in General. Most Cited
Cases
      (Formerly 78k372)
For purposes of determining whether county sheriff
was qualifiedly immune from race discrimination
claims under Title VII, § 1981, and § 1983, it was
clearly established in December 1992, when sheriff
assumed office, that intentional discrimination in
workplace on account of race violated federal law.
42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1432**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1432 k. Defenses; Immunity and Good

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                Page 3
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Faith. Most Cited Cases
    (Formerly 78k244)

**Civil Rights 78 ☞1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
In light of jury finding that sheriff intentionally dis-
criminated against employees on basis of race, Dis-
trict Court did not err in denying sheriff's motion
for judgment as matter of law based on qualified
immunity in action under § 1981, § 1983, and Title
VII. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Federal Courts 170B ☞724**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(I) Dismissal, Withdrawal or Aban-
donment
            170Bk723 Want of Actual Controversy
                170Bk724 k. Particular Cases. Most
Cited Cases
Question whether district court erred in denying
employees' motion for judgment as matter of law as
to county's liability under § 1983 was academic and
therefore would not be addressed by Court of Ap-
peals; county could be held liable under Title VII
for all of employees' § 1983 claims since jury did
not specify its theory of liability, none of employ-
ees' total damages awards exceeded statutory limit-
ation of $300,000 imposed by Title VII, and em-
ployees conceded that they could not be awarded
punitive damages against county. 42 U.S.C.A. §§
1981a(b)(3)(D), 1983; Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1474(2)**

78 Civil Rights
    78III Federal Remedies in General

        78k1466 Monetary Relief in Employment
Practices Cases
            78k1474 Exemplary or Punitive Damages
                78k1474(2) k. Government Liability.
Most Cited Cases
    (Formerly 78k275(2))
Employees could not recover punitive damages
against sheriff in her official capacity under § 1983,
inasmuch as their suit against sheriff in her official
capacity was functional equivalent of suing county.
42 U.S.C.A. § 1983.

**[10] Federal Courts 170B ☞813**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk813 k. Allowance of Remedy
and Matters of Procedure in General. Most Cited
Cases
A district court's joinder of claims and denial of
severance is reviewed for abuse of discretion.

**[11] Federal Civil Procedure 170A ☞241**

170A Federal Civil Procedure
    170AII Parties
        170AII(F) Permissive Joinder
            170AII(F)1 In General
                170Ak241 k. In General. Most Cited
Cases
The central purpose of the rule governing per-
missive joinder is to promote trial convenience and
expedite the resolution of disputes, thereby elimin-
ating        unnecessary        lawsuits.    Fed.Rules
Civ.Proc.Rule 20, 28 U.S.C.A.

**[12] Federal Civil Procedure 170A ☞242**

170A Federal Civil Procedure
    170AII Parties
        170AII(F) Permissive Joinder
            170AII(F)1 In General
                170Ak242 k. Common Question of
Law or Fact. Most Cited Cases

207 F.3d 1303                                                                                    Page 4
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

The requirement that a party seeking joinder of claimants must establish some question of law or fact common to all persons seeking to be joined does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties. Fed.Rules Civ.Proc.Rule 20(a), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ☞256**

170A Federal Civil Procedure
   170AII Parties
      170AII(F) Permissive Joinder
         170AII(F)2 Particular Parties Who May Be Joined
            170Ak256 k. Employers, Employees and Labor Unions. Most Cited Cases
District court did not abuse its discretion in joining claims of 18 officers against county sheriff alleging race discrimination in violation of § 1981, § 1983, and Title VII; although officers suffered different effects, such as discrimination in promotions, transfers, assignments, or discipline, all their claims stemmed from same core allegation that they were subject to systemic pattern or practice of race-based discrimination, and alleged discriminatory character of sheriff's conduct was common to each officer's recovery. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 20(a), 28 U.S.C.A.

**[14] Federal Civil Procedure 170A ☞1956**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(A) In General
         170Ak1956 k. Separate Trial as to Particular Parties. Most Cited Cases
District court did not abuse its discretion in deciding not to order separate trials of claims of 18 plaintiffs against county sheriff alleging race discrimination in violation of § 1981, § 1983, and Title VII; although the large number of plaintiffs, claims, and defenses provided a potential for confusion, such potential was minimized because of core

similarities of claims, and jury's verdict suggested it discerned strengths and weaknesses of individual claims. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ☞1954.1**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(A) In General
         170Ak1954 Separate Trials in Same Action
            170Ak1954.1 k. In General. Most Cited Cases
Because the rule providing for separate trials requires the district court to balance considerations of convenience, economy, expedition, and prejudice, the decision to order separate trials depends on the peculiar facts and circumstances of each case. Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**[16] Federal Courts 170B ☞813**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk813 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases
A district court's decision not to order separate trials will be reversed only upon a showing of abuse of discretion. Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**[17] Federal Courts 170B ☞823**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk823 k. Reception of Evidence. Most Cited Cases

**Federal Courts 170B ☞896.1**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                    Page 5
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk896 Admission of Evidence
               170Bk896.1 k. In General. Most
Cited Cases

**Federal Courts 170B ☞901.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk901 Exclusion of Evidence
               170Bk901.1 k. In General. Most
Cited Cases
The Court of Appeals reviews a district court's
evidentiary rulings for abuse of discretion, and will
reverse only if the moving party establishes that the
ruling resulted in a substantial prejudicial effect.
Fed.Rules Civ.Proc.Rule 61, 28 U.S.C.A.;
Fed.Rules Evid.Rule 103(a), 28 U.S.C.A.

**[18] Federal Courts 170B ☞812**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk812 k. Abuse of Discretion.
Most Cited Cases
When employing an abuse of discretion standard,
the Court of Appeals must affirm unless it at least
determines that the district court has made a clear
error of judgment, or has applied an incorrect legal
standard.

**[19] Civil Rights 78 ☞1413**

78 Civil Rights
   78III Federal Remedies in General
      78k1408 Admissibility of Evidence
         78k1413 k. Employment Practices. Most
Cited Cases
   (Formerly 78k241)

**Civil Rights 78 ☞1542**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1542 k. Admissibility of Evidence; Stat-
istical Evidence. Most Cited Cases
   (Formerly 78k381)
Statistical evidence generally comparing racial
composition of county sheriff's department to
demographics of the county and to eight-county
metropolitan area did not support white officers'
race discrimination claims under § 1981, § 1983,
and Title VII and should have been excluded, inas-
much as officers' jobs were not entry level or of low
skill level, and relevant labor pools were narrower
than vague comparison to general population would
suggest. 42 U.S.C.A. §§ 1981, 1983; Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[20] Civil Rights 78 ☞1542**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1542 k. Admissibility of Evidence; Stat-
istical Evidence. Most Cited Cases
   (Formerly 78k381)
The usefulness of statistics showing that a given
minority is underrepresented in the work force by
comparison with the general population is generally
limited to disparate treatment discrimination claims
involving jobs with low skill levels where the ap-
plicant pool can be considered roughly coextensive
with the general population. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[21] Civil Rights 78 ☞1542**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1542 k. Admissibility of Evidence; Stat-
istical Evidence. Most Cited Cases
   (Formerly 78k381)

207 F.3d 1303                                                                                               Page 6
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

In a disparate treatment Title VII case where low skill jobs are not at issue, the statistical evidence must be finely tuned to compare the employer's relevant workforce with the qualified populations in the relevant labor market. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[22] Civil Rights 78 ⬤⟲1413**

78 Civil Rights
   78III Federal Remedies in General
      78k1408 Admissibility of Evidence
         78k1413 k. Employment Practices. Most Cited Cases
   (Formerly 78k241)

**Civil Rights 78 ⬤⟲1542**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1542 k. Admissibility of Evidence; Statistical Evidence. Most Cited Cases
   (Formerly 78k381)

Statistical evidence showing increase in number of minority employees in county's government did not support white officers' claims that county sheriff discriminated against them on basis of race in violation of § 1981, § 1983, and Title VII and should have been excluded, inasmuch as the evidence did not alone tend to establish that county officials initiated and maintained custom of discrimination, and, even if it had established such custom, it would have had no bearing on whether such custom was also maintained by sheriff's department. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[23] Federal Courts 170B ⬤⟲896.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk896 Admission of Evidence
               170Bk896.1 k. In General. Most

Cited Cases
Erroneous admission of statistical evidence comparing racial composition of county sheriff's department to demographics of general population, and showing increase in number of minority employees of county government, did not substantially prejudice county in white officers' race discrimination action under § 1981, § 1983, and Title VII, and thus was not reversible error; district court adequately instructed jury on weight to be given the evidence, and those verdicts against county that were sustained were products of one-sided evidence. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Civil Rights 78 ⬤⟲1413**

78 Civil Rights
   78III Federal Remedies in General
      78k1408 Admissibility of Evidence
         78k1413 k. Employment Practices. Most Cited Cases
   (Formerly 78k241)

**Civil Rights 78 ⬤⟲1542**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1542 k. Admissibility of Evidence; Statistical Evidence. Most Cited Cases
   (Formerly 78k381)

**Federal Courts 170B ⬤⟲896.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk896 Admission of Evidence
               170Bk896.1 k. In General. Most

Cited Cases
Although testimony of former county manager and former clerk of county board of commissioners, offered in white employees' § 1981, § 1983, and Title VII action for purpose of establishing custom

or practice of discrimination, was not sufficiently connected in time or subject-matter to challenged personnel decisions to be admissible, its admission did not substantially prejudice county, and thus was not reversible error; jury was unlikely to give the testimony any weight, jury instructions suggested it was of no real moment, and evidence supporting verdicts was one-sided. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[25] Civil Rights 78 ⟲1413**

78 Civil Rights
    78III Federal Remedies in General
        78k1408 Admissibility of Evidence
            78k1413 k. Employment Practices. Most
Cited Cases
    (Formerly 78k241)

**Civil Rights 78 ⟲1542**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1542 k. Admissibility of Evidence; Statistical Evidence. Most Cited Cases
    (Formerly 78k381)

**Federal Courts 170B ⟲896.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk896 Admission of Evidence
                    170Bk896.1 k. In General. Most
Cited Cases
Although admission of county's affirmative action plans in white employees' § 1981, § 1983, and Title VII action against county sheriff was abuse of discretion in light of absence of evidence that sheriff saw any of the plans at times she made employment decisions at issue, admission of plans did not prejudice county, and thus was not reversible error. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964,

§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[26] Federal Courts 170B ⟲763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk763.1 k. In General. Most
Cited Cases
Review of a trial court's jury instructions is limited.

**[27] Federal Civil Procedure 170A ⟲2173.1(1)**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(G) Instructions
            170Ak2173.1 Form, Requisites, and Sufficiency
                170Ak2173.1(1) k. In General. Most
Cited Cases
If jury instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed.

**[28] Federal Civil Procedure 170A ⟲2182.1**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(G) Instructions
            170Ak2182 Construction and Effect of Charge as a Whole
                170Ak2182.1 k. In General. Most
Cited Cases
In considering a challenge to jury instructions, the Court of Appeals examines whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled.

**[29] Federal Civil Procedure 170A ⟲2182.1**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(G) Instructions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                    Page 8
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

170Ak2182 Construction and Effect of
Charge as a Whole
170Ak2182.1 k. In General. Most
Cited Cases
If a jury charge as a whole correctly instructs the
jury, even if it is technically imperfect, no revers-
ible error has been committed.

**[30] Federal Courts 170B ☞908.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)6 Harmless Error
170Bk908 Instructions
170Bk908.1 k. In General. Most
Cited Cases
The Court of Appeals will reverse because of an er-
roneous jury instruction only if it is left with a sub-
stantial and ineradicable doubt as to whether the
jury was properly guided in its deliberations.

**[31] Civil Rights 78 ☞1556**

78 Civil Rights
78IV Remedies Under Federal Employment Dis-
crimination Statutes
78k1556 k. Instructions. Most Cited Cases
(Formerly 78k389)
District court adequately explained the correct law,
and thus did not err, in instructing jury, inter alia,
that it could review Title VII plaintiffs' Equal Em-
ployment Opportunity Commission (EEOC)
charges as evidence of their contentions at time
they were filed. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

**[32] Civil Rights 78 ☞1516**

78 Civil Rights
78IV Remedies Under Federal Employment Dis-
crimination Statutes
78k1512 Exhaustion of Administrative Rem-
edies Before Resort to Courts
78k1516 k. Scope of Administrative Pro-
ceedings; Like or Related Claims. Most Cited Cases

(Formerly 78k362.1)
The starting point of ascertaining the permissible
scope of a judicial Title VII complaint alleging em-
ployment discrimination is the administrative
charge and investigation. Civil Rights Act of 1964,
§ 706, 42 U.S.C.A. § 2000e-5.

**[33] Civil Rights 78 ☞1517**

78 Civil Rights
78IV Remedies Under Federal Employment Dis-
crimination Statutes
78k1512 Exhaustion of Administrative Rem-
edies Before Resort to Courts
78k1517 k. Parties in Administrative Pro-
ceedings. Most Cited Cases
(Formerly 78k364)

**Civil Rights 78 ☞1523**

78 Civil Rights
78IV Remedies Under Federal Employment Dis-
crimination Statutes
78k1521 Persons Protected and Entitled to
Sue
78k1523 k. Right to Sue Letter or Notice;
Official Inaction. Most Cited Cases
(Formerly 78k367)
In class actions brought under Title VII, it is not ne-
cessary for all class members to have filed charges
with the Equal Employment Opportunity Commis-
sion (EEOC) or to have received notices of the right
to sue in order to be represented by the class. Civil
Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5;
Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[34] Civil Rights 78 ☞1517**

78 Civil Rights
78IV Remedies Under Federal Employment Dis-
crimination Statutes
78k1512 Exhaustion of Administrative Rem-
edies Before Resort to Courts
78k1517 k. Parties in Administrative Pro-
ceedings. Most Cited Cases
(Formerly 78k364)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                 Page 9
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

As long as one named plaintiff timely files a charge with the Equal Employment Opportunity Commission (EEOC), the precondition to a Title VII action is met for all other named plaintiffs and class members. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

### [35] Civil Rights 78 ⟜1517

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1512 Exhaustion of Administrative Remedies Before Resort to Courts
         78k1517 k. Parties in Administrative Proceedings. Most Cited Cases
      (Formerly 78k364)
Under the single-filing rule, if one plaintiff, in a multi-plaintiff, non-class action Title VII suit, has filed a timely complaint with the Equal Employment Opportunity Commission (EEOC) as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5.

### [36] Civil Rights 78 ⟜1516

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1512 Exhaustion of Administrative Remedies Before Resort to Courts
         78k1516 k. Scope of Administrative Proceedings; Like or Related Claims. Most Cited Cases
      (Formerly 78k362.1)
Officers' Title VII race discrimination claims fell within ambit of their Equal Employment Opportunity Commission (EEOC) charges stating that each officer was victim of pattern or practice of discrimination against white officers in county sheriff's department; although several claims in complaint, such as denial of access to promotional exams, were not specifically mentioned in charges, they could be fairly characterized as arising out of similar discriminatory treatment. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e-5.

### [37] Civil Rights 78 ⟜1556

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1556 k. Instructions. Most Cited Cases
      (Formerly 78k389)
District court did not err in charging jury in Title VII action that it could find discrimination where "another similarly situated employee, who is not a member of the protected group, was not treated in a similar manner," inasmuch as term "similarly situated" was not ambiguous, but was correct term of art in employment discrimination law. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

### [38] Civil Rights 78 ⟜1138

78 Civil Rights
   78II Employment Practices
      78k1138 k. Disparate Treatment. Most Cited Cases
      (Formerly 78k153)
To be "similarly situated," for purposes of the principle that dissimilar treatment of a similarly situated but nonprotected coemployee is evidence of discrimination under Title VII, an individual is not required to be one who has engaged in the same or nearly identical conduct as the disciplined plaintiff; instead, the law only requires similar misconduct from the similarly situated comparator. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

### [39] Civil Rights 78 ⟜1556

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1556 k. Instructions. Most Cited Cases
      (Formerly 78k389)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                               Page 10
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

District court did not err in charging jury in race discrimination action against county that local government is responsible under Title VII for any acts and statements of its employees made within scope of their duties as government employees; county failed to identify any "stray remarks" for which jury might have improperly held county liable as result of charge, district court told jury that county's liability was limited to intentional acts of discrimination, and gist of instruction was correct. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Restatement (Second) of Agency § 219(1).

**[40] Federal Courts 170B ⟜776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews de novo the district court's denial of a motion for judgment as a matter of law, applying the same standards used by the district court.

**[41] Federal Courts 170B ⟜798**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk798 k. Directed Verdict. Most
Cited Cases

**Federal Courts 170B ⟜801**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk801 k. Judgment N. O. v. Most
Cited Cases
In reviewing a denial of a motion for judgment as a matter of law, the Court of Appeals considers all of the evidence and draws all reasonable inferences in a light most favorable to the non-moving party.

**[42] Federal Courts 170B ⟜764**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk764 k. Taking Case from
Jury. Most Cited Cases

**Federal Courts 170B ⟜765**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk765 k. Judgment Notwithstanding Verdict. Most Cited Cases
In reviewing the denial of a motion for judgment as a matter of law, the Court of Appeals ultimately must decide whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable people could have reached.

**[43] Federal Civil Procedure 170A ⟜2152**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from
Jury
            170AXV(F)2 Questions for Jury
                170Ak2152 k. Conclusions or Inferences from Evidence. Most Cited Cases
Judgment as a matter of law is proper only when the facts and inferences point so overwhelmingly in favor of the movant that reasonable people could not arrive at a contrary verdict.

**[44] Federal Courts 170B ⟜765**

207 F.3d 1303                                                                 Page 11
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
               170Bk765 k. Judgment Notwith-
standing Verdict. Most Cited Cases
In reviewing denial of employer's motion for judg-
ment as matter of law in Title VII action in which
employer had proffered non-discriminatory reasons
for its actions, Court of Appeals would have no oc-
casion to revisit whether employees established
prima facie cases, but would consider all evidence
submitted by employees in determining whether
reasonable jury could disbelieve employer's
proffered reasons. Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

**[45] Civil Rights 78 🔗1138**

78 Civil Rights
   78II Employment Practices
      78k1138 k. Disparate Treatment. Most Cited
Cases
   (Formerly 78k153)
To establish discrimination in discipline under Title
VII, an employee must first make out a prima facie
case demonstrating: (1) that he or she belongs to a
protected class under Title VII; (2) that he or she
was qualified for the job; and (3) that a similarly
situated employee engaged in the same or similar
misconduct but did not receive similar discipline.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[46] Civil Rights 78 🔗1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1534 Presumptions, Inferences, and Bur-
den of Proof
         78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
   (Formerly 78k378)

Once an employee makes a prima facie of showing
of discrimination in discipline under Title VII, the
burden of going forward shifts to the employer who
must provide a specific legitimate non-
discriminatory reason for disciplining the employ-
ees differently. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

**[47] Civil Rights 78 🔗1535**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1534 Presumptions, Inferences, and Bur-
den of Proof
         78k1535 k. In General. Most Cited Cases
   (Formerly 78k377.1)
In a Title VII case alleging discrimination in discip-
line, the ultimate burden of persuasion rests with
the employee, who must show that the employer's
proffered legitimate reasons for the different disci-
plinary actions were pretextual, thereby permitting,
but not compelling, the trier of fact to conclude that
the employment action at issue was the product of
illegal discrimination. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

**[48] Civil Rights 78 🔗1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1555 k. Questions of Law or Fact. Most
Cited Cases
   (Formerly 78k389)
Evidence that county sheriff disciplined white ma-
jor more severely than she disciplined similarly
situated black officers who committed similar of-
fenses was for jury in Title VII action; major
presented evidence he was suspended and trans-
ferred after allowing subordinate to drive cars be-
longing to sheriff's department home, while black
officer was not disciplined for engaging in same
conduct. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                 Page 12
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

**[49] Civil Rights 78 ☞1575(1)**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
 crimination Statutes
  78k1569 Monetary Relief; Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(1) k. In General. Most Cited
Cases
 (Formerly 78k404)
What is necessary for an award of punitive damages
in a Title VII action is not a showing of egregious
or outrageous discrimination, but only a showing
that the employer acted with the appropriate state of
mind. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §
1981a(b)(1).

**[50] Civil Rights 78 ☞1575(1)**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
 crimination Statutes
  78k1569 Monetary Relief; Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(1) k. In General. Most Cited
Cases
 (Formerly 78k404)
The state of mind upon which an award of punitive
damages may be based in a Title VII action is act-
ing with malice or with reckless indifference to the
employee's federally protected rights, which re-
quires a showing of either an evil intention to de-
prive an employee of his or her federally protected
rights or a conscious indifference to these rights.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.; 42 U.S.C.A. § 1981a(b)(1).

**[51] Civil Rights 78 ☞1575(1)**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
 crimination Statutes
  78k1569 Monetary Relief; Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(1) k. In General. Most Cited

Cases
 (Formerly 78k404)
At a minimum, to be liable in punitive damages in a
Title VII action, an employer must discriminate in
the face of a perceived risk that its actions will viol-
ate federal law. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §
1981a(b)(1).

**[52] Civil Rights 78 ☞1575(1)**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
 crimination Statutes
  78k1569 Monetary Relief; Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(1) k. In General. Most Cited
Cases
 (Formerly 78k404)
The standard of liability for punitive damages in a
Title VII action is higher than that for establishing a
right to compensatory damages. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42
U.S.C.A. § 1981a(b)(1).

**[53] Civil Rights 78 ☞1575(1)**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
 crimination Statutes
  78k1569 Monetary Relief; Restitution
   78k1575 Exemplary or Punitive Damages
    78k1575(1) k. In General. Most Cited
Cases
 (Formerly 78k404)
Liability for punitive damages in a Title VII action
requires not merely a showing of intentional dis-
crimination but a showing that the employer acted
with knowledge that it may be acting in violation of
federal law. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §
1981a(b)(1).

**[54] Civil Rights 78 ☞1555**

78 Civil Rights

207 F.3d 1303                                                                Page 13
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff acted in face of per-
ceived risk that her actions would violate federal
law, and that she thus was liable for punitive dam-
ages in white major's Title VII action alleging ra-
cial discrimination in discipline, was for jury; the-
ory of discrimination at issue was neither novel nor
poorly recognized, and sheriff testified she knew it
was illegal to treat employees differently on ac-
count of race. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §
1981a(b)(1).

**[55] Civil Rights 78 ⚖═1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff twice disciplined white
sergeant on basis of his race was for jury in Title
VII action; black sergeant testified he bore greater
responsibility than white sergeant for releasing
wanted inmates but was not reprimanded, and white
sergeant said he was reassigned after prisoner was
assaulted while black officers were not. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[56] Civil Rights 78 ⚖═1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Trans-
fer. Most Cited Cases
    (Formerly 78k148)
To prevail on a discriminatory failure to promote
claim under Title VII, an employee must establish a
prima facie case of race discrimination by showing
that: (1) he or she is a member of a protected

minority; (2) he or she was qualified and applied
for the promotion; (3) he or she was rejected des-
pite his or her qualifications; and (4) other equally
or less qualified employees who are not members of
the protected minority were promoted. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[57] Civil Rights 78 ⚖═1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k153)
In a failure to promote case under Title VII, an em-
ployee cannot prove pretext by simply arguing or
even by showing that he or she was better qualified
than the employee who received the position in
question; an employee must show not merely that
the employer's employment decisions were mis-
taken but that they were in fact motivated by race.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[58] Civil Rights 78 ⚖═1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k142)
In a Title VII action, it is not the court's role to
second-guess the wisdom of an employer's de-
cisions as long as the decisions are not racially mo-
tivated. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[59] Civil Rights 78 ⚖═1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                    Page 14
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Evidence that county sheriff discriminated against white sergeant in appointing black sergeant instead of her to captain's position was insufficient for submission to jury in Title VII action; sheriff stated she appointed black sergeant because he was union leader who could keep open line of communication between rank-and-file and sheriff, and white sergeant pointed to no evidence that this was not sheriff's real reason. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[60] Civil Rights 78 ⚖⇒1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
      (Formerly 78k389)
Evidence that county sheriff discriminated against white lieutenant in appointing black employees instead of him to captain's position was for jury in Title VII action; although sheriff stated she appointed one of the employees because he was union leader who could keep open line of communication between rank-and-file and sheriff, sheriff failed to identify any specific qualifications justifying the other appointment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[61] Civil Rights 78 ⚖⇒1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
      (Formerly 78k389)
Evidence that county sheriff discriminated against white captain in appointing black employees instead of him to unclassified positions was for jury in Title VII action; although sheriff stated she appointed one of the employees because he was union leader who could keep open line of communication between rank-and-file and sheriff, sheriff failed to identify what specific qualifications merited the

other promotion. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[62] Civil Rights 78 ⚖⇒1571**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1569 Monetary Relief; Restitution
            78k1571 k. Back Pay or Lost Earnings. Most Cited Cases
      (Formerly 78k401)
Captain who had been denied promotion to unclassified position in violation of Title VII by county sheriff was not entitled to "make whole" relief consisting of benefits and pay of unclassified position, where he testified that he would not have accepted unclassified position without written assurances of job security, and where he failed to refute evidence that sheriff would not have provided such assurances. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[63] Civil Rights 78 ⚖⇒1574**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1569 Monetary Relief; Restitution
            78k1574 k. Measure and Amount. Most Cited Cases
      (Formerly 78k403)
Award of $10,000 in compensatory damages to captain who had been denied promotion to unclassified position by county sheriff was supported by sufficient evidence in Title VII action; there was competent testimony that he suffered emotional distress as result of non-selection. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[64] Civil Rights 78 ⚖⇒1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                    Page 15
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Cited Cases
   (Formerly 78k389)
Evidence that county sheriff discriminated against
white lieutenant in appointing black employees in-
stead of her to unclassified captain positions was
for jury in Title VII action; sheriff offered no spe-
cific explanation for her selection of two of the
black employees. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

**[65] Civil Rights 78 ⬅1564**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1559 Relief
         78k1564 k. Assignment, Transfer, or Pro-
motion. Most Cited Cases
         (Formerly 78k395)

**Civil Rights 78 ⬅1572**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1569 Monetary Relief; Restitution
         78k1572 k. Mental Suffering, Emotional
Distress, Humiliation, or Embarrassment. Most
Cited Cases
         (Formerly 78k400.1)
Lieutenant who had been denied promotion to un-
classified captain position in violation of Title VII
by sheriff was precluded from receiving equitable
"make whole" relief by her testimony that she
would not have accepted unclassified position
without written assurances of job security, but she
was entitled to compensatory damages for emotion-
al distress she suffered as result of non-selection.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

**[66] Civil Rights 78 ⬅1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes

         78k1555 k. Questions of Law or Fact. Most
Cited Cases
         (Formerly 78k389)
Evidence that county sheriff discriminated against
white sergeant in appointing black employees in-
stead of him to position of unclassified captain, and
that sergeant would have accepted such position,
was for jury in Title VII action; white sergeant test-
ified he was more qualified that successful candid-
ates, and his testimony on whether he would have
accepted position was not clear. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[67] Civil Rights 78 ⬅1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
         78k1555 k. Questions of Law or Fact. Most
Cited Cases
         (Formerly 78k389)
Evidence that county sheriff made promotional de-
cisions in face of perceived risk that her actions
would violate federal law, and that she thus was li-
able to white officers for punitive damages under
Title VII, was for jury; officers presented evidence
of intentional discrimination, and sheriff professed
understanding that discrimination in promotions
would violate the law. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.; 42
U.S.C.A. § 1981a(b)(1).

**[68] Civil Rights 78 ⬅1135**

78 Civil Rights
   78II Employment Practices
      78k1135 k. Promotion, Demotion, and Trans-
fer. Most Cited Cases
         (Formerly 78k148)
To establish job discrimination in transfers and as-
signments, a Title VII plaintiff first must make a
prima facie case of discrimination by showing that
he or she was treated differently than were similarly
situated nonprotected employees with respect to
transfers and assignments. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                      Page 16
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

**[69] Civil Rights 78 ⚖⚟1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff discriminated against
white sergeant in denying her transfer from jail pos-
ition, and evidence that sergeant was entitled to
punitive damages, was for jury in Title VII action;
sergeant testified transfers were given to similarly
situated black employees, and sheriff stated she un-
derstood that race-based employment discrimina-
tion violated federal rights. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42
U.S.C.A. § 1981a(b)(1).

**[70] Civil Rights 78 ⚖⚟1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff discriminated against
white corporal in reassigning him to operate metal
detector at juvenile court was insufficient for sub-
mission to jury in Title VII action; corporal attrib-
uted reassignment to retaliation for his alleged im-
proper use of computers, he presented no evidence
of similarly situated black comparators, and he
turned down opportunity for transfer from metal de-
tector position. Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

**[71] Civil Rights 78 ⚖⚟1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)

Evidence that county sheriff discriminated against
white sergeant in denying her requests for reassign-
ments within jail was insufficient for submission to
jury in Title VII action; sergeant failed to identify
which black officers were given assignments she
desired. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[72] Civil Rights 78 ⚖⚟1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff discriminated against
white sergeant in denying his requests for transfer
and reassignment, and in temporarily removing him
from rotation of firearm training instructors, was in-
sufficient for submission to jury in Title VII action;
sergeant offered no evidence of similarly situated
black comparators, and offered no reason for find-
ing that sheriff's proffered reason for his temporary
removal was pretextual. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

**[73] Civil Rights 78 ⚖⚟1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases
    (Formerly 78k389)
Evidence that county sheriff discriminated against
white sergeant in denying her requests for transfer
or reassignment within and outside jail was insuffi-
cient for submission to jury in Title VII action; ser-
geant conceded that no one was transferred during
transition between administrations and that both
black and white supervisors were transferred after
that period ended, and sergeant could not recall
when she had requested reassignments. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                 Page 17
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L. Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

**[74] Civil Rights 78 €══1555**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1555 k. Questions of Law or Fact. Most Cited Cases
  (Formerly 78k389)
Evidence that county sheriff discriminated against white lieutenant in transferring him to jail was insufficient for submission to jury in Title VII action; lieutenant failed to present evidence refuting sheriff's proffered reason for transfer, i.e., that it furthered policy of cross-training officers. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[75] Civil Rights 78 €══1555**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1555 k. Questions of Law or Fact. Most Cited Cases
  (Formerly 78k389)
Evidence that county sheriff discriminated against white lieutenant in assigning her to operate metal detector and reassigning her to female detention unit was insufficient for submission to jury in Title VII action; lieutenant agreed to assist with metal detectors in order to obtain change in hours, and she failed to dispute sheriff's proffered reasons for reassigning her. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[76] Civil Rights 78 €══1555**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1555 k. Questions of Law or Fact. Most Cited Cases
  (Formerly 78k389)
Evidence that county sheriff discriminated against white sergeant in failing to reclassify him as lieutenant, and evidence of sheriff's liability for punit-

ive damages, was for jury in Title VII action; although sheriff offered explanation that sergeant failed to inform sheriff of his desire to be reclassified, record did not demonstrate that four black officers who were reclassified expressed any interest in reclassification. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1981a(b)(1).

**[77] Civil Rights 78 €══1555**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1555 k. Questions of Law or Fact. Most Cited Cases
  (Formerly 78k389)
Evidence that county sheriff discriminated against white acting sergeant in not reclassifying him as sergeant was for jury in Title VII action; jury could have concluded that because acting sergeant was qualified for reclassification when sheriff took office, sheriff should have known this fact and reclassified him. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[78] Civil Rights 78 €══1430**

78 Civil Rights
 78III Federal Remedies in General
  78k1425 Questions of Law or Fact
   78k1430 k. Employment Practices. Most Cited Cases
  (Formerly 78k244)
Evidence that county sheriff and county were liable under § 1983 for preventing white sergeants from taking promotional exams was insufficient for submission to jury; sergeants presented no evidence sheriff had role in preventing them from taking exams, sheriff was not final policymaking authority for decisions related to classified positions, and there was no policy or custom of discrimination against white employees in county. 42 U.S.C.A. § 1983.

**[79] Civil Rights 78 €══1555**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                          Page 18
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L. Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
       78k1555 k. Questions of Law or Fact. Most Cited Cases
   (Formerly 78k389)
Evidence that county sheriff discriminated against white deputies in failing to restore their former ranks after they voluntarily accepted demotions in order to be transferred out of jail was insufficient for submission to jury in Title VII action; although deputies presented evidence that black officer's rank was restored after she accepted demotion, she was not similarly situated, in that she left jail due to medical condition and contested her loss of rank. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**\*1313** Lisa Bodenstein Golan, Office of Lisa B. Golan, Dunwoody, GA, Charles G. Hicks, Stone Mountain, GA, Paula Morgan Nash, Atlanta, GA, for Defendants-Appellants.

Harlan S. Miller, III, A. Lee Parks, Jr., Parks, Chesin & Miller, P.C., Atlanta, GA, Richard G. Tisinger, Jr., Tisinger, Tisinger, Vance & Greer, P.C., Carrollton, GA, Georgia Kay Lord, Nelson, Hill, Lor & Beasley, LLP, Decatur, GA, for Plaintiffs-Appellees.

Appeals from the United States District Court for the Northern District of Georgia.

Before ANDERSON, Chief Judge, MARCUS, Circuit Judge, and HANCOCK[FN*], Senior District Judge.

       FN* Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

MARCUS, Circuit Judge:
This case involves various claims of race discrimination brought by eighteen current and former Fulton County Sheriff's Department employees individually and on behalf of all similarly situated white

employees of the Sheriff's Department against Fulton County, Georgia and Sheriff Jacquelyn H. Barrett, in her official and individual capacities (collectively, "Defendants"). Plaintiffs sued Fulton County and Sheriff Barrett alleging that Fulton County maintained a "policy or custom" of racial discrimination in employment decisions, that Fulton County and the Sheriff's Department engaged in a "pattern or practice" of employment discrimination, and specifically that Fulton County and Sheriff Barrett intentionally discriminated on the basis of race with respect to discipline, promotions, transfers, reclassifications, promotional examinations, restorations of rank, and appointments to unclassified positions. Defendants now appeal from a jury verdict entered for most of the Plaintiffs finding that Fulton County maintained a policy or custom of discrimination against white employees and that Sheriff Barrett intentionally discriminated against white employees. After a thorough review of the record, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

In September 1993, Plaintiffs[FN1] filed their complaint as a class action alleging a "pattern or practice" of employment discrimination against white personnel of the Fulton County Sheriff's Department in the **\*1314** terms and conditions of employment in violation of 42 U.S.C. § 1981,[FN2] 42 U.S.C. § 1983,[FN3] and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[FN4] In April 1994, the district court, finding the requisite numerosity, commonality, typicality, and adequacy of representation, certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure the following class:[FN5]

       FN1. The Plaintiffs are: Major A.M. Alexander, Sergeant Charles "Tony" Alexander, Sergeant Joseph Bantin, Sergeant Billy Bolt, Sergeant Denise Brooks, Lieutenant Robert Fox, Captain Gary Gettis,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                    Page 19
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Corporal Sara Henderson, Sergeant Kathy Jones, Lieutenant Carolyn Masson, Corporal Donnie McBee, Corporal Guerry "Bubba" Moore, Sergeant James NeSmith, Sergeant Joan Paschal, Sergeant Heidi Schaefer, Sergeant Robert Smith, Sergeant Benjamin Steele, and Corporal Robert Upshaw.

FN2. Section 1981 provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

FN3. Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

FN4. 42 U.S.C. § 2000e-2 provides in relevant part:

a) Employer practices

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin....

Certain Plaintiffs also claimed employment discrimination on the grounds of age, disability, retaliation and gender. Before trial, the parties agreed to sever those claims from this lawsuit.

FN5. Rule 23(b)(2) includes those class action suits where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This subdivision was added specifically to Rule 23 to facilitate civil rights class actions. *See Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 506 n. 6 (5th Cir.1981). The district court concluded that this subdivision best described Plaintiffs' putative class.

All present and future sworn white employees of the Fulton County Sheriff's Department and all past sworn white employees who allege discriminatory acts by Defendants within the applicable statute of limitations.

On June 12, 1996, after an extended trial, the jury awarded damages to fifteen of the eighteen Plaintiffs and the district court entered judgment.FN6 On July 8, 1996, Plaintiffs moved to amend the judgment, requesting injunctive relief and back pay, and, on July 10, 1996, the district court vacated the judgment. Thereafter, the district court entered a modified judgment for damages, backpay, individual equitable relief, and class-based injunctive relief.

FN6. The jury did not indicate on which theory of liability it relied in reaching its verdict. However, because the substantive law and proof requirements of Title VII, section 1981, and section 1983 are the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                    Page 20
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

same for claims alleging intentional employment discrimination based on race by state actors, this failure to identify the particular basis of liability does not present any insurmountable problems for appellate review. *See, e.g., Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (explaining that "[b]oth [Title VII and section 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."); *Cross v. State of Ala.,* 49 F.3d 1490, 1507-08 (11th Cir.1995) (noting that when section 1983 is used as a parallel remedy for violation of Title VII the elements of the two causes of action are the same).

The jury verdict and final judgment included the following for each Plaintiff:

1. *Major A.M. Alexander*-The jury found that the Defendants had discriminated against Alexander with respect to *1315 assignments or transfers and that he had been disciplined in whole or in part because of his race. The jury awarded Alexander $125,000 in compensatory damages against both Fulton County and Sheriff Barrett and $25,000 in punitive damages against Sheriff Barrett for discriminatory assignments or transfers. The jury also awarded Alexander $2,800 in back pay, an additional $125,000 in compensatory damages against Fulton County and Sheriff Barrett, and $25,000 in punitive damages against Sheriff Barrett for his suspension. The district court also ordered that the record of disciplinary action against Alexander be expunged from his Sheriff's Department file.

2. *Sergeant Charles "Tony" Alexander*-The jury awarded Charles Alexander $15,000 in compensatory damages because of Sheriff Barrett's failure to restore Alexander's rank after his voluntary demotion from sergeant to deputy. The district

court ordered the Defendants to recalculate Alexander's retirement benefits and other employee benefits to reflect any changes that would have occurred had his rank been restored.

3. *Sergeant Joseph Bantin*-The jury found in favor of Bantin on his claims that Sheriff Barrett did not consider him for appointment to the unclassified [FN7] positions of captain or major on account of his race, and that he was not permitted to compete in the promotional process for the rank of classified lieutenant, also because of race. Finally, the jury returned a verdict for the Defendants on Bantin's claim that he had not been considered for reclassification because of his race. The jury awarded Bantin $10,000 in compensatory and $5,000 in punitive damages based on its finding of discrimination against Bantin in the promotional process.

FN7. Unclassified positions are like political appointments; they are appointed by the Sheriff and can be terminated at will. Classified positions are explicitly subject to civil service-type protections and comprise the vast majority of jobs in the Sheriff's Department. *See* discussion *infra* section II.

4. *Sergeant Billy Bolt*-The jury found that Bolt was wrongfully not appointed to the classified position of lieutenant in June 1993 because of his race and awarded him $20,000 in compensatory damages and $5,000 in punitive damages. The district court also entered an award of $1,000.98 in back pay and ordered the Defendants to reclassify Bolt as a lieutenant providing him with the pay grade, employee benefits, and seniority he would have achieved had he been appointed to the rank of classified lieutenant on June 1, 1993.

5. *Sergeant Denise Brooks*-The jury found that Brooks was not selected for appointment to the unclassified positions of captain or major due to her race. The jury concluded that Brooks should

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have been appointed as an unclassified captain in June 1993 and awarded her $10,000 in compensatory damages and $10,000 in punitive damages. The jury also found that she was discriminated against with respect to assignments or transfers and awarded her an additional $25,000 in compensatory damages and $5,000 in punitive damages. The district court also ordered the Defendants to provide Brooks with the pay grade, employee benefits, and seniority she would have achieved had she been appointed to captain on June 1, 1993.

6. *Lieutenant Robert Fox*-The jury found that Fox was not appointed to the position of unclassified captain in March 1993 and was transferred to a position in the Jail against his will in 1994 because of race. The jury awarded Fox $20,000 in compensatory damages and $10,000 in punitive damages on his failure to promote*1316 claim. It awarded him an additional $50,000 in compensatory damages and $10,000 in punitive damages on his discriminatory assignment or transfer claim. The district court ordered the Defendants to recalculate Fox's retirement and other benefits as if he had been appointed to an unclassified captain position on March 1, 1993.

7. *Captain Gary Gettis*-The jury found that Gettis was not appointed to the unclassified positions of captain or major due to his race. The jury concluded that in the absence of discrimination, Gettis would have been appointed to an unclassified captain position in June 1993, and awarded him $10,000 in compensatory damages and $10,000 in punitive damages. The district court also awarded Gettis $2,290.59 in back pay, the amount he would have received had he been appointed to an unclassified captain position in June 1993, and ordered the Defendants to recalculate Gettis' retirement and other employee benefits as if he had been appointed to an unclassified captain position on June 1, 1993.

8. *Corporal Sara Henderson*-The jury found that Henderson was not considered for appointment to

the unclassified positions of captain or major on account of her race. However, the jury found against Henderson on her claim that she was denied promotions to the positions of classified corporal and sergeant in 1993 because of race. The jury did not award her *any* damages.

9. *Sergeant Kathy Jones*-The jury found that Jones was denied transfers outside the Jail because of race and awarded her $10,000 in compensatory damages and $5,000 in punitive damages. The district court declined to award injunctive relief to Jones.

10. *Lieutenant Carolyn Masson*-The jury found that Masson was not considered or selected for appointment to the unclassified positions of captain or major due to her race and that she was also discriminated against with regard to assignments or transfers because of her race. As for not selecting her to an unclassified position, the jury concluded that Masson should have been appointed to an unclassified captain position in June 1993 and awarded her $10,000 in compensatory damages and $10,000 in punitive damages. As for its findings concerning the assignments or transfers, the jury awarded Masson an additional $50,000 in compensatory damages and $10,000 in punitive damages. The district court also awarded Masson $5,412.99 in back pay to compensate her for wages she would have received had she been appointed to the position of unclassified captain in June 1993. The court also ordered the Defendants to provide Masson with the pay grade, employee benefits, and seniority she would have earned had she been appointed to the position of captain on June 1, 1993.

11. *Corporal Donnie McBee*-Although the jury found for McBee on his claim that he was not considered for appointment to the unclassified positions of captain or major because of his race, it found his failure to be selected for these positions was not on account of his race. The jury also concluded McBee had not been discriminated against with respect to assignments or trans-

207 F.3d 1303                                                                                    Page 22
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

fers. Accordingly, the jury did not award McBee any damages.

12. *Corporal Guerry "Bubba" Moore*-The jury found that Moore was not considered for appointment to the unclassified positions of captain or major because of race, but found that his failure to be selected for appointment to these positions was not on account of race. The jury did find, however, that Moore had been discriminated against on the basis of race with regard to assignments **\*1317** or transfers and awarded him $10,000 in compensatory damages and $5,000 in punitive damages. The district court entered judgment in these amounts but declined to enter any individual injunctive relief.

13. *Sergeant James NeSmith*-The jury found for NeSmith on his claims that he was discriminated against because of race with regard to promotions, assignments or transfers, and discipline. The jury awarded him $10,000 in compensatory damages and $10,000 in punitive damages on his unclassified position non-selection claim. The jury also awarded him $40,000 in compensatory damages and $8,000 in punitive damages on his discriminatory assignment or transfer claim, and an additional $30,000 in compensatory damages and $7,000 in punitive damages on his discriminatory discipline claim. The district court also awarded NeSmith $2,156.83 in back pay to compensate him for wages he would have received had he been promoted to the position of unclassified captain in March 1993, and ordered the Defendants to provide NeSmith with the pay grade, employee benefits, and seniority he would have earned had he been promoted to the position of unclassified captain on March 1, 1993.

14. *Sergeant Joan Paschal*-The jury found for Paschal on her claim that she was not considered for appointment to the unclassified positions of captain or major due in whole or in part to her race, but it awarded her no monetary relief, and the district court ordered no injunctive relief.

15. *Sergeant Heidi Schaefer*-The jury found that Schaefer was not considered for appointment to the unclassified positions of captain or major on account of her race and that she was discriminated against because of race with respect to assignments or transfers. The jury also concluded that Schaefer had not been permitted to compete in the promotional process for the rank of classified lieutenant in 1993 because of her race. Accordingly, the jury awarded Schaefer $10,000 in compensatory damages and $5,000 in punitive damages for the assignment or transfer claim, and an additional $10,000 in compensatory damages and $5,000 in punitive damages for the promotional process claim.

16. *Sergeant Robert Smith*-The jury found that Smith was not reclassified as a classified sergeant until July 1994, and was not permitted to compete in 1993 in the promotional process for the position of classified lieutenant because of his race. Although the jury found that Smith was the victim of discrimination when he was not considered for appointment to the unclassified positions of captain or major, it concluded that his failure to be selected was not the result of discrimination. The jury also determined that Smith was not discriminated against with respect to assignments or transfers. As for his reclassification claim, the jury found that Smith should have been reclassified as a classified sergeant in November 1992 and awarded him $10,000 in compensatory damages and $0 in punitive damages. As for his promotional process claim, the jury awarded Smith $10,000 in compensatory damages and $5,000 in punitive damages. Finally, the district court ordered the Defendants to provide Smith with the pay grade, employee benefits, and seniority he would have achieved had he been promoted to the rank of classified sergeant on November 1, 1992.

17. *Sergeant Benjamin Steele*-The jury found that while Steele was not considered for appointment to the unclassified positions of captain or major

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                      Page 23
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

on account of race, his failure to be selected for these positions was not due to his race. The jury did find that Steele was discriminated against with *1318 respect to assignments or transfers but not with respect to reclassifications. Based on finding discrimination on Steele's assignment or transfer claims, the jury awarded Steele $10,000 in compensatory damages and $5,000 in punitive damages.

18. *Corporal Robert Upshaw*-Finally, the jury found that while Upshaw was not considered for appointment to the unclassified positions of captain or major because of his race, his failure to be selected for these positions was not on account of race. The jury did find, however, that Upshaw's rank of classified lieutenant was not restored after his voluntary demotion to deputy because of his race. As for this claim, the jury awarded Upshaw $20,000 in compensatory damages but no punitive damages. The district court also ordered Defendants to promote Upshaw to the rank of classified lieutenant retroactive to March 1, 1993, and to adjust his pay grade, employee benefits, and seniority accordingly.

The district court decertified the class after trial observing that because of the different types of discrimination claims alleged, Plaintiffs did not satisfy the commonality and typicality prerequisites of a class action. The court also expressed doubt as to whether the members of the class were really so numerous as to warrant class certification. In January 1997, the district court denied the Defendants' motion for judgment as a matter of law and entered final judgment for the Plaintiffs.

II.

A brief description of the structure, function, and hierarchy of the Fulton County Government offices at issue is necessary to understand the resolution of this appeal. We begin with Defendant Fulton County which is administered by the Fulton County Board of Commissioners ("Board"), in turn made

up of seven Commissioners elected by the voters of Fulton County to four-year terms. The Board sets Fulton County governmental policy and approves departmental budget requests. Fulton County voters elect the Sheriff every four years. On December 14, 1992, defendant Jacquelyn Barrett took office as the Sheriff of Fulton County, Georgia. As of August 1993, the Fulton County Sheriff's Department had 629 sworn law enforcement officers. Among those officers, 521, or 83%, were black.

The Sheriff's Department, like all other Fulton County departments, uses the services of the Fulton County Personnel Department. The Personnel Board is appointed by the Board of Commissioners and is the major decision-making authority within the Personnel Department. The Personnel Department is responsible for the County's human resources system, which designates the positions of Fulton County employees as being either "classified" or "unclassified." Classified jobs comprise the vast majority of the jobs in the Sheriff's Department and are explicitly subject to civil service-type protections.[FN8] For those jobs, the Personnel Department advertises the positions available, noting the minimum qualifications required for each, and thereafter processes all applications. In reviewing them, the Board determines whether an applicant meets the "published" minimum requirements. If the applicant does not meet the requirements the Board notifies the applicant of this finding and the applicant is given thirty days to provide the Board with additional information and contest the finding. But, if the Personnel Board finds that an applicant meets the minimum qualifications, the applicant receives notification of the next scheduled promotions test. The Personnel Board then administers a written*1319 test. If an applicant passes that, he is eligible to take an oral examination given by high-ranking officers in the Sheriff's Department. Thereafter, if an applicant passes both the written and oral tests, his name appears on a list of eligible applicants ranked by examination scores. When an opening for a classified position arises, the Sheriff promotes an individual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                    Page 24
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

from the list in rank designated order. Each list ex-
pires after six months, and the officers who are not
promoted from the list but wish to be considered for
future promotions must go through the entire pro-
cess again.

> FN8. The highest-ranking classified posi-
> tion is captain.

Unclassified jobs, in contrast, are more like politic-
al appointments. In Sheriff Barrett's administration,
they consist of positions with the rank of captain or
higher. Notably, a department head such as Sheriff
Barrett with appointment authority does not have to
advertise for open unclassified positions, is not re-
quired to employ the services of the Personnel De-
partment, and can dismiss an unclassified employee
at her pleasure.

The Personnel Board hears appeals of classified
employees who have suffered demotions, suspen-
sions, or dismissals when the employee alleges that
the action was taken for personal, political, or reli-
gious reasons. The Personnel Board also considers
"reclassification" applications.[FN9] The Grievance
Review Committee hears classified and unclassified
employees' appeals of employment decisions made
by superiors. Its review of classified employees'
grievances, however, is limited to cases not falling
under the jurisdiction of the Personnel Board. This
Committee is comprised of two Fulton County non-
supervisory employees, two members drawn from
the supervisory ranks or management appointed by
the Board of Commissioners, and one person who
is not employed by Fulton County and who is selec-
ted by the other members. According to Committee
procedure, an employee's chain of command first
reviews and considers a grievance. If the employee
cannot establish a satisfactory resolution through
the chain of supervision, the grievance is passed to
the Personnel Department which logs in the griev-
ance. The Personnel Department then forwards the
complaint to the Grievance Review Committee
Chairperson who schedules a hearing. After the
Grievance Review Committee conducts a hearing,
the Committee may recommend settlement orders

which are subject to approval by the County Man-
ager. Elected officials such as Sheriff Barrett are
not obligated to accept and implement the recom-
mendations of the Grievance Review Committee,
but, as a practical matter, they usually do.

> FN9. Generally, a department head seeks
> reclassification of a subordinate's classified
> rank when she believes the employee is
> performing the duties of a higher-ranking
> position than the one actually held. An em-
> ployee may also request that her depart-
> ment head seek reclassification on her be-
> half, but Department sponsorship is gener-
> ally required for successful reclassifica-
> tion.

Finally, the Fulton County Sheriff's Department
consists of several Divisions. The Jail Division runs
the Fulton County Jail and administers prisoner
transfers. The Jail Division is by far the largest of
the Sheriff's Departments, with over 500 employ-
ees. Next in size is the Court Services Division
which provides security to Fulton County court-
houses and individual courtrooms. Other Divisions
include the Service Division, the Office of Profes-
sional Standards, and the Bonding Division. The
Service Division is responsible for the service of
warrants and civil processes. The Office of Profes-
sional Standards handles investigations into alleged
wrongdoings by Sheriff's Department employees
and conducts background investigations on new ap-
plicants. The Bonding Division manages the De-
partment's interaction with bonding companies, as
well as the whole bonding process.

*1320 Upon taking office, Sheriff Barrett created
the Community Relations Division and the Re-
search and Planning Division. The Community Re-
lations Division performs various crime prevention
activities, and serves as a liaison between the Sher-
iff and the community. The Research and Planning
Division studies issues that the Sheriff believes will
be important and prepares the Department's Policy
and Procedures Manual.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                                Page 25
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

III.

On appeal we consider six broad challenges to the proceedings below: first, that the district court erred in denying qualified immunity to Sheriff Barrett; second, that it erred in concluding Fulton County is liable under section 1983; third, that the court should have granted Defendants' motion to sever Plaintiffs' individual claims; fourth, that the district court wrongfully admitted into evidence certain statistical and non-statistical evidence that was both irrelevant and unfairly prejudicial; fifth, that the court erred in its jury instructions; and finally, that the trial court erroneously denied Defendants' motions for judgment as a matter of law because the evidence was plainly insufficient to support any of the individual Plaintiffs' claims. We consider each claim in turn.

A.

[1][2] We examine first Sheriff Barrett's belated argument raised for the first time in the Defendants' motion for judgment as a matter of law that she is protected, in her individual capacity, from civil damages by the doctrine of qualified immunity because the Plaintiffs failed to demonstrate that her conduct violated their clearly established statutory or constitutional rights.[FN10]

> FN10. Qualified immunity is an affirmative defense which must be pled by the defendant. *Gonzalez v. Lee County Housing Auth.,* 161 F.3d 1290, 1294 (11th Cir.1998). Here, Sheriff Barrett adequately pled the defense of qualified immunity in the Defendants' answer to Plaintiffs' complaint, but notably did not pursue the defense further by either a pretrial motion to dismiss or for summary judgment, thereby losing the protection from litigation, including discovery and trial, qualified immunity may afford government actors. *See Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1184 (11th

Cir.1994). Not until Defendants' motion for judgment as a matter of law, raised initially at the close of the Plaintiffs' case, did Sheriff Barrett again raise the defense of qualified immunity.

[3][4] We review *de novo* the district court's denial of qualified immunity. *Belcher v. City of Foley,* 30 F.3d 1390, 1395 (11th Cir.1994). Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Lassiter, v. Alabama A&M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). And " '[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' " *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir.1997) (en banc) (quoting *Lassiter,* 28 F.3d at 1150).

**\*1321** [5] In analyzing a defense of qualified immunity, we first consider whether Sheriff Barrett was acting within the scope of her discretionary authority when the alleged wrongful acts occurred. *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997). If Sheriff Barrett has met this burden, the Plaintiffs must then demonstrate that she violated clearly established law based upon objective standards. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                          Page 26
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

[6] On this record, it is undisputed that the Sheriff was acting within the scope of her discretionary authority when she made the various employment decisions at issue. Moreover, there can be no doubt that in December 1992, when Sheriff Barrett assumed office, it was clearly established that intentional discrimination in the workplace on account of race violated federal law. *See Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir.1995); *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1064 (11th Cir.1992) (citing *Washington v. Davis*, 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976)); *Busby v. City of Orlando*, 931 F.2d 764, 775 (11th Cir.1991) (same); *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1478 (11th Cir.1991) (same).

[7] Sheriff Barrett, however, relying on *Foy v. Holston*, 94 F.3d 1528 (11th Cir.1996), argues that she is entitled to qualified immunity because she had a "substantial lawful motive" for making each of the employment decisions in question. In *Foy*, the parents of children removed or threatened with removal from a religious community[FN11] sued the responsible state social service employees under section 1983 claiming that the state employees acted out of hostility toward the parents' religious beliefs. The social service employees moved for summary judgment claiming qualified immunity. We held that the defendants were entitled to qualified immunity because "it was [not] already clearly established when [the employees] acted that no child custody worker could lawfully act-that is, do what Defendants did-to protect children in the circumstances of this case if the worker also acted, in part, out of hostility toward the parent's religion." *Id.* at 1536. Subsequently, we have observed that the holding in *Foy* "rested primarily on the existence of an *indisputable and adequate lawful motive* on the part of the social service employees such that reasonable officials would disagree as to the legality of their conduct." *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1379 (11th Cir.1997) (emphasis added).

FN11. The plaintiffs were married couples who belonged to Christ Temple Church and lived in "The Holyland"-property owned by the Church.

In this case, however, the jury squarely found that Sheriff Barrett intentionally discriminated against many white law enforcement officers on account of race, and, in so doing, unambiguously rejected her proffered non-discriminatory reasons for her employment decisions. *Foy*, therefore, is inapposite. Based on a painstaking review of this record, we are satisfied that a reasonable jury could find Sheriff Barrett intentionally made race-based employment decisions in violation of Plaintiffs' clearly established rights. As a result, the district court properly denied the Defendants' motion for judgment as a matter of law because of qualified immunity. *See Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir.1990) ("[I]f there is substantial evidence opposed to the motions [for judgment as a matter of law], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.' ") (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)).

B.

[8][9] Next, the Defendants argue that the district court erred in denying their *1322 motion for judgment as a matter of law as to Fulton County's liability under section 1983. Specifically, they claim that Sheriff Barrett did not have "final policy-making authority" over personnel decisions and that Fulton County had no "policy or custom" of employment discrimination, thereby foreclosing County liability for any of the many challenged employment decisions. Whether the County may properly be held liable under section 1983 makes no practical difference to the outcome of the case for three independent reasons. First, to the extent that Plaintiffs complied with Title VII's preconditions to suit, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                    Page 27
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

County may properly be held liable under Title VII for all of the claims Plaintiffs press under section 1983.[FN12] Second, none of the Plaintiffs' total damages awards exceeded the relevant statutory limitation of $300,000 imposed by Title VII.[FN13] Therefore, we need not consider whether the awards would be permissible under section 1983. Third, as Plaintiffs conceded before the district court, they may not be awarded punitive damages against the County.[FN14] *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258-61, 101 S.Ct. 2748, 2755-56, 69 L.Ed.2d 616 (1981); *Healy v. Town of Pembroke Park,* 831 F.2d 989, 991 (11th Cir.1987). Because Title VII provides an alternative basis for liability in this case, we need not, and will not, address the purely academic question of whether the County could also properly have been found liable under section 1983.

> FN12. As we have noted previously, the jury did not specify on which theory of liability it grounded its award of damages.

> FN13. 42 U.S.C. § 1981a(b)(3)(D) provides that the total amount recoverable for each complaining party under Title VII for compensatory and punitive damages shall not exceed $300,000, where the employer has more than 500 employees. Here, the Sheriff's Department employs greater than 500 employees, and the highest damages award was $300,000 for Major Alexander, $250,000 in compensatory damages and $50,000 in punitive damages. Compensatory damages do not include backpay or any other relief authorized under section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g). *See* 42 U.S.C. § 1981a(b)(2).

> FN14. Plaintiffs also cannot recover punitive damages against Sheriff Barrett in her official capacity, *see Colvin v. McDougall,* 62 F.3d 1316, 1319 (11th Cir.1995), because Plaintiffs' suit against Sheriff Barrett in her official capacity is the functional

equivalent of suing the County, *see Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

C.

[10] Defendants also broadly allege that the district court erred in so far as it tried each of the Plaintiffs' claims together. After discovery, Defendants moved to sever Plaintiffs' individual claims of discrimination contending that the joint trial of these claims would confuse the jury and unfairly prejudice their defense. The district court rejected this motion. We review a district court's joinder of Plaintiffs' claims and denial of severance for abuse of discretion. *Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1100 (5th Cir.1973).[FN15] Although we recognize that unfair prejudice may result from trying together the claims of multiple Plaintiffs alleging different types of discrimination, we discern no abuse of discretion in the district court's decision to join the Plaintiffs' claims in this case.

> FN15. The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

[11] Among other things, the Federal Rules of Civil Procedure provide that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or **\*1323** fact common to all these persons will arise in the action." Fed.R.Civ.P. 20(a). *See also Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996). A party seeking joinder of claimants under Rule 20 must establish two prerequisites: 1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and 2) some question of law or fact common to all persons seeking to be joined. *See* Fed.R.Civ.P. 20(a). Plainly, the central purpose of Rule 20 is to promote trial convenience and ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                          Page 28
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

pedite the resolution of disputes, thereby eliminating unnecessary lawsuits. *See Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332 (8th Cir.1974). The Federal Rules, however, also recognize countervailing considerations to judicial economy. Rule 42(b), for example, provides for separate trials where the efficiency of a consolidated trial is outweighed by its potential prejudice to the litigants. *See*Fed.R.Civ.P. 42(b); *Grayson,* 79 F.3d at 1097. The Supreme Court has instructed the lower courts to employ a liberal approach to permissive joinder of claims *and* parties in the interest of judicial economy: "Under the Rules, the impulse is towards entertaining the broadest scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1137, 16 L.Ed.2d 218 (1966).

In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts have looked for meaning to Fed.R.Civ.P. 13(a) governing compulsory counterclaims. *See Mosley,* 497 F.2d at 1333. For the purposes of Rule 13(a), " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926) (interpreting the compulsory counterclaim provision of former Equity Rule 30). Accordingly, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley,* 497 F.2d at 1333. Several courts have concluded that allegations of a "pattern or practice" of discrimination may describe such logically related events and satisfy the same transaction requirement. In *Mosley,* perhaps the leading case on the joinder of Title VII plaintiffs under Rule 20, *see* 4 Lex K. Larson, *Employment Discrimination,* § 78.05, at 28-29 (2d ed.1994), ten black plaintiffs alleged that General Motors had a general policy of discrimina-

tion against black employees. The trial court had ordered the severance of the claims, concluding that the allegations presented a variety of issues and had little relationship to one another. *Mosley,* 497 F.2d at 1332. The Eighth Circuit reversed the trial court's order to sever plaintiffs' claims, concluding that, based on its reading of Rule 20, the General Motors policy "purportedly designed to discriminate against blacks in employment ... [arose] out of the same series of transactions and occurrences." *Id.* at 1334. The court held that "[s]ince a 'state-wide system designed to enforce the registration laws in a way that would inevitably deprive colored people of the right to vote' was determined to arise out of the same series of transactions or occurrences, we conclude that a company-wide policy purportedly designed to discriminate against blacks in employment ... arises out of the same series of transactions or occurrences."*Id.* at 1333-34 (quoting *United States v. Mississippi,* 380 U.S. 128, 142, 85 S.Ct. 808, 815-16, 13 L.Ed.2d 717 (1965)). *See also Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1422 (S.D.N.Y.1989) ( "A company-wide policy purportedly designed to discriminate against females in employment arises out of the same series of transactions or occurrences."); *\*1324King v. Pepsi Cola Metro. Bottling Co.,* 86 F.R.D. 4, 6 (E.D.Pa.1979) (noting that allegations of a "pervasive policy of discrimination" by the employer bring the "complaints of individual Plaintiffs under the rubric of the 'same series of transactions' "); *Vulcan Soc'y of Westchester Cty. v. City of White Plains Fire Department,* 82 F.R.D. 379, 387 (S.D.N.Y.1979) (stating that transaction requirement met where Plaintiffs and would-be Plaintiffs claimed discriminatory policies and practices which included a series of exams allegedly used to discriminate against blacks).

[12] The second prong of Rule 20 does not require that *all* questions of law and fact raised by the dispute be common, but only that *some* question of law or fact be common to all parties. *See Mosley,* 497 F.2d at 1334. Several courts have found that the question of the discriminatory character of De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                    Page 29
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

fendants' conduct can satisfy the commonality requirement of Rule 20. *See Mosley,* 497 F.2d at 1334 (finding that whether the threat of a racially discriminatory policy hangs over a racial class is a question of fact common to all the members of the class); *Blesedell,* 708 F.Supp. at 1422 (noting that "[i]n employment discrimination cases under Title VII, courts have found that the discriminatory character of a defendant's conduct is common to each plaintiff's recovery"); *cf. Grayson,* 79 F.3d at 1095-96 (suggesting that "a unified policy, plan, or scheme of discrimination" can satisfy Rule 20's commonality requirement).

On the other hand, the prejudicial effects of other witnesses' alleged discriminatory experiences may outweigh their probative value where, for example, the alleged discrimination occurs during different time periods, *see, e.g., Annis v. County of Westchester,* 136 F.3d 239, 247 (2d Cir.1998); *Williams v. The Nashville Network,* 132 F.3d 1123, 1130 (6th Cir.1997), different supervisors make the challenged decisions, *see, e.g., Annis,* 136 F.3d at 246-47; *Williams,* 132 F.3d at 1130; *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1221 (5th Cir.1995), or the alleged discrimination happens at geographically removed places, *see, e.g., Williams,* 132 F.3d at 1130; *Mooney,* 54 F.3d at 1221. None of these concerns is presented here.

[13] In this case, the district court did not abuse its discretion in finding that the Plaintiffs satisfied both requirements for joinder. As for the first requirement, all of the Plaintiffs' claims stem from the same core allegation that they were subject to a *systemic* pattern or practice of race-based discrimination against white law enforcement officers by Sheriff Barrett in her first year in office. Plaintiffs all seek relief based on the same series of discriminatory transactions by the same decision-maker in the same department during the same short time frame. As for the second requirement, the discriminatory character of Defendants' conduct is plainly common to each plaintiff's recovery. The fact that the Plaintiffs suffered different effects-in this case,

discrimination in promotions, transfers, assignments, or discipline-from the alleged policy of discrimination did not preclude the trial court from finding a common question of law and fact. *See Mosley,* 497 F.2d at 1334; *Blesedell,* 708 F.Supp. at 1422.

[14][15][16] Alternatively, the Defendants argue that even if the district court did not abuse its discretion in finding proper joinder under Rule 20(a), it did err in failing to sever the Plaintiffs' cases for trial under Fed.R.Civ.P. 42(b).[FN16] *Grayson,* 79 F.3d at 1097. As Rule 42(b) requires the district **\*1325** court to balance considerations of convenience, economy, expedition, and prejudice, the decision to order separate trials naturally depends on the peculiar facts and circumstances of each case. Again, we disturb a district court's decision not to order separate trials only upon a showing of abuse of discretion. *See Bailey v. Board of County Comm'rs,* 956 F.2d 1112, 1127-28 (11th Cir.1992). We can discern no abuse of discretion here.

> FN16. Rule 42(b) provides in full: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States." The trial court likewise has discretion under Rule 20(b) to order separate trials "to prevent delay or prejudice," but this was not argued by appellants' in their brief, and therefore we will not address that rule here.

Defendants suggest that there was no way to try together the individual claims of the eighteen Plaintiffs, each involving different work histories,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                    Page 30
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

employment decisions and prayers for relief, without unfairly prejudicing their defense and confusing the jury. While we acknowledge the real potential for confusion among jurors and for unfair prejudice to a defendant where there are large numbers of Plaintiffs, claims, and defenses, and urge care in joining together in one case multiple claims and multiple claimants, we conclude that in this case the potential for prejudice was minimized because of the core similarities in Plaintiffs' claims. As we have stated, the claims all center on the core allegation of a systemic pattern of race-based discrimination against white law enforcement officers instigated by Sheriff Barrett during her first year in office. Moreover, the Plaintiffs' specific claims also overlap substantially. Each plaintiff, with the exception of Major A.M. Alexander, challenged on the grounds of race discrimination Sheriff Barrett's alleged failure to consider him or her for appointment to unclassified positions. Thirteen Plaintiffs claimed the Sheriff discriminated against each of them in assignments or transfers. In addition to these two main claims, three of the Plaintiffs alleged that they were discriminated against with respect to reclassifications, two claimed that they were discriminated against when Sheriff Barrett failed to restore their rank after voluntary demotions, and two claimed they were disciplined in a discriminatory manner. Furthermore, several of the claims-discriminatory denial of reclassification, discriminatory denial of restoration of rank, and denial of promotion claims-logically relate or overlap. Finally, each of the Plaintiffs' claims and the evidence of discrimination undoubtedly are relevant to every other plaintiff's core allegation of systemic discrimination. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (explaining that evidence of pervasive discrimination against others is admissible if such evidence is similar to the complainant's experience and tends to establish that "racial discrimination was the company's standard operating procedure-the regular rather than the unusual practice") (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336,

97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)); *Mooney,* 54 F.3d at 1221 (holding that "to show relevancy, Trial Plaintiffs had to show that the proffered anecdotal witnesses were sufficiently similar to themselves so that the witnesses' testimony would have a tendency to show 'standard [discriminatory] operating procedure' and a 'regular rather than unusual practice' of discrimination.") (quoting *International Brotherhood of Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855).

Given the common core of allegations, the substantial overlap of the particular claims, and the logical interconnection of several of the different forms the alleged discrimination took, we are satisfied that the district court did not abuse its discretion**\*1326** in finding that the efficiency of a consolidated trial outweighed the potential for unfair prejudice or jury confusion.

While the Defendants also claim that the verdict itself reflects that the joint trial of the eighteen Plaintiffs hopelessly confused the jury, requiring remand and severance, we cannot agree. The verdict actually delivered by the jury, when considered in its entirety, suggests to the contrary that the jury discerned the strengths and weaknesses of the claims of each individual plaintiff. Indeed, the jury denied relief on all claims concerning promotion to unclassified major.[FN17] The jury also found against two of the four Plaintiffs who claimed that they should have been reclassified,[FN18] and against five of the ten Plaintiffs who alleged that they were not *selected* to unclassified captain positions due in part or in whole to their race.[FN19] *See United States v. Bermea,* 30 F.3d 1539, 1574 (5th Cir.1994) (stating that "[t]he mixed verdicts returned with respect to [the two of the Defendants] demonstrate that the jury was not confused"); *United States v. LaSpesa,* 956 F.2d 1027, 1032 (11th Cir.1992) (finding no error in the district court's denial of motion for severance because, among other reasons, "the jury's mixed verdict showed, at least to some degree, that it effectively linked the evidence to the appellants and 'refuted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any allegation of compelling prejudice' ") (quoting *United States v. Hernandez,* 921 F.2d 1569, 1578 (11th Cir.1991); *United States v. Perlstein,* 120 F.2d 276, 281 (3d Cir.1941)) (finding that the jury was not confused by two conspiracies being tried together because they acquitted one defendant and convicted the other). On this record, we cannot say that the district court abused its discretion in not severing Plaintiffs' individual claims.

> FN17. While the jury found that all Plaintiffs, except for Major Alexander, were not considered for promotion to the unclassified position of major because of race, it rejected all of their claims that they were not actually selected for the position because of race.

> FN18. The jury found in favor of Jimmy Bolt and Robert Smith, and against Joseph Bantin, and Benjamin Steele.

> FN19. The jury found in favor of Denise Brooks, Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith. The jury found against Charles Alexander, Joseph Bantin, Jimmy Bolt, Benjamin Steele, and Robert Upshaw.

### D.

[17][18] Next, the Defendants challenge the district court's evidentiary rulings concerning the admissibility of statistical evidence designed to show that white officers were underrepresented in the Sheriff's department, and non-statistical evidence offered to show a custom or practice of discrimination against white employees by Fulton County. Again, we review the district court's evidentiary rulings for abuse of discretion, *see Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.1997), and reverse only if the moving party establishes that the ruling resulted in a "substantial prejudicial effect," *Piamba Cortes v. American Airlines, Inc.,* 177 F.3d 1272, 1305 (11th Cir.1999) (citation and internal quotation marks omitted); *see also*Fed.R.Evid.

103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."); Fed.R.Civ.P. 61 (An erroneous evidentiary ruling is not subject to reversal unless refusal to take such action is "inconsistent with substantial justice."). When employing an abuse of discretion standard, "we must affirm unless we at least determine that the district court has made a clear error of judgment, or has applied an incorrect legal standard." *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1333 (11th Cir.1996) (citations and internal quotation marks omitted). While we think the district court erred in admitting both *1327 types of evidence, we are satisfied that the error did not result in a substantial injustice to the Defendants.

First, the Defendants challenge the district court's decision to admit five pieces of statistical evidence: (1) testimony concerning and comparing the racial composition of the Sheriff's Department to the general demographics of an eight-county Metropolitan Atlanta area; (2) evidence regarding changes in the overall racial composition of the Sheriff's Department and the workforce in Fulton County over two decades; (3) evidence establishing the change in the racial composition of the general workforce of Fulton County government from the mid-1970's to the present; (4) testimony regarding the increase in the number of minority employees in Fulton County government from 1985 to 1995 and the concomitant decrease in the number of white employees; and finally, (5) evidence that the overall composition of the County workforce had increased from 22.1% minority in 1972 to 55.9% in 1989, that the percentage of black County Department Heads had increased from zero in 1972 to 40 to 50% in 1990, and that the number of black members of the Board of Commissioners had increased from zero of three to five of seven between 1972 and 1990.

[19][20][21] We begin by considering the relevance of the first two pieces of evidence generally comparing the racial composition of the Sheriff's De-

207 F.3d 1303                                                                                    Page 32
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 542
(Cite as: 207 F.3d 1303)

partment to the demographics of Fulton County and the eight-county metropolitan Atlanta area to show discrimination by the Sheriff's Department. On occasion, we have regarded as probative of class-based disparate treatment statistics showing that a given minority is "underrepresented" in the work force by comparison with the *general* population. *See, e.g., United States v. City of Miami,* 614 F.2d 1322, 1339 (5th Cir.1980) (comparing numbers of Spanish-surnamed City employees with Spanish-surnamed members of the Miami labor force), *reh'g granted on other grounds,*664 F.2d 435 (5th Cir.1981). The usefulness of such statistical comparisons, however, is generally limited to claims involving jobs with low skill levels where the applicant pool can be considered roughly coextensive with the general population. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 726, 102 L.Ed.2d 854 (1989) (explaining that "[i]n the employment context, we have recognized that for certain *entry* level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination. But where *special* qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task") (citations omitted) (emphasis added); *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977) (noting that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value"); *International Brotherhood of Teamsters,* 431 U.S. at 338 n. 17, 97 S.Ct. at 1856 n. 17 (considering as evidence of intentional discrimination statistics comparing the percentage of black residents in various cities with the percentage of blacks hired as line drivers in those cities). *See also Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1553 (11th Cir.1994) (noting that "in order to

determine discriminatory exclusion, unskilled positions are compared to a different statistical pool than are jobs requiring special skills"). In a disparate treatment case where low skill jobs are not at issue, "the statistical evidence must be finely tuned to compare the employer's relevant workforce*1328 with the qualified populations in the relevant labor market." *Forehand v. Florida State Hosp. at Chattahoochee,* 89 F.3d 1562, 1575 (11th Cir.1996) (disparate treatment class action) (citation and internal quotation marks omitted).

In this case, the Plaintiffs consist of current or former sworn law enforcement officers in the Fulton County Sheriff's Department. Plainly, these jobs are not entry level and are not of a "low skill level" within the meaning of *International Brotherhood of Teamsters* and *Hazelwood.* The relevant labor pools undoubtedly are narrower than Plaintiffs' vague comparison to general population figures would suggest, and the comparisons must be more subtle and nuanced. Indeed, for the unclassified captain and major positions, Sheriff Barrett appointed officers with the rank of classified sergeant or higher (in addition to some outside hires). The relevant labor market for these positions, therefore, consisted of all law enforcement officers with at least the rank of sergeant. For reclassifications, the relevant population was comprised of all law enforcement officers eligible for reclassification. For transfers and assignments, the relevant market consisted of all law enforcement officers eligible for the transfer or assignment in question. And for disciplinary actions, the relevant pool was made up of law enforcement officers who had committed the same or similar offenses as the officer who was subject to discipline. Because the general population is not readily qualified for the law enforcement positions at issue in the case, the Plaintiffs cannot show discrimination in hiring simply by comparing the percentage of white sworn officers in the Fulton County Sheriff's Department with the percentage of white residents of Fulton County or metropolitan Atlanta. To show discrimination in hiring for these law enforcement positions, the Plaintiffs would in-

207 F.3d 1303                                                                    Page 33
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

stead have to show a disparity between the percentage of whites hired as law enforcement officers and the percentage of whites in the relevant labor pool of qualified individuals. Because Plaintiffs' statistical evidence attempts to show discrimination just by looking at the general population rather than at the *relevant* skilled labor pool, the evidence has no real probative value of whether, within the relevant labor pool, the Sheriff's Department discriminated on the basis of race. As a result, we think the first two pieces of statistical evidence should have been excluded by the trial court.

[22] The remaining three pieces of statistical evidence showing the increase in the number of minority employees of Fulton County government also are not relevant to the allegations that the Sheriff discriminated in this case. The evidence was offered to suggest the Sheriff's Department was somehow influenced and encouraged by a larger County-wide policy of discriminating against whites. But this evidence is not probative of a custom or policy in the Sheriff's department for two reasons. First, the statistical evidence reflecting the rising number of minority employees in the County workforce does not alone tend to establish that Fulton County officials initiated and maintained a custom of discrimination against their white employees. It does not ineluctably follow that a rise in the number or percentage of minority employees in the County was caused by a custom or policy of discrimination maintained by County officials. Second, even if a policy or custom of discrimination by the County was somehow demonstrated or even suggested by the rising number of minorities in the County workforce, this evidence standing alone has no bearing on whether such a policy or custom of discrimination was also maintained by the Sheriff's Department. Notably, the Plaintiffs have not shown that the County participated in any way in the employment decisions made by the Sheriff and therefore cannot establish any connection*1329 between the hiring decisions and policies of the County and those of the Sheriff's Department. As a result, evidence of the racial composi-

tion of Fulton County government employees, even if it suggests a policy of racial discrimination by the County, does not make a similar pattern or policy of racial discrimination by the Sheriff's Department against its employees any more or less likely.

[23] Although we believe that the district court erroneously admitted the challenged statistical evidence, we are satisfied, after a thorough review of the record, that the error does not warrant reversal for two reasons. First, the district court adequately instructed the jury on the proper weight to be given to the evidence thereby ameliorating any prejudicial effect the evidence might otherwise have had. In instructing the jury on how to evaluate the statistical evidence, the district court stated: "[I]f you find that the Plaintiffs demonstrate a racial disparity, you may consider whether factors other than race account for the disparity and you may consider whether such disparity, if any, caused the specific personnel decisions about which they complain."

The district court's instruction to consider whether factors other than race account for any statistical disparity, largely cures any error caused by admitting the first two pieces of evidence comparing the racial composition of the Sheriff's Department with the non-relevant general populations of Fulton County and the Metropolitan Atlanta area. The instruction properly focused the jury on the question of whether the statistical disparities were the result of race-based discrimination in the Sheriff's Department or the result of a racially skewed qualified labor pool. By focusing the jury on this critical question of whether the statistical disparities showed that similarly situated black and white individuals were treated differently by the Sheriff's Department-a question in no way answered by the statistical evidence-the district court ensured that the jury did not accord the statistical evidence weight it was not due.

Moreover, as for the remaining statistical evidence examining the racial composition of the Fulton County government workforce, we are satisfied that the district court's instruction to the jury to consider

207 F.3d 1303                                                                                              Page 34
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

whether the racial disparity reflected in the statistics *caused* the specific personnel decisions challenged in this case cured any potential injustice caused by the district court's erroneous admission of this evidence. Again, the district court's instruction emphasized the need for the jury to find a causal link between the statistical disparities and the decisions made by Sheriff Barrett. No such causal link between the County and the Sheriff was presented. The district court's instruction, by focusing the jury on the need to find such a link before giving the statistical evidence weight, again ensured that the jurors would not give the evidence weight it did not deserve.

Simply put, the district court "sufficiently instructed the jury so that the jurors understood the issues and were not misled" by the statistical evidence erroneously admitted. *Carter v. DecisionOne Corp.,* 122 F.3d 997, 1005 (11th Cir.1997) (citation omitted). *See also Nettles v. Electrolux Motor AB,* 784 F.2d 1574, 1581 (11th Cir.1986) (holding that although the district court erroneously admitted certain evidence, the error was not grounds for reversal because the district court correctly focused the jury's attention on the relevant issue making it "highly unlikely" that the jury gave the evidence undue consideration).

Second, although we do find the admissible evidence presented at trial was insufficient to sustain several of the jury's verdicts,*1330 [FN20] the verdicts that we do sustain were the product of such one-sided evidence that we find it very unlikely, indeed remote, that the jury could have been swayed erroneously by the wrongfully admitted evidence. *See United States v. Mendez,* 117 F.3d 480, 486 (11th Cir.1997) (finding harmless the district court's erroneous introduction of evidence because of the ample evidence supporting the jury's verdict); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 271 (5th Cir.1980) (upholding a jury verdict despite the district court's erroneous admission of evidence because "[i]n light of our determination that the evidence was suffi-

cient to support the jury's finding of an agency relationship even without the challenged testimony, in view of the minor importance of the inadmissible matter, and in light of the district court's general instructions to the jury, we conclude that the inadmissible matter had no prejudicial impact upon the final outcome of this case"). In six of the nine verdicts that we uphold, Defendants offered *no* legitimate non-discriminatory reason for their disparate treatment of each plaintiff when compared to the identified similarly situated black comparator.[FN21] As for the remaining three verdicts, Defendants presented either patently illogical rationales for their disparate treatment of each plaintiff,[FN22] or the evidence presented by the Plaintiffs was clearly sufficient to support the jury's conclusion that the non-discriminatory rationale given by Defendants was pretextual.[FN23]

> FN20. *See infra* section IV.
>
> FN21. This was the case with the discriminatory discipline claim of James NeSmith, the failure to promote claims of Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith, and the discriminatory reclassification claim of Robert Smith. *See* discussion *infra* sections IV-A2, IV-B2-5, and IV-D.
>
> FN22. This was the case with the discriminatory reclassification claim of Jimmy Bolt. *See* discussion *infra* section IV-D.
>
> FN23. This was the case with the discriminatory discipline claim of A.M. Alexander and the discriminatory transfer clam of Kathy Jones. *See* discussion *infra* sections IV-A1 and V-C1.

While we are honestly troubled by the district court's erroneous admission of irrelevant statistical evidence, we conclude that in light of both the curative effect of the given jury instructions and the one-sidedness of the evidence presented on those claims whose verdicts we uphold, Defendants did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                Page 35
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

not suffer substantial injustice as a result of the court's evidentiary ruling. Accordingly, we decline to reverse on these grounds.

[24] The Defendants also challenge the district court's rulings on the admissibility of non-statistical evidence offered to establish "custom" under section 1983. Specifically, Defendants challenge the district court's admission of testimony from Sam Brownlee, former County Manager of Fulton County from 1972-1990, and Alice Smith, former Clerk to the Board of Commissioners who left her position before Sheriff Barrett was elected. Brownlee testified as to four principal points. First, between 1978 and 1989 the Board of Commissioners engaged in public and private discussions about making a deliberate effort to increase minority hiring. Second, the dialogue regarding affirmative action increased in the 1980's when five of the seven members of the Board of Commissioners were black. Third, during Brownlee's time as County Manager, several commissioners told him they believed there were too few blacks at department head level jobs and that he should recommend only the appointment of minorities to these positions until the situation was improved. Finally, in the mid-to-late 1980's outside groups supposedly pressured the County Commission and others within Fulton County government to fill all appointments of any consequence with blacks. Alice Smith testified that Michael *1331 Hightower, a black Commissioner, told her she had to be replaced as Clerk with a black individual.

Defendants correctly argue that the admitted testimony is not sufficiently connected in time or subject-matter to the challenged personnel decisions to be admissible. Brownlee's testimony is completely unrelated to Sheriff Barrett's actions. His testimony stemmed back twenty years *before* Sheriff Barrett was even elected. Second, the composition of the Board changed between Brownlee's tenure with the Board and Sheriff Barrett's election. Third, there is *no* evidence that the County did anything to suggest that Sheriff Barrett engage in discrimination, let

alone that it influenced or coerced her to do so. Smith's testimony is similarly irrelevant to the question of whether Sheriff Barrett discriminated against Plaintiffs. Smith's testimony did not pertain to actions by any Sheriff's Department employee. Moreover, the testimony related to a time period nine years prior to Sheriff Barrett's election.

[25] Although the non-statistical evidence at issue was improperly admitted by the district court, we again conclude its admission did not result in a substantial injustice to Defendants. First, because the anecdotal evidence admitted was so completely unconnected to the question of Sheriff Barrett's discriminatory employment policies, and so unrelated in time to the conduct here at issue, it is highly unlikely the jury would have given this evidence any weight. Second, the district court's jury instructions suggested that this evidence was of no real moment by emphasizing that in order to find Defendants liable they had to find that Sheriff Barrett, not some past and unrelated Board member, engaged in discriminatory employment practices. The court instructed the jury: "The Plaintiffs must show that Sheriff Barrett either encouraged the specific incidents complained of by the Plaintiffs or in some way directly participated in them. At a minimum, the Plaintiffs must prove that Sheriff Barrett at least officially authorized, approved or knowingly acquiesced in the alleged discriminatory conduct." And third, as we have already said, the evidence offered in support of the verdicts we uphold was so one-sided that there is no danger the jury was unduly swayed in reaching these verdicts by the erroneously admitted evidence. In short, we decline the Defendants' invitation to reverse the district court's ruling on this point.[FN24] Indeed, with regard to all of the erroneously admitted evidence, the jury's carefully considered mixed verdicts reflect that it was not unduly swayed by the irrelevant evidence. *See LaSpesa,* 956 F.2d at 1032; *United States v. Nixon,* 918 F.2d 895, 906 (11th Cir.1990).

> FN24. Defendants also challenge the admission of Fulton County's 1978, 1989,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                    Page 36
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

and 1990 affirmative action plans. They claim there was no evidence that Sheriff Barrett saw any of the plans at the times she made the determinations at issue in this case, and, thus, these plans could have no relevance to this action. With respect to the 1978 and 1989 plans, there is clearly no temporal relevance, and the district court abused its discretion in admitting them. Indeed, both plans were no longer in effect when Sheriff Barrett took office. As for the 1990 plan, Plaintiffs failed to demonstrate that Sheriff Barrett took the plan into account when she engaged in any of the challenged actions. However, for the reasons we have previously stated, we can discern no prejudicial effect stemming from the admission of these plans.

E.

Defendants also challenge on appeal three of the district court's jury instructions: first, an instruction concerning the relationship between Plaintiffs' claims and the scope of their EEOC charge; second, a charge as to what constitutes a "similarly situated" person for a discriminatory discipline*1332 allegation; and finally, the charge regarding when a local government can be held responsible for the acts or statements of its employees.[FN25] We can find no reversible error in the challenged jury instructions.

> FN25. Defendants also contest the district court's charge that, under Georgia law, Sheriff Barrett had the final decision-making authority in employment matters in the Sheriff's Department, and the instruction on statistical evidence. These challenges are addressed in separate discussions devoted to section 1983 liability and admission of statistical evidence. See discussion supra sections III-B and III-D.

[26][27][28][29][30] Our review of a trial court's jury instructions is limited. *See Eskra v. Provident*

*Life & Accident Ins. Co.,* 125 F.3d 1406, 1415 (11th Cir.1997). If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed. *See id.* On appeal, we examine "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Carter,* 122 F.3d at 1005 (citation omitted). When measured against this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed. *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir.1996). In short, we will reverse because of an erroneous instruction only if we are " 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.' " *Carter,* 122 F.3d at 1005 (quoting *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982)).

[31] First, the Defendants challenge the district court's charge concerning the relationship between the Plaintiffs' Title VII claims and the scope of their EEOC charges. The district court instructed the jury in these terms:

> Plaintiff is required to file charges of discrimination with the Equal Employment Opportunity Commission or the EEOC and to receive from the EEOC a notice of the right to sue. An EEOC charge is sufficient when it identifies the parties and describes generally the complained of act or practice. While you may review the EEOC charges as evidence of Plaintiffs' contentions at the time they were filed, the claims asserted in this case may encompass discrimination claims that are like the discrimination described in the EEOC charges, as well as claims that may reasonably be expected to grow out of the allegations in the EEOC charge during a reasonable investigation by the EEOC.

We can find no error in this charge, and conclude that it adequately stated the correct law.

[32] The starting point of ascertaining the permiss-

207 F.3d 1303                                                                    Page 37
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

ible scope of a judicial complaint alleging employ-ment discrimination is the administrative charge and investigation. *See Griffin v. Carlin,* 755 F.2d 1516, 1522 (11th Cir.1985). No action alleging a violation of Title VII may be brought unless the al-leged discrimination has been made the subject of a timely-filed EEOC charge. *See generally*42 U.S.C. § 2000e-5. EEOC regulations provide that charges should contain, among other things, "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employ-ment practices." 29 C.F.R. § 1601.12(a)(3). A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reason-ably be expected to grow out of the charge of dis-crimination." *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 589 n. 8 (11th Cir.1994) (citing *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir.1970)). Defendants contend that many of Plaintiffs' Title VII claims were not related to the allegations of discrimination raised in their EEOC charges. We are not persuaded.

**\*1333** [33][34][35] We observe at the outset that in class actions brought under Title VII, which this case was before it was decertified after the jury had returned its verdict, it is not necessary for all class members to have filed EEOC charges or to have re-ceived notices of the right to sue in order to be rep-resented by the class. *See Griffin v. Dugger,* 823 F.2d 1476, 1492 (11th Cir.1987) (citing *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 498-99 (5th Cir.1968)). As long as one named plaintiff timely files an EEOC charge, "the precondition to a Title VII action is met for all other named Plaintiffs and class members,"*id.*(citing *Oatis,* 398 F.2d at 498-99), and under the so-called "single-filing rule," if one plaintiff, in a multi-plaintiff, non-class action suit, " 'has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar dis-criminatory treatment in the same time frame need not have satisfied the filing requirement.' " *Fore-hand,* 89 F.3d at 1566 n. 8 (quoting *Jackson v. Sea-board Coast Line R.R.,* 678 F.2d 992, 1011 (11th

Cir.1982)).

[36] In this case, every plaintiff alleged in his or her EEOC charge that he or she was the victim of a pat-tern or practice of discrimination against white em-ployees in the Sheriff's Department. The allegations ultimately leveled in the complaint filed in the dis-trict court are either addressed in the *collective* EEOC charges or could be reasonably expected to grow out of those administrative charges of dis-crimination. Major Alexander's EEOC charge of discrimination, for example, contains the central claim that there was a general pattern or practice of race discrimination against white employees of the Sheriff's Department in hiring, promotions, job as-signments, and discipline. The other EEOC charges are not as specific as Major Alexander's; they are limited to allegations of discrimination in promo-tions to classified and unclassified positions. It is true that several claims of racial discrimination as-serted in Plaintiffs' complaint-denial of access to promotional exams, reclassifications, and transfers-were not specifically mentioned in the EEOC charges. However, these claims are sufficiently similar to the promotions and job assignment claims-all involve the allegedly race-based rejec-tion of Plaintiffs for desired positions within the Sheriff's Department-to be fairly characterized as arising out of similar discriminatory treatment to that specifically alleged before the EEOC. *Cf. Griffin v. Dugger,* 823 F.2d 1476, 1493 (11th Cir.1987) (holding as dissimilar for the purposes of the single-filing rule non-filing plaintiff's objective testing claim and plaintiff's subjective promotion and discipline claims); *Hill v. AT & T Technolo-gies, Inc.,* 731 F.2d 175, 181 (4th Cir.1984) (holding as dissimilar EEOC charges alleging dis-crimination in the conditions of employment and plaintiff's allegations of discrimination in hiring). Accordingly, we reject the Defendants' suggestion that Plaintiffs' Title VII claims did not fall within the ambit of their EEOC charges.

[37][38] Second, Defendants contend that the dis-trict court erred in charging the jury that it could

207 F.3d 1303                                                                    Page 38
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

find discrimination where "another similarly situated employee, who is not a member of the protected group, was not treated in a similar manner." Defendants claim that the term "similarly situated" is ambiguous, and that this charge miscasts the governing law of this circuit, which they claim requires the "same or nearly identical conduct". Again, we disagree. Although susceptible to manipulation, the phrase "similarly situated" is the correct term of art in employment discrimination law. *See Olmstead v. L.C. by Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 2193, 144 L.Ed.2d 540 (1999) (Kennedy, J., concurring in the judgment) (characterizing the "normal definition of discrimination" as "differential treatment of *similarly situated* groups" (emphasis added)); **\*1334** *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that *similarly situated* employees were not treated equally."(emphasis added)); *Osram Sylvania, Inc. v. Teamsters Local Union 528,* 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when *similarly situated* workers are treated differently even though they have committed similar acts."(emphasis added)); *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989) (holding that in order to show discriminatory discipline, plaintiff must show either that he did not violate the work rule or "that he engaged in misconduct *similar* to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who engaged in *similar* misconduct" (emphasis added)). Moreover, the law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator. *See, e.g., Osram,* 87 F.3d at 1265; *Gerwens,* 874 F.2d at 1540-41 & n. 12.

[39] Third, the Defendants argue that the district court erred when it charged the jury that "a local

government is responsible under [Title VII] for any of the acts and statements of its employees which are made within the scope of their duties as employees of the government." The Defendants suggest that the jury could have concluded that Fulton County was liable for any "stray remarks" made that were unrelated to the employment decisions. This argument is unpersuasive for three reasons: first, the Defendants failed to identify any "stray remarks" introduced into the record that may have been misinterpreted by the jury; second, in the beginning of the district judge's instruction on Title VII, he specifically discussed the statute's coverage, which limits Fulton County's liability to *intentional* acts of discrimination by its employees affecting the Plaintiffs' terms and conditions of employment; and third, the gist of the district court's instruction, even when selectively quoted by Defendants, is correct. *See, e.g.,* Restatement (Second) of Agency § 219(1) (1958); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 793, 118 S.Ct. 2275, 2286, 141 L.Ed.2d 662 (1998) (noting that, under agency principles, " 'a master is subject to liability for the torts of his servants committed while acting in the scope of their employment' ") (quoting Restatement (Second) of Agency § 219(1) (1958)); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining that "Congress has directed federal courts to interpret Title VII based on agency principles"); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1558 n. 4 (11th Cir.1987) (explaining that "[b]ecause the acts of an employer's 'agents' are those of the employer, an employer is directly, rather than indirectly, liable for its 'agents' Title VII violations"); *Williams v. City of Montgomery,* 742 F.2d 586, 589 (11th Cir.1984) (observing that "[w]here the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship" (citation and quotation marks omitted)).

IV.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                      Page 39
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

[40][41][42][43] Finally, the Defendants broadly challenge the sufficiency of the evidence presented to support the verdicts and damages entered against them. We review *de novo* the district court's denial of Defendants' motion for judgment as a matter of law, applying the same standards used by the district court. *See* *1335*Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). In conducting our review, we consider all of the evidence and draw all reasonable inferences in a light most favorable to the non-moving party. *See Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1560 (11th Cir.1995). Ultimately, we must decide "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Rabun v. Kimberly-Clark Corp.,* 678 F.2d 1053, 1057 (11th Cir.1982). Put differently, judgment as a matter of law is proper only when the "facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict." *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir.1995) (citations and internal quotation marks omitted).

[44] At various times in their briefs, the Defendants suggest that some of the Plaintiffs failed to establish a "prima facie" case of discrimination. We need not revisit this question however. "When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case 'is no longer relevant.' " *Richardson,* 71 F.3d at 806 (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983)). Here the Defendants failed to persuade the district court to dismiss Plaintiffs' claims for lack of a prima facie case. The Defendants responded to Plaintiffs' proof by proffering non-discriminatory reasons for some of Sheriff Barrett's actions. At that point, "the factfinder was then required to 'decide

whether the rejection was discriminatory within the meaning of Title VII,' "*Combs,* 106 F.3d at 1539 n. 11(quoting *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481), and the question of whether a Plaintiff had made out a prima facie case was no longer before the district court. Thus, on appeal, we have no occasion to revisit whether Plaintiffs established their prima facie cases. We do consider, however, all of the *evidence* submitted by the Plaintiffs as we determine whether a reasonable jury could disbelieve Defendants' proffered non-discriminatory reasons for the challenged employment decisions. *See id.*

Ultimately, we must examine whether the evidence presented on behalf of *each* plaintiff was sufficient to sustain each of the jury's verdicts. We note, however, that eighteen Plaintiffs brought this case alleging a broad based pattern and practice of discrimination, and the great bulk of the evidence presented was admissible as to each of the other Plaintiffs' individual cases precisely because it points to such a pattern and practice. Consequently, although we analyze each aspect of the verdict separately and individually, we emphasize that the sum of the evidence presented additionally supports each of the individual verdicts of discrimination. Thus, although a determination that a defendant may have engaged in a pattern and practice of discrimination is, standing alone, insufficient to support a claim of race discrimination in an individual case, if, as the jury plainly concluded, Sheriff Barrett racially discriminated against each of the eighteen Plaintiffs in various ways, this conclusion undoubtedly makes it more likely, in any given case, that Sheriff Barrett discriminated against a particular plaintiff.

After painstaking review of all the evidence presented we conclude: first, that there was sufficient evidence to sustain the *discriminatory discipline* claims of A.M. Alexander and James NeSmith; second, that there was sufficient evidence to sustain the verdicts in favor of Robert Fox, Gary Gettis, Carolyn Masson, and James *1336 NeSmith on their *discriminatory failure to promote* claims, but

207 F.3d 1303                                                                                               Page 40
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

there was not enough evidence to sustain the verdict in favor of Denise Brooks as to this charge; third, that there was sufficient evidence to support the jury verdict on the *discriminatory transfer or assignment* claim of Kathy Jones, but insufficient evidence to sustain the verdicts on the claims of Guerry Moore, Heidi Schaefer, Benjamin Steele, Denise Brooks, Robert Fox, and Carolyn Masson; fourth, that there was sufficient evidence presented to sustain the verdicts reached on the *discriminatory reclassification* claims of Jimmy Bolt and Robert Smith; fifth, that the evidence was insufficient on the *discrimination in access to promotional examinations* claims of Joseph Bantin, Robert Smith, and Heidi Schaefer; and finally, that the evidence was insufficient to sustain the verdicts on the *discriminatory failure to restore rank* claims of Charles Alexander and Robert Upshaw.

For ease of analysis, we group the claims according to the type of employment discrimination alleged-discipline claims, failure to promote claims, assignment or transfer claims, reclassification claims, access to promotional examinations claims, and restoration of rank claims.

*A. Discipline Claims*

[45][46][47] Major A.M. Alexander and Sergeant James NeSmith alleged that they were disciplined more severely than were black officers who committed similar offenses because of their race. To establish discrimination in discipline, just like showing discrimination in hiring, a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline. *See Lathem v. Dep't of Children and Youth Servs.,* 172 F.3d 786, 792 (11th Cir.1999); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Once a plaintiff makes a prima facie showing, the burden of going forward shifts to the employer who must provide a specific legitimate non-discriminatory

reason for disciplining the employees differently. *See Burdine,* 450 U.S. at 254-55, 101 S.Ct. 1089; *Lathem,* 172 F.3d at 793. Finally, the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of illegal discrimination. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Lathem,* 172 F.3d at 793; *Combs* 106 F.3d at 1529-38.

*1. Major A.M. Alexander*

[48] Major Alexander claims that he was disciplined more severely than were similarly situated black officers who committed similar offenses on account of his race. Major Alexander was both suspended for fifteen days *and* transferred from his position in the Service Division after allowing a subordinate to drive several Department cars home in violation of Sheriff Barrett's instructions. While Sheriff Barrett contended that the suspension and transfer of Alexander to Grady Hospital were appropriate disciplinary responses to Major Alexander's transgression, Major Alexander presented evidence suggesting he was demonstrably treated more harshly than a black officer who committed exactly the same offense. Alexander claimed that Major Louwinski, a black officer, also allowed a subordinate law enforcement officer, Teresa Simon, to drive a car home in violation of departmental policy but, unlike Alexander, he was not disciplined. While both Louwinski and Sheriff Barrett testified that Louwinski had received permission from the Sheriff before authorizing Simon to drive the car home, Alexander *1337 argued that this assertion was not worthy of belief. Neither Louwinski nor Sheriff Barrett could produce a copy of the memorandum Louwinski claimed that he wrote to Sheriff Barrett seeking permission to allow Simon to take home a Department vehicle. And, when pressed on cross-examination, Louwinski conceded that he could not even remember what the memorandum supposedly said. In addition, another officer,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                                      Page 41
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Barron Cole, testified that soon after Major Alexander left the Service Division and Louwinski took over, Louwinski allowed three more law enforcement officers to drive Department cars home, without the imposition of any sanctions. Neither Major Louwinski nor Sheriff Barrett submitted any evidence suggesting that Sheriff Barrett authorized Louwinski to allow any of those officers to take home Department cars, and none of their names appeared on a list of officers permitted to take home Department vehicles submitted into evidence by the Defendants. Based on all the evidence presented, we are satisfied the jury had sufficient basis to find that Alexander was treated more harshly than Louwinski because of his race. Accordingly, we uphold the jury's compensatory damages award against Sheriff Barrett.

[49][50][51] We must consider separately the appropriateness of the jury's award of punitive damages. Last term in *Kolstad v. American Dental Ass'n.,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court determined the circumstances under which a court can award punitive damages under Title VII.[FN26] The Supreme Court rejected the holding of the Court of Appeals for the District of Columbia that eligibility for punitive damages required a showing of "egregious" misconduct by the employer. *Kolstad,* 119 S.Ct. at 2124. The Court emphasized that what was necessary for an award of punitive damages was not "a showing of egregious or outrageous discrimination" but only a showing that the employer acted with the appropriate state of mind. *Id.* at 2124. The appropriate state of mind meant acting "with malice or with reckless indifference to [the plaintiff's] federally protected rights,"§ 1981a(b)(1), which, the Court explained, required a showing of either an *evil intention* to deprive a plaintiff of his federally protected rights or a *conscious indifference* to these rights. *Id.* at 2124-25.[FN27] At a minimum, the Court explained, in order to be liable in punitive damages, "an employer must ... discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 2125.

FN26. Title VII's punitive damages provision was based on §§ 1983 and 1981 standards. *See, e.g., Kolstad,* 119 S.Ct. at 2124; *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278 (5th Cir.1999)

FN27. The Supreme Court in *Kolstad* relied primarily on its earlier case of *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), which described the standard for awarding punitive damages in § 1983 cases, to illuminate the meaning of the terms "malice" and "reckless indifference" as used in the parallel standard for awarding punitive damages under Title VII. *Smith,* like *Kolstad,* emphasized that malice or an intent to injure was not required for an award of punitive damages, but only reckless indifference which, the Court suggested, entailed a "criminal indifference to civil obligations" or a "subjective consciousness of risk of injury." *Id.* at 37 n. 6, 41, 51,103 S.Ct. 1625.

[52][53][54] The Supreme Court emphasized that this standard of liability is higher than that for establishing a right to compensatory damages. *Id.* at 2124. Liability for punitive damages requires not merely a showing of intentional discrimination but a showing that the employer acted with "knowledge that it may be acting in violation of federal law." *Id.* at 2124. The Court explained that under this standard:

[t]here will be circumstances where intentional discrimination does not give rise to punitive damages.... In some *1338 instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                          Page 42
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

*Id* at 2125. The instant case, however, does not fall into this category of cases in which intentional discrimination was shown but the appropriate state of mind for punitive damages was not. The theory of discrimination at issue in this case, the illegality of race-based employment decisions, is neither novel nor poorly recognized. The question of race as a bona fide occupational qualification was never suggested. Most importantly, however, Sheriff Barrett did not operate under any misapprehension about the legality of treating black and white law enforcement officers differently. Indeed, Sheriff Barrett unambiguously testified that she knew it was illegal to treat employees differently on account of race.FN28 Given the jury's amply supported finding that Sheriff Barrett intentionally discriminated against Alexander on account of his race, in concert with Sheriff Barrett's self-professed understanding that such treatment deprives an employee of his federal rights, a reasonable jury could conclude that Sheriff Barrett indeed acted "in the face of a perceived risk that [her] actions [would] violate federal law." *Id.* at 2125. *See also Equal Employment Opportunity Commission v. Wal-Mart Stores, Inc.,* 187 F.3d 1241, 1246 (10th Cir.1999) (holding that because store manager testified he was familiar with the requirements of the ADA a reasonable jury could have concluded that the employer intentionally discriminated against plaintiff in the face of a perceived risk that its action would violate federal law and upholding award of punitive damages).

> FN28. The relevant portion of the transcript is as follows:
>
> Q: Well, it wouldn't be-would you agree that it would be permissible to terminate people because of their race?
>
> A: Would I agree-I'm sorry.
>
> Q: Does any reason include race?
>
> A: It wouldn't for me.
>
> ...

> Q: So when you say that they are terminable at will or could be fired for any reason, you are not asserting that it would be okay to fire someone because of their race?
>
> A: I would never assert that, no.
>
> ...
>
> Q: ... Although no one has a right to a classified job, people do have a right to be considered for those jobs independent of their race. Would you agree?
>
> A: Certainly.
>
> R3-16-216-217.

Accordingly, we uphold the jury's punitive damages award against Sheriff Barrett.

### 2. James NeSmith

[55] Sergeant James NeSmith alleged that on two occasions he too was disciplined more severely than were similarly situated black employees. First, Sergeant NeSmith points to his receipt of a letter of reprimand from Chief Deputy Gregory P. Henderson for his role in releasing two female inmates from the Jail who were wanted by the Waycross, Georgia police. Sergeant NeSmith was working as the Relief Sergeant at the Booking Intake Area at the Jail when the two women, who were supposedly wanted by the Waycross Police Department, were brought in. After noticing discrepancies between the physical characteristics of the two women and the descriptions of the individuals wanted by the Waycross Police and after discussing the situation with a detective in the Waycross Police Department and with Sergeant David Mosley, a black man who was *1339 in charge of the Booking Intake Area at the Jail, Sergeant NeSmith released the two women. Soon thereafter, Sergeant NeSmith learned that the women he had released were in fact the women who were wanted by the law enforcement authorit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                    Page 43
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

ies in Waycross. Indeed, Sergeant Mosley testified that he bore the greater responsibility for the decision to release the two women. Sergeant Mosley, however, received no reprimand for his role in the release.

Second, Sergeant NeSmith points to the discipline he received-being assigned to the "guard shack"-after a black prisoner was assaulted in his cell while NeSmith was on duty in the control tower. Sergeant NeSmith was working in a control tower in the Booking Intake Area when he observed Sergeant LeBarron Woodard and Officer Marvin Swint, both black officers, physically remove a combative prisoner from a police car. The officers put the prisoner in a padded cell which Sergeant NeSmith could not see from the control tower. Shortly thereafter, the prisoner was abused in his cell. While the charges of abuse were being investigated, NeSmith was assigned to the "guard shack," a small building that controls the outer gate of the Jail, and a position not generally filled by a sergeant. The two black officers, Sergeant Woodard and Officer Swint, were not reassigned during the investigation.

Defendants did not present any non-discriminatory reason for why NeSmith received different treatment in both the booking and police brutality incidents than did the other officers who were more closely involved, except to say simply that Ne-Smith's conduct merited the actions taken by the Department. Based on the evidence presented showing that NeSmith received punishment when black officers involved in the same incidents did not, we are satisfied that the jury had a reasonable basis to find that Sergeant NeSmith was twice disciplined on account of his race.

### B. Failure to Promote Claims

[56] In order to prevail on a discriminatory failure to promote claim, each plaintiff must establish a prima facie case of race discrimination by showing that: 1) he is a member of a protected minority; 2)

he was qualified and applied for the promotion; 3) he was rejected despite his qualifications; and 4) other equally or less qualified employees who are not members of the protected minority were promoted. *See Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir.1999) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988)). Again, once the plaintiff has made out a prima facie case of discrimination, the employer must articulate some legitimate, non-discriminatory reason for the employee's rejection. *See Wu*, 847 F.2d at 1483-84. If the employer meets this burden of production, the plaintiff then must establish that the defendant's proffered reasons for promoting a black officer instead of plaintiff were pretextual. *See id.*

[57] In a failure to promote case, however, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race. We have explained, "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer." *Combs*, 106 F.3d at 1543. *See also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision"); *\*1340Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277 (5th Cir.1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position.... The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination."). However, both the Supreme Court and this court have observed that evidence showing an employer hired a less qualified applicant over

207 F.3d 1303                                                                                                          Page 44
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual. *See Walker v. Mortham,* 158 F.3d 1177, 1190 (11th Cir.1998) (" 'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.' ") (quoting *Burdine,* 450 U.S. at 258-59, 101 S.Ct. 1089). *See also Taylor,* 175 F.3d at 868 (stating that evidence of plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when it promoted him).

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing he was more qualified than the person promoted. In *Deines,* for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that: "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase "jump off the page and slap you in the face" "should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact...." *Id.* at 280-81. The Tenth Circuit in *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321 (10th Cir.1999), suggested a similar evidentiary burden for proving pretext. According to the Tenth Circuit, "Our role is to prevent unlawful hiring practices, not to act as a 'super personnel de-

partment' that second-guesses employers' business judgments.... Moreover ... [plaintiff] provides no evidence that he was so clearly better qualified than Mr. Valley that a jury could reasonably conclude that [the employer] based its decision on something other than its proffered reason." *Simms,* 165 F.3d at 1329-30.

Here, the jury found that five Plaintiffs, Denise Brooks, Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith, would have been promoted but for their race.[FN29] In support of their claims, Plaintiffs introduced several pieces of generally applicable evidence. Among other things, the Plaintiffs pointed out that between February 1993 and October 1994, nine out of ten promotions to unclassified positions went to blacks,[FN30] and notably that several blacks who were promoted, Greg Walker *1341 (Sergeant to Captain), Gary Harmon (Sergeant to Captain), and Dave Louwinski (Sergeant to Major), skipped ranks, notwithstanding the fact that the Fulton County "classified" captain job description expressly provides that Captains should have "two years experience as a Lieutenant or comparable rank." Plaintiffs established that there were no minimum qualifications or quantifiable special skills applicable to the "unclassified" positions, that there was no formal application or selection process for those positions, and that there were no advertising and recruitment efforts.[FN31] Finally, each of these Plaintiffs directed the jury generally to the evidence that Sheriff Barrett engaged in a pervasive pattern or practice of discrimination against white law enforcement officers on account of race.

> FN29. Sheriff Barrett promoted five individuals to unclassified captain positions over Plaintiffs: Greg Walker, Gary Harmon, Dorothy Walker, Edward McIver, and Mark Calloway. All of these individuals except for Mark Calloway are black.
>
> FN30. The ten promotions to unclassified positions made by Sheriff Barrett went to Lafayett Briggs, David Louwinski, Mi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                    Page 45
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

chael Cooke, Gary Harmon, Edward McIver, Riley Taylor, Dorothy Walker, Edgar Hillsman, and Greg Walker, twice. Greg Walker was promoted first to unclassified captain on February 25, 1993, and then to unclassified major on May 11, 1994. Of these individuals only Riley Taylor is white.

FN31. Sheriff Barrett testified at trial that there were no formal hiring requirements by which she was bound in promoting individuals to unclassified positions. According to Sheriff Barrett:

> I know that I'm not held on the unclassified service to what is listed [as the minimum qualifications for jobs in the County job descriptions].... I'm also saying I'm not held to these documents on the unclassified service.... I'm free to make those appointments based on my best judgment of a person's ability to perform whatever function it is that I'm asking them to perform.

> ...

> I don't know there are any thresholds for eligibility as required by law. I think that maybe common sense might dictate that I do something like make certain that a person I want to appoint as captain is, in fact, a peace officer. But I don't even know that I have thresholds [for eligibility] legally.

> R24-37-4253-4254.

[58] Assessing whether the Plaintiffs have presented sufficient evidence to sustain a verdict that they were denied a promotion because of race is particularly difficult in a case such as this where the disputed positions are essentially political appointments. While the usual disparate treatment case involves a position for which the qualifications may

be measured objectively, we anticipate that for political appointments the qualifications required will be both subjective and objective. We expect, for example, that an elected official may appoint a command team, or a political staff, that not only is objectively qualified to handle its day-to-day job duties, but that also shares a vision with and possesses a certain degree of loyalty to the elected official who appoints them. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (recognizing that loyalty is a legitimate hiring criteria for an elected official to use when selecting individuals to serve in policymaking positions under him); *Shahar v. Bowers,* 114 F.3d 1097, 1104 (11th Cir.1997) (noting that the state Attorney General, who is an elected official, "may properly limit the lawyers on his professional staff to persons in whom he has trust"). We add that it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated. We measure each claim against these standards.

*1. Denise Brooks*

[59] Sergeant Brooks claimed that Sheriff Barrett failed to promote her to the unclassified position of captain because of race. Brooks suggested that she was more qualified than a black man, Greg Harmon, whom Sheriff Barrett did appoint to an unclassified captain position because, although both were sergeants, she had experience working in an administrative capacity in the Jail and Harmon did not.

At trial, Sheriff Barrett plainly articulated a legitimate, non-discriminatory reason for appointing Harmon to the unclassified position, namely that Harmon had been **\*1342** elected by his peers to lead the local union and could keep an open line of communication between the rank-and-file officers and the Sheriff. But in response, Brooks pointed to no evidence suggesting this legitimate race-neutral reason was not the real reason Sheriff Barrett promoted Harmon and not Brooks. *See Nix v. WLCY*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                              Page 46
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
(Cite as: 207 F.3d 1303)

*Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984) (explaining that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Based on the whole record, we are constrained to conclude that the evidence simply cannot support the jury's finding that Sheriff Barrett discriminated against Brooks when the Sheriff appointed Harmon to the unclassified captain position.

*2. Robert Fox*

[60] Lieutenant Fox also alleged that Sheriff Barrett discriminated against him on the basis of race when she failed to promote him to the position of unclassified captain but instead promoted two black men to the unclassified position. Fox testified that he had more experience than either Greg Harmon or Edward McIver and had served as their supervisor before Sheriff Barrett appointed them to their unclassified captain positions. Sheriff Barrett's legitimate non-discriminatory reason for promoting Harmon remains just as valid with respect to Fox as it was for Brooks. Sheriff Barrett, however, failed to identify *any* specific qualifications of McIver's that explained his appointment. Indeed, the Sheriff offered *no* reason, let alone a legitimate race-neutral reason, to explain the promotion of McIver and not Fox. As a result, we conclude that a reasonable jury could find, as it plainly did, that the Sheriff promoted McIver and not Fox to the position of unclassified captain on account of race. Accordingly, we affirm the jury's verdict in favor of Fox on his failure to promote claim.

*3. Gary Gettis*

[61] Captain Gettis argued that he too was more qualified than both Harmon and Dorothy Walker who were selected to serve in unclassified positions. Gettis testified about his educational background and indicated that the fact that he passed the promotional examination for the rank of captain made him qualified for the equivalent unclassified position. Gettis also testified that he was more qualified than Dorothy Walker for this position because Walker regularly sought his assistance and advice with her duties and had difficulty understanding orders. Again, Sheriff Barrett's legitimate non-discriminatory reason for promoting Harmon is valid and was in no way challenged as being pretextual. But, like with McIver, Barrett failed to identify what specific qualifications merited Dorothy Walker's promotion. Because Sheriff Barrett failed to offer any legitimate non-discriminatory reason to explain why Dorothy Walker was promoted over Gettis, a reasonable jury could attribute the Sheriff's failure to promote Gettis to race.

[62][63] Gettis also testified, however, that he would not have accepted an unclassified position without written assurances of job security. All of the individuals Sheriff Barrett appointed to unclassified positions accepted the appointments *without* conditions and, on this record, the evidence is unrefuted that Sheriff Barrett would not have provided Gettis with the written assurance of job security he desired. As a result, we are constrained to conclude that Gettis could not have suffered any pecuniary damages as a result of not being selected as an unclassified captain because he would not have accepted the position had it been offered. Gettis is therefore not entitled to the "make *1343 whole" relief of the benefits and the pay of a job he concededly would not have accepted. Accordingly, we reverse the district court's entry of a *back pay* award as well as its order granting individual injunctive relief to Captain Gettis requiring Defendants to recalculate his retirement and other employee benefits as if he had been appointed to an unclassified captain position on June 1, 1993. We leave intact, however, the *compensatory damages* award because there is competent testimony that he suffered emotional distress as a result of his non-selection to the unclassified position. Simply put, a reasonable jury could have found that even though Captain Gettis would not have accepted an unclassified appointment had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                        Page 47
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

he been offered one, he nonetheless experienced sufficient pain and suffering as a result of not being selected for the position because of his race to justify the $10,000 compensatory damages award he received. *See Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985) (affirming compensatory damages award of $100,000 because of emotional distress and humiliation plaintiff suffered as a result of being denied promotions on account of race).

### 4. Carolyn Masson

[64] Lieutenant Carolyn Masson alleged that she too was discriminated against on the basis of race by being overlooked for unclassified captain positions that were awarded by Sheriff Barrett to Harmon, McIver, Greg Walker, and Dorothy Walker. As stated above, Sheriff Barrett offered *no* specific explanation for her selection of either McIver or Dorothy Walker to unclassified positions. As a result, we are satisfied that the jury had sufficient evidence from which to conclude that Lieutenant Masson was more qualified than were McIver or Dorothy Walker and that they were promoted instead of her on account of race.

[65] Like Gettis, however, Masson testified that she would not have accepted an unclassified appointment in the absence of written assurances that she would retain her unclassified position until she retired and that she would not be fired from that position when another Sheriff took office. Because Masson plainly would not have accepted the unclassified captain position had it been offered to her, again we conclude that Masson is not entitled to the *equitable* relief ordered by the district court of backpay, the pay grade, employee benefits, and seniority she would have received had she been appointed to the position of unclassified captain on June 1, 1993. As with Captain Gettis, however, she is entitled to the $10,000 in compensatory damages the jury awarded her for the emotional distress she suffered as a result of her non-selection.

### 5. James NeSmith

[66] Sergeant NeSmith argued that Sheriff Barrett discriminated against him by denying him a promotion to the position of unclassified captain granted to Harmon, Dorothy Walker, and Greg Walker. As discussed previously, Sheriff Barrett proffered legitimate, non-discriminatory reasons to explain Harmon's promotion that the jury was given *no* reason to disbelieve. However, NeSmith testified that he was more qualified than Dorothy Walker because she never passed the lieutenant examination, and more qualified than Greg Walker because Walker had only previously served at the Jail commissary, whereas NeSmith had worked in several areas of the Jail, as well as in the Service and Court Services divisions. Based on this evidence, and particularly in light of Sheriff Barrett's complete failure to explain why she appointed either Dorothy or Greg Walker to unclassified captain positions, we conclude that there was sufficient evidence for the jury to find that Sheriff Barrett did not select NeSmith for an unclassified captain position on account of his race.

**\*1344** Nevertheless, the Defendants urge us not to permit NeSmith to recover on this claim because, they contend, he testified that he too would not have accepted an unclassified position without written assurances of job security. In reviewing the record, however, we find that NeSmith's testimony is not at all clear on this point.[FN32] Because a reasonable jury could understand his testimony as allowing that NeSmith would have accepted an unclassified appointment, we uphold the jury's award of compensatory damages and the district court's individual injunctive relief.

> FN32. The relevant testimony is as follows:
>
> Q: If you had been offered the captain's position awarded to Gary Harmon, would you have accepted it knowing it was an unclassified position?

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 F.3d 1303                                                                                     Page 48
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

A: That's a hard question. At that time?

Q: Yes, at that time.

A: I'm not really sure. That is a hard question to answer. Knowing what I know now, no.

R3-16-300.

### 6. Punitive Damages

[67] As for the Plaintiffs whose liability judgments we have upheld-namely, Fox, Gettis, Masson, and NeSmith-we are invited to examine whether the evidence was sufficient to support the punitive damages awarded to each of them. As we stated previously, *see* discussion *supra* section IV-A1, the appropriateness of punitive damages rests on the defendant's state of mind. In order to be liable for punitive damages an employer must act with "knowledge that it may be acting in violation of federal law." *Kolstad*, 119 S.Ct. at 2124. In the instant case, Fox, Gettis, Masson, and NeSmith presented sufficient evidence to sustain the jury's finding that Sheriff Fox intentionally discriminated against them because of race. This evidence, combined with Sheriff Barrett's professed understanding that such treatment violates federal law, is sufficient to sustain the jury's verdict on punitive damages. A reasonable jury could have found, based on the evidence presented, that Sheriff Barrett acted toward them "in the face of a perceived risk that [her] actions [would] violate federal law." *Id.* at 2125. Accordingly we affirm the district court's judgment as to punitive damages on the non-selection claims.

### C. Transfer and Assignments

[68] In order to establish job discrimination in transfers and assignments, a plaintiff must meet a burden similar to the one required for showing discrimination in promotions. First, a plaintiff must make a prima facie case of discrimination by showing that he was treated differently than were similarly situated black officers with respect to transfers and assignments. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 955 (5th Cir.1981). The burden of going forward then shifts to the defendant to establish a legitimate non-discriminatory reason for the employment decisions. *See id.* Finally, in order to prevail, the plaintiff must then establish that the defendant's asserted reasons are simply a pretext for racial discrimination. *See id.* at 956. Thirteen Plaintiffs alleged that they were discriminated against on account of race with respect to transfers and assignments.[FN33] Nine Plaintiffs-A.M. Alexander, Brooks, Fox, Jones, Masson, Moore, NeSmith, Schaefer, and Steel-prevailed on their individual allegations of discriminatory transfers and assignments. The claims of Major Alexander and Nesmith have already been discussed in the context of their discipline claims. After thorough review of this record, we conclude there was sufficient evidence presented to sustain the verdict in favor of Kathy Jones, but we are constrained to conclude that the evidence was insufficient *1345 to sustain the verdicts for Heidi Schaefer, Guerry Moore, Benjamin Steele, Denise Brooks, Robert Fox and Carol Masson.

> FN33. Transfers denote movement between divisions within the Department, while assignments refer to a change of job responsibility within a division.

### 1. Kathy Jones

[69] Sergeant Jones alleged that she was discriminated against in her request for transfers because of her race. Jones testified that she was denied transfers out of the Jail, where she had spent her entire career, when such transfers were given to similarly situated black employees. Jones specifically compared herself to Sergeant Benita Wallace, a black woman, who was transferred from the Jail to the Community Relations Division, Sergeant Marcia Greenlee, a black woman who was transferred from the Jail to the Service Division, and Sergeant Earl Glenn, a black man who was transferred from the Jail to the Court Services Division.[FN34] Defend-

207 F.3d 1303                                                                                                Page 49
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

ants explained that the transfers of the black of-ficers out of the Jail was part of Sheriff Barrett's cross-training program designed to give officers who had served exclusively in the Jail an opportunity to serve in other Divisions. Jones argued that this reason for the transfer of the other officers was wholly pretextual. Jones noted that while Sheriff Barrett said her cross-training program was aimed specifically at officers who had served exclusively in the Jail, Jones, who had served her entire eight-year career at the Jail, was not a beneficiary of the program. Furthermore, Jones pointed out that at least two black sergeants were transferred out of the Jail at a time when Sheriff Barrett testified that she needed additional sergeants in the Jail. The evidence is sufficient to sustain the jury's verdict regarding Sergeant Jones's claim, and, consequently, we affirm the district court judgment as it pertains to liability on Sergeant Jones's claims.

> FN34. Defendants contend, and Jones agreed, that none of these transferred co-workers wore her rank. Wallace was transferred from the Jail to the Community Relations Division upon her promotion to the position of sergeant, but she had applied for the opening in Community Relations while she was still working at the Jail as a deputy. Greenlee was a deputy at the time of her transfer to the Service Division, but became a sergeant shortly thereafter. Glenn was transferred from the Jail to the Court Services Division on the day of his promotion to sergeant. Since these co-workers of Jones' were promoted to sergeant and transferred at roughly the same time, we believe there is a sufficient basis for comparison between Jones and Wallace, Greenlee, and Glenn.

Moreover, this evidence of intentional discrimination, combined with Sheriff Barrett's stated understanding that race-based discrimination in employment violated federal rights, is sufficient to sustain the jury's award of punitive damages for Jones. *See*

discussion *supra* section IV-A1.

*2. Guerry Moore*

[70] Corporal Moore also alleged that he was discriminated against by Sheriff Barrett because of his race when he was reassigned within the Court Services Division from the Superior Court to the Juvenile Court to operate the metal detector there. Moore was assigned to the Juvenile Court after being accused by an unknown person in the Sheriff's Department of having used Department computers to review personnel records in connection with the instant lawsuit. Moore argued the position at the metal detector was tedious and beneath someone with his qualifications.

Considering all of the evidence and drawing all inferences in a light most favorable to the non-moving party, we are constrained to conclude that the evidence does not sustain Corporal Moore's claim that Sheriff Barrett discriminated against him on the basis of race when he was reassigned to work the metal detector. First, Corporal Moore himself did not attribute the reassignment to racial discrimination, but rather to retaliation for his **\*1346** alleged improper use of Department computers. Retaliation claims, however, are not part of this lawsuit. Second, Corporal Moore did not present any evidence of a similarly situated black comparator and therefore did not show that he was treated differently because of his race. *See Watkins v. Sverdrup Technology, Inc.,* 153 F.3d 1308, 1315 (11th Cir.1998) (explaining that "[t]he most fatal shortcoming ... was that ... Plaintiffs did not identify ... employees similarly situated to themselves"). Third, Corporal Moore actually turned down the opportunity to be transferred out of the Court Services Division to the Service Division which would have ended his metal detector duty. Based on this record, we cannot sustain the jury's finding that Corporal Moore was discriminated against on the basis of race. Accordingly, we reverse the district court's judgment in this respect.

207 F.3d 1303                                                                    Page 50
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

*3. Heidi Schaefer*

[71] Sergeant Schaefer alleged that her requests for transfers out of the Jail and for reassignment within the Jail were denied on account of her race. Schaefer testified that she had sought numerous transfers out of the Jail. According to the record, however, all of Schaefer's transfer requests were made in 1988, notably *four* years before Sheriff Barrett took office and well outside the statute of limitations for Title VII (180 days) or section 1981 and section 1983 claims (two years). Schaefer also testified that she was repeatedly rebuffed when she sought reassignments within the Jail while Sheriff Barrett was in office. Schaefer testified that she requested to work at Visitation, Intake Booking, and Medical, but that she generally received assignments to work as a floor deputy. Schaefer claimed that black officers were assigned to the areas she considered more desirable. Schaefer did not however identify specifically which black officers were given the assignments Schaefer desired, which positions they were assigned to, which positions they were reassigned from, how long they had held their previous assignments, or what their qualifications were for the new assignments. As such, Schaefer has not satisfied her burden of showing that she was treated differently than similarly situated black officers, much less has she shown that such disparate treatment was because of race. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (explaining that "[t]o make a comparison of the Plaintiffs's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects"); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994) (noting that "for us to compare Smith's treatment with that of terminated or transferred male executives in a meaningful way, Smith would have to show that she was similarly situated to those men in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations") (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)). Accordingly, we re-

verse the district court's judgment in favor of Schaefer on her transfer and assignment claims.

*4. Benjamin Steele*

[72] Sergeant Steele alleged that his transfer and reassignment requests likewise were denied because of his race, however Steele too failed to show he was treated differently than a similarly situated black officer. In June 1994, Sergeant Steele requested in writing to his superior, Captain Nash, that he be permanently transferred from the Jail to the Training Division for firearms instruction. In July 1994, Sergeant Steele requested in writing a reassignment to the day shift. Both requests were denied. Sergeant Steele also argued that his temporary removal from participation in a rotation of firearm training instructors was motivated by race.

**\*1347** The evidence in the record is not sufficient to sustain the verdict as to any of Steele's claims. As for the transfer claim, the evidence reflects that only one officer, a white man, was a permanent fire range instructor at the time in question. Because there was only one such position and it was not held by a black officer, there was no similarly-situated black comparator and no evidence that the denial of Steele's transfer request was because of race. *See Holifield,* 115 F.3d at 1562. Similarly, with respect to the reassignment claim, Steele offered no evidence of a similarly situated black comparator who received a reassignment similar to the one he was denied. As for the claim regarding Sergeant Steele's temporary removal from the firearm training rotation, Defendants argued that Sergeant Steele was removed from the rotation temporarily because the Jail was short of sergeants. Sergeant Steele also conceded that there was a shortage of sergeants at the Jail during his regularly scheduled shift, and he offered no evidence suggesting this proffered reason for his temporary removal from the firearm rotation was pretextual. Based on this record, we conclude that a reasonable jury could not have found the Defendants' legitimate, non-discriminatory reason for Sergeant Steele's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

temporary removal from the training rotation to be pretextual, and we therefore reverse the jury verdict rendered in Steele's favor.

### 5. Denise Brooks

[73] Sergeant Brooks alleged discrimination in the denial of her requests for transfer or reassignment to different positions within and outside the Jail. Shortly after Sheriff Barrett took office, Brooks requested a transfer from the Jail to the Court Services Division. Her request was denied and she was informed that no transfers were being granted during the transition between the McMichael and Barrett administrations. Brooks was also denied reassignment within the Jail to Central Control and Records. Brooks argued she was discriminated against on the basis of race because Antonio Johnson, a black man, was assigned to Central Control instead of her.

As for the transfer claim, Brooks conceded that no one was transferred during the transitional period and that after the period ended both black and white supervisors were transferred. Brooks did not produce any evidence showing that a similarly situated black officer was permitted to transfer at the time when she was not. As for the reassignment claim, Brooks could not recall when she had requested assignments to Central Control and Records or who was the Sheriff at that time. She therefore established no causal nexus between Sheriff Barrett and the challenged employment decisions. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d 207 (noting that the plaintiff bears the burden of showing the *defendant* intentionally discriminated against her). Furthermore, Brooks was not sure that Johnson ultimately received the Central Control assignment and did not know the identity or race of the individual who ultimately received the Records assignment. She did not, therefore, show she was treated differently than a similarly situated black comparator with respect to reassignments. We conclude that the evidence was not sufficient to sustain the jury's finding that the Defendants discriminated

against Brooks on the basis of race in denying either her transfer or her reassignment requests.

### 6. Robert Fox

[74] Lieutenant Fox alleged that Sheriff Barrett transferred him from the Court Services Division to the Jail in 1994 because of his race. Defendants contend that at the time Fox was transferred to the Jail, a number of other lieutenants-white and black alike-were also transferred *1348 from the Jail to other divisions, and from other divisions to the Jail in furtherance of Sheriff Barrett's policy of cross-training officers. Fox failed to present any evidence that could cause a reasonable jury to disbelieve Defendants' proffered reason for Fox's transfer, or to believe his transfer was instead the product of race-based discrimination. *See Holifield,* 115 F.3d at 1565; *Karazanos v. Navistar Int'l Trasp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991). As a result, we reverse the jury's verdict in his favor.

### 7. Carolyn Masson

[75] Lieutenant Masson alleged that she was discriminated against on the basis of race when she was reassigned from the Female Detention Unit to the Superior Court and then reassigned back to the Female Detention Unit five months later after an incident involving a subordinate. Masson argued that while she repeatedly asked to be reassigned from her position at the Female Detention Unit to another division in the Court Services, her reassignment to work the metal detector at the Superior Court was beneath her and was the product of race-based discrimination, as was her reassignment back to the Female Detention Unit five months later.

Masson testified that she did not know of any other lieutenant who was assigned to work the metal detector at the Superior Court. While this may be true, the record reflects that Major Jones assigned Masson to operate the metal detector in the mornings because Masson requested a workday from 7:30 to 3:30 p.m. In order to accommodate this request,

207 F.3d 1303                                                                                                         Page 52
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

Major Jones explained to Masson that she would need to assist with the metal detectors in the mornings and Masson agreed. Masson offered no evidence suggesting the transfer was discriminatory.

Defendants also presented evidence showing that Masson was reassigned to the Female Detention Unit because she had failed to adequately supervise a subordinate at the Superior Court metal detector and had allowed weapons to be brought into the courthouse. Defendants also introduced testimony from Masson's supervisor, Captain Arndt, that Masson often complained about and questioned assignments he gave her and had personality conflicts with several of the deputies.

Based on review of all of the evidence presented, there is no basis for a reasonable jury to conclude that Masson's assignment to the metal detector at the Superior Court or her subsequent reassignment to the Female Detention Unit was made on account of race. Defendants proffered legitimate, non-discriminatory reasons for each employment decision, which remain undisputed. We therefore reverse the jury verdict rendered for Lieutenant Masson.

*D. Reclassification Claims*

According to Fulton County employment practices, a Department head may seek an upward reclassification of an employee's classified position when the supervisor believes the employee is performing the duties of a higher level position. From the beginning of her tenure on December 14, 1992, to the advent of this lawsuit in April 1994, Sheriff Barrett reclassified four sworn officers, all of whom were black. The jury determined that Sheriff Barrett did not reclassify Plaintiffs Sergeant Bolt and then-Acting Sergeant Smith in whole or in part because of their race.

Bolt argued that Sheriff Barrett discriminated against him on the basis of race by not reclassifying him as a lieutenant despite the fact that he per-

formed the tasks of a lieutenant for thirteen months after the retirement of Lieutenant Hicks. Smith too alleged that Sheriff Barrett discriminated against him by not reclassifying him to the position of sergeant even *1349 though he became an acting sergeant in 1991, carried out the responsibilities of a sergeant, and received the Sergeant-of-the-Year Award.[FN35]

> FN35. Smith was reclassified as a classified sergeant in July 1994.

[76] Defendants offered two non-discriminatory reasons for not reclassifying Bolt. Defendants contended that Bolt presented no evidence that Sheriff Barrett knew of his desire to be reclassified, and that Bolt did not complete the lieutenant's exam. Defendants' explanation that Bolt failed to inform Sheriff Barrett of his desire to be reclassified could be a legitimate, non-discriminatory reason for failing to reclassify him if the sworn officers who were reclassified had informed the Sheriff of their desire to be reclassified. However, the record does not demonstrate that those four reclassified officers expressed any interest to Sheriff Barrett in being reclassified. Defendants' other proffered explanation for failing to reclassify Bolt also is inadequate. Bolt's failure to complete the lieutenant's exam affects only his eligibility for promotion to the position of classified lieutenant; it does not alter his eligibility for reclassification, which is based solely on his performance of the duties of the higher position, and does not require completion of the formal requirements for promotion. A reasonable jury could have disbelieved these reasons and found the real reasons for the failure to reclassify to be race-based discrimination. As stated previously, the evidence of Sheriff Barrett's intentional race discrimination against Bolt, combined with evidence of Barrett's understanding that such discrimination violated federal law, is sufficient to sustain the jury's award of punitive damages as well. A reasonable jury could have concluded that Sheriff Barrett intentionally discriminated against Bolt with knowledge that doing so violated Bolt's federally protec-

207 F.3d 1303                                                                Page 53
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

ted rights. *See* discussion *supra* section IV-A1.

[77] As for Smith, the Defendants argue that the jury in its special verdict form concluded that Smith should have been reclassified as of November 1992, before Sheriff Barrett assumed office. They contend, therefore, that Sheriff Barrett cannot be held liable for Smith's not being reclassified. Defendants' argument is unpersuasive. The fact that the jury determined that Smith should have been reclassified as of November 1992, does not mean that the jury could not also have reasonably found that Sheriff Barrett should have reclassified him upon taking office soon thereafter. The jury could have concluded that because Smith was qualified for reclassification in November 1992, Sheriff Barrett should have known this fact when she took office in December and should have reclassified him as soon as she had the power to do so. Accordingly, we affirm the entry of the jury's verdict of compensatory damages and injunctive relief for Smith but order that Smith's backpay be recalculated from December 14, 1992, when Sheriff Barrett took office, instead of from November 1992.[FN36]

> FN36. The jury did not award punitive damages to Smith.

*E. Promotional Examination Claims*

[78] The fifth type of employment discrimination involved allegations that the Defendants prevented three of the Plaintiffs from taking promotional examinations. Sergeants Bantin, Smith, and Schaefer alleged they were not permitted to sit for the lieutenant's examination because of their race. The Personnel Board administers the eligibility requirements for taking a promotional examination for a classified rank within the Sheriff's Department. In order to take the promotional examination for the rank of lieutenant, the applicants had to submit an application showing, among other things, that they had two years of experience at the rank of sergeant or its equivalent. All three *1350 Plaintiffs received notices of ineligibility for the examination from the Personnel Board because they did not have the re-

quired experience. Plaintiffs argued that three black deputies were permitted to sit for the examination even though they had served less time as sergeants than had the Plaintiffs. None of the jury verdicts against either Sheriff Barrett or Fulton County withstand appellate review.

With respect to Sheriff Barrett, the Plaintiffs have failed to demonstrate the required causation because they presented no evidence indicating that Sheriff Barrett or the Sheriff's Department played a role in designating Bantin, Smith, and Schaefer ineligible to take the promotional examination for the position of classified lieutenant. Moreover, as we have explained previously, Sheriff Barrett is not the "final policymaking authority" for employment decisions related to *classified* positions generally or for decisions related to eligibility to take promotional exams for classified positions more specifically. Notably, in Fulton County, applicants for classified positions are recruited and screened by the Personnel Department and classified employees enjoy civil-service type protections. *See Scala v. City of Winter Park,* 116 F.3d 1396, 1402-03 (11th Cir.1997) (holding that the city manager and public safety director of Winter Park, Florida were not final policymakers because their termination decisions were subject to meaningful administrative review by a city civil service board). Based on this conclusion, and our determination that there was no "policy or custom" of discrimination against white employees in Fulton County, Fulton County also cannot be held liable under section 1983 for Plaintiffs' promotional examination claims.

*F. Restoration of Rank Claims*

[79] The final jury verdicts Defendants challenge pertain to the restoration of rank claims of Sergeant Charles Alexander and Corporal Robert Upshaw. Both Alexander and Upshaw voluntarily accepted reductions in rank in order to be transferred out of the Jail. Both accepted demotions to the position of deputy and were transferred to the Court Services Division prior to the Barrett regime.[FN37] They ar-

207 F.3d 1303                                                                 Page 54
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L.
Weekly Fed. C 545
**(Cite as: 207 F.3d 1303)**

gued they were treated differently with regard to the restoration of their rank than was Sergeant Barbara Woodward, a black officer, who also voluntarily surrendered her rank in order to be transferred from the Jail but later had her rank restored.

> FN37. While at Court services in 1993, Alexander successfully competed for promotion to the rank of sergeant, and was promoted to that rank on October 12, 1993. Presumably, therefore, Alexander is claiming that Sheriff Barrett discriminated against him by not restoring his rank between December 14, 1992, the first day of Sheriff Barrett's tenure, and October 12, 1993, the date of his promotion.

As Sheriff Barrett argued, however, Woodward was not similarly situated to Alexander and Upshaw because she left the Jail due to a medical condition and contested her loss of rank with the Grievance Review Committee, which then recommended that she be restored to the rank of sergeant. Neither Alexander nor Upshaw sought relief for giving up their rank, even though they knew of the existence of the Grievance Review Committee. In addition, both Alexander and Upshaw failed to present any evidence showing that Sheriff Barrett had any personal involvement in the failure to have their ranks restored. On this record, we conclude, that no reasonable jury could find the failure of Sheriff Barrett to restore the ranks of Alexander and Upshaw was the result of race-based discrimination. Defendants are, therefore, entitled to judgment as a matter of law on these claims.

### V.

In sum, we affirm the district court's denial of qualified immunity to Sheriff Barrett, the denial of the Defendants' motion for judgment as a matter of law as to Fulton County's liability under *1351section 1983, the denial of the Defendants' motion for severance of the Plaintiffs' individual claims of discrimination, and its jury instructions. We also find

that the Defendants did not suffer substantial injustice as a result of the court's erroneous evidentiary rulings. With respect to the Defendants' challenge to the sufficiency of the evidence, we hold that the evidence was sufficient to support the jury's verdict on the following claims: the discriminatory discipline claims of A.M. Alexander and NeSmith; the failure to promote claims of Fox, Gettis, Masson, and NeSmith; the discriminatory transfer claim of Jones; and the reclassification claims of Bolt and Smith. However, we are constrained to find that the evidence was insufficient to support the jury's verdicts on the following claims and awards: Brook's failure to promote claim; the transfer and assignment claims of Brooks, Fox, Masson, Moore, Schaefer and Steele and their punitive damages awards for those claims; the promotional examination claims of Bantin, Schaefer, and Smith and their punitive damages awards for those claims; and the restoration of rank claims of Charles Alexander and Upshaw. We also reverse the district court's grant of back pay and individual injunctive relief to Gettis and Masson. Finally, we instruct the district court to recalculate Smith's back pay and benefits from December 14, 1992.

In short we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

C.A.11 (Ga.),2000.
Alexander v. Fulton County, Ga.
207 F.3d 1303, 82 Fair Empl.Prac.Cas. (BNA) 858, 78 Empl. Prac. Dec. P 40,046, 46 Fed.R.Serv.3d 347, 13 Fla. L. Weekly Fed. C 545

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

946 F.2d 805                                                                      Page 1
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
(Cite as: 946 F.2d 805)

▷

Wall v. Trust Co. of Georgia
C.A.11 (Ga.),1991.

United States Court of Appeals,Eleventh Circuit.
Sandra P. WALL, Plaintiff-Appellant,
v.
TRUST COMPANY OF GEORGIA, Defendant-Appellee.
**No. 90-8511.**

Nov. 5, 1991.

Black employee brought suit against bank, alleging she was denied promotion based on discrimination in violation of § 1981 and Title VII. The United States District Court for the Northern District of Georgia, No. 1:87-cv-1867-ODE, Orinda D. Evans, J., granted partial summary judgment in favor of bank on § 1981 claim and entered judgment for bank on Title VII claim after bench trial. Employee appealed. The Court of Appeals, Dyer, Senior Circuit Judge, held that: (1) failure to promote bank employee from position as customer service representative to tax analyst was not cognizable claim under § 1981 since promotion would not have created new and distinct contractual relationship, and (2) court applied correct legal standard and did not make clearly erroneous findings in determining that decision to promote white male rather than black employee did not violate Title VII.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⚖1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
        (Formerly 78k148)
Black bank employee did not have claim under § 1981 for allegedly discriminatory denial of promo-

tion to position as tax analyst where promotion would not have risen to level of opportunity for new and distinct relation between employee and bank; employee's position as customer service representative and tax analyst position were both nonexempt salaried jobs, were relatively equal in grade, provided identical benefits and compensation, and were covered by same policies and procedures. 42 U.S.C.A. § 1981.

**[2] Civil Rights 78 ⚖1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited Cases
        (Formerly 78k383)
When employee establishes prima facie case of race discrimination by direct evidence of intent to discriminate on account of race, employer's burden to rebut evidence is to prove by preponderance of evidence that it would have made same employment decision in absence of discriminatory motivation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78 ⚖1548**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1548 k. Promotion or Transfer. Most Cited Cases
        (Formerly 78k386)
Prima facie case of race discrimination may be established by circumstantial evidence in failure to promote case if employee shows that she belongs to racial minority, that she applied and was qualified for job for which employer was seeking applicants, that despite her qualifications, she was rejected and that after her rejection, position remained open and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                                                    Page 2
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
**(Cite as: 946 F.2d 805)**

employer continued to seek applicants from persons of complainant's qualifications. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ⚖1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)

**Civil Rights 78 ⚖1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited Cases
    (Formerly 78k383)

Employer's burden to meet employee's prima facie case of discrimination is discharged by articulating some legitimate, nondiscriminatory reason for employee's rejection; employee must then demonstrate that employer's stated reason for her rejection was in fact pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⚖1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1, 78k377)

Ultimate burden of persuading trier of fact that employer intentionally discriminated against employee remains at all times with employee. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⚖1536**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes
    78k1534 Presumptions, Inferences, and Burden of Proof
        78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)

District court did not err in its application of burden of proof in Title VII case in which employee introduced both direct and indirect evidence of racial discrimination when, after employer stated reasons for its employment action court shifted burden to employee to prove pretext; court's finding that employer chose candidate it believed to be best qualified, satisfied employer's burden under both standards-the heavier burden to convincingly rebut employee's direct evidence of discrimination, arising from evidence that supervisor admittedly took racial considerations into account in making employment decision, and presentation of presumptively valid reason to rebut plaintiff's circumstantial evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⚖1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k142)

Where there is direct evidence of discrimination, court must find that defendant would have reached identical decision in absence of any race consideration. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ⚖1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
    (Formerly 78k148)

Bank was not guilty of racial discrimination in failing to promote black customer service representat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                                                                 Page 3
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
(Cite as: 946 F.2d 805)

ive to position of tax analyst based on its choice of white male to fill position, given white candidate's superior verbal communication skills and higher rating in categories of enthusiasm and potential. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**\*806** Nelson & Hill, P.A., Amy S. Gellins, Athens, Ga., for plaintiff-appellant.
Edward Katze, Constangy Brooks & Smith, Mitchell S. Allen, Atlanta, Ga., for defendant-appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before BIRCH, Circuit Judge, and DYER, Senior Circuit Judge, and FULLAM [FN*], Senior District Judge.

> FN* Honorable John P. Fullam, Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

DYER, Senior Circuit Judge:
Sandra P. Wall, a black employee of Trust Company Bank, sued her employer, alleging that she was denied a promotion based on discrimination on account of her race, in violation of 42 U.S.C. section 1981 and Title VII of the Civil Rights Act of **\*807** 1964, 42 U.S.C. section 2000e *et seq.* The district court granted partial summary judgment in favor of defendant on the section 1981 claim and entered judgment for the defendant on the Title VII claim after a bench trial. We agree that the nonpromotion of appellant Wall is not a cognizable claim under section 1981, and that the correct legal standard was applied by the court in denying Wall relief against her employer under Title VII. Accordingly, we affirm.

### FACTS

Sandra P. Wall worked for Trust Company Bank on a part-time basis from January 1980, and was em-

ployed full-time beginning in June 1984. She was a customer service representative in the cash management department. Wall received favorable evaluations of her job performance. The principal responsibilities of the customer service representative were to handle telephone calls and correspondence from customers, perform research, accounting and clerical functions, analyze banking errors for corrective action, and communicate verbally and in writing with customers, other financial institutions and other bank personnel. When a job notice was posted for a newly created position of tax analyst in her department, Wall sought the position. She submitted her resume to her supervisor, Octavia Brown. The principal responsibilities of the tax analyst were to prepare and file federal and state tax returns for customers, verify tax worksheets, research current tax laws and rulings, and dictate correspondence.

The department manager, Charles Sprayberry, had the ultimate hiring authority. He directed and worked with Brown in the selection process. Several current bank employees expressed an interest in the position. Of those who were interested in filling the vacancy, three were white and four were black. Wall was qualified and was Brown's choice. Sprayberry, in supervising Brown, advised her that the most qualified applicant should be selected, but he was also concerned that selecting a black person to fill the position could be perceived as reflecting preferential treatment towards blacks or maintaining segregated job classifications in their department. Sprayberry and Brown interviewed three final candidates, including a white male David Yoak, a recent college graduate who was not a current bank employee. Because Sprayberry had been given Yoak's resume by his superior manager at the bank, he believed at the time that there was no violation under the anti-nepotism policy of the closeness in relation to a bank employee. Sprayberry used a chart to rate and compare the qualifications of Yoak and Wall. He listed characteristics and skills, designating his evaluations by check marks and comments. Sprayberry selected Yoak as the tax analyst.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                    Page 4
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
**(Cite as: 946 F.2d 805)**

Yoak was terminated after a short time due to the anti-nepotism policy of the bank.

Wall was perceived by Sprayberry as lacking enthusiasm and not sufficiently proficient in verbal communication skills to inspire customer confidence as a tax analyst. Wall received additional training in verbal communication skills in a "Speakeasy" course, paid for by the bank, in October 1986, following the denial of her promotion in May 1986. She was subsequently promoted twice: to operations support assistant in February 1987; and to weekend shift manager in November 1987. Wall is still employed with the bank.

### PROCEDURAL BACKGROUND

Wall filed this employment discrimination suit in August 1987 after exhausting the administrative procedures of the EEOC. Wall filed a demand for jury trial. Each party filed a motion for summary judgment on the Title VII claim. The motions were denied, as there were disputed material issues of fact. Wall contended that the bank intentionally discriminated against her on the basis of her race to maintain a "racial balance" in the affected department. The bank contended that it did not discriminate against Wall, and simply selected the applicant it deemed best qualified. The court granted the bank's motion for partial summary judgment on Wall's section 1981 claim filed before trial, *808 after receiving evidence in accordance with Fed.R.Civ.P. 43(e). The court found that Wall's promotion opportunity denied here did not rise to the level of a new and distinct contractual relationship, citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) and *Hishon v. King and Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Wall's Title VII claim was tried before the Magistrate as special master. The Magistrate's report and recommendation were adopted as the opinion of the district court.

### DISCUSSION

*1. Section 1981 Claim*

[1] The first issue to be considered is whether defendant's motion for partial summary judgment should have been granted. Wall contends it was error as a matter of law for the trial court to hold that the promotion to tax analyst was not a "new and distinct contractual relationship," in accord with *Patterson v. McLean Credit Corp.,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). She also contends that the erroneous grant of defendant's motion for summary judgment deprived her of her right to trial by jury.[FN1]

> FN1. "When legal and equitable claims are joined in the same action, 'the right to jury trial on the legal claim, including all issues of fact common to both claims, remains intact.' " *Lytle v. Household Manuf., Inc.,* 494 U.S. 545, 110 S.Ct. 1331, 1335, 108 L.Ed.2d 504 (1990) (citing *Curtis v. Loether,* 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260 (1974)).

*Patterson* clearly governs our analysis on the section 1981 issue. In *Patterson,* the Supreme Court clarified and restricted the contours of an actionable claim for discriminatory promotion under section 1981 to a "change in position [that] was such that it involved the opportunity to enter into a new contract with the employer." 491 U.S. at 185, 109 S.Ct. at 2377. Section 1981 provides in part:

"[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...."

Guidance in interpreting this statutory language, provided by *Patterson* in dicta, is that the meaning of "the same right ... to make ... contracts" should

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                                    Page 5
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
(Cite as: 946 F.2d 805)

not be "strain[ed] in an undue manner." *Id.* The Court did not resolve the question whether section 1981 applied to Patterson's failure to promote claim, since the defendant had never argued at any stage that section 1981 excluded such a claim. The Court stated in *Patterson* that "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under section 1981," citing *Hishon v. King and Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (refusal of law firm to accept associate into partnership) (Title VII). 491 U.S. at 185, 109 S.Ct. at 2377. Effectively, *Patterson* held that in the promotion context, a new contract is not *made* for purposes of section 1981 unless such a new and distinct relationship would flow from the promotion. *Bennun v. Rutgers State Univ.,* 941 F.2d 154 (3rd Cir.1991) (denying relief for nonpromotion from tenured associate professor to full professor based on application of *Patterson* test).

We disagree with Wall that the promotion here rises above the bright line of a relation sufficiently "new and distinct" to qualify under the *Patterson* test. *See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1519-20 (11th Cir.1991) (remanding to apply "new contract" test). The customer service representative and tax analyst positions are both nonexempt salaried jobs, are relatively equal in grade (118 versus 119), provide identical benefits and compensation, and are covered by the same policies and procedures. Specifically, the change would not have involved the elevation of Wall to a management position which could be considered a new contract, analogous to the change in status in *Hishon,* cited by means of example in *Patterson. See e.g., Harrison v. Associates Corp. of North America,* 917 F.2d 195, 198 (5th Cir.1990)**809** (no change to general supervisory duties); *Mallory v. Booth Refrigeration Supply Co., Inc.,* 882 F.2d 908, 910 (4th Cir.1989) (promotion from clerk to supervisor satisfies test).

Since the trial court properly dismissed Wall's sec-

tion 1981 claim, her equitable claim under Title VII was not entitled to a trial by jury. *Harrison, supra,* at 198; *Wilson v. City of Aliceville,* 779 F.2d 631 (11th Cir.1986).

### 2. *Title VII Burden of Proof*

The second issue is whether the trial court erred as a matter of law in its application of the burden of proof in a Title VII action. Wall contends that the special master correctly found that plaintiff presented *direct* evidence of racial discrimination, but erred as a matter of law in then applying the burden of proof for a *circumstantial* evidence case. Wall urges this court to determine under an "objective review of the evidence", rather than a review under the clearly erroneous standard, that defendant violated Title VII. She relies on the principle that this court is not bound by the clearly erroneous standard when "findings [are] made under an erroneous view of controlling legal principles." *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11th Cir.1990) (citing *Harris v. Birmingham Bd. of Educ.,* 712 F.2d 1377, 1381 (11th Cir.1983)). We find, however, that the trial court properly evaluated the evidence in accordance with the order and allocation of proof in an employment discrimination action under Title VII. *See Wilson v. City of Aliceville,* 779 F.2d 631, 634 (11th Cir.1986) (direct evidence of discrimination); *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (circumstantial evidence of discrimination).

In reaching the conclusion that the defendant did not violate Title VII when it failed to promote plaintiff, the court found that Wall had established a *prima facie* case of discriminatory failure to promote by *both* direct and circumstantial evidence. The court found, based on Brown's testimony, that Sprayberry had, in fact, considered Wall's race.

[2] When plaintiff establishes her *prima facie* case by direct evidence of intent to discriminate on account of race, defendant's burden to rebut that evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                                                      Page 6
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
(Cite as: 946 F.2d 805)

ence is to prove by a preponderance of the evidence that it would have made the same employment decision in the absence of discriminatory motivation. *Hill v. Metro. Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1539 (11th Cir.1988); *Wilson, supra; Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,*467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774-76 (11th Cir.1982).

[3][4] The *prima facie* case may also be established by circumstantial evidence in a failure to promote case. This requires the plaintiff to show that (1) she belongs to a racial minority; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d 668 (1973). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection, which suffices at this stage to discharge the employer's burden of proof in rebuttal to meet the employee's *prima facie* case of discrimination. 411 U.S. at 803, 93 S.Ct. at 1825. However, the inquiry does not end there. To prove her case, the employee must demonstrate that the defendant's stated reason for her rejection was in fact pretext; *i.e.,* that the presumptively valid reason for her rejection was in fact a coverup for a racially discriminatory decision. *Id.* at 805, 93 S.Ct. at 1825.

[5] The court noted that once a case is tried on the merits, the trial court is no longer concerned with whether the plaintiff made out a *prima facie* case, but, rather, the ultimate question may be addressed directly-whether the defendant intentionally**810 discriminated against plaintiff. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Woody v. St. Clair County Commission,* 885 F.2d 1557, 1560 (11th Cir.1989); *Powers v. Ala. Dept. of Educ.,* 854

F.2d 1285, 1290 (11th Cir.1988), *cert. denied,*490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). Whether the *prima facie* case was established by direct or circumstantial evidence determines what must be shown by the defendant to rebut plaintiff's initial evidentiary showing. *See Wilson,* 779 F.2d at 634 (more difficult for plaintiff with no direct evidence). However, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains at all times with the plaintiff. *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988).

[6] The court analyzed the evidence of both the hiring decision and pretext, based on the credibility of Sprayberry's testimony and what it found to be plaintiff's unconvincing proof on the ultimate question of discrimination. The totality of the evidence convinced the court that defendant would have made the same decision to hire Yoak rather than to promote Wall regardless of the admitted racial consideration initially expressed by Sprayberry to Brown as his concern about employee morale and perception of racial bias in the department.

In giving Wall the benefit of establishing by *direct* evidence that, *arguendo,* her lack of promotion was at least motivated in part because of her race, the court's finding regarding plaintiff's failure to prove pretext was not required. *See Wilson,* 779 F.2d at 634 (direct evidence of discrimination cannot be met by *McDonnell Douglas* rebuttal). Wall contends that the error of law was in shifting the burden to require her to prove pretext. In light of the articulated *alternative* nature of the trial court's findings, we disagree. The court's finding that Sprayberry chose the candidate he believed to be the best qualified, satisfied the defendant's burden under both standards: the heavier burden to convincingly rebut plaintiff's direct evidence and the presentation of a presumptively valid reason to rebut plaintiff's circumstantial evidence.

[7] Where there is direct evidence, the court must find that the defendant would have reached the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

946 F.2d 805                                                                                    Page 7
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338, 57 Empl. Prac. Dec. P 41,077
**(Cite as: 946 F.2d 805)**

identical decision in the absence of any racial consideration. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See also Woody v. St. Clair County, supra; Hill v. MARTA, supra; Lee v. Russell County, supra; Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1143 (11th Cir.1983).

[8] Finding no error as a matter of law in the application of burden of proof, we are bound to review the findings of the district court under the clearly erroneous standard. *Bigge v. Albertsons, supra.* Acting as a substitute factfinder is not the role of this court. *See Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). Appellant argues that "the evidence compels the conclusion that defendant employed an invalid selection device in order to reject plaintiff for a position that she would have received if only she, like Yoak, had been white." We disagree. According to Sprayberry's testimony, Yoak's superior verbal communication skills weighed in his favor. The chart introduced as evidence also rated Yoak highly in the categories of "enthusiasm" and "potential." The record provides no support for Wall's argument that Sprayberry's emphasis on communication skills was delayed, contrived after the fact and in bad faith. Sprayberry was familiar with Wall's work, and his belief that her communication skills and analytical abilities necessary for the tax analyst position were not satisfactorily developed was found credible by the court. The findings of fact are not clearly erroneous.

AFFIRMED.

C.A.11 (Ga.),1991.
Wall v. Trust Co. of Georgia
946 F.2d 805, 57 Fair Empl.Prac.Cas. (BNA) 338,
57 Empl. Prac. Dec. P 41,077

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

146 F.3d 1286                                                                    Page 1
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

▷
Ross v. Rhodes Furniture, Inc.
C.A.11 (Ala.),1998.

United States Court of Appeals,Eleventh Circuit.
Arthur ROSS, Plaintiff-Appellant,
v.
RHODES FURNITURE, INCORPORATED, d.b.a.
Marks Fitzgerald, Defendant-Appellee.
**No. 97-6729.**

July 20, 1998.

Former employee brought Title VII action against
former employer. Following entry of jury verdict in
favor of former employee, the United States Dis-
trict Court for the Northern District of Alabama,
No. CV-95-P-2380-S,Sam C. Pointer, Jr., J., gran-
ted employer's renewed motion for judgment as a
matter of law. Former employee appealed. The
Court of Appeals, Paine, Senior District Judge, sit-
ting by designation, held that: (1) because record on
appeal made it impossible to determine whether the
grounds in employer's original motion for judgment
as a matter of law were substantially different than
those asserted in its renewed motion, jury's verdict
would be sustained if supported by any evidence,
and (2) evidence that employer's proffered reason
for terminating employee was pretextual was suffi-
cient for submission to jury.

Reversed and remanded with instructions.

West Headnotes

**[1] Federal Civil Procedure 170A ⟨⟩2114.1**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from
Jury
            170AXV(F)1 In General
                170Ak2114 Nature and Form of Rem-
edy
                    170Ak2114.1 k. In General. Most

Cited Cases
Rule governing judgment as a matter of law was
designed to protect plaintiff's Seventh Amendment
right to cure evidentiary deficiencies before case
goes to jury. Fed.Rules Civ.Proc.Rule 50, 28
U.S.C.A.

**[2] Federal Civil Procedure 170A ⟨⟩2121.1**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from
Jury
            170AXV(F)1 In General
                170Ak2121 Motion and Proceedings
Thereon
                    170Ak2121.1 k. In General. Most
Cited Cases
Motions for judgment as a matter of law must be
made on the record. Fed.Rules Civ.Proc.Rule 50, 28
U.S.C.A.

**[3] Federal Courts 170B ⟨⟩776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Standard of review of grant of motion for judgment
as a matter of law is de novo. Fed.Rules
Civ.Proc.Rule 50, 28 U.S.C.A.

**[4] Federal Courts 170B ⟨⟩765**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
                    170Bk765 k. Judgment Notwith-
standing Verdict. Most Cited Cases
When reviewing trial court's resolution of renewed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                      Page 2
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

motion for judgment as a matter of law, Court of Appeals compares the grounds originally argued by movant in its original motion for judgment as a matter of law with those cited by the trial court in granting the renewed motion. Fed.Rules Civ.Proc.Rule 50(a, b), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⊂⇒2602**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(E) Notwithstanding Verdict
         170Ak2602 k. Necessity for Motion for Directed Verdict. Most Cited Cases

**Federal Courts 170B ⊂⇒914**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk914 k. Judgment and Relief; Summary Judgment. Most Cited Cases

**Jury 230 ⊂⇒37**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k37 k. Re-Examination or Other Review of Questions of Fact Tried by Jury. Most Cited Cases
If the grounds argued in original motion for judgment as a matter of law are closely related to those argued in renewed motion for judgment as a matter of law, then setting aside a jury's verdict is no surprise to the non-movant, and no Seventh Amendment right is ambushed; however, if the new and old grounds vary greatly, and trial judge relies on the new grounds to set aside the jury's verdict, Court of Appeals will reverse. Fed.Rules Civ.Proc.Rule 50(a, b), 28 U.S.C.A.

**[6] Federal Courts 170B ⊂⇒765**

170B Federal Courts
   170BVIII Courts of Appeals

170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)1 In General
      170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
         170Bk765 k. Judgment Notwithstanding Verdict. Most Cited Cases
Where record on appeal made it impossible to determine whether the grounds in employer's original motion for judgment as a matter of law were substantially different than those asserted in its renewed motion for judgment as a matter of law which was granted by district court, Court of Appeals would sustain jury's verdict in Title VII action if it was supported by any evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50(a, b), 28 U.S.C.A.

**[7] Civil Rights 78 ⊂⇒1555**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1555 k. Questions of Law or Fact. Most Cited Cases
      (Formerly 78k389)
Evidence that employer's proffered reason for terminating employee, i.e., his solicitation of tips, was pretextual, was sufficient for submission to jury under "any evidence" standard in Title VII action; employee testified that supervisor who fired him had himself received tips, that supervisor said he was going to get rid of employee, and that another supervisor said "I never seen as many blacks in this building except in a Tarzan movie." Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 50(a, b), 28 U.S.C.A.

**[8] Federal Courts 170B ⊂⇒776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most Cited Cases
District court's determination of renewed motion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                                                                    Page 3
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
(Cite as: 146 F.3d 1286)

for judgment as a matter of law is reviewed de novo. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[9] Federal Courts 170B ⟐⟐⟐801**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk801 k. Judgment N. O. v. Most Cited Cases
In reviewing district court's determination of renewed motion for judgment as a matter of law, Court of Appeals must consider all the evidence in the light most favorable to the nonmovant and determine whether or not reasonable jurors could have concluded as this jury did based on the evidence presented. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[10] Civil Rights 78 ⟐⟐⟐1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k144)
Employee made prima facie case for discriminatory discharge under Title VII by establishing that he was African-American, that he received glowing evaluations and thus was qualified as delivery manager, and that he was fired and replaced with a non-minority. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ⟐⟐⟐1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1)
Once employer produces legitimate non-discriminatory reasons for its adverse employment

action, employee must prove his or her Title VII case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ⟐⟐⟐1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Terminated employee could employ either of two methods to carry his ultimate burden of proof in Title VII action, that is, he could adduce evidence that might directly establish discrimination, or he could point to enough evidence to permit jury to reasonably disbelieve employer's proffered reason for terminating employee. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ⟐⟐⟐1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited Cases
    (Formerly 78k383)
Court may consider employee's prima facie case in determining whether he or she carried his or her ultimate burden in Title VII action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 ⟐⟐⟐1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Although employee must present prima facie case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                    Page 4
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

and show pretext to fulfill his or her ultimate bur-
den in Title VII action, the showing of pretext need
not necessarily involve further evidence; the evid-
ence in a prima facie case might be strong enough
to also show pretext. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules
Civ.Proc.Rule 50, 28 U.S.C.A.

**\*1288** Rocco Calamusa, Jr.,James Mendelsohn,
Birmingham, AL, for Plaintiff-Appellant.
Gary E. Thomas, Kenneth J. Barr, Donald B.
Harden, Atlanta, GA, for Defendant-Appellee.

Appeal from the United States District Court for the
Northern District of Alabama.

Before ANDERSON and BIRCH, Circuit Judges,
and PAINE[FN*], Senior District Judge.

> FN* Honorable James C. Paine, Senior
> U.S. District Judge for the Southern Dis-
> trict of Florida, sitting by designation.

PAINE, Senior District Judge:
Arthur Ross appeals the district court's setting aside
a jury verdict that awarded him more than thirty
seven thousand dollars in back pay. We reverse and
remand with instructions to the district court to re-
instate and enter judgment on the jury's verdict.
First, the record on appeal is insufficient to permit
an evaluation of whether the trial court erred when
it granted the defendant's renewed motion for judg-
ment as a matter of law. Second, our *de novo* re-
view of the trial testimony convinces us that the
jury could have reasonably disbelieved the defend-
ant's proffered reasons for firing Ross.

In 1987, Ross, who is an African-American, was
hired by Marks Fitzgerald to help deliver furniture.
In 1990, Ross began working for Rhodes Furniture
when that company acquired Marks Fitzgerald.
Ross performed well and climbed the company lad-
der at Rhodes, ultimately rising to the position of
delivery manager. R. 2-26-27. Ross was never dis-
ciplined before he was accused of and fired for soli-
citing tips. R. 2-30.

On December 23, 1993, Ross was supervising the
loading dock at Rhodes's warehouse. He noticed
that customers' tipping of employees for loading
furniture was slowing down operations. Ross testi-
fied that, to remedy the situation, he made a tip box
and placed it near the loading dock. R. 2-31-33.
Ross further testified that he immediately removed
the box from its perch outside the loading dock
when the receptionist informed him that a customer
had complained about the tip box. R. 2-35.

Ross finished work on December 23rd and went on
Christmas vacation. When he returned a week later
to pick up his paycheck, Ross noticed that Ricky
Mann (Mann), a white male, was serving as the de-
livery manager. Until that time, Mann had been a
driver for Rhodes and, at times, under Ross's super-
vision. On January 5, 1994, Ross returned from va-
cation to find that he was fired and that Mann had
replaced him. R.2-37, 39.

Upon being fired, Ross filed a charge of discrimina-
tion with the Equal Employment Opportunity Com-
mission (EEOC). Ross claimed that he was fired
because he is black. He also charged that tip solicit-
ation was Rhodes's pretext for discriminatory dis-
charge. Pl.'s Trial Ex. 2 (Ross's EEOC charge). The
EEOC issued Ross a right to sue letter. Ross then
filed suit in the United States District Court for the
Northern District of Alabama, seeking relief under
Title VII and Section 1981.

Ross alleged that "[t]he defendant discriminated on
the basis of race against the plaintiff with respect to
discharge, discipline[,] and other terms of employ-
ment." Pl.'s Compl. at 2, ¶ 6. The trial judge denied
Rhodes's motion for summary judgment, and the
case went to trial. Upon deliberation, the jury awar-
ded Ross $37,341.85 in back pay.

After moving for and receiving an extension of
time, Rhodes filed a renewed motion for judgment
as a matter of law under Rule 50(b). Rhodes also
moved for a new trial. Apparently, Ross opposed
neither motion. **\*1289** *See* Trial Docket. Chief
Judge Pointer granted Rhodes's renewed motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                                                    Page 5
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

judgment as a matter of law, set aside the jury's verdict, and entered judgment for Rhodes. He denied as moot Rhodes's motion for a new trial. Trial Docket No. 54. Ross appealed.

[1] At oral argument to the appellate panel, counsel agreed that Rhodes moved for judgment as a matter of law both at the close of Ross's case and at the close of all the evidence.[FN1] The parties did not, however, identify what grounds Rhodes offered in support of its pre-verdict motions under Rule 50(a). The record on appeal is also silent on this point.FN2 The abbreviated record prevents any meaningful appellate review of whether Ross was afforded his Seventh Amendment right to cure evidentiary deficiencies before his case went to the jury. Rule 50 was designed to protect that right, and therefore, we adhere to its procedural mandates. *See Crawford v. Andrew Sys., Inc.,* 39 F.3d 1151, 1154 (11th Cir.1994)(holding that a district judge has no authority to grant a Rule 50(b) motion when no Rule 50(a) is made) *and see also Sims' Crane Serv., Inc. v. Ideal Steel Prods.,* 800 F.2d 1553, 1557 (11th Cir.1986) (noting our attention to both the purpose and the wording of Rule 50(b)).

> FN1. In the present case, the Plaintiff challenges the entry of jnov on the merits. Accordingly, whether the Plaintiff's failure to object to Defendant's Rule 50(b) motion on the ground that the basis of Defendant's Rule 50(b) motion was waived by Defendant's inadequate Rule 50(a) motion, constitutes waiver of Plaintiff's right to challenge the district court's entry of jnov pursuant to Defendant's Rule 50(b) motion, is not before this court because the Plaintiff has not raised the waiver issue on appeal. *Cf. Williams v. Runyon,* 130 F.3d 568 (3d Cir.1997) (holding that where a party did not object to a movant's Rule 50(b)motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party's right to object on that basis is itself waived); *Whelan v. Abell,* 48

F.3d 1247 (D.C.Cir.1995) (holding that failure to assert an objection to a Rule 50(b) motion constitutes waiver of the objection).

> FN2. At the close of Ross's evidence, defense counsel said, "Your Honor, I think we have a motion ready." R. 2-155. A discussion was then held off the record. *Id.*Rule 50(a)(2) provides:

>> Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and facts on which the moving party is entitled to the judgment.

>> In this case, the record on appeal does not specify the judgment sought and the law and facts on which Rhodes should have been entitled to the judgment.

[2][3] Rule 50 motions must made on the record. That rule is not unique to this circuit. *See Keith v. Truck Stops Corp. of Am.,* 909 F.2d 743, 744 (3rd Cir.1990) ("the better practice would be for such motions to be made on the record"). An adequate record may allow us to excuse technical noncompliance with Rule 50. *See MacArthur v. University of Texas Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995). More importantly, an adequate record on appeal reveals whether a plaintiff's Seventh Amendment rights have been ambushed. It also controls the evidentiary standard we apply when reviewing a district court's decision to set aside a jury verdict. The standard of review is *de novo. General American Life Insurance Company v. AmSouth Bank,* 100 F.3d 893, 899 (11th Cir.1996); *Bateman v. Mnemonics,* 79 F.3d 1532 (11th Cir.1996)(district judge's resolution of post trial motions renewed *de novo*).

[4][5] When reviewing a trial court's resolution of a Rule 50(b) motion, we compare the grounds originally argued by the movant in its Rule 50(a) motion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                                      Page 6
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

with those cited by the trial court in granting a renewed motion for judgment as a matter of law. *See National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545(11th Cir.1986); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 845-46 (5th Cir.1975). If the grounds argued in a motion under Rule 50(a) are "closely related" to those argued in a Rule 50(b) motion, then setting aside a jury's verdict is no surprise to the non-movant. No Seventh Amendment right is ambushed. *National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d at 1549-50. But if the new and old grounds vary greatly, then a trial judge may not rely on the new grounds to set aside the jury's verdict. *See Sulmeyer v. Coca Cola Co.,* 515 F.2d at 845-46. If they do vary greatly and the trial court relies upon the new grounds to set aside the jury's verdict, we will reverse. *See id.*

*1290 In *National Industries,* the record on appeal enabled us to conclude that the new grounds in the Rule 50(b) motion constituted no surprise to the non-movant because the new and old grounds were "closely related." *See National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d at 1549. In this case, however, we are unable to evaluate whether the grounds in Rhodes's Rule 50(a) motions were substantially different from those asserted in its Rule 50(b) motion. Hence, we cannot ascertain if this appeal is more like *National Industries,* where "[t]he difference ... between the matters raised in the motion for judgment n.o.v. and the earlier motion is not so great [,]" or whether it is akin to *Sulmeyer v. Coca Cola Company* and *Wilson v. Attaway,* 757 F.2d 1227 (11th Cir.1985), where the matters varied greatly and required reversal.

We see no difference between a record that omits any mention of a Rule 50(a) motion and one that is mute concerning the grounds argued in support of the Rule 50(a) motion. Both deficiencies go to the heart of our concerns that a plaintiff's Seventh Amendment rights not be ambushed and that a plaintiff be allowed to cure evidentiary deficiencies before the jury retires.

[6] The record before us makes it impossible to de-

termine whether the trial court should be affirmed under the "flexible approach" we took in *National Industries* or whether we should follow a stricter approach as we did in *Sulmeyer* and *Wilson.* Accordingly, we must act in an abundance of caution towards preserving the sanctity of a jury's verdict and vacate the trial judge's decision. *Cf. Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1113 (3rd Cir.1979) (vacating judgment of district court because "[t]he record before us is not sufficiently complete to permit adequate appellate review of the district court's action."). Instead of culling the record for substantial evidence to support the verdict (as we would normally do), we will look for *any* evidence that would sustain the jury's decision. We employ the "any evidence" standard because we are unable to ascertain whether Ross was sandbagged by new arguments in Rhodes's motion under Rule 50(b). *Cf. Wilson v. Attaway,* 757 F.2d at 1237 (applying the "any evidence" standard when no Rule 50(a) motion was made).

[7][8][9] Applying this "any evidence" standard, we conclude that the jury verdict was supported by the evidence, and therefore, it must be reinstated. We review *de novo* a district court's determination of a Rule 50(b) motion. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). In doing so, "we must consider all the evidence in the light most favorable to [the nonmovant] and determine 'whether or not reasonable jurors could have concluded as this jury did based on the evidence presented.' " *Id.* (quoting *Quick v. Peoples Bank,* 993 F.2d 793, 797 (11th Cir.1993)).

[10] In his quest for relief, Ross must clear several evidentiary hurdles. He must make a prima facie case. *Id.* at 1528. Ross made a prima facie case for discriminatory discharge. As an African-American, he is a member of a protected class. Given the glowing evaluations Ross received prior to being discharged, he was certainly qualified to serve as Rhodes's delivery manager. Rhodes fired Ross and replaced him with a non-minority, Ricky Mann. That is a prima facie case. *See Jones v. Lumberjack*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                          Page 7
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

*Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982)(iterating the elements of discriminatory discharge).

[11] Second, once Rhodes produced legitimate non-discriminatory reasons for its adverse employment action, Ross must prove his case. *Combs v. Plantation Patterns,* 106 F.3d at 1528. Rhodes satisfied its intermediate burden of production when it claimed that Ross was fired for soliciting tips. Ross then had to produce evidence from which the jury could have reasonably inferred that Ross was fired because he is black. *See id.*

[12] Ross could employ either of two methods to carry his ultimate burden of proof. He could adduce evidence that might directly establish discrimination. Alternatively, he could point to enough evidence to permit the jury to reasonably disbelieve Rhodes's proffered reason that it fired Ross for soliciting tips. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). We must determine if Ross succeeded under either method.

***1291** [13][14] Reviewing the first "direct" method-whether Ross's evidence could have persuaded the jury that discrimination motivated his firing-the court examines whether Ross produced any evidence beyond his prima facie case. Ross's prima facie case may certainly be considered in determining whether he carried his ultimate burden. *Combs v. Plantation Patterns,* 106 F.3d at 1528 (citing *Burdine* ). Although a plaintiff must both present a prima facie case *and* show pretext, the showing of pretext need not necessarily involve further evidence; the evidence in a prima facie case might be strong enough to also show pretext. *See id.* at 1530. In this case, however, Ross needed additional evidence beyond that which established his prima facie case. He needed trial testimony if he was to carry his burden and survive Rhodes's Rule 50 motions.

Ross could carry his burden via the second method by producing "any evidence that, if believed, sustains his burden of proof[,]"*Swanson v. General*

*Servs. Admin.,* 110 F.3d 1180, 1185 (5th Cir.1997), "to demonstrate the existence of a genuine issue of fact as to the truth of" Rhodes's explanation that it fired him for soliciting tips. *Combs v. Plantation Patterns,* 106 F.3d at 1529. If Ross succeeded, he was entitled to survive Rhodes's Rule 50 motions. *See Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). Applying the "any evidence" standard required by *Wilson v. Attaway,* we conclude that Ross succeeded via the second method: he presented evidence which permitted the jury to reasonably disbelieve Rhodes's proffered reason.

One segment of Ross's testimony is especially compelling. Ross testified that Ron Kirkland-the supervisor who was instrumental in Rhodes's decision to fire Ross for soliciting tips. R. 2-48 at ¶¶ 15-17. Yet Kirkland decided to fire Ross, an African-American, and replace him with a non-minority. The jury could have chosen to reject Kirkland and Sweeney's testimony, i.e., that they decided to fire Ross for soliciting tips, as untrue. Although we hold that this testimony satisfies *Wilson v. Attaway*'s "any evidence" standard, Ross presented additional evidence, which satisfies the more demanding "substantial evidence" standard. Ross further testified that sometime prior to his being fired, Kirkland pointed to Ross and said "You see that one over there, I am going to get rid of him." R. 2-55 at ¶¶ 21-23. Kirkland made that statement to a white man. *Id.* at ¶¶ 24, 25. Ross contends that Kirkland's reference to "that one over there" evinced racial animus by a decision maker who would ultimately fire him.

Ross also testified that sometime in 1990, Kevin Sweeney said "I never seen as many blacks in this building except in a Tarzan movie." R. 2-117, at ¶¶ 4-7. Even though Kirkland and Sweeney made their comments long before they fired Ross, that did not prevent Ross from using these statements as evidence to persuade the jury that it should disbelieve Rhodes's proffered reason. *See Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1436 (11th Cir.1998) (citing *Allen v. County of Montgomery,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 F.3d 1286                                                                                           Page 8
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640,
11 Fla. L. Weekly Fed. C 1622
**(Cite as: 146 F.3d 1286)**

788 F.2d 1485, 1488 (11th Cir.1986)).

The district judge rejected the Tarzan remark as an "isolated general racial remark," unable to aid Ross in proving his case. The trial judge erred. Although we have repeatedly held that such comments are not *direct* evidence of discrimination because they are either too remote in time or too attenuated because they were not directed at the plaintiff, *see, e.g., Evans v. McClain of Ga., Inc.,* 131 F.3d 957 (11th Cir.1997), we have not held that such comments can never constitute *circumstantial* evidence of discrimination. Other Courts of Appeals have indicated that such comments may provide circumstantial evidence to support an inference of discrimination. *E.g., Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 521 (3rd Cir.1997) ("Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out.").

Ross's case relied on circumstantial evidence. Even the district judge so concluded. That is clear from the trial court's use of *McDonnell Douglas*'s burden-shifting analysis, which does not apply in direct evidence cases. *See* **\*1292** *Massaro v. Mainlands Sections 1 & 2 Civic Ass'n, Inc.,* 3 F.3d 1472, 1476 n. 6 (11th Cir.1993). Because Ross's case turned on circumstantial evidence, the proper inquiry is whether Sweeney's "Tarzan" remark and Kirkland's remark, when read in conjunction with the entire record, are circumstantial evidence of those decisionmakers' discriminatory attitude. If so, the court must then determine whether such circumstantial evidence, along with other evidence (including Ross's prima facie case), might lead a reasonable jury to disbelieve Rhodes's proffered reason for firing Ross. We conclude that these comments, considered together with the fact that Kirkland had received tips, support the jury's rejecting Rhodes's proffered explanation for firing Ross.

In our view, Ross's evidence created a genuine issue of fact concerning the truth of Rhodes's proffered reason. The jury could have found that the tipping episode was a pretext for firing Ross. That is enough because, consistent with *Combs,* once Ross was able to present evidence from which a jury reasonably could have disbelieved Rhodes' proffered explanation for its action, it is the jury's job (not ours) to decide whether Rhodes acted with discriminatory intent. *See Combs v. Plantation Patterns,* 106 F.3d at 1530 ("[O]ne way a plaintiff may succeed in establishing discrimination is by showing that the employer's proffered explanations are not credible. When that happens, the plaintiff may or may not ultimately prevail in the litigation, because the factfinder may or may not choose to make the permissible inference of discrimination."). Here, the jury made that inference, and it was a permissible one. Because Ross presented enough evidence from which the jury could find pretext, the jury's final, permissible inference as to the question of Rhodes's intent should be left undisturbed. Therefore, the judgment of the district court is REVERSED and the case is REMANDED to the district court with instructions to reinstate the jury verdict and to enter judgment in accordance therewith, with allowance of interest from the date the jury rendered its verdict.

C.A.11 (Ala.),1998.
Ross v. Rhodes Furniture, Inc.
146 F.3d 1286, 77 Fair Empl.Prac.Cas. (BNA) 388, 73 Empl. Prac. Dec. P 45,474, 11 Fla. L. Weekly Fed. C 1640, 11 Fla. L. Weekly Fed. C 1622

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

47 F.3d 1068
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

Page 1

**C**

Coutu v. Martin County Bd. of County Com'rs
C.A.11 (Fla.),1995.

United States Court of Appeals,Eleventh Circuit.
D. Tammy COUTU, Plaintiff-Appellant,
v.
MARTIN COUNTY BOARD OF COUNTY COM-
MISSIONERS, Robert H. Oldland, Defendants-Ap-
pellees.
**No. 93-4471.**

March 16, 1995.

Former employee brought suit against county board
and county administrator, contending that they viol-
ated Title VII by terminating her employment and
by declining to rehire her when another position
with county became available. Specifically,
plaintiff alleged that defendants discriminated
against her because she is Mexican-American and
retaliated against her because she filed grievance
against administrator and protested allegedly un-
lawful discriminatory practices during her tenure
with county. The United States District Court for
the Southern District of Florida, No.
91-14159-CIV-WJZ, William J. Zloch, J., granted
directed verdict in favor of defendants, and plaintiff
appealed. The Court of Appeals held that: (1) as-
suming that plaintiff established prima facie case of
national origin discrimination, her unsubstantiated
allegations of discrimination did not show that
county's reasons for her termination and decision
not to rehire her were pretextual, and (2) plaintiff
failed to establish prima facie case of retaliation.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⬡1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes

        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
    (Formerly 78k383)
Absent direct evidence of discrimination, plaintiff
in a termination case establishes a prima facie case
of employment discrimination by showing: that she
is member of protected class; that she was qualified
for the position held; that she was terminated; and
that she was replaced by person outside protected
class.

**[2] Civil Rights 78 ⬡1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes

        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
    (Formerly 78k383)
When plaintiff was terminated due to reduction in
force, prima facie case of discrimination based on
termination requires that plaintiff show: that she is
member of protected class; that she was terminated;
that she was qualified for another position at time
of termination; and that employer intended to dis-
criminate in failing to consider plaintiff for another
position.

**[3] Civil Rights 78 ⬡1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes

        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
    (Formerly 78k383)
In a discrimination case alleging failure to hire,
plaintiff establishes a prima facie case by showing:
that she is member of protected class; that she ap-
plied and was qualified for the job; that despite her
qualifications, she was rejected; and that the posi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                Page 2
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

tion remained open or was filled by person outside the protected class.

**[4] Civil Rights 78 ⚖══1127**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1127 k. Hiring. Most Cited Cases
    (Formerly 78k146)

**Civil Rights 78 ⚖══1128**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1128 k. Discharge or Layoff. Most
Cited Cases
    (Formerly 78k146)
Former county employee did not establish that county administrator discriminated against her because she was Mexican-American when her employment was terminated and when she was not rehired for another position with county; county terminated employee because of budgetary constraint, and did not rehire her as county administrator's executive assistant because she lacked seniority, and had a poor working relationship with administrator; plaintiff offered nothing but unsubstantiated allegations of discrimination to show that county's reasons were pretextual.

**[5] Civil Rights 78 ⚖══1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 255k40(1) Master and Servant)
Plaintiff alleging retaliation claim under Title VII establishes prima facie case by showing: that she engaged in statutorily protected activity; that an adverse employment action occurred; and that adverse action was causally related to plaintiff's protected activities. Civil Rights Act of 1964, § 704(a), 42

U.S.C.A. § 2000e-3(a).

**[6] Counties 104 ⚖══67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
Former county employee failed to establish prima facie case that county retaliated against her because she filed grievance against county administrator and protested allegedly unlawful discriminatory practices during her tenure with county; plaintiff failed to prove that grievance of performance evaluation constituted a statutorily protected activity; although written grievance contained conclusory allegation of racial discrimination, her attorney specifically waived allegation at grievance hearing, and plaintiff made no allegation and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating than county administrator had given her. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[7] Civil Rights 78 ⚖══1118**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k141)
Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Counties 104 ⚖══67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
Assuming that county employee engaged in statutorily protected activities in carrying out her duties as personnel assistant to county administrator, she failed to establish, for purposes of retaliation claim under Title VII, that such activities were in any way

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                                           Page 3
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
(Cite as: 47 F.3d 1068)

related either to her subsequent termination or to county board's decision not to rehire her; while county administrator felt that plaintiff was too aggressive in her role as employee advocate, he criticized her not because she was attempting to "stop discrimination," but because she failed to complete necessary management tasks, such as revision of personnel manual; moreover, notwithstanding poor working relationship and plaintiff's adamant refusal to accept constructive criticism, she worked for county administrator for nearly three years. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**\*1069** D. Tammy Coutu, pro se.

George P. Roberts, Jr., Tamara A. McNierney, Roberts & Reynolds, P.A., West Palm Beach, FL, for appellees.

Appeal from the United States District Court for the Southern District of Florida.

Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.

PER CURIAM:

Plaintiff D. Tammy Coutu, a Mexican-American, brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a), against her former employer, Martin County Board of County Commissioners, and Robert Oldland, the County Administrator. Coutu contends that defendants violated Title VII by terminating her employment and by declining to rehire her when another position with the County became available. Specifically, she alleges that defendants (1) discriminated against her because of her national origin and (2) retaliated against her because she filed a grievance against Oldland and protested allegedly unlawful discriminatory practices during her tenure with the County.

By stipulation of the parties, the case was tried before a jury. At the close of Coutu's case, the district court granted a directed verdict in favor of Oldland,FN1 but reserved ruling on defendants'

motion for a directed verdict in favor of the Board. After hearing all of the evidence presented by the parties, **\*1070** the district court found that the Board had demonstrated that Coutu was terminated as part of a reduction in force necessitated by County budgetary constraints and that Coutu had failed to prove that this legitimate, nondiscriminatory reason was pretextual. Accordingly, the district court granted a directed verdict in favor of the Board. For the reasons explained below, we affirm.

> FN1. The district court granted this verdict in favor of Oldland because Coutu had failed to file an EEOC charge against him. (R9-776). Coutu does not challenge this ruling on appeal.

## FACTS

Prior to 1983, Martin County did not have a centralized personnel section; each department did its own advertising, recruitment, and hiring of personnel. In early 1983, Robert Oldland, the County Administrator, reorganized all of the departments in the County and centralized the personnel responsibilities within his office. To handle these centralized personnel responsibilities, he requested and received Board approval for two new positions: a Personnel Assistant to the County Administrator, and a secretary. Oldland initially assigned the centralized personnel responsibilities to Sue Whittle, the Executive Assistant to the County Administrator, pending hiring for the two new positions.[FN2] In November 1983, Oldland hired the plaintiff, Tammy Coutu, to fill the Personnel Assistant position, and the centralized personnel responsibilities passed to her.[FN3]

> FN2. R9-787-88.

> FN3. R8-537-41.

The new secretarial position was also filled, so that Coutu had one secretary to help her with the personnel responsibilities.[FN4] These responsibilities included establishing centralized personnel records;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                        Page 4
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

recruiting, screening, and testing potential employees; developing employee evaluation procedures, disciplinary programs, and grievance procedures; FN5 revising the personnel manual; preparing a job description manual; [FN6] and implementing equal employment opportunity and affirmative action compliance programs.[FN7] As Personnel Assistant, Coutu reported directly to Oldland.[FN8]

> FN4. R7-366.

> FN5. R8-542-43.

> FN6. R8-606.

> FN7. R6-243, 247-49. At the suggestion of a federal equal employment opportunity officer, Oldland took responsibility for the affirmative action compliance program himself in October of 1985. R8-615-24.

> FN8. R8-590.

Coutu did not have a good working relationship with either Oldland or Whittle, Oldland's executive assistant.[FN9] Several factors appear to have contributed to these poor working relationships. First, Coutu and Oldland had differing views of Coutu's job responsibilities and priorities. Coutu repeatedly testified that she was hired to "stop discrimination." FN10 She saw herself as an employee advocate whose job it was to root out problems. Oldland believed that Coutu devoted too much time to her role as an employee advocate.[FN11] In his opinion, Coutu's number one job priority was the revision of the personnel manual,[FN12] a job that Coutu never completed.[FN13] Second, Coutu felt that she was overworked and that she should have been provided with additional assistance to perform her duties.FN14 Third, Oldland was ill during his tenure with the County.[FN15] According to Coutu, his illness caused him to have mood swings; sometimes he was jolly and sometimes he was hostile.[FN16] Coutu testified that when Oldland was in a good mood, he "was good to work with" [FN17] and Coutu "was his best buddy." [FN18] Coutu had prob-

lems working with Oldland, however, when he was in a bad mood. She testified that she ***1071** was not the only one who had such problems: "He was the mood swings, and I'm sure Mrs. Whittle had the same problem with him." [FN19]

> FN9. R7-513-14; R8-596.

> FN10. R6-234, 246, 250, 327.

> FN11. R6-189.

> FN12. R9-734.

> FN13. R9-805.

> FN14. R7-366, 520.

> FN15. R9-790.

> FN16. R7-375, 513-14.

> FN17. R8-577.

> FN18. R7-514.

> FN19. R8-577.

Oldland gave Coutu two performance reviews, one in early 1985 and one in early 1986.[FN20] In the 1985 review, Oldland commented that Coutu needed to improve relationships with her co-workers and with supervisory personnel with whom she worked; that she needed to improve the manner in which she prioritized tasks, as she spent too much time on employee advocacy and insufficient time on required management tasks; and that she needed to complete tasks on schedule.[FN21] Coutu did not agree with *any* of the criticisms of her work contained in the evaluation;[FN22] she also disagreed with the performance rating Oldland gave her, and she wrote a three-page memorandum expressing her dissatisfaction with the rating.[FN23]

> FN20. R7-511.

> FN21. R8-587.

> FN22. R8-593-94.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                    Page 5
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
(Cite as: 47 F.3d 1068)

FN23. R7-512.

In Coutu's 1986 performance review, Oldland commented that Coutu was unable to accept constructive criticism; that, while she had improved her work scheduling, she still needed to prioritize her tasks and timely complete projects, particularly the personnel manual; and that she needed to develop personnel systems to reduce paper flow.[FN24] Again, Coutu did not agree with the criticisms in the performance review; she viewed them as "minor little things and I would have been able to take care of them properly and efficiently if I had had the requested additional help that I tremendously needed." [FN25] Coutu also disagreed with the rating she received in the 1986 evaluation. After Oldland declined to change this rating, Coutu filed a grievance.[FN26]

FN24. R8-636-37.

FN25. R8-638.

FN26. R7-512-13.

In her written grievance, Coutu contended that she was "justified in requesting a six percent merit increase plus the five percent salary increase requested on 1/8/86 for additional duties and responsibilities." [FN27] She also alleged racial discrimination, although she gave no specific examples of discrimination.[FN28]

FN27. R7-519.

FN28. R7-515, 519.

In accordance with County policy, a grievance hearing was held on July 16, 1986.[FN29] Notwithstanding Coutu's written allegations, Coutu's lawyer specifically declared at the beginning of the hearing that the grievance did *not* involve racial discrimination. Indeed, Coutu presented no evidence of racial discrimination at the hearing; she contended only that she worked hard and deserved a better rating than Oldland had given her.[FN30] The five-member grievance committee denied Coutu's grievance, by a

vote of four to one.[FN31]

FN29. R8-668.

FN30. R6-279. Although Coutu testified at trial that her lawyer did not follow her instructions during the grievance hearing, she admitted that she did nothing during the hearing to make this known. R8-680-81.

FN31. R6-286.

During her trial testimony, Coutu repeatedly complained about numerous alleged irregularities in her grievance hearing. For example, she complained that the administration hand-picked her grievance committee, rather than drawing names from a hat, as was the usual practice. She also complained that her grievance hearing was held in the committee chambers, rather than in a back conference room, as was the usual practice.[FN32] Coutu's testimony eventually revealed that the irregularities about which she complained were due to her unique position as Personnel Assistant and were entirely justified. County policy provided that Coutu, as Personnel Assistant, would sit as the chairperson of any grievance committee, and that the committee would consist of Coutu, another member of *1072 the administration, and three salaried employees. The policy did not specify how the three salaried employees were to be chosen, or where the grievance hearing was to take place.[FN33] Because Coutu obviously could not serve as chairperson of her own grievance committee, Oldland selected another chairperson, who opted to appoint the members of the committee, rather than to draw names from a hat as Coutu did. This chairperson expressed his willingness to reconsider any appointment upon objection.[FN34] Coutu objected to one person who was appointed to the committee; consequently, that person was replaced by a person to whom Coutu did not object,[FN35] and Coutu did not object to the other three appointments to the committee.[FN36] As to the location of the hearing, Coutu admitted that the back conference room that she used when she

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                                              Page 6
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

served as chairperson held only 12 people, that members of the press and public were present at her grievance hearing, and that the large number of people present was "a good logical reason" to hold the hearing in the committee chambers.[FN37]

> FN32. R6-317-20.
>
> FN33. R8-639-41.
>
> FN34. R8-652.
>
> FN35. R8-662.
>
> FN36. R8-653.
>
> FN37. R8-677-78.

In the summer of 1986, contemporaneous with Coutu's grievance proceedings, the County was suffering budgetary constraints; it had lost approximately $600,000.00 in revenue for 1986 due to the discontinuation of federal revenue sharing. In an effort to compensate for the revenue loss, the County placed a freeze on hiring and did not buy any new equipment or expand services.[FN38] In addition, Oldland formulated a proposal for reorganizing certain County jobs. He suggested eliminating the position of Personnel Assistant to the County Administrator and the position of General and Public Service Director by merging these two positions into the existing Assistant County Administrator position. The merger of these three positions would save the County $56,000.00 a year. Oldland also suggested eliminating an electrician position and a carpenter position. The Board approved Oldland's proposed changes.[FN39] Thus, Coutu's position as Personnel Assistant to the County Administrator was eliminated due to budgetary constraints, and she was subsequently terminated.[FN40]

> FN38. R9-793-94.
>
> FN39.  R7-415-17,  521-22;  R9-758, 796-97, 814.
>
> FN40. R9-753-54.

At the time the Board approved Oldland's reorganization plan, the position of Assistant County Administrator was vacant. Sue Whittle, then Executive Assistant to the County Administrator, was chosen to fill the position of Assistant County Administrator. Thus, Whittle took over the functions of the Personnel Assistant to the County Administrator, as well as the functions of the General and Public Service Director.[FN41]

> FN41. R9-757-58.

When Whittle assumed the position of Assistant County Administrator, her former position as Executive Assistant to the County Administrator became available. Upon learning of the opening, Coutu applied for the Executive Assistant position.[FN42] Kathy Leahy, a County employee who had served for a number of years as secretary to the Chairman of the Board of County Commissioners, also applied and was ultimately chosen for the position over Coutu.[FN43] The trial testimony established that Leahy was qualified for the position; in fact, as secretary to the Chairman of the Board, she had handled responsibilities very similar to those that she would handle as Executive Assistant.[FN44] Moreover, Coutu admitted that Leahy had seniority over her.[FN45] Coutu also admitted that the Executive Assistant was the County Administrator's "right-hand person," such that a good working relationship between the *1073 two was essential.[FN46] Thus, Coutu's poor working relationship with Oldland rendered her a less than acceptable candidate for the position.

> FN42. R7-437-38.
>
> FN43. R7-459.
>
> FN44. R9-785-86, 807.
>
> FN45. R8-703.
>
> FN46. R7-509-10.

*DISCUSSION*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068    Page 7
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

Coutu raises two claims: national origin discrimination and retaliation. We discuss these claims separately.

### National Origin Discrimination

[1][2][3] Coutu contends that the Board discriminated against her based on her national origin by terminating her employment and by declining to rehire her for the Executive Assistant position. In order to prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.[FN47] When the plaintiff is terminated through a reduction in force, the prima facie case is modified somewhat, such that the plaintiff must show (1) that she is a member of a protected class, (2) that she was terminated, (3) that she was qualified for another position at the time of termination, and (4) that the employer intended to discriminate in failing to consider the plaintiff for another position.[FN48] In a case alleging failure to hire, the plaintiff must establish a prima facie case by showing (1) that she is a member of a protected class, (2) that she applied and was qualified for the job, (3) that despite her qualifications, she was rejected, and (4) that the position remained open or was filled by a person outside the protected class.[FN49]

> FN47. *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1498 and n. 3 (11th Cir.1985).
>
> FN48. *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1028 (11th Cir.1994).
>
> FN49. *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir.1987).

[4] In this case, we express some doubt as to whether Coutu established a prima facie case of national origin discrimination. As to her termination, Coutu failed to prove that she was replaced by someone outside the protected class; indeed, she was not replaced at all, as her position was eliminated. If Coutu's termination is considered a reduction in force, there is some question as to whether Coutu was qualified for another position; the only position she sought was that of Executive Assistant, and her poor working relationship with Oldland may have disqualified her for that position. Nevertheless, we will, as did the district court, assume without finding that Coutu established a prima facie case of national origin discrimination.

A prima facie case of discrimination raises the inference that discriminatory intent motivated the adverse employment action. The employer may rebut this inference by "clearly articulating in a reasonably specific manner a legitimate nondiscriminatory reason" for the adverse action. Once the employer satisfies this burden of production, the plaintiff then has the burden of persuading the court that the proffered reason is a pretext for the true discriminatory reason.[FN50]

> FN50. *Conner*, 761 F.2d at 1499.

In this case, the Board articulated a legitimate, non-discriminatory reason for Coutu's termination: due to County budgetary constraints, the Board decided to merge three County positions, thus eliminating Coutu's position, to produce a yearly savings of $56,000.00. The Board also articulated a legitimate, non-discriminatory reason for the Board's failure to hire Coutu for the Executive Assistant position: Leahy was qualified for the position and had seniority over Coutu, and Coutu's poor working relationship with Oldland rendered her qualification for the position questionable. Coutu failed to produce *any* evidence that indicated that these reasons were pretextual. " '[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... extensive evidence of *1074 legitimate, non-discriminatory reas-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                                    Page 8
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
(Cite as: 47 F.3d 1068)

ons for its actions.' "[FN51] Coutu's case against the Board consisted of repeated but unsubstantiated allegations of discrimination. Indeed, Coutu's testimony indicated that employees outside the protected class, such as Whittle, had problems with Oldland's "mood swings;" this testimony undermines Coutu's allegation that Oldland discriminated against her because she is Mexican-American. The district court did not err in granting a directed verdict on Coutu's claim of national origin discrimination.

> FN51. *Young v. General Food Corp.,* 840 F.2d 825, 830 (11th Cir.1988) (quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987)), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

### Retaliation

[5] Coutu contends that the Board retaliated against her because she filed a grievance against Oldland, and because she protested allegedly unlawful discriminatory practices in carrying out her responsibilities as Personnel Assistant. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[FN52] As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities. This circuit has interpreted the causal link requirement broadly; "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."[FN53]

FN52. 42 U.S.C. § 2000e-3(a).

> FN53. *Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993).

[6][7] Having carefully reviewed the record in this case, we conclude that Coutu failed to establish a prima facie case of retaliation. As to her claim regarding the filing of the grievance, we find that Coutu failed to prove the first element of the prima facie case; that is, she failed to prove that the grievance constituted statutorily protected activity. Although Coutu's written grievance contained a conclusory allegation of racial discrimination, her attorney specifically waived this allegation at the grievance hearing. During the hearing, Coutu made no allegation and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating than Oldland had given her. Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII. Accordingly, Coutu's grievance against Oldland did not constitute statutorily protected activity.

[8] As to Coutu's claim regarding her alleged protestations against unlawful discriminatory practices, we will assume, without deciding, that Coutu engaged in statutorily protected activities in carrying out her duties as Personnel Assistant to the County Administrator; thus, we will assume that she satisfied the first element of the prima facie case. She failed, however, to establish the third element; that is, she failed to establish that these activities were in any way related either to her termination or to the Board's decision not to hire her for the Executive Assistant position. While Oldland felt that Coutu was too aggressive in her role as an employee advocate, he criticized her in this regard *not* because she was attempting to "stop discrimination," but because she failed to complete necessary management tasks, such as the revision of the personnel manual. Notwithstanding a poor working relationship and Coutu's adamant refusal to accept constructive criticism, Coutu worked for Oldland for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 F.3d 1068                                                                                               Page 9
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414, 66 Empl. Prac. Dec. P 43,536
**(Cite as: 47 F.3d 1068)**

nearly three years. Had Oldland or the Board
wished to terminate Coutu because of her efforts to
"stop discrimination," they had ample opportunity
and reason to do so long before the summer of
1986. The record indicates*1075 that any statutor-
ily protected activities in which Coutu did engage
as Personnel Assistant were completely unrelated to
the negative employment action taken against
her.FN54

> FN54. Even if Coutu did establish a prima
> facie case of retaliation, the claim would
> fail for the same reason that her national
> origin discrimination claim fails. The
> Board articulated legitimate non-
> discriminatory reasons for Coutu's termin-
> ation and for the Board's decision not to
> hire her as Executive Assistant, and Coutu
> failed to show that these reasons were pre-
> textual.

*CONCLUSION*

During the trial of this case, Coutu made repeated
allegations of unlawful discrimination, but she
failed to substantiate these allegations. The crux of
her case against the Board was that she was over-
worked and underappreciated and that her position
should not have been eliminated; essentially, she
contended that she was unfairly treated. Title VII is
designed to protect employees against discrimina-
tion based on race, sex, or national origin; it is *not*
designed to protect against any and all unfair treat-
ment in the workplace. As Coutu failed to prove her
claims of unlawful discrimination, the district court
did not err in granting a directed verdict for the
Board. Accordingly, the decision of the district
court is AFFIRMED. Appellees' motion to strike
documents included in Coutu's "Addendum of Rel-
evant Information" that are not a part of the record
on appeal is GRANTED.

C.A.11 (Fla.),1995.
Coutu v. Martin County Bd. of County Com'rs
47 F.3d 1068, 67 Fair Empl.Prac.Cas. (BNA) 414,
66 Empl. Prac. Dec. P 43,536

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

101 F.3d 1371                                                              Page 1
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

**C**

Mayfield v. Patterson Pump Co.
C.A.11 (Ga.),1996.

United States Court of Appeals,Eleventh Circuit.
Christopher Todd MAYFIELD, Plaintiff-Appellant,
v.
PATTERSON PUMP COMPANY, Defendant-Appellee.
**No. 95-9202.**

Dec. 20, 1996.

Former employee brought Title VII race discrimination action against his former employer. The United States District Court for the Northern District of Georgia, No. 2:94-CV-0005-WCO, William C. O'Kelley, J., granted summary judgment for employer. Employee appealed. The Court of Appeals, Fay, Senior Circuit Judge, held that: (1) employer proffered legitimate, nondiscriminatory reason for employee's discharge, and (2) employee failed to show that employer's reason for discharge was pretext for race discrimination under Title VII.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⚖776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews grants of summary judgment de novo, applying same legal standards employed by district court in the first instance. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Civil Rights 78 ⚖1122**

78 Civil Rights

78II Employment Practices
    78k1122 k. Discharge or Layoff. Most Cited
Cases
    (Formerly 78k144)
Employer produced legitimate, nondiscriminatory reasons under Title VII for discharge of African-American employee by alleging that employee was terminated for incompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which resulted in loss of earnings to entire group of employees. Civil Rights Act of 1964, § 703(a), as amended, 42 U.S.C.A. § 2000e-2(a).

**[3] Civil Rights 78 ⚖1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k153)
African-American employee failed to produce evidence that employer's reasons for his discharge including incompetence, failure to meet reasonable standards of efficiency, and repeated failure to meet production standards, were false or unworthy of credence as would show pretext for race discrimination under Title VII; although employee argued that employer's explanations for discharge were pretext for discrimination none of his conclusory allegations were supported in the record. Civil Rights Act of 1964, § 703(a), as amended, 42 U.S.C.A. § 2000e-2(a).

**\*1372** Willie James Woodruff, Jr., Toccoa, GA, for Plaintiff-Appellant.
Allan Robert Ramsay, Elizabeth Felton Moore, Mc-Clure, Ramsay & Dickerson, Toccoa, GA, for Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON, Circuit Judge, FAY, Senior

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 F.3d 1371                                                                    Page 2
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

Circuit Judge, and ALDRICH [FN*], Senior District
Judge.

> FN* Honorable Ann Aldrich, Senior U.S.
> District Judge for the Northern District of
> Ohio, sitting by designation.

FAY, Senior Circuit Judge:
Pursuant to Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e-2(a) (1994) and 42 U.S.C.
§ 1981 (1994), Appellant, Christopher Todd May-
field ("Mayfield"), an African-American employee
of Appellee, Patterson Pump Company
("Patterson") filed suit against Patterson alleging
that he was discriminated against on the basis of
race.[FN1] Patterson moved for summary judgment
contending, among other reasons, that Mayfield
was fired for a legitimate, nondiscriminatory reas-
on. The district court granted summary judgment in
favor of Patterson on all counts. Mayfield appeals
only the district court's determination that no issue
of fact exists as to whether he was unlawfully ter-
minated on the basis of his race. Because we find
that Mayfield was fired for a legitimate, nondis-
criminatory reason and that Mayfield has failed to
present any evidence of pretext, we agree with the
district court and affirm its order granting summary
judgment.

> FN1. More specifically, Mayfield contends
> he was unlawfully terminated on the basis
> of race, subjected to a racially hostile en-
> vironment, and subjected to disparate treat-
> ment on the basis of race.

## I. STATEMENT OF FACTS

On November 6, 1989, Mayfield was hired by Pat-
terson, a manufacturer of fire pumps as a Pump
Test Mechanic. Approximately one month after be-
ing hired, Mayfield was promoted to Test Techni-
cian on the recommendation of his supervisor Rod
Pelot ("Pelot"). Pelot, pleased with Mayfield's per-
formance as a Test Technician, and the company,
believing he had the potential to advance in man-

agement, recommended that Mayfield be sent to
Patterson's supervisory development training pro-
gram.

On April 1, 1992, after Mayfield's completion of
the supervisory development training program and
upon another recommendation from Pelot, Mayfield
was promoted to Senior Test Technician, a newly
created supervisory position. In this capacity, May-
field supervised other employees in the cleaning
room and test pit. As Senior Test Technician, in-
stead of receiving an hourly wage, Mayfield was
paid an annual salary. Pelot further encouraged
Mayfield to attend school in order to obtain future
promotions, and Mayfield was also allowed to ar-
range his work schedule to accommodate his school
schedule.

According to Pelot, upon Mayfield's promotion to
Senior Test Technician his performance began to
decline. Noting this decline, Pelot talked with May-
field about his poor performance. On September 25,
1992, Pelot terminated Mayfield. The written reas-
on for the termination was "[i]ncompetence or fail-
ure to meet reasonable standards of efficiency and
repeated failure to meet production standards which
results in loss of earnings to an entire group of em-
ployees." In particular, Pelot pointed to three incid-
ents that resulted in Mayfield's dismissal. The
parties disagree on some of the circumstances sur-
rounding the three incidents. Because we **\*1373** are
legally obligated to view the evidence in the light
most favorable to the nonmoving party, we will re-
solve all inferences in Mayfield's favor.

The first incident involved an unexcused absence
that occurred in August of 1992. On August 20,
1992, a Thursday, Mayfield asked Pelot if he could
be excused from work on Saturday, August 22,
1992, in order to help a local church put a roof on
his father's house. Pelot granted the request. The
parties agree that it rained on Saturday, making it
difficult to put a roof on Mayfield's father's house.
On Friday, August 21, 1992, Mayfield asked to be
excused from work that day because of an Internal
Revenue Service audit taking place in Atlanta.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 F.3d 1371                                                                                                  Page 3
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

Again, Pelot gave Mayfield permission to miss work. On Monday, August 24, 1992, Mayfield had a friend notify Pelot that he was stranded in Indianapolis, Indiana and would not be able to make work. At this point, Pelot asserts that he realized Mayfield had lied about his plans for the weekend.FN2 Based on Mayfield's unexcused absence on August 24th, Pelot issued him a written warning. In part the warning states that the absence on August 24th, "will be considered an unexcused absence because he failed to call me personally, of his absence. Todd is well aware of policy that either myself or Jack Claxton be notified of any absences." Mayfield contends that the reason he did not personally call Pelot on August 24th was because he did not find it necessary to wake up at 5:00 a.m. and place a call through two or three long distance carriers, when a friend could more easily take care of it. Furthermore, upon his return, Mayfield stated he was in Indianapolis interviewing with a competitor of Patterson.

> FN2. Mayfield contends that since Patterson and Pelot did not know the IRS excuse was a lie until after he was terminated, they are precluded from using this "after acquired" evidence as a reason to terminate him. While Mayfield may be correct that Pelot at the time did not know the IRS excuse was a lie, Mayfield offers no evidence to contradict Pelot's belief that Mayfield had given him some false information. It is also clear that prior to September 25, 1992, (the day Mayfield was terminated) Pelot knew Mayfield had lied about his plans for the weekend.

The second incident involved the approval and shipment of a fire pump. Prior to its shipment, Pelot discovered that the test data of this pump, which had been approved by Mayfield for shipment, did not meet the owner's specifications. Pelot had further work done on the pump to meet the owner's approval. Mayfield affirms that the problem with the pump lay with the pump containing an erroneous

number for the impeller pattern. As a result of this incident, Pelot issued Mayfield a second disciplinary reprimand.

Finally, the last event Patterson proffers as specific evidence of Mayfield's incompetence is the warranty completion of the "Sandario 2 Pump." The Sandario 2 Pump was one pump out of approximately ten that had been returned to Patterson for repairs. As Senior Test Technician, Mayfield was in charge of the cleaning and testing of the pump. Mayfield's primary responsibility was to polish and grind the Sandario 2 Pump's impeller in a timely fashion.

The final completion date for the Sandario 2 Pump was set for September 21, 1992. The impeller, a part of the pump, needed to be individually tested and installed in the pump prior to September 21, 1992, the date the entire pump would be tested. As supervisor of the cleaning room and test pit, it was Mayfield's responsibility to ensure the project was completed on time.

On Thursday, September 17, 1992, the Sandario 2 Pump's impeller was received in the cleaning room. Two of Patterson's more experienced employees were unavailable to grind and polish the impeller. Terry Metcalfe ("Metcalfe") was assigned by Pelot to perform the task. Mayfield asserts that Pelot placed Metcalfe on the job, despite Mayfield's opposition because Mayfield wanted Lewis Curry ("Curry") to clean the impeller.

Metcalfe proceeded to work on the impeller on September 17th. According to Mayfield, whenever he checked on Metcalfe's progress, everything was proceeding satisfactorily. Pelot, however, asserts that when he reviewed the impeller's progress, Metcalfe seemed to be having difficulties. Metcalfe continued to work on the impeller during Friday, September 18, 1992. Curry worked on the impeller Friday night. Mayfield was *1374 not required to work on Friday night and he did not. He previously had informed Pelot that he would be attending a wedding in Atlanta on Saturday, September 19,

101 F.3d 1371                                                                                                    Page 4
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

1992, and would be unable to work all day Saturday. However, Mayfield told Pelot that he would check on the progress of the impeller on Saturday morning.

Sometime between four and six in the morning of Saturday, September 19, 1992, Mayfield inspected the impeller. Mayfield did not see anybody else at the plant that morning. Metcalfe apparently arrived at work at five in the morning on Saturday, but never saw Mayfield. Following his early Saturday morning inspection, Mayfield concluded the work could be completed that day.

Upon Pelot's arrival at Patterson on Saturday morning (he also never saw Mayfield), Pelot discovered that the supply of polishing pads to clean the impeller was running low, and he had to implement another procedure in order to complete the polishing on time. In sum, Pelot avers that he was required to perform Mayfield's job in order to ensure timely completion of the Sandario 2 Pump's impeller. Mayfield returned to Patterson on Sunday, September 20, 1992. Based primarily on these three incidents, Mayfield was dismissed by Pelot on September 25, 1992.

Mayfield, believing he was dismissed due to racial reasons filed the instant suit against Patterson. In support of his allegation of a discriminatory dismissal, Mayfield offers three incidents which he claims show racial animus.

The first incident occurred in July, 1991, when Gibbs Crumpton ("Crumpton"), a Patterson supervisor, used the word "nigger" in Mayfield's presence. Mayfield reported the incident to Pelot, who filed a written complaint about the episode. Jim Davis, Crumpton's supervisor, verbally reprimanded Crumpton and informed him that if it were to happen again, he would be terminated.

The next incident took place in June, 1992. Roger Poole, a Patterson employee, told Pelot to "keep his nigger [Mayfield] away from him." Pelot relayed this statement to Mayfield. Poole was issued a written warning and told if it were to happen again he would be fired.

The last episode occurred at the end of July 1992. Mayfield, while on vacation, learned from other employees that the words "Mayfield Nigger" were written on a Patterson bathroom wall. Initially, Reese Mayfield, a Patterson employee (no relation to Appellant Mayfield), informed Pelot and Al Huber, the President of Patterson, about the writing on the wall. After Reese Mayfield told Pelot and Huber, Appellant Mayfield, while on vacation, called Pelot and Huber inquiring about what was being done. Huber told Mayfield that the words had been immediately removed and he was scheduling a meeting with the company's supervisors to advise them about the company's policy concerning racial slurs. At the scheduled meeting, Huber stated that anyone caught using racial slurs would face immediate disciplinary action.

Notwithstanding these three isolated incidents, Mayfield at his deposition stated that Pelot, the person who terminated him, was not racist and did not evaluate him on the basis of race.

## II. STANDARD OF REVIEW

[1] This Court "reviews grants of summary judgment *de novo,* applying the same legal standard employed by the district court in the first instance." *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993), *reh'g denied and reh'g en banc denied,*16 F.3d 1233 (11th Cir.1994). Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The evidence must be viewed in the light most favorable to the nonmoving party. *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir.1988).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 F.3d 1371                                                                    Page 5
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

### III. ANALYSIS

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national *1375 origin in a variety of employment practices. *See Walker v. NationsBank of Fla. N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995).[FN3] In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).

> FN3. 42 U.S.C.A. § 2000e-2(a)(1) (1994) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

Because direct evidence of discrimination can be difficult to produce, the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184,*reh'g denied,*747 F.2d 710 (11th Cir.1984) (noting that *McDonnell Douglas* framework is valuable tool for analyzing disparate treatment cases). To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these reasons are pretextual. *McDonnell Douglas,* 411 U.S. at 802-04, 93 S.Ct. at 1824-25.

Under the first part of the *McDonnell Douglas* test, a plaintiff may establish a prima facie case by demonstrating that: (1) he was a member of a pro-

tected class, (2) he was qualified for the job, (3) he was terminated despite his qualifications, and (4) after his termination the position remained open and the employer continued to seek applicants of similar qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The parties seem to agree that Mayfield can demonstrate a prima facie case through the four-part test in *McDonnell Douglas.* Although Patterson "does not concede" that Mayfield can establish a prima facie case, Patterson does not argue against it. Accordingly, because we believe Mayfield can establish a prima facie case and because Patterson implicitly agrees, we will not address this part of the *McDonnell Douglas* test.

[2] Under the second part of the *McDonnell Douglas* test, the burden shifts to Patterson to produce legitimate, nondiscriminatory reasons for Mayfield's discharge. Pelot, in his affidavit, stated that he fired Mayfield because he "viewed [Mayfield's] conduct as intentional neglect of his job responsibilities and felt that the only appropriate way to respond to such failure to perform was to terminate [Mayfield's] employment with Patterson Pump Company." The written reason for the termination was Mayfield's "[i]ncompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which results in loss of earnings to an entire group of employees." In support of its employment decision, Patterson offered three specific incidents as evidence of Mayfield's incompetence. The three incidents proffered by Patterson and Pelot are as discussed earlier: (1) Pelot's belief that Mayfield lied concerning his whereabouts the weekend of August 22, 1992, (2) Mayfield's approval of a pump for shipment despite its failure to meet the owner's specifications, and (3) Mayfield's performance or lack thereof on the timely completion of the Sandario 2 Pump's impeller.

These are legitimate, nondiscriminatory reasons to terminate Mayfield. We believe that Patterson has met its burden under the second part of the *McDon-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 F.3d 1371                                                                                                    Page 6
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

*nell Douglas* test. Thus, we must now turn to the third part of the *McDonnell Douglas* test, which requires Mayfield to establish that Patterson's reasons for his discharge are pretextual. In *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court elaborated on the third part of the *McDonnell Douglas* test:

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the **\*1376** employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine,* U.S. 450 at 256, 101 S.Ct. at 1095 (citing *McDonnell Douglas,* 411 U.S. at 804-05, 93 S.Ct. at 1825-26).

In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court again attempted to clarify the *McDonnell Douglas* test. Addressing the third part of the test, the Supreme Court stated that if "the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework-with its presumptions and burdens-is no longer relevant." *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749. Instead, "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him]' because of his race." *Id.* at 511, 113 S.Ct. at 2749 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94 (alteration not in original).[FN4]

> FN4. Unfortunately, *Hicks* has not clarified the issue among the circuit courts of what proof must be presented by the plaintiff to avoid summary judgment based upon a contention that the employer's explanation

was false. *See generally Waldron v. SL Industries, Inc.,* 849 F.Supp. 996, 1004 n. 11 (D.N.J.1994) (discussing circuit split), *rev'd,* 56 F.3d 491 (3d Cir.1995). In fact, an apparent conflict exists within this circuit on the issue. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436 (11th Cir.1996) (noting and discussing conflict in this circuit); *Walker v. NationsBank of Fla. N.A.,* 53 F.3d 1548, 1560-65 (11th Cir.1995) (J. Johnson's specially concurring opinion discussing conflict). As stated in more detail in *Isenbergh* and *NationsBank,* the disagreement stems mainly from some language used in the Supreme Court's opinion in *Hicks,* the procedural setting of *Hicks-a* bench trial, and some opinions in this circuit which have held that the fact finder's rejection of defendant's proffered reasons is enough to defeat judgment for the employer. *See Howard v. BP Oil Co.,* 32 F.3d 520, 527 (11th Cir.1994) ("fact finder's rejection of defendant's proffered reasons is sufficient circumstantial evidence upon which to base a judgment for the plaintiff.") (citing *Hicks,* 509 U.S. at 510-11, 113 S.Ct. at 2748-49); *Hairston v. Gainesville Sun Publ. Co.,* 9 F.3d 913, 920-21 (11th Cir.1993), *reh'g denied and reh'g en banc denied,* 16 F.3d 1233 (11th Cir.1994) (plaintiff can establish pretext by showing that proffered explanation is unworthy of credence). Contrary to *Howard* and *Hairston,* the *Isenbergh* panel interprets *Hicks* as requiring a plaintiff to show "that the employer's proffered reason for the adverse employment decision was false **and that** discrimination was the real reason." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 440 (11th Cir.1996) (emphasis added).

[3] In any event, for purposes of the case before us, we need not resolve the apparent conflict within

101 F.3d 1371                                                                    Page 7
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

this circuit on whether a fact finder's possible dis-belief of the employer's proffered reasons is suffi-cient to defeat judgment for the defendant or whether a plaintiff must show both that the employ-er's reason for the decision was false and that dis-crimination was the real reason, because Mayfield has failed to produce any evidence that Patterson's explanation is false or unworthy of credence.

In this case, Mayfield had to produce evidence that Patterson's reasons for his discharge were a pretext for discrimination. A plaintiff may prove pretext "either directly by persuading the court that a dis-criminatory reason more likely motivated the em-ployer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. "[B]ecause the plaintiff bears the burden of estab-lishing pretext [for discrimination], he must present 'significant probative' evidence on the issue to avoid summary judgment." *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 443-44 (11th Cir.1996) (quoting *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988)) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). "Conclusory allegations of discrimina-tion, without more, are not sufficient to raise an in-ference of pretext or intentional discrimination where [an employer] has offered ... extensive evid-ence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 443-44 (11th Cir.1996) (quoting *1377*Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir.1988)) (quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987)).

Mayfield makes the following arguments to estab-lish that Patterson's explanation for his discharge was a pretext for discrimination: (1) the reasons are filled with inconsistencies, (2) the reasons are not worthy of belief, and (3) a discriminatory reason was more likely the real motivation for Patterson. However, none of Mayfield's arguments are suppor-

ted in the record.

First, Mayfield asserts that the written reason for his termination which states that "[i]ncompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which results in loss of earnings to an entire group of employees" is inconsistent with the three specif-ic examples proffered by Patterson. Instead, May-field contends that Patterson changed the reason it terminated him. The district court found that "[t]he consistent reason offered for [Mayfield's] termina-tion is failure to perform his job duties adequately. Pelot's later statements simply offer more details re-garding perceived inadequacies in plaintiff's job performance." We agree with the district court. There is nothing inconsistent between the written reason and the more specific reasons justifying Mayfield's termination. The gravamen of May-field's termination was his failure to adequately per-form his duty as Senior Test Technician. The more particular reasons given by Pelot are just specific examples of how Mayfield was incompetent and failed to meet reasonable standards of efficiency.

Next, Mayfield attempts to show that Patterson's reasons for his discharge are not worthy of belief. Mayfield, in his affidavit and depositions asserts that there are questions of fact surrounding the three incidents which indicate that the incidents were false or, at the very least, raise issues of fact that preclude the entry of summary judgment. Al-though there may be some questions concerning some of the details, Mayfield fails to offer evidence that the reasons for his discharge are false. He also refutes totally any suggestion that Pelot was motiv-ated by race.

For example, Mayfield attempts to create an issue of fact regarding his approval of the pump for ship-ment. Mayfield concedes he approved the shipment of the pump, despite test data that revealed the fail-ure of the pump to meet its owner's specifications. Rather, Mayfield offers as an explanation for this mishap that the pump had a wrong number for the impeller pattern. Even if we were to accept May-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 F.3d 1371                                                                                                      Page 8
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L.
Weekly Fed. C 592
**(Cite as: 101 F.3d 1371)**

field's explanation as true, it does not explain how he would have approved shipment of the pump even though it did not satisfy the owner's specifications.

Another example concerns the Sandario 2 Pump's impeller. All that Mayfield asserts on this example is that he disagreed with the person who Pelot assigned to do the work. Mayfield does not disagree or raise a question of fact that it was his responsibility to oversee the timely completion of the project nor that it was Pelot and not Mayfield who oversaw the cleaning and grinding of the impeller.

Finally, Mayfield alleges that a discriminatory reason more likely motivated Patterson and Pelot's decision to terminate him. In support of this pretextual argument, Mayfield proffers the three racial incidents and his unexcused absence on August 24, 1992.

Mayfield proffers the unexcused absence as additional evidence that discrimination was the true reason he was terminated. On August 24, 1992, Mayfield was issued a written reprimand for failing to call Pelot or Jack Claxton personally about being absent on August 24th. Mayfield does not contest that he was absent, instead Mayfield argues this incident depicts he was treated differently than white supervisors at Patterson. According to Mayfield, white supervisors did not have to call Pelot or Claxton personally when they were going to be absent. There is simply nothing offered in support of this statement.

It is uncontroverted that Pelot recommended Mayfield for each of his promotions. It is also undisputed that Pelot immediately took corrective action following the three racist incidents referred to him by Mayfield. It is also uncontested that Pelot made the decision to fire Mayfield. Furthermore, Mayfield during his deposition stated that Pelot was not racist and did not evaluate him on **\*1378** the basis of race.[FN5] In sum, Mayfield has failed to offer any evidence to show that a discriminatory reason more likely motivated Pelot's decision to terminate

him or that Pelot treated Mayfield differently from other white supervisors. Rather, the evidence shows that Pelot was not racist and that Mayfield was fired for a legitimate, nondiscriminatory reason.

> FN5. A: [Pelot] didn't understand the racism down here. He was from California, so he didn't understand that.
>
> Q: Did, did, uh, did you detect any, uh, or perceive any racism on his part?
>
> A: No, I did not.
>
> Q: Do you think that he, uh, evaluated you based upon you as an individual, rather than you-than your race?
>
> A: Yes, he did.

### IV. CONCLUSION

For the foregoing reasons, we conclude that there are no genuine issues of material fact and that the district court properly granted Patterson's motion for summary judgment. The judgment of the district court is AFFIRMED.

C.A.11 (Ga.),1996.
Mayfield v. Patterson Pump Co.
101 F.3d 1371, 72 Fair Empl.Prac.Cas. (BNA) 1153, 69 Empl. Prac. Dec. P 44,432, 97 FCDR 334, 10 Fla. L. Weekly Fed. C 592

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

118 S.Ct. 2257                                                                  Page 1
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

▷

Burlington Industries, Inc. v. Ellerth
U.S.Ill.,1998.

Supreme Court of the United States
BURLINGTON INDUSTRIES, INC., Petitioner,
v.
Kimberly B. ELLERTH.
**No. 97-569.**

Argued April 22, 1998.
Decided June 26, 1998.

Employee who had suffered no adverse job con-
sequences as result of alleged sexual harassment by
supervisor brought suit against former employer
under Title VII alleging that sexual harassment
forced her constructive discharge. The United
States District Court for the Northern District of
Illinois, Castillo, J., 912 F.Supp. 1101, entered
summary judgment in favor of employer. The Sev-
enth Circuit Court of Appeals, 123 F.3d 490, re-
versed. Employer petitioned for certiorari. The Su-
preme Court, Justice Kennedy, held that: (1) em-
ployer is subject to vicarious liability for an action-
able hostile environment created by a supervisor
with immediate or successively higher authority
over employee; (2) in those cases in which employ-
ee has suffered no tangible job consequences as res-
ult of supervisor's actions, employer may raise an
affirmative defense to liability or damages; and (3)
affirmative defense requires employer to show that
it exercised reasonable care to prevent and correct
promptly any sexually harassing behavior and that
employee unreasonably failed to take advantage of
any preventive or corrective opportunities provided
or to avoid harm otherwise.

Affirmed.

Justice Ginsburg filed opinion concurring in judg-
ment.

Justice Thomas filed dissenting opinion, in which
Justice Scalia joined.

West Headnotes

**[1] Civil Rights 78 ⟜1184**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1184 k. Quid Pro Quo. Most Cited
Cases
    (Formerly 78k167)

**Civil Rights 78 ⟜1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)

**Civil Rights 78 ⟜1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respon-
deat Superior. Most Cited Cases
    (Formerly 78k371)
Terms quid pro quo and hostile work environment
are not controlling for purposes of determining em-
ployer liability for harassment by supervisor;
however, terms are helpful in making rough de-
marcation between Title VII cases in which sexual
harassment threats are carried out and where they
are not or are absent altogether, and thus terms are
relevant when there is threshold question whether
employee can prove discrimination in violation of
Title VII. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⟜1183**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k167)

**Civil Rights 78 ☞1184**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1184 k. Quid Pro Quo. Most Cited Cases
        (Formerly 78k167)

**Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)
When employee proves that tangible employment action resulted from refusal to submit to supervisor's sexual demands, he or she establishes that employment decision itself constitutes change in terms and conditions of employment that is actionable under Title VII; however, for any sexual harassment preceding employment decision to be actionable, conduct must be severe or pervasive. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respon-

deat Superior. Most Cited Cases
    (Formerly 78k371)
Federal law, based on general common law principles of agency, governs employer's vicarious liability under Title VII for sexual harassment by supervisor, although common law principles may not be wholly transferable to Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Labor and Employment 231H ☞3026**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3026 k. Nature of Liability in General. Most Cited Cases
    (Formerly 255k306 Master and Servant)

**Labor and Employment 231H ☞3045**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3044 Scope of Employment
                    231Hk3045 k. In General. Most Cited Cases
    (Formerly 255k302(2) Master and Servant)
Employer may be liable for both negligent and intentional torts committed by employee within scope of his or her employment.

**[5] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
    (Formerly 78k371)
General rule is that sexual harassment by supervisor is not conduct within scope of employment for pur-

118 S.Ct. 2257                                                          Page 3
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

poses of employer liability under agency principles.

**[6] Civil Rights 78 ☜1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
        (Formerly 78k167)
Although supervisor's sexual harassment is outside scope of employment because conduct was for personal motives, employer can be liable, nonetheless, where its own negligence is cause of harassment; employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it.

**[7] Principal and Agent 308 ☜159(1)**

308 Principal and Agent
    308III Rights and Liabilities as to Third Persons
        308III(C) Unauthorized and Wrongful Acts
            308k159 Negligence or Wrongful Acts of Agent
                308k159(1) k. Rights and Liabilities of Principal. Most Cited Cases
Apparent authority is relevant to principal's vicarious liability where agent purports to exercise power which he or she does not have, as distinct from where agent threatens to misuse actual power.

**[8] Civil Rights 78 ☜1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
        (Formerly 78k371)
Under "aided in the agency relation" standard for vicarious liability, more than mere presence of employment relation that aids in commission of harassment is necessary to hold employer liable for su-

pervisor's action; however, whatever exact contours of standard, vicarious liability may be found under standard when supervisor's discriminatory act results in tangible employment action against employee.

**[9] Civil Rights 78 ☜1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
        (Formerly 78k371)
Tangible employment action taken by supervisor becomes for Title VII purposes the act of employer. Civil Rights Act of 1964, §§ 701 et seq., 701(b), 42 U.S.C.A. §§ 2000e et seq., 2000e(b).

**[10] Civil Rights 78 ☜1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

**Civil Rights 78 ☜1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
        (Formerly 78k167)

**Civil Rights 78 ☜1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable

118 S.Ct. 2257                                                    Page 4
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
(Formerly 78k371)

**Civil Rights 78 ⚖1549**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1549 k. Sex Discrimination. Most Cited Cases
      (Formerly 78k387)
Employer is subject to vicarious liability to victimized employee for actionable hostile environment created by supervisor with immediate (or successively higher) authority over employee; when no tangible employment action is taken, employer may raise affirmative defense to liability or damages, subject to proof by preponderance of the evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ⚖1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
      (Formerly 78k167)

**Civil Rights 78 ⚖1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
      (Formerly 78k371)
Employer's affirmative defense to vicarious liability for supervisor's creation of hostile work environment comprises two necessary elements: (a) that employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ⚖1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
      (Formerly 78k371)
Employer has no affirmative defense to vicarious liability for supervisor's harassing conduct in violation of Title VII when supervisor's harassment culminates in tangible employment action, such as discharge, demotion, or undesirable reassignment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ⚖1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
      (Formerly 78k167)

**Civil Rights 78 ⚖1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
      (Formerly 78k167)

**Civil Rights 78 ⚖1528**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                Page 5

524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respon-
deat Superior. Most Cited Cases
    (Formerly 78k371)
Employer might be held vicariously liable under
Title VII for supervisor's making unwelcome and
threatening sexual advances to employee, even
though conduct did not result in tangible job con-
sequences for employee; however, employer could
avoid liability by showing by preponderance of
evidence that it exercised reasonable care to pre-
vent and correct promptly any sexually harassing
behavior and employee unreasonably failed to use
preventive or corrective measures provided by em-
ployer. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**\*\*2259 \*742 Syllabus** [FN*]

> [FN*] The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the con-
> venience of the reader. See *United States v.
> Detroit Timber & Lumber Co.,* 200 U.S.
> 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Respondent Kimberly Ellerth quit her job after 15
months as a salesperson in one of petitioner Burl-
ington Industries' many divisions, allegedly because
she had been subjected to constant sexual harass-
ment by one of her supervisors, Ted Slowik. Slowik
was a midlevel manager who had authority to hire
and promote employees, subject to higher approval,
but was not considered a policymaker. Against a
background of repeated boorish and offensive re-
marks and gestures allegedly made by Slowik,
Ellerth places particular emphasis on three incid-
ents where Slowik's comments could be construed
as threats to deny her tangible job benefits. Ellerth
refused all of Slowik's advances, yet suffered no
tangible retaliation and was, in fact, promoted once.
Moreover, she never informed anyone in authority
about Slowik's conduct, despite knowing Burling-

ton had a policy against sexual harassment. In filing
this lawsuit, Ellerth alleged Burlington engaged in
sexual harassment and forced her constructive dis-
charge, in violation of Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000*eet seq.* The District
Court granted Burlington summary judgment. The
Seventh Circuit en banc reversed in a decision that
produced eight separate opinions and no consensus
for a controlling rationale. Among other things,
those opinions focused on whether Ellerth's claim
could be categorized as one of *quid pro quo* harass-
ment, and on whether the standard for an employ-
er's liability on such a claim should be vicarious li-
ability or negligence.

*Held:* Under Title VII, an employee who refuses
the unwelcome and threatening sexual advances of
a supervisor, yet suffers no adverse, tangible job
consequences, may recover against the employer
without showing the employer is negligent or other-
wise at fault for the supervisor's actions, but the
employer may interpose an affirmative defense. Pp.
2264-2271.

(a) The Court assumes an important premise yet to
be established: A trier of fact could find in Slowik's
remarks numerous threats to retaliate against
Ellerth if she denied some sexual liberties. The
threats, however, were not carried out. Cases based
on carried-out threats are referred to often as *"quid
pro quo"* cases, as distinct from bothersome atten-
tions or sexual remarks sufficient to create a
"hostile work environment." Those two terms do
not appear in Title VII, which forbids only **\*743**
"discriminat[ion] against any individual with re-
spect to his ... terms [or] conditions ... of employ-
ment, because of ... sex." § 2000e-2(a)(1). In *Merit-
or Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65,
106 S.Ct. 2399, 2404-2405, 91 L.Ed.2d 49, this
Court distinguished between the two concepts, say-
ing both are cognizable under Title VII, though a
hostile environment claim requires harassment that
is severe or pervasive. *Meritor* did not discuss the
distinction for its bearing upon an employer's liabil-
ity for discrimination, but held, with no further spe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                                Page 6
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
(Cite as: 524 U.S. 742, 118 S.Ct. 2257)

cifics, that agency principles controlled on this point. *Id.,* at 72, 106 S.Ct., at 2408-2409. Nevertheless, in *Meritor's* wake, Courts of Appeals held that, if the plaintiff established a *quid pro quo* claim, the employer was subject to vicarious liability. This rule encouraged Title VII plaintiffs to state their claims in *quid pro quo* terms, which in turn **2260 put expansive pressure on the definition. For example, the question presented here is phrased as whether Ellerth can state a *quid pro quo* claim, but the issue of real concern to the parties is whether Burlington has vicarious liability, rather than liability limited to its own negligence. This Court nonetheless believes the two terms are of limited utility. To the extent they illustrate the distinction between cases involving a carried-out threat and offensive conduct in general, they are relevant when there is a threshold question whether a plaintiff can prove discrimination. Hence, Ellerth's claim involves only unfulfilled threats, so it is a hostile work environment claim requiring a showing of severe or pervasive conduct. This Court accepts the District Court's finding that Ellerth made such a showing. When discrimination is thus proved, the factors discussed below, not the categories *quid pro quo* and hostile work environment, control on the issue of vicarious liability. Pp. 2264-2265.

(b) In deciding whether an employer has vicarious liability in a case such as this, the Court turns to agency law principles, for Title VII defines the term "employer" to include "agents." § 2000e(b). Given this express direction, the Court concludes a uniform and predictable standard must be established as a matter of federal law. The Court relies on the general common law of agency, rather than on the law of any particular State. *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811. The Restatement (Second) of Agency (hereinafter Restatement) is a useful beginning point, although common-law principles may not be wholly transferable to Title VII. See *Meritor, supra,* at 72, 106 S.Ct., at 2408. Pp. 2265-2266.

(c) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment. Restatement § 219(1). Although such torts generally may be either negligent or intentional, sexual harassment under Title VII presupposes intentional conduct. An intentional tort is within the scope of employment when *744 actuated, at least in part, by a purpose to serve the employer. *Id.,* §§ 228(1)(c), 230. Courts of Appeals have held, however, a supervisor acting out of gender-based animus or a desire to fulfill sexual urges may be actuated by personal motives unrelated and even antithetical to the employer's objectives. Thus, the general rule is that sexual harassment by a supervisor is not conduct within the scope of employment. Pp. 2265-2267.

(d) However, scope of employment is not the only basis for employer liability under agency principles. An employer is subject to liability for the torts of its employees acting outside the scope of their employment when, *inter alia,* the employer itself was negligent or reckless, Restatement § 219(2)(b), or the employee purported to act or to speak on behalf of the employer and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation, *id.,* § 219(2)(d). An employer is negligent, and therefore subject to liability under § 219(2)(b), if it knew or should have known about sexual harassment and failed to stop it. Negligence sets a minimum standard for Title VII liability; but Ellerth seeks to invoke the more stringent standard of vicarious liability. Section 219(2)(d) makes an employer vicariously liable for sexual harassment by an employee who uses apparent authority (the apparent authority standard), or who was "aided in accomplishing the tort by the existence of the agency relation" (the aided in the agency relation standard). P. 2267.

(e) As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from threatening to misuse actual power. Compare Restatement § 6

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                                              Page 7
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

with § 8. Because supervisory harassment cases involve misuse of actual power, not the false impression of its existence, apparent authority analysis is inappropriate. When a party seeks to impose vicarious liability based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule provides the appropriate analysis. Pp. 2267-2268.

(f) That rule requires the existence of something more than the employment relation itself because, in a sense, most workplace**2261 tortfeasors, whether supervisors or co-workers, are aided in accomplishing their tortious objective by the employment relation: Proximity and regular contact afford a captive pool of potential victims. Such an additional aid exists when a supervisor subjects a subordinate to a significant, tangible employment action, *i.e.,* a significant change in employment status, such as discharge, demotion, or undesirable reassignment. Every Federal Court of Appeals to have considered the question has correctly found vicarious liability in that circumstance. This Court imports the significant, tangible employment action concept for resolution of the vicarious *745 liability issue considered here. An employer is therefore subject to vicarious liability for such actions. However, where, as here, there is no tangible employment action, it is not obvious the agency relationship aids in commission of the tort. Moreover, *Meritor* holds that agency principles constrain the imposition of employer liability for supervisor harassment. Limiting employer liability is also consistent with Title VII's purpose to the extent it would encourage the creation and use of antiharassment policies and grievance procedures. Thus, in order to accommodate the agency principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, the Court adopts, in this case and in*Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the following holding: An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action. Pp. 2268-2270.

(g) Given the Court's explanation that the labels *quid pro quo* and hostile work environment are not controlling for employer-liability purposes, Ellerth should have an adequate opportunity on remand to prove she has a claim which would result in vicarious liability. Although she has not alleged she suffered a tangible employment action at Slowik's hands, which would deprive Burlington of the affirmative defense, this is not dispositive. In light of the Court's decision, Burlington is still *746 subject to vicarious liability for Slowik's activity, but should have an opportunity to assert and prove the affirmative defense. P. 2271.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                  Page 8
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

123 F.3d 490, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, *post,* p. 2271. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post,* p. 2271.

James J. Casey, for petitioner.

Ernest T. Rossiello, Chicago, IL, for respondent.
Barbara D. Underwood, Brooklyn, NY, for United States as amicus curiae by special leave of this Court.For U.S. Supreme Court briefs, see:1998 WL 90827     (Pet.Brief)1998     WL     145325 (Resp.Brief)1998 WL 173106 (Reply Brief)
**2262 Justice KENNEDY delivered the opinion of the Court.
We decide whether, under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e*et* *747 *seq.,* an employee who refuses the unwelcome and threatening sexual advances of a supervisor, yet suffers no adverse, tangible job consequences, can recover against the employer without showing the employer is negligent or otherwise at fault for the supervisor's actions.

I

Summary judgment was granted for the employer, so we must take the facts alleged by the employee to be true. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)*(per curiam).* The employer is Burlington Industries, the petitioner. The employee is Kimberly Ellerth, the respondent. From March 1993 until May 1994, Ellerth worked as a salesperson in one of Burlington's divisions in Chicago, Illinois. During her employment, she alleges, she was subjected to constant sexual harassment by her supervisor, one Ted Slowik.

In the hierarchy of Burlington's management structure, Slowik was a midlevel manager. Burlington has eight divisions, employing more than 22,000 people in some 50 plants around the United States. Slowik was a vice president in one of five business units within one of the divisions. He had authority to make hiring and promotion decisions subject to the approval of his supervisor, who signed the paperwork. See 912 F.Supp. 1101, 1119, n. 14 (N.D.Ill.1996). According to Slowik's supervisor, his position was "not considered an upper-level management position," and he was "not amongst the decision-making or policy-making hierarchy." *Ibid.* Slowik was not Ellerth's immediate supervisor. Ellerth worked in a two-person office in Chicago, and she answered to her office colleague, who in turn answered to Slowik in New York.

Against a background of repeated boorish and offensive remarks and gestures which Slowik allegedly made, Ellerth places particular emphasis on three alleged incidents where Slowik's comments could be construed as threats to deny her *748 tangible job benefits. In the summer of 1993, while on a business trip, Slowik invited Ellerth to the hotel lounge, an invitation Ellerth felt compelled to accept because Slowik was her boss. App. 155. When Ellerth gave no encouragement to remarks Slowik made about her breasts, he told her to "loosen up" and warned, "you know, Kim, I could make your life very hard or very easy at Burlington." *Id.,* at 156.

In March 1994, when Ellerth was being considered for a promotion, Slowik expressed reservations during the promotion interview because she was not "loose enough." *Id.,* at 159. The comment was followed by his reaching over and rubbing her knee. *Ibid.* Ellerth did receive the promotion; but when Slowik called to announce it, he told Ellerth, "you're gonna be out there with men who work in factories, and they certainly like women with pretty butts/legs." *Id.,* at 159-160.

In May 1994, Ellerth called Slowik, asking permission to insert a customer's logo into a fabric sample. Slowik responded, "I don't have time for you right now, Kim ...-unless you want to tell me what you're

118 S.Ct. 2257                                                                              Page 9
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

wearing." *Id.,* at 78. Ellerth told Slowik she had to go and ended the call. *Ibid.* A day or two later, Ellerth called Slowik to ask permission again. This time he denied her request, but added something along the lines of, "are you wearing shorter skirts yet, Kim, because it would make your job a whole heck of a lot easier." *Id.,* at 79.

A short time later, Ellerth's immediate supervisor cautioned her about returning telephone calls to customers in a prompt fashion. 912 F.Supp., at 1109. In response, Ellerth quit. She faxed a letter giving reasons unrelated to the alleged sexual harassment we have described. *Ibid.* About three weeks later, however, she sent a letter explaining she quit because of Slowik's behavior. *Ibid.*

During her tenure at Burlington, Ellerth did not inform anyone in authority about Slowik's conduct, despite knowing Burlington had a policy against sexual harassment. *Ibid.* **\*749** In fact, she chose not to inform her **\*\*2263** immediate supervisor (not Slowik) because " 'it would be his duty as my supervisor to report any incidents of sexual harassment.' " *Ibid.* On one occasion, she told Slowik a comment he made was inappropriate. *Ibid.*

In October 1994, after receiving a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), Ellerth filed suit in the United States District Court for the Northern District of Illinois, alleging Burlington engaged in sexual harassment and forced her constructive discharge, in violation of Title VII. The District Court granted summary judgment to Burlington. The court found Slowik's behavior, as described by Ellerth, severe and pervasive enough to create a hostile work environment, but found Burlington neither knew nor should have known about the conduct. There was no triable issue of fact on the latter point, and the court noted Ellerth had not used Burlington's internal complaint procedures. *Id.,* at 1118. Although Ellerth's claim was framed as a hostile work environment complaint, the District Court observed there was a *quid pro quo* "component" to the hostile environment. *Id.,* at 1121. Proceeding from the

premise that an employer faces vicarious liability for *quid pro quo* harassment, the District Court thought it necessary to apply a negligence standard because the *quid pro quo* merely contributed to the hostile work environment. See *id.,* at 1123. The District Court also dismissed Ellerth's constructive discharge claim.

The Court of Appeals en banc reversed in a decision which produced eight separate opinions and no consensus for a controlling rationale. The judges were able to agree on the problem they confronted: Vicarious liability, not failure to comply with a duty of care, was the essence of Ellerth's case against Burlington on appeal. The judges seemed to agree Ellerth could recover if Slowik's unfulfilled threats to deny her tangible job benefits was sufficient to impose vicarious liability on Burlington. **\*750**Jansen v. Packaging Corp. of America,* 123 F.3d 490, 494 (C.A.7 1997) (*per curiam* ). With the exception of Judges Coffey and Easterbrook, the judges also agreed Ellerth's claim could be categorized as one of *quid pro quo* harassment, even though she had received the promotion and had suffered no other tangible retaliation. *Ibid.*

The consensus disintegrated on the standard for an employer's liability for such a claim. Six judges, Judges Flaum, Cummings, Bauer, Evans, Rovner, and Diane P. Wood, agreed the proper standard was vicarious liability, and so Ellerth could recover even though Burlington was not negligent. *Ibid.* They had different reasons for the conclusion. According to Judges Flaum, Cummings, Bauer, and Evans, whether a claim involves a *quid pro quo* determines whether vicarious liability applies; and they in turn defined *quid pro quo* to include a supervisor's threat to inflict a tangible job injury whether or not it was completed. *Id.,* at 499. Judges Wood and Rovner interpreted agency principles to impose vicarious liability on employers for most claims of supervisor sexual harassment, even absent a *quid pro quo. Id.,* at 565.

Although Judge Easterbrook did not think Ellerth had stated a *quid pro quo* claim, he would have fol-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                              Page 10
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

lowed the law of the controlling State to determine the employer's liability, and by this standard, the employer would be liable here. *Id.,* at 552. In contrast, Judge Kanne said Ellerth had stated a *quid pro quo* claim, but negligence was the appropriate standard of liability when the *quid pro quo* involved threats only. *Id.,* at 505.

Chief Judge Posner, joined by Judge Manion, disagreed. He asserted Ellerth could not recover against Burlington despite having stated a *quid pro quo* claim. According to Chief Judge Posner, an employer is subject to vicarious liability for "act[s] that significantly alte[r] the terms or conditions of employment," or "company act[s]." *Id.,* at 515. In the emergent terminology, an unfulfilled *quid pro quo* is a *751 mere threat to do a company act rather than the act itself, and in these circumstances, an employer can be found liable for its negligence only. *Ibid.* Chief Judge Posner also found Ellerth failed to create a triable issue of fact as to Burlington's negligence. *Id.,* at 517.

Judge Coffey rejected all of the above approaches because he favored a uniform **2264 standard of negligence in almost all sexual harassment cases. *Id.,* at 518.

The disagreement revealed in the careful opinions of the judges of the Court of Appeals reflects the fact that Congress has left it to the courts to determine controlling agency law principles in a new and difficult area of federal law. We granted certiorari to assist in defining the relevant standards of employer liability. 522 U.S. 1086, 118 S.Ct. 876, 139 L.Ed.2d 865 (1998).

II

[1] At the outset, we assume an important proposition yet to be established before a trier of fact. It is a premise assumed as well, in explicit or implicit terms, in the various opinions by the judges of the Court of Appeals. The premise is: A trier of fact could find in Slowik's remarks numerous threats to

retaliate against Ellerth if she denied some sexual liberties. The threats, however, were not carried out or fulfilled. Cases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.

Section 703(a) of Title VII forbids

"an employer-

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or *752 privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).

"*Quid pro quo* " and "hostile work environment" do not appear in the statutory text. The terms appeared first in the academic literature, see C. MacKinnon, Sexual Harassment of Working Women (1979); found their way into decisions of the Courts of Appeals, see, *e.g.,Henson v. Dundee,* 682 F.2d 897, 909 (C.A.11 1982); and were mentioned in this Court's decision in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). See generally E. Scalia, The Strange Career of *Quid Pro Quo* Sexual Harassment, 21 Harv. J.L. & Pub. Policy 307 (1998).

In *Meritor,* the terms served a specific and limited purpose. There we considered whether the conduct in question constituted discrimination in the terms or conditions of employment in violation of Title VII. We assumed, and with adequate reason, that if an employer demanded sexual favors from an employee in return for a job benefit, discrimination with respect to terms or conditions of employment was explicit. Less obvious was whether an employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                    Page 11

524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692

**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

er's sexually demeaning behavior altered terms or conditions of employment in violation of Title VII. We distinguished between *quid pro quo* claims and hostile environment claims, see 477 U.S., at 65, 106 S.Ct., at 2404-2405, and said both were cognizable under Title VII, though the latter requires harassment that is severe or pervasive. *Ibid.* The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive. The distinction was not discussed for its bearing upon an employer's liability for an employee's discrimination. On this question *Meritor* held, with no further specifics, that agency principles controlled. *Id.,* at 72, 106 S.Ct., at 2408.

Nevertheless, as use of the terms grew in the wake of *Meritor,* they acquired their own significance. The standard of employer responsibility turned on which type of harassment**753** occurred. If the plaintiff established a *quid pro quo* claim, the Courts of Appeals held, the employer was subject to vicarious liability. See *Davis v. Sioux City,* 115 F.3d 1365, 1367 (C.A.8 1997); *Nichols v. Frank,* 42 F.3d 503, 513-514 (C.A.9 1994); *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 106-107 (C.A.3 1994); *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (C.A.10 1993); *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185-186 (C.A.6),cert. denied, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); **2265**Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (C.A.11 1989). The rule encouraged Title VII plaintiffs to state their claims as *quid pro quo* claims, which in turn put expansive pressure on the definition. The equivalence of the *quid pro quo* label and vicarious liability is illustrated by this case. The question presented on certiorari is whether Ellerth can state a claim of *quid pro quo* harassment, but the issue of real concern to the parties is whether Burlington has vicarious liability for Slowik's alleged misconduct, rather than liability limited to its own negligence. The question presented for certiorari asks:

"Whether a claim of *quid pro quo* sexual harassment may be stated under Title VII ... where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions or privileges of employment as a consequence of a refusal to submit to those advances?" Pet. for Cert. i.

[2] We do not suggest the terms *quid pro quo* and hostile work environment are irrelevant to Title VII litigation. To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the **754** employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive. Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct. See *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1002-1003, 140 L.Ed.2d 201, (1998); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). For purposes of this case, we accept the District Court's finding that the alleged conduct was severe or pervasive. See *supra,* at 2262-2263. The case before us involves numerous alleged threats, and we express no opinion as to whether a single unfulfilled threat is sufficient to constitute discrimination in the terms or conditions of employment.

When we assume discrimination can be proved, however, the factors we discuss below, and not the categories *quid pro quo* and hostile work environment, will be controlling on the issue of vicarious

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                                    Page 12
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

liability. That is the question we must resolve.

### III

[3] We must decide, then, whether an employer has vicarious liability when a supervisor creates a hostile work environment by making explicit threats to alter a subordinate's terms or conditions of employment, based on sex, but does not fulfill the threat. We turn to principles of agency law, for the term "employer" is defined under Title VII to include "agents." 42 U.S.C. § 2000e(b); see *Meritor, supra,* at 72, 106 S.Ct., at 2408-2409. In express terms, Congress has directed federal courts to interpret Title VII based on agency principles. Given such an explicit instruction, we conclude a uniform and predictable standard must be established as a matter of federal law. We rely "on the general common law of agency, rather than on the law of any particular State, to give meaning to these *755 terms." *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2173, 104 L.Ed.2d 811 (1989). The resulting federal rule, based on a body of case law developed over time, is statutory interpretation pursuant to congressional direction. This is not federal common law in "the strictest sense, *i.e.,* a rule of decision that amounts, not simply to an interpretation of a federal statute ..., but, rather, to the judicial 'creation' of a special federal rule of decision." *Atherton v. FDIC,* 519 U.S. 213, 218, 117 S.Ct. 666, 670, 136 L.Ed.2d 656 (1997). State-court decisions, applying state employment discrimination law, may be instructive in applying general agency principles, but, it is interesting to note, in many cases their determinations of employer liability under state law rely in large part on **2266 federal-court decisions under Title VII. *E.g.,Arizona v. Schallock,* 189 Ariz. 250, 259, 941 P.2d 1275, 1284 (1997); *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 622, 626 A.2d 445, 463 (1993); *Thompson v. Berta Enterprises, Inc.,* 72 Wash.App. 531, 537-539, 864 P.2d 983, 986-988 (1994).

As *Meritor* acknowledged, the Restatement (Second) of Agency (1957) (hereinafter Restate-

ment) is a useful beginning point for a discussion of general agency principles. 477 U.S., at 72, 106 S.Ct., at 2408. Since our decision in *Meritor,* federal courts have explored agency principles, and we find useful instruction in their decisions, noting that "common-law principles may not be transferable in all their particulars to Title VII." *Ibid.* The EEOC has issued Guidelines governing sexual harassment claims under Title VII, but they provide little guidance on the issue of employer liability for supervisor harassment. See 29 CFR § 1604.11(c) (1997) (vicarious liability for supervisor harassment turns on "the particular employment relationship and the job functions performed by the individual").

### A

Section 219(1) of the Restatement sets out a central principle of agency law:

*756 "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment."

[4] An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment. Sexual harassment under Title VII presupposes intentional conduct. While early decisions absolved employers of liability for the intentional torts of their employees, the law now imposes liability where the employee's "purpose, however misguided, is wholly or in part to further the master's business." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 70, p. 505 (5th ed.1984) (hereinafter Prosser and Keeton on Torts). In applying scope of employment principles to intentional torts, however, it is accepted that "it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited." F. Mechem, Outlines of the Law of Agency § 394, p. 266 (P. Mechem 4th ed. 1952). The Restatement defines conduct, including an intentional tort, to be within the scope of employment when

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                                     Page 13
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

"actuated, at least in part, by a purpose to serve the [employer]," even if it is forbidden by the employer. Restatement §§ 228(1)(c), 230. For example, when a salesperson lies to a customer to make a sale, the tortious conduct is within the scope of employment because it benefits the employer by increasing sales, even though it may violate the employer's policies. See Prosser and Keeton on Torts § 70, at 505-506.

As Courts of Appeals have recognized, a supervisor acting out of gender-based animus or a desire to fulfill sexual urges may not be actuated by a purpose to serve the employer. See, *e.g.,Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1444 (C.A.10 1997), vacated on other grounds, 524 U.S. 947, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998); *Torres v. Pisano,* 116 F.3d 625, 634, n. 10 (C.A.2 1997). But see *Kauffman v. Allied Signal, Inc.,* 970 F.2d, at 184-185 (holding harassing supervisor acted within scope of employment, **\*757** but employer was not liable because of its quick and effective remediation). The harassing supervisor often acts for personal motives, motives unrelated and even antithetical to the objectives of the employer. Cf. Mechem, *supra,* § 368 ("[F]or the time being [the supervisor] is conspicuously and unmistakably seeking a personal end"); see also Restatement § 235, Illustration 2 (tort committed while "[a]cting purely from personal ill will" not within the scope of employment); *id.,* Illustration 3 (tort committed in retaliation for failing to pay the employee a bribe not within the scope of employment). There are instances, of course, where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer. *E.g.,Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1075 (M.D.Ala.1990) (supervisor acting in scope of employment where employer has a policy of discouraging women from seeking advancement**\*2267** and "sexual harassment was simply a way of furthering that policy").

The concept of scope of employment has not always been construed to require a motive to serve

the employer. *E.g.,Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 172 (C.A.2 1968). Federal courts have nonetheless found similar limitations on employer liability when applying the agency laws of the States under the Federal Tort Claims Act, which makes the Federal Government liable for torts committed by employees within the scope of employment. 28 U.S.C. § 1346(b); see, *e.g.,Jamison v. Wiley,* 14 F.3d 222, 237 (C.A.4 1994) (supervisor's unfair criticism of subordinate's work in retaliation for rejecting his sexual advances not within scope of employment); *Wood v. United States,* 995 F.2d 1122, 1123 (C.A.1 1993) (BREYER, C.J.) (sexual harassment amounting to assault and battery "clearly outside the scope of employment"); see also 2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.07[4], p. 9-211 (1998).

[5] The general rule is that sexual harassment by a supervisor is not conduct within the scope of employment.

## \*758 B

Scope of employment does not define the only basis for employer liability under agency principles. In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment. The principles are set forth in the much-cited § 219(2) of the Restatement:

"(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

"(a) the master intended the conduct or the consequences, or

"(b) the master was negligent or reckless, or

"(c) the conduct violated a non-delegable duty of the master, or

"(d) the servant purported to act or to speak on be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                              Page 14
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

half of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

See also § 219, Comment e (Section 219(2) "enumerates the situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment").

Subsection (a) addresses direct liability, where the employer acts with tortious intent, and indirect liability, where the agent's high rank in the company makes him or her the employer's alter ego. None of the parties contend Slowik's rank imputes liability under this principle. There is no contention, furthermore, that a nondelegable duty is involved. See § 219(2)(c). So, for our purposes here, subsections (a) and (c) can be put aside.

[6] Subsections (b) and (d) are possible grounds for imposing employer liability on account of a supervisor's acts and must be considered. Under subsection (b), an employer is liable when the tort is attributable to the employer's own negligence.*759 § 219(2)(b). Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII; but Ellerth seeks to invoke the more stringent standard of vicarious liability.

Section 219(2)(d) concerns vicarious liability for intentional torts committed by an employee when the employee uses apparent authority (the apparent authority standard), or when the employee "was aided in accomplishing the tort by the existence of the agency relation" (the aided in the agency relation standard). *Ibid.* As other federal decisions have done in discussing vicarious liability for supervisor harassment, *e.g.,Henson v. Dundee,* 682 F.2d 897,

909 (C.A.11 1982), we begin with § 219(2)(d).

### C

[7] As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, **\*\*2268** as distinct from where the agent threatens to misuse actual power. Compare Restatement § 6 (defining "power") with § 8 (defining "apparent authority"). In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence. Apparent authority analysis therefore is inappropriate in this context. If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one. Restatement § 8, Comment c ("Apparent authority exists only to the extent it is reasonable for the third person dealing with the agent to believe that the agent is authorized"). When a party seeks to impose vicarious liability*760 based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule, rather than the apparent authority rule, appears to be the appropriate form of analysis.

### D

[8] We turn to the aided in the agency relation standard. In a sense, most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation: Proximity and regular contact may afford a captive pool of potential victims. See *Gary v. Long,* 59 F.3d 1391, 1397 (C.A.D.C.1995). Were this to satisfy the aided in the agency relation standard, an employer would be subject to vicarious liability not only for all supervisor harassment, but also for all co-worker harassment, a result enforced by neither the EEOC nor any court of appeals to have considered the issue. See, *e.g.,Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 872 (C.A.6 1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                Page 15
524 U.S. 742, 118 S.Ct. 2257, 77 Fair.Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

(sex discrimination); *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 480 (C.A.7 1996) (sex discrimination); *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1273 (C.A.7 1991) (race discrimination); see also 29 C.F.R. § 1604.11(d) (1997) ("knows or should have known" standard of liability for cases of harassment between "fellow employees"). The aided in the agency relation standard, therefore, requires the existence of something more than the employment relation itself.

At the outset, we can identify a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate. Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory act results in a tangible employment action. See, *e.g.,Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (C.A.10 1993) (" 'If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing ...' "). **\*761** In *Meritor,* we acknowledged this consensus. See 477 U.S., at 70–71, 106 S.Ct., at 2407–2408 ("[T]he courts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, or should have known, or approved of the supervisor's actions"). Although few courts have elaborated how agency principles support this rule, we think it reflects a correct application of the aided in the agency relation standard.

In the context of this case, a tangible employment action would have taken the form of a denial of a raise or a promotion. The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action

for resolution of the vicarious liability issue we consider here. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Compare *Crady v. Liberty Nat. Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (C.A.7 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly**\*\*2269** diminished material responsibilities, or other indices that might be unique to a particular situation"), with *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (C.A.7 1994) (a "bruised ego" is not enough), *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 887 (C.A.6 1996) (demotion without change in pay, benefits, duties, or prestige insufficient), and *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (C.A.8 1994) (reassignment to more inconvenient job insufficient).

When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted **\*762** absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. See *Gary, supra,* at 1397; *Henson,* 682 F.2d at 910; *Barnes v. Costle,* 561 F.2d 983, 996 (C.A.D.C.1977) (MacKinnon, J., concurring). But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                    Page 16
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
(Cite as: 524 U.S. 742, 118 S.Ct. 2257)

Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. E.g.,*Shager v. Upjohn Co.,* 913 F.2d 398, 405 (C.A.7 1990) (noting that the supervisor did not fire plaintiff; rather, the Career Path Committee did, but the employer was still liable because the committee functioned as the supervisor's "cat's-paw"). The supervisor often must obtain the imprimatur of the enterprise and use its internal processes. See *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (C.A.2 1992) ("From the perspective of the employee, the supervisor and the employer merge into a single entity").

[9] For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action *763 against a subordinate. In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability, as *Meritor* itself appeared to acknowledge. See, *supra,* at 2268.

Whether the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action is less obvious. Application of the standard is made difficult by its malleable terminology, which can be read to either expand or limit liability in the context of supervisor harassment. On the one hand, a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation. See *Meritor,* 477 U.S., at 77, 106 S.Ct., at 2410-2411 (Marshall, J., concurring in judgment) ("[I]t is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct

on subordinates"). On the other hand, there are acts of harassment a supervisor might commit which might be the same acts a coemployee would commit, and there may be some circumstances where the supervisor's status makes little difference.

It is this tension which, we think, has caused so much confusion among the Courts of Appeals which have sought to apply the aided in the agency relation standard to Title VII cases. The aided in the agency relation standard, however, is a developing feature of agency law, and we hesitate to render a definitive explanation of our understanding of the standard in an area where other important considerations must affect our judgment.**2270 In particular, we are bound by our holding in *Meritor* that agency principles constrain the imposition of vicarious liability in cases of supervisory harassment. See *id.,* at 72, 106 S.Ct., at 2408 ("Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible"). Congress has not altered *764*Meritor*'s* rule even though it has made significant amendments to Title VII in the interim. See *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736, 97 S.Ct. 2061, 2069-2070, 52 L.Ed.2d 707 (1977) ("[W]e must bear in mind that considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation").

Although *Meritor* suggested the limitation on employer liability stemmed from agency principles, the Court acknowledged other considerations might be relevant as well. See 477 U.S., at 72, 106 S.Ct., at 2408 ("common-law principles may not be transferable in all their particulars to Title VII"). For example, Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms. Were employer liability to depend in part on an employer's effort to create such procedures, it would effect Congress' intention to promote conciliation rather than litigation in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                    Page 17

524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340, 141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405, 11 Fla. L. Weekly Fed. S 692

**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

Title VII context, see *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77, 104 S.Ct. 1621, 1635, 80 L.Ed.2d 41 (1984), and the EEOC's policy of encouraging the development of grievance procedures. See 29 C.F.R. § 1604.11(f) (1997); EEOC Policy Guidance on Sexual Harassment, 8 BNA FEP Manual 405:6699 (Mar. 19, 1990). To the extent limiting employer liability could encourage employees to report harassing conduct before it becomes severe or pervasive, it would also serve Title VII's deterrent purpose. See *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 358, 115 S.Ct. 879, 884-885, 130 L.Ed.2d 852 (1995). As we have observed, Title VII borrows from tort law the avoidable consequences doctrine, see *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232, n. 15, 102 S.Ct. 3057, 3066, n. 15, 73 L.Ed.2d 721 (1982), and the considerations which animate that doctrine would also support the limitation of employer liability in certain circumstances.

[10][11][12] In order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), also decided today. *765 An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an

employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

## **2271 IV

Relying on existing case law which held out the promise of vicarious liability for all *quid pro quo* claims, see *supra,* at 2264-2265, Ellerth focused all her attention in the Court of Appeals on proving her claim fit within that category. Given our explanation that the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability, see *supra,* at 2265, Ellerth *766 should have an adequate opportunity to prove she has a claim for which Burlington is liable.

[13] Although Ellerth has not alleged she suffered a tangible employment action at the hands of Slowik, which would deprive Burlington of the availability of the affirmative defense, this is not dispositive. In light of our decision, Burlington is still subject to vicarious liability for Slowik's activity, but Burlington should have an opportunity to assert and prove the affirmative defense to liability. See *supra,* at 2270.

For these reasons, we will affirm the judgment of the Court of Appeals, reversing the grant of summary judgment against Ellerth. On remand, the Dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                    Page 18
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

trict Court will have the opportunity to decide whether it would be appropriate to allow Ellerth to amend her pleading or supplement her discovery.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Justice GINSBURG, concurring in the judgment.

I agree with the Court's ruling that "the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability." *Ante,* at 2271. I also subscribe to the Court's statement of the rule governing employer liability, *ante,* at 2270, which is substantively identical to the rule the Court adopts in *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1988).

Justice THOMAS, with whom Justice SCALIA joins, dissenting.

The Court today manufactures a rule that employers are vicariously liable if supervisors create a sexually hostile work environment, subject to an affirmative defense that the Court barely attempts to define. This rule applies even if the employer has a policy against sexual harassment, the employee knows about that policy, and the employee never *767 informs anyone in a position of authority about the supervisor's conduct. As a result, employer liability under Title VII is judged by different standards depending upon whether a sexually or racially hostile work environment is alleged. The standard of employer liability should be the same in both instances: An employer should be liable if, and only if, the plaintiff proves that the employer was negligent in permitting the supervisor's conduct to occur.

I

Years before sexual harassment was recognized as "discriminat[ion] ... because of ... sex," 42 U.S.C. § 2000e-2(a)(1), the Courts of Appeals considered whether, and when, a racially hostile work environment could violate Title VII.[FN1] In the landmark

case *Rogers v. EEOC,* 454 F.2d 234 (1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), the Court of Appeals for the Fifth Circuit held that the practice of racially segregating patients in a doctor's office could amount to discrimination in " 'the terms, conditions, or privileges' " of employment, thereby violating Title VII. 454 F.2d, at 238 (quoting 42 U.S.C. § 2000e-2(a)(1)). The principal opinion in the case concluded that employment discrimination was not limited to the "isolated and distinguishable events" of "hiring, firing, and promoting." 454 F.2d, at 238 (opinion of Goldberg, J.). Rather, Title VII could also be violated by a work environment "heavily polluted with discrimination," because of the deleterious effects of such an **2272 atmosphere on an employee's well-being. *Ibid.*

> FN1. This sequence of events is not surprising, given that the primary goal of the Civil Rights Act of 1964 was to eradicate race discrimination and that the statute's ban on sex discrimination was added as an eleventh-hour amendment in an effort to kill the bill. See *Barnes v. Costle,* 561 F.2d 983, 987 (C.A.D.C.1977).

Accordingly, after *Rogers,* a plaintiff claiming employment discrimination based upon race could assert a claim for a racially hostile work environment, in addition to the classic *768 claim of so-called "disparate treatment." A disparate treatment claim required a plaintiff to prove an adverse employment consequence and discriminatory intent by his employer. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 10-11 (3d ed.1996). A hostile environment claim required the plaintiff to show that his work environment was so pervaded by racial harassment as to alter the terms and conditions of his employment. See, *e.g., Snell v. Suffolk Cty.,* 782 F.2d 1094, 1103 (C.A.2 1986) ("To establish a hostile atmosphere, ... plaintiffs must prove more than a few isolated incidents of racial enmity"); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (C.A.8 1981) (no violation of Title VII

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                                          Page 19
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

from infrequent use of racial slurs). This is the same standard now used when determining whether sexual harassment renders a work environment hostile. See *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370-371, 126 L.Ed.2d 295 (1993) (actionable sexual harassment occurs when the workplace is *"permeated* with discriminatory intimidation, ridicule, and insult" (emphasis added; internal quotation marks and citation omitted)).

In race discrimination cases, employer liability has turned on whether the plaintiff has alleged an adverse employment consequence, such as firing or demotion, or a hostile work environment. If a supervisor takes an adverse employment action because of race, causing the employee a tangible job detriment, the employer is vicariously liable for resulting damages. See *ante,* at 2268. This is because such actions are company acts that can be performed only by the exercise of specific authority granted by the employer, and thus the supervisor acts as the employer. If, on the other hand, the employee alleges a racially hostile work environment, the employer is liable only for negligence: that is, only if the employer knew, or in the exercise of reasonable care should have known, about the harassment and failed to take remedial action. See, *e.g., Dennis v. Cty. of Fairfax,* 55 F.3d 151, 153 (C.A.4 1995); *\*769Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (C.A.6 1988), cert. denied, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989). Liability has thus been imposed only if the employer is blameworthy in some way. See, *e.g., Davis v. Monsanto Chemical Co.,supra,* at 349; *Snell v. Suffolk Cty., supra,* at 1104; *DeGrace v. Rumsfeld.* 614 F.2d 796, 805 (C.A.1 1980).

This distinction applies with equal force in cases of sexual harassment.[FN2] When a supervisor inflicts an adverse employment consequence upon an employee who has rebuffed his advances, the supervisor exercises the specific authority granted to him by his company. His acts, therefore, are the company's acts and are properly chargeable to it. See 123 F.3d 490, 514 (C.A.7 1997) (Posner, C. J., dis-

senting); *ante,* at 2269 ("Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control").

> FN2. The Courts of Appeals relied on racial harassment cases when analyzing early claims of discrimination based upon a supervisor's sexual harassment. For example, when the Court of Appeals for the District of Columbia Circuit held that a work environment poisoned by a supervisor's "sexually stereotyped insults and demaning propositions" could itself violate Title VII, its principal authority was Judge Goldberg's opinion in *Rogers v. EEOC,*454 F.2d 234 (C.A.5 1971). See *Bundy v. Jackson,* 641 F.2d 934, 944 (C.A.D.C.1981); see also *Henson v. Dundee,* 682 F.2d 897, 901 (C.A.11 1982). So, too, this Court relied on *Rogers* when in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), it recognized a cause of action under Title VII for sexual harassment. See *id.,* at 65-66, 106 S.Ct., at 2404-2405.

If a supervisor creates a hostile work environment, however, he does not act for the employer. As the Court concedes, a supervisor's creation of a hostile work environment is neither within the scope of his employment, nor part of his apparent authority. See *ante,* at 2265-2268. Indeed, a hostile work environment is antithetical to the interest of the employer. In such circumstances, an employer should be liable only if it has been negligent. That is, liability should attach\*\*2273 only if the employer either knew, or in the exercise of *\*770* reasonable care should have known, about the hostile work environment and failed to take remedial action.[FN3]

> FN3. I agree with the Court that the doctrine of *quid pro quo* sexual harassment is irrelevant to the issue of an employer's vi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                                        Page 20
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

carious liability. I do not, however, agree that the distinction between hostile work environment and *quid pro quo* sexual harassment is relevant "when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII."*Ante,* at 2265. A supervisor's threat to take adverse action against an employee who refuses his sexual demands, if never carried out, may create a hostile work environment, but that is all. Cases involving such threats, without more, should therefore be analyzed as hostile work environment cases only. If, on the other hand, the supervisor carries out his threat and causes the plaintiff a job detriment, the plaintiff may have a disparate treatment claim under Title VII. See E. Scalia, The Strange Career of *Quid Pro Quo* Sexual Harassment, 21 Harv. J.L. & Pub. Policy 307, 309-314 (1998).

Sexual harassment is simply not something that employers can wholly prevent without taking extraordinary measures-constant video and audio surveillance, for example-that would revolutionize the workplace in a manner incompatible with a free society. See 123 F.3d, at 513 (Posner, C.J., dissenting). Indeed, such measures could not even detect incidents of harassment such as the comments Slowik allegedly made to respondent in a hotel bar. The most that employers can be charged with, therefore, is a duty to act reasonably under the circumstances. As one court recognized in addressing an early racial harassment claim:

"It may not always be within an employer's power to guarantee an environment free from all bigotry.... [H]e can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with

discriminating on the basis of race." *DeGrace v. Rumsfeld,* 614 F.2d 796, 805 (1980).

\*771 Under a negligence standard, Burlington cannot be held liable for Slowik's conduct. Although respondent alleged a hostile work environment, she never contended that Burlington had been negligent in permitting the harassment to occur, and there is no question that Burlington acted reasonably under the circumstances. The company had a policy against sexual harassment, and respondent admitted that she was aware of the policy but nonetheless failed to tell anyone with authority over Slowik about his behavior. See *ante,* at 2262. Burlington therefore cannot be charged with knowledge of Slowik's alleged harassment or with a failure to exercise reasonable care in not knowing about it.

II

Rejecting a negligence standard, the Court instead imposes a rule of vicarious employer liability, subject to a vague affirmative defense, for the acts of supervisors who wield no delegated authority in creating a hostile work environment. This rule is a whole-cloth creation that draws no support from the legal principles on which the Court claims it is based. Compounding its error, the Court fails to explain how employers can rely upon the affirmative defense, thus ensuring a continuing reign of confusion in this important area of the law.

In justifying its holding, the Court refers to our comment in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that the lower courts should look to "agency principles" for guidance in determining the scope of employer liability, *id.,* at 72, 106 S.Ct., at 2408. The Court then interprets the term "agency principles" to mean the Restatement (Second) of Agency (1957). The Court finds two portions of the Restatement to be relevant: § 219(2)(b), which provides that a master is liable for his servant's torts if the master is reckless or negligent, and § 219(2)(d), which states that a master is liable for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                           Page 21
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

his servant's torts when the servant is "aided in ac-complishing the tort by the existence of the agency relation." The Court *772 appears to reason that a supervisor is "aided ... by ... the agency relation" in creating a hostile work environment because the su-pervisor's **2274 "power and authority invests his or her harassing conduct with a particular threaten-ing character." *Ante,* at 2269.

Section 219(2)(d) of the Restatement provides no basis whatsoever for imposing vicarious liability for a supervisor's creation of a hostile work envir-onment. Contrary to the Court's suggestions, the principle embodied in § 219(2)(d) has nothing to do with a servant's "power and authority," nor with whether his actions appear "threatening." Rather, as demonstrated by the Restatement's illustrations, li-ability under § 219(2)(d) depends upon the plaintiff's belief that the agent acted in the ordinary course of business or within the scope of his appar-ent authority.[FN4] In this day and age, no sexually harassed employee can reasonably believe that a harassing supervisor is conducting the official busi-ness of the company or acting on its behalf. Indeed, the Court admits as much in demonstrating why sexual harassment is not committed within the scope of a supervisor's employment and is not part of his apparent authority. See *ante,* at 2265-2268.

> FN4. See Restatement § 219, Comment *e;* § 261, Comment *a* (principal liable for an agent's fraud if "the agent's position facilit-ates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of business confided to him"); § 247, Illustrations (newspaper li-able for a defamatory editorial published by editor for his own purposes).

Thus although the Court implies that it has found guidance in both precedent and statute-see *ante,* at 2265 ("The resulting federal rule, based on a body of case law developed over time, is statutory inter-pretation pursuant to congressional direction")-its

holding is a product of willful policymaking, pure and simple. The only agency principle that justifies imposing employer liability in this context is the principle *773 that a master will be liable for a ser-vant's torts if the master was negligent or reckless in permitting them to occur; and as noted, under a negligence standard, Burlington cannot be held li-able. See *supra,* at 2273.

The Court's decision is also in considerable tension with our holding in *Meritor* that employers are not strictly liable for a supervisor's sexual harassment. See *Meritor Savings Bank, FSB v. Vinson, supra,* at 72, 106 S.Ct., at 2408. Although the Court recog-nizes an affirmative defense-based solely on its divination of Title VII's *gestalt,* see *ante,* at 2270-it provides shockingly little guidance about how em-ployers can actually avoid vicarious liability. In-stead, it issues only Delphic pronouncements and leaves the dirty work to the lower courts:

"While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employ-ment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an un-reasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employ-er's burden under the second element of the de-fense." *Ante,* at 2270.

What these statements mean for district courts rul-ing on motions for summary judgment-the critical question for employers now subject to the vicarious liability rule-remains a mystery. Moreover, employ-ers will be liable notwithstanding the affirmative defense, *even though they acted reasonably,* so long as the plaintiff in question fulfilled *her* duty of reas-onable care to avoid harm. See *ibid.* In practice, therefore, employer liability very well may be the rule. *774 But as the Court acknowledges, this is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2257                                                                 Page 22
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340,
141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405,
11 Fla. L. Weekly Fed. S 692
**(Cite as: 524 U.S. 742, 118 S.Ct. 2257)**

the one result that it is clear Congress did *not* intend. See *ante,* at 2269-2270; *Meritor Savings Bank, FSB v. Vinson, supra,* at 72, 106 S.Ct., at 2408.

The Court's holding does guarantee one result: There will be more and more litigation to clarify applicable legal rules in an area in which both practitioners and the courts have long been begging for guidance. It thus truly boggles the mind that the Court can claim that its holding will effect "Congress' intention to promote conciliation rather**2275 than litigation in the Title VII context." *Ante,* at 2270. All in all, today's decision is an ironic result for a case that generated eight separate opinions in the Court of Appeals on a fundamental question, and in which we granted certiorari "to assist in defining the relevant standards of employer liability." *Ante,* at 2263-2264.

* * *

Popular misconceptions notwithstanding, sexual harassment is not a freestanding federal tort, but a form of employment discrimination. As such, it should be treated no differently (and certainly no better) than the other forms of harassment that are illegal under Title VII. I would restore parallel treatment of employer liability for racial and sexual harassment and hold an employer liable for a hostile work environment only if the employer is truly at fault. I therefore respectfully dissent.

U.S.Ill.,1998.
Burlington Industries, Inc. v. Ellerth
524 U.S. 742, 118 S.Ct. 2257, 77 Fair Empl.Prac.Cas. (BNA) 1, 170 A.L.R. Fed. 677, 73 Empl. Prac. Dec. P 45,340, 141 L.Ed.2d 633, 66 USLW 4634, 98 Cal. Daily Op. Serv. 5029, 98 Daily Journal D.A.R. 6991, 98 CJ C.A.R. 3405, 11 Fla. L. Weekly Fed. S 692

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

H

**Baldwin** v. **BlueCross/Blue** Shield of Alabama
C.A.11 (Ala.),2007.

Susan **BALDWIN**, Plaintiff-Appellant,
v.
**BLUECROSS/BLUE** SHIELD OF ALABAMA,
Defendant-Appellee.
**No. 05-15619.**

March 19, 2007.

**Background:** Terminated employee sued employer for sexual harassment and retaliation under Title VII, and asserted various tort claims against employer under Alabama law. The United States District Court for the Northern District of Alabama, No. 03-02621-CV-B-S,Sharon Lovelace Blackburn, J., entered summary judgment for employer. Employee appealed.

**Holdings:** The Court of Appeals, Carnes, Circuit Judge, held that:
(1) employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, as required for *Faragher-Ellerth* defense;
(2) employee failed to take advantage of preventive or corrective measures, thus satisfying second element of *Faragher-Ellerth* defense; and
(3) employee's termination was not in retaliation for her sexual harassment complaint.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⟜1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
To prevail under the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim, an

employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⟜1119**

78 Civil Rights
    78II Employment Practices
        78k1119 k. Adverse Actions in General. Most Cited Cases

**Civil Rights 78 ⟜1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
The alteration of the terms and conditions of employment forbidden by Title VII can be brought about through a tangible employment action, such as a pay decrease, demotion, or termination, or through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[3] Civil Rights 78 ⟜1190**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1190 k. Other Particular Cases. Most Cited Cases
Employer's offer to transfer employee to another office to resolve problems she and her supervisor were having was not tangible employment action upon which Title VII sexual harassment claim could be based; providing employee with choice about where she worked did not change terms or

conditions of her employment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ⚖1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
Termination will support a Title VII claim only if it was caused by discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⚖1168**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1168 k. Particular Cases. Most Cited Cases

**Civil Rights 78 ⚖1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Employee's termination was not caused by discrimination, and thus did not violate Title VII under "tangible employment action" theory, where employee was terminated after she refused to work with alleged sexual harasser, refused to accept transfer offer, and refused to accept offer to resolve problem through counseling. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⚖1166**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1166 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
Firing an employee because she will not cooperate with the employer's reasonable efforts to resolve

her complaints is not discrimination based on sex in violation of Title VII, even if the complaints are about sex discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⚖1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
To establish a right to recover for sexual harassment under Title VII pursuant to the hostile environment theory, an employee need not show a tangible employment action, but she must show that she was harassed because of her sex, that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment, and that there is some basis for holding the employer liable. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ⚖1118**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

**Civil Rights 78 ⚖1145**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1145 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

**Civil Rights 78 ⚖1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                    Page 3
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

Cases

**Civil Rights 78 ☞1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
Title VII does not prohibit profanity alone, however profane, and it does not prohibit harassment alone, however severe and pervasive; instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1183 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
Because a claim of sexual harassment under Title VII is a claim of disparate treatment, in order to prevail a plaintiff must show that similarly situated persons not of her sex were treated differently and better. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1145**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1145 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
Title VII does not enact a general civility code. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ☞1149**

78 Civil Rights

    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases

**Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
When a Title VII plaintiff alleges that her employer is liable for the harassing conduct of co-workers instead of supervisors, the employer will be held liable only if it knew or should have known of the harassing conduct but failed to take prompt remedial action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
The *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim is not available where the discrimination the employee has suffered included a tangible employment action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
The *Faragher-Ellerth* defense to a Title VII sexual harassment claim is available to an employer de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                    Page 4
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

fending against a hostile environment claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 €⇒1189**

78 Civil Rights
  78II Employment Practices
    78k1181 Sexual Harassment; Work Environment
      78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
An employer avoids liability under the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim if: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities it provided. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 €⇒1537**

78 Civil Rights
  78IV Remedies Under Federal Employment Discrimination Statutes
    78k1534 Presumptions, Inferences, and Burden of Proof
      78k1537 k. Sex Discrimination. Most Cited Cases
Because the *Faragher-Ellerth* defense to a Title VII sexual harassment claim is an affirmative defense, the employer bears the burden of establishing both of its elements. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[16] Civil Rights 78 €⇒1189**

78 Civil Rights
  78II Employment Practices
    78k1181 Sexual Harassment; Work Environment
      78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, as required for *Faragher-Ellerth* affirmative defense to Title VII sexual harassment claim, where it had valid anti-discrimination policy and reasonable reporting requirements, and employer's investigation was reasonable, given, inter alia, that investigation was conducted by head of human resources department who was experienced in such matters, and that employer warned and counseled alleged harasser even though it was unable to substantiate employee's allegations. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[17] Civil Rights 78 €⇒1189**

78 Civil Rights
  78II Employment Practices
    78k1181 Sexual Harassment; Work Environment
      78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
The requirement that an employer conduct a reasonable investigation of a sexual harassment complaint in order to establish the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[18] Civil Rights 78 €⇒1189**

78 Civil Rights
  78II Employment Practices
    78k1181 Sexual Harassment; Work Environment
      78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
An employer is not required to conduct a full-blown, due process, trial-type proceeding in response to complaints of sexual harassment in order to benefit from the *Faragher-Ellerth* defense to a Title VII claim; all that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                    Page 5
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

ducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[19] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim is still available if the remedial result is adequate; in other words, a reasonable result cures an unreasonable process. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[20] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
For a remedial measure offered by an employer to be reasonable, for purposes of the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim, it is enough if the measure is reasonably likely to prevent the misconduct from recurring. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[21] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Pre-

ventive or Remedial Measures. Most Cited Cases
For purposes of the first element of the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim, namely that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, the sexual harassment complainant does not get to choose the remedy. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[22] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
An employee's failure to take advantage of preventive or corrective measures can take the form of not using the procedures in place to promptly report any harassment or of not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported, and either failure is sufficient to establish the second element of the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[23] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Employee's refusal to take advantage of counseling offered by her employer to resolve problems between her and her alleged sexual harasser constituted failure to take advantage of preventive or corrective measures, thus satisfying second element of employer's *Faragher-Ellerth* affirmative defense to Title VII claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                    Page 6
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

**[24] Civil Rights 78 ⟜1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Employee's failure to report alleged sexual harassment constituted failure to take advantage of preventive or corrective measures, thus satisfying second element of employer's *Faragher-Ellerth* affirmative defense to Title VII claim, notwithstanding that employee feared being fired and felt that silence would best serve her career interests, where employer's policy imposed duty to report harassing conduct immediately, but employee's complaint came over three months after alleged incidents of harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[25] Civil Rights 78 ⟜1149**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
To preclude a finding that an employee failed to take advantage of preventive or corrective measures, as required for an employer to establish the second element of the *Faragher-Ellerth* affirmative defense to Title VII claim, the employee must comply with the reporting rules and procedures her employer has established. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[26] Civil Rights 78 ⟜1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
An employee in extreme cases may have reasons for not reporting harassment earlier that are good enough to excuse a delay in reporting, for purposes of the second element of the *Faragher-Ellerth* affirmative defense to a Title VII sexual harassment claim, namely that the employee unreasonably failed to take advantage of any preventive or corrective opportunities it provided. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[27] Federal Courts 170B ⟜611**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)1 Issues and Questions in Lower Court
                170Bk611 k. Necessity of Presentation in General. Most Cited Cases
The Court of Appeals does not ordinarily consider arguments raised for the first time on appeal.

**[28] Civil Rights 78 ⟜1247**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1247 k. Discharge or Layoff. Most Cited Cases
Employee's termination was not in retaliation for her sexual harassment complaint, so as to violate Title VII, where she was terminated because she refused to cooperate in employer's reasonable efforts to solve the problem through counseling her and alleged harasser, and, although she indicated that she did not mean it when she repeatedly said she would not work with supervisor, what counted was not what she believed about her intent but what employer believed. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[29] Torts 379 ⟜330**

379 Torts
    379IV Privacy and Publicity
        379IV(B) Privacy

480 F.3d 1287                                                                                                Page 7
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

379IV(B)1 Privacy in General
  379k330 k. In General. Most Cited
Cases

Under Alabama law, to prove invasion of privacy, a plaintiff must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation.

**[30] Damages 115 ☞57.22**

115 Damages
 115III Grounds and Subjects of Compensatory
Damages
  115III(A) Direct or Remote, Contingent, or
Prospective Consequences or Losses
   115III(A)2 Mental Suffering and Emotional Distress
    115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
     115k57.22 k. Nature of Conduct.
Most Cited Cases

Under Alabama law, to prove intentional infliction of emotional distress, a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it cannot be tolerated in a civilized society.

**[31] Damages 115 ☞57.55**

115 Damages
 115III Grounds and Subjects of Compensatory
Damages
  115III(A) Direct or Remote, Contingent, or
Prospective Consequences or Losses
   115III(A)2 Mental Suffering and Emotional Distress
    115k57.50 Labor and Employment
     115k57.55 k. Sex and Gender. Most
Cited Cases

**Damages 115 ☞57.58**

115 Damages
 115III Grounds and Subjects of Compensatory
Damages
  115III(A) Direct or Remote, Contingent, or

Prospective Consequences or Losses
   115III(A)2 Mental Suffering and Emotional Distress
    115k57.50 Labor and Employment
     115k57.58 k. Other Particular
Cases. Most Cited Cases

**Torts 379 ☞341**

379 Torts
 379IV Privacy and Publicity
  379IV(B) Privacy
   379IV(B)2 Intrusion
    379k341 k. Particular Cases in General. Most Cited Cases

Supervisor's alleged conduct, including repeated use of profanity in office and various incidents of sexual harassment, including asking employee to spend night in his hotel room, if proven, was not sufficiently outrageous to constitute invasion of privacy or intentional infliction of emotional distress under Alabama law.

**[32] Labor and Employment 231H ☞3042**

231H Labor and Employment
 231HXVIII Rights and Liabilities as to Third
Parties
  231HXVIII(B) Acts of Employee
   231HXVIII(B)1 In General
    231Hk3042 k. Negligent Retention.
Most Cited Cases

**Labor and Employment 231H ☞3043**

231H Labor and Employment
 231HXVIII Rights and Liabilities as to Third
Parties
  231HXVIII(B) Acts of Employee
   231HXVIII(B)1 In General
    231Hk3043 k. Negligent Supervision.
Most Cited Cases

Under Alabama law, employer was not liable for negligent training, supervision, or retention in connection with any sexual harassment of employee by supervisor, where supervisor had received copy of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                        Page 8
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

and was trained in employer's sexual harassment policy, and employer neither knew nor had reason to suspect that supervisor was harassing employee or anyone else until employee reported it.

*1291 Roderick T. Cooks, Lee David Winston, Winston Cooks, LLC, Birmingham, AL, for Baldwin.

Alysonne O. Hatfield, John Richard Carrigan, Peyton Lacy, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Birmingham, AL, for Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Alabama.

*1292 Before CARNES and MARCUS, Circuit Judges, and JORDAN,[FN*] District Judge.

> FN* Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

CARNES, Circuit Judge:

[1] Employers generally are liable for a supervisor's sexual harassment if the harassment is severe and pervasive enough to result in a hostile work environment amounting to discrimination prohibited by Title VII, 42 U.S.C. § 2000e *et seq.* There is, however, an affirmative defense, which the Supreme Court wrote into the law in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The defense has two halves, one of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect herself and others from harassment by using the procedures the employer has in place to promptly report it. To prevail under the *Faragher-Ellerth* defense, an employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers. This appeal

presents us with issues about both halves of that defense, some of which we have not addressed before.

**I.**

The facts we consider are taken from our view of the evidence in the light most favorable to Susan Baldwin, the plaintiff who suffered summary judgment in the district court and is the appellant here. *See Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 556-57 (11th Cir.1997). She began working for Blue Cross in 1989, and became a marketing representative in the company's Huntsville, Alabama office in 1998. Scott Head became Baldwin's boss in November 2000 when Blue Cross promoted him from marketing representative to the position of district manager in Huntsville. There is no evidence that either of them had been involved in any reported incidents of sexual harassment before the events at issue here.

The record does not paint a complete picture of Head and Baldwin's professional relationship before he became district manager, but there are enough brush strokes that we can see that there were problems. We know, for example, that when Baldwin was first hired, Head told her: "Hey, Baldwin, look, the only reason you are here is because we needed a skirt in the office." Baldwin did not like Head calling all the women in the office "Babe," as in his characteristic greeting "Hey, Babe ...," although she never complained about it. We also know that Baldwin believed Head had mistreated Blue Cross customers and acted unethically on occasion and she had openly supported another Huntsville staff member for the district manager's position that went to Head. The short of it is that the two had never been each other's biggest boosters.

Nonetheless, on the day Head's promotion to district manager was announced in November 2000, Baldwin stopped by his office to congratulate him. Head told her to sit down and asked, "Hey, Babe, are you on my team?" She told him that everyone in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                                    Page 9
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

the Huntsville office was on his team and that she would continue to handle her responsibilities as she had. Head replied: "That is not the question that I asked you." When Baldwin told him that she believed she had answered the question, *1293 Head stood up, leaned across the desk, and pointed his finger at her. In what she describes as a "very raised tone of voice," Head said, "[t]hat's not the fucking question I asked you. Are you on my team?" As Baldwin puts it, the two of them "proceeded in a very lengthy discussion regarding whether or not I was on his, quote, fucking team." Their talk was also about "power, authority, and respect."

Baldwin described this post-promotion discussion as a "follow up" to an earlier conversation in which she and Head had expressed different views about the same subject when Head was anticipating becoming district manager. After he had said on that earlier occasion that he was looking forward to having the power and authority of a district manager, Baldwin told him "you may have the power and you may have the authority in this position [they were in the district manager's office], but as far as respect goes, you'll get that from people in the office based on ... how you handle your job responsibilities." This context reinforced Baldwin's view of Head's "on-my-team" inquiry as a demand for loyalty.

The discussion in question on that November day when Head became district manager ended after about thirty minutes with Head once more asking if Baldwin was on his team and Baldwin simply saying, "Yes, Scott, I'm on the team." Baldwin says that Head's behavior on that day made her feel "pretty threatened." She did not, however, complain to anyone about it, at least not then.

Over the next eight months, there were no problems. When Baldwin went in and asked Head something or if he had a question for her, in her view "everything was handled very professionally." Head did use some offensive language, but not in a threatening manner and not aimed at her specific-

ally. As Baldwin would later explain in her deposition, "[p]rofanity can be used in different ways," and she agreed that "there is a difference in being cursed in front of and [being] cursed at." When pointedly asked, Baldwin testified that she could not recall a specific incident between November 2000 (the day of Head's promotion) and July 26, 2001 (the significance of that date will be apparent later) when she was cursed at "[i]n a threatening kind of manner." Baldwin also conceded that she had herself used profanity in the office, although not on a daily basis.

Head, by contrast, did eventually come to use profanity on a daily basis. And that may be an understatement. If, as John Marshall Harlan suggested, it is "often true that one man's vulgarity is another's lyric,"*Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971), then Head was quite lyrical around the office. He regularly called the marketing representatives, who were all male with the exception of Baldwin, "cocksuckers" and "peckerwoods." For example, he would summon the marketing representatives into a meeting by saying, "Hey, you bunch of cocksuckers, hey, you bunch of peckerwoods, come in here. I need to talk to y'all." Or, during the meeting, he would ask, "Hey, you bunch of cocksuckers, how much business I got coming in?" Head regularly used the word "fuck" in general conversation, as in "what the fuck" or something along those lines. And Baldwin testified that Head used the term "bitch" to refer to women in general, although she could not provide many examples of Head's use of the word in that way. She did recall a single instance, when the two of them were marketing representatives, in which Head referred to a prospective client as a bitch. And she also recalled another instance in which Head, after he became district manager, *1294 referred to his wife as a "fucking bitch" (more about that later).

On Tuesday, July 26, 2001, Head, along with Baldwin and other marketing representatives from the Huntsville office, went to Birmingham for a ban-

480 F.3d 1287                                                                                    Page 10
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

quet honoring top Blue Cross managers. After noticing Baldwin speaking to the company president, Head asked her what she had said. Baldwin told him that she had spoken to the president favorably about Head's job performance, to which Head replied, "Thanks Babe, you take care of me, I take care of you."

Later, while the banquet speaker was talking, Head leaned over to Baldwin and invited her to forgo her return trip to Huntsville in favor of a night of dancing and partying that would include her staying in his hotel room in Birmingham. "No one will ever know," he assured her. Baldwin told Head, "Thanks, a lot, Scott, but I can't do that. I've got meetings tomorrow," or something along those lines. After the banquet was over, she drove to Huntsville.

While she was on the trip home, Head called her and urged her to spend some time with him that night. He told her that he was on his way back to Huntsville himself, was coming to her house, that she should just leave her garage door open, and that he would get some beer, pick her up, put the car top down, and they would "just cruise through Green Mountain, drink and play CDs." Baldwin told Head that she really appreciated the offer but had to decline. Head called her a couple of more times before she got home, and during one conversation when the connection was lost she may have called him back. As Baldwin was pulling into her driveway, Head called her and said that he was at her front door. We don't know for sure whether Head actually was at Baldwin's front door, but she told him over the phone, "Scott, you just need to go home to your wife and kids." He responded, "All right, Babe. All right, Babe."

A few days later-Baldwin thinks it was the following Monday (which would have been July 31, 2001)-Head called her into his office. After she went in, he closed the door, walked behind her, and said "Hey, Babe, blow me," having moved so close to her that the only place for her to go was to fall backwards onto a couch behind her. Baldwin

replied by asking Head if there was anything else that he needed her for. When Head replied "No," she got off the couch, retrieved a couple of M&M candies from a jar on Head's desk, and sat down in a chair in front of his desk. Right about then, Head asked Baldwin about her weekend. Baldwin told him that she and her husband had not done anything exciting, and asked Head what he had done over the weekend.

Head said: "Well, you know, we went out partying this weekend" and "that fucking bitch wife of mine, you know, she got tanked and we got home and she came pretty unglued and she came at me," and "I threw that fucking bitch on the floor." When Baldwin replied "What?," Head continued that he got his hands around his wife's neck but then realized that he should get out of his house. That frightened Baldwin, who realized she needed to leave Head's office. She then asked him where he had gone after he left his house, and Head told her he had spent the night at the house of his ex-wife, who was out of town. As Baldwin later said, "And at that point, I realized that I was dealing with somebody who just wasn't quite right." She also had work to do and realized that Head was wasting her time, so she left his office. Baldwin says that she was afraid of Head at this point. But she did not report the conversation or her fears to any higher-up*1295 or to anyone in the Human Resources Department.

As Baldwin observed it, from that point on the situation in the office deteriorated. Head's cursing became part of his "standard, everyday ... conversation in the office." There was also one occasion where Head, explaining his decision not to promote a certain female employee to the position of marketing representative, told Baldwin: "I need to hire a guy for this job, a Susan Baldwin, somebody who has balls like you do." He described the employee he was not going to promote as a "slut" and a "tramp." And, on several occasions around this time, Baldwin overheard Head crack a few jokes with some of her male colleagues about their wives. Head might say something like, "Yeah, your wife

looked good this morning," or "Hey, I'm going over to your house this afternoon .... to see your wife."

At least twice during this period, Head approached Baldwin's desk and after getting Baldwin's attention with his trademark greeting "Hey, Babe," unzipped his pants fly and moved the zipper up and down. There were "two or three" times when Head would come up behind Baldwin, take a loud breath, say "Hey, Babe," and breathe down her neck. Baldwin found Head's behavior offensive; it made her uncomfortable.

The behavior of some of Baldwin's other co-workers was not a model of propriety, either. Once a male colleague, first name Jeff, made a passing reference to his prospective customer "tickler file" in the presence of Baldwin and another co-worker, first name Kirk. After Jeff left, Kirk began playing with his penis through his pants and said to Baldwin, "tell Jeff to tickle this." Baldwin testified, "[i]t was just always like that."

Despite what Baldwin characterized as the "uncomfortable" situations and the "deteriorating" office conditions in August and September 2001, she did not file a complaint with anyone in the company, as Blue Cross' anti-sexual harassment policy and procedures required. Baldwin knew about the policy and procedures because she had periodically received training in them. The material parts of the policy in place during the relevant time provided:

Our company's policy prohibits any type of harassment, violence, or threat of violence. Any employee who engages in this conduct is subject to termination.

An employee who believes that he or she has been subject to harassment or violence in any form should report the incident or conduct immediately to his or her manager or to Employee Relations .... Employee Relations will promptly and thoroughly conduct an impartial investigation of the conduct ....

The manager of Employee Relations ... will investigate reports, assess and evaluate risks and implement actions to remedy potentially threatening or violent situations.

Baldwin eventually shared her concerns about all of the vulgar language with her secretary, and she told at least two of her co-workers about Head's propositions. She made no attempt, however, to report anything to Employee Relations-which everyone called Human Resources. Career considerations kept her from making a report. She didn't believe at the time that her job was in jeopardy, and she didn't want anything to appear in her personnel file or on her record that could get in the way of a future promotion. As she explained it, her strategy in response to the harassment was to "just go along to get along."

Baldwin began to rethink that strategy not because of any change in the amount of harassment, but because of disputes **\*1296** involving prospective clients and the amount of a bonus check she received. The bonus check she received was for $2,000, but she thought it should have been for $3,000. On the morning of Monday, September 24, 2001, Baldwin walked into Head's office, put the check on his desk, and asked him to do something about it. Head said that he had no control over the amount of the check. Baldwin asked Head if she needed to talk with Tommy Hudgins, who, as Vice President for Sales, was Head's superior. As Baldwin put it, "And at that point, I challenged him on the issue, and he really pretty much came unglued with me." She testified:

He looked at me and said, [a]re you fucking stupid? Excuse me. He said, Don't you ever fucking go over my head. You'll fucking lose your job, with his finger pointed in my face as he's screaming at me.

After hearing that, Baldwin told Head: "You know what, Scott, I'm done with you. I'm done."

Sometime during their conversation that morning, Head told Baldwin that she was on the verge of in-

480 F.3d 1287                                                                                              Page 12
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

subordination, to which Baldwin replied, "You know what, Scott, if you think I'm insubordinate, why don't you just fire me?" After confronting Head, she walked out of his office to go to an appointment, telling a co-worker along the way that this was the last straw, that she had taken all she could take. She felt that what she had gone through that morning had been "very, very demeaning, very demeaning."

Later that afternoon, Head called Baldwin into his office and tried to make amends. He told her he was uncomfortable with how the morning had gone, to which Baldwin responded that it was obvious he did not care about her perspective. She told him that he had missed an opportunity to manage, to which he responded "in no uncertain terms" that she should not tell him how to manage. The next morning Head told Baldwin that he had called his superiors on her behalf about the bonus issue, but he again reiterated that she was "never to go above his head."

After the exchanges with Head about her bonus check, Baldwin came to believe that her situation at Blue Cross was "pretty miserable," because she was subject to the whims of a "manipulative and controlling" boss. She believed that Head controlled her destiny within the company, and interpreted his remarks as a threat. She feared that she would lose her job, and was convinced she would if she ever went over Head's head. Baldwin had a good relationship with and the utmost respect for Hudgins (Head's supervisor), but she did not report any of this to Hudgins or to anyone else in Blue Cross management for another month and a half.

Two incidents during the next month and a half led to Baldwin finally filing an internal complaint about Head. The first occurred on October 1, 2001, when Head assigned a prospective client to another marketing representative before hearing Baldwin's side of the dispute. Baldwin took this occasion to "confront" Head about the "circus-like conditions in the office," to accuse him of leaking confidential information about her prospects to other represent-

atives, and to tell him that she no longer trusted him. Baldwin explained to Head that during the first six months after his promotion, in her words, "he had won me over based on his actions, but once [he] knew that he had won me over, things deteriorated." The deterioration she referred to was the noise and the "goofing around" occurring in an office with cubicles instead of individual offices. Head dismissed Baldwin's complaints about the poor workplace conditions as "bullshit," but he did call her later that day to apologize*1297 about her prospect information being leaked and promised that it would not happen again.

The last incident in the downward sliding relationship between the two also involved a dispute about a prospective client. On October 29, 2001, Baldwin called Head for help. She and another co-worker had gotten into a quarrel about a prospective client, during which the co-worker yelled at her and accused her of being nothing but a problem to everyone in the office. During the call to Head, Baldwin told him what had happened, reiterated her concerns about the circus-like conditions in the office making it difficult to work, and said she would no longer tolerate being yelled at and was "tired of the vocabulary that's being used" around her. Head assured Baldwin that she was not a problem, and as she put it, tried to build her up by reminding her that he had asked her to represent the company at numerous functions and had bragged about her to others. He agreed with her that it was not appropriate to use profanity in the workplace and assured her that he would talk with the co-worker with whom she had the angry dispute earlier that day.

A meeting was arranged for later that afternoon, but when Baldwin showed up for it at Head's office the offending co-worker was not there. Instead, there was another employee present, which Baldwin took as a sign that Head was planning to counsel her, although he never called it a counseling session. Head told Baldwin that he valued her, that he had always tried to promote her, that he had told many people she was the best salesperson in the office,

480 F.3d 1287                                                                                                    Page 13
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

and that the only problem he had with her was earlier that month involving the dispute over her bonus check. But Head also told Baldwin that people in the office found her to be unapproachable and intimidating. And, in an apparent reference to Baldwin's criticisms about the office atmosphere, Head said that he did not understand her view and told her that "[w]e teach people how to treat us." Uncharacteristically, Baldwin mostly kept quiet during this meeting, sensing that she "wasn't supposed to talk."

Head assigned the disputed prospective client to Baldwin's male co-worker, but, a few days later, asked Baldwin to go to lunch. The lunch with Head, which took place on November 6, 2001, was in Baldwin's view "purely a 'temperature check' " to see if Baldwin was "OK" and to pacify her. By this time, Baldwin was not okay, but, in her words, she "[didn't] say a word." Two days later, on November 8, 2001, Baldwin finally complained to the Blue Cross Human Resources Department. She met with Emma Barclay of that department and submitted a five-page written synopsis of the conduct she found offensive that had happened since Head's promotion a year earlier. The events referred to in the synopsis and the time that had passed since they occurred are (although the synopsis did not enumerate them in this fashion): (1) the "on-my-team" conversation in Head's office (12 months earlier); (2) Head's proposition at and after the banquet in Birmingham (more than three months earlier); (3) the "Hey, Babe, Blow me" incident (about three months earlier); (4) the bonus check controversy (about seven weeks earlier); (5) the prospective client disputes (the month before); and (6) the lunch that Baldwin and Head had together (two days earlier).

The synopsis that Baldwin gave Barclay also included a paragraph entitled "August 2001," which stated in its entirety:

The conditions are deteriorating in the office. I am very uncomfortable with the unprofessionalism that is being display [sic] by Scott, and also other **\*1298**

members of the staff. Scott repeatedly addresses the Marketing Reps as "Cocksuckers and Peckerwood." He uses the word "fuck" on a regular basis. This type of vocabulary is now being consistently used in the office. It makes me very uncomfortable. It is now difficult for me to even be in the office around Scott. I feel that his conduct is now affecting my ability to perform my job while in the office.

The breathing and zipper incidents were not mentioned in the synopsis, but Baldwin told Barclay about them. The two women spoke for about an hour that day, with Baldwin going through all the notes she had made. According to Baldwin, Barclay listened attentively, seemed shocked, and promised to take everything to Rick King, who was then the Blue Cross Vice President of Human Resources and a compliance officer.

On November 27, 2001, King and Barclay, along with Sharon Heaton, the company's Manager of Associate Resources, traveled from Birmingham to Huntsville to investigate Baldwin's allegations. They interviewed Head and three other members of the Huntsville office they thought might have relevant information. One of those three, Bud Smith, was the long-time office manager in Huntsville who would have been in the office at virtually all times during the work day, unlike sales personnel who were often out making calls. Smith was described by another interviewee as being very perceptive, knowing the "pulse" of the office, and being the "ear" to many associates in Huntsville. King thought that Smith would be a "very good and objective witness."

King himself interviewed two of the four potential witnesses, including Head, while the two women on the investigating team interviewed one each. The interviews took place in a restaurant near the Huntsville office, with each of the four people being interviewed in different parts of the restaurant or at different times. The result of the questioning of the three people other than Head was that none of them corroborated Baldwin's charges, except that one of the three did say that he had heard offensive

480 F.3d 1287                                                                                                    Page 14
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

language in the Huntsville office. According to Barclay's notes, what the man said about the profanity was that "[e]veryone use[d] it including Susan B."

Barclay's notes also indicate that the answers of one of the employees who was questioned seemed "rehearsed" and that he mentioned Baldwin's name almost before the first question was asked. Barclay later testified that the man's answers did not seem rehearsed, but it did appear that he had come in knowing what the subject matter of the questioning was going to be.

In his answers to King's questions that day, Head admitted using the term "peckerwood" as a nickname for one of the male marketing representatives in the Huntsville office, but he otherwise denied all of Baldwin's allegations. King did not take notes during his interview of Head. He suggested to Head during the interview that the relationship between him and Baldwin could benefit from some outside assistance. King believed that Head seemed open to the possibility of working out his differences with Baldwin.

Where Blue Cross is not able to substantiate complaints of sexual harassment, it is King's practice to warn the accused employee that "if the conduct was true or had been true or if like conduct is proven true in the future, that they will be subject to disciplinary action, up to and including termination." He gave Head that warning both before and after the conclusion of the investigation.

The three members of the investigating team discussed the results of the interviews during the drive back to Birmingham.*1299 According to King, they "preliminarily [concluded] that there was no merit to the charges or the contentions that [ ] Baldwin was making" because they hadn't heard anything to support her allegations. Barclay testified that she turned her notes from the interviews over to King and that the discussion on the drive back was "[j]ust a general conversation but nothing in depth." Her role in the case ended after that.

Baldwin first learned about the results of the investigation on November 29, 2001, which was a couple of days after the Human Resources team's visit to Huntsville, when Baldwin met with King while in Birmingham for some other Blue Cross event. King told Baldwin that no one had corroborated her complaint. She insisted that her charges were true and demanded that Head be fired. King explained that the company did not have sufficient evidence to do that, and he proposed instead to enlist the assistance of an expert to counsel them and monitor their interactions in order to prevent any future problems. The person he had in mind was an industrial psychologist, Dr. Buddy Seay, whom the company had used successfully in similar cases in the past.

As Baldwin recalled the conversation, King had asked her, in effect, whether she would be willing for the company to work with Head to "mold and shape his behavior." She wasn't willing and rejected King's proposed solution, telling King that she "could not work for Scott." Given what she knew to be Head's past behavior, Baldwin thought that the counseling "was not anything that I thought that I should have to be a part of."

On December 7, 2001, Baldwin met with her old boss Tommy Hudgins, the Vice President for Sales. Hudgins offered Baldwin another means of remedying any problems she was having with Head, which was that she could be a marketing representative in the Birmingham office. Baldwin refused this proposal as well, again saying, "I can't work for Scott" and explaining that her family, friends and clients were located in and around Huntsville. That was the second time she had refused a solution that the company offered.

The third time came in another meeting with Hudgins, which took place on December 10, 2001. In that meeting, Baldwin said that she was not going to participate in counseling with Head and the outside psychologist or accept a transfer to Birmingham. As a result, Hudgins placed Baldwin on administrative leave and instructed her to stop doing company business.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                    Page 15
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

Later that same week, King gave Baldwin another chance to choose between counseling and a transfer, and for the fourth time Baldwin refused to cooperate. She reiterated that she would not work for Head or transfer to Birmingham. As a result, King sent Baldwin a letter demanding her resignation, citing her refusal to work with the relationship counselor in Huntsville or to accept the transfer, and offering her a more generous severance arrangement than she was entitled to receive. Baldwin refused to resign and was terminated, with the enhanced severance arrangement, effective December 20, 2001.

## II.

In the litigation that followed, Baldwin sued Blue Cross for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, -3, alleging that Head's harassing behavior created a hostile work environment and that she was fired in retaliation for reporting it. **Baldwin** also alleged that **BlueCross** was liable to her on state law claims of invasion of privacy, intentional infliction of emotional *1300 distress, and negligent retention, supervision, and training. After discovery, the parties **cross**-filed motions for summary judgment. The court denied **Baldwin's** motion for partial judgment and granted **BlueCross'** motion for judgment as to each of **Baldwin's** claims.

With respect to the hostile environment claim, the district court concluded that the alleged incidents of harassment were not sufficiently severe or pervasive to constitute sexual harassment and that, in any event, **BlueCross** had established the affirmative defense provided in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). As for the retaliation claim, the court concluded that Blue Cross had proffered a non-retaliatory reason for firing Baldwin, and that she had not put forward evidence to support a finding of pretext. Finally, regarding the state law claims,

the court determined that Head's conduct was not sufficiently extreme to constitute an invasion of privacy or an intentional infliction of emotional distress and, in the absence of an underlying tort, the conduct could not be the basis for a claim for negligent training, supervision, or retention.

In this appeal Baldwin challenges the district court's judgment as to all of her claims.

## III.

[2] Title VII prohibits sex-based discrimination that alters the terms and conditions of employment. 42 U.S.C. § 2000e-2(a)(1). The forbidden alteration can be brought about in either of two ways. *Hulsey v. Pride Rests., LLC,* 367 F.3d 1238, 1245 (11th Cir.2004). One is through a tangible employment action, such as a pay decrease, demotion or termination. *Id.* The other way is through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work. *Id.*

## A.

[3] Although Baldwin's primary contention is that the terms of her employment were altered by a hostile work environment, she also claims that she suffered tangible employment action discrimination. To support that theory she points to two actions by Blue Cross, the first of which was the offer to transfer her to the Birmingham office in order to resolve the problems she and Head were having. An offer to transfer an employee, however, is not an employment action; it is merely an offer. Providing an employee with a choice about where she works does not change the terms or conditions of her employment.

[4][5] The second action Baldwin contends was a tangible employment action is her termination. To be sure, termination is the ultimate change in the terms and conditions of employment because it ends them. But termination will support a claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                          Page 16
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

only if it was caused by discrimination. *See Ellerth,* 524 U.S. at 760, 118 S.Ct. at 2268 (noting that an employer is liable if its "discriminatory act *results* in a tangible employment action" (emphasis added)). There is no genuine issue of material fact about what caused Baldwin's termination. She refused to work with Head, who was the district manager in Huntsville; she refused to accept a transfer to Birmingham; and she refused to accept the company's offer to resolve the problem through counseling. On at least four occasions Baldwin was given the choice of accepting a transfer or participating\*1301 in counseling, and each time she adamantly refused to accept either.

[6] Firing an employee because she will not cooperate with the employer's reasonable efforts to resolve her complaints is not discrimination based on sex, even if the complaints are about sex discrimination. Were it otherwise, an employee would be free to refuse any reasonable remedy the employer offered to resolve her complaint. As we'll explain later in our discussion of Blue Cross' obligation under the *Faragher-Ellerth* defense, the offered remedy was reasonable.

## B.

[7] Having determined that Baldwin's tangible employment action theory for recovery under Title VII fails at the gate, we turn to her hostile environment theory. To establish her right to recover under this theory an employee need not show a tangible employment action, but she must show that she was harassed because of her sex, that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment," and that there is some basis for holding the employer liable. *Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1279-80 (11th Cir.2003); *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 582 (11th Cir.2000); *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (en banc); *see Pa. State Police v. Suders,* 542 U.S. 129, 133, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004).

Although Baldwin complained to Barclay about Head's handling of her bonus check in September 2001 and the dispute with two male co-workers over prospective clients in October 2001, she does not now contend that Head's actions or inactions involving those matters amounted to harassment or other discrimination based on sex.

As part of the harassment she suffered, Baldwin points to the widespread use of profanity. This is hardly a new problem. In the second month of our independence, George Washington issued a general order to the Continental Army in which he bemoaned the fact that "the foolish, and wicked practice, of profane cursing and swearing ... is growing into fashion." General Orders on Profanity of 3 August 1776, *in* 5 *The Papers of George Washington: Revolutionary War Series* 551 (Philander D. Chase ed., 1993). It was still in fashion two-and-a-quarter centuries later in Blue Cross' Huntsville office. As our earlier description of the facts details, there was a lot of profanity, but the problem for Baldwin's discrimination case is that very little of it was aimed specifically at females. Most of the curse words that were frequently used–"fuck," "fucking," "bullshit," "cocksucker," and "peckerwood"–are relatively gender-neutral. And it is undisputed (Baldwin herself testified to it) that those curse words were used indiscriminately in front of, and towards, males and females alike. It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct.FN1

> FN1. This principle might with some justification be called the Vince Lombardi Rule, if what one of his former players said about the great coach is true. Henry Jordan, who played defensive tackle for the Packers, when asked how Lombardi treated his players, answered: "[He] treats us all alike. Like dogs!" David Maraniss, *When Pride Still Mattered: A Life of Vince Lombardi* 377 (1999). If so, no one could accuse Lombardi of discrimination, and

480 F.3d 1287                                                                                           Page 17
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

what is true on the practice and playing fields is also true in the workplace.

[8][9][10] Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment *1302 that discriminates based on a protected category such as sex. Because "[a] claim of sexual harassment [under Title VII] is a claim of disparate treatment," in order to prevail a plaintiff must show "that similarly situated persons not of [her] sex were treated differently and better." *Mendoza*, 195 F.3d at 1254 n. 3 (Edmondson, J., concurring). An equal opportunity curser does not violate a statute whose concern is, as the Supreme Court has phrased it, "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (citation omitted). Another way to put it, as the Supreme Court has, is that the statute does not enact "a general civility code." *Id.* at 81, 118 S.Ct. at 1002; *accord Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir.2006); *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir.2005); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001); *Gupta*, 212 F.3d at 587.

Some of the profanity or swear words Head used were more sex specific, which is to say more degrading to women than to men. On one or two occasions Head used the term "bitch" to refer to women, although never in reference to Baldwin herself. A different time he referred to another employee as a "slut" and a "tramp." Somewhat sexually ambivalent was Head's attempt to compliment Baldwin by describing to her the kind of man he needed to hire for a particular job: "a Susan Baldwin, somebody who has balls like you do." Giving Baldwin the benefit of the doubt, these comments may be considered, for whatever weight they have, on the sexual harassment scales.

[11] As further evidence of sexual harassment, Baldwin points to Head and her fellow marketing representatives making sexually charged remarks or jokes about each others' wives, and to the occasion when a male co-worker made a suggestive remark about the prospective customer "tickler file" and played with his penis through his pants in her presence. When a plaintiff alleges that her employer is liable for the harassing conduct of co-workers instead of supervisors, the employer will be held liable only if it "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir.2002) (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000)). There is reason to doubt whether Baldwin can meet that requirement here. In any event, the evidence is undisputed that after an administrative assistant in the Huntsville office complained to Head about the wife remarks and jokes, they stopped. For now, however, we can assume that this offensive behavior can be attributed to the company, because it will not matter to the result.

Some of Head's remarks and conduct toward Baldwin clearly were sexual in nature. He propositioned her at the Birmingham banquet and on her drive home from it. He cornered her in his office and propositioned her by saying, "Hey, babe, blow me." He approached her on more than one occasion and said "Hey, babe" while playing with his zipper. And he came up behind her two or three times, said "Hey, babe" and breathed down her neck.

The question this part of the case comes down to is whether the sexually harassing conduct that Baldwin did experience during the thirteen months she worked under Head's supervision was "sufficiently severe *1303 or pervasive to alter the terms and conditions of [her] employment." *Gupta*, 212 F.3d at 582. The district court concluded that it was not, but that is a question we need not answer in light of our resolution of the issues involving the *Faragher-Ellerth* defense.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## C.

[12][13] The *Faragher-Ellerth* defense is not available where the discrimination the employee has suffered included a tangible employment action. *See Ellerth,* 524 U.S. at 762-63, 765, 118 S.Ct. at 2269, 2270; *see also Faragher,* 524 U.S. at 808, 118 S.Ct. at 2293. As we have already explained, however, Baldwin did not suffer any tangible employment action as a result of the claimed sexual discrimination. The only arguable basis for recovery that she has is hostile environment discrimination, and the *Faragher-Ellerth* defense is available to an employer defending against that type of Title VII claim.

[14][15] An employer avoids liability under this defense if: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. Because it is an affirmative defense, the employer bears the burden of establishing both of these elements. *See Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1313 (11th Cir.2001). Baldwin contends that Blue Cross has established neither one, but we are convinced that it has established both.

[16] As to the first element of the defense, Baldwin does not dispute that Blue Cross has a valid antidiscrimination policy prohibiting harassment, which was effectively communicated to all employees, nor does she dispute that there were reasonable reporting requirements and procedures of which she was fully aware. *See generally Frederick,* 246 F.3d at 1314 (listing requirements of a reasonable sexual harassment policy). The policy and procedures that Blue Cross had in place are substantially similar to others that we have upheld. *See, e.g., Walton,* 347 F.3d at 1287; *Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1298-99 (11th Cir.2000). Blue Cross' policies and procedures not only were in place but had been used to fight harassment in the past. Rick King, the Vice President of Human Resources who was in charge of investigating the complaint Baldwin filed, had personally been involved in at least a half dozen investigations of sexual harassment complaints. In the ones where the allegations proved to be true, disciplinary action, up to and including termination, had been taken.

[17] According to Baldwin, the policy and procedures and how they had been applied in the past is not the problem; the problem is how the company applied them in her case. In the words of *Faragher* and *Ellerth,* the question is whether, once Baldwin complained, Blue Cross "exercised reasonable care to ... correct promptly any sexually harassing behavior." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances. The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser. Nothing in the *Faragher-Ellerth* defense puts a thumb on either side of the scale in a he-said, she-said situation. The employer is **\*1304** not required to credit the statements on the she-said side absent circumstances indicating that it would be unreasonable not to do so. Although it is not entirely clear, Baldwin does not seem to contest this point.

Instead, she contests the reasonableness of the investigative procedures used by the company in her case. Baldwin argues that there were five deficiencies in the investigation: (1) Rick King, who was in charge of the investigation, failed to speak personally with her during it; (2) King failed to take notes during his interview with Head; (3) the interview of Baldwin's colleagues from the Huntsville office took place in the same restaurant where Head was present (although in a different part of the restaurant); (4) the discussion that took place between King and the two other members of the investigat-

ive team after the interviews was not thorough enough; and (5) not enough weight was given to the notes taken by Emma Barclay, a member of the investigative team, indicating that the responses of one of the interviewed employees seemed rehearsed (although Barclay testified in deposition that his answers had not seemed rehearsed, but it appeared he knew in advance what he would be questioned about).

[18] For two reasons we reject Baldwin's contention that what she describes as shortcomings in the investigation render it unreasonable for *Faragher-Ellerth* purposes. The first reason is there is nothing in the *Faragher* or *Ellerth* decisions requiring a company to conduct a full-blown, due process, trial-type proceeding in response to complaints of sexual harassment. All that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth. *See Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1012 (7th Cir.1994) ("It is difficult for an employer to sort out charges and countercharges of sexual harassment among feuding employees ....").

The investigation that Blue Cross conducted at least meets minimum standards for this type of case. It was conducted by the head of the company's Human Resources Department, who was experienced in such matters, and he was assisted by two other members of that department. They not only interviewed Baldwin and Head but also other employees of the Huntsville office whom they had reason to believe would have witnessed the harassment if it had occurred. They did interview Head and the other employees at the same location, but those interviews were conducted separately. Although King himself did not personally interview Baldwin, another member of the investigative team, Emma Barclay, had talked to Baldwin about her allegations for more than an hour, and King had the five-

page written synopsis Baldwin submitted.

We will not hold that the investigation does not count, as Baldwin urges us to, because the investigators did not take more notes, because the discussion among them was not more thorough, or because they did not give more weight to a particular factor, such as Barclay's initial impression that the answers of one of the employees seemed rehearsed. To second guess investigations on grounds like those would put us in the business of supervising internal investigations conducted by company officials into sexual harassment complaints. We already have enough to do, and our role under the *Faragher* and *Ellerth* decisions does not include micromanaging internal investigations. Instead, we look only to the overall reasonableness of the *1305 investigation under the circumstances, and this investigation was reasonable.

[19] The second independently adequate reason we reject Baldwin's contention that shortcomings in the investigation Blue Cross undertook render the *Faragher-Ellerth* defense inapplicable is the result. We have held that even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate. *Walton,* 347 F.3d at 1288 ("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."). In other words, a reasonable result cures an unreasonable process. It does so because Title VII is concerned with preventing discrimination, not with perfecting process. *See Faragher,* 524 U.S. at 805-06, 118 S.Ct. at 2292 (Title VII's "primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm."(quotation marks omitted)).

[20] Baldwin, however, contests the reasonableness-primarily the adequacy of-the remedial measures Blue Cross offered her. Of course, with human beings there are no guarantees, but it is enough if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                                              Page 20
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

the remedial measure is "reasonably likely to prevent the misconduct from recurring." *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir.1996) (quotation marks omitted) (quoting *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)).

Even if we assume that transferring Baldwin to Birmingham was not a proper remedial measure because of the hardship it would have imposed on her, the transfer was just one of the options she was given. Blue Cross also offered to have Dr. Seay, an industrial psychologist on contract with the company, conduct a counseling program with Baldwin and Head and monitor their relationship. Dr. Seay was an expert in the area and had successfully done that sort of thing for Blue Cross before, and the company had no reason to believe that he could not succeed this time.

Counseling is the first-step corrective measure required by the nation's largest employer, the federal government, in all cases of sexual harassment. *See*29 C.F.R. § 1614.105(a) ("Aggrieved persons who believe they have been discriminated against on the basis of ... sex ... must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."). We are unwilling to hold, as Baldwin would have us, that a warning to the alleged harasser coupled with counseling of both parties and monitoring is not an adequate corrective remedy to begin with where, as here, the employer could not corroborate the allegations.

We have held that warnings and counseling of the harasser are enough where the allegations are substantiated. *See Fleming v. Boeing Co.,* 120 F.3d 242, 246-47 (11th Cir.1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action"); *id.* at 247-48 (giving the harasser a verbal warning and transferring the complainant to a different work group in the same facility also constituted "immediate and appropriate corrective action"); *accord Gawley v. Ind. Univ.,* 276 F.3d 301,

306-07, 311-12 (7th Cir.2001) (issuance of "counseling memorandum" to the harasser was sufficient); *Intlekofer v. Turnage,* 973 F.2d 773, 779-80 (9th Cir.1992) (lead opinion) (noting that counseling may be a sufficient remedy "as a first resort"); *see also* *1306Skidmore v. Precision Printing & Packaging, Inc.,* 188 F.3d 606, 615 (5th Cir.1999) ("What is appropriate remedial action will necessarily depend on the particular facts of the case ... [including] the effectiveness of any initial remedial steps."(quoting *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 479 (5th Cir.1989))).

Because warning the harasser and counseling him ordinarily is enough where the employer is able to substantiate the allegations, it certainly follows that the same remedy is enough where it is not able to do so. Here, although Blue Cross wasn't able to substantiate Baldwin's allegations, it could tell that there was hostility between her and Head. Where the employer sees hostility but cannot tell if there has been harassment, warning the alleged harasser, requiring both parties to participate in counseling, and monitoring their interactions is a proper and adequate remedy, at least as a first step.

[21] We will mention the obvious. This is not a case where the employer's first remedy proved inadequate, and it failed to take further action to correct the problem. It is instead a case where the complainant refused to cooperate with the first step. She did that because she was not happy with Blue Cross' proposed remedy. She not only refused to give Blue Cross' remedy a chance but also insisted that she would not work with Head again. As we have indicated before, the complainant does not get to choose the remedy. *See Farley v. Am. Cast Iron Pipe Co.,* 115 F.3d 1548, 1555 (11th Cir.1997). This point is relevant to the second element of the *Faragher-Ellerth* defense.

[22][23] To establish the second element of the defense, the employer must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Fara-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                            Page 21
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
(Cite as: 480 F.3d 1287)

*gher,* 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. An employee's failure to take advantage of preventive or corrective measures can take two forms-not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported. Either failure is sufficient to establish the second element of the defense, and in this case we have both. As our preceding discussion shows, **Baldwin** refused to take advantage of the counseling option, a reasonable corrective measure which **BlueCross** offered her, and that by itself is enough to carry the day for **BlueCross** on the second element of the *Faragher-Ellerth* defense.

[24][25] Even if **Baldwin** had not refused to cooperate with the corrective measure **BlueCross** offered after she finally reported the alleged harassment, her failure to report the harassment sooner would establish the second element of the defense. She had a prompt reporting duty under **BlueCross'** policy, which provided that: "An employee who believes that he or she has been subject to harassment or violence in any form should report the incident or conduct immediately to his or her manager or to Employee Relations." An employee must comply with the reporting rules and procedures her employer has established. *See Frederick,* 246 F.3d at 1314 (citing *Madray,* 208 F.3d at 1302; *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1365 (11th Cir.1999) (per curiam)).

And, more importantly, Baldwin had a prompt reporting duty under the prophylactic rules the Supreme Court built into Title VII in the *Faragher* and *Ellerth* decisions. The rules of those decisions place obligations and duties not only on the employer but also on the employee. One of the primary obligations that the employee *1307 has under those rules is to take full advantage of the employer's preventative measures. The genius of the *Faragher-Ellerth* plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches

the severe or pervasive stage amounting to discrimination in violation of Title VII. *See Ellerth,* 524 U.S. at 764, 118 S.Ct. at 2270 (limiting employer liability where the employee fails to comply with reporting requirements "encourage[s] employees to report harassing conduct before it becomes severe or pervasive" and serves Title VII's deterrent purpose). But that design works only if employees report harassment promptly, earlier instead of later, and the sooner the better.

[26] Baldwin waited too long to complain. Her complaint came three months and two weeks after the first proposition incident and three months and one week after the second one. That is anything but prompt, early, or soon. *See, e.g., Walton,* 347 F.3d at 1289-91 (an employee's reporting delay of two and a half months after the first incidents of harassment was too long for *Faragher-Ellerth* purposes). Baldwin argues that her delay in reporting the harassment was reasonable because she had good reasons for not doing so sooner. An employee in extreme cases may have reasons for not reporting harassment earlier that are good enough to excuse the delay, *see Frederick,* 246 F.3d at 1314, but the ones that Baldwin puts forward are not.

Baldwin says that she waited to file her complaint until November 8, 2001-three months after the solicitation in Head's office at the very end of July-because she feared being fired and felt that silence would best serve her career interests. Her goal, she testified, was to "just go along to get along." While we have recognized that filing a sexual harassment complaint may be "uncomfortable, scary or both," *Walton,* 347 F.3d at 1290 (quoting *Reed v. MBNA Mktg. Sys., Inc.,* 333 F.3d 27, 35 (1st Cir.2003)), we have also explained that, "the problem of workplace discrimination ... cannot be [corrected] without the cooperation of the victims." *Id.* (quoting *Madray,* 208 F.3d at 1302 (omission and alteration in original)). The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                    Page 22
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment. *See Reed,* 333 F.3d at 35.

Every employee could say, as Baldwin does, that she did not report the harassment earlier for fear of losing her job or damaging her career prospects. As the First Circuit has explained, the Supreme Court undoubtedly realized as much when it designed the *Faragher-Ellerth* defense, but it nonetheless decided to require an employee to make the choice in favor of ending harassment if she wanted to impose vicarious liability on her employer. *See id.* Were it otherwise, the *Faragher-Ellerth* defense would be largely optional with plaintiffs, and it would be essentially useless in furthering the important public policy of preventing sexual harassment.

For these reasons, we conclude that Blue Cross has established both elements of the *Faragher-Ellerth* defense, and on that basis the district court's grant of summary judgment is due to be affirmed.

## IV.

[27] We turn now to Baldwin's Title VII retaliation claim, *see* 42 U.S.C. § 2000e-3(a), which is based upon her allegation that she was fired because she complained about Head's sexual harassment. Baldwin relied on circumstantial evidence, and in considering her claim the district *1308 court applied the analytical framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[FN2] Blue Cross proffered as its non-retaliatory reason for firing Baldwin her insistence that she would not work with Head, and her repeated refusals to either accept the company's proposal for counseling and monitoring or a transfer to the Birmingham office. Finding no genuine issue of material fact about that, the district court granted summary judgment against Baldwin.

> FN2. For the first time on appeal, Baldwin argues that a December 14, 2001 letter

from King to her constitutes direct evidence of unlawful retaliation, and that the *McDonnell Douglas* burden-shifting framework is for that reason inapplicable. We do not ordinarily consider arguments raised for the first time on appeal. *See Tanner Adver. Group, L.L.C. v. Fayette County, Ga.,* 451 F.3d 777, 787 (11th Cir.2006) (en banc). In any event, our examination of the letter reveals that it does not provide any direct evidence of retaliatory intent (or even circumstantial evidence for that matter).

[28] As our discussion of the tangible employment action issue in Part III.A above indicates, we agree with the district court that there is no genuine issue of fact about the reason Baldwin lost her job, and the reason is exactly what the district court said: Baldwin refused to cooperate in the company's reasonable attempt to solve the problem. Her argument that Blue Cross' reasons for firing her are pretextual is that she really did not mean what she repeatedly said about not being willing to work with Head. She argues that because what she said about refusing to work with Head was not true, Blue Cross cannot rely on those statements as a basis for firing her. In effect, she is attempting to transfer her dishonesty to the company: she lied to the company, so its reliance on her lie must itself be a lie.

If arguments had feelings, this one would be embarrassed to be here. It faults an employer for taking an employee at her word. Having insisted on three different occasions that she would not work with Head, we will not listen to Baldwin complain that Blue Cross believed her. Baldwin's "had-my-fingers-crossed" argument fails because what counts is not what she believed about her stated intent but what the decision maker at Blue Cross believed, *see Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1363 n. 3 (11th Cir.1999), and there is no genuine issue of fact about that. The evidence is uniform and strong that King, who fired Baldwin, believed she meant what

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1287                                                                                              Page 23
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420
**(Cite as: 480 F.3d 1287)**

she said about not working with Head. Besides, failure to cooperate in an employer's reasonable corrective action is a non-retaliatory reason for termination, and Baldwin does not contend that she was bluffing when she said she would not cooperate in the proposed counseling and monitoring. That by itself is enough to support the grant of summary judgment.

The district court's grant of summary judgment to Blue Cross on this claim was correct.

### V.

Baldwin's final contentions are that the district court erred in granting summary judgment for Blue Cross on her state law invasion of privacy, intentional infliction of emotional distress, and negligent training, supervision, and retention claims. We agree with the district court that there is no genuine issue of material fact as to an essential element of each of these claims.

[29][30][31] As to the invasion of privacy and intentional infliction of emotional distress claims, a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation (for invasion of privacy) or that it cannot be *1309 tolerated in a civilized society (for intentional infliction). *McIsaac v. WZEW-FM Corp.,* 495 So.2d 649, 651 (Ala.1986). Assuming that Head did everything that Baldwin said he did, his harassment of Baldwin was not sufficiently outrageous as a matter of Alabama law for either claim. *See id.* at 651-52 (granting summary judgment in favor of employer on plaintiff's invasion of privacy and intentional infliction claims where plaintiff alleged facts similar to those alleged by Baldwin here).

[32] As to Baldwin's negligence claims, she must show that Blue Cross had actual knowledge of Head's harassment and did nothing about it (for negligent retention) or would have known about the harassment had it exercised due and proper dili-

gence (for negligent training and supervision). *See Stevenson v. Precision Standard, Inc.,* 762 So.2d 820, 824 (Ala.1999); *Thompson v. Havard,* 285 Ala. 718, 235 So.2d 853, 858 (1970). Head, like all **BlueCross** employees, had received a copy of and was trained in the company's sexual harassment policy. There is no evidence that **BlueCross** knew or had reason to suspect that Head was harassing **Baldwin** or anyone else until she reported it.

When **BlueCross** had received reports of harassment by other employees in the past, and had been able to substantiate the allegations, it had taken disciplinary action up to and including termination. And once **BlueCross** received **Baldwin's** report of harassment, it investigated and attempted to remedy the problem even though it was unable to substantiate her allegations. In other words, there is no basis in Alabama law for holding **BlueCross** liable for Head's alleged actions.

AFFIRMED.

C.A.11 (Ala.),2007.
Baldwin v. Blue Cross/Blue Shield of Alabama
480 F.3d 1287, 100 Fair Empl.Prac.Cas. (BNA) 273, 89 Empl. Prac. Dec. P 42,757, 20 Fla. L. Weekly Fed. C 420

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

512 F.3d 157                                                                      Page 1
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

**H**

**Lauderdale** v. **Texas** Dept. of Criminal Justice, Institutional Div.
C.A.5 (**Tex.**),2007.

United States Court of Appeals,Fifth Circuit.
Debra **LAUDERDALE**, Plaintiff-Appellant,
v.
**TEXAS** DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION; Rodrick
D. Arthur, Defendants-Appellees.
**No. 06-41636.**

Dec. 21, 2007.

**Background:** Female employee sued her former
employer, the **Texas** Department of Criminal
Justice (TDCJ), under Title VII and her former ulti-
mate supervisor under § 1983, alleging that she was
sexually harassed while working as a correctional
officer. The United States District Court for the
Eastern District of **Texas**, Michael H. Schneider, J.,
2006 WL 3166609, granted summary judgment for
both defendants, and employee appealed.

**Holdings:** The Court of Appeals, Jerry E. Smith,
Circuit Judge, held that:
(1) genuine issue of material fact existed as to
whether ultimate supervisor's alleged behavior cre-
ated a hostile work environment, for purposes of
Title VII;
(2) employee's failure to file a subsequent com-
plaint after her immediate supervisor indicated an
unwillingness to act on her initial complaint was
unreasonable, and so former employer established
the *Ellerth/Faragher* defense and avoided vicarious
liability;
(3) genuine issue of material fact existed as to
whether ultimate supervisor's alleged behavior cre-
ated a hostile work environment, for purposes of §
1983;
(4) ultimate supervisor was not entitled to qualified
immunity; and
(5) employee failed to establish her claim of con-

structive discharge under Title VII.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts 170B ⟺776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ⟺802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment.
Most Cited Cases
Court of Appeals reviews grants of summary judg-
ment *de novo*, applying the same standard as does a
district court, viewing the evidence in a light most
favorable to the non-movant.

**[2] Civil Rights 78 ⟺1183**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1183 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases

**Civil Rights 78 ⟺1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

512 F.3d 157                                                    Page 2
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

Cases

Title VII prohibits sexual harassment that takes the form of a tangible employment action, such as a demotion or denial of promotion, or the creation of a hostile or abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[3] Civil Rights 78 ⟿1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

Where the claim of harassment is against a supervisor, there are four elements of a Title VII hostile working environment claim: (1) that the employee belongs to a protected class, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment was based on sex, and (4) that the harassment affected a "term, condition, or privilege" of employment. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[4] Civil Rights 78 ⟿1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

To satisfy the fourth element of a claim of Title VII sexual harassment against a supervisor, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[5] Civil Rights 78 ⟿1185**

78 Civil Rights

**[6] Civil Rights 78 ⟿1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

To satisfy the fourth element of a claim of Title VII sexual harassment against a supervisor, the working environment must be deemed both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[6] Civil Rights 78 ⟿1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
           78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

In determining whether an environment is hostile or abusive, for purposes of an employee's Title VII claim of sexual harassment against a supervisor, the court must look to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, whether it unreasonably interferes with the employee's work performance, and whether the complained of conduct undermined the employee's workplace competence. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[7] Civil Rights 78 ⟿1145**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
           78k1145 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

**Civil Rights 78 ⟿1147**

512 F.3d 157                                                                    Page 3
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

Title VII is not a general civility code, and simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[8] Civil Rights 78 €⟶1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

Test for whether a supervisor's sexual harassment created a hostile or abusive working environment, for purposes of an employee's claim under Title VII, that is, whether the harassment is severe or pervasive, is stated in the disjunctive; thus, an egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment, and the inverse is also true, as frequent incidents of harassment, though not severe, can reach the level of pervasive, thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[9] Civil Rights 78 €⟶1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited

Cases
In determining whether a supervisor's sexual harassment created a hostile or abusive working environment, for purposes of an employee's claim under Title VII, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[10] Federal Civil Procedure 170A €⟶2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases

Genuine issue of material fact existed as to whether ultimate supervisor's alleged behavior created a hostile work environment, precluding summary judgment in female employee's Title VII action. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[11] Civil Rights 78 €⟶1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases

**Civil Rights 78 €⟶1549**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1549 k. Sex Discrimination. Most Cited Cases

So long as supervisor's actions did not result in a "tangible employment action" against the employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

512 F.3d 157                                                                    Page 4
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

ee, employers may assert the *Ellerth/Faragher* affirmative defense to a claim of sexual harassment under Title VII, which requires the employer to prove by a preponderance of the evidence (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[12] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases

**Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
Female employee's failure to file subsequent complaint after her immediate supervisor failed to act on her initial complaint of sexual harassment on the part of her ultimate supervisor was unreasonable, and so former employer, the Texas Department of Criminal Justice (TDCJ), established the *Ellerth/Faragher* defense and avoided vicarious liability for employee's Title VII claim; no tangible employment action resulted from ultimate supervisor's behavior, as employee was not demoted, reassigned, or rescheduled because of his actions, such that TDCJ was entitled to raise the defense, TDCJ had institutional policies and educational programs in place regarding sexual harassment, there was no allegation that TDCJ's program was insufficient or unreasonable, and TDCJ's program offered numerous avenues for reporting sexual harassment, including any supervisor, the Human Resources Department's Employee Relations Office, the TDCJ Executive Director, and the Texas Commission on Human Rights. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[13] Civil Rights 78 ☞1149**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
Complaint of harassment filed by employee on the date of her resignation is no longer a saving action contemplated and encouraged by Title VII, and so it is not sufficient to defeat her employer's *Ellerth/Faragher* affirmative defense; filing a complaint upon, or after, resigning does not mitigate any of the damage, because it does not allow the employer to remediate the situation. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[14] Civil Rights 78 ☞1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and Elements of Civil Actions. Most Cited Cases
To state a viable claim under § 1983, plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ☞1182**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1182 k. In General. Most Cited Cases

**Constitutional Law 92 ☞3391**

92 Constitutional Law

92XXVI Equal Protection
   92XXVI(B) Particular Classes
      92XXVI(B)11 Sex or Gender
         92k3388 Labor, Employment, and
Public Officials
         92k3391 k. Harassment. Most Cited
Cases
Sexual harassment in public employment violates
the Equal Protection Clause of the Fourteenth
Amendment and is therefore actionable under §
1983. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §
1983.

**[16] Civil Rights 78 ⬅══1304**

78 Civil Rights
   78III Federal Remedies in General
      78k1304 k. Nature and Elements of Civil Ac-
tions. Most Cited Cases

**Civil Rights 78 ⬅══1511**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-
crimination Statutes
      78k1511 k. Civil Actions in General. Most
Cited Cases
Section 1983 and Title VII are parallel causes of
action. 42 U.S.C.A. § 1983; Civil Rights Act of
1964, § 701, 42 U.S.C.A. § 2000e.

**[17] Civil Rights 78 ⬅══1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
Inquiry into intentional discrimination is essentially
the same for individual actions brought under sec-
tions 1981 and 1983, and Title VII. 42 U.S.C.A. §§
1981, 1983; Civil Rights Act of 1964, § 701, 42
U.S.C.A. § 2000e.

**[18] Federal Civil Procedure 170A ⬅══2497.1**

170A Federal Civil Procedure
   170AXVII Judgment

   170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
         170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
         170Ak2497.1 k. In General. Most
Cited Cases
Genuine issue of material fact existed as to whether
ultimate supervisor's alleged behavior created a
hostile work environment, precluding summary
judgment in female employee's § 1983 action. 42
U.S.C.A. § 1983.

**[19] Civil Rights 78 ⬅══1376(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
         78k1376(1) k. In General. Most Cited
Cases

**Civil Rights 78 ⬅══1376(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith
and Probable Cause
         78k1376 Government Agencies and Of-
ficers
         78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
Qualified immunity analysis requires court first to
determine whether plaintiff's allegations, if true, es-
tablish a violation of a clearly established right;
next, if plaintiff has alleged a violation, court must
decide whether the conduct was objectively reason-
able in light of clearly established law at the time of
the incident.

**[20] Civil Rights 78 ⬅══1376(10)**

78 Civil Rights
   78III Federal Remedies in General

512 F.3d 157                                                      Page 6

512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073

**(Cite as: 512 F.3d 157)**

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(10) k. Employment Practices. Most Cited Cases

**Civil Rights 78 ⟜1529**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes

78k1529 k. Defenses in General. Most Cited Cases

Ultimate supervisor of female employee was not entitled to qualified immunity with respect to employee's claims sexual harassment under Title VII and § 1983; right to be free of sexual harassment that creates a hostile work environment was clearly established and had been for some time, and, because court already had determined that ultimate supervisor's alleged behavior was actionable under Title VII and § 1983, it necessarily determined that such behavior was objectively offensive and, therefore, not objectively reasonable. 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[21] Civil Rights 78 ⟜1376(10)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(10) k. Employment Practices. Most Cited Cases

**Civil Rights 78 ⟜1529**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes

78k1529 k. Defenses in General. Most Cited Cases

Given that actionable sexual harassment under Title VII must be "objectively offensive," such behavior cannot be "objectively reasonable" for purposes of the qualified immunity inquiry; thus, qualified immunity can never offer protection for sexual harassment because, if it is actionable at all, the harassment is by definition objectively offensive and unreasonable, and qualified immunity protects only the "objectively reasonable." 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[22] Civil Rights 78 ⟜1123**

78 Civil Rights

78II Employment Practices

78k1123 k. Constructive Discharge. Most Cited Cases

To prove "constructive discharge" under Title VII, plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[23] Civil Rights 78 ⟜1123**

78 Civil Rights

78II Employment Practices

78k1123 k. Constructive Discharge. Most Cited Cases

Events that are relevant evidence that a reasonable employee would feel compelled to resign, for purposes of employee's claim of constructive discharge under Title VII, include: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage employee's resignation, or (7) offers of early retirement, or continued employment on terms less favorable than employee's former status. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

**[24] Civil Rights 78 ⟜1123**

512 F.3d 157                                                                                     Page 7
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most
Cited Cases
To prove constructive discharge under Title VII,
plaintiff is not required to demonstrate that the em-
ployer specifically intended to force his resignation,
but constructive discharge requires a greater degree
of harassment than that required by a hostile envir-
onment claim. Civil Rights Act of 1964, § 701, 42
U.S.C.A. § 2000e.

**[25] Civil Rights 78 ⚖═══1123**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most
Cited Cases
Female employee failed to establish her claim of
constructive discharge under Title VII; employee
presented no evidence of demotion, reduction in
salary or responsibilities, reassignment, or altered
terms of employment, employee instead offered
evidence only of sexual harassment, there was no
evidence that the harassment was calculated to en-
courage her resignation, nor was there evidence of
any aggravating factors, such as an invidious intent
on employer's part to create or perpetuate intoler-
able conditions compelling resignation, and so em-
ployee failed to establish that a reasonable employ-
ee would have felt compelled to resign under the
same circumstances. Civil Rights Act of 1964, §
701, 42 U.S.C.A. § 2000e.

**\*160** Curtis B. Stuckey (argued), Stuckey, Garrigan
& Castetter, Nacogdoches, TX, for **Lauderdale**.
**\*161** Phillip E. Marrus, Asst. Atty. Gen. (argued),
Adrienne R. Butcher, Austin, TX, for **Tex.** Dept. of
Crim. Justice.
Lara M. Johnson (argued), Austin, TX, for Arthur.

Appeals from the United States District Court for
the Eastern District of **Texas** .

Before HIGGINBOTHAM, SMITH and OWEN,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:
Debra **Lauderdale** alleges she was sexually har-
assed by her ultimate supervisor, Rodrick Arthur,
over the period of almost four months during which
she worked as a correctional officer for the **Texas**
Department of Criminal Justice ("TDCJ"). **Lauder-
dale** sued the TDCJ under title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e, and sued
Arthur under 42 U.S.C. § 1983. The district court
granted summary judgment for both defendants. We
affirm in part, reverse in part, and remand.

I.

Lauderdale began her employment with the TDCJ
on June 3, 2004. After five weeks of TDCJ
academy training, she was assigned as a correction-
al officer to the Coffield Unit. Her first two weeks
consisted of on-the-job training in various areas of
the unit, during which time she met Arthur. Upon
completion of Lauderdale's training, Arthur, as act-
ing warden on the night shift, became her ultimate
supervisor.

In late July, shortly after Lauderdale completed her
on-the-job training, Arthur began to pursue a rela-
tionship with her. According to Lauderdale, Arthur
would call her multiple times at her duty station
during the night shift. During one of the first phone
conversations, he asked her to get coffee with him
after the shift ended. After this first evening of
phone calls, Lauderdale told Sergeant Kroll, her im-
mediate supervisor, that Arthur had been telephon-
ing her. Kroll told Lauderdale she could speak to
the warden about the calls but that she should not
mention Kroll's name.

The calls and requests to go out after the night shift
continued and, though they varied in frequency,
eventually reached an average of ten to fifteen calls
during a shift. During one call, Arthur asked Laud-
erdale whether she was married; she lied and told
him she was, to which Arthur responded that his
heart was broken and he might hang himself. At
other times, Arthur told Lauderdale she was beauti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

512 F.3d 157                                                                    Page 8
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

ful and that he loved her.

On another occasion, Arthur called Lauderdale and, during the course of the discussion, asked her what she enjoyed doing. She told him she enjoyed gambling. Arthur suggested that the two of them could go to Las Vegas and "snuggle;" Lauderdale said "No." Other topics of conversation during the phone calls were about Arthur's family and horses. On one occasion, he called and Lauderdale explained that she was upset that, for some reason, she was not going to rotate according to the schedule.

In August, after Lauderdale began working in another building at the unit, Arthur called and told her he missed her, then showed up at the building in which she was working. He would also invite her to sit with him in the warden's office during her breaks; she refused those invitations. After a break one evening in mid-October, as she returned to her duty station, Lauderdale passed Arthur in the hall by the "searcher's desk." Arthur grabbed her handcuff case, which she wore in the middle of her back on her belt, and pulled her to himself. Her lower back touched **\*162** his stomach before she jerked away from him.

Finally, on October 25, Arthur sent for Lauderdale, presumably ordering her to report to him. She believed he had no legitimate reason to see her, and she refused to report to him. After this incident, she did not return to work. Before her next shift she telephoned a supervisor and indicated she would not be at work that day; she did not, however, indicate that she no longer intended to work for the TDCJ. After receiving a letter from Human Resources indicating that she would not receive her last pay check until she turned in her uniforms, Lauderdale returned to the unit on December 3 and officially resigned and indicated "Dissatisfaction with supervisors or coworkers" as the reason. She then spoke with Assistant Warden Sizemore and filed a formal EEO complaint against Arthur for sexual harassment.

The TDCJ investigated Lauderdale's allegations and

found sufficient evidence to deem Arthur guilty of "Discourteous Conduct of a Sexual Nature." This determination resulted in a four-day suspension without pay and a nine-month probation. Arthur ultimately resigned at some point following the investigation.

Lauderdale does not allege that any adverse employment actions were taken against her; she concedes that she was able to perform her duties fully despite Arthur's harassment. She also acknowledges she received and read a copy of the various policies covering sexual harassment and watched a training video on the subject. Save for her discussion with Kroll in late July, Lauderdale admits she never complained to anyone else who was in her chain of command or was identified in the TDCJ sexual harassment policy. She contends that she did not complain to anyone other than Kroll because she feared retaliation.

## II.

[1] "This Court reviews grants of summary judgment *de novo,* applying the same standard as does a district court, viewing the evidence in a light most favorable to the non-movant." *Fruge ex rel. Fruge v. Parker Drilling Co.,* 337 F.3d 558, 560 (5th Cir.2003) (citations omitted). We apply that standard of review now.

## A.

The district court granted the TDCJ's motion for summary judgment because it held that, as a matter of law, Arthur's behavior was neither severe nor pervasive and, therefore, did not create a hostile work environment. We disagree.

[2] Under title VII, it is illegal "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). This

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-00635-WKW-WC    Document 38-28    Filed 06/06/2008    Page 9 of 13

512 F.3d 157                                                                                      Page 9
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

text prohibits sexual harassment that takes the form of a tangible employment action, such as a demotion or denial of promotion, or the creation of a hostile or abusive working environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Here, there is no allegation of a tangible employment action.

[3] The only issue is whether Arthur's behavior created a hostile or abusive working environment. Where the claim of harassment is against a supervisor, there are four elements of a hostile working *163 environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a "term, condition, or privilege" of employment. *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999).

[4][5] As a woman, Lauderdale satisfies the first element; the second and third elements are satisfied by the TDCJ's finding that Arthur had engaged in "Discourteous Conduct of a Sexual Nature." To satisfy the fourth element, however, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The environment must be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275 (citing *Harris,* 510 U.S. at 21-22, 114 S.Ct. 367).

[6][7] In determining whether an environment is hostile or abusive, the court must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; ... whether it unreasonably interferes with an employee's work performance,"*Harris,* 510 U.S. at 23, 114 S.Ct. 367, and "whether the complained of conduct undermined the plaintiff's workplace competence,"*Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270 (5th Cir.1998). Title VII, however, is not a " 'general civility code,' " and " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

[8][9] Although the district court correctly noted that none of the incidents of alleged harassment rises to the level of severity we have required,[FN1] the test-whether the harassment is severe or pervasive-is stated in the disjunctive. An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. *Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 434-35 (5th Cir.2005). The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991).

> FN1. *See, e.g., Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 328 (5th Cir.2004) (holding that comments to plaintiff about another employee's body, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff were not severe as a matter of law); *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 871-75 (5th Cir.1999) (holding that several

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

512 F.3d 157                                                                    Page 10
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

inappropriate comments, including "your elbows are the same color as your nipples," and touchings, including rubbing plaintiff's arm from shoulder to wrist, were not severe); *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (holding that conduct, including asking plaintiff out on dates, placing "I love you" signs in her work area, and attempting to kiss her three times did not constitute severe or pervasive harassment).

**\*164** [10] Viewing Lauderdale's allegations in the most favorable light, as we must, Arthur's behavior was pervasive. Lauderdale alleges that he called her ten to fifteen times a night for almost four months. Though Lauderdale does not assert that each phone call carried sexual overtones, the frequency of unwanted attention, over a four-month time period, amounts to pervasive harassment. Given this pervasiveness, the level of severity necessary to establish an altered work environment is diminished and Arthur's invitation to Lauderdale to "snuggle" in Las Vegas, the physical act of pulling her to himself, and the repeated requests to get coffee after work all satisfy the requirement. Thus, Lauderdale has a viable hostile work environment claim under title VII.

### B.

[11] Because there is a genuine issue of material fact regarding the creation of a hostile work environment, we must consider the TDCJ's assertion of the *Ellerth/Faragher* affirmative defense. In *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 764-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275, the Court recognized one affirmative defense that employers may raise against a title VII claim alleging a hostile work environment created by a supervisor's sexual harassment. So long as the supervisor's actions did not result in a "tangible employment action" against the employee, *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275, employers may assert

the *Ellerth/Faragher* defense, which requires the employer to prove by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

[12] It is undisputed that no tangible employment action resulted from Arthur's behavior; Lauderdale was never demoted, reassigned, or had her hours changed because of his actions. Thus, the TDCJ is entitled to raise the *Ellerth/Faragher* defense. The TDCJ has satisfied the requirements of the first prong by virtue of its institutional policies and educational programs regarding sexual harassment. It is undisputed that Lauderdale received the requisite training and copies of the TDCJ's sexual-harassment policy statements. There is no allegation that the TDCJ's program, designed to avoid, report, and correct instances of sexual harassment, is insufficient or unreasonable.

The contested issue is whether the second prong of the affirmative defense is satisfied. Lauderdale claims the *Ellerth/Faragher* defense is unavailable to the TDCJ because she took advantage of the TDCJ's sexual-harassment prevention and remediation policies by reporting Arthur's harassment to Kroll, her immediate supervisor, as dictated by TDCJ policy. The TDCJ's policy offers numerous avenues for reporting sexual harassment, including any supervisor, the Employee Relations Office of the Human Resources Department, the TDCJ Executive Director, the United States Equal Employment Opportunity Commission, and the **Texas** Commission on Human Rights. It was therefore unreasonable for **Lauderdale** not to pursue any other avenue available under the TDCJ policy after Kroll explicitly indicated his unwillingness to act on her complaint.

We have confronted a similar circumstance before. In *Wyatt v. Hunt Plywood Co.,* 297 F.3d 405, 412 (5th Cir.2002), the plaintiff reported her super-

visor's*165 harassment to his supervisor, who dealt ineffectively with the harassment and subsequently began harassing the plaintiff himself. We held that it was unreasonable for the plaintiff not to report the harassment to another person listed in the defendant's reporting policy once her initial complaint was obviously ineffective. *Id.* at 413. Thus, *Wyatt* counsels that Lauderdale's failure to use one of the other reporting avenues provided by the TDCJ was unreasonable.

In most cases, as here, once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint. This conclusion is consistent with title VII's intent to encourage "saving action by objecting employees." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Although it is conceivable that under certain circumstances an employee's failure to file a subsequent complaint would not be unreasonable, even where there are multiple reporting avenues, **Lauderdale's** circumstances do not render her failure reasonable.

[13] Likewise, **Lauderdale's** formal complaint on December 3, 2004, the date of her resignation, does not defeat the second prong of the *Ellerth/ Faragher* defense. Filing a complaint upon, or after, resigning does not mitigate any of the damage, because it does not allow the employer to remediate the situation. A complaint filed at such a late date is no longer a saving action contemplated and encouraged by title VII, *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275, hence it is not sufficient to defeat the *Ellerth/ Faragher* affirmative defense. "[I]f damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." *Id.* Thus, **Lauderdale's** complaint, filed on the day she resigned, does not defeat the affirmative defense.

Furthermore, the TDCJ conducted an investigation after **Lauderdale** formally complained. That investigation resulted in disciplinary action against

Arthur. The TDCJ's prompt remedial action upon receiving **Lauderdale's** complaint confirms that the first prong of the *Ellerth/Faragher* defense has been satisfied and that **Lauderdale** could have mitigated the harm had she tried to make a second complaint after Kroll had refused to intervene.

In light of the TDCJ's standing policies on sexual harassment, its training program, and its prompt action following **Lauderdale's** formal complaint, the TDCJ has satisfied the first prong of the *Ellerth/Faragher* defense. **Lauderdale's** failure to complain after her initial conversation with Kroll is a failure to take advantage of the TDCJ's prevention program, thereby satisfying the second prong. Thus, the TDCJ avoids vicarious liability.

### III.

### A.

The district court, having concluded that Arthur's behavior, as alleged by Lauderdale, was not sufficiently severe or pervasive to satisfy the requirements of title VII, also decided that Arthur's behavior did not create a viable § 1983 claim. That is error.

[14][15] To state a viable claim under § 1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994). It is undisputed that Arthur acted under color *166 of state law, and "sexual harassment in public employment violate[s] the Equal Protection Clause of the Fourteenth Amendment" and is therefore actionable under § 1983. *Southard v. Tex. Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir.1997). Thus, the initial question here, as under title VII, is whether Arthur's behavior amounts to actionable sexual harassment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

512 F.3d 157                                                                                      Page 12
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073
**(Cite as: 512 F.3d 157)**

[16][17][18] Section 1983 and title VII are "parallel causes of action." *Cervantez v. Bexar County Civil Serv. Comm'n,* 99 F.3d 730, 734 (5th Cir.1996). Accordingly, the "inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Briggs v. Anderson,* 796 F.2d 1009, 1019-21 (8th Cir.1986)). As demonstrated above, title VII requires that actionable harassment be severe or pervasive. We apply the same standard under § 1983 and reach the same conclusion. Because Arthur's behavior, as alleged, was pervasive, it creates an actionable § 1983 claim about which there is a genuine issue of material fact, so summary judgment is not appropriate.

### B.

Arthur avers that, in the event we conclude, as we have, that his alleged behavior does constitute sexual harassment, he is nonetheless entitled to qualified immunity. The district court, though it did not need to reach the issue, agreed that Arthur was entitled to qualified immunity. Again we disagree.

[19] The qualified immunity analysis requires us first to determine "whether the plaintiff['s] allegations, if true, establish a violation of a clearly established right." *Wallace v. County of Comal,* 400 F.3d 284, 289 (5th Cir.2005) (citing *Hare v. City of Corinth,* 135 F.3d 320, 325 (5th Cir.1998) (en banc)). Next, "if the plaintiff[ ] ha[s] alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." *Id.*

[20] Answering the first question in the qualified immunity analysis is easy in this case. The right to be free of sexual harassment that creates a hostile work environment is clearly established and has been since the Court decided *Meritor* in 1986. *See Meritor,* 524 U.S. at 66, 118 S.Ct. 1876. Answering the second question in the qualified immunity analysis is only slightly more complicated. Although

no one thinks that sexual harassment is objectively reasonable, the question is whether a reasonable person would have thought Arthur's specific acts constituted sexual harassment; that brings us back to the original question whether his behavior amounted to sexual harassment under title VII or § 1983.

[21] Given that actionable sexual harassment under title VII must be "objectively ... offensive," *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275 (citing *Harris,* 510 U.S. at 21-22, 114 S.Ct. 367), such behavior cannot be "objectively reasonable" for purposes of the qualified immunity inquiry. Thus, qualified immunity can never offer protection for sexual harassment because, if it is actionable at all, the harassment is by definition objectively offensive and unreasonable, and qualified immunity protects only the "objectively reasonable," *County of Comal,* 400 F.3d at 289 (citing *Hare,* 135 F.3d at 325). Because we have already determined that Arthur's alleged behavior is actionable under title VII and § 1983, we have necessarily determined that such behavior was objectively offensive and, therefore, not *167 objectively reasonable. Thus, he is not entitled to qualified immunity.

### IV.

[22][23] Lauderdale claims constructive discharge. To prove that, a " 'plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.' " *Brown v. Kinney Shoe Co.,* 237 F.3d 556, 566 (5th Cir.2001) (quoting *Faruki v. Parsons,* 123 F.3d 315, 319 (5th Cir.1997)). The following events are relevant evidence that a reasonable employee would feel compelled to resign:

(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000) (internal citations omitted).

[24][25] A plaintiff is not required to demonstrate that the employer specifically intended to force his resignation, *Haley v. Alliance Compressor,* 391 F.3d 644, 650 (2004) (citation omitted), but "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim,"*Kinney Shoe,* 237 F.3d at 566. Lauderdale has presented no evidence of demotion, reduction in salary or responsibilities, reassignment, or altered terms of employment. She has offered evidence only of harassment, and there is no evidence that the harassment was calculated to encourage her resignation, nor is there evidence of any aggravating factors, such as an employer's "invidious intent to create or perpetuate the intolerable conditions compelling resignation." *Haley,* 391 F.3d at 650 (citation omitted).

Lauderdale has merely reiterated the facts that constituted harassment and has failed to mention constructive discharge except in the summary-of-the-argument section of her brief. Thus, she has offered no additional facts that might establish the "greater degree of harassment" necessary for constructive discharge. Her failure to brief and correctly to distinguish constructive discharge from her harassment claim means she has failed to create a genuine issue of material fact that a reasonable employee would have felt compelled to resign under the same circumstances.

V.

In summary, because the TDCJ has successfully asserted the *Ellerth/ Faragher* defense, the summary judgment in favor of the TDCJ is AFFIRMED. The denial of the constructive discharge claim against the TDCJ is also AFFIRMED. The summary judg-

ment as to the § 1983 claim against Arthur and Arthur's qualified immunity defense is REVERSED. This matter is REMANDED for further proceedings as required.

C.A.5 (Tex.),2007.
Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div.
512 F.3d 157, 102 Fair Empl.Prac.Cas. (BNA) 555, 90 Empl. Prac. Dec. P 43,073

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

520 F.3d 1269
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

**C**

Rioux v. City of Atlanta, Ga.

C.A.11 (Ga.),2008.

United States Court of Appeals,Eleventh Circuit.
Gerard RIOUX, Plaintiff-
Counter-Defendant-Appellant,
v.
CITY OF ATLANTA, GEORGIA, Lynette Young,
in her individual capacity, Defendants-
Counter-Claimants-Appellees,
Dennis L. Rubin, in his official capacity as City of
Atlanta Fire Chief, Consolidated Defendant-
Counter-Claimant-Appellee.
**No. 07-11657.**

March 18, 2008.

**Background:** Caucasian deputy fire chief brought
race discrimination action against city and city offi-
cials, challenging his demotion. The United States
District Court for the Northern District of Georgia,
No. 05-02657-CV-BBM-1,Beverly B. Martin, J.,
granted summary judgment in favor of city offi-
cials, and employee appealed.

**Holdings:** The Court of Appeals, Altonaga, District
Judge, sitting by designation, held that:
(1) employee satisfied his prima facie showing of
discriminatory demotion;
(2) African-American battalion chief's discipline,
which was meted out two years following Caucasi-
an deputy fire chief's, could not serve as a valid
comparator to assist deputy in showing that his de-
motion was a pretext for race discrimination; and
(3) fire chief and city's chief operating officer were
entitled to qualified immunity.

Affirmed.

Edmondson, Chief Judge, filed opinion concurring
in the result.

West Headnotes

**[1] Civil Rights 78 €=1113**

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1113 k. Individuals as "Employers".
Most Cited Cases
Relief granted under Title VII is against the em-
ployer, not individual employees whose actions
would constitute a violation of the Act. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[2] Civil Rights 78 €=1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
Employee may prove a claim of intentional dis-
crimination through direct evidence, circumstantial
evidence, or through statistical proof. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[3] Civil Rights 78 €=1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
Where racial discrimination is alleged in the applic-
ation of work rules to discipline an employee, and
where there is no claim that the employee did not
violate the work rules, employee, in order to estab-
lish prima facie case of employment discrimination
under *McDonnell Douglas*, must show that he en-
gaged in misconduct similar to that of a person out-
side the protected class, and the disciplinary meas-
ures enforced against him were more severe than
those enforced against the other persons who en-
gaged in similar misconduct. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                    Page 2
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
(Cite as: 520 F.3d 1269)

U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases

**Civil Rights 78 ☞1238**

78 Civil Rights
    78II Employment Practices
        78k1236 Affirmative Action; Remedial Measures
            78k1238 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
Caucasian city employee satisfied his prima facie showing of discriminatory demotion where he showed that he was qualified for the job, he was demoted for work rule violation, and then was replaced by someone outside his protected class, an Asian American woman, and where he presented evidence that his department tried to maintain a racial balance, and that proposed comparator who committed a similar offense was treated differently with respect to the investigation of the incident and disciplinary action taken thereafter. 42 U.S.C.A. § 1983.

**[5] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
           170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
In light of evidence of race-based pressure exerted, genuine issue of material fact existed as to whether fire department defendants' reason for demoting Caucasian deputy fire chief for violation of workplace rule was a pretext for race discrimination, precluding summary judgment in favor of city defendants on discriminatory demotion claim. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
African-American battalion chief's discipline, which was meted out two years following Caucasian deputy fire chief's, could not serve as a valid comparator to assist deputy in showing that his demotion was a pretext for race discrimination; deputy was found to have violated one of the department work rules on violence in the workplace, while battalion chief was not, and battalion chief held a position not one, but two levels distant from deputy, a position shared by 30 men and women, and consequently, significantly removed from fire chief. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
Differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive

520 F.3d 1269                                                         Page 3
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

and Intent, in General. Most Cited Cases

In order to defeat qualified immunity defense, law establishing the violation must be pre-existing, that is, it must be in effect at the time of the alleged violation; moreover, the plaintiff must show that the law establishing the violation was clearly established.

**[9] Civil Rights 78 €══1376(10)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(10) k. Employment Practices. Most Cited Cases

Even if fire chief and city's chief operating officer acted with improper race-based animus or a desire to achieve race-balancing in the workplace, they were entitled to qualified immunity for demoting a high-ranking, subordinate, discretionary officer for violation of workplace rule since reasonable officials faced with the same evidence of subordinate's violations of work rules would not have known that demoting subordinate violated clearly established federal law. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 €══1033(1)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1030 Acts or Conduct Causing Deprivation
         78k1033 Discrimination in General
            78k1033(1) k. In General. Most Cited Cases

State officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent. 42 U.S.C.A. § 1983.

**\*1271** William J. Atkins, A. Lee Parks, Jr., Steven

E. Wolfe, Parks, Chesin & Walbert, P.C., Atlanta, GA, for Rioux.

Cleora S. Anderson, Robert N. Godfrey, City of Atlanta, Law Dept., Atlanta, GA, for Defendants.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and ALTONAGA, [FN*] District Judge.

> FN* Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of Florida, sitting by designation.

ALTONAGA, District Judge:

The issues in this appeal, a civil rights action raising claims of race discrimination, are whether the trial court erred in granting summary judgment in favor of Appellees, Defendants below, Lynette Young ("COO Young") and Dennis L. Rubin ("Rubin"), by misapplying the summary judgment standard to the facts presented and on the basis of Appellees' qualified immunity. While we agree with Appellant, Plaintiff below, Gerard Rioux ("Rioux"), that he presented a prima facie case of discrimination and showed sufficient evidence of pretext, we find that he has not shown Defendants violated clearly established federal law, and we affirm.

## I. BACKGROUND

In December 2003, Rubin was hired as Fire Chief of the Atlanta Fire Department ("AFD"). Rubin, a Caucasian male, is the highest-ranking member of the AFD. Rubin's predecessor had appointed Rioux, a Caucasian male, to the position of Deputy Fire Chief of the Field Operations Division of the AFD on a temporary basis in 2002. In January 2004, Rubin made **\*1272** Rioux's promotion to Deputy Fire Chief permanent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                          Page 4
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

One of Rubin's concerns shared with his supervisory personnel, including Rioux, involved the slow response time of the AFD Fire Investigation Unit ("FIU") in getting to the scenes of fires. On May 2, 2004, although he was off duty, Rioux arrived at the scene of a fire and concluded that members of the FIU, including Lieutenant Michael Austin ("Austin"), had taken too long to arrive. Rioux approached Austin, a Caucasian male, grabbed and pulled him by the lapel of his coat, and proceeded to chastise him for arriving late to the fire. A few days after the incident, Austin filed a formal complaint against Rioux.

The AFD Office of Professional Standards ("OPS") initiated an investigation into the incident. The OPS commander was a member of an organization of African American firefighters known as the Brothers Combined. The OPS is a section within the AFD Office of the Fire Chief and is overseen by AFD Fire Chief and Appellee, Rubin. Shortly after OPS began its investigation, Appellee COO Young, Rubin's direct supervisor and the City of Atlanta Chief Operating Officer, called Rubin and told Rubin "she had received or perhaps even the mayor had received a telephone call from Ivory Lee Young [Councilman of the City of Atlanta] from the Brothers Combined ... that the ... investigation of Gerard Rioux ... was being obstructed by [Rubin]." Although the interference and favoritism allegations against Rubin were found meritless, Rubin also turned the investigation over to the City of Atlanta Law Department ("Law Department").

On July 19, 2004, OPS completed its investigation and concluded that Rioux had violated at least four AFD Work Rules. OPS further concluded that Rioux had been untruthful and uncooperative during the investigation. The Law Department completed its own investigation on September 10, 2004 and reached conclusions similar to those reached by OPS with a few exceptions, most notably that the Law Department disagreed Rioux had lied during the investigation.

Both reports were given to Rubin, as well as COO

Young, an African American woman. Rubin recommended to COO Young that Rioux be demoted two ranks to Battalion Chief, the lowest "discretionary officer" position in the AFD. COO Young concurred with Rubin's recommendation. On September 28, 2004, Rioux was informed of Appellees' decision and given a copy of the Law Department's report. Although Rioux believes his actions at the May 2, 2004 fire did not violate any AFD Work Rules, he does not dispute the basic facts of his interaction with Austin that night.

Around the time of Rioux's demotion, Rubin sought to fill the vacated position of Deputy Chief. Assistant Chief Michael Williams ("Williams"), an African American male, testified that sometime in September 2004, Rubin approached him, and after stating Rubin would "more than likely" reduce Rioux in rank, asked Williams if Williams would be interested in accepting the position.[FN1] Williams rejected the position. According to Williams, Rubin also identified to Williams two others on Rubin's "short list," and these, too, were African Americans. The position was ultimately offered to Nishiama Willis ("Willis"), an Asian woman.

> FN1. Rubin was evasive in answering questions regarding this issue at his deposition.

Rioux asserts his demotion from Deputy Chief to Battalion Chief was not the result of his actions at the May 2, 2004 fire but rather Rubin's and COO Young's desire to replace Rioux with an African American. *1273 Rioux believes the organization of African American firefighters, Brothers Combined, in conjunction with COO Young, convinced Austin to file the complaint against Rioux and ultimately influenced Appellees' decision to demote Rioux. He also maintains that Rubin intended and tried to fill his position with an African American, only settling on Willis when no African American candidate would take the job.

Finally, Rioux asserts the disciplinary action taken against him was more severe than that imposed two

520 F.3d 1269                                                                    Page 5
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

years later on AFD Battalion Chief, Samuel Dunham ("Dunham"), an African American male, for what Rioux contends is similar misconduct. Dunham was alleged to have grabbed the arm of another AFD member, an African American woman, when she tried to open a refrigerator while leading a tour of high school students through an AFD facility. After grabbing her arm, Dunham verbally berated the complainant in front of the students and other firefighters. After an OPS investigation of the incident, Dunham received a six-day suspension and a written reprimand.

**Rioux** filed the underlying action in this case against the **City of Atlanta** and COO Young ("First Complaint") in her individual and official capacities, alleging discrimination in violation of the Equal Protection Clause.[FN2] The First Complaint alleged a first count under 42 U.S.C. § 1981 against the **City** and Young, and this count was merged into **Rioux's** section 1983 claim stated in count two.[FN3] The First Complaint identified Nathaniel Grissom ("Grissom") as a similarly situated high-ranking African American firefighter (former AFD Fire Marshal) who was treated differently from **Rioux** after coming under investigation. **Rioux** also alleged that Young "took over [**Rioux's**] investigation in order to remove **Rioux** from his position as Deputy Chief in hopes that an African-American would replace him." The **City** of **Atlanta** was dismissed from the action with prejudice due to the absence of any allegation that COO Young was the final policymaker for the **City**.

> FN2. The Equal Protection Clause provides, in relevant part, that:
>
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

> FN3. Section 1983 "constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." *Butts v. County of Volusia,* 222 F.3d 891, 893 (11th Cir.2000) (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 731-32, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

Rioux separately filed a lawsuit ("Second Complaint") alleging similar claims under sections 1981 and 1983 against Rubin individually and in his official capacity. The second count, under section 1983, alleged a denial of Rioux's equal protection rights based on Rioux's contention that similarly highly-ranked African American members of the AFD, including Samuel Dunham, were treated more favorably than Rioux based on race, despite having committed nearly identical disciplinary infractions to those Rioux committed. The Second Complaint alleged that Rubin's decision to demote Rioux "was motivated by Rioux's race, not only as an act of appeasement to the Brothers Combined and others who continued accusing him of racism toward African Americans, but also as part of Rubin's continuing policy, custom, and practice of achieving and maintaining what he perceives as racial balance among the upper ranks of AFD."

**\*1274** The district court consolidated the actions against COO Young and Rubin and thereafter granted summary judgment in Defendants' favor. Rioux challenges that portion of the trial court's order finding he did not proffer sufficient evidence to support his claim of discriminatory demotion and the trial court's conclusion that COO Young and Rubin were entitled to qualified immunity for claims against them in their personal capacities.FN4

> FN4. As noted by Appellees in their brief, **Rioux** appears to have abandoned his arguments regarding any official capacity claim against Rubin (a claim against the **City of Atlanta**). *See Kentucky v. Graham,* 473

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                                    Page 6
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (official capacity suit is, in actuality, suit against the local government entity the individual represents). **Rioux** neither challenges the **City's** dismissal in his briefs, nor did he clarify a contrary view at oral argument. Thus, appeal of any issues concerning the trial court's grant of summary judgment in favor of the **City** is deemed abandoned. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (11th Cir.1989) (issues not argued on appeal are deemed waived).

## II. *DISCUSSION*

**Rioux** raises three arguments on appeal: (1) the district court erred in applying the summary judgment standard to **Rioux's** pretext arguments; (2) the district court erred in concluding Dunham was not a suitable comparator to **Rioux**; and (3) the district court erred in granting summary judgment to Rubin and COO Young in their individual capacities on the basis of qualified immunity. While Appellees disagree in all respects, they also argue the district court improperly determined Rioux had established a prima facie case of discrimination.

### A. *Standard of Review*

The Court's review of the grant of summary judgment is *de novo,* with evidence considered in the light most favorable to Rioux. *See, e.g., Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir.2004). Summary judgment is rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party,"*Stewart v. Happy Her-*

man's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant,"*United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.,* 894 F.2d 1555, 1558 (11th Cir.1990).

### B. *Proving Discrimination Through Circumstantial Evidence*

As an initial matter, Appellees argue the district court's conclusion that Rioux established a prima facie case of discriminatory demotion was in error. Thus, we turn to this issue first.

[1][2] A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990); *Burke-Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1322-23 (11th Cir.2006) (two theories of intentional discrimination under Title VII are disparate treatment discrimination and pattern or practice discrimination; disparate treatment claims may be proven with direct or circumstantial evidence). Rioux offered only circumstantial evidence in support of his claim of discrimination, and maintained in his summary judgment papers that he **\*1275** brought this consolidated case "solely under the *McDonnell Douglas* circumstantial evidence analysis." Consequently, we use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to evaluate the sufficiency of his claim.[FN5]

> FN5. Although *McDonnell Douglas* was a Title VII case, Title VII and section 1983 claims have the same elements where the claims are based on the same set of facts. *Abel v. Dubberly,* 210 F.3d 1334, 1338 n. 3 (11th Cir.2000). Nevertheless, "[t]he relief granted under Title VII is against the *employer,* not individual employees whose actions would constitute a violation of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                                                  Page 7
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

Act." *Smith v. Lomax,* 45 F.3d 402, 403 n. 4 (11th Cir.1995) (emphasis in original) (quoting *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)).

Under the *McDonnell Douglas* framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citations omitted).

The successful assertion of a prima facie case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir.2002) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). If this occurs, and a prima facie case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, nondiscriminatory reason then shifts to the employer. *See Joe's Stone Crabs,* 296 F.3d at 1272.

In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* at 1272-73 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The focused inquiry in the last step requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotation marks and citation omitted).

### 1. Prima Facie Case

[3] More than one formulation of the elements of a prima facie case exist. The Court in *McDonnell Douglas* recognized this when it articulated four elements for a prima facie case[FN6] but stated that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. 1817. Appellees correctly argue that one way of establishing a prima *1276 facie case of employment discrimination based on a demotion following an employee's misconduct requires the plaintiff to show that "(1) he belongs to a protected class; (2) he was qualified for the job; and (3) the misconduct for which the employer demoted him was the same or similar misconduct to that which a similarly situated employee engaged in, but was not similarly disciplined for." *Moore v. Alabama Dep't of Corr.,* 137 Fed.Appx. 235, 238 (11th Cir.2005) (citing *Holifield,* 115 F.3d at 1562); *accord Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 792 (11th Cir.1999). Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class, and ... the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Id.* (citing *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989)).

> FN6. In *McDonnell Douglas,* given the facts of that case, the Court stated that a complainant in a Title VII case *may* meet his burden of establishing a prima facie case of racial discrimination by showing (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                    Page 8
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
(Cite as: 520 F.3d 1269)

he was rejected; and (4) that, after his rejection, the position remained open and the employer continued seeking applicants from persons of complainant's qualifications. 411 U.S. at 802, 93 S.Ct. 1817.

Under this formulation of the prima facie case, Appellees challenge Rioux's ability to meet the third element, pertaining to a showing of a comparator, that is, a similarly-situated employee who committed the same violation of work rules, but who was disciplined less severely than Rioux. We agree with Appellees' challenge and the trial court's conclusion that Rioux has not presented such a similarly-situated employee, as explained below. Thus, if the third element was required, Rioux could not meet his prima facie showing.

Another formulation of a prima facie case, however, has been articulated in cases raising claims of discrimination where a plaintiff is demoted, and it is this other formulation that the district court applied and that Appellant asserts he satisfied. The district court applied the prima facie test for discriminatory demotion from *Sturniolo v. Sheaffer, Eaton, Inc.,* which differs from the test articulated by Appellants in that it requires the plaintiff to demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he was demoted; and (4) following the demotion he was replaced by someone outside his protected class. 15 F.3d 1023, 1025 (11th Cir.1994); *see also Hinson v. Clinch County, Georgia Bd. of Educ.,* 231 F.3d 821, 828 (11th Cir.2000) (applying same standard in case involving teacher claiming discriminatory demotion). In *Sturniolo* and *Hinson,* the demotions were unrelated to any claimed discipline or discipline more severe than that received by others similarly situated. In *Sturniolo* and *Hinson,* unlike in the present case, there was no claim that a similarly situated employee had committed a similar violation of work rules, but had been treated more favorably than the plaintiffs.

[4] While Rioux has always maintained in his two complaints that another employee was similarly

situated to him but was disciplined less severely than he (Grissom in the First Complaint, and Dunham in the Second), it appears he has raised the comparator issue not as an element of his prima facie showing, but rather, as evidence of pretext, the third step of the *McDonnell Douglas* burden-shifting framework. *See e.g., Silvera v. Orange County School Board,* 244 F.3d 1253, 1259 (11th Cir.2001) (where court examined, as part of the complainant's showing of pretext, whether there was any disparate treatment of a similarly situated employee of a different race); *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817 ("Especially relevant" to a showing of pretext "would be evidence that white employees involved in acts against petitioner of comparable seriousness ... were nevertheless retained or rehired."); *1277Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1563 n. 20 (11th Cir.1987) (noting that comparator evidence may be used to show pretext). We, too, address the sufficiency of any comparator evidence in our examination of pretext, rather than as an element of Rioux's prima facie case, recognizing that it is not always possible for high-ranking employees to find suitable comparators. *See Holifield,* 115 F.3d 1555, 1563 ("[T]here are only a limited number of potential 'similarly situated employees' when higher level supervisory positions for medical doctors are involved."). Indeed, this Court has previously stated that "*[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*" *Id.* at 1562 (emphasis in original).

Here, while we agree that Rioux has not presented a comparator, it is undisputed that he has shown he is a member of a protected class; he was qualified for the job; he was demoted; and following the demotion, he was replaced by someone outside his protected class, an Asian American woman. Moreover, in the absence of a similarly-situated employee, and as we further explain below, he has also come forward with "other evidence of discrimination."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                                                    Page 9
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

In **Rioux's** view, the district court improperly discounted the following evidence from which an inference of discrimination could be found: (1) Rubin tried to maintain a racial balance at the AFD, maintaining a race tracking spreadsheet of personnel decisions, including **Rioux's**, that he regularly presented to his political superiors; (2) Rubin had discussions with **AtlantaCity** Councilman, Ivory Lee Young, Jr. ("Councilman Young"), in which Rubin reviewed the spreadsheet and expressed his desire to achieve a particular racial balance of 50/50 black/white among the AFD discretionary ranks; (3) Rubin's "short list" of candidates to replace **Rioux** contained three black firefighters, and Rubin attempted to recruit a black officer-Williams-to replace **Rioux**; (4) Rubin felt pressure from the AFD black power structure to harshly discipline **Rioux**, amidst allegations from the Brothers Combined that Rubin would favor **Rioux** following earlier and harsh treatment Rubin had given to Grissom, a black chief accused of taking bribes (treatment the Brothers Combined had been critical of); (5) **Rioux's** aggressive response to the AFD's delayed arrival at the May 2, 2004 fire was prompted by Rubin himself, who had told **Rioux** the Fire Investigation Unit needed to respond more quickly to fires; (6) an inference could be drawn that Austin was goaded into filing the grievance against **Rioux** by members of the Brothers Combined; (7) the differences in manner and degree of investigating the **Rioux** incident as compared to the incident involving proposed comparator Dunham; and (8) evidence showing Dunham *was* a discretionary officer subject to the same rules and supervisor-Rubin-as **Rioux**, who committed a similar offense to **Rioux's** but who was treated differently with respect to the investigation of the incident and disciplinary action taken thereafter.

The foregoing categories of evidence, combined with **Rioux** satisfying the *Sturniolo* and *Hinson* prima facie test for discriminatory demotion, lead us to conclude that **Rioux** satisfied his prima facie showing under *McDonnell Douglas.*

### 2. Legitimate Reason/Pretext

[5] Because the parties agree Appellees had a legitimate, nondiscriminatory reason for **Rioux's** demotion following the OPS and Law Department investigations, the presumption of discrimination is eliminated, *see Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir.2005), and we accordingly turn to the "focused" inquiry*1278 concerning **Rioux's** showing of pretext. *See Silvera,* 244 F.3d at 1258. "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield,* 115 F.3d at 1565 (citations omitted). The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons. *See Silvera,* 244 F.3d at 1258 (quoting *Combs,* 106 F.3d at 1538). It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for his demotion was pretextual. *Chapman v. AI Transp.,* 229 F.3d 1012, 1024-25 (11th Cir.2000).

The district court concluded that none of the other evidence submitted by Rioux[FN7] was sufficient to create a genuine issue of material fact as to whether the proffered reason for his demotion was pretextual. We now address the two general categories of evidence Rioux presented in his effort to show that Appellees' legitimate reason for his demotion was a pretext for discrimination. The first category consists of the first six evidentiary matters identified by Rioux from which a jury could infer discrimination. The second category involves his proposed comparator, Dunham.

> FN7. The trier of fact is permitted to consider the evidence establishing a plaintiff's prima facie case and inferences drawn therefrom on the issue of whether the defendant's proffered reason is pretextual. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147 L.Ed.2d 105 (2000).

### (i) Rioux's Claim that Race Motivated the Demotion Decision

Citing the Eleventh Circuit's decision in *Vessels,* 408 F.3d at 771, Rioux argues that his submission of statements by Rubin expressing a desire to conform AFD's personnel to the racial make-up of the City of Atlanta is sufficient evidence of pretext to survive summary judgment. Appellees distinguish *Vessels,* as the district court did, on the ground that the plaintiff in that case offered at least three additional pieces of evidence in addition to allegedly racially-tinged statements by the defendant, in contrast to Rioux, whom they assert cannot offer any additional evidence. In further support of this position, Appellees cite a series of decisions in which racially-tinged statements alone were held to be insufficient to create a genuine issue of material fact as to pretext. *See, e.g., Kincaid v. Bd. of Trustees,* 188 F. App'x 810, 816-17 (11th Cir.2006); *Riley v. Birmingham Bd. of Educ.,* 154 Fed.Appx. 114, 116 (11th Cir.2005). Appellees also argue that the district court correctly discounted the testimony of Councilman Young, and testimony regarding the role of Brothers Combined in the Rioux investigation, as the record contradicts any assertion that Appellees were influenced by the agenda of either of these parties.

Rioux submitted uncontroverted statements by Rubin stating the latter's belief that the racial composition of the AFD should reflect the racial composition of the City of Atlanta generally. In concluding this evidence was insufficient, the district court interpreted *Vessels* as standing for the proposition that evidence of racially tinged statements must be coupled with other circumstantial evidence of discrimination to survive summary judgment. The district court distinguished Rubin's statements regarding the racial makeup of the AFD from the statements at issue in *Vessels,* concluding that Rubin's statements did not express a preference for a particular racial group.[FN8] The district court concluded*1279 that the sum total of the evidence

did not call into question Appellees' proffered reason for **Rioux's** demotion and amounted to mere speculation. While "speculation" may accurately describe some factual assertions by **Rioux,** other factual assertions find support in the record.

> FN8. It is undisputed that Rubin was aware that the **City of Atlanta** is 60% African American.

Considering all the evidence, a reasonable factfinder could determine the proffered legitimate reason for **Rioux's** two-step demotion-an altercation during which **Rioux** was seeking to impress upon his subordinates Rubin's own directive regarding responding more quickly to fires-was not the only event that actually motivated Appellees. **Rioux's** burden, again, was to demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action. *See Combs,* 106 F.3d at 1528; *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir.1998).

Rioux maintains that between May 10 and September 10, Brothers Combined and Councilman Young brought pressure to bear on Appellees. Cameron Dixon, President of the Brothers Combined, had meetings with COO Young to complain about the Rioux investigation and about Rubin's new process for promoting captains. Dixon complained to COO Young about vindictive attacks by Rubin against black managers. The Councilman, too, contacted COO Young and left a message regarding the matter of Chief Rioux with her. COO Young then asked Rubin to bring her up to date on personnel moves, and to also be prepared to update her on the incident involving Rioux and any actions taken as a result.

When Rubin offered Rioux's position to Williams, Rubin told Williams he had been "instructed to take some actions with Chief Rioux." In his deposition, Rubin only admitted to first offering Rioux's posi-

520 F.3d 1269                                                                    Page 11
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

tion to Williams after being repeatedly pressed to confirm that fact.

Rioux maintains Rubin adheres to a de facto and unwritten affirmative action policy, and an inference can be drawn that Rioux was demoted as part of the overall strategy of race balancing.[FN9] Rubin presents a copy of his spreadsheet two to three times a year to Councilman Young; if Rubin were to show up at a meeting without documentation of the promotions on the basis of race, Councilman Young "would have made a more formal inquiry and would have required that some documentation be provided by the administration." In response to the question, "How far away from a 50/50 balance between African Americans and Caucasians do you think promotions would have to get before you would take it upon yourself to say something to Chief Rubin ...?" Councilman Young admitted, "If we started getting in the low percentiles of 30 percent or below that."

> FN9. Rioux's demotion was recorded on Rubin's spreadsheet as an appointment of a Caucasian to Section Chief. Rioux's replacement by Ms. Willis was recorded as the routine appointment of an Asian American.

Taken together and viewed in the light most favorable to Rioux, we cannot say, based upon the foregoing summary of additional evidence, that Rioux has not satisfied his burden of presenting disputed facts showing Appellees were motivated by a discriminatory reason in selecting the level of discipline Rioux received, in contrast to any discipline he could or would have received in the absence of the race-based pressure exerted.

#### (ii) *Dunham as a Comparator*

Rioux's second argument supporting his burden of showing pretext, that Dunham *1280 was a similarly-situated employee who was treated more favorably than Rioux following similar misconduct,

however, fails. "[T]o determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.' " *Burke-Fowler,* 447 F.3d at 1323 (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999) (citations and quotation marks omitted)). A comparator is an employee "similarly situated [to the plaintiff] 'in all relevant respects.' " *Wilson,* 376 F.3d at 1091 (quoting *Holifield,* 115 F.3d at 1562). The " 'quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.' " *Burke-Fowler,* 447 F.3d at 1323 (quoting *Maniccia,* 171 F.3d at 1368) (citation omitted). Misconduct merely "similar" to the misconduct of the disciplined plaintiff is insufficient. *Id.* at n. 2.

In his pleadings, Rioux advanced two comparators, Grissom and Dunham. At summary judgment and before this Court, Rioux proposes only Dunham as a comparator. Rioux argues that the district court improperly determined Dunham was not an appropriate comparator because it focused on superficial differences between the employees' respective positions within the AFD. Rioux contends the court should have focused instead on the "nature of the offenses committed and the nature of the punishments imposed." *Silvera,* 244 F.3d at 1259. Appellees assert the district court properly determined that Dunham, a Battalion Chief, was not a suitable comparator to Rioux, a Deputy Chief, because of: (1) the material differences in their respective rank and job responsibilities; (2) the differences in the charges levied against them; and (3) the differing nature of the investigations and the different identities of the individuals making a final decision as to what discipline each employee should receive.

[6] The following facts regarding Rioux's and Dunham's respective ranks and job responsibilities are undisputed. Rioux, who held the second highest position in the AFD, and Dunham, who held the fourth highest, were both among just 40 discretion-

520 F.3d 1269                                                                                                  Page 12
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

ary officers in a department of approximately 1,200 members. Prior to his demotion, Dunham was a Battalion Chief. There are approximately 30 Battalion Chiefs in the AFD. A Battalion Chief typically oversees a handful of fire stations and less than 50 people.

Prior to his demotion, Rioux was one of only three Deputy Fire Chiefs, second in command to Chief Rubin. As Deputy Chief, Rioux was responsible for five battalions, 35 fire stations, and 45 pieces of equipment. All AFD chief appointments are discretionary; the chiefs serve at Rubin's pleasure. After Chief Rubin, a Deputy Chief has the highest level of supervision in the AFD. Only Deputy Chiefs fill in for Rubin when he is absent. A Deputy Chief would not consider him or herself to have the same status as a Battalion Chief or an Assistant Chief. Deputy Chiefs have greater responsibilities than Battalion Chiefs, supervise hundreds of more people, and are paid more. Rioux's promotion to Deputy Chief was more meaningful than his other promotions because it was rising to the top of his profession.

As to any differences in the charges levied against Rioux and Dunham, Appellees submit that while Rioux was found to have violated one of the AFD work rules on violence in the workplace, Dunham was not. The Law Department Compliance Unit concluded that Rioux's actions on May 2, 2004 violated four different AFD work rules and two sections of the City Code. In March 2006, Dunham was **\*1281** charged by OPS with violating AFD work rules of conduct, courtesy, and truthfulness.

Finally, Appellees argue that different decisionmakers were responsible for the sanctions imposed on Rioux and Dunham, and each incident was investigated differently. *See Silvera,* 244 F.3d at 1261 n. 5 ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination.") (citing *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989)). Appellees assert that, whereas Rubin directly determined Rioux's punishment based on the OPS and

Law Department reports, Dunham's discipline (a six-day suspension and letter of reprimand) was determined by a Section Chief of the OPS, Cindy Thompson, and only submitted to Rubin for his approval later.

[7] We are persuaded that Dunham was not a valid comparator on the basis of the first two arguments advanced by Appellees concerning the material differences in the men's respective ranks and job responsibilities and the differences in the charges levied against them. Admittedly, differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim. *See Lathem,* 172 F.3d at 793 (different job titles not dispositive). Here, however, rank clearly matters, as Rioux was one of only three of the highest-ranked members of the AFD, reporting directly to Rubin. In contrast, Dunham held a position not one, but two levels distant from Rioux, a position shared by 30 men and women, and consequently, significantly removed from Rubin. It cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the Chief's immediate advisors, who are held to a higher level of professionalism and who are expected to set the standard of conduct for the department.

Neither Rubin nor COO Young selected the charges Rioux and Dunham were found to have violated, and the charges were not the same. Dunham was neither charged with nor found to have violated an AFD workplace violence rule. As Rioux correctly points out, the most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. *Silvera,* 244 F.3d at 1259. "[T]he comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (citation and internal quotation marks omitted). The

520 F.3d 1269                                                                    Page 13
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
(Cite as: 520 F.3d 1269)

standard for similar conduct is a fairly rigorous one, and here, while the incidents certainly appear to be similar, the offenses Rioux and Dunham were charged with were different. *Moore,* 137 Fed.Appx. at 239 ("We have previously held that a difference in the charged offenses can preclude a comparison for Title VII purposes.").

Appellees' argument that different decisionmakers were responsible for disciplining Rioux and Dunham (an argument not considered in the district court's order) is unpersuasive. *See Anderson v. WBMG-42,* 253 F.3d 561, 565-66 (11th Cir.2001) (different supervisors not dispositive). It is undisputed, for instance, that all discretionary officers in the AFD ultimately serve at the pleasure of the Fire Chief, Rubin, and even as Appellees contend that Rubin was not directly involved in the investigation of Dunham, they concede it was necessary for him to approve the ultimate sanction imposed.

Dunham, whose discipline was meted out two years following Rioux's, cannot *1282 serve as a valid comparator to assist Rioux in showing pretext. Nevertheless, as stated, Rioux's other evidence of an unwritten affirmative action plan and pressures exerted by Brothers Combined and Councilman Young, along with Rubin's offer of the position to an African American and evasive answers regarding that offer, are sufficient to satisfy Rioux's burden with respect to pretext.

### C. The Qualified Immunity Defense

We now turn to Appellees' defense of qualified immunity, interposed in the individual capacity claims for money damages. "[Q]ualified immunity protects government officials performing discretionary functions[FN10] from the burdens of civil trials and from liability,"*McMillian v. Johnson,* 88 F.3d 1554, 1562 (11th Cir.1996) (citing *Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc)), "[i]n all but exceptional cases." *Id.* It is only "when an official's conduct violates 'clearly established statutory or constitutional rights of

which a reasonable person would have known' " that "the official is not protected by qualified immunity." *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> FN10. It is undisputed that Appellees were engaged in discretionary functions at all relevant times.

Our qualified immunity inquiry thus proceeds in the following sequence. We must first determine whether the plaintiff has shown that the challenged conduct violates a statutory or constitutional right. *See McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir.2007) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Again, we are obliged to review the facts in the light most favorable to the plaintiff. *Id.*

[8] The law establishing the violation must be pre-existing, that is, it must be in effect at the time of the alleged violation. *Id.* Moreover, the plaintiff must show that the law establishing the violation was clearly established. *Id.* In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citation omitted). Thus, "[i]f objective observers cannot predict-at the time the official acts-whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996) (citing *Elder v. Holloway,* 510 U.S. 510, 513-15, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)).

Rioux's claims, if believed, would establish a violation of the Equal Protection Clause, which ensures the right to be free from intentional discrimination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                      Page 14
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

based on race. *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 1268 (11th Cir.2003); *see also Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056, 1064 (11th Cir.1992) (holding that intentional discrimination in hiring and firing practices violated Equal Protection Clause). If the trier of fact believed Rioux's showing of pretext, and disbelieved Appellees' proffered legitimate reason, then a violation of the Equal Protection Clause would be shown. The "other" evidence from which a jury might infer discriminatory animus on the part of Rubin and COO Young, which we have summarized above, constitutes that showing**\*1283** by Rioux, at the summary judgment stage, of the violation of a constitutional right.

The trial court below addressed the next step in the qualified immunity analysis by noting that there was no real dispute that the right to be free from employment discrimination was clearly established at the time of Rioux's demotion. As a general principle, we can all agree with that statement. *See Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1378 (11th Cir.1997) ( "[T]he right to be free from workplace discrimination and harassment on the basis of race ... [was] clearly established at the relevant times"); *Bogle v. McClure,* 332 F.3d 1347, 1355 (11th Cir.2003) ("[T]here is no doubt that by May 2000, ... it was clearly established that intentional discrimination in the workplace on account of race violated federal law.") (citation omitted). However, the "clearly established" prong of the qualified immunity analysis asks the question "in light of the specific context of the case, not as a broad general proposition." *Williams,* 341 F.3d at 1269 (internal quotation marks and citations omitted).

[9] We therefore turn to an examination of "whether the defendant's conduct was nonetheless 'objectively reasonable' in light of that [Equal Protection] right." *Johnson,* 126 F.3d at 1378 (citing *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034). Rioux must demonstrate at this step in the qualified immunity analysis that a reasonable fire chief and a

reasonable chief operating officer of a city would know that demoting a high-ranking, subordinate, discretionary officer in the factual circumstances presented here violated clearly established law. *See Stanley v. City of Dalton, Ga.,* 219 F.3d 1280, 1294 (11th Cir.2000) (citing *Harlow,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396). And it is this that he cannot show.

[10] Clearly established law provides that state officials "can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully ...." *Foy,* 94 F.3d at 1534 (citing *Vil. of Arlington Hts. v. Metro. Housing Dev.,* 429 U.S. 252, 269-71 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *see also Mt. Healthy v. Doyle,* 429 U.S. 274, 286-87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Thus, "state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent." *Id.* (citing *Mt. Healthy,* 429 U.S. at 286-87, 97 S.Ct. 568). The events of May 2, 2004 are largely undisputed, and the results of the OPS and Law Department investigations confirmed that Rioux violated department rules. Viewing the facts in the light most favorable to Rioux, Appellees had adequate lawful reasons to support their decision to demote Rioux, and may have had improper race-based motives to take the challenged action as well. What Rioux has presented, then, is a "mixed-motives" case, which is governed by the analysis set out in *Foy. See Stanley,* 219 F.3d at 1295 ("The decision in *Foy* sets out the proper analysis to apply in potential mixed-motive cases.")

*Foy* explained:

> At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct-despite his having adequate lawful reasons to support the act-was the result of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 F.3d 1269                                                                              Page 15
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
(Cite as: 520 F.3d 1269)

his unlawful motive, the defendant is entitled to immunity. Where the facts assumed for summary judgment purposes in a case involving qualified immunity show *1284 mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

94 F.3d at 1534-35.

Tracking the reasoning used in *Foy* to reverse the denial of summary judgment where qualified immunity was interposed as a defense, here no jury could find that it would have been unlawful for a fire chief and the city's chief operating officer to do as Appellees did if they had lacked discriminatory intent. *Id.* at 1535. No jury could find that a reasonable fire chief and chief operating officer would never have demoted Rioux but for a discriminatory intent. *Id.* The record here, as in *Foy,* undisputably establishes that Appellees were motivated *at least in part* by lawful justifications, supported by the independent investigations conducted by OPS and the Law Department, investigations which these two decisionmakers were not a part of and which there is no evidence they manipulated. *Id.* at 1535 n. 9. *Cf. McMillian,* 88 F.3d 1554 (affirming trial court denial of summary judgment where genuine issues of fact existed as to reasons officials placed plaintiff on death row, in part, due to issue of whether officers lied concerning their reasons).

The *Foy* analytical framework was applied in *Stanley* to a mixed motives case, following the Supreme Court pronouncement in *Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In *Crawford-El,* the Court rejected a rule that would have required a heightened burden of proof from plaintiffs in unconstitutional-motive cases. 523 U.S. at 580-86, 118 S.Ct. 1584. The *Crawford-El* decision did not address how courts should apply the objective reasonableness test after a plaintiff creates a jury question on improper motive, where improper motive is an element of the claim, as it is here. *Stanley* concluded that *Foy* was

the correct approach and remained the law of this circuit. 219 F.3d at 1296 n. 26. And so *Stanley* reiterated that a defendant is entitled to qualified immunity only where "the record undisputably establishes that the defendant in fact was motivated, *at least in part,* by lawful considerations." *Id.* at 1296 (emphasis in original).

The objective reasonableness inquiry in *Stanley* proceeded in the following manner. Chadwick, the chief of police, had cause to resent Stanley, a police officer who had years before named Chadwick as a suspect in an investigation. Years after Stanley's remarks, and following several disciplinary incidents, Chadwick terminated Stanley, and Stanley brought a section 1983 action for violation of his first amendment rights. The reversal of the denial of a motion for summary judgment on qualified immunity rested on two undisputed facts. First, the record undisputably established that objectively valid reasons existed for the step Chadwick took, because the incidents underlying the discipline that led to the termination did in fact take place. Thus, "no jury could find that it would have been unlawful to terminate Stanley as Chadwick did absent retaliatory motive." *Id.* at 1296.

Second, summary judgment was appropriate because the record undisputably established that Chadwick was motivated, at least in part, by the lawful considerations of the disciplinary incidents. A four-year time gap existed between Stanley's initial protected speech naming Chadwick as a suspect, and in those four years, Stanley had engaged in actions that resulted in discipline. "Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable police chief-faced with the same undisputed evidence of Stanley's misconduct and undisputably acting at least in *1285 part because of Stanley's misconduct-should not have terminated Stanley in the same manner." *Id.* at 1297 (citing *Johnson,* 126 F.3d at 1379).

Similarly, *Johnson* reversed the denial of a summary judgment motion raising qualified immunity

520 F.3d 1269                                                              Page 16
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485
**(Cite as: 520 F.3d 1269)**

on the ground that the demotion and discharge of the plaintiff-firefighter was based on indisputable and adequate lawful motives, specifically, the firefighter's failure to obey a direct order and repeated lies at his disciplinary hearing. 126 F.3d at 1379. In *Johnson,*"[e]ven assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner." *Id.* at 1379. *Cf. Bogle,* 332 F.3d at 1356 (affirming denial of renewed motion for judgment as a matter of law following jury verdict where evidence suggested defendants' evidence of reorganization plan was a sham designed to cover-up race-based transfers and jury squarely found appellants intentionally discriminated on account of race, rejecting proffered nondiscriminatory reasons).

Here, the record shows Appellees were in fact motivated, *at least in part,* by objectively valid reasons in demoting Rioux. Notwithstanding the evidence of pretext, which is sufficient to sustain Rioux's burden of showing that his demotion was the result of discrimination, there is no evidence that Rubin or COO Young influenced two independent investigations concerning the May 2, 2004 incident. There is no evidence that the May 2, 2004 incident did not in fact take place, or that the incident did not involve some violation of one or more work rules by the second-highest ranking member of the AFD. No evidence was presented that Appellees' decisions to demote Rioux were not motivated, at least in part, by the lawful consideration of the OPS and Law Department's concluded investigations and findings. We cannot say that, even assuming Appellees were acting with improper race-based animus or a desire to address race-balancing in the workplace, reasonable officials faced with the same evidence of Rioux's violations of work rules would have known that demoting Rioux violated clearly established federal law.

Because pre-existing law did not provide fair warning to Appellees that demoting Rioux under these circumstances would violate clearly established federal law, Appellees are entitled to qualified immunity.

### III. *CONCLUSION*

If Rioux had presented his claims under the provisions of Title VII, he would be entitled to have his claims of discrimination heard by a jury. The result we reach here is compelled by the remedy Rioux chose, that is, section 1983 claims against individual decisionmakers rather than his employer, for which the law recognizes the right to qualified immunity. Again, because Rioux has not been able to present any evidence that Appellees' decisions were not motivated, at least in part, by lawful justifications, Appellees are entitled to qualified immunity. Accordingly, the judgment of the district court is AFFIRMED.

EDMONDSON, Chief Judge, concurring in the result:

I would not reach the qualified immunity issue because I think the record established no violation of the Constitution. Plaintiff can point to no comparator. The decisions set out in today's court opinion to support a prima facie case are not being followed, but are being extended to the disciplinary-demotion situation. I also doubt that Plaintiff has presented sufficient**1286** evidence of pretext. If I believed this record did establish pretext, I would worry that qualified immunity could not apply: no mixed motive, just an unlawful discriminatory one.

C.A.11 (Ga.),2008.
Rioux v. City of Atlanta, Ga.
520 F.3d 1269, 102 Fair Empl.Prac.Cas. (BNA) 1820, 21 Fla. L. Weekly Fed. C 485

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

226 F.3d 1249                                                    Page 1
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

▷
**Lee** v. **GTEFlorida, Inc.**
C.A.11 **(Fla.),**2000.

United States Court of Appeals,Eleventh Circuit.
Andrea D. **LEE,** Plaintiff-Ap-
pellee-Cross-Appellant,
v.
**GTEFLORIDA,** INC., Defendant-Appel-
lant-Cross-Appellee.
**No. 98-3380.**

Sept. 13, 2000.

Employee sued employer, alleging that she was
denied a promotion because of her sex in violation
of Title VII. After employer's motion and renewed
motion for judgment as a matter of law were
denied, jury returned a verdict finding intentional
sex discrimination, and employer renewed its mo-
tion. The United States District Court for the
Middle District of Florida, No.
95-01544-CV-T-17(B), Thomas B. McCoun, III,
United States Magistrate Judge, again denied the
motion in relevant part and entered judgment for
employee. Employer appealed. The Court of Ap-
peals held that evidence presented by employee at
trial to prove pretext was not legally sufficient to
support a jury verdict in her favor.

Reversed and remanded.

West Headnotes

**[1] Federal Courts 170B ⚏776**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)1 In General
    170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews the district court's denial
of defendant's motion for judgment as a matter of
law de novo, applying the same standards used by

the district court. Fed.Rules Civ.Proc.Rule 50(a),
28 U.S.C.A.

**[2] Federal Courts 170B ⚏764**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)1 In General
    170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
      170Bk764 k. Taking Case from
Jury. Most Cited Cases
In reviewing the district court's denial of defend-
ant's motion for judgment as a matter of law, Court
of Appeals must consider whether the evidence
presents a sufficient disagreement to require sub-
mission to a jury or whether it is so one-sided that
one party must prevail as a matter of law. Fed.Rules
Civ.Proc.Rule 50(a), 28 U.S.C.A.

**[3] Civil Rights 78 ⚏1166**

78 Civil Rights
 78II Employment Practices
  78k1164 Sex Discrimination in General
   78k1166 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
  (Formerly 78k158.1)
To establish a prima facie case of Title VII sex dis-
crimination in a promotional decision, plaintiff
must prove: (1) that she is a member of a protected
minority, (2) that she was qualified and applied for
the promotion, (3) that she was rejected despite
these qualifications, and (4) other equally or less
qualified employees who are not members of the
protected minority were promoted. Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ⚏1537**

78 Civil Rights
 78IV Remedies Under Federal Employment Dis-
crimination Statutes
  78k1534 Presumptions, Inferences, and Bur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                                                    Page 2
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

den of Proof

78k1537 k. Sex Discrimination. Most Cited Cases

(Formerly 78k379)

Once employee has established a prima facie case of Title VII sex discrimination, burden shifts to employer to articulate some legitimate, nondiscriminatory reason for employee's rejection. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ⊂⇒1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k153)

If employer meets its burden of production by articulating some legitimate, nondiscriminatory reason for employee's rejection, employee must then establish that employer's proffered reasons were pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⊂⇒1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k153)

In a Title VII failure-to-promote case, plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ⊂⇒1171**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1171 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k158.1)

Employee bringing a Title VII failure-to-promote action must show not merely that employer's employment decisions were mistaken, but that they were in fact motivated by sex. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ⊂⇒1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k153)

Employee in a failure-to-promote case may not establish that employer's proffered reason is pretextual merely by questioning the wisdom of employer's reasons, at least not where the reason is one that might motivate a reasonable employer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ⊂⇒1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k153)

Evidence showing that employer hired a less qualified applicant over plaintiff may be probative of whether employer's proffered reason for not promoting plaintiff was pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ⊂⇒1171**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1171 k. Motive or Intent; Pretext. Most Cited Cases

(Formerly 78k158.1)

Employee failed to prove that the reason given by employer for its failure to promote her was just a pretext for sex discrimination where, although in her own mind employee was more qualified than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                                    Page 3
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

the person chosen for the job, employee was clearly more qualified than the person hired in only one of the four stated criteria in employer's position questionnaire, and so none of employee's proffered evidence established that she was more qualified than the person hired, let alone so clearly more qualified for the position that a reasonable juror could have inferred discriminatory intent from the comparison. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[11] Civil Rights 78 ☜1171**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1171 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k158.1)
Evidence that employer's representative, in his letter in response to employer's investigation of discrimination claims brought by employee who was not selected for promotion, changed the importance of the criteria he used in the selection process so that one of the hired person's strengths became the most important of the four criteria, was not significantly probative of pretext, for purposes of employee's Title VII sex discrimination action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[12] Civil Rights 78 ☜1537**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1537 k. Sex Discrimination. Most Cited Cases
    (Formerly 78k379)
No reasonable inference of pretext could be made, for purposes of employee's Title VII sex discrimination action, where, although employee was treated differently during her interview for the position at issue, in that she was not allowed to discuss her

background and qualifications whereas other applicants were allowed to do so, employee conceded that employer's representative already knew her background and qualifications. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[13] Civil Rights 78 ☜1537**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1537 k. Sex Discrimination. Most Cited Cases
    (Formerly 78k379)
Actions by employer's representative in posting the position at issue, creating a position questionnaire establishing objective criteria for the position, and interviewing a number of candidates, including employee-plaintiff, before deciding on the person chosen for the job, rebutted any reasonable inference of pretext that could otherwise have been drawn from any prior relationship between representative and person selected for the job, for purposes of employee's Title VII sex discrimination action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[14] Civil Rights 78 ☜1168**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1168 k. Particular Cases. Most Cited Cases
    (Formerly 78k158.1)
Employee's claim that employer's representative had a poor history of promoting women was too generalized to have any statistical significance, for purposes of employee's Title VII sex discrimination action, where, although employee claimed that representative only promoted a total of four women into management positions and only hired two women into staff positions, employee did not show how many people representative promoted in total,

226 F.3d 1249                                                                                              Page 4
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

nor did she provide any evidence as to relative qualifications. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 ⟵1168**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1168 k. Particular Cases. Most Cited
Cases
    (Formerly 78k158.1)
Employee's contention that, although the applicant list for seven management positions that employer's representative had to fill when he reorganized the company contained "a significant number of females," representative filled all seven spots with men, was statistically meaningless, for purposes of employee's Title VII sex discrimination action, where employee provided no specific context against which to measure those facts. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**\*1251** Gregory A. Hearing,Thompson, Sizemore & Gonzalez, P.A., Tampa, FL, for **GTEFlorida**, Inc. Leslie R. Stein, **GTEFlorida**, Inc., Tampa, FL, David J. Sockol, Richard Eric Macdonald, Sockol & Associates, P.A., St. Petersburg, FL, for **Lee**.

Appeals from the United States District Court for the Middle District of **Florida**.

Before EDMONDSON and MARCUS, Circuit Judges, and HANCOCK $^{FN*}$, District Judge.

        FN* Honorable James H. Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

PER CURIAM:
Defendant **GTEFlorida** appeals from the district court's denial of its Rule 50(b) motion for judgment as a matter of law as to Plaintiff Andrea **Lee's** Title VII sex discrimination claim. **Lee** cross-appeals the district court's reversal of the jury's punitive dam-

ages award and its award of only two years of front pay. Because the evidence **Lee** presented at trial to prove pretext was not legally sufficient to support a jury verdict in her favor, the district court erred in denying **GTE's** motion for judgment as a matter of law and we reverse. In light of this ruling, the cross appeal is moot.

I.

On September 18, 1995, **Lee** sued **GTE** alleging sex discrimination under Title VII and **Florida** law arising out of a failure to promote, retaliatory termination under Title VII and the ADEA, and a violation of ERISA. After the magistrate judge granted **GTE's** motion for partial summary judgment, **Lee's** only remaining cause of action was whether she was denied a promotion to the position of Manager-Real Estate Services because of her sex and/or age.

This matter was tried before a jury in December 1997. Immediately after **Lee** rested her case, **GTE** moved for judgment as a matter of law pursuant to Fed. R. Civ. Pro. 50(a). The court denied the motion. Thereafter, **GTE** rested without calling any witnesses, again renewing its Motion for Judgment as a Matter of Law. The court again denied the motion but observed that **Lee's** evidence was "paper thin." The jury returned a verdict finding intentional sex discrimination and awarded **Lee** back pay, including pension benefits and punitive damages. But the jury found for **GTE** on **Lee's** ADEA claim.

Soon thereafter, **GTE** renewed its Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial, and on April 3, 1998, the court granted in part and denied in part the motion. The court upheld the jury's verdict on **Lee's** sex discrimination claim, as well as the award of back pay, including pension benefits. However, it reversed the jury's award of punitive damages. The court entered judgment for **Lee** in the amount of $216,000. Later, the court added an award for front pay, in the amount of $98,647, and for attorney's fees and costs in the amount of $100,000. The total amount awarded to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                 Page 5
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

**Lee** was $414,647.

## II.

The facts of this case are straightforward. Andrea **Lee** was first hired by **GTE** as an operator in Tampa, **Florida**, in June 1970. In December 1970 she was promoted to a facilities clerk position, and in December 1972 she was again promoted to an engineer position in **GTE's** Real Estate **\*1252** Division in Tampa. **Lee's** engineering position carried a salary level of "4." In January 1980 **Lee** was promoted to a senior engineering position in **GTE's** Real Estate Services at a salary level of "5." **Lee** held this position until November 6, 1994, when her job was eliminated as a result of a reduction in force.

In the early 1990s **GTE** implemented a reduction in force plan called Process Reengineering. As a result of the reengineering, many positions were either eliminated or consolidated into other positions. **Lee's** position of Engineer-Real Estate was eliminated and six other individuals who held the same position in other parts of the country also lost their jobs.

As part of the company reorganization, Tom Shaffer, a member of the Process Reengineering task force, created three new positions with the title of Manager-Real Estate Services. Shaffer divided the country into three equal zones, making one position responsible for the Western U.S., the second position responsible for the Central U.S., and the third position, located in Tampa, responsible for the Eastern U.S.

Employees whose jobs were to be eliminated because of the reengineering process were given an opportunity to apply for other positions within GTE. In March 1994, Lee applied for the Manager-Real Estate Services position that was responsible for the Eastern U.S.[FN1] In order to fill the Manager-Real Estate Services positions, Shaffer created a Position Questionnaire. The Questionnaire de-

scribed the experience and qualifications relevant for the position, in descending order of importance: 1) managerial experience; 2) strategic planning experience; 3) a Bachelor's degree in business or engineering; and 4) commercial real estate experience.

> FN1. Lee indicated she was not willing to move from Tampa, and therefore applied only for the Manager-Real Estate Services East position.

Shaffer interviewed Andrea Lee, along with several other candidates, for the Manager-Real Estate Services East position. During Lee's interview, Shaffer told her not to discuss her background and qualifications because he already knew them. According to Lee, Shaffer also expressed concern about any employee making a salary level jump from a level "5" (the level which Lee held) to a level "9" (the new level established for the Manager-Real Estate position). Shaffer said that he had never promoted anyone four salary levels at one time and that he had never promoted someone to a level "9" position with no supervisory experience. Shaffer also told Lee that her real estate experience was a low priority to him since that function was going to be outsourced.

Neither Lee nor her immediate supervisor, Bob Atteberry, who also applied for the position, were selected for the position. Shaffer testified that he ultimately chose Colin Hines because Shaffer believed Hines was more qualified than Lee (and the other candidates).

After Lee was informed that she was not selected for the new position, she complained to Nancy Dinkel, a GTE Employee Relations Manager. **GTE** commenced an internal investigation, but concluded that there had been no discrimination in the selection process.

As part of the investigatory process, Shaffer was requested to write a letter summarizing the reasons why he selected Hines over Lee. In his letter, Shaf-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                    Page 6
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

fer stated that he chose Hines over Lee because he felt that Hines's background, experience, knowledge, and education gave him an advantage over Lee based on four primary criteria: strategic planning, proven managerial ability, education, and real estate experience. Shaffer acknowledged that Lee had more real estate experience, but opined that Hines possessed stronger qualifications in the three other areas. Shaffer wrote that Hines held a Bachelor's degree, a **GTE** Associate Technical degree, and an Associate Management degree, while Lee only held a high school degree.

**\*1253** At trial, Lee called numerous witnesses, all of whom testified that she was extremely competent in real estate transactions. None of these witnesses testified that they ever heard Shaffer act or speak in a discriminatory manner.

### III.

[1][2] We review the district court's denial of defendant's motion for judgment as a matter of law de novo, applying the same standards used by the district court. *See Tidwell v. Carter Prods.*, 135 F.3d 1422, 1425 (11th Cir.1998). "Those standards require the consideration of 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

[3][4][5] To establish a prima facie case of Title VII sex discrimination in a promotional decision, a plaintiff must prove: (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *See Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir.1999). Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to

articulate some legitimate, nondiscriminatory reason for the employee's rejection. *See id.* If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual. *See id.* at 867.

[6][7][8] In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex. *See Alexander v. Fulton County,* 207 F.3d 1303, 1339 (11th Cir.2000). We have explained that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997), *cert. denied, sub nom., Combs v. Meadowcraft Co.,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999), *cert. denied,*529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Deines v. Texas Dept. of Protective and Regulatory Servs.,* 164 F.3d 277, 281 (5th Cir.1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position.... The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination.")

[9] Nevertheless, evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting the plaintiff was pretextual. *See Alexander,* 207 F.3d at 1340; *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*also Walker v. Mortham,* 158 F.3d 1177, 1190 (11th Cir.1998), *cert. denied,*528 U.S. 809, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999)(" 'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination' ") (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258-59, 101 S.Ct. 1089, 1096-97, 67 L.Ed.2d 207 (1981)); *see also Taylor,* 175 F.3d at 868*1254 (stating that evidence of plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when it promoted him).

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County,* 207 F.3d at 1340. In *Deines,* for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase

"jump off the page and slap [you] in the face"... should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact.

*Id.* at 280-81.

The Tenth Circuit in *Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse*

*Services,* 165 F.3d 1321 (10th Cir.), *cert. denied,*528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999), articulated a similar evidentiary burden for proving pretext. The court explained that "an employee's own opinions about his ... qualifications [do not] give rise to a material factual dispute.... When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Id.* at 1329-30 (internal quotations and citations omitted). The court emphasized that its "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments." *Id.* at 1330.

Shaffer testified that he hired Hines instead of the plaintiff Lee because, in his judgment, Hines was better qualified with respect to three of the four criteria listed in the Position Questionnaire. According to Shaffer, Hines had more managerial experience, more strategic planning experience, and had a Bachelor's degree in Building Construction from Virginia Polytechnic Institute, the equivalent of an Engineering degree.

Indeed, the evidence is undisputed that Hines had strong managerial skills, that he had direct supervisory responsibility for over 25 employees since 1982, that his experience included the supervision of three safety administrators and one clerk in his Loss Prevention Management position, and that he had occasion to manage six planners, a secretary, and a contract drafter when he held the position of Section Manager-Exchange Planning. In contrast, Lee never managed any GTE management level employees.

Moreover, the evidence is likewise undisputed that Hines had substantial experience in strategic planning dating back to 1978, when he became a Senior Outside Plant Engineer. In Hines's last position prior to his selection for the Manager-Real Estate Services position, he was responsible for the planning

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                                              Page 8
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
(Cite as: 226 F.3d 1249)

efforts in coastal Florida for a telephone switching network valued at more than $500 million.

As for the third qualification identified by Shaffer in the job description-a preference for someone with a Bachelor's degree in business or engineering-it is undisputed that Hines had a bachelor's degree, whereas Lee finished two years of school at Hillsborough Community College obtaining an equivalent to an Associate of Arts degree in real estate.

*1255 [10][11][12][13][14][15] Lee argues, nevertheless, that Shaffer's stated reason for denying her the promotion was pretextual because in her opinion she was more qualified than Hines. On this record, however, the evidence is insufficient to raise a genuine issue of fact regarding whether GTE's stated reason for promoting Hines instead of her is pretextual. *None* of Lee's proffered evidence established that she was more qualified than Hines, let alone so clearly more qualified for the position that a reasonable juror could infer discriminatory intent from the comparison. *See Fulton County,* 207 F.3d at 1340; *Deines,* 164 F.3d at 280-81; *Simms,* 165 F.3d at 1329-30. Indeed, the evidence establishes that, of the four stated criteria in the position questionnaire, Lee was clearly more qualified that Hines in only one-that of commercial real estate experience. Further, GTE never disputed that Lee had more real estate experience than Hines, but said that real estate experience was the least important of the four criteria because the real estate function of the position had been outsourced. As for the first two criteria in the position questionnaire-managerial skills and strategic planning experience-the evidence established at most that the candidates were equally qualified. As for the preference for a Bachelor's degree, Hines was decidedly more qualified than Lee.

Quite simply, this evidence does not rise to the level of proof that is required when an employee attempts to prove pretext by showing she was substantially more qualified than the person promoted. Since Lee's evidence at trial fell far short of establishing that she was clearly more qualified for the position than Hines, Lee did not meet her burden of establishing that Shaffer's proffered reason for denying her the promotion was a pretext for gender discrimination.[FN2]

> FN2. Lee also argues that several other pieces of evidence support her position. First, Lee points to the fact that Shaffer, in his letter in response to the GTE investigation, changed the importance of the criteria he used in the selection process so that strategic planning became the most important of the four criteria. Lee claims that this shift in priorities was made after Shaffer hired Hines, to more closely tailor the criteria to Hines's qualifications. This evidence is not, however, significantly probative of pretext. *See Nichols v. Lewis Grocer,* 138 F.3d 563, 568 (5th Cir.1998) (finding unpersuasive plaintiff's argument that the fact that the employer had changed the importance of the criteria used in the selection process established pretext, because "[t]he promotion decision is a dynamic one, and the relative importance placed on various selection criteria cannot be expected to remain fixed and unyielding.")

> In addition, Lee claims that Shaffer's letter is evidence of pretext because in it "Shaffer played up Hines's qualifications, experience, and background while at the same time he down played Lee's qualifications, experience, and background." However, while Lee may have believed that Shaffer was mistaken in not giving greater weight to her educational experience, we have held that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason...." *Combs,* 106 F.3d at 1543.

226 F.3d 1249                                                                                                Page 9
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
(Cite as: 226 F.3d 1249)

Next, Lee claims that the fact that she was treated differently from the other applicants during her interview is proof of pretext. Specifically, she testified that she was treated differently because she was not allowed to discuss her background and qualifications during the interview whereas the other applicants were allowed to do so. However, Lee conceded that Shaffer already knew her background and qualifications, a fact that undercuts any reasonable inference of pretext.

Lee also attempts to establish pretext by testifying that she was treated differently from Hines because Hines and Shaffer golfed together, and had once met privately for dinner in Tampa before the position was posted, to discuss Hines's interest in managing the real estate department. However, Shaffer did post the position, created a Position Questionnaire establishing objective criteria for the position, and interviewed a number of candidates, including Lee, before deciding on Hines. These actions rebut any reasonable inference of pretext that could otherwise be drawn from any relationship between Hines and Shaffer.

Lee also relies on the fact that Shaffer expressed concern during her interview about promoting an employee four management pay levels as evidence of pretext. Lee claims that since she had previously been promoted four pay levels, Shaffer's statement that he had never promoted anyone four pay levels indicated pretext. Lee mischaracterizes Shaffer's testimony. First, in the promotion where Lee was promoted four pay levels, she was not promoted four *management* pay levels, as would have been the case if she was promoted to the Manager-

Real Estate Services position. Second, Shaffer testified only that it would be rare for someone to be promoted four management pay levels, and that he, personally, had never done it, a point in no way rebutted by Lee.

Finally, Lee attempts to show pretext by arguing that Shaffer had a poor history of promoting women, and, more specifically, that he did not offer a single Real Estate Services position (of the four total) to a female. Neither of these claims, however, is sufficient to raise a genuine issue regarding pretext. First, Lee's claim that Shaffer had a poor history of promoting women is too generalized to have any statistical significance. She claims that Shaffer only promoted a total of four women into management positions and only hired two women into staff positions. Notably, however, Lee does not tell us how many people Shaffer promoted in total and she provides no evidence as to relative qualifications. Lee also claims that although "the applicant list" for the seven management positions that Shaffer had to fill when he reorganized the company contained "a significant number of females," Shaffer filled all seven spots with men. Again, this data is statistically meaningless, because Lee has provided no specific context against which to measure these brief facts.

Lee also attempts to use as evidence of pretext the fact that Shaffer ultimately hired no women for the Real Estate Services position. However, this argument is wholly misleading, because Shaffer originally offered the Central Position to a woman, Janeen Travillyan, but she turned it down.

*1256 Lee did not present sufficient evidence at tri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

226 F.3d 1249                                                                                                    Page 10
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232, 78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly Fed. C 1142
**(Cite as: 226 F.3d 1249)**

al to support the jury's finding that Shaffer's
proffered reason for denying her the promotion was
a pretext for sex discrimination. Accordingly, we
REVERSE the court's denial of GTE's motion for
judgment as a matter of law, and remand for the
district court to enter judgment in GTE's favor.

REVERSED AND REMANDED.

C.A.11 (Fla.),2000.
Lee v. GTE Florida, Inc.
226 F.3d 1249, 84 Fair Empl.Prac.Cas. (BNA) 232,
78 Empl. Prac. Dec. P 40,216, 14 Fla. L. Weekly
Fed. C 1142

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

229 F.3d 1012                                                                          Page 1
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

▷

Chapman v. AI Transport
C.A.11 (Ga.),2000.

United States Court of Appeals,Eleventh Circuit.
John D. CHAPMAN, Plaintiff-Appellant,
v.
AI TRANSPORT, et al., Defendants-Appellees.
**Nos. 97-8838, 97-9086 and 97-9269.**

Oct. 2, 2000.

Former employee brought action against former
employer and its sister company under Americans
with Disabilities Act (ADA) and Age Discrimina-
tion in Employment Act (ADEA). Following entry
of summary judgment against employee on ADEA
claims, and following jury trial, the United States
District Court for the Northern District of Georgia,
No. 94-01666-1-CV-WBH, Willis B. Hunt, Jr., J.,
entered judgment in favor of former employer and
sister company on ADA claims and awarded them
costs. Former employee appealed. The Court of Ap-
peals, Birch, Circuit Judge, 180 F.3d 1244, reversed
grant of summary judgment on ADEA claims, af-
firmed judgment insofar as it embodied jury's ver-
dict on ADA claims, and vacated cost award. On
rehearing en banc, the Court of Appeals, Carnes,
Circuit Judge, held that: (1) summary judgment rule
applies in job discrimination cases just as in other
cases, abrogating *Delgado v. Lockheed-Georgia
Co.* and *Batey v. Stone*; (2) District Court did not
abuse its discretion in refusing to re-open summary
judgment after trial; (3) evidence offered at trial
was not relevant to review of entry of summary
judgment; (4) employee failed to rebut employer's
proffered nondiscriminatory for refusing to hire
him; (5) subjective reason can be legally sufficient,
legitimate, nondiscriminatory reason for adverse
employment action; and (6) District Court could
consider non-prevailing party's financial status in
awarding costs.

Affirmed in part, vacated in part, and remanded.

Birch, Circuit Judge, concurred in part, dissented in
part, and filed opinion in which Barkett and
Wilson, Circuit Judges, joined.

West Headnotes

**[1] Federal Courts 170B ⬤823**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk823 k. Reception of Evidence.
Most Cited Cases

**Federal Courts 170B ⬤829**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk829 k. Amendment, Vacation, or
Relief from Judgment. Most Cited Cases

**Federal Courts 170B ⬤830**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk830 k. Costs, Attorney's Fees
and Other Allowances. Most Cited Cases
The Court of Appeals reviews a district court's ex-
clusion of evidence, award of costs, or denial of a
motion to reconsider summary judgment only for
abuse of discretion. Fed.Rules Civ.Proc.Rules
56(c), 60, 28 U.S.C.A.

**[2] Civil Rights 78 ⬤1210**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1210 k. Disparate Treatment. Most
Cited Cases

229 F.3d 1012                                                                                                          Page 2
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

(Formerly 78k168.1)

When an employee alleges disparate treatment under the ADEA, liability depends on whether age actually motivated the employer's decision; that is, the employee's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[3] Civil Rights 78 ⇌1539**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)

The Court of Appeals uses the burden-shifting framework established in *McDonnell Douglas Corp. v. Green* and *Texas Department of Community Affairs v. Burdine* to evaluate ADEA claims that are based upon circumstantial evidence of discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[4] Civil Rights 78 ⇌1539**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)

Under the burden-shifting framework for evaluating ADEA claims that are based upon circumstantial evidence of discrimination, the employee must first establish a prima facie case of discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[5] Civil Rights 78 ⇌1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)

One method an employee can use to establish a prima facie case for an ADEA violation is by showing that he or she: (1) was a member of the protected age group; (2) was subjected to adverse employment action; (3) was qualified to do the job; and (4) was replaced by or otherwise lost a position to a younger individual. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[6] Civil Rights 78 ⇌1539**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)

If an employee establishes a prima facie case of discrimination under the ADEA, the employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[7] Civil Rights 78 ⇌1539**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)

**Federal Civil Procedure 170A ⇌2497.1**

229 F.3d 1012                                                                                                 Page 3
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most
Cited Cases
The employer's burden to articulate a legitimate, nondiscriminatory reason for the employment action challenged in an employee's ADEA action is merely one of production, and the employer need not persuade the court at the summary judgment stage that it was actually motivated by the proffered reasons; it is sufficient if the evidence raises a genuine issue of fact as to whether it discriminated against the employee. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[8] Civil Rights 78 ☞1539**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
        78k1539 k. Age Discrimination. Most Cited Cases
   (Formerly 78k380)

**Civil Rights 78 ☞1551**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1551 k. Age Discrimination. Most Cited Cases
   (Formerly 78k388)
If an employer articulates one or more legitimate, nondiscriminatory reasons for an adverse employment action in an ADEA case, the presumption of discrimination is eliminated and the employee has the opportunity to come forward with evidence, in-

cluding the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[9] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most
Cited Cases
If an employee does not proffer sufficient evidence at the summary judgment stage of an ADEA action to create a genuine issue of material fact regarding whether each of the employer's articulated reasons for its adverse employment action is pretextual, the employer is entitled to summary judgment. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
            170Ak2497.1 k. In General. Most
Cited Cases
Although an employer is entitled to summary judgment in its favor if the employee does not proffer sufficient evidence of pretext in an ADEA action, the converse is not necessarily true; if the employee does proffer sufficient evidence that the employer's stated reasons are pretextual, the employee still may not be entitled to take the case to a jury. Age Discrimination in Employment Act of 1967, § 2 et

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 4
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

### [11] Federal Civil Procedure 170A ⟺2470.4

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to Judgment
                170Ak2470.4 k. Right to Judgment as Matter of Law. Most Cited Cases
The standard for granting summary judgment mirrors the standard for granting judgment as a matter of law, such that the inquiry under each is the same. Fed.Rules Civ.Proc.Rules 50, 56(c), 28 U.S.C.A.

### [12] Federal Civil Procedure 170A ⟺2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                170Ak2497.1 k. In General. Most Cited Cases
The summary judgment rule applies in job discrimination cases just as in other cases; no thumb is to be placed on either side of the scale; abrogating *Delgado v. Lockheed-Georgia Co.,* 815 F.2d 641, and *Batey v. Stone,* 24 F.3d 1330. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

### [13] Federal Courts 170B ⟺752

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk752 k. Matters or Evidence Considered. Most Cited Cases
In reviewing a grant of a motion for summary judgment, a federal appellate court may examine only the evidence which was before the district court when the latter decided the motion. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

### [14] Federal Civil Procedure 170A ⟺2557

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2557 k. Partial Summary Judgment. Most Cited Cases
Neither the evidence offered at trial nor the verdict is relevant in determining whether partial summary judgment should have been granted prior to trial; one who loses on summary judgment cannot give a retroactive effect to a trial verdict, using it in an effort to create a genuine issue of material fact at the time the court was considering the motion for summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

### [15] Federal Civil Procedure 170A ⟺2559

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2559 k. Subsequent Proceedings. Most Cited Cases
District court did not abuse its discretion when, after trial of employee's ADA claims, it refused to re-open summary judgment it had previously granted in favor of employer on employee's ADEA claims; requiring re-opening would burden district court with multiple trials in single case in which one should suffice. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

### [16] Federal Courts 170B ⟺752

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 5
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

170BVIII(K)1 In General
    170Bk752 k. Matters or Evidence Considered. Most Cited Cases
Evidence offered at trial of employee's ADA claims was not relevant to Court of Appeals' review of summary judgment entered in favor of employer on employee's ADEA claims prior to trial, since district court did not have testimony from trial before it when it granted summary judgment. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ⬅2655**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds
                170Ak2655 k. Further Evidence or Argument. Most Cited Cases
Evidence proffered by employee at trial of his ADA claims did not warrant relief, under rule providing for relief from judgment due to such things as mistake and inadvertence, from summary judgment previously granted on his ADEA claims, inasmuch as proffered evidence fit none of the grounds for relief explicitly decided in rule. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed.Rules Civ.Proc.Rules 56(c), 60(b), 28 U.S.C.A.

**[18] Federal Civil Procedure 170A ⬅2651.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds
                170Ak2651.1 k. In General. Most Cited Cases
Trial evidence on one issue is not a "reason justifying relief" from an earlier summary judgment on

another issue. Fed.Rules Civ.Proc.Rules 56(c), 60(b), 28 U.S.C.A.

**[19] Civil Rights 78 ⬅1203**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1203 k. Particular Cases. Most Cited Cases
    (Formerly 78k168.1)
Insurance claims representative failed to rebut employer's proffered nondiscriminatory reason for refusing to hire him, i.e., his record of recent job instability, in ADEA action; "job-skipping" was reasonable basis upon which to choose among applicants, and his purported loyalty to one client shared by several of his employers could be of less concern to employer than his lack of loyalty to employers. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[20] Civil Rights 78 ⬅1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)
An ADEA plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his or her business judgment for that of the employer. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[21] Civil Rights 78 ⬅1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k168.1)
Provided that an employer's proffered reason for an adverse employment action in response to an AD-

229 F.3d 1012                                                                                    Page 6
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

EA claim is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[22] Civil Rights 78 ☞1118**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k141)

**Civil Rights 78 ☞1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k168.1)
Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions when reviewing an employer's proffered nondiscriminatory reasons for its actions, and the ADEA does not interfere no matter how medieval a firm's practices, how high-handed its decisional process, or how mistaken its managers; rather the inquiry is limited to whether the employer gave an honest explanation of its behavior. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[23] Civil Rights 78 ☞1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)
In ADEA actions, courts should refrain from recasting employers' proffered nondiscriminatory reasons for their adverse employment actions. Age Discrim-

ination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[24] Civil Rights 78 ☞1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k168.1)
Insurance claims representative failed to rebut employer's proffered nondiscriminatory reason for refusing to hire him, i.e., his poor interview, in ADEA action; representative's lack of aggressiveness was considered by employer because he was not aggressive in interview, not because of stereotype based on age, and representative stated in response to proffered reason only that employer's opinions about his appearance and demeanor had little probative value and were pretextual. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[25] Civil Rights 78 ☞1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k168.1)
An employer's explanation of its legitimate reasons must be clear and reasonably specific in an ADEA action, so that the employee will be afforded a full and fair opportunity to demonstrate pretext. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[26] Civil Rights 78 ☞1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

(Formerly 78k168.1)

A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason for an adverse employment action in an ADEA case if the employer articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[27] Courts 106 $\Longleftarrow$90(2)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k90 Decisions of Same Court or Co-Ordinate Court
                    106k90(2) k. Number of Judges Concurring in Opinion, and Opinion by Divided Court. Most Cited Cases

When the Court of Appeals sits as an en banc court, it has the ability to overrule prior circuit precedent.

**[28] Civil Rights 78 $\Longleftarrow$1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)

An employer is not precluded in an ADEA action from relying upon reasons for not hiring an applicant that are not written down in advance of the selection process. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[29] Federal Civil Procedure 170A $\Longleftarrow$2723**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2723 k. Discretion of Court. Most Cited Cases

Under the rule providing that costs other than attor-

ney fees shall be allowed as of course to a prevailing party unless the court otherwise directs, there is a presumption that costs are to be awarded to a prevailing party, but the district court is vested with discretion to decide otherwise. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**[30] Federal Civil Procedure 170A $\Longleftarrow$2723**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2723 k. Discretion of Court. Most Cited Cases

District court's discretion not to award the full amount of costs incurred by a prevailing party is not unfettered, since denial of costs is in the nature of a penalty for some defection on the prevailing party's part in the course of the litigation. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**[31] Federal Civil Procedure 170A $\Longleftarrow$2742.1**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2742 Taxation
            170Ak2742.1 k. In General. Most Cited Cases

District court must have and state a sound basis for defeating the presumption that costs will be awarded to a prevailing party. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**[32] Federal Civil Procedure 170A $\Longleftarrow$2731**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2731 k. Persons Liable. Most Cited Cases

A non-prevailing party's financial status is a factor that a district court may, but need not, consider in its award of costs. Fed.Rules Civ.Proc.Rule 54(d), 28 U.S.C.A.

**[33] Federal Civil Procedure 170A $\Longleftarrow$2731**

170A Federal Civil Procedure
    170AXIX Fees and Costs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                              Page 8
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

170Ak2731 k. Persons Liable. Most Cited Cases

If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**[34] Federal Civil Procedure 170A ⟨⟩2731**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2731 k. Persons Liable. Most Cited Cases

When awarding costs a district court should not consider the relative wealth of the parties. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**[35] Federal Civil Procedure 170A ⟨⟩2731**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2731 k. Persons Liable. Most Cited Cases

Even in those rare circumstances where the non-prevailing party's financial circumstances are considered in determining the amount of costs to be awarded, a court may not decline to award any costs at all. Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

**\*1016** Teresa A. Ferrante,Lawyers Committee for Civil Right Under Law, Washington, DC, R. Lawrence Ashe, Jr., Nancy E. Rafuse, William B. Hill, Jr., Paul, Hastings, Janofsky & Walker, LLP, Michael Dubus, Atlanta, GA, Richard T. Seymour, Washington, DC, for Plaintiff-Appellant.

David N. Schaeffer, Kidd & Vaughan, Atlanta, GA, James J. Oh, Allison Zousmer Stein, P. Kevin Connelly, Martin Harris, Connelly, Sheehan & Moran, Chicago, IL, for Defendants-Appellees.

Allan H. Weitzman, Proskauer Rose, LLP, Boca Raton, FL, for Amicus Society for Human Resources Management.

Geoffrey L.J. Carter, Washington, DC, Amicus Curiae for EEOC.

Appeals from the United States District Court for the Northern District of Georgia.

Before ANDERSON, Chief Judge, and TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, MARCUS and WILSON, Circuit Judges.[FN*]

> FN* Judge Frank Hull recused herself and did not participate in this decision.

CARNES, Circuit Judge:

John Chapman filed a lawsuit in federal district court against AI Transport, AIG Aviation, American International Group Claims Services ("AIGCS"), and American International Group ("AIG") (collectively, "the defendants"). His complaint included claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, and disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-17. The district court granted summary judgment in favor of the defendants on Chapman's ADEA claims, but it denied summary judgment on the ADA claims. Chapman's ADA claims were tried before a jury, which returned a verdict in favor of the defendants.

A panel of this Court affirmed the judgment insofar as it embodied the jury's verdict on the ADA claims, but the panel reversed the grant of summary judgment on the ADEA claims and also vacated the district court's award of costs to the defendants. *See Chapman v. AI Transport,* 180 F.3d 1244 (11th Cir.1999). We granted rehearing en banc primarily to decide some important issues that arise regularly in job discrimination cases. Those issues have to do with an employer's ability to select its own criteria for making employment decisions and with the permissibility of using subjective criteria. We had also planned to address an issue about whether evidence impeaching the credibility of one corporate official could be used to undermine the credibility of a different decisionmaker. As we will explain in due course, however, it turns out that general corporate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 9
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

credibility issue is not presented by the record. While we have the case, we will also use it to decide whether a district **\*1017** court may consider a losing party's financial status in awarding costs to the prevailing party.

## I. FACTS

### A. *Chapman's Pre-October 1988 Employment History*

From May 1964 until September 1969, John Chapman worked as a claims representative for the Hartford Insurance Company. He voluntarily left Hartford Insurance in September 1969 and began working as a claims supervisor for Home Insurance Company in Atlanta, Georgia. He left Home Insurance in June 1985. In July 1985, Chapman began working for Claimsman, Inc., another insurance company, as a senior liability claims examiner. While at Claimsman, Chapman handled the J. Gordon Gaines ("Gaines") account.

In August 1986, Chapman voluntarily left the Claimsman company in order to accept an offer to become manager of the general liability unit of Gaines, which had decided to start its own claims department. In April 1988, Gaines was purchased by Liberty National Fire Insurance Company. Liberty National moved its claims division to Birmingham, Alabama, and offered Chapman, who was apparently living in Atlanta, the opportunity to continue working in the claims division. Chapman decided instead to move to Long Beach, California and work for B.R. Martin Company. At B.R. Martin, Chapman supervised the files of Liberty National Fire Insurance Company. In September 1988, after only a few months with B.R. Martin, Chapman left that company and moved back to Atlanta, Georgia.

### B. *Chapman's Tenure at AI Transport and His Application to AIGCS*

In October 1988, Chapman began working for AI Transport in Atlanta as a senior claims representative. He interviewed with and was hired by Robert Spann, who was then the Manager of Claims at AI Transport. In 1989, Chapman was promoted to supervisor. His performance reviews usually ranged from the middle-of-the-scale "meets expectations" to the second-highest category, "above expectations." [FN1]

> FN1. Professional and managerial employees were rated using a five-level scheme in ascending order as follows: "unsatisfactory," "meets some expectations," "meets expectations," "above expectations," and "outstanding."
>
> The defendants state that **Chapman** received less than a "meets expectations" in several categories in his August 1989 review.

In late 1989, **AITransport** became a division of AIG Aviation, which is itself a subsidiary of AIG. AIG owns in whole or in part approximately 120 companies worldwide, including AIGCS. AIG, AIG Aviation, **AITransport** and AIGCS are all insurance-related companies.

In June 1992, **AITransport** instituted a reduction-in-force. Three of **Chapman's** four subordinates were terminated. **AITransport** removed **Chapman's** supervisory duties and assigned him to handle the claims representative duties formerly performed by his dismissed subordinates. **Chapman** was also transferred to the position of Self-Insured Retention ("SIR") Manager.

During September and October 1992, AIGCS restructured its organization and created new positions in the process. [FN2] On September 17, 1992, **Chapman** wrote James Wogsland, a vice president at AIGCS, about open positions. Wogsland and Ward Turnquist, another AIGCS vice president, interviewed **Chapman** on October 13, 1992 for the position of Casualty Claims Manager. Turnquist

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                          Page 10
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

testified in deposition that his assignment from Wogsland was "to screen these people for that position." Turnquist stated that he interviewed**1018 Chapman**, was not impressed and thought AIGCS should look further, but recommended that Wogsland talk to **Chapman** himself. **Chapman** testified, however, that Wogsland interviewed him before Turnquist did. At the time of the interviews, **Chapman** was 61 years old.

> FN2. AIGCS was formerly known as American International Adjustment Company. For simplicity, we will use the name AIGCS throughout our opinion.

Later that month, **Chapman** was informed that AIGCS would not be hiring him. Among the employees eventually hired by AIGCS for some position were four other **AITransport** employees. Graham Wiggins was hired as the Casualty Claims Manager; Warren Jones was hired as the Complex Claims Director; Duane Sevillian was hired as the Fast Track Manager; and Ernest John Smith was hired as a Casualty Claims Representative. Two of the four were over forty years old, but all four were younger than Chapman.[FN3]

> FN3. Smith was 50 years old, Wiggins was 47 years old, Sevillian was 39 years old, and Jones was 37.

On December 18, 1992, Chapman was terminated by AI Transport because of his refusal to travel, which he claimed to be the result of a heart condition. The facts relating to that condition and Chapman's termination by AI Transport are accurately summarized in the panel opinion. *See Chapman,* 180 F.3d at 1247-48. We will not set out in this opinion all of those facts, because they are not relevant to the ADEA claims which arose from AIGCS's failure to hire Chapman while he was still working at AI Transport.

**II. PROCEDURAL HISTORY**

A. *Complaint*

In June 1994, after having exhausted his EEOC administrative remedies, Chapman filed a lawsuit in federal district court against the defendants. His complaint included claims of age discrimination in violation of the ADEA, 29 U.S.C. §§ 621-34, and disability discrimination in violation of the ADA, 42 U.S.C. §§ 12101-17.[FN4] His complaint set out his allegations of age discrimination as follows:

> FN4. Chapman also brought claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.,* and salary discrimination in violation of the ADA, ADEA, Title VII, and 42 U.S.C. § 1981. The district court awarded summary judgment to AIGCS, AIG and AI Transport on the race discrimination claims and to AIG and AI Transport on the salary discrimination claims based on the ADA, ADEA and Title VII. The court denied summary judgment as to the claims of salary discrimination in violation of § 1981. The district court entered a Rule 50(a) dismissal of the salary discrimination claim at the close of the evidence in the trial. The race and salary discrimination claims are not at issue on appeal and we will not discuss them further.

25. During September or October of 1992, a claims supervisor position came open in the Atlanta Service Center of [AIGCS]. Mr. **Chapman** was qualified to perform this position, which would have required no out-of-town travel on business.

26. Mr. **Chapman** went through the proper procedures to apply for the open position at [AIGCS]. The [AIGCS] employee who interviewed Mr. **Chapman** for the position, James Wogsland (Vice President of [AIGCS] in Atlanta), informed Mr. **Chapman** that he would rely upon Mr. Spann's assessment of Mr. **Chapman's** work in making his decision.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                           Page 11
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

27. The position at [AIGCS] for which Mr. **Chapman** applied was awarded to Mr. Graham Wiggins, black. Mr. Wiggins was less qualified than Mr. **Chapman** for the position, had no physical disability and was much younger than Mr. **Chapman**.

28. **AITransport** also transferred Mr. Warren Jones and Mr. Duane Sevillian to [AIGCS] to perform positions that Mr. **Chapman** was more qualified to perform. Mr. Jones and Mr. Sevillian are black, are not physically disabled, and are much younger than Mr. **Chapman**.

### B. *Motions for Summary Judgment*

On April 29, 1996, **Chapman** moved for partial summary judgment on his disability * discrimination claims. Included in the Statement of Undisputed Material Facts submitted by **Chapman** with his motion for partial summary judgment were the following statements:

25. Mr. **Chapman** applied for any open positions, including Complex Claims Director, Fast Track Manager, Casualty Claims Manager, and Casualty Claims Representative. According to the AIGCS managers responsible for supervising and filling these positions, Mr. **Chapman** was qualified for all of them. None of these positions required business travel.

26. Nevertheless, instead of transferring Mr. **Chapman** to one of these open positions, which would have fully accommodated his disability, Defendants filled the positions with other non-disabled individuals from **AITransport**. Graham Wiggins was placed in the Casualty Claims Manager position; Warren Jones was placed in the Complex Claims Director position; Duane Sevillian (a claims representative at **AITransport**) was placed in the Fast Track Manager position and Ernest John Smith (a claims representative at **AITransport**) was placed in the Casualty Claims Representative position **Chapman** was more qualified than these other candidates.

On April 30, 1996, **AITransport**, AIG Aviation and AIG moved for summary judgment on all claims. AIGCS and AIG filed a separate motion for summary judgment on all claims. In the Statement of Material Facts attached to its summary judgment motion, AIGCS stated that Wogsland and Turnquist, the two AIGCS vice presidents who interviewed Chapman, chose Wiggins over Chapman because of Chapman's poor interview and their concern "about [his] stability in light of the number of jobs he had held in a short period of time." [FN5]

> FN5. AIGCS's Memorandum in Support of [its] Motion for Summary Judgment reads as follows:
>
> > The evidence belies Plaintiff's allegations that he was not hired by AIGCS because of his age. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because Plaintiff interviewed poorly and because they were concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time (Turnquist at 64, 78-79; Wogsland at 102-08, 111). Plaintiff offered no evidence to rebut these reasons. Instead, he argues that Turnquist's notes were evidence of discrimination and that he was better qualified than Wiggins.
>
> AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed in support of its motion for summary judgment, reads as follows:
>
> 9. Plaintiff interviewed with [James] Wogsland, [the Vice President in charge of AIGCS's Atlanta office] and Ward Turnquist, Vice President of AIGCS's Complex Claims Unit, who were responsible for filling the position....
>
> 13. In his interview, Turnquist, as he did with other candidates he interviewed,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                      Page 12
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

questioned Plaintiff regarding when he received degrees and switched jobs to ascertain continuity of and stability in employment....

14. Plaintiff was not hired....

15. Graham Wiggins, a black Claims Supervisor at Transport, was hired for this position....

17. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because they "didn't get a real feeling of confidence from" Plaintiff, because Wiggins made a "better presentation" than Plaintiff, and because Plaintiff did not give "sharp and concise" answers to their questions....

18. They were also concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time....

In depositions attached as exhibits to the summary judgment motion, Wogsland and Turnquist explained their reasoning. Turnquist stated that he "had some concerns about [Chapman's] career path" and that "there was (sic) quite a few jobs after the Home [Insurance Company] and before he came to [his current employer]." In his mind, Turnquist questioned "what necessitated making as many and as frequent a job change during what ... was a fairly short period of time...." Turnquist also described what he said to Wogsland after his interview with Chapman as follows:

*1020 I didn't get a real feeling of confidence from [Chapman]-from my interview with [Chapman] and that I thought we could do better and that he should continue the interview process with other people. But I think I told [Wogsland]-I believe I did tell [him] that I think you need to talk to [Chapman] yourself.

Turnquist stated that he "thought that Graham Wig-

gins made a better presentation of himself and his skills. His knowledge skills and abilities and thought that he would have-he seemed to exhibit. I just had ... more confidence in Graham in the way he presented his work history."[FN6]

FN6. Turnquist's deposition as attached to Chapman's response to AIGCS's motion for summary judgment contained pages not attached as an exhibit to AIGCS's motion. In those pages, Turnquist related the following:

I didn't feel that John [Chapman] came into the interview to sell himself and his knowledge, skills and abilities for the position that I was interviewing for. Everybody does it a little differently I realize, but I didn't get a real strong feeling that this was somebody that was going to be able to be the leader of this unit. I didn't feel that he was the-he had all the things that we were look[ing] for in terms of being able to build confidence in a group of people, so that he could be the leader of that group of people.... Two and a half years later-you know-the only thing that I can recall quite frankly is that general overall impressions that I had of the interview with John and I do specifically recall the comments that I made to Jim [Wogsland] after I interviewed him. But I cannot recall in detail the specific comments that he made to questions that I might has (sic) asked or the specific detail he might have offered regarding his job history, but I reached the conclusion on the basis of my interview with John that we could do better I felt than John.

Wogsland shared Turnquist's concerns, testifying in deposition that he looked for "stability with a company and a progression within a particular company" and that "[w]e did not see that in those three positions between when [Chapman] left Home

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                   Page 13
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

[Insurance Company] and AI Transport."

Wogsland further recounted that:

Within the interview that I conducted with
[Chapman], it was basically that he was not very
concise with the answers. He did not take an ag-
gressive approach in asking me questions about the
position, where we were going. His answers were
not very sharp, to the point, when I asked them,
which basically were the same comments that
[Turnquist] gave me about his interview [with
Chapman].

When asked for an example of a question to which
he received an unsatisfactory answer, Wogsland ex-
plained that "[Chapman] wasn't very clear about
why he had gone from Home [Insurance Company]
to several other positions before he got to Trans-
port...."

Chapman responded to the defendants' motions.
Chapman disputed AIGCS's allegation that he was
not hired because of his recent job instability by ar-
guing that he "had established a record as evid-
enced by his performance appraisals which were a
more immediate indication of his stability," and ar-
guing that "he continued to work on files for J.
Gordon Gaines while working for three different
employers between the time he left Home Insurance
(after 16 years) and joined AI Transport." [FN7]
Chapman*1021 also compared his entire employ-
ment history to Wiggins' employment history and
alleged that "it is undisputed that both Mr. Chap-
man and Wiggins worked for a total of six other
employers ..." throughout their entire careers. [FN8]

> FN7. The pertinent portions of AIGCS's
> Statement of Material Facts as to Which
> There is no Genuine Issue to be Tried are
> quoted *supra* note 5. Chapman's Response
> to those parts of that statement reads as
> follows:
>
> 9. Plaintiff does not dispute.
>
> 13. Plaintiff disputes the factual allega-

tion in ¶ 13. Defendants mischaracterize
Plaintiff's testimony. Plaintiff's interview
with Turnquist did not require asking
questions to which Turnquist either
already had answers or did not need
those answers. Turnquist had Plaintiff's
file which included a resume. Continuity
and stability of employment was a pre-
text for intentional discrimination.
(Chapman Dep., pp. 259, 260)
Moreover, Wiggins and Chapman both
worked for a total of six other employers
before applying for transfers to AIAC
and Turnquist did not inquire or question
Wiggins' "stability." (Wiggins Dep., pp.
15-25; Wogsland Dep., p. 138)

14. Plaintiff disputes the factual allega-
tion in ¶ 14 to the extent that Plaintiff
was already an employee. Rather,
Plaintiff was not transferred. (Plaintiff's
Exhibit 132)

15. Plaintiff disputes the factual allega-
tion in ¶ 15 to the extent that Graham
Wiggins was already an employee.
Rather, Wiggins was transferred.
(Plaintiff's Exhibit 81)

17. Plaintiff does not dispute but
Plaintiff contends that this testimony is
pretext for intentional discrimination.

18. Plaintiff disputes the factual allega-
tion in ¶ 18 to the extent that Plaintiff
already had been working at AIG for
more than three years and was actually
an employee asking for a transfer.
Plaintiff had established a record as
evidenced by his performance appraisals
which were a more immediate indication
of his stability. (Chapman Dep. I, pp.
254,; Defendants' Exhibits 74, 77, 78,
80, 81; Wogsland Dep., p. 111)
Moreover, Mr. Chapman explained to
Mr. Wogsland that he continued to work

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 14
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

on files for J. Gordon Gaines while working for three different employers between the time he left Home Insurance (after 16 years) and joined AI Transport. (Chapman Aff. ¶ 4-6; Wogsland Dep., pp. 142-45.)

FN8. Chapman's Response to AIGCS's Motion for Summary Judgment reads as follows:

The only alleged legitimate reason offered by Defendants for selecting Wiggins instead of Mr. Chapman was the claimed subjective opinion of Turnquist and Wogsland (after interviewing Mr. Chapman and Wiggins) that they "didn't get a real feeling of confidence from" Mr. Chapman; Wiggins made a "better presentation," and Mr. Chapman did not give "sharp and concise" answers. Turnquist and Wogsland also claim they were concerned about Plaintiff's stability in light of the number of jobs he had held.

Aside from the limited probative value of their opinions about Mr. Chapman's appearance and demeanor, the record suggests that Turnquist's and Wogsland's reliance on the "stability" factor was a pretext for intentional discrimination. It is undisputed that, although Mr. Chapman worked for three employers between the time he left Home Insurance (after 16 years) and joined AI Transport, he continued to work on files for J. Gordon Gaines for all three of those employers. Thus, rather than indicating a lack of stability, Mr. Chapman's interim employment demonstrated the customer's preference for his continued handling of its claims as it changed insurers-a factor which reflects favorably on his performance in the industry. Mr. Chapman explained this continued relationship with

J. Gordon Gaines during his interview with Wogsland and in fact, Wogsland wrote "Gaines" in his notes of the interview. Moreover, in further contradiction of the alleged focus on lack of stability in Mr. Chapman's employment background, it is undisputed that both Mr. Chapman and Wiggins worked for a total of six other employers before interviewing at [AIGCS].

Chapman's Response to AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried contains similar statements in paragraphs 13 and 18. *See supra* note 7.

Chapman responded to AIGCS's allegation that he was not hired based on a poor interview by contending that "this testimony [was] pretext for intentional discrimination."[FN9] Chapman did not refute Wogsland and Turnquist's evaluation of his interview. He did not contend that he asked a lot of questions during the interview, gave concise answers, or otherwise interviewed well. Instead, Chapman argued that there was "limited probative value of [Wogsland and Turnquist's] opinions about Mr. Chapman's appearance and demeanor...." Neither Chapman's affidavit nor the excerpts from his deposition that were attached as exhibits to his summary judgment response set out a different version of the interview.[FN10]

FN9. AIGCS's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed in support of its motion for summary judgment, asserted that: "Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because they 'didn't get a real feeling of confidence from' Plaintiff, because Wiggins made a 'better presentation' than Plaintiff, and because Plaintiff did not give 'sharp and concise' answers to their questions...."

229 F.3d 1012                                                                Page 15
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

Chapman's response reads as follows: "Plaintiff does not dispute but Plaintiff contends that this testimony is pretext for intentional discrimination."

FN10. The dissenting opinion says that the summary judgment record contains "evidence tending to show" that Chapman gave reasons for every job move that he had made. But the reasons that opinion cites are drawn from the explanations for those moves that Chapman gave after the lawsuit was filed, not during the interviews. Nowhere in Chapman's depositions does he contradict Wogsland's testimony that "[h]is answers were not very sharp, to the point, when I asked them, which basically were the same comments that [Turnquist] gave me about his interview." Nor did Chapman ever put forward any testimony or other evidence to contradict Wogsland's testimony that during the interview "[Chapman] wasn't very clear about why he had gone from Home [Insurance Company] to several other positions before he got to Transport...."

## *1022 C. *Magistrate Judge's Report and District Court Order*

In August 1996, the magistrate judge issued his report and recommendation. With respect to the age discrimination claims, the report recommended that AIGCS's motion for summary judgment be denied. The report stated that Chapman's evidence about his overall employment record and continuity of work on J. Gordon Gaines' files cast doubt on AIGCS's proffered nondiscriminatory reason of job instability. The report also stated that AIGCS's other proffered reason, Chapman's poor interview, was subjective and for that reason was an inappropriate basis upon which to award summary judgment.

On March 5, 1997, the district court issued an order granting summary judgment in favor of the defendants on Chapman's ADEA claims, but denying summary judgment on the ADA claims. With respect to the ADEA claims, the district court held that Chapman did not present sufficient evidence for a reasonable factfinder to conclude that the second proffered reason, his poor interview, was pretextual. Having so held, the district court found it unnecessary to address AIGCS's first reason, Chapman's recent job instability. With respect to the ADA claims, the court concluded that there were genuine issues of material fact including whether Chapman was disabled and whether travel was an essential function of his job. Accordingly, the court denied summary judgment on the ADA claims, leaving them to be decided at trial.

### D. *Post-Summary Judgment Events and Trial*

Before trial of the ADA claims, the defendants moved in limine to exclude a position statement AIG prepared for submission to the EEOC as part of the conciliation process. That position statement described Chapman's transfer to the position of SIR Manager as a promotion. The defendants later admitted that the transfer was actually a lateral move. Esther Kornblau, AIG's Director of Employee Relations in New York City, wrote the position statement and Valerie Zaleski, the human resources manager for AI Transport, checked it in Atlanta. Bill O'Brien, the vice president in charge of claims operations at AI Transport, either read it or had it read to him and did not point out any mistakes. Spann, Chapman's immediate supervisor, also probably reviewed the statement, and he did not point out any mistakes either.

The district court granted the defendants' motion in limine. At trial, however, the court allowed Chapman to introduce most of the position statement into evidence as an exhibit but not the part of it which characterized Chapman's transfer as a promotion. The court required Chapman to redact that part of the position statement. Chapman's ADA claims were tried before a jury from June 17 to June 30, 1997. The jury returned a verdict in favor of the defendants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 16
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

On July 2, 1997, Chapman filed a motion to reconsider and vacate summary judgment on his ADEA claims. He argued that evidence adduced immediately prior to and at the trial of his ADA claims established a genuine issue of material fact about whether AIGCS's proffered nondiscriminatory reasons regarding his ADEA claims were pretextual, thereby requiring a jury trial. Chapman also filed a timely motion for a new trial on the ADA claims. He argued, among other things, that the court had erred by redacting from the *1023 position statement the defendants' false characterization of his transfer. The district court denied both motions. Thereafter, the court awarded costs to the defendants. Chapman appealed the grant of summary judgment on the ADEA claims, the jury verdict on the ADA claims, the district court's denial of his post-trial motions, and the award of costs to the defendants.

### E. *Panel Opinion*

A panel of this Court issued a decision affirming in part and reversing in part. *See Chapman v. AI Transport,* 180 F.3d 1244 (11th Cir.1999). Addressing the award of summary judgment on the ADEA claims, the panel concluded that the district court did not "properly evaluate Chapman's effort to demonstrate the pretextual nature of AIGCS's reason for its employment decision...." *Id.* at 1249. The panel decided that the fact that Chapman worked for six different companies over a thirty-five year period and the fact that he had done work primarily involving one client during the recent three-year period in which he worked for three employers raised a genuine issue of material fact as to whether AIGCS's objective reason, Chapman's recent job instability, was a pretext for age discrimination. *See id.* at 1250. The panel stated that those facts were also sufficient at the summary judgment stage to cast doubt on AIGCS's subjective reason, Chapman's poor interview, even though that evidence did not directly rebut AIGCS's assessment of his interview. *See id.* For those reasons, the panel reversed the district court's grant of summary judg-

ment and remanded for further proceedings on that issue. *See id.* at 1250-51, 1254.

With respect to the ADA claims, the panel concluded that there was sufficient evidence for a reasonable jury to find in favor of the defendants and affirmed the jury's verdict. *See id.* at 1251. Although believing that the district court had abused its discretion by excluding from evidence the false description of Chapman's transfer as a promotion in the position statement the defendants filed with the EEOC, the panel concluded that the error was harmless. *See id.* at 1252. Finally, the panel vacated the district court's award of costs to the defendants, because the "district court incorrectly concluded that it lacked the authority to consider Chapman's financial status as a factor in calculating the total costs awarded to the defendants." *Id.* at 1253.

### III. STANDARD OF REVIEW

[1] We review *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court. *See Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999). Under Federal Rule of Civil Procedure 56(c):

[s]ummary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (internal marks and citations omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                      Page 17
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

We review the district court's exclusion of evidence, award of costs and denial of a motion to reconsider summary judgment only for abuse of discretion. *See Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1554 (11th Cir.1995) (exclusion of evidence); **\*1024***Technical Resource Servs. v. Dornier Medical Sys., Inc.,* 134 F.3d 1458, 1468 (11th Cir.1998) (costs); *Cavaliere v. Allstate Ins. Co.,* 996 F.2d 1111, 1115 (11th Cir.1993) (Rule 60 motion to reconsider).

## IV. DISCUSSION

### A. *Summary Judgment on Chapman's ADEA Claims*

#### 1. The Applicable Legal Framework

[2] The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As the Supreme Court has stated:

[w]hen a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (internal marks and citations omitted).

[3][4][5] This Court, as well as other federal courts of appeals, uses the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981),

to evaluate ADEA claims that are based upon circumstantial evidence of discrimination. *See Reeves,* 120 S.Ct. at 2105 (noting widespread use of the *McDonnell Douglas* framework in ADEA cases and assuming its applicability); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir.1997). Under that framework, the plaintiff must first establish a prima facie case of discrimination. *See Combs,* 106 F.3d at 1527-28 (citations omitted). One method a plaintiff can use to establish a prima facie case for an ADEA violation is by showing that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual. *See Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207-08 (11th Cir.1997).

Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

*Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 (footnote omitted)).

[6][7] If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See id.* However, the employer's burden is merely one of production; it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 1528 (quoting *Burdine,* 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted)).

[8][9][10][11] If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and "the plaintiff has the opportunity to come forward with evidence, including the

229 F.3d 1012                                                                                    Page 18
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (citations omitted). If the plaintiff does not proffer sufficient evidence to create a genuine issue of material **\*1025** fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim. *See id.* at 1529 (holding that there must be "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").[FN11]

> FN11. Although the defendant is entitled to summary judgment in its favor if the plaintiff does *not* proffer sufficient evidence of pretext, the converse is not necessarily true. If the plaintiff does proffer sufficient evidence that the defendant's stated reasons are pretextual, the plaintiff still may not be entitled to take his case to a jury. In *Reeves,* which dealt with Rule 50, judgment as a matter of law, the Supreme Court stated:
>
>> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if

the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred....

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law....

*Reeves,* 120 S.Ct. at 2109.

The *Reeves* case involved a judgment as a matter of law under Rule 50, and not summary judgment under Rule 56. But the Supreme Court said that, although the evidence considered when a district court rules upon a motion for judgment as a matter of law is different from the evidence considered when the court rules upon a summary judgment motion, the "standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Id.* at 2110 (quotations and citations omitted).

The Supreme Court's decision in *Reeves* modifies part of our *Combs* decision. We had stated in *Combs* that judgment as a matter of law was unavailable to an employer once a plaintiff offered sufficient evidence of pretext as to each of the proffered reasons. *Combs,* 106 F.3d at 1538. As we have just explained, *Reeves* tells us judgment as a matter of law will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                          Page 19
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

sometimes be available to an employer in such a case. *Reeves,* 120 S.Ct. at 2109. And, because the "standard for granting summary judgment mirrors the standard for granting judgment as a matter of law, such that the inquiry under each is the same,"*id.* at 2110, the same is true of summary judgment.

A final note is in order about the law applicable to summary judgment in job discrimination cases. Some of our opinions from past years purport to announce "[a]s a general rule [that] summary judgment is not a proper vehicle for resolving claims of employment discrimination which often turn on an employer's motivation and intent." *E.g., Delgado v. Lockheed-Georgia Co.,* 815 F.2d 641, 644 (11th Cir.1987); *accord Batey v. Stone,* 24 F.3d 1330, 1336 (11th Cir.1994) ("summary judgment in employment discrimination cases ... is especially questionable" (internal quotation and citation omitted)). There is some question about whether that supposed rule was ever followed, *see Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990) ( "Summary judgments for defendants are not rare in employment discrimination cases.") (citing cases), but no question that it has not been followed in recent years. As the Seventh Circuit has observed, "Summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial, ... many of them on the basis of summary judgment for the defendant." *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir.1997) (citations omitted); *see also* Lewis Maltby, *Employment Arbitration: Is it Really Second Class Justice?,***1026** Disp. Resol. Mag., Fall 1999, at 23-24 (footnote omitted) ("In fact, the majority of employment cases, some 60 percent, are resolved by summary judgment."); *see generally* Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts: 1999 Report of the Director,* p. 160-62 (indicating, from figures in Table C-4, that 94.09% of employment civil rights cases are resolved before trial).

[12] While acknowledging that questions of fact in job discrimination cases are "both sensitive and difficult" and "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," the Supreme Court has told us that "none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) (quoting *Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)). And quite recently, the Court rejected a rule which would have made it easier for job discrimination plaintiffs to get their case to a jury, explaining that "[t]o hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves,* 120 S.Ct. at 2109 (internal quotation and citation omitted). The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.

### 2. The Evidence We Consider in Reviewing a Grant of Summary Judgment

On March 5, 1997, the district court granted summary judgment in favor of the defendants on Chapman's ADEA claims but denied summary judgment on the ADA claims. On July 2, 1997, after the jury had returned its verdict against Chapman at the trial of the ADA claims, he filed a motion requesting the court to reconsider and vacate summary judgment on the ADEA claims. Chapman argued in his motion that evidence adduced immediately prior to and at the trial of his ADA claims created a genuine issue of material fact as to whether AIGCS's proffered nondiscriminatory reasons regarding his ADEA claims were pretextual. The district court denied Chapman's motion to reconsider and vacate, leaving intact the summary judgment previously entered on the ADEA claims. Chapman contends

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                           Page 20
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

that the trial testimony demonstrates that the district court's grant of summary judgment on the ADEA claims was erroneous, and his en banc brief to this Court relies extensively upon trial testimony in arguing that we should reverse summary judgment. By our count, the brief's "Statement of the Facts" section contains sixty-seven citations to trial testimony and only one citation to the summary judgment record.

There are two closely related issues here. One is whether the district court abused its discretion in not re-opening summary judgment on the ADEA claims after the trial of the ADA claims based upon evidence that came out shortly before and during that trial. The other issue is whether we should consider that later evidence in reviewing the district court's decision to grant summary judgment on the ADEA claims. The two issues are inextricably intertwined and they require a consistent answer. If the district court did not abuse its discretion in failing to re-open summary judgment on the ADEA claims, then we cannot consider the evidence that would have been available if the court had re-opened summary judgment.

[13][14] The rule is that "a federal appellate court may examine *only* the evidence which was before the district court when the latter decided the motion for summary judgment." *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 n. 3 (11th Cir.1992) (citations omitted) (emphasis added); *see also* **\*1027**10A Charles Alan Wright et al., Federal Practice and Procedure § 2716 (3rd ed. 1998) ("The appellate court is limited in its review.... [I]t can consider only those papers that were before the trial court. The parties cannot add exhibits, depositions, or affidavits to support their position."). The Tenth Circuit elaborated on the rule in *United States v. Hardage,* 982 F.2d 1436 (10th Cir.1992), stating that:

[n]either the evidence offered subsequently at the trial nor the verdict is relevant. One who loses on summary judgment cannot give a retroactive effect to a trial verdict, using it in an effort to create a genuine issue of material fact at the time the court

was considering the motion for summary judgment.

*Id.* at 1444 (internal quotations and citations omitted). This universally followed rule is indispensable to the orderly processing of cases in the district courts.

We have frequently railed about the evils of shotgun pleadings and urged district courts to take a firm hand and whittle cases down to the few triable claims, casting aside the many non-triable ones through dismissals where there is failure to state a claim and through summary judgment where there is no genuine issue of material fact. *See, e.g., Morro v. City of Birmingham,* 117 F.3d 508, 515 (11th Cir.1997) (explaining that "[t]he use of shotgun pleadings in civil cases is a ubiquitous problem," and "[g]iven the seriousness of that problem, it is particularly important for the district courts to undertake the difficult, but essential, task of attempting to narrow and define the issues before trial."(internal quotation and citation omitted)). It would seriously impair the ability of district courts to pare down the issues in multi-claim civil cases if we required them to revisit and re-evaluate a summary judgment previously granted on one claim because of evidence that comes out later at the trial of other claims.

Moreover, the approach Chapman would have us follow would burden our already heavily burdened district courts with multiple trials in a single case where one should suffice. To vacate summary judgment on one claim after the trial of another claim would necessarily result in two trials instead of one. Indeed, that is precisely what Chapman's motion to reconsider and vacate requested. There is no good reason for inflicting that burden of multiple trials upon our system with its finite resources. Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.

[15][16][17][18] The district court did not abuse its discretion in refusing to re-open after the trial of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ADA claims the summary judgment it had previously granted in favor of the defendants on the ADEA claims. And because the district court did not have the testimony from the trial of the ADA claims before it when it granted summary judgment in favor of the defendants on the ADEA claims, any evidence offered at trial is not relevant to our review of the ADEA summary judgment and we will not consider it. *See U.S. East Telecomm., Inc. v. U.S. West Communications Servs., Inc.,* 38 F.3d 1289, 1301 (2nd Cir.1994); *Hardage,* 982 F.2d at 1444-45; *Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988); *Voutour v. Vitale,* 761 F.2d 812, 817 (1st Cir.1985).[FN12]

> FN12. We recognize that Federal Rule of Civil Procedure 60(b), upon which Chapman based his motion, allows a district court to relieve a party from a final judgment under circumstances that include "mistake, inadvertence, surprise, or excusable neglect,""newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial,""fraud, ... misrepresentation, or other misconduct of an adverse party," or "any other reason justifying relief...." Fed.R.Civ.P. 60(b). Despite Chapman's assertions to the contrary, his proffered evidence fits none of the grounds for relief explicitly described in Rule 60(b), and as we have discussed above, trial evidence on one issue is not a "reason justifying relief" from an earlier summary judgment on another issue.

#### *1028 3. AIGCS's Proffered Nondiscriminatory Reasons

It is undisputed that Chapman established his prima facie case. He was sixty-one years old at the time that he applied, but was not hired, for a job at AIGCS. He was qualified for at least one of the positions for which he applied, Casualty Claims Manager. Four individuals who accepted jobs for which Chapman had applied, including the position of

Casualty Claims Manager, were younger than him. Applying the *McDonnell Douglas* framework, because Chapman met his burden of establishing a prima facie case, a presumption of discrimination arose and the burden shifted to AIGCS to proffer a legitimate, nondiscriminatory reason for not hiring Chapman.[FN13] *See Combs,* 106 F.3d at 1527-28. To meet that burden, which is only a burden of production, AIGCS in its motion for summary judgment proffered two legitimate, nondiscriminatory reasons, one of which was objective and the other subjective. The objective reason as stated by Turnquist and Wogsland, the decision makers for the positions for which Chapman applied, was Chapman's lack of "stability in light of the number of jobs he had held in a short period of time." The subjective reason, stated by those same decisionmakers, was Chapman's poor interview.[FN14]

> FN13. Chapman presented little or no statistical evidence in the district court that AIGCS discriminated against older applicants, that is, the members of the protected class. According to AIGCS's calculations, of the 110 people hired in 1992 (the year in which Chapman was turned down), almost forty percent were over forty years old. Unable to make his case with statistics, Chapman instead relied upon circumstantial evidence. Therefore, we use the *McDonnell Douglas* framework to analyze his claims. *See Combs,* 106 F.3d at 1527-28.

> FN14. There is some ambiguity in the record about exactly what role Turnquist had in the decisionmaking. Chapman's complaint and early submissions to the district court only mention his interview with Wogsland and do not mention Turnquist, but Chapman did not allege that Wogsland was the only decisionmaker or that Turnquist was uninvolved. The position statement the defendants filed with the EEOC refers only to Turnquist interviewing Chapman and not to Wogsland. Wogs-

229 F.3d 1012                                                                                                    Page 22
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

land testified in deposition that he hired Wiggins, Sevillian and Smith, and that Turnquist testified in his deposition that Turnquist hired Jones. Turnquist testified in his deposition that he screened candidates for Wogsland and that he interviewed Chapman. Chapman and the defendants did refer to both Wogsland and Turnquist as decisionmakers numerous times in the district court and in their briefs to this Court. Also, it is undisputed that both of them interviewed Chapman and each had input into the hiring decisions. Notwithstanding all of this, Chapman's en banc brief to this Court also states, "Wogsland was the selecting official."

> Viewing the evidence in the light most favorable to Chapman, we accept what we understand to be his current position: that Wogsland and Turnquist were both decisionmakers in regard to his employment application in the sense that each had input, although Wogsland made the final call.

AIGCS's proffer of those nondiscriminatory reasons eliminated the presumption of discrimination, thereby shifting the burden to Chapman to come forward with sufficient evidence to permit a reasonable factfinder to find that those reasons were pretextual. *See Combs*, 106 F.3d at 1528. We will discuss each of AIGCS's proffered reasons and Chapman's attempted showing of pretext as to that reason separately.

### a. Chapman's Record of Recent Job Instability

[19] AIGCS articulated its objective reason for not hiring Chapman as follows: "[Ward Turnquist and James Wogsland, the two vice-presidents who interviewed Chapman,] were concerned about [his] stability in light of the number of jobs he had held in a short period of time." [FN15] Turnquist*1029 explained his position more thoroughly in his deposition, stating that he "had some concerns about

[Chapman's] career path" and that "there [were] quite a few jobs after the Home [Insurance Company] and before he came to [his current employer]." That bothered Turnquist, who questioned "what necessitated making as many and as frequent a job change during what ... was a fairly short period of time...." Notes from Turnquist's interview with Chapman corroborate his concern. In those notes, Turnquist listed Chapman's employers and the dates Chapman left each employer.

> FN15. AIGCS's Memorandum in Support of [its] Motion for Summary Judgment reads as follows:
>
> > The evidence belies Plaintiff's allegations that he was not hired by AIGCS because of his age. Turnquist and Wogsland both testified that they selected Wiggins over Plaintiff because Plaintiff interviewed poorly and because they were concerned about Plaintiff's stability in light of the number of jobs he had held in a short period of time....

Wogsland expressed similar sentiments in his deposition. He stated:

The question was basically when you look at a resume and look at why somebody left somewhere you look for stability in a position, stability with a company and a progression within a particular company or if they have left a position for growth opportunities. We did not see that in those three positions between when he left Home [Insurance Company] and AI Transport.

Wogsland asked Chapman during the interview about the various jobs Chapman had between Home Insurance Company and AI Transport, but Chapman "wasn't very clear about why he had gone from Home to several other positions before he got to Transport...."

In response to AIGCS's articulated reason, Chapman asserted that he "had established a record as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 23
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

evidenced by his performance appraisals which were a more immediate indication of his stability," and that "he continued to work on files for J. Gordon Gaines while working for [the] three different employers between the time he left Home Insurance (after 16 years) and joined **AITransport**." **Chapman** also argued that Wiggins, who was selected instead of him as Casualty Claims Manager, had worked for a total of six other employers during his entire career (which spanned twenty-three years).

**Chapman** and Wiggins each went to work in 1988 for **AITransport**, which was their employer when they applied for the Casualty Claims Manager position at AIGCS in 1992. Notably, **Chapman** did not dispute that he had worked for three different employers in the three years before he joined **AITransport** in 1988. Nor did he dispute that Wiggins had worked for only one employer in the ten years before Wiggins joined **AITransport** in that same year.

**Chapman's** assertions about his good performance and continued work on the Gaines account may be true, but the reason AIGCS proffered for not hiring **Chapman** was the number of times he had changed employers in a specified short period of time (between leaving Home Insurance in 1985 and going to **AITransport** in 1998), not his performance appraisals and not the number of clients he had been involved with as he switched from one employer to another.[FN16] And while it may be true that both **Chapman** and Wiggins had worked for a total of six other employers during their entire careers, AIGCS's proffered nondiscriminatory reason was not the number of employers for which **Chapman** had ever worked. It was the number of times **Chapman** had changed employers in a specified period.[FN17]

> FN16. **Chapman's** reliance on his continued work on the Gaines account as an explanation for his job skipping may be unfounded. It appears from Wogsland's interview notes and **Chapman's** affidavit that although **Chapman** continued working on

files for Gaines, the files upon which he worked were different at each employer. However, it is unnecessary for us to decide whether **Chapman's** explanation is persuasive because, as discussed above, that explanation does not meet the reason proffered by AIGCS.

> FN17. Turnquist did say in his deposition that he also looked at an applicant's entire work history, and recognized that there were commendable parts of Chapman's history. He also indicated that his concerns went beyond the job switching during the period between Home Insurance and AI Transport, saying that he was concerned "[n]ot necessarily just [with] that time frame." That is not inconsistent with the salient concern about job instability being, as Wogsland testified, the proffered one of the three job switches during the specified three-year period.

*1030 [20][21][22][23] A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. See *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs,* 106 F.3d at 1541-43.[FN18] We have recognized previously and we reiterate today that:

> FN18. In *Combs,* the employer maintained that the superior supervisory experience of the person selected for the job was the reason that person was hired instead of the plaintiff. *See id.* at 1541-43. The plaintiff, in response, presented evidence that the person selected had been forced to resign

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from a prior position because of financial improprieties. *See id.* at 1543. We stated that "[f]inancial impropriety is a serious matter," but recognized that the employer's proffered nondiscriminatory reason was not financial probity, but supervisory experience, and that the employer was entitled to select the criteria upon which it based hiring decisions. *Id.*

> As a result, we held in *Combs* that the undisputed evidence of the comparator's financial impropriety was not sufficient to create a genuine issue of pretext when the employer's proffered reason was the difference in supervisory experience. We explained that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." *Id.* Accordingly, we held that the plaintiff had not presented sufficient evidence for a factfinder to conclude the employer's reason was pretextual, and we reversed the district court's denial of the employer's motion for judgment as a matter of law. *See id.*

[f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."
*Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a

reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly,* 210 F.3d 1334, 1339 n. 5 (11th Cir.2000). We "do not ... second-guess the business judgment of employers." *Combs,* 106 F.3d at 1543; *accord Alexander,* 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair."(internal citation omitted)).[FN19]

> FN19. Just as plaintiffs are not allowed to recast an employer's proffered reason, so also should courts refrain from doing so. Accordingly, we take the reason proffered by the employer at the time of summary judgment, the reason presented to the district court, and examine it. AIGCS's proffer, as particularized in the Wogsland and Turnquist depositions, focused on the 1985 to 1988 period, the three years between Chapman's departure from Home Insurance and his arrival at AI Transport. The dissenting opinion focuses instead on the thirteen-year period before Chapman arrived at AI Transport, but that is not the period proffered at the summary judgment stage as specified in the deposition of the two decision makers.

**\*1031** Here, the proffered reason clearly meets the test of being one that might motivate a reasonable employer. Indeed, leaving several employers in a recent and short period of time, or job-skipping, is an emminently reasonable basis upon which to choose between job applicants. As the Seventh Circuit has observed: "High turnover of skilled workers can be very harmful to a company. The worker who leaves may take with him trade secrets valuable to a competitor or the benefits of specialized training that the employer had given him, at some

229 F.3d 1012                                                                                    Page 25
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

expense, in the hope of recouping the expense in the worker's superior productivity now to be enjoyed by another employer." *Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir.2000). Furthermore, it makes sense for an employer to be concerned about how often an applicant has changed employers in recent years, instead of his career total or average. An employer could reasonably conclude that a job applicant who has not stayed with any recent employer for very long is unlikely to stay with it for long, either, and that what the applicant will do in the near- and mid-range future is better predicted from recent behavior than from what happened ten or twenty years ago.[FN20]

> FN20. It appears that Chapman may have shared AIGCS's opinion about what his job history showed. The resume that he submitted to AIGCS listed all of his employers, but gave not one date as to when he started or finished with any of them.

Chapman's purported loyalty to one client of several of his employers does not do him any good in this analysis. An employer reasonably could be more concerned with an applicant's loyalty to employers than with his loyalty to clients. Indeed, we would be surprised if that were not the case. For that reason, it is altogether understandable why an employer might count the number of times a job applicant has changed employers instead of the number of different clients he has worked with at his various employers. In any event, even if we were to disagree with the wisdom of the hiring criterion used by AIGCS, it is not our role to decide how to run AIGCS's business or to dictate employment criteria to it.

AIGCS presented Chapman's job instability in light of the number of jobs he had held in a specified recent and short period of time as a legitimate, nondiscriminatory reason for not hiring him. The burden shifted to Chapman to produce sufficient evidence for a factfinder to conclude that this reason was a pretext for age discrimination. Chapman

did not produce any such evidence. None of the evidence he offered rebutted AIGCS's articulated nondiscriminatory reason. Chapman's good performance appraisals indicate that he performed satisfactorily his job for his present employer. Chapman's continuous work on the Gaines account supposedly shows that he was loyal to that client and the client was pleased with his work. But those facts in no way undermine AIGCS's stated concern about Chapman's changing employers three times in a recent three-year period.[FN21]

> FN21. At oral argument, Chapman also contended that AIGCS's reliance on Chapman's having changed employers three times in three years as a legitimate, nondiscriminatory reason was implausible because any such concern must have been resolved when Chapman was hired by AI Transport in 1988. That contention is meritless. Different decisionmakers are entitled to be concerned about different things. Just as we will not dictate employment criteria to any company, we will not require separate decisionmakers for different, albeit related, companies to use the same criteria. Spann hired Chapman into AI Transport in 1988. Wogsland and Turnquist interviewed Chapman in 1992 and chose not to hire him into AIGCS. Whether Spann considered Chapman's job-skipping and, if so, how he factored that shortcoming into his decision has no bearing on whether Wogsland and Turnquist reasonably could consider it. Besides, there is nothing in the record to show the job skipping history of anyone else who applied for the job Chapman got at AI Transport. For all we know, any other applicant for that position at AI Transport in 1988 had an even worse record of disloyalty to employers, or had some additional shortcoming.

*1032 Unable to knock down AIGCS's proffered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                Page 26
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

reason of job instability by comparing himself to Wiggins, who was hired as the Casualty Claims Manager, Chapman has attempted on appeal to extend his comparison beyond Wiggins, contending that one of the other AI Transport employees-Earnest John Smith-who was hired by AIGCS in another position had an employment history similar to his own. However, this contention does not help Chapman. First, he did not make this argument in the district court; there, the only employee Chapman contended had an employment history similar to his own was Wiggins. *See Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1511 n. 30 (11th Cir.1996) ("As a general rule, we will not address claims or arguments not fairly presented to the district court."(citation omitted)).

Second, even if we were to consider the job history of Smith, Chapman would still have failed to create a genuine issue of pretext. AIGCS's concern was the number of times Chapman had changed jobs in a recent, short period of time. Smith had not changed employers as many times as Chapman had in as recent and short a period of time. Unlike Chapman, who had worked for three different employers in the three years before he joined AI Transport in 1988, Smith had only worked for two employers during that time period (and the first of those he had been with for six years, unlike Chapman who had been with his first one during that period for only one year).[FN22]

> FN22. AIGCS has not been inconsistent about what it means by Chapman's "recent" history of job skipping. In its Memorandum in Support of Motion for Summary Judgment, AIGCS proffered Turnquist and Wogsland's concern "about Plaintiff's stability in light of the number of jobs he had held in a short period of time," not characterizing it as "recent." In his deposition, Turnquist further specified that concern about Chapman's job instability as "there was quite a few jobs after the Home [Insurance Company] and before he

came to [his current employer]." Wogsland specified that same three-year period as the source of his concern, testifying in deposition that he had been looking for someone with job stability and progression within a company, and "We did not see that in those three positions between when he left Home [Insurance Company] and AI Transport."

The dissenting opinion suggests that Wogsland and Turnquist's concern with Chapman's job skipping during the three-year period between the time he left Home Insurance and went to AI Transport, which was from 1985 to 1988, is somehow inconsistent with Wogsland's statement in deposition that Chapman "had not had any recent general liability experience" (which was never proffered as a reason for not hiring him). The perceived inconsistency is apparently between the period Wogsland referred to as not "recent" for purposes of Chapman's general liability experience, and Wogsland's use of the word "recent" at one point during his deposition to refer to Chapman's job skipping during what was approximately the same period of time in which Chapman did not have general liability experience.

We see no inconsistency, because there is no reason why what is recent for purposes of job skipping also must be defined as recent for purposes of a particular type of claims handling experience. The more fundamental point, however, is that the proffered reason was not "recent" job skipping-although that is how the panel opinion, this opinion, and the dissenting opinion have characterized it. The actual proffered reason, as specified in Wogsland and Turnquist's depositions, was job skipping during a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                Page 27
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

particular short period of time, defined as the period from Chapman's departure from Home Insurance Company (in 1985) to his arrival at AI Transport (in 1988). Wogsland did at one point in his deposition apply the adjective "recent" to that period of time, but his doing so in no way detracts from the specificity of the period. And there is nothing vague or undefined about that specified period between the time Chapman left Home Insurance and the time he started work at AI Transport-regardless of whether one would call it "recent," "nearly recent," "pretty darn recent," or "mighty recent."

Our dissenting colleagues point to Sevillian and Jones, two other employees who were hired in other positions at AIGCS, and contend that they, too, had job instability records as bad or worse than Chapman. This is an argument Chapman himself did not make in the district court or in his panel or en banc briefs to this Court. We share Chapman's apparent conclusion *1033 that this argument lacks merit. For one thing, Jones was hired by AIGCS after Chapman had been fired by AI Transport, and we do not think a reasonable jury could find discrimination in the failure of a company to hire an applicant recently fired by another company for insubordination, or one who had just left (yet again) one employer for another.[FN23] In any event, Jones did not have a recent history of job instability like Chapman. To the contrary, he had been with one employer during the period Chapman had been with three, and in fact had been with that one company since 1983. As for Sevillian, he had also been with only one employer during the period Chapman had been with three, and he had been with that employer since 1981.[FN24]

FN23. While there is no evidence that Turnquist knew at the time he hired Jones for the position of Complex Claims Director that Chapman had been fired by AI Transport for insubordination, Turnquist's undisputed deposition testimony was that he did not consider Chapman for the Complex Claims Director position because he heard that Chapman had left AI Transport and gone with another company.

FN24. It might appear to the casual reader that the historical facts concerning the job histories of Wiggins, Jones, Smith, and Sevillian that are set out in this opinion differ from those set out in the dissenting opinion. Not so. A careful review will reveal that the difference is in the period of time involved. We feel that the proper period of measurement is the time after Chapman left Home Insurance in 1985 until the time he joined AI Transport in 1988. That three-year period is the proper measurement because it is the one the decision-makers used, the one proffered by AIGCS. As we have explained, neither plaintiffs nor courts are allowed to recast proffered reasons.

Because Chapman did not produce sufficient evidence for a reasonable factfinder to conclude that AIGCS's proffered nondiscriminatory reason of recent job instability for declining to hire Chapman was a pretext for age discrimination, the defendants were entitled to summary judgment on the ADEA claims.

### b. Chapman's Interview

[24] AIGCS articulated another reason for not hiring Chapman, his poor interview. Chapman asserts that Wogsland and Turnquist's assessment of his interview is not a legally sufficient reason to grant summary judgment for the defendants because of its subjective nature.

We begin with an important threshold point: A subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas /Burdine* analysis. Indeed, sub-

229 F.3d 1012                                                                                                    Page 28
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

jective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy. Take, for example, a job requiring continuing interaction with the public, such as a sales clerk or wait staff position. Attitude, articulateness, and enthusiasm, as well as appearance, can be vitally important in such a job, yet there are few if any ways to gauge such qualities objectively or from a written application. Interviews give prospective employers a chance to see if an applicant has the kind of personal qualities a service job requires and can be the best way an employer has to determine how a person interacts with others. Body language, tone of voice, eye contact, facial expressions and other non-verbal cues can significantly affect the impression an applicant makes on the interviewer and will make on those whose business the company wants to attract or retain, but such things are hard to quantify and articulate with any precision and can only be evaluated subjectively.

Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions. *See Sengupta v. Morrison-Knudsen Co.,* 804 F.2d 1072, 1075 (9th Cir.1986) (racial discrimination alleged in layoff from position as engineer) ("Indeed, in many situations [subjective criteria] are indispensable to the process...."); *1034Risher v. Aldridge,* 889 F.2d 592, 597 (5th Cir.1989) (sex discrimination alleged in failure to promote) ("Subjective criteria necessarily and legitimately enter into personnel decisions involving supervisory positions."(citation omitted)). Traits such as "common sense, good judgment, originality, ambition, loyalty, and tact" often must be assessed primarily in a subjective fashion, *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988), yet they are essential to an individual's success in a supervisory or professional position. *See id.* at 999, 108 S.Ct. at 2791 ("It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult

for a court to review.") (quoting *Zahorik v. Cornell Univ.,* 729 F.2d 85, 96 (2nd Cir.1984)).

It is inconceivable that Congress intended antidiscrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation. *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. at 999, 108 S.Ct. at 2791. To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons.

[25][26] Nonetheless, we are mindful of the requirement articulated by the Supreme Court in *Burdine* that "the defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff be afforded a full and fair opportunity to demonstrate pretext." *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096 (quotation omitted). A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. Continuing our example of a sales clerk or wait staff position, it might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion-the applicant's bad (in the employer's view) appearance. That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant. The burden would then shift back to the plaintiff to offer sufficient evidence for a reasonable factfinder to find that the defendant's

229 F.3d 1012                                                                                         Page 29
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

reason was pretext for discrimination.[FN25]

> FN25. The warnings in *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1255-56 (11th Cir.1999) (en banc) (Carnes, J., concurring), about the dangers of "perception prevarication" are not inconsistent with our holding in this case. Those warnings were directed at purely subjective, conclusory impressions of a litigant that are devoid of any objective facts which, if false, can be contradicted by testimony or other evidence. As we explain in the text, where a decisionmaker's subjective reason is supported by a "clear and reasonably specific" explanation, as required by *Burdine,* there will be objective factors that can be tested against other testimony and evidence.

[27] Although we, sitting as an en banc court, have the ability to overrule our prior circuit precedent, *see Combs,* 106 F.3d at 1534, we do not believe our holding today is inconsistent with our past decisions. *See Allison v. Western Union Telegraph Co.,* 680 F.2d 1318, 1322 (11th Cir.1982) ("An employer's decision may properly be based on subjective factors."(citation omitted)); *Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1011-14 (11th Cir.1984); *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500 (11th Cir.1985) (A subjective reason "is legally sufficient to satisfy the employer's *1035 burden of produc[ing] [a legitimate, non-discriminatory reason] so long as it is capable of objective evaluation."); *Woody v. St. Clair County Comm'n,* 885 F.2d 1557, 1562-63 (11th Cir.1989) (affirming district court's judgment that employer's subjective evaluation of how long employee would stay on the job was not pretextual because it was based on objective indicators); *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1280 n. 17 (11th Cir.2000) ( "[E]mployment decisions may legitimately be based on subjective criteria as long as the criteria are capable of objective evaluation and are stated with a sufficient degree of particularity."). But to the extent of any inconsistency between our past

decisions and our decision today, of course, the rule we announce today controls.

We now apply this rule to the present case. Although the proffered reason, Chapman's poor interview, was subjective, AIGCS offered a clear and reasonably specific explanation of why Wogsland and Turnquist, the decisionmakers, arrived at that subjective conclusion. Wogsland stated:

Within the interview that I conducted with [Chapman], it was basically that he was not very concise with the answers. He did not take an aggressive approach in asking me questions about the position, where we were going. His answers were not very sharp, to the point, when I asked them, which basically were the same comments that [Turnquist] gave me about his interview [with Chapman].

Wogsland observed that Chapman's imprecise answers were not "the answers [he] would expect [Chapman] needed to [be able to] give to technicians under his control, within his unit." As an example of an unclear answer given by Chapman, Wogsland stated that Chapman "wasn't very clear about why he had gone from Home [Insurance Company] to several other positions before he got to Transport...."

[28] Turnquist explained that he too was concerned about how Chapman presented his work history. In comparing Wiggins and Chapman's interviews, Turnquist stated:

I thought that Graham Wiggins made a better presentation of himself and his skills. His knowledge skills and abilities and thought that he would have-he seemed to exhibit. I just had-I don't have an answer to that-I seem-I felt I had more confidence in Graham in the way he presented his work history.

Even though Wogsland and Turnquist subjectively evaluated Chapman's interview, they also explained the grounds for their evaluation with reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                      Page 30
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

clarity and specificity given the passage of time.FN26 AIGCS thus met its burden of producing a legitimate, nondiscriminatory reason.

> FN26. Chapman argues, among other things, that Wogsland and Turnquist's explanations are insufficient because they were neither contemporaneously documented nor detailed. First, we believe that their explanations, especially Wogsland's, were sufficiently detailed given the circumstances. Wogsland even provided an example of a question to which Chapman's answer was unclear. Second, the interview notes did not purport to be complete. Wogsland testified that he did not write down every word or even every topic of conversation. This Court has never held that an interviewer must take substantially verbatim notes of an interview, or even any notes at all, to be entitled to proffer legitimate, nondiscriminatory reasons gleaned from an interview, and we refuse to hold that today. Such close judicial oversight of a business and its hiring practices would be unprecedented and unwarranted.

> Similarly, we have never held that an employer cannot rely upon reasons that are not written down in advance of the selection process, and we decline to do so now.

After AIGCS articulated this second reason, Chapman's poor interview, the burden shifted back to Chapman to present sufficient evidence that AIGCS's reason was pretextual. In response, Chapman said only that there was "limited *1036 probative value of [Wogsland and Turnquist's] opinions" about Mr. Chapman's appearance and demeanor" and that "this testimony is pretext for intentional discrimination."FN27

> FN27. In deposition testimony, Chapman stated only that Wogsland and Turnquist were courteous, businesslike, professional

and respectful during his interviews, something no one disputes. However, deposition testimony about that fact was not responsive to Wogsland and Turnquist's assessment of Chapman's performance in his interviews, and Chapman did not argue to the district court that it was responsive.

Our dissenting colleagues focus on Wogsland's statement that one reason he was unimpressed with Chapman was that he was not aggressive in answering questions during the interview. Because there is a stereotype that older people are not as aggressive as younger people, they would have us treat use of aggressiveness as a hiring criteria as equivalent to age bias, or at the least as highly suspicious. We decline to do so. In the rough and tumble, highly competitive business world, aggressiveness can be a valuable and much sought after trait. Just because a sought after trait is linked by stereotype to an impermissible consideration does not mean an employer cannot search for and consider the trait itself independently from the stereotype. For example, according to stereotype women are not as physically strong as men. If an employer is hiring people for positions that require a great deal of physical strength, it would be permissible for the decision-makers to hire a man instead of a woman if that particular man has more physical strength than that particular woman, even though the decision could not be based on the stereotype about the comparative physical strength of men and women in general. In this case, the decisionmakers considered Chapman's lack of aggressiveness because he was not aggressive in the interview, not because of his age. Along these lines, it is noteworthy that Turnquist also thought another interviewee, who was only 39 years old, also was not aggressive enough for the position of Casualty Claims Manager.FN28

> FN28. That other interviewee was Sevillian. Although not hired to be Casualty Claims Manager, Sevillian was hired for another position. That does not mean Wogsland or Turnquist disregarded Sevil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                          Page 31
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

lian's lack of aggressiveness. It was only one factor in their assessment of the interviewees, and Sevillian definitely did not have the recent history of job instability that weighed against Chapman. Nor is there any basis in the record for assuming that aggressiveness was thought to be equally important in all positions across the board.

Chapman had a fair chance to respond to the objective bases for the subjective reason proffered for not hiring him, but Chapman never refuted those objective bases. He never said he asked a single question during the interview, never said he explained clearly during the interview why he had so many employers between Home Insurance Company and AI Transport, and never said he had given concise answers to the questions he was asked. Moreover, Chapman's affidavit submitted in response to AIGCS's summary judgment motion does not even mention the interview. Because the poor interview subjective reason backed up by clear and reasonably specific bases is a legitimate, nondiscriminatory reason, and Chapman failed to present sufficient evidence to show that the reason was pretextual, the defendants were entitled to summary judgment on the ADEA claims.[FN29] *See Combs,* 106 F.3d at 1543.

> FN29. One of the issues we asked the parties to brief and argue was whether a plaintiff could establish pretext as to a proffered subjective reason by showing that a proffered objective reason was pretextual. Because we conclude that Chapman failed to create a genuine issue of material fact as to the objective reason, *see* Part IV.A.3.a *supra,* we have no occasion to address the objective-to-subjective pretext spillover issue. That part of the panel opinion, *see Chapman,* 180 F.3d at 1250, remains vacated. Of course, the fact that we do not address that issue does not in any way imply our agreement with the dis-

senting opinion about it.

### *1037 4. Conclusion

In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. *See id.*(requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid judgment as a matter of law).FN30 The defendants in this case proffered two nondiscriminatory reasons for failing to hire Chapman. He did not produce sufficient evidence to create a genuine issue of pretext as to either. Therefore, we affirm the district court's grant of summary judgment to the defendants on two independently adequate bases: Chapman's failure to create a genuine issue of pretext as to the objective reason, and also his failure to create a genuine issue of pretext as to the subjective reason.[FN31]

> FN30. In *Combs,* the defendant employer proffered three legitimate, nondiscriminatory reasons why it had promoted another employee instead of the plaintiff. We "consider[ed] the evidence related to *each* of the three proffered nondiscriminatory reasons." *Id.* at 1539 (emphasis added). After analyzing each reason separately, we concluded that the plaintiff had presented sufficient evidence to show that two of the reasons were pretextual, but he had failed to present sufficient evidence to show the third reason was pretextual. *See id.* at 1539-43. Because the plaintiff failed to rebut one of the three reasons, we held that the defendant was entitled to judgment as a matter of law. *See id.* at 1543.

> The dissenting opinion would carve out a number of exceptions to the well-established rule that a plaintiff must show pretext as to each proffered reason. To the extent this case presents a factual basis for any such exception, we reject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                          Page 32
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

that exception. To the extent this case does not present a factual basis for such an exception, we express no view on whether that exception might exist in some case with different facts.

FN31. While Chapman's main focus is on the failure to hire him for the Casualty Claims Manager position which went to Wiggins, he also contends that he has a viable ADEA claim as to the three other positions that went to Jones, Smith, and Sevillian. His written application note did express interest "concerning the openings or new positions to be available" at AIGCS, and said he "would welcome the opportunity to discuss this with you or to be considered for one of the open positions." Wogsland and Turnquist did consider Chapman for one of the open positions, the position of Casualty Claims Manager. After interviewing Chapman for that position, Wogsland and Turnquist were less than impressed with his interview and were concerned about his history of job instability. Given those facts, we do not think that a jury could reasonably infer age discrimination as to the other positions that went to Jones, Smith, and Sevillian. Moreover, as we have already mentioned, the position for which Jones was hired was not filled until Chapman had been terminated at AI Transport.

Implicit in Chapman's contentions about the other positions is the premise that an applicant can, by the simple expedient of expressing an interest in all open positions, put on an employer filling a large number of positions the burden of proffering reasons for not hiring the applicant for each position. That would be quite a burden. Here, for example, Wogsland alone hired people to fill 110 positions during the Fall of 1992

(Chapman was interviewed in October of 1992). At least where the employer considers an applicant for a particular position and has a reason for not hiring him that is generally applicable (as job instability is), the employer need not specifically consider that applicant for every other position that is open at the time or comes open in the future.

B. *The Trial of Chapman's ADA Claims*

1. Chapman's Motion for a New Trial

Part B of the panel opinion addresses Chapman's contentions that the jury verdict against him on his ADA claims should be overturned based upon the trial evidence. *See Chapman v. AI Transport,* 180 F.3d 1244, 1251 (11th Cir.1999). The panel concluded "that the district court did not abuse its discretion in refusing to grant Chapman's motion for a new trial on his ADA claims against all defendants." *Id.* Agreeing with that conclusion and the analysis supporting it, we reinstate Part B of the panel opinion.

2. The Redaction of Part of the Position Statement

The panel opinion also deals with Chapman's contention that the district court *1038 abused its discretion by excluding from evidence at trial part of the position statement the defendants had submitted to the EEOC in response to Chapman's charges. That statement was prepared by Esther Kornblau, an AIG employee, as part of the EEOC conciliation process. The part of the position statement that the district court refused to admit into evidence described Chapman's transfer by AI Transport to the position of SIR Manager as a promotion, when it was actually a lateral move. The panel concluded that part of the statement should have been admitted into evidence because it "would have been, from Chapman's perspective, evidence of the defendants' lack of credibility." *Chapman,* 180 F.3d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1252. The panel posited that the "evidence might have been useful to impeach the defendants' general integrity." *Id.* at 1252 n. 2. However, the panel concluded that the district court's failure to admit that part of the position statement was harmless. *See id.* at 1252.

When we granted rehearing en banc we had intended to decide the issue of whether evidence of one corporate official's false statement concerning the plaintiff's employment is admissible to undermine the credibility of another corporate official, who was the actual decisionmaker, or to undermine the credibility of the corporation as a whole. Upon closer review of the record, however, we find that issue is not presented in this case. Although a corporate official who was uninvolved in Chapman's termination from AI Transport prepared the position statement, the AI Transport officials who were involved in his termination reviewed the statement and did not point out any mistakes. Thus, the false statement was directly relevant to those decision makers' credibility. We need not decide whether the district court abused its discretion in failing to admit the evidence, however, because we agree with the panel opinion that any error was harmless.

We leave vacated that part of the panel opinion indicating that a false or misleading statement by one corporate official may be used to undermine the credibility of another corporate official who was not involved in the making or submission of the statement. *See id.* at 1252. We also leave vacated any implication about general corporate credibility. *See id.* at 1252 n. 2. Those issues are not presented by this record, and we express no view on them.

3. The Award of Costs Pursuant to Rule 54(d)

The defendants, as the prevailing party, submitted a bill of costs pursuant to Federal Rule of Civil Procedure 54(d)(1), and the district court initially awarded costs to the defendants in the full amount requested, which was $34,504.90. However, after Chapman filed objections, the defendants submitted

an amended bill of costs for $28,943.95. After deducting $7,088.70 from the amount requested in the amended bill of costs in order to remove items it found were not necessary to the litigation of the case, the district court awarded costs in the amount of $21,855.25. Chapman contends that in calculating the amount of costs he was required to pay, the district court erred by failing to take his financial status into account, as he requested in his opposition to the amended bill of costs.

[29] We asked the parties to brief the issue of whether the district court has the authority to consider the non-prevailing party's financial resources, or the lack thereof, as a factor in calculating the amount of costs to be awarded. Rule 54(d)(1) provides that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." That provision establishes a presumption that costs are to be awarded to a prevailing party, but vests the district court with discretion to decide otherwise. *See* Fed.R.Civ.P. 54(d)(1); *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 351, 101 S.Ct. 1146, 1149, 67 L.Ed.2d 287 (1981).

**\*1039** [30][31] However, the district court's discretion not to award the full amount of costs incurred by the prevailing party is not unfettered, *see Head v. Medford,* 62 F.3d 351, 354-55 (11th Cir.1995), "since denial of costs is in the nature of a penalty for some defection on [the prevailing party's] part in the course of the litigation." *Walters v. Roadway Express, Inc.,* 557 F.2d 521, 526 (5th Cir.1977) (internal marks and citation omitted). To defeat the presumption and deny full costs, a district court must have and state a sound basis for doing so. *See Medford,* 62 F.3d at 354 (citing *Gilchrist v. Bolger,* 733 F.2d 1551, 1557 (11th Cir.1984)); *Cherry v. Champion Int'l Corp.,* 186 F.3d 442, 446 (4th Cir.1999). We review a district court's decision about costs only for abuse of discretion. *See Technical Resource Servs.,* 134 F.3d at 1468.

[32][33] We hold that a non-prevailing party's financial status is a factor that a district court may, but

need not, consider in its award of costs pursuant to Rule 54(d). *See Smith v. Southeastern Penn. Transp. Auth.,* 47 F.3d 97, 100 (3rd Cir.1995); *Mc-Gill v. Faulkner,* 18 F.3d 456, 459 (7th Cir.1994). If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay. *See McGill,* 18 F.3d at 459 (non-prevailing party offered no documentary support, relying instead on "unsupported, self-serving statements"); *Cherry,* 186 F.3d at 447 (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k) plan).

[34][35] Moreover, when awarding costs a district court should not consider the relative wealth of the parties. Comparing the financial resources of the parties would unduly prejudice parties with assets and undermine "the presumption that Rule 54(d)(1) creates in prevailing parties' favor, and ... the foundation of the legal system that justice is administered to all equally, regardless of wealth or status." *Cherry,* 186 F.3d at 448; *see also Smith,* 47 F.3d at 100. Even in those rare circumstances where the non-prevailing party's financial circumstances are considered in determining the amount of costs to be awarded, a court may not decline to award any costs at all. *Cf. Durrett v. Jenkins Brickyard, Inc.,* 678 F.2d 911, 917 (11th Cir.1982) ("we hold that in no case may the district court refuse altogether to award attorney's fees to a prevailing Title VII defendant because of the plaintiff's financial condition," because "[a] fee must be assessed which will serve the deterrent purpose of the statute, and no fee will provide no deterrence."). Subject to that restriction and to the requirement that there be clear proof of the non-prevailing party's dire financial circumstances before that factor can be considered, we leave it to the district court's discretion whether to do so in a particular case.

Chapman did submit financial disclosures to the

district court, although the defendants contend those disclosures are not detailed enough and fail to establish that full costs should be awarded. The district court noted that "the Eleventh Circuit has not yet directly addressed ability to pay as a factor in assessing costs." It then awarded the full amount of costs it found to have been necessary to the litigation.

We cannot tell from the district court order whether the court recognized that it had limited discretion to consider a non-prevailing party's financial condition in calculating the amount of costs to award, or thought it had no discretion regardless of the financial showing made.[FN32] Accordingly,**\*1040** we will vacate the order awarding costs and remand this case to the district court for the limited purpose of allowing the court to reconsider its decision in light of the rules we set out in this opinion. We do not mean to imply that the district court must consider Chapman's financial situation in calculating the amount of costs to be awarded, even if he proves his financial situation is extreme, but only that the court must realize that it has the discretion to do so.[FN33] Now that we have stated the law of the circuit on this matter, we will assume in cases arising hereafter that district courts are aware of their discretion and its parameters, unless there is some affirmative indication to the contrary.

> FN32. The final explanatory sentence of the district court's order awarding costs does say that "at least under the circumstances here, Chapman's financial situation is not a factor in whether the Court awards costs," but that statement was preceded in the same sentence with these words: "given the Eleventh Circuit's willingness to award statutorily permitted costs and fees limited only by the precaution that the party seeking reasonable reimbursement be the prevailing party."

> FN33. Chapman makes other contentions relating to the district court's award of costs against him, but we find none of

229 F.3d 1012                                                                                    Page 35
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

them merit discussion.

## V. CONCLUSION

We AFFIRM the district court's grant of summary judgment to the defendants on the ADEA claims, and AFFIRM the judgment entered on the jury verdict in favor of the defendants on the ADA claims. We VACATE the order awarding costs to the defendants and REMAND the case to the district court for the limited purpose of allowing it to reconsider that order in light of our discussion about the matter in this opinion.

BIRCH, Circuit Judge, concurring in part and dissenting in part, in which BARKETT and WILSON, Circuit Judges, join:

While important to the parties involved and deserving of careful treatment by the court, this case does not appear to be unusual at first blush. An older employee with excellent performance evaluations applies to receive one of several higher-paying positions-but the positions all go to younger workers. The older employee sues his employer for age discrimination. This seemingly modest case, however, has become a vehicle for considering plaintiffs' right to a jury trial and the distinction between questions of fact for the jury and questions of law for the judge. Most specifically, this case focuses upon the dispositive weight to be accorded an employer's purely subjective rationale for a putative non-discriminatory adverse employment action. Because summary judgment is inappropriate in light of Defendants' purely subjective decisionmaking and in the face of significant gaps and inconsistencies in the record, I dissent.[FN1]

> FN1. I concur in the majority opinion as to the appeal on the ADA trial verdict and on the award of costs.

### I. Background

#### A. Procedural Posture

While the Americans with Disabilities Act portion of this case did proceed to trial, the district court

granted summary judgment to Defendants as to the Age Discrimination in Employment Act ("ADEA") claim. In granting Defendants summary judgment on the ADEA claims, the district court rejected the magistrate judge's recommendation that summary judgment be denied as to AIGCS on the ADEA claim.

#### B. The Applicants & Application Process

The ADEA portion of this case arose from the interviewing and hiring process applied to certain applicants for positions with AIGCS.[FN2] The applicants included:

> FN2. To be consistent with the majority opinion, we will likewise refer throughout the opinion to the American International Adjustment Company as "AIGCS."

*Plaintiff John Chapman:* Chapman graduated with a bachelor's degree from Emory University in 1955 and with a J.D. from Stetson College of Law (an accredited*1041 law school) in 1961.[FN3] His post-college experience included: State Farm (1957 to May 1964); Hartford Insurance (May 1964 to September 1969); Home Insurance (September 1969 to June 1985); the Claimsman (July 1985 to August 1986); J. Gordon Gaines/Liberty National Fire Insurance ("Gaines") (August 1986 to April 1988); B.R. Martin (April 1988 to September 1988); and AIGCS/AI Transport[FN4] (October 1988 to December 1992).[FN5] Thus, Chapman had a bachelor's degree, a J.D. from an accredited law school, and six employers in the 31 years between finishing college and starting to work for AIGCS. Chapman worked on Gaines files at all of the employers for which he worked between leaving Home Insurance and starting to work for AIGCS.FN6

> FN3. *See* Ptf's Ex. 48 to Spann Dep. II at D000065 (Chapman job application); *see also* R7-79-Ex. E-2 at ¶ 3. All depositions were filed as part of the summary judg-

229 F.3d 1012                                                                    Page 36
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

ment record. *See* R5-71; R6-76; R9-84; *see also En Banc* Brief of Defendants-Appellees at 1 n. 1.

FN4. A number of the applicants, including Chapman, had been initially hired by AIGCS and then were transferred to AI Transport as part of a restructuring.

FN5. *See* R7-79-Ex. E-3-4 at ¶¶ 3-7; Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt., Attach. 1) at 2; Ptf's Ex. 48 to Spann Dep. at D000065-D000068 (Chapman's job application and resume submitted to Defendants in 1988).

FN6. *See* R7-79-Ex. E-2-3 at ¶¶ 4-5.

*Warren Jones:* Jones graduated with a bachelor's degree from Jonathan C. Smith University in 1977. He attended insurance training classes but had no graduate or law school training.[FN7] His post-college experience included: Prudential (1977-79); Crawford & Company (from mid-1980 to mid 1982); Progressive (from mid-1982 to late 1982 or early 1983); USF & G (from late 1982/early 1983 to 1987 or 1988); AIGCS/AI Transport (1987 or 1988 to present).[FN8] Thus, Jones had a bachelor's degree, no graduate or law school training, and four employers in the 11 years between college and starting to work for the AIGCS.

FN7. *See* Jones Dep. at 21-26.

FN8. *See* Jones Dep. at 33-36.

*Duane Sevillian:* Sevillian graduated with a bachelor's degree from Johnson C. Smith College, and he received a J.D. from Atlanta Law School (an unaccredited law school) in 1980. After graduating from law school, Sevillian worked for: New York Life (from 1980 to 1981); Safeco (from 1981 to 1988); and AIGCS/AI Transport (from January 1989 to present).[FN9] Thus, Jones had a bachelor's degree, a J.D. from an unaccredited law school, and two employers in the eight years between law school and starting to work for AIGCS.

FN9. *See* Sevillian Dep. at 11-17.

*John Smith:* Smith received an associate's degree from Middle Georgia College in 1962, a bachelor's degree from the University of Georgia in 1965, and a Masters in Science & Administration from Georgia College in 1976.[FN10] Smith's employment history included: Southeastern Underwriters (from June 1965 to February 1966) (as an inspection engineer); the United States Army (from February 1966 to February 1968); Crawford & Company (from March 1968 to March 1971); Georgia Farm Bureau Insurance Company (from March 1971 to March 1976); Prudential Insurance Company (from March 1976 to March 1977); Government Employees Insurance Company (from June 1977 to June 1979); Dairyland or Sentry Insurance Company (from June 1979 to June 1980); the Moore Group (from June 1980 to January 1986); Gulf Insurance Co. (from January 1986 to December 27, 1988); and AI Transport (December 27, 1988 to present).FN11 Thus, Smith had associate's, bachelor's, and graduate degrees, no law school training, and seven employers in the twenty years **\*1042** between his discharge from the army and beginning to work for AIGCS.

FN10. *See* Smith Dep. at 14-15.

FN11. *See* Smith Dep. at 17-31.

*Graham Wiggins:* Wiggins graduated from Tuskegee Institute with a bachelor's degree and attended Emory Law School for one year before leaving without graduating.[FN12] After leaving law school, Wiggins worked at Delta Airlines as a fueling agent, starting in Fall 1969, for 6 months. His insurance career included working at Allstate Insurance Co. (from February 1970 to 1974), Maryland Casualty Co. (from 1974 to 1978), and Gulf Insurance Co. (from 1978 to 1988), before beginning to work at AI Transport in 1988.[FN13] Thus, Wiggins had a bachelor's degree, one year of law school, and three employers in the 18 years of his insurance career before beginning to work for AIGCS.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 37
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

FN12. *See* Wiggins Dep. at 15-16.

FN13. *See* Wiggins Dep. at 16-22, 26.

In 1992, the applicants applied to transfer from AI Transport to sister company AIGCS. After applying, the applicants were each interviewed by both Jim Wogsland and Ward Turnquist for the position of casualty claims manager. After the interviews, Chapman was informed that he had not been hired for the casualty claims manager position, while the other four men were hired for a variety of positions: Jones for a complex director position (in March 1993); Sevillian for a fast track manager position (in October 1992); Smith for a casualty claims specialist position (in October 1992); and Wiggins for the casualty claims manager position (in October 1992).[FN14]

FN14. *See* Jones Dep. at 116-22; Sevillian Dep. at 51; Smith Dep. at 85-86; Wiggins Dep. at 67-70.

### II. Analysis

#### A. Summary Judgment Standard of Review

Reviewing the briefs in this case and listening to the oral arguments, I was struck by the sense that defense counsel appeared to be arguing from a different procedural posture than the one actually at issue in this case. With a large number of material issues of fact, defense counsel often hypothesized-making assumptions or raising inferences from the evidence to fill gaps in the record.[FN15] Counsel's hypothesizing may have been appropriate and even persuasive in a case where he was arguing against summary judgment granted in Chapman's favor or was seeking to preserve a trial verdict in Defendants' favor, because the standard of review in those situations would require us to make all reasonable inferences in favor of Defendants.[FN16] However, because this case involves a grant of summary judgment awarded to *Defendants,* we are obliged to draw all reasonable inferences in favor of **\*1043** Chapman. *See, e.g., Taylor v. Runyon,* 175 F.3d

861, 866 (11th Cir.1999).[FN17]

FN15. As I discuss in more detail, these hypotheses include: (1) defining the term "recent"; (2) justifying why Wogsland reviewed Smith's performance evaluations but not Chapman's; (3) assuming that Chapman must have been "mistaken" when he said that he thought that he interviewed with Wogsland before interview with Turnquist because Turnquist was just a "screening interview"; (4) claiming that Wogsland had viewed Sevillian's interview as being better than had Turnquist; and (5) claiming that either Wogsland or Turnquist considered Jones, Sevillian, or Smith's job history as stable or as better than Chapman's.

FN16. *See, e.g., Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988) ("A court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. An appellate court applies this same legal standard when a party appeals an adverse summary judgment ruling.") (citations omitted); *Morro v. City of Birmingham,* 117 F.3d 508, 513 (11th Cir.1997) ("In reviewing the sufficiency of the evidence to support the jury's verdict, we draw all reasonable inferences in favor of the non-movant, in order to determine 'whether or not reasonable jurors could have concluded as this jury did based on the evidence presented.' ") (citations omitted).

FN17. As a matter of description, the majority is correct in stating that courts in this circuit are not reluctant to grant summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment in employment discrimination cases. Indeed, because of the burden-shifting test applied in such cases, it would not be unreasonable to surmise that a significant majority of employment discrimination cases end with summary judgment granted to the defendants. That said, I emphasize a limit on the majority's statement as a *prescriptive* matter. It is true that, where an employer meets its burden of producing at least one justification that is both legitimate and nondiscriminatory and the employee fails to produce evidence tending to demonstrate pretext, then courts should not only be open to granting summary judgment, but, instead, *must* grant summary judgment as a matter of law. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir.1998). However, where the employee produces evidence tending to demonstrate pretext, courts should proceed cautiously before granting summary judgment to the employer. Like the majority, *see* majority op. at 1025 n. 11, I recognize that the Supreme Court has rejected a *per se* rule stating that a showing of a *prima facie* case and of pretext is sufficient to survive a motion for judgment as a matter of law (and, inferentially, a motion for summary judgment), *see Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000), but the Supreme Court also admonished that, in many cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated,"*id.* Before granting summary judgment to an employer where the employee has offered evidence tending to establish pretext, courts must carefully balance a "number of factors," including at least the following: "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a law." *Id.* Like the Supreme Court, I see no need to discuss further the rules for when a *prima facie* case, plus pretext, is insufficient to survive a motion for judgment as a matter of law because this case does not present that situation.

*B. Standards for Assessing a Summary Judgment Motion in Employment Discrimination Case*

Like the majority, I assume that the burden-shifting test first announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to discrimination cases filed under the ADEA. *See Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000). Applying that familiar test to this case, Chapman is required to establish as his *prima facie* case that he was a member of the class protected by the ADEA (i.e., was at least 40 years old at the time that he was denied promotion, *see* 29 U.S.C. § 631(a)), that he applied for one or more positions for which he was qualified, that he did not receive any of the positions for which he applied, and that substantially younger employees who were equally or less qualified than Chapman received the positions.[FN18] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once Chapman establishes his *prima facie* case, the burden then shifts to Defendants to produce at least one "legitimate, nondiscriminatory reason" for not selecting Chapman for each of the positions for which he applied. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If Defendants fail to produce a legitimate, nondis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 39
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

criminatory reason for failing to hire Chapman, then "the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If Defendants produce admissible evidence setting forth at least one **\*1044** legitimate, nondiscriminatory reason for their rejection of Chapman, the burden shifts back to Chapman to proffer evidence tending to show that the reasons offered by Defendants were pretextual, *i.e.,* "not the true reason[s] for the employment decision." *Id.* at 255-56, 101 S.Ct. at 1094-95. To this point, the majority and I agree on the substance of the law. However, I must clarify several issues.

> FN18. *See Bogle v. Orange County Board of County Comm'rs,* 162 F.3d 653, 656-57 (11th Cir.1998); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997) (listing elements of *prima facie* case for discriminatory failure to promote claim).

*1. The PrimaFacie Case and the Four Younger Applicants*

At no time at summary judgment or on appeal have Defendants challenged Chapman's *prima facie* case as to *any* of the four positions given to Jones, Sevillian, Smith, and Wiggins. Indeed, at summary judgment, *no* section of either Defendants' statements of undisputed material facts or their memoranda in support of summary judgment even addressed Chapman's *prima facie* case as to the applications for employment with AIGCS.[FN19] Instead, Defendants addressed only the second of the three *McDonnell Douglas* steps, *i.e.,* by offering justifications for hiring *Wiggins* instead of Chapman.[FN20] However, as to *Jones, Sevillian, and Smith,* Defendants only stated that Chapman "was not considered for the positions filled by Sevillian, Jones, and Smith"-but offered no justification for their decision not to consider him for those positions.[FN21] It is axiomatic that an argument not raised before the trial court or on appeal has been waived. *See Campaign for a Prosperous Georgia v. SEC,* 149

F.3d 1282, 1287 (11th Cir.1998) (holding that issue not raised on appeal is abandoned); *Depree v. Thomas,* 946 F.2d 784, 793 (11th Cir.1991) (holding that issue not raised before district court is waived). Accordingly, like the majority, I will consider the *prima facie* case as to each of the four employees to be undisputed and will analyze the justifications and pretext showings as to each of the four employees.

> FN19. *See* R6-72, R6-73.

> FN20. *See* R6-72 (Stmt. of Undisputed Facts) at 3, 5-6.

> FN21. R6-72 (Stmt. of Undisputed Facts) at 2-4. As discussed below, this justification is not only insufficient but is actually evidence of discrimination. Additionally, a review of the passage of deposition cited by Defendants to support their claim that they did not even consider Chapman for positions other than the claims casualty manager position shows that Wogsland, based on his knowledge of Chapman's resume and of the positions available at the time of the 1992 interviews, acknowledged that it was possible that Chapman was qualified for a number of positions open at that time, including, without limitation, the fast track claims manager position. *See* R5-70-Ex. I (Wogsland Dep.) at 186-90.

*2. Subjectivity and the Legitimacy of Nondiscriminatory Reasons*

At the outset, I must emphasize what my argument does and does not embrace. By suggesting the position that subjective reasons are *per se* illegitimate and then countering it, the majority erects a straw man and then topples it. That position, however, is neither one which I advocate nor one which I need to advocate in order to justify the conclusion that summary judgment was improvidently granted in this case. Admittedly, it would be difficult to justify a claim that subjective reasons are *always* inappro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                Page 40
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

priate; my true position, instead, rests upon two venerable principles adopted in case after case by this circuit, as well as by many others.

First, courts have examined and should continue to examine subjective reasons with higher scrutiny than objective reasons. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir.1998) (rejecting subjective criteria that "are too subjective to allow for any meaningful comparison between" applicants and observing that such subjective criteria "cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion").[FN22] Notwithstanding the majority's***1045** disagreement with this principle, its wide acceptance rests upon sound logic. Subjective reasons, by their very nature, often serve to mask discrimination.[FN23] *See Roberts v. Gadsden Mem'l Hosp.,* 835 F.2d 793, 798 (11th Cir.1988) ("[I]nformal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria."); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir.1985) ("This circuit has frequently noted ... that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another.").[FN24] Thus, "[w]hile there is nothing inherently wrong with allowing decision makers to base decisions on subjective criteria," it is reasonable to scrutinize strictly decisions based on such subjective criteria, which " 'provide a ready mechanism' " for discrimination. *Carter,* 132 F.3d at 644 (quoting *Miles,* 750 F.2d at 871).

FN22. *See also Howard v. BP Oil Co.,* 32 F.3d 520, 526 (11th Cir.1994) (Moreno, J.) (stating in case where the employer "seeks individuals with managerial, business and interpersonal skills and prefers people with prior experience in the petroleum industry" that "[w]e view these subjective and *ad hoc* criteria with greater scrutiny than we would if BP strictly followed written criteria."); *Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1010-11 (11th Cir.1984) ("[T]he nature of the defendant's selection process and of the reasons that he offers affects the weight of his burden. Where the reasons that the employer offers for rejection are based on purely subjective factors, the defendant's burden is greater.").

FN23. As I discuss below, this tendency is exacerbated where the subjective reason corresponds with discriminatory stereotypes.

FN24. *See also Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1298 (D.C.Cir.1998) (*en banc* ) ("Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination."); *McCullough v. Real Foods, Inc.,* 140 F.3d 1123, 1129 (8th Cir.1998); *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1510 (10th Cir.1997); *Lilly v. Harris-Teeter Supermarket,* 842 F.2d 1496, 1506 (4th Cir.1988); *Sweeney v. Research Found. of SUNY,* 711 F.2d 1179, 1185 (2d Cir.1983).

The second principle is that subjective reasons, like any other reason offered pursuant to the *McDonnell Douglas* test, must be legitimate, as well as nondiscriminatory. In this context, "legitimate" does not refer to the moral value of the nondiscriminatory reason, for "a defendant may ... [refuse to promote] an employee for a good or bad reason without violating federal law." *Damon,* 196 F.3d at 1361. Rather, "legitimate" refers to the requirements in *Burdine* that "[t]he explanation provided must be legally sufficient to justify a judgment for the defendant" and that the defendant must "frame the factual issue with sufficient clarity so that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                          Page 41
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

plaintiff will have a full and fair opportunity to demonstrate pretext." 450 U.S. at 255-56, 101 S.Ct. at 1094-95.[FN25] In judging whether a subjective reason is legitimate, we have required that it be "capable of objective evaluation." *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500 (11th Cir.1985). *See also Miles,* 750 F.2d at 871 ("[S]ubjective and vague criteria may be insufficient reasons given by an employer for its failure to [ ]hire because such criteria do not allow a reasonable opportunity for rebuttal.").[FN26] Thus, "the mere statement*1046 that the [employer] selected the 'best qualified' would be insufficient to satisfy the *Burdine* requirements" because such a statement "leaves no opportunity for the employee to rebut the given reason as a pretext," while a claim that the person selected was better qualified by virtue of his or her "seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination of them" may be sufficient to satisfy the *Burdine* requirements. *Increase Minority Participation by Affirmative Change Today of Northwest Fla., Inc. v. Firestone,* 893 F.2d 1189, 1194 (11th Cir.1990).[FN27]

> FN25. As I discuss throughout the next section, defense counsel has offered many hypotheses not supported by admissible evidence. In addition to requiring that the nondiscriminatory reason be established "through the introduction of *admissible evidence,"Burdine* also makes clear that "[a]n articulation not admitted into evidence will not suffice. Thus, *the defendant cannot meet its burden merely* though an answer to the complaint or *by argument of counsel,*"450 U.S. at 255 & n. 9, 101 S.Ct. at 1094 & n. 9 (emphasis added).

> FN26. Interestingly, it was recently suggested that we should reject a sexual harassment plaintiff's subjective perception of her supervisor's conduct, partly because of:

> the problem of perception prevarication.

An employee who makes up or exaggerates a description of objective conduct runs a risk of being found out that is greater than the risk run by an employee who is attempting to make a case based upon her subjective impressions. There is more temptation to exaggerate, to "puff," to put subjective spin on the facts. A plaintiff describing her subjective impressions can say that while her supervisor's conduct might have appeared neutral to some, she felt, believed-just knew-it was lecherous.

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1256 (11th Cir.1999) (*en banc* ) (Carnes, J., conc.), *cert. denied,* 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). This opinion also noted the difficulty that a supervisor would have "to rebut testimony about those perceptions." *Id.* I am incapable of finding any reasoned justification for rejecting wholesale the subjective perceptions of sexual harassment plaintiffs, while rendering unassailable the equally subjective perceptions of age discrimination defendants. At oral argument, defense counsel attempted to distinguish between the two situations by noting that the burden of persuasion remains with the plaintiff throughout all employment discrimination cases. As true as this statement is, it does not remedy my quandary, for the *burden of production,* as shifted to the defendants under *McDonnell Douglas,* still requires the defendants to proffer a legally sufficient reason. *Burdine,* 450 U.S. at 255-56, 101 S.Ct. at 1094-95. The reasoning offered in the *Mendoza* concurrence offers one explanation of why subjective perceptions should not be considered legally sufficient unless based on objective evidence.

229 F.3d 1012                                                                                                Page 42
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

FN27. *See also Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir.1981) (concluding that reason offered was legally sufficient where it could be "objectively evaluated" and noting that "[t]he fact that satisfaction of job performance criteria is judged by an employee's superiors does not necessarily warrant the inference that the evaluations are subjective").

In this case, my general concerns with subjective reasons are exacerbated by the fact that Defendants' proffered reasons correspond strongly with the very stereotypes that the ADEA was designed to combat. A stereotype of older persons is that they are not "aggressive," such that employers frequently identify younger workers as "aggressive" and, thus, more desirable than older workers. *See, e.g., Damon*, 196 F.3d at 1362 ("Soto's remark to Kanafani's younger successor, D'Angelo, right after Kanafani was terminated, that Soto wanted 'aggressive, young men' like himself to be promoted is highly suggestive circumstantial evidence from which a jury could infer discriminatory animus.... The comment also arguably suggests that Soto had an ageist preference for young managers."; reversing grant of summary judgment in favor of employer).[FN28] It is *1047 interesting how often in the case law the words "young" and "aggressive" are linked together by defendant employers. The very frequency of this conjunction supports the conclusion that "aggressive" is a sign of "age bias, i.e., ... the assumption that older employees lack the aggressive and competitive disposition likely to be possessed by younger employees...." *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 n. 2 (2d Cir.1994). Where courts have found that summary judgment for the employer is appropriate in the face of such comments, their conclusion was more likely to be *in spite of* the comments, rather than *because of* the comments. *See, e.g., id.*(noting that some of the other cited comments demonstrated neutral concerns). This is because of the purposes behind the ADEA:

FN28. *See also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1553 (11th Cir.1988) (reversing judgment notwithstanding the verdict granted to employer where manager had made various statements indicating that he "believed that the older employees lacked an aggressive approach to business, that they were part of the 'cancer' and the 'malaise' that existed at the Sarasota plant, that the older employees were 'set in their ways,' that 'they were the reason that the business wasn't going forward,' and that 'they would have to be replaced with younger people' in order for the company's business to progress"); *Warter v. Bergen-Brunswig Corp.*, 162 F.3d 1171 (table) (9th Cir.1998) (finding that comments "that the company wanted to hire 'fresh, young blood,' and 'young, aggressive, recent college graduates' ... are in themselves sufficient to support a jury verdict") (unpublished opinion cited solely for persuasive value); *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 53 (2d Cir.1998) (reversing grant of summary judgment to employer where supervisor requested chart of employees' ages, called older workers "old fogies" in Yiddish, and commented on the plaintiff's evaluation that plaintiff lacked "aggressive initiative to get new business"); *Boehms v. Crowell*, 139 F.3d 452, 457 (5th Cir.1998) (affirming district court's finding of age discrimination; rejecting defendant's claim "that Boehm's' nonselection [for promotion] was due to his negative 'approach to organizational change' and his lack of an 'aggressive and proactive leadership style' " and defendant's argument "that its business judgment in this regard should not be disturbed"); *Washington v. Honeywell, Inc.*, 94 F.3d 654 (table) (9th Cir.1996) (reversing grant of summary judgment to employer where "a manager allegedly told Washington that Honeywell 'liked to pro-

229 F.3d 1012                                                                 Page 43
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

mote aggressive younger people' "; stating that the manager's alleged statement "went to the heart of the claim") (unpublished opinion cited solely for persuasive value); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 306 (3d Cir.1983) (reversing grant of summary judgment based on timeliness where employer made a belated explanation that the plaintiff was not hired because the employer "had needed someone 'aggressive,' someone 'vigorous,' someone with a background that could handle chemical problems at some of the mills.' ").

It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.... Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.
*Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (citation omitted). Accordingly, rather than accepting wholesale the claim that Chapman did not appear "aggressive" as an adequate justification for rejecting his application for employment, we should, as with gender discrimination, be suspicious of employers' evaluations of a given employee's level of aggressiveness.[FN29] This is no less true in the area of age discrimination. *Cf. Aka,* 156 F.3d at 1298 ("[W]e cannot altogether ignore the fact that outward manifestations of 'enthusiasm' are just the kind of traits that advancing age and heart-related disability may tend to diminish.").

> FN29. *See, e.g., Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 60-61 (1st Cir.1999) (" 'In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.' ...The concept of 'stereotyping' includes not only simple beliefs such as 'women are not aggressive' but also a host

of more subtle cognitive phenomena which can skew perceptions and judgments.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 249, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *superseded by statute on other grounds as stated in Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)); *Pivirotto v. Innovative Sys.,* 191 F.3d 344, 355 (3d Cir.1999) (citing *Price Waterhouse* for proposition that "an employer may act on gender-based stereotypes, firing women it perceives as not feminine enough (or as too feminine), or discharging women who are too aggressive while not doing the same to male employees"); *Hopkins v. Price Waterhouse,* 920 F.2d 967, 973 n. 3 (D.C.Cir.1990) (quoting with approval Radford, *Sex Stereotyping and the Promotion of Women to Positions of Power,* 41 Hastings L.J. 471, 533 (1990): "Obviously, in cases such as *Hopkins,* in which the legitimate reason articulated by the employer was of such a subjective nature as to itself invite stereotyping, the employer bears the additional burden of showing that the stereotyped attitudes did not so pervade the subjective evaluation as to destroy the articulated reason's legitimacy. In cases in which such subjective factors as 'interpersonal skills' are offered as the determining cause for the negative employment decision, Justice Brennan's mandate in *Hopkins* [490 U.S. at 252, 109 S.Ct. at 1791] that 'the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive' should be adopted.' ").

Applying these principles, I come, not to the conclusion that subjective reasons are *1048 *per se* illegitimate, but to the conclusion that subjective reasons, like other reasons offered pursuant to *Burdine,* must be given weight according to their legal sufficiency. Some subjective reasons, those

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                      Page 44
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

which cannot be objectively evaluated and/or are vague, should be accorded no weight. Other subjective reasons, such as those that are premised on stereotypes, should be scrutinized strictly.[FN30] Subjective reasons, like objective reasons, should be evaluated based on the evidence offered in their support and the context in which those reasons arose. For example, courts have been more willing to accept subjective reasons where specific criteria existed prior to the adverse employment action. *See, e.g., Carter,* 132 F.3d at 643 (reversing summary judgment in part because of poorly drafted criteria); *Miles,* 750 F.2d at 871-72 (noting that lack of preexisting criteria tends to weaken the value of a subjective evaluation). Similarly, courts have been more willing to accept subjective reasons where evidence preexisting the litigation supports those reasons. *See, e.g., Aka,* 156 F.3d at 1298 (noting that lack of note on interview summary regarding plaintiff's alleged lack of enthusiasm weakened subjective evaluation). Thus, a subjective reason that is clear and specific, is capable of objective evaluation, is not premised on a stereotype, is consistent with clear criteria that preexisted the adverse employment action, and was documented at the time of the adverse employment action and before litigation is initiated should be accorded more weight than a subjective reason that does not meet all of those factors.

> FN30. While the majority expresses concern that the approach outlined by me and adopted by other courts would stymie employers' attempts to hire people with desirable, but potentially stereotypical, traits, this approach, in reality, would not have that result. I do not deny that some characteristics, such as physical strength, may simultaneously be both "valuable and much sought after" traits *and* consistent with stereotypes, nor do I seek to preclude employers from attempting to hire employees with such traits. Majority Op. at 1036. Where, however, such traits are used as criteria, it is especially important that an

employer's subjective perception of an applicant with regard to such traits be supported by objective evidence. For instance, with the majority's example of physical strength, sheer reliance on gender stereotypes would be insufficient, but the employer would be able to rely on perceptions grounded on objective evidence, such as weight-lifting tests.

*3. Distinguishing Between the Business Judgment Rule and Challenges to the Credibility of Proffered Nondiscriminatory Reasons*

The majority, like Defendants, contends that a number of the arguments raised by Chapman, *e.g.,* regarding the job instability of other candidates over their entire careers, contravene a long line of cases that protect an employer's business judgment from being second-guessed by judges or by juries.[FN31] This argument miscomprehends Chapman's claims, as well as the points made in this dissent. While the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) ("The inquiry of the ADEA is limited to whether [the defendant's decision makers] *believed* that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge...."). A showing that Wogsland and Turnquist acted inconsistently would tend to establish that they lack credibility. *Cf. Williams v. City of Valdosta,* 689 F.2d 964, 975 (11th Cir.1982) (reversing**1049** grant of new trial to employer in First Amendment demotion case despite employer's legitimate justification that employee had not passed a promotional exam where the employer's "adherence to its formal promotional policy was inconsistent and arbitrary at best" because "[t]his inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out [the plaintiff] for unfavorable treatment."). Accordingly, while the business judgment

rule protects Defendants against claims that their reasons are *imprudent,* it must not be used to shield Defendants against colorable claims that their reasons are *non-credible.*

> FN31. *See, e.g., Damon,* 196 F.3d at 1361("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1501 (11th Cir.1991) ("[W]e do 'not sit as a super-personnel department that reexamines an entity's business decisions.' ") (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)).

*4. Pretext Where the Defendant Offers Multiple Reasons for its Actions*

We noted in *Combs* that "[p]rovided that the record evidence would permit a reasonable factfinder to reject *each* of [the employer's] proffered explanations for its decision, the case properly was submitted to the jury for a decision on the ultimate question of intentional discrimination." 106 F.3d at 1539 (emphasis added). As a general rule, I agree with the concept that, where an employer offers multiple legitimate, nondiscriminatory reasons for its challenged action, the employee must proffer evidence that shows pretext as to *each* of the proffered reasons. However, I also agree with other circuits that there are limits to this general rule. The Third Circuit, addressing this question, stated:

We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a

factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*Fuentes v. Perskie,* 32 F.3d 759, 764-65 n. 7 (3d Cir.1994); *see also Narin v. Lower Merion Sch. Dist.,* 206 F.3d 323, 332-34 (3d Cir.2000) (discussing *Fuentes* ). Similarly, the Seventh Circuit has observed that

under the established law of this circuit, the existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested.... [H]owever, we have indicated that this analysis ought not be followed when the grounds that are offered are so intertwined or the pretextual ground for one of them so strong that a reasonable jury, hearing all the proffered grounds, could find for the plaintiff on the discrimination issue.

*Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 399 (7th Cir.1998) (citing *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 920 (7th Cir.1996) and *Russell v. Acme-Evans Co.,* 51 F.3d 64, 69-70 (7th Cir.1995)). The Sixth Circuit, citing the Seventh Circuit's *Russell* decision, has observed "that an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire" such that "a multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate." *Smith v. Chrysler Corp.,* 155 F.3d 799, 809 (6th Cir.1998).

I find persuasive these cases and the reasoning applied in them. While the general rule requiring an employment discrimination plaintiff to demonstrate pretext as to each and every legitimate, nondiscriminatory reason offered by the employer is reasonable in the majority of cases, that general rule fails when applied *1050 to a small percentage of cases.FN32 Demonstrating pretext by "[c]asting doubt on an employer's asserted reasons for an ad-

229 F.3d 1012                                                                          Page 46
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

verse employment action" is an indirect means of demonstrating "that the employer acted with the forbidden animus." *Taylor,* 175 F.3d at 867; *see also Wolf,* 77 F.3d at 919 ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action' ") (quoting *Russell,* 51 F.3d at 68); *Black's Law Dictionary* 1206 (7th ed.1999) (defining "pretext" as "[a] false or weak reason or motive advanced to hide the actual or strong reason or motive"). The reason why we have the general rule requiring an employment discrimination plaintiff to dispute each proffered reason is that, where at least one independent justification for the challenged employment action remains unscathed after the plaintiff attempts to establish pretext, a jury could not presume by the failure of another independent justification that the real motivation was discriminatory animus. *See Russell,* 51 F.3d at 69. This accords well with common sense, for, if the inference of discriminatory animus arises from the failure of all legitimate reasons offered by the defendant, then the inference is inappropriate where one or more legitimate reasons remain unrebutted. However, common sense also counsels that there are some situations where the failure of one proffered reason may affect the reliability of other proffered reasons. Like the Seventh Circuit, I believe that logic tells us that, where two legitimate reasons proffered by an employer are intertwined, the employee's showing of pretext as to one of those reasons may (but not always will) [FN33] sufficiently weaken the other reason so as to preclude a grant of summary judgment to the employer. *See Russell,* 51 F.3d at 70. Similarly, it is reasonable, where the showing of pretext as to one reason is sufficiently strong as to permit a jury to find that the employer (or its decisionmaker) lacks all credibility, to conclude that summary judgment is inappropriate-even without a specific showing of pretext as to another reason. *See id.* I likewise find persuasive the reasoning of the Third and Sixth Circuits where they find that the proffering of a large number of arguably pretextual reasons may cast sufficient doubt on the remainder of the proffered reasons, such that sum-

mary judgment should be denied. *See Smith,* 155 F.3d at 809; *Fuentes,* 32 F.3d at 764 n. 7. This is but common sense: if a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is *non-credible,* and should not be believed as to other issues, is a reasonable one.

> FN32. Indeed, as the various cases discussing this exception to the general rule illustrate, the percentage of cases affected by the exception is quite small. *See Narin,* 206 F.3d at 332-34 (holding that exception did not apply under the facts presented in that case); *Smith,* 155 F.3d at 809 (same); *Adreani,* 154 F.3d at 399 (same); *Wolf,* 77 F.3d at 923 (same); *Russell,* 51 F.3d at 70 (same). *But see Aka,* 156 F.3d at 1298 (holding that, where "a jury could find that Aka was in all other respects markedly better qualified for the job" for which he had applied, that the interviewer's claims that she subjectively viewed the applicant's interview as poor should be submitted to the jury for a credibility assessment).

> FN33. This would require a factual analysis as to how intertwined the reasons were. *See, e.g., Adreani,* 154 F.3d at 399 (analyzing whether the reasons were sufficiently intertwined to permit application of the "so intertwined" exception to the rule that the plaintiff must show pretext as to each separate reason).

The D.C. Circuit, sitting *en banc,* has suggested a fourth exception to the general rule: where an employer offers an objective reason for its employment action (*e.g.,* that the plaintiff was less qualified than the person hired instead of the plaintiff) and a subjective reason (*e.g.,* that the plaintiff failed to show "enthusiasm" or "interest"), the fact that the plaintiff has offered evidence establishing pretext as to the objective reason creates a question for **\*1051** the jury as to the disputed [FN34] subjective assessments. *See Aka,* 156 F.3d at 1298-99. This,

229 F.3d 1012                                                                    Page 47
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

like the other exceptions suggested by the Third, Sixth, and Seventh Circuits, accords well with common sense. When a reason is subjective, its validity depends entirely on the credibility of the witness offering the reason. Where that credibility has been compromised, a jury could reasonably conclude that the subjective reason offered by the witness is not credible or, in other words, that the subjective reason "was untrue-indeed, a lie." *Id.*

> FN34. It is true that Aka, unlike Chapman, specifically disputed the subjective assessment of his interviewer. *See Aka,* 156 F.3d at 1298 ("Aka claims that he, too, expressed enthusiasm at his interview...."). I believe that this is a distinction without a difference. If the only evidence in support of Chapman's claim was that he had said that his interviews went well, that he was aggressive during his interviews, and that he offered sharp and concise answers, it seems unlikely that a majority of judges on this court would conclude that he had raised a genuine dispute regarding a material fact. Indeed, subjective perceptions of an employee, without more, are insufficient to survive summary judgment. *See, e.g., Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997) (adopting reasoning of district court summary judgment order); *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir.2000); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994); *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980) (stating that the employee's "perception of himself ... is not relevant. It is the perception of the decision maker which is relevant"). Indeed, in *Aka,* the dissent challenged Aka's disputation of the subjective assessment on the ground that he had "offered no evidence that he was more enthusiastic than [the successful applicant] Valenzuela at the interview." 156 F.3d at 1298 n. 19. Even more to the point, Defendants raised this same ground

at summary judgment by stating that "Plaintiff's good opinion of his qualifications is not sufficient to defeat summary judgment." R9-90-Ex. A at 11. Because the only real means to challenging Wogsland and Turnquist's subjective assessments of the interview is to challenge their credibility, I conclude that it would not only be insufficient for Chapman to counter their claims with his own subjective assessments, but that it is also futile and, thus, unnecessary for him to do so.

Additionally, I am concerned that if we follow the suggestion of Defendants and refuse to adopt these reasonable exceptions, we will have created a blueprint for evasion. This hoary term is perhaps overused, but it is in this case an appropriate one. If a defendant can offer with impunity a slew of nondiscriminatory reasons in a summary judgment motion, with the knowledge that a strong showing of pretextuality as to 99% of them would be irrelevant as long as but one survives unscathed, then employment discrimination cases will be, for all practical purposes, precluded. This problem is exacerbated where the one reason that survives the onslaught is a purely subjective one. If we do not apply the reasonable exceptions adopted by the other circuits, employers will be encouraged to throw their reasons like mud at a wall-with the certainty that one of those reasons will stick because of the unlikelihood of the plaintiff being able to prove that the purely subjective perception of the decisionmaker was dishonest without referring to the proof that other reasons offered were pretextual.

For all of the above reasons, I would adopt the Third, Sixth, Seventh, and D.C. Circuits' exceptions to the general rule of requiring a plaintiff to rebut each proffered reason. In addition to their internal logic, these exceptions are consistent with the Supreme Court's admonition that the *McDonnell Douglas* test "was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in

229 F.3d 1012                                                                                                    Page 48
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

light of common experience as it bears on the critical question of discrimination.' " *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

*5. Multiple Ways of Disputing Nondiscriminatory Reasons*

Just as "there is more than one way to skin a cat," there is also more than one *1052 way for a plaintiff to challenge a defendant's proffered nondiscriminatory reasons. *See Reeves,* 120 S.Ct. at 2108 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). As the Supreme Court stated in *Burdine,* once a defendant proffers legitimate, nondiscriminatory reasons, a plaintiff may dispute those reasons by showing "that she has been the victim of intentional discrimination ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256, 101 S.Ct. at 1095. I mention this principle not because I believe that the majority disputes it, but because Chapman's attack on Defendants' proffered reasons involves not only challenges to the credibility of the reasons offered, but also a showing of disparate treatment that is relevant to the ultimate question of whether a discriminatory reason more likely motivated Defendants in their decision not to hire Chapman than did the proffered reasons.

*6. Conclusion*

In conclusion, the majority and I approach this case from a similar, yet not identical, perspective. Applying these principles to the summary judgment record, I find a large number of disputed facts and

factual claims not supported by the record. Accordingly, I turn to a close review of the summary judgment record.

*C. Gaps and Inconsistencies in the Record*

*1. "Recent"*

Turning first to the claim that Chapman was rejected because of his "recent" [FN35] history*1053 of job skipping, I note that "recent" is not a clear term with a definite timeframe attached. In arguing that we should defer to the definition used by Wogsland in evaluating Chapman, Defendants allude to a 10-year timeframe before the 1992 interviews-but, of necessity, their allusions are without record citations because record citations to a definition do not exist. [FN36] An exhaustive search of the record shows that neither Wogsland nor Turnquist *ever* defined "recent." Thus, when asked at oral argument if the record included a definition of "recent," defense counsel could only argue that "recent" implicitly was "the period when plaintiff switched jobs." Not only is this definition without record citation and hypothetical, [FN37] but the fact remains that defense counsel has now offered two different definitions of "recent": ten [FN38] years before the 1992 interviews and a fuzzy period including the time between Chapman's employment with Home and his employment by AIGCS. There is no reason that we should privilege these periods of time over another reasonable definition of "recent"-for they are not definitions provided by the record.

> FN35. The majority asserts that the actual "job history" reason for Defendants' decision not to hire Chapman was his lack of job stability during a "specified" time period-not the recency of that period. *See, especially,* Majority Op. at 1033, n. 24. This conclusion fails for a number of reasons. First, Wogsland stated in his deposition that one of the reasons supporting his decision not to hire Chapman was "the lack of *recent* stability in job positions prior to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

joining AI Transport." R7-79-Ex. H (Wogsland Dep.) at 134 (emphasis added). This statement, which the majority attempts to gloss over, *see* Majority Op. at 1033, n. 24, is not only part of the summary judgment record, but it is a statement primarily relied upon by Defendants on appeal. *See* Brief of Defendants/Appellees at 31-32 n. 11; *En Banc* Brief of Defendants-Appellees at 2, 4. Second, the quote upon which the majority relies for its conclusion regarding Defendants' "job history" reason merely states that Wogsland and Turnquist had "questions" about Chapman's job history during that time period. *See* R8-81-Ex. B (Wogsland Dep.) at 111 (quoted in Majority Op. at 1033, n. 24). In that quote, unlike in his statement regarding Chapman's "recent" job history, Wogsland does not say that these questions were a basis for his job decision. Of course, I do not dispute that this statement *explains* Wogsland's subsequent statement that he relied on Chapman's lack of "recent" job stability in making his decision not to hire Chapman. Rather, I recognize that the mere fact that an employer had "questions" about an applicant does not mean that the employer rejected the applicant because of those questions. Additionally, while the majority may not believe that Defendants' "job history" explanation relies upon Wogsland's characterization of Chapman's alleged job instability as "recent," Defendants on appeal not only did not make the argument on which the majority focuses but, instead, they repeatedly emphasized the "recent" aspect of their "job history" reason. *See, e.g.,* Brief of Defendants/Appellees at 31 n. 11 ("*recent* history of job skipping") (emphasis in original); *id.* at 32 (asserting that Chapman "had two strikes against him: he interviewed poorly *and* had a recent history of job skipping") (emphasis in original); *En Banc* Brief of

Defendants-Appellees at 2 (stating that, in addition to Wogsland's perception of Chapman's interview, "Wogsland also was concerned about plaintiff's *recent* work history, which suggested a tendency to change jobs fairly often") (emphasis in original); *id.* at 3 ("More recently, though, plaintiff began job skipping"); *id.* at 4 (" '*recent* stability in job positions' ") (quoting Wogsland Dep. at 134 and adding emphasis); *id.* at 25 (discussing Wogsland's decision to "look[ ] at *recent* histories") (bracketing added) (emphasis in original); *id.*(asserting that Chapman "had more *recent* job changes than any comparative") (emphasis in original); Appellee's Supplemental Letter-Brief of July 21, 2000 at 2 ("*recent* work history") (emphasis in original); *id.* at 3 (stating that Defendants' judgment was "that recent job stability is important"); *id.*(explaining focus "on more recent events"). Beyond the fact that our precedent holds that an issue not raised on appeal is deemed to be abandoned, *see Campaign for a Prosperous Georgia,* 149 F.3d at 1287, I suspect that Defendants' consistent emphasis on the characterization of Chapman's alleged job instability as "recent" is purposeful. The *only* distinction between Chapman and the three comparators of Jones, Sevillian, and Smith that Defendants have offered on appeal (though not at summary judgment) is that Chapman's period of alleged job instability was more "recent" than were the Jones, Sevillian, and Smith's periods of job instability. In light of their inability to use anything other than timeframe to justify their decision to hire Jones, Sevillian, and Smith instead of Chapman, Defendants were faced with a decision: either rely on the vague, undefined, and inconsistent term "recent" or have *no argument* whatsoever to defend that decision. Indeed, the majority likewise sought to explain away Jones,

229 F.3d 1012                                                                    Page 50
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

Sevillian, and Smith's hiring by relying almost exclusively on that "recent" timeframe. *See* Majority Op. at 1028-34 (relying on timeframe argument and on fact that Jones was hired after Chapman was fired by AI Transport for insubordination). Because, as I discuss in further detail, there is neither evidence in the record indicating either that Wogsland or Turnquist knew of the insubordination or that they relied on that for their decision to hire Jones instead of Chapman nor argument either at summary judgment or on appeal that we should consider that justification, rejection of the "recent" characterization would nullify Defendants' only justification on appeal.

FN36. *See En Banc* Brief of Defendants-Appellants at 25.

FN37. Since one possible theory of pretext in this case is that Wogsland purposely tailored his timeframe of concern in order to justify rejecting Chapman, I suspect that defense counsel regrets suggesting this particular hypothetical definition.

FN38. Indeed, at oral argument, defense counsel suggested a *third* definition of "recent"-namely, 12-13 years before the 1992 interviews. *See also En Banc* Brief of Defendants-Appellees at 6-8. Defendants' *en banc* brief also proffers a *fourth* definition of "recent"-namely, 7 years before the 1992 interviews. *See id.* at 25.

Even worse than the fact that defense counsel has offered us two different, unsupported definitions of "recent" is the fact that Wogsland himself used two different definitions of "recent" in evaluating Chapman. Wogsland stated that he was concerned about "the lack of *recent* stability in job positions prior to joining AI Transport."[FN39] This "recent" time period apparently includes Chapman's employment with Gaines and The Claimsman on Gaines work.

Wogsland also stated that he was "not happy with" the fact that Chapman "had not had any *recent* general liability experience."[FN40] It is undisputed that Chapman gained general liability experience while working with Gaines and *1054 The Claimsman on Gaines work.[FN41] Accordingly, "recent" in the context of general liability experience did not include Chapman's employment with Gaines and The Claimsman. This is troubling, not only in light of the lack of a definition of "recent" in the record, but also because the differing timeframes were selectively applied so as to maximize the harm to Chapman's job application. Indeed, this selective application appears on its face to be "transparently pretextual, and ... to have been tailored to the needs of the occasion." *Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1398 (6th Cir.1990).

FN39. R7-79-Ex. H (Wogsland Dep.) at 134 (emphasis added).

FN40. R7-79-Ex. H (Wogsland Dep.) at 107 (emphasis added).

FN41. *See* R7-79, Ex. E at 2, ¶ 4; Ptf's Ex. 48 to Spann Dep II at D001071 (Turnquist's interview notes which note "GL" for "general liability"); Ptf's Ex. 48 to Spann Dep. at D001072 (Wogsland's interview notes which note "GL" for "general liability").

It may be that defense counsel could persuade a reasonable jury that there is a very good reason for the differing timeframes, or that Wogsland could testify at trial as to a reasonable definition of "recent" that would account for his varying treatment of different aspects of Chapman's job history. But even if we cannot discount those possibilities or may find persuasive the hypothetical definitions offered by defense counsel,[FN42] the procedural posture compels us to conclude that summary judgment was improvidently granted.

FN42. Of all of the hypotheses offered for the definition of "recent," I find least cred-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 51
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

ible the suggestions that measure back ten (or twelve or thirteen) years from the 1992 interviews. Yet Wogsland's testimony at his deposition is clear about only one thing: that his definition of "recent" focused on the time period "*prior* to [**Chapman**] joining **AITransport**." R7-79-Ex. H (Wogsland Dep.) at 134 (emphasis added). Thus, if we (following Defendants' suggestion) measure back ten (or twelve or thirteen) years, we should measure back from 1988, when AIGCS initially hired **Chapman**. As I discuss further, *that* is a period of job instability for other job applicants hired by AIGCS-particularly, Smith.

## 2. "Job-skipping"

It is undisputed that the other applicants each had less experience than did **Chapman**. It is also undisputed that the other applicants each had experienced a number of job changes in their comparatively shorter careers, with Jones having four employers in the eleven years between ending school and starting with **AITransport**, Sevillian having two employers in the eight-plus years between ending school and starting with **AITransport**, Smith having seven employers in the twenty years between leaving the Army and starting with **AITransport**, and Wiggins having three employers in the eighteen years between beginning his career in insurance and starting with **AITransport**.[FN43],[FN44] Thus, while **Chapman** had six employers*1055 over a thirty-one year career prior to starting to work for **AITransport**,[FN45] his average of 5.16 years per employer compares favorably with each of the other four men: Jones (average of 2.75 years per employer), Sevillian (average of 4+ years per employer), Smith (average of 2.86 years per employer), and Wiggins (average of 6 years per employer)-with only Wiggins having a better average of years per employer. And yet, *Chapman* was the only one noted as having job stability problems-and the only one not hired by AIGCS.

FN43. *See* Jones Dep. at 33-36; Sevillian Dep. at 11-17; Smith Dep. at 17-31; Wiggins Dep. at 16-22, 26. In Smith's working career, he held nine jobs in the twenty-three years between graduating from college and starting with AI Transport. *See* Smith Dep. at 17-31. In light of the fact that the second job was with the Army during the mid- to late-sixties, I will measure the relevant time period from his discharge from the Army.

FN44. The majority notes that Chapman did not argue at summary judgment that applicants other than Wiggins had similar or worse histories of job stability. However, a review of the summary judgment record reveals that *Defendants* never raised at summary judgment the claim that applicants other than Wiggins had demonstrated job stability. Indeed, in referring to Wiggins' job history, Chapman was responding to the claim that he was not hired *for the casualty claims manager position* because of his lack of recent job stability. *See* R6-72 (Stmt. of Undisputed Facts) at 3-4, ¶¶ 13, 17-18; R7-79 (Resp. to Stmt. of Undisputed Facts) at 3-4, ¶¶ 13, 17-18. By contrast, the only justification given for not hiring Chapman for any of the positions given to Jones, Sevillian, and Smith is the singularly unilluminating statement that he was not considered for their positions. *See* R6-72 (Stmt. of Undisputed Facts) at 4, ¶ 21. It is true that in attempting to dispute Chapman's claim that he was more qualified than Jones, Sevillian, and Smith, Defendants did cite to the portions of Wogsland and Turnquist's depositions where they justify not hiring Chapman *for the casualty claims manager position,* but they never cite any evidence comparing Chapman to Jones, Sevillian, and Smith-or even any evidence referencing Jones, Sevillian, and Smith's experience or job

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 52
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

history. *See* R8-82 (Stmt. of Undisputed Facts) at 17-18, ¶ 26. Accordingly, if we should not consider Chapman's arguments on appeal about the lack of job stability demonstrated by Jones, Sevillian, and Smith, we should also not consider the arguments to which Chapman is responding: namely, any claims by Defendants that Jones, Sevillian, and Smith are in any way equal to or superior to Chapman. Rather, Defendants should be limited to their decision (unexplained at summary judgment) not to consider Chapman for the positions given to Jones, Sevillian, and Smith. As discussed below, this discriminatory treatment, for which Defendants did not offer any legitimate, nondiscriminatory justification at summary judgment, itself justifies reversing summary judgment and remanding for trial.

FN45. *See* R7-79, Ex. E at 2-4.

The majority (agreeing with the Defendants) argues that relying on these averages usurps the Defendants' business judgment in contravention of a long line of cases. *See, e.g., Damon,* 196 F.3d at 1361; *Alphin,* 940 F.2d at 1501. As I previously discussed, this argument misapplies the business judgment rule by protecting Defendants against attacks on their credibility. *See Elrod,* 939 F.2d at 1470. Where an employer asserts that it was concerned about the job stability of an applicant, the fact that other applicants have a history of job instability but were not penalized for that history tends to demonstrate a lack of credibility. *Cf. Alphin,* 940 F.2d at 1501-02 (discussing business judgment rule and reversing grant of summary judgment to employer where employee proffered evidence tending to show that he was competent in his work and that similarly situated employees had received more favorable treatment). Thus, while merely showing that the employer was mistaken is not sufficient to show pretext, "both the Supreme Court and this court have observed that evidence showing an em-

ployer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting [the] plaintiff was pretextual." *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1340 (11th Cir.2000). I do not dispute that, if a jury finds that Wogsland was sincere in his belief that Chapman's "recent" job history was unstable, then the business judgment rule protects him from the jury second-guessing his asserted conclusion that that job instability merited not hiring Chapman. I merely conclude that, because a reasonable jury could find that Wogsland's treatment of the various applicants' job histories was inconsistent and, therefore, that Defendants' job history justification was pretextual, it is inappropriate for us to take this case out of the hands of the jury. *Cf. Williams,* 689 F.2d at 975 (reversing grant of new trial to employer where the employer's "adherence to its formal promotional policy was inconsistent and arbitrary at best" because "[t]his inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out [the plaintiff] for unfavorable treatment.").

Additionally, there is no evidence, *anywhere,* to indicate that Wogsland or Turnquist judged Chapman's job instability to be worse than either Jones's or Smith's. Indeed, the only evidence of any comparison made between any of the candidates was Turnquist's statement that he "felt [he] had more confidence in Graham [Wiggins] in the way he presented his work history." [FN46] Thus, Defendants' attempt to *1056 protect the "business judgment" of Wogsland and of Turnquist assumes that a business judgment has been made, *i.e.,* that Wogsland and Turnquist actually viewed Chapman's job history to be *worse than* his fellow applicants. It also assumes that Wogsland and Turnquist believed that overall career history was irrelevant or, at least, less important than recent job history. Yet there is no evidence to indicate that they agree with that position or applied it in evaluating the applicants. To the contrary, Turnquist testified that he looked to the "entire work history" of a candidate [FN47] and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 53
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

that his concerns were "not necessarily" focused on the timeframe between Chapman's employment by Home Insurance and his employment by AI Transport but, instead, that he looked at Chapman's entire career.[FN48] Those statements notwithstanding, Turnquist could not recall having any concerns about the stability of *Smith* 's prior employment history, despite the fact that he had worked for *more* employers than Chapman over a *shorter* career than Chapman. As for Wogsland, there is no evidence in the summary judgment record about his beliefs regarding stability of an applicant's entire career.FN49 With no evidence in the summary judgment record explaining why Wogsland and Turnquist apparently ignored the weaknesses in Smith's and Jones's employment histories-or even stating that they had considered their employment histories [FN50]-there has been no "business judgment" demonstrated and, thus, the business judgment rule should not be used to justify a grant of summary judgment.

> FN46. Turnquist Dep. at 79. This quote, in fact, does not even state that Wiggins' job history was more favorable than was Chapman's but, instead, addresses the manner of presentation.

> FN47. The relevant portion of the deposition reads:

> You are asking me to characterize the stability of John's [Chapman's] prior employment by asking about each individual company that he has worked at. *When I evaluate the stability of an applicant I don't look at one company. I look at their entire work history as a group.* The fact that John worked for Home Insurance Company for 16 years is very commendable and it shows stability. The fact that he worked for AI Transport is commendable and it shows some stability. *But if you look at the entire employment history of the applicant you have I believe its seven jobs in that entire work*

*history. Many applicants that we interview have multi employers but not as many as seven and it is a natur[al] question to wonder and to ask an applicant why you had these various job changes over the course of your claims or insurance career. So to answer your question the four years tenure at AI Transport is helpful. It would appear as if John found a home there and he had been with the company for four and a half years which is good. But to characterize his entire employment history one job at a time as being stable, I cannot do that.*

> Turnquist Dep. at 116-17 (emphasis added).

> FN48. The relevant portion of Turnquist's deposition states:

> Q. Is it true that your concerns about Mr. Chapman's stability in his work experience center on the time between his employment at the Home Insurance and his employment at the AIAC?

> A. *Not necessarily just that time frame.*

> Q. What other-what else about his employment background raises a concern about his stability?

> A. The fact that he has been with seven different companies. I'd have to count the companies again but there just seemed to be quite a number of companies that he had been with. One, two, three, four, five, six-AI Transport being the seventh.

> Q. And this is over a 35 year career, correct?

> A. Yes ma'am.

> Turnquist Dep. at 120 (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 54
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

FN49. It is unsurprising that the summary judgment record lacks evidence showing that Wogsland believed Smith's job history to be irrelevant, for Wogsland admitted at trial that Smith's job history "would have been a negative." R22-218.

FN50. Indeed, Smith stated in his deposition that he did not recall Wogsland expressing any concern about job instability or asking why he had stayed with certain employers for short periods of time and that he did not remember Turnquist expressing any concern about Smith's job history. Smith Dep. at 80-81.

Even if we credit the reasoning of the Defendants and use a period of thirteen *1057 years prior to being hired by AI Transport,[FN51] we find the following: four employers for Chapman for an average of 3.25 years per employer; four employers (over eleven years) for Jones for an average of 2.75 years per employer; two employers (over eight plus years) for Sevillian for an average of 4+ years per employer; six employers for Smith for an average of 2.17 years per employer; and two employers for Wiggins for an average of 6.5 years per employer. Thus, of the five applicants, Chapman had the third best average of years per employer over the thirteen years prior to being hired by AIG. Indeed, his average of 3.25 over those thirteen years was superior to Smith and Jones's averages for either their total career *or* the thirteen year sample period. Yet he was still rejected by Defendants as having worse "recent" job stability. Thus, even applying Defendants' theory, and applying the time period arbitrarily suggested by them and the starting point apparently used by Wogsland, I still find disparate treatment and inconsistencies.

FN51. This suggestion is a combination of the time period suggested by defense counsel in their brief, *see En Banc* Brief of Defendants-Appellees at 6-8, and at oral argument, and the starting point testified to by Wogsland, *see* R7-79-Ex H (Wogsland

Dep.) at 134 (looking at "lack of recent stability in job positions *prior to joining AI Transport* ") (emphasis added).

*3. Decisionmaker: Wogsland or Turnquist*

It is not clear what role Turnquist played in the decision not to hire Chapman for any of the available positions at AIGCS. Defendants argue that Turnquist merely conducted a screening interview and, thus, that he was not a decisionmaker for the purpose of hiring Wiggins for the position of casualty claims manager. The record, as it existed at the time that summary judgment was granted, includes several pieces of evidence that tend to dispute Defendants' characterization of Turnquist. At summary judgment, Defendants identified both Wogsland and Turnquist as the persons "who were responsible for filling the position" eventually given to Wiggins.[FN52] Wogsland himself identified Turnquist as one of the persons that he relied on in deciding not to hire Chapman to be a casualty claims manager and also stated that he relied on Turnquist's interview with Chapman.[FN53] In fact, I also note that, in stating that "Plaintiff forgets that Wogsland was the decision-maker; Turnquist merely provided a second opinion to Wogsland," Defendants cite only to Turnquist's *trial testimony*.FN54 As Defendants themselves repeatedly point out, such trial testimony cannot be considered in our review of the district court's grant of summary judgment because that trial testimony was, of necessity, not in the record that the district court reviewed when considering the summary judgment motions.[FN55] Similarly, while defense counsel repeatedly referred at oral argument to Turnquist's statement that his interview was merely a "screening interview," Turnquist first used that term in his *trial testimony*,[FN56] which cannot be considered in this appeal.

FN52. *See* R6-72 (Stmt. of Undisputed Facts) at 2-3 at ¶¶ 9, 17.

FN53. *See* R7-79-Ex. H (Wogsland Dep.) at 102.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN54. *See En Banc* Brief of Defendants-Appellees at 22 (citing R23-62).

FN55. *See Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 n. 3 (11th Cir.1992) ("Upon review of a grant by a district court of a motion for summary judgment, a federal appellate court may examine only the evidence which was before the district court when the latter decided the motion for summary judgment.") (cited in *En Banc* Brief of Defendants-Appellees at 19); *U.S. East Telecomns., Inc. v. U S West Communications Servs., Inc.,* 38 F.3d 1289, 1301 (2d Cir.1994) ("Our review is confined to an examination of the materials before the trial court at the time the ruling was made, and neither the evidence offered subsequently at trial nor the verdict is relevant.") (cited in *En Banc* Brief of Defendants-Appellees at 20).

FN56. *See* R23-44 (cited at oral argument by defense counsel).

*1058 Additionally, Chapman testified that he was interviewed first by Wogsland and then by Turnquist.[FN57] While defense counsel asserted at oral argument, without support, that Chapman must have been "mistaken" in this testimony because Turnquist was merely a "screening interview" and, therefore, must have interviewed Chapman first, this assertion assumes that we accept Turnquist's testimony and reject contradictory evidence. This conclusion inherently requires a weighing of the evidence: something not permitted at summary judgment. *See Howard,* 32 F.3d at 524. In addition to Chapman's testimony in his deposition that he was interviewed by Wogsland prior to being interviewed by Turnquist, other evidence tends to support the claim that Turnquist was not a mere screening interview. The date on both Wogsland and Turnquist's notes from their interviews with Chapman are "10/13/92."[FN58] Thus, it appears that Wogsland and Turnquist both interviewed Chapman on October 13, 1992; a fact that is inconsistent

with Defendants' characterization of Turnquist as a screening interview. Likewise, at their depositions, Jones[FN59] and Wiggins[FN60] both testified that they interviewed with Wogsland before interviewing with Turnquist. Thus, there is evidence tending to show that Wogsland interviewed at least three of the five applicants before Turnquist did, which, as defense counsel implicitly recognized at oral argument, is inconsistent with the claim that Turnquist was a mere screening interview.

FN57. *See* Chapman Dep. I at 255. Chapman's Deposition occurred on two separate dates; Chapman Dep. I is the volume relating to the August 1, 1995 deposition.

FN58. *See* Ptf's Ex. 48 to Spann Dep. at D001071, D001072.

FN59. *See* Jones Dep. at 119.

FN60. *See* Wiggins Dep. at 69.

In their position statement to the EEOC,[FN61] the Defendants stated: "There were three positions to be filled in the Atlanta AIAC office. Thirty to forty people were interviewed for the positions by Ward Turnquist (age 51, White), Vice President. Three employees were hired from AI Transport *based upon the quality of their responses to Mr. Turnquist's questions.*"[FN62] In addition to not mentioning the alleged "job skipping" concerns, the position statement also puts the decision squarely on Turnquist-not Wogsland.

FN61. Defense counsel asserted at oral argument that the EEOC position statement was not part of the summary judgment record and that the position statement was "used only at trial." These assertions are incorrect. Indeed, the magistrate judge chastised Defendants in his summary judgment Report and Recommendation for the discrepancy between the position statement's characterization of one of Chapman's positions as a "promotion" and the

229 F.3d 1012                                                                                                    Page 56
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

testimony of Defendants' employee Valerie Crabb Zaleski that the position was "at best a lateral transfer involving less responsibility, no pay raise, and less potential for pay raises." R9-95 at 3 n. 1 (stating that "the falsehood as well as the distasteful, cavalier attitude towards the judicial process" was "disconcerting"). I, for one, find it "disconcerting" that defense counsel could not recall the position statement being part of the summary judgment record when the magistrate judge issued such a strong statement about that selfsame position statement in assessing the summary judgment record.

FN62. Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt, Attach. 1) at 2 (emphasis added).

The discrepancies in the characterizations of Turnquist are significant not only because of the light they tend to cast on the credibility of both Wogsland and Turnquist. *See Howard,* 32 F.3d at 526 ("[T]he identification of inconsistencies in the defendant's testimony is evidence of pretext."); *see also Damon,* 196 F.3d at 1365 n. 6 (noting that "a jury could infer that the 'inconsistencies' between [the employer's] deposition and affidavit may be evidence of pretext"). By supporting the claim that Turnquist was a decisionmaker (or even the primary decisionmaker), this evidence also renders more important a series of his statements, all of which are in the summary judgment record and are *1059 helpful to Chapman. These statements include: (1) that Turnquist had a negative impression of Sevillian during his interview and that he told Wogsland that he "questioned whether or not Duane Sevillian would have been aggressive enough" to be the casualty claims manager;[FN63] (2) that Turnquist looked to the "entire history" of a candidate;[FN64] (3) that Turnquist's concerns were "not necessarily" focused on the timeframe between Chapman's employment by Home Insurance and his employment by AI Transport but, instead, that he

was also focusing on the number of jobs that Chapman had held over his entire career;[FN65] and (4) that Turnquist could not recall having any concerns about Smith's job history despite the fact that he had had more employers than Chapman during a shorter career.[FN66] These statements are useful to Chapman in defending against summary judgment because they tend to show disparate treatment in the assessment of different candidates.

FN63. Turnquist Dep. at 59. Contrary to defense counsel's claim at oral argument, Turnquist's criticisms regarding the caliber of Sevillian's interview were not confined to the trial testimony. I do not dispute that Turnquist testified at trial that he "didn't think Duane was particularly aggressive ... [and] thought he was a little laid-back" in the interview and that he had told Wogsland that Sevillian's interview had not favorably impressed him. R23-32, 72. However, as Turnquist's deposition testimony makes clear, there was comparable evidence in the summary judgment record.

FN64. Turnquist Dep. at 116.

FN65. *See* Turnquist Dep. at 120.

FN66. *See* Turnquist Dep. at 126.

I also note that, while those statements are *more* significant if Turnquist was the final decisionmaker or one of the co-decisionmakers, they are still relevant even if he was merely a source of information for Wogsland. While Defendants cite to a line of cases holding that, where two managers disagree in their assessment of an employee or applicant, courts should look to the assessment of the final decisionmaker, those cases are inapposite in this situation where there is *no* evidence that Wogsland and Turnquist disagreed about the substance of these statements. Indeed, at no time did Wogsland and Turnquist indicate that they disagreed about anything; instead, Wogsland indicated that he *relied* on Turnquist.[FN67] To conclude that Wogsland dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                              Page 57
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

agreed with Turnquist about the caliber of Sevillian's interview or that the relevance of the number of jobs held over an entire career would require us to make impermissible assumptions and to read the inferences in favor of the summary judgment movant-contrary to the standards applied at summary judgment. *See Taylor,* 175 F.3d at 866.

> FN67. *See* R7-79-Ex. H (Wogsland Dep.) at 102.

#### 4. "Poor" interview

The only aspect of Chapman's interview that Wogsland raised in his deposition was that Chapman "did not give us [Wogsland and Turnquist] as concise, direct answers to questions as we would like to see" and that Chapman was not "aggressive." [FN68] While Defendants argue that Chapman's interview was unusually short and that he failed to ask pertinent questions, Defendants cite to Wogsland's *trial testimony* for these points. [FN69] Because trial testimony *1060 is not relevant to the question of whether summary judgment was appropriately granted before the trial testimony ever even came into existence, *see Welch,* 951 F.2d at 1237 n. 3; *U.S. East Telecomms.,* 38 F.3d at 1301, we are, therefore, limited to the allegations that Chapman's answers were not sharp [FN70] and that he was not "aggressive."

> FN68. R7-79-Ex. H (Wogsland Dep.) at 103-04.

> FN69. *See En Banc* Brief of Defendants-Appellees at 8 (citing to trial testimony for everything other than claim that Chapman did not take an "aggressive approach in asking [Wogsland] questions"). It is particularly interesting that Defendants' only support for these critical points is trial testimony. Defendants cannot claim ignorance of the rule barring such use of trial testimony in this appeal because they invoked it in their brief, *see En Banc* Brief of Defendants-Appellees at 19-20, and at oral

argument. Indeed, in a blaze of irony (or of chutzpah), Defendants specifically invoked the rule in their brief, *see id.* at 19, and at oral argument in addressing Chapman's use of trial testimony to counter these points-while ignoring the fact that Defendants' section on "What Plaintiff Said And Did During His Interview" relies on trial testimony, *see id.* at 8.

> FN70. Defendants claim that Chapman did not dispute at summary judgment "that some of his answers were not clear and concise." *En Banc* Brief of Defendants-Appellees at 19. The only cite for this remarkable statement is "Supra-8." *Id.* A brief foray to page 8 of Defendants' brief shows the disingenuity of this claim. First, the cited page of the brief cites to nothing about the clarity or conciseness of Chapman's responses-rather, it addresses the length and substance of Chapman's interview with Wogsland and asserts that Chapman failed to allege that he asked questions during his interview. *See id.* at 8. Even worse, the support cited on page 8 for this point is *not* from the summary judgment phase of the case but, instead, comes from the trial testimony, *see id.,* and, as reiterated throughout this opinion and throughout Defendants' brief and argument, is accordingly immaterial to this appeal.

Wogsland noted only two specific answers with which he was "not happy": that **Chapman** had no "recent general liability experience" and that **Chapman** "wasn't very clear about why he had gone from Home to several other positions before he got to **Transport**." [FN71] **Chapman** has sufficiently demonstrated pretext as to both of these points.

> FN71. R7-79-Ex. H (Wogsland Dep.) at 107-08.

· *Recent general liability experience:* Wogsland

229 F.3d 1012                                                                                                                        Page 58
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

never stated that **Chapman's** answer to this question was substandard as to form-but only as to substance. It *is* undisputed that **Chapman's** job at **AITransport** did not involve general liability work, but it is also undisputed that **Chapman** had general liability experience while working for Gaines and on Gaines work for The Claimsman. Additionally, as Wogsland and Turnquist's own notes from their interviews with **Chapman** prove, **Chapman** specifically told them during the interview that he'd had general liability experience working for and with Gaines.[FN72] Accordingly, **Chapman** gave Wogsland and Turnquist a specific, complete answer: that he did not do general liability work for **AITransport**, but that he did have general liability experience in the period immediately preceding his time with **AITransport**. To the extent that **Chapman's** (specific and complete) answer was unsatisfactory to Wogsland as a matter of substance, *Wiggins'* answer should have been at least as unsatisfactory to Wogsland-because he likewise did not do general liability work for **AITransport**.[FN73] Thus, the "recent general liability experience" justification is flawed in two crucial respects:[FN74] because (1) **Chapman** gave a specific, complete answer to Wogsland's questions about general liability experience and (2) because Wiggins, the candidate chosen for the casualty claims manager position, likewise lacked general liability experience in his job at **AITransport**.

> FN72. See Ptf's Ex. 48 to Spann Dep. II at D001071-72.

> FN73. *See* R7-79-Ex. H (Wogsland Dep.) at 107.

> FN74. A third way that this argument is flawed is that it assumes that Chapman's general liability experience with The Claimsman, Gaines, and B.R. Martin is not "recent." As previously noted, Wogsland ignored this period of time when assessing Chapman's "recent" general liability experience, while he apparently included it when assessing Chapman's "recent" job history.

· *Job history:* In direct contradiction to Wogsland's claims that Chapman's responses regarding his job changes between his employment with Home Insurance and his hiring by AIGCS were not sharp and concise, the summary judgment record includes evidence tending to show that Chapman gave reasons for every move that he made. Specifically, he left Home Insurance *1061 because he was forced out and then began to work for The Claimsman on Gaines files; he left The Claimsman when Gaines ceased its contractual relationship with The Claimsman; he was then hired by Gaines to work on Gaines files; he left Gaines because Gaines had been purchased by Liberty National Fire Insurance Company and had moved its claims department from Atlanta to Birmingham and because he was then offered the opportunity to work with B.R. Martin in California, again on Gaines files; he left B.R. Martin because B.R. Martin lost an important client and no longer had sufficient work for its employees; he returned to Atlanta and began to work with AIGCS. Regardless of whether Wogsland and Turnquist agree with Chapman's assessment that the reasons (particularly as they relate to his consistent work with Gaines) demonstrate stability, they do not deny that these reasons were given during his interviews with them. Indeed, both Wogsland and Turnquist stated in their depositions that they did not recall the substance of Chapman's answers about his job history.[FN75]

> FN75. *See* R7-79-Ex. H (Wogsland Dep.) at 107-08; Turnquist Dep. at 113; *see also* Ptf's Ex. 48 to Spann Dep. II at D001071 (grouping The Claimsman and Gaines on one line and grouping with B.R. Martin in one timeframe); *see also* Ptf's Ex. 48 to Spann Dep. at D000065-D000068 (Chapman's 1988 job application and resume). Indeed, at trial, Turnquist admitted that his interview notes may indicate that he viewed The Claimsman and Gaines as substantively the same job. *See* R23-81-82.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                Page 59
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

While we cannot consider this on the merits, for it was not available at summary judgment, it tends to show that a reasonable factfinder could likewise read the notes as indicating that Chapman did give Turnquist specific reasons for his job changes. While the majority opinion asserts that "the reasons [the dissent] cites are drawn from the explanations for those moves that Chapman gave after the lawsuit was filed, not during the interviews," Majority op. at 1021-22 n.10, the interview notes tend to show that he did, in fact, offer these explanations during his interview. Also, Chapman's 1988 job application and resume, which were in his personnel file, *see* Ptf's Ex. 48 to Spann Dep. at D000065-D000068, include both the dates when he was employed by each of his employers *and* the explanations cited in this dissent. Thus, this pre-existing evidence, which was available to Wogsland and Turnquist at the time of the 1992 interviews, nullifies any inference that Chapman manufactured these explanations in anticipation of litigation or that he was seeking to hide the dates of his employment changes.

Accordingly, because Chapman has offered testimony tending to show that he did, in fact, give Wogsland and Turnquist specific answers to their questions, he has successfully disputed the substance of Wogsland and Turnquist's complaints-namely, that he did not provide specific answers to his questions.[FN76] Thus, the only remaining contention is that his answers were, as a matter of form, somehow lacking in sharpness, conciseness, or aggressiveness.

> FN76. This disputative evidence is much more useful than the conclusory statements that defense counsel stated at oral argument were missing in this case. Subjective perceptions of an employee, without more,

are insufficient to survive summary judgment. *See, e.g., Holifield,* 115 F.3d at 1565. Here, instead, Chapman has offered something much more valuable: testimony and evidence tending to show that he gave specific answers to the questions that he was asked and provided precise information which could be assessed by Wogsland and Turnquist. *See Dey,* 28 F.3d at 1460 ("Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies."). In light of that evidence, I see no reason to require Chapman to regurgitate language stating that his interview went well-particularly in light of the great body of caselaw indicating that such subjective perceptions are not relevant.

For three reasons, I conclude that the contention that his answers were lacking as a matter of form remains in dispute and, thus, that Chapman has established pretext as to this justification. The first two reasons flow from the simple proposition that the best evidence of the form of *1062 the answers given at an interview are the answers themselves. Given the evidence that Chapman did, in fact, give specific answers to the questions asked of him, *i.e.,* the evidence that he answered with completeness and specificity the questions about his general liability experience and his recent job history, I would conclude that Chapman has sufficiently disputed the contention that his answers lacked sharpness, conciseness, or aggressiveness.[FN77] This conclusion is supported by my second reason: that Wogsland and Turnquist's recollections of the interviews were so lacking in detail [FN78] as to be purely subjective-with no objective elements that could reasonably be disputed (other than the disputed allegations about Chapman's answers to questions about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                              Page 60
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

his general liability experience and job history). My third reason relates to the fact that there is no contemporaneous evidence supporting Wogsland and Turnquist's claims that they found Chapman to lack aggressiveness or to have otherwise had a poor interview. It is undisputed that neither Wogsland nor Turnquist wrote any remarks on their notes from the interviews with Chapman that indicated that Chapman's interview lacked aggressiveness [FN79] or was otherwise poor in quality-indeed, they made no notes regarding their perspective on Chapman's personality, performance as an interviewee, or character. Thus, there is no evidence supporting Wogsland and Turnquist's *post hoc* rationalizations that they found Chapman's interview to be in any way lacking. In light of the fact that both Wogsland and Turnquist assert now (years later) that they rejected Chapman on the basis of his interviews, this "lacking" is suspicious. Their present claim that they made no such notes because they were merely summarizing the interviews should be assessed by the jury.

> FN77. This reason differs from the separate claim, discussed further in this dissent, that this is one of the rare cases where the establishment of pretext as to the objective justifications is sufficient to establish pretext as to a purely subjective justification.

> FN78. *See, e.g.,* R7-79-Ex. H (Wogsland Dep.) at 104-05 ("Q. Can you remember any examples? A. Not specific comments, quotes. Q. Can you remember any general examples? I am not asking you for word-for-word quotes. A. No, I can't."); *id.* at 108 ("[Chapman] wasn't very clear about why he had gone from Home to several other positions before he got to Transport, but I don't remember the exact questions or the exact answers."); Turnquist Dep. at 113 (stating that he could not recall what information that Chapman had given him about his job changes). *Cf.* Turnquist Dep. at 58-59 (discussing Sevillian's interview

and stating, "I couldn't tell you specifically what comments were made that far back. I just can't recall.").

> FN79. Indeed, at no time in the summary judgment record did either Turnquist or Wogsland offer any definition of "aggressive." "Aggressive," like "recent," is a term given to many different interpretations, and without knowing what definition Turnquist and Wogsland applied, Chapman was left unable to rebut their allegation. Did they believe that Chapman asked too few questions? Asked questions, but did not ask perceptive, searching ones? Asked questions that were sufficient in number and in subject matter, but which were poorly phrased? Evaded questions? Answered the questions that were asked but used poor phrasing? Asked questions and gave answers in an acceptable manner, but had mannerisms or body posture that seemed too "laid back"? Any of these, or some combination of them, could be deemed "nonaggressive." The lack of definition, therefore, rendered the claim that Chapman was not "aggressive" unrebuttable and, therefore, legally insufficient under *Burdine.*

### 5. Other Disparate Treatment

At summary judgment, Chapman offered evidence tending to show disparate treatment as compared to the other applicants. In light of the undisputed fact that Chapman's education and performance evaluations were equal to or superior to that of the other applicants, this evidence of disparate treatment gains heightened significance. Having already addressed the disparate treatment of Chapman as to his job history and as to his "poor" interview, I will focus two other types of disparate treatment to which Chapman was subjected: that he, alone of all of the *1063 applicants, was not considered for multiple positions and that he, unlike Wiggins, was singled out for lacking "recent" general liability ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

perience.

### a. Consideration for multiple positions

Unlike each of the other applicants, Chapman was considered for only one position: the casualty claims manager position. Once rejected for that position, he was not considered for any other position. As a primary point, I note that it is undisputed that Chapman never limited his interest to the casualty claims manager position.[FN80] At his deposition, Wogsland admitted that neither the written message from Chapman applying for any open position with AIGCS nor Chapman's oral statements at his interview indicated that his interest was limited to the casualty claims manager position.[FN81] Despite Chapman's apparent interest in *any* open positions, Wogsland not only did not consider Chapman for positions other than the casualty claims manager position, but he did not even bother to consider whether he was qualified for the other open positions.[FN82] I also note that there is no evidence disputing Chapman's claims that he was qualified for the other open positions.[FN83]

> FN80. *See* R5-70-Ex. I (Wogsland Dep.) at 186-90; *see also* Turnquist Dep. at 63 (testifying that Turnquist never said that he was interested solely in the casualty claims manager).

> FN81. *See* R5-70-Ex. I (Wogsland Dep.) at 189.

> FN82. *See* R5-70-Ex. I (Wogsland Dep.) at 188 ("I considered [Chapman] for the casualty manager position. *I didn't really go through his qualifications versus the requirements for the other positions.*") (emphasis added). I note that, even if we were able to consider Wogsland's trial testimony that he did not consider Chapman for the other positions because he was "overqualified," R22-212-13, that testimony would stand in apparent contradic-

tion with the admission in his deposition that he failed to consider Chapman for the other positions.

> FN83. It is unsurprising that there is no evidence in the summary judgment record disputing this claim, for Wogsland admitted at trial that Chapman was qualified for all of the positions open at AIGCS in 1992-93. *See* R22-188. I also note that, at summary judgment, Chapman asserted that "[b]ased on [his] more than thirty successful years as a claims professional in the insurance industry, strong performance appraisals, and law degree from an accredited law school, Mr. Chapman was more qualified than these other candidates," including Jones, Sevillian, Smith, and Wiggins. *See* R5-70 (Stmt. of Undisputed Facts) 8-9 at ¶ 26. In responding to this claim, Defendants cited to materials disputing Chapman's superiority *only as compared to Wiggins* and *only as to the casualty claims manager position. See* R8-82 at 17-18 at ¶ 26 (citing Turnquist Dep. at 64, 78-79; Wogsland Dep. at 102-08, 111). The only statement even referring to other candidates addresses "recent" general liability experience-which was only in relation to the casualty claims manager position and, accordingly, does not dispute Chapman's claim that he was better qualified than Jones, Sevillian, and Smith for the positions that they received.

Wogsland and Turnquist's treatment of Chapman contrasts strongly with each of the other candidates. *Jones* was hired from AI Transport by AIGCS for a Complex Director position in March 1993. He initially interviewed with Turnquist in October 1992 for approximately 45 minutes and with Wogsland for the casualty claims manager position even though he only wanted the Complex Director position. After a new Complex Director position was created, Turnquist hired Jones. Thus, Jones was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                                    Page 62
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
(Cite as: 229 F.3d 1012)

considered for two positions, including one for which he was explicitly not interested.[FN84] *Sevillian* was hired from AI Transport by AIGCS in October 1992 as a fast track manager.[FN85] He stated that he limited his application to the claims manager position, which he stated was the same as the fast track manager position.[FN86] However, when he interviewed with Turnquist, he was not interviewing specifically *1064 for the fast track manager position.[FN87] Turnquist testified that he considered Sevillian for the casualty claims manager position.[FN88] Accordingly, Sevillian was considered for two different positions, including one for which he did not apply. *Smith:* In applying to AIGCS for transfer from AI Transport, Smith indicated that he was not interested in either the fast track manager or claim representative positions.FN89 When Wogsland interviewed Smith, he indicated that he was considering him for either the senior claims representative position or the senior casualty specialist.[FN90] Smith also interviewed with Turnquist,[FN91] who indicated in his deposition that he was interviewing Smith for the casualty manager position.[FN92] Thus, Smith was considered for three positions, including one position in which he was specifically not interested. *Wiggins:* Wiggins was hired for the casualty claims manager position despite telling both Wogsland and Turnquist that he was interested in the claims director position and that he was specifically *not interested* in the casualty claims manager position. Wiggins was told that he could be considered for other claims director positions that became available at a later time. Thus, Wiggins was considered and hired for a position for which he had stated he had no interest and also received assurances that he would be considered later for a different position.[FN93]

> FN84. *See* Jones Dep. at 116-22; Turnquist Dep. at 70.
>
> FN85. *See* Sevillian Dep. at 51.
>
> FN86. *See* Sevillian Dep. at 49, 51-52.
>
> FN87. *See* Sevillian Dep. at 63.

> FN88. *See* Turnquist Dep. at 58.
>
> FN89. *See* Smith Dep. at 79.
>
> FN90. *See* Smith Dep. at 82.
>
> FN91. *See* Smith Dep. at 81-82.
>
> FN92. *See* Turnquist Dep. at 126.
>
> FN93. *See* Wiggins Dep. at 67-70.

### b. Lack of "recent" general liability experience

Wogsland testified in his deposition that he was not happy with Chapman's statement that he had "not had any recent general liability experience."[FN94] When asked if the other applicants had stated that they had "recent" general liability experience, Wogsland testified that "[a]ll except for Mr. Wiggins" did.[FN95] Yet it was Wiggins who was given the casualty claims manager position over Chapman.[FN96] Wogsland justified Wiggins' lack of "recent" general liability experience on the ground that Wiggins "had been working for the same AI Transport that Mr. Chapman had."[FN97] Wogsland never explained, however, why he considered Chapman's lack of "recent" general liability experience to be a negative, unlike with Wiggins, who equally lacked "recent" general liability experience *for the precise same reason as Chapman.*

> FN94. *See* R7-79-Ex. H (Wogsland Dep.) at 107.
>
> FN95. R7-79-Ex. H (Wogsland Dep.) at 107.
>
> FN96. *See* R7-79-Ex. H (Wogsland Dep.) at 107.
>
> FN97. R7-79-Ex. H (Wogsland Dep.) at 107.

### D. Analysis

As I have discussed at length, the summary judgment record is plagued by a large number of gaps

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                                    Page 63
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

and inconsistencies. As a result, a number of material disputed facts exist that weaken Defendants' proffered nondiscriminatory reasons to such an extent that summary judgment is inappropriate.

### 1. Arguments Applicable to All Four Applicants

#### a. "Recent" history of job skipping

In considering the job history justification, I find a number of material gaps and inconsistencies in the record, as well as evidence of disparate treatment. First, Defendants have never defined the term "recent," which renders vague and uncertain Wogsland and Turnquist's claims that they rejected Chapman for his "recent" job instability. Second, the record indicates that Wogsland selectively applied **\*1065** two different definitions of "recent" in evaluating Chapman's job application—one which included his time working for The Claimsman, Gaines, and B.R. Martin and one which did not include that timeframe. Particularly disturbing is the fact that those different definitions were selectively applied in order to effect the maximum damage to Chapman's application. Third, Chapman gave explanations regarding each of his job changes, but neither Wogsland nor Turnquist could explain what reasons (if any) they used to justify ignoring those explanations. Indeed, neither Wogsland nor Turnquist could recall what answers Chapman gave regarding his job changes. Fourth, in evaluating the job histories of the various candidates over a time frame starting with the date on which Chapman was hired by AIGCS in 1988, his average years with each employer compares favorably with all of the other candidates and is superior to two of the candidates (Jones and Smith). Fifth, Turnquist admitted that he considered the entire job history of applicants to be relevant in assessing job stability. This not only tends to negate the claims of "recent" job instability, but also makes more relevant the fact that Chapman's average years with each employer over his entire history compares favorably with all of the other candidates and is, again, super-

ior to two of the candidates (Jones and Smith). Sixth, Turnquist's admission that he did not recall having *any* concerns about Smith's prior employment history is evidence of disparate treatment of Chapman as compared to Smith (who had averaged fewer years per employer than Chapman regardless of whether one considers their entire job histories or the timeframe prior to Chapman's hiring in 1988). Seventh, when Defendants had the opportunity to state in their EEOC Position Statement that the "recent" history of job instability was a reason for their decision not to hire Chapman, they rested solely on the applicants' interviews with Turnquist as their reason for refusing to hire him for the casualty claims manager position.[FN98] Eighth, notwithstanding defense counsel's arguments to the contrary, there is no evidence in the summary judgment record indicating that Wogsland had any beliefs about the relevance of an applicant's entire job history when assessing that applicant's job stability.

> FN98. Ptf's Ex. 30 to Zaleski Dep. (EEOC Position Stmt., Attach. 1) at 2.

#### b. "Poor" Interview

Gaps and inconsistencies in the record and evidence of disparate treatment likewise undermine the "poor" interview reason proffered by Defendants. First, the evidence indicates that Chapman gave Wogsland a complete answer to both of the questions specified by Wogsland in his deposition. As to the "recent" general liability experience, the evidence indicates that Chapman told Wogsland that his position at AI Transport did not involve general liability work but that his work with on Gaines files during the time period immediately preceding his hiring by AIGCS in 1988 did involve general liability work. Regardless of whether Wogsland did not like the substance of this response (a claim significantly weakened by the fact that Wiggins likewise lacked such "recent" general liability experience), the response was still complete. As to Chapman's job history, the evidence indicates that he had reasons for each of the moves that occurred in the 1980's. Again, regardless of whether Wogsland and

229 F.3d 1012                                                                                                    Page 64
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

Turnquist did not like the substance of this response (a claim without support in the record, as neither Wogsland nor Turnquist could remember what response they were given),[FN99] the evidence indicates that he did provide complete responses*1066 to the questions about his job history.

> FN99. In particular, defense counsel's hypothesis that Wogsland and Turnquist preferred loyalty to an employer over loyalty to a client remains just that-a hypothesis, without any evidentiary value in the *McDonnell Douglas* scheme. *See Burdine,* 450 U.S. at 255 n. 9, 101 S.Ct. at 1094 n. 9.

Additionally, Wogsland and Turnquist's claims that Chapman's interview was insufficient as a matter of form are likewise in dispute. First, there is no definition of "aggressive" in the record. This renders their claim vague and irrebuttable, in contravention of *Burdine.* Second, the evidence that Chapman did, in fact, answer completely the two questions specified by Wogsland tends to dispute the claims as to form. Third, Wogsland and Turnquist's recall of the interview was so lacking in detail and so conclusory in description as to be purely subjective and, thus, to lack value under *Burdine.* Fourth, Wogsland and Turnquist's notes from Chapman's interviews include no notations regarding their perspective on his personality, character, or performance as an interviewee. Fifth, there is evidence of disparate treatment, with Sevillian being hired despite Turnquist's perception of Sevillian as not sufficiently aggressive.

#### c. Other Disparate Treatment and Inconsistencies

In addition to the disparate treatment discussed above regarding Defendants' two proffered reasons, the record reflects two other instances of disparate treatment. First, Wogsland treated Chapman's lack of "recent" general liability experience as a negative-yet hired Wiggins, who lacked "recent" general liability experience for the exact same reason as did

Chapman. Indeed, Wogsland did not state that he even considered that lack to be a negative in evaluating Wiggins' application. Second, unlike the other applicants, Chapman was considered for only one position, despite his unlimited request to be considered for any of the open positions. No reason was given at summary judgment for Defendants' failure to consider Chapman for the other open positions.

Finally, the role that Turnquist played in the decision not to hire Chapman in the fall of 1992 is disputed. There is evidence in the summary judgment record supporting the claim that he was the sole decisionmaker, that he was a co-decisionmaker with Wogsland, that he was an important source of information on which Wogsland relied, and that he was a screening interview. This dispute is important both because of significant admissions made by Turnquist and because of the light that this inconsistency sheds on Wogsland and Turnquist's credibility.

#### d. Cross-applying Pretext

This is one of the rare cases in which it is appropriate to permit a showing of pretext as to one proffered reason to be considered in evaluating another proffered reason. First, the evidence indicates that the two reasons, "recent" history of job stability and "poor interview," are intertwined. The summary judgment record indicates that Wogsland and Turnquist did not conclude that Chapman was *per se* precluded from the casualty claims manager position by virtue of his job history. Rather, the testimony indicates that they decided to ask Chapman about his recent job history and that they were not pleased with his answers, even though they could not recall what his answers were.[FN100] In short, the evidence indicates that the perceptions as to the "poor interview" and the perceptions as to "recent" job instability are interrelated. The showing of pretext as to both of the reasons is likewise partly related. In particular, there has been a showing of disparate treatment as to Smith with both the "recent"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

job instability reason and the "poor interview" reason, as well as with the separate claim that all of the applicants (including Smith) other than Chapman were considered for multiple positions. Second, this is a case in which numerous challenges have been made as to the credibility of the decisionmakers-as to both of the proffered reasons.

> FN100. *See* R7-79-Ex. H (Wogsland Dep.) at 107-08; Turnquist Dep. at 78-79.

**\*1067** Additionally, I conclude that the vague and subjective elements of these proffered reasons justifies evaluating each of the reasons in light of the evidence of pretext offered as to the other reasons. Both proffered reasons include at least one element that is vague. In the case of "recent" job instability, the term "recent," which was never defined in the record, is sufficiently unclear that we have had *six* different meanings of it suggested in the record, by defense counsel, and by the majority: (1) some vague period beginning at the time of the 1992 interviews and extending back at least to the time that Chapman left Home Insurance (defense counsel at oral argument); (2) some vague period beginning at the time of the 1988 interviews and extending back at least to the time that Chapman left Home Insurance (Wogsland in assessing Chapman's job history); (3) seven years before the 1992 interviews (Defendants' *en banc* brief); (4) ten years before the 1992 interviews (Defendants' *en banc* brief); (5) twelve to thirteen years before the 1992 interviews (Defendants' *en banc* brief and defense counsel at oral argument); and (6) the time period during which Chapman was at AIGCS/AI Transport (Wogsland in assessing Chapman's "recent" general liability experience). The vagueness of the term is exacerbated by the fact that the only thing that is clear in the record is that Wogsland selectively applied two different definitions of it to Chapman. In the case of the "poor interview" justification, the key term used by both Wogsland and Turnquist is that Chapman was not "aggressive." With no definition in the record, this characterization was even more susceptible to refutation than such a subject-

ive characterization would usually be. Additionally, the "poor interview" reason was rendered purely subjective by the faulty memories of Wogsland and Turnquist, who could recall only their perceptions of Chapman's responses-and not the responses themselves. Thus, while they used words like "sharp," "concise," and "aggressive," their inability to recall either the substance or the form of Chapman's responses and other statements from the interviews had no objective content.

### e. Conclusion

Accordingly, I would conclude that summary judgment was inappropriate as to each of the four other positions because Chapman has demonstrated pretext as to each of the proffered reasons both independently and as considered together. Additionally, I would conclude that the purely subjective aspects of the "poor interview" justification are not legitimate under *Burdine* because they cannot be objectively evaluated. I would also conclude that the large amount of evidence undermining Wogsland and Turnquist's credibility creates a jury question as to the verity of their proffered reasons, which are both at least partly subjective and, therefore, reliant on credibility for their validity. Finally, in light of the disparate treatment of Chapman as to the evaluation of his job history and of his interview, the treatment of his lack of "recent" general liability experience as compared to Wiggins, and the unexplained failure to consider him for multiple positions, I would conclude that Chapman has produced sufficient evidence to create a jury question as to whether it is more likely that Chapman's rejection was caused by discriminatory animus than by the proffered reasons.

### 2. Application to Jones, Sevillian, and Smith

In addition to the above points, which are relevant to all four positions, I conclude that summary judgment was inappropriate because of the failure of Defendants to offer *any* legitimate, nondiscriminat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 66
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

ory reasons at summary judgment for their failure to consider Chapman for any positions other than the casualty claims manager position. Defendants have proceeded under the useful fiction that the nondiscriminatory reasons offered to justify their refusal to hire Chapman for the casualty *1068 claims manager position likewise apply to their decision not to hire Chapman for the positions given to Jones,[FN101] Sevillian, and Smith-but that claim is, indeed, a fiction. No reason was given at summary judgment for the failure to consider Chapman for the other positions given to AI Transport applicants.[FN102] Thus, even if I agreed with the majority in its analysis of the pretext issue as it applies to Wiggins and the casualty claims manager position, I would still conclude that summary judgment was inappropriate in light of the fact that no nondiscriminatory reason was ever proffered for selecting Jones, Sevillian, and Smith without even considering Chapman for their positions. *See Alexander,* 207 F.3d at 1342 (holding that where employer "failed to offer any legitimate non-discriminatory reason to explain why [one applicant] was promoted over [the plaintiff], a reasonable jury could attribute the [employer's] failure to promote [the plaintiff] to race").[FN103]

> FN101. The majority also treats Chapman's termination for insubordination as a potential justification for Defendants' decision to hire Jones, instead of Chapman. In addition to the fact that this justification was never proffered at either summary judgment or on appeal and, thus, has been waived, *see Campaign for a Prosperous Georgia,* 149 F.3d at 1287; *Depree,* 946 F.2d at 793, my search of the record confirms what plaintiff's counsel stated at oral argument when questioned about this very point: there is no evidence in the record tending to show that Turnquist (who hired Jones) knew about the termination for insubordination at the time that he hired Jones or that Turnquist relied on that insubordination for his decision to hire Jones instead of Chap-

man. Such after-acquired evidence cannot be used as the basis for Defendants' employment decision. *See McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 359-60, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995) (establishing after-acquired evidence rule: where employer discovers evidence after making an employment action that would justify its decision, "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was [not hired] for the nondiscriminatory reason"). Accordingly, Chapman's termination for insubordination cannot be relied upon as a nondiscriminatory reason for hiring Jones instead of Chapman.

FN102. It is arguable that, given Defendants' utter failure at summary judgment to explain the decision not to consider Chapman for the positions given to Jones, Sevillian, and Smith, that summary judgment should have been granted to Chapman. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094 ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."). Having alleged that his experience, education, and performance evaluations rendered him more qualified than Jones, Sevillian, and Smith for the positions which they received, Chapman has established his *prima facie* case, which has never been disputed.

FN103. Cf. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1134 (11th Cir.1984) (holding that, where plaintiff was not given opportunity to apply for a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 1012                                                                    Page 67
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29
**(Cite as: 229 F.3d 1012)**

specific job, "the defendant's subjective promotion procedures imposed upon the defendant a duty to consider for any open position all employees who might reasonably be interested in the position"); *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1382 (11th Cir.1983) (holding that "false assumption ... that [the plaintiff] was not interested" in a position is not a legitimate nondiscriminatory reason).

### III. Conclusion

As the record makes clear, summary judgment was improvidently granted. While I do not disagree with the majority that a reasonable jury, faced with the evidence in this case, could conclude that the asserted nondiscriminatory reasons were sincere and, therefore, not pretextual, it is manifest that a reasonable jury could instead conclude that the reasons were not sincere-that they were, in fact, a mask for age discrimination. In reaching this conclusion, I do not challenge the employer's business judgment-but I do require that the employer *make* a business judgment. I do not deny the possibility that a jury trial could end in a verdict for the defendants-but I do conclude that a jury **\*1069** trial is required. As we have previously admonished, "[s]ummary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952-53 (11th Cir.1986). Put differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In this case, we should reverse the grant of summary judgment and remand for a jury trial so that the jury may serve its unique factfinding function-particularly where, as here, the credibility of interested parties is at the heart of the case. Accordingly, I must respectfully dissent.

C.A.11 (Ga.),2000.
Chapman v. AI Transport
229 F.3d 1012, 83 Fair Empl.Prac.Cas. (BNA) 1849, 48 Fed.R.Serv.3d 87, 14 Fla. L. Weekly Fed. C 29

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 **Labor and Employment Law Library**

Source:  Fair Employment Cases > U.S. District Courts, Georgia > Otu v. Papa John's Pizza, 96 FEP Cases 1602 (N.D. Ga. 2005)

**96 FEP Cases 1602**

**Otu v. Papa John's Pizza**

**U.S. District Court,
Northern District of Georgia,
Atlanta Division**

No. 1:04-CV-633-TWT

August 19, 2005,
as adopted September 16, 2005

**ITA S. OTU, Plaintiff v. PAPA JOHN'S USA, INC., d/b/a Papa John's Pizza, Defendant**

## Headnotes

### CIVIL RIGHTS ACT OF 1964

**[1] Sexual harassment — Unwelcomeness ▶108.415905 ▶108.415919**

Male employee established that sexual harassment by female supervisor was unwelcome and subjectively severe or pervasive, despite contentions that he expressed interest in consorting with her and failed to report her conduct, where he was offended and bothered by her sexual advances, he told her to stop, he did not want to reject her outright because he wanted to protect his job, and his failure to report her is just one factor in determining whether conduct was unwelcome.

**[2] Sexual harassment — Severe or pervasive ▶108.415905**

Male employee failed to establish that sexual harassment by female supervisor was objectively severe or pervasive, where supervisor's conduct—asking him to spend weekend with her and asking to be his girlfriend, unbuttoning her blouse in front of him, writing her phone number and words "I love you" on napkin, attempting to kiss and hug him and rub his private parts, introducing him as her boyfriend, rubbing her breasts against him, and inviting him to dinner, movie, and her home—was infrequent, and there is no evidence that he ever felt physically threatened or afraid of her or that her conduct interfered with his job performance.

**[3] Sexual harassment — Vicarious liability▶108.415909**

Male employee failed to establish that employer was vicariously liable for sexual harassment by female supervisor, where there was no tangible employment action taken, employer's sexual harassment policy was disseminated to employees and instructed them to report inappropriate behavior, and employee's claim that he reported supervisor's harassing behavior is not supported by record.

### AGE DISCRIMINATION IN EMPLOYMENT ACT

**[4] Discharge — Evidence ▶106.1325 ▶106.13271 ▶106.134001**

Employer's statement to terminated protected-age pizza delivery driver that "I didn't need you anymore. You are not as fast as younger drivers," is not direct evidence of age discrimination that shifts burden of proof to employer, where statement does not prove discriminatory animus as to age without inference or presumption, and it implies that performance, namely speed, motivated employer, as opposed to age.

**[5] Transfer — Adverse action ▶106.13273 ▶106.1352**

Protected-age employee did not suffer adverse employment action when employer transferred him from opening shift to evening shift, where transfer was lateral and did not involve any change in prestige, pay, or responsibility.

**[6] Discharge — Replacement ▶106.13273 ▶106.134001**

Terminated protected-age employee failed to establish prima facie case, despite contention that younger employee named "Mike" replaced him on shift, where there is no evidence that Mike replaced him after he was

terminated, how old Mike was, or how he was similarly situated.

### [7] Discharge — Pretext ▶106.13278 ▶106.134001

Protected-age pizza delivery driver failed to establish that employer's reason for terminating him—that his work performance was deficient because of his slow delivery time and lack of cross-training—was pretextual, where employee admits that he was not cross-trained, and his subjective perceptions and conclusory allegations as to his job performance do not create issue of fact.

### Attorneys

Fredrick C. McLam (Office of Fredrick C. McLam), Decatur, Ga., for plaintiff.

Darren T. Horvath and Rebecca J. Jakubcin (Fisher & Phillips, LLP), Atlanta, Ga., for defendant.

## Opinion Text

### Opinion By:

THOMAS W. THRASH, Jr., District Judge.

This is an employment discrimination action. It is before the Court on the Report and Recommendation [Doc. 42] of the Magistrate Judge recommending granting the Defendant's Motion for Summary Judgment [Doc. 27]. The Court approves and adopts the Report

**Page 1604**

and Recommendation as the judgment of the Court. The Defendant's Motion for Summary Judgment [Doc. 27] is GRANTED. SO ORDERED, this 16 day of September, 2005.

## Opinion Text

### Opinion By:

E. CLAYTON SCOFIELD III, Magistrate Judge.

Attached is the Final Report and Recommendation of the undersigned United States Magistrate Judge made in this action in accordance with 28 U.S.C. §636(b)(1) and this Court's Civil Local Rule 72. The Clerk shall serve this Final Report and Recommendation on the parties.

Pursuant to 28 U.S.C. §636(b)(1), within ten (10) days after being served with a copy of this cover order, each party may file written objections, if any, to this Final Report and Recommendation. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Final Report and Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729 (1984).

The Clerk is **DIRECTED** to submit the Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 19th day of August, 2005.

## FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

### I.
### Introduction

Ita S. Otu ("Plaintiff") filed the instant employment discrimination action against Defendant, Papa John's USA, Inc. d/b/a/ Papa John's Pizza ("Defendant" or "Papa John's"), on March 8, 2004. [Doc. No. 1]. In his complaint, Plaintiff charges Defendant with violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq. Plaintiff contends he was sexually harassed by his female supervisor, Caretta Brown ("Brown"). (*Id.*) Plaintiff further alleges that he was discharged by Defendant on the basis of his age and/or his sex. (Id.) This matter is presently before the Court on Defendant's motion for summary judgment. [Doc. No. 27]. For the reasons expressed herein, the Court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** in its entirety and that this case be **DISMISSED**.

### II.
### Factual Background

When evaluating the merits of a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 [85 FEP Cases 1332] (11th Cir. 2001); *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 920 [63 FEP Cases

838] (11th Cir. 1993). Applying this legal standard, the Court derives the following facts from the parties' statements of facts and from the record as a whole:[1]

---

[1] Unless otherwise indicated, the Court derives this overview from the allegations in Defendant's statement of material facts ("Def. SMF") which are not disputed by Plaintiff. [Doc. No. 27, Attachment 1].

---

On August 12, 2002, Papa John's rehired[2] Plaintiff, at age 53, as a pizza delivery driver at its Flakes Mill Road location. Between August 12, 2002 and February 10, 2003 Caretta Brown also worked at Papa John's Flakes Mill Road location as either a shift leader or an Assistant General Manager, until leaving on February 10, 2003 to be the General Manager ("GM") at another location.[3] [Doc. No. 27] (Def. Br. at Exs. 2-4).

---

[2] Plaintiff had previously worked for Defendant on multiple occasions at various store locations as a pizza delivery driver. (Plaintiff's Deposition ("Pl. Dep.") at 50-77). His previous employment history with Defendant has no bearing on the facts at issue in the instant lawsuit. Unless otherwise indicated, all facts relate to Plaintiff's employment at the Flakes Mill Road location between August 12, 2002 and November 23, 2003.

[3] It is undisputed that Ms. Brown never discriminated against or sexually harassed Plaintiff between August 12, 2002 and February 10, 2003 at the Flakes Mill restaurant.

---

Plaintiff left Papa John's in April of 2003 but was rehired again on June 9, 2003. (Pl. Dep. at 63, 77 and Exs. 5-6). Approximately two months later, on August 11, 2003, Ms. Brown returned to the Flakes Mill restaurant to assume the responsibility of the GM of that store. Ms. Brown's immediate supervisor was

**Page 1605**

Director of Operations, Mohsen "Mason" Alsaleh. [Doc. No. 27] (Def. Br. at Ex. 25—Brown Affidavit ("Brown Aff.") ¶2). Between August 11, 2003 and November 24, 2003, Ms. Brown had two Assistant Managers, Artega Anderson ("Anderson") and Brandi Boyd ("Boyd"). Ms. Brown is a lesbian and has been in an exclusive relationship with another woman for the last four-and-a half years.[4] See also [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶4).

---

[4] Plaintiff was unaware of Ms. Brown's sexual orientation during the times relevant to the issues in dispute in the instant lawsuit. [Doc. No. 37] (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶7).

---

As part of their job duties, Papa John's pizza delivery drivers were "required to check all products for quality against standards and deliver quality products to customers in a safe, courteous and timely manner." [Doc. No. 27] (Def. Br. Ex. 13—Team Member Handbook). In addition to their driving duties, drivers generally had to perform "side jobs" during each shift, such as mopping, stocking cola, sweeping the floor, and washing dishes. Side jobs generally were assigned in two ways. First, "side jobs" were sometimes listed on a "job sheet" next to the names of the drivers working. Second, the "side jobs" were sometimes assigned when a manager noticed that a job needed to be performed. Usually, either Assistant General Managers Artega or Boyd would make up the "job sheet" for each day. In addition, managers would sometimes instruct drivers to do "side jobs" that were not listed by their names on the job sheet. For instance, Ms. Brown assigned another driver, Sherlock Sampson ("Sampson") "side jobs" that were not listed by Mr. Sampson's name on the "job chart." Ms. Brown also assigned Plaintiff "side jobs" outside of those listed on the "job chart". [Doc. No. 26] (Def. Br. Ex. 26); (Pl. Dep. at 230-237).

When Ms. Brown became the GM at the Flakes Mill restaurant, she evaluated the skills and performance of the employees. She felt that Plaintiff was not one of the better drivers because he was slower than the other drivers. [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶9). Plaintiff's assistant manager also found Plaintiff to have slower delivery times than other drivers. (Boyd Aff. ¶10).

Plaintiff claims that Ms. Brown made several sexual advances toward him beginning the first week that she assumed the role of GM at the Flakes Mill store.[5] (Pl. Dep. at 123-24). The first incident occurred when Ms. Brown told Plaintiff that July 13th was her birthday and that she was lonely that day because she did not have a boyfriend. (Pl. Dep. at 123-24, 127). Ms. Brown invited Plaintiff to come spend the weekend with her to make up for her loneliness and asked Plaintiff if he would like Ms. Brown to be his girlfriend. (Pl. Dep. at 124, 126-27, 130). Plaintiff responded by asking where she lived, and when she told him that she lived in Union City, he responded that it was too far and that he would not be able to be there. (Pl. Dep. at 124). Plaintiff also told Ms. Brown "[w]ell, maybe next year, because the birthday has already been gone." (Id.) Plaintiff did not consider Ms. Brown's invitation to spend the weekend with her to be sexual harassment but Plaintiff did consider Ms. Brown's request to be his girlfriend as sexual harassment because he was not interested in her. (Pl. Dep. at 129, 145). At the conclusion of this conversation, Plaintiff returned to work. (Pl. Dep. at 150).

---

[5] Ms. Brown denies making any sexual advances towards Plaintiff. For purposes of summary judgment, however, the Court reviews the record in a light most favorable to the Plaintiff as the non-moving party. [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶31).

---

The second incident occurred approximately one week later. On that occasion, Ms. Brown wrote her phone number

and the words "I love you" on a Papa John's napkin. [Doc. No. 27] (Def. Br. Ex. 19 ("Napkin")); (Pl. Dep. at 141-42; 146, 148-49). She gave Plaintiff the napkin with her number and told Plaintiff to call him that evening, said "Otu, hug me", and tried to kiss Plaintiff on the cheek. (Dep. at 142-43). Ms. Brown also hugged Plaintiff. (Pl. Dep. at 145). Plaintiff returned to work after this conversation took place. (Pl. Dep. at 152). The following day, Ms. Brown asked Plaintiff why he did not call her the previous evening, to which Plaintiff responded that he did not have time to call her. (Pl. Dep. at 173-74). Plaintiff testified that he found these actions to be offensive but would not have if he were interested in her because:

> "I have my own policy. This is just personal. I have my own policy if I were to kiss a woman. I don't—I don't just kiss a woman in a day because I didn't know whether she is a smoker or not, because I don't shake my hand with any woman who smokes. So I don't just kiss a woman in the day like she wants to kiss me. I don't. And that offended me. It's against my will."

**Page 1606**

(Pl. Dep. at 147, 152). Plaintiff returned to work after this incident.

Approximately one month after Ms. Brown became GM, she decided that drivers should undergo cross-training to learn skills such as order taking. [Doc. No. 27] (Def. Br. Exs. 25, 26) (Brown Aff. ¶11-14; Boyd Aff. ¶4-5; Deposition of Sherlock Sampson "Sampson Dep." at 44-46). Ms. Brown believed that cross-training was especially important for drivers, who often had "down time" while they were waiting for deliveries. As a result, Ms. Brown divided the employees who needed to be cross-trained into three groups, and assigned one group to Mr. Anderson, one to Ms. Boyd, and one to herself for training. [Doc. No. 27] (Def. Br. Exs. 25, 26) (Brown Aff. ¶13; Boyd Aff. ¶5). It was "Ms. Brown's policy that drivers who did not learn ordertaking and other restaurant skills would not get as many deliveries or work hours as drivers who were cross-trained." [Doc. No. 27] (Def. Br. Exs. 25, 26) (Brown Aff. ¶12; Boyd Aff. ¶6; Sampson Dep. at 46).

Plaintiff was one of the drivers who did not know how to take customer orders. As a result, Ms. Brown instructed Plaintiff to come to work at 9:00 a.m. on either the first or second Saturday in September so she could train him on order taking. Plaintiff testified that, in response to Ms. Brown's request, he went to the store at 9:00 on Saturday morning, an hour before the store opened for business. (Pl. Dep. at 153, 155). When Plaintiff arrived, Ms. Brown took him back to her office and started unbuttoning her shirt. (*Id.* at 157). Plaintiff believed that Ms. Brown was attempting to expose her breast to him. (Pl. Dep. at 156). Plaintiff testified that "[a]s soon as she started to unbutton her shirt, [Plaintiff] said, 'No. No. No. No. We can do this at home in your house, in my house, in a hotel, but not here in the store." (Pl. Dep. at 157). Ms. Brown then stopped unbuttoning her shirt. *Id.* Plaintiff was bothered by Ms. Brown's attempt to unbutton her shirt because he felt he had been misled by Ms. Brown to come to the store early to learn how to take orders. (Pl. Dep. at 158). Plaintiff, however, did not tell Ms. Brown that he was not interested in her. (Pl. Dep. at 159).

Plaintiff also alleges that Ms. Brown made several other sexual advances towards Plaintiff. Specifically, on a few occasions beginning in September, Plaintiff alleges that Ms. Brown would stand behind Plaintiff so that her breasts touched his back while Plaintiff was folding pizza boxes and attempted to rub his "privacy" with her hand. [6] [Doc. No. 36] (Pl. Br. at 4; Pl. Dep. at 159, 161-64, 171). Plaintiff would move out of the way and Ms. Brown never made contact with Plaintiff's private area. (Pl. Dep. at 162). Also, between August and November of 2003, Ms. Brown attempted to kiss and hug Plaintiff on several occasions (Pl. Dep. at 143, 145; Sampson Dep. at 50, 57-58) and did hug Plaintiff on one occasion (Pl. Dep. at 145); introduced Plaintiff to her friends and parents as her boyfriend [7] (Pl. Dep. at 169, 217, 220); began calling Plaintiff on his home and cell phone asking him when he was going to take her to dinner or to a movie and when he was going to come to her house (Pl. Dep. at 175-183); and called Plaintiff "Playboy" and "Sugardaddy" on a few occasions. (Pl. Dep. at 223-25).

---

[6] Plaintiff is not sure how many times this occurred but believes that it happened on more than one occasion and possibly as many as five occasions. (Pl. Dep. at 163-64).

[7] Plaintiff claims that Ms. Brown introduced him to her friends as her boyfriend on approximately five occasions (Pl. Dep. at 222) and to her parents on one occasion (Pl. Dep. at 169).

---

Prior to Ms. Brown's arrival at the Flakes Mill restaurant, Plaintiff had been working the opening shift on Saturdays and Sundays. (Pl. Dep. at 153). Towards the end of September, Ms. Brown began periodically to schedule drivers other than Plaintiff to work the opening driver shift. According to Ms. Brown, Plaintiff "was not a good opening driver because of his poor delivery times, and his inability to effectively assist with other restaurant duties because he was not cross-trained." [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶18). Plaintiff contends that Ms. Brown removed him from his position as an opening driver because of his unfavorable reaction to Ms. Brown when she attempted to unbutton her blouse. [8] (Pl. Dep. at 228; Pl. SMF ¶8). In addition, Ms. Brown reduced Plaintiff's hours, and the hours of other drivers, because they were not cross-trained. [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶20). Once the drivers became cross-trained as instructed, Ms. Brown's intent was to increase the drivers' hours. (*Id.*)

**Page 1607**

---

[8] Plaintiff asserts that he was removed from the opening driver position because he ignored and rebuffed Ms. Brown's sexual advances and because of his age. (Pl. SMF ¶8, 11). However, at his deposition Plaintiff testified that he was removed from the opening driver position because he rebuffed Ms. Brown's sexual advances when she began unbuttoning her shirt and not because of his age. (Pl. Dep. at 189-90; 228-30).

---

The number of deliveries assigned to the next driver in line to make a delivery run depended on several factors, including when customer orders were received, the target time for delivery of the orders, and where the customers lived. When assigning deliveries, the managers tried to distribute them in the way they thought was most efficient, such that the customers would get their pizzas within the target time while improving productivity and lowering labor costs. To improve efficiency in the delivery process, managers would assign multiple deliveries that needed to be made in the same general direction to one driver and just one delivery that needed to be made in a different general direction to another driver. Plaintiff was initially assigned multiple delivery runs. (Pl. Dep. at 225). However, in the last few weeks of his tenure as a delivery driver, Plaintiff would only be dispatched for single runs. (Id.). Plaintiff contends that Ms. Brown skipped over him when assigning delivery slots because of his age. [9] (Pl. Dep. at 227-28; Pl. SMF ¶¶8, 11). Defendant asserts that Ms. Brown scheduled deliveries in the most efficient fashion by assigning multiple deliveries to drivers going in the same general direction and single deliveries to other drivers going in the opposite direction. [Doc. 27] (Def. Br. Ex. 25) (Brown Aff. ¶23).

---

[9] Plaintiff's Statement of Material Facts asserts that Ms. Brown skipped over him when assigning delivery spots because he ignored and rebuffed Ms. Brown's sexual advances and because of his age. (Pl. SMF ¶8). However, at his deposition Plaintiff testified that he did not consider it to be sex discrimination when Ms. Brown only assigned him to a single run. (Pl. Dep. at 227-28). Instead, he testified that assigning him a single run "could be age discrimination" because "in her mind … I'm not as fast as younger drivers." (Id.). As a result, this Court will not consider this allegation in connection with Plaintiff's sexual harassment claim.

---

On September 18, 2003, Ms. Brown drafted an Employee Consultation Memorandum ("9/18/03 Memorandum") on Plaintiff noting that he took too long on deliveries and that he must learn ordertaking. [Doc. No. 27] (Def. Br. Ex. 11); [Doc. No. 27] (Def. Br. Ex. 25) (Brown Aff. ¶16). According to the notes on this document, Plaintiff received a verbal warning on these issues and refused to sign this Memorandum. Id.; see also (Brown Aff. ¶16). Plaintiff, however, denies ever receiving any written or verbal reprimands from Ms. Brown regarding his job performance. (Pl. SMF at 12; Pl. Dep. at 259-63).

On November 17, 2003, Ms. Brown drafted another counseling memorandum addressing Plaintiff's slow delivery times and his failure to learn ordertaking. [Doc. No. 27] (Def. Br. Ex. 14). She did not, however, have the opportunity to discuss the memorandum with him because she was out sick the following week and because she did not work the same shift as Plaintiff before he worked his final shift. (Id.)

On November 23, 2003, Plaintiff worked his final shift at Papa John's. Ms. Boyd was the only manager on duty that evening. [Doc. No. 27] (Def. Br. Ex. 26) (Boyd Aff. ¶12). Ms. Boyd stated that Plaintiff did not complete his shift, left the restaurant without clocking out, and did not return although he was still needed. [Doc. No. 27] (Def. Br. Ex. 26) (Boyd Aff. ¶12, Ex. A). Ms. Boyd drafted a memorandum on November 23, 2003, regarding this incident. Plaintiff denies that he walked off the job and claims that he completed his shift that evening. (Pl. Dep. at 249-50).

Prior to leaving on November 23rd, Plaintiff took the work schedule for the Flakes Mill restaurant for the week of November 24, 2003 and for the prior week. Before taking the schedules, Plaintiff did not ask Ms. Boyd or Ms. Brown why he was not scheduled to work the week of November 24, 2003. According to Ms. Brown, Plaintiff was not placed on the schedule because he was still not cross-trained and because he had not had an opportunity to discuss the counseling memorandum with Plaintiff. [Doc. No. 27] (Def. Br. Exs. 25, 26) (Brown Aff. ¶27; Boyd Aff. ¶13).

The following day, Plaintiff went to the store before it opened and asked Ms. Brown why she removed his name from the schedule. (Pl. Dep. at 212-13, 242-43). According to Plaintiff, Ms. Brown responded by stating that " Otu I didn't need you anymore. You are not as fast as younger drivers." (Pl. SMF ¶12; Pl. Dep. 212-14, 242-45). Plaintiff was not terminated from Papa John's system until December 24, 2003; however, the termination effective date was November 24, 2003. [Doc. No. 27] (Def. Br. Exs. 8, 25) (Brown Aff. ¶30). Plaintiff testified that Ms. Brown placed a younger driver named "Mike", who was already a driver at the Flakes Mill store, in the opening driver position on November 24, 2003. (Pl. Dep. at 243-44). Plaintiff further testified that Ms. Brown did not hire a replacement driver for his position. (Pl. Dep. at 244).

Defendant's policies prohibit illegal harassment of, and discrimination against, its employees. See [Doc. No. 27] (Def. Br. Ex. 18—Handbook containing no harassment policy).

**Page 1608**

Plaintiff was provided with a copy of Defendant's handbook, which included Defendant's policies against harassment and discrimination. Defendant's No Harassment policy expressly instructs employees to report "any inappropriate behavior immediately to a manager or director of operations or call People Services hotline at 1-888-442-7272." See also [Doc. 27] (Def. Br. at Ex. 18). Plaintiff was also provided with the telephone numbers for the Director of Operations and the Peoples Services Director. Plaintiff understood that if he experienced any harassment or

discrimination, he should tell his supervisor or the Director of Operations, and that if he was dissatisfied with their handling of a complaint, he could report it to the hotline or to the People Services Director.

In Plaintiff's Statement of Material Facts, he asserts that he "reported the employment discrimination to Mason [Mohammed Alsaleh] ("Alsaleh"), the supervisor over Caretta Brown and he was unresponsive." (Pl. SMF ¶13). However, the record does not support Plaintiff's contention. Plaintiff testified that he called Mr. Alsaleh to report that Ms. Brown had reduced his hours. (Id.) In response, Mr. Alsaleh told Plaintiff to discuss the matter with Ms. Brown and if she did not respond well, instructed Plaintiff to call him back. (Id.) Plaintiff did as instructed and Ms. Brown increased his hours by one hour. (Id.) at 214-15. Still dissatisfied, Plaintiff phoned Mr. Alsaleh the following week to express his dissatisfaction with the one-hour increase. (Id.) at 215. Mr. Alsaleh agreed to talk to Ms. Brown about the matter. (Id.) Plaintiff does not know whether Ms. Alsaleh spoke with Ms. Brown. (Id.) However, Plaintiff also testified that he did not report any incidents of harassment and/or discrimination to anyone, including Mr. Alsaleh. (Pl. Dep. at 214-16).

## III.
## Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 [76 FEP Cases 303] (11th Cir. 1998). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The substantive law applicable to the case determines which facts are material. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Four Parcels*, 941 F.2d at 1437-1438. If the moving party fails to discharge this initial burden, then the motion must be denied. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 [62 FEP Cases 1484] (11th Cir. 1993) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). If the burden is met, however, the non-moving party must then "go beyond the pleadings and...designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

## IV.
## Discussion

## A. Plaintiff's Hostile Environment Claim

In the instant case, Defendant argues that it is entitled to summary judgment because the undisputed facts demonstrate that Plaintiff was not subjected to a hostile working environment within the meaning of Title VII. [Doc. No. 27] (Def. Br. at 11-12). Plaintiff responds that he was subjected to a hostile working environment as a result of Ms. Brown's conduct. [Doc. No. 36] (Pl. Br. at 2-5). Specifically, Plaintiff contends that the following incidents constitute unlawful sexual harassment:

> (1) Ms. Brown attempted to kiss and hug Plaintiff on a few occasions, and did hug Plaintiff on one occasion;

> (2) Ms. Brown told Plaintiff on one occasion that she was lonely because she did not have a boyfriend, invited Plaintiff to spend the weekend with her, and asked Plaintiff if he would like Ms. Brown to be his girlfriend;

> (3) Ms. Brown attempted to unbutton her blouse in front of Plaintiff on one occasion;

> (4) Ms. Brown stood behind Plaintiff so that her breasts touched his back and attempted

**Page 1609**

> to rub Plaintiff's private parts on a few occasions;

> (5) Ms. Brown referred to Plaintiff as "Playboy" and "Sugardaddy" on a few occasions;

> (6) Ms. Brown introduced Plaintiff as her boyfriend to her parents on one occasion and to her friends on a few occasions;

> (7) Ms. Brown wrote her phone number and the words "I love you" on a Papa John's napkin, gave Plaintiff the napkin with her number and told Plaintiff to call her, and said " Otu, hug me";

> (8) Ms. Brown called Plaintiff and asked him to go to dinner or to a movie and to come to her house.

*See* [Doc. No. 36] (Pl. Br. at 4-5); (Pl. Dep. at 123-27, 142-59, 161-64, 175-83, 217-25).

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with

respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63 [40 FEP Cases 1822] (1986) (quoting 42 U.S.C. §2000e-2(a)(1)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 [76 FEP Cases 221] (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 [63 FEP Cases 225] (1993)).

"[W]hen analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a 'tangible employment action,' such as discharge, demotion, or undesirable reassignment, and (2) harassment in which no adverse 'tangible employment action' is taken but which is sufficient to constructively alter an employee's working conditions." *Frederick*, 246 F.3d at 1311 (internal citations omitted); *see also Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1280-1281 [92 FEP Cases 1284] (11th Cir. 2003) (per curiam), *cert. denied*, 541 U.S. 959 [93 FEP Cases 704] (2004). [10] An employer is automatically liable for sexual harassment by a supervisor that falls into the first category. *Walton*, 347 F.3d at 1280-1281. With respect to sexual harassment by a supervisor that falls into the second category, however, the employer may escape liability by satisfying the two-part affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 [77 FEP Cases 14] (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742 [77 FEP Cases 1] (1998). *Id*. In the instant case, Defendant asserts that Plaintiff cannot establish direct liability because there is no tangible employment action causally connected to Brown's alleged harassment. [Doc. No. 27] (Def. Br. at 18). Defendant also asserts that Defendant should not be held vicariously liable because it has a valid affirmative defense pursuant to *Faragher*. (*Id*. at 26).

---

[10] It is undisputed that Brown was Plaintiff's supervisor during the time of the alleged sexual harassment.

---

To prevail on either of these theories of sexual harassment under Title VII, the evidence must be sufficient to establish that (1) the plaintiff belongs to a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the harassment was objectively and subjectively severe or pervasive so as to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. [11] *Walton*, 347 F.3d at 1279-1280; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 [87 FEP Cases 1209] (11th Cir. 2002). With respect to the fourth element, to establish that the harassment was severe or pervasive, Plaintiff must show that the conduct created an environment that was "both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that [she] in fact perceive[d] to be so." *Faragher*, 524 U.S. at 787; *Harris*, 510 U.S. at 21-22; *accord Fleming v. Boeing Co.*, 120 F.3d 242, 245 [74 FEP Cases 1307] (11th Cir. 1997).

---

[11] The same five elements apply to hostile work environment cases, as well as tangible employment action cases. See, e.g., *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 [81 FEP Cases 470] (11th Cir. 1999) (en banc); *Johnson*, 234 F.3d at 508 n.7.

---

Defendant does not argue that Plaintiff was not a member of a protected group. [Doc. No. 27] (Def. Br. at 11-12). Rather, Defendant contends that Plaintiff cannot meet his burden with respect to the other three elements of her claim. (*Id*. at 12). In other words, Defendant contends that Plaintiff cannot demonstrate that

**Page 1610**

Brown's conduct was unwelcome; or was subjectively and objectively severe or pervasive; or that there is a basis for holding Papa John's liable.

### (1) Was the harassment unwelcome and subjectively severe or pervasive?

[ 1 ] Defendant first contends that the harassment was neither unwelcome nor subjectively severe or pervasive. [Doc. No. 27] (Def. Br. at 12). Whether Plaintiff subjectively perceived his work environment as abusive is "closely related" to whether he welcomed the conduct. *See Balletti v. Sun-Sentinel Co.*, 909 F.Supp. 1539, 1546 [73 FEP Cases 1341] (S.D. Fla. 1995). Thus, the Court will analyze these elements together.

In determining whether conduct was unwelcome, the Court must view the nature of the alleged harassment and the context in which it occurred in light of the totality of the circumstances. *Mangrum v. Republic Indust., Inc.*, 260 F.Supp.2d 1229, 1248 [91 FEP Cases 1252] (N.D. Ga. 2003) (citing *Morgan v. Fellini's Pizza, Inc.*, 64 F.Supp.2d 1304, 1309 (N.D. Ga. 1999)). "The correct inquiry is whether the plaintiff, by her conduct, indicated that the complained of behavior was unwelcome." *Balletti*, 909 F.Supp. at 1547 (quoting *Meritor*, 477 U.S. at 68); *accord* EEOC Policy Guidance on Sexual Harassment (Mar. 19, 1990) ("Investigators and triers of fact rely on objective evidence, rather than subjective, uncommunicated feelings."). "This question may present 'difficult problems of proof and [turn] largely on credibility determinations committed to the trier of fact." *Id*.

In the instant case, Defendant contends that the harassment was not unwelcome or subjectively severe or pervasive because Plaintiff's responses to Ms. Brown's advances demonstrate that Plaintiff expressed an interest in consorting with Ms. Brown. [Doc. No. 27] (Def. Br. at 12-15). In addition, Defendant points to Plaintiff's failure to report Ms.

Brown's conduct as further evidence that Plaintiff did not perceive the conduct as offensive or unwelcome. (*Id.*). This Court disagrees.

First, it is undisputed that Plaintiff claims to have found Ms. Brown's conduct offensive. [Doc. No. 27] (Def. Br. at 4). In fact, throughout his deposition, Plaintiff testified that he was offended and bothered by Ms. Brown's sexual advances. *See e.g.* (Pl. Dep. at 127, 146-47, 152, 158, 170, 176, 182). In addition, on at least one occasion, Plaintiff told Ms. Brown to stop. (Pl. Dep. at 168). Second, while some of Plaintiff's responses to Ms. Brown's conduct could, on their face, be construed to suggest that he may have had some reciprocal interest in Ms. Brown and that he did not find her conduct offensive, he also testified that he did not want to reject her outright because he wanted to protect his job and not make her mad. (Pl. Dep. at 173, 178). Finally, the fact that Plaintiff did not report Ms. Brown's harassment is not dispositive; failure to report is just one factor in determining whether the conduct was unwelcome in light of the totality of the circumstances. *Balletti*, 909 F.Supp. 1547 [73 FEP Cases 1341] (stating that "the court *may* consider whether, as well as the manner in which, the plaintiff registered her complaint") (emphasis added).

At the summary judgment stage, the Court is not entitled to weigh the credibility of the varying accounts of the events that took place. Although the evidence presents a close call, this Court concludes that an issue of fact exists on this issue. Therefore, drawing all reasonable inferences in favor of the non-moving party, as it must, the Court concludes that a reasonable jury could find that the Ms. Brown's conduct was unwelcomed by Plaintiff and that Plaintiff found the conduct subjectively severe or pervasive.

## 2) Was the harassment objectively severe or pervasive?

[ 2 ] Whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment" is the element that tests the legitimacy of most sexual harassment claims and is therefore regarded as crucial. *Gupta v. Florida Bd. of Regents*, 212 F.2d 571, 583 [82 FEP Cases 1863] (11th Cir. 2000). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. at 370). In determining whether harassment is sufficiently severe and pervasive as to be actionable under the statute, courts should consider the following four factors to determine "whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive

**Page 1611**

utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d 1246 [81 FEP Cases 470] (Citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 [74 FEP Cases 1694] (11th Cir. 1997). "These factors taken together must reveal conduct extreme enough to 'amount to a change in terms and conditions of employment.' " *Lawerence v. Wal-Mart Stores, Inc.*, 236 F.Supp.2d 1314, 1324 (M.D. Fla. 2002) (citations omitted). Determining whether harassment is severe "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.

An examination of the four factors set forth above reveals that Plaintiff did not endure conduct sufficiently severe or pervasive so that a reasonable person in Plaintiff's position would find that the conduct altered the terms or conditions of his employment. First, the allegedly harassing conduct was infrequent. The following incidents were isolated events occurring only one time over a three-month period: Ms. Brown told Plaintiff she was lonely and asked him to spend the weekend with her and to be his girlfriend; she attempted to unbutton her blouse in front of Plaintiff; she wrote her phone number on a napkin with the words "I love you" and told Plaintiff to call him; she hugged him, and she introduced Plaintiff to her parents as her boyfriend. With respect to the other incidents, Plaintiff was unclear as to the number of times they occurred, but testified that Ms. Brown introduced him to her friends as his boyfriend on approximately five times and testified that the breast rubbing incident also may have occurred as many as five occasions. (Pl. Dep. at 163-64, 222). These incidents were not frequent enough to amount to the "continuous barrage" of harassment which the Eleventh Circuit deems actionable. See *Miller*, 277 F.3d at 1276 (finding that ethnic slurs made three to four times a day enough to establish that harassment was frequent); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 [79 FEP Cases 1446] (11th Cir. 1999) (finding that almost daily abuse in the form of sexually explicit stores and jokes, comments about plaintiff's body, and physical harassment sufficiently severe).

Second, the conduct at issue was not sufficiently severe to rise to the level of unlawful harassment necessary to maintain his claim. As stated above, Plaintiff testified that Ms. Brown's conduct included: attempts to hug and kiss him, brushing her breasts against his back and attempts (unsuccessful) to rub his private parts, comments about her desire to be his girlfriend and introduction to friends and parents as same, unbuttoning her blouse, professions of love on a napkin, invitations to go to dinner, a movie, and to her home, and references to Plaintiff as "Playboy" and "Sugardaddy" over the course of a three-month period. While the record supports that Plaintiff was bothered by this behavior and found it offensive, there is absolutely no evidence that Plaintiff ever felt physically threatened or afraid of Ms. Brown or that the conduct interfered with Plaintiff's job performance. Moreover, comparing these allegations to conduct deemed nondiscriminatory by other courts persuades this Court that the incidents at issue are not sufficiently severe. See *e.g. Gupta*, 212 F.3d at 584-85 (supervisor touched employees jewelry and asked her to lunch on several occasions, touched her knee and raised her dress him while asking about the material; stated that she looked 'very

beautiful' and stared at her in a way that made her uncomfortable, called her home two or three times per week and on weekends asking her about her boyfriend, suggesting that he would like to come over and spend the night not severe); *Weiss v. Coca Cola Bottling Co.*, 990 F.2d 333, 334-35 [61 FEP Cases 773] (7th Cir. 1993) (supervisor asked about plaintiff's personal life, complimented her on her look, asked her for dates, called her a dumb blonde, repeatedly put hands on her shoulders, placed "I love you" signs in her work area, and attempted to kiss her on three occasions not severe); *Evans v. Mobile Infirmary Med. Ctr.*, 2005 WL 1840235 at **9, 11 (S.D. Ala. Aug. 2, 2005) (comments about plaintiff's breasts, grabbing her buttocks on two occasions, touching her breast on one occasion not severe and pervasive); *Willets v. Interstate Hotels, LLC*, 204 F.Supp.2d 1334, 1337 (M.D. Fla. 2002) (supervisor hugged plaintiff three times a year, rubbed her head and shoulders, frequently indicated love for her, grabbed her buttocks, kissed her, and placed hand on her inner thigh not severe enough to constitute actionable harassment); *see also Mendoza*, 195 F.3d at 1246-47 (11th Cir. 1999) (detailing cases from other circuits delineating minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination). Thus, the Court finds that the incidents testified to here do not rise to the level of severe or pervasive necessary to maintain a claim of sexual harassment under Title VII.

**Page 1612**

### (3) Is there a basis for finding Defendant liable for a tangible employment action?

[ **3** ] Next, Defendant argues that there is no basis for finding Defendant liable, for two reasons. First, Defendant contends that Plaintiff failed to show that there was a tangible employment action causally related to the harassment. [Doc. No. 27] (Def. Br. at 18-26). The Court notes that Plaintiff failed to address the substance of Defendant's arguments on this point in his response to Defendant's motion and made no attempt to show a causal relationship between the alleged employment actions and the harassment. Instead, Plaintiff focused his argument on his contention that Plaintiff complained to District Manager Alsaleh about some of Ms. Brown's actions, presumably in an attempt to refute Defendant's asserted Faragher defense. While the Court must view the facts and all inferences therefrom in a light most favorable to the nonmoving party, it does not follow that the Court must also construct legal arguments to support that party's position. Plaintiff's failure to respond to Defendant's legal arguments relating to a claim alone constitutes abandonment of the claim. *Burnett v. Northside Hosp.*, 342 F.Supp.2d 1128, 1140 (N.D.Ga. 2004) (finding that non-movant's failure to address a claim challenged on summary judgment warranted dismissal of that claim); *Bute v. Schuller Int'l, Inc.*, 998 F.Supp. 1473, 1477 [7 AD Cases 1607] (N.D.Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); *Welch v. Delta Air Lines*, 978 F.Supp. 1133, 1137 [79 FEP Cases 1771] (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). Thus, the Court finds that, by failing to respond to Defendant's argument that there is no tangible employment action causally connected to the alleged harassment, Plaintiff concedes this part of his claim. [12]

---

[12] In addition, this Court notes that Defendant's arguments on this point are well taken, especially with respect to the lack of a causal relationship between the alleged harassment and any potential tangible employment action. *See* [Doc. No. 27] (Def. Br. at 18-26). See also the Court's discussion of Plaintiff's alleged adverse employment action in connection with Plaintiff's ADEA claim, *infra* pp. 37-39. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239-40 [85 FEP Cases 788] (11th Cir. 2001) (analysis of what constitutes adverse employment action is the same as for tangible employment action in hostile environment claims).

---

Second, Defendant contends that there is no basis for liability because it satisfies the two-part Faragher affirmative defense applicable in cases involving no tangible employment action. This "defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Defendant bears the burden of proof on these elements, both of which must be met in order for Defendant to avoid liability. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

The existence of a sexual harassment policy satisfies the first part of this burden only if the employer demonstrates that the policy "was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." *Id.* (citing *Madray v. Publix Supermarkets*, 208 F.3d 1290, 1298-1299 [82 FEP Cases 1071] (11th Cir. 1999)). The *Faragher* Court "implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." *Madray*, 208 F.3d at 1297-98. Dissemination of such a policy is "fundamental to meeting the requirement for exercising reasonable case in preventing sexual harassment." *Id.*

In the instant case it is undisputed that Defendant had a handbook, which included Papa John's policies against harassment and discrimination and that the handbook was disseminated to employees, including Plaintiff, at the onset of employment. (Pl. Dep. at 47, 120). Defendant's no harassment policy expressly instructs employees to report "any inappropriate behavior immediately to a manager or director of operations or call People Services hotline at 1-888-442-7272." [Doc. 27] (Def. Br. at Ex. 18). Plaintiff was provided with the telephone numbers for the Director of

Operations and the Peoples Services Director and he understood that if he experienced any harassment or discrimination, he should tell his supervisor or the Director of Operations, and that if he was dissatisfied with their handling of a complaint, he could report it to the hotline or to the People Services Director. (Def. SMF ¶¶71-72). Therefore, the Court

**Page 1613**

concludes that Defendant is able to show that it took reasonable care to prevent harassment.

Having determined that Defendant is able to satisfy its burden with respect to the first prong of the *Faragher* defense, the Court turns to the second prong—whether Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by Defendant or to prevent harm otherwise. Reporting sexual harassment is a necessary requirement for seeking relief under Title VII. The Eleventh Circuit recognized that:

> Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both. But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort if the employee wants to impose vicarious liability on the employer and collect damages under Title VII.

*Walton*, 347 F.3d at 1290 (quoting *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 35 [92 FEP Cases 98] (1st Cir. 2003)).

Defendant contends that Plaintiff's failure to report the harassment was unreasonable. [Doc. No. 27] (Def. Br. at 26-28). In response, Plaintiff claims that Plaintiff "complained directly to the District Manager Mason [Alsaleh] on two occasions and objected to the employment discrimination by Caretta Brown" and that no action was taken. [Doc. No. 36] (Pl. Br. at 6).

The Court finds that Plaintiff's claim of having complained is not supported by the record. Plaintiff testified that he called Mr. Alsaleh, Ms. Brown's supervisor, on two occasions over the course of his employment with Defendant to report his dissatisfaction with the fact that Ms. Brown cut his hours and that she sent him to deliver a pizza without a label and did not want to pay him his $1.00 commission. (Pl. Dep. at 185, 188, 214, 240-41). Plaintiff did not, however, report any other incident to Mr. Alsaleh, including any of Ms. Brown's harassing behavior. (*Id.* at 240). To the contrary, Plaintiff testified that he never reported to *anyone* that he was being harassed and/or discriminated against by Ms. Brown as was required under Defendant's anti-harassment policy:

> Q. Okay. The—sexual harassment incidents that we've talked about, did you report those to anybody?
>
> A. No.
>
> Q. The age discrimination incidents we talked about, did you report those to anybody?
>
> A. No.

(Pl. Dep. at 240-41). Nor did Plaintiff ever call the People Services Director or the 1-800 number set out in Defendant's Handbook for reporting harassing behavior. (Pl. Dep. at 246-48).

The Court finds that Plaintiff's failure to report Ms. Brown's sexual harassment was unreasonable. Therefore, Defendant has demonstrated that it would be entitled to assert, and to prevail on, the *Faragher* defense with regard to Plaintiff's sexual harassment claim. Accordingly, the Court **RECOMMENDS** that Defendant's motion for summary judgment with respect to Plaintiff's sexual harassment claim be **GRANTED**.

## B. Plaintiff's Age Discrimination Claim

Plaintiff claims he was unlawfully discriminated against based on his age. The ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age ... be made free from any discrimination based on age." 29 U.S.C. §633a(a). The ADEA "bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 [70 FEP Cases 486] (1996). In age discrimination cases, the plaintiff bears the ultimate burden of proving that age was the determinative factor in the employer's termination decision. *Carter v. City of Miami*, 870 F.2d 578, 581 [49 FEP Cases 1014] (11th Cir. 1989).

The Eleventh Circuit has applied the principles governing the order and allocation of proof in actions arising under Title VII to claims of age discrimination. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 [63 FEP Cases 838] (11th Cir. 1993). Accordingly, in order to show that Defendant intentionally discriminated against him, Plaintiff may present direct evidence of discriminatory intent, causing the burden to shift to Defendant to prove by a preponderance of the evidence that it would have made the same employment decision even absent the discriminatory motive. *EEOC v. Alton Packaging Corp.*, 901 F.3d 920, 925 [52 FEP Cases 1734] (11th Cir. 1990). If direct evidence is not available, Plaintiff may present circumstantial evidence

**Page 1614**

from which an inference of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308,

1313 [65 FEP Cases 1742] (11th Cir. 1994). If Plaintiff relies on circumstantial evidence, the Court will utilize the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 [5 FEP Cases 965] (1973); see also *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-38 [73 FEP Cases 232] (11th Cir. 1997) (surveying development of burden-shifting scheme in ADEA jurisprudence).

[ 4 ] In the instant case, Plaintiff contends that Brown's statement that, "Otu, I didn't need you anymore. You are not as fast as younger drivers", constitutes direct evidence of age discrimination. [Doc. No. 37] (Pl. Br. at 9). This statement is not, however, direct evidence of discriminatory motive. Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of the employee. *Carter*, 132 F.3d at 641 (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 [53 FEP Cases 885] (11th Cir. 1990)). It is evidence which, if believed, proves the existence of *a fact at issue without inference or presumption. Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 [74 FEP Cases 1511] (11th Cir. 1997); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 [45 FEP Cases 1129] (11th Cir. 1987). See also *Shook v. St. Bede School*, 74 F.Supp.2d 1172, 1177-1178 (M.D. Ala. 1999) ("Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption.") (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 [53 FEP Cases 968] (11th Cir. 1990)). "As a result, 'only the most blatant remarks, whose intent could be nothing more than to discriminate ...' will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d. 1353, 1359 [82 FEP Cases 899] (11th Cir. 1999) (quoting *Earley*, 907 F.2d at 1081-82). "In other words, the evidence must indicate that the complained-of employment decision was motivated by the decision-maker's ageism." *Damon*, 196 F.3d at 1358-59; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 [49 FEP Cases 954] (1989) (Brennan, J., for plurality) ("The plaintiff must show the employer actually relied on [the protected characteristic] in making its decision"); *Trotter v. Bd. of Trustees of Univ. of Ala.*, 91 F.3d 1449, 1453 [71 FEP Cases 1175] (11th Cir. 1996) (citing *Price Waterhouse* and indicating the need to demonstrate a correlation between the statement and the "challenged decision").

While Brown's statement refers to the speed of drivers younger than Plaintiff, it does not prove the existence of discriminatory animus as to Plaintiff's age without inference or presumption. The statement implies that performance, namely speed, motivated the speaker, as opposed to age. The Eleventh Circuit has repeatedly refused to hold that such comments constitute direct evidence of discrimination. See, e.g., *Minton v. American Bankers Ins. Group*, 2003 WL 21303330 *1 (11th Cir. 2003) (finding that statements that the company needed "fresh new blood" and that it was about time the older employees stepped aside so the younger employees could also achieve a measure of wealth was not direct evidence of discrimination); *Beaver v. Rayonier, Inc.*, 188 F.3d 1279, 1285-1286 [80 FEP Cases 1496] (11th Cir. 1999) (finding that decision-maker's comment that he wanted to attract "younger, engineer-type employees or supervisors" in reduction-in-force case did not rise to the level of direct evidence of discrimination); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393-94 [75 FEP Cases 1063] (11th Cir. 1997) (holding that evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition); *see also Shook*, 74 F.Supp.2d at 1177 (finding that employer's statement that "it's just Gerry's old and set in his ways" as an explanation for employee's termination did not constitute direct evidence of age discrimination). Thus, the alleged statement by Ms. Brown does not constitute direct evidence of discrimination. Accordingly, this Court will analyze Plaintiff's age discrimination claim pursuant to the framework set forth in *McDonnell Douglas*.

Under *McDonnell Douglas*, a plaintiff relying on circumstantial evidence of discrimination must first establish a prima facie case. *McDonnell Douglas Corp.*, 411 U.S. at 802-804. If he is able to establish a prima facie case, an inference of discrimination arises, and the burden of production then shifts to the defendant to rebut this inference of discrimination by articulating a legitimate, non-discriminatory reason for its action. *Id.* The defendant's burden at this stage is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060-61 [66 FEP Cases 340] (11th Cir. 1994). If the defendant meets this burden, then the inference of discrimination is

**Page 1615**

erased and the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802-804.

Plaintiff can establish a prima facie case of age discrimination under the ADEA by showing that: (1) he was a member of a protected class or age group (over forty); (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced with someone younger or his employer treated similarly situated younger employees more favorably. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 [82 FEP Cases 1748] (2000); *Denney v. City of Albany*, 247 F.3d 1172, 1183 [86 FEP Cases 741] (11th Cir. 2001) (citations omitted); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 [83 FEP Cases 1849] (11th Cir. 2000) (citing *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 [74 FEP Cases 376] (11th Cir. 1997)); *Damon*, 196 F.3d at 1359 (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 [76 FEP Cases 303] (11th Cir. 1998)). A plaintiff must demonstrate each of these four elements to fulfill the prima facie case. *Maynard v. Board of Regents of the Division of Universities of the Florida Department of Education*, 342 F.3d 1281, 1289 [92 FEP Cases 777] (11th Cir. 2003).

In the instant case, Defendant contends that Plaintiff cannot establish a prima facie case because he did not suffer an adverse action, and because Plaintiff did not meet his burden of presenting evidence that he was replaced by a younger employee or that similarly situated younger employees were treated more favorably. [Doc. No. 41] (Def. Reply Br. at 10-12). In response, Plaintiff asserts that "Otu has established his prima facie case as he was over forty when he was demoted and then discharged, was qualified for the position of delivery driver and was replaced by a

younger driver." [Doc. No. 36] (Pl. Br. at 7). Plaintiff identified an employee named "Mike" as the younger employee who replaced him. (Pl. Resp. To Def. SMF ¶82).

## 1. Did Plaintiff suffer an adverse action because of his age?

[ 5 ] An employment action must affect a term, condition or privilege of employment, and is not adverse merely because the employee dislikes it or disagrees with it. See *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 [76 FEP Cases 1506] (11th Cir. 1998). Decisions that do not constitute ultimate employment actions must meet "some threshold level of substantiality ... to be cognizable." *Id.* There must be a serious and material change in the terms, conditions, or privileges or employment in order to satisfy the prima facie case of employment discrimination. *Davis v. Town of Lake Park,* 245 F.3d 1232, 1239 [85 FEP Cases 788] (11th Cir. 2001). The only adverse actions Plaintiff contends he suffered, pursuant to his age discrimination claim, were demotion and termination. [Doc. No. 36] (Pl. Br. at 7). Therefore his ADEA claim is limited to these claims because he failed to present any argument as to the other alleged adverse actions. [13] *Bute,* 998 F.Supp. at 1477.

> [13] Plaintiff did not respond to Defendant's argument that giving Plaintiff single deliveries, as opposed to multiple deliveries, was an adverse action. *Bute,* 998 F.Supp. at 1477. Also, Plaintiff does not contend that Brown's alleged disparate application of the "first-out" policy was an adverse action, and instead refers to it as evidence of her ageism. [Doc. No. 36] (Pl. Br. at 7-8). Therefore, the Court need not address whether these incidents were adverse actions with respect to Plaintiff's ADEA claim.

First, Plaintiff alleges he was unlawfully demoted based on his age. [Doc. No. 36] (Pl. Br. at 7). The only potential demotion in this case occurred when Defendant changed Plaintiff's schedule so he was no longer a driver on the opening shift, but instead worked during the evening shift. However, Plaintiff has not shown that this was an adverse action because there is no evidence that he suffered a reduction in pay, prestige or responsibility. *Hinson,* 231 F.3d at 829 (citing *Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1448-1449 [8 AD Cases 1475] (11th Cir. 1998) (ADEA case)) ("[A] transfer to a different position can be adverse if it involves a reduction in pay, prestige, or responsibility."); see also *Gupta,* 212 F.3d at 583 (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 [74 FEP Cases 359] (3rd Cir. 1997)). A purely lateral transfer, that is a transfer which does not involve a demotion in form or substance, does not rise to the level of an adverse employment action. *Doe,* 145 F.3d at 1449. Therefore, Plaintiff's transfer from the opening shift to the evening shift is not actionably adverse in this case because it was a lateral in nature and did not involve any change in prestige, pay or responsibility. [14]

**Page 1616**

> [14] Moreover, the claims fail because Plaintiff admitted during his deposition that his removal from the opening shift was *not* age related. (Pl. Dep. at 228).

Next, Defendant disputes whether Plaintiff was terminated. [Doc. No. 27] (Def. Br. at 32). Plaintiff maintains he was terminated when he was removed from the schedule in November of 2003 and Brown told him that she did not need him anymore. [Doc. No. 36] (Pl. Br. at 8). On summary judgment, the proper question is whether a reasonable person in Plaintiff's position "would view the employment action in question as adverse." *Doe,* 145 F.3d at 749. The Court, viewing the evidence in a light most favorable to Plaintiff, finds an issue of fact as to whether Plaintiff was terminated and to that extent subjected to an actionable adverse action. *Ellerth,* 524 U.S. at 761 (stating that "a tangible employment action constitutes a significant change in employment status such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

## 2. Was Plaintiff replaced with a younger driver or were similarly situated younger drivers treated more favorably than Plaintiff?

[ 6 ] Plaintiff must show that he was discriminated against, based on his age, by adducing sufficient evidence that he was either replaced by a younger driver or treated more favorably than a similarly situated younger driver. *Maynard,* 342 F.3d at 1289. Plaintiff must set forth at least one of these circumstances to satisfy his prima facie case. *Id.* "A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he who was not a member of his protected class." *Morris v. Emory Clinic, Inc.,* 402 F.3d 1076, 1082 [95 FEP Cases 599] (11th Cir. 2005).

Defendant asserts that Plaintiff has no evidence that he was replaced by a younger driver or that similarly situated younger drivers were treated more favorably. [Doc. No. 27] (Def. Br. at 32-33). The Court agrees. Indeed, the only comparator Plaintiff avers to is an employee named "Mike", who Plaintiff claims replaced him on the opening shift. (Pl. Dep. at 243). This allegation is insufficient to support Plaintiff's prima facie case of age discrimination. Plaintiff has put forth no evidence to establish that Mike replaced him after he was terminated; how old Mike was; or how he was similarly situated to Plaintiff. Plaintiff has furthermore failed to meet his burden of showing adequate similarities between his conduct and that of Mike, or any other younger employee. [15] *Jones v. Gerwens,* 874 F.2d 1534, 1541 [50 FEP Cases 163] (11th Cir. 1989) ("the burden is on [the plaintiff] to show a similarity between his conduct and that of [younger] employees"); *Holifield v. Reno,* 115 F.3d 1555, 1562 [74 FEP Cases 511] (11th Cir. 1997) (plaintiff and

employees must be "similarly situated in all relevant respects"). Accordingly, Plaintiff has failed to set forth a prima facie case of age discrimination.

---

[15] Also, Plaintiff stated during his deposition that Mike was hired *before* Plaintiff was terminated and replaced Plaintiff during the opening shift. (Pl. Dep. at 228). Plaintiff, however, admitted that his removal from the opening shift was *not* related to age. *Id.* Thus, Plaintiff's own testimony conflicts with any argument that he was replaced by Mike after he was terminated.

---

## 3. Defendant's reasons for terminating Plaintiff

Although a court's analysis generally ends with a finding that the plaintiff failed to establish a prima facie case, *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 [35 FEP Cases 1104] (11th Cir. 1984), the Court will nevertheless address the remaining steps to show that summary judgment would be appropriate, even if Plaintiff had established a prima facie case, because Defendant has put forth a legitimate, non-discriminatory reason for taking adverse employment action against Plaintiff. In this case, Defendant justifies removing Plaintiff from the schedule because he had performance deficiencies that needed to be addressed before he could continue working. [Doc. No. 27] (Def. Br. at 33). Specifically, Defendant articulates that Brown and other managers believed Plaintiff's work performance was deficient because of his slow delivery time and lack of cross-training. Id. These explanations satisfy Defendant's burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 [62 FEP Cases 96] (1993). The burden now shifts back to Plaintiff, who must be afforded "a fair opportunity to show that [Defendant's] stated reason [is] in fact pretext." *McDonnell Douglas Corp.*, 411 U.S. at 804-807.

## 4. Pretext

[ 7 ] To survive summary judgment, Plaintiff must provide evidence that creates a genuine

**Page 1617**

issue of material fact that Defendant's articulated, nondiscriminatory reason is, instead, pretext for unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804-807; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 [82 FEP Cases 1748] (2000) (finding that "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence'.") (quoting *Burdine*, 450 U.S. at 256); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 [73 FEP Cases 232] (11th Cir. 1997).

In reviewing Defendant's explanation, however, the Court cannot usurp an employer's legitimate business judgment in the absence of evidence of racial discrimination. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 [83 FEP Cases 873] (11th Cir. 2000) (finding that "in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law."). "In evaluating a summary judgment motion, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 [95 FEP Cases 1048] (quoting *Combs*, 106 F.3d 1519, 1538 [73 FEP Cases 232] ) (internal citations omitted).

In this case, Plaintiff points to the following evidence in support of pretext: (1) Plaintiff's testimony that he did not have performance deficiencies and did not receive any written reprimands; and (2) Brown's "age bias" as demonstrated by certain employment decisions. [Doc. No. 36] (Pl. Br. at 7-8). These arguments are unavailing. Plaintiff has not put forth any evidence that shows that Defendant did not believe that his performance was deficient, and his own testimony expressly contradicts this contention. Specifically, Plaintiff admitted that he was not cross-trained, making Defendant's articulated reason for his termination—deficient job performance—undisputed. (Pl. Dep. at 254-255; 241-242). Therefore, Plaintiff's own testimony refutes his assertion that Defendant terminated him for being deficient when he was not. [16]

---

[16] Plaintiff must show that all of Defendant's reasons for terminating him were pretext for age discrimination. *See Johnson v. Booker T. Washington Broadcasting Services*, No. 99-6078, 2000 WL 1752177, at 6 n.9 [232 F.3d 844, 84 FEP Cases 665] (11th Cir. November 29, 2000); *Chapman v. A.I. Transport*, 229 F.3d 1012, 1024-25 [83 FEP Cases 1849] (11th Cir. 2000) (explaining that if the Plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment). Therefore, Plaintiff's entire pretext argument fails because his admission that he was not cross-trained.

---

Moreover, Plaintiff's subjective perceptions and conclusory allegations unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. *See Chapman*, 229 F.3d at 1051 n.34; *Wood v. City of Lakeland*, 203 F.3d 1288, 1292 (11th Cir. 2000); *Holifield*, 115 F.3d 1555, 1564 n.6 [74 FEP Cases 511] (11th Cir. 1997); *Carter v. City of Miami*, 870 F.2d 578, 585 [49 FEP Cases 1014] (11th Cir. 1989). This is because the relevant "inquiry into pretext centers upon the employer's beliefs and not the employee's own perceptions of his performance." *Holifield*, 115 F.3d at 1565. Consequently, "where the employer produces performance reviews and

other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment in the absence of other evidence." *Id.* In fact, Defendant need only to show that it had good reason to believe Plaintiff had performance deficiencies. *Jones*, 874 F.2d at 1540. Accordingly, Plaintiff's allegations of pretext fail because they are based on his own perceptions and do not caste doubt on Defendant's articulated reason for terminating him based on his performance deficiencies.

Plaintiff also contends that Brown discriminated against him and Sampson, both of whom were over forty, with respect to the "first driver out" policy and the number of work hours assigned to them. [Doc. No. 36] (Pl. Br. at 8). These assertions are without support because, as noted with respect to Plaintiff's prima facie case, he has not put forth any evidence that he was treated less favorably than similarly situated younger employers, nor pointed to an adequate comparator to show that he was discriminated against because of his age. *Cf. Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 852 [73 FEP Cases 784] (11th Cir. 1997) ("Evidence offered in the prima facie case may be sufficient to raise a genuine issue of material fact regarding pretext.").

**Page 1618**

Plaintiff's conclusory allegations as to his job performance, as well as his perception that younger employees were given more hours and more favorable application of the "first out" policy, without more, fail to support a finding of pretext. *See, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 n. 6 [76 FEP Cases 1635] (11th Cir. 1998) (holding that conclusory and generalized allegations of racial bias such as "there was a racially biased attitude by management towards minority black employees" were properly struck by the district court). As stated by the Eleventh Circuit, "provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d 1012, 1030 [83 FEP Cases 1849] (11th Cir. 2000). Therefore, summary judgment should be **GRANTED** as to Plaintiff's claims brought under the ADEA.

## VI.
## Conclusion

For the reasons expressed herein, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment [Doc. No. 27] be **GRANTED** in its entirety. The Clerk is **DIRECTED** to terminate the referral of this case to the undersigned magistrate judge.

It is **SO REPORTED AND RECOMMENDED**, this 19th day of August, 2005.

- End of Case -

Contact customer relations at: customercare@bna.com or 1-800-372-1033

ISSN 1527-7356
Copyright © 2008, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Westlaw.

118 S.Ct. 2275                                                                                          Page 1
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

▷

**Faragher v. City of BocaRaton**
U.S.Fla.,1998.

Supreme Court of the United States
Beth Ann **FARAGHER**, Petitioner,
v.
**CITY** OF **BOCARATON**.
No. 97-282.

Argued March 25, 1998.
Decided June 26, 1998.

Former **city** lifeguard sued **city** under Title VII for
sexual harassment based on conduct of supervisors.
Following bench trial, the United States District
Court for the Southern District of Florida, 864
F.Supp. 1552,Shelby Highsmith, J., entered judg-
ment for lifeguard. Appeal was taken. A panel of
the Court of Appeals for the Eleventh Circuit re-
versed in part, 76 F.3d 1155.After vacation of panel
opinion and granting of rehearing en banc, the
Court of Appeals for the Eleventh Circuit, Cox,
Circuit Judge, reversed decision of District Court in
part, 111 F.3d 1530.Granting certiorari, the Su-
preme Court, Justice Souter, held that: (1) employer
is subject to vicarious liability under Title VII to a
victimized employee for actionable discrimination
caused by a supervisor, but employer may raise an
affirmative defense that looks to the reasonableness
of employer's conduct in seeking to prevent and
correct harassing conduct and to the reasonableness
of employee's conduct in seeking to avoid harm,
and (2) city was vicariously liable to lifeguard in
view of its failure to exercise reasonable care to
prevent harassing behavior.

Judgment of Court of Appeals for the Eleventh Cir-
cuit reversed; case remanded for reinstatement of
judgment of District Court.

Justice Thomas filed a dissenting opinion in which
Justice Scalia joined.

West Headnotes

**[1] Civil Rights 78 ⚖=1119**

78 Civil Rights
    78II Employment Practices
        78k1119 k. Adverse Actions in General.
Most Cited Cases
    (Formerly 78k141)
Although employment discrimination provisions of
Title VII mention specific employment decisions
with immediate consequences, scope of the prohibi-
tion is not limited to "economic" or "tangible" dis-
crimination and covers more than terms and condi-
tions of employment in the contractual sense. Civil
Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. §
2000e-2(a)(1).

**[2] Civil Rights 78 ⚖=1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environ-
ment
            78k1185 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
In order to be actionable under Title VII, a sexually
objectionable environment must be both objectively
and subjectively offensive, one that a reasonable
person would find hostile or abusive, and one that
the victim in fact did perceive to be so; courts must
determine whether an environment is sufficiently
hostile or abusive by looking at all the circum-
stances, including frequency of discriminatory con-
duct, its severity, whether it is physically threaten-
ing or humiliating or a mere offensive utterance,
and whether it unreasonably interferes with an em-
ployee's work performance. Civil Rights Act of
1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[3] Civil Rights 78 ⚖=1185**

78 Civil Rights
    78II Employment Practices

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                    Page 2
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
(Cite as: 524 U.S. 775, 118 S.Ct. 2275)

78k1181 Sexual Harassment; Work Environment

78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases

(Formerly 78k167)

Antidiscrimination provisions of Title VII do not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex; simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[4] Civil Rights 78 ☞1119**

78 Civil Rights
    78II Employment Practices
        78k1119 k. Adverse Actions in General.
Most Cited Cases
    (Formerly 78k145)

**Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)

Conduct must be extreme to amount to a change in the terms and conditions of employment, within context of antidiscrimination provisions of Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[5] Civil Rights 78 ☞1104**

78 Civil Rights
    78II Employment Practices
        78k1102 Constitutional and Statutory Provisions
            78k1104 k. Purpose and Construction in

General. Most Cited Cases
    (Formerly 78k141)

Although Title VII seeks to make persons whole for injuries suffered on account of unlawful employment discrimination, its primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[6] Civil Rights 78 ☞1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
    (Formerly 78k167)

**Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
    (Formerly 78k371)

Under antidiscrimination provisions of Title VII, employer is subject to vicarious liability to victimized employee for an actionable hostile environment created by a supervisor with immediate or successively higher authority over employee; when no tangible employment action is taken, employer may raise an affirmative defense to liability or damages, subject to proof by preponderance of evidence and comprising two necessary elements: (a) that employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by employer or to avoid harm otherwise. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P 45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

**[7] Civil Rights 78 ⟶1149**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
     (Formerly 78k167)

**Civil Rights 78 ⟶1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
     (Formerly 78k167)

**Civil Rights 78 ⟶1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
     (Formerly 78k371)
Under antidiscrimination provisions of Title VII, while proof that an employer has promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law for asserting an affirmative defense to vicarious liability for an actionable hostile environment created by a supervisor, the need for a stated policy suitable to the employment circumstances may appropriately be addressed when litigating that element of the defense. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[8] Civil Rights 78 ⟶1189**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1189 k. Knowledge or Notice; Pre-

ventive or Remedial Measures. Most Cited Cases
     (Formerly 78k167)

**Civil Rights 78 ⟶1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
     (Formerly 78k371)
Demonstration that an employee failed to use a complaint procedure provided by the employer in response to sexual harassment by a supervisor will normally suffice to satisfy the employer's burden of demonstrating lack of reasonable care by employee to avoid harm, as element of affirmative defense to a vicarious liability claim under Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[9] Civil Rights 78 ⟶1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
     (Formerly 78k371)
Under Title VII, no affirmative defense is available to an employer on an employee's claim of vicarious liability for an actionable hostile environment created by a supervisor when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[10] Civil Rights 78 ⟶1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable

118 S.Ct. 2275                                                                Page 4
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
(Formerly 78k371)

City was vicariously liable under Title VII for sexual harassment of female city lifeguard over five-year period by male supervisors in form of uninvited and offensive touching, lewd remarks, and offensive references to women; degree of hostility in work environment rose to actionable level and was attributable to supervisors, supervisors were granted virtually unchecked authority over subordinates, and lifeguard was completely isolated from city's higher management. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[11] Civil Rights 78 ⟜1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
            (Formerly 78k167)

**Civil Rights 78 ⟜1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
            (Formerly 78k167)

City could not be found to have exercised reasonable care to prevent male supervisors' harassing conduct toward female city lifeguard, as necessary to establish affirmative defense to vicarious liability for supervisors' conduct in Title VII action; city failed entirely to disseminate its policy against sexual harassment among beach employees, its officials made no attempt to keep track of conduct of supervisors in question, and city's sexual harassment policy did not include any assurance that harassing supervisors could be bypassed in registering complaints. Civil Rights Act of 1964, § 703(a)(1),

42 U.S.C.A. § 2000e-2(a)(1).

**\*\*2277 \*775 Syllabus** [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

After resigning as a lifeguard with respondent **City of BocaRaton (City),** petitioner Beth Ann **Faragher** brought an action against the **City** and her immediate supervisors, Bill Terry and David Silverman, for nominal damages and other relief, alleging, among other things, that the supervisors had created a "sexually hostile atmosphere" at work by repeatedly subjecting **Faragher** and other female lifeguards to "uninvited and offensive touching," by making lewd remarks, and by speaking of women in offensive terms, and that this conduct constituted discrimination in the "terms, conditions, and privileges" of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). Following a bench trial, the District Court concluded that the supervisors' conduct was discriminatory harassment sufficiently serious to alter the conditions of Faragher's employment and constitute an abusive working environment. The District Court then held that the City could be liable for the harassment of its supervisory employees because the harassment was pervasive enough to support an inference that the City had "knowledge, or constructive knowledge," of it; under traditional agency principles Terry and Silverman were acting as the City's agents when they committed the harassing acts; and a third supervisor had knowledge of the harassment and failed to report it to City officials. The Eleventh Circuit, sitting en banc, reversed. Relying on *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, and on the Restatement (Second) of Agency § 219 (1957) (Restatement), the Court of Appeals held that Terry and Silverman were not acting within the scope of their employment when

118 S.Ct. 2275                                                                    Page 5
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

they engaged in the harassing conduct, that their agency relationship with the City did not facilitate the harassment, that constructive knowledge of it could not be imputed to the City because of its pervasiveness or the supervisor's knowledge, and that the City could not be held liable for negligence in failing to prevent it.

*Held:* An employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff victim. Pp. 2282-2294.

(a) While the Court has delineated the substantive contours of the hostile environment Title VII forbids, see, *e.g.,\*776Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-371, 126 L.Ed.2d 295, its cases have established few definitive rules for determining when an employer will be liable for a discriminatory environment that is otherwise actionably abusive. The Court's only discussion to date of the standards of employer liability came in *Meritor,supra,* where the Court held that traditional agency principles were relevant for determining employer liability. Although the Court cited the Restatement §§ 219-237 with general approval, the Court cautioned that common-law agency principles might not be transferable in all their particulars. Pp. 2282-2286.

(b) Restatement § 219(1) provides that "a master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Although Title VII cases in the Courts of Appeals have typically held, or assumed, that supervisory sexual harassment falls outside the scope of employment because it is motivated solely by individual desires and serves no purpose of the employer, these cases appear to be in tension with others defining the scope of the employment broadly to hold employers vicariously liable for employees' intentional torts, including sexual assaults, that were not done \*\*2278 to serve the employer, but were deemed to be characteristic of its activities or a foreseeable consequence of its business. This ten-

sion is the result of differing judgments about the desirability of holding an employer liable for his subordinates' wayward behavior. The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement, but rather an inquiry into whether it is proper to conclude that sexual harassment is one of the normal risks of doing business the employer should bear. An employer can reasonably anticipate the possibility of sexual harassment occurring in the workplace, and this might justify the assignment of the costs of this behavior to the employer rather than to the victim. Two things counsel in favor of the contrary conclusion, however. First, there is no reason to suppose that Congress wished courts to ignore the traditional distinction between acts falling within the scope of employment and acts amounting to what the older law called frolics or detours from the course of employment. Second, the lower courts, by uniformly judging employer liability for co-worker harassment under a negligence standard, have implicitly treated such harassment outside the scope of employment. It is unlikely that such treatment would escape efforts to render them obsolete if the Court held that harassing supervisors necessarily act within the scope of their employment. The rationale for doing so would apply when the behavior was that of coemployees, because the employer generally benefits from the work of common employees as from the work of supervisors. The answer to this argument might be that the scope of supervisory employment may be treated separately because supervisors\*777 have special authority enhancing their capacity to harass and the employer can guard against their misbehavior more easily. This answer, however, implicates an entirely separate category of agency law, considered in the next section. Given the virtue of categorical clarity, it is better to reject reliance on misuse of supervisory authority (without more) as irrelevant to the scope-of-employment analysis. Pp. 2286-2290.

(c) The Court of Appeals erred in rejecting a theory of vicarious liability based on § 219(2)(d) of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                          Page 6
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

Restatement, which provides that an employer "is not subject to liability for the torts of his servants acting outside the scope of their employment unless ... the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." It makes sense to hold an employer vicariously liable under Title VII for some tortious conduct of a supervisor made possible by use of his supervisory authority, and the aided-by-agency-relation principle of § 219(2)(d) provides an appropriate starting point for determining liability for the kind of harassment presented here. In a sense a supervisor is always assisted in his misconduct by the supervisory relationship; however, the imposition of liability based on the misuse of supervisory authority must be squared with *Meritor's* holding that an employer is not "automatically" liable for harassment by a supervisor who creates the requisite degree of discrimination. There are two basic alternatives to counter the risk of automatic liability. The first is to require proof of some affirmative invocation of that authority by the harassing supervisor; the second is to recognize an affirmative defense to liability in some circumstances, even when a supervisor has created the actionable environment. The problem with the first alternative is that there is not a clear line between the affirmative and merely implicit uses of supervisory power; such a rule would often lead to close judgment calls and results that appear disparate if not contradictory, and the temptation to litigate would be hard to resist. The second alternative would avoid this particular temptation to litigate and implement Title VII sensibly by giving employers an incentive to prevent and eliminate harassment and by requiring employees to take advantage of the preventive or remedial apparatus of their employers. Thus, the Court adopts the following holding in this case and in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633, also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with **2279 immediate (or

successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance*778 of the evidence. See Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Pp. 2289-2293.

(d) Under this standard, the Eleventh Circuit's judgment must be reversed. The District Court found that the degree of hostility in the work environment rose to the actionable level and was attributable to Silverman and Terry, and it is clear that these supervisors were granted virtually unchecked authority over their subordinates and that Faragher and her colleagues were completely isolated from the City's higher management. While the City would have an opportunity to raise an affirmative defense if there were any serious prospect of its presenting one, it appears from the record that any such avenue is closed. The District Court found that the City had entirely failed to disseminate its sexual harass-

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

ment policy among the beach employees and that its officials made no attempt to keep track of the conduct of supervisors, and the record makes clear that the City's policy did not include any harassing supervisors assurance that could be bypassed in registering complaints. Under such circumstances, the Court holds as a matter of law that the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct. Although the record discloses two possible grounds upon which the City might seek to excuse its failure to distribute its policy and to establish a complaint mechanism, both are contradicted by the record. The City points to nothing that might justify a conclusion by the District Court on remand that the City had exercised reasonable care. Nor is there any reason to remand for consideration of Faragher's efforts to mitigate her own damages, since the award to her was solely nominal. Pp. 2293-2294.

**\*779** e) There is no occasion to consider whether the supervisors' knowledge of the harassment could be imputed to the City. Liability on that theory could not be determined without further factfinding on remand, whereas the reversal necessary on the supervisory harassment theory renders any remand for consideration of imputed knowledge (or of negligence as an alternative to a theory of vicarious liability) entirely unjustifiable. P. 2294.

111 F.3d 1530, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post,* p. 2294.

William R. Amlong, Ft. Lauderdale, FL, for Petitioner.
Irving L. Gornstein, Washington, DC, for U.S.
Harry A. Rissetto, Washington, DC, for Respondent.For U.S. Supreme Court briefs, see:1997 WL 793076 (Pet.Brief)1998 WL 32487 (Resp.Brief)**\*\*2280** 1998 WL 66037 (Reply.Brief)

**\*780** Justice SOUTER delivered the opinion of the Court.
This case calls for identification of the circumstances under which an employer may be held liable under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e*et seq.,* for the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment amounting to employment discrimination. We hold that an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim.

I

Between 1985 and 1990, while attending college, petitioner Beth Ann **Faragher** worked part time and during the summers as an ocean lifeguard for the Marine Safety Section of the Parks and Recreation Department of respondent, the **City** of **BocaRaton**, Florida **(City)**. During this period, **Faragher's** immediate supervisors were Bill Terry, David Silverman, and Robert Gordon. In June 1990, **Faragher** resigned.

In 1992, **Faragher** brought an action against Terry, Silverman, and the **City**, asserting claims under Title VII, Rev.Stat. § 1979, 42 U.S.C. § 1983, and Florida law. So far as it concerns the Title VII claim, the complaint alleged that Terry and Silverman created a "sexually hostile atmosphere" at the beach by repeatedly subjecting Faragher and other female lifeguards to "uninvited and offensive touching," by making lewd remarks, and by speaking of women in offensive terms. The complaint contained specific allegations that Terry once said that he would never promote a woman to the rank of lieutenant, and that Silverman had said to Faragher, "Date me or clean the toilets for a year." Asserting that **\*781** Terry and Silverman were agents of the City, and that their conduct amounted to discrimination in the "terms, conditions, and priv-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                          Page 8
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

ileges" of her employment, 42 U.S.C. § 2000e-2(a)(1), Faragher sought a judgment against the City for nominal damages, costs, and attorney's fees.

Following a bench trial, the United States District Court for the Southern District of Florida found that throughout Faragher's employment with the City, Terry served as Chief of the Marine Safety Division, with authority to hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline. 864 F.Supp. 1552, 1563-1564 (1994). Silverman was a Marine Safety lieutenant from 1985 until June 1989, when he became a captain. *Id.,* at 1555. Gordon began the employment period as a lieutenant and at some point was promoted to the position of training captain. In these positions, Silverman and Gordon were responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training. *Id.,* at 1564.

The lifeguards and supervisors were stationed at the city beach and worked out of the Marine Safety Headquarters, a small one-story building containing an office, a meeting room, and a single, unisex locker room with a shower. *Id.,* at 1556. Their work routine was structured in a "paramilitary configuration," *id.,* at 1564, with a clear chain of command. Lifeguards reported to lieutenants and captains, who reported to Terry. He was supervised by the Recreation Superintendent, who in turn reported to a Director of Parks and Recreation, answerable to the City Manager. *Id.,* at 1555. The lifeguards had no significant contact with higher city officials like the Recreation Superintendent. *Id.,* at 1564.

In February 1986, the City adopted a sexual harassment policy, which it stated in a memorandum from the City Manager*782 addressed to all employees. *Id.,* at 1560. In May 1990, the City revised the policy and reissued a statement of it. *Ibid.* Although the City may actually have circulated the memos and statements to some employees, it completely

failed to disseminate its policy among employees of the Marine Safety Section, with the result that Terry, Silverman, **2281 Gordon, and many lifeguards were unaware of it. *Ibid.*

From time to time over the course of Faragher's tenure at the Marine Safety Section, between 4 and 6 of the 40 to 50 lifeguards were women. *Id.,* at 1556. During that 5-year period, Terry repeatedly touched the bodies of female employees without invitation, *ibid.,* would put his arm around Faragher, with his hand on her buttocks, *id.,* at 1557, and once made contact with another female lifeguard in a motion of sexual simulation, *id.,* at 1556. He made crudely demeaning references to women generally, *id.,* at 1557, and once commented disparagingly on Faragher's shape, *ibid.* During a job interview with a woman he hired as a lifeguard, Terry said that the female lifeguards had sex with their male counterparts and asked whether she would do the same. *Ibid.*

Silverman behaved in similar ways. He once tackled Faragher and remarked that, but for a physical characteristic he found unattractive, he would readily have had sexual relations with her. *Ibid.* Another time, he pantomimed an act of oral sex. *Ibid.* Within earshot of the female lifeguards, Silverman made frequent, vulgar references to women and sexual matters, commented on the bodies of female lifeguards and beachgoers, and at least twice told female lifeguards he would like to engage in sex with them. *Id.,* at 1557-1558.

Faragher did not complain to higher management about Terry or Silverman. Although she spoke of their behavior to Gordon, she did not regard these discussions as formal complaints to a supervisor but as conversations with a person she held in high esteem. *Id.,* at 1559. Other female *783 lifeguards had similarly informal talks with Gordon, but because Gordon did not feel that it was his place to do so, he did not report these complaints to Terry, his own supervisor, or to any other city official. *Id.,* at 1559-1560. Gordon responded to the complaints of one lifeguard by saying that "the City just [doesn't]

118 S.Ct. 2275                                                                                                Page 9
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

care." *Id.,* at 1561.

In April 1990, however, two months before Faragher's resignation, Nancy Ewanchew, a former lifeguard, wrote to Richard Bender, the City's Personnel Director, complaining that Terry and Silverman had harassed her and other female lifeguards. *Id.,* at 1559. Following investigation of this complaint, the City found that Terry and Silverman had behaved improperly, reprimanded them, and required them to choose between a suspension without pay or the forfeiture of annual leave. *Ibid.*

On the basis of these findings, the District Court concluded that the conduct of Terry and Silverman was discriminatory harassment sufficiently serious to alter the conditions of Faragher's employment and constitute an abusive working environment. *Id.,* at 1562-1563. The District Court then ruled that there were three justifications for holding the City liable for the harassment of its supervisory employees. First, the court noted that the harassment was pervasive enough to support an inference that the City had "knowledge, or constructive knowledge," of it. *Id.,* at 1563. Next, it ruled that the City was liable under traditional agency principles because Terry and Silverman were acting as its agents when they committed the harassing acts. *Id.,* at 1563-1564. Finally, the court observed that Gordon's knowledge of the harassment, combined with his inaction, "provides a further basis for imputing liability on [sic] the City."*Id.,* at 1564. The District Court then awarded Faragher $1 in nominal damages on her Title VII claim. *Id.,* at 1564-1565.

A panel of the Court of Appeals for the Eleventh Circuit reversed the judgment against the City. *78*476 F.3d 1155 1996). Although the panel had "no trouble concluding that Terry's and Silverman's conduct ... was severe and pervasive enough to create an objectively abusive work environment,"*id.,* at 1162, it overturned the District Court's conclusion that the City was liable. The panel ruled that Terry and Silverman were not acting within the scope of their employment when they engaged in the harassment, *id.,* at 1166, that they were not

aided in their actions by the agency relationship, *id.,* at 1166, n. 14, and that the City had no constructive knowledge of the harassment by virtue of its pervasiveness or Gordon's actual knowledge, *id.,* at 1167, and n. 16.

**\*\*2282** In a 7-to-5 decision, the full Court of Appeals, sitting en banc, adopted the panel's conclusion. 111 F.3d 1530 (1997). Relying on our decision in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and on the Restatement (Second) of Agency § 219 (1957) (hereinafter Restatement), the court held that "an employer may be indirectly liable for hostile environment sexual harassment by a superior: (1) if the harassment occurs within the scope of the superior's employment; (2) if the employer assigns performance of a nondelegable duty to a supervisor and an employee is injured because of the supervisor's failure to carry out that duty; or (3) if there is an agency relationship which aids the supervisor's ability or opportunity to harass his subordinate." 111 F.3d, at 1534-1535.

Applying these principles, the court rejected Faragher's Title VII claim against the City. First, invoking standard agency language to classify the harassment by each supervisor as a "frolic" unrelated to his authorized tasks, the court found that in harassing Faragher, Terry and Silverman were acting outside the scope of their employment and solely to further their own personal ends. *Id.,* at 1536-1537. Next, the court determined that the supervisors' agency relationship with the City did not assist them in perpetrating their harassment. *Id.,* at 1537. Though noting that "a supervisor is always aided in accomplishing hostile environment sexual *785* harassment by the existence of the agency relationship with his employer because his responsibilities include close proximity to and regular contact with the victim," the court held that traditional agency law does not employ so broad a concept of aid as a predicate of employer liability, but requires something more than a mere combination of agency relationship and improper conduct by the agent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P 45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

*Ibid.* Because neither Terry nor Silverman threatened to fire or demote Faragher, the court concluded that their agency relationship did not facilitate their harassment. *Ibid.*

The en banc court also affirmed the panel's ruling that the City lacked constructive knowledge of the supervisors' harassment. The court read the District Court's opinion to rest on an erroneous legal conclusion that any harassment pervasive enough to create a hostile environment must *a fortiori* also suffice to charge the employer with constructive knowledge. *Id.,* at 1538. Rejecting this approach, the court reviewed the record and found no adequate factual basis to conclude that the harassment was so pervasive that the City should have known of it, relying on the facts that the harassment occurred intermittently, over a long period of time, and at a remote location. *Ibid.* In footnotes, the court also rejected the arguments that the City should be deemed to have known of the harassment through Gordon, *id.,* at 1538, n. 9, or charged with constructive knowledge because of its failure to disseminate its sexual harassment policy among the lifeguards, *id.,* at 1539, n. 11.

Since our decision in *Meritor,* Courts of Appeals have struggled to derive manageable standards to govern employer liability for hostile environment harassment perpetrated by supervisory employees. While following our admonition to find guidance in the common law of agency, as embodied in the Restatement, the Courts of Appeals have adopted different approaches. Compare, *e.g.,Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437 (C.A.10 1997), vacated, 524 U.S. 947, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998); 111 F.3d 1530 (C.A.11 1997) (case below); *786*Gary v. Long,* 59 F.3d 1391 (C.A.D.C.), cert. denied, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); and *Karibian v. Columbia University,* 14 F.3d 773 (C.A.2),cert. denied, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). We granted certiorari to address the divergence, 522 U.S. 978, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997), and now reverse the judgment of the

Eleventh Circuit and remand for entry of judgment in Faragher's favor.

II

A

[1] Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual**2283** with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). We have repeatedly made clear that although the statute mentions specific employment decisions with immediate consequences, the scope of the prohibition " 'is not limited to "economic" or "tangible" discrimination,' "*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson, supra,* at 64, 106 S.Ct., at 2404), and that it covers more than " 'terms' and 'conditions' in the narrow contractual sense." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). Thus, in *Meritor* we held that sexual harassment so "severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment' " violates Title VII. 477 U.S., at 67, 106 S.Ct., at 2405-2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (C.A.11 1982)).

In thus holding that environmental claims are covered by the statute, we drew upon earlier cases recognizing liability for discriminatory harassment based on race and national origin, see, *e.g., Rogers v. EEOC,* 454 F.2d 234 (C.A.5 1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *Firefighters Institute for Racial Equality v. St. Louis,* 549 F.2d 506 (C.A.8), cert. denied *sub nom. Banta v. United States,* 434 U.S. 819, 98 S.Ct.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                    Page 11
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

60, 54 L.Ed.2d 76 (1977), *787 just as we have also followed the lead of such cases in attempting to define the severity of the offensive conditions necessary to constitute actionable sex discrimination under the statute. See, *e.g.,Rogers, supra,* at 238 ("[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate Title VII).[FN1] See also *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1271-1272 (C.A.7 1991); *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (C.A.6 1988), cert. denied, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (C.A.2 1986); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed.1996) (hereinafter Lindemann & Grossman) (citing cases instructing that "[d]iscourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable harassment").

> FN1. Similarly, Courts of Appeals in sexual harassment cases have properly drawn on standards developed in cases involving racial harassment. See, *e.g., Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (C.A.2 1989) (citing *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (C.A.2 1987), a case of racial harassment, for the proposition that incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.

[2][3] So, in *Harris,* we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. 510 U.S., at 21-22, 114 S.Ct., at 370-371. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening*788 or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.,* at 23, 114 S.Ct., at 371. Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale,* 523 U.S., at 81, 118 S.Ct., at 1003. A recurring point in these opinions is that "simple teasing," *id.,* at 82, 118 S.Ct., at 1003, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

[4] These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility **2284 code." *Id.,* at 80, 118 S.Ct., at 1002. Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992) (hereinafter Lindemann & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. See, *e.g., Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County,* 792 F.2d 746, 749-750 (C.A.8 1986); See also 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                          Page 12

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

While indicating the substantive contours of the hostile environments forbidden by Title VII, our cases have established few definite rules for determining when an employer will be liable for a discriminatory environment that is otherwise actionably abusive. Given the circumstances of many of the litigated cases, including some that have come to us, it is not surprising that in many of them, the issue has been joined over the sufficiency of the abusive conditions, not the *789 standards for determining an employer's liability for them. There have, for example, been myriad cases in which District Courts and Courts of Appeals have held employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop. See, *e.g., Katz v. Dole,* 709 F.2d 251, 256 (C.A.4 1983) (upholding employer liability because the "employer's supervisory personnel manifested unmistakable acquiescence in or approval of the harassment"); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1516 (C.A.9 1989) (employer liable where hotel manager did not respond to complaints about supervisors' harassment); *Hall* v. *Gus Constr. Co.,* 842 F.2d 1010, 1016 (C.A.8 1988) (holding employer liable for harassment by co-workers because supervisor knew of the harassment but did nothing). In such instances, the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy. Cf. *Oncale, supra,* at 77, 118 S.Ct., at 1001 (victim reported his grounds for fearing rape to company's safety supervisor, who turned him away with no action on complaint).

Nor was it exceptional that standards for binding the employer were not in issue in *Harris, supra.* In that case of discrimination by hostile environment, the individual charged with creating the abusive atmosphere was the president of the corporate employer, 510 U.S., at 19, 114 S.Ct., at 369, who was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy. *Burns* v. *McGregor Electronic Industries, Inc.,* 955 F.2d 559, 564 (C.A.8 1992) (employer-company liable where harassment was perpetrated by its owner); see *Torres v. Pisano,* 116 F.3d 625, 634-635, and n. 11 (C.A.2) (noting that a supervisor may hold a sufficiently high position "in the management hierarchy of the company for his actions to be imputed **790 automatically to the employer"), cert. denied, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); cf. *Katz,supra,* at 255 ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior," an employee must "demonstrat[e] the propriety of holding the employer liable").

Finally, there is nothing remarkable in the fact that claims against employers for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown. See *Meritor,* 477 U.S., at 70-71, 106 S.Ct., at 2407-2408 (noting that "courts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions"); *id.,* at 75, 106 S.Ct., at 2409-2410 (Marshall, J., concurring in judgment) ("[W]hen a supervisor**2285 discriminatorily fires or refuses to promote a black employee, that act is, without more, considered the act of the employer"); see also *Anderson* v. *Methodist Evangelical Hospital, Inc.,* 464 F.2d 723, 725 (C.A.6 1972) (imposing liability on employer for racially motivated discharge by low-level supervisor, although the "record clearly shows that [its] record in race relations ... is exemplary").

A variety of reasons have been invoked for this apparently unanimous rule. Some courts explain, in a variation of the "proxy" theory discussed above, that when a supervisor makes such decisions, he "merges" with the employer, and his act becomes that of the employer. See, *e.g.,Kotcher v. Rosa and*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                      Page 13
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

*Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (C.A.2 1992) ("The supervisor is deemed to act on behalf of the employer when making decisions that affect the economic status of the employee. From the perspective of the employee, the supervisor and the employer merge into a single entity"); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (C.A.11 1989) ("When a supervisor requires sexual favors as a *quid pro quo* for job benefits, the supervisor, by definition, acts as the company"); see also Lindemann & *791 Grossman 776 (noting that courts hold employers "automatically liable" in *quid pro quo* cases because the "supervisor's actions, in conferring or withholding employment benefits, are deemed as a matter of law to be those of the employer"). Other courts have suggested that vicarious liability is proper because the supervisor acts within the scope of his authority when he makes discriminatory decisions in hiring, firing, promotion, and the like. See, *e.g., Shager v. Upjohn Co.,* 913 F.2d 398, 405 (C.A.7 1990) ("[A] supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer" (citing Restatement § 228)). Others have suggested that vicarious liability is appropriate because the supervisor who discriminates in this manner is aided by the agency relation. See, *e.g., Nichols v. Frank,* 42 F.3d 503, 514 (C.A.9 1994). Finally, still other courts have endorsed both of the latter two theories. See, *e.g., Harrison,* 112 F.3d, at 1443; *Henson,* 682 F.2d, at 910.

The soundness of the results in these cases (and their continuing vitality), in light of basic agency principles, was confirmed by this Court's only discussion to date of standards of employer liability, in *Meritor, supra,* which involved a claim of discrimination by a supervisor's sexual harassment of a subordinate over an extended period. In affirming the Court of Appeals's holding that a hostile atmosphere resulting from sex discrimination is actionable under Title VII, we also anticipated proceed-

ings on remand by holding agency principles relevant in assigning employer liability and by rejecting three *per se* rules of liability or immunity. 477 U.S., at 70-72, 106 S.Ct., at 2407-2408. We observed that the very definition of employer in Title VII, as including an "agent," *id.,* at 72, 106 S.Ct., at 2408, expressed Congress's intent that courts look to traditional principles of the law of agency in devising standards of employer liability in those instances where liability for the actions of a supervisory*792 employee was not otherwise obvious, *ibid.,* and although we cautioned that "common-law principles may not be transferable in all their particulars to Title VII," we cited the Restatement §§ 219-237 with general approval. *Ibid.*

We then proceeded to reject two limitations on employer liability, while establishing the rule that some limitation was intended. We held that neither the existence of a company grievance procedure nor the absence of actual notice of the harassment on the part of upper management would be dispositive of such a claim; while either might be relevant to the liability, neither would result automatically in employer immunity. *Ibid.* Conversely, we held that Title VII placed some limit on employer responsibility for the creation of a discriminatory environment by a supervisor, and we held that Title VII does not make employers "always automatically liable for sexual harassment by their supervisors,"*ibid.,*contrary to the view of the Court of Appeals, which had held that "an employer is strictly liable for a hostile environment created by a supervisor's sexual advances, even though the employer neither knew nor **2286 reasonably could have known of the alleged misconduct,"*id.,* at 69-70, 106 S.Ct., at 2406-2407.

*Meritor's* statement of the law is the foundation on which we build today. Neither party before us has urged us to depart from our customary adherence to *stare decisis* in statutory interpretation, *Patterson v. McLean Credit Union,* 491 U.S. 164, 172-173, 109 S.Ct. 2363, 2370-2371, 105 L.Ed.2d 132 (1989) (*stare decisis* has "special force" in statutory inter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                     Page 14
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

pretation). And the force of precedent here is enhanced by Congress's amendment to the liability provisions of Title VII since the *Meritor* decision, without providing any modification of our holding. Civil Rights Act of 1991, § 102, 105 Stat. 1072, 42 U.S.C. § 1981a; see *Keene Corp. v. United States,* 508 U.S. 200, 212, 113 S.Ct. 2035, 2043, 124 L.Ed.2d 118 (1993) (applying the "presumption that Congress was aware of [prior] judicial interpretations and, in effect, adopted them"). See also *infra,* at 2291, n. 4.

#### *793 B

The Court of Appeals identified, and rejected, three possible grounds drawn from agency law for holding the City vicariously liable for the hostile environment created by the supervisors. It considered whether the two supervisors were acting within the scope of their employment when they engaged in the harassing conduct. The court then inquired whether they were significantly aided by the agency relationship in committing the harassment, and also considered the possibility of imputing Gordon's knowledge of the harassment to the City. Finally, the Court of Appeals ruled out liability for negligence in failing to prevent the harassment. Faragher relies principally on the latter three theories of liability.

1

A "master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement § 219(1). This doctrine has traditionally defined the "scope of employment" as including conduct "of the kind [a servant] is employed to perform," occurring "substantially within the authorized time and space limits," and "actuated, at least in part, by a purpose to serve the master," but as excluding an intentional use of force "unexpectable by the master." *Id.,* § 228(1).

Courts of Appeals have typically held, or assumed,

that conduct similar to the subject of this complaint falls outside the scope of employment. See, *e.g., Harrison,* 112 F.3d, at 1444 (sexual harassment " 'simply is not within the job description of any supervisor or any other worker in any reputable business' "); 111 F.3d, at 1535-1536 (case below); *Andrade v. Mayfair Management, Inc.,* 88 F.3d 258, 261 (C.A.4 1996) ("[I]llegal sexual harassment is ... beyond the scope of supervisors' employment"); *Gary,* 59 F.3d, at 1397 (harassing supervisor acts outside the scope of his employment**794 in creating hostile environment); *Nichols* v. *Frank,* 42 F.3d 503, 508 (C.A.9 1994) ("The proper analysis for employer liability in hostile environment cases is ...*not* whether an employee was acting within his 'scope of employment' "); *Bouton v. BMW of North Am., Inc.,* 29 F.3d 103, 107 (C.A.3 1994) (sexual harassment is outside scope of employment); see also *Burlington Industries, Inc. v. Ellerth,* decided with *Jansen v. Packaging Corp. of America,* 123 F.3d 490, 561 (C.A.7 1997) (en banc) (Manion, J., concurring and dissenting) (supervisor's harassment would fall within scope of employment only in "the rare case indeed"), aff'd, 524 U.S. 1086, 118 S.Ct. 876, 139 L.Ed.2d 865 (1998); Lindemann & Grossman 812 ("Hostile environment sexual harassment normally does not trigger respondeat superior liability because sexual harassment rarely, if ever, is among the official duties of a supervisor"). But cf. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1351-1352 (C.A.4 1995) (holding employer vicariously liable in part based on finding that the supervisor's rape of employee was within the scope of employment); *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 184 (C.A.6) (holding that a supervisor's harassment was within the scope of his employment, but nevertheless requiring the victim to show that the employer failed to respond adequately when it learned of the harassment), cert. denied, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). In so doing, the courts have emphasized that harassment consisting of unwelcome remarks **2287 and touching is motivated solely by individual desires and serves no purpose of the employer. For this reason, courts have likened hostile en-

118 S.Ct. 2275                                                                                                                       Page 15
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

vironment sexual harassment to the classic "frolic and detour" for which an employer has no vicarious liability.

These cases ostensibly stand in some tension with others arising outside Title VII, where the scope of employment has been defined broadly enough to hold employers vicariously liable for intentional torts that were in no sense inspired by any purpose to serve the employer. In *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167 (C.A.2 1968), for example, *795 the Second Circuit charged the Government with vicarious liability for the depredation of a drunken sailor returning to his ship after a night's carouse, who inexplicably opened valves that flooded a drydock, damaging both the drydock and the ship. Judge Friendly acknowledged that the sailor's conduct was not remotely motivated by a purpose to serve his employer, but relied on the "deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities," and imposed vicarious liability on the ground that the sailor's conduct "was not so 'unforeseeable' as to make it unfair to charge the Government with responsibility." *Id.,* at 171. Other examples of an expansive sense of scope of employment are readily found, see, *e.g., Leonbruno v. Champlain Silk Mills,* 229 N.Y. 470, 128 N.E. 711 (1920) (opinion of Cardozo, J.) (employer was liable under worker's compensation statute for eye injury sustained when employee threw an apple at another; the accident arose "in the course of employment" because such horseplay should be expected); *Carr v. Wm. C. Crowell Co.,* 28 Cal.2d 652, 171 P.2d 5 (1946) (employer liable for actions of carpenter who attacked a co-employee with a hammer). Courts, in fact, have treated scope of employment generously enough to include sexual assaults. See, *e.g., Primeaux v. United States,* 102 F.3d 1458, 1462-1463 (C.A.8 1996) (federal police officer on limited duty sexually assaulted stranded motorist); *Mary M. v. Los Angeles,* 54 Cal.3d 202, 216-221, 285 Cal.Rptr. 99, 107-111, 814 P.2d 1341, 1349-1352 (1991) (en banc) (police officer raped

motorist after placing her under arrest); *Doe v. Samaritan Counseling Ctr.,* 791 P.2d 344, 348-349 (Alaska 1990) (therapist had sexual relations with patient); *Turner v. State,* 494 So.2d 1292, 1296 (La.App.1986) (National Guard recruiting officer committed sexual battery during sham physical examinations); *Lyon v. Carey,* 533 F.2d 649, 655 (C.A.D.C.1976) (furniture deliveryman raped recipient of furniture); *Samuels v. Southern Baptist Hospital,* 594 So.2d 571, 574 (La.App.1992) (nursing *796 assistant raped patient).[FN2] The rationales for these decisions have varied, with some courts echoing *Bushey* in explaining that the employee's acts were foreseeable and that the employer should in fairness bear the resulting costs of doing business, see, *e.g., Mary M., supra,* at 218, 285 Cal.Rptr., at 108, 814 P.2d, at 1350, and others finding that the employee's sexual misconduct arose from or was in some way related to the employee's essential duties. See, *e.g., Samuels, supra,* at 574 (tortious conduct was "reasonably incidental" to the performance of the nursing assistant's duties in caring for a "helpless" patient in a "locked environment").

> FN2. It bears noting that many courts in non-Title VII cases have held sexual assaults to fall outside the scope of employment. See Note, "Scope of Employment" Redefined: Holding Employers Vicariously Liable for Sexual Assaults Committed by their Employees, 76 Minn. L.Rev. 1513, 1521-1522, and nn. 33, 34 (1992) (collecting cases).

An assignment to reconcile the run of the Title VII cases with those just cited would be a taxing one. Here it is enough to recognize that their disparate results do not necessarily reflect wildly varying terms of the particular employment contracts involved, but represent differing judgments about the desirability of holding an employer liable for his subordinates' wayward behavior. In the instances in which there is a genuine question about the employer's responsibility for harmful conduct he did not in fact authorize, a holding that the conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                    Page 16
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
(Cite as: 524 U.S. 775, 118 S.Ct. 2275)

falls within the scope of employment ultimately expresses a conclusion not of fact but of law. As one eminent authority has observed, the "highly indefinite phrase" is "devoid of meaning in **2288 itself" and is "obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keaton on Law of Torts 502 (5th ed.1984); see also Seavey, Speculations as to "Respondeat Superior," in Studies in Agency 129, 155 *797 (1949) ("The liability of a master to a third person for the torts of a servant has been widely extended by aid of the elastic phrase 'scope of the employment' which may be used to include all which the court wishes to put into it"). Older cases, for example, treated smoking by an employee during working hours as an act outside the scope of employment, but more recently courts have generally held smoking on the job to fall within the scope. Prosser & Keeton, *supra,* at 504, and n. 23. It is not that employers formerly did not authorize smoking but have now begun to do so, or that employees previously smoked for their own purposes but now do so to serve the employer. We simply understand smoking differently now and have revised the old judgments about what ought to be done about it.

The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement, see, *e.g.,*§§ 219, 228, 229, but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment, and the reasons for the opposite view. The Restatement itself points to such an approach, as in the commentary that the "ultimate question" in determining the scope of employment is "whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed." *Id.,* § 229, Comment *a.* See generally *Taber v. Maine,* 67 F.3d

1029, 1037 (C.A.2 1995) ("As the leading Torts treatise has put it, 'the integrating principle' of *respondeat superior* is 'that the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not' " (quoting 5 F. Harper, F. James, & O. Gray, Law of Torts § 26.8, pp. 40-41 (2d ed.1986)).

In the case before us, a justification for holding the offensive behavior within the scope of Terry's and Silverman's employment was well put in Judge Barkett's dissent: "[A] *798 pervasively hostile work environment of sexual harassment is never (one would hope) authorized, but the supervisor is clearly charged with maintaining a productive, safe work environment. The supervisor directs and controls the conduct of the employees, and the manner of doing so may inure to the employer's benefit or detriment, including subjecting the employer to Title VII liability." 111 F.3d, at 1542 (opinion dissenting in part and concurring in part). It is by now well recognized that hostile environment sexual harassment by supervisors (and, for that matter, coemployees) is a persistent problem in the workplace. See Lindemann & Kadue 4-5 (discussing studies showing prevalence of sexual harassment); *Ellerth,* 123 F.3d, at 511 (Posner, C.J., concurring and dissenting) ("[E]veryone knows by now that sexual harassment is a common problem in the American workplace"). An employer can, in a general sense, reasonably anticipate the possibility of such conduct occurring in its workplace, and one might justify the assignment of the burden of the untoward behavior to the employer as one of the costs of doing business, to be charged to the enterprise rather than the victim. As noted, *supra,* at 2287-2288, developments like this occur from time to time in the law of agency.

Two things counsel us to draw the contrary conclusion. First, there is no reason to suppose that Congress wished courts to ignore the traditional distinction between acts falling within the scope and acts amounting to what the older law called frolics or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                                     Page 17
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

detours from the course of employment. Such a distinction can readily be applied to the spectrum of possible harassing conduct by supervisors, as the following examples show. First, a supervisor might discriminate racially in job assignments in order to placate the prejudice pervasive in the labor force. Instances of this variety of the heckler's veto **2289 would be consciously intended to further the employer's interests by preserving peace in the workplace. Next, supervisors might reprimand male employees for workplace failings with banter, but respond to women's *799 shortcomings in harsh or vulgar terms. A third example might be the supervisor who, as here, expresses his sexual interests in ways having no apparent object whatever of serving an interest of the employer. If a line is to be drawn between scope and frolic, it would lie between the first two examples and the third, and it thus makes sense in terms of traditional agency law to analyze the scope issue, in cases like the third example, just as most federal courts addressing that issue have done, classifying the harassment as beyond the scope of employment.

The second reason goes to an even broader unanimity of views among the holdings of District Courts and Courts of Appeals thus far. Those courts have held not only that the sort of harassment at issue here was outside the scope of supervisors' authority, but, by uniformly judging employer liability for coworker harassment under a negligence standard, they have also implicitly treated such harassment as outside the scope of common employees' duties as well. See *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872-873 (C.A.6 1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Fleming v. Boeing Co.*, 120 F.3d 242, 246 (C.A.11 1997); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (C.A.2 1997); *Yamaguchi v. United States Dept. of Air Force*, 109 F.3d 1475, 1483 (C.A.9 1997); *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1213 (C.A.8 1996), cert. denied, 519 U.S. 1110, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (C.A.7 1996); *Andrade*, 88 F.3d, at 261; *Way-*

*mire v. Harris County*, 86 F.3d 424, 428-429 (C.A.5 1996); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 783 (C.A.10 1995); *Andrews v. Philadelphia*, 895 F.2d 1469, 1486 (C.A.3 1990); cf. *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 438 (C.A.1 1997) (applying "knew or should have known" standard to claims of environmental harassment by a supervisor); see also 29 CFR § 1604.11(d) (1997) (employer is liable for co-worker harassment if it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate *800 corrective action"); 3 L. Larson & A. Larson, Employment Discrimination § 46.07[4][a], p. 46-101 (2d ed.1998) (courts "uniformly" apply Equal Employment Opportunity Commission (EEOC) rule; "[i]t is not a controversial area"). If, indeed, the cases did not rest, at least implicitly, on the notion that such harassment falls outside the scope of employment, their liability issues would have turned simply on the application of the scope-of-employment rule. Cf. *Hunter v. Allis-Chalmers, Corp.*, 797 F.2d 1417, 1422 (C.A.7 1986) (noting that employer will not usually be liable under *respondeat superior* for employee's racial harassment because it "would be the rare case where racial harassment ... could be thought by the author of the harassment to help the employer's business").

It is quite unlikely that these cases would escape efforts to render them obsolete if we were to hold that supervisors who engage in discriminatory harassment are necessarily acting within the scope of their employment. The rationale for placing harassment within the scope of supervisory authority would be the fairness of requiring the employer to bear the burden of foreseeable social behavior, and the same rationale would apply when the behavior was that of coemployees. The employer generally benefits just as obviously from the work of common employees as from the work of supervisors; they simply have different jobs to do, all aimed at the success of the enterprise. As between an innocent employer and an innocent employee, if we use scope-of-employment reasoning to require the em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                          Page 18
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

ployer to bear the cost of an actionably hostile workplace created by one class of employees (*i.e.,* supervisors), it could appear just as appropriate to do the same when the environment was created by another class (*i.e.,* co-workers).

The answer to this argument might well be to point out that the scope of supervisory employment may be treated separately by recognizing that supervisors have special authority enhancing their capacity to harass, and that the **\*801** employer can guard against their misbehavior more easily because their **\*\*2290** numbers are by definition fewer than the numbers of regular employees. But this answer happens to implicate an entirely separate category of agency law (to be considered in the next section), which imposes vicarious liability on employers for tortious acts committed by use of particular authority conferred as an element of an employee's agency relationship with the employer. Since the virtue of categorical clarity is obvious, it is better to reject reliance on misuse of supervisory authority (without more) as irrelevant to scope-of-employment analysis.

2

The Court of Appeals also rejected vicarious liability on the part of the City insofar as it might rest on the concluding principle set forth in § 219(2)(d) of the Restatement, that an employer "is not subject to liability for the torts of his servants acting outside the scope of their employment unless ... the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Faragher points to several ways in which the agency relationship aided Terry and Silverman in carrying out their harassment. She argues that in general offending supervisors can abuse their authority to keep subordinates in their presence while they make offensive statements, and that they implicitly threaten to misuse their supervisory powers to deter any resistance or complaint. Thus, she maintains that power con-

ferred on Terry and Silverman by the City enabled them to act for so long without provoking defiance or complaint.

The City, however, contends that § 219(2)(d) has no application here. It argues that the second qualification of the subsection, referring to a servant "aided in accomplishing the tort by the existence of the agency relation," merely "refines" the one preceding it, which holds the employer vicariously**\*802** liable for its servant's abuse of apparent authority. Brief for Respondent 30-31, and n. 24. But this narrow reading is untenable; it would render the second qualification of § 219(2)(d) almost entirely superfluous (and would seem to ask us to shut our eyes to the potential effects of supervisory authority, even when not explicitly invoked). The illustrations accompanying this subsection make clear that it covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship. See Restatement § 219, Comment *e* (noting employer liability where "the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons" and where the manager who operates a store "for an undisclosed principal is enabled to cheat the customers because of his position"); *id.,* § 247, Illustration 1 (noting a newspaper's liability for a libelous editorial published by an editor acting for his own purposes).

We therefore agree with Faragher that in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here.[FN3] Several courts, indeed, have noted what Faragher has argued, that there is a sense in which a harassing su-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                                              Page 19

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

pervisor is always assisted in his misconduct by the supervisory relationship. See, *e.g.,* *803*Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 675 (C.A.7 1993); *Taylor v. Metzger,* 152 N.J. 490, 505, 706 A.2d 685, 692 (1998) (emphasizing that a supervisor's conduct may have a greater impact than that of colleagues at the same level); cf. *Torres,* 116 F.3d, at 631. See also *White v. Monsanto Co.,* 585 So.2d 1205, 1209-1210 (La.1991) (a supervisor's harassment of a subordinate is more apt to rise to **2291 the level of intentional infliction of emotional distress than comparable harassment by a coemployee); *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 740, 565 P.2d 1173, 1176 (1977) (same); *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 498-499, and n. 2, 86 Cal.Rptr. 88, 90-92, and n. 2, 468 P.2d 216, 218-219, and n. 2 (1970) (same). The agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior. When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker. When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose "power to supervise-[which may be] to hire and fire, and to set work schedules and pay rates-does not disappear ... when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion." Estrich, Sex at Work, 43 Stan. L.Rev. 813, 854 (1991). Recognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train

them, and monitor their performance.

> FN3. We say "starting point" because our obligation here is not to make a pronouncement of agency law in general or to transplant § 219(2)(d) into Title VII. Rather, it is to adapt agency concepts to the practical objectives of Title VII. As we said in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), "common-law principles may not be transferable in all their particulars to Title VII."

**804** In sum, there are good reasons for vicarious liability for misuse of supervisory authority. That rationale must, however, satisfy one more condition. We are not entitled to recognize this theory under Title VII unless we can square it with *Meritor's* holding that an employer is not "automatically" liable for harassment by a supervisor who creates the requisite degree of discrimination,[FN4] and there is obviously some tension between that holding and the position that a supervisor's misconduct aided by supervisory authority subjects the employer to liability vicariously; if the "aid" may be the unspoken suggestion of retaliation by misuse of supervisory authority, the risk of automatic liability is high. To counter it, we think there are two basic alternatives, one being to require proof of some affirmative invocation of that authority by the harassing supervisor, the other to recognize an affirmative defense to liability in some circumstances, even when a supervisor has created the actionable environment.

> FN4. We are bound to honor *Meritor* on this point not merely because of the high value placed on *stare decisis* in statutory interpretation, *supra,* at 2286, but for a further reason as well. With the amendments enacted by the Civil Rights Act of 1991, Congress both expanded the monetary relief available under Title VII to include compensatory and punitive damages, see § 102, 105 Stat. 1072, 42 U.S.C. § 1981a,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                        Page 20
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

and modified the statutory grounds of several of our decisions, see § 101 *et seq.* The decision of Congress to leave *Meritor* intact is conspicuous. We thus have to assume that in expanding employers' potential liability under Title VII, Congress relied on our statements in *Meritor* about the limits of employer liability. To disregard those statements now (even if we were convinced of reasons for doing so) would be not only to disregard *stare decisis* in statutory interpretation, but to substitute our revised judgment about the proper allocation of the costs of harassment for Congress's considered decision on the subject.

There is certainly some authority for requiring active or affirmative, as distinct from passive or implicit, misuse of supervisory authority before liability may be imputed. That is the way some courts have viewed the familiar cases holding the employer liable for discriminatory employment *805 action with tangible consequences, like firing and demotion. See *supra,* at 2284. And we have already noted some examples of liability provided by the Restatement itself, which suggest that an affirmative misuse of power might be required. See *supra,* at 2290 (telegraph operator sends false messages, a store manager cheats customers, editor publishes libelous editorial).

But neat examples illustrating the line between the affirmative and merely implicit uses of power are not easy to come by in considering management behavior. Supervisors do not make speeches threatening sanctions whenever they make requests in the **2292 legitimate exercise of managerial authority, and yet every subordinate employee knows the sanctions exist; this is the reason that courts have consistently held that acts of supervisors have greater power to alter the environment than acts of coemployees generally, see *supra,* at 2290-2291. How far from the course of ostensible supervisory behavior would a company officer have to step be-

fore his orders would not reasonably be seen as actively using authority? Judgment calls would often be close, the results would often seem disparate even if not demonstrably contradictory, and the temptation to litigate would be hard to resist. We think plaintiffs and defendants alike would be poorly served by an active-use rule.

The other basic alternative to automatic liability would avoid this particular temptation to litigate, but allow an employer to show as an affirmative defense to liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided. This composite defense would, we think, implement the statute sensibly, for reasons that are not hard to fathom.

[5] Although Title VII seeks "to make persons whole for injuries suffered on account of unlawful employment discrimination,"*806 *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), its "primary objective," like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm. *Id.,* at 417, 95 S.Ct., at 2371. As long ago as 1980, the EEOC, charged with the enforcement of Title VII, 42 U.S.C. § 2000e-4, adopted regulations advising employers to "take all steps necessary to prevent sexual harassment from occurring, such as ... informing employees of their right to raise and how to raise the issue of harassment." 29 CFR § 1604.11(f) (1997), and in 1990 the EEOC issued a policy statement enjoining employers to establish a complaint procedure "designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor." EEOC Policy Guidance on Sexual Harassment, 8 FEP Manual 405:6699 (Mar. 19, 1990) (internal quotation marks omitted). It would therefore implement clear statutory policy and complement the Government's Title VII en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                    Page 21
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

forcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty. Indeed, a theory of vicarious liability for misuse of supervisory power would be at odds with the statutory policy if it failed to provide employers with some such incentive.

The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, n. 15, 102 S.Ct. 3057, 3065, n. 15, 73 L.Ed.2d 721 (1982) (quoting C. McCormick, Law of Damages 127 (1935) (internal quotation marks omitted)). An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably *807 failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

[6][7][8][9] In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), also decided today. An employer is subject **2293 to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a *808 demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See *Burlington,* 524 U.S., at 762-763, 118 S.Ct., at 2269.

[10] Applying these rules here, we believe that the judgment of the Court of Appeals must be reversed. The District Court found that the degree of hostility in the work environment rose to the actionable level and was attributable to Silverman and Terry. It is undisputed that these supervisors "were granted virtually unchecked authority" over their subordinates, "directly controll[ing] and supervis[ing] all aspects of [Faragher's] day-to-day activities." 111 F.3d, at 1544 (Barkett, J., dissenting in part and concurring in part). It is also clear that Faragher and her colleagues were "completely isolated from the City's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
**(Cite as: 524 U.S. 775, 118 S.Ct. 2275)**

higher management." *Ibid.* The City did not seek
review of these findings.

[11] While the City would have an opportunity to
raise an affirmative defense if there were any seri-
ous prospect of its presenting one, it appears from
the record that any such avenue is closed. The Dis-
trict Court found that the City had entirely failed to
disseminate its policy against sexual harassment
among the beach employees and that its officials
made no attempt to keep track of the conduct of su-
pervisors like Terry and Silverman. The record also
makes clear that the City's policy did not include
any assurance that the harassing supervisors could
be bypassed in registering complaints. App. 274.
Under such circumstances, we hold as a matter of
law that the City could not be found to have exer-
cised reasonable care to prevent the supervisors'
harassing conduct. Unlike the employer of a small
work force, who might expect that sufficient care to
prevent tortious behavior could be exercised in-
formally, those responsible for city operations
could not reasonably have thought that precautions
against hostile environments in any one of many
departments in far-flung*809 locations could be ef-
fective without communicating some formal policy
against harassment, with a sensible complaint pro-
cedure.

We have drawn this conclusion without overlook-
ing two possible grounds upon which the City
might argue for the opportunity to litigate further.
There is, first, the Court of Appeals's indulgent
gloss on the relevant evidence: "There is some
evidence that the City did not effectively dissemin-
ate among Marine Safety employees its sexual har-
assment policy." 111 F.3d, at 1539, n. 11. But, in
contrast to the Court of Appeals's characterization,
the District Court made an explicit finding of a
"complete failure on the part of the City to dissem-
inate said policy among Marine Safety Section em-
ployees." 864 F.Supp., at 1560. The evidence sup-
ports the District Court's finding and there is no
contrary claim before us.

The second possible ground for pursuing a defense

was asserted by the City in its argument addressing
the possibility of negligence liability in this case. It
said that it should not be held liable for failing to
promulgate an antiharassment policy, because there
was no apparent duty to do so in the 1985-1990
period. The City purports to rest this argument on
the position of the EEOC during the period men-
tioned, but it turns out that the record on this point
is quite against the **2294 City's position. Al-
though the EEOC issued regulations dealing with
promulgating a statement of policy and providing a
complaint mechanism in 1990, see *supra,* at 2292,
ever since 1980 its regulations have called for steps
to prevent violations, such as informing employees
of their rights and the means to assert them, *ibid.*
The City, after all, adopted an antiharassment
policy in 1986.

The City points to nothing that might justify a con-
clusion by the District Court on remand that the
City had exercised reasonable care. Nor is there any
reason to remand for consideration of Faragher's ef-
forts to mitigate her own damages, since the award
to her was solely nominal.

### *810 3

The Court of Appeals also rejected the possibility
that it could hold the City liable for the reason that
it knew of the harassment vicariously through the
knowledge of its supervisors. We have no occasion
to consider whether this was error, however. We
are satisfied that liability on the ground of vicarious
knowledge could not be determined without further
factfinding on remand, whereas the reversal neces-
sary on the theory of supervisory harassment
renders any remand for consideration of imputed
knowledge entirely unjustifiable (as would be any
consideration of negligence as an alternative to a
theory of vicarious liability here).

### III

The judgment of the Court of Appeals for the Elev-
enth Circuit is reversed, and the case is remanded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

118 S.Ct. 2275                                                                                              Page 23
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P
45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ
C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699
(Cite as: 524 U.S. 775, 118 S.Ct. 2275)

for reinstatement of the judgment of the District Court.

It is so ordered.

Justice THOMAS, with whom Justice SCALIA joins, dissenting.

For the reasons given in my dissenting opinion in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), absent an adverse employment consequence, an employer cannot be held vicariously liable if a supervisor creates a hostile work environment. Petitioner suffered no adverse employment consequence; thus the Court of Appeals was correct to hold that the **City of BocaRaton (City)** is not vicariously liable for the conduct of Chief Terry and Lieutenant Silverman. Because the Court reverses this judgment, I dissent.

As for petitioner's negligence claim, the District Court made no finding as to the **City's** negligence, and the Court of Appeals did not directly consider the issue. I would therefore remand the case to the District Court for further proceedings on this question alone. I disagree with the Court's **\*811** conclusion that merely because the City did not disseminate its sexual harassment policy, it should be liable as a matter of law. See *ante,* at 2293.[FN1] The City should be allowed to show either that: (1) there was a reasonably available avenue through which petitioner could have complained to a City official who supervised both Chief Terry and Lieutenant Silverman, see Brief for United States and EEOC as *Amici Curiae* in *Meritor Savings Bank, FSB v. Vinson,* O.T.1985, No. 84-1979, p. 26,[FN2] or (2) it would not have learned of the harassment even if the policy had been distributed.[FN3] Petitioner, as the plaintiff, would of course bear the burden of proving the City's negligence.

> FN1. The harassment alleged in this case occurred intermittently over a 5-year period between 1985 and 1990; the District Court's factual findings do not indicate when in 1990 it ceased. It was only in

March 1990 that the Equal Employment Opportunity Commission (EEOC) issued a "policy statement" "enjoining" employers to establish complaint procedures for sexual harassment. See *ante,* at 2292. The 1980 Guideline on which the Court relies-because the EEOC has no substantive rule-making authority under Title VII, the Court is inaccurate to refer to it as a "regulatio [n]," see *ante,* at 2294-was wholly precatory and as such cannot establish negligence *per se.* See 29 CFR § 1604.11(f) (1997) ( "An employer should take all steps necessary to prevent sexual harassment from occurring ... ").

> FN2. The City's Employment Handbook stated that employees with "complaints or grievances" could speak to the City's Personnel and Labor Relations Director about problems at work. See App. 280. The District Court found that the City's Personnel Director, Richard Bender, moved quickly to investigate the harassment charges against Terry and Silverman once they were brought to his attention. See App. to Pet. for Cert. 80a.

> FN3. Even after petitioner read the City's sexual harassment policy in 1990, see App. 188, she did not file a charge with City officials. Instead, she filed suit against the City in 1992.

U.S.Fla.,1998.
Faragher v. City of Boca Raton
524 U.S. 775, 118 S.Ct. 2275, 77 Fair Empl.Prac.Cas. (BNA) 14, 157 A.L.R. Fed. 663, 73 Empl. Prac. Dec. P 45,341, 141 L.Ed.2d 662, 66 USLW 4643, 98 Cal. Daily Op. Serv. 5048, 98 Daily Journal D.A.R. 7009, 98 CJ C.A.R. 3375, 11 Fla. L. Weekly Fed. S 699

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.