IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JOHN DYESS,PRO-SE                    2008 JUN 19 A 11: 09

     PLAINTIFF,                    DEBRA P. HACKETT
                            U.S. DISTRICT COURT
                            MIDDLE DISTRICT ALA
    V.                                        NO.3;07CV-635-WKW

AUBURN UNIVERSITY,

     DEFENDANT.

RESPONSE TO SUMMARY JUDGMENT MOTION

    THE PLAINTIFF,JOHN DYESS, RESPECTFULLY MOVES THIS
COURT  TO ENTER FULL AND FINAL SUMMARY JUDGMENT IN ITS
FAVOR. (SCHEDULING ORDER NO. 23)

RESPECTFULLY SUBMITTED,

JOHN DYESS,PRO-SE

CERTIFICATE OF SERVICE

I  HEREBY CERTIFY THAT ON THIS  THE 14 DAY OF JUNE 2008,
I FILED THE FOREGOING DOCUMENT USING FIRST CLASS MAIL ,
AND THAT I CONTEMPORANEOUSLY MAILED A TRUE  AND
CORRECT COPY OF THE FOREGOING TO THE DEFENDANT COUSEL
ADDRESSED AS FOLLOWS.

SIGNED,

John Dyes

AARON DETTLING
BALCH AND BINGHAM
P.O.BOX 306
BIRMINGHAM ALABAMA,35201-0306

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JOHN DYESS,

     Plaintiff,

v.

AUBURN UNIVERSITY,

     Defendant.

No. 3:07CV-635-WKW

## MOTION FOR SUMMARY JUDGMENT

The Defendant, Auburn University ("Auburn"), respectfully moves this Court to enter full and final summary judgment in its favor pursuant to Fed.R.Civ.P. 56.  In support of this motion, Auburn files its statement of material undisputed facts and brief, evidentiary submissions, and appendix of authorities contemporaneously herewith.

Respectfully submitted,

*/s Aaron L. Dettling*
DAVID R. BOYD
AARON L. DETTLING

Attorneys for the Defendant, Auburn University

OF COUNSEL:

David R. Boyd (BOY005)

Aaron L. Dettling (DET003)
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201-0306
Telephone:  (205) 226-8723
Facsimile:   (205) 488-5699

Lee F. Armstrong
General Counsel, Auburn University
101 Samford Hall
Auburn, Alabama  36849
Telephone:  (334) 844-5176
Facsimile:   (334) 844-4575

## CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of June, 2008, I mailed a true and correct copy of the foregoing to the Plaintiff via first-class mail addressed as follows:

John W. Dyess, III
1509 Union Street
Mobile, Alabama  36617

*/s Aaron L. Dettling*
OF COUNSEL

2

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **JOHN DYESS,** | |
| **Plaintiff,** | |
| **v.** | **No. 3:07CV-635-WKW** |
| **AUBURN UNIVERSITY,** | |
| **Defendant.** | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendant, Auburn University ("Auburn"), respectfully files the following Brief in support of its Motion for Summary Judgment contemporaneously herewith. For the reasons set forth below, there is no genuine issue of material fact, and Auburn is entitled to judgment as a matter of law on all claims asserted in the Complaint.

## STATEMENT OF THE CASE

Plaintiff John W. Dyess, III ("Dyess") is a former employee of the Defendant, Auburn University College of Veterinary Medicine ("Auburn"). Shortly after Dyess was moved to a new supervisor, Mr. Bud Richards ("Richards"), Auburn began to have problems with Dyess' job performance, including veiled threats and frequent insubordination. Dyess was written up several times for various forms of insubordination. Finally, only four days after

3

## CONTESTED FACTS[8]

1.    Dyess discussed Biblical scriptures with Mr. Richards and Mr. Richards told Dyess that his father-in-law was a minister.

2.    Dyess often referred to Scriptures when having conversations to avoid hostile situations.

3.    Richards was not there on the day that Dyess took a two hour lunch. There was no immediate supervisor to report to that day and other employees often took extra time if supervisors weren't there. Dyess had an emergency to take care of that day.

4.    Albert Snipes and Sonya Dixon forced Dyess to attend psychological care and placed him on administrative leave.

5.    Dyess denies that he came up with the idea that Richards was touching his private area after he was terminated. In Dyess' initial meeting with Richards, he was flirting. Dyess constantly told Dixon and Snipes that Richards was sexually harassing him.

6.    In the incident where Richards touched Dyess, Richards used profanity and said he would "fire his ass." Dyess was in the room for less than one minute.

---

[8] *See* fn. 1, *supra*. Auburn believes that these six "Contested Facts" presented by Dyess fail to call any of the "Uncontested Facts" into material dispute. These six points are the only response Auburn received to its request to consult on "Uncontested" versus "Contested" facts.

being warned in writing that "all leave must be approved in advance," Dyess took a

two-hour lunch without prior approval. Accordingly, he was terminated.

This lawsuit ensued. Dyess claims that his discharge was unlawfully

motivated by race, sex, and religious discrimination. He also claims that Richards

sexually harassed him.

For the reasons discussed below, there is no genuine issue of material fact,

and Auburn is entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS
### UNCONTESTED FACTS[1]

Dyess was first employed by Auburn on a temporary basis in the fisheries

area in 2000 or 2001. (Dyess Depo. at 108:10-109:11.)

Beginning in March 2002, Dyess was employed by Auburn as an Animal

Care Attendant in the College of Veterinary Medicine. (Dyess Depo., Ex. 1.)

Dyess's job duties generally included stocking patient (animal) surgery and

recovery rooms with clean towels, food and supplies, performing various cleaning

---

[1] For purposes of this Motion only, these "facts" assume that Dyess' deposition testimony is true. Of course, Auburn disputes Dyess' allegations and much of his deposition testimony, but even taking his testimony as true, Auburn is entitled to judgment in its favor as a matter of law. In accordance with this Court's Order of October 23, 2007 (Doc. No. 23), undersigned counsel sent a copy of these "Uncontested Facts" to Plaintiff for his review. Plaintiff attempted to reach undersigned counsel by telephone, and left a message stating his objections to the "Uncontested Facts." Counsel in turn attempted to reach Plaintiff many times during the week of June 2, but each time found that Plaintiff's cellular telephone was not accepting calls and would not accept a voice message. Counsel has made a good-faith attempt to summarize Plaintiff's exceptions from the "Uncontested Facts" in the "Contested Facts" section.

4

and stocking duties, mopping up spills, refilling dog food bins, cleaning up dog

droppings in the yard where the patients (animals) have walked, washing and

folding laundry, sweeping, and general janitorial work. (*See* Dyess Depo. at 212,

213 and Ex. 6.)

When Dyess became a regular employee of Auburn, he was given a copy of

the Employee Handbook, which contains the following policy against harassment:

### Employee Non-Harassment Policy

Auburn University will not tolerate harassment of its employees. Any
form of harassment related to an employee's race, color, sex, religion,
national origin, age, or physical or mental disability is a violation of
this policy and will be treated as a disciplinary matter. For these
purposes, the term "harassment" includes, but is not necessarily
limited to the following: Slurs, jokes, or other verbal, graphic, or
physical conduct relating to an individual's race, color, sex, religion,
national origin, age, physical or mental disability. Harassment also
includes unwelcome sexual advances, requests for sexual favors and
other verbal, graphic, or physical conduct of a sexual nature.

Violation of this policy by an employee shall subject that employee to
disciplinary action, up to and including discharge. If an employee
feels that he or she is being harassed by any other employee because
of race, color, sex, religion, national origin, age, or physical or mental
disability, the employee should at once make this known to his or her
immediate supervisor. The supervisor will promptly notify
University's Equal Employment Opportunity Officer, who will see
that the matter is investigated, and that, where appropriate,
disciplinary action is taken. If the employee does not feel the matter
can be discussed with the supervisor, the employee should arrange for
a conference with the EEO Officer to discuss the complaint.

Harassment of University employees in connection with their work by
non-employees may also be a violation of this policy. Any employee
who becomes aware of any harassment of an employee by a non-
employee should report such harassment to his or her supervisor or to

5

> the EEO Officer, who is responsible for investigating all such
> incidents. Appropriate action will be taken against violation of this
> policy by any non-employee.

(Dyess Depo. at 122:4-23, Ex. 2, at 31-32.) Dyess had read and was aware of

Auburn's policy prohibiting harassment of employees. (Dyess Depo. at 123:6-12.)

Dyess' first supervisor at the veterinary hospital was Junior Ledbetter.

(Dyess Depo. at 110:7-13.) Dyess alleges that Ledbetter was "discriminatory at

times," (Dyess Depo. at 112:4), but he appreciated Ledbetter hiring him. (Dyess

Depo. at 112:8-9.) Ledbetter did not look at Dyess, attempt to touch Dyess, nor

speak to Dyess in any discriminatory way. (Dyess Depo. at 112:15-19.) Ledbetter

never attempted to make any sexual advances toward Dyess. (Dyess Depo. at

112:20-113:1)    Dyess never complained of any alleged discrimination by

Ledbetter. (Dyess Depo. at 113:2-5.)

Dyess' next supervisor was Mary Tefend. (Dyess Depo. at 113:6-8.)

Tefend never discriminated against Dyess in any way. (Dyess Depo. at 116:20-

117:14.) While Dyess worked for Tefend, at times he would come in to work

during the hours of 2:00 to 5:00 a.m. (Dyess Depo. at 120:6-16.)

Dyess' next supervisor after Tefend was Floyd "Bud" Richards

("Richards"). (Dyess Depo. at 120:17-19.)

Two or three days after Richards became Dyess' supervisor, Richards and

Dyess had a conversation that made Dyess feel uncomfortable. (*See generally*

6

Dyess Depo. at 134-144.) Dyess was cleaning an animal room that was not used very often. (Dyess Depo. at 134:5-8.) Mr. Richards came into the room and made conversation with Dyess consisting of: "Hi, John," "What are you doing," "Well, John, I'm trying to get to know you better, I want to know you in a better way. Tell me more about yourself," "What do you do when you're not at the vet school," "Well, what do you do at nighttime," "Are you married," "What else do you do? Do you go out to dinner?" (Dyess Depo. at 135:13-136:9; 140:17-23.)

Dyess claims that Richards was too close to him during this conversation. This made Dyess uncomfortable, because Richards could have been speaking to him from across the room. (Dyess Depo. at 137:2-14.) Dyess felt as though Richards "was trying to date me because he could have just kept a distance and asked me." (Dyess Depo. at 137:14-17.) Dyess did not ask Richards to allow him more personal space. (Dyess Depo. at 139:7-11.) Dyess says that Richards' "body signals" made him uncomfortable; the "body signals" consisted of simply being too close to him. (Dyess Depo. at 141:1-15.) Dyess also claims that Richards was "looking at me like a man trying to date a woman," and that Richards' tone of voice was "too calm and casual." (Dyess Depo. at 142:6-10; 143:12-16.) However, if Richards had said that it didn't have anything to do with the job but invited Dyess to a football game, dinner, or to take a ride and talk, that would have been fine with Dyess. (Dyess Depo. at 67:9-21.)

7

Because Dyess was feeling uncomfortable, he "introduced [the] idea" that he was a minister. (Dyess Depo. at 145:4-10, 133:2-8.)

According to Richards' handwritten account of the conversation, Dyess made a statement to the effect that Dyess was a "man of God and if I messed with him or bothered him, that 'bad' things would happen to [Richards]. [Dyess] then wanted to give me examples of bad things happening to other people. I asked if he was threatening me. He said he wasn't but God was. Basically that God was threatening me through him, if I irritated him." (Dyess Depo., Ex. 3.)

As Dyess later described the conversation in writing, "[Richards] and I had a conversation involving Christian principals [sic] and that I told him what the Bible says of what happens to people who harms a minister. I told him that I am a licensed minister." (Dyess Depo., Ex. 16, 307:10-22.)

Dyess admits the substance of the conversation, but says that "I didn't say it directly like that." (Dyess Depo. at 146:23-147:8.) Instead, Dyess says he "merely brushed around it." (Dyess Depo. at 148:11-12.) Dyess "reminded [Richards] of Scripture teaching of what happens when we offend, not just ministers, but people of God, period." (Dyess Depo. at 33:23-34:4.)

One of the particular Bible verses Dyess was reminding Bud Richards of was Romans 12:19 ("Beloved, do not avenge yourselves, but rather give place to

wrath; for it is written, 'Vengeance is mine, I will repay,' says the Lord."). (Dyess Depo. 56:6-9, 54:9-19, 308:21-309-12.)

Another Bible verse stating the same principle that Dyess was explaining to Richards is Matthew 18:6 ("But whoever causes one of these little ones who believe in me to sin, it would be better for him if a millstone were hung around his neck, and he were drowned in the depth of the sea."). (Dyess Depo. 57:17-59:19.)

Dyess claims he did not say specifically that something bad was going happen to Richards, but that bad things do happen to people who oppose a child of God. (Dyess Depo. at 148:14-149:1.) Dyess believes that the Bible teaches that bad things will happen to those who oppose him, because he is one of the "Lord's people." (Dyess Depo. at 34:11-35:4.).

Richards "immediately said, 'Are you threatening me?'" (Dyess Depo. at 75:18-19; Dyess Depo. at 149:2-5.) Dyess believes that Richards "jumped to the conclusion" that Dyess was threatening him. (Dyess Depo. at 78:5-8.)

Dyess cannot understand how someone who doesn't understand the Bible the same way he does might be offended when he says "Vengeance is mine." (Dyess Depo. at 76:19-77:3.)[2]

---

[2] Before Auburn, Dyess was employed by Mobile Infirmary. Dyess was terminated from Mobile Infirmary because "It was said . . . that I threatened a women using the exact Scripture from the Bible." (Dyess Depo. at 52:19-21.) The Scripture verse Dyess used at Mobile Infirmary "quotes vengeance is mine saith the Lord. I will repay. That's in the New Testament in one of the Apostle Paul's writings. And he quotes something from the Old Testament . . . so I just rehearsed it to her." (Dyess Depo. at 54:11-18; *also see* Dyess Depo. at 357:2-358:1.)

Four or five days later, Richards asked Dyess to get some particular dog food. Dyess told Richards that they did not need that particular dog food. (Dyess Depo. at 150:1-10, 151:15-21.) Dyess claims that he knew better than Richards what dog food was needed, and that he was trying to prevent waste. (Dyess Depo. at 150:10-23.) Dyess and Richards "had kind of—what seemed a hot, heated conversation" in which Dyess "was firm in trying to trying to get [Richards] to understand that that was unnecessary." (Dyess Depo. at 153:2-4.) Richards "got very fierce" and said, "I said get that particular dog food." (Dyess Depo. at 151:21-23.)

The next day, Richards called Dyess into his office to discuss his failure to get the dog food. (Dyess Depo. at 153:5-9.) Richards said, "I want to discuss with you about your behavior concerning my asking for the dog food. . . . [B]e careful not to do that ever again. When I ask you to do something, you do it; Dr. Saidla made you my employee, so you do as I say." (Dyess Depo. at 154:4-10.) Dyess replied that he understood. (Dyess Depo. at 154:10-11.) Dyess went on to say, "we have to be careful how we treat God's children." (Dyess Depo. at 154:17-19, 155:4-156:7) Richards again asked Dyess if he was threatening him. (Dyess

---

Dyess admits that what happened at Mobile Infirmary is "exactly" the same as his conversation with Richards. (Dyess Depo. at 74:19-23.) Yet, he does not believe that his termination from Mobile Infirmary was motivated by racial discrimination. (Dyess Depo. at 74:2-18.) After his termination from Auburn, Dyess was terminated from his job at Ruby Tuesday for having a conversation about "Biblical views" with a customer. (Dyess Depo. at 50:13-51:10.)

10

Depo. at 156:14-20.) Dyess replied, "Of course not, I'm not threatening you. This is God's Word, it's not my word." (Dyess Depo. at 157:1-3.)

This statement led to a meeting "about a week later" between Dyess, Richards, Dr. Saidla, and Sonya Dixon of Auburn's Human Resources Department. (*See generally*, Dyess Depo. at 158-172:1) Dr. Saidla was the director of the Veterinary Hospital, and Richards' supervisor.

Dixon acted as a "mediator" between Richards and Dyess, and facilitated a discussion of "the supposedly heated conversation" referenced in Exhibit 3 to Mr. Dyess' deposition, as well as allegations that Dyess was "stealing" towels.[3] (Dyess Depo. at 161:6-11.)

Dyess said in the meeting that he thought Richards "was trying to date me." (Dyess Depo. at 166:21-167:1.) Dixon asked Dyess exactly what Richards was doing. (Dyess Depo. at 167:4-5.) Dyess told Dixon that "he's asking me to go out—he asked me to go—asked me about my personal life and that he made me feel uncomfortable by the way he stands too close and too much—not enough personal space." (Dyess Depo. at 167:4-11.) Dyess also mentioned the way Richards allegedly "looked at" Dyess, and that Richards had told Dyess that he "admired" him. (Dyess Depo. at 167:12-168:12.)

---

[3] While Mr. Dyess uses the word "stealing" in his deposition, Auburn never accused Dyess of actually "stealing" the towels for his own use. The issue was his taking clean, folded towels out of wards that other employees were responsible for, and moving them into his wards. Dyess admits to having done this. (Dyess Depo. at 164:20-165:11.)

In this same meeting, Dyess also said that his former supervisor, Mary Tefend, and her staff, drove by his apartment "at all times of day and night," that Tefend had a key to his apartment, and that his neighbors had told him that people—Dyess believed it was Tefend—were going into his apartment while he wasn't there. (Dyess Depo. at 179:17-181:8.)

Dyess told Dixon, Richards, and Saidla "that it was a ridiculous meeting, that it was a waste of time, that it was uncalled for, that I didn't need to be here, and that I felt like Mr. Richards was just merely using the situation and a lot of nonsense to make me go – get too close to him in a perverted kind of way." (Dyess Depo. at 165:15-21.)

Dixon concluded the meeting by telling Dyess she understood that Dyess did not mean to threaten Richards, but that she could understand how Richards could feel threatened by the things Dyess had said. (Dyess Depo. at 170:4-12.)

This first meeting was followed by a second meeting with Dyess, Dixon, and another female, approximately 27 years old. (*See generally*, Dyess Depo. at 172-184.) In this second meeting with Dixon, Dyess again "interjected a lot of things about me being a minister." (Dyess Depo. at 174:20-21; 176:6-10.) Dyess also told Dixon and the other employee that he personally ministered to Jason

12

Campbell, Carnell "Cadillac" Williams, and Chet Williams.  (Dyess Depo. at 177:11-179:3.)[4]

Shortly after this second meeting with Human Resources, Dyess met again with Dixon and Albert Snipes.  (Dyess Depo. at 185:16-19.)  At this meeting, Dyess was placed on paid administrative leave and was referred for a mandatory psychological examination to determine his fitness for work.  (Dyess Depo. at 184:18-21, 201:1-6.)  At the same time, Dyess was also warned by Albert Snipes that if the threats were repeated, he would be terminated.  (Dyess Depo. at 188:15-189:7.)  Dyess said, "Man, Jason Campbell and them would love to hear about this one."  (Dyess Depo. at 188:10-14, 191:2-6.)

Dyess was evaluated by Dr. Glen Vollenweider, a psychologist.  (Dyess Depo., Ex. 4.)  Dr. Vollenweider found that, subject to some conditions, Mr. Dyess was "likely" able to work, and that Dyess was not "imminently dangerous to himself or others."  (Dyess Depo., Ex. 4.)  Dr. Vollenweider recommended more extensive psychotherapy for Mr. Dyess, and further evaluation by a psychiatrist, but Dyess refused any further treatment or counseling.  (Dyess Depo. at 193:10-13; 202:9-203:3; 203:21-204:18.)

---

[4] Campbell and "Cadillac" Williams were at the time star Auburn football players.  Both have since gone on to careers in the National Football League.  Chet Williams was and is the team Chaplain.

13

Based on the outcome of the evaluation, Dyess was returned to work on August 17, 2005. (Dyess Depo., Ex. 5.)

When he returned to work, Dyess was given a written memorandum from Dr. Saidla which stated:

> This is to inform you that you may return to work on Wednesday, August 17 at 7:45 am. Upon your return I expect you to follow all rules and policies of Auburn University and the Department of Clinical Sciences. Before you begin working you are to discuss your hours with your supervisor, Mr. Bud Richards since you will have weekend duty as well as working Monday to Friday. You need to understand that Mr. Richards is your supervisor and that you are to do what he tells you to do when he tells you to do it.

(Dyess Depo. at 207:12-208:11, Ex. 5.)

In December 2005, another meeting was held with Dyess, Dixon, Richards, and Dr. Saidla. In this December 2005 meeting, Dyess told Dixon that Richards' conduct was "promiscuous and perverted." (Dyess Depo. at 230:20-232:6.) The alleged behavior that Dyess claims was "promiscuous and perverted" included being too close to Dyess, "trying to set something up to get us alone," and allegedly sending Dyess work in places other than where he was normally assigned to work. (Dyess Depo. at 232:7-235:12.) Dyess believes that Richards was trying to get them alone, so that Richards could hug or kiss him. (Dyess Depo. at 235:4-18.) Dyess does not describe any other alleged conduct through December 2005 as "promiscuous" or "perverted." (Dyess Depo. at 236:14-20.)

14

On February 23, 2006, Dyess received a "Written Formal Reprimand" for "inappropriate behavior & insubordination toward his supervisor." (Dyess Depo., Ex. 7.)

Dyess admits the essential facts set forth in the discipline form. (Dyess Depo. at 245:6-248:7.) According to the discipline form, on February 22, 2006, Dyess had entered a room that was off-limits to him. Richards told Dyess that he was not allowed in the room, and asked him to leave. For several minutes, Dyess refused even to acknowledge his supervisor's presence or his repeated instructions to leave the room. Dyess finally left the room without ever responding to Richards or even acknowledging his presence. The written discipline noted that "this is the second time in two months that John has been insubordinate to his supervisor," and that "If John's inappropriate behavior and insubordination toward his supervisor continues, he could face termination." Dyess refused to sign the discipline form. (Dyess Depo. at 239:1-6, Ex. 7.)

According to Dyess' deposition account of the February 22, 2006 incident, he went into the Central Supply Room, which was normally locked at all times, looking for a pair of latex gloves. (Dyess Depo. at 240:7-241:6.) Dyess encountered Richards, who began "yelling, John, what are you doing here. . . . John, what are you doing in here? You don't belong in here." (Dyess Depo. at 241:11-13, 242:3-5, 243:20-22.) Dyess was surprised by "the tone of his voice as

15

well as the loudness." (Dyess Depo. at 241:14-16.) Richards appeared to Dyess to
be "frustrated," "angry," "mad," and "thoroughly upset." (Dyess Depo. at 243:15-
19.) Dyess did not tell Richards he was looking for a box of latex gloves; he did
not answer Richards at all. (Dyess Depo. at 243:20-244:5.) Dyess left the Central
Supply Room without speaking to his supervisor. (Dyess Depo. at 247:10-11.) He
went out into the hall where there was a cart laden with supplies that Richards was
taking out of the Central Supply Room and moving somewhere else. (Dyess Depo.
at 248:8-249:7.) Dyess began to look over the cart to see if he could find the latex
gloves. (Dyess Depo. at 249:20-250:4.)

According to Richards' written account of what happened next, Richards
prevented Dyess from taking anything from the cart by "stepping between him and
the cart." (Dyess Depo., Ex. 7.) According to Dyess, Richards "comes behind me
and his hand is in my private area before I know it. . . . So when he put his hand,
it just got all inside my private area." (Dyess Depo. at 250:5-6, 250:18-20, 251:1-
2, 251:9-10.) Dyess believes that Richards was "trying to cop a feel." (Dyess
Depo. at 257:13-16.) Dyess alleges that Richards "rubbed" his private area, but
that the contact only lasted a second or two, because Dyess moved away quickly.
(Dyess Depo. at 254:19-20, 257:6-20.) Neither Dyess nor Richards said anything
at the time of the alleged touching. (Dyess Depo. at 257:17-20.) There were no
witnesses to the alleged touching. (Dyess Depo. at 321:10-15.)

16

Dyess refused to sign the February 23 "Written Formal Reprimand" discipline form, and, while he could have written something about the alleged touching incident on the discipline form, he did not do so. (Dyess Depo. at 259:12-260:5.)

Dyess claims that the day after the February 22 alleged touching incident, he orally reported the touching to Sonya Dixon. (Dyess Depo. at 264:6-265:6.) Dixon denies receiving any such report from Dyess. (Dixon Aff., ¶ 5.) Dyess admits that he made no *written* allegation of touching until after he was terminated. (Dyess Depo. at 265:1-6, 310:17-21, Ex. 16.)

Sonya Dixon is not Auburn's "EEO Officer;" Kelley Taylor is. (Dixon Aff., ¶ 2; Taylor Aff., ¶ 2; Snipes Aff., ¶ 2.) Sonya Dixon does not work in the Affirmative Action/Equal Employment Office. (Dixon Aff., ¶¶ 2, 3.) Dixon works in the Human Resources department, which is a separate and distinct office from AA/EEO. (Dixon Aff. ¶ 2; Snipes Aff., ¶¶ 2, 3; Taylor Aff., ¶ 2.)

On another occasion, the date of which is unknown, Dyess claims that Richards attempted to get too close to him. (*See generally*, Dyess Depo. at 311-314.) On this occasion, Richards asked Dyess to review his time sheet with him. However, instead of just handing Dyess the paper, Richards allegedly held the document close to him so that Dyess had to lean in close to see it. (Dyess Depo. at 312:13-313:9.) Regarding this incident, Dyess alleges, "Now, if that's not leading,

17

trying to force someone to be sexually attracted to you, I don't know what is. I mean, why would you ask someone to look at something and not give it to them?" (Dyess Depo. at 314:2-6.)

Richards spoke to Dyess on Dyess' cellular telephone one time, but Richards did not made any sexual comments to Dyess on the call. (Dyess Depo. at 316:12-16.) On that one telephone call, Richards asked Dyess "where he was." (Dyess Depo. at 316:21-317:1.) Dyess alleges that Richards called Dyess' cellular telephone several times after that, but Dyess never answered, because he remembered Richards' telephone number. (Dyess Depo. at 316:12-23.)

Dyess admits that the allegations stated above are the only ways in which Richards "attempted to express his sexual desires" with Dyess. (Dyess Depo. at 306:9-12.) Richards never made any sexual comments or used any dirty language to Dyess. (Dyess Depo. at 306:13-18.) Richards never propositioned Dyess. (Dyess Depo. at 306:19-21.) Richards also never used any language that was "racial" in nature or that ridiculed Dyess' religion. (Dyess Depo. at 337:19-338:5.) Dyess does not claim that Richards is homosexual. (Dyess Depo. at 80:3-6; 81:5-8.) Nonetheless, Dyess believes that Richards wanted to be sexually intimate with him. (Dyess Depo. at 81:19-21.) Dyess also believes that Richards wanted to be close to him so that Richards could take advantage of spiritual blessings. (Dyess Depo. at 82:17-88:11.)

18

On February 23, 2006[5], Dyess also received a "Written Final Reprimand." (Dyess Depo., Ex. 8.) Dyess admits the facts outlined in the February 23, 2006 "Written Final Reprimand." (Dyess Depo. at 269:13-271:14.) On that day, Richards saw Dyess sitting at a computer while Dyess was not on his authorized break time. When Richards attempted to speak to Dyess about this, Dyess refused to respond or even acknowledge his supervisor's presence or his efforts to communicate with him. Richards called another employee, Renza Floyd, into the room to observe Dyess's behavior. Still, Dyess refused to acknowledge his supervisor's presence. As Richards and Floyd were leaving the room, Dyess said, "Have a nice day." The written discipline noted that "If John's inappropriate behavior and his insubordination toward his supervisor continues, he will be terminated." (Dyess Depo. at 269:13-271:14, Ex. 8.)

Dyess refused to sign the discipline form, and did not write any explanation on the form where given an opportunity to do so. (Dyess Depo. at 269:5-12.)[6]

---

[5] Although Exhibit 8 bears a date of February 23, 2008, and the file stamp at the offices of Human Resources is dated February 24, Dyess believes that these dates are incorrect and falsified. (Dyess Depo. at 266:16-267:3.) Dyess does not dispute that he received the "Written Final Reprimand" write-up from Richards, he only disputes the dates. (Dyess Depo. at 268:17-269:4; 273:11-15.)

[6] Dyess admits that he tried to keep his distance from people at work at Auburn. (Dyess Depo. at 66:5-8.) Dyess admits that he tried to keep his distance from co-workers at Auburn "All the time. That's just why they wrote up in the – in my employee file that John would never talk to us. That's all I was doing." (Dyess Depo. at 66:11-14.)

On March 29, 2006, Dyess received another "Written Final Reprimand" and a five day suspension for using a computer he was not authorized to use, while he was not on his authorized break time. (Dyess Depo., Ex. 9.) The written discipline specifically noted, "If hospital rules and policies are not followed, he will be terminated." (Dyess Depo., Ex. 9.) Dyess admits that the March 29, 2006 discipline was discussed with him. (Dyess Depo. at 277:14-19.) Dyess refused to sign the March 29, 2006 discipline form, and did not write any explanation on the form where given an opportunity to do so. (Dyess Depo. at 277:20-278:5; 281:2-5.) Dyess disputes the discipline only because the clocks in the veterinary hospital were not synchronized. (Dyess Depo. at 279:10-22.) Dyess admits that he told the office administrator that he would not meet with his supervisor, Bud Richards, unless either Dr. John Saidla or Dr. David Whitley were present. (Dyess Depo. at 281:6-14.)

Also on March 29, 2006, Dyess came to the offices of Affirmative Action/Equal Employment Opportunity to make an informal complaint that Richards was discriminating against him on the basis of race and religion. (Dyess Depo., Ex. 15.). According to Kelley Taylor and Michelle Martin, Dyess did not allege that Richards touched him in the private area. (Taylor Aff., ¶ 3.). If he had, it would have been investigated. Nonetheless, Kelley Taylor and Michelle Martin of Auburn's AA/EEO office conducted a thorough inquiry into Dyess' allegations

of racial and religious discrimination. (Taylor Aff., ¶ 3.) In addition to Dyess and Richards, Taylor and Martin interviewed co-worker Mixti Cox, former supervisor Mary Tefend, co-employee Henry Echols, co-worker Sara Henderson, co-worker Chris Ferrell, and co-worker Renza Floyd. (Taylor Aff., ¶ 3.) Taylor and Martin interviewed Richards and Dyess, and every employee who worked with Dyess who was also supervised by Bud Richards. (Taylor Aff., ¶ 3.) At the conclusion of their first investigation, on May 18, 2006 (after Dyess had already been fired), Martin wrote Dyess to inform him that they had found no evidence that Auburn's policies against discrimination or harassment had been violated. (Taylor Aff., ¶ 3; Dyess Depo., Ex. 15.)

On April 3, 2006, Dyess filed an internal grievance of his five-day suspension. (Dyess Depo., Ex. 10.) The grievance form did not mention any improper touching. (Dyess Depo., Ex. 10.) On April 27, 2006, a grievance committee made up of three disinterested members of the university community held a hearing on Dyess' grievance. (Dyess Depo. at 290:4-19.) The grievance panel unanimously concurred with the five-day suspension, finding that "there was adequate documentation leading to this event." (Dyess Depo., Ex. 11.) Dyess claims that he told the grievance panel "several times" that Richards touched him in the private area, specifically using the word "penis." (Dyess Depo. at 263:2-22, 290:19-10.) However, the grievance hearing was audio-recorded, and all three

21

members of the grievance panel affirm that Dyess never mentioned any touching of his private area in his grievance hearing. (Affidavits of Debbie Griggs, Trish Digman, and Sherry Boothe.) Rather, Dyess told the grievance panel that Richards was trying to provoke a fight with him. (Affidavits of Debbie Griggs, Trish Digman, and Sherry Boothe.)

On April 24, 2006, Dyess was warned in writing that "Annual leave must be pre-approved three days in advance. There is a calendar near the time clock where you should note the day or days of your planned leave in addition to telling your supervisor. A leave slip MUST be signed and turned in before the day of leave." (Dyess Depo. at 298:11-17, Ex. 12.)

On April 28, 2006, Dyess, without prior authorization, was gone for two hours at lunchtime. (Dyess Depo. at 299:13-18.) As a result, on May 3, 2006, Dyess' employment was terminated. (Dyess Depo. at 299:1-12, Ex. 13.) The written discipline noted that "John has been given repeated warnings but continues to fail to follow the university's policies and rules. He leaves no other choice but for his position to be termination [sic]." Dyess again refused to sign the discipline form, and did not write any explanation on the discipline form where given an opportunity to do so. (Dyess Depo. at 301:18-23, 302:1-3, Ex. 13.)

After Dyess was terminated, on May 3, 2006, he filed another internal grievance. (Dyess Depo., Ex. 14.) Dyess' second grievance form, like the first,

made no mention of improper touching. (Dyess Depo., Ex. 14.) On June 8, 2006—more than a month after his termination—Dyess supplemented his second grievance with a letter that alleged that he was improperly touched by Richards. (Dyess Depo., Ex. 16.) One sentence of Dyess' letter alleges that Richards "approached me in the hall and rubbed his hand and private body area on me." (Dyess Depo., Ex. 16.)

Because Dyess' June 8 letter appeared to amend his grievance to include allegations of violations of Auburn's policies prohibiting discrimination and harassment, his grievance was referred to the office of Affirmative Action/Equal Employment Opportunity for investigation. (Dyess Depo. at 318:8-15, Ex. 17; Snipes Aff., ¶ 5; Taylor Aff., ¶ 4.)

Even though Dyess was no longer employed at Auburn, Kelley Taylor, Auburn's AA/EEO Officer, investigated Dyess' "new" allegation of improper touching. (Taylor Aff., ¶ 5.) Taylor interviewed Dyess and Richards. (Taylor Aff., ¶ 5.) Richards denied that he ever touched Dyess inappropriately, and denied any romantic interest in or attraction to Dyess. (Taylor Aff., ¶ 5.) When Taylor interviewed Dyess, Dyess told Taylor that the alleged offensive touching had occurred the day before his five-day suspension, or March 28, 2006. (Taylor Aff.,

¶ 5.)[7] Dyess also told Taylor that he had previously reported the alleged offensive touching to Sonya Dixon and Albert Snipes, who were two employees in Auburn's Human Resources Department. (Taylor Aff., ¶ 5.) Both Dixon and Snipes told Taylor that Dyess had never made any such allegation or complaint, and that if he had, they immediately would have referred the allegation to AA/EEO for investigation, as provided by Auburn's Non-Harassment Policy. (Taylor Aff., ¶ 5; Snipes Aff., ¶ 4; Dixon Aff., ¶ 5.) Dixon and Snipes both deny that Dyess ever told them that Richards had touched him in his private area. (Taylor Aff., ¶ 5; Dixon Aff., ¶ 5; Snipes Aff., ¶¶ 4-5.) Finding no evidence to support Dyess' allegations of sexual harassment or touching, Taylor closed the investigation and so advised Dyess in writing. (Taylor Aff., ¶ 6; Dyess Depo., Ex. 18.)

Dyess considers himself Baptist (Dyess Depo. at 18:7-23), and a licensed and ordained pastor. (Dyess Depo. at 27:5-9.) Dyess does not consider his religious beliefs to be that different from those who go to church on Sunday mornings at Baptist, Methodist, or Presbyterian churches. (Dyess Depo. at 27:23-28:12.)

---

[7] Dyess also alleged in his EEOC Charge that the alleged touching occurred the day before his five-day suspension, which would be March 28, 2006; however, in the same document he also alleged that the touching occurred and "in February of 2006." (*See* EEOC Charge of Discrimination.)

## CONCLUSION

PLAINFIFF  ASK COURT TO CONSIDER  THE FOLLOWING CLAIMS AND
DAMAGES AS  TO REACHING A  JUDGMENT.

## CLAIMS

RACIAL DISCRIMINATION

RELIGIOUS DISCRIMINATION  (SEE CIVIL RIGHTS ACT -1964 TITLE-V11

SEXUAL HARRASSMENT

WRONGFUL TERMINATION

NEGLIGENCE

DEFAMATION OF CHARACTER

HOSTILE WORK ENVIROMENT

RETALIATION (SEE EQUAL-EMPLOYMENT-OPPORTUNITY COMMISSION

MENTAL CRULETY

## DAMAGES

LOSS OF INCOME UNTIL  RETIREMENT:$975,000 (NINE-HUNDRED-SEVENTY
FIVE THOUSAND DOLLARS.

RE-EMPLOYMENT(UNDER  COURT ORDERED CONTRACT)

 LOSS OF WAGES SINCE TERMINATION  $100,000 (ONE-HUNDRED-
THOUSAND DOLLARS

$1,850000 - One-million- Eight- Hundred -Fifty thousand Dollars

PERSONAL-PUNITIVE : $850,000(EIGHT-HUNDRED-THOUSAND DOLLARS)

NOTICE CONCERNING SETTLEMENT

CONFERENCE AND MEDIATION

AS ORDERED BYE THE UNIFORM SCHEDULE ORDER (SECTION –3) A
MEETING WAS HELD INVOLVING PLAINTIFF AND DEFENDANT COUSEL.

PLAINTIFF STATED AMOUNT OF SETTLEMENT AS FOUND IN CLAIMS AND
DAMAGES COULD BE NEGOTIATED.

PLAINTIFF STATED REINSTATEMENT OF JOB OR SETTLEMENT AMOUNT
(PAYABLE IN SALARY FORM) WOULD ALSO BE ACCEPTED.

DEFENEDANT COUSEL (AARON DETTLING-BALCH AND BINGHAM) STATED
NO REINSTATEMENT OF JOB WAS AVIALABLE.

DEFENDANT COUSEL STATED 3 TYPES OF OFFERS OF SETTLEMENT.

1. DISSIMISSAL OF LAWSUIT
2. DEFENDANT WOULD NOT SEEK PAYMENT OF LEGAL FEES FROM
   PLAINTIFF.
3. A ONE TIME PAYMENT OF $1,000.00 (ONE-THOUSAND- DOLLARS).

OR

DISMISSAL OF LAWSUIT
NOT SEEK PAYMENT OF LEGAL FEES
A ONE TIME PAYMENT OF $2,000.00 (TWO THOUSAND DOLLARS)

OR

DISMISSAL OF LAWSUIT
NOT SEEK PAYMENT OF LEGAL FEES
A ONE TIME PAYMENT OF $2500.00 ( TWENTY-FIVE-HUNDRED DOLLARS)

NO SETTLEMENT WAS REACHED.

DEFENDANT COUSEL REFUSED MEDIATIONS FROM THE COURT.

**John W. Dyess**
**1509 Union Street**
**Mobile, AL 36617**
**251-456-8746**

To:
**Auburn University Human Resources**
**Albert Snipes**
**Sonya Dixon**
**Grievance Committees**
**Len Hammond**

June 8, 2006

This letter is in regards to my being terminated from A.U. on May 3, 2006. I feel that I have been thoroughly mistreated in being terminated. I feel that the reason Mr. Floyd Richards terminated me was because I would not respond to his many attempts to express his sexual desires with me. I will list several of the reasons I feel I was sexually harassed below.

In June of 2005, I was asked to a meeting with Sonya Dixon (Human Resources) Dr. John Saidla (Administrator-Vet School) and Mr. Floyd Richards. Mr. Richards stated that I had threatened him; I explained that he and I had a conversation involving Christian principals and that I told him what the Bible says of what happens to people who harms a minister. I told him that I am a licensed Minister. He said he understood what I meant and that his father-in-law was also a minister. He also stated that I had been seen stealing towels from the Emergency Room. I explained that I made it my daily task to clean the Emergency Room and that I would make sure there were enough clean towels for use. I then told Ms. Dixon and Dr. John Saidla that Mr. Richards was approaching me like he wanted to date me. I explained that Mr. Richards told me (3 days after I had been assigned to him) that he admired me and that he wanted to get to know me better. I further stated that he looked me in the eyes like a man trying to set-up a date with a woman. After I finished talking, Ms. Dixon concluded the meeting.

In December of 2005, I met with Ms. Dixon of Human Resources. I told her that Mr. Richards was still trying to get me alone. He was trying to get me to go places at the Vet School saying he needed me to clean or do something. She asked was any of this told to me when I had first been assigned to him as my responsibility. I answered "No". I received a written letter detailing what room and areas of the vet school I was responsible for cleaning. The Kennel Room (dog food) and the surgery area across the street were the two rooms where he constantly tried to get me alone. I further stated to Ms. Dixon that Mr. Floyd (Bud) Richards was always asking me to get to know him better. This, I said, was very unprofessional of him. I felt like he and I had a descent enough working relationship and that I needed not to know anything else about him. I also stated to Ms. Dixon that Dr. John Saidla had no interest in helping me with this situation and that he felt like I was wasting his time. He said I could talk with Dr. Ed Richardson or even Governor Riley for all he cared.

John W. Dyess- Grievance Page 2

He made me feel like I was never to come in his office again.  Mr. Richards and Dr. David Whitley (Vet School Administrator) both were there and heard him.

In February of 2006, Mr. Richards used profanity on me.  He said that he was going to "fire my ass".  He later approached me in the hall and rubbed his hand and private body area on me.  I didn't say anything to him because of fear of being terminated.  The next morning Mr. Richards called me to a meeting with Dr. John Saidla and himself.   In this meeting, I was suspended for 5 days without pay.  I asked Dr. Saidla if it would help if I explained my side of the story.  He said "No".  I reported this to Albert Snipes (Human Resources) and to Ms. Dixon.  I was given no advice other than it was proper procedure.  I further spoke with affirmative action.  I informed them that Mr. Richards was harassing me sexually.   I told them that he had rubbed against me.  I was told by them that they would contact me after they had investigated this situation.  I also told them that Mr. Richards was stalking me, calling my home from his cellular phone (for no reason).  Two weeks went by and I had not heard from anyone from Affirmative Action or Human Resources.

Between the time I was suspended and the time I was terminated, Mr. Richards continued to stalk and harass me.  The reason I think the termination was unjust is that I had an Emergency to occur during my lunch period and was detained.   Mr. Richards was off that day, so I had no one to report to.  Further, I was never warned or advised on how to handle this situation before it happened.  Moreover, I always missed lunch breaks earlier (returned early) so I had overtime to replace the lost time.  In previous time when ever I was late returning from lunch, I explained to Mr. Richards that I would shorten my lunch the following day to accumulate the proper 40 hours.  He said that would be alright.  Finally, the reason I say this is wrong is because Mr. Richards allowed my fellow co-worker to leave without notice, clock each other in/out etc.

8.2.3 **Guidelines** - Auburn University believes that one of the basic functions at all levels of supervision is to identify below standard job performance and take the necessary steps to help the employee improve his or her performance. All supervisors are responsible for the effective adoption and implementation of this policy in their departments or units. In such situations the proper supervisory action is to refer the troubled employee, on the basis of deteriorating job performance only, to the EAP Coordinator who will, if necessary, refer the employee for appropriate consultation. However, the cause of below standard job performance may well be outside the realm of job responsibilities when the employee is unable or unwilling to correct the situation on his or her own or with normal supervisory assistance.

8.2.3.1 Auburn University becomes involved with an employee's behavioral, medical, and other personal problems only when the problems affect job performance, attendance, safety, conduct, and productivity. There is no wish or intent to intrude upon the private or personal life of an employee but rather to provide assistance where needed for his or her success.

8.2.3.2 Some employees may have problems that have not yet progressed to the point of seriously affecting job performance. Any employee who recognizes such problems may voluntarily contact the EAP Coordinator for confidential help.

8.2.3.3 An employee's job performance may be affected when a family member is troubled. For this reason, Auburn University extends the same offer of assistance, through the employee, to immediate family members.

8.2.3.4 Participation in Auburn University's EAP is voluntary to the extent that the employee will not be forced to participate in or accept recommended treatment. Refusing an offer to participate in the Employee Assistance Program will not be a basis for disciplinary actions and will not, in itself, be used against the employee. If the employee fails to follow recommendations, normal existing disciplinary action based on documented job performance will be taken.

8.2.3.5 Employees are responsible for the costs involved in resolving or treating any personal problem just as they are presently responsible for any costs for hospitalization or medical services. Auburn University's group health and hospital insurance coverage may cover all or a percentage of the cost of services of health care professional (including alcoholism and drug abuse treatment) to whom employees and their eligible dependents may be referred for assistance.

8.2.3.6 If the problem is not covered by health insurance, the EAP Coordinator will inform the employee in advance and work with the employee to locate other resources to provide assistance if needed.

8.2.3.7 **Confidentiality** - Referral for evaluation or acceptance of suggested treatment



<<Back

# $80,000 in AU Clinic Payments Not Deposited

Nov 25, 2006 10:49 PM CST

More than $80,000 in customer payments at Auburn University's Large Animal Clinic were never deposited in a bank. An audit released Friday by the Examiners of Public Accounts cites the clinic for not complying with university accounting policies.

Auditors found that between 2001 and 2004 receipts were written for $80,322 in payments by customers, but were not included in deposits to the bank or collection reports.

Doctor Tim Boosinger, dean of Auburn's College of Veterinary Medicine, says in a written response to the examiners the employee who handled the payments had been dismissed and procedures had been changed.

The employee was not named.

*Copyright 2006. Alabama Associated Press. All Rights Reserved.*

WORLDNOW

All content © Copyright 2000 - 2007 WorldNow and WSFA, a Raycom Media Station.
All Rights Reserved. For more information on this site, please read our Privacy Policy and Terms of Service.

Plaintiff talked with DR. Boosinger and his Assistant concerning MR Richard Sexual Harrassment and UnFair treatment. No Response Was given.



**http://public.findlaw.com**

Thursday, Jul. 5, 2007

# Employment Discrimination: U.S. Supreme Court Cases

Below is a list of U.S. Supreme Court cases involving employees' rights and employment discrimination, including links to the full text of the U.S. Supreme Court decisions.

- Griggs v. Duke Power Co. (1971)
  In this case, the Court decided that certain education requirements and intelligence tests used as conditions of employment acted to exclude African-American job applicants, did not relate to job performance, and were prohibited.

- Cleveland Bd. of Ed. V. LaFleur (1974)
  Found that Ohio public school mandatory maternity leave rules for pregnant teachers violate constitutional guarantees of due process.

- Meritor Savings Bank v. Vinson (1986)
  Found that a claim of "hostile environment" sexual harassment is a form of sex discrimination that may be brought under Title VII of the Civil Rights Act of 1964.

- Johnson v. Transportation Agency (1987)
  The Court decides that a county transportation agency appropriately took into account an employee's sex as one factor in determining whether she should be promoted.

- Oncale v. Sundowner Offshore Serv., Inc. (1987)
  In this case, the Court held that sex discrimination consisting of same-sex sexual harassment can form the basis for a valid claim under Title VII of the Civil Rights Act of 1964.

- Burlington Industries, Inc. Ellerth (1998)
  Holding that an employee who refuses unwelcome and threatening sexual advances of a supervisor (but suffers no real job consequences) may recover against the employer without showing the employer is at fault for the supervisor's actions.

- Faragher v. City of Boca Raton (1998)
  The Court decides that an employer may be liable for sexual discrimination caused by a supervisor, but liability depends on the reasonableness of the employer's conduct, as well as the reasonableness of the plaintiff victim's conduct.

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    **Privacy Policy   Disclaimer**        **About FindLaw   Advertise on FindLaw**



**FindLaw**
For Legal Professionals

http://caselaw.findlaw.com

# U.S. Supreme Court

## MERITOR SAVINGS BANK v. VINSON, 477 U.S. 57 (1986)

### 477 U.S. 57

### MERITOR SAVINGS BANK, FSB v. VINSON ET AL.
### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT
### No. 84-1979.

### Argued March 25, 1986
### Decided June 19, 1986

Respondent former employee of petitioner bank brought an action against the bank and her supervisor at the bank, claiming that during her employment at the bank she had been subjected to sexual harassment by the supervisor in violation of Title VII of the Civil Rights Act of 1964, and seeking injunctive relief and damages. At the trial, the parties presented conflicting testimony about the existence of a sexual relationship between respondent and the supervisor. The District Court denied relief without resolving the conflicting testimony, holding that if respondent and the supervisor did have a sexual relationship, it was voluntary and had nothing to do with her continued employment at the bank, and that therefore respondent was not the victim of sexual harassment. The court then went on to hold that since the bank was without notice, it could not be held liable for the supervisor's alleged sexual harassment. The Court of Appeals reversed and remanded. Noting that a violation of Title VII may be predicated on either of two types of sexual harassment - (1) harassment that involves the conditioning of employment benefits on sexual favors, and (2) harassment that, while not affecting economic benefits, creates a hostile or offensive working environment - the Court of Appeals held that since the grievance here was of the second type and the District Court had not considered whether a violation of this type had occurred, a remand was necessary. The court further held that the need for a remand was not obviated by the fact that the District Court had found that any sexual relationship between respondent and the supervisor was a voluntary one, a finding that might have been based on testimony about respondent's "dress and personal fantasies" that "had no place in the litigation." As to the bank's liability, the Court of Appeals held that an employer is absolutely liable for sexual harassment by supervisory personnel, whether or not the employer knew or should have known about it.

*Held:*

   1. A claim of "hostile environment" sexual harassment is a form of sex discrimination that is actionable under Title VII. Pp. 63-69.

   (a) The language of Title VII is not limited to "economic" or "tangible" discrimination. Equal Employment Opportunity Commission Guidelines fully support the view that sexual harassment leading to [477 U.S. 57, 58] non-economic injury can violate Title VII. Here, respondent's allegations were sufficient to state a claim for "hostile environment" sexual harassment. Pp. 63-67.

(b) The District Court's findings were insufficient to dispose of respondent's "hostile environment" claim. The District Court apparently erroneously believed that a sexual harassment claim will not lie absent an economic effect on the complainant's employment, and erroneously focused on the "voluntariness" of respondent's participation in the claimed sexual episodes. The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her participation in them was voluntary. Pp. 67-68.

(c) The District Court did not err in admitting evidence of respondent's sexually provocative speech and dress. While "voluntariness" in the sense of consent is no defense to a sexual harassment claim, it does not follow that such evidence is irrelevant as a matter of law in determining whether the complainant found particular sexual advances unwelcome. Pp. 68-69.

2. The Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. While common-law agency principles may not be transferable in all their particulars to Title VII, Congress' decision to define "employer" to include any "agent" of an employer evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. In this case, however, the mere existence of a grievance procedure in the bank and the bank's policy against discrimination, coupled with respondent's failure to invoke that procedure, do not necessarily insulate the bank from liability. Pp. 69-73.

243 U.S. App. D.C. 323, 753 F.2d 141, affirmed and remanded.

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, STEVENS, and O'CONNOR, JJ., joined. STEVENS, J., filed a concurring opinion, post, p. 73. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, post, p. 74.

F. Robert Troll, Jr., argued the cause for petitioner. With him on the briefs were Charles H. Fleischer and Randall C. Smith.

Patricia J. Barry argued the cause for respondent Vinson. With her on the brief was Catherine A. MacKinnon. *

[ Footnote * ] Briefs of amici curiae urging reversal were filed for the United States et al. by Solicitor General Fried, Assistant Attorneys General Reynolds [477 U.S. 57, 59] and Willard, Deputy Solicitor General Kuhl, Albert G. Lauber, Jr., John F. Cordes, John F. Daly, and Johnny J. Butler; for the Equal Employment Advisory Council by Robert E. Williams, Douglas S. McDowell, and Garen E. Dodge; for the Chamber of Commerce of the United States by Dannie B. Fogleman and Stephen A. Bokat; and for the Trustees of Boston University by William Burnett Harvey and Michael B. Rosen. Briefs of amici curiae urging affirmance were filed for the State of New Jersey et al. by W. Cary Edwards, Attorney General of New Jersey, James J. Ciancia, Assistant Attorney General, Susan L. Reisner and Lynn B. Norcia, Deputy Attorneys General, John Van de Kamp, Attorney General of California, Joseph I. Lieberman, Attorney General of Connecticut, Neil F. Hartigan, Attorney General of Illinois, Hubert H. Humphrey III, Attorney General of Minnesota, Paul Bardacke, Attorney General of New Mexico, Robert Abrams, Attorney General of New York, Jeffrey L. Amestoy, Attorney General of Vermont, and Elisabeth S. Shuster; for the American Federation of Labor and the Congress of Industrial Organizations et al. by Marsha S. Berzon, Joy L. Koletsky, Laurence Gold, Winn Newman, and Sarah E. Burns; for the Women's Bar Association of Massachusetts et al. by S. Beville May; for the Women's Bar Association of the State of New York by Stephen N. Shulman and Lynda S. Mounts; for the

Union St
Site   Ala. 36617



U.S. POSTAGE
PAID
MOBILE, AL
36607
JUN 17 '08
AMOUNT

$1.85
00087697-11

0000        36101

OFFice oF the CleRK
United states District Court
P. O. Box 711

montgomery Alabama
711