IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DYESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:07cv635-WKW |
| | ) | |
| | ) | |
| AUBURN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Currently pending before the undersigned Magistrate Judge is Defendant Auburn University's Motion for Summary Judgment (Doc. #35) as well as Plaintiff John Dyess's Response (Doc. #39). Upon consideration of the Motion and Plaintiff's Response, and for the reasons that follow, the undersigned Magistrate Judge RECOMMENDS the Motion (Doc. #35) be GRANTED.

I.      **BACKGROUND**

On July 11, 2007, Plaintiff, John Dyess (Dyess) commenced this action against Kelley G. Taylor, Lynn Hammond, and John Saidla. Compl. (Doc. #1) at 1. Dyess subsequently amended his Complaint, replacing those individuals with a single Defendant, Auburn University (Auburn). Am. Compl. (Doc. #10). Dyess's Complaint, as amended, alleges wrongful termination on the basis of race, sex, and religion as well as sex-, race-, and religious-based hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (2000). Compl. (Doc. #1) at 1-3. He also

alleges "negligence in handling [his] civil rights." Id. at 3.  Dyess seeks recovery of back pay and reinstatement of his former employment, including injunctive relief, damages, costs, and attorneys fees.  Compl. (Doc. #1) at 1-3.  Upon careful consideration of all documents[1] submitted in support of and in opposition to the Motion, the parties' submissions establish the following relevant facts:

From March 2002 through May 2006, Dyess worked as an animal care attendant at Auburn's College of Veterinary Medicine.  Pl.'s Response to Summ. J Mot. (Doc. #39) at 3 (Pl.'s Br.); Def.'s Br. Supp. Mot. Summ. J. (Doc. #36) at 3-4 (Def.'s Br.).  Dyess's duties included stocking patient (animal) surgery and recovery rooms with clean towels, food and supplies, mopping up spills, refilling dog food bins, cleaning up dog droppings, washing and folding laundry, sweeping, and performing other janitorial work.  Pl.'s Br. at 4-5; Def.'s Br. at 4-5.

During his employment at the college, Dyess's supervisor changed three times.  Pl.'s Br. at 6; Def.'s Br. at 6.  Dyess testified neither of his first two supervisors discriminated against him.  Pl.'s Br. at 6; Def.'s Br. at 6.

Dyess's third supervisor was Floyd Bud Richards (Richards).  On the second or third day after Richards became Dyess's supervisor, Richards approached Dyess in an animal room, and the two men engaged in a conversation that made Dyess feel

---

[1]In his Response Brief, the undersigned observes Dyess did not challenge Auburn's recitation of the "undisputed facts."  Rather, Dyess simply photocopied Auburn's undisputed facts section and included that section in Dyess's Response.  The Court construes Dyess's action as accepting Auburn's presentation of the facts and finds no genuine issues of material fact exist.

uncomfortable.  Pl.'s Br. at 6; Def.'s Br. at 6.  The conversation consisted of the following: "Hi [Dyess]."  "What are you doing?"  "Well, [Dyess], I'm trying to get to know you better, I want to know you in a better way.  Tell me more about yourself," "What do you do when you're not at the vet school."  "Well, what do you do at nighttime?"  "Are you married?" "What else do you do?  Do you go out to dinner?"  Pl.'s Br. at 7; Def.'s Br. at 7.  Dyess says Richards stood too close to him during this conversation.  Dyess felt Richards "was trying to date" Dyess because Richards "could have just kept a distance and asked" Dyess these questions.  Id.  Dyess did not ask Richards to allow more space between them.  Id.  Dyess testified Richards was "looking at me like a man trying to date a woman," and spoke in a tone "too calm and casual."  Id.

In response to Dyess's uncomfortable feeling, he "introduced [the] idea" he was a minister.  Pl.'s Br. at 8; Def.'s Br. at 8.[2]  Richards and Dyess then discussed Christian principles; Dyess reminded Richards what the Bible says will happen to those who harm God's people.  Id.  As an example, Dyess reminded Richards a passage which says "Vengeance is mine."  Pl.'s Br. at 8-9; Def.'s Br. at 8-9.  Richards asked Dyess in response if he was threatening Richards.  Pl.'s Br. at 9; Def.'s Br. at 9.

A few days later, Richards asked Dyess to get some particular dog food, but Dyess told Richards the food was not needed, because Dyess believed he knew better than Richards and wanted to prevent waste.  Pl.'s Br. at 10; Def.'s Br. at 10.  The conversation

---

[2]Dyess testified he is a licensed and ordained minister in the Baptist Church.  Pl.'s Br. at 24; Def.'s Br. at 24.

became heated, and Richards fiercely instructed Dyess to get the particular dog food.  Id.

The next day, Richards called Dyess into his office to discuss Dyess's failure to get the

requested dog food.  Id.  Richards told Dyess he must do as Richards says.  Id.  Dyess

informed Richards he understood and again told Richards to "be careful how [he] treat[s]

God's children."  Id.  Richards then asked Dyess again if he was threatening Richards.

Id.  Dyess replied "Of course not, I'm not threatening you.  This is God's Word; it's not

my word."  Pl.'s Br. at 11; Def.'s Br. at 11.

About a week later, Dyess attended a meeting with Richards, Dr. John Saidla (Dr.

Saidla), Director of the Veterinary Hospital and Richards's supervisor, and Sonya Dixon

(Dixon), Employee Relations professional in the Office of Human Resources for Auburn.

Id.  The purpose of the meeting was to discuss Richards's belief Dyess threatened

Richards and allegations Dyess stole towels from other wards.  Dyess's Depo. (Doc. #37-

1) at 161-62.  Dyess informed the group he thought Richards was trying to date Dyess.

Pl.'s Br. at 11; Def.'s Br. at 11.  Dixon asked what Richards did.  Id.  Dyess replied that

Richards asked Dyess out and about his personal life; stood too close to Dyess; looked at

him; and told Dyess Richards admired Dyess.  Id.  Dixon concluded the meeting by

telling Dyess she understood Dyess did not mean to threaten Richards, but she also

understood how Richards could have felt threatened.  Pl.'s Br. at 12; Def.'s Br. at 12.

A second meeting with Dyess, Dixon, and another young female followed.  During

this meeting, Dyess "interjected a lot of things about . . . being a minister," including

naming several individuals to whom he personally ministered.  Id.  Dyess attended

another meeting with Dixon and Albert Snipes (Snipes) shortly thereafter.  Pl.'s Br. at 13;

Def.'s Br. at 13.  During this meeting, Dyess was placed on administrative leave and

referred to a psychologist for a mandatory fitness for work examination.  Id.  Snipes

warned Dyess that if he continued making threats, he would face termination.  Id.

Subsequently, Dr. Glen Vollenweider (Dr. Vollenweider) evaluated Dyess.  Dr.

Vollenweider concluded Dyess "likely" could work and did not present an imminent

danger to himself or others.  But the doctor recommended Dyess receive extensive

psychotherapy and further evaluation.  Dyess refused any further treatment and returned

to work in August 2005.  Id.

On the day Dyess returned, he received a written memorandum from Dr. Saidla,

cautioning Dyess to follow the rules and policies of the university and department and to

do what Richards tells him.  The letter also directed Dyess to discuss his work schedule

with Richards.  Pl.'s Br. at 14; Def.'s Br. at 14.

In December 2005, Dyess attended another meeting with Dixon, Richards, and Dr.

Saidla.  During this meeting, Dyess described Richards's behavior as "promiscuous and

perverted."  Id.  The behavior to which Dyess referred included Richards:  being too close

to Dyess; trying to get the two of them alone; and sending Dyess to work in places outside

of his assigned areas.  Dyess reported Richards was trying to get them alone so he could

hug or kiss Dyess.  Id.

About two months later, on February 22, 2006, Dyess entered the supply room, an area outside of his permitted work zone, looking for latex gloves.  <u>See</u> Pl.'s Br. at 15; Def.'s Br. at 15.  Richards was in the supply room.  Upon seeing Dyess in the room, Richards yelled at Dyess,[3] telling him he did not have permission to enter the room and asked Dyess to leave.  <u>Id.</u>  For about a minute, Dyess stood silent and did not acknowledge Richards's presence or instructions.  <u>Id.</u>  Dyess exited the room without speaking to Richards.  Dyess entered the hallway and walked up to a cart filled with supplies Richards intended to distribute.  <u>See</u> Pl.'s Br. at 16; Def.'s Br. at 16.  Richards then stepped in between Dyess and the cart to prevent Dyess from taking supplies out of the cart.  <u>Id.</u>  Dyess testified Richards placed his hand on Dyess's private area and then rubbed the area to "cop a feel."  <u>Id.</u>  The touching lasted a second or two before Dyess moved away.  <u>Id.</u>

The next morning, Dyess received a written formal reprimand for "inappropriate behavior [and] insubordination toward his supervisor."  Pl.'s Br. at 15; Def.'s Br. at 15. The reprimand noted Dyess had been insubordinate to his supervisor on one prior occasion.  <u>Id.</u>  It also cautioned Dyess that his continued insubordination could subject him to termination.  <u>Id.</u>  Dyess refused to sign the reprimand form and, though given the

---

[3]Dyess claims Richards used profanity and said he would "fire [Dyess's] ass."  <u>See</u> Def.'s Br. at 25; Pl.'s Br. at 25.  Auburn disputes the veracity of Dyess's allegation and argues the fact is immaterial to the dispute.  It nonetheless, for purposes of this motion, argues even if the fact was true, Auburn is still entitled to summary judgment.  In light of that argument, the undersigned assumes Richards used profanity and said he would fire Dyess while the two men were in the supply closet.

6

option of making a statement on the form, Dyess did not do so.  Id.  Dyess, instead,

alleges he orally reported the touching incident to Dixon.  Pl.'s Br. at 17; Def.'s Br. at 17.

Dixon denies Dyess reported that incident to her.  Id.

Dyess received a second written reprimand, cautioning Dyess about termination if

his behavior continued, dated February 23, 2006.[4]  Pl.'s Br. at 19; Def.'s Br. at 19.  That

day, Richards saw Dyess sitting at a computer while he was not on break.  Dyess did not

respond when Richards spoke to him.  Richards called another employee, Renza Floyd

(Floyd), into the room to witness the situation.  Dyess again refused to respond to

Richards's inquiry.  Richards and Floyd then left the computer room.  Upon receiving the

reprimand, Dyess refused to sign the form and did not make any statements on the form.

Id.

The following month, Dyess received a third written reprimand and a five-day

suspension for using an unauthorized computer while working.  Pl.'s Br. at 20; Def.'s Br.

at 20.  The reprimand again warned Dyess if he did not follow the rules and policies of

the hospital, he would face termination.  Id.  Although he discussed the reprimand, Dyess

did not sign the form, nor did he make any written statement(s).  Id.

That same day, March 29, 2006, Dyess filed an informal complaint with the Office

of Affirmative Action/Equal Employment Opportunity (AA/EEO), claiming Richards

discriminated against him on the basis of race and religion.  Id.  The AA/EEO office

---

[4]Dyess disputes the date on this reprimand.  The date is not a material fact at issue.

7

investigated the charges.[5]  No evidence substantiating Dyess's charges was recovered.
Pl.'s Br. at 21; Def.'s Br. at 21.

In April 3, 2006, Dyess filed an internal grievance of his five-day suspension.
Later that month, a grievance committee compiled of three disinterested members of the
university community held a hearing on the grievance.  Id.[6]  Dyess informed the panel
Richards tired to provoke a fight with him.  Id.  Finding adequate documentation to
support the disciplinary action, the panel unanimously concurred with the suspension.  Id.

On April 24, 2006, Dyess received a written warning informing him that he had to
receive prior approval from his supervisor at least three days in advance before using
annual leave.  Pl.'s Br. at 22; Def.'s Br. at 22.  The written warning also instructed Dyess
to note the day(s) he planned to use leave on a specific calendar.  Id.  Four days later,
Dyess left work for two hours at lunchtime without prior authorization.  Dyess claims he
could not report his leave to Richards because he was not there.  Pl.'s Br. at 25; Def.'s Br.
at 25.

On another occasion during Dyess's tenure at Auburn, Dyess alleges Richards
attempted to get too close.  Richards asked Dyess to review his time sheet.  Pl.'s Br. at 17;
Def.'s Br. at 17.  Instead of handing the sheet to Dyess, he claims Richards held the

---

[5]According to Kelly Taylor, Director of the AA/EEO office, Dyess did not inform the office about the touching incident.  Taylor Aff. (Doc. #37-5) at ¶ 3.

[6]The grievance form did not mention the touching incident, and the panelists testified Dyess did not mention the touching incident during his hearing.  Dyess's Depo. Exh. 10 (Doc. #37-2); Def.'s Exhs E-G (Doc. #37-6, #37-7, #37-8).

document close to himself, causing Dyess to lean in close to see it.  Id.  Richards also called Dyess once on his cellular telephone during Dyess's employment.  Richards asked Dyess where he was.  Pl.'s Br. at 18; Def.'s Br. at 18.  After this call, Dyess testified Richards called his cellular telephone several times, but Dyess did not answer.  Id.

Dyess's termination followed on May 3, 2006.  Id.  The written termination noted repeated warnings about Dyess's failure to follow the university policies and rules.  Id.  Dyess did not sign or write any statement on this form.  Id.

That same day, Dyess filed another internal grievance.[7]  On June 8, 2006, Dyess filed a letter alleging Richards touched him in February 2006.  Dyess's Depo. Exh. 16. (Doc. #37-2) at 2.  The letter was referred to the AA/EEO office, which undertook a second investigation of Dyess's claims.  Pl.'s Br. at 23; Def.'s Br. at 23.  Finding no evidence substantiating Dyess's claims, the investigation ended.  Pl.'s Br. at 24; Def.'s Br. at 24.

On or about July 2006, Dyess filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) against Auburn.  Compl. (Doc. #1-2). This litigation followed Dyess's receipt of a right-to-sue letter from the EEOC.

## II.    STANDARD OF REVIEW

In considering Auburn's Motion for Summary Judgment, Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is

---

[7]The second grievance did not mention the touching incident.  Dyess's Depo. Exh. 14 (Doc. #37-2).

no genuine issue as to any material fact and . . . the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  This standard can be met by the moving party,

in cases where the moving party bears the burden of proof at trial, by submitting

affirmative evidence establishing every element of the moving party's claim.  All the

evidence, and the inferences drawn therefrom, must be viewed in the light most favorable

to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986).

        With respect to issues (such as affirmative defenses when the plaintiff is the

moving party) for which the nonmoving party bears the burden of proof at trial, the

moving party may present evidence negating an essential element of the nonmoving

party's claim or by demonstrating that the nonmoving party's evidence itself is

insufficient to establish an essential element of his claim.  An issue of fact is "material" if

under the applicable substantive law, it might affect the outcome of the case.  Hickson

Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (internal citations

omitted).  In either case, the burden then shifts to the nonmoving party to present

evidence showing that there is a genuine issue of material fact.  See Castleberry v.

Goldome Credit Corp., 408 F.3d 773, 785-86 (11th Cir. 2005).  To satisfy this burden, the

nonmoving party cannot rest on the pleadings, but must, by affidavit or other means, set

forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

In other words, to avoid summary judgment, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts." Matsushita

Elec. Indus. Co., 475 U.S. at 586.  The moving party bears "the exacting burden of

demonstrating that there is no dispute as to any material fact in the case," Warrior

Tombigbee Transport Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983), and

that it is entitled to judgment as a matter of law.  See Keel v. United States Dep't of Air

Force, 256 F. Supp. 2d 1269, 1291 (M.D. Ala. 2003).

## III.  DISCUSSION

### A.  Dyess's Claims

Under 42 U.S.C. 2000e-5(e)(1), a plaintiff cannot bring a Title VII claim unless he

first files a charge of discrimination with the EEOC.  Pijnenburg v. W. Ga. Health Sys.,

Inc., 255 F.3d 1304, 1305-06 (11th Cir. 2001).  Furthermore, a plaintiff cannot amend his

complaint by means of a summary judgment response.  Gilmour v. Gates, McDonald &

Co., 382 F.3d 1312, 1315 (11th Cir. 2005); Boyd v. Province Healthcare Co., Inc., 2005

WL 3132394 at *9 (S.D. Ala. Nov. 22, 2005).[8]  Consequently, the only claims properly

before this Court are those that (1) appear in the Dyess's EEOC charge, and (2) also

appear in Dyess's Complaint, as amended.

In his EEOC charge, Dyess alleged sex discrimination based on sexual harassment

---

[8]Under the law of this circuit, this Court need not discuss the three new claims, defamation of character, retaliation, and mental cruelty, Dyess attempted to add to the litigation in his summary judgment response.

from Richards.[9]  Dyess claimed Richards wanted to date him; asked Dyess if he wanted to

get to know Richards better; called Dyess's home; "stalked him;" rubbed Dyess's private

area; and made requests to get Dyess alone.  Def.'s Evid. Submission (Doc. #37-9) at

Exh. I.  Dyess also alleges his termination was pretextual because other employees had

taken long lunches without using leave or giving notice and had not been terminated.

These are the only claims properly before this court and the only ones the Court will

consider on this Motion.  See Pijnenburg v. W. Ga. Health Sys., Inc., 255 F.3d at 1305[10].

Though not a model a clarity, the Complaint specifies Dyess's theories of recovery:  a

hostile work environment created by sexual harassment and wrongful termination based

on sex discrimination.

### B.     Hostile Work Environment Claim

Auburn argues entitlement to summary judgment because Dyess has failed to

establish a *prima facie* case of sexual harassment.  In particular, Auburn argues Dyess has

failed to show Richards's alleged conduct was sufficiently severe and pervasive to alter

the terms and conditions of his employment and create an abusive and hostile work

environment.  See Def.'s Br. at 35-37.  Dyess makes no counter argument.  See Pl.'s Br.[11]

---

[9]Dyess also alleged retaliation before the EEOC, but he did not set forth that claim in his Complaint.

[10]Consequently, the Court will not address Dyess's claims of wrongful termination on the basis of race and religion as well as race- and religious-based hostile work environment.

[11]The undersigned observes Dyess's response brief contains little, if any, argumentation. The only possible arguments he makes are set forth on a page containing citations to seven

The Court agrees with Auburn.

"'Sexual harassment is a form of sex discrimination.'"  Webb-Edwards v. Orange

County Sheriff's Office, 525 F.3d 1013, 1026 (11th Cir. 2008) (quoting Gupta v. Fla. Bd.

of Regents, 212 F.3d 571, 582 (11th Cir. 2000)).

> An employee must present evidence of the following elements to support a
> cause of action for a hostile environment claim created by sexual
> harassment:
>
>> "(1) that he or she belongs to a protected group; (2) that the
>> employee has been subject to unwelcome sexual harassment,
>> such as sexual advances, requests for sexual favors, and other
>> conduct of a sexual nature; (3) that the harassment must have
>> been based on the sex of the employee; (4) that the
>> harassment was sufficiently severe or pervasive to alter the
>> terms and conditions of employment and create a
>> discriminatorily abusive working environment; and (5) a basis
>> for holding the employer liable."

Webb-Edwards, 525 F.3d at 1026 (quoting Mendoza v. Borden, Inc., 195 F.3d 1238,

1245 (11th Cir. 1999) (en banc)).[12]  In other words, actionable sexual harassment occurs

when inappropriate sexual conduct causes a hostile work environment that is sufficiently

severe or pervasive to alter the terms and conditions of work.  Hulsey v. Pride Rests.,

LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).

---

Supreme Court cases.  Each citation contains a one sentence description of the High Court's
holdings, none of which directly address the merits of Dyess's hostile work environment and/or
wrongful termination claims.  As the Court afforded Dyess an opportunity to present his
arguments, the undersigned is loath to make arguments for Dyess.

[12]"[A]n employer may be vicariously liable for actionable hostile environment
discrimination caused by a supervisor with immediate or successively higher authority over the
employee-subject to an affirmative defense."  Mendoza, 195 F.3d at 1245 n. 4.

Auburn argues Dyess has failed to establish the second, third, and fourth elements of this claim.  The Court agrees Dyess has failed to establish the fourth element of a hostile work environment and sexual harassment claim.[13]

### 1.    Severe or Pervasive

The question is whether the harassment was sufficiently severe or pervasive to constitute actionable sexual harassment.  In <u>Gupta</u>, the Eleventh Circuit noted that the "severe or pervasive" analysis "is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'"  212 F.3d at 583 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)).  Thus, "a plaintiff must establish not only that she subjectively perceived the environment as

---

[13]Thus, the Court need not reach the second or third elements.  With regards to the second element, although this Court does not decide this element, it points out Dyess may have presented testimony demonstrating Richards's alleged placement of his hand on Dyess's private area for a second or two was unwelcome.  Dyess also testified he told Dixon and other meeting attendees Richards stood too close to him, looked at Dyess like Richards wanted to date Dyess, and asked him questions that made him feel uncomfortable.  This testimony demonstrates Dyess did not welcome Richards's alleged conduct.  Nevertheless, it questionable whether all of Richards's alleged conduct involved the necessary sexual connotations to be actionable sex discrimination.  For instance, there is nothing sexual in nature about the conversation which took place two or three days after Richards became Dyess's supervisor.  On the contrary, it appears Richards attempted to exchange pleasantries with Dyess and get to know his new employee for whom Richards had responsibility.  While Richards may have stood too close to Dyess, he admits nothing else happened during this incident.  Dyess also claims Richards tried to get Dyess alone and called his cell phone.  While calling and trying to get someone alone may suggest sexual attraction, "the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees."  <u>Mendoza,</u> 195 F.3d at 1248.  These interactions do not objectively indicate Richards's alleged conduct had the requisite sexual connotation.

hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." Gupta, 212 F.3d at 583 (citations omitted). Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

It is questionable whether Dyess perceived his work environment as hostile and sexually abusive. To support its contention Dyess did not perceive his work environment as hostile and abusive, Auburn has presented three written reprimands that provided Dyess an opportunity to report his perceptions. Auburn also provided affidavits of the grievance panel who listened to Dyess's complaints about Richards's alleged conduct. Specifically, the affiants state Dyess discussed Richards's alleged conduct in the supply room, where Richards yelled at Dyess. The affiants state Dyess told them Richards attempted to start a fight with Dyess, but he did not discuss the alleged touching incident. Def.'s Evid. Submission (Doc. #37) at Exhs. E-G. This evidence is somewhat contradicted by Dyess's testimony where he repeatedly described Richards's alleged conduct, with the exception of the alleged touching incident, to Dixon and the other attendees. Though not argued or cited as support for his argument, Dyess produced a grievance letter dated June 8, 2006. The letter explains the reasons Dyess felt sexually harassed, describing the same conduct at issue in this case. The letter, however, was

written after Dyess's termination and gave notice to Auburn, for the first time, about the alleged touching incident that occurred about four months earlier.  Dyess also admits in the letter he believed he had a "descent enough working relationship" with Richards.  These facts tend to show Dyess did not perceive his work environment as hostile and sexually abusive.  Nevertheless, the letter describes Dyess's perception Richards sexually harassed him.  In light of these inconsistencies, the Court makes no finding on this issue, but instead, assumes Dyess has satisfied the subjective component of the fourth element.

The critical inquiry, therefore, is whether, from an objective viewpoint, the alleged sexual harassment was so frequent, severe or pervasive so as to constitute actionable sexual harassment.  See Gupta, 212 F.3d at 583.  This component of the analysis is somewhat fact intensive.  Mendoza, 195 F.3d at 1247.  Nonetheless, there are four factors the Eleventh Circuit considers to determine if comments or actions of a sexual nature are sufficiently severe or pervasive to alter an employee's terms and conditions of employment:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Mendoza, 195 F.3d at 1246.  "[In hostile environment cases] [t]he courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive."  Id. (citations omitted).  The Court will now examine the four factors.

16

### a.    Frequency

During the course of more than a year, Dyess alleges Richards stood too close to Dyess twice, asked Dyess questions to get to know him better once; looked at Dyess like Richards wanted to date him once; yelled profanity at Dyess once; touched Dyess's private area for a second or two once; called Dyess's cellular phone several times; tried to get the two men alone; and made requests to get Dyess alone.  This conduct was not frequent.  These incidents are far too infrequent over a period of more than twelve months to alter the conditions under which Dyess worked.  See Mendoza, 195 F.3d at 1249 (concluding a single instance of slight physical contact, one arguably inappropriate statement, and three instances of sniffing sounds, in addition to constant following and staring over an eleven-month period were not frequent) (citing Spraque v. Thorn Am., Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (reasoning that five sexually-oriented incidents over sixteen months were sporadic).

### b.    Severity

None of the conduct alleged by Dyess is severe.  Although offensive to Dyess, Richards allegedly stood too close to Dyess twice, asked Dyess questions to get to know him better once; looked at Dyess once like Richards wanted to date Dyess; yelled profanity at Dyess once; touched Dyess's private area once for a second or two; called Dyess's cellular phone several times; tried to get the two men alone; and made requests to get Dyess alone, are far less severe than the incidents of sexual banter and inappropriate

touching described, <u>and found insufficient</u>, by this Circuit and other circuits.  <u>Compare</u>

<u>Webb-Edwards v. Orange County Sheriff's Office</u>, 525 F.3d 1013, 1027 (11th Cir. 2008)

(finding supervisor's remarks that (1) plaintiff looked hot and should wear tighter clothes,

(2) he wished his wife would wear hot clothes on at least a weekly basis over an eight-

week period, and (3) once that he was eating plaintiff for lunch to plaintiff's husband

were not severe or pervasive ); <u>Gupta</u>, 212 F.3d at 584-586 (concluding trial court should

have granted judgment as a matter of law to defendant because the following alleged

conduct by a male department coordinator (Rhodd) at a university directed toward a

female associate professor (Gupta) over a six or seven month period was not sufficiently

severe or pervasive from an objective view:  (1) flirtatious comments such as "[you are]

looking very beautiful;" (2) frequent calls to her house at night asking personal questions

such as "Are you in bed yet?," "I was wondering how you were doing?," and "Are you

talking to your boyfriend?;" (3) one incident when Gupta entered Rhodd's office when he

was expecting her and she found him sitting in his chair with his dress shirt off (but

wearing an undershirt) and he "unbuckled his belt and pulled down his zipper and started

tucking his shirt in" (4) one incident where Rhodd placed his hand on Gupta's inner

thigh; and (5) one incident where Rhodd lifted Gupta's dress about four inches, felt the

hem and said "What kind of material is that?"); <u>Mendoza</u>, 195 F.3d at 1247-53 (finding

that over an eleven month period, supervisor's "constant" following of employee and

staring in a "very obvious fashion," two instances of making a sniffing sound while

18

looking at the employee's groin area and another instance of sniffing without looking at the groin area, one incident of rubbing up against the employee's hip while touching her shoulder and smiling, and one incident where the supervisor made the comment that he was "getting fired up too" when the employee came into his office to exclaim that she was only there to work (and not to be harassed), fell well short of conduct that would be deemed sufficiently severe or pervasive to alter conditions of employment); Harvill v. Westward Comm., LLC, 433 F.3d 428, 435-36 (5th Cir. 2005) (finding a triable issue of hostile environment existed where the alleged harasser, a male co-worker, grabbed the plaintiff and kissed her on the cheek; fondled her breasts "numerous times," popped rubber bands at her breasts, patted her on the buttocks "numerous times," came behind her and rubbed his body against plaintiff, and once made comments about her sex life and her abilities in bed); Hockman v. Westward Comms., LLC, 407 F.3d 317, 328-29 (5th Cir. 2004) (actions of a co-worker toward plaintiff over a year and a half period were not sufficiently severe or pervasive to satisfy the objective standard:  (1) commenting to plaintiff about a co-worker's behind and body; (2) once slapping plaintiff on the behind with a newspaper; (3) brushing up against plaintiff's breasts and behind while passing her; (4) one incident of holding her cheeks and trying to kiss her; (5) asking plaintiff to come to the office early so that they could be alone; and (6) one incident of standing in the doorway to the bathroom while plaintiff was washing her hands); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (affirming summary judgment for

19

employer where supervisor told plaintiff she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand"); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (plaintiff's claims that supervisor repeatedly told plaintiff how beautiful she was, asked her out on dates, then when rebuffed told plaintiff she was a "dumb blonde" when she made mistakes counting inventory, tried to kiss her at a bar as well as two other times, placed "I love you" signs in plaintiff's work area and touched her shoulder at least six times, were insufficient to establish actionable sexual harassment); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (holding that multiple instances of inappropriate conduct, including placing a magnifying glass over the plaintiff's crotch, did not establish sexual harassment), with Hulsey, 367 F.3d at 1247-1249 (employee of fast food restaurant presented enough evidence for a jury to conclude that the following conduct of her male supervisor over a two to three week period was objectively severe or pervasive:  (1) multiple direct and indirect proposals for sex; (2) repeated attempts to touch her breasts, place his hands down her pants or pull off her pants; (3) following her into the bathroom; and (4) enlisting help from others while he attempted to grope her); Johnson v. Booker T. Wash. Broad. Serv., Inc., 234 F.3d 501, 506-07, 509 (11th Cir. 2000) (radio co-host who also served as plaintiff's supervisor engaged in conduct that was sufficiently severe or pervasive to fall within objective sexual harassment when in a four-month period he, among other things, repeatedly told

20

plaintiff she had a sexy voice, called out plaintiff's name and pulled his pants up in an obscene manner so plaintiff could see the imprint of his private parts, repeatedly attempted to massage plaintiff's shoulders against her wishes, stuck his tongue out in an obscene manner, rubbed his "body parts" against plaintiff and commented about sex to plaintiff and asked her about her sex life); Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 418, 422 n. 12 (11th Cir. 1999) (finding actions of Fire Chief and Assistant Chief and two other supervisory personnel toward plaintiff on a daily basis over about a three year period including sexually explicit jokes, comments about her body, requests to sit on their laps - and on one occasion when plaintiff refused, the Assistant Chief picking her up and squeezing her so hard she urinated in her pants, one occasion where one of the supervisors ground his groin into plaintiff's buttocks while stating "look at that sexy mama, I could just eat you in that skirt," multiple propositions for sex and repeated incidents of grabbing and slapping plaintiff's buttocks and leg, were sufficiently severe or pervasive); Splunge v. Shoney's, Inc., 97 F.3d 488, 490 (11th Cir. 1996) (finding pervasive hostile environment existed where four managers of restaurant "grabbed [p]laintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, [and] speculated as to the plaintiffs' sexual prowess"); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 601-03, 608 (2d Cir. 2006) (reversing district court's grant of summary judgment and holding a reasonable jury

could conclude that vice president of company's actions toward employee over a five

month period of repeatedly telling her that if she wanted a raise she was "sleeping with

the wrong employee," at an office party in the presence of other employees placing his

hand on employee's upper thigh and taking a picture of himself doing it, asking if the

employee would go with him to his hotel room after the party, and, on several occasions,

approaching plaintiff from the back while she was working and placing his hands on her

back, neck and shoulders, was objectively severe or pervasive).

**c.    Physically Threatening or Humiliating and Unreasonable
Interference with Job Performance**

Dyess did not present any evidence demonstrating Richards's alleged conduct was

physically threatening or humiliating or that the cumulative effect of this alleged conduct

unreasonably interfered with Dyess's job performance.  Even construing the evidence in

the light most favorable to Dyess, Richards's alleged conduct did not physically threaten

Dyess in any manner.  While the alleged touching incident may have humiliated Dyess, he

neither alleges or provides any evidence to support this claim.  Indeed, during Dyess's

deposition, produced by Auburn, Dyess testified there were no witnesses to the alleged

touching incident; thus, his testimony does not support a conclusion Richards humiliated

him in front of others.  See Orquiola v. Nat'l City Mortg. Co., 510 F. Supp. 2d 1134, 1151

(N.D. Ga. 2007).  Additionally, there is no testimony that Richards's alleged conduct

physically threatened or humiliated Dyess or that the cumulative effect of this conduct

unreasonably interfered with Dyess's job performance.  Because Auburn has provided

22

Dyess's deposition testimony to support its contention that Dyess cannot prove this factor, to withstand entry of summary judgment, Dyess must present competent evidence designating "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Dyess has failed to do so.  His bald assertions, which the Court finds implicit in his general charge of sexual harassment, are based entirely on conjecture.  Mere conclusory allegations or speculation will not defeat a properly supported summary judgment motion.  Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989) ("If the nonmoving party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor.").  Accordingly, Dyess has not presented a genuine issue of material fact as to these two factors.

### 2.  My "Severe or Pervasive" Conclusion

Thus, in considering the four factors under the totality of the circumstances here, the Court deems this case falls more in line with the Eleventh Circuit's decisions in Gupta and Mendoza rather than Hulsey, Johnson, Dees and Splunge.  Richards's purported conduct, at least as far as the alleged touching incident, was boorish, inappropriate and, if proven, potentially actionable against him individually.  Nevertheless, Richards's alleged conduct was not sufficiently severe or pervasive to be actionable against Auburn under this Circuit's prevailing precedent.

While it is not the Court's intent to condone or trivialize Richards's alleged

conduct, the Court must take an objective view as to whether these acts cross the line into the realm of actionable sexual harassment against Auburn pursuant to the Eleventh Circuit's articulated standards. My judgment is these incidents, viewed *in toto*, do not cross that line, and there is no factual issue for a jury to decide. Summary judgment is therefore appropriate.[14]

### C.     Wrongful Termination

In his EEOC charge and Complaint, as amended, Dyess alleges wrongful termination based on sex discrimination. Auburn argues Dyess cannot establish a *prima facie* case of discriminatory discharge. Def.'s Br. at 45.

As provided above, Title VII prohibits employers from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where a plaintiff has not presented direct evidence of discrimination, as in the instant case, "a plaintiff may [ ] present circumstantial evidence of discrimination sufficient to create a jury question." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001). For claims based on circumstantial evidence, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Id.

In evaluating discrimination claims based on circumstantial evidence, courts use

---

[14]Because Dyess is unable to show he was subjected to a sexually hostile work environment, the Court need not address Auburn's argument regarding the affirmative defense established by the Supreme Court in Faragher, 524 U.S. at 807, and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

the three-part, burden-shifting framework set out by the Supreme Court in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  First, a plaintiff must establish a

prima facie case of disparate treatment, which may be accomplished by showing that

"'(1) [ ]he belongs to a protected class; (2) [ ]he was subjected to an adverse employment

action; (3) [his] employer treated similarly situated employees outside [his] classification

more favorably; and (4) [ ]he was qualified to do the job.'"  Samuels v. Univ. of S. Ala.,

153 F. App'x 612, 614 (11th Cir. 2005) (unpublished) (quoting Wilson v. B/E Aerospace,

Inc., 376 F.3d 1079, 1091 (11th Cir. 2004)).  If a plaintiff is successful in establishing a

prima facie case, the second step of the McDonnell Douglas framework shifts "the

burden of production . . . to the employer to articulate a legitimate, nondiscriminatory

reason for its actions."  Wilson v. B/E Aerospace, Inc., 376 F.3d at 1087.  Third, the

plaintiff may then attempt to demonstrate the proffered reason was, in fact, merely pretext

for the defendant's acts.  Id. at 1088.  "The ultimate burden of persuading the trier of fact

. . . the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff."  Tx. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 256 (1981).

       Auburn does not dispute the first two prongs.  Rather, it argues Dyess cannot

establish the third prong.  The Court agrees.  Dyess has not presented any evidence

demonstrating Auburn treated similarly-situated female employees more favorably.

Indeed, the only evidence Dyess presents, the letter dated June 8, 2006, discusses his

"fellow co-worker," without identifying the name, gender, or position of this coworker.

25

Although Dyess testified how one female co-worker, Sara Henderson (Henderson), "was allowed to take lengths of time," Dyess has not provided any evidence indicating he and Henderson are similarly situated. There is no evidence Henderson worked as an animal care attendant, nor has Dyess shown Henderson took these "lengths of time" without the permission of her supervisor. See Toney v. Montgomery Job Corps, 211 F. App'x 816, 818 (11th Cir. 2006) (finding plaintiff, a former shift coordinator, was not similarly situated to the two female shift coordinators plaintiff identified); Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005) (concluding plaintiff, a physician, had not identified a female physician who replaced him and had received "nearly identical" complaints); Samuels v. Univ. of S. Ala., 153 F. App'x at 614 (finding female-plaintiff had not established the third prong because she did not present any evidence how male employees were treated more favorably by employer); Dyess's Depo. (Doc. #37-1) at 333-34. In fact, Dyess's testimony, which reads "Richards allowed . . . Henderson and others . . . to take lengths of time," suggests Richards authorized Henderson's use of leave. Dyess's Depo. (Doc. #37-1) at 333. Dyess's testimony therefore shows Henderson's conduct was not "nearly identical" to his. Toney, 211 F. App'x at 818. Moreover, Dyess's testimony discusses favorable treatment of not only female co-workers, but also male co-workers. Thus, his testimony cannot show Auburn treated female employees more favorably than males. Because Dyess did not present evidence of a valid comparator, he cannot make it past the first step of the McDonnell Douglas

26

framework.  <u>Wright v. Sanders Lead Co.</u>, 217 F. App'x 925, 930 (11th Cir. 2007) ("'If

two employees are not similarly situated, then the different application of workplace rules

to them does not constitute illegal discrimination,' and the plaintiff's *prima facie* case

fails as a matter of law.") (quoting <u>Lathem v. Dep't of Children & Youth Servs.</u>, 172 F.2d

786, 793 (11th Cir. 1999).  Consequently, the burden would not shift to Auburn to put

forth a legitimate, nondiscriminatory reason for the termination, and therefore, there is no

need to address the second and third steps of the <u>McDonnell Douglas</u> framework.

### D.    State Law Claims

Dyess asserts several state law claims in his Complaint, as amended.  These claims

are due to be dismissed.  If the federal claims over which the court has original

jurisdiction are dismissed, the court may decline to exercise jurisdiction over state law

claims.  <u>See</u> 28 U.S.C. § 1367(c)(3); <u>McCulloch v. PNC Bank, Inc.</u>, 298 F.3d 1217, 1227

(11th Cir. 2002).  In view of this Court's determination that summary judgment is

appropriate for the federal claims presented in Dyess's Complaint, the Court concludes it

should decline jurisdiction over the state law claims and dismiss them.  <u>Id.</u>

## IV.    CONCLUSION

For the reasons specified above, the undersigned Magistrate Judge

RECOMMENDS Auburn's Motion for Summary Judgment (Doc. #35) be GRANTED.

The undersigned further RECOMMENDS that Final Judgment be entered against the

named Plaintiff –John Dyess– and in favor of Defendant—Auburn.  Having

27

recommended the dismissal of the federal claims, the Magistrate Judge further RECOMMENDS the Court DECLINE to exercise supplemental jurisdiction over any state law claims.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before August 26, 2008**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Sec., Inc., 667 F.2d 33 (11th Cir. 1982); see also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 13th day of August, 2008.

28

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE