IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JOHN DYESS, PRO-SE

PLAINTIFF,

V.                                    NO. 3;07CV-635-WKW

AUBURN UNIVERSITY,

DEFENDANT.

RESPONSE TO SUMMARY JUDGMENT MOTION

THE PLAINTIFF, JOHN DYESS, RESPECTFULLY MOVES THIS
COURT TO ENTER FULL AND FINAL SUMMARY JUDGMENT IN ITS
FAVOR. (SCHEDULING ORDER NO. 23)

RESPECTFULLY SUBMITTED,

JOHN DYESS, PRO-SE

John W. Dyess
1509 Union Street
Mobile, AL 36617
251-456-8746

To:
**Auburn University Human Resources**
**Albert Snipes**
**Sonya Dixon**
**Grievance Committees**
**Len Hammond**

June 8, 2006

      This letter is in regards to my being terminated from A.U. on May 3, 2006. I feel that I have been thoroughly mistreated in being terminated. I feel that the reason Mr. Floyd Richards terminated me was because I would not respond to his many attempts to express his sexual desires with me. I will list several of the reasons I feel I was sexually harassed below.

In June of 2005, I was asked to a meeting with Sonya Dixon (Human Resources) Dr. John Saidla (Administrator-Vet School) and Mr. Floyd Richards. Mr. Richards stated that I had threatened him; I explained that he and I had a conversation involving Christian principals and that I told him what the Bible says of what happens to people who harms a minister. I told him that I am a licensed Minister. He said he understood what I meant and that his father-in-law was also a minister. He also stated that I had been seen stealing towels from the Emergency Room. I explained that I made it my daily task to clean the Emergency Room and that I would make sure there were enough clean towels for use. I then told Ms. Dixon and Dr. John Saidla that Mr. Richards was approaching me like he wanted to date me. I explained that Mr. Richards told me (3 days after I had been assigned to him) that he admired me and that he wanted to get to know me better. I further stated that he looked me in the eyes like a man trying to set-up a date with a woman. After I finished talking, Ms. Dixon concluded the meeting.

In December of 2005, I met with Ms. Dixon of Human Resources. I told her that Mr. Richards was still trying to get me alone. He was trying to get me to go places at the Vet School saying he needed me to clean or do something. She asked was any of this told to me when I had first been assigned to him as my responsibility. I answered "No". I received a written letter detailing what room and areas of the vet school I was responsible for cleaning. The Kennel Room (dog food) and the surgery area across the street were the two rooms where he constantly tried to get me alone. I further stated to Ms. Dixon that Mr. Floyd (Bud) Richards was always asking me to get to know him better. This, I said, was very unprofessional of him. I felt like he and I had a descent enough working relationship and that I needed not to know anything else about him. I also stated to Ms. Dixon that Dr. John Saidla had no interest in helping me with this situation and that he felt like I was wasting his time. He said I could talk with Dr. Ed Richardson or even Governor Riley for all he cared.

John W. Dyess- Grievance Page 2

He made me feel like I was never to come in his office again. Mr. Richards and Dr. David Whitley (Vet School Administrator) both were there and heard him.

In February of 2006, Mr. Richards used profanity on me. He said that he was going to "fire my ass". He later approached me in the hall and rubbed his hand and private body area on me. I didn't say anything to him because of fear of being terminated. The next morning Mr. Richards called me to a meeting with Dr. John Saidla and himself. In this meeting, I was suspended for 5 days without pay. I asked Dr. Saidla if it would help if I explained my side of the story. He said "No". I reported this to Albert Snipes (Human Resources) and to Ms. Dixon. I was given no advice other than it was proper procedure. I further spoke with affirmative action. I informed them that Mr. Richards was harassing me sexually. I told them that he had rubbed against me. I was told by them that they would contact me after they had investigated this situation. I also told them that Mr. Richards was stalking me, calling my home from his cellular phone (for no reason). Two weeks went by and I had not heard from anyone from Affirmative Action or Human Resources.

Between the time I was suspended and the time I was terminated, Mr. Richards continued to stalk and harass me. The reason I think the termination was unjust is that I had an Emergency to occur during my lunch period and was detained. Mr. Richards was off that day, so I had no one to report to. Further, I was never warned or advised on how to handle this situation before it happened. Moreover, I always missed lunch breaks earlier (returned early) so I had overtime to replace the lost time. In previous time when ever I was late returning from lunch, I explained to Mr. Richards that I would shorten my lunch the following day to accumulate the proper 40 hours. He said that would be alright. Finally, the reason I say this is wrong is because Mr. Richards allowed my fellow co-worker to leave without notice, clock each other in/out etc.

## CONTESTED FACTS[8]

1. Dyess discussed Biblical scriptures with Mr. Richards and Mr. Richards told Dyess that his father-in-law was a minister.

2. Dyess often referred to Scriptures when having conversations to avoid hostile situations.

3. Richards was not there on the day that Dyess took a two hour lunch. There was no immediate supervisor to report to that day and other employees often took extra time if supervisors weren't there. Dyess had an emergency to take care of that day.

4. Albert Snipes and Sonya Dixon forced Dyess to attend psychological care and placed him on administrative leave.

5. Dyess denies that he came up with the idea that Richards was touching his private area after he was terminated. In Dyess' initial meeting with Richards, he was flirting. Dyess constantly told Dixon and Snipes that Richards was sexually harassing him.

6. In the incident where Richards touched Dyess, Richards used profanity and said he would "fire his ass." Dyess was in the room for less than one minute.

---

[8] *See* fn. 1, *supra*. Auburn believes that these six "Contested Facts" presented by Dyess fail to call any of the "Uncontested Facts" into material dispute. These six points are the only response Auburn received to its request to consult on "Uncontested" versus "Contested" facts.

25

PLAINFIFF FEELS AUBURN SHOULD BE HELD LIABLE BECAUSE

RACIAL DISCRIMINATION

RELIGIOUS DISCRIMINATION

SEXUAL HARRASSMENT

WRONGFUL TERMINATION

RETALIATION (SEE EQUAL EMPLOYMENT OPP. COMMISSION)

MENTAL CRUELTY

NEGLIGENCE

HUMAN RESOURCES FORCED ME TO TAKE PSYCHOLOGICAL TREATMENT. (SEE ENCLOSED COPY OF EMPLOYEE HAND BOOK.

THIS IS NOW ON MY EMPLOYEE FILE , DAMAGING MY ABILITY TO OBTAIN OTHER EMPLOYMENT OPPURTUNITY.

I WAS VERY EMBARSSED PUBLICALLY .

DUE TO WORKING IN CENTRAL SUPPLY, IWOULD OFTEN NOT BE ABLE TO TAKE LUNCN BREAK AT THE PROPER TIME, FORGIONG LUNCH AND HAVING EXTRA TIME TO TAKE OFF DURING THE LUNCH BREAK ON ANOTHER DAY. MR. RICHARDS APPROVED THIS. THIS OCCURRED DURING THE WEEK BEFORE TERMINATION.

MR RICHARD WAS ON ANNUAL LEAVE THE DAY OF LATE RETURN . THEREWAS NO SUPERVISOR TO REPORT THIS TO . THE TIME SHEETS WERE ALLREADY SENT TO PAYROLL BYE MR RICHARDS THE DAY BEFORE .

AUBURN ENCOURAGES IT EMPLOYEES TO TAKE ALL OF THEIR ANNUAL LEVE AND SICK TIME SO AS TO NOT LOSE ANY OF IT. I COULD HAVE TAKE OFF THE ENTIRE DAY.

MR RICHARDS CALLED MY HOME PHONE AT NIGHT FROM HIS CELL PHONE. THE NEXT THE HE WOULD NEVER TELL ME WHY.

MR RICHARD SEXUAL HARRASSMENT WAS VERY OFTEN (ONCE OR TWICE A MONTH)

I REPORTED THIS TO MS DIXON AND MR SNIPES (HUMAN RESOURCES) AS WELL AS DR JOHN SAIDLA (MR RICHARDS SUPERVISOR), DEAN TIM BOOSINGER AND DR DAVID WHITLEY.

I SPOKE WITH MS DIXON AS TOLD BY DR. SAIDLA ONCE OR TWICE A MONTH CONCERNING MR RICHARDS BEHAVIOR. SHE NEVER TOOK NOTES AND NEVER GAVE ME ANY ADVICE AS TO HOW TO HANDLE THE PROBLEM . I CONSTANTLY AS HER TO DISCUSS THE ISSUE WITH MS LEN HAMMOND (V.P. HUMAN RESOURCES ) CONCERNIN TRANSFERING ME TO ANOTHER DEPARTMENT. SHE JUST IGNORED IT.

EVERYONE IN MY DEPARTMENT TOOK EXTRA LUNCH TIME WHEN MR RICHARDS WAS NOT THERE. I HAD AN EMERGENCY AND DELAYED. HAVING NOT TAKEN ALL OF LUNCH TIME ON PREVIOUS DAYS, I FELT LIKE IT WOULD BE OKAY SINCE MR RICHARD WAS NOT THERE AND THERE WAS NO IMMEDIATE SUPERVISOR TO CONTACT.

THE COMPUTER GROUP OKAY ME to USE ANY COMMPUTER AS ANY EMPLOYEE. . I WAS NOT TOLD NOT USE THE COMPUTER AND I BACK WITH IN MY 15 MINUTE TIME FOR BREAK. MR RICHARD SAID NOT USE THE COMPUTER IN ANY OFFICE. THAT WAS NOT AN OFFICE . I VARYFIED MY BEIN BACK IN 15 MINUTE WITH MR LINDA JOHNSON DR WHITLEY S ASSISTANT. This is why I was supended Fole.

CONCLUSION:

THE PLAINTIFF WOULD LIKE ;

TO RETURN TO WORK

RECEIVE BACK PAY (WHATEVER THE COURT WOULD DECIDE)

ANY OTHER COMPENSATION THE COURT WOULD ALLOW.


SIGNED
*John Dye*

8-19-08

**8.2.3 Guidelines** - Auburn University believes that one of the basic functions at all levels of supervision is to identify below standard job performance and take the necessary steps to help the employee improve his or her performance. All supervisors are responsible for the effective adoption and implementation of this policy in their departments or units. In such situations the proper supervisory action is to refer the troubled employee, on the basis of deteriorating job performance only, to the EAP Coordinator who will, if necessary, refer the employee for appropriate consultation. However, the cause of below standard job performance may well be outside the realm of job responsibilities when the employee is unable or unwilling to correct the situation on his or her own or with normal supervisory assistance.

8.2.3.1 Auburn University becomes involved with an employee's behavioral, medical, and other personal problems only when the problems affect job performance, attendance, safety, conduct, and productivity. There is no wish or intent to intrude upon the private or personal life of an employee but rather to provide assistance where needed for his or her success.

8.2.3.2 Some employees may have problems that have not yet progressed to the point of seriously affecting job performance. Any employee who recognizes such problems may voluntarily contact the EAP Coordinator for confidential help.

8.2.3.3 An employee's job performance may be affected when a family member is troubled. For this reason, Auburn University extends the same offer of assistance, through the employee, to immediate family members.

8.2.3.4 Participation in Auburn University's EAP is voluntary to the extent that the employee will not be forced to participate in or accept recommended treatment. Refusing an offer to participate in the Employee Assistance Program will not be a basis for disciplinary actions and will not, in itself, be used against the employee. If the employee fails to follow recommendations, normal existing disciplinary action based on documented job performance will be taken.

8.2.3.5 Employees are responsible for the costs involved in resolving or treating any personal problem just as they are presently responsible for any costs for hospitalization or medical services. Auburn University's group health and hospital insurance coverage may cover all or a percentage of the cost of services of health care professional (including alcoholism and drug abuse treatment) to whom employees and their eligible dependents may be referred for assistance.

8.2.3.6 If the problem is not covered by health insurance, the EAP Coordinator will inform the employee in advance and work with the employee to locate other resources to provide assistance if needed.

8.2.3.7 **Confidentiality** - Referral for evaluation or acceptance of suggested treatment

# Auburn University

Auburn University, Alabama 36849-5101

Procurement & Payment Services
311 Ingram Hall

Telephone: (334) 844-7771

April 27, 2006

On April 27, 2006 the Grievance filed by John W. Dyess, III against Floyd "Bud" Richards, Jr was heard by the Grievance Panel consisting of Debbie Griggs, Trish Digman and Sherry Boothe. Our finding is that we agree with the action taken by the Clinical Sciences Department of 5 days suspension without pay. We feel there was adequate documentation leading to this event.

We recommend that Mr. Dyess be relocated to another department away from Clinical Sciences within 30 days. We also recommend that Mr. Richards attend the Supervisor Training that is offered by Human Resources.

*Debbie Griggs*
Debbie Griggs, Chair

*Trish Digman*
Trish Digman

*Sherry Boothe*
Sherry Boothe



For The Public

http://public.findlaw.com

Thursday, Jul. 5, 2007

# Employment Discrimination: U.S. Supreme Court Cases

Below is a list of U.S. Supreme Court cases involving employees' rights and employment discrimination, including links to the full text of the U.S. Supreme Court decisions.

- Griggs v. Duke Power Co. (1971)
  In this case, the Court decided that certain education requirements and intelligence tests used as conditions of employment acted to exclude African-American job applicants, did not relate to job performance, and were prohibited.

- Cleveland Bd. of Ed. V. LaFleur (1974)
  Found that Ohio public school mandatory maternity leave rules for pregnant teachers violate constitutional guarantees of due process.

- Meritor Savings Bank v. Vinson (1986)
  Found that a claim of "hostile environment" sexual harassment is a form of sex discrimination that may be brought under Title VII of the Civil Rights Act of 1964.

- Johnson v. Transportation Agency (1987)
  The Court decides that a county transportation agency appropriately took into account an employee's sex as one factor in determining whether she should be promoted.

- Oncale v. Sundowner Offshore Serv., Inc. (1987)
  In this case, the Court held that sex discrimination consisting of same-sex sexual harassment can form the basis for a valid claim under Title VII of the Civil Rights Act of 1964.

- Burlington Industries, Inc. Ellerth (1998)
  Holding that an employee who refuses unwelcome and threatening sexual advances of a supervisor (but suffers no real job consequences) may recover against the employer without showing the employer is at fault for the supervisor's actions.

- Faragher v. City of Boca Raton (1998)
  The Court decides that an employer may be liable for sexual discrimination caused by a supervisor, but liability depends on the reasonableness of the employer's conduct, as well as the reasonableness of the plaintiff victim's conduct.

---

Copyright © 2007 FindLaw. ALL RIGHTS RESERVED    **Privacy Policy    Disclaimer**    **About FindLaw    Advertise on FindLaw**

obile Ala 36617



U.S. POSTAGE
PAID
MOBILE, AL
36607
AUG 19, '08
AMOUNT
$1.17
00087697-10

0000    36101

Office of the Clerk
United States District Court
P.O. Box 711
Montgomery, Alabama
36101-0711